> **THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DISH DBS CORPORATION, | ) | Case No. 26-[●] ([●]) |
| DISH WIRELESS L.L.C., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN OF DISH DBS CORPORATION, DISH WIRELESS L.L.C., AND THEIR RESPECTIVE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:     (713) 496-9700
Email:     charles.koster@whitecase.com

Ronald K. Gorsich (*pro hac vice* pending)
Doah Kim (*pro hac vice* pending)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:     (213) 620-7700
Email:     rgorsich@whitecase.com
     doah.kim@whitecase.com

**WHITE & CASE LLP**
Thomas E Lauria (Texas Bar No. 11998025)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:     (305) 371-2700
Email:     tlauria@whitecase.com

Matthew E. Linder (*pro hac vice* pending)
Laura E. Baccash (*pro hac vice* pending)
300 N. LaSalle Drive
Chicago, Illinois 60654
Telephone:     (312) 881-5400
Email:     mlinder@whitecase.com
     laura.baccash@whitecase.com

David M. Turetsky (*pro hac vice* pending)
Samuel P. Hershey (S.D. Texas Fed. No. 3465170)
Andrea Amulic (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Email:     david.turetsky@whitecase.com
     sam.hershey@whitecase.com
     andrea.amulic@whitecase.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

---

[1]    The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/DBS. The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

**DISCLOSURE STATEMENT, DATED JUNE 29, 2026**

**SOLICITATION OF VOTES ON THE *JOINT PREPACKAGED CHAPTER 11 PLAN OF DISH DBS CORPORATION, DISH WIRELESS L.L.C., AND THEIR RESPECTIVE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION* (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "PLAN")[2] FROM HOLDERS OF CLAIMS IN THE FOLLOWING CLASSES:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 1C | 2026 SENIOR SECURED NOTES CLAIMS |
| CLASS 1D | 2028 SENIOR SECURED NOTES CLAIMS |
| CLASS 1E | 2026 SENIOR NOTES CLAIMS |
| CLASS 1F | 2028 SENIOR NOTES CLAIMS |
| CLASS 1G | 2029 SENIOR NOTES CLAIMS |
| CLASS 2E | DISH WIRELESS GENERAL UNSECURED CLAIMS |

**BALLOTS, RECORD DATE(S), AND VOTING DEADLINE**

**THE DEBTORS ARE SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN ONLY FROM HOLDERS OF CLAIMS IN CLASSES 1C, 1D, 1E, 1F, 1G, AND 2E (THE "VOTING CLASSES").  THE DEBTORS ARE NOT SOLICITING VOTES ON THE PLAN FROM HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 1A, 1B, 1H, 1I, 1J, 2A, 2B, 2C, 2D, AND 2F (COLLECTIVELY, THE "NON-VOTING CLASSES").**

**AS FURTHER DESCRIBED IN THE SOLICITATION AND VOTING PROCEDURES, HOLDERS OF CLAIMS IN CLASSES 1C, 1D, 1E, 1F, AND 2E ARE ENTITLED TO VOTE ON THE PLAN; *PROVIDED THAT*: (A) CLAIMS THAT ARE  (1) LISTED ON THE DISH WIRELESS DEBTORS' SCHEDULES OF ASSETS AND LIABILITIES FOR $0.00 OR AS CONTINGENT, UNLIQUIDATED, OR DISPUTED AND FOR WHICH A PROOF OF CLAIM WAS NOT FILED BY THE GENERAL CLAIMS BAR DATE AND (2) SUBJECT TO AN OBJECTION THAT IS FILED WITH THE COURT ON OR PRIOR TO JULY 31, 2026 THAT DOES NOT RESULT IN A RESOLUTION EVENT, ARE NOT ENTITLED TO VOTE; (B) CLAIMS ASSERTED IN A PROOF OF CLAIM ON ACCOUNT OF A CONTINGENT, UNLIQUIDATED, OR UNDETERMINED AMOUNT SHALL BE ENTITLED TO VOTE ON ACCOUNT OF SUCH PROOF OF CLAIM IN A SINGLE VOTE IN THE AGGREGATE AMOUNT OF $1.00; AND (C) ANY AND ALL TIMELY FILED PROOFS OF CLAIM ARISING**

---

[2]     Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

FROM OR RELATING TO THE DISH WIRELESS DEBTORS' REAL PROPERTY LEASES OR OTHER AGREEMENTS RELATED TO THE 5G NETWORK AND WHICH HAS NOT COMMENCED OR BEEN FIXED PURSUANT TO A JUDGMENT OR SETTLEMENT ENTERED INTO AND APPROVED BY A COURT OF COMPETENT JURISDICTION, INCLUDING THE BANKRUPTCY COURT, AND REFLECTS, IN WHOLE OR IN PART, AN UNLIQUIDATED, CONTINGENT, OR UNDETERMINED CLAIM THAT IS NOT SUBJECT TO A PENDING OBJECTION (REGARDLESS OF WHETHER SUCH CLAIM IS WHOLLY OR PARTIALLY CONTINGENT OR NON-CONTINGENT OR LIQUIDATED OR UNLIQUIDATED) (EACH, A "CONTESTED CONTRACT CLAIM"), SHALL BE TEMPORARILY ALLOWED, IN THE AMOUNT OF $1.00, FOR VOTING PURPOSES ONLY AND NOT FOR PURPOSES OF ALLOWANCE OR DISTRIBUTION; *PROVIDED THAT* THE DEBTORS SHALL NOT BE REQUIRED TO SOLICIT VOTES FROM ANY HOLDER OF A CLAIM WITH RESPECT TO ANY ASSERTED CLAIM TO THE EXTENT THAT THE DEBTORS DETERMINE THAT SUCH CLAIM IS A CLASS 2D SECURED TYPE A CLAIM UNDER THE PLAN AND IS UNIMPAIRED AFTER GIVING EFFECT TO APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 502(B)(6); *PROVIDED*, *FURTHER*, *THAT* SUCH HOLDER WILL RECEIVE A NOTICE OF NON-VOTING STATUS ON ACCOUNT OF SUCH HOLDER'S CLASS 2D SECURED TYPE A CLAIM.   THE TEMPORARY ALLOWANCE OF A CONTESTED CONTRACT CLAIM IN THE AMOUNT OF $1.00 IS SOLELY FOR VOTING PURPOSES AND SHALL NOT BE BINDING UPON THE HOLDER OF THE CONTESTED CONTRACT CLAIM, THE DEBTORS, OR ANY OTHER PARTY IN INTEREST FOR ANY PURPOSE OTHER THAN VOTING ON THE PLAN.

THE RECORD DATES FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS (A) JUNE 29, 2026 OR (B) JULY 27, 2026, APPLICABLE TO ANY CREDITOR THAT HOLDS A CLAIM AGAINST DISH WIRELESS DEBTORS AND FILES A TIMELY PROOF OF CLAIM AFTER THE VOTING RECORD DATE (AS APPLICABLE, THE "VOTING RECORD DATE").

THE DEADLINE TO VOTE ON THE PLAN OR OPT IN TO THE THIRD-PARTY RELEASE (AS DEFINED BELOW) IS AUGUST 7, 2026, AT 5:00 P.M. (PREVAILING CENTRAL TIME) (THE "VOTING DEADLINE") UNLESS EXTENDED BY THE DEBTORS IN THEIR SOLE DISCRETION.

HOLDERS OF CLAIMS IN THE VOTING CLASSES SHOULD CAREFULLY READ THEIR BALLOT AND THE SOLICITATION AND VOTING PROCEDURES FOR FURTHER INSTRUCTIONS.  BALLOTS MUST BE RETURNED IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED ON OR WITH THE BALLOTS..

## THIRD-PARTY RELEASE

ARTICLE VIII OF THE PLAN PROVIDES FOR CERTAIN RELEASES BY RELEASING PARTIES OF RELEASED PARTIES. SUCH RELEASES INCLUDE THE THIRD-PARTY RELEASE AS SET FORTH IN ARTICLE VIII.F OF THE PLAN (THE

3

**"THIRD-PARTY RELEASE").  THE PLAN  PROVIDES THAT EACH HOLDER OF A CLAIM OR INTEREST THAT AFFIRMATIVELY OPTS IN TO THE THIRD PARTY RELEASE BY CHECKING THE APPLICABLE BOX ON ITS BALLOT OR OPT IN RELEASE FORM (AS DEFINED BELOW), AS APPLICABLE, IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE VOTING AND SOLICITATION PROCEDURES (AS DEFINED HEREIN) SHALL, IN EACH CASE, BE DEEMED TO HAVE GRANTED THE THIRD-PARTY RELEASE AS OF THE EFFECTIVE DATE OF THE PLAN.**

**Under the Plan, "Releasing Parties" means, collectively, each of the following, in each case solely in their respective capacities as such: (a) each Debtor; (b) each Reorganized DBS Debtor and each Post-Effective Date DISH Wireless Debtor; (c) each Indenture Trustee; (d) each Consenting Creditor; (e) the DIP Lender; (f) EchoStar, (g) each Holder of one or more Claims; (h) each Holder of one or more Interests; and (i) each Related Party of each Entity in the foregoing clauses (a) through (h); provided, however, that, in each case, an Entity shall not be a Releasing Party if it: (x) elects not to opt in to (as applicable) the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before entry of the Confirmation Order.**

**Under the Plan, "Released Parties" means, collectively, each of the following, in each case solely in their respective capacities as such: (a) each Debtor; (b) each Reorganized DBS Debtor and each Post-Effective Date DISH Wireless Debtor; (c) each Indenture Trustee; (d) each Consenting Creditor; (e) the DIP Lender; (f) EchoStar, (g) each Releasing Party; and (h) each Related Party of each Entity in the foregoing clauses (a) through clause (g); provided, however, that, in each case, an Entity shall not be a Released Party if it: (x) elects not to opt in to (as applicable) the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before entry of the Confirmation Order.  For the avoidance of doubt and notwithstanding anything in the Plan to the contrary, no Entity that is not a Releasing Party shall be a Released Party.**

**Holders of Claims in the Voting Classes may opt in to becoming a Releasing Party by checking the applicable box on their respective Ballots.**

**Holders of Claims or Interests in the Non-Voting Classes will receive a notice of non-voting status (the "Notice of Non-Voting Status")[3] and a form by which such Holders may affirmatively opt in to the Third-Party Release (the "Release Opt In Form").  The deadline for Holders of Claims and Interests in such Classes to opt in to the Third-Party Release is August 7, 2026 at 5:00 p.m. (prevailing Central Time) (the "Opt In Deadline").  HOLDERS OF CLAIMS IN THE VOTING CLASSES AND NON-VOTING CLASSES WILL ONLY BE GRANTED THE BENEFITS OF THE THIRD-PARTY RELEASE AND GRANT SUCH THIRD-PARTY RELEASE IF THEY VALIDLY AND TIMELY OPT IN TO THE**

---

[3]     Holders of Claims or Interests, as applicable, in Classes 2G and 2H are held by the Debtors' affiliates. The Debtors are requesting a waiver of any requirement to serve the Notice of Non-Voting Status or any other type of notice in connection with the Plan to such Holders of Claims and Interests, as applicable, in Classes 2G and 2H.

4

**THIRD-PARTY RELEASE TO THE SOLICITATION AGENT BY THE OPT IN DEADLINE.**

---

**OPTIONAL TYPE A CONVENIENCE CLAIM ELECTION**

HOLDERS OF COVERED CLAIMS (AS DEFINED IN THE FCC TRUST AGREEMENT) IN AN AMOUNT GREATER THAN $100,000 (WITHOUT REGARD TO INTEREST) MAY IRREVOCABLY ELECT TO HAVE SUCH CLAIM RECLASSIFIED AND TREATED AS A CLASS 2D SECURED TYPE A CLAIM UNDER THE PLAN BY MAKING A TYPE A CONVENIENCE CLAIM ELECTION ON THE BALLOT; *PROVIDED THAT* (A) SUCH HOLDER MUST FILE A TIMELY PROOF OF CLAIM FOR SUCH ELECTION TO BE VALID, AND (B) SUCH HOLDER THAT FAILS TO FILE A TIMELY PROOF OF CLAIM WILL NOT HAVE MADE A VALID ELECTION AND WILL NOT RECOVER UNDER THE PLAN.

HOLDERS OF CLASS 2E CLAIMS THAT MAKE THE OPTIONAL TYPE A CONVENIENCE CLAIM ELECTION BY CHECKING THE APPLICABLE BOX ON THEIR BALLOT IRREVOCABLY AGREE TO: (A) REDUCE THE AMOUNT OF THEIR COVERED CLAIM TO $100,000 FOR ALL PURPOSES UNDER THE PLAN AND THE FCC TRUST DOCUMENTS, IT BEING UNDERSTOOD AND AGREED BY THE DISH WIRELESS DEBTORS THAT THE $100,000.00 THRESHOLD IS INTENDED TO BE DETERMINED WITHOUT REGARD TO INTEREST, IF ANY, TO WHICH THE BANKRUPTCY COURT MAY DETERMINE THE HOLDER OF A TYPE A CONVENIENCE CLAIM IS ENTITLED; (B) BE TREATED IN ALL RESPECTS AS A CLASS 2D SECURED TYPE A CLAIM UNDER THE PLAN AND RECEIVE DISTRIBUTIONS, IF ANY, SOLELY FROM THE TYPE A CLAIMS RESERVE PURSUANT TO THE FCC TRUST DOCUMENTS IN ACCORDANCE WITH ARTICLE IV.C.2 OF THE PLAN; AND (C) EXECUTE A WAIVER AND RELEASE WITH RESPECT TO ANY RIGHT TO ASSERT, RECOVER, OR RECEIVE ANY DISTRIBUTION ON ACCOUNT OF THE PORTION OF SUCH COVERED CLAIM IN EXCESS OF $100,000 AGAINST ANY DEBTOR, REORGANIZED DBS DEBTOR, POST-EFFECTIVE DATE DISH WIRELESS DEBTOR, ESTATE, ANY OTHER ECHOSTAR PARTY, OR THE FCC TRUST.

ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES ARE ENCOURAGED TO READ THEIR BALLOT AND THE SOLICITATION AND VOTING PROCEDURES FOR FURTHER INSTRUCTIONS.

---

**RECOMMENDATION BY THE DEBTORS**

EACH DEBTOR'S BOARD OF DIRECTORS OR BOARD OF MANAGERS, INCLUDING THE DWLLC SPECIAL COMMITTEE, AS APPLICABLE, HAS APPROVED THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH DEBTOR'S

ESTATE, PROVIDE THE BEST RECOVERY AVAILABLE TO HOLDERS OF CLAIMS,  AND REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOT SO AS TO BE <u>ACTUALLY RECEIVED</u> BY EPIQ CORPORATE RESTRUCTURING, LLC (THE "<u>SOLICITATION AGENT</u>") ON OR BEFORE THE VOTING DEADLINE ON AUGUST 7, 2026 AT 5:00 P.M. (PREVAILING CENTRAL TIME).

### <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

THE DEBTORS ARE PROVIDING THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR AND CONFIRMATION OF THE PLAN, AND MAY NOT BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  FUTURE BANKRUPTCY COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

ALTHOUGH SOLICITATION IS COMMENCED BEFORE THE FILING OF THE CHAPTER 11 CASES, THE VOTING DEADLINE (AS DEFINED BELOW), FOR ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN WILL BE POSTPETITION.

BECAUSE THE DEBTORS' ANTICIPATED FORTHCOMING CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE AND SUBJECT TO THE RESTRUCTURING SUPPORT AGREEMENT. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN **ARTICLE XI** HEREIN.

THE DEBTORS AND CERTAIN HOLDERS OF CLAIMS SUPPORT THE PLAN, INCLUDING HOLDERS OF OVER 88% OF THE AGGREGATE PRINCIPAL AMOUNT OUTSTANDING UNDER THE DBS NOTES.  THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR MAXIMIZING VALUE AND COMPLETING THE CHAPTER 11 CASES.   THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.   FURTHERMORE,   THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (WHEN AND IF APPROVED) DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' FORTHCOMING CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  THE SUMMARIES OF THE DEBTORS' FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENT INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENT WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT TEAM EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.  THE DEBTORS ARE UNDER NO DUTY TO UPDATE

OR SUPPLEMENT THIS DISCLOSURE STATEMENT, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, NOR SHALL IT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE

VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX.E OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE XI, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B).  DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017.  THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN. HOWEVER, AS OF THE DATE HEREOF, THE BANKRUPTCY COURT HAS NOT APPROVED THIS DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  ALL HOLDERS OF CLAIMS AND/OR INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING, WITHOUT LIMITATION, UNDER ARTICLE IV.P THEREOF) IN FULL.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT, HOWEVER, BEEN, AND

WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

TO THE EXTENT SECURITIES ARE ISSUED PURSUANT TO THE PLAN UPON CONFIRMATION OF THE PLAN, SUCH SECURITIES WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER, THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE EXTENT PERMITTED UNDER APPLICABLE LAW.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.

PRIOR TO THE PETITION DATE, THE DEBTORS ARE RELYING ON: (I) SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER AND (II) REGULATION S UNDER THE SECURITIES ACT OUTSIDE THE UNITED STATES WITH RESPECT TO INVESTORS THAT ARE NOT U.S. PERSONS (AS DEFINED IN RULE 902(K) OF REGULATION S UNDER THE SECURITIES ACT), TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS THE OFFER, TO HOLDERS OF DBS NOTES CLAIMS AND/OR OF AMENDED NOTES.

AFTER THE PETITION DATE, THE DEBTORS WILL RELY ON (I) SECTION 1145(A) OF THE BANKRUPTCY CODE TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS THE OFFER (AFTER THE PETITION DATE), ISSUANCE, AND DISTRIBUTION, IF APPLICABLE, OF SECURITIES UNDER THE PLAN, AND (II) SECTION 4(A)(2) OF THE SECURITIES ACT, REGULATION D PROMULGATED THEREUNDER, REGULATION S UNDER THE SECURITIES ACT, AND/OR OTHER APPLICABLE EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS.  NEITHER THE SOLICITATION OF THE PLAN NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

IF EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT UNDER A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES ISSUED UNDER THE PLAN CONSULT THEIR OWN LAWYERS CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES IN COMPLIANCE WITH THE FEDERAL SECURITIES LAWS AND ANY APPLICABLE BLUE SKY LAWS. THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF SUCH SECURITIES.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING

ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. ALTHOUGH THE DEBTORS BELIEVE THE EXPECTATIONS REFLECTED IN SUCH FORWARD-LOOKING STATEMENTS ARE BASED ON REASONABLE ASSUMPTIONS, THE DEBTORS CAN GIVE NO ASSURANCE THAT THEIR EXPECTATIONS WILL BE ATTAINED, AND IT IS POSSIBLE THAT ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE INDICATED BY THESE FORWARD-LOOKING STATEMENTS DUE TO A VARIETY OF RISKS AND UNCERTAINTIES. ALL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE DEBTORS OR ENTITIES ACTING ON THEIR BEHALF ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS SET FORTH IN THIS DISCLOSURE STATEMENT. FORWARD-LOOKING STATEMENTS MAY INCLUDE, BUT ARE NOT LIMITED TO, STATEMENTS ABOUT:

- THE COMPANY'S PLANS, OBJECTIVES, INTENTIONS, AND EXPECTATIONS;

- THE COMPANY'S BUSINESS STRATEGY;

- THE DEBTORS' FINANCIAL STRATEGY, BUDGET, AND PROJECTIONS;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE SUCCESS OF THE DEBTORS' OPERATIONS;

- THE COSTS OF CONDUCTING THE DEBTORS' OPERATIONS;

- THE SATISFACTION OF ALL CLOSING CONDITIONS FOR THE AT&T TRANSACTIONS AND THE SPACEX TRANSACTION (EACH AS DEFINED HEREIN) AND THE TIMING THEREOF;

- THE DEBTORS' LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- THE LEVEL OF UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- THE TERMS OF CAPITAL AVAILABLE TO THE DEBTORS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS (INCLUDING WITH RESPECT TO NON-U.S. CURRENCY FLUCTUATIONS, TARIFFS, AND/OR TRADE NEGOTIATIONS, PARTICULARLY WITH RESPECT TO ANY NON-U.S. MARKETS WHERE THE DEBTORS CONDUCT BUSINESS);

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS;**

- **THE EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **THE DEBTORS' COUNTERPARTIES' CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION CLAIMS OR REGULATORY PROCEEDINGS;**

- **THE GOVERNMENTAL REGULATIONS AND TAXATION APPLICABLE TO THE DEBTORS, INCLUDING ANY CHANGES THERETO; AND**

- **THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE FUTURE PERFORMANCE OF THE REORGANIZED DBS DEBTORS AND POST-EFFECTIVE DATE DISH WIRELESS DEBTORS. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DBS DEBTORS', POST-EFFECTIVE DATE DISH WIRELESS DEBTORS', OR COMPANY'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, EMPLOYEES, AND OTHER THIRD PARTIES AS A RESULT OF THE CHAPTER 11 FILING OR THOSE PARTIES' FAILURE TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS; CUSTOMER AND VENDOR RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; THE POSSIBILITY THAT FOREIGN COURTS WILL NOT ENFORCE THE CONFIRMATION ORDER; TRADE BALANCE; NATURAL DISASTERS; PANDEMICS; GEOPOLITICAL INSTABILITY;**

**GOVERNMENT SHUTDOWNS; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED OR INCORPORATED BY REFERENCE HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS AND ALLOWED INTERESTS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

**SPECIAL NOTE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities, to the extent issued pursuant to the Plan on or after the Effective Date, will not have been the subject of a registration statement filed with the SEC under the Securities Act, any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"), or the securities laws of any other jurisdiction. The Plan has not been approved or disapproved by the SEC, any state regulatory authority, or the regulatory authority of any jurisdiction and neither the SEC, any state regulatory authority, nor any other regulatory authority in any jurisdiction has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors are relying on: (i) section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, and (ii) Regulation S under the Securities Act outside the United States with respect to investors that are not U.S. Persons (as defined in Rule 902(k) of Regulation S under the Securities Act), to exempt from registration under the Securities Act and Blue Sky Laws the offer, to holders of DBS Notes Claims and/or of Amended Notes, prior to the Petition Date, including in connection with the solicitation of the Plan.

After the Petition Date, the Debtors will rely on (i) section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer (after the Petition Date), issuance, and distribution, if applicable, of securities under the Plan, and (ii) section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other applicable exemptions from registration under the Securities Act and any other applicable securities laws. Neither the solicitation of the Plan nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and may be subject to any additional restrictions on the transferability of such securities pursuant to the applicable underlying documentation.

EXCEPT TO THE EXTENT PUBLICLY AVAILABLE, THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, THE PLAN, AND THE INFORMATION SET FORTH HEREIN AND THEREIN ARE CONFIDENTIAL. THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE DEBTORS, THEIR

14

**SUBSIDIARIES, AND THEIR RESPECTIVE DEBT AND SECURITIES. EACH RECIPIENT HEREBY ACKNOWLEDGES THAT IT (A) IS AWARE THAT THE FEDERAL SECURITIES LAWS OF THE UNITED STATES PROHIBIT ANY PERSON (AS DEFINED IN SECTION 101(41) OF THE BANKRUPTCY CODE, A "PERSON") WHO HAS MATERIAL NON-PUBLIC INFORMATION ABOUT A COMPANY, WHICH IS OBTAINED FROM THE COMPANY OR ITS REPRESENTATIVES, FROM PURCHASING OR SELLING SECURITIES OF SUCH COMPANY OR FROM COMMUNICATING THE INFORMATION TO ANY OTHER PERSON UNDER CIRCUMSTANCES IN WHICH IT IS REASONABLY FORESEEABLE THAT SUCH PERSON IS LIKELY TO PURCHASE OR SELL SUCH SECURITIES AND (B) IS FAMILIAR WITH THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT"), AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND AGREES THAT IT WILL NOT USE OR COMMUNICATE TO ANY PERSON OR ENTITY, UNDER CIRCUMSTANCES WHERE IT IS REASONABLY LIKELY THAT SUCH PERSON OR ENTITY IS LIKELY TO USE OR CAUSE ANY PERSON OR ENTITY TO USE, ANY CONFIDENTIAL INFORMATION IN CONTRAVENTION OF THE EXCHANGE ACT OR ANY OF ITS RULES AND REGULATIONS, INCLUDING RULE 10B-5 PROMULGATED THEREUNDER.**

**TABLE OF CONTENTS**

I.   INTRODUCTION................................................................................................................. 1

II.  PRELIMINARY STATEMENT ........................................................................................ 1

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
     THE PLAN ........................................................................................................................ 11

    A.   What Is Chapter 11? ................................................................................................ 11
    B.   Why Are the Debtors Sending Me This Disclosure Statement? ....................................... 12
    C.   Why Are Votes and Consents Being Solicited Prior to Bankruptcy Court Approval of
        the Disclosure Statement?........................................................................................ 12
    D.   What Are the Restructuring Transactions Under the Plan? ............................................. 12
    E.   Am I Entitled to Vote on the Plan?............................................................................ 14
    F.   Why Are Holders of Contested Contract Claims Being Solicited to Vote on the Plan
        for $1.00, or in Some Cases, Not Being Solicited to Vote at All?................................... 14
    G.   What Is the Deadline to Vote on the Plan? ................................................................. 15
    H.   How Do I Vote For or Against the Plan?.................................................................... 15
    I.   What Will I Receive From the Debtors If the Plan Is Consummated? ............................. 16
    J.   What Is the DWLLC Claims Trust? .......................................................................... 30
    K.   What Is the FCC Trust? ........................................................................................... 30
    L.   What are the FCC Trust Election and Type A Convenience Claim Election? ................ 31
    M.   What Is the Type A Claims Reserve? ........................................................................ 31
    N.   What Will I Receive From the Debtors If I Hold an Allowed Administrative Claim,
        Professional Fee Claim, Priority Tax Claim, or DIP Financing Claim?........................... 32
    O.   What Happens to My Recovery If the Plan Is Not Confirmed or Does Not Go
        Effective?.............................................................................................................. 37
    P.   What Is the Purpose of the Confirmation Hearing?...................................................... 38
    Q.   If the Plan Provides That I Get a Distribution, Do I Get It Upon Confirmation or
        When the Plan Goes Effective, and What Is Meant by "Confirmation," "Effective
        Date," and "Consummation"?................................................................................ 38
    R.   What Are the Sources of Cash and Other Consideration Required to Fund the Plan? ..... 38
    S.   Is There Potential Litigation Related to the Plan? ....................................................... 39
    T.   Will There Be Releases, Injunction, and Exculpation Granted to Parties-In-Interest as
        Part of the Plan?.................................................................................................... 39
    U.   What Are the Consequences of Electing Not to Opt In to the Releases Provided by
        the Plan?............................................................................................................... 40
    V.   Who Do I Contact If I Have Additional Questions with Respect to This Disclosure
        Statement or the Plan? ............................................................................................ 40
    W.   Do the Debtors Recommend Voting in Favor of the Plan? ............................................ 41
    X.   Who Supports the Plan?........................................................................................... 41

IV. SOLICITATION AND VOTING PROCEDURES .......................................................... 41

    A.   Voting Record Dates............................................................................................... 41
    B.   Voting on the Plan and the Type A Convenience Claim Election.................................... 41
    C.   Solicitation Agent .................................................................................................. 42
    D.   Solicitation Package................................................................................................ 42
    E.   Distribution of the Solicitation Package .................................................................... 42
    F.   Non-Voting Status Notice and Release Opt In Form.................................................... 42
    G.   Type A Convenience Claim Election ......................................................................... 43
    H.   Ballots Not Counted................................................................................................ 43

| | | | |
|---|---|---|---|
| V. | | **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESSES** | **44** |
| | A. | Overview of the Company, Its History, and Its Businesses | 44 |
| | B. | The Company's Businesses | 45 |
| | C. | The Debtors' Corporate Structure | 49 |
| | D. | The Debtors' Prepetition Corporate and Capital Structure | 49 |
| | E. | The Debtors' Shared Services Obligations | 53 |
| VI. | | **EVENTS LEADING TO THE CHAPTER 11 FILINGS** | **53** |
| | A. | DBS Debtors' Prepetition Restructuring Initiatives | 53 |
| | B. | DISH Wireless Debtors' Prepetition Regulatory Challenges | 55 |
| | C. | The Company's Prepetition Wireless Spectrum License Sales | 60 |
| | D. | Negotiations with the Ad Hoc Group and Entry into the Restructuring Support Agreement | 66 |
| | E. | FCC Trust and Security Agreement | 70 |
| | F. | The DIP Facility | 74 |
| | G. | The Stalking Horse APA | 75 |
| VII. | | **MATERIAL ANTICIPATED EVENTS IN THE CHAPTER 11 CASES** | **76** |
| | A. | Commencement of the Chapter 11 Cases | 76 |
| | B. | First Day Motions | 76 |
| | C. | Schedules, Statements, and Bankruptcy Rule 2015.3 Report | 79 |
| | D. | Proposed Confirmation Schedule | 80 |
| VIII. | | **SUMMARY OF THE PLAN** | **80** |
| | A. | General Settlement of Claims and Interests. | 80 |
| | B. | Sources of Plan Consideration. | 81 |
| | C. | FCC Trust Matters. | 81 |
| | D. | DNC Transactions. | 83 |
| | E. | Intercompany Transactions. | 84 |
| | F. | Restructuring Transactions. | 84 |
| | G. | Director, Officer, and Manager Liability Insurance. | 85 |
| | H. | Cancellation of Notes, Instruments, Certificates, and Other Documents. | 85 |
| | I. | Corporate Existence | 87 |
| | J. | Corporate Action. | 87 |
| | K. | The Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors. | 88 |
| | L. | The Wind Down Debtor Account. | 88 |
| | M. | Vesting of Assets in the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors. | 88 |
| | N. | Wind-Down Authority of the Post-Effective Date DISH Wireless Debtors. | 89 |
| | O. | Effectuating Documents; Further Transactions. | 90 |
| | P. | Section 1146 Exemption. | 90 |
| | Q. | Certain Securities Law Matters. | 91 |
| | R. | Preservation of Causes of Action. | 91 |
| | S. | Closing of the Chapter 11 Cases | 92 |
| IX. | | **OTHER KEY ASPECTS OF THE PLAN** | **92** |
| | A. | Treatment of Executory Contracts and Unexpired Leases. | 92 |
| | B. | Provisions Governing Distributions | 96 |
| | C. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims. | 104 |
| | D. | Settlement, Release, Injunction, and Related Provisions. | 107 |

|      | E.   | Conditions Precedent to Consummation of the Plan | 116 |
|      | F.   | Modification, Revocation, or Withdrawal of the Plan | 118 |
| X.   | **CONFIRMATION OF THE PLAN** | | **119** |
|      | A.   | The Confirmation Hearing | 119 |
|      | B.   | Requirements for Confirmation of the Plan | 120 |
|      | C.   | Feasibility | 120 |
|      | D.   | Acceptance by Impaired Classes | 120 |
|      | E.   | Confirmation Without Acceptance by All Impaired Classes | 121 |
|      | F.   | Liquidation Analyses | 122 |
| XI.  | **RISK FACTORS** | | **126** |
|      | A.   | General | 126 |
|      | B.   | Bankruptcy Law and Chapter 11 Case Considerations | 127 |
|      | C.   | Risks Related to Recoveries Under the Plan | 134 |
|      | D.   | Risks Related to the Company's and the Businesses of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors | 146 |
|      | E.   | Additional Factors | 150 |
| XII. | **CERTAIN SECURITIES LAW MATTERS** | | **150** |
|      | A.   | Issuance of Securities Under the Plan Pursuant to Section 1145 of the Bankruptcy Code | 151 |
|      | B.   | "Underwriters"; Subsequent Transfers of Securities Issued Under the Plan | 152 |
|      | C.   | Private Placement Exemptions | 153 |
| XIII.| **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | **155** |
|      | A.   | Introduction | 155 |
|      | B.   | Certain U.S. Federal Income Tax Consequences to the Debtors, Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors | 156 |
|      | C.   | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote on the Plan | 157 |
|      | D.   | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims Entitled to Vote on the Plan | 160 |
|      | E.   | Information Reporting and Back-Up Withholding | 162 |
| XIV. | **RECOMMENDATION** | | **163** |

iv

**EXHIBITS**[1]

| | |
|---|---|
| **EXHIBIT A** | Joint Prepackaged Chapter 11 Plan |
| **EXHIBIT B** | Restructuring Support Agreement |
| **EXHIBIT C** | Financial Projections |
| **EXHIBIT D-1** | DBS Liquidation Analysis |
| **EXHIBIT D-2** | Wireless Liquidation Analysis |
| **EXHIBIT E** | Organizational Structure Chart |

---

[1]   Each Exhibit is incorporated herein by reference.

iv

## I.    INTRODUCTION

DISH DBS Corporation ("DBS"), DISH Wireless L.L.C. ("DWLLC"), and their respective affiliated debtors and debtors in possession (collectively with DBS and DWLLC, the "Debtors") submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Prepackaged Chapter 11 Plan of DISH DBS Corporation, DISH Wireless L.L.C., and Their Respective Affiliated Debtors and Debtors in Possession* (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.[1]

**THE DEBTORS AND CERTAIN CONSENTING CREDITORS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO CREDITORS AND STAKEHOLDERS.  THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR SUCCESSFULLY MAXIMIZING VALUE AND COMPLETING THE CHAPTER 11 CASES.   THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors are subsidiaries of EchoStar Corporation (NASDAQ: ECHO) ("EchoStar" and, together with its Debtor and non-Debtor subsidiaries, the "Company").   EchoStar was founded in 1980 and provides pay-TV, wireless, and internet services to millions of customers, having pioneered technological advancements that redefined those industries.  As more fully discussed below, the Company has four primary business segments:  (a) Pay-TV, which provides pay-TV services under the DISH® and Sling® brands, (b) Wireless, which operates as a Hybrid MNO (as defined below) through non-Debtor DISH Network Corporation ("DNC") and certain of its non-Debtor subsidiaries (including non-Debtor Boost SubscriberCo L.L.C. ("BoostCo"), (c) Broadband and Satellite Services, which operates through EchoStar's direct, wholly-owned non-Debtor subsidiary Hughes Satellite Systems Corporation and its non-Debtor subsidiaries, and (d) Other,[2] which consists of the Company's legacy 5G open radio access network (the "5G Network") and related assets that are not used in the Wireless segment's Hybrid MNO operations.  As of the date of this Disclosure Statement, the Company has approximately 10,400 employees in the United States and serves more than 6 million pay-TV subscribers, approximately 7 million wireless subscribers, and approximately 641,000 broadband subscribers.

---

[1]    The descriptions and summaries of the Plan contained in this Disclosure Statement are qualified in their entirety by reference to the terms of the Plan.  To the extent of any inconsistency between these descriptions and summaries and the Plan, the terms of the Plan will control.

[2]    This segment is defined as "Other" in EchoStar's public filings with the United States Securities and Exchange Commission (the "SEC").

1

The Debtors comprise two of the Company's business segments—the Pay-TV segment and the Other segment.[3]  In this regard, DBS and certain of its Debtor subsidiaries (collectively, the "DBS Debtors") operate the Company's Pay-TV segment, which includes DISH- and Sling TV-branded pay-TV services.[4]  In 2025, Pay-TV generated operating income of $2.4 billion on revenue of $9.7 billion.  Moreover, from 2020 to 2025, DWLLC and certain of its affiliated and subsidiary Debtors (collectively, the "DISH Wireless Debtors")[5] operated the Company's wireless segment under the Boost Mobile® and Gen Mobile® brands.  The DISH Wireless Debtors invested more than $13 billion (funded primarily by the proceeds of an intercompany loan from DNC) to build out the Company's nationwide 5G mobile network infrastructure.  Moreover, EchoStar's non-Debtor subsidiaries invested an additional $3 billion in the buildout and paid more than $30 billion to acquire spectrum licenses since 2008 from the FCC and through secondary market transactions (not including $10 billion of capitalized interest related to the carrying value of such licenses).  In 2024, the last full year of the Company's 5G Network operations, the wireless business generated an operating loss of $477 million on revenue of $3.6 billion.

As more fully discussed in this Disclosure Statement, the Debtors have experienced significant challenges in recent years and are proposing the Plan for the purpose of maximizing the value of the DBS Debtors and the DISH Wireless Debtors and resolving their respective issues in a manner that is in the best interests of their respective creditors and stakeholders

*The FCC-Directed Sales of EchoStar's Wireless Spectrum Licenses*

In 2020, DNC acquired Sprint Corporation's ("Sprint") Boost Mobile business for $1.4 billion, subject to working-capital adjustments, to satisfy antitrust conditions to the acquisition of Sprint by T-Mobile US, Inc. ("T-Mobile").  DWLLC then set to work building out its 5G Network under a complex set of terms negotiated with the FCC.  By May 5, 2025, DWLLC had deployed more than 144,000 radios across over 24,000 tower sites across the country, allowing the Company to timely certify compliance with all buildout commitments, including that the 5G Network provided coverage to more than 80% of the United States population.  The FCC certified the Company's compliance with its buildout commitments on September 29, 2023, and again confirmed that the Company had met all buildout obligations as of September 8, 2025.  The Company certified compliance with buildout obligations on July 14, 2023, March 13, 2024, January 10, 2025, March 17, 2025, May 5, 2025, and June 17, 2025.

On May 9, 2025, notwithstanding the Company having certified compliance with all applicable buildout commitments up to that date, the FCC Chairman sent a letter to the Company expressing concerns about the extension granted by the prior administration related to the Company's 5G Network buildout and disclosing that he had directed FCC staff to commence an

---

[3]  Neither the business operations of the Company's Broadband and Satellite Services segment nor the Wireless segment (which now conducts its Hybrid MNO operations through BoostCo), is implicated by these Chapter 11 Cases.

[4]  The DBS Debtors are: (a) DBS; (b) DISH Network L.L.C.; (c) DISH Operating L.L.C.; (d) DISH Broadcasting Corporation; (e) DISH Network Service L.L.C.; (f) DISH Technologies Holding Corporation; (g) DISH Technologies L.L.C.; (h) Sling Media, L.L.C.; (i) Sling TV Holding L.L.C.; (j) Sling TV Purchasing L.L.C.; (k) Sling TV L.L.C; and (*l*) Sling TV Gift Card Corporation.

[5]  The DISH Wireless Debtors are: (a) Neyland Networks LLC; (b) DWLLC; (c) DISH Wireless Leasing L.L.C.; (d) DISH Wireless Retail Holding L.L.C.; (e) DISH Infinite Corporation; and (f) DISH Wireless Retail Operating L.L.C.

investigation and seek public comment to "inform the FCC's thinking about EchoStar's use of spectrum" (the "May 2025 FCC Letter"). In ensuing discussions between EchoStar representatives and the FCC, including the Chairman and his staff, the FCC made clear its intent to terminate a wide range of the Company's spectrum licenses, including those necessary to operate the 5G Network, unless the Company sold such licenses in the secondary market. Any such termination would have posed an existential threat to the Company, which would have lost the entire $46 billion investment it had collectively made in its wireless network buildout, including DWLLC's buildout. In response, the Company retained White & Case LLP and FTI Consulting, Inc. as its legal and financial advisors and began evaluating options to protect its interests, including preparations for a potential chapter 11 filing of the Company. At the same time, the Company worked with the FCC to identify a potential path forward that would permit the Company to retain its spectrum licenses. In June 2025, the Company's Chairman, Charlie Ergen, met with President Donald J. Trump and the FCC Chairman, Brendan Carr. President Trump directed the FCC Chairman to work with the Company to find a resolution that would benefit all parties.

During the negotiations, the FCC directed EchoStar to sell spectrum on an expedited basis on terms acceptable to the FCC or face significant license forfeitures. The FCC had never previously required a party to sell its spectrum licenses under threat of termination. Under the time pressure imposed by the FCC, the Company worked to negotiate definitive agreements to sell a material portion of its terrestrial and satellite spectrum licenses on terms acceptable to the FCC. After several months of discussions with the FCC about the nature and scope of transactions that would satisfy its directive, EchoStar and other non-Debtor affiliates entered into the following definitive license purchase agreements with AT&T Mobility II LLC ("AT&T") and Space Exploration Technologies Corp. ("SpaceX"):

(a)     on August 25, 2025, EchoStar agreed to sell the Company's 3.45 GHz and 600 MHz spectrum licenses—a total of 50 MHz of nationwide spectrum—to AT&T for approximately $23 billion, subject to regulatory approval. In addition to this agreement, the AT&T Network Services Agreement was amended to provide for additional terms and services to facilitate the Company's transition to a Hybrid MNO (as defined below);

(b)     on September 7, 2025, EchoStar agreed to sell the Company's AWS-4 and H-block spectrum licenses to SpaceX for approximately $17 billion, comprised of up to $8.5 billion in cash and up to $8.5 billion in SpaceX stock at a per share valuation of $212.00 as adjusted for stock dividends, splits, or reorganization; and

(c)     on November 5, 2025, EchoStar entered into an amended definitive agreement with SpaceX to also sell the Company's unpaired AWS-3 licenses for approximately $2.6 billion of additional SpaceX stock at the same valuation.

On September 8, 2025, immediately following the announcement of the AT&T and SpaceX transactions, the FCC Chairman confirmed by letter that "the relevant FCC buildout and other related obligations had been satisfied by EchoStar in view of the company's current FCC milestones." The Company believes that the sequence of events at issue—an inquiry into the Company's spectrum licenses, an FCC-directed sale, and the subsequent resolution of that inquiry—is unusual.

As a result of these spectrum sales, DWLLC can no longer operate the 5G Network. Neither DWLLC nor any of its current or former subsidiaries currently owns or previously owned

3

the spectrum licenses being sold to AT&T or SpaceX.  Accordingly, the DISH Wireless Debtors are not entitled to any proceeds of the sale transactions.  The sales also forced the Company to transition its Boost Mobile subscribers to third-party networks and to convert its operations to those of a hybrid mobile network operator ("Hybrid MNO")—a telecom provider that owns and operates certain core network functions, such as the software systems that authenticate subscribers and process calls, texts and data, while relying on third-party carriers to provide the spectrum frequencies and cell sites that actually deliver wireless service to subscribers' devices.  In other words, the Company continues to control the subscriber relationship and processes calls, texts and data through its cloud-native 5G core, but it is AT&T's physical network, including its towers, antennas, radios, radio access network software, and spectrum frequencies, that primarily carries the traffic.

To protect against customer disruption and support this wholesale change to its business plan, in August 2025, DWLLC contributed certain vendor contracts, liabilities, and core network assets to BoostCo in exchange for $5.0 billion of debt forgiveness under the DWLLC Intercompany Loan (as defined below).  As a result, the Company's wireless business split into two distinct segments: (a) the go-forward Hybrid MNO operations under BoostCo and (b) the non "core" network assets associated with the 5G Network deployment, which are held by the DISH Wireless Debtors.  The Hybrid MNO remains fully operational through BoostCo and continues to deliver uninterrupted service to its millions of customers nationwide.  As discussed herein, the DISH Wireless Debtors' remaining assets are contemplated to be transitioned pursuant to the terms of the Plan.

Given the immense undertaking of building out the 5G Network from scratch, DWLLC entered into thousands of agreements with tower lessors and other vendors, including for fiber backhaul services, equipment (including servers, lithium-ion batteries, radios, and antennae, data centers), and for other goods and services.  DWLLC entered into these agreements in reliance on a straightforward principle, supported by longstanding FCC practice: DWLLC could safely invest the billions of dollars needed to operate the 5G Network so long as EchoStar remained in compliance with its buildout milestones.  But the FCC's directive that EchoStar sell or forfeit its spectrum licenses, despite having complied with all of its buildout obligations, disrupted these reasonable expectations, which DWLLC has argued constitutes a force majeure event that rendered DWLLC's performance under tower leases and vendor agreements impossible or commercially impracticable.  For these reasons, and because without the Company's wireless spectrum, it is not possible to deploy or operate the 5G Network (or any radio access network), DWLLC has asserted that it is excused from any further obligations under those leases and other agreements.  If DWLLC were to remain obligated under the agreements notwithstanding the FCC's unprecedented actions, DWLLC would be required to spend billions of dollars for services it is no longer able to use.

Beginning in September 2025, DWLLC sent notices to thousands of 5G Network counterparties, informing them that the FCC's actions constituted force-majeure events or otherwise excused DWLLC's performance obligations under applicable law.  In each of these notices, DWLLC expressed its willingness to discuss a mutually acceptable resolution.  DWLLC has reached settlements with hundreds of Network claimants, but many other claimants have disputed DWLLC's defenses, and more than 170 lawsuits have been filed by 5G Network claimants in state and federal courts across the country, each of which seeks damages for breach of contract ranging from the single-digit thousands to several billion dollars and for declaratory relief that no force majeure or other event has occurred that would excuse DWLLC's performance.

In many cases, the expectancy damages asserted against DWLLC are for rent payments extending more than ten (10) years into the future.  In addition to defending against these lawsuits, DWLLC has been diligently working to decommission the portions of its legacy 5G Network, including the cell site radios and ground infrastructure, that are not utilized in the Company's go-forward Hybrid MNO operations, having discontinued its 5G Network deployment in August 2025, following the announcement of the spectrum sale to AT&T.

On September 18, 2025, EchoStar jointly filed with AT&T and SpaceX for FCC approval of the respective transactions.  In orders issued on May 12, 2026, the Wireless Telecommunications Bureau of the FCC (the "FCC Wireless Bureau") approved the AT&T and SpaceX sales, conditioned on EchoStar depositing $2.4 billion (the "Contribution") into a trust for the benefit of creditors with claims related to the 5G Network (the "FCC Trust").  Copies of the AT&T and SpaceX orders are attached to the Plan as Exhibit A.  The purpose of the FCC Trust is to make funds available to pay final judgments, arbitration awards, and settlements for amounts due in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned to AT&T or SpaceX (claims for such judgments, awards or settlements are referred to herein as "Covered Claims").  With the FCC Wireless Bureau's approval, The Bank of New York Mellon has been appointed trustee of the FCC Trust, and EchoStar established the FCC Trust on June 26, 2026.  The Debtors anticipate that the Contribution will be remitted to the FCC Trust directly from the proceeds of the AT&T Transactions at closing.

*Negotiations with the Ad Hoc Group of DBS Noteholders*

Although the DBS Debtors operations continue to generate significant revenue and cash flow, the DBS Debtors have, nonetheless, faced numerous challenges in recent years associated with industry-wide cord-cutting, steadily increasing programming costs, and increased competition from streaming platforms.  As more fully described herein, the DBS Debtors undertook various operational and financial initiatives to address their issues, including liability management transactions in January 2024, that were designed to unlock incremental strategic, financial, and operational flexibility (the "January 2024 Transactions").[6]  In October 2025, the Company, with the assistance of its advisors, initiated discussions with advisors to an ad hoc group of holders of the $9.75 billion in aggregate principal amount of the DBS Debtors' funded debt represented by Milbank LLP and Lazard Frères & Co. LLC (the "Ad Hoc Group").  The Company's objective was to explore a global resolution of disputes among the parties, including the dismissal of long-running litigation by members of the Ad Hoc Group challenging the January 2024 Transactions, and to deleverage the DBS Debtors' balance sheet while gaining additional flexibility to explore and consummate strategic M&A transactions.  In November 2025, the Company and the steering committee of the Ad Hoc Group (the "Steering Committee") entered into nondisclosure agreements, and the parties commenced several months of negotiations regarding the terms of such a global restructuring deal.

On February 16, 2026, in anticipation of entry into a restructuring support agreement, the Company appointed Gerard Uzzi and Vikram Jindal to the Board of Managers of DWLLC as independent managers (the "Independent Managers").  On March 3, 2026, DWLLC established a special committee of the Board of Managers comprised of the Independent Managers (the

---

[6]   For a more detailed discussion of such initiatives, see Article VI.A of this Disclosure Statement.

"DWLLC Special Committee"). As detailed further herein, the DWLLC Special Committee has the exclusive authority to take any action with respect to a transaction that constitutes a conflict matter, to conduct an independent investigation and assess the merits of any potential claims and causes of action in connection with such investigation, and to act upon, prosecute, settle, release and take any other action in connection with such investigation.

On March 19, 2026, the DBS Debtors and holders of 82% of the DBS Notes[7] entered into that certain Restructuring Support Agreement (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits thereto, the "Restructuring Support Agreement"). A copy of the Restructuring Support Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.[8] As of such date, the parties implemented the "Execution Date Transactions," which include:

(a)  dismissal with prejudice of the lawsuit filed in April 2024 by U.S. Bank Trust Company, in its capacity as trustee under the indentures for certain DBS Notes, against DBS and certain of its Debtor and non-Debtor affiliates related to certain intercompany asset transfers in January 2024 (the "Bondholder Lawsuit");

(b)  DNC's payment to DBS of approximately $2.1 billion plus accrued and unpaid interest to satisfy certain intercompany loans made by DBS (the "2024 Intercompany Loans");

(c)  DBS's payment of approximately $1.6 billion and $178.7 million to satisfy, respectively, certain term loan and preferred equity obligations issued by DISH DBS Issuer L.L.C. ("DBS SubscriberCo");

(d)  the reconsolidation of DBS SubscriberCo and all Sling TV entities with DBS, such that the credit support for the DBS Notes (as defined below) includes all of the value of the DBS Pay-TV businesses;

(e)  amendments to the applicable DBS Notes indentures, which provide enhanced creditor protections against upstream payments to affiliates, limit the ability of DBS or its subsidiaries to enter into priming financings or liability management transactions, and facilitate a potential business combination;

(f)  amendments to the indenture governing the 2028 Senior Secured Notes, which, commencing with the fiscal quarter ending March 31, 2027, implement a quarterly offer to repurchase at par and without premium or penalty an amount of 2028 Senior

---

[7]  The "DBS Notes" are, collectively, the 7.750% senior notes due July 1, 2026 in the aggregate principal amount of $2.0 billion (the "2026 Senior Notes"), the 5.250% senior secured notes due December 1, 2026 in the aggregate principal amount of $2.75 billion (the "2026 Senior Secured Notes"), the 5.750% senior secured notes due 2028 in the aggregate principal amount of $2.5 billion (the "2028 Senior Secured Notes"), the 7.375% Senior Notes due 2028 in the aggregate principal amount of $1.0 billion (the "2028 Senior Notes"), and the 5.125% Senior Notes due 2029 in the aggregate principal amount of $1.5 billion (the "2029 Senior Notes").

[8]  The descriptions and summaries of the Restructuring Support Agreement contained in this Disclosure Statement are qualified in their entirety by reference to the terms of the Restructuring Support Agreement. To the extent of any inconsistency between these descriptions and summaries and the Restructuring Support Agreement, the terms of the Restructuring Support Agreement will control.

Secured Notes equal to DBS's available cash in excess of $500 million (the "DBS Cash Sweep");

(g)    DBS's payment of $75 million of a nonrefundable $125 million "Claim Settlement Amount" certain Consenting Creditors and the Ad Hoc Group's professionals; and

(h)    the execution of mutual releases among the Company and the holders of DBS Noteholders that are (or become) parties to the Restructuring Support Agreement (the "Consenting Creditors"), which will become effective on the "Effective Date" of the Restructuring Support Agreement—i.e., the Effective Date of the Plan.

On the Effective Date, the "Effective Date Transactions" will occur in accordance with the Restructuring Support Agreement, including:

(a)    the application of AT&T Transactions proceeds to repay or otherwise satisfy and discharge approximately $7.6 billion of intercompany loans made by DBS to DNC;

(b)    the repayment in full at par of the 2026 Senior Secured Notes[9] and the 2026 Senior Notes,[10] in each case plus accrued interest;

(c)    the further amendment of the indenture for the 2028 Senior Secured Notes to require DBS to redeem such notes at par through the quarterly DBS Cash Sweep;

(d)    payment of any remaining $50 million balance of the Claim Settlement Amount to certain Consenting Creditors (which EchoStar paid on June 1, 2026 in accordance with the Restructuring Support Agreement); and

(e)    the effectiveness of mutual releases among the "Company Parties" (*i.e.*, the DBS Debtors and the DISH Wireless Debtors) and the Consenting Creditors.

The Restructuring Support Agreement provides that the Restructuring Transactions may be effectuated either out of court or through the Chapter 11 Cases, at the DBS Debtors' election (the "Chapter 11 Election"),[11] and further contemplates that the DISH Wireless Debtors can become parties to the Restructuring Support Agreement. On June 29, 2026, the DBS Debtors (with the approval of their respective boards of directors and boards of managers) formally notified the Consenting Creditors of the Chapter 11 Election and the DISH Wireless Debtors (with the approval of their respective boards of managers and the DWLLC Special Committee) agreed to become parties to the Restructuring Support Agreement.

The Restructuring Support Agreement also accommodates restructuring transactions involving the DISH Wireless Debtors. As part of the agreed-upon consideration being provided

---

[9]    Based on the Debtors Financial Projections attached hereto as **Exhibit C**, the 2026 Senior Secured Notes will be repaid at maturity in December 2026,

[10]    All amounts owed under the 2026 Senior Notes will be paid in full in cash as promptly as practicable following the closing of the AT&T Transactions, and in any event on or prior to consummation of the Plan.

[11]    The Restructuring Support Agreement provided that if the DBS Debtors elected to effectuate the Restructuring Transactions through the Chapter 11 Cases (the "Chapter 11 Election"), they must do so on or before March 31, 2026 (the "Election Date"), which Election Date may be extended by up to ninety (90) days (*i.e.*, until June 29, 2026) with written notice, which notice was provided to the Consenting Creditors on March 24, 2026.

to the Consenting Creditors in exchange for their concessions under the Restructuring Support Agreement, it was agreed that it was agreed that claims arising from that assignment are treated as Allowed DISH Wireless General Unsecured Claims against DWLLC.  Distributions received by the DWLLC Claims Trust on account of those claims will be distributed in the following order of priority:

1.      first, to the trustee of the DWLLC Claims Trust and the DWLLC Claims Trust for any unpaid and outstanding fees and reasonable and documented expenses of the trustee and the DWLLC Claims Trust (including the outstanding fees of counsel to the trustee of the DWLLC Claims Trust and counsel to the DWLLC Claims Trust);

2.      second, up to the DWLLC Recovery Cap, such amounts recovered by the DWLLC Claims Trust shall be distributed by the DWLLC Claims Trust to the applicable Indenture Trustees on behalf of Holders of 2028 Senior Secured Notes Claims, 2028 Senior Notes Claims, and 2029 Senior Notes Claims on a Pro Rata basis, to be applied to the optional redemption of the applicable 2028 and 2029 Notes at the applicable optional redemption price in accordance with the applicable DBS Notes Indenture;

3.      third, if the DWLLC Claims Trust recovers in excess of the DWLLC Recovery Cap (such excess the "DWLLC Excess Recovery"), the DWLLC Claims Trust shall (a) hold the DWLLC Excess Recovery in trust for the benefit of the applicable Indenture Trustee for the 2028 Senior Secured Notes on behalf of the Holders of the 2028 Senior Secured Notes and (b) promptly remit the DWLLC Excess Recovery to such Indenture Trustee (without set-off or counterclaim), to be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on 2028 Senior Secured Notes then outstanding, in each case at par, without any premium, penalty, or charge (pursuant to provisions of the Amended 2028 Senior Secured Notes Indenture to be amended to implement such redemption feature); and

4.      fourth, any amounts by which the DWLLC Excess Recovery exceeds the aggregate outstanding principal amount and accrued and unpaid interest on the 2028 Senior Secured Notes (the "DWLLC Residual Recovery") shall be remitted by the DWLLC Claims Trust to the applicable Indenture Trustees for the 2028 Senior Notes and the 2029 Senior Notes, to be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on the 2028 Senior Notes and 2029 Senior Notes then outstanding, on a Pro Rata basis, in each case at par, without any premium, penalty, or charge (pursuant to the provisions of the 2028 Senior Notes Indenture and the 2029 Senior Notes Indenture to be amended to implement such redemption features).

Importantly, the treatment of the DBS Notes classes under the Plan does not alter, reduce, or satisfy the separate Allowed DISH Wireless General Unsecured Claim arising from the assigned intercompany loan, and holders of the DBS Notes will not receive a recovery in excess of 100%.

*Objectives of the Chapter 11 Cases*

The Debtors anticipate commencing prepackaged chapter 11 cases (the "Chapter 11 Cases") to accomplish two principal objectives.  First, the Debtors will implement the terms of the Restructuring Support Agreement through the Plan.  Notably, the transactions contemplated by the Restructuring Support Agreement and implemented through the Plan provide significant benefits to the DBS Debtors and their creditors, including the following:

| Benefits to DBS Debtors | Benefits to Creditors |
|---|---|
| • Dismissal of the Bondholder Lawsuit with prejudice.<br><br>• The Consenting Creditors released the Company Parties from all pre-RSA claims, including relinquishing their claim to the $4.8 billion 2026 Tranche intercompany loan that DBS assigned to EchoStar Intercompany Receivable Company L.L.C. in January 2024.<br><br>• The Consenting Creditors consented to indenture amendments to facilitate a potential future DirecTV business combination, subject to certain conditions<br><br>• DBS exercised the bespoke call feature negotiated in the preferred equity and term loans at DBS SubscriberCo at par (which right was available only until June 30, 2026), eliminating more than $19 million of monthly interest.<br><br>• The DBS Cash Sweep requires early repayment of the 2028 Senior Secured Notes at par without penalty and, in the event of a DirecTV business combination, terminates under certain circumstances.<br><br>• Following emergence from the Chapter 11 Cases, DBS will be permitted to redeem with "Available Cash" (resulting from its own balance sheet cash, the repayment of the unsecured intercompany loans, and the repayment of the 2028 Tranche) all 2026 Notes maturities at par plus accrued and unpaid interest without prepayment premiums or penalties. | • DNC paid to DBS approximately $2.1 billion plus accrued and unpaid interest in satisfaction of the 2024 Intercompany Loans, approximately thirty (30) months earlier than required.<br><br>• All Pay-TV subscribers have been reconsolidated with DBS as credit support for the remaining DBS Notes.<br><br>• The Sling TV entities have been designated as restricted subsidiaries and joined as additional guarantors of the DBS Notes.<br><br>• The indentures for the DBS Notes were amended to (1) prevent future upstreaming of cash or other value other than in the ordinary course, (2) prevent further "priming" or "liability management" transactions, and (3) implement the DBS Cash Sweep to repay the principal balance of the 2028 Senior Secured Notes at par as much as twenty (20) months before maturity.<br><br>• DBS and EchoStar paid $75 million and $50 million, respectively, of the Claim Settlement Amount to certain Consenting Creditors.<br><br>• Recoveries of the DWLLC Claims Trust will be used to optionally redeem 2028 Senior Secured Notes, 2028 Senior Notes, and 2029 Senior Notes, up to the DWLLC Recovery Cap. |

| Benefits to DBS Debtors | Benefits to Creditors |
|---|---|
| • Early repayment of approximately $2.1 billion of intercompany loans to DBS eliminated DNC's accrual of PIK interest.<br><br>• All Pay-TV subscribers have been reconsolidated with DBS, streamlining administration of the Pay-TV business, reducing ongoing expenses, and relieving the administrative and governance burden of operating DBS SubscriberCo. | |

Second, the DISH Wireless Debtors will address billions of dollars of claims asserted against them by tower lease and other 5G Network agreement counterparties under the terms of the Plan. The Chapter 11 Cases will afford 5G Network claimants the right to assert any claims they purport to hold against the DISH Wireless Debtors in a centralized forum and recover from DISH Wireless Debtors' assets under the Plan to the extent their claims are allowed. Moreover, 5G Network claimants that hold an allowed or settled Covered Claim against the DISH Wireless Debtors may seek recovery from the FCC Trust, subject to the FCC Trust's eligibility requirements and Third-Party Payment provisions and the Trustee's determination.

The Restructuring Support Agreement is now supported by Consenting Creditors that are holders of more than 88% in aggregate principal amount of DBS Notes:

| Series | Principal Amount ($) | Consenting Creditor Holdings ($) | Consenting Creditor Support (%) |
|---|---|---|---|
| 2026 Senior Secured Notes | 2,750,000,000 | 2,447,252,500 | 88.99 |
| 2028 Senior Secured Notes | 2,500,000,000 | 2,360,372,000 | 94.41 |
| 2026 Senior Notes | 2,000,000,000 | 1,768,773,700 | 88.44 |
| 2028 Senior Notes | 1,000,000,000 | 767,428,000 | 76.74 |
| 2029 Senior Notes | 1,500,000,000 | 1,266,928,000 | 84.46 |
| | **9,750,000,000** | **8,610,754,200** | **88.32** |

On the date hereof, the Debtors began soliciting votes on the Plan from five classes of impaired creditors of the DBS Debtors (corresponding to each series of DBS Notes) and from the class of general unsecured creditors of the DISH Wireless Debtors. The Plan incorporates the Effective Date Transactions and other restructuring transactions contemplated by the Restructuring Support Agreement, as well as the restructuring of claims against the DISH Wireless Debtors.

The Restructuring Support Agreement requires confirmation of the Plan within 120 days of the commencement of the Chapter 11 Cases. Moreover, the Debtors believe that the Chapter 11 Cases can and should proceed quickly to confirmation. To that end, the Debtors anticipate proposing the following key case dates, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | June 29, 2026 |
| Petition Date | June 30, 2026 |

| Event | Date |
|---|---|
| Deadline to Distribute Combined Hearing Notice | Three (3) calendar days following entry of the Order conditionally approving the Disclosure Statement (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Four (4) business days following entry of the Order conditionally approving the Disclosure Statement (or as soon as reasonably practicable thereafter) |
| Deadline to File the Plan Supplement | July 23, 2026 |
| Supplemental Voting Record Date | July 27, 2026 at 5:00 p.m. (prevailing Central Time) |
| Rule 3018 Motion Deadline | July 27, 2026 |
| Supplemental Solicitation Deadline | July 30, 2026 |
| Supplemental Rule 3018 Motion Deadline | August 3, 2026 |
| Rule 3018(a) Motion Objection Deadline | August 5, 2026 |
| Voting Resolution Event Deadline | August 7, 2026 |
| Voting Deadline | August 7, 2026 at 5:00 p.m. (prevailing Central Time) |
| Opt In Deadline | August 7, 2026 at 5:00 p.m. (prevailing Central Time) |
| Plan and Disclosure Statement Objection Deadline | August 7, 2026 at 5:00 p.m. (prevailing Central Time) |
| Voting Report Deadline | August 13, 2026 (or two business days prior to any adjourned Combined Hearing) |
| Confirmation Brief Deadline | August 13, 2026 (or two business days prior to any adjourned Combined Hearing) |
| Combined Hearing | August 17, 2026, subject to the Court's availability |

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.   What Is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation and, where appropriate, the orderly liquidation of a debtor's assets, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate comprising all of the legal and equitable interests of a debtor as of the date such chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any creditor or equity interest holder of the debtor whether or not such creditor or equity

11

interest holder voted to accept the plan, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.      Why Are the Debtors Sending Me This Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being provided in accordance with these requirements.

### C.      Why Are Votes and Consents Being Solicited Prior to Bankruptcy Court Approval of the Disclosure Statement?

The Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases. Soliciting votes and consents for the Plan prior to Bankruptcy Court approval of this Disclosure Statement is intended to facilitate that timeline. The Debtors will request that the Bankruptcy Court approve this Disclosure Statement on a final basis concurrently with Confirmation of the Plan. The Debtors will seek approval of a schedule relating to Confirmation of the Plan at the "first day" hearing, which may be scheduled as soon as forty-eight (48) days after the commencement of the Chapter 11 Cases, subject in all respects to the Bankruptcy Court's approval and availability.

### D.      What Are the Restructuring Transactions Under the Plan?

The Plan is proposed jointly by DISH DBS Corporation, DISH Wireless L.L.C., and their respective Debtor affiliates and provides for the treatment and resolution of all outstanding Claims against, and Interests in, each of the Debtors. Distributions to Holders of Allowed Claims against the Debtors shall be funded from (a) Cash on hand, (b) the Amended Notes, (c) the DISH Wireless Distributable Value, and (d) solely with respect to holders of Allowed Secured Type A Claims, the Type A Claims Reserve to the extent of DWLLC's perfected prepetition security interest therein.

With respect to the DBS Debtors, the Plan implements a balance sheet restructuring through amendments of the DBS Notes. Holders of Allowed 2026 Senior Notes Claims will receive Cash equal to 100% of the outstanding principal amount thereof, plus all accrued and unpaid interest, including interest on defaulted interest, as promptly as practicable following the closing of the AT&T Transactions, and in any event on or prior to consummation of the Plan, without any make-whole amount, premium, penalty, or other charge. Holders of Allowed 2026 Senior Secured Notes Claim will receive Amended 2026 Senior Secured Notes in a principal amount equal to the amount of such holder's Allowed 2026 Senior Secured Notes Claim. Holders of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims will likewise receive Amended Notes in a principal amount equal to the amount of their respective Allowed Claims. For the avoidance of doubt, the receipt of Amended Notes does not affect any separate Allowed DISH Wireless General Unsecured Claims arising under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date, subject to the DWLLC Recovery Cap, with any DWLLC Excess Recovery or DWLLC

12

Residual Recovery to be applied to repay principal and accrued interest under the 2028 Senior Secured Notes, 2028 Senior Notes and 2029 Senior Notes, as applicable. The legal, equitable, and contractual rights of holders of Allowed DBS General Unsecured Claims are unaltered by the Plan, and all such Claims shall be Reinstated. All Interests in the DBS Debtors shall likewise be Reinstated on the Effective Date.

With respect to the DISH Wireless Debtors, the Plan contemplates distribution of all value remaining in the DISH Wireless Debtors' estates, including the net proceeds of the sale of all or substantially all of the DISH Wireless Debtors' assets pursuant to a competitive bidding process under section 363 of the Bankruptcy Code, with EchoStar Corporation serving as the initial stalking horse bidder pursuant to an Asset Purchase Agreement.  Each Holder of an Allowed DISH Wireless General Unsecured Claim shall receive, in full and final satisfaction, settlement, and release of such Claim, its Pro Rata share of the DISH Wireless Distributable Value, subject to the DWLLC Recovery Cap, with any DWLLC Excess Recovery or DWLLC Residual Recovery to be applied to repay principal and accrued interest under the 2028 Senior Secured Notes, 2028 Senior Notes and 2029 Senior Notes, as applicable. Each Holder of an Allowed DISH Wireless General Unsecured Claim that asserts such Claim is a Covered Claim may elect to pursue recovery from the FCC Trust (the "FCC Trust Election"), subject in all respects to the FCC Trust Third-Party Payment Provisions[12] of the FCC Trust Agreement. The FCC Trust has been funded with a contribution of $2,400,000,000, deposited in accordance with the FCC Trust Agreement and the FCC Trust Collateral Documents. Once a Holder of an Allowed DISH Wireless General Unsecured Claim makes the FCC Trust Election, the Disbursing Agent is expressly prohibited from making any distribution to that Holder under the Plan, absent written agreement of the applicable EchoStar Party.

Of this $2,400,000,000 contribution, $200,000,000 was deposited into the "Type A Claims Reserve"—a segregated deposit account of the FCC Trust maintained solely to satisfy Allowed Secured Type A Claims and subject to DWLLC's perfected prepetition security interest under the FCC Trust Security Agreement.  Any Holder of a DISH Wireless General Unsecured Claim in excess of $100,000 may make a one-time, irrevocable election on its Ballot by the Voting Deadline to reduce such Claim to $100,000 and have it treated as a Secured Type A Claim entitled to receive distributions, if any, solely from the Type A Claims Reserve pursuant to the FCC Trust Documents if the Trustee determines such Claim is eligible (such election, the "Type A Convenience Claim Election").  A Holder that makes the Type A Convenience Claim Election and timely files a Proof of Claim is entitled to receive distributions  in exchange for an irrevocable waiver and release of any right to recover such Claim in excess of $100,000 from any Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, Estate, any other EchoStar Party, or the FCC Trust.  If the Trustee determines a Claim is not eligible to receive a distribution from the FCC Trust and that determination is not overturned, the Holder of such Claim is entitled to receive its Pro Rata share of the DISH Wireless Distributable Value in accordance with the Plan.

In connection with the foregoing, on the AT&T Closing Date, non-Debtor DISH Network Corporation shall redeem or cause to be redeemed all then-outstanding DNC Notes in accordance with the AT&T License Purchase Agreement, the DNC Notes Indenture, and the Restructuring

---

[12]   Such Third-Party Payment Provisions include sections 4.1, 4.2.1(d), 4.2.5, 4.2.9(b)(v), and 4.2.10 of the FCC Trust Agreement that pertain to Third-Party Payments or the waiver and release of legal rights against EchoStar Parties upon the submission of a Covered Claim to the FCC Trust.

13

Support Agreement, and upon such redemption, all DNC Notes Guarantee Claims against DISH Wireless L.L.C. and DISH Wireless Leasing L.L.C. in their respective capacities as guarantors of the DNC Notes shall be deemed fully satisfied, released, and discharged without any payment or distribution from any Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, or Estate.

### E.      Am I Entitled to Vote on the Plan?

Your eligibility to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of June 29, 2026).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."

The classification of Claims against and Interests in the DBS Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 1A | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 1B | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 1C | 2026 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 1D | 2028 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 1E | 2026 Senior Notes Claims | Impaired | Entitled to Vote |
| 1F | 2028 Senior Notes Claims | Impaired | Entitled to Vote |
| 1G | 2029 Senior Notes Claims | Impaired | Entitled to Vote |
| 1H | DBS General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| 1I | DBS Intercompany Claims | Unimpaired | No (Presumed to Accept) |
| 1J | Interests in DBS Debtors | Unimpaired | No (Presumed to Accept) |

The classification of Claims against and Interests in the DISH Wireless Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 2A | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2B | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2C | Prepetition Secured Loan Claims | Unimpaired | No (Presumed to Accept) |
| 2D | Secured Type A Claims | Unimpaired | No (Presumed to Accept) |
| 2E | DISH Wireless General Unsecured Claims | Impaired | Entitled to Vote |
| 2F | DNC Notes Guarantee Claims | Unimpaired | No (Presumed to Accept) |
| 2G | DISH Wireless Intercompany Claims | Unimpaired / Impaired | No (Presumed to Accept or Deemed to Reject) |
| 2H | Interest in DISH Wireless Debtors | Unimpaired / Impaired | No (Presumed to Accept or Deemed to Reject) |

### F.      Why Are Holders of Contested Contract Claims Being Solicited to Vote on the Plan for $1.00, or in Some Cases, Not Being Solicited to Vote at All?

As reflected in the DISH Wireless Debtors' Debtors schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements"), the Debtors believe that

14

Contested Contract Claims are contingent, unliquidated, and disputed based on based on force majeure events, including after the Debtors sent notices to the relevant counterparties informing them of the FCC's unprecedent actions and other grounds excusing the Debtors' performance under relevant agreements and have no claim amount after the distribution of such notices.[13] Although the Debtors believe that all Contested Contract Claims should be disallowed, to the extent a Holder of Contested Contract Claim files a timely Proofs of Claim by the General Claims Bar Date, such Holder's Claim will temporarily allowed, in the amount of $1.00, for voting purposes only and not for purposes of allowance or distribution.[14]

The Debtors are proposing to classify Contested Contract Claims for voting purposes only, based on the maximum theoretical Allowed amount of such Claims, after giving effect to applicable provisions of the Bankruptcy Code, including section 502(b)(6) of the Bankruptcy Code. To the extent that this methodology places a Contested Contract Claim in Class 2E (DISH Wireless General Unsecured Claims) under the Plan, the Holder of such Contested Contract Claim will be entitled to vote in the amount of $1.00, with all rights to seek different treatment of such Claim for voting purposes as described herein fully reserved. Holders of Contested Contract Claims in Class 2E were provided with Ballots, in the voting amount of $1.00, on account of such Holder's Contested Contract Claim and a notice of such Holder's classification and rights to challenge such classification or amount for voting purposes. To the extent that this methodology places a Contested Contract Claim in Class 2D (Secured Type A Claims) under the Plan, such Claims are Unimpaired under the Plan and are not entitled to vote on the Plan. The Debtors have not solicited (and do not intend to solicit) votes from any Holder of a Contested Contract Claim to the extent the Debtors determined that such Claim is a Secured Type A Claim, *provided* that such Holder will receive a Notice of Non-Voting Status on account of such Holder's Class 2D Secured Type A Claim and a notice of such Holder's classification and rights to challenge such classification.

Notwithstanding the foregoing, any Holder of a Contested Contract Claim that seeks different treatment for such Claim for voting purposes is required to file a Rule 3018(a) Motion by the applicable Rule 3018(a) Motion Deadline and otherwise satisfy the requirements for Rule 3018(a) Motions set forth in the Solicitation and Voting Procedures.

### G.      What Is the Deadline to Vote on the Plan?

The Voting Deadline is August 7, 2026 at 5:00 p.m. (prevailing Central Time).

### H.      How Do I Vote For or Against the Plan?

Detailed instructions regarding how to vote on the Plan are contained in your solicitation package, including the Ballots, the Solicitation and Voting Procedures, and applicable notice, distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your Ballot (or your Nominee's Master Ballot containing your vote if you are a beneficial holder of the DBS Notes) must be properly completed, executed, and delivered as directed, so that the

---

[13]   Any amounts owed under such agreements prior to the Debtors sending notices to the applicable contract counterparties, and which amounts the Debtors do not dispute, have been listed in the Schedules and Statements, in such liquidated and undisputed amounts, as applicable.

[14]   This applies solely for the purpose of voting and shall not constitute an admission of the validity, priority, or amount of any Claim, nor shall it be construed as a waiver of any objection or defense that any party may have with respect to such Claim.

Ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.

In addition to accepting hard copy Ballots via U.S. mail, overnight courier, and hand delivery, at the address set forth on the Ballots, the Debtors will accept Ballots via electronic online transmission solely through a customized online balloting portal on the Debtors' restructuring website maintained by the Solicitation Agent at https://dm.epiq11.com/DBS (the "E-Ballot Portal"). Parties entitled to vote may, where applicable, cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing the E-Ballot Portal (which allows a Holder to submit an electronic signature). The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission (other than a Master Ballot) will not be counted.

### I.　What Will I Receive From the Debtors If the Plan Is Consummated?

Except to the extent different treatment is agreed to by the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, on the one hand, and the Holders of an Allowed Claim or Allowed Interest, on the other hand, as applicable, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described in Article III.B of the Plan in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest.

**THE PROJECTED RECOVERIES ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[15]**

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 1A | Other Secured Claims | The legal, equitable, and contractual rights of Holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, at the option of the Debtors or the Reorganized DBS Debtors, such Holder shall receive (A) payment in | $0 | N/A |

---

[15]　The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (B) Reinstatement of such Allowed Other Secured Claim as of the Effective Date or (C) such other treatment that renders such Holder's Allowed Other Secured Claim Unimpaired. | | |
| 1B | Other Priority Claims | The legal, equitable, and contractual rights of Holders of Allowed Other Priority Claims are unaltered by the Plan. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, at the option of the Debtors (with the consent of the Required Consenting Creditors (such consent to not be unreasonably withheld)) or the Reorganized DBS Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (B) treatment that is otherwise consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business | $0 | N/A |

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim. | | |
| 1C | 2026 Senior Secured Notes Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2026 Senior Secured Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2026 Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2026 Senior Secured Notes Claim, (A) Amended 2026 Senior Secured Notes in a principal amount equal to the amount of such Holder's Allowed 2026 Senior Secured Notes Claim on account of the unpaid principal amount of the 2026 Senior Secured Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2026 Senior Secured Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2026 Senior Secured Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2026 Senior Secured Notes Claim (but not yet due and owing under the 2026 Senior Secured Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2026 Senior Secured Notes, but instead will be paid in full in accordance with the Amended 2026 Senior Secured Notes Indenture and Amended 2026 Senior Secured Notes on the next | $2,762.0 | 100.0% |

18

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | scheduled semiannual interest payment date to Holders of record of the Amended 2026 Senior Secured Notes in accordance with the terms of the Amended 2026 Senior Secured Notes Indenture and Amended 2026 Senior Secured Notes. | | |
| 1D | 2028 Senior Secured Notes Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2028 Senior Secured Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2028 Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2028 Senior Secured Notes Claim, (A) Amended 2028 Senior Secured Notes in a principal amount equal to the amount of such Holder's Allowed 2028 Senior Secured Notes Claim on account of the unpaid principal amount of the 2028 Senior Secured Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2028 Senior Secured Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2028 Senior Secured Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2028 Senior Secured Notes Claim (but not yet due and owing under the 2028 Senior Secured Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2028 Senior Secured Notes, but instead will be | $2,512.0 | 100.0% |

19

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | paid in full in accordance with the Amended 2028 Senior Secured Notes Indenture and Amended 2028 Senior Secured Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2028 Senior Secured Notes in accordance with the terms of the Amended 2028 Senior Secured Notes Indenture and Amended 2028 Senior Secured Notes. For the avoidance of doubt, the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2028 Senior Secured Notes Claim (and Holders of Allowed 2028 Senior Notes Claims and Allowed 2029 Senior Notes Claims) shall be preserved and treated solely in accordance with Class 2E and Article VI.E of the Plan. | | |
| 1E | 2026 Senior Notes Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2026 Senior Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2026 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2026 Senior Notes Claim, Cash equal to (A) 100% of the outstanding principal amount thereof, plus (B) all accrued and unpaid interest, including interest on the defaulted | $2,000.0 | 100.0% |

20

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | interest, in each case up to and including the Effective Date, to the extent not previously paid, without any make-whole amount, premium, penalty, or other charge, distributed through the applicable Indenture Trustee in accordance with the 2026 Senior Notes Indenture, including the charging lien provisions thereof. As part of the treatment of Class 1E Claims, all unpaid Indenture and DWLLC Claims Trust Trustee Fees and Expenses of the Indenture Trustee for the 2026 Senior Notes, as of the Effective Date, shall be paid in cash by DBS. | | |
| 1F | 2028 Senior Notes Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2028 Senior Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2028 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2028 Senior Notes Claim, (A) Amended 2028 Senior Notes in a principal amount equal to the amount of such Holder's Allowed 2028 Senior Notes Claim on account of the unpaid principal amount of the 2028 Senior Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2028 Senior Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2028 Senior Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2028 Senior Notes | $1,000.0 | 100.0% |

21

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | Claim (but not yet due and owing under the 2028 Senior Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2028 Senior Notes, but instead will be paid in full in accordance with the Amended 2028 Senior Notes Indenture and Amended 2028 Senior Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2028 Senior Notes in accordance with the terms of the Amended 2028 Senior Notes Indenture and Amended 2028 Senior Notes. For the avoidance of doubt, the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2028 Senior Notes Claim (and Holders of Allowed 2028 Senior Secured Notes Claims and Allowed 2029 Senior Notes Claims) shall be preserved and treated solely in accordance with Class 2E and Article VI.E of the Plan. | | |
| 1G | 2029 Senior Notes Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2029 Senior Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2029 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2029 | $1,506.4 | 100.0% |

22

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | Senior Notes Claim, (A) Amended 2029 Senior Notes in a principal amount equal to the amount of such Holder's Allowed 2029 Senior Notes Claim on account of the unpaid principal amount of the 2029 Senior Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2029 Senior Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2029 Senior Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2029 Senior Notes Claim (but not yet due and owing under the 2029 Senior Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2029 Senior Notes, but instead will be paid in full in accordance with the Amended 2029 Senior Notes Indenture and Amended 2029 Senior Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2029 Senior Notes in accordance with the terms of the Amended 2029 Senior Notes Indenture and Amended 2029 Senior Notes. For the avoidance of doubt, the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2029 Senior Notes Claim (and Holders of other | | |

23

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | Allowed 2028 Senior Notes Claims and Allowed 2028 Senior Secured Notes Claims) shall be preserved and treated solely in accordance with Class 2E and Article VI.E of the Plan. | | |
| 1H | DBS General Unsecured Claims | The legal, equitable, and contractual rights of Holders of Allowed DBS General Unsecured Claims are unaltered by the Plan.  Except to the extent that a Holder of an Allowed DBS General Unsecured Claim agrees to less favorable treatment of its Allowed DBS General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DBS General Unsecured Claim, such Allowed DBS General Unsecured Claim shall be Reinstated. | $1,884.7 | 100% |
| 1I | DBS Intercompany Claims | On the Effective Date, each Allowed DBS Intercompany Claim shall be either: (A) Reinstated or (B) set off, settled, distributed, contributed, merged, canceled, or released, in each case in the discretion of the Debtors or the Reorganized DBS Debtors. | N/A | 100% |
| 1J | Interests in DBS Debtors | On the Effective Date, each Interest in the DBS Debtors shall be Reinstated. | N/A | 100% |
| 2A | Other Secured Claims | The legal, equitable, and contractual rights of Holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, | N/A | N/A |

24

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | at the option of the Debtors (with the consent of the Consenting Creditors) or the Post-Effective Date DISH Wireless Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or (B) such other treatment that renders such Holder's Allowed Other Secured Claim Unimpaired. | | |
| 2B | Other Priority Claims | The legal, equitable, and contractual rights of Holders of Allowed Other Priority Claims are unaltered by the Plan. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, at the option of the Debtors (with the consent of the Consenting Creditors) or the Post-Effective Date DISH Wireless Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (B) treatment that is otherwise consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the later of the Effective Date | N/A | N/A |

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim. | | |
| 2C | Prepetition Secured Loan Claims | Except to the extent that a Holder of an Allowed Prepetition Secured Loan Claim agrees to less favorable treatment of its Allowed Prepetition Secured Loan Claim, solely to the extent such Allowed Prepetition Secured Loan Claim shall not have been paid in full in Cash upon the closing of the Sale, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition Secured Loan Claim, such Holder shall receive payment in full in Cash on or as soon as reasonably practicable after the Effective Date. | $75.0 | 100% |
| 2D | Secured Type A Claims | Except to the extent that a Holder of an Allowed Secured Type A Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Type A Claim, each Holder of an Allowed Secured Type A Claim shall receive payment of such Allowed Claim in full in Cash solely from distributions made from the Type A Claims Reserve pursuant to the FCC Trust Documents; provided that any distribution that, as applicable, DWLLC or Post-Effective Date DWLLC receives from the FCC Trust on account of such Allowed Secured Type A Claim and pays or | $120.2[16] | 100% |

---

[16]   The projected amount of Class 2D Secured Type A Claims assumes that no Holder of a Class 2E DISH Wireless General Unsecured Claim makes the optional Type A Convenience Claim Election to be treated as a Class 2D Secured Type A Claim.

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | transfers to the applicable Holder in accordance with the FCC Trust Documents shall be subject to entry of the FCC Trust Distributions Order. For the avoidance of doubt, pursuant to the FCC Trust Security Agreement, distributions made from the Type A Claims Reserve constitute distributions from DWLLC's Estate which shall be made in the manner provided in the FCC Trust Documents—either (A) directly by the Trustee to the applicable Holder or (B) by the Trustee to the applicable Holder through DWLLC or Post-Effective Date DWLLC, as the Secured Party. | | |
| 2E | DISH Wireless General Unsecured Claims | On or as soon as reasonably practicable after the later of the Effective Date and the date on which a DISH Wireless General Unsecured Claim becomes an Allowed DISH Wireless General Unsecured Claim, except to the extent a Holder of an Allowed DISH Wireless General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed DISH Wireless General Unsecured Claim shall receive, in full and final satisfaction, settlement, | $9,011.6 – $10,548.6 – $13,925.8[17] | 2.2% – 1.9% – 1.4%[18] |

[17] The projected Claims range for Class 2E assumes that the Claims held by the DWLLC Claims Trust under the DWLLC Intercompany Loan are Allowed. The low range assumes that the value of each Claim held by DWLLC's lease or contract counterparties that is subject to dispute is $0.00 based on DWLLC's performance having been excused under the *force majeure* provisions of the applicable agreements or pursuant to the doctrines of frustration of purpose, impossibility, or impracticability under applicable law. The middle range assumes that the Claims arising from the termination of a lease of real property (*e.g.*, tower leases) are capped under section 502(b)(6) of the Bankruptcy Code. The high range assumes that such lease claims are not capped under section 502(b)(6) but that Allowed Claims asserted by such creditors are discounted to present value at a discount rate of 10%.

[18] The projected recovery percentage assumes that the assets available for distribution to Holders of Class 2E Claims are limited to the DISH Wireless Distributable Value and does not include such Holders' recovery from the FCC Trust under the FCC Trust Election.

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | release, and discharge of and in exchange for such Allowed DISH Wireless General Unsecured Claim, its Pro Rata share of the DISH Wireless Distributable Value; *provided* that Allowed DISH Wireless General Unsecured Claims held by the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries shall be subject to the waterfall set forth in Article VI.Eof the Plan, in accordance with the Restructuring Support Agreement.. *FCC Trust Election*: Each Holder of an Allowed DISH Wireless General Unsecured Claim that asserts such Claim is a Covered Claim may (A) make the FCC Trust Election, subject in all respects to the FCC Trust Third-Party Payment Provisions, or (B) if the amount of such Claim exceeds $100,000.00, shall be entitled to elect to have such Claim treated as a Secured Type A Claim in Class 2D by making the Type A Convenience Claim Election on such Holder's ballot on or before the Voting Deadline; *provided* that, for the avoidance of doubt, no such Holder shall be permitted to make both the FCC Trust Election on account of such Claim in an amount that exceeds $100,000.00, on the one hand, and a Type A Convenience Claim Election with respect to the same Claim as reduced to $100,000.00, on the other hand. | | |
| 2F | DNC Notes Guarantee Claims | Except to the extent that a Holder of an Allowed DNC Notes Guarantee Claim agrees to less favorable treatment of its Allowed DNC Notes | $3,500.0 | N/A |

28

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | Guarantee Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DNC Notes Guarantee Claim, on or before the Effective Date, on the AT&T Closing Date, non-Debtor DNC shall redeem or cause to be redeemed all outstanding DNC Notes in accordance with the terms of the DNC Notes Indenture. For the avoidance of doubt, no distribution under the Plan from any Debtor or Estate shall be required or made on account of DNC Notes Guarantee Claims; provided that no DNC Notes Guarantee Claim shall be deemed satisfied, settled, released, or discharged with respect to any Debtor or Estate unless and until all Allowed Claims arising under the DNC Notes have been paid in full in Cash. | | |
| 2G | DISH Wireless Intercompany Claims | On or as soon as reasonably practicable after the Effective Date, each DISH Wireless Intercompany Claim shall be: (A) Reinstated or (B) set off, settled, distributed, contributed, merged, canceled, or released, in each case in the discretion of the Debtors or the Post-Effective Date DISH Wireless Debtors. | N/A | N/A |
| 2H | Interests in DISH Wireless Debtors | On the Effective Date, each Interest in the DISH Wireless Debtors shall be: (A) Reinstated or (B) cancelled, released, or otherwise adjusted, in each case in the discretion of the Debtors or the Post-Effective Date DISH Wireless Debtors. | N/A | N/A |

29

### J.     What Is the DWLLC Claims Trust?

As part of the agreed-upon consideration being provided to the Consenting Creditors in exchange for their concessions under the Restructuring Support Agreement, DNC assigned to DBS, and DBS assigned to a newly formed trust for the benefit of the holders of the DBS 2028 Senior Secured Notes, 2028 Senior Notes, and 2029 Senior Notes, DNC's intercompany loan claims against DWLLC under that certain Loan Agreement dated as of August 22, 2025 in the aggregate amount of approximately $8.8 billion (inclusive of principal and accrued interest and net of $5 billion of prior loan forgiveness), to recover against DWLLC's estate and/or the FCC Trust.

The claims arising from that assignment are treated as Allowed DISH Wireless General Unsecured Claims against DWLLC.   Distributions received by the DWLLC Claims Trust on account of those Claims will be distributed ratably to the holders of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims, subject to the $300 million DWLLC Recovery Cap.   If the DWLLC Claims Trust recovers any amounts in excess of the DWLLC Recovery Cap (the "DWLLC Excess Recovery"), the DWLLC Excess Recovery shall be held for the benefit of the Allowed 2028 Senior Secured Notes Claims and applied solely to redeem the principal and accrued and unpaid interest on the outstanding 2028 Senior Secured Notes without any premium, penalty, or charge.   If the DWLLC Excess Recovery exceeds the aggregate principal amount and accrued interest outstanding at the time of any distribution (the "DWLLC Residual Recovery"), then the DWLLC Residual Recovery shall be held for the benefit of the Allowed 2028 Senior Notes Claims and Allowed 2029 Senior Notes Claims and applied, pro rata, a corresponding aggregate amount of principal and accrued and unpaid interest on such notes at par without any premium, penalty, or charge.   For the avoidance of doubt, application of the foregoing recoveries to redeem 2028 Senior Secured Notes is in addition to, and not in lieu of, the DBS Cash Sweep.

The treatment of the DBS Notes classes under the Plan does not alter, reduce, or satisfy the separate Allowed DISH Wireless General Unsecured Claim arising from the assigned intercompany loan.   Holders of 2028 Senior Secured Notes, 2028 Senior Notes, and 2029 Senior Notes, as beneficiaries of the DWLLC Claims Trust, are entitled to recover on the DWLLC Intercompany Loan up to the DWLLC Recovery Cap, and to use any such recoveries to optionally redeem DBS Notes pro rata at the applicable redemption price under the relevant indentures. Holders of 2028 Senior Secured Notes, as beneficiaries of the DWLLC Claims Trust, are entitled to further recover on the DWLLC Intercompany Loan in the amount of the DWLLC Excess Recovery to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on the 2028 Senior Secured Notes then outstanding.   Holders of 2028 Senior Notes and 2029 Senior Notes, as beneficiaries of the DWLLC Claims Trust, are also entitled to further recover on the DWLLC Intercompany Loan in the amount of the DWLLC Residual Recovery to redeem, pro rata, a corresponding aggregate amount of principal and accrued and unpaid interest on the 2028 Senior Notes and 2029 Senior Notes.

### K.     What Is the FCC Trust?

On September 18, 2025, EchoStar jointly filed with AT&T and SpaceX for FCC approval of the respective transactions. In orders issued on May 12, 2026, the FCC Wireless Bureau approved the AT&T and SpaceX sales, conditioned on EchoStar depositing $2.4 billion Contribution into a trust for the benefit of creditors with claims related to the 5G Network—*i.e.*,

30

the FCC Trust. The purpose of the FCC Trust is to make funds available to pay final judgments, arbitration awards, and settlements for Covered Claims—*i.e.*, amounts due in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned to AT&T or SpaceX. With the FCC Wireless Bureau's approval, The Bank of New York Mellon has been appointed trustee of the FCC Trust, and EchoStar established the FCC Trust on June 26, 2026. The Contribution will be remitted to the FCC Trust directly from the proceeds of the AT&T Transactions at closing.

### L.      What are the FCC Trust Election and Type A Convenience Claim Election?

The Plan establishes a framework for the treatment of Claims being satisfied from the FCC Trust. Holders of Allowed Secured Type A Claims—which consist of certain claims secured by the FCC Trust's Type A Claims Reserve—are unimpaired and will be paid in full in cash solely from the Type A Claims Reserve established under the FCC Trust Documents, which, due to DWLLC's security interest in the Type A Claims Reserve, constitutes a distribution required from DWLLC's estate under the Plan. In addition, holders of Allowed DISH Wireless General Unsecured Claims who assert a Covered Claim may elect to pursue recovery outside of the Plan from the FCC Trust—*i.e.*, the FCC Trust Election—or, for claims exceeding $100,000, may elect instead to reduce the claim to $100,000 and have it treated as a Secured Type A Claim—*i.e.*, the Type A Convenience Claim Election—but may not make both elections with respect to the same claim.

To prevent double recoveries, any Plan distribution on a claim for which the holder has made the FCC Trust Election is treated as a "Third-Party Payment" that reduces the holder's FCC Trust distribution dollar-for-dollar. Holders who submit a Covered Claim to the FCC Trust generally provide an irrevocable waiver and release of other recovery rights against the EchoStar parties, including the Debtors. Except as any EchoStar Party may otherwise agree in writing, under no circumstances shall the Disbursing Agent make a distribution to any Holder of an Allowed DISH Wireless General Unsecured Claim that has made the FCC Trust Election.

### M.      What Is the Type A Claims Reserve?

Upon receipt of funds, the FCC Trust is required to cause $200 million to be deposited into the Type A Claims Reserve, a segregated bank account subject to the terms of the FCC Trust Agreement, for the purpose of satisfying Allowed Secured Type A Claims. The FCC Trust must maintain the Type A Claims Reserve at all times in an amount sufficient to satisfy in full all Secured Type A Claims and initial FCC Trust expenses.

The FCC Trust entered into a security agreement in favor of DWLLC (on behalf of the Holders of Secured Type A Claims against DWLLC as the secured party), granting a security interest over all of the FCC Trust's right, title, and interest in and to the Type A Claims Reserve. The FCC Trust also entered into a deposit account control agreement, pursuant to which the security interest in the Type A Claims Reserve is perfected by control, together with the filing of one or more UCC financing statements. The "Collateral" consists of the Type A Claims Reserve, the secured FCC Trust bank account (or any replacement or substitution thereof, or any account that otherwise holds the Type A Claims Reserve from time to time), together with any monies, securities, or instruments deposited or required to be deposited in such account, all security entitlements in and to the foregoing, and all proceeds thereof. The security interest secures only the FCC Trust's obligations to make distributions to Holders of Allowed Secured Type A Claims.

31

**N.**     **What Will I Receive From the Debtors If I Hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Financing Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Financing Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of the Plan.

**1.  Administrative Claims.**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, or such Holder has been paid by any Debtors on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) shall receive, in full and final satisfaction of its Allowed Administrative Claim, an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in <u>Article II</u> of the Plan or in an order of the Bankruptcy Court, requests for payment of Administrative Claims against the DISH Wireless Debtors must be Filed with the Bankruptcy Court and served on the Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, by the DISH Wireless Administrative Claims Bar Date. **Any Holder of an Administrative Claim against the DISH Wireless Debtors that is required to, but does not, File and serve a request for payment of such Administrative Claim by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claim against the DISH Wireless Debtors, their Estates, or their property, and such Administrative Claim shall be deemed discharged as of the Effective Date without the need for any objection by the Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party by the DISH Wireless Administrative Claims Objection Deadline. For the avoidance of doubt, no request for payment of an Administrative Claim against a DBS Debtor shall be required to be Filed under the Plan unless otherwise ordered by the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

## 2. Professional Compensation.

### a. Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and orders of the Bankruptcy Court. Any objections to a Professional Fee Claim shall be Filed and served no later than twenty-one (21) days after the Filing of the final request for payment of such Professional Fee Claim.

Each Professional seeking allowance of a Professional Fee Claim shall, to the extent reasonably practicable, identify in its final fee application the portion of its Professional Fee Claim allocable to the DBS Debtors and the portion allocable to the DISH Wireless Debtors. To the extent any Professional Fee Claim is not so allocated, the Debtors shall allocate such Professional Fee Claim between the DBS Debtors and the DISH Wireless Debtors in good faith and in their reasonable discretion, after consultation with the applicable Professional, and such allocation shall control absent further order of the Bankruptcy Court.

The portion of each Allowed Professional Fee Claim allocable to the DBS Debtors shall be paid by the DBS Debtors or the Reorganized DBS Debtors, as applicable, from the DBS Professional Fee Escrow Account to the extent previously unpaid, and the portion of each Allowed Professional Fee Claim allocable to the DISH Wireless Debtors shall be paid by the DISH Wireless Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, from the DISH Wireless Professional Fee Escrow Account to the extent previously unpaid, in each case as soon as reasonably practicable after such Allowed Professional Fee Claim is Allowed by Final Order.

If the amounts in the DBS Professional Fee Escrow Account or the DISH Wireless Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims allocable to the DBS Debtors  or the DISH Wireless Debtors, respectively, the Holder of such deficiency shall have an Allowed Administrative Claim against the DBS Debtors or the DISH Wireless Debtors, as applicable, for such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

### b. Professional Fee Escrow Account.

Within seven (7) Business Days after Confirmation, the Debtors shall have calculated and delivered to the DIP Lender the True-Up Statement and deposited the True-Up Amount into the Professional Fee Escrow Accounts. After such True-Up Amount has been deposited into the Professional Fee Escrow Accounts, the balance of each Professional Fee Escrow Account shall be an amount equal to the DBS Professional Fee Escrow Amount or the DISH Wireless Professional Fee Escrow Amount, as applicable. Under no circumstances shall funds in the DBS Professional Fee Escrow Account be used to satisfy Professional Fee Claims against the DISH Wireless Debtors, and under no circumstances shall funds in the DISH Wireless Professional Fee Escrow Account be used to satisfy Professional Fee Claims against the DBS Debtors.

Consistent with the DIP Order, each Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and solely for the purpose of paying Allowed Professional Fee Claims. Amounts deposited into the Professional Fee Escrow Accounts shall not constitute

property of the Debtors' Estates, except to the extent of any residual amounts remaining after payment in full of all Allowed Professional Fee Claims.

After payment in full of all Allowed Professional Fee Claims allocable to the DBS Debtors and the DISH Wireless Debtors, respectively, any remaining amounts in the corresponding Professional Fee Escrow Account attributable thereto shall become DISH Wireless Distributable Value available for distribution to Holders of Allowed DISH Wireless General Unsecured Claims in accordance with the Plan without further notice to or action, order, or approval of the Bankruptcy Court.

### c.   Estimation of Fees and Expenses.

Each Professional shall reasonably estimate its unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Confirmation Date and shall deliver such estimate to the Debtors by the earlier of (a) five (5) Business Days after the Confirmation Date and (b) two (2) Business Days prior to the Effective Date; provided, however, that such estimate shall not constitute an admission or agreement with respect to the fees and expenses of such Professional, and neither the Professionals nor the Debtors shall be bound by such estimates for any purpose.

Each such estimate shall, to the extent reasonably practicable, identify the portion of such unpaid fees and expenses allocable to the DBS Debtors and the portion of such unpaid fees and expenses allocable to the DISH Wireless Debtors. If a Professional does not timely provide such estimate, or does not provide such allocation, or such allocation is incomplete, the Debtors may estimate and allocate such unpaid and unbilled fees and expenses in good faith and in their reasonable discretion for purposes of delivering a True-Up Statement to the DIP Lender that sets forth the True-Up Amount to be deposited into the Professional Fee Escrow Accounts.

### d.   Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the DBS Debtors or the Reorganized DBS Debtors, as applicable, and the DISH Wireless Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred in connection with the implementation and Consummation of the Plan that are allocable to the DBS Debtors or the DISH Wireless Debtors, respectively.

On and after the Confirmation Date, unless otherwise ordered by the Bankruptcy Court, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Confirmation Date shall terminate, and the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, may employ and compensate Professionals in the ordinary course of business without further notice to or action, order, or approval of the Bankruptcy Court.

### e.   Substantial Contribution.

Except as otherwise specifically provided in the Plan or ordered by the Bankruptcy Court, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code shall File an application for the allowance of such compensation or reimbursement and serve

34

such application on counsel for the Debtors and such other parties as required by the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court, no later than thirty (30) days after the Effective Date.

Any amount Allowed by the Bankruptcy Court on account of a substantial contribution claim shall be allocated between, and payable by, the DBS Debtors or the DISH Wireless Debtors, as applicable, as determined by the Debtors in good faith and in their reasonable discretion or as otherwise ordered by a Final Order of the Bankruptcy Court. For the avoidance of doubt, the Indenture and DWLLC Claims Trust Trustee Fees and Expenses shall be paid in accordance with the relevant DBS Indentures as amended by the Amended Indentures and with any applicable DWLLC Claims Trust agreement and shall not be subject to any requirement of allowance as an administrative expense claim under section 503 of the Bankruptcy Code.

### 3. Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, and in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, (a) payment in full in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter, (b) Reinstatement of such Allowed Priority Tax Claim, or (c) such other treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code and reasonably acceptable to the Required Consenting Creditors. To the extent an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall be treated as a Secured Tax Claim (and, to the extent not paid in full, as an Other Secured Claim) in accordance with the Plan. Upon payment in full of an Allowed Priority Tax Claim to the extent required by the Plan (or upon such other treatment agreed by the Holder and the Debtors consistent with the Plan), any Lien securing such Claim shall be deemed released, terminated, and extinguished, without further notice to or order of the Bankruptcy Court, and without any further act or action under applicable law.

### 4. DIP Financing Claims.

Notwithstanding anything to the contrary herein, the DIP Financing Claims held by the DIP Lender shall be deemed Allowed as of the Effective Date in an amount equal to all obligations due and owing under the DIP Financing Documents and applicable DIP Orders, including (1) the outstanding principal amount thereunder, (2) all accrued and unpaid interest thereon up to and including the date of satisfaction, (3) all accrued and unpaid fees, expenses, and noncontingent indemnification and reimbursement obligations payable thereunder, and (4) all other obligations due and owing thereunder.

Except to the extent that the DIP Lender agrees to less favorable treatment of its Allowed DIP Financing Claims, the Allowed DIP Financing Claims shall be treated as follows, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Financing Claims: (a) if the DISH Wireless Successful Bidder is the DIP Lender and makes a credit bid in the Sale Transaction, and the amount of the purchase price is greater than the Allowed DIP Financing Claims, the aggregate amount of the Allowed DIP Financing Claims outstanding as of the closing of the Sale shall be credited against and shall reduce, on a dollar-for-dollar basis, the purchase price payable by such DISH Wireless Successful Bidder at closing, and such credit shall constitute full and final satisfaction and discharge of the Allowed DIP Financing Claims (up

to the full amount of the purchase price) as of such closing date; or (b) if the DISH Wireless Successful Bidder is not the DIP Lender, or if the DISH Wireless Successful Bidder is the DIP Lender but the Allowed DIP Financing Claims exceed the purchase price, then the DIP Lender shall, in either case, receive Cash in an amount equal to the full amount of the Allowed DIP Financing Claims (or the remaining amount of the Allowed DIP Financing after reduction and crediting against the purchase price, if applicable) from, as applicable, the DISH Wireless Debtors' available cash or the proceeds of the Sale on the closing date thereof, or as soon as reasonably practicable thereafter.

All Liens, security interests and superpriority claims granted to the DIP Lender pursuant to the DIP Financing Documents shall continue in full force and effect and shall not be released until the Allowed DIP Financing Claims have been satisfied in full in accordance with Article II.D of the Plan. Upon satisfaction in full of the Allowed DIP Financing Claims, all such Liens, security interests and superpriority claims shall be deemed automatically released, terminated, and extinguished without further notice to or order of the Bankruptcy Court and without any further act or action under applicable law; provided, however, that any contingent indemnification or reimbursement obligations under the DIP Financing Documents as to which no claim has been asserted and that are not then due and payable shall survive in accordance with their terms.

For the avoidance of doubt, (i) the Allowed DIP Financing Claims shall not be subject to the procedures set forth in Article II.A or Article II.B of the Plan, including any requirement to File a request for payment of an Administrative Claim, a Proof of Claim, or a fee application; and (ii) the Allowed DIP Financing Claims shall not be subject to avoidance, reduction, setoff, recoupment, recharacterization, subordination, counterclaim, defense, disallowance, impairment, objection, or challenge of any kind under applicable law or regulation.

### 5. Ad Hoc Group Professional Fees.

To the extent payable under Section 11 of the Restructuring Support Agreement, the Debtors, EchoStar, or DNC shall pay, or cause to be paid, the Ad Hoc Group Professional Fees in accordance with, and subject to, Section 11 of the Restructuring Support Agreement. For the avoidance of doubt, (1) the Ad Hoc Group Professional Fees shall not constitute Professional Fee Claims, shall not be subject to the procedures set forth in Article II.A or Article II.B of the Plan, including the requirement to file fee applications, and shall not be payable from any Professional Fee Escrow Account; and (2) nothing in the Plan shall require Milbank LLP or any other advisor entitled to payment of Ad Hoc Group Professional Fees under the Restructuring Support Agreement to file a Proof of Claim or an application under sections 330 or 503 of the Bankruptcy Code as a condition to payment of the Ad Hoc Group Professional Fees.

To the extent not otherwise paid, the Debtors, EchoStar, DNC, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, shall promptly pay in Cash in full outstanding and invoiced Ad Hoc Group Professional Fees as follows: (i) on the Effective Date, Ad Hoc Group Professional Fees incurred, or estimated to be incurred, during the period prior to the Effective Date to the extent invoiced to the Debtors at least two (2) Business Days in advance of the Effective Date, and (ii) after the Effective Date, any unpaid Ad Hoc Group Professional Fees within five (5) Business Days of receiving an invoice; provided that such Ad Hoc Group Professional Fees shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and

without any requirement for further notice or Bankruptcy Court review or approval; provided further that, to the extent timely invoiced, Ad Hoc Group Professional Fees that are not paid by the Debtors or the Reorganized DBS Debtors, as applicable, within the timeframes set forth herein, such Ad Hoc Group Professional Fees shall not be deemed waived and shall be included in a subsequent invoice.

### 6. Indenture and DWLLC Claims Trust Trustee Fees and Expenses.

On the Effective Date, the Debtors or the Reorganized DBS Debtors, as applicable, shall pay in full in Cash all reasonable and documented fees, expenses, costs, disbursements, indemnities, and other amounts due and owing to the Indenture Trustees under the applicable Indentures, including the reasonable and documented fees and expenses of counsel and other professionals retained by the Indenture Trustees, in each case to the extent not previously paid.  The Indenture Trustees shall not be required to file a Proof of Claim, Administrative Claim request, fee application, or any other application or request for allowance, and no Bankruptcy Court approval shall be required, as a condition to payment of such amounts.  To the extent any such fees, expenses, costs, disbursements, indemnities, or other amounts are incurred after the Effective Date in connection with distributions, cancellation mechanics, lien releases, implementation of the Plan, enforcement of the Indenture Trustees' rights, or any other duties expressly required under the Plan, the Confirmation Order, or the applicable Indentures, such amounts shall be paid promptly in Cash by the Reorganized DBS Debtors or such other applicable funding source provided under the Plan.  Nothing in the Plan or the Confirmation Order shall impair, waive, release, discharge, or otherwise affect the Indenture Trustees' rights to payment, reimbursement, indemnification, priority of payment, charging liens, or any other rights, protections, privileges, immunities, or remedies under the applicable Indentures, the Plan, the Confirmation Order, or applicable law.

All reasonable and documented fees, expenses, costs, disbursements, indemnities, and other amounts incurred by the trustee of the DWLLC Claims Trust, including the reasonable and documented fees and expenses of its professionals, in each case to the extent not previously paid, shall be paid in full in Cash by the Debtors or the Reorganized DBS Debtors, as applicable, on the Effective Date, without the need for the trustee of the DWLLC Claims Trust to file a Proof of Claim, Administrative Claim request, fee application, or other request for allowance, and without Bankruptcy Court review or approval.

### O.      What Happens to My Recovery If the Plan Is Not Confirmed or Does Not Go Effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, see Article XI of this Disclosure Statement entitled "Risk Factors," and the Liquidation Analyses attached hereto as **Exhibit D-1** and **D-2**.

**P.      What Is the Purpose of the Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.  The purpose of the Confirmation Hearing is to seek approval of the Plan and this Disclosure Statement.  If this Disclosure Statement is approved, the Bankruptcy Court will have held that this Disclosure Statement provided the Voting Classes with adequate information to make an informed decision as to whether to vote and/or consent to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

If the Plan is confirmed, the Plan will bind the Debtors (including as any issuers of securities under the Plan), any person acquiring property under the Plan, any Holder of Claims against or Interests in any of the Debtors, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming the Plan will discharge the Debtors from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed Plan.  Notwithstanding anything to the contrary in the Plan, nothing in the Plan or the order confirming the Plan shall discharge, release, impair, waive, or otherwise affect, (x) any Person's rights (if any) to enforce the FCC Trust Documents in accordance with their terms, (y) any obligations of a Reorganized DBS Debtor to pay Cure Costs (or other amounts required under section 365(b)(1) of the Bankruptcy Code as a condition to assumption) with respect to an Executory Contract or Unexpired Lease assumed by a DBS Debtor pursuant to the Plan, to the extent such obligations remain unpaid as of the Effective Date, and (z) any Claim held by a Holder that is or may constitute a Covered Claim, which shall survive the discharge provided herein solely to the extent necessary for such Holder to assert such Claim against the FCC Trust and receive distributions therefrom in accordance with the FCC Trust Documents and subject to the FCC Trust Third-Party Payment Provisions.

**Q.      If the Plan Provides That I Get a Distribution, Do I Get It Upon Confirmation or When the Plan Goes Effective, and What Is Meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  "Consummation" of the Plan refers to the occurrence of the Effective Date.  See Article IX.A of this Disclosure Statement, entitled "Conditions Precedent to Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**R.      What Are the Sources of Cash and Other Consideration Required to Fund the Plan?**

Subject to the terms of the Plan (including the Restructuring Support Agreement), distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein shall be funded from (a) Cash on hand,

38

(b) the issuance and distribution of the Amended Notes, (c) the DISH Wireless Distributable Value (with respect to Holders of Allowed Class 2E Claims against the DISH Wireless Debtors), and (d) solely with respect to Holders of Allowed Secured Type A Claims, the Type A Claims Reserve to the extent of DWLLC's perfected prepetition security interest therein.

Subject in all respects to the FCC Trust Agreement, including the FCC Trust Third-Party Payment Provisions, a Holder of an Allowed DISH Wireless General Unsecured Claim that is asserted to be a Covered Claim may receive its Pro Rata share of the DISH Wireless Distributable Value as a Holder of an Allowed Class 2E Claim pursuant to the Plan and subsequently make the FCC Trust Election to seek distributions from the FCC Trust on account of such Claim pursuant to the FCC Trust Documents, provided, however, that except as any EchoStar Party may otherwise agree in writing, under no circumstances shall the Disbursing Agent make a distribution to any Holder of an Allowed DISH Wireless General Unsecured Claim that has made the FCC Trust Election.

### S.      Is There Potential Litigation Related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. See Article X.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

### T.      Will There Be Releases, Injunction, and Exculpation Granted to Parties-In-Interest as Part of the Plan?

Yes, the Plan proposes to release the Released Parties (as defined below) and to exculpate the Exculpated Parties (as defined below), as set forth in the Plan.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Creditors in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

The releases and exculpations are integral provisions of the Plan.  The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties-in-interest. Accordingly, the Debtors believe that each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part in Article IX.D of this Disclosure Statement, entitled "Settlement, Release, Injunction, and Related Provisions."

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY**

**RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (A) EACH DEBTOR; (B) EACH REORGANIZED DBS DEBTOR AND EACH POST-EFFECTIVE DATE DISH WIRELESS DEBTOR; (C) EACH CONSENTING CREDITOR; (D) THE DIP LENDER; (E) ECHOSTAR, (F) EACH HOLDER OF ONE OR MORE CLAIMS; (G) EACH HOLDER OF ONE OR MORE INTERESTS; AND (H) EACH RELATED PARTY OF EACH ENTITY IN THE FOREGOING CLAUSES (A) THROUGH (G); PROVIDED, HOWEVER, THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS NOT TO OPT IN TO (AS APPLICABLE) THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE ENTRY OF THE CONFIRMATION ORDER.**

**THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASED PARTIES":  (A) EACH DEBTOR; (B) EACH REORGANIZED DBS DEBTOR AND EACH POST-EFFECTIVE DATE DISH WIRELESS DEBTOR; (C) EACH CONSENTING CREDITOR; (D) THE DIP LENDER; (E) ECHOSTAR, (F) EACH RELEASING PARTY; AND (G) EACH RELATED PARTY OF EACH ENTITY IN THE FOREGOING CLAUSES (A) THROUGH CLAUSE (F); PROVIDED, HOWEVER, THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS NOT TO OPT IN TO (AS APPLICABLE) THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE ENTRY OF THE CONFIRMATION ORDER.  FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, NO ENTITY THAT IS NOT A RELEASING PARTY SHALL BE A RELEASED PARTY.**

**THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "EXCULPATED PARTIES":  (A) THE DEBTORS; AND (B) VIKRAM JINDAL AND GERARD UZZI, SOLELY IN THEIR CAPACITY AS THE INDEPENDENT MANAGERS SERVING ON THE SPECIAL COMMITTEE, FOR CONDUCT WITHIN THE SCOPE OF THEIR DUTIES.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### U.     What Are the Consequences of Electing Not to Opt In to the Releases Provided by the Plan?

If a Holder of a Claim or Interest elects not to opt in to the Third-Party Release, such Holder will not be a "Releasing Party" and will preserve any direct Causes of Action that it may have against the Released Parties.  Such Holder will also not be a "Released Party," and, the Reorganized DBS Debtors, Post-Effective Date DISH Wireless Debtors and any third party that is a Releasing Party will preserve all Causes of Action against such Holder.

### V.     Who Do I Contact If I Have Additional Questions with Respect to This Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the     Solicitation     Agent,     Epiq     Corporate     Restructuring,     LLC,     by     (a)     emailing

DBSInformation@epiqglobal.com (with "Solicitation" in the subject line) or (b) calling (888) 873-0758 (U.S./Canada toll free) or +1 (971) 414-3498 (International, for calls originating outside of the U.S./Canada).  Copies of the Plan, this Disclosure Statement, and any other publicly-filed documents in the Chapter 11 Cases are available free of charge, as applicable, by: (a) visiting the Debtors' restructuring website at https://dm.epiq11.com/DBS after the Petition Date; (b) emailing using DBSInformation@epiqglobal.com (with "Solicitation" in the subject line); or (c) calling the Solicitation Agent at the number(s) listed above. You may also obtain copies of any pleadings filed in the Chapter 11 Cases after the Petition Date via PACER at https://www.pacer.gov (for a fee).

### W.      Do the Debtors Recommend Voting in Favor of the Plan?

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative (to the extent one exists). The Debtors believe the Plan, which contemplates a significant deleveraging of the DBS Debtors' balance sheets, provides for the completion of the DISH Wireless Debtors' decommissioning efforts, fully and fairly addresses Claims against or Interests in the Debtors, enables the Debtors to emerge from chapter 11 expeditiously, and is in the best interest of all Holders of Claims against or Interest in the Debtors.  The Debtors further believe that other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### X.      Who Supports the Plan?

The Plan is supported by the Debtors and the Consenting Creditors under the Restructuring Support Agreement, which hold more than 88% of the aggregate principal amount outstanding under the DBS Notes.

## IV.    SOLICITATION AND VOTING PROCEDURES

**THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**  PLEASE REFER TO THE SOLICITATION AND VOTING PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.      Voting Record Dates

The record date for purposes of determining which Holders of Claims in the Voting Classes are entitled to vote on the Plan is **June 29, 2026** (the "Voting Record Date").  The voting record date solely for any creditor who holds a Claim that is subject to the General Claims Bar Date and who files a Proof of Claim after the Voting Record Date, is **July 27, 2026** (the "Supplemental Voting Record Date").

### B.      Voting on the Plan and the Type A Convenience Claim Election

Detailed instructions regarding how eligible Holders of Claims can vote on the Plan are contained on the Ballots distributed to Holder of Claims that are entitled to vote on the Plan pursuant to the Solicitation and Voting Procedures.  For your vote to be counted, your Ballot must be properly executed, completed, and delivered to the Solicitation Agent in accordance with the instructions provided on or with the Ballot so that the Ballot containing your vote is actually received by the Solicitation Agent on or before Voting Deadline (August 7, 2026 at 5:00 p.m. (prevailing Central Time)).

For the avoidance of doubt, any Holder of a Class 2E – DISH Wireless General Unsecured Claim that makes the Type A Convenience Claim Election will have its DISH Wireless General

41

Unsecured Claim treated as an Unimpaired Class 2D – Secured Type A Claim under the Plan and will not have its vote on the Plan counted; *provided that* such Holder's election, if any, to opt in to the Third-Party Release, will be counted.

### C.      Solicitation Agent

The Debtors have retained Epiq Corporate Restructuring, LLC to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

### D.      Solicitation Package

The following materials constitute the solicitation package (the "Solicitation Package"): (a) a cover letter (the "Cover Letter") in connection with the solicitation of the Plan; (b) the appropriate form of Ballot, together with the detailed voting instructions; and (c) an electronic link and instructions (provided in the Cover Letter and the Ballots) to access electronic copies of the Plan, the Disclosure Statement, the Solicitation and Voting Procedures, the Restructuring Support Agreement, and other related documents (excluding the Ballots) for review and download, free of charge, at https://dm.epiq11.com/DBS.

### E.      Distribution of the Solicitation Package

The Debtors will cause the Solicitation Agent to commence distribution of the Solicitation Package to Holders of Claims in the Voting Classes on June 29, 2026.

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by (a) emailing DBSInformation@epiqglobal.com (with "Solicitation" in the subject line); (b) calling (888) 873-0758 (U.S./Canada toll free) or +1 (971) 414-3498 (International, for calls originating outside of the U.S./Canada); or (c) writing to DISH DBS Corporation Ballot Processing c/o Epiq Ballot Processing, 10300 SW Allen Blvd, Beaverton, OR 97005.  After the Debtors file the chapter 11 cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://dm.epiq11.com/DBS (free of charge), or for a fee via PACER at https://www.pacer.gov.

### F.      Non-Voting Status Notice and Release Opt In Form

Holders of Claims in Class 1A, Class 1B, Class 1H, Class 1I, Class 1J, Class 2A, Class 2B, Class 2C, Class 2D, and Class 2F will receive a notice informing them of their non-voting status and the accompanying Release Opt In Form (the "Notice of Non-Voting Status").[19]  Such notice instructs Holders in the Non-Voting Classes as to how they may obtain copies of the documents contained in the Solicitation Package (excluding the Ballots) should they wish to receive them.

The Non-Voting Classes may opt in to the Third-Party Release set forth in Article VIII.F of the Plan by submitting the Release Opt In Form on or before **August 7, 2026, at 5:00 p.m. (prevailing Central Time)** (the "Opt In Deadline").  Opt in elections must be submitted pursuant to the instructions provided in the Release Opt In Form so that such document is received by the Solicitation Agent by the Opt In Deadline.   A Holder of a Claim or Interest's decision to opt in to

---

[19]      The Debtors will seek a waiver to serve the Notice of Non-Voting Status, or any other type of notice in connection with the Plan to such Holders of Claims in Class 2G and Interests in Class 2H, as such Claims and Interests are held by the Debtors' affiliates and not individual creditors or interest holders.

the Third-Party Release in the Plan does not affect the amount of distribution such Holder will receive, if any, under the Plan, and such Holder's recovery under the Plan, if any, will be the same if such Holder opts in.

### G.  Type A Convenience Claim Election

The Ballots for Holders of DISH Wireless General Unsecured Claims include an optional election of the Type A Convenience Claim Election. As further stated in the instructions in the Ballot, to make a valid Type A Convenience Claim Election, a Holder must complete and submit the DISH Wireless General Secured Claim Ballot on or prior to the Voting Deadline in accordance with the Plan, the Solicitation and Voting Procedures, and the instructions provided in the Ballot, **and** timely file a Proof of Claim by the General Claims Bar Date for the Type A Convenience Claim to be valid.

For the avoidance of doubt, a Holder of a DISH Wireless General Unsecured Claim that makes the Type A Convenience Claim Election shall not be treated as a Holder of an Allowed DISH Wireless General Unsecured Claim in Class 2E for purposes of receiving Plan distributions. Instead, such Claim shall be treated as a Secured Type A Claim that is conclusively presumed to have accepted the Plan and not be entitled to vote to accept or reject this Plan on account of such Secured Type A Claim. Making a Type A Convenience Claim Election shall not affect such Holder's right to affirmatively opt in to the Third-Party Release pursuant to a Release Opt In Form.

### H.  Ballots Not Counted

No Ballot will be counted toward Confirmation of the Plan if, among other things:  (a) it is cast by an entity that is not entitled to vote on the Plan; (b) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (c) it is submitted other than as specifically set forth in the Ballot; (d) it is unsigned; (e) it is sent to any person or entity other than the Solicitation Agent; (f) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan; (g) it partially rejects and/or partially accepts the Plan in a particular Voting Class; or (h) it is superseded by a later dated, timely submitted valid Ballot. **Please refer to your Ballot for additional requirements with respect to voting to accept or reject the Plan**.

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE THAT IS NOT OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL NOT BE COUNTED WITH RESPECT TO VOTING ON THE PLAN UNLESS THE DEBTORS, IN THEIR SOLE DISCRETION, DETERMINE OTHERWISE.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR

**PURPOSES OF ACCEPTING OR REJECTING THE PLAN.  FURTHER, TO THE EXTENT THERE ARE MULTIPLE CLAIMS WITHIN THE SAME VOTING CLASS, THE CLAIMS OF ANY PARTICULAR HOLDER MAY BE AGGREGATED FOR THE PURPOSE OF COUNTING VOTES.**

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESSES

### A.    Overview of the Company, Its History, and Its Businesses

EchoStar and its subsidiaries are a premier provider of technology, networking services, television entertainment, and connectivity, offering consumer, enterprise, operator, and government solutions worldwide under its EchoStar®, Boost Mobile, DISH, Gen Mobile, Sling, EchoStar®, Hughes®, HughesNet®, HughesON™, and JUPITER™ brands.

The Company was founded by Charlie Ergen, Candy Ergen, and James DeFranco in 1980 as a C-band satellite distributor.  During the ensuing 46 years, the Company has pioneered technological advancements that have redefined the telecommunications industry.  The Company's historical milestones and achievements include:

- filing for a direct broadcast satellite license in 1987 and being granted its first real estate in space in 1992: orbital slot 119° west longitude;

- launching its first satellite—EchoStar I—in 1995, which cleared the way for the Company to gain its first pay-TV customers in March 1996;

- continuing to deploy satellite assets, allowing DNC to grow rapidly from the late 1990s through the 2000s, innovating the world's first DVR and voice remote;

- completing a significant corporate restructuring in 2008, which spun off DNC from EchoStar into a separate, publicly traded company, allowing each company to pursue distinct strategic objectives, with EchoStar increasingly focused on satellite assets, technology development, and related infrastructure services and DNC retaining the consumer-facing satellite television business;

- beginning in 2008, spending more than $30 billion to acquire spectrum licenses from the FCC and through the secondary market;

- launching Sling TV, the first live, over-the-top domestic television service in 2015, transforming the television industry and ushering in a new era of affordable, flexible, and accessible entertainment;

- acquiring Boost Mobile in 2020 to maintain the existence of a fourth facilities-based carrier following T-Mobile's acquisition of Sprint;

- deploying the 5G Network, which pioneered use of a cloud-native, open radio access network architecture that was the first of its kind deployed at nationwide scale in the United States;

- merging DNC with EchoStar as of December 31, 2023, reuniting the companies after more than a decade of separate public operations and combining Satellite and Broadband Communications, Pay-TV, and Wireless assets under a single corporate structure to pursue a unified strategy centered on integrated connectivity; and

44

- successfully launching the EchoStar XXV satellite, a high-power Ku-band satellite that delivers direct-to-home television broadcasting for DISH Network across North America, into a geosynchronous transfer orbit in March 2026.

Today, the Company is a diversified, multi-billion dollar telecommunications enterprise with millions of customers across the globe, supported by billions of dollars of capital investments over the past half century.

The Company has four primary business segments: (a) Pay-TV, which operates through the DBS Debtors and their subsidiaries; (b) Wireless, which operates as a Hybrid MNO through DNC and its non-Debtor subsidiaries, including BoostCo; (c) Broadband and Satellite Services, which operates through EchoStar's direct, wholly-owned non-Debtor subsidiary Hughes Satellite Systems Corporation and its subsidiaries; and (d) Other,[20] which consists of the Company's legacy 5G Network and related assets that are not used in the Wireless segment's Hybrid MNO operations. The Debtors comprise two of the Company's business segments—the Pay-TV segment and the Other segment. Neither the business operations of the Company's Broadband and Satellite Services segment nor the Wireless segment (which now conducts its Hybrid MNO operations through BoostCo), is implicated by these Chapter 11 Cases. Organizational charts depicting the Company's corporate structure are attached hereto as **Exhibit E**.

The Company has approximately 10,400 employees in the United States and serves more than 6 million pay-TV subscribers, approximately 7 million wireless subscribers, and approximately 641,000 broadband subscribers. For the fiscal year ended 2025, the Company reported consolidated revenue of approximately $15.0 billion. As of December 31, 2025, the Company had total assets of approximately $43.0 billion (comprised of approximately $5.1 billion of current assets and approximately $37.9 billion of non-current assets) and total liabilities of approximately $37.2 billion (comprised of approximately $12.4 billion of current liabilities and approximately $24.8 billion of non-current liabilities).

### B.    The Company's Businesses

The Debtors are subsidiaries of EchoStar that comprise two of the Company's business segments, with the DBS Debtors operating the Pay-TV segment and the DISH Wireless Debtors constituting the Other segment.

### 1.    Pay-TV

The DBS Debtors offer pay-TV services under the DISH and Sling TV brands. The DBS Debtors are responsible for selling, billing, and servicing pay-TV subscriptions, managing the associated customer relationships, and holding necessary FCC licenses for direct broadcasting satellite and fixed satellite service spectrum used to deliver television programming.

The Pay-TV segment has historically been the Company's largest revenue driver. For the 2025 fiscal year, Pay-TV accounted for approximately 65% (approximately $9.7 billion) of the Company's consolidated revenue, producing operating income of approximately $2.4 billion. As of March 31, 2026, DBS had approximately 6.6 million pay-TV subscribers in the United States, including approximately 4.8 million DISH TV subscribers and approximately 1.8 million Sling TV subscribers.

---

[20]    This segment is defined as "Other" in EchoStar's public filings with the SEC.

### (a)  DISH

The Company's vertically integrated direct-to-home satellite television business operates under the DISH brand.  Unlike cable, which depends on terrestrial hybrid fiber-coax networks, DISH transmits linear multichannel video via satellites positioned in fixed orbital slots.  The DBS Debtors rely on a fleet of eight satellites orbiting roughly 22,300 miles above the equator.  The Company owns seven of these satellites and leases one from a third party.  Programming from national cable networks, local broadcast affiliates, and premium programmers is aggregated at centralized broadcast centers, where it is encoded, compressed, encrypted, and transmitted to satellites.  Those satellites retransmit signals across the continental United States, Alaska, Hawaii, and Puerto Rico.

Subscribers pay monthly fees structured around tiered channel bundles and often commit to two-year service agreements. Additional revenue streams include premium movie networks, sports add-ons, international programming tiers, pay-per-view events, video-on-demand rentals, equipment lease fees, installation charges and protection plans.

### (b)  SLING

Debtor Sling TV L.L.C. ("Sling") operates as the Company's multichannel, live-linear and on-demand streaming service provider for customers who do not subscribe to traditional satellite or cable pay-TV services, desire a lower cost alternative, or intend to watch programming primarily on mobile devices.  Sling takes in live feeds from programmers at centralized facilities, transcodes them into streaming formats, and distributes them to users across smart TVs, streaming devices, mobile platforms, gaming consoles, and web browsers.  Because delivery occurs over the internet, no dish installation, technician visit, or proprietary receiver is required.  Subscribers simply download an app and activate service, significantly lowering onboarding costs.

Sling's business model was designed to disrupt traditional large cable bundles by introducing smaller, modular "skinny bundles."  Its core offerings—Sling Orange and Sling Blue—divide channel lineups into thematic clusters (*i.e.*, sports, news, or entertainment) and can be combined or supplemented with optional mini-bundles (e.g., sports extras, kids programming, lifestyle packages, and international add-ons).  Pricing is daily, weekly, or month-to-month without long-term contracts, giving consumers flexibility.  This structure enhances Sling's competitive appeal by lowering barriers to entry for prospective subscribers and positioning the service as an attractive, low-risk alternative to traditional Pay-TV offerings.

The Sling user interface emphasizes personalization, integrated search, curated recommendations, and cross-device continuity.  Sling must therefore continuously optimize streaming quality, latency, buffering performance, and app compatibility across devices, which requires ongoing software development and cloud infrastructure investment, rather than satellite capital expenditure.

### (c)  Legal and Regulatory Framework

The Company's pay-TV operations exist within a complex and highly technical regulatory structure that spans communications law, copyright law, antitrust policy, consumer protection statutes, advertising regulation, satellite spectrum licensing, and contractual carriage obligations.

46

FCC oversight is at the core of the DISH satellite television framework.[21]   The FCC regulates spectrum licensing, orbital slot assignments, satellite construction milestones, signal carriage rules, and public interest obligations.   The Company must maintain authority to operate satellites in assigned orbital positions and must comply with strict technical parameters governing, among other things, interference, signal strength, and coverage.

Additionally, the Company must obtain approvals for retransmission and content licensing. The Company may be required to seek consent to retransmission from local broadcast stations, forcing the Company to negotiate per-subscriber fees.   Without retransmission ability, the Company risks programming interruptions, reputational harm, and subscriber churn.   Content licensing is governed primarily by private contract but intersects heavily with copyright law.   The Company must negotiate multiyear agreements with programmers covering linear distribution rights, video-on-demand rights, cloud DVR rights, out-of-home streaming rights, and digital streaming rights.   These contracts typically include minimum subscriber thresholds, most-favored-nation clauses, and annual fee escalators.   Copyright compliance also requires payment of statutory royalties in certain retransmission scenarios and adherence to anti-piracy obligations.

The DBS Debtors' operations may also be subject to consumer protection regulations, including FCC and Federal Trade Commission truth-in-billing and advertising transparency standards, the Telephone Consumer Protection Act's restrictions on telemarketing, and privacy requirements under the Cable Communications Policy Act and applicable state-level data protection statutes.

In the aggregate, the regulatory and legal framework governing the Company's Pay-TV business is multifaceted and ever-evolving.   Compliance costs are significant, regulatory risks can affect strategic flexibility, and legislative changes can influence the economic viability of the entire Pay-TV model.

### 2.      Wireless

#### (a)      Segment Background

Wireless is the Company's newest business segment.   The Company offers nationwide wireless communications services to subscribers under its Boost Mobile and Gen Mobile brands, along with a competitive portfolio of wireless devices.   The Company's Wireless business is operated through non-Debtor DNC and its non-Debtor subsidiaries, including BoostCo.   As of the date hereof, the Company had approximately 7 million wireless subscribers who are primarily served by the Company's Hybrid MNO operations implemented following EchoStar's entry into definitive agreements to sell spectrum licenses to AT&T and SpaceX (as more fully discussed herein).   For the 2025 fiscal year, the Wireless segment accounted for approximately 25% (approximately $3.8 billion) of the Company's consolidated revenue, producing net losses of approximately $495 million.   The Wireless segment has incurred operating losses for each fiscal year since 2022.

Boost Mobile represents the largest portion of the Company's Wireless subscriber base. The brand offers wireless service aimed at price-sensitive consumers.   Most subscribers pay in

---

[21]   The FCC's oversight functions arise under the Communications Act of 1934, as amended by the Cable Television Consumer Protection and Competition Act of 1992 and the Satellite Television Extension and Localism Act and its successors.

advance for monthly service and are not tied to long-term contracts. Plans typically emphasize unlimited talk and text with tiered data offerings, and the Company currently offers a broad range of premium wireless devices, including the latest generation iPhones, as well as a wide selection of Samsung, Motorola, and other premium devices. Boost Mobile relies on a hybrid distribution model that includes branded retail stores, third-party retail partnerships (including national retailers such as Amazon and Walmart), and digital channels.

Gen Mobile serves a narrower and strategically distinct segment. The brand focuses heavily on low-income consumers and participants in federal support programs such as Lifeline and, previously, the Affordable Connectivity Program. Its subscriber base is highly price-sensitive and often dependent on government subsidies to maintain service affordability. Gen Mobile's plans are typically ultra-low-cost, emphasizing essential connectivity rather than premium features

### (b)     Legal and Regulatory Framework

The Company's Wireless business is highly regulated. Among other things, like any company, the Company is unable to operate and control its facilities using electromagnetic frequencies without a license for those frequencies from the FCC. Therefore, the FCC's intention to invalidate the Company's licenses in short order meant that the Company would be unable to continue operation of its licensed system.

Specifically, under the Communications Act, the FCC has authority to issue licenses and authorizations for the use of the electromagnetic spectrum, including the wireless spectrum licenses held by the Company. The FCC generally establishes buildout milestones and other conditions that licensees must meet. Failure to meet these milestones and conditions can result in termination of the license. The FCC has also established various bureaus that act on behalf of the FCC under delegated authority, including the FCC Wireless Bureau and Space Bureaus (the "FCC Space Bureau"). These bureaus can, among other things, seek public comment on the application of Commission rules to licenses and authorizations, decide license extension requests, review petitions for reconsideration of their respective prior licensing decisions, and terminate (or declare the termination of) licenses. FCC licensees, such as the Company, are required to always control their licenses and any licensed facilities, to not cause harmful interference into other authorized users of the spectrum, and to coordinate their operations with such other spectrum users.

FCC licensees and regulated companies also generally have an obligation to pay annual regulatory fees to the FCC, as well as filing fees for any applications for new or modified licenses. In the event of reorganization, even one that involves control and operation by a debtor in possession, the transition is viewed as a transfer of control under FCC rules and requires FCC approval, which will be timely requested from the FCC in this case.

### 3.     Other [22]

The Other segment primarily consists of the Company's legacy 5G Network and related deployment operations that are not utilized in the Wireless segment's Hybrid MNO operations. As described above and discussed in further detail in Section III.C below, in August and September 2025, EchoStar and certain of its non-Debtor affiliates entered into definitive agreements to sell a material portion of its spectrum licenses to AT&T and SpaceX—including the licenses necessary for DWLLC to operate the 5G Network. In August 2025, following EchoStar's entry into these

---

[22]   This segment is defined as "Other" in EchoStar's public filings with the SEC.

48

transactions, DWLLC discontinued its deployment of the 5G Network after meeting certain interim and final build-out requirements established by the FCC, and began decommissioning efforts.  As of November 15, 2025, the Company had no customer traffic on the 5G Network.

### C.       The Debtors' Corporate Structure

EchoStar is the ultimate parent company of each of the Debtors.  EchoStar is domiciled in Nevada and headquartered in Colorado.  It has two classes of voting common equity outstanding. EchoStar's Class A shares trade on NASDAQ under the symbol "ECHO,"[23] and its Class B shares, which are not publicly traded, are convertible at the option of the holder into an equal number of Class A shares.  EchoStar's Chairman and Chief Executive Officer, Charlie Ergen, beneficially owns approximately 51.0% of EchoStar's equity securities (assuming conversion of the Class B common stock beneficially owned by Mr. Ergen into Class A common stock and giving effect to the exercise of certain options held by Mr. Ergen) and beneficially owns approximately 90.3% of the total voting power of all classes of shares (assuming no conversion of any Class B common stock and giving effect to the exercise of certain options held by Mr. Ergen).  Class A shares entitle holders to one vote per share, and Class B shares entitle holders to ten votes per share.

EchoStar's direct subsidiary, DNC, is the indirect parent of DBS, which, together with its subsidiaries (including the other DBS Debtors), operates the Company's Pay-TV segment.  The DBS Debtors are, collectively:  (a) DBS; (b) DISH Network L.L.C.; (c) DISH Operating L.L.C.; (d) DISH Broadcasting Corporation; (e) DISH Network Service L.L.C.; (f) DISH Technologies Holding Corporation; (g) DISH Technologies L.L.C.; (h) Sling Media, L.L.C.; (i) Sling TV Holding L.L.C.; (j) Sling TV Purchasing L.L.C.; (k) Sling TV L.L.C; and (*l*) Sling TV Gift Card Corporation.  DBS is also the direct parent of Neyland Networks L.L.C. ("Neyland Networks"), a Texas limited liability company, which, in turn, is the sole member of DWLLC.  DWLLC and its subsidiaries (including the other DISH Wireless Debtors) comprise the Company's Other segment. The DISH Wireless Debtors are, collectively: (a) Neyland Networks LLC; (b) DWLLC; (c) DISH Wireless Leasing L.L.C.; (d) DISH Wireless Retail Holding L.L.C.; (e) DISH Infinite Corporation; and (f) DISH Wireless Retail Operating L.L.C.

Organizational charts depicting the Company's corporate structure as of the Petition Date are attached hereto as **Exhibit E**.

### D.       The Debtors' Prepetition Corporate and Capital Structure

#### 1.       DBS Debtors' Prepetition Capital Structure

As of the date of this Disclosure Statement, the DBS Debtors have approximately $9.75 billion in aggregate principal amount of funded debt obligations—*i.e.*, the DBS Notes. Approximately $5.25 billion in aggregate principal amount of DBS Notes are secured by substantially all of the DBS Debtors' assets and approximately $4.5 billion is unsecured.  As of the date hereof, the DBS Debtors have sufficient cash or cash equivalents and receivables to fund their operations in the ordinary course and pay restructuring expenses.[24]  The DBS Debtors do not anticipate needing any debtor-in-possession financing in these cases.

---

[23]    Previously, EchoStar's Class A shares traded on NASDAQ under the symbol "SATS".

[24]    The Ad Hoc Group has consented to use of cash collateral under the *Stipulation and Agreed Order Granting Adequate Protection to Prepetition DBS Notes Secured Parties*.

| Funded Debt Obligations | |
|---|---|
| DBS Notes | Principal Amount |
| 5.250% Senior Secured Notes due 2026 | $2,750,000,000 |
| 7.750% Senior Notes due 2026 | $2,000,000,000 |
| 5.750% Senior Secured Notes due 2028 | $2,500,000,000 |
| 7.375% Senior Notes due 2028 | $1,000,000,000 |
| 5.125% Senior Notes due 2029 | $1,500,000,000 |
| **Total** | **$9,750,000,000** |

### (a)     DBS Debtors' Secured Funded Debt Obligations

DBS is the issuer of the 2026 Senior Secured Notes in the aggregate principal amount of $2.75 billion[25] and the 2028 Senior Secured Notes in the aggregate principal amount of $2.5 billion[26] (the 2026 Senior Secured Notes and the 2028 Senior Secured Notes collectively, the "DBS Senior Secured Notes").   The DBS Senior Secured Notes are secured by substantially all of the assets of DBS, subject to exclusions including the DNC 2021 Intercompany Loan (as defined herein).  DBS's obligations under the DBS Senior Secured Notes are guaranteed by each of the other DBS Debtors.  As of the date hereof, the full principal amount of the DBS Senior Secured Notes remains outstanding.

### (b)     DBS Debtors' Unsecured Funded Debt Obligation

DBS is also the issuer of three series of unsecured senior notes: (a) the 2026 Senior Notes in the aggregate principal amount of $2.0 billion;[27] (b) the 2028 Senior Notes in the aggregate principal amount of $1.0 billion;[28] and (c) the 2029 Senior Notes in the aggregate principal amount of $1.5 billion[29] (the 2026 Senior Notes, the 2028 Senior Notes, and the 2029 Senior Notes collectively, the "DBS Senior Notes").  DBS's obligations under the DBS Senior Notes are guaranteed by each of the other DBS Debtors.  As of the date hereof, the full principal amount of the DBS Senior Notes remains outstanding.  The maturity date of the 2026 Senior Notes is July 1, 2026.  As of the date of this Disclosure Statement, the full principal amount of the DBS Senior Notes remains outstanding.  The maturity date of the 2026 Senior Notes is July 1, 2026.  As of the date of this Disclosure Statement, DBS does not have sufficient liquidity to both repay the 2026 Senior Notes and to satisfy its ordinary course obligations.  Upon the AT&T closing, DNC will pay in full amounts that DBS will use to, among other things, pay in full and retire the 2026 Senior Notes.  However, owing to unforeseen delays in obtaining the requisite regulatory approvals, the AT&T Transactions have not yet closed.

### (c)     DBS Debtors' Intercompany Loans

---

[25]   The 2026 Senior Secured Notes are 5.250% senior secured notes issued by DBS on November 1, 2021 and due December 1, 2026.

[26]   The 2028 Senior Secured Notes are 5.750% senior secured notes issued by DBS on November 9, 2021 and due December 1, 2028.

[27]   The 2026 Senior Notes are 7.750% senior notes issued by DBS on November 14, 2016  and due July 1, 2026.

[28]   The 2028 Senior Notes are 7.375% senior notes issued by DBS on July 24, 2020 and due July 1, 2028.

[29]   The 2029 Senior Notes are 5.125% senior notes issued by DBS on May 24, 2021 and due June 1, 2029.

50

In addition to their funded debt, the DBS Debtors are parties to certain intercompany loans with their affiliates, including the DISH Wireless Debtors and DNC.  The loans described below do not include the June or September 2024 loans that DBS made to DNC in the amounts of $1.711 billion and $535 million, respectively, which DNC repaid concurrently with execution of the Restructuring Support Agreement.

### (i)   Prepetition Secured Loan

On April 21, 2026, following deliberation and approval by the DWLLC Special Committee, DBS, as lender, and DWLLC, as borrower, entered into that certain Loan and Security Agreement in respect of a $75 million term loan to DWLLC for general corporate purposes (the "Prepetition Secured Loan").  On May 26, 2026, DISH Wireless Leasing L.L.C. ("DW Leasing"), as guarantor, and DBS, as lender, entered into that certain Guarantee and Security Agreement with respect to the Prepetition Secured Loan.  The Prepetition Secured Loan matures on April 21, 2027. Interest accrues at 5.50% per annum, is payable in cash on the first day of each calendar month and, upon a default or after acceleration, accrues interest at an additional 2.0% per annum at DBS's option.  DWLLC may prepay the Prepetition Secured Loan in full or in part at any time without premium or penalty.  The Prepetition Secured Loan is secured by a lien on substantially all of DWLLC's assets and guaranteed by DW Leasing.  As of the date hereof, the aggregate principal amount outstanding under the Prepetition Secured Loan is $75 million.  The Prepetition Secured Loan will be repaid in full upon the closing of the DISH Wireless Debtors' sale of substantially all of their assets, subject to Bankruptcy Court approval.

### (ii)  DNC 2021 Intercompany Loan

On November 26, 2021, DBS, as lender, and DNC, as borrower, entered into that certain Loan and Security Agreement (the "2021 Loan Agreement" and the loan issued thereunder, the "DNC 2021 Intercompany Loan").  DNC used the loan proceeds to finance the purchase of wireless spectrum licenses and for general corporate purposes, including the 5G Network deployment.  The DNC 2021 Intercompany Loan matures in two tranches, with the first tranche of approximately $4.8 billion maturing on December 1, 2026 (the "2026 Tranche"), and the second tranche of approximately $2.8 billion maturing on December 1, 2028 (the "2028 Tranche").  The DNC 2021 Intercompany Loan was initially secured by interests in the Company's 3.45–3.55 GHz Licenses.  During the first quarter of 2025, in compliance with the 2021 Loan Agreement, certain of the 3.45–3.55 GHz Licenses were substituted for other previously unencumbered wireless spectrum licenses of equal or greater value (based on the most recent third-party valuation). Interest on the DNC 2021 Intercompany Loan accrues and is payable semiannually in cash.  As of the date hereof, the total amount outstanding under the DNC 2021 Intercompany Loan was approximately $7.6 billion plus accrued interest.

### 2.   DISH Wireless Debtors' Prepetition Capital Structure

As of the date of this Disclosure Statement, (a) DWLLC and DW Leasing guarantee DNC's obligations under the DNC Notes (as defined below) in the aggregate principal amount of $3.5 billion; (b) DWLLC is the borrower under the DWLLC Intercompany Loan in the aggregate amount of approximately $8.8 billion (inclusive of principal and accrued interest and net of $5 billion of prior loan forgiveness); and (c) DWLLC is the borrower under the Prepetition Secured Loan in the aggregate principal amount of $75 million.  Prior to the date of this Disclosure Statement, in accordance with the Restructuring Support Agreement, a Loan Agreement dated as of

November 1, 2024 in the borrowing principal amount of $4.50 billion from EchoStar Financing L.L.C. to DWLLC was extinguished in the amount of $3.89 billion.

### (a)  DNC Notes Guarantee

DWLLC and DW Leasing are guarantors under the 11.75% senior secured notes due 2027 issued by DNC in the aggregate principal amount of $3.5 billion (the "DNC Notes").  The DNC Notes are secured by the Company's 600 MHz spectrum licenses, which EchoStar has agreed to sell to AT&T under the AT&T License Purchase Agreement (as defined herein).  EchoStar is therefore required, at least ten (10) calendar days prior to the closing, to obtain and deliver to AT&T evidence that it has delivered a notice of redemption of all outstanding DNC Notes in accordance with the terms of the relevant indenture.  The DNC Notes will be redeemed substantially concurrently with the AT&T closing with proceeds of the AT&T Transactions, resulting in the termination or discharge in full of indebtedness under the indenture governing the DNC Notes.  For these reasons, the Plan provides that the DNC Notes will be redeemed in full on the AT&T closing date and no distributions shall be required or made on account of the DNC Notes under the Plan.

### (b)  DISH Wireless Debtors' Intercompany Loans and Obligations

From time to time prior to the date hereof, beginning in 2020, DNC extended intercompany loans to DWLLC, which were used to, among other things, build out the 5G Network (the "DWLLC Intercompany Loan").  On August 22, 2025, DNC memorialized these loans under the Loan Agreement with DWLLC on account of the DWLLC Intercompany Loan which, as of June 28, 2026, had an aggregate balance of $8,856,507,760.88, including principal and accrued interest, which reflects $5.0 billion of loan forgiveness as consideration for the contributions related to the Hybrid MNO transaction described above.[30]  The DWLLC Intercompany Loan matures on November 30, 2030.  Interest accrues at an annual rate of 11.50% and is payable monthly in kind (and after the second anniversary of the effective date, in cash or in kind).

As described above, DWLLC is the borrower under the Prepetition Secured Loan in the aggregate principal amount of $75 million.  The Prepetition Secured Loan is contemplated to be repaid in full upon the closing of the DISH Wireless Debtors' sale of substantially all of their assets, subject to Bankruptcy Court approval.

### (c)  Lease Obligations

DWLLC is party to long-term leases of non-residential real property, including communications towers, data centers, office space, warehouses and distribution centers, as well as operating and finance leases of vehicles and equipment.  The DISH Wireless Debtors became party to a significant portion of these long-term leases in connection with the deployment of the 5G Network.  In 2025, the DISH Wireless Debtors' rent under tower leases totaled approximately $567.8 million.  As described in this Disclosure Statement, DWLLC has asserted that, as a result of the FCC's actions in 2025, its performance obligations under these tower leases were excused from and after the date DWLLC sent notices informing contract counterparties that the FCC's actions constituted force-majeure events or otherwise excused DWLLC's performance obligations under applicable law, and DWLLC therefore discontinued deployment of the 5G Network.  In light

---

[30]   DNC, the lender under the DWLLC Intercompany Loan, is the indirect parent of BoostCo and DWLLC.

of the Company's transition to Hybrid MNO operations, the Company no longer has any business operations for which it can make use of these communication tower leases.

### E. The Debtors' Shared Services Obligations

In the ordinary course of their businesses, the Debtors rely on non-Debtor affiliates EchoStar, DNC, DISH Purchasing Corporation, and Echosphere L.L.C. ("Echosphere" and, collectively with EchoStar, DNC, and DISH Purchasing Corporation, the "Shared Services Providers") for the provision of certain operational, administrative, technological, and other corporate services that are critical to their business operations. Echosphere is the Company's employer of record and provides the Debtors with the necessary employees to operate their respective businesses. As part of this arrangement, DNC, on behalf of the Debtors, makes employee compensation and benefits payments to the employees that provide services to the Debtors. These payments include payments related to employee wages, health and welfare benefits, incentive programs, severance obligations, 401(k) plan contributions, paid leave benefits, workers compensation insurance and related obligations, additional fringe benefits, non-employee director compensation, and payroll and benefit program processing obligations. The Debtors, in turn, incur intercompany obligations to DNC in exchange for such payments.

The Debtors also benefit from a variety of services from third parties that the Shared Services Providers provide or arrange in the ordinary course of business, including certain tax services, insurance and surety bond services, utilities services, customer programs, and third-party vendor services, among others. The Shared Services Providers typically contract or engage with various third parties on the Debtors' behalf for the provision of essential shared business services to the Debtors. DNC makes payments to the Shared Services Providers or the third-party providers, as applicable. The Debtors do not incur obligations to pay these third parties directly but incur intercompany obligations to reimburse DNC for the shared business services the Debtors receive. The shared services arrangements by which the Debtors obtain (and in limited circumstances provide) shared services, as well as the resulting intercompany accounting by which the Debtors and non-Debtor affiliates record such intercompany activity, are memorialized in that certain Shared Services Agreement dated May 5, 2026 (the "Shared Services Agreement").[31]

As of the date of this Disclosure Statement, the DISH Wireless Debtors owe approximately $3.7 million to the Shared Services Providers in respect of their shared services obligations, and the DBS Debtors owe approximately $2.2 billion. The Debtors anticipate that they will file a motion to continue performing under their Shared Services Agreement with their non-Debtor affiliates substantially contemporaneously with the filing of the Chapter 11 Cases.

## VI. EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A. DBS Debtors' Prepetition Restructuring Initiatives

#### 1. Operational Challenges and Initiatives

---

[31] Substantially contemporaneously with the filing of the Chapter 11 Cases, the Debtors intend to file the Shared Services Motion (as defined herein) seeking authorization to continue operating under and to assume the Shared Services Agreement. See Article VII.B.2 of this Disclosure Statement for a discussion of the Debtors' anticipated Shared Services Motion.

The DBS Debtors' operations continue to generate significant revenue and cash flow for the Company.  Nevertheless, the DBS Debtors have faced numerous operational challenges in recent years associated with industry-wide cord-cutting, steadily increasing programming costs, and increased competition from streaming platforms.  After peaking at more than fourteen (14) million subscribers in 2014, the Company reported its first full-year net Pay-TV subscriber loss in 2015 and has since experienced consistent year-over-year decline, even with Sling TV's growth.  Since 2014, the Company's Pay-TV segment has lost roughly 7.3 million net subscribers.  As consumers increasingly migrate to on-demand streaming platforms and broadband-delivered content, linear channel bundles are perceived as expensive and inflexible.  Although Sling TV mitigates some losses by appealing to cord-cutters, it experiences higher churn than the satellite segment due to its month-to-month subscription model, which requires constant marketing and acquisition efforts to maintain subscriber levels.

In response to these operational challenges, the DBS Debtors have shifted from prioritizing gross subscriber counts to optimizing profitability per remaining subscriber.  For the satellite television business, the DBS Debtors have implemented various churn-management initiatives, such as targeted retention credits (rather than blanket discounts), selective short-term bill reductions or contract extensions for higher-value or long-tenured customers, improved customer service processes, and selective content packaging.  For Sling TV, the Company has moderated acquisition marketing spend to manage customer acquisition costs and has avoided excessive promotional pricing.

To manage high programming expenses, the Company has been forced to take a more aggressive posture in negotiations with broadcasters, occasionally accepting temporary takedowns rather than agreeing to inflated programming costs.  In parallel, the Company has adapted its programming packaging strategy and has placed high-cost channels in higher subscription tiers.  Other cost-cutting initiatives include reducing corporate staff, vehicle fleets, field and warehouse operations, and call-center staffing to reflect a smaller subscriber footprint.

### 2.      2024 Transactions and Bondholder Lawsuit

EchoStar acquired DNC and its subsidiaries, including DBS, in an all-stock merger closing on December 31, 2023.  Subsequently, the newly combined companies worked to integrate the EchoStar and DNC businesses in a manner that maximized synergies, cost savings, and growth opportunities.  In connection with such integration, EchoStar and DNC announced a series of transactions designed to unlock incremental strategic, financial, and operational flexibility for the combined business (the "January 2024 Transactions"), including: (a) an assignment of approximately 3 million pay-TV subscribers from DBS to its wholly owned subsidiary, DBS Issuer L.L.C. ("DBS SubscriberCo"), and the designation of DBS SubscriberCo as an unrestricted subsidiary; (b) an assignment by DBS of the receivable in respect of the 2026 Tranche of the DNC 2021 Intercompany Loan to an EchoStar subsidiary; and (c) the designation of certain DBS subsidiaries constituting the Sling TV business as unrestricted subsidiaries.  DBS also made a loan to DNC in connection with customary, ordinary-course cash management functions to support permitted business activities, as memorialized by an intercompany loan agreement maturing in 2028 (the "2024 Intercompany Loan").  On September 29, 2024, DBS SubscriberCo entered into a financing arrangement with certain outside investors who provided approximately $2.3 billion in secured debt and $200 million in preferred equity (the "DBS SubscriberCo Financing"), the proceeds of which were loaned to DBS primarily to repay in full approximately $2.0 billion of

DBS senior notes maturing in November 2024, with the remainder used for general corporate purposes, including the payment of interest on other DBS debt when due.

In April 2024, the indenture trustee for two series of DBS Notes, acting at the direction of certain bondholders, commenced a lawsuit (the "Bondholder Lawsuit"), which challenged the January 2024 Transactions. The Bondholder Lawsuit was commenced in the Supreme Court of the State of New York; the defendants removed it to the United States District Court for the Southern District of New York, where it was captioned *U.S. Bank Tr. Co. Nat'l Ass'n v. DISH DBS Corp.*, No. 1:24-cv-3646 (JGLC) (S.D.N.Y.). The complaint was amended twice, culminating in a second amended complaint that added DNC as a defendant and asserted claims for breach of the DBS Notes indentures and actual and constructive fraudulent transfer under the Colorado Uniform Fraudulent Transfer Act concerning: (a) the January 2024 Transactions; (b) the 2024 Intercompany Loans; and (c) the DBS SubscriberCo Financing (the "September 2024 Transactions"). The defendants moved to dismiss, arguing, among other things, that the complaint failed to adequately plead actual fraudulent intent, and that the challenged transactions were ordinary-course corporate restructuring transactions undertaken in connection with the post-merger integration of EchoStar and DNC. On August 21, 2025, the court granted Defendants' motion in part, dismissing plaintiff's fraud claims relating to the September 2024 Transactions without prejudice on the ground that Plaintiffs had alleged only speculative, rather than actual, injury arising from those transactions. As to the remaining claims, the Court found that the parties' disputes were principally factual in nature and could not be resolved on the pleadings, and accordingly denied the motion in part. After a period of discovery, the Bondholder Lawsuit was ultimately dismissed on March 20, 2026 pursuant to and in connection with the Restructuring Support Agreement.

### 3. DirecTV Transaction

The Company also pursued a strategic transaction to address the structural mismatch between declining pay-TV revenue and high fixed debt service obligations. On September 29, 2024, the Company entered into that certain Equity Purchase Agreement with DirecTV, under which DirecTV would have acquired all of the Company's issued and outstanding equity interests in DBS for a package of consideration that included the assumption of all of DBS's outstanding debt (totaling more than $10 billion) via a series of exchange offers and, subject to closing conditions (including government approvals and the successful completion of related debt-exchange offers made to holders of DBS Notes.) If consummated, the deal with DirecTV would have reduced the Company's consolidated pay-TV debt by an estimated $11.7 billion and significantly mitigated near-term refinancing needs. Ultimately, holders of DBS Notes rejected the proposed debt exchange, and DirecTV terminated the Equity Purchase Agreement on November 22, 2024 because the exchange offer was not consummated by the applicable outside date.

### B. DISH Wireless Debtors' Prepetition Regulatory Challenges

### 1. The Company's Wireless Spectrum Licenses

In 2008, the Company began strategically acquiring spectrum licenses at auction from the FCC to assemble a nationwide portfolio of low-band and mid-band spectrum (including AWS-3 and AWS-4 mid-band holdings) intended to support future mobile broadband and voice services. The Company also acquired spectrum licenses through strategic acquisitions, including its acquisition of reorganized DBSD North America, Inc. and substantially all of the assets of TerreStar Networks, Inc. through their respective bankruptcy proceedings in 2011 and 2012.

Beginning in 2018, T-Mobile sought regulatory approval of its acquisition, which would have reduced the number of facilities-based wireless carriers in the United States from four to three.  The United States Department of Justice ("DOJ") and the United States District Court for the District of Columbia agreed that the merger would harm competition in violation of antitrust laws.  As a condition to approval of the merger, the DOJ required T-Mobile and Sprint to sell sufficient assets to maintain and promote the existence of a fourth facilities-based carrier.  The Company stepped in as that fourth carrier, acquired certain assets and liabilities associated with Boost Mobile from Sprint in July 2020 for $1.4 billion, subject to working-capital adjustments, and subsequently commenced the buildout of its own 5G Network.

In connection with the government's approval of the merger and the Boost Mobile sale, the FCC imposed on the Company a complex set of commitments and milestones governing the 5G Network deployment.  If the Company failed to meet the buildout commitments and milestones, it would risk forfeiting its licenses and incurring fines of up to $2.2 billion.  Despite a global pandemic, severe supply chain disruptions, and inflation, the Company timely met all of its commitments and each of these milestones (as such milestones have been extended from time to time).  These included meeting band-specific 5G commitments, as well as nationwide commitments to deploy a 5G network with download speeds equal to or greater than 35 megabits per second to at least 70% of the United States population with a minimum of 15,000 sites, as verified by a drive test overseen by a third party using a methodology approved by the FCC Wireless Bureau.

In total, the Company invested more than $46 billion to deploy and operationalize its 5G Network.  The Company invested more than $30 billion to acquire wireless spectrum licenses, including at FCC auctions (excluding $10 billion of capitalized interest related to the carrying value of such licenses).  In addition, the Company invested more than $16 billion (including approximately $13 billion paid by DWLLC and certain of its subsidiaries) to construct the extensive network infrastructure needed to deploy the Company's wireless spectrum, including more than 144,000 radios installed on over 24,000 5G cell sites throughout the United States.

During the 5G Network deployment, the Company was also transitioning from operating primarily as a mobile virtual network operator ("MVNO") to a mobile network operator ("MNO").  An MVNO is a wireless carrier that does not own its own radio spectrum and physical network infrastructure.  Instead, it purchases wholesale network access from one or more facilities-based carriers and resells that connectivity to its own subscribers under its own brand.  An MNO, by contrast, owns and operates its own licensed spectrum and physical network infrastructure, enabling it to deliver wireless services directly to subscribers over its own facilities without relying on a third-party carrier's network.  Pending the completion of the Company's 5G Network deployment, only a portion of the Company's wireless subscribers were on its 5G Network, with the Company relying on T-Mobile and AT&T to carry a large portion of its subscribers' voice and data traffic over those carriers' respective networks.  The Company was in the process of transitioning to operating primarily as an MNO as the buildout proceeded and coverage of the network grew, delivering wireless services to its subscribers entirely over its own licensed spectrum and physical infrastructure.

    **2.**    **The FCC Grants the Company's Request to Accelerate or Extend Certain Deadlines**

In connection with T-Mobile's acquisition of Sprint, the FCC updated the buildout deadline for certain of the Company's wireless spectrum licenses to June 14, 2025. The Company was required to make 5G wireless broadband available to either 70% or 75% of the regional population, depending on the license type, within the geographic footprint for each of the vast majority of the Debtors' 600 MHz, Lower 700 MHz E Block, AWS H Block, and AWS-4 licenses on or before such deadline. Separately, the Company was also required to make 5G wireless broadband available to 75% of the regional population within the geographic footprint for nearly all of its AWS-3 licenses by October 27, 2025. These commitments required substantial investments, as the Company estimated that it would need to deploy 15,000–20,000 additional cell sites to satisfy the FCC's coverage requirements, among other reasons, because many of the Company's AWS-3 licenses covered rural areas that are among the hardest and most expensive to cover in the United States. While the Company was prepared to continue to meet the then-existing FCC requirements, it became apparent to the Company that the best use of available resources to achieve its business objectives and promote stronger competition would be to strengthen and densify the 5G Network in the markets and geographies that were already being served by the 5G Network.

On September 17, 2024, the Company submitted a request to the FCC for the conditional extension of the final buildout deadlines related to various wireless spectrum licenses (the "2024 Extension Request"). Specifically, the 2024 Extension Request sought to conditionally extend the construction milestones associated with certain of its AWS-4, Lower 700 MHz E Block, 600 MHz, AWS-3, and AWS H Block licenses so that the Company could optimize its buildout for maximum competitive impact, which would serve the public interest by allowing it to deploy higher quality service in the most populous markets. In exchange for the proposed extensions, the Company committed to additional milestones that went beyond the requirements of T-Mobile's acquisition of Sprint, including to:

(a)     accelerate the deployment of its 5G Network so that it would cover over 80% of the United States population by December 31, 2024 ("Commitment 1");

(b)     accelerate and expand the final construction milestones for certain of the AWS-4 licenses, H Block licenses, 700 MHz licenses, and 600 MHz licenses to require EchoStar to provide 5G broadband service to 85% of the population in each respective license by December 31, 2024, and modify the final construction milestones to require EchoStar to provide reliable signal coverage and offer service to 85% of the population in specific AWS-3 license areas by December 31, 2024 ("Commitment 2");

(c)     accelerate and expand the final construction milestones for additional AWS-4 licenses, H Block licenses, 700 MHz licenses, and 600 MHz licenses to require EchoStar to provide 5G broadband service to 80% of the population in each respective license by December 31, 2024, and modify the final construction milestones to require EchoStar to provide reliable signal coverage and offer service to 80% of the population in additional specific AWS-3 licenses by December 31, 2024 ("Commitment 3");

(d)     provide a nationwide affordable 5G plan and devices to consumers for the duration of the extension period ("Commitment 4");

(e)     deploy 24,000 5G sites by June 14, 2025 (a 60% increase in 5G site obligations) ("Commitment 5");

(f)      upgrade the deployed 5G sites to a next-generation 5G standard (3GPP Release 17) by June 14, 2025 ("Commitment 6"); and

(g)      load at least 75% of new subscribers with compatible devices on EchoStar's MNO network in accelerated markets ("Commitment 7").

The Company also agreed to permit small carriers and tribes to lease the Company's spectrum in the license extension areas.

Only upon fulfilling the accelerated and expanded milestones would the targeted extensions proposed in the 2024 Extension Request go into effect. Specifically, the 2024 Extension Request provided that, if EchoStar fulfilled Commitments 2 and 3, the final construction milestones for (a) certain of the AWS-4, AWS H Block, Lower 700 MHz E Block, and 600 MHz licenses would be further extended from June 14, 2025 to December 14, 2026, and (b) certain of the AWS-3 licenses would be extended from October 27, 2025 to December 14, 2026.

The 2024 Extension Request explained that, in addition to the greater public interest commitments proposed by the Company's new obligations, the proposed milestone adjustments promoted the FCC's public interest objectives by increasing competition in the markets in which the Company would accelerate its commitments. On September 20, 2024, the FCC Wireless Bureau accepted and approved the 2024 Extension Request (the "2024 Extension Grant").

### 3.      The Company Dedicates Significant Resources and Capital to Satisfy Its Accelerated Commitments

The Company accelerated its efforts and the pace of its buildout to successfully meet the expanded commitments by the December 31, 2024 deadline to obtain an extension to June 2028. The Company invested significant capital and prioritized its resources in markets subject to accelerated and expanded commitments, and away from markets where the Company's obligations had been deferred under the 2024 Extension Grant.

The Company successfully fulfilled Commitments 1–4 by December 31, 2024, thereby extending the final buildout milestones for 1,173 wireless spectrum licenses to December 14, 2026. The Company certified completion of these commitments on January 10, 2025 in a buildout report it submitted to the FCC. The Company further certified completion of Commitment 5 on May 5, 2025, Commitment 6 on March 17, 2025, and Commitment 7 on June 17, 2025. The Company repeatedly met with the FCC Wireless Bureau to walk through the supporting documentation and address any questions, consistent with the FCC Wireless Bureau's practice when reviewing regulated entities' compliance with FCC milestones.

Under the 2024 Extension Grant, satisfaction of each commitment triggered the extension of the final buildout milestones for 1,173 wireless spectrum licenses from June 14, 2025 to December 14, 2026—and, ultimately, to June 14, 2028.

### 4.      The May 2025 FCC Letter and the Public Notices

On May 9, 2025, the FCC Chairman sent the May 2025 FCC Letter informing the Company that FCC staff had been directed to begin reviewing and investigating the Company's (a) compliance with its federal obligations to provide 5G service throughout the United States per the

58

terms of its wireless spectrum licenses, and (b) mobile satellite service ("MSS")[32] utilization in the 2 GHz Band. The May 2025 FCC Letter questioned the 2024 Extension Grant that the FCC Wireless Bureau had issued merely eight months earlier under the previous administration.

On May 12, 2025, the FCC issued two separate public notices. The first was the FCC Wireless Bureau's request for comment on a petition by another telecommunications company that had sought reconsideration of the 2024 Extension Grant. The second was issued by the FCC Space Bureau seeking comment on the current status of the Company's MSS operations in the 2 GHz Band, including information on whether the Company was utilizing the 2 GHz Band for MSS and on the steps the FCC might take to support more intensive use of the 2 GHz Band, such as by allowing new MSS entrants into that band.

The May 2025 FCC Letter and subsequent issuance of the public notices caused significant uncertainty regarding the Company's spectrum rights, including with respect the spectrum licenses necessary to operate the 5G Network. If the FCC were to reverse the 2024 Extension Grant—which would reinstate the milestones in place before the FCC granted the 2024 Extension Request—it could have resulted in the termination of hundreds of the Company's wireless spectrum licenses and the MSS authorizations because the Company had not satisfied the 2025 milestones that were subsequently extended under the 2024 Extension Grant, and no longer had sufficient time to do so. In addition, if the FCC opened the 2 GHz Band to other licensees, it would have upended decades of FCC precedent and caused severe interference with the Company's MSS operations in the 2 GHz Band.

In comments filed with the FCC and meetings among FCC representatives and the Company, the Company set forth that it had invested tens of billions of dollars to deploy the 5G Network, which was capable of providing broadband service to more than 268 million people nationwide, created tens of thousands of American jobs, was a competitive alternative to incumbent wireless carriers, and helped ensure that the United States is at the forefront of wireless leadership. The Company further explained that the extended buildout deadlines adopted by the FCC Wireless Bureau enhanced its network's scope and its ability to provide competitive alternatives for consumers, that EchoStar had fulfilled its commitments in exchange for the 2024 Extension Grant, and that the 2024 Extension Grant was consistent with long-standing FCC precedent. The Company also explained that the 2 GHz band must remain exclusively with EchoStar because sharing was not technically feasible and would cripple EchoStar's present and planned terrestrial and MSS operations, all to the detriment of competition.

### 5. The Company Delays Certain Interest Payments

As EchoStar observed in its filings with the FCC, the May 2025 FCC Letter and resulting public notices "created a dark cloud of uncertainty over EchoStar's spectrum rights and its . . . 5G network. This cloud . . . effectively froze[] EchoStar's decision making—it cannot reasonably invest more capital into a buildout if the Commission indicates it may take away its licenses through unprecedented actions."[33] Given this uncertainty, the Company delayed making certain

---

[32]  MSS authorizations allow the Company to deploy integrated satellite and terrestrial wireless communications networks that provide users with seamless two-way coverage through traditional land-based wireless networks when in range and satellites communications when not in range.

[33]  EchoStar Corp., Comments of EchoStar Corporation, SB Docket No. 25-173, WT Docket No. 22-212 (Fed. Commc'ns Comm'n May 27, 2025).

interest payments on the Company's funded debt, consistent with the Company's rights under the applicable debt documents. Specifically, in late May and early June 2025, EchoStar and DBS elected not to make scheduled interest payments under certain of their outstanding notes, thereby entering applicable thirty (30)-day grace periods, to allow time for EchoStar to gather information and assess its alternatives on a more informed basis. In July 2025, DBS again elected not to make scheduled interest payments on additional series of DBS Notes, likewise entering applicable thirty (30)-day grace periods. Prior to the expiration of each applicable grace period, EchoStar and DBS, as applicable, made the scheduled interest payments, in each case including interest on the defaulted interest, before any such non-payment would constitute an event of default under the relevant indentures.

6.     **The Company Engages in Discussions with the FCC Regarding Potential Pathways to Resolve the FCC's Stated Concerns**

After the Company disclosed that it had elected not to make cash interest payments on certain outstanding notes, the FCC agreed to meet with the Company. In June 2025, EchoStar representatives held a series of meetings and calls with the FCC Chairman and his staff regarding the Company's spectrum holdings.

During these meetings, the FCC communicated its position that the Company's spectrum was being underutilized and that the Company's continued ownership of such wireless spectrum licenses was inconsistent with the public interest. As a result, the FCC asserted that EchoStar needed to exit the terrestrial wireless business.

On June 12, 2025, EchoStar representatives met with President Trump, who encouraged the parties to reach an amicable resolution. In a subsequent meeting with the FCC Chairman, EchoStar was directed to sell a substantial portion of its wireless spectrum licenses on an expedited time frame. During the ensuing weeks, the FCC repeatedly pressed EchoStar to accelerate the pace of negotiations and expand the scope of any proposed sale, rejecting EchoStar's initial proposals as insufficient.

In sum, in the discussions between EchoStar representatives and the FCC, including the Chairman and his staff, the FCC made clear its intent to terminate a wide range of the Company's spectrum licenses, including those necessary to operate the 5G Network, unless the Company sold such licenses in the secondary market.

C.     **The Company's Prepetition Wireless Spectrum License Sales**

After extensive meetings with and input from the FCC, in the third quarter of 2025, the Company entered into transactions with AT&T and SpaceX to sell a material portion of its wireless spectrum licenses.[34] Shortly after these agreements were announced, the FCC concluded its investigation of EchoStar's compliance with its buildout obligations.

---

[34]   The following summaries of the terms of the AT&T Transactions and SpaceX Transactions (each as defined in this Disclosure Statement) are qualified in their entirety by reference to the applicable provisions of the AT&T License Purchase Agreement, Original SpaceX License Purchase Agreement, and A&R SpaceX License Purchase Agreement (each as defined in this Disclosure Statement). To the extent of any inconsistency between these summaries and the terms of the applicable transaction documents, the terms of the applicable transaction documents will control.

### 1. The AT&T Transactions

On August 25, 2025, the Company and AT&T entered into a License Purchase Agreement (the "AT&T License Purchase Agreement," and the transactions contemplated thereby, the "AT&T Transactions"). Pursuant to the terms of the AT&T License Purchase Agreement, the EchoStar and certain of its non-Debtor affiliates agreed to sell the Company's 3.45–3.55 GHz and 600 MHz wireless spectrum licenses to AT&T, and to grant a 99-year extension of existing leases for AT&T's exclusive use of certain wireless spectrum licenses in Hawaii, for an aggregate purchase price of approximately $23 billion in cash, subject to certain potential adjustments (the "AT&T Purchase Price"). The AT&T License Purchase Agreement also extends to AT&T the right to lease certain additional 3.45 GHz licenses from the Company, which AT&T exercised at the end of the third quarter of 2025. The AT&T Purchase Price was subject to downward adjustment if certain 3.45 GHz and 600 MHz licenses were ultimately excluded by either the Company or AT&T from the sale. The Company was not obligated to consummate the sale to AT&T if the AT&T Purchase Price, after giving effect to the aggregate amount of any such adjustments, would be less than $18.6 billion. In that case, AT&T could still elect to proceed by paying a minimum cash purchase price of at least $18.6 billion. The consummation of the AT&T Transactions is subject to the satisfaction or waiver of additional customary closing conditions, including obtaining approvals from the FCC and DOJ. As of the date of this Disclosure Statement, the closing of the AT&T Transactions has yet to occur.

### 2. The SpaceX Transactions

On September 7, 2025, the EchoStar, SpaceX, and Spectrum Business Trust 2025-1 (the "Spectrum Trust"), entered into a License Purchase Agreement (the "Original SpaceX License Purchase Agreement" and the transactions contemplated thereby and by the A&R SpaceX License Purchase Agreement (as defined below), the "SpaceX Transactions"). Pursuant to the terms of the Original SpaceX License Purchase Agreement, the Company agreed to sell to SpaceX the Company's rights and licenses related to an aggregate of 50 MHz of spectrum in frequency ranges 2000–2020, 2180–2200, 1915–1920, and 1995–2000 (the "AWS-4 and H-Block Licenses"), together with certain international authorizations and rights for that spectrum and certain related assets (collectively, the "Foreign Assets"). The transfer of the AWS-4 and H-Block Licenses occurs in two steps, the first of which has already occurred: first, the AWS-4 and H-Block Licenses were transferred by the Company to the Spectrum Trust (the "Spectrum Transfer Closing") on May 22, 2026, and second, the AWS-4 and H-Block Licenses will be transferred by the Spectrum Trust to SpaceX (the "Spectrum Acquisition Closing"). The Foreign Assets will be transferred directly to SpaceX at the Spectrum Acquisition Closing, to the extent that required regulatory approvals have been obtained by such date.

The consideration for the SpaceX Transactions payable at the Spectrum Acquisition Closing is $17 billion, comprised of up to $8.5 billion of cash and up to $8.5 billion of SpaceX stock at a per share price of $212.00 as adjusted for stock dividends, splits, or reorganization (the "Total Consideration Amount"). A portion of the Total Consideration Amount will be used to: (a) fully pay off all outstanding amounts owed on certain secured notes issued by EchoStar due in 2029 and 2030, which are secured by the Company's AWS-4 and AWS-3 licenses (respectively, the "EchoStar Secured 2029 Notes" and "EchoStar Secured 2030 Notes"), and (b) settle the anticipated redemption and conversion of certain convertible notes issued by EchoStar (the "EchoStar Convertible Notes," and, together with the EchoStar Secured 2029 Notes and EchoStar

61

Secured 2030 Notes, the "Seller Notes").  The remaining amount after paying off the Seller Notes (the "Purchase Price") will be paid by SpaceX to EchoStar as follows:  (i) up to $8.5 billion will be paid in SpaceX's Class A Common Stock (the "Equity Amount"); and (ii) any amount exceeding $8.5 billion will be paid in cash.  If the amount necessary to pay off the Seller Notes exceeds $8.5 billion, the Company may elect to pay the excess using cash, the Company's Class A Common Stock (with respect to the EchoStar Convertible Notes), or both, to maintain its receipt of the full Equity Amount.  If the Company elects not to pay such excess amount, the Equity Amount will be reduced dollar-for-dollar to ensure that the combined Equity Amount and amounts necessary to pay off the Seller Notes do not exceed the Total Consideration Amount.  As of December 31, 2025, the aggregate principal amount outstanding of the Seller Notes was $9.821 billion.

On November 5, 2025, EchoStar, SpaceX, and the Spectrum Trust entered into an Amended and Restated License Purchase Agreement (the "A&R SpaceX License Purchase Agreement" and, together with the "Original SpaceX License Purchase Agreement, the "SpaceX License Purchase Agreement").  Pursuant to the A&R SpaceX License Purchase Agreement, EchoStar agreed to transfer up to an aggregate of 15 MHz of AWS spectrum in the frequency range of 1695–1710 MHz for each relevant license area to SpaceX in exchange for additional consideration of $2.6 billion, all of which will be paid in SpaceX's Class A Common Stock.  As a result of this change, the total consideration for the SpaceX Transactions increased from $17 billion to $19 billion with up to $11 billion to be paid in SpaceX's Class A Common Stock at a per share price of $212.00 as adjusted for stock dividends, splits, or reorganization.  The material terms of the A&R SpaceX License Purchase Agreement are otherwise substantially the same as the terms of the Original SpaceX License Purchase Agreement.

Following the approval of the transactions by the FCC Wireless Bureau and FCC Space Bureau, the first step of the SpaceX Transactions, the Spectrum Transfer Closing, occurred on May 22, 2026.  At the Spectrum Transfer Closing, EchoStar and its licensing subsidiaries executed and delivered assignment and assumption instruments to convey the licenses comprising the AWS-4/H-Block Licenses and the AWS-3 Licenses to the Spectrum Trust, making the Spectrum Trust the interim license holder.  Concurrently with the Spectrum Transfer Closing, SpaceX funded the Spectrum Trust, and the Spectrum Trust, in turn, paid EchoStar an amount equal to the interest accrued on the Seller Notes from June 1, 2025 through the Spectrum Transfer Closing Date, plus the applicable "Make-Whole Amount" in the amount of $432,034,989.24.  Following the Spectrum Transfer Closing, the Spectrum Trust is required to service ongoing interest payments on the Seller Notes from funds contributed by SpaceX.

The Spectrum Acquisition Closing is expected to occur on or about November 30, 2027, following the expiration of the make-whole period for the Seller Notes and the date on which the EchoStar Convertible Notes become eligible for redemption.  If SpaceX elects to proceed with the Spectrum Acquisition Closing prior to November 30, 2027, SpaceX will be responsible for any additional amounts required to satisfy the Seller Notes, other than additional amounts payable as a result of any potential default under the Seller Notes.

The completion of the SpaceX Transactions is subject to the satisfaction or waiver of customary closing conditions.  The SpaceX License Purchase Agreement also includes specified termination rights.

Finally, the SpaceX License Purchase Agreement provides for future long-term commercial agreements that will enable the Company to offer its wireless subscribers access to SpaceX's next-generation Starlink "Direct to Cell" text, voice, and broadband services, which will utilize certain rights and licenses related to the spectrum to be conveyed by the Company to SpaceX at the Spectrum Acquisition Closing. The commercial agreements will also provide for a fee-based referral program that lets the Company refer existing HughesNet customers and new Starlink customers to SpaceX.

### 3.      Resolution of the FCC Investigation

On September 8, 2025, one day after EchoStar announced its entry into the Original SpaceX License Purchase Agreement, the Company received a follow-up letter from the FCC Chairman, which stated as follows:

> Earlier this year, I wrote a letter notifying you that I had asked FCC staff to investigate EchoStar's compliance with its buildout milestones and other obligations regarding the company's federal spectrum licenses. . . .

> I have appreciated your responses, engagement, and information provided since my original letter.

> Accordingly, I have asked FCC staff to bring the agency's investigation to conclusion. In particular, I have directed FCC staff to: (1) dismiss VTel's petition for reconsideration; (2) confirm that EchoStar holds exclusive terrestrial and MSS rights over the AWS-4 spectrum to which it is currently licensed; and (3) find that relevant FCC buildout and other related obligations have been satisfied by EchoStar in view of the company's current FCC milestones.

### 4.      Transition to Hybrid MNO

As a result of the FCC-directed sales of spectrum licenses to AT&T and SpaceX, DWLLC could no longer operate the 5G Network. Neither DWLLC nor any of its current or former subsidiaries owned (or had previously owned) the spectrum licenses being sold to AT&T and SpaceX and accordingly the DISH Wireless Debtors were not entitled to any of the proceeds of these transactions. Furthermore, because the FCC-directed sales involved spectrum licenses that were necessary to the 5G Network, the Company was forced to transition its Boost Mobile subscribers to third-party networks and to convert its operations to those of a Hybrid MNO[35] under which the Company would continue to control the subscriber relationship and process calls, texts and data through its cloud-native 5G core, but would rely on AT&T's physical network (including its towers, antennas, radios, radio access network software, and spectrum frequencies), to primarily carry the traffic. To protect against customer disruption and support this wholesale change to its business plan, in August 2025, DWLLC contributed certain vendor contracts, liabilities, and core network assets to BoostCo in exchange for $5.0 billion of debt forgiveness under the intercompany loan from DNC, the indirect parent company of both DWLLC and BoostCo, to DWLLC. As a result of this Hybrid MNO transaction, the Company's wireless business split into two distinct

---

[35]    A Hybrid MNO is a telecom provider that owns and operates certain core network functions—such as the software systems that authenticate subscribers and process calls, texts and data—while relying on third-party carriers to provide the spectrum frequencies and cell sites that receive, deliver to subscribers' devices and transmit to the core the wireless signals.

segments: (a) the go-forward Hybrid MNO operated by BoostCo and (b) the assets associated with the 5G Network deployment, which are held by the DISH Wireless Debtors.  The Hybrid MNO remains fully operational through BoostCo and continues to deliver uninterrupted service to its millions of customers nationwide.  As discussed herein, the DISH Wireless Debtors' remaining assets are contemplated to be transitioned pursuant to the terms of the Plan.

### 5. 5G Network Decommissioning

In September 2025, shortly after EchoStar's entry into the AT&T Transactions and SpaceX Transactions, under which the spectrum licenses necessary to operate the 5G Network were agreed to be sold, and the closing of the FCC's investigation, DWLLC began the decommissioning process for the portions of its 5G Network that will not be utilized in its Hybrid MNO operations.  As a result of these sales, which encompassed only the spectrum licenses and none of the 5G Network infrastructure and the resulting transition to Hybrid MNO operations, which was necessary to ensure continuity of service to customers, DWLLC had no need for—and was rendered incapable of performing obligations under—the agreements relating to the 5G Network, including tower leases.  These decommissioning efforts have included removing software from cell site equipment, turning down communications circuits and electrical connections, and deploying field personnel to remove certain of the DISH Wireless Debtors' equipment from the former 5G Network sites and storing or disposing of such equipment as appropriate via various warehouse facilities.

As more fully discussed in this Disclosure Statement, including Article VI.G below, the DISH Wireless Debtors intend to sell substantially all of their assets to EchoStar as the stalking horse bidder or to any party that submits a bid determined to be higher or better than EchoStar's proposal.  Substantially concurrently with the filing of the Chapter 11 Cases, the DISH Wireless Debtors intend to file a motion with the Bankruptcy Court seeking an order, among other things, (a) approving bidding procedures with respect to the sale of the DISH Wireless Debtors' assets, (b) scheduling certain dates with respect to the sale, (c) approving the form and manner of related notices, (d) authorizing entry into a stalking horse agreement with EchoStar, (e) authorizing the sale of assets free and clear of liens, claims, interests, and encumbrances, and (f) granting related relief.[36]

### 6. Tower Lease Litigation

Given the immense undertaking of building out the 5G Network from scratch, DWLLC had entered into thousands of agreements with tower lessors and other vendors, including for fiber backhaul services, equipment (including servers, lithium-ion batteries, radios, and antennae, data centers), and for other goods and services.  DWLLC entered into these agreements in reliance on a straightforward principle, supported by longstanding FCC practice: DWLLC could safely invest the billions of dollars needed to operate the 5G Network so long as EchoStar remained in compliance with milestones it negotiated at length with the FCC.  However, the FCC's unprecedented directive that EchoStar sell or forfeit its spectrum licenses—despite having complied with all of its buildout obligations—disrupted these well-founded expectations.  DWLLC had no choice but to abandon its plan, as without wireless spectrum, it is not possible to deploy or operate a radio access network.

---

[36]   For further discussion of the anticipated sale of the DISH Wireless Debtors' assets, see Articles III.D and VI.G of this Disclosure Statement.

Beginning in September 2025, DWLLC sent notices to its tower lessors and other 5G Network contract counterparties asserting that the unforeseeable actions taken by the FCC outside of DWLLC's control and the resulting spectrum sales constituted one or more events of force majeure under the applicable agreements, frustrated the principal purpose of such agreements, and rendered DWLLC's performance commercially impracticable.  In each of these notices, DWLLC expressed its willingness to discuss a mutually acceptable resolution, and DWLLC has reached settlements with hundreds of 5G Network claimants.  Many claimants have disputed DWLLC's defenses, and more than 170 lawsuits have been filed against DWLLC by tower lessors and other 5G Network counterparties.  These lawsuits generally assert claims for breach of contract or unlawful detainer and seek declaratory relief, damages, and possession of property with respect to DWLLC's purported performance obligations under 5G Network leases and other contracts following EchoStar's entry into the AT&T License Purchase Agreement and the SpaceX License Purchase Agreement.  In particular, these plaintiffs seek damages for, among other things, unpaid rent, future rent obligations, equipment removal costs, and other amounts allegedly owed under the applicable agreements.  In the aggregate, the asserted damages in these tower lease and infrastructure-related actions total more than $6 billion dollars, far exceeding the DWLLC's available assets and ability to pay.  DWLLC continues to vigorously defend against and dispute these claims.

Six lawsuits also name EchoStar as a defendant and assert claims for tortious interference with contract, alleging that EchoStar intentionally and improperly directed DWLLC to repudiate its contractual obligations to counterparties through baseless invocations of force majeure, frustration of purpose, and impossibility.  EchoStar has filed motions to dismiss in two of these actions, both pending in the District of Colorado.  Approximately 85 of these cases have advanced past the pleading stage into the early stages of discovery. There are currently three dispositive motions pending: a motion for judgment on the pleadings against DWLLC in *SBA Telecommunications, LLC et al v. DISH Wireless L.L.C.*, Docket No. 1:26-cv-00218 (W.D.N.Y. Feb 05, 2026), and motions to dismiss filed on behalf of EchoStar in *Aircomm of Avon, L.L.C. et al v. DISH Wireless LLC*, Docket No. 1:25-cv-03756 (D. Colo. Nov 20, 2025) and *Comcast Business Communications, LLC v. DISH Wireless L.L.C. et al*, Docket No. 1:26-cv-00824 (D. Colo. Feb 27, 2026).  Discovery is also underway in several actions, though it is in the preliminary stages. On March 2, 2026, DWLLC filed a motion with the Judicial Panel on Multidistrict Litigation (the "JPML") seeking transfer and consolidation of 10 pending federal actions into a single multidistrict litigation proceeding in the District of Colorado.  On June 4, 2026, the JPML denied DWLLC's motion because "[t]he limited factual overlap among these actions is overshadowed by numerous case-specific factual and legal questions." *In re DISH Wireless L.L.C. Commc'n Towers Contract Litig.*, MDL No. 3182, ECF No. 106 at 2 (J.P.M.L. June 4, 2026).

### 7.    Appointment of Independent Managers

On February 16, 2026, Gerard Uzzi and Vikram Jindal were appointed to the Board of Managers of DWLLC as the Independent Managers.  On March 3, 2026, the Board of Managers (excluding the Independent Managers) unanimously approved the formation and appointment of the DWLLC Special Committee comprised of the Independent Managers, having concluded that the Independent Managers possess no material business relationships, close personal relationships, or other affiliations, or any history of any such material business relationships, close personal relationships, or other affiliations, with the Company or any of its related parties that would cause either of them to be unable to (a) exercise independent judgment based on the best interests of the

65

Company or (b) make decisions and carry out their responsibilities as members of the Board of Managers, in accordance with the terms of DWLLC's operating agreement and applicable law.

The Board of Managers delegated to the DWLLC Special Committee the tasks of: (a) reviewing and evaluating DWLLC's capital structure, assets, liabilities, operations, liquidity, and general financial condition and considering, evaluating, and negotiating financing transactions, restructuring transactions, and/or other strategic alternatives for DWLLC and its stakeholders, including the possibilities of undertaking a strategic, restructuring, financing, and/or any sale transaction or series of such transactions (each, a "Transaction") involving DWLLC or its subsidiaries, and approving and implementing any such Transaction, in each case to the extent that the Board of Managers or the DWLLC Special Committee reasonably determines that such matter or matters present an actual or potential conflict of interest between DWLLC or its subsidiaries, on the one hand, and EchoStar or one or more of its subsidiaries (other than DWLLC or its subsidiaries), on the other hand; (b) conduct an independent investigation and assess the merits and potential value of any potential claims and causes of action held by DWLLC or its subsidiaries against one or more of EchoStar or its subsidiaries (other than DWLLC or its subsidiaries); and (c) take any and all actions necessary or desirable in connection with the foregoing, including the authority to retain independent advisors.  The DWLLC Special Committee retained Dentons US LLP as its counsel to advise and support the DWLLC Special Committee in the discharge of its duties pursuant to an engagement letter dated March 11, 2026.  DWLLC also retained FTI Capital Advisors, LLC ("FTICA") to advise on one or more Transactions pursuant to an engagement letter dated June 17, 2026.  FTICA is working at the direction of the Special Committee to market the DISH Wireless Debtors' assets.

The Special Committee commenced an investigation relating to the Stalking Horse APA described in greater detail in Article VI.G of this Disclosure Statement.  Under the Stalking Horse APA, the DISH Wireless Debtors are proposing to sell substantially all of their assets to EchoStar (as Stalking Horse), subject to higher or better bids.  The Special Committee, with the assistance of Dentons, is actively assessing the existence of potential Claims or Causes of Action that the DISH Wireless Debtors may hold against certain insiders and other affiliated Entities, whether the DISH Wireless Debtors should sell such Claims and Causes of Action, and, if so, whether the consideration under the Stalking Horse APA provides sufficient value in exchange for such Claims and Causes of Action.  The DISH Wireless Debtors, at the direction of the Special Committee, reserve the right to exercise their "fiduciary out" in accordance with the terms of the Stalking Horse APA based on the results of the Special Committee's investigation.

### D. Negotiations with the Ad Hoc Group and Entry into the Restructuring Support Agreement

In October 2025, the Company initiated discussions with advisors to the Ad Hoc Group with the objective of  exploring a global resolution of the disputes among the parties (including the resolution and dismissal of the Bondholder Lawsuit) and deleveraging the DBS Debtors' balance sheet while gaining additional flexibility to explore and consummate strategic M&A transactions.  In November 2025, the Company and Steering Committee of the Ad Hoc Group entered into nondisclosure agreements, and the parties commenced several months of negotiations regarding the terms of such a global restructuring deal.

On March 19, 2026, after several months of negotiations, the DBS Debtors and an initial group of Consenting Creditors holding 82% in aggregate principal amount of DBS Notes entered

into the Restructuring Support Agreement.  The Restructuring Support Agreement is now supported by more than 88% of such holders.  A copy of the Restructuring Support Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.[37]

The Debtors believe that the restructuring transactions set forth in the Restructuring Support Agreement provide the DBS Debtors with a right-sized balance sheet and enhanced flexibility to pursue potential strategic transactions to maximize the value of their business for the benefit of their stakeholders.  As set forth in the following table, the Restructuring Support Agreement provides, as of the Effective Date, for the reduction of the aggregate principal balance of the DBS Debtors' funded debt from $9.75 billion to $5.0 billion, as such balance may be further reduced by application of the DBS Cash Sweep, which will be applied to redeem the 2028 Senior Secured Notes at par to the extent of DBS's "Available Cash" in excess of $500 million commencing with the fiscal quarter ended March 31, 2027.

| Pre- and Post-Emergence Capital Structure | | |
| --- | --- | --- |
| DBS Notes | Prepetition Principal Amount | Post-Emergence Principal Amount |
| 2026 Senior Secured Notes | $2,750,000,000 | $0.00 |
| 2026 Senior Notes | $2,000,000,000 | $0.00 |
| 2028 Senior Secured Notes | $2,500,000,000 | $2,500,000,000 |
| 2028 Senior Notes | $1,000,000,000 | $1,000,000,000 |
| 2029 Senior Notes | $1,500,000,000 | $1,500,000,000 |
| **Total** | **$9,750,000,000** | **$5,000,000,000** |

\* 2028 Senior Secured Notes to be redeemed at par to the extent of DBS's "Available Cash" in excess of $500 million commencing with the fiscal quarter ended March 31, 2027.  The 2028 Senior Secured Notes are also entitled to recover up to the full aggregate principal balance of the notes plus accrued interest, at par, under the DWLLC Intercompany Loan.

The Restructuring Support Agreement contemplates certain "Execution Date Transactions" and "Effective Date Transactions" that provide for the repayment or amendment of the indentures governing approximately $11.55 billion of funded debt obligations, including $9.75 billion in aggregate principal amount of DBS Notes and approximately $1.8 billion of term loan and preferred equity obligations of DBS SubscriberCo.  Upon execution of the RSA, the following "Execution Date Transactions" occurred:

(a)     the Consenting Creditors agreed to dismiss the Bondholder Lawsuit with prejudice, and filed a stipulation of dismissal on March 20, 2026;

(b)     DNC paid DBS approximately $2.1 billion in satisfaction of the 2024 Intercompany Loans;

(c)     DBS paid approximately $1.6 billion and $178.7 million, respectively, in satisfaction of certain term loan and preferred equity obligations issued by DBS SubscriberCo;

---

[37]   The descriptions and summaries of the Restructuring Support Agreement contained in this Disclosure Statement are qualified in their entirety by reference to the terms of the Restructuring Support Agreement.  To the extent of any inconsistency between these descriptions and summaries and the Restructuring Support Agreement, the terms of the Restructuring Support Agreement will control.

(d)     DBS SubscriberCo (and its subscribers and other assets) was reconsolidated with DBS, and all affiliates holding Sling TV business assets were consolidated with DBS, such that the credit support for the DBS Notes now includes all of the value of the DISH pay-TV and Sling TV businesses;

(e)     DBS SubscriberCo, its subsidiaries, and the Sling TV entities were designated as restricted subsidiaries and joined as additional guarantors of the DBS Notes;

(f)     DBS and EchoStar agreed to pay the nonrefundable $125 million Claim Settlement Amount to tcertain Consenting Creditors, with $75 million paid by DBS upon execution of the RSA;

(g)     the 2028 Senior Secured Notes indenture was amended to implement the DBS Cash Sweep, which requires DBS to make an offer to purchase the 2028 Senior Secured Notes at par without any premium, penalty, or charge in an amount equal to the DBS Debtors' "Available Cash" in excess of $500 million, on a quarterly basis commencing with the fiscal quarter ending March 31, 2027;

(h)     the indentures for the DBS Notes were amended to:

     (i)     limit the circumstances under which DBS may upstream cash or other value;

     (ii)     limit the ability of DBS and its subsidiaries to enter into further financing transactions constituting priming financings or liability management transactions;

     (iii)     reflect such modifications reasonably necessary to facilitate a potential DirecTV business combination (whether by merger, acquisition or other transaction), consisting of: (A) a waiver or amendment to the applicable definition of "Change of Control" to permit such business combination so long as (B) the combined company's total net leverage ratio not exceed 2.75x at closing of the business combination; and

     (iv)     restrict DBS's and, if a future DirecTV business combination is consummated, the combined company's ability to incur any new debt for borrowed money with a maturity date before June 30, 2029; and

(i)     mutual releases among the Company Parties and Consenting Creditors were executed on the Execution Date, to become effective on the Effective Date.

The Restructuring Support Agreement also contemplates the following "Effective Date Transactions":

(a)     upon the closing of the AT&T Transactions, DNC will: (i) pay DBS approximately $2.8 billion plus accrued and unpaid interest in full satisfaction of the 2028 Tranche of the DNC 2021 Intercompany Loan; and (ii) satisfy or discharge approximately $4.8 billion plus accrued and unpaid interest on account of the 2026 Tranche of the DNC 2021 Intercompany Loan, and all liens and encumbrances with respect to the collateral securing the DNC 2021 Intercompany Loan will be concurrently released;

(b)     pursuant to the Plan, the indenture for the 2028 Senior Secured Notes will be amended to require DBS to redeem (rather than make an offer to purchase) the 2028 Senior Secured Notes in accordance with the DBS Cash Sweep;

(c)     pursuant to the Plan, the indentures for the 2026 Senior Secured Notes and the 2026 Senior Notes will be amended to permit such notes to be redeemed at par plus accrued and unpaid interest without any premium, penalty, or charge;

(d)     as promptly as practicable following the closing of the AT&T transaction, and in any event prior to consummation of the Plan, DBS will redeem any remaining 2026 Senior Notes at a redemption price equal to 100% of the principal amount thereof plus accrued and unpaid interest;

(e)     on June 1, 2026, EchoStar was obligated to pay certain Consenting Creditors the remaining $50 million balance of the $125 million Claim Settlement Amount not previously paid by DBS on the RSA Execution Date, and EchoStar timely made such payment in accordance with such obligation; and

(f)     on the Effective Date of the Plan, the mutual releases among the Company Parties (including the DBS Debtors and the DISH Wireless Debtors and Consenting Creditors will become effective.

Under the Restructuring Support Agreement, the Company Parties were entitled to notify counsel to the Ad Hoc Group, on or before March 31, 2026—as such date was extended by the Company Parties to June 29, 2026—of their intent, subject to approval by their respective boards of directors or managers, to implement the Restructuring Support Agreement transactions through pursuit of chapter 11 cases and confirmation of the Plan (the "Chapter 11 Election"). The recovery allocations annex to the Restructuring Support Agreement provides that if the Company Parties make the Chapter 11 Election, then, concurrently with the Company Parties' delivery of written notice thereof, the Company Parties may determine to implement the provisions set forth on such annex, including:

(a)     the commencement of Chapter 11 Cases for DWLLC and such subsidiaries and affiliates necessary    or desirable to implement the RSA transactions;

(b)     as partial consideration for the agreements of the Consenting Creditors under the RSA, DNC will assign to DBS, and DBS shall assign to the DWLLC Claims Trust its claims against DWLLC under the DWLLC Intercompany Loan, in the aggregate principal amount of $8,612,136,593.42 plus accrued and unpaid interest, subject to the DWLLC Recovery Cap, with any DWLLC Excess Recovery or DWLLC Residual Recovery to be applied to repay principal and accrued interest under the 2028 Senior Secured Notes, 2028 Senior Notes and 2029 Senior Notes, as applicable; and

(c)     prior to the commencement of Chapter 11 Cases, the intercompany loan from EchoStar Financing L.L.C. to DWLLC, in the principal amount of $3,890,491,943.00, shall be contributed to DWLLC such that the loan shall have been extinguished as of the date of commencement of Chapter 11 Cases.

Holders of 2028 Senior Secured Notes, 2028 Senior Notes, and 2029 Senior Notes, as beneficiaries of the DWLLC Claims Trust, are entitled to vote on the Plan as holders of claims against DWLLC under the DWLLC Intercompany Loan as DISH Wireless General Unsecured

Claims (the "DWLLC Intercompany Loan Claims") and recover from DWLLC's estate or the FCC Trust on a pro rata basis up to the DWLLC Recovery Cap. If the DWLLC Claims Trust recovers any amounts in excess of the DWLLC Recovery Cap, the DWLLC Excess Recovery shall be held for the benefit of the Allowed 2028 Senior Secured Notes Claims and applied solely to redeem the principal and accrued and unpaid interest on the outstanding 2028 Senior Secured Notes without any premium, penalty, or charge. If the DWLLC Excess Recovery exceeds the aggregate principal amount and accrued interest outstanding at the time of any distribution, then the DWLLC Residual Recovery shall be held for the benefit of the Allowed 2028 Senior Notes Claims and Allowed 2029 Senior Notes Claims and applied, pro rata, a corresponding aggregate amount of principal and accrued and unpaid interest on such notes at par without any premium, penalty, or charge. For the avoidance of doubt, application of the foregoing recoveries to redeem 2028 Senior Secured Notes is in addition to, and not in lieu of, the DBS Cash Sweep.

On June 29, 2026, the DBS Debtors (with the approval of their respective boards of directors and boards of managers) formally notified the Consenting Creditors of the Chapter 11 Election and the DISH Wireless Debtors (with the approval of their respective boards of managers and the DWLLC Special Committee) agreed to become parties to the Restructuring Support Agreement.

Also on June 29, 2026, in accordance with section 4(e) of the RSA, the Debtors commenced solicitation of votes to accept or reject the Plan from holders of DBS Notes (with respect to the DBS Debtors) and from holders of DISH Wireless General Unsecured Claims (with respect to the DISH Wireless Debtors).

### E. FCC Trust and Security Agreement

On September 18, 2025, AT&T and EchoStar filed applications pursuant to section 310(d) of the Communications Act of 1934, as amended, seeking the consent of the FCC to assign EchoStar's 3.45 GHz and 600 MHz wireless spectrum licenses to AT&T under the AT&T License Purchase Agreement. On the same date, the Spectrum Trust, SpaceX, and EchoStar filed applications seeking the FCC's consent to a two-step assignment whereby EchoStar's AWS-4 and AWS-H Block wireless spectrum licenses and several earth station licenses would be assigned to the Spectrum Trust and then, approximately two years later, to SpaceX under the terms of the Original SpaceX License Purchase Agreement. On November 10, 2025, the Spectrum Trust, SpaceX, and EchoStar amended their pending applications and filed two new applications with the FCC to add EchoStar's unpaired AWS-3 licenses to the assignment applications from EchoStar ultimately to SpaceX under the A&R SpaceX License Purchase Agreement.

#### 1. FCC Orders

On May 12, 2026, the FCC Wireless Bureau of the FCC entered orders approving the AT&T Transactions and the SpaceX Transactions. As a condition to that approval, the FCC Wireless Bureau imposed a single limited trust fund condition requiring the $2.4 billion Contribution be deposited into the trust within thirty (30) days of closing of the AT&T Transactions to help pay obligations to 5G Network claimants that obtain a final judgment or arbitration award against, or may enter into a settlement with, EchoStar, DNC, DWLLC or any of their affiliates (each, an "EchoStar Party") for amounts due in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned in the AT&T Transactions (collectively, the "Covered

Activities"). A claim for such a final judgment, arbitration award, or settlement, prior to a determination that such claim is eligible to receive a distribution from the FCC Trust, is referred to as a "Covered Claim" and a holder of such Covered Claim a "Claimant" A Covered Claim is eligible for a distribution from the FCC Trust, and the Trustee is bound to pay the applicable Claimant in accordance with the FCC Trust Agreement, if it is the subject of a Judicial or Arbitral Claim Determination or a Covered Claim Settlement. No EchoStar Party will obtain possession or control of any portion of the Contribution, which will be remitted to the Trust directly from the proceeds of the AT&T Transactions upon consummation of the assignment.

## 2.    FCC Orders

In furtherance of these requirements, EchoStar entered into the Trust Agreement (the "FCC Trust Agreement"), dated as of June 26, 2026, with The Bank of New York Mellon, solely in its capacity as trustee (the "Trustee"), establishing the "Wireless Creditor Trust," defined herein as the FCC Trust, for the benefit of (a) the "Beneficiaries" and (b) DWLLC in its capacity as secured party (the "Secured Party") on behalf of 5G Network Claimants holding Eligible Type A Claims against DWLLC. A copy of the FCC Trust Agreement is attached to the Plan as Exhibit A to the Plan. The FCC Trust was created for the purpose of holding, administering, and liquidating the Contribution and any income, proceeds or other earnings received by the FCC Trust thereon (the "Trust Assets"), distributing Trust Assets to the Beneficiaries and the Secured Party, verifying the validity and eligibility of Covered Claims (such Covered Claims, "Eligible Covered Claims"),[38] granting and perfecting security interests with respect to the Type A Claims Reserve in support of the entitlement of Type A Claims to distributions, and performing such other duties as set forth in the Trust Agreement. The FCC Trust has been established pursuant to the FCC's orders approving the AT&T Transaction and the SpaceX Transactions for the purpose of resolving tort, breach of contract, or other Covered Claims and will remain subject to the Bureau's continuing jurisdiction in accordance with the Orders and the Trust Agreement.

## 3.    Covered Claim Categories

The Trust Agreement establishes three priority-based categories of Covered Claims, and distributions follow a strict waterfall:

(a)    A "Type A Claim" is a Covered Claim for $100,000 or less in damages, including a Covered Convenience Claim. A "Covered Convenience Claim" arises where a Claimant holding a Covered Claim in an amount exceeding $100,000 agrees to voluntarily reduce its claim to $100,000 and be treated in all respects as a Type A Claim. The Trust is required to make full distributions on an Eligible Type A Claim from the Type A Claims Reserve promptly after the Trustee determines that such Type A Claim is an Eligible Covered Claim. Any distribution made by the Trustee to DWLLC, as the Secured Party, on account of an Eligible Type A Claim may be paid or transferred to the applicable Claimant only after entry of the Secured Party Distributions Order, which shall then be in effect and not have been stayed. The Trust also retains discretion, for administrative convenience, to elect to make distributions on any Eligible Type A Claim directly to the applicable Claimant on five (5) Business Days' notice to DWLLC notwithstanding DWLLC's security interest in the Type A Claims Reserve.

---

[38]    Eligible Covered Claims include Eligible Type A Claims, Eligible Type B-1 Claims, and Eligible Type B-2 Claims, as described below and in the FCC Trust Agreement.

(b)     A "<u>Type B-1 Claim</u>" is a Covered Claim to the extent it is for (i) outstanding amounts due as of the earlier of December 31, 2025 or the date the Claimant received notice from an EchoStar Party that it is excused from its obligations under the agreements underlying the Covered Claim, and/or (ii) amounts expended or reasonably expected to be expended by the completion of the Covered Activities (e.g., costs for decommissioning towers and cell sites, costs for electricity used). The Trust is required to make the first distribution on an Eligible Type B-1 Claim within thirty (30) days of the first Semi-Annual Determination Date following the Trustee's determination that such Type B-1 Claim is an Eligible Covered Claim, subject to maintenance of the Type A Claims Reserve, and to continue making distributions within 30 days after each subsequent Semi-Annual Determination Date until all Eligible Type B-1 Claims are paid in full or, if insufficient Trust Assets remain, such claims receive pro rata distributions from remaining Trust Assets.

(c)     A "<u>Type B-2 Claim</u>" is a Covered Claim to the extent it is for (i) lost future rents or profits and other future amounts (e.g., future taxes, insurance) due under agreements (including leases) for Covered Activities that have been terminated, and/or (ii) costs incurred for Covered Activities that the Claimant reasonably expected to be paid out of future receipts. If, after five years from the date on which the FCC Trust begins accepting Covered Claim Submissions (the "Claims Opening Date"), all Eligible Type A Claims and Eligible Type B-1 Claims have received distributions sufficient to satisfy them in full and sufficient Trust Assets remain to pay all Trust Expenses, then the Trust shall make distributions sufficient to satisfy each Eligible Type B-2 Claim in full or, if insufficient Trust Assets remain, such claims shall receive pro rata distributions.  If all Eligible Type A Claims and Eligible Type B-1 Claims have been paid in full before five years from the Claims Opening Date, the Trustee may accelerate distributions to Eligible Type B-2 Claims.

### 4.     Type A Claims Reserve

Central to the priority structure of the Trust Agreement is the Type A Claims Reserve. Upon receipt of the Contribution, the Trustee is required to cause $200 million to be deposited into the Type A Claims Reserve, a segregated bank account of the Trust subject to the terms of the Trust Agreement. The Trustee must maintain the Type A Claims Reserve at all times in an amount sufficient to satisfy in full all Type A Estimated Eligible Claims and initial Trust Expenses, and no distribution on account of an Eligible Type B-1 Claim or Eligible Type B-2 Claim may be made unless, after giving effect to such distribution, the Trust retains Trust Assets in an amount at least equal to the Type A Claims Reserve. If all Eligible Type A Claims are paid in full, any remaining amounts in the Type A Claims Reserve become available for distribution to other Eligible Covered Claims.

To further support the entitlement of Eligible Type A Claims to receive distributions, and following the DWLLC Special Committee's deliberation and approval, the Trustee entered into a security agreement (the "<u>Security Agreement</u>") in favor of DWLLC (on behalf of claimants holding Eligible Type A Claims against DWLLC, as the Secured Party), granting a security interest over all of the Trustee's right, title, and interest in and to the Type A Claims Reserve.  The Trustee also entered into a deposit account control agreement (the "<u>Control Agreement</u>") among the Trustee, DWLLC (as the Secured Party), and the bank at which the Type A Claims Reserve is maintained, pursuant to which the security interest in the Type A Claims Reserve is perfected by

control, together with the filing of one or more UCC financing statements. The "Collateral" under the Security Agreement consists of the Type A Claims Reserve, the Secured Trust Account (or any replacement or substitution thereof, or any account that otherwise holds the Type A Claims Reserve from time to time), together with any monies, securities, or instruments deposited or required to be deposited in such Secured Trust Account, all Security Entitlements in and to the foregoing, and all proceeds thereof. The security interest secures only the Trust's obligations to make distributions to Claimants holding Eligible Type A Claims against the Secured Party (the "Specified Purpose"), with Eligible Type A Claims determined, liquidated, or fixed by a Judicial or Arbitral Claim Determination or a Covered Claim Settlement, subject to entry of the Secured Party Distributions Order. The Trustee, as Grantor, has good and valid title to the Collateral, free and clear of all liens other than the security interest granted to the Secured Party, and such security interest constitutes a first-priority perfected security interest in the Collateral, subject to no prior or pari passu liens.

### 5.     Covered Claim Submissions

With respect to the process for making Covered Claim Submissions, within 30 days of Claims Opening Date, (a) the Trustee is required to (i) establish an online portal (the "Trust Website") for the submission of Covered Claims and (ii) begin accepting Covered Claim Submissions and (b) EchoStar is required to give notice to all known or reasonably ascertainable potential Claimants of the establishment of the FCC Trust and the Trust Website, though such notice shall not be deemed an admission that any potential Claimant holds an Eligible Covered Claim. Each Claimant's Covered Claim Submission Deadline is the later of 180 days after the Claims Opening Date (as the Trustee may extend from time to time with EchoStar's prior written consent) and forty-five (45) days after a Judicial or Arbitral Claim Determination or Covered Claim Settlement, and any Claimant that fails to submit by the deadline is forever barred from asserting its Covered Claim against the FCC Trust and from receiving distributions.

For each Covered Claim Submission, the Trustee determines whether the Covered Claim is an Eligible Covered Claim, and a Covered Claim may be determined eligible only if the Claimant has obtained a Judicial or Arbitral Claim Determination or entered into a Covered Claim Settlement and timely made the Covered Claim Submission in the manner specified on the Trust Website. Upon determining that a Covered Claim is eligible, the Trustee promptly notifies the Claimant of the determination and the projected timing of any distribution. If the Trustee determines that a claim is not eligible (a "Denied Claim"), the Trustee promptly notifies the Claimant with a reasonably detailed explanation. A Claimant's sole recourse with respect to the Trustee's determination is to make a Reconsideration Request or to proceed before a court of competent jurisdiction, in each case within 30 days of the applicable notice; any Claimant that fails to do so by such deadline is deemed to accept the determination.

### 6.     Recovery Sources

Any Claimant that makes a Covered Claim Submission agrees that the FCC Trust is its sole source of recovery on account of its Covered Claim (except as any EchoStar Party may otherwise agree), and that, subject to execution of a release in form and substance acceptable to EchoStar and DWLLC, such submission constitutes a voluntary irrevocable waiver and release of any legal rights the Claimant may have against any EchoStar Party to otherwise recover against or enforce the underlying determination or settlement. Any distribution by the FCC Trust to a Claimant on account of an Eligible Covered Claim is subject to the Claimant's execution of a full and complete

73

release and discharge of any and all Covered Claims against the EchoStar Parties, in a form prepared and promulgated by the Trustee that is acceptable to EchoStar and DWLLC.

With respect to payments from other sources, distributions to a Claimant shall be reduced by the aggregate amount of any "Third-Party Payments"—*i.e.*, payments received by the Claimant on account of its Covered Claim from any source other than the FCC Trust, including under the Plan—and no Claimant shall recover more than the full amount of its Eligible Covered Claim from the FCC Trust or DWLLC, as Secured Party, including after taking into account any Third-Party Payments. If a Claimant receives any Third-Party Payment after making a Covered Claim Submission, the Claimant must notify the Trustee within ten (10) Business Days, and any failure to provide timely notice after receiving a distribution will result in the Claimant owing the FCC Trust annualized interest at the federal judgment rate on the amount of the Third-Party Payment for each Business Day after the ten (10)-day notice period until the Trustee is notified.

### 7. Termination of the FCC Trust

The FCC Trust will terminate upon the earlier of satisfaction of all Trust Expenses and all obligations owed in connection with Eligible Covered Claims in full, or distribution of all Trust Assets on account of Eligible Covered Claims, at which time any remaining Trust Assets (including all amounts earned thereon) are returned to EchoStar. If the FCC Trust has not been terminated by the date that is five years from the FCC Trust Effective Date (the "Outside Termination Date"), the Trustee shall distribute all Trust Assets to Beneficiaries and DWLLC, as Secured Party, and pay any remaining Trust Assets to EchoStar, and the FCC Trust shall dissolve. If Trust Assets remain, the Bureau may order in its reasonable discretion that the FCC Trust remain open for additional time. The FCC Trust may not be terminated by the Beneficiaries or DWLLC.

### F. The DIP Facility

The DISH Wireless Debtors obtained a commitment for post-petition financing to fund the administration of the DISH Wireless Debtors' estates during these Chapter 11 Cases pursuant to that certain Debtor-In-Possession Loan and Security Agreement (the "DIP Credit Agreement"), with EchoStar, as lender (in such capacity, the "DIP Lender"), DWLLC, as borrower, and each other DISH Wireless Debtor as guarantor, which provides for a secured, junior, multi-draw debtor-in-possession term loan facility (the "DIP Facility") in an aggregate principal amount of up to $85 million to be used in accordance with an approved 13-week cash flow forecast (the "Approved Budget") for the general corporate purposes of DWLLC and the other DISH Wireless Debtors. The DIP Credit Agreement will be entered into prior to the Petition Date to the extent not entered into as of the date of this Disclosure Statement.

Prior to the Petition Date, however, the DISH Wireless Debtors obtained access to an additional approximately $56 million of liquidity, after Apple, Inc. ("Apple") authorized the transfer of $56,014,795.05 of funds that had been held in a securities account (the "Apple Securities Account") and pledged as collateral to Apple under certain agreements. The DISH Wireless Debtors revised their 13-week cash flow forecast to account for this additional liquidity and determined that they would not need additional financing during the first twenty-one days of the Chapter 11 Cases and that emergency interim relief was not necessary. Accordingly, the DISH Wireless Debtors will enter into the DIP Credit Agreement prior to the Petition Date (to the extent not entered into as of the date of this Disclosure Statement) and anticipate filing a motion substantially contemporaneously with filing the Chapter 11 Cases seeking entry of a final order of

the Bankruptcy Court, on regular notice, authorizing the DIP Facility on the terms set forth in the DIP Credit Agreement (the "DIP Motion").[39]

The material terms of the DIP Facility are as follows. Loans made under the DIP Facility ("DIP Loans") bear interest at a rate per annum equal to 11.50%, payable monthly in kind, with an additional 2.00% per annum default interest rate accruing during the continuance of any uncured Event of Default. The outstanding principal amount of the DIP Loans, together with any accrued and unpaid interest, is due and payable on December 31, 2026 (the "Maturity Date"), or earlier upon acceleration. DWLLC, as borrower, may voluntarily prepay all or any portion of the outstanding DIP Loans at any time, without premium, penalty, or break costs, upon at least three (3) Business Days' prior written notice to the DIP Lender. The DIP Credit Agreement also sets forth a mechanism for mandatory prepayment and/or reduction of commitments, in each case at the DIP Lender's sole discretion, with any additional funds that may be released from the Apple Securities Account after the DIP Facility is drawn. The DIP Facility is secured by a lien on substantially all of the DISH Wireless Debtors' assets (the "DIP Collateral"), including accounts, inventory, equipment, general intangibles, investment property, deposit accounts, Avoidance Actions (subject to entry of a Final Order), and all proceeds of the foregoing. The DIP Lender will have a superpriority administrative expense claim against the DISH Wireless Debtors with priority over all other administrative expenses and claims, subject only to the Carve-Out and, with respect to any DIP Collateral that also constitutes Prepetition Collateral, to claims under the Prepetition Secured Loan. The DIP Lender's lien on the DIP Collateral is junior to the liens securing the Prepetition Secured Loan. The DIP Lender also has the right to credit bid the outstanding secured obligations under the DIP Facility in connection with any sale of DIP Collateral, including pursuant to the Stalking Horse APA (as defined and described below).

Because EchoStar is DWLLC's indirect parent, EchoStar retained separate counsel and negotiated the DIP Credit Agreement with the DWLLC Special Committee, which authorized DWLLC to execute the DIP Credit Agreement prior to the Petition Date.

As of the date of this Disclosure Statement, the Debtors believe that the additional liquidity to be provided under the DIP Facility at a later stage of these Chapter 11 Cases is necessary to ensure the DISH Wireless Debtors have sufficient liquidity to administer these Chapter 11 Cases and consummate the sale of substantially all of their assets for the benefit of their estates and creditors.

### G.    The Stalking Horse APA

As described elsewhere in this Disclosure Statement, the DISH Wireless Debtors intend to sell substantially all of their assets to maximize value for the benefit of their estates and creditors. To that end, DWLLC and certain of its subsidiaries will enter into the Asset Purchase Agreement (the "Stalking Horse APA") prior to the Petition Date (to the extent not entered into as of the date of this Disclosure Statement) with EchoStar under which EchoStar has agreed to serve as a stalking horse and is proposing to acquire substantially all of the assets of the DISH Wireless Debtors (in such capacity, the "Stalking Horse Bidder"). Under the Stalking Horse APA, the DISH Wireless Debtors have agreed to sell, transfer, and assign to the Stalking Horse Bidder substantially all of

---

[39]    All summaries in this Declaration of the terms of the DIP Facility are qualified in their entirety by reference to the applicable provisions of the DIP Credit Agreement and proposed interim and final orders granting the relief requested in the DIP Motion. To the extent of any inconsistency between the summaries in this Declaration and the terms of the applicable documents, the terms of the applicable transaction documents shall control.

the Selling Entities' assets, properties, and rights of every kind and nature, wherever located, that are specified and defined therein as "Purchased Assets" (collectively, the "Purchased Assets"), under sections 105 and 363 of the Bankruptcy Code, free and clear of all encumbrances, claims, interests, and liabilities (other than Permitted Encumbrances and Assumed Liabilities, each as defined in the Stalking Horse APA), subject to the entry of a sale order by the Bankruptcy Court and completion of the investigation being conducted by the DWLLC Special Committee with respect to claims and causes of action proposed to be sold by the DISH Wireless Debtors to the Stalking Horse Bidder.  The DISH Wireless Debtors, with the assistance of FTICA, began conducting a marketing process for the DISH Wireless Debtors' assets in an effort to identify any higher or better bids.  The DISH Wireless Debtors have proposed to establish a bid deadline of August 10, 2026.  If any qualifying bids are received b such deadline, an auction is proposed to be held on August 12, 2026, and the hearing to approve the sale(s) to the successful bidder(s) is proposed to proceed on August 16, 2026.[40]

## VII.   MATERIAL ANTICIPATED EVENTS IN THE CHAPTER 11 CASES

### A.   Commencement of the Chapter 11 Cases

On June 30, 2026 (the "Petition Date"), the Debtors will file voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing Chapter 11 Cases.  The Debtors intend to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The commencement of the Debtors' Chapter 11 Cases will trigger the automatic stay under section 362 of the Bankruptcy Code, which, unless and until lifted, will enjoin all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtors and the commencement or continuation of prepetition litigation against the Debtors, including the litigation described in Article VI.C.5 of this Disclosure Statement.

### B.   First Day Motions

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors intend to file several motions (the "First Day Motions") seeking relief to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations and businesses following the commencement of the Chapter 11 Cases.  The First Day Motions, and all orders for relief, once entered in the Chapter 11 Cases, will be available free of charge at https://dm.epiq11.com/DBS or via PACER at https://www.pacer.gov (for a fee).  The following is a brief overview of the first day relief the Debtors intend to seek through the First Day Motions.

#### 1.   Debtors' Cash Management Motion

The Debtors maintain  a cash management system that enables the Debtors to control and monitor corporate funds, ensure cash availability and liquidity across the Debtors' operations, and reduce administrative expenses by facilitating the movement of funds as needed.  On the Petition

---

[40]   All summaries in this Disclosure Statement of the terms of the Stalking Horse APA and the bidding procedures are qualified in their entirety by reference to the applicable provisions of the Stalking Horse APA, such procedures, and the proposed order granting the relief requested in the Bidding Procedures Motion.  To the extent of any inconsistency between the summaries in this Disclosure Statement and the terms of the applicable documents, the terms of the applicable documents shall control.

Date, the Debtors will seek authority from the Bankruptcy Court to continue their existing cash management system and practices, honor certain prepetition obligations related thereto, and continue ordinary course intercompany transactions between and among the Debtors and their non-Debtor affiliates and subsidiaries.

### 2.    Debtors' Shared Services Motion

The Debtors are party to that certain Shared Services Agreement dated as of May 5, 2026 by and among the Debtors and non-Debtors EchoStar and other non-Debtor affiliates, pursuant to which the Debtors receive certain intercompany shared services in support of the Company's overall business operations (the "Shared Services"), which may be provided or paid for by non-Debtor affiliates, and incur related intercompany obligations to reimburse such non-Debtors for costs related to their respective portions of the Shared Services.  The Shared Services include, among other things, services related to tax, insurance and surety bonds, utilities, third-party vendors, and employees.  In limited circumstances, the Debtors may also provide Shared Services to certain non-Debtor affiliates and are owed reimbursements on account of such services.

On the Petition Date, the Debtors will request authority from the Bankruptcy Court to continue operating under the Shared Services Agreement on an interim basis and to assume the Shared Services Agreement on a final basis, including the payment of prepetition intercompany obligations under the Shared Services Agreement.

### 3.    Debtors' Utilities Motion

In the ordinary course of business, the Debtors incur certain expenses related to essential utility services such as power, gas, water, sewer, recycling, trash disposal and waste management, telecommunications and other similar services.  To facilitate timely and efficient processing and payment of invoices with respect to these utility services, the Debtors (and their non-Debtor affiliates) contract, in the ordinary course of business, with a payment processor to process and remit payments to certain utility companies on the Debtors' behalf.  On the Petition Date, the Debtors will request authority from the Bankruptcy Court to establish  adequate assurance deposits for the benefit of utility providers and to pay any fees owed to the payment processor, whether arising pre- or post-petition, in the ordinary course of the Debtors' business.  To the extent that the Debtors pay for utilities under the Shared Services Agreement, they will continue to do so postpetition, subject to obtaining Bankruptcy Court approval in connection with Shared Services.

### 4.    Debtors' Bar Date Motion

On the Petition Date, the Debtors will seek the Bankruptcy Court's approval to establish bar dates by which creditors of the DISH Wireless Debtors must submit proofs of claim in respect of such creditors' general unsecured claims, governmental claims, and rejection damages claims. Any order granting the Bar Date Motion may provide that parties that do not file a Proof of Claim by the applicable bar date are forever barred, estopped, and enjoined from asserting such claim against the Debtors.

Through the Bar Date Motion, the Debtors will request entry of an order setting the following bar dates: (1) the General Claims Bar Date of July 27, 2026 at 5:00 p.m. (prevailing Central Time); (2) the Governmental Bar Date of December 27, 2026 at 5:00 p.m. (prevailing Central Time); (3) the Rejection Damages Bar Date, which is the later of (a) the General Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (prevailing Central Time) on the date that is twenty-one (21) days after the latest of (i) the proposed date of a rejection, (ii)

the date of filing of a Rejection Notice, and (iii) the date of entry of an order by the Bankruptcy Court rejecting the applicable executory contract and unexpired lease; and (4) the Amended Schedules Bar Date, which is the later of (a) the General Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (prevailing Central Time) on the date that is twenty-one (21) days from the date on which the DISH Wireless Debtors serve notice of an amendment to their schedules of assets and liabilities.

### 5.     Debtors' Disclosure Statement Motion

On the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement, and a motion seeking Bankruptcy Court approval of (1) the Disclosure Statement on a conditional basis, solely to the extent necessary to continue solicitation postpetition,  (2) proposed solicitation and voting procedures, the form of Ballots and related notices, and dates and deadlines in connection with Plan solicitation and confirmation, (3) a proposed schedule relating to Plan confirmation, including a combined hearing on final approval of this Disclosure Statement and confirmation of the Plan, and (4) the conditional waiver of  a creditors' meeting, schedules of assets and liabilities and statements of financial affairs and related reports for the DBS Debtors only.

The Proposed Confirmation Schedule is set forth below.

### 6.     DBS Debtors' All Trade Motion

In the ordinary course of business, the DBS Debtors incur obligations to various third-party providers of goods and services related to the DBS Debtors' pay-TV business operations (the "Ordinary Course Claims").  The Ordinary Course Claims consist of prepetition claims held by (a) vendors in connection with programming, including content distribution rights and licenses, (b) suppliers of goods, services, or software based outside of the United States, (c) shippers, warehousemen, or mechanics, that may give rise to liens against the DBS Debtors' property if unpaid, and (d) general unsecured creditors that provide supplies and/or services utilized by the DBS Debtors, including ordinary course professionals that are not otherwise retained pursuant to a separate order of the Bankruptcy Court.

On the Petition Date, the Debtors will request authority from the Bankruptcy Court to pay Ordinary Course Claims in full in their discretion and in the ordinary course of business, consistent with the Unimpaired treatment of Class 1H (DBS General Unsecured Claims) under the Plan.  The DBS Debtors will seek to make such payments pursuant to the reimbursement mechanism set forth in the Shared Services Motion.

### 7.     DBS Debtors' Customer Programs Motion

In the ordinary course of business, the DBS Debtors administer various customer-related programs and practices to attract new customers and to reward and provide incentives to existing customers (the "Customer Programs").  On the Petition Date, the DBS Debtors will seek authority from the Bankruptcy Court to continue to maintain and administer the Customer Programs, continue honoring their obligations under the Customer Programs on a postpetition basis in the ordinary course of business, honor certain prepetition customer obligations related to the Customer Programs.  For certain Customer Programs that constitute cash obligations, the DBS Debtors will seek to satisfy such obligations in accordance with the payment mechanism set forth in the Shared Services Motion.

### 8.     DISH Wireless Debtors' Critical Vendors Motion

As part of their ongoing efforts related to the decommissioning of the legacy wireless 5G network, the DISH Wireless Debtors require various third-party vendors to provide services such as removing and retrieving the DISH Wireless Debtors' equipment from leased property, transporting and storing such equipment, and other related services.  On the Petition Date, the Debtors will request authority from the Bankruptcy Court to pay prepetition claims of such vendors and to continue to honor their obligations to such vendors on a postpetition basis.  Certain of these vendors are paid directly by DWLLC, and others are paid through the reimbursement mechanism set forth in the Shared Services Motion.

### 9.      DISH Wireless Debtors' DIP Motion

On the Petition Date, the DISH Wireless Debtors will seek Bankruptcy Court approval, on regular notice and on a final basis, to enter into the DIP Facility described in Article VI.F of this Disclosure Statement.  The DIP Facility with EchoStar provides up to $85 million of aggregate secured superpriority DIP Financing to fund the DISH Wireless Debtors' Chapter 11 Cases, subject to an approved budget.  The DIP Financing is secured by a lien on all of the DISH Wireless Debtors' assets, junior to the liens securing the Prepetition Secured Loan.

### 10.      DISH Wireless Debtors' Rejection Procedures Motion

The DISH Wireless Debtors are party to thousands of executory contracts and unexpired lease related to the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with the DISH Wireless Debtors' 5G Network.  As described in this Disclosure Statement, the DISH Wireless Debtors have asserted *force majeure*, impracticability or impossibility, and frustration of purpose under such leases and contracts to which they are parties and assert that any Claims arising from the termination of such tower leases and contracts should therefore be disallowed.  Nevertheless, on the Petition Date, the DISH Wireless Debtors will seek the Bankruptcy Court's approval of certain procedures to reject such contracts, which, to the extent still operative, are no longer necessary for their ongoing businesses.  The motion will also request authority to remove or abandon personal property of the DISH Wireless Debtors that may be located on or installed in leased premises.  The proposed order will include procedures related to, among other things, notices to counterparties and such counterparties' opportunity to object.

### 11.      DISH Wireless Debtors' Bidding Procedures Motion

As described in Article VI.G and elsewhere in this Disclosure Statement, the DISH Wireless Debtors anticipate conducting a sale of substantially all of their assets to maximize value for the benefit of their estates and creditors.  On the Petition Date, the DISH Wireless Debtors will seek Bankruptcy Court approval of bidding procedures in connection with one or more sales, dates and deadlines relating to such sale(s),  the form and manner of notices relating to such sales, and entry into the Stalking Horse APA with EchoStar as the Stalking Horse Bidder.

### C.      Schedules, Statements, and Bankruptcy Rule 2015.3 Report

On the Petition Date, the DISH Wireless Debtors will file their respective Schedules and Statements, the global notes regarding the Schedules and Statements, and an initial report of financial information with respect to entities in which the DISH Wireless Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the

"2015.3 Report").  In their 2015.3 Report, the DISH Wireless Debtors will provide a report of financial information with respect to non-Debtor DISH Wireless Puerto Rico LLC, which is a wholly-owned, non-Debtor subsidiary of DWLLC.

As noted above, in the Debtors' Disclosure Statement Motion, the Debtors will seek a waiver of the requirements for (a) the DBS Debtors to file Schedules and Statements and 2015.3 Reports, provided that, the Plan is confirmed no later than 80 days after the Petition Date and (b) the U.S. Trustee to convene a meeting of creditors pursuant to section 341(e) of the Bankruptcy Code with respect to the DBS Debtors only.

### D.        Proposed Confirmation Schedule

It is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from these chapter 11 Cases.  Expeditious confirmation of the Plan is in the best interests of the Debtors, the Estates, and their stakeholders.  The Debtors will propose the case timeline set forth in Article II of this Disclosure Statement.

## VIII.   SUMMARY OF THE PLAN

**THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERENCED THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

**FOR A SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, SEE ARTICLE III.I OF THIS DISCLOSURE STATEMENT.**

### A.        General Settlement of Claims and Interests.

As discussed further in this Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123

of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be (and shall be) final, except as expressly provided in the Plan.

### B.   Sources of Plan Consideration.

Subject to the terms of the Plan (including the Restructuring Support Agreement), distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in the Plan shall be funded from (a) Cash on hand, (b) the issuance and distribution of the Amended Notes, (c) the DISH Wireless Distributable Value, and (d) solely with respect to Holders of Allowed Secured Type A Claims, the Type A Claims Reserve to the extent of DWLLC's perfected prepetition security interest therein.

### C.   FCC Trust Matters.

As set forth below, any Holder of an Allowed DISH Wireless General Unsecured Claim that such Holder asserts is a Covered Claim may make the FCC Trust Election, subject in all respects to the FCC Trust Third-Party Payment Provisions, and any Holder of a DISH Wireless General Unsecured Claim may make the Type A Convenience Claim Election. As provided in the FCC Order, no such Holder shall be permitted to make more than one FCC Trust Claim Submission, and no Holder of an Allowed DISH Wireless General Unsecured Claim may make both the FCC Trust Election on account of such Claim in an amount that exceeds $100,000.00 and the Type A Convenience Claim Election on account of such Claim in the amount of $100,000.00.

**Notwithstanding anything to the contrary in the Plan or the Confirmation Order, except as any EchoStar Party may otherwise agree in writing, under no circumstances shall the Disbursing Agent make a distribution to any Holder of an Allowed DISH Wireless General Unsecured Claim that has made the FCC Trust Election.**

#### 1.   Third-Party Payments

##### (a)   Reduction for Third-Party Payment

Any distribution made under the Plan (or otherwise from a Debtor or its Estate) to the Holder of an Allowed DISH Wireless General Unsecured Claim that makes the FCC Trust Election on account of such Claim is hereby deemed to be a "Third-Party Payment" under the FCC Trust Documents, which Third-Party Payment shall reduce, on a dollar-for-dollar basis, the amount distributable to such Holder from the FCC Trust on account of such Claim in accordance with the FCC Trust Third-Party Payment Provisions.

If the Disbursing Agent receives notice that the FCC Trust has made a distribution to a creditor asserting a Covered Claim, the Disbursing Agent shall reduce, on a dollar-for-dollar basis, any distribution payable under the Plan to such Holder on account of such Claim by the amount of such FCC Trust distribution.

The Disbursing Agent shall provide prompt written notice to the Trustee (with a copy to the relevant Holder) of any Plan distribution made on account of an Allowed DISH Wireless General Unsecured Claim that the Disbursing Agent determines is or has been asserted as a Covered Claim under the FCC Trust Documents, which notice shall be given no later than five (5) Business Days following such distribution. The FCC Trust Documents provide that the Trustee will reduce any distribution made on account of such a Covered Claim from the FCC Trust on

81

account of such Third-Party Payment in accordance with the FCC Trust Third-Party Payment Provisions.

If a Plan distribution and an FCC Trust distribution are made concurrently with respect to the same Claim, the Disbursing Agent and the Trustee shall coordinate in good faith to implement the FCC Trust Third-Party Payment Provisions.

### 2.  Type A Claims Reserve.

Pursuant to the FCC Trust Documents, the FCC Trust has been established and is administered by the Trustee in accordance with the FCC Trust Documents. Distributions from the Type A Claims Reserve on account of Allowed Secured Type A Claims constitute Plan distributions from DWLLC's Estate by virtue of DWLLC's perfected security interest in the Type A Claims Reserve pursuant to the FCC Trust Security Agreement. Such distributions on account of Allowed Secured Type A Claims shall be made solely pursuant to the FCC Trust Documents from the Type A Claims Reserve, including, as applicable, through DWLLC or Post-Effective Date DWLLC, as Secured Party (subject to entry of the FCC Trust Distributions Order[41]) or directly by the FCC Trust, in each case in accordance with the FCC Trust Documents.

No distribution under the Plan by any Debtor or any Estate shall be permitted, required or otherwise made on account of Allowed Secured Type A Claims unless the FCC Trust Distributions Order shall have been entered, remains in effect, and shall not have been stayed and the Trustee makes a distribution to, as applicable, DWLLC or Post-Effective Date DWLLC, as Secured Party, on account of a Secured Type A Claim (including a Covered Convenience Claim), which DWLLC or Post-Effective Date DWLLC, in turn, distributes, pays or transfers to the applicable creditor in accordance with the FCC Trust Documents.  Nothing in the Plan is intended to or shall alter or modify the FCC Trust Documents or the administration of the FCC Trust thereunder.

Neither the Reorganized DBS Debtors nor the Post-Effective Date DISH Wireless Debtors shall take any action that would impair, challenge, release, or otherwise adversely affect the security interest granted by the Trustee in the Type A Claims Reserve under the FCC Trust Collateral Documents, or the perfection of such security interest pursuant to the FCC Trust Collateral Documents. For the avoidance of doubt, such security interest shall survive the Effective Date and shall not be released, subordinated, primed, impaired, or adversely affected by operation of any provision of the Plan, the Confirmation Order, or any other Definitive Document, no term, condition or provision of which shall or shall be construed to authorize or permit any action inconsistent with, or prohibit or preclude any Person (including the Post-Effective Date DISH Wireless Debtors) from taking or omitting to take any action contemplated by, the FCC Trust Collateral Documents.

### 3.  Type A Convenience Claim Election.

The Solicitation Materials specify how a Holder of a DISH Wireless General Unsecured Claim in an amount greater than $100,000.00 can make the Type A Convenience Claim Election. To make a valid Type A Convenience Claim Election, a Holder must complete and submit the appropriate ballot on or prior to the Voting Deadline in accordance with the Solicitation Procedures (or such other date as may be established by order of the Bankruptcy Court) and the Plan.  A

---

[41]  An FCC Trust Distributions Order is a separate order of the Bankruptcy Court approving the procedures for distributions from the Type A Claims Reserve established under the FCC Trust Agreement.  See Article XI.C.5 of this Disclosure Statement for a discussion of the risks associated with such order.

valid Type A Convenience Claim Election shall constitute the irrevocable agreement of the electing Holder to: (a) reduce the amount of its Covered Claim to $100,000.00 for all purposes under the FCC Trust Documents and the Plan, it being understood and agreed by the DISH Wireless Debtors that the $100,000.00 threshold is intended to be determined without regard to interest, if any, to which the Bankruptcy Court may determine the Holder of a Type A Convenience Claim is entitled; (b) be treated in all respects as a Secured Type A Claim and receive distributions, if any, solely from the Type A Claims Reserve pursuant to the FCC Trust Documents in accordance with Article IV.C.2 of the Plan; and (c) execute a waiver and release with respect to any right to assert, recover, or receive any distribution on account of the portion of such Covered Claim in excess of $100,000.00 against any Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, Estate, any other EchoStar Party, or the FCC Trust.

For the avoidance of doubt, a Holder of a DISH Wireless General Unsecured Claim that makes the Type A Convenience Claim Election shall not be treated as a Holder of an Allowed DISH Wireless General Unsecured Claim in Class 2E for purposes of receiving Plan distributions. Instead, such Claim shall be treated as a Secured Type A Claim that is conclusively presumed to have accepted the Plan and not be entitled to vote to accept or reject the Plan on account of such Secured Type A Claim. Making a Type A Convenience Claim Election shall not affect such Holder's right to affirmatively opt in to the Third-Party Release pursuant to a Release Opt In Form.

4. **Sources of Recovery for DISH Wireless General Unsecured Claims Asserted Against the FCC Trust.**

As set forth in the FCC Trust Documents, subject to the FCC Trust Third-Party Payment Provisions, a Covered Claim Submission on account of any DISH Wireless General Unsecured Claim (including Type A Convenience Claims) constitutes a voluntary, irrevocable waiver and release by the relevant creditor of any legal rights it may have against the Debtors and any other EchoStar Party to otherwise recover on or enforce such Claim, subject to Article VI.E of the Plan. If and to the extent that the Trustee determines that such Holder's Claim is not eligible to receive a distribution from the FCC Trust, then, subject to the Holder's timely filing of a reconsideration request in accordance with the FCC Trust Documents and the denial of such reconsideration request, such Holder shall be solely entitled to receive its Pro Rata share of the DISH Wireless Distributable Value in accordance with the Plan; provided, however, that making a Covered Claim Submission does not and shall not be deemed to adversely impact the jurisdiction of any court of competent jurisdiction or arbitration tribunal to reconsider any eligibility determination by the Trustee in accordance with the FCC Trust Documents. Notwithstanding any provision of the Plan to the contrary, in no event shall the aggregate amount of all distributions received by a Holder on account of such Claim from any source whatsoever—including from the FCC Trust, from the DISH Wireless Distributable Value, or any combination thereof—exceed the Allowed amount of such Claim.

D. **DNC Transactions.**

On the AT&T Closing Date, non-Debtor DNC shall redeem or cause to be redeemed all then-outstanding DNC Notes in accordance with the AT&T License Purchase Agreement, and the DNC Notes Indenture. Upon such redemption, all DNC Notes Guarantee Claims against DWLLC and DISH Wireless Leasing L.L.C. in their respective capacities as guarantors of the DNC Notes shall be deemed fully satisfied, released, and discharged without any payment or distribution from any Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, or Estate. For

the avoidance of doubt, no distribution under the Plan from any Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, or Estate shall be required or made on account of DNC Notes Guarantee Claims; <u>provided</u> that no DNC Notes Guarantee Claim shall be deemed satisfied, settled, released or discharged with respect to any Debtor or Estate unless and until all Allowed DNC Note Claims have been paid in full in Cash.

### E.  Intercompany Transactions.

On or as soon reasonably practicable following the AT&T Closing Date, and no later than three (3) Business Days after the AT&T Closing Date, DNC shall pay (or cause to be paid) the 2021 Intercompany Loan Payments to DBS; <u>provided</u> that if the 2021 Intercompany Loan – Tranche B Payment has not been paid by December 1, 2026, DNC will pay the 2021 Intercompany Loan – Tranche B Payment to DBS on December 1, 2026.

### F.  Restructuring Transactions.

Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan, and any documents in connection therewith and herewith, shall be deemed authorized and approved without any requirement of further act or any actions by the Debtors or their general partners, managers, members, directors, or other governing bodies, or any other Entity or Person. Upon the entry of the Confirmation Order, the Debtors, the Reorganized DBS Debtors, and the Post-Effective Date DISH Wireless Debtors, as applicable, are authorized (without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation or rule, or the vote, authorization or approval of any Entity) to take all actions as may be necessary or appropriate to effect the Restructuring Transactions and any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the negotiation, execution, delivery, filing, and performance of the Amended Notes Indentures and any related instruments, agreements, and documentation contemplated thereby, and the issuance and distribution of the Amended Notes, in each case, as provided in the Plan and the applicable Amended Notes Indentures; (3) the cancellation of any existing notes, instruments, certificates, and other documents being exchanged for, replaced by, or otherwise rendered of no further force or effect by the Amended Notes or any other transaction contemplated by the Plan; (4) the execution and delivery of such agreements, instruments, and other documents as may be necessary or appropriate to implement any Sale and to distribute the DISH Wireless Distributable Value in accordance with the Plan; (5) taking any action deemed necessary, appropriate or desirable to carry out the provisions of the Plan and the FCC Trust Documents, including with respect to the treatment of Secured Type A Claims; (6) to the extent not previously redeemed, the redemption of all outstanding DNC Notes by or on behalf of non-Debtor DNC pursuant to <u>Article IV.D</u>; (7) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, interest, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (8) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (9) the implementation of the waterfall set forth in Article VI.E with respect to distributions on account of Allowed DISH Wireless General Unsecured Claims held by the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries, in accordance with the Restructuring Support Agreement and the Plan;

84

(10) the execution, delivery, filing, recordation, and issuance of any other notes, documents, instruments, or agreements in connection with the Restructuring Transactions; and (11) subject to the occurrence of the Effective Date, the consummation of the remaining transactions contemplated by the Restructuring Support Agreement and the Plan that are to occur on or after the Effective Date.

The Confirmation Order shall and shall be deemed to, pursuant to section 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Confirmation Order shall authorize the Debtors, the Reorganized DBS Debtors, and the Post-Effective Date DISH Wireless Debtors, as applicable, to undertake the Restructuring Transactions, including those contemplated by the Restructuring Support Agreement and pursuant to sections 363, 365, and 1123 of the Bankruptcy Code.

### G. Director, Officer, and Manager Liability Insurance.

After the Effective Date, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors, shall not terminate, cancel, impair, or otherwise reduce the coverage under any D&O Policies (including any tail policy) in effect as of the Effective Date or purchased in connection with the Chapter 11 Cases, and all current and former members, managers, directors, officers, employees, and other individuals insured thereunder shall remain entitled to the full benefits of such D&O Policies for the full term of such policies, in each case, in accordance with and subject to the terms, conditions, limitations, and exclusions of such D&O Policies. Nothing in the Plan, any exhibit to the Plan, the Confirmation Order, this Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings, or any order entered related thereto, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, shall alter, amend, modify, or otherwise impair any rights, obligations, or coverage under any D&O Policy.

Notwithstanding anything to the contrary in the Plan, including Article V.A of the Plan, no D&O Policy shall be deemed rejected, terminated, cancelled, or adversely affected by operation of any provision of the Plan, including the deemed rejection of Executory Contracts and Unexpired Leases of the DISH Wireless Debtors pursuant to Article V.A of the Plan. To the extent any D&O Policy is deemed an Executory Contract, such D&O Policy shall be deemed assumed by the applicable Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, and the Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption.

### H. Cancellation of Notes, Instruments, Certificates, and Other Documents.

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests (and any guarantees or other obligations of a Debtor thereunder) shall, to the extent relating to Claims or Interests that are satisfied, released, compromised, discharged, cancelled, or otherwise treated under the Plan, be deemed cancelled and of no further force and effect. Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof,

except the rights provided for pursuant to the Plan or a Confirmation Order; provided, however, that the foregoing shall not cancel, impair, or otherwise affect (1) any Claim or Interest that is Reinstated under the Plan, (2) the DIP Financing Documents, which shall be governed by Article II.D, or (3) any Claim based upon the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture, in each case to the extent amended and supplemented pursuant to the applicable Amended Notes Indentures, or any obligations and rights thereunder or under any related documents or agreements, including any and all rights and obligations under security documents executed or delivered in connection with the 2026 Secured Notes Indenture or the 2028 Senior Secured Notes Indenture, in each case as amended and supplemented. All privileges, rights, indemnities and immunities of the Indenture Trustees, including the Collateral Agent for the 2026 Senior Secured Notes and the 2028 Senior Secured Notes, are expressly preserved. Notwithstanding anything to the contrary herein, the cancellation of any notes, indentures, securities, instruments, certificates, or other documents shall not impair, waive, release, discharge or otherwise affect the rights of any Indenture Trustee or trustee of the DWLLC Claims Trust to payment of fees and expenses, indemnification, reimbursement, priority of payment, charging liens, exculpation, limitation of liability, or any rights or obligations necessary to receive, process, or make distributions under the Plan or to enforce the foregoing rights.

Any such cancelled instrument, agreement or other document that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of, as applicable: (a) enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; and (b) allowing and preserving the rights of any applicable paying agent or trustee, to (i) make distributions in satisfaction of Allowed Claims, (ii) maintain and exercise their respective charging liens, against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions or for any amount and enforcing any obligation owed to the applicable paying agent or trustee under the Plan, (iv) maintain and enforce any right to indemnification, expense reimbursement, contribution, subrogation, any priority of payment or charging liens or any other claim or entitlement, (v) exercise their rights and obligations relating to the interests of their holders, and (vi) appear and be heard in these Chapter 11 Cases.

On the Effective Date, the Indenture Trustees shall be automatically and fully released and discharged from any further responsibility under the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture and shall have no further obligation or liability in respect of the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture, except as provided in the Plan and the Confirmation Order. The fees, expenses, and costs of any Indenture Trustee or trustee of the DWLLC Claims Trust, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, the 2029 Senior Notes Indenture and any applicable DWLLC Claims Trust agreement, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to the Plan or any applicable DWLLC Claims Trust agreement, including the fees and expenses of counsel, shall be paid in accordance with the terms of the Plan and the applicable Definitive Documents.

**I.      Corporate Existence**

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors may be amended or modified in accordance with the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**J.      Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan (including any action to be undertaken by the Debtors)  shall be deemed authorized and approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person, including: (a) the implementation of the Restructuring Transactions; (b) the execution, delivery, and performance of the Amended Notes Indentures and the issuance and distribution of the Amended Notes, in each case, in accordance with the Plan and the applicable Amended Notes Indentures; (c) the consummation of any intercompany settlements, setoffs, contributions, cancellations, reinstatements, or other intercompany transactions contemplated by the Plan (including with respect to Intercompany Claims and Intercompany Interests); (d) the distribution (if any) of the DISH Wireless Distributable Value in accordance with the Plan; (e) the administration of distributions on account of Allowed Secured Type A Claims in the manner provided in, to the extent applicable, the Plan and the FCC Trust Documents; (f) the adoption, execution, and filing of any organizational documents or amendments thereto of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, if any, contemplated by the Plan; (g) the selection of the directors and officers (or managers, as applicable) of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors as contemplated by the Plan and disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (h) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases and the payment of any Cure Costs in connection therewith, in each case in accordance with the Plan and any applicable Final Order; and (i) all other acts or actions contemplated by, or reasonably necessary or appropriate to implement, consummate, and effectuate the Plan and the Restructuring Transactions (whether to occur before, on, or after the Effective Date) in a manner consistent with the Plan and, to the extent applicable, the Restructuring Support Agreement.

All matters provided for in the Plan involving the corporate structure of the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, and any corporate action required by the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, in connection with the Plan, shall be deemed to have occurred and shall be in effect without any requirement of further action by the directors, officers, managers, or other governing bodies of the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable.

On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver any and all agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable. The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### K. The Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors.

On the Effective Date, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall be authorized to adopt any agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to Consummate the Plan.

### L. The Wind Down Debtor Account.

On or prior to the Effective Date, the Post-Effective Date DISH Wireless Debtors shall establish the Wind Down Debtor Account and deposit therein Cash equal to the Wind Down Amount from the gross proceeds of the Sale. The Wind Down Debtor Account shall be used to fund all fees, costs, and expenses incurred in connection with the administration and Wind Down of the DISH Wireless Debtors' Estates, including: (a) all administrative fees, costs, and expenses necessary to administer the Wind Down of the DISH Wireless Debtors' Estates; (b) all go-forward fees and expenses of Professionals retained by the Post-Effective Date DISH Wireless Debtors in connection with such Wind Down; (c) all fees and expenses of the Disbursing Agent incurred on or after the Effective Date allocable to the DISH Wireless Debtors; and (d) any taxes or fees payable by the Post-Effective Date DISH Wireless Debtors in connection with such Wind Down.

Following completion of the Wind Down of the Post-Effective Date DISH Wireless Debtors, any amounts remaining in the Wind Down Debtor Account shall be distributed by the Disbursing Agent in accordance with the priorities set forth in Article III of the Plan until all such remaining amounts are exhausted.

### M. Vesting of Assets in the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors.

Except as otherwise provided in the Plan, the Confirmation Order, any Sale Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances and interests. On and after the Effective Date, except as otherwise provided in the

88

Plan, the Confirmation Order, any Sale Order, or any agreement, instrument, or other document incorporated herein, each Reorganized DBS Debtor and Post-Effective Date DISH Wireless Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, all present and future property subject to Liens securing the indebtedness evidenced by the DBS Notes or obligations under the DBS Indentures as amended shall remain subject to all such Liens.

N.     **Wind-Down Authority of the Post-Effective Date DISH Wireless Debtors.**

On and after the Effective Date, the Post-Effective Date DISH Wireless Debtors shall have full authority, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, to take any and all actions necessary or appropriate, in their reasonable business judgment, to implement, administer, and complete the Wind Down of the DISH Wireless Debtors' Estates, including the authority to:

1.     identify, collect, and wind down any assets of the DISH Wireless Debtors' Estates not transferred to the DISH Wireless Successful Bidder pursuant to the Sale, and to make distributions therefrom in accordance with the Plan;

2.     abandon or donate to a charitable organization of their choosing, pursuant to section 554 of the Bankruptcy Code and without further notice to or action, order, or approval of the Bankruptcy Court, any property of the DISH Wireless Debtors' Estates that is not transferred to the DISH Wireless Successful Bidder pursuant to the Sale and that the Post-Effective Date DISH Wireless Debtors determine, in their reasonable business judgment, to be of inconsequential value and benefit to, or to be burdensome upon, the DISH Wireless Debtors' Estates;

3.     investigate, prosecute, compromise, settle, or otherwise resolve any Causes of Action belonging to the DISH Wireless Debtors' Estates on and after the Sale that are not otherwise released or waived under the Plan, without further notice to or action, order, or approval of the Bankruptcy Court;

4.     object to, compromise, settle, or otherwise resolve any Disputed Claims against the DISH Wireless Debtors without further notice to or action, order, or approval of the Bankruptcy Court, except as otherwise required by the Plan or the Bankruptcy Code;

5.     retain, employ, and compensate such attorneys, accountants, and other professionals and consultants as the Post-Effective Date DISH Wireless Debtors deem necessary or appropriate in connection with the Wind Down, and pay the reasonable and documented fees and expenses of such Professionals solely from the Wind Down Debtor Account;

6.     maintain and store the books, records, and documents of the DISH Wireless Debtors' Estates and, upon completion of the Wind Down, dispose of or destroy such books, records, and documents to the extent permitted by applicable law and any applicable record retention obligations; and

7.      take all steps necessary or appropriate to wind up the affairs of each Post-Effective Date DISH Wireless Debtor under applicable non-bankruptcy law, without further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, all costs and expenses incurred by the Post-Effective Date DISH Wireless Debtors shall be paid solely from the Wind Down Debtor Account to the extent such costs and expenses are incurred in connection with the administration and Wind Down of the DISH Wireless Debtors' Estates.

## O.      Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors and the officers, managers, general partners, and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## P.      Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (including, for the avoidance of doubt, any transfers from a Debtor to a Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor or to any other Person) of property under or in connection with the Plan, including or pursuant to: (a) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, or other interest in the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security pursuant to the Plan; (f) the consummation of any Sale and any transfer of assets pursuant thereto, or (g) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

90

**Q.      Certain Securities Law Matters.**

To the extent the Amended Notes are issued, offered, distributed, exchanged, or otherwise delivered under the Plan, such Amended Notes shall be issued, offered, and distributed to the fullest extent permitted in reliance on the exemption from registration provided by section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act and any other available exemption(s) from registration under applicable securities laws.

To the extent section 1145 of the Bankruptcy Code is applicable, the offer, issuance, and distribution of the Amended Notes under the Plan shall be exempt from the registration and prospectus delivery requirements of section 5 of the Securities Act and any applicable state securities laws, subject to the limitations set forth in section 1145 and applicable law.

To the extent section 1145 of the Bankruptcy Code is not available or is determined not to apply to any issuance or distribution of the Amended Notes, such notes shall be offered, issued, and distributed pursuant to one or more other available exemptions from registration (including, as applicable, section 4(a)(2) of the Securities Act, Regulation D, and/or Regulation S) and may be subject to customary legends and transfer restrictions consistent with applicable law and the applicable governing documents.  The availability of section 1145 of the Bankruptcy Code or any other exemption shall not be a condition to the occurrence of the Effective Date.

**R.      Preservation of Causes of Action.**

Except as provided in any Sale Order, in accordance with section 1123(b) of the Bankruptcy Code, and subject to Article VIII of the Plan and the terms of the Restructuring Support Agreement, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall retain and may enforce any and all Causes of Action of the Debtors and their Estates, whether arising before, on, or after the Petition Date, including any Causes of Action described in, or reserved by, the Plan, the Plan Supplement, or this Disclosure Statement.

Except to the extent that any Cause of Action is expressly waived, released, compromised, settled, exculpated, or otherwise disposed of pursuant to (a) the Plan, (b) the Confirmation Order, (c) the Restructuring Support Agreement, or (d) any Sale Order, no Cause of Action shall be deemed waived, released, compromised, exculpated, or otherwise disposed of by the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, and the Debtors, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors expressly reserve all rights to prosecute, enforce, settle, compromise, or otherwise resolve any such retained Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as provided in any Sale Order, upon the Effective Date, all Causes of Action of the Debtors and their Estates that are retained pursuant to the Plan shall vest in the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable. The Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall have the exclusive right, authority, and discretion to commence, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action, without the consent of any third party and without further notice to or order of the Bankruptcy Court, except as otherwise expressly provided in the Plan or the Confirmation Order.

Except to the extent a Cause of Action is expressly waived, released, compromised, settled, exculpated, or otherwise disposed of pursuant to the Plan, the Confirmation Order, the

Restructuring Support Agreement, or the Sale Order, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to any retained Cause of Action as a consequence of the filing, confirmation, or Consummation of the Plan.

### S.        Closing of the Chapter 11 Cases

Upon the occurrence of the Effective Date, the Debtors shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of one designated Debtor, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of such Debtor.

When all Claims that are Disputed have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Debtors shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## IX.      OTHER KEY ASPECTS OF THE PLAN

### A.        Treatment of Executory Contracts and Unexpired Leases.

#### 1.        Assumption and Rejection of Executory Contracts and Unexpired Leases.

As of the Confirmation Date, under the Confirmation Order pursuant to sections 365(a) and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease to which a DBS Debtor is a party shall be deemed assumed by the applicable Reorganized DBS Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is identified as a Rejected Contract or Lease on the Schedule of Rejected Contracts and Leases; (b) has expired or terminated pursuant to its own terms prior to the Confirmation Date; (c) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order; or (d) is the subject of a pending motion to reject filed by the Debtors as of the Confirmation Date.

As of the Confirmation Date, under the Confirmation Order pursuant to sections 365(a) and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease to which a DISH Wireless Debtor is a party shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) has expired or terminated pursuant to its own terms prior to the Confirmation Date; (b) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order, including pursuant to the Rejection Procedures Order or any notice filed thereunder; (c) is the subject of (i) a pending motion to assume or assume and assign filed by the Debtors as of the Confirmation Date or (ii) a pending motion to reject or a pending notice filed pursuant to the Rejection Procedures Order; (d) is an FCC Trust Document; or (e) is a D&O Policy, which shall be governed by Article IV.F of the Plan.

Nothing in Article V.A of the Plan shall limit, modify, or otherwise affect: (a) the treatment, including the effective date of assumption, assumption and assignment, or rejection, of any Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected pursuant to a Final Order, including pursuant to the Rejection Procedures Order or any notice filed thereunder; (b) the prosecution, resolution, withdrawal, or settlement, and the effective date of any relief granted, of any motion to assume, assume and assign, or reject an Executory Contract or Unexpired Lease that is pending as of the Confirmation Date; (c) the right of any DISH Wireless Debtor, the applicable DISH Wireless Successful Bidder, or the applicable DISH Wireless Backup Bidder to cause an Executory Contract or Unexpired Lease to be assumed and

92

assigned or rejected, as applicable; (d) the right of any DISH Wireless Debtor to seek or obtain authority to abandon personal property under section 554 of the Bankruptcy Code; or (e) the FCC Trust Documents or any aspect of the FCC Trust. Any pending motion to assume, assume and assign, or reject may be withdrawn, settled, or otherwise prosecuted by the Debtors prior to the Effective Date or the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors on and after the Effective Date, as applicable.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall be assumed in its entirety and shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by applicable law, any provision in an Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan that restricts, conditions, or prohibits, or purports to restrict, condition, or prohibit, or is breached or deemed breached by, such assumption or assumption and assignment, including any "change of control" provision or similar provision, shall be unenforceable to the extent of such restriction, condition, prohibition, or breach, and shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any default-related rights or demands for payment with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Contracts and Leases at any time prior to the Effective Date without order of the Bankruptcy Court; provided, that the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, may amend the Schedule of Rejected Contracts and Leases to add or remove any Executory Contract or Unexpired Lease after the Effective Date to the extent agreed with the relevant counterparties and upon entry of an order of the Bankruptcy Court authorizing such amendment.

## 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases by operation of the Plan must be Filed with the Bankruptcy Court within twenty-one (21) days after service of the Confirmation Order. For the avoidance of doubt, this deadline applies to all Executory Contracts and Unexpired Leases rejected by operation of the Plan, including (1) any Executory Contract and Unexpired Lease of a DISH Wireless Debtor rejected pursuant to Article V.A of the Plan and (2) any Executory Contract and Unexpired Lease identified as a Rejected Contract or Lease on the Schedule of Rejected Contracts and Leases. The deadline for filing Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Rejection Procedures Order or any separate order of the Bankruptcy Court shall be governed by such order or the applicable Bar Date Order, as applicable.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time shall be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the**

93

**Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, the Estates, or their property without the need for any objection by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**

All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified and treated as follows: (i) to the extent such Allowed Rejection Damages Claim is a Claim against a DBS Debtor, it shall be treated as a DBS General Unsecured Claim in accordance with Article III of the Plan; and (ii) to the extent such Allowed Rejection Damages Claim is a Claim against a DISH Wireless Debtor, it shall be treated as a DISH Wireless General Unsecured Claim in accordance with Article III of the Plan. Any Claim arising from the rejection of an Unexpired Lease of nonresidential real property shall be subject to section 502(b)(6) of the Bankruptcy Code.

### 3. Cure of Defaults for Assumed Contracts and Leases

With respect to each Executory Contract and Unexpired Lease assumed by a DBS Debtor pursuant to the Plan, any monetary defaults shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash in the ordinary course of business on or after the Effective Date, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding: (a) the amount of any Cure Costs; (b) the ability of the applicable Reorganized DBS Debtor to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the applicable Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; provided, that the DBS Debtors or the Reorganized DBS Debtors, as applicable, may settle any dispute regarding the amount of any Cure Costs without any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything in the Plan to the contrary, any Cure Costs asserted in connection with the assumption and assignment of any Executory Contract or Unexpired Lease pursuant to a Sale Order shall be governed by, and satisfied in accordance with, the Sale Order. Any Cure Costs arising in connection with any other assumption or assumption and assignment of any Executory Contract or Unexpired Lease under any separate order of the Bankruptcy Court shall be governed by such order.

**Any and all Proofs of Claim based upon Assumed Contracts and Leases, and for which any Cure Costs have been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 4. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, under such Rejected

Contracts and Leases, and all rights to such preexisting obligations shall vest in the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors on the Effective Date. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to Rejected Executory Contracts and Unexpired Leases.

### 5.       Indemnification Obligations.

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any governing body, general partners, directors, officers, managers, members, employees, attorneys, accountants, investment bankers, advisors, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be assumed by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors and shall remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any governing body, general partners, directors, officers, managers, employees, attorneys, accountants, investment bankers, advisors, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

### 6.       Insurance Policies.

Nothing in the Plan, any exhibit to the Plan, the Confirmation Order, this Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings or any order entered related thereto, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, shall diminish, impair, or otherwise modify any rights of the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, or any other insured, additional insured, beneficiary, or other covered party under any insurance policy that provides coverage to or for the benefit of any Debtor or such other insured, including any D&O Policies. To the extent any insurance policy issued to, or providing coverage to, any Debtor is an Executory Contract and has not previously been rejected pursuant to a Final Order of the Bankruptcy Court, such insurance policy shall be deemed assumed by the applicable Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, nothing in the Plan shall be deemed to revest in any Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor any insurance policy, proceeds, rights, or interests that are not property of the applicable Debtor's Estate.

### 7.       Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other

interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless otherwise agreed by the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, and the counterparty to such Executory Contract or Unexpired Lease.

No modification, amendment, supplement, or restatement to a prepetition Executory Contract or Unexpired Lease made by the Debtors during the Chapter 11 Cases shall, by virtue of such modification alone, give rise to an Administrative Claim against any Debtor or its Estate under section 503(b) of the Bankruptcy Code or otherwise; provided that the foregoing shall not limit the right of any counterparty to assert an Administrative Claim to the extent such Claim would otherwise be allowable under applicable Law.

### 8. Reservation of Rights.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

### 9. Nonoccurrence of Effective Date.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 10. Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor, Reorganized DBS Debtor, or Post-Effective Date DISH Wireless Debtor, as applicable, and shall remain liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### B. Provisions Governing Distributions

### 1. Timing and Calculation of Amounts to Be Distributed.

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act

under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VI of the Plan. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

For the avoidance of doubt, Article VI of the Plan governs only distributions made under the Plan from property of the Estates or other Plan consideration, including distributions from the Type A Claims Reserve on account of Allowed Secured Type A Claims. Notwithstanding any other provision of Article VI of the Plan, the mechanics and procedures governing distributions from the Type A Claims Reserve on account of Allowed Secured Type A Claims shall be as set forth in the FCC Trust Documents, and nothing in Article VI of the Plan shall be construed to modify or supersede the FCC Trust Documents with respect to the administration of the Type A Claims Reserve or the manner in which such distributions are made  (including any distributions made by the Trustee directly to Holders of Allowed Secured Type A Claims or made to, as applicable, DWLLC or Post-Effective Date DWLLC for further payment in accordance with the FCC Trust Documents and the FCC Trust Distributions Order).

### 2. Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent.  All distributions to Holders of Allowed Claims in Classes 1C, 1D, 1E, 1F, and 1G on account of the DBS Notes shall be made by the Disbursing Agent in the first instance to the applicable Indenture Trustee for further distribution to the applicable Holders in accordance with the applicable DBS Indenture. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, if the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable

To the extent distributions are made through an Indenture Trustee, the trustee of the DWLLC Claims Trust, DTC, or other securities intermediary, such distributions shall be deemed made to the applicable Holders when delivered to the Indenture Trustee, the trustee of the DWLLC Claims Trust, DTC, or such intermediary, as applicable.  Each Indenture Trustee and trustee of the DWLLC Claims Trust shall be entitled to rely on the records and procedures of DTC, Cede & Co., nominees, participants, brokers, banks, custodians, and other intermediaries and shall have no liability for any act or omission of any of the foregoing.  Such distributions shall be subject in all respect to any rights of each Indenture Trustee to assert a charging lien against such distributions. All distributions to be made through DTC shall be made eligible for distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any distribution under the Plan to Holders of Allowed Claims on account of the DBS Notes if such distribution is not eligible to be distributed through the facilities of DTC.  For the avoidance of doubt, the respective Indenture Trustees shall have no obligation to identify the Holders of Claims on account of the DBS Notes, respectively, calculate or allocate the amounts distributable to the Holders of Claims on account of the DBS

Notes hereunder, set up new positions at DTC relating to the distributions hereunder, or make or ensure such positions are DTC-eligible.

3.      **Rights and Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized DBS Debtors or, in the case of costs allocable to the Post-Effective Date DISH Wireless Debtors, from the Wind Down Debtor Account, as applicable.

4.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

(a)      **Record Date for Distribution.**

On the Distribution Record Date, the Claims Register shall be closed and the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the Claims Register (or, as may be applicable, only those designees of such Holders that are affiliates of such Holders, as determined by or may be waived by the Debtors in their sole discretion) as of the close of business on the Distribution Record Date. The Distribution Record Date shall not apply to the DBS Notes or any Securities of the Debtors for which a Plan distribution is to be made in exchange for such Securities.  For the avoidance of doubt, the Distribution Record Date has no application to any distribution from the Type A Claims Reserve.

(b)      **Delivery of Distributions in General.**

(i)      **Payments and Distributions on Disputed Claims.**

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Disbursing Agent, be deemed to have been made by the Disbursing Agent on the Effective Date unless the Disbursing Agent and the Holder of such Claim agree otherwise.

(ii)      **Special Rules for Distributions to Holders of Disputed Claims.**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Disbursing Agent, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(iii)      **Distributions.**

On and after the Effective Date, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims under the Plan. Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date shall be made on the next Subsequent Distribution Date that occurs after such Claim becomes an Allowed Claim. To the extent any reserve is expressly required under Article VII.D of the Plan or any other provision of the Plan, the Disbursing Agent may hold such distribution in and make such distribution from the applicable reserve in accordance with the Plan. Except as expressly provided in the Plan, nothing in Article VI.D.2(c) of the Plan shall be construed to require the establishment of any reserve with respect to any Claim. Subject to Article VI.D of the Plan, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to the Plan.

The Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, and the Disbursing Agent (including any Agent that may be acting as Disbursing Agent), as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for its own fraud, gross negligence, or willful misconduct as determined by a final, nonappealable order of a court of competent jurisdiction.

Neither the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, nor the Disbursing Agent shall have any obligation to make a distribution that consists of less than one hundred dollars ($100) in the aggregate to any Holder of an Allowed Claim.

### (c)    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, automatically and without need for a further order by the Bankruptcy Court and the Claim of any Holder to such property or interest in property shall be released, discharged, settled, compromised, and forever barred.

For the avoidance of doubt, any undeliverable, unclaimed, or undistributable amounts with respect to distributions from the Type A Claims Reserve shall be governed exclusively by the FCC Trust Documents (and any applicable order of a court of competent jurisdiction referenced therein), and not by section 347(b) of the Bankruptcy Code or the Plan.

### (d)    Manner of Payment Pursuant to the Plan.

At the sole and exclusive discretion of the Disbursing Agent, any Cash payment to be made hereunder may be made by check, ACH transfer, or wire transfer or as otherwise required or provided in the applicable agreements.  For the avoidance of doubt, the manner of payment of any distribution from the Type A Claims Reserve shall be governed solely by the FCC Trust Documents.

### 5.    Distributions to Consenting Creditors.

99

Distributions to Holders of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims on account of their respective Allowed DISH Wireless General Unsecured Claims under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date in accordance with the Restructuring Support Agreement shall be made to the DWLLC Claims Trust for the ratable benefit of the DWLLC Claims Trust Beneficiaries; provided, that pursuant to the terms of the Restructuring Support Agreement and notwithstanding anything to the contrary in Article VI.E of the Plan or elsewhere in the Plan, the Plan Supplement, or the Confirmation Order, if the DWLLC Claims Trust recovers any amounts exceeding the DWLLC Recovery Cap, then the DWLLC Claims Trust shall (1) hold such excess amounts for the benefit of Reorganized DBS and (2) promptly remit such amounts to Reorganized DBS (without set-off or counterclaim).

Pursuant to the Restructuring Support Agreement, all amounts recovered by the DWLLC Claims Trust from DWLLC's Estate and/or the FCC Trust on account of Allowed DISH Wireless General Unsecured Claims held by the DWLLC Claims Trust under the DWLLC Intercompany Loan shall be applied in the following order of priority:

1. first, to the trustee of the DWLLC Claims Trust and the DWLLC Claims Trust for any unpaid and outstanding fees and reasonable and documented expenses of the trustee and the DWLLC Claims Trust (including the outstanding fees of counsel to the trustee of the DWLLC Claims Trust and counsel to the DWLLC Claims Trust);

2. second, up to the DWLLC Recovery Cap, such amounts recovered by the DWLLC Claims Trust shall be distributed by the DWLLC Claims Trust to the applicable Indenture Trustees on behalf of Holders of 2028 Senior Secured Notes Claims, 2028 Senior Notes Claims, and 2029 Senior Notes Claims on a Pro Rata basis, to be applied to the optional redemption of the applicable 2028 and 2029 Notes at the applicable optional redemption price in accordance with the applicable DBS Notes Indenture;

3. third, if the DWLLC Claims Trust recovers any DWLLC Excess Recovery, the DWLLC Claims Trust shall (a) hold the DWLLC Excess Recovery in trust for the benefit of the applicable Indenture Trustee for the 2028 Senior Secured Notes on behalf of the Holders of the 2028 Senior Secured Notes and (b) promptly remit the DWLLC Excess Recovery to such Indenture Trustee (without set-off or counterclaim), to be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on 2028 Senior Secured Notes then outstanding, in each case at par, without any premium, penalty, or charge (pursuant to provisions of the Amended 2028 Senior Secured Notes Indenture to be amended to implement such redemption feature); and

4. fourth, any DWLLC Residual Recovery shall be remitted by the DWLLC Claims Trust to the applicable Indenture Trustees for the 2028 Senior Notes and the 2029 Senior Notes, to be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on the 2028 Senior Notes and 2029 Senior Notes then outstanding, on a Pro Rata basis, in each case at par, without any premium, penalty, or charge (pursuant to the provisions of the 2028 Senior Notes

100

Indenture and the 2029 Senior Notes Indenture to be amended to implement such redemption features).

For the avoidance of doubt, the remittance of any DWLLC Excess Recovery to the applicable Indenture Trustee for the 2028 Senior Secured Notes for application to the optional redemption of Allowed 2028 Senior Secured Notes Claims pursuant to Article VI.E of the Plan and the Restructuring Support Agreement is in addition to, and not in lieu of, any distributions made to Holders of Allowed 2028 Senior Secured Notes Claims from the proceeds of the DBS Cash Sweep or any other consideration available to Holders of Allowed DBS Notes Claims under the Plan

Notwithstanding anything to the contrary in Article VI.E of the Plan or elsewhere in the Plan, and for the avoidance of doubt, the treatment of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims against the DBS Debtors under Classes 1D, 1F and 1G, respectively, and the treatment of such Allowed Claims under the Plan with respect to the DBS Debtors shall not alter, impair, satisfy, discharge, or otherwise affect such Holders' separate Allowed DISH Wireless General Unsecured Claims against DWLLC under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries prior to the Petition Date in accordance with the Restructuring Support Agreement. All distributions for the benefit of the Holders of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims against the DBS Debtors under Classes 1D, 1F, and 1G, respectively, shall be made through the applicable Indenture Trustee for application and further distribution to the applicable Holders in accordance with the applicable DBS Indenture. The Indenture Trustees shall have no duty after the Effective Date with respect to the DWLLC Claims Trust except to distribute funds actually received in accordance with the applicable DBS Indenture. The duties, obligations, liabilities, and protections of the trustee of the DWLLC Claims Trust shall be limited to those expressly set forth in the applicable trust agreement and accepted by such trustee, and the trustee of the DWLLC Claims Trust shall have no personal liability for obligations of the Debtors, Reorganized DBS Debtors, Post-Effective Date DISH Wireless Debtors, the DWLLC Claims Trust, Holders, or beneficiaries, except as expressly provided in the applicable trust agreement.

### 6. Compliance with Tax Requirements/Allocations.

In connection with the Plan, to the extent applicable, the Disbursing Agent shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements unless an exception applies. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes is reasonable and appropriate. The Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and

exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

### 7.  Allocation of Plan Distributions Between Principal and Interest.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein. Distributions made to the Indenture Trustees for the benefit of their respective Holders shall be made for each series of DBS Notes, in accordance with the terms of the relevant DBS Indenture.

### 8.  No Postpetition Interest on Claims.

Other than with respect to Allowed DBS Notes Claims or as required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim. Notwithstanding the foregoing, to the extent that the payment of postpetition interest on any Claim is required by applicable law for such Claim to satisfy the requirements of section 1124 of the Bankruptcy Code, the Holder of such Allowed Claim shall receive postpetition interest on such Claim at the applicable contractual rate or, if no contractual rate applies, at the Federal Judgment Rate, in each case calculated from the Petition Date through the date such Claim is paid in full.

Notwithstanding the foregoing, to the extent that a Holder of a Disputed DISH Wireless General Unsecured Claim asserts that it is entitled to postpetition interest on such Claim for the period from the Effective Date to the date of distribution, such Holder may seek an order of the Bankruptcy Court awarding such postpetition interest upon notice and a hearing; provided that no such postpetition interest shall be paid except pursuant to a Final Order of the Bankruptcy Court expressly authorizing such payment, and no such postpetition interest shall be payable from the DISH Wireless Distributable Value except to the extent expressly authorized or directed by such Final Order.

### 9.  Foreign Currency Exchange Rate.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)* on the Effective Date.

### 10.  Setoffs and Recoupment.

Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, may, but shall not be required to, set off or recoup any Claims of any nature whatsoever that the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors may have against the claimant against any amounts otherwise payable to such claimant under the Plan (including

any Plan Distributions), but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors of any such Claim they may have against the Holder of such Claim. On and after the Confirmation Date, without the need for Bankruptcy Court approval, the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, may exercise, litigate, or settle any rights of setoff or recoupment that the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors may have. On the Effective Date, all such rights of setoff or recoupment shall be preserved and shall vest in the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable.

In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### 11. Claims Paid or Payable by Third Parties.

#### (a) Claims Paid by Third Parties.

The Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, a Reorganized DBS Debtor, or a Post-Effective Date DISH Wireless Debtor, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized DBS Debtor, or a Post-Effective Date DISH Wireless Debtor, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized DBS Debtor or a Post-Effective Date DISH Wireless Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

Notwithstanding anything to the contrary in Article VI.K.1 of the Plan, no distribution under the FCC Trust Documents shall give rise to any obligation to repay or return any distribution made under the Plan to any Debtor, Reorganized DBS Debtor, or Post-Effective Date DISH Wireless Debtor..

#### (b) Claims Payable by Insurance, Third Parties

No distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Claim has exhausted all

remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor-payors pays or satisfies in full or in part a Claim (if and to the extent finally adjudicated by a court of competent jurisdiction or otherwise settled), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Article VI.K.2 of the Plan is not intended to direct any Holder of a Claim to exhaust remedies against the FCC Trust.

### (c)      Applicability of Insurance Policies

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party under any of the Debtor's insurance policies with respect to such policies (including the D&O Policies), nor shall anything contained in the Plan (a) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under any insurance policy, applicable law, equity, or otherwise, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

### C.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.

#### 1.      Allowance of Claims.

After the Effective Date and subject to the terms of the Plan, each of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors shall have and retain any and all rights and defenses that such Debtor had with respect to any Claim or Interest immediately before the Effective Date.  The Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, may, in their discretion, deem any Unimpaired Claim to be Allowed to the same extent such Claim would be allowed under applicable non-bankruptcy law.

Any objections to Claims shall be served and Filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; provided that the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors, may extend such deadline to object to Claims for an additional one hundred and eighty (180) days in their sole discretion upon the filing of a notice with the Bankruptcy Court, without further notice or a hearing; provided, further, that any further extensions thereafter shall be permitted only after notice and a hearing.  All Disputed Claims not objected to by the end of such period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding anything to the contrary in Article VII of the Plan, the procedures in Article VII of the Plan shall not apply to Secured Type A Claims, and the eligibility, determination, and payment of Secured Type A Claims shall be governed solely by the FCC Trust Documents, and, to the extent applicable, subject to the FCC Trust Distributions Order.

#### 2.      Claims Administration Responsibilities.

Except as otherwise expressly provided in the Plan, from and after the Effective Date, the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors shall have the exclusive authority to: (a) File, withdraw, prosecute, or litigate to judgment any objection to any Claim; (b) settle or compromise any such objection, in each case, without further notice to, or action, order, or approval of, the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlement, compromise, or determination, without further notice to, or action, order, or approval of, the Bankruptcy Court.

Except as otherwise expressly provided in the Plan or the Confirmation Order, from and after the Effective Date, each of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall have and retain any and all rights and defenses that such Entity had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including any Causes of Action retained pursuant to the Plan.

### 3.      Disputed Claims Process.

If the Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, dispute any Proof of Claim that is Filed on account of an Unimpaired Claim, such dispute shall be determined, resolved, or adjudicated in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date; provided, however, that the Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, or the Holder of such Claim may elect to have the validity or amount of such Claim adjudicated by the Bankruptcy Court instead.  If the Holder makes such election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been commenced.

If the Debtors, the Reorganized DBS Debtors, or Post-Effective Date DISH Wireless Debtors, as applicable, dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to Article III.B of the Plan or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors, the Reorganized DBS Debtors, or Post-Effective Date DISH Wireless Debtors, as applicable, shall File an objection with the Bankruptcy Court, and such dispute shall be determined, resolved, or adjudicated by the Bankruptcy Court.

### 4.      Disputed Claims Reserve.

On or before the Effective Date, the Disbursing Agent shall be authorized, but not directed, to establish and maintain the Disputed Claims Reserve exclusively from the DISH Wireless Distributable Value, in the Disputed Claims Reserve Amount, to the extent the Disbursing Agent determines is appropriate in its reasonable discretion.  The Disbursing Agent may, in its reasonable discretion, hold Cash in the Disputed Claims Reserve and make distributions, if any, from the Disputed Claims Reserve on account of Allowed DISH Wireless General Unsecured Claims in Class 2E that are Disputed as of the Effective Date as such Claims are resolved by settlement or Final Order.  To the extent any amount set aside in the Disputed Claims Reserve on account of a DISH Wireless General Unsecured Claim is not distributed to the Holder of such Claim because such Holder has received a prior or concurrent distribution from the FCC Trust, such amount shall be released from the Disputed Claims Reserve and redistributed as part of the DISH Wireless Distributable Value available for Pro Rata distribution to other Holders of Allowed DISH Wireless General Unsecured Claims in Class 2E, without further notice to or order of the Bankruptcy Court.

To the extent any Disputed DISH Wireless General Unsecured Claim in Class 2E is Allowed after the Effective Date, such Holder shall receive its distribution, if any, from the DISH Wireless Distributable Value in accordance with Article III.B.2(e) of the Plan and the distribution provisions of Article VI of the Plan, solely to the extent of amounts available in the Disputed Claims Reserve.  Any amounts remaining in the Disputed Claims Reserve after all such Disputed Claims have been resolved and all related distributions, if any, have been made shall be released and distributed as part of the DISH Wireless Distributable Value in accordance with the Plan, without further notice to or order of the Bankruptcy Court.

### 5.      Estimation of Claims.

Before, on, or after the Effective Date, the Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable Law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision in the Plan to the contrary, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed estimated at zero dollars ($0.00), unless otherwise ordered by the Bankruptcy Court.  If the Bankruptcy Court estimates any Claim and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings. The Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, may elect to pursue supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code (or otherwise) be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration no later than seven (7) days after the date on which such Claim is estimated.  The foregoing Claim objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or otherwise resolved by any mechanism approved by the Bankruptcy Court.

### 6.      Adjustment to Claims or Interests Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors without having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.      Disallowance of Claims or Interests

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy

Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided in the Plan or as agreed to by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, any and all Proofs of Claim Filed after the General Claims Bar Date or Governmental Bar Date, as applicable, shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order**.

### 8.     Amendments to Proofs of Claim or Interest

From and after the Effective Date, and subject to the Bar Date Order and Bankruptcy Rule 3003, a Proof of Claim (or, if applicable, a Proof of Interest) may not be Filed or materially amended with regard to amount, priority, or Secured status without the prior authorization of the Bankruptcy Court or the written consent of the Debtors (before the Effective Date) or the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors (after the Effective Date), as applicable.  Any such new or amended Proof of Claim (or, if applicable, Proof of Interest) Filed without such authorization or consent shall be deemed Disallowed in full and reflected accordingly in the Claims Register without any further action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, this paragraph applies only after the applicable General Claims Bar Date or Governmental Bar Date, as applicable, has occurred.

### 9.     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

### 10.     Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

### D.     Settlement, Release, Injunction, and Related Provisions.

### 1.     Discharge of Claims and Termination of Interests and Intercompany Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement

107

or document created or entered into pursuant to the Plan or the Confirmation Order, the distributions, rights, and treatment provided in the Plan shall be in complete satisfaction and discharge, effective as of the Effective Date, of all Claims, Interests, Intercompany Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests and Intercompany Interests in, the Debtors, their Estates or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Interests, or Intercompany Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim, Interest or Intercompany Interest based upon such debt, right, Interest or Intercompany Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such Claim, Interest or Intercompany Interest has accepted the Plan.

The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims), Interests, and Intercompany Interests (other than any Intercompany Interests that are Reinstated), subject to the occurrence of the Effective Date.

Notwithstanding anything to the contrary in Article VIII.A of the Plan, the discharge provided in the Plan shall not apply to, and nothing in the Plan or the Confirmation Order shall discharge, release, impair, waive, or otherwise affect, (x) any Person's rights (if any) to enforce the FCC Trust Documents in accordance with their terms, (y) any obligations of a Reorganized DBS Debtor to pay Cure Costs (or other amounts required under section 365(b)(1) of the Bankruptcy Code as a condition to assumption) with respect to an Executory Contract or Unexpired Lease assumed by a DBS Debtor pursuant to the Plan, to the extent such obligations remain unpaid as of the Effective Date, or (z) any Claim held by a Holder that is or may constitute a Covered Claim, which shall survive the discharge provided in the Plan solely to the extent necessary for such Holder to assert such Claim against the FCC Trust and receive distributions therefrom in accordance with the FCC Trust Documents and subject to the FCC Trust Third-Party Payment Provisions.

### 2.    Release of Liens

Except as otherwise specifically provided in the Plan, the Confirmation Order, the Amended Notes Indentures, the Sale Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or existing in connection with the DBS Notes and any Liens securing any DBS Notes, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Allowed Secured Claim, satisfaction in full of the portion of such Allowed Secured Claim that is Allowed as of the Effective Date, except for any Other Secured Claim that is Reinstated under the Plan, any Liens securing the DIP Financing Claims until such DIP Financing Claims have been paid in accordance with Article II.D of the Plan, or any Liens required to continue in accordance with the Plan and the applicable Amended Notes Indenture with respect to the Amended 2026 Senior Secured Notes or the Amended 2028 Senior Secured Notes, all mortgages, deeds of trust, Liens, pledges, or other security interests in or against any property of the Debtors or their Estates shall be fully satisfied and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable

108

agent of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, and their successors and assigns.  Each Holder of such an Allowed Secured Claim (and the applicable agent for such Holder) shall be authorized and directed, and the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall be entitled to direct, at the sole cost and expense of the applicable Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor, such Holder (or applicable agent for such Holder) to release any collateral or other property of any Debtor (including any possessory collateral) held by such Holder (or the applicable agent for such Holder) and to take such actions as may be reasonably requested by the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors to evidence the release of such mortgage, deed of trust, Lien, pledge, or other security interest, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state or local agency records office or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgage, deed of trust, Lien, pledge, or other security interest.

### 3.    Releases by the Debtors

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, in each case except for Claims arising under, or expressly preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, their Estates, and the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors, in each case on behalf of themselves and their respective successors, assigns, and Representatives, and any and all Entities that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, and the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, Representatives, or any other Entity claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest or Intercompany Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, the Restructuring Transactions, the FCC Trust, the FCC Trust Documents, the FCC Trust Assets, the FCC Trust**

109

Contribution, the Type A Claims Reserve, the Chapter 11 Cases, the Debtors' in- or out- of-court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, including the sale and marketing efforts related thereto, intercompany transactions between or among the Debtors or between or among the Debtors and their non-Debtor Affiliates, the Restructuring Support Agreement, the Prepetition Secured Loan Agreement, the DIP Facility, the DIP Order, the Sale, the Sale Order, the Sale Documents, the Amended Notes, the Amended Notes Indentures, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Definitive Documents, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, this Disclosure Statement, the Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, this Disclosure Statement, the DIP Facility, the Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any post-Effective Date obligations of any party or Entity under the Plan, any exhibit to the Plan, the Confirmation Order, this Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings or any order entered related thereto, the Sale Order, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents; (2) any Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct; or (3) any rights, claims, or Causes of Action to enforce the FCC Trust Documents and the FCC Trust Distributions Order, in each case in accordance with their terms (including any rights to receive distributions from the FCC Trust or to compel the application of such distributions as required thereby); or (4) any Claim, defense, right of setoff or recoupment, or Cause of Action of the Debtors, their Estates, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors against any Released Party that has filed a Proof of Claim against any of the Debtors' Estates in the Chapter 11 Cases, to the extent such Claim, defense, right of setoff or recoupment, or Cause of Action: (a) constitutes a defense to, or basis for objection to, the allowance of such proof of claim in whole or in part; (b) constitutes a right of setoff, recoupment, or counterclaim with respect to any liability asserted in or arising from such proof of claim; or (c) arises from or relates to the same transaction, agreement, series of transactions, or occurrence or series of occurrences giving rise to the claims or liabilities asserted in such proof of claim; provided that nothing in this clause (4) shall be construed to (i) revive or reinstate any Claim or Cause of Action that has been separately released, waived, or relinquished by a written agreement

110

entered into prior to the Effective Date, (ii) limit the rights of any Released Party to assert any defense to any such Claim or Cause of Action, or (iii) expand the rights of the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, or any other Entity beyond those rights that existed under applicable Law as of the Petition Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims and Causes of Action released by the Debtor Release; (3) in the best interests of the Debtors, their Estates, and all Holders of Claims, Interests, and Intercompany Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, their Estates, and the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors,  asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.      **Releases by the Debtors, EchoStar, DNC, and the Specified Non-Debtor Affiliates.**

From and after the Effective Date, each of the Debtors, EchoStar, DNC, and the Specified Non-Debtor Affiliates, to the maximum extent permitted under applicable Law, as such Law may be extended subsequent to the Effective Date, hereby expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharges and releases each of the Consenting Creditors (solely in the Consenting Creditors' capacities as such), respectively, and their respective property and successors and assigns (solely in their capacities as such), of and from any and all Claims, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, now existing or hereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of laws, or otherwise, including causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that the Debtors, EchoStar, DNC, or the Specified Non-Debtor Affiliates would have been legally entitled to assert (whether individually or collectively) against any Consenting Creditor based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Effective Date; provided, however, that the foregoing shall not apply to any Claim or Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

5.      **Releases by the Consenting Creditors.**

From and after the Effective Date, each of the Consenting Creditors, to the maximum extent permitted under applicable Law, as such Law may be extended subsequent to the Effective Date, hereby expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharges and releases each of the Debtors, EchoStar, DNC, the Specified Non-Debtor Affiliates, and their respective property and successors and assigns, of and from any and all Claims, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, now existing or

111

hereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of laws, or otherwise, including causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that any Consenting Creditor would have been legally entitled to assert (whether individually or collectively) against the Debtors, EchoStar, DNC, or the Specified Non-Debtor Affiliates, in each case based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Effective Date; provided, however, that the foregoing shall not apply to any Claim or Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

6. **Releases by Holders of Claims, Interests and Intercompany Interests.**

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors (as applicable), whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, Representatives, and any other Entities claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, the Restructuring Transactions, the FCC Trust, the FCC Trust Documents, the FCC Trust Assets, the FCC Trust Contribution, the Type A Claims Reserve, the FCC Trust Distributions Order, the Chapter 11 Cases, the Debtors' in- or out- of- court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, including the sale and marketing efforts related thereto, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Restructuring Support Agreement, the Prepetition Secured Loan Agreement, the DIP Facility, the DIP Order, the Sale, the Sale Order, the Sale Documents, the Amended Notes, the Amended Notes Indentures, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Definitive Documents, the formulation, preparation,

dissemination, negotiation, or filing of the Restructuring Support Agreement, this Disclosure Statement, the Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, this Disclosure Statement, the DIP Facility, the Definitive Documents, the Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, any exhibit to the Plan, the Confirmation Order, this Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings or any order entered related thereto, the Sale Order, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, (2) any Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct,  (3) any rights, claims, or Causes of Action to enforce the FCC Trust Documents or the FCC Trust Distributions Order, in each case in accordance with their terms (including any rights to receive distributions from the FCC Trust or to compel the application of such distributions as required thereby), or (4) any Covered Claim held by a Releasing Party, which shall survive the releases provided above solely to the extent necessary for such Releasing Party to assert such Claim against the FCC Trust and receive distributions therefrom in accordance with the Plan (in respect of Secured Type A Claims) and the FCC Trust Documents.

Notwithstanding anything to the contrary in the Plan, neither the Plan, nor any order of the Bankruptcy Court, including the Confirmation Order, or any eligible Holder's election not to opt in to the Third-Party Release (as applicable), or to object to the Third-Party Release, shall modify or otherwise affect the requirement of the FCC Trust Documents that any Entity seeking to recover from the FCC Trust execute a full and complete release and discharge of any and all Covered Claims against the EchoStar Parties, in a form prepared and promulgated by the Trustee that is acceptable to EchoStar and DWLLC.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

7.      Exculpation.

113

**Except as otherwise specifically provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, each Exculpated Party is exculpated from, and no Exculpated Party shall have or incur any liability to, or be subject to any right, claim or cause of action by, any Entity for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of this Disclosure Statement, the Definitive Documents, the Solicitation Materials, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with this Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the First Day Pleadings, the Definitive Documents, the negotiation and pursuit of the Restructuring Support Agreement, the Amended Notes Indentures, the Plan Supplement, the participation in the DIP Facility, the participation in the Sale, the pursuit of Confirmation, the FCC Trust, the FCC Trust Documents, the FCC Trust Assets, the FCC Trust Contribution, the Type A Claims Reserve, the FCC Trust Distributions Order, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; provided, however, that the foregoing exculpation shall not apply to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.  The Exculpated Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities hereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

8.      **Injunction.**

**Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Intercompany Interests that have been released, discharged, or settled, or are subject to exculpation under the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or**

114

Intercompany Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests; and (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities, in each case, on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by the Plan until the closing of these Chapter 11 Cases.

Upon entry of the Confirmation Order, all Holders of Claims, Interests, and Intercompany Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim, Allowed Interest, or Allowed Intercompany Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, Interest, or Intercompany Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.H of the Plan.

Notwithstanding the foregoing, nothing in Article VIII.H of the Plan shall enjoin or otherwise restrict any Holder of a Claim that is or may constitute a Covered Claim from asserting such Claim against the FCC Trust or the Trustee, or from receiving distributions from the FCC Trust, in each case in accordance with the Plan (in respect of Secured Type A Claims) and the FCC Trust Documents.

### 9.      Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, no Governmental Unit shall deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, any Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, or another Entity with whom the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors have been associated, solely because such Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 10.      Subordination Rights

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute

115

an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property, assets, and interests distributed under the Plan, in each case other than as provided in the Plan.

### 11.      Document Retention

On and after the Effective Date, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors.

### 12.      Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

### E.      Conditions Precedent to Consummation of the Plan

### 1.      Conditions Precedent to the Effective Date.

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived in accordance with Article IX.B of the Plan:

**(a)**      the Restructuring Support Agreement shall not have been terminated as to the Consenting Creditors and shall be in full force and effect and no termination event thereunder shall have occurred and remain occurring;

**(b)**      the AT&T Closing Date shall have occurred;

**(c)**      the Sale shall have been consummated and the net proceeds thereof shall have been received by the DISH Wireless Debtors' Estates in accordance with the Sale Order;

**(d)**      the Restructuring Transactions shall have been implemented in all material respects;

**(e)**      no court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, or entered any final, non-appealable order or injunction (that has not been stayed) that makes illegal or otherwise restrains, enjoins, or prohibits the consummation of the Plan or any of the Definitive Documents;

**(f)**      any and all authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by Law to be received or to occur to implement the Plan on the Effective Date shall have been obtained or shall have occurred;

116

**(g)**   the Bankruptcy Court shall have entered the Disclosure Statement Order, which order shall be in full force and effect and shall not have been stayed, modified, or vacated on appeal;

**(h)**   the Bankruptcy Court shall have entered the Confirmation Order, which shall be in full force and effect and shall not have been reversed, stayed, modified, dismissed, reconsidered, or vacated on appeal, and such order shall:

> **(i)**   authorize the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;
>
> **(ii)**   decree that the provisions in the Confirmation Order and the Plan are non-severable and mutually dependent;
>
> **(iii)**   authorize the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, to take all actions applicable or necessary to (i) implement the Restructuring Transactions, (ii) make all distributions and issuances as required under the Plan, including the Amended Notes pursuant to the Amended Notes Indentures, and (iii) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement;
>
> **(iv)**   authorize the implementation of the Plan in accordance with the terms hereof;
>
> **(v)**   provide that all Claims for damages resulting from the rejection or termination of an Unexpired Lease of nonresidential real property shall be Allowed only to the extent provided under section 502(b)(6) of the Bankruptcy Code; and
>
> **(vi)**   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

**(i)**   the final version of each of the Plan, the Plan Supplement, and the Definitive Documents, and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all material respects with the Restructuring Support Agreement and the Plan, and comply with the applicable consent rights set forth in the Restructuring

117

Support Agreement and the Plan, and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement and the Plan, and all conditions precedent to the effectiveness of the Definitive Documents shall have been satisfied or waived in accordance with the terms of such Definitive Documents;

**(j)** the Amended Notes shall have been issued by DBS in accordance with the Plan;

**(k)** the Professional Fee Escrow Accounts shall have been established and funded in Cash in amounts equal to the DBS Professional Fee Escrow Amount and the DISH Wireless Professional Fee Escrow Amount, respectively, in accordance with Article II.B; and

**(l)** all amounts required to be paid by the Debtors, EchoStar, or DNC on or prior to the Effective Date as a condition precedent to the occurrence of the Effective Date under the Restructuring Support Agreement shall have been paid, or shall be paid substantially contemporaneously with the occurrence of the Effective Date, in accordance with the Restructuring Support Agreement and the Plan, including the Ad Hoc Group Professional Fees.

## 2. Waiver of Conditions

The conditions to Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting Creditors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to Confirm or Consummate the Plan.

## 3. Substantial Consummation

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## 4. Effect of Non-Occurrence of Conditions to the Effective Date

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or this Disclosure Statement shall: (1) constitute a waiver or release by the Debtors of any Claims, Interests, or Intercompany Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity in any respect; provided that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## F. Modification, Revocation, or Withdrawal of the Plan

## 1. Modifications and Amendments

Except as otherwise provided in the Plan and subject to any approval rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section

118

1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, this Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan. Notwithstanding anything to the contrary in the Plan, the Plan may be modified, with the consent of the Required Consenting Creditors, to provide for Consummation of the Plan as to the DBS Debtors to occur prior to Consummation of the Plan as to the DISH Wireless Debtors without resolicitation of votes on such modified Plan.

### 2. Effect of Confirmation on Modifications.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then: (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to the Plan with respect to such Debtor, other than the Restructuring Support Agreement and any rights or obligations thereunder that survive in accordance with its terms, shall be deemed null and void; and (3) nothing contained in the Plan with respect to such Debtor shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

## X.   CONFIRMATION OF THE PLAN

### A.   The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Confirmation Hearing may be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation of the Plan.  An objection to Confirmation of the Plan must be Filed with the

119

Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.  The Plan and Disclosure Statement Objection Deadline is August 7, 2026, at 5:00 p.m. (prevailing Central Time).

### B.        Requirements for Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of the Plan.  Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan otherwise satisfies the requirements for confirmation and "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith and not by any means forbidden by law.

### C.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan.

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their Advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared a projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections") with respect to the DBS Debtors, set forth in **Exhibit C** hereto.  Creditors and other interested parties should review Article XI of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors.  Based upon the Financial Projections with respect to the DBS Debtors and the terms of the Plan, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors (except to the extent contemplated by the Plan).

### D.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that each class of claims or equity interests that is impaired under a plan, accept the plan unless certain other requirements are

120

met.[42]   A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[43]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  A class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  A Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that actually vote on the Plan cast their ballots in favor of acceptance

Pursuant to Article III.E of the Plan, if a Class contains Claims and is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E.        Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that all other requirements for confirmation have been satisfied including that the plan has been accepted by at least one impaired class where such acceptance is determined without including acceptance by an insider.[44]  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or

---

[42]   For a discussion of plan confirmation requirements without acceptance by all impaired classes, see Article X.E of this Disclosure Statement entitled "Confirmation Without Acceptance by All Impaired Classes."

[43]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

[44]   *See* 11 U.S.C. §§ 1129(a)(10), 1129(b).  Section 101(31) of the Bankruptcy Code defines "insider" to include, among others, directors, officers, and persons in control of a debtor corporation, as well as affiliates or insiders of affiliates.  11 U.S.C. § 101(31).

withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and receive different treatment under a plan.  The test does not require that treatment be the same or equivalent, but that treatment be "fair."  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly."  All Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.

### 2.      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive any value under the Plan on account of such junior claims or interests.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it satisfies the "fair and equitable" requirement.  No Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.      Liquidation Analyses

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires, as a condition to confirmation, that each holder of a claim or an equity interest in an impaired class either (a) vote to accept or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if these Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code.  To make these findings, the Bankruptcy Court must: (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the Debtors' Chapter 11 Cases were converted to a chapter 7 case and the assets of such Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of an Impaired Claim or Interest would receive from such liquidation proceeds

122

under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the Distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In these cases, as described below, the Debtors believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation.

Attached hereto as Exhibits D-1 and D-2 and incorporated herein by reference are liquidation analyses (the "Liquidation Analyses") prepared by the DBS Debtors and DISH Wireless Debtors, respectively, with the assistance of the Advisors and reliance upon the valuation methodologies utilized by the Advisors.  As reflected in the Liquidation Analyses, the Debtors believe that liquidation of the Debtors' respective businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

The following chart reflects the estimated recoveries under a hypothetical chapter 7 liquidation as compared to the recoveries under the Plan:[45]

---

[45]   Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement. These estimates are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from these estimates should one or more underlying assumptions prove to be incorrect. Such differences may adversely affect the percentage of recovery to holders of Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on certain assumptions, the realization of which are beyond the Debtors' control.

| Class | Claims and Interests | Estimated Amount and Approximate Percentage Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
| 1A | Other Secured Claims | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: N/A |
| 1B | Other Priority Claims | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: N/A |
| 1C | 2026 Senior Secured Notes Claims | Estimated Allowed Amount: $2,762.0 million<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $2,762.0 million<br><br>Estimated Percentage Recovery: 78.1% – 92.9% |
| 1D | 2028 Senior Secured Notes Claims | Estimated Allowed Amount: $2,512.0 million<br><br>Estimated Percentage Recovery:<br><br>100% | Estimated Allowed Amount: $2,512.0 million<br><br>Estimated Percentage Recovery:<br><br>78.1% – 92.9% |
| 1E | 2026 Senior Notes Claims | Estimated Allowed Amount: $2,000.0 million<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $2,000.0 million<br><br>Estimated Percentage Recovery: 0% |
| 1F | 2028 Senior Notes Claims | Estimated Allowed Amount: $1,000.0 million<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $1,000.0 million<br><br>Estimated Percentage Recovery: 0% |
| 1G | 2029 Senior Notes Claims | Estimated Allowed Amount: $1,506.4 million<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $1,506.4 million<br><br>Estimated Percentage Recovery: 0% |
| 1H | DBS General Unsecured Claims | Estimated Allowed Amount: $1,884.7 million<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $1,884.7 million<br><br>Estimated Percentage Recovery: 0% |

| | | | |
|---|---|---|---|
| 1I | DBS Intercompany Claims | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 1J | Interests in DBS Debtors | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 2A | Other Secured Claims | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: N/A |
| 2B | Other Priority Claims | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: N/A | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: N/A |
| 2C | Prepetition Secured Loan Claims | Estimated Allowed Amount: $75.0 million<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $75.0 million<br><br>Estimated Percentage Recovery: 56.4% – 100% |
| 2D | Secured Type A Claims[46] | Estimated Allowed Amount: $120.2 million<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $120.2 million<br><br>Estimated Percentage Recovery: 100% |
| 2E | DISH Wireless General Unsecured Claims[47] | Estimated Allowed Amount: $9,011.6 – $10,548.6 – $13,925.8 million<br><br>Estimated Percentage Recovery:[48] 2.2% – 1.9% – 1.4% | Estimated Allowed Amount: $9,011.6 – $10,548.6 – $13,925.8 million<br><br>Estimated Percentage Recovery:[49] 0.5% – 0.6% |
| 2F | DNC Notes Guarantee Claims | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |

---

[46] The projected amount of Class 2D Secured Type A Claims assumes that no Holder of a Class 2E DISH Wireless General Unsecured Claim makes the optional Type A Convenience Claim Election to be treated as a Class 2D Secured Type A Claim.

| 2G | DISH Wireless Intercompany Claims | Estimated Allowed Amount: N/A | Estimated Allowed Amount: N/A |
|----|-----------------------------------|-------------------------------|-------------------------------|
|    |                                   | Estimated Percentage Recovery: N/A | Estimated Percentage Recovery: N/A |
| 2H | Interests in DISH Wireless Debtors | Estimated Allowed Amount: N/A | Estimated Allowed Amount: N/A |
|    |                                   | Estimated Percentage Recovery: N/A | Estimated Percentage Recovery: N/A |

## XI.   RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS, THE REORGANIZED DBS DEBTORS, AND THE POST-EFFECTIVE DATE DISH WIRELESS DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.   General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive and should not be regarded as presenting the only risks or considerations with respect to the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, the Plan, or the Plan's implementation.  In

---

[47]   The projected Claims range for Class 2E assumes that the Claims held by the DWLLC Claims Trust under the DWLLC Intercompany Loan are Allowed.  The low range assumes that the value of each Claim held by DWLLC's lease or contract counterparties that is subject to dispute is $0.00 based on DWLLC's performance having been excused under the *force majeure* provisions of the applicable agreements or pursuant to the doctrines of frustration of purpose, impossibility, or impracticability under applicable law.  The middle range assumes that the Claims arising from the termination of a lease of real property (*e.g.*, tower leases) are capped under section 502(b)(6) of the Bankruptcy Code.  The high range assumes that such lease claims are not capped under section 502(b)(6) but that Allowed Claims asserted by such creditors are discounted to present value at a discount rate of 10%.

[48]   The projected recovery percentage assumes that the assets available for distribution to Holders of Class 2E Claims are limited to the DISH Wireless Distributable Value and does not include such Holders' recovery, if any, from the FCC Trust under the FCC Trust Election.

[49]   The projected recovery percentage assumes that the assets available for distribution to Holders of Class 2E Claims are all remaining assets of the DISH Wireless Debtors' Estates after payment of higher priority Claims.

126

considering whether to vote to accept or reject the Plan, Holders of Claims entitled to vote on the Plan should read and carefully consider the factors set forth below, as well as other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

## B.      Bankruptcy Law and Chapter 11 Case Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  Here, it is possible that parties may object to confirmation of the Debtors' Plan on grounds related to how the Claims and Interests are classified in the Plan. In that case, the cost of the Chapter 11 Cases and time needed to confirm the Plan (or otherwise resolve the Chapter 11 Cases) could increase.  This is particularly the case if the Bankruptcy Court concludes that the classification of Claims and/or Interests under the Plan do not comply with the Bankruptcy Code's requirements.  Under such circumstances, the Plan might need to be modified. Such modification could require the Debtors to re-solicit votes on the Plan before the Plan can be confirmed.

Nevertheless, the Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.      The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern (as applicable), will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following, to the extent applicable:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee or examiner, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect

the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Moreover, the associated costs to the Debtors may be significantly increased if the Chapter 11 Cases prove to be highly contentious or protracted. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3. The Restructuring Support Agreement May Be Terminated

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies, including the withdrawal of such creditors' votes to approve the Plan. Any such loss of support could adversely affect the Debtors' Chapter 11 Cases and their ability to confirm and consummate the Plan.

### 4. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX.A of the Plan, the Consummation of the Plan is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan. In such event, if the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, the Debtors may be forced to liquidate their assets which the Debtors believe would likely result in less favorable outcomes to Holders of Claims and Interests than would be afforded by the Plan (including, with respect to assets contemplated to be sold or liquidated by the Plan, because such assets may be sold or liquidated in a manner less favorable than those contemplated by the Plan).

### 5. If the Plan Is Confirmed But Consummation Does Not Thereafter Occur, the Plan Will Become Null and Void in All Respects.

Confirmation of the Plan by the Bankruptcy Court is a necessary but not sufficient condition to the implementation of the Plan and the making of distributions to Holders of Allowed Claims. Consummation of the Plan—meaning the occurrence of the Effective Date—requires the satisfaction or waiver of each of the conditions precedent set forth in Article IX.A of the Plan following entry of the Confirmation Order. There can be no assurance that all such conditions will be timely satisfied or waived.

If the Plan is confirmed but Consummation does not thereafter occur, the Plan shall be null and void in all respects. In such event, nothing contained in the Plan or this Disclosure Statement shall: (a) constitute a waiver or release of any Claims against, or Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of any Holder of a Claim against or Interest in the Debtors, the Debtors themselves, or any other party in interest; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other party in interest. Entry of the Confirmation Order alone does not confer any legal protection on any party with respect to Claims, Interests, or rights that are intended to be modified, released, or discharged

under the Plan, and all such Claims, Interests, and rights would revert to their pre-confirmation status if the Effective Date does not occur.

This risk is distinct from and in addition to the risk of non-confirmation addressed above. Holders of impaired Claims should therefore not assume that a vote in favor of the Plan or entry of the Confirmation Order will result in the distributions and other treatment described in the Plan. Holders of Claims are strongly urged to review the conditions precedent to the Effective Date set forth in Article IX.A of the Plan and consult with their legal advisors regarding the consequences of non-consummation.

### 6.     The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  Nonetheless, there can be no assurance that votes will be received in sufficient number or amounts to enable the Bankruptcy Court to confirm the Plan, that there may not be disputes about whether sufficient accepting votes have been received or the outcome of such disputes.  In the event that the Plan is not accepted by one or more voting classes (not counting the votes of any insiders), the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the Restructuring Support Agreement.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 7.     The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate

Usually, votes to accept or reject a chapter 11 plan are solicited after the filing of a petition commencing a chapter 11 case and after the bankruptcy court has approved procedures relating to the solicitation, including a disclosure statement that the court has approved as containing adequate information.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with section 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable non-bankruptcy law;

- the chapter 11 plan be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short under the circumstances.

In addition, Bankruptcy Rule 3018(v) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.  While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**8.      The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Under the Plan, certain Classes are unimpaired and are conclusively presumed to accept the Plan without the solicitation of votes. Certain other Classes are impaired and entitled to vote to accept or reject the Plan. Certain additional Classes are deemed to reject the Plan because they will receive no distribution under the Plan. With respect to any Class that votes to reject the Plan, or that is deemed to reject the Plan, the Debtors intend to seek nonconsensual confirmation (commonly referred to as "cramdown") of the Plan in accordance with section 1129(b) of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will confirm the Plan by cramdown over any rejecting or deemed-rejecting Class.

There can be no assurance that the requisite acceptances to confirm the Plan will be received, or that the Bankruptcy Court will confirm the Plan even if votes are received in the requisite numbers and amounts. A non-accepting Holder of an Allowed Claim or other party might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their businesses or otherwise resolve these Chapter 11 Cases on terms that are as favorable as the Plan or what, if anything, Holders of Claims against them would ultimately receive.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented through an alternative mechanism or plan and what Holders of Claims and Interests would ultimately receive with respect to their Claims and Interests. Any alternative would likely provide Holders of Claims with less than they would have received pursuant to the Plan. Moreover, an inability to confirm the Plan could result in extended chapter 11 proceedings with greater administrative costs.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

130

9. **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if at least one impaired Class (as defined under section 1124 of the Bankruptcy Code) has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation may result in, among other things, increased expenses relating to professional compensation and additional delay in the Chapter 11 Cases.

10. **The Periods in Which the Debtors Have an Exclusive Right to Propose and Solicit the Plan May Expire**

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose and solicit votes on the Plan and prohibits creditors and others from proposing and soliciting votes on a plan. If the Debtors' exclusivity rights expire or the Bankruptcy Court terminates those rights, however, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan because creditors and other parties may propose a competing plan.

11. **The Debtors May Amend or Withdraw the Plan Prior to Confirmation**

The Debtors, subject to the terms and conditions of the Plan and the terms of the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation. The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

Additionally, subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn by the Debtors before Confirmation.

12. **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

Although uncommon, if the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such cases, a chapter 7 trustee is appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. As set forth in the Liquidation Analyses attached as **Exhibits D-1** and **D-2**, the Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative

131

expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 13. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the Restructuring Support Agreement. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 14. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date should occur quickly after the Confirmation Date, and have agreed to a milestone in the Restructuring Support Agreement in furtherance such quick consummation, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 15. Risk of Non-Occurrence of the Closing of the AT&T Transactions

The Plan's effectiveness is critically dependent upon the closing of the AT&T Transaction. As of the date of this Disclosure Statement, the AT&T Transactions had not yet closed and remains subject to certain closing conditions, including that the Final Judgment and Stipulation and Order entered in *United States v. Deutsche Telekom AG, et al*, Case No. 1:19-cv-02232, ECF Nos. 85 and 2-1 (D.D.C.) shall have been terminated or modified to allow the consummation of the AT&T Transactions (the "AFJ Termination"). The occurrence of the AT&T Closing Date is an express condition precedent to the Effective Date of the Plan. If the AFJ Termination fails to occur, the Debtors may be unable to close the AT&T Transactions, which would prevent the consummation of certain of the Restructuring Transactions and the Plan. There can be no assurance that AFJ Termination will be obtained on a timely basis, on acceptable terms, or at all.

### 16. Risk Related to Novel Regulatory Framework

As described in this Disclosure Statement, the FCC's actions in connection with the spectrum divestiture are without precedent—the FCC has never previously required a party to divest spectrum licenses under the threat of termination. As a result of the FCC-directed spectrum divestiture, DWLLC can no longer operate the 5G Network, and none of the DISH Wireless Debtors are entitled to any proceeds from the AT&T Transactions or the SpaceX Transactions. The novelty of the regulatory circumstances that precipitated the commencement of these Chapter 11 Cases by the DISH Wireless Debtors creates uncertainty regarding the ultimate resolution of legal and contractual disputes with respect to the DISH Wireless Debtors. Adverse determinations or regulatory action or delays caused by these or other factors could increase costs, delay case timelines, reduce the amount of distributable value available to creditors, or otherwise impair the ability of the Debtors to consummate the Plan. Holders of Claims are strongly urged to review the description of the AT&T Transactions and circumstances that precipitated the commencement of these Chapter 11 Cases as set forth in this Disclosure Statement in their entirety.

17.     **The DIP Facility Imposes Superpriority Liens, Milestones, and Financial Obligations That Could Adversely Affect Distributions to Unsecured Creditors**

The DISH Wireless Debtors anticipate seeking Bankruptcy Court approval for a debtor-in-possession term loan credit facility (the "DIP Facility") in an aggregate principal amount of up to $85 million provided by EchoStar to fund the administration of the Chapter 11 Cases and general corporate purposes in accordance with an approved budget.  The DIP Facility is proposed to be secured by liens on substantially all assets of the DISH Wireless Debtors and is proposed to carry a superpriority administrative expense claim over all other administrative expense claims and unsecured claims (subject to a carve-out and, with respect to shared collateral, the Prepetition Secured Loan).  Although the DISH Wireless Debtors believe that approval of the DIP Facility by the Bankruptcy Court is warranted, there can be no assurance that the Bankruptcy Court agrees and the failure to obtain such approval may leave the DISH Wireless Debtors without sufficient funding to pursue the Chapter 11 Cases.  The DISH Wireless Debtors anticipate that the DIP Facility will be repaid from Sale proceeds ahead of any distributions to holders of Class 2E Claims.  If the DIP Facility is drawn in excess of projections, the resulting reduction in Sale proceeds available for distribution could materially and adversely affect recoveries for holders of unsecured claims against the DISH Wireless Debtors.

18.     **The United States Trustee or Other Parties May Object to the Plan on Account of the Third-Party Release Provisions**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized DBS Debtors, Post-Effective Date DISH Wireless Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved as currently drafted, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

The Plan's Third-Party Release is structured on an opt in basis. The definition of "Released Parties" expressly excludes any Entity that: (i) elects not to opt in to (as applicable) the Third-Party Release or (y) timely objects to the Third-Party Release and does not withdraw or resolve such objection prior to entry of the Confirmation Order. Holders of Claims who wish to grant the Third-Party Release must affirmatively opt in to such release on their ballots or applicable release forms prior to the Voting Deadline.  Holders of Claims who wish to preserve their claims against non-Debtor Released Parties must timely elect not to opt in or timely object as described above. Failure to act in a timely manner in accordance with the applicable procedures could result in the inadvertent inclusion or exclusion of a Holder from the Third-Party Release in a manner the Holder did not intend, with no ability to undo such result after the Voting Deadline or entry of the Confirmation Order.

In addition, regardless of whether a Holder of a Covered Claim declines to opt into or objects to the Third-Party Release in the Plan, the FCC Trust Documents separately and independently require execution of a full and unconditional release of all Covered Claims against the EchoStar Parties—including the Debtors and their non-Debtor affiliates—as a condition to receiving any distribution from the FCC Trust.  Holders of Covered Claims should be aware that the FCC Trust release requirement operates independently of the Plan's release provisions, and that declining to opt in to the Plan's Third-Party Release or objecting to the Plan on the basis of the Third-Party Release will not preserve any Covered Claims against the EchoStar Parties if such Holder elects to receive distributions from the FCC Trust.

Holders of impaired Claims are strongly urged to consult with their legal advisors before the Voting Deadline to understand the opt in mechanics for the Third-Party Release, the identity of the Released Parties and Exculpated Parties, the Schedule of Non-Released Parties, the terms and conditions for pursuing Covered Claims against the FCC Trust (including all release requirements), and the consequences of granting or withholding any release under the Plan or the FCC Trust Documents.

### 19. The Restructuring Support Agreement Is Subject to Significant Conditions and Milestones

There are certain material conditions that must be satisfied under the Restructuring Support Agreement, including the timely satisfaction of milestones in the Chapter 11 Cases.  The ability to timely complete such milestones is subject to risks and uncertainties, certain of which are beyond the Debtors' control.

### 20. Dismissal of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors or other parties-in-interest may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code.  Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and might allow certain creditors to attempt to collect on their Claims or otherwise foreclose on the assets of the Debtors.  Moreover, the dismissal of the Chapter 11 Cases would severely impair the Debtors' ability to wind down their remaining decommissioning assets and the Retained Causes of Actions for the benefit of creditors.  Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' assets.

### C. Risks Related to Recoveries Under the Plan

### 1. Contingencies Could Affect Distributions to Holders of Allowed Claims

The distributions and recoveries available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, the amounts at which Claims are Allowed, and whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  Without limiting the generality of the foregoing, among other things and as described in this Disclosure Statement, the DISH Wireless Debtors have asserted *force majeure*, impracticability or impossibility, and frustration of purpose under leases and contracts to which they are parties and assert that any Claims arising from the termination of such tower leases and contracts should therefore be disallowed.  Additionally, the DISH Wireless Debtors assert that any Claims arising from the termination of the tower leases are subject to section 502(b)(6) of the Bankruptcy Code, which caps the claim of a lessor for damages resulting from the termination of a real property lease to: (A) the rent reserved by such lease, without

acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease following the earlier of the Petition Date and the date of repossession or surrender of the leased property; plus (B) any unpaid rent due under such lease, without acceleration, on the earlier of the Petition Date or the date of repossession or surrender of the leased property. The Bankruptcy Court, however, may disagree that a *force majeure* event has occurred, that the DISH Wireless Debtors' other defenses excuse performance, or that claims should be capped under section 502(b)(6) of the Bankruptcy Code, and there can be no certainty regarding the amounts at which Claims may be Allowed by the Bankruptcy Court. In addition, the range of projected recoveries for Class 2E Claims assumes that the DWLLC Intercompany Loan Claims would be Allowed and would be treated as a Type B-1 Claim with priority over Type B-2 Claims under the FCC Trust. The Bankruptcy Court, however, may disagree or may disallow or subordinate such Claim. The resolution of these issues may have a material impact upon distributions to and recoveries of Class 2E Claims. The occurrence of any of the foregoing contingencies, which could diminish Holders of Allowed Claims' distributions under the Plan, may not necessarily affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require resolicitation of the Plan to allow Holders of Claims in the Impaired Classes to change their votes.

### 2. Pending and Future Litigation May Affect Distributions

The Debtors are involved in various litigations, claims, and other proceedings, including proceedings relating to the conduct of the Debtors' businesses and operations, which so long as they remain unresolved represent a legal issue and potential Claims for monetary damages. Additionally, there is a risk of future litigation, claims, and other proceedings. Pending litigation or future litigation, pending or future claims, and other pending or future proceedings could each result in a material judgment against the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors. Such matters, and any judgments in connection therewith, could have a material negative effect on the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors and their ability to make distributions under the Plan.

In particular, more than 170 lawsuits have been filed by tower lessors and other 5G Network counterparties asserting breach of contract, unlawful detainer, and seeking declaratory relief, damages, and other relief, including for unpaid rent, future rent, equipment removal costs, and lost profits, with aggregate asserted claims that the Debtors believe far exceed DWLLC's available assets and ability to pay. DWLLC's attempt to centralize certain of these federal actions through multi-district litigation proceedings was denied by the Judicial Panel on Multidistrict Litigation, which found limited factual overlap and numerous case-specific issues among the pending proceedings, resulting in litigation proceeding before courts in numerous jurisdictions with potentially inconsistent outcomes.

### 3. The Reorganized DBS Debtors May Not Be Able to Achieve Their Projected Financial Results

The Financial Projections set forth in this Disclosure Statement represent the DBS Debtors' management team's best estimate of the DBS Debtors' future financial performance as of the date of this Disclosure Statement, which is necessarily based on certain assumptions regarding the anticipated future performance of the operations of the Reorganized DBS Debtors, as well as the United States and world economies in general, and the industry segments in which the DBS

135

Debtors operate in particular.[50]   While the DBS Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized and, therefore, the DBS Debtors actual results may differ materially from the Financial Projections.  If the DBS Debtors do not achieve their projected financial results, the DBS Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the DBS Debtors' historical financial statements.

### 4.      Distributions to Allowed Claims Under the Plan May Change

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately allowed and the estimated funds available for distribution.  The Debtors believe that these assumptions and estimates are reasonable.  There can be no assurance that the estimated amount of Claims in certain Classes will not be significantly more than projected, which could cause the value of distributions to creditors to be reduced substantially.  Certain assumptions may not materialize, and unanticipated events and circumstances may affect the ultimate results.  For example, if Administrative Expense Claims are lower (or higher) than anticipated, then the amount available for distribution to creditors would be more (or less) than projected herein and recoveries on account of Allowed Claims would be more (or less) than the estimated recoveries set forth herein.   The Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Nor can the Debtors determine with any certainty at this time, the funds that will be available to satisfy such Claims.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 5.      Distributions from the FCC Trust Are Subject to Additional Gating Requirements

Distributions on account of Secured Type A Claims under the Plan are subject to an independent gating requirement: such distributions may only be made if and when the FCC Trust Distributions Order—a separate order of the Bankruptcy Court approving the procedures for distributions from the Type A Claims Reserve established under the FCC Trust Agreement—has been entered and remains in effect and has not been stayed, modified, or vacated. This is a gating condition that is separate from and in addition to the occurrence of the Effective Date. If the FCC Trust Distributions Order is not entered by the Bankruptcy Court on a timely basis, on acceptable terms, or at all, or if it is subsequently stayed or vacated, no distributions may be made on account of Secured Type A Claims regardless of whether the Plan has otherwise become effective. There can be no assurance that the FCC Trust Distributions Order will be entered, or that any objections to the procedures set forth therein will be resolved favorably.

Furthermore, Holders of DISH Wireless General Unsecured Claims who assert that they hold Covered Claims may make an FCC Trust Election with respect to such Claims. Under the Plan, if a Holder makes an FCC Trust Election, then, absent written agreement of the applicable

---

[50]   Financial projections are not provided for the DISH Wireless Debtors because, as described elsewhere in this Disclosure Statement, the DISH Wireless Debtors intend to sell substantially all of their assets to maximize value for the benefit of their estates and creditors.

EchoStar Parties, under no circumstances shall the Disbursing Agent make any distribution under the Plan to such Holder during the pendency of such election. Any distribution made by the Disbursing Agent to a Holder that has made an FCC Trust Election will be deemed a Third-Party Payment under the FCC Trust Documents and will reduce such Holder's FCC Trust distributions on a dollar-for-dollar basis. Similarly, if the FCC Trust makes a distribution to a Holder of a Covered Claim, the Disbursing Agent is required to reduce corresponding Plan distributions to such Holder on a dollar-for-dollar basis. The Disbursing Agent and the FCC Trust Trustee must coordinate to effectuate concurrent distributions in order to prevent a double recovery.

Additionally, Holders of Covered Claims who wish to make the Type A Convenience Claim Election must do so by the Voting Deadline on their ballots and timely filing a Proof of Claim. A valid Type A Convenience Claim Election irrevocably reduces the Covered Claim to $100,000 for all Plan and FCC Trust purposes, entitles the Holder to be treated as a Holder of a Secured Type A Claim (Class 2D), and entitles the Holder to receive distributions solely from the Type A Claims Reserve under the FCC Trust Documents. A Holder making a valid Type A Convenience Claim Election waives all rights to distributions above $100,000 against the Debtors, their Estates, the EchoStar Parties, and the FCC Trust, and will be conclusively presumed to have accepted the Plan; such Holder will have no right to vote on the Plan with respect to the resulting Secured Type A Claim.  These elections and their consequences are complex and irreversible; Holders of Covered Claims are strongly urged to consult with their legal advisors before the Voting Deadline.

6.     **The FCC Trust Maintains a Priority Waterfall Among Claim Categories; Type B-2 Claims May Receive No Distribution**

The FCC Trust Agreement establishes a strict waterfall among Type A Claims (each capped at $100,000), Type B-1 Claims (covering certain accrued and outstanding amounts and completion costs), and Type B-2 Claims (covering certain future rents, profits, and other future amounts).  Other than with respect to Settled Covered Claims, Type B-2 Claims will not receive any distribution from the FCC Trust unless and until all Type A Claims and Type B-1 Claims have been paid in full and all other applicable conditions under the FCC Trust Agreement have been satisfied.  Holders of Covered Claims that are classified as Type B-2 Claims face a significant risk that the FCC Trust will not have sufficient funds to satisfy Type A and Type B-1 Claims in full, in which case Type B-2 Claims would receive no distribution from the FCC Trust.  Holders of Covered Claims are urged to consult with their legal advisors regarding the terms of the FCC Trust, the category under which their Claims may be classified, the consequences of such classification for their expected recovery, and the consequences of making the FCC Trust Election, including the release of any and all Covered Claims against the EchoStar Parties, including the Debtors.

7.     **The DWLLC Claims Trust's Election to Seek Recoveries from the FCC Trust as Type B-1 Claims Could Materially Diminish Distributions Available to Other Claimants, Including Holders of Covered Claims Classified as Type B-1 or Type B-2 Claims**

The DWLLC Claims Trust has been established to hold the DWLLC Intercompany Loan Claims against DWLLC for the ratable benefit of the DWLLC Claims Trust Beneficiaries.  The DWLLC Claims Trust may assert the DWLLC Intercompany Loan Claims against the FCC Trust as Type B-1 Claims. To the extent that the DWLLC Intercompany Loan Claims are allowed as Type B-1 Claims, Holders of 2028 and 2029 Notes who are DWLLC Claims Trust Beneficiaries

would be entitled to receive pro rata distributions from FCC Trust recoveries on the DWLLC Intercompany Loan Claims, subject to the $300 million DWLLC Recovery Cap, the DWLLC Excess Recovery, and the DWLLC Residual Recovery.  Holders of Covered Claims should be aware of the following significant risks arising from this structure.

(a) <u>Priority Effects on the FCC Trust Waterfall</u>.  The FCC Trust Agreement establishes a strict distribution waterfall: (i) first, all Trust Expenses and distributions on account of Eligible Type A Claims must be paid in full from the Type A Claims Reserve; (ii) second, distributions on account of Eligible Type B-1 Claims are to be made on a semi-annual basis until all Eligible Type B-1 Claims are paid in full or, if insufficient Trust Assets remain, on a pro rata basis; and (iii) third, distributions on account of Eligible Type B-2 Claims (other than B-2 Claims that are the subject of a Covered Claim Settlement) may only occur after five years from the Claims Opening Date and only if all Eligible Type A Claims and all Eligible Type B-1 Claims have been satisfied in full. If the DWLLC Intercompany Loan Claims are allowed as Eligible Type B-1 Claims, they will rank pari passu with—and directly compete for Trust Assets against—all other Eligible Type B-1 Claims submitted by tower lessors, infrastructure vendors, and other Claimants on account of their Covered Claims.  A significant Type B-1 recovery by the DWLLC Claims Trust could substantially diminish the pool of FCC Trust Assets available to other Eligible Type B-1 Claimants and could effectively preclude or substantially reduce distributions to Eligible Type B-2 Claimants entirely.

(b) <u>Potential Dispute Over Type B-1 Characterization</u>. The classification of the DWLLC Intercompany Loan Claims as Type B-1 Claims—rather than a Type B-2 Claim or an ineligible claim—may be disputed.  Type B-1 Claims are defined under the FCC Trust Agreement as Covered Claims for: (i) outstanding amounts due as of the earlier of December 31, 2025 or the date the Claimant received notice from an EchoStar Party that it is excused from its obligations or commitments under the agreements underlying the Covered Claim; and/or (ii) amounts expended or reasonably expected to be expended by the completion of the Covered Activities, such as costs for decommissioning towers and cell sites and costs for electricity used.  Disputes about whether (or the extent to which) the DWLLC Intercompany Loan Claims satisfy this definition may arise and such disputes may require resolution by the Trustee, through reconsideration proceedings, or in a court of competent jurisdiction.  A determination by the Trustee or a court that the DWLLC Intercompany Loan Claims are not Type B-1 Claims, or are only partially Type B-1 Claims, would reduce or eliminate the priority of the DWLLC Claims Trust's expected recovery from the FCC Trust relative to other Claimants, and could adversely affect distributions to Holders of 2028 and 2029 Notes who are DWLLC Claims Trust Beneficiaries. Conversely, a determination that the DWLLC Intercompany Loan Claims are Type B-1 Claims could effectively reduce Trust Assets available for other Eligible Type B-1 and Eligible Type B-2 Claimants.

(c) <u>Interaction Between FCC Trust Recoveries and Plan Distributions to Note Holders</u>. Holders of Notes who are Beneficiaries of the DWLLC Claims Trust are entitled to vote as holders of DISH Wireless General Unsecured Claims and to receive pro rata distributions on the DWLLC Intercompany Loan Claims from both the DISH Wireless Distributable Value under the Plan and from FCC Trust recoveries, subject in each case to the $300 million DWLLC Recovery Cap, the DWLLC Excess Recovery, and the DWLLC

Residual Recovery. Any distributions received by the DWLLC Claims Trust from the FCC Trust on account of the DWLLC Intercompany Loan Claims will constitute Third-Party Payments under the Trust Agreement to the extent applicable, and the interaction between FCC Trust recoveries and Plan distributions will be governed by terms of both the Plan and the FCC Trust Documents. The DWLLC Claims Trust's actual aggregate recovery from the FCC Trust and from the Plan—and the allocation of that recovery among Holders of Notes who are its Beneficiaries—will depend on the outcome of the Type B-1 eligibility determination, the amount of competing Eligible Type B-1 Claims, the total Trust Assets available for distribution, and the quantum of DISH Wireless Distributable Value actually generated from the Sale. There can be no assurance that the DWLLC Claims Trust will recover any amount approaching the $300 million DWLLC Recovery Cap from either source.  There can be no assurance that the DWLLC Claims Trust will recover any DWLLC Excess Recovery or any DWLLC Residual Recovery.

(d) <u>Effect on Type B-2 Claimants</u>. Holders of tower leases and other infrastructure agreements whose Covered Claims consist primarily of lost future rents, profits, and other future amounts—which are defining characteristics of Type B-2 Claims—face a materially heightened risk that no Trust Assets will remain for Type B-2 distributions if the aggregate of all Eligible Type A Claims, all Trust Expenses, and all Eligible Type B-1 Claims (including the DWLLC Intercompany Loan Claims, if allowed as a Type B-1 Claim) exhausts the $2,400,000,000 Trust corpus. Type B-2 distributions may not occur at all unless and until all Type A and Type B-1 Claims are paid in full, and may not begin until five years after the Claims Opening Date under any circumstances (absent acceleration by the Trustee if all Type A and B-1 Claims are paid in full prior to that date).  Holders whose Covered Claims are or may be categorized wholly or partly as Type B-2 Claims may wish to consider this risk in evaluating whether to make the FCC Trust Election and their expected recoveries from the FCC Trust.

Holders of impaired Claims are strongly urged to review the Plan, the FCC Trust Documents, and the description of the DWLLC Claims Trust and the DWLLC Intercompany Loan Claims set forth in this Disclosure Statement in their entirety, and to consult with their own legal and financial advisors regarding the effects of an FCC Trust Election by the DWLLC Claims Trust on their expected recoveries from the FCC Trust and under the Plan.

8.  **Covered Claimants Who Miss the Submission Deadline Will Be Permanently Barred From Recovery Through the FCC Trust**

A Holder of a Covered Claim that misses its applicable Covered Claim Submission Deadline under the FCC Trust Agreement will be forever barred from asserting the Covered Claim against the FCC Trust and from receiving any distributions from the FCC Trust on account of such Claim. Given the strict nature of this deadline and the consequences of failing to comply, Holders of potential Covered Claims are strongly urged to consult with their legal advisors regarding applicable submission deadlines and to timely submit their Covered Claims to the FCC Trust in accordance with the procedures set forth in the FCC Trust Agreement.

9.  **FCC Trust Distributions Are Subject to Stringent Eligibility Requirements, Mandatory Releases, and Third-Party Payment Offsets**

Holders of Covered Claims who make, or are deemed to have made, an FCC Trust Election must satisfy a number of conditions before receiving any distributions from the FCC Trust. The

139

FCC Trust is intended to pay Covered Claims only if (and to the extent) they are subject to a final, non-appealable judgment or arbitration award, or an eligible settlement that meets the criteria set forth in the FCC Trust Agreement. Distributions from the FCC Trust require execution of a full and unconditional release of all Covered Claims against the EchoStar Parties, will be reduced on a dollar-for-dollar basis by any Third-Party Payments received by the Holder (including distributions under the Plan), and cannot in any event exceed the full amount of the Eligible Covered Claim. There can be no assurance that any particular Covered Claim will satisfy the eligibility requirements under the FCC Trust Agreement, that the FCC Trust will have sufficient funds to pay all Eligible Covered Claims in full, or that a claimant will be able to satisfy the release and other procedural requirements necessary to receive a distribution.

10.     **Making an FCC Trust Election Will Cause Plan Distributions to Be Withheld, and Any Plan Distributions Received Will Be Treated as Dollar-for-Dollar Offsets Against FCC Trust Recoveries**

A Holder of an Allowed DISH Wireless General Unsecured Claim that asserts it holds a Covered Claim and makes an FCC Trust Election will be prohibited from receiving Plan distributions absent written agreement from an EchoStar Party, and the Disbursing Agent will be directed not to make any distribution under the Plan to such a Holder. Any distribution made under the Plan to a Holder that has made an FCC Trust Election will be deemed a "Third-Party Payment" under the FCC Trust Documents, reducing FCC Trust distributions on a dollar-for-dollar basis. Similarly, if the FCC Trust makes a distribution to a Holder of a Covered Claim, the Disbursing Agent is required to reduce corresponding Plan distributions on a dollar-for-dollar basis, and the Disbursing Agent and the FCC Trust Trustee must coordinate to effectuate concurrent distributions. The interaction of these mechanics is complex and Holders asserting Covered Claims should carefully review all applicable provisions of the Plan and the FCC Trust Documents and consult with their legal advisors before making any election.

11.     **The Type A Convenience Claim Election Is Irrevocable and Requires Broad Waivers and Releases**

A valid Type A Convenience Claim Election is an irrevocable agreement by the electing Holder to: (a) reduce its Covered Claim to $100,000 for all purposes under the Plan and FCC Trust Documents; (b) receive distributions solely from the Type A Claims Reserve established under the FCC Trust Agreement; and (c) waive and release all rights to distributions on any amount above $100,000 against the Debtors, their Estates, the EchoStar Parties, and the FCC Trust. Without limiting the foregoing, a Holder may not both make the FCC Trust Election for amounts above $100,000 and make a Type A Convenience Claim Election for the reduced $100,000 amount. A Holder making a valid Type A Convenience Claim Election must also timely file a Proof of Claim, will not be treated as a Class 2E Holder, and will be conclusively presumed to accept the Plan; such Holder will have no right to vote on the Plan with respect to the resulting Secured Type A Claim. Given the irrevocable nature of this election and the terms of the associated waivers and releases, Holders contemplating the Type A Convenience Claim Election should consult with their legal advisors before the Voting Deadline.

12.     **The FCC Has Unilateral Authority to Require Modification of the FCC Trust Agreement Process, and Any Such Modification Could Materially Alter the Terms and Conditions Governing Distributions to Holders of Covered Claims**

140

The FCC Trust Agreement may be amended, supplemented, or modified upon: (a) the request of EchoStar; (b) an agreement between the Trustee and EchoStar; or (c) notice by the Bureau of a modification required by the Bureau of the process described in Appendix B pursuant to paragraph 9 of Appendix B of the AT&T Order and paragraph 9 of Appendix B of the SpaceX Order, with each of (a) and (b) subject to Bureau approval, which shall not be unreasonably withheld, conditioned, or delayed. Accordingly, the Bureau possesses the unilateral authority to require modifications to the FCC Trust Agreement process without the consent of EchoStar, the Trustee, or any Claimant or Beneficiary.

Although the Bureau's authority to require modifications is expressly limited to the distribution process for Covered Claims, there can be no assurance that the Bureau will not purport to exercise that authority in a manner that would materially alter the procedures, eligibility standards, claim categories, distribution waterfall, submission deadlines, or other terms governing the submission of claims to, or the receipt of distributions from, the FCC Trust. Any such Bureau-required modification could purport to, among other things: (a) change the criteria by which Covered Claims are determined to be Eligible Covered Claims; (b) alter the allocation of Covered Claims among Type A, Type B-1, and Type B-2 categories and the corresponding distribution priority; (c) modify the Covered Claim Submission Deadline or other procedural requirements that, if missed, result in permanent forfeiture of Trust distributions; (d) change the timing or amount of distributions; or (e) impose new conditions on the receipt of distributions from the FCC Trust. A dispute may arise between the Bureau, on the one hand, and EchoStar, DWLLC, or other EchoStar Parties, on the other hand regarding a Bureau-required modification, and the adjudication of such dispute may delay resolution of these Chapter 11 Cases or distributions from the FCC Trust.

Any amendment, supplement, or modification made at the request of EchoStar or by agreement between EchoStar and the Trustee may not be inconsistent with the FCC Orders in effect as of May 12, 2026; however, modifications required by the Bureau pursuant to Section 9.11(c) of the Trust Agreement are not expressly subject to that same limitation, creating additional uncertainty as to the outer bounds of the Bureau's modification authority.

Furthermore, the initial Trustee has been selected by EchoStar and approved by the Bureau, and the Trustee's compensation is subject to approval by the Bureau. On a quarterly basis, the Trustee is required to provide EchoStar, DWLLC, and the Bureau with a report containing information regarding the number, categories, and aggregate amounts of Covered Claims submitted, aggregate distributions made, aggregate Trust Expenses disbursed, and the balance of FCC Trust Assets, and must also provide such additional information and reports as the Bureau may reasonably request. The Bureau's ongoing supervisory role, combined with its unilateral modification authority, means that the operational and economic terms of the FCC Trust may be subject to change at any time during the life of the Trust.

As set forth in the FCC Trust Agreement, upon request of the Trustee or a Claimant, the Bureau may also order, in its reasonable discretion and subject to the public interest standard, that the Trust remain open beyond the five-year Outside Termination Date. The exercise or non-exercise of this discretion by the Bureau could affect the timing and availability of distributions to Claimants holding Type B-2 Claims in particular.

Holders of Covered Claims should be aware that the terms of the FCC Trust—and the rights and procedures governing their recoveries thereunder—are subject to modification by a

141

federal regulatory agency acting pursuant to its own orders, and the Bureau may take the position that no private party, including any Claimant or Beneficiary, has any right to prevent or challenge such a modification other than through whatever administrative or judicial remedies may be available under the Communications Act and applicable law.  Holders of Covered Claims are strongly urged to consult with their legal advisors regarding the Bureau's modification authority and the potential implications of any future Bureau-required modifications for their expected recoveries from the FCC Trust.

### 13.    The Sale May Not Occur

Consummation of the Sale and receipt of the net proceeds thereof is an express condition precedent to the Effective Date of the Plan.  There can be no assurance that the DISH Wireless Debtors will locate a purchaser for their assets, inventory, and equipment.  Further, there can be no assurance that the Stalking Horse or any other party will consummate the Sale Transaction, including as a result of: (i) failure to reach agreement on the commercial terms of the Sale Transaction; (ii) volatility or adverse developments in the regulatory scheme that could impact the Sale Transaction; (iii) failure to obtain Bankruptcy Court, governmental, or any other approvals required to consummate the Sale Transaction; (iv) a material adverse change in the assets or value of the Sale; or (v) other factors beyond the Debtors' control.

Because consummation of the Sale is a condition to the Effective Date, the failure to consummate the Sale Transaction would prevent the Effective Date from occurring. If the Plan is confirmed but Consummation does not thereafter occur as a result of the failure of the Sale to close or the failure of any other condition precedent, the Plan shall be null and void in all respects, and nothing contained in the Plan or this Disclosure Statement shall: (a) constitute a waiver or release of any Claims against, or Interests in, the Debtors; (b) prejudice in any manner the rights of any Holder of a Claim or Interest, the Debtors, or any other party in interest; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other party in interest. In such circumstances, the failure to consummate the Sale Transaction could adversely impact distributions to Holders of all Classes of Claims against the DISH Wireless Debtors and could adversely affect the Reorganized DBS Debtors' restructuring.

### 14.    The DWLLC Special Committee's Investigation of Claims and Causes of Action May Result in Material Modifications to the Stalking Horse APA or Even Termination Thereof, Which May Reduce DISH Wireless Distributable Value

As noted herein, the DWLLC Special Committee has been delegated the task of investigating and assessing the merits and potential value of any potential Claims and Causes of Action held by DWLLC or its subsidiaries against one or more of EchoStar or its subsidiaries. Prior to the date of this Disclosure Statement, the Special Committee commenced an investigation relating to the Stalking Horse APA to assess, among other things, (a) the existence of potential Claims or Causes of Action that the DISH Wireless Debtors may hold against certain insiders and other affiliated entities, (b) whether the DISH Wireless Debtors should sell such Claims and Causes of Action as part of the proposed Sale; and (c) if so, whether the consideration provided under the Stalking Horse APA reflects sufficient value in exchange for such Claims and Causes of Action.

As of the date of this Disclosure Statement, the DWLLC Special Committee's investigation remains pending.  The course of the DWLLC Special Committee's investigation and its outcome

are unpredictable and uncertain, and may impact the DISH Wireless Debtors and distributions to Holders of Allowed Claims.  There can be no assurance as to the timing of completion of the DWLLC Special Committee's investigation, the conclusions the DWLLC Special Committee will reach, or the manner in which such conclusions will affect the terms of the proposed Sale or the Plan more broadly.  The Special Committee's findings could result in material modifications to the Stalking Horse APA, renegotiation of the consideration thereunder, the pursuit of independent litigation or other remedies, or the exercise of the "fiduciary out" provision of the Stalking Horse APA.  Any of these outcomes could cause significant delays in the sale process and the administration of these Chapter 11 Cases, and could adversely affect distributions to holders of Allowed Claims.

For example, the DWLLC Special Committee may determine that the consideration allocated to the Claims and Causes of Action to be sold under the Stalking Horse APA is insufficient to reflect their fair value.  If such Claims and Causes of Action are retained by the DISH Wireless Debtors' Estates and pursued independently, there can be no assurance as to the ultimate recovery, if any, that the Estates would realize, as the prosecution of such claims involves inherent litigation risks, including risks as to liability, damages, and collectability.

Further, depending on the results of the DWLLC Special Committee, one or more parties may exercise the "fiduciary out" provision of the Stalking Horse APA, which may result in the termination of the Stalking Horse APA and eliminate the baseline bid currently established by EchoStar as the Stalking Horse Bidder.  If the Stalking Horse APA is terminated or materially modified, there can be no assurance that an alternative transaction would be identified, negotiated, and consummated on terms as favorable as, or more favorable than, those currently reflected in the Stalking Horse APA, or at all.  The absence of a Stalking Horse could reduce competitive tension in the sale or auction process, depress sale proceeds, and adversely affect the value of the DISH Wireless Debtors' estates and recoveries for creditors.

The pendency of the DWLLC Special Committee's investigation introduces uncertainty with respect to the timeline for confirmation of the Plan and the consummation of the proposed Sale.  Any delay in completing the investigation, renegotiating the Stalking Horse APA, or pursuing alternative transactions (if any) may extend the duration of the Chapter 11 Cases, increase administrative expenses, and adversely affect creditor recoveries.  To the extent that the investigation results in material modifications to the proposed Sale structure, the Plan may require amendment, which could necessitate re-solicitation of votes and further extend the timeline for emergence from bankruptcy.

### 15.    Wind-Down Costs Are Uncertain and May Reduce DISH Wireless Distributable Value

The Plan contemplates that a Wind Down Debtor Account will be funded from Sale proceeds in an amount determined in good faith to pay the costs of administering the DISH Wireless Debtors' estates, with any remaining amounts following the completion of wind-down activities distributed to Holders of Claims in accordance with the Plan's priority scheme. Wind-down costs, including costs associated with litigation, professional fees, tax obligations, and other administrative expenses incurred in connection with resolving potentially hundreds of disputed Claims, are inherently uncertain and could be materially greater than initially reserved. To the extent actual wind-down costs exceed the amounts initially reserved, DISH Wireless Distributable

Value—and therefore pro rata recoveries available to Holders of Class 2E Claims—could be materially and adversely affected.

16.   **Holders of DBS Notes Claims in Classes 1C, 1D, 1F, and 1G Will Receive Amended Notes Rather Than Cash, and the Value and Liquidity of Such Securities Are Uncertain**

Under the Plan, Holders of Allowed Claims in Classes 1C (2026 Senior Secured Notes), 1D (2028 Senior Secured Notes), 1F (2028 Senior Notes), and 1G (2029 Senior Notes) will receive Amended Notes in a principal amount equal to the Holder's Allowed Claim.  The value and liquidity of the Amended Notes following the Effective Date are uncertain and will depend on, among other things, the financial performance of Reorganized DBS and prevailing market conditions. There can be no assurance that an active trading market will develop or be maintained for the Amended Notes, or that such notes will trade at or near par value following issuance.

17.   **The Terms of the Amended Notes Indentures Are Subject to Change Based on Negotiations and Approval of the Bankruptcy Court**

The terms of the Amended Notes Indentures are subject to change based on negotiations between the Debtors and the Consenting Creditors.  There can be no assurance that such negotiations will be successful.  Furthermore, Holders of Claims that are not members of the Consenting Creditors will not participate in these negotiations, may object to the terms of the Amended Notes Indentures, and there can be no assurance that the Bankruptcy Court will approve such terms.

18.   **Repayment of Amended 2028 Senior Secured Notes Through the DBS Cash Sweep Is Dependent on Future Cash Generation by Reorganized DBS**

The Plan framework contemplates a "DBS Cash Sweep" mechanism pursuant to which Reorganized DBS will be obligated to redeem the Amended 2028 Senior Secured Notes at par from "Available Cash" in excess of $500 million, beginning with the fiscal quarter ending March 31, 2027.  The actual timing and amount of any cash sweep payment will depend entirely on the future cash generation and liquidity of Reorganized DBS following the Effective Date.  If Reorganized DBS does not generate Available Cash in excess of $500 million in any given quarter, no cash sweep payment will be required for that period.  There can be no assurance that Reorganized DBS will generate sufficient Available Cash to repay the Amended 2028 Senior Secured Notes within any particular timeframe or at all.

19.   **Recoveries for Holders of Certain DBS Notes Through the DWLLC Claims Trust Are Capped and Subject to Dilution and Other Provisions Regarding Excess Recovery and Residual Recovery**

Holders of the 2028 Senior Secured Notes, 2028 Senior Notes, and 2029 Senior Notes may recover up to the DWLLC Recovery Cap of an aggregate of $300 million through the DWLLC Claims Trust established for their benefit pursuant to the Plan, which holds an intercompany obligation owed by DWLLC. As beneficiaries of the DWLLC Claims Trust, such Holders are entitled to vote and to receive pro rata recoveries alongside other Holders of DISH Wireless General Unsecured Claims, subject to the DWLLC Recovery Cap with any DWLLC Excess Recovery or DWLLC Residual Recovery to be applied to repay principal and accrued interest under the 2028 Senior Secured Notes, 2028 Senior Notes and 2029 Senior Notes, as applicable.

144

Given the anticipated number and amount of Claims against the DISH Wireless Debtors and the residual nature of DISH Wireless Distributable Value, there can be no assurance regarding what, if any, amounts the DWLLC Claims Trust will recover.

20. **A Decline in the Credit Ratings of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors Could Negatively Affect the Debtors' Ability to Refinance Their Debt**

The credit ratings of the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, could be lowered, suspended, or withdrawn entirely, at any time by the rating agencies if, in each rating agency's judgment, circumstances warrant such action, including as a result of exposure to the credit risk and the business and financial condition of the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors as applicable. Downgrades in the long-term credit ratings of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors may make it more difficult to refinance their debt, if any, and increase the cost of any debt that they may incur in the future.

21. **The Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May be Forced to Take Other Actions to Satisfy Their Obligations, Which May Not Be Successful**

The abilities of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the control of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors. The Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt.

If cash flows and capital resources are insufficient to fund the debt obligations of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, subject to the terms of the Restructuring Support Agreement. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

22. **The Value of Retained Causes of Action Is Uncertain**

The Retained Causes of Action that will vest in the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors are inherently difficult to value; any such Retained Cause of Action may prove to have limited or zero value. In addition, litigating the Retained Causes of Action is a time consuming and expensive process. Recoveries on account of any of the Retained Causes of Action are speculative and uncertain due to the risk of success on the merits and the

145

potential difficulties of collection and enforcement of any judgments.  The value of any Retained Causes of Action may be difficult to realize.

**23.    Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized DBS Debtors, Post-Effective Date DISH Wireless Debtors, and Holders of certain Claims.

**D.    Risks Related to the Company's and the Businesses of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors**

**1.    Operating in Bankruptcy for a Long Period of Time May Harm the Company's Businesses**

The Debtors' business depends upon the Company's maintenance of its FCC licenses, including licenses for the use of spectrum, which are renewable upon timely application to the FCC.  Interested parties may challenge a renewal application.  The Company's and the Debtors' future results are dependent upon the successful confirmation and implementation of the Plan.  In addition, the Debtors are relying on an expedited case timeline to maintain their business through this restructuring.  A longer process could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' and the Company's businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers could lose confidence in the Debtors' ability to reorganize their businesses successfully and seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  Furthermore, the Debtors cannot predict the ultimate amount of all Claims that will be subject to resolution by the Plan (or by an alternative plan).  Even if the Plan (or an alternative plan) is confirmed and consummated, the operating results of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

**2.    Financial Results May Be Volatile and May Not Reflect Historical Trends**

The Financial Projections attached hereto as **Exhibit C** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the DBS Debtors, industry performance, general business and economic conditions, and other matters, many of which are

146

beyond the control of DBS Debtors or the Company, and some or all of which may not materialize.[51]

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the DBS Debtors' operations.  There can be no assurance that the projected results will be realized or that actual results will not be subject to significant variations.  These variations may be material and may adversely affect the DBS Debtors' financial position and the ability of the DBS Debtors to make payments with respect to its indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

In addition, if the DBS Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The DBS Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Company's consolidated balance sheets.  The DBS Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, there can be no assurances that the DBS Debtors' business plan will not change, perhaps materially, as a result of decisions that may be made after fully evaluating the strategic direction of the DBS Debtors.  Any deviations from the DBS Debtors' existing business plan would necessarily cause a deviation.

3. **The DBS Debtors' Businesses and Operations Are Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business and of their Operations**

The Company's and the DBS Debtors' operations are subject to various federal, state and local laws and regulations, including communications law, copyright law, antitrust policy, consumer protection statutes, advertising regulation, and satellite spectrum licensing.  The DBS Debtors may be required to make large expenditures to comply with such regulations.  Sanctions for noncompliance may include revocation of licenses or permits, corrective action orders, administrative or civil penalties, and criminal prosecution.  These liabilities and costs could have an adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized DBS Debtors.  As more fully described herein, the DISH Wireless Debtors are seeking to sell substantially all of their assets and decommission their 5G Network and their efforts may be impacted by various laws and regulations.

In addition, as set forth in this Disclosure Statement, the Debtors and the Company have been the target of unprecedented regulatory scrutiny.  No assurances can be given that the FCC or other regulatory body governing the Debtors' operations will not further interfere with the Debtors or the Company, such as by threatening to terminate the spectrum licenses utilized in the Debtors'

---

[51] Financial projections are not provided for the DISH Wireless Debtors because, as described elsewhere in this Disclosure Statement, the DISH Wireless Debtors intend to sell substantially all of their assets to maximize value for the benefit of their estates and creditors.

businesses, either during the Chapter 11 Cases or upon emergence of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors.

4. **The DBS Debtors' Business Depends Upon Licenses Issued by the FCC, and If Licenses Are Not Renewed or the Reorganized DBS Debtors Are Out of Compliance with FCC Regulations and Policies, Their Businesses Could Be Impaired**

The DBS Debtors are subject to regulation by the FCC under the Communications Act of 1934, as amended.  The majority of the Company's satellites are licensed and regulated by the FCC.  The DBS Debtors' business depends upon the Company's maintenance of its FCC licenses, which are renewable upon timely application to the FCC.  Interested parties may challenge a renewal application.  The FCC has authority to revoke licenses or not grant renewal applications.  The Debtors cannot be certain that the future renewal applications of the Reorganized DBS Debtors will be approved, or that the renewals will not include conditions or qualifications that could adversely affect the operations of the Reorganized DBS Debtors, could result in impairment, and could adversely affect the liquidity and financial condition of the Reorganized DBS Debtors.

FCC rules governing the DBS Debtors' regulated service offerings impose costs on their operations, and changes in those rules could have an adverse effect on the businesses of the Reorganized DBS Debtors.  Moreover, governmental regulations and policies may change over time, and the changes may have an adverse impact upon the businesses, financial condition, and results of operations of the Reorganized DBS Debtors.

5. **The Reorganized DBS Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful**

The ability of the Reorganized DBS Debtors to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors, many of which are beyond the control of the Reorganized DBS Debtors.  The Reorganized DBS Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest.

If cash flows and capital resources are insufficient to fund the debt obligations of the Reorganized DBS Debtors, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance such debt.  These alternative measures may not be available, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized DBS Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

6. **The DISH Wireless Debtors May Not Complete the Sale of All Equipment Prior to Confirmation, and Any Unsold Equipment May Be Abandoned**

The DISH Wireless Debtors intend to cease their decommissioning activities upon the closing of the Sales.  However, there can be no assurance that the Debtors will be able to sell all of their assets prior to Confirmation.  To the extent any assets remain unsold as of the Petition

148

Date, the DISH Wireless Debtors intend to abandon such assets under section 554(a) of the Bankruptcy Code.

Abandoned equipment may be subject to applicable federal, state, and local environmental laws and regulations, and may trigger cleanup or remediation obligations under applicable environmental statutes, including the Comprehensive Environmental Response, Compensation, and Liability Act and analogous state law equivalents.  Governmental authorities may assert claims against the Debtors' estates or seek to impose liability on parties in interest in connection with such abandoned equipment, which could diminish the assets available for distribution to creditors.

Abandoned equipment located at leased premises, customer sites, or other third-party properties may give rise to claims by landlords, property owners, or operators.  Such parties may assert claims for the cost of removal, storage, disposal, or remediation of abandoned equipment, which could result in administrative or general unsecured claims against the estates, thereby reducing recoveries to creditors.

7.     **The Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases, as well as ongoing investigations by the DWLLC Special Committee.**

It is possible that certain parties will commence litigation with respect to the treatment of their Claims, or other provisions under the Plan.  It is not possible to predict the potential litigation that the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors may become party to, nor the final resolution of such litigation.  In general, litigation can be expensive and time consuming to bring or defend against and could divert management's attention.  Such litigation could result in settlements or damages that could significantly affect the financial results of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors.  The impact of any such litigation on the businesses and financial stability of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors could thus be material.

In addition, as noted in Article VI.C.7 of this Disclosure Statement, DWLLC appointed the DWLLC Special Committee and delegated to it the authority to conduct an investigation and assess the merits and potential value of any potential claims and causes of action held by the DISH Wireless Debtors, including with respect to all acts and omissions taken (or not taken) following the Company's receipt of the May 2025 FCC Letter.  As of the date of this Disclosure Statement, the DWLLC Special Committee's investigation remains pending, including the investigation related to the Stalking Horse APA referenced herein for which a separate Risk Factor has been provided in Article XI.C of this Disclosure Statement.  The course of the DWLLC's Special Committee's investigation and its outcomes are unpredictable and uncertain, and may impact the DISH Wireless Debtors and distributions to Holder of Allowed Claims.

8.     **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on key management personnel and a highly skilled employee base, all of which are employed by non-Debtor Echosphere and provided to the Debtors pursuant to the Shared Services Agreement.  The Debtors' recent issues have created distractions and uncertainty for key management personnel and employees that, while employed by non-Debtor affiliates, are relied upon by the Debtors.  As a result, the Debtors may experience increased

149

levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### E.      Additional Factors

#### 1.      The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 2.      No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

#### 3.      No Legal or Tax Advice Is Provided by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or Interest should consult its own legal counsel and accountants as to legal, tax, and other matters concerning its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

#### 4.      No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

## XII.   CERTAIN SECURITIES LAW MATTERS

Except as otherwise provided herein, in the Plan, the Amended 2026 Senior Secured Notes, Amended 2028 Senior Secured Notes, Amended 2028 Senior Notes, and Amended 2029 Senior Notes (the "Amended Notes") to the extent issued pursuant to the Plan, will be issued without registration under the Securities Act or any other similar U.S. federal, state, or local Law.  The Debtors are relying on section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Sections Act (or another applicable exemption under the Securities Act) to exempt from registration under the Securities Act and Blue Sky Laws the offer, to holders of DBS Notes Claims prior to the Petition Date, including in connection with the solicitation of the Plan.  Prior to the Petition Date, solicitation of the Plan shall only be made to holders of DBS Notes Claims and the Debtors reasonably believe that each such Holders of DBS Notes Claims are

either (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or (ii) a person other than a "U.S. person" (as defined in Rule 902(k) of Regulation S under the Securities Act).

After the Petition Date, the Debtors will rely on: (i) section 1145 of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws any offer (after the Petition Date), issuance, and distribution of Amended Notes under the Plan, and (ii) section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act) to exempt from registration under the Securities Act and Blue Sky Laws any offer (if made after the Petition Date), issuance, and distribution of the Amended Notes under the Plan, subject to, in each case, other applicable securities Laws.

The Debtors believe that the Amended Notes, to the extent issued pursuant to the Plan, constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state Blue Sky Law. The Debtors further believe that the offer, sale, issuance and initial distribution of the Amended Notes (to the extent such notes are issued pursuant to the Plan) is exempt from federal and state securities registration requirements under the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law, as described in more detail below. No registration statement for the Amended Notes to be issued pursuant to the Plan will be filed under the Securities Act or any state securities laws.

The following discussion of the issuance and transferability of the Amended Notes to be issued pursuant to the Plan relates solely to matters arising under federal and state securities laws. The rights of Holders of the Amended Notes to be issued pursuant to the Plan will also be governed by the terms of the applicable Amended Notes Indentures.

### A.     Issuance of Securities Under the Plan Pursuant to Section 1145 of the Bankruptcy Code

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of Securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be Securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or "principally" in exchange for such claim or interest and "partly" for cash or property.

The Debtors believe that to the extent the Amended Notes are issued under the Plan, such note should satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code, to the extent permitted and available with respect to any respective Holder, subject to other applicable securities law. No registration statement will be filed under the Securities Act or any local or state securities laws. Recipients of the Amended Notes are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law or other local law. As discussed below, the exemptions provided for in section 1145(a)(1) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### B.        "Underwriters"; Subsequent Transfers of Securities Issued Under the Plan

The Amended Notes, to the extent offered, issued and distributed in reliance of section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by any initial recipient thereof that (A) is not an "affiliate" of the Reorganized DBS Debtors as defined in Rule 144(a)(1) under the Securities Act, (B) has not been such an "affiliate" within ninety (90) calendar days of such transfer, (C) has not acquired the Amended Notes from an "affiliate" of the Reorganized DBS Debtors within one year of such transfer and (D) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code, and (iii) will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and section 1145(b)(1) of the Bankruptcy Code, and (b) compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

To the extent that persons deemed to be "underwriters" receive Amended Notes pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy

Code from registration under the Securities Act or other applicable law.  Such persons would not be permitted to resell such Amended Notes unless such securities were registered under the Securities Act or an exemption from such registration requirements were available.  Under certain circumstances, holders of such Amended Notes who are deemed to be "underwriters" for purposes of Section 1145 of the Bankruptcy Code may be able, at a future time and under certain condition, to resell their Amended Notes pursuant to the limited safe harbor resale provisions of Rule 144 or another available exemption under the Securities Act.

Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. The Debtors do not intend to make publicly available the requisite information regarding the Reorganized DBS Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such Amended Notes by Persons deemed to be underwriters or otherwise.

Whether any particular person would be deemed to be an "underwriter" (including whether the person is a "Controlling Person") with respect to the Amended Notes would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any person would be deemed an "underwriter" with respect to the Amended Notes and, in turn, whether any person may freely resell Amended Notes.  Moreover, because of the complex, subjective nature of the question of whether a security is exempt from the registration requirements under the federal or state securities laws or whether a particular recipient of securities may be an underwriter, we make no representation concerning the ability of a person to dispose of the securities issued under the Plan.

### C.        Private Placement Exemptions

The Amended Notes issued and distributed pursuant to the Plan to applicable holders of DBS Notes Claims will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act.  Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering or issuance of securities by an issuer in transactions not involving a public offering is exempt from registration under Section 5 of the Securities Act. Regulation S provides that the offering or issuance of securities to persons that, at the time of the issuance, were outside of the United States and were not "U.S. persons" (and were not purchasing for the account or benefit of a "U.S. person") within the meaning of Regulation S is exempt from registration under Section 5 of the Securities Act.

Each Holder of a DBS Notes Claim that will receive the Amended Notes is required to represent, in accordance with the election procedures set forth herein, that it is: (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or (ii) (A) a person other than a "U.S. person" (as defined in Rule 902(k) of Regulation S under the Securities Act) that is acquiring the Amended Notes in an offshore transaction in compliance with Rule 904 of Regulation S under the Securities Act and not participating on behalf of or on account of a U.S. person and (B) a qualified investor as defined in Regulation (EU) 2017/1129 and as defined in Article 2 of Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018.

All Amended Notes issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act will be considered "restricted securities" (and, if applicable, any applicable restrictions on transfer set forth in Regulation S under the Securities Act) and may not be offered, sold, exchanged, assigned or otherwise transferred (i) unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available (such as Rule 144 or Regulation S) and other applicable state and foreign laws (including Blue Sky Laws) and (ii) pursuant to the transfer restrictions that will be set forth in the Amended Notes Indenture. As discussed above, Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met.

The Amended Notes Indenture will include restrictions on the ability of holders of the Amended Notes to transfer such Amended Notes and will provide, among other restrictions, that holders of the Amended Notes cannot offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement.

The DBS Debtors and Reorganized DBS Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The DBS Debtors and Reorganized DBS Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Amended Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE

AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.

## XIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under U.S. federal income tax laws (including, for example, banks, brokers, dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors, the Reorganized DBS Debtors, and the Post-Effective Date DISH Wireless Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax

consequences for such Holders may differ materially from that described below. In particular, except as otherwise provided herein, this summary does not discuss the tax consequences of the entitlements and obligations under the Restructuring Support Agreement to which certain Holders are party. This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.    Certain U.S. Federal Income Tax Consequences to the Debtors, Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors**

**1.    Characterization of the Restructuring Transactions**

For U.S. federal income tax purposes, each of the Debtors (i) is a member of an affiliate group of corporations of which EchoStar Corporation is the common parent and files a single consolidated U.S. federal income tax return (the "Tax Group") or (ii) an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group.

Subject to the discussion under "—*The Sale*" below, the Debtors do not believe that the Restructuring Transactions will result in any material gain or loss to the Debtors.

### 2.      The Sale

The Debtors expect that the Sale will be structured as one or more taxable sales with respect to all of the DISH Wireless Debtors' assets.  The Debtors generally expect to recognize any gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors and the Debtors' tax basis in such assets.

Purchasers will take a tax basis in the acquired assets equal to the amount of consideration paid and will not inherit any tax attribute of the Debtors.

### C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote on the Plan

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

### 1.      Consequences to Holders of DBS Notes Claims

Except to the extent that a Holder of an Allowed DBS Notes Claim agrees to less favorable treatment, each Holder of (i) an Allowed 2026 Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed 2026 Senior Secured Notes Claims, Amended 2026 Senior Secured Notes in an aggregate principal amount equal to such Holder's Allowed 2026 Senior Secured Notes Claims, (ii) an Allowed 2028 Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed 2028 Senior Secured Notes Claims, Amended 2028 Senior Secured Notes in an aggregate principal amount equal to such Holder's Allowed 2028 Senior Secured Notes Claims, (iii) an Allowed 2026 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed 2026 Senior Notes Claims, Cash in an amount equal to 100% of the outstanding principal amount thereof plus all accrued and unpaid interest through the Effective Date, without any make-whole payment, premium, penalty, or other charge of any kind, after which the 2026 Senior Notes and related indenture will be cancelled except to the limited extent necessary to effectuate wind-down and distribution mechanics, (iv) an Allowed 2028 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed 2028 Senior Notes Claims, Amended 2028 Senior Notes in an aggregate principal amount equal to such Holder's Allowed 2028 Senior Notes Claims, and (v) an Allowed 2029 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed 2029 Senior Notes Claims, Amended 2029 Senior Notes in an aggregate principal amount equal to such Holder's Allowed 2029 Senior Notes Claims.

In addition, each Holder of an Allowed 2028 Senior Secured Notes Claim, Allowed 2028 Senior Notes Claim, or Allowed 2029 Senior Notes Claims  will receive the benefit of recovery from DWLLC's estate through the DWLLC Claims Trust ("Additional Collateral") in accordance with the order of priority set forth in the Plan and subject to the applicable limitations therein.

#### (a)      U.S. Federal Income Tax Considerations for a U.S. DBS Claim Holder

157

The U.S. federal income tax consequences of the Plan to a DBS Claim Holder that is a U.S. Holder (a "U.S. DBS Claim Holder") depends on whether the consummation of the Plan, including the receipt of the Additional Collateral, constitutes a modification of the DBS Notes that results in a "deemed" exchange for U.S. federal income tax purposes. Under U.S. federal income tax law, the modification of a debt instrument generally results in a deemed exchange upon which gain or loss is realized if the modified debt instrument differs materially either in kind or in extent from the original debt instrument (a "Significant Modification"). Under applicable U.S. Treasury regulations, the modification of a debt instrument is a Significant Modification if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively (other than modifications that are subject to special rules), the legal rights or obligations that are altered and the degree to which they are altered are "economically significant." A change in yield of a debt instrument generally is a Significant Modification under the applicable regulations if the yield of the modified instrument (determined taking into account any accrued interest and any payments) varies from the yield on the unmodified instrument (determined as of the date of the last modification) by more than the greater of (i) 1/4 of 1% and (ii) 5% of the annual yield of the unmodified instrument. Applicable U.S. Treasury regulations also provide that a modification that releases, substitutes, adds or otherwise alters the collateral for or other form of credit enhancement for a recourse debt instrument is a Significant Modification if the change results in a change in payment expectations (*i.e.*, there is a substantial enhancement of the obligor's capacity to meet the payment obligations under a debt instrument and that capacity was primarily speculative prior to the modification and is adequate after the modification; or there is a substantial enhancement of the obligor's capacity to meet the payment obligations under a debt instrument and that capacity was primarily speculative prior to the modification and is adequate after the modification).

Although the matter is not free from doubt, the Debtors do not believe that the consummation of the Plan, including the receipt of the Additional Collateral, will result in a Significant Modification. Accordingly, the Amended Notes received by the U.S. DBS Claim Holders are expected to be treated for U.S. federal income tax purposes as a continuation of the DBS Notes exchanged therefor.

U.S. DBS Claim Holders should consult their tax advisors regarding the United States federal income tax treatment of the adoption of the Plan.

### (i)  Issue Price of the Amended Notes.

Because the consummation of the Plan generally is not expected to result in a Significant Modification, the Amended Notes are expected to continue to have the same issue price as the applicable DBS Notes. To the extent the receipt of the Claim Settlement Amount by certain U.S. DBS Claim Holders ("CSA DBS Claim Holders") resulted in a Significant Modification of the DBS Notes held by them, such "old" DBS Notes (the "Old DBS Notes") were treated as deemed exchanged for the "new" DBS Notes (the "New DBS Notes") for U.S. federal income tax purposes (the "Deemed Exchange"). The issue price of a New DBS Note, and thus the issue price of a corresponding Amended Note received hereunder (a "Deemed Exchanged Amended Note"), would have equaled the fair market value of the New DBS Note on the date of the Deemed Exchange if the New DBS Note were considered to be "publicly traded" for United States federal income tax purposes. In general, an issue of debt instruments will be treated as publicly traded if, at any time during the thirty-one day period ending fifteen days after the issue date, there is a sales price or one or more firm or indicative quotes available for such debt instrument. If the New DBS

158

Note were not considered to be publicly traded but the Old DBS Note for which such New DBS Note was deemed exchanged were considered to be publicly traded during the relevant period in respect of the Deemed Exchange, then the issue price of the New DBS Note generally would have been determined by reference to the fair market value of such Old DBS Note. The fair market value of a debt instrument generally is determined by reference to the trading price or quoted price of the debt instrument (possibly reduced by the amount of a consent payment, if the consent payment were reflected in the trading price or quoted price). If neither the New DBS Note nor the Old DBS Note were considered to be publicly traded during the relevant period in respect of the Deemed Exchange, then the issue price of the New DBS Note generally would have equaled its stated principal amount. Although no assurances can be provided, we believe that the New DBS Notes and/or the Old DBS Notes were considered "publicly traded" for these purposes. The rules regarding the determination of issue price are complex and highly detailed, and each U.S. DBS Claim Holder should consult its tax advisor regarding the determination of the issue price of the New DBS Notes and the Deemed Exchanged Amended Notes for United States federal income tax purposes.

For U.S. DBS Claim Holders that did not receive any Claim Settlement Amount ("Non-CSA DBS Claim Holders"), the Amended Notes received hereunder by such Non-CSA DBS Claim Holder generally are treated as a continuation of their original DBS Notes that are not treated as deemed exchanged for New DBS Notes. Such Non-CSA DBS Claim Holders should be aware, however, that if the Deemed Exchanged Amended Notes were treated as issued with original issue discount ("OID") at the time of the Deemed Exchange, then the Amended Notes received by such Non-CSA DBS Claim Holders may not be "fungible" with the Deemed Exchanged Amended Notes received by CSA DBS Claim Holders (as described above). Accordingly, although such Amended Notes held by the Non-CSA DBS Claim Holders are not expected to be treated as having been issued with OID, we expect to be required to report all Amended Notes (including those that are not Deemed Exchanged Amended Notes) as having been issued with OID for U.S. federal income tax purposes, because such Deemed Exchanged Amended Notes would not otherwise be distinguishable from the other Amended Notes, held by the Non-CSA DBS Claim Holders. This could affect the marketability of such other Amended Notes. U.S. Holders of DBS Notes should consult their own tax advisors as to the U.S. federal income tax consequences to them of the adoption of the Plan.

### (ii)    Distributions with Respect to Accrued but Unpaid Interest.

In general, to the extent that any amount received (whether cash or other property) by a U.S. DBS Claim Holder is treated as received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. DBS Claim Holder as ordinary interest income (if and to the extent not previously included in the U.S. DBS Claim Holder's gross income).

### 2.    Consequences to U.S. Holders of DISH Wireless General Unsecured Claims

Except to the extent that a U.S. Holder of an Allowed DISH Wireless General Unsecured Claim agrees to less favorable treatment, each U.S. Holder of an Allowed DISH Wireless General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the DISH Wireless Distributable Value. While Holders of Allowed DBS Notes Claims will receive Additional Collateral, distributions made to them through the DWLLC Claims Trust on account of the DWLLC Intercompany Loan Claims do not alter, reduce, or satisfy the separate Allowed

159

DISH Wireless General Unsecured Claim arising from the assigned DWLLC Intercompany Loan Claims.

To the extent receiving Cash, a U.S. Holder of an Allowed DISH Wireless General Unsecured Claim is expected to recognize gain or loss equal to (a) the amount of any Cash received, *minus* (b) the Holder's adjusted tax basis in its Allowed DISH Wireless General Unsecured Claim.  A U.S. Holder of an Allowed DISH Wireless General Unsecured Claim should consult its own tax advisors as to the U.S. federal income tax consequences to it of the adoption of the Plan.

### D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims Entitled to Vote on the Plan

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

#### 1.      Gain Recognition

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claims generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

#### 2.      Accrued Interest

Subject to the discussion of FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (or original issue discount, if any) with respect to the

Allowed Claims generally will not be subject to U.S. federal income or withholding tax, provided that the Non-U.S. Holder provides to the withholding agent, prior to receipt of such payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns ten percent or more of the total combined voting power of all classes of the applicable Debtor's stock entitled to vote (or, in the case where n applicable Debtor is a partnership, ten percent or more of the capital or profits interest in such Debtor);

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the applicable Debtor (each, within the meaning of section 881(c)(3)(C) the IRC);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of thirty percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest (or original issue discount, if any) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a thirty percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest (or original issue discount, if any). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

### 3. FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual, or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the

sale of any property of a type which can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder is urged to consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### E.      163Information Reporting and Back-Up Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make available to the tax authorities of the country in which a Non-U.S. Holder is resident the information returns reporting such interest and dividends and withholding.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Respectfully submitted,

Dated: June 29, 2026

**DISH DBS Corporation, DISH Wireless L.L.C., and their respective affiliated debtors and debtors in possession**

*/s/ John Swieringa*

Name:   John Swieringa
Title:     Authorized Signatory