**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| DISH DBS CORPORATION, | ) Case No. 26-90627 (CML) |
| DISH WIRELESS L.L.C., *et al.*,[1] | ) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) (Emergency Hearing Requested) |

**DBS DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING, BUT NOT DIRECTING, THE DBS DEBTORS
TO CONTINUE THEIR PREPETITION BUSINESS OPERATIONS, POLICIES,
AND PRACTICES AND SATISFY RELATED CLAIMS IN THE ORDINARY COURSE
OF BUSINESS ON A POSTPETITION BASIS, (II) GRANTING ADMINISTRATIVE
EXPENSE PRIORITY TO ALL OUTSTANDING ORDERS AND AUTHORIZING,
BUT NOT DIRECTING, THE DBS DEBTORS TO SATISFY SUCH OBLIGATIONS
IN THE ORDINARY COURSE, AND (III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 2:30 p.m. (prevailing Central Time) on July 1, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on July 1, 2026 at 2:30 p.m. (prevailing Central Time) in Courtroom 402, 4th Floor, 515 Rusk Street, Houston, Texas 77002.  Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388.  A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/DBS.  The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

The DBS Debtors[2] state as follows in support of this motion (this "**Motion**"):[3]

## Relief Requested

1.      The DBS Debtors request entry of interim and final orders, substantially in the forms attached hereto (respectively, the "**Proposed Interim Order**" and the "**Proposed Final Order**"), (a) authorizing, but not directing, the DBS Debtors (or non-Debtor affiliates of the DBS Debtors on the DBS Debtors' behalf) to (i) continue the DBS Debtors' prepetition business operations, policies, and practices, (ii) pay the Ordinary Course Claims (as defined below), and (iii) subject to entry of a final order on the Motion, pay the DBS Notes Interest (as defined below) on a postpetition basis, solely in the event that such interest comes due during these Chapter 11 Cases; (b) granting administrative expense priority to all Outstanding Orders (as defined below) and authorizing, but not directing, the DBS Debtors (or non-Debtor affiliates of the DBS Debtors on the DBS Debtors' behalf) to satisfy such obligations in the ordinary course of business; and (c) granting related relief.   With respect to any Ordinary Course Claims and satisfaction of obligations relating to Outstanding Orders, the DBS Debtors anticipate that the vast majority (if not all) payments with respect to such claims and obligations would be made on the DBS Debtors' behalf by their non-Debtor affiliate DISH Network Corporation ("**DNC**") (or another non-Debtor affiliate, as applicable) in accordance with the Shared Services Agreement dated May 5, 2026

---

[2]     The "**DBS Debtors**" include: (a) DISH DBS Corporation; (b) DISH Network L.L.C.; (c) DISH Operating L.L.C.; (d) DISH Broadcasting Corporation; (e) Dish Network Service L.L.C.; (f) DISH Technologies Holding Corporation; (g) DISH Technologies L.L.C.; (h) Sling Media L.L.C.; (i) Sling TV Holding L.L.C.; (j) Sling TV Purchasing L.L.C.; (k) Sling TV L.L.C.; and (l) Sling TV Gift Card Corporation.  For the avoidance of doubt, the DBS Debtors are only seeking relief under this Motion with respect to the DBS Debtors and not the DISH Wireless Debtors (as defined in the First Day Declaration (as defined below) and, together with the DISH Wireless Debtors, the "**Debtors**").

[3]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of John Swieringa in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed concurrently herewith.  Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the First Day Declaration.

among the Debtors and certain of their non-Debtor affiliates (the "**Shared Services Agreement**"), and have separately sought authorization for the DBS Debtors to continue performing under the Shared Services Agreement (and other relief) in connection with the *Debtors' Emergency Motion for Entry of (I) Interim Order (A) Authorizing, but Not Directing, the Debtors to Continue Performing Under the Shared Services Agreement and Satisfy Prepetition Obligations Related Thereto, and (B) Granting Related Relief; and (II) Final Order Authorizing the Debtors to Assume the Shared Services Agreement* (the "**Shared Services Motion**"), filed contemporaneously herewith and incorporated by reference herein.[4]  The Debtors also request that the Court schedule a final hearing approximately 21 days after the commencement of these Chapter 11 Cases, or as soon thereafter as practicable, to consider approval of this Motion on a final basis.

### Jurisdiction, Venue, and Predicates for Relief

2.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The predicates for the relief requested herein are sections 105(a), 363, 503(b), 1107(a), and 1108  of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

---

[4]    As further described in the Shared Services Motion, the satisfaction of such claims and obligations results in a corresponding intercompany obligation payable to DNC (or another non-Debtor affiliate, as applicable) by the relevant DBS Debtors.

3

**Background**

**I.      Overview of Chapter 11 Cases**

4.      On June 30, 2026 (the "**Petition Date**"), each Debtor filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committee has been appointed.

5.      The Debtors are subsidiaries of EchoStar Corporation (NASDAQ: ECHO) ("**EchoStar**" and, together with its Debtor and non-Debtor subsidiaries, the "**Company**"), which is not itself a Debtor in these cases.  EchoStar was founded in 1980 and provides pay-TV, wireless, and internet services to millions of customers, having pioneered technological advancements that redefined those industries.  As of the Petition Date, the Company has approximately 10,400 employees in the United States and serves more than 6 million pay-TV subscribers, approximately 7 million wireless subscribers, and approximately 641,000 broadband subscribers.  The Debtors comprise two of the Company's business segments.  The DBS Debtors operate the Company's Pay-TV segment, which includes DISH®- and Sling TV®- branded pay-TV services.  In 2025, Pay-TV generated operating income of $2.4 billion on revenue of $9.7 billion.  From 2020 to 2025, the DISH Wireless Debtors, led by DWLLC, operated the Company's Wireless segment under the Boost Mobile® and Gen Mobile® brands.

6.      The DBS Debtors commenced these prepackaged Chapter 11 Cases to implement a global resolution of disputes with holders of their debt securities pursuant to the Restructuring

Support Agreement dated as of March 19, 2026 (the "**RSA**"), which is supported by holders of approximately 88.3% of the $9.75 billion in aggregate principal amount of the DBS Debtors' secured and unsecured notes.  In accordance with the RSA, the joint prepackaged chapter 11 plan filed concurrently with this Motion (the "**Plan**") deleverages the DBS Debtors' balance sheet by providing for the reduction of the aggregate principal balance of the DBS Debtors' funded debt obligations from $9.75 billion to $5.0 billion, as such balance may be further reduced by a sweep of available cash of the DBS Debtors in excess of $500 million, commencing with the fiscal quarter ended March 31, 2027, to redeem up to the entire aggregate principal balance of the $2.5 billion of 5.750% senior secured notes due 2028.

7.        The DISH Wireless Debtors commenced these Chapter 11 Cases, as contemplated by the RSA, concurrently with the DBS Debtors to address billions of dollars of disputed claims asserted by tower lease and other 5G network infrastructure creditors following EchoStar's entry into definitive agreements to sell spectrum licenses to AT&T and SpaceX, as directed by the Federal Communications Commission (the "**FCC**") to resolve its investigation of EchoStar's use of spectrum.  The sales, which the Wireless Telecommunications Bureau (the "**Bureau**") of the FCC approved on May 12, 2026, will dispose of the spectrum licenses on which the DISH Wireless Debtors relied to operate more than 24,000 tower sites that the DISH Wireless Debtors built from the ground up at a cost of more than $13 billion—plus an additional $3 billion invested in the buildout by EchoStar's non-Debtor subsidiaries—between 2020 and 2025.  The Bureau conditioned approval of the FCC-directed sales on EchoStar's establishment of a trust funded with $2.4 billion to pay qualifying judicially determined or settled claims related to the 5G Network (the "**FCC Trust**"), which was established by EchoStar on June 26, 2026.  The Chapter 11 Cases afford holders of claims against the DISH Wireless Debtors a centralized forum to assert, liquidate,

and recover against the DISH Wireless Debtors—subject to the DISH Wireless Debtors' defenses—or obtain judicially determined claims for submission to and evaluation and potential payment by the FCC Trust.

## II.  Overview of the DBS Debtors' Ordinary Course Claims and Payment Process

### A.  Ordinary Course Claimants

8.  In the ordinary course of business, the DBS Debtors or their non-Debtor affiliates, on the DBS Debtors' behalf, incur numerous fixed, liquidated, and undisputed obligations related to the DBS Debtors' Pay-TV business segment to a variety of creditors, including: vendors providing programming distribution rights; ordinary course goods and services providers; lien claimants; foreign claimants with little or no operations in the United States; and many other vendors and trade claimants (collectively, the "**Ordinary Course Claimants**" and, the undisputed prepetition claims held by such Ordinary Course Claimants, the "**Ordinary Course Claims**").

9.  The DBS Debtors rely on a broad network of vendors that are critical to maintaining their operations.  The DBS Debtors' operational revenue is derived primarily from subscription fees for media services provided to individual residential customers and commercial customers, including assisted living facilities, casinos, hospitals, hotels, student housing facilities, and restaurants.  Generally, these services require a multi-step transmission process: programming signals are (a) acquired and aggregated, (b) routed through data centers where they are processed and prepared for distribution, (c) transmitted to uplink facilities, (d) relayed via satellite, and (e) ultimately delivered to equipment on the customer premises.  In addition, the DBS Debtors depend heavily on a broad network of suppliers, including (i) equipment providers (such as manufacturers of satellite dishes, receivers, remote controls, and set-top boxes), (ii) satellite capacity and satellite leasing providers, (iii) software vendors that support signal transmission, monitoring, and delivery

systems, (iv) installation and repair service providers, (v) contract manufacturers responsible for assembling and configuring customer equipment, and (vi) providers of programming distribution rights for content on their media services.  Due to the highly technical nature of the DBS Debtors' business, each Ordinary Course Claimant provides highly specialized goods and services, and the DBS Debtors rely on such Ordinary Course Claimants to receive components critical to running their operations successfully.

10.     The DBS Debtors' go-forward viability depends on their (a) ability to sustain the complex process by which they provide telecommunication and entertainment-related services and reliable connectivity and (b) uninterrupted access to, and relationships with, these third-party providers.  Any disruption in the provision of such critical goods and services from their vendors would have far-reaching and adverse economic and operational consequences on the DBS Debtors' businesses.  The DBS Debtors must therefore collaborate seamlessly with, and consistently and timely pay, these Ordinary Course Claimants to maintain their continued global operations.

11.     The DBS Debtors are, therefore, making every effort to avoid interruptions to their operations and supply chain in connection with the commencement of these Chapter 11 Cases. Because of the nature of the DBS Debtors' businesses, the DBS Debtors believe that absent payment on account of their prepetition claims, existing relationships with many Ordinary Course Claimants could be strained or otherwise jeopardized, which could adversely affect the DBS Debtors' business going forward.

**B.      Ordinary Course Payment Process to the Ordinary Course Claimants**

12.     The DBS Debtors' vendors generally provide goods and services to the DBS Debtors in the ordinary course of business pursuant to customary net 60-day payment terms.

7

Consistent with these ordinary course practices, the DBS Debtors, through non-Debtor DNC and in accordance with the Shared Services Agreement, (a) process vendor invoices through their consolidated cash management and accounts payable systems; (b) generate checks (and, where applicable, other customary forms of payment), on a rolling basis over several weeks; and (c) review, approve, and remit such payments to the DBS Debtors' vendors in satisfaction of such obligations as they become due.  Accordingly, outstanding checks may be in various stages of payment processing (*e.g.*, checks (i) generated but not yet mailed, (ii) mailed but not yet received by vendors, and/or (iii) received by vendors but not yet cashed).  Maintaining ordinary course trade relationships on customary terms is vital to preserving business continuity, avoiding supply disruptions, and minimizing operational instability during these Chapter 11 Cases.

13.     The DBS Debtors therefore request authorization, but not direction, to pay or cause to be paid the Ordinary Course Claims held by the Ordinary Course Claimants as such claims become due and payable in the ordinary course of business.  Notably, the Plan contemplates that all allowed DBS General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired.  Furthermore, the Plan is supported by holders of approximately 88.3% of the $9.75 billion in aggregate principal amount of the DBS Debtors' secured and unsecured notes (the only claims against the DBS Debtors that are contemplated to be impaired under the Plan), including the ad hoc group of holders represented by Milbank LLP and Lazard Frères & Co. LLC (the "**Ad Hoc Group**").  The relief requested by this Motion therefore seeks to alter only the timing, not the amount or priority, of such payments, and is a mechanism for implementing the DBS Debtors' restructuring in accordance with the proposed Plan.  The relief requested herein will minimize any disruption to the DBS Debtors' businesses, allow for a smooth and efficient reorganization in these Chapter 11 Cases, and lay the groundwork for an essential element of the

Plan—leaving the DBS Debtors' General Unsecured Claims, including the Ordinary Course Claims, unimpaired.  In addition, the Ad Hoc Group has consented to the relief requested herein.

14.     The magnitude of the Ordinary Course Claims is typical for the DBS Debtors in the ordinary course of their business.  The DBS Debtors, through their non-Debtor affiliates, historically remit approximately $7,100,000,000 annually to vendors supplying goods and services essential to ongoing operations while receiving approximately $9,600,000,000 in subscriber revenue.  As of the Petition Date, the DBS Debtors estimate that they owe an aggregate amount of approximately $1,882,490,000 across four categories of Ordinary Course Claimants (*i.e.*, Programming Claims, Foreign Claims, Lien Claims, and Other Trade Claims).

15.     The following table describes the Debtors' estimates of the Programming Claims, the Foreign Claims, the Lien Claims, and Other Trade Claims (each as defined below) accrued as of the Petition Date:

| Category | Description of Claims | Estimated Amount Outstanding |
|---|---|---|
| Programming Claims | Claims for amounts owed in connection with programming, including content distribution rights and licenses. | $1,722,810,000 |
| Foreign Claims | Claims held by suppliers of goods, services, or software based outside of the United States. | $4,300,000 |
| Lien Claims | Claims that may give rise to shippers, warehousemen, mechanics, or other liens against the DBS Debtors' property if unpaid. | $11,770,000 |
| Other Trade Claims[5] | Other claims for goods and services that are provided to the DBS Debtors in the ordinary course of business, including claims entitled to statutory priority under section 503(b)(9) of the Bankruptcy Code. | $143,610,000 |

---

[5]     "**Other Trade Claims**" are any Ordinary Course Claims that are not categorized as Programming Claims, Foreign Claims, or Lien Claims, and no Ordinary Course Claims are captured by more than one category.  For example, if an Other Trade Claim is subject to a valid lien, such Other Trade Claim is categorized as a Lien Claim.

| Category | Description of Claims | Estimated Amount Outstanding |
|---|---|---|
| **TOTAL ORDINARY COURSE CLAIMS** | | $1,882,490,000 |

### C. Programming Claims

16.     As further described in the First Day Declaration, the DBS Debtors offer pay-TV services under the DISH and SLING brands.  Through both brands and in the ordinary course of business, the DBS Debtors offer a wide selection of local, regional, and national programming, including sports, original content, foreign language, and other premium content and related services, and depend on numerous third-party programming vendors (the "**Programming Vendors**") to deliver a broad array of programming to their pay-TV subscribers.  In the ordinary course of business, the DBS Debtors or non-Debtor DNC, on the DBS Debtors' behalf, enter into contracts that allow the DBS Debtors to purchase programming content.  DNC's obligations under such contracts for distribution rights (among other things) are generally incurred on a per subscriber basis and contingent on the number of pay-TV subscribers to whom the DBS Debtors provide the respective content.  Given the magnitude of the DBS Debtors' subscriber base, the pay-TV programming expenses and other related costs owed to Programming Vendors represent the largest component of the total ongoing obligations the DBS Debtors incur to DNC.  If the DBS Debtors fail to ensure that the prepetition claims held by certain Programming Vendors (collectively, the "**Programming Claims**") are paid in the ordinary course of business, the DBS Debtors' total revenue will be directly and negatively impacted in part by a decrease in pay-TV subscriber activations and an increase in subscriber cancellations.  In addition, failure to pay the Programming Claims may result in, among other things, prohibitive fees or other less favorable contract terms imposed by the Programming Vendors or suspension or termination of programming feeds altogether.  Accordingly, the DBS Debtors' success depends on, among other

things, their ability to continue to obtain and maintain desirable programming from the Programming Vendors and deliver such programming to their subscribers at competitive rates.

17.     As of the Petition Date, the DBS Debtors estimate that they owe approximately $1,722,810,000 on account of the Programming Claims (whether to the holders of such claims or to DNC in connection with satisfying such claims on the DBS Debtors' behalf).  To obtain and maintain access to the services provided by the Programming Vendors, the DBS Debtors request authority to pay or cause to be paid the prepetition Programming Claims as they become due and payable and to continue paying or causing to be paid the Programming Vendors in the ordinary course of business.

### D.     Foreign Claims

18.     In the ordinary course of business, the DBS Debtors procure products and services from, and rely on long-standing relationships with, certain vendors located outside of the United States (the "**Foreign Claimants**").  These Foreign Claimants supply goods and services to the DBS Debtors that are crucial to the DBS Debtors' ongoing operations and the continuation of their businesses in the ordinary course during these Chapter 11 Cases.  For example, major international programming providers, including TelevisaUnivision and MBC Group, supply foreign-language content that is critical to the DBS Debtors' Pay-TV platforms.  Further, the DBS Debtors utilize overseas contract manufacturers to produce customer equipment, including remote controls and set-top boxes.  Failure to pay prepetition claims held by certain Foreign Claimants and accrued in the ordinary course of business (the "**Foreign Claims**") could cause such Foreign Claimants to refuse to provide the goods and services necessary for the DBS Debtors to continue business operations.

19.     Foreign Claimants may consider themselves beyond the Court's jurisdiction and, therefore, may disregard the automatic stay, notwithstanding its global effect. Lawsuits in non-U.S. courts and efforts to exercise other remedies in non-U.S. jurisdictions—including the assertion of liens by the Foreign Claimants—could result from a failure to make payment to such parties in the ordinary course, including on account of prepetition claims. In many instances, it would be unduly time-consuming and burdensome for the DBS Debtors to seek to enforce an order of the Court in a Foreign Claimant's home country, thereby compounding the loss and disruption in services.

20.     As of the Petition Date, the DBS Debtors estimate that they owe approximately $4,300,000 on account of the Foreign Claims (whether to the holders of such claims or to DNC in connection with satisfying such claims on the DBS Debtors' behalf). To maintain access to the critical goods and services provided by the Foreign Claimants, the DBS Debtors request authority to pay or cause to be paid the prepetition Foreign Claims as they become due and payable and to continue paying or causing to be paid the Foreign Claims in the ordinary course of business.

### E.     Lien Claims

21.     In the ordinary course of business, certain other claimants perform various services, such as network equipment and maintenance, engineering services, shipping, and warehousing, and provide goods to the DBS Debtors (such claimants, the "**Lien Claimants**"), all of which are necessary for the DBS Debtors' business. If they are not timely paid, the Lien Claimants could possess and retain the DBS Debtors' goods, enforce mechanics' liens or similar liens, or take other action, any of which would likely disrupt the DBS Debtors' operations and affect the DBS Debtors' ability to efficiently administer these Chapter 11 Cases.

22.     Under applicable non-bankruptcy law, Lien Claimants may be able to assert liens on the goods in their possession or on the property they improved, as applicable in specified circumstances, to secure payment of prepetition amounts owed by DNC (such amounts, collectively, the "**Lien Claims**").  If the Lien Claims remain unpaid, Lien Claimants could attempt to assert or foreclose on such liens, refuse to deliver or release goods in their possession, or otherwise impede the DBS Debtors' use of goods or real property until the Lien Claimants' prepetition claims are satisfied and their liens released.

23.     Lien Claimants are often not subject to executory contracts under which they could be compelled to perform.  If Lien Claimants are subject to contracts, on the other hand, the time and expense to enforce such contracts against Lien Claimants would risk the successful completion of projects or delivery of essential goods needed for the DBS Debtors' operations because the attendant delay and enforcement costs would outweigh the cost of simply paying their claims.

24.     As of the Petition Date, the DBS Debtors estimate that approximately $11,770,000 is outstanding on account of Lien Claims.  The DBS Debtors seek authorization, but not direction, to pay or cause to be paid the prepetition Lien Claims in the ordinary course of business throughout these Chapter 11 Cases.

**F.     Other Trade Claims**

25.     As set forth above, certain other vendors that supply goods and services in the ordinary course of business are utilized by the DBS Debtors in the operation of their business (including all other Ordinary Course Claimants not covered by the above categories, but excluding other prepetition claims covered by relief sought in other First Day Motions, the "**Other Trade Claimants**").  Specifically, the Other Trade Claimants supply, enable, and/or maintain, among other things, the specialized hardware and technology necessary for the connectivity and other

related services for the Pay-TV segment of the DBS Debtors' businesses, network access and roaming through interconnection services, the infrastructure that underpins the DBS Debtors' network, and critical inventory necessary for the DBS Debtors' services. The DBS Debtors also rely on third-party providers to install, repair, and maintain television and entertainment services for both retail and business customers. These Other Trade Claimants include: equipment manufacturers that produce satellite dishes, receivers, remote controls, set-top boxes, and other specialized hardware and technology necessary for the Pay-TV segment; satellite capacity and leasing providers that enable signal transmission; software vendors that support signal monitoring, encryption, and delivery systems; installation and repair service providers that service customer equipment in the field; and contract manufacturers responsible for assembling and configuring customer devices. Each of these Other Trade Claimants provides a critical contribution at various stages of the transmission process, and the failure to timely pay counterparties at any stage could disrupt operations, jeopardize the DBS Debtors' ability to deliver their pay-TV and streaming services to subscribers, and strain or impair relationships with other essential vendors in the transmission chain. Further, a range of specialized vendors provide essential operational support, including IT systems, billing, customer service, logistics, and other administrative functions that are critical to the DBS Debtors' day-to-day business. The ability to maintain strong relationships with the Other Trade Claimants throughout these Chapter 11 Cases is imperative to preserving and maximizing the value of the estates.

26.    The Other Trade Claimants also include various vendors from which the DBS Debtors may have received certain goods within the twenty-one day period immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code. Such vendors supply goods, including component parts

for certain DBS Debtor equipment maintained at the DBS Debtors' facilities and deployed at customer premises, that are critical to the DBS Debtors' ongoing operations, and may refuse to ship goods unless some or all of the prepetition claims owing to such vendors are paid.

27.     The interruption or loss of business with the Other Trade Claimants would greatly reduce the efficiency and success of the DBS Debtors' operations.  Any material interruption in the provision of the products, software, and services from the Other Trade Claimants—however brief—would disrupt the DBS Debtors' operations and could cause irreparable harm to the DBS Debtors' go-forward businesses, goodwill, employees, customer base, and market share.  Such harm would likely far outweigh the cost of payment of the Other Trade Claims.  In addition, the Debtors' businesses are highly regulated by federal and state regulatory agencies.  If the DBS Debtors are forced to stop services because a vendor were to cease performance, the DBS Debtors or their affiliates may face regulatory consequences, including fines.

28.     The DBS Debtors estimate they owe approximately $143,610,000 on account of Other Trade Claims as of the Petition Date (whether to the holders of such claims or to DNC in connection with satisfying such claims on the DBS Debtors' behalf).  In light of the potential for immediate and irreparable consequences to the DBS Debtors' go-forward business, goodwill, employees, customer base, and market share if the Other Trade Claimants do not continue to provide uninterrupted and timely delivery of products, software, and services, the DBS Debtors have determined, in the exercise of their business judgment, that payment of the Other Trade Claims is essential to avoid costly disruptions to their operations.  Accordingly, to maintain stability during this critical stage of these Chapter 11 Cases and to avoid jeopardizing the DBS Debtors' business operations going forward, the DBS Debtors request authority to pay or cause to be paid the Other Trade Claims in the ordinary course of business, as described herein.

**III.    Payment of Outstanding Orders**

29.    Before the Petition Date and in the ordinary course of business, the DBS Debtors may have ordered goods, including component parts for certain DBS Debtor equipment maintained at the DBS Debtors' facilities and deployed on customer premises, that will not be delivered until after the Petition Date (collectively, the "**Outstanding Orders**").  To avoid the risk of becoming general unsecured creditors with respect to such goods, certain vendors may refuse to ship or transport such goods (or may recall certain shipments) with respect to such Outstanding Orders unless the DBS Debtors issue substitute postpetition purchase orders.  To prevent any disruption to the DBS Debtors' business operations, and given that, in certain circumstances, goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the DBS Debtors request that the Court (a) grant administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the DBS Debtors arising from the acceptance of goods subject to the Outstanding Orders and (b) authorize, but not direct, the DBS Debtors (or non-Debtor affiliates of the DBS Debtors on the DBS Debtors' behalf) to satisfy such obligations in the ordinary course of business.

**IV.    DBS Notes Interest**

30.    As described in further detail in the First Day Declaration and the Plan, the DBS Debtors have approximately $9.75 billion in prepetition funded debt obligations, consisting of the 2026 Senior Secured Notes, the 2026 Senior Notes, the 2028 Senior Secured Notes, the 2028 Senior Notes, and the 2029 Senior Notes (each as defined in the Plan and, collectively, the "**DBS Notes**").  Interest on the DBS Notes is payable semi-annually in cash, in arrears, with the next interest payments due on July 1, 2026 for the 2026 Senior Notes and the 2028 Senior Notes.  The interest with respect to the 2026 Senior Notes and the 2028 Senior Notes that was due July 1, 2026

16

was paid prior to the commencement of these Chapter 11 Cases on June 29, 2026, and the next interest payments are not due until December 1, 2026. On December 1, 2026, approximately $72.2 million will come due on the 2026 Senior Secured Notes, $71.9 million will come due on the 2028 Senior Secured Notes, and $38.4 million will come due on the 2029 Senior Notes. The DBS Debtors expect to emerge well in advance of this date and therefore do not anticipate any interest payments coming due during these Chapter 11 Cases, but are seeking the requested relief out of an abundance of caution.

31.    Under the RSA, the DBS Debtors are obligated to pay interest on the DBS Notes in full in cash on the terms and at the rates set forth in the indentures for the DBS Notes.[6] To the extent that any such payments become due and payable during these Chapter 11 Cases, and subject to entry of a final order on the Motion, the DBS Debtors seek authority to pay all such obligations as they come due. Failure to timely make such payments could trigger a default under the RSA and result in termination of the RSA by the Consenting Creditors (as defined in the First Day Declaration). Given that the agreements memorialized in the RSA and the support of the Consenting Creditors for the restructuring form the backbone of the Plan and these Chapter 11 Cases, the Debtors cannot risk being precluded from making interest payments on the DBS Notes as and when such payments become due during these cases and submit that the authorization they are seeking is appropriate under the circumstances.

---

[6]    *See* RSA Ex. B at 12 ("Interest on the DBS Notes will be paid in full in cash on a current basis during the Chapter 11 Cases on the terms and at the rates set forth in the indentures for the DBS Notes (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the Chapter 11 Cases extend past such date, unless such DBS Notes are repaid, redeemed or repurchased in full on or prior to such maturity date).").

**V.      Proposed Conditions on Payment of Ordinary Course Claims**

32.      To avoid disruption to their operations, the DBS Debtors seek authorization, but not direction, to condition payment of an Ordinary Course Claim on the respective Ordinary Course Claimant's written agreement (an email being sufficient) to continue providing goods, software, or services to the DBS Debtors during these Chapter 11 Cases on terms acceptable to the DBS Debtors in light of customary industry and historical practice, and at least as favorable to the DBS Debtors as the most favorable terms in place during the twelve months prior to the Petition Date (the "**Customary Trade Terms**").

33.      The DBS Debtors also propose that if an Ordinary Course Claimant accepts and receives payment on account of its Ordinary Course Claim pursuant to the relief requested by this Motion and subsequently refuses to maintain Customary Trade Terms with the DBS Debtors, then: (a) the DBS Debtors may take any and all appropriate steps to cause such Ordinary Course Claimant to repay payments made to it pursuant to this Motion on account of its prepetition Ordinary Course Claims to the extent that such payments exceed the postpetition amounts then owing to such Ordinary Course Claimant, including because any such payments are unauthorized postpetition transfers recoverable under section 549 of the Bankruptcy Code; (b) upon recovery by the DBS Debtors, any prepetition claim held by such Ordinary Course Claimant shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the DBS Debtors to such Ordinary Course Claimant, the DBS Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested in this Motion to such outstanding postpetition balance and such Ordinary Course Claimant shall be required to repay to the DBS Debtors such paid amounts that exceed the postpetition obligations then

18

outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

**Basis for Relief**

34.     The DBS Debtors commenced these Chapter 11 Cases to implement a comprehensive balance sheet restructuring through the Plan, which has significant stakeholder support through the RSA.  As discussed in greater detail below, the DBS Debtors believe the relief requested herein is appropriate because, among other things, (a) the Plan provides for the payment in full of all DBS General Unsecured Claims, (b) certain Ordinary Course Claimants could refuse to continue doing business with the DBS Debtors, causing irreparable harm to the DBS Debtors' business during these Chapter 11 Cases, (c) the Foreign Claimants may disregard the automatic stay in the event their Foreign Claims are not paid, (d) the Lien Claimants may be able to assert and enforce liens over the DBS Debtors' property in the event their Lien Claims are not paid, and (e) certain of the Other Trade Claims are entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.[7]

35.     The DBS Debtors' business relies on the flow of products and services provided by their global technology partners and vendors. Without strong vendor relationships, the DBS Debtors' ability to continue to provide quality services and products to their customers would be negatively impacted.   For this reason, the DBS Debtors are making every effort to avoid

---

[7]     The DBS Debtors further note that the vast majority – if not the entirety – of the prepetition claims proposed to be paid by this Motion would be paid by DNC or other non-Debtor affiliates in accordance with the Shared Services Agreement.  Although the DBS Debtors do not believe that this Court's approval is necessary to permit non-Debtor payment of prepetition claims, the DBS Debtors have filed this Motion out of an abundance of caution and submit that the relief requested is appropriate to the extent required (either with respect to payments by non-Debtors under the Shared Services Agreement or by the DBS Debtors themselves).  Moreover, and as noted herein, the Debtors (including the DBS Debtors) have separately filed the Shared Services Motion seeking, among other things, authority to continue performance under the Shared Services Agreement (including with respect to payment of prepetition amounts by the DBS Debtors).

interruptions in their operations in connection with the commencement of these Chapter 11 Cases. Moreover, a default under the RSA or indentures governing the DBS Notes could, among other things, jeopardize the restructuring that these Chapter 11 Cases are meant to achieve.  The DBS Debtors seek the relief requested herein to maintain stability during the opening days of these Chapter 11 Cases, avoid jeopardizing the DBS Debtors' ability to serve their customers going forward, and allow the DBS Debtors to perform under the RSA.

**I.      Payment of the Ordinary Course Claims Is Warranted Under Sections 105(a) and 363 of the Bankruptcy Code and Is an Appropriate Exercise of Business Judgment**

36.      Courts in the Fifth Circuit and elsewhere have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." (citing *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882))).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code support the payment of prepetition claims outside of a confirmed chapter 11 plan.

37.      Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit and elsewhere authorize a debtor's use of estate property outside the ordinary course of business under section 363(b) when supported by a "sound business justification."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 603 (5th Cir.

20

2011); *Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases).

38.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), bankruptcy courts may "authorize the payment of pre-petition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization."  *In re Just for Feet*, 242 B.R. at 824.  Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 175–76; *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").  The Bankruptcy Code authorizes the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.  *See, e.g., In re CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.").

39.     The "two recognized policies" of chapter 11 of the Bankruptcy Code are preserving the going concern value of a debtor's business and maximizing the value of property available to

21

satisfy creditors. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (noting that "two recognized policies underlying Chapter 11" are "preserving going concerns and maximizing property available to satisfy creditors"). Courts also recognize that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497–98. Allowing the DBS Debtors to pay the Ordinary Course Claims is consistent with these policies and necessary for the DBS Debtors to fulfill their fiduciary duties.

40.    The DBS Debtors require a steady stream of products, software, and services from the Ordinary Course Claimants to maintain stability while operating in these Chapter 11 Cases. Without the products, software, and services provided by the Ordinary Course Claimants, the DBS Debtors could be forced to halt operations immediately while they search for substitute vendors and service providers. Any disruption to the provision of products, software, and services could result in a significant loss of operational efficiency, decreasing the value of the DBS Debtors' businesses and impairing stakeholder value at this critical juncture in these Chapter 11 Cases. Having the authority to pay the Ordinary Course Claimants will signal clearly to the DBS Debtors' business partners and customers that it is "business as usual" while the Debtors seek to consummate the restructuring transactions contemplated by the RSA. Payment of the Ordinary Course Claims affords the Debtors the greatest likelihood of successfully reorganizing.

41.    Moreover, the relief requested herein only affects the timing of payment because, as previously noted, the proposed Plan enjoys broad creditor support and contemplates that all allowed DBS General Unsecured Claims against the DBS Debtors will be reinstated and unimpaired. The Plan's proposed treatment of such General Unsecured Claims does not upset the Bankruptcy Code's priority scheme because the holders of the DBS Notes have consented to being

22

impaired on account of their claims. *See In re Superior Offshore Int'l, Inc.*, 591 F.3d 350, 355 (5th Cir. 2009) (noting that the "law is settled" that "the absolute priority rule unambiguously does not apply" to claims of an impaired class that has accepted the plan). The DBS Debtors' prepetition funded debt creditors, *i.e.*, the holders of the DBS Notes, have agreed to accept treatment in an amount less than the value of their claims and to give value (in the form of not objecting to the DBS Debtors' repayment of Ordinary Course Claims) to the Ordinary Course Claimants to support the Debtors' uninterrupted operations. These creditors are sophisticated financial institutions represented by highly competent counsel and have been actively negotiating the terms of the Debtors' restructuring transactions over the past year. *See Equalnet Commc'ns Corp.*, 258 B.R. at 370 ("[O]ne very important set of factors . . . is the level of sophistication of the parties, the sophistication of their representation, the sufficiency of notice, the extent to which there is unanimous support or strong disagreement, and whether or not there exists potential harm to any sort of 'silent' or unrepresented constituencies . . . ."). Payment of Ordinary Course Claims therefore does not subvert the priority scheme.

42. For the reasons set forth herein, the Debtors request that the Court authorize the DBS Debtors (or their non-Debtor affiliates) to satisfy the Ordinary Course Claims.

## II. Additional Bases Support Payment of Certain Ordinary Course Claims

### A. The Court Should Authorize the Payment of Foreign Claims

43. A critical component of the DBS Debtors' businesses involves transacting with certain Foreign Claimants. The Foreign Claimants supply goods and services to the DBS Debtors that are crucial for the continuation of their businesses in the ordinary course during these Chapter 11 Cases. Failure to pay the Foreign Claims held by certain Foreign Claimants and accrued in the

ordinary course of business could cause such Foreign Claimants to refuse to provide the goods and services necessary for the Debtors to continue business operations.

44.     Each Foreign Claimant is based outside the United States and, as such, may lack minimum contacts with the United States.  There is significant risk that the Foreign Claimants consider themselves beyond the jurisdiction of the Court and therefore may disregard the automatic stay, notwithstanding the automatic stay's global effect.  Failure to make payment to such parties in the ordinary course could lead to a proliferation of lawsuits in foreign courts and efforts to exercise other detrimental remedies overseas.  In many instances, it would be unduly time-consuming and expensive to seek to enforce an order of the Court in the creditor's home country.

45.     To maintain access to the critical goods and services provided by the Foreign Claimants, the DBS Debtors request authority to pay certain prepetition Foreign Claims as they become due and payable and to continue paying certain Foreign Claims in the ordinary course of business.  For the avoidance of doubt, the DBS Debtors intend to pay prepetition Foreign Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

### B.     Certain Ordinary Course Claims May Be Secured by Liens

46.     The DBS Debtors anticipate that certain Ordinary Course Claimants may assert or perfect liens to secure their claims.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[8]  As a result, the DBS Debtors anticipate that certain

---

[8]     *See* 11 U.S.C. § 546(b)(1) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.")

24

of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.

47.     Even absent a valid lien, to the extent certain Lien Claimants have possession of goods, inventory, or other products ordered by the Debtors, mere possession or retention thereof could disrupt the Debtors' operations.  In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claimant's claim, such party may be a fully-secured creditor of the DBS Debtors' estates.  Payment provides such party with what they might be entitled to receive under a plan of reorganization, without requiring the DBS Debtors to pay any additional interest costs that might otherwise accrue during these Chapter 11 Cases.  Conversely, all creditors will benefit from the seamless transition of the DBS Debtors' operations into bankruptcy and the ultimate delivery and services by the DBS Debtors.

### C.     Certain Ordinary Course Claims Are Administrative Expenses

48.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  Administrative claims must be paid in full for a debtor to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  The timing of such payments also lies squarely within the Court's discretion.  *See In re Global Home Prods., LLC*, No. 06-10340, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

49.     The DBS Debtors' ongoing ability to obtain certain goods and services as provided herein is key to their survival and necessary to preserve the value of their estates.  Absent payment of certain Other Trade Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code,

25

at the DBS Debtors' discretion at the outset of these Chapter 11 Cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the DBS Debtors could be denied access to the goods necessary to maintain the DBS Debtors' business operations and maximize the value of the Debtors' estates.  Further, the proposed Plan provides for payment of all administrative claims, so payment of such administrative priority claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan unless they consented otherwise.  Finally, authorizing the DBS Debtors (or non-Debtor affiliates on the DBS Debtors' behalf) to pay Ordinary Course Claims pursuant to the terms set forth herein should eliminate the burden on this Court and the Debtors, which would arise from numerous motions requesting payment on account of claims under section 503(b)(9) of the Bankruptcy Code.

### III. Confirmation of Administrative Expense Priority Status of Outstanding Orders Is Appropriate and Necessary to the Debtors' Reorganization

50.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, will be administrative expense priority claims because they benefit the DBS Debtors' estates postpetition.  *See* 11 U.S.C. § 503(b)(1).  Granting the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not unduly prejudice any other party in interest.

### IV. Payment of DBS Notes Interest Is Necessary to Preserve and Enhance the Debtors' Estate and Constitutes a Sound Exercise of the Debtors' Business Judgment

51.     As discussed above, bankruptcy courts possess broad authority to authorize payment of prepetition obligations when necessary to protect the debtor's estate and preserve its going-concern value.  *See supra* ¶¶ 36–41.  This is particularly true where there is a possibility that

a "creditor will employ an immediate economic sanction" if such payment is not made. *In re Lehigh*, 657 F.2d at 581. Due to the risks associated with failing to satisfy a prepetition claim, in certain circumstances, a debtor in possession can fulfill its fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497–98. The Court should permit the payment of the DBS Notes Interest for various reasons.

52.     ***First***, the transactions contemplated by the RSA and the Plan leave the DBS General Unsecured Claims unimpaired and ensure that such claims will be paid in full. Permitting payment of the DBS Notes Interest alters only the timing, not the amount or priority, of such payments. The Plan has overwhelming support from Holders of the DBS Notes, which are the only claims against the DBS Debtors that the Plan proposes to impair. No parties in interest will be prejudiced by permitting payment of the prepetition DBS Notes Interest. Although the DBS Debtors expect to emerge well in advance of the next interest payments coming due on December 1, 2026, and therefore do not anticipate that any interest payments will come due during these Chapter 11 Cases, they submit that approving relief with respect to the payment of interest is appropriate insofar as the Debtors cannot risk being precluded from making interest payments on the DBS Notes should such payments become due during these cases.

53.     ***Second***, the parties to the RSA agreed that the DBS Notes Interest would be paid.[9] This component was essential to the Ad Hoc Group's execution of the RSA and agreement to support the Debtors' restructuring and withdraw the lawsuits it had filed against certain of the DBS Debtors. This Court's *Procedures for Complex Cases in the Southern District of Texas* (the

---

[9]     *See* RSA Ex. B at 12 ("Interest on the DBS Notes will be paid in full in cash on a current basis during the Chapter 11 Cases on the terms and at the rates set forth in the indentures for the DBS Notes (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the Chapter 11 Cases extend past such date, unless such DBS Notes are repaid, redeemed or repurchased in full on or prior to such maturity date.").

"**Complex Case Procedures**") specifically contemplate postpetition performance under agreements such as the RSA and do not disfavor a debtor's actual performance under a plan support agreement. Complex Case Procedures § D. A failure to pay the DBS Notes Interest as such payments become due would trigger defaults under the indentures and the RSA and risk termination of the RSA. Such a result would undermine the consensual framework underpinning these Chapter 11 Cases and jeopardize the Debtors' ability to consummate a value-maximizing restructuring. By preventing the destabilizing effects of a default under the RSA, payment of the DBS Notes Interest maximizes the value of the Debtors' estate, preserves its going-concern value, and is supported by an adequate business justification.

### Emergency Consideration

54.     Bankruptcy Rule 6003 prevents a court from granting relief within the first 21 days after the Petition Date "[u]nless relief is needed to avoid immediate and irreparable harm." Failure to receive the relief requested in this Motion during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture. The DBS Debtors have satisfied the "immediate and irreparable" harm standard in Bankruptcy Rule 6003 and request that the Court approve the relief requested on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

55.     To implement the foregoing successfully, the DBS Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the DBS Debtors have established cause to exclude such relief from the 14 day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

56.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any action taken pursuant to any order granting the relief requested herein is intended to be or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a release, waiver, or limitation of any claim or cause of action that the Debtors have (or may have) against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) a release, waiver, or limitation of any of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to this Motion are valid and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of any such liens.  If the Court grants the relief requested herein, any payment made pursuant to an order of the Court granting such relief is not intended and should not be construed as an admission as to the validity or priority of any claim or a release, waiver, or limitation of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

57.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**"); (b) the United States Attorney's Office for the Southern District of Texas; (c) the state attorneys general for the states in which the Debtors

29

operate; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the Federal Communications Commission; (g) the indenture trustees, administrative agents, and collateral agents in respect of: (i) the 2026 Senior Secured Notes, (ii) the 2028 Senior Secured Notes, (iii) the 2026 Senior Notes, (iv) the 2028 Senior Notes, and (v) the 2029 Senior Notes; (h) counsel to the Ad Hoc Group; (i) the holders of the 30 largest unsecured claims against the DBS Debtors; (j) the holders of the 30 largest unsecured claims against the DISH Wireless Debtors; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no other or further notice need be provided.

The DBS Debtors request that the Court enter the Proposed Interim Order and Proposed Final Order granting the relief requested in this Motion and such other and further relief as the Court deems appropriate under the circumstances.

June 30, 2026
Houston, Texas

/s/ Charles R. Koster

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:      (713) 496-9700
Facsimile:      (713) 496-9701
Email:          charles.koster@whitecase.com


Ronald K. Gorsich (*pro hac vice* pending)
Doah Kim (*pro hac vice* pending)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:      (213) 620-7700
Email:          rgorsich@whitecase.com
                doah.kim@whitecase.com

**WHITE & CASE LLP**
Thomas E Lauria (Texas Bar No. 11998025)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:      (305) 371-2700
Email:          tlauria@whitecase.com


Matthew E. Linder (*pro hac vice* pending)
Laura E. Baccash (*pro hac vice* pending)
300 N. LaSalle Drive
Chicago, Illinois 60654
Telephone:      (312) 881-5400
Email:          mlinder@whitecase.com
                laura.baccash@whitecase.com


David M. Turetsky (*pro hac vice* pending)
Samuel P. Hershey (S.D. Texas Fed. No. 3465170)
Andrea Amulic (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone:      (212) 819-8200
Email:          david.turetsky@whitecase.com
                sam.hershey@whitecase.com
                andrea.amulic@whitecase.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Charles R. Koster*
Charles R. Koster

**Certificate of Service**

I certify that on June 30, 2026, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Charles R. Koster*
Charles R. Koster

2