**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DISH DBS CORPORATION, | ) | Case No. 26-90627 (CML) |
| DISH WIRELESS L.L.C., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JOHN SWIERINGA IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, John Swieringa, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am President, Technology and Chief Operating Officer and a member of the Board of Managers of DISH Wireless L.L.C. ("**DWLLC**"), one of the debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned prepackaged chapter 11 cases (the "**Chapter 11 Cases**"). I am also President, Technology and Chief Operating Officer of the Debtors' indirect parent company, EchoStar Corporation (NASDAQ: ECHO) ("**EchoStar**"). As discussed below, DWLLC, its direct parent, Neyland Networks L.L.C., a Texas limited liability company ("**Neyland Networks**"), and four of DWLLC's subsidiaries (collectively, the "**DISH Wireless Debtors**") commenced Chapter 11 Cases on the date hereof (the "**Petition Date**") concurrently with the commencement of Chapter 11 Cases by their affiliates DISH DBS Corporation ("**DBS**") and its Debtor subsidiaries (such DBS subsidiaries, excluding the DISH Wireless Debtors, collectively, the "**DBS Debtors**"). EchoStar, the Debtors, and EchoStar's non-Debtor subsidiaries are

---

[1] The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/DBS. The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

collectively referred to herein as the "**Company**."  I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtors in these Chapter 11 Cases.

2.      I submit this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and certain "first-day" relief requested in motions filed concurrently with this Declaration (the "**First Day Motions**").  If called as a witness, I would testify competently to the facts set forth in this Declaration.

3.      In my role as President, Technology and Chief Operating Officer, I am responsible for key technology and operations across the Debtors and their brands, including wireless network development and deployment, engineering, information technology, customer experience operations, in-home services, manufacturing, and billing and credit.  I joined the Company in 2007 and have served in roles with increasing responsibility during my tenure.  I previously served as President and Chief Operating Officer of DWLLC, where I was responsible for the deployment and management of the nation's first facilities-based, virtualized, 5G open radio access network (the "**5G Network**").  I also previously served as Group President of Retail Wireless & Chief Operating Officer, Chief Operating Officer, EVP of Operations, Chief Information Officer, and VP of Application Development.  I spent the first ten years of my career working in corporate finance for DBS's non-Debtor parent company, DISH Network Corporation ("**DNC**") and for other Fortune 500 companies.  I earned my Bachelor of Science in Business Administration from Bucknell University and Masters of Business Administration from the University of Denver's Daniels College of Business.

4.      I am familiar with the Debtors' operations, business affairs, and books and records, as well as the circumstances leading to the commencement of these Chapter 11 Cases.  Except as

otherwise stated herein, the statements set forth in this Declaration are based on (a) my personal knowledge, (b) my discussions with other members of the Debtors' senior management and advisors, (c) my review of relevant documents, or (d) my opinion, based on my experience and knowledge of the Debtors' operations and financial condition.  In preparing this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my supervision or at my direction.

5.      This Declaration is divided into four parts and is accompanied by certain exhibits, including an organizational chart attached hereto as **Exhibit 1**.  Part I is an introduction.  Part II describes the Company, its business operations, and its corporate and capital structures.  Part III describes the circumstances leading to the commencement of these Chapter 11 Cases, including the sales of wireless spectrum licenses directed by the Federal Communications Commission (the "**FCC**"), the Debtors' entry into the Restructuring Support Agreement dated March 19, 2026 (the "**RSA**"), a copy of which is attached hereto as **Exhibit 2**, the terms of the proposed debtor in possession financing facility (the "**DIP Facility**"), the terms of the asset purchase agreement under which EchoStar is proposing to acquire substantially all of the assets of the DISH Wireless Debtors (the "**Stalking Horse APA**"), the Debtors' joint prepackaged chapter 11 plan filed concurrently with this Declaration (the "**Plan**"), and the timeline for these Chapter 11 Cases.[2]  Part IV affirms the facts that support the relief requested in the First Day Motions.

---

[2]      All summaries of the RSA and the Plan in this Declaration are qualified in their entirety by reference to the terms of the RSA and the Plan.  To the extent of any inconsistency between such summaries and the terms of the RSA or the Plan, the terms of the RSA or the Plan, as applicable, shall control.  A more comprehensive overview of the RSA is also included in Section III.D.

## I.      Introduction

6.      The Debtors are subsidiaries of EchoStar.  EchoStar was founded in 1980 and provides pay-TV, wireless, and internet services to millions of customers, having pioneered technological advancements that redefined those industries.  As of the Petition Date, the Company has approximately 10,400 employees in the United States and serves more than 6 million pay-TV subscribers, approximately 7 million wireless subscribers, and approximately 641,000 broadband subscribers.

7.      The Debtors comprise two of the Company's business segments.  The DBS Debtors operate the Company's Pay-TV segment, which includes DISH®- and Sling TV®- branded pay-TV services.  In 2025, Pay-TV generated operating income of $2.4 billion on revenue of $9.7 billion.  From 2020 to 2025, the DISH Wireless Debtors, led by DWLLC, operated the Company's Wireless segment under the Boost Mobile® and Gen Mobile® brands.  The DISH Wireless Debtors invested more than $13 billion (funded primarily by the proceeds of an intercompany loan from DNC) to build out the Company's nationwide 5G mobile network infrastructure.  Moreover, EchoStar's non-Debtor subsidiaries invested an additional $3 billion in the buildout and paid more than $30 billion to acquire spectrum licenses since 2008 from the FCC and through secondary market transactions (not including $10 billion of capitalized interest related to the carrying value of such licenses).  In 2024, the last full year of the Company's 5G Network operations, the wireless business generated an operating loss of $477 million on revenue of $3.6 billion.

### A.      The FCC-Directed Sales of EchoStar's Wireless Spectrum Licenses

8.      In 2020, DNC acquired Sprint Corporation's ("**Sprint**") Boost Mobile business for $1.4 billion, subject to working-capital adjustments, to satisfy antitrust conditions to the acquisition of Sprint by T-Mobile US, Inc. ("**T-Mobile**").  DWLLC then set to work building out its 5G Network under a complex set of terms negotiated with the FCC.  By May 5, 2025, DWLLC

had deployed more than 144,000 radios across over 24,000 tower sites across the country, allowing the Company to timely certify compliance with all buildout commitments, including that the 5G Network provided coverage to more than 80% of the United States population. The FCC certified the Company's compliance with its buildout commitments on September 29, 2023, and again confirmed that the Company had met all buildout obligations as of September 8, 2025. The Company certified compliance with buildout obligations on July 14, 2023, March 13, 2024, January 10, 2025, March 17, 2025, May 5, 2025, and June 17, 2025.

9. On May 9, 2025, notwithstanding the Company having certified compliance with all applicable buildout commitments up to that date, the FCC Chairman sent a letter to the Company expressing concerns about the extension granted by the prior administration related to the Company's 5G Network buildout and disclosing that he had directed FCC staff to commence an investigation and seek public comment to "inform the FCC's thinking about EchoStar's use of spectrum" (the "**May 2025 FCC Letter**"). A copy of the May 2025 FCC Letter is attached hereto as **Exhibit 3**. In ensuing discussions between EchoStar representatives and the FCC, including the Chairman and his staff, the FCC made clear its intent to terminate a wide range of the Company's spectrum licenses, including those necessary to operate the 5G Network, unless the Company sold such licenses in the secondary market. Any such termination would have posed an existential threat to the Company, which would have lost the entire $46 billion investment it had collectively made in its wireless network, including DWLLC's buildout. In response, the Company retained White & Case LLP and FTI Consulting, Inc. as its legal and financial advisors and began evaluating options to protect its interests, including preparations for a potential chapter 11 filing of the Company. At the same time, the Company worked with the FCC to identify a potential path forward that would permit the Company to retain its spectrum licenses. In June

2025, the Company's Chairman, Charlie Ergen, met with President Donald J. Trump and the FCC Chairman, Brendan Carr.  President Trump directed the FCC Chairman to work with the Company to find a resolution that would benefit all parties.

10.     During the negotiations, the FCC directed EchoStar to sell spectrum on an expedited basis on terms acceptable to the FCC or face significant license forfeitures.  I understand that the FCC has never previously required a party to sell its spectrum licenses under threat of termination.  Under the time pressure imposed by the FCC, EchoStar and certain of its non-Debtor affiliates worked to negotiate definitive agreements to sell a material portion of its terrestrial and satellite spectrum licenses on terms acceptable to the FCC.  After several months of discussions with the FCC about the nature and scope of transactions that would satisfy its directive, EchoStar and other non-Debtor affiliates entered into the following definitive license purchase agreements with AT&T Mobility II LLC ("**AT&T**") and Space Exploration Technologies Corp. ("**SpaceX**"):

(a)     on August 25, 2025, EchoStar and certain of its non-Debtor affiliates agreed to sell their 3.45 GHz and 600 MHz spectrum licenses—a total of 50 MHz of nationwide spectrum—to AT&T for approximately $23 billion, subject to regulatory approval.  In addition to this agreement, the AT&T Network Services Agreement was amended to provide for additional terms and services to facilitate the Company's transition to a Hybrid MNO (as defined below);

(b)     on September 7, 2025, EchoStar and certain of its non-Debtor affiliates agreed to sell their AWS-4 and H-block spectrum licenses to SpaceX for approximately $17 billion, comprised of up to $8.5 billion in cash and up to $8.5 billion in SpaceX stock at a per share valuation of $212.00 as adjusted for stock dividends, splits, or reorganization; and

(c)     on November 5, 2025, EchoStar and certain of its non-Debtor affiliates entered into an amended definitive agreement with SpaceX to also sell their unpaired AWS-3 licenses for approximately $2.6 billion of additional SpaceX stock at the same valuation as the September agreement.

11.     On September 8, 2025, immediately following the announcement of the AT&T and SpaceX transactions, the FCC Chairman confirmed by letter that "the relevant FCC buildout and other related obligations had been satisfied by EchoStar in view of the company's current FCC milestones."  I understand that the sequence of events at issue—an inquiry into the Company's spectrum licenses, an FCC-directed sale, and the subsequent resolution of that inquiry—is unusual. A copy of the FCC Chairman's September 2025 letter is attached hereto as **Exhibit 4**.

12.     As a result of these spectrum sales, DWLLC can no longer operate the 5G Network. Neither DWLLC nor any of its current or former subsidiaries currently owns or previously owned the spectrum licenses being sold to AT&T or SpaceX.  Accordingly, the DISH Wireless Debtors are not entitled to any proceeds of the sale transactions.  The sales also forced the Company to transition its Boost Mobile subscribers to third-party networks and to convert its operations to those of a hybrid mobile network operator ("**Hybrid MNO**")—a telecom provider that owns and operates certain core network functions, such as the software systems that authenticate subscribers and process calls, texts and data, while relying on third-party carriers to provide the spectrum frequencies and cell sites that actually deliver wireless service to subscribers' devices.  In other words, the Company continues to control the subscriber relationship and processes calls, texts and data through its cloud-native 5G core, but it is AT&T's physical network, including its towers, antennas, radios, radio access network software, and spectrum frequencies, that primarily carries the traffic.

13.     To protect against customer disruption and support this wholesale change to its business plan, in August 2025, DWLLC contributed certain vendor contracts, liabilities, and core network assets to Boost SubscriberCo L.L.C. ("**BoostCo**") in exchange for $5.0 billion of debt forgiveness under the DWLLC Intercompany Loan (as defined below).  As a result, the Company's wireless business split into two distinct segments: (a) the go-forward Hybrid MNO operations under BoostCo and (b) the non "core" network assets associated with the 5G Network deployment, which are held by the DISH Wireless Debtors.  The Hybrid MNO remains fully operational through BoostCo and continues to deliver uninterrupted service to its millions of customers nationwide.  As discussed herein, the DISH Wireless Debtors' remaining assets are contemplated to be transitioned pursuant to the terms of the Plan.

14.     Given the immense undertaking of building out the 5G Network from scratch, DWLLC entered into thousands of agreements with tower lessors and other vendors, including for fiber backhaul services, equipment (including servers, lithium-ion batteries, radios, and antennae, data centers), and for other goods and services.  DWLLC entered into these agreements in reliance on a straightforward principle, which I understand is supported by longstanding FCC practice: DWLLC could safely invest the billions of dollars needed to operate the 5G Network so long as EchoStar remained in compliance with its buildout milestones.  But the FCC's directive that EchoStar sell or forfeit its spectrum licenses, despite having complied with all of its buildout obligations, disrupted these well-founded expectations, which DWLLC has argued constitutes a force majeure event that rendered DWLLC's performance under tower leases and vendor agreements impossible or commercially impracticable.  For these reasons, and because without the Company's wireless spectrum, it is not possible to deploy or operate the 5G Network (or any radio

access network), DWLLC has asserted that it is excused from any further obligations under those leases and other agreements.

15.     Beginning in September 2025, DWLLC sent notices to thousands of 5G Network counterparties, informing them that the FCC's actions constituted force-majeure events or otherwise excused DWLLC's performance obligations under applicable law.  In each of these notices, DWLLC expressed its willingness to discuss a mutually acceptable resolution.  A representative example of such notice is attached hereto as **Exhibit 5**.  DWLLC has reached settlements with hundreds of 5G Network claimants, but many other claimants have disputed DWLLC's defenses.  To date, more than 170 lawsuits have been filed by 5G Network claimants in state and federal courts across the country, each of which seeks damages for breach of contract ranging from the single-digit thousands to several billion dollars and for declaratory relief that no force majeure or other event has occurred that would excuse DWLLC's performance.  In many cases, the expectancy damages asserted against DWLLC are for rent payments extending more than ten (10) years into the future.  In addition to defending against these lawsuits, DWLLC has been diligently working to decommission the portions of its legacy 5G Network, including the cell site radios and ground infrastructure, that are not utilized in the Company's go-forward Hybrid MNO operations, having discontinued its 5G Network deployment in August 2025, following the announcement of the spectrum sale to AT&T.

16.     On September 18, 2025, EchoStar jointly filed with AT&T and SpaceX for FCC approval of the respective transactions.  In orders issued on May 12, 2026, the Wireless Telecommunications Bureau of the FCC (the "**FCC Wireless Bureau**") approved the AT&T and SpaceX sales, conditioned on EchoStar depositing $2.4 billion (the "**Contribution**") into a trust for the benefit of creditors with claims related to the 5G Network (the "**FCC Trust**").  Copies of

the AT&T and SpaceX orders are attached hereto as **Exhibits 6** and **7**, respectively.  The purpose of the FCC Trust is to make funds available to pay final judgments, arbitration awards, and settlements for amounts due in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned to AT&T or SpaceX (claims for such judgments, awards or settlements are referred to herein as "**Covered Claims**").  With the FCC Wireless Bureau's approval, The Bank of New York Mellon has been appointed trustee of the FCC Trust, and EchoStar established the FCC Trust on June 26, 2026.  The Contribution will be remitted to the FCC Trust directly from the proceeds of the AT&T Transactions at closing.  The FCC Trust is discussed in detail in Section III.E below.

**B.**      **Negotiations with the Ad Hoc Group of DBS Noteholders**

17.      In October 2025, the Company, with the assistance of its advisors, initiated discussions with advisors to an ad hoc group of holders of the $9.75 billion in aggregate principal amount of the DBS Debtors' funded debt represented by Milbank LLP and Lazard Frères & Co. LLC (the "**Ad Hoc Group**").  The Company's objective was to explore a global resolution of disputes among the parties, including the dismissal of long-running litigation by members of the Ad Hoc Group challenging the Company's January 2024 liability management transactions, and to deleverage the DBS Debtors' balance sheet while gaining additional flexibility to explore and consummate strategic M&A transactions.  In November 2025, the Company and the Steering Committee of the Ad Hoc Group entered into nondisclosure agreements, and the parties commenced several months of negotiations regarding the terms of such a global restructuring deal.

18.      On February 26, 2026, in anticipation of entry into the RSA, the Company appointed Gerard Uzzi and Vikram Jindal to the Board of Managers of DWLLC as independent managers (the "**Independent Managers**").  On March 3, 2026, DWLLC established a special

committee of the Board of Managers comprised of the Independent Managers (the "**DWLLC Special Committee**").  As detailed further herein, the Special Committee has the exclusive authority to take any action with respect to a transaction that constitutes a conflict matter, to conduct an independent investigation and assess the merits of any potential claims and causes of action in connection with such investigation, and to act upon, prosecute, settle, release and take any other action in connection with such investigation.

19.   On March 19, 2026, the DBS Debtors and holders of 82% of the DBS Notes[3] entered into the RSA.  The terms of the RSA are set forth in Exhibit 2.

\*     \*     \*

20.   The Debtors have commenced these prepackaged Chapter 11 Cases to accomplish two principal objectives.  First, the Debtors will implement the terms of the RSA through the Plan.  Second, the DISH Wireless Debtors will address billions of dollars of claims asserted against them by tower lease and other 5G Network agreement counterparties under the terms of the Plan.  These cases afford 5G Network claimants the right to assert any claims they purport to hold against the DISH Wireless Debtors in a centralized forum and recover from DISH Wireless Debtors' distributable assets under the Plan to the extent their claims are allowed.  Moreover, 5G Network claimants that hold an allowed or settled Covered Claim (as defined below) against the DISH Wireless Debtors may seek recovery from the FCC Trust, subject to the FCC Trust's eligibility determination.

---

[3]   The "**DBS Notes**" are, collectively, the 7.750% senior notes due July 1, 2026 in the aggregate principal amount of $2.0 billion (the "**2026 Senior Notes**"), the 5.250% senior secured notes due December 1, 2026 in the aggregate principal amount of $2.75 billion (the "**2026 Senior Secured Notes**"), the 5.750% senior secured notes due 2028 in the aggregate principal amount of $2.5 billion (the "**2028 Senior Secured Notes**"), the 7.375% Senior Notes due 2028 in the aggregate principal amount of $1.0 billion (the "**2028 Senior Notes**"), and the 5.125% Senior Notes due 2029 in the aggregate principal amount of $1.5 billion (the "**2029 Senior Notes**").

21.     I understand from the Company's advisors that the RSA is now supported by holders of more than 88% in aggregate principal amount of DBS Notes (the "**Consenting Creditors**"):

| Series | Principal Amount ($) | Consenting Creditor Holdings ($) | Consenting Creditor Support (%) |
|---|---|---|---|
| 2026 Senior Secured Notes | 2,750,000,000 | 2,447,252,500 | 88.99 |
| 2028 Senior Secured Notes | 2,500,000,000 | 2,360,372,000 | 94.41 |
| 2026 Senior Notes | 2,000,000,000 | 1,768,773,700 | 88.44 |
| 2028 Senior Notes | 1,000,000,000 | 767,428,000 | 76.74 |
| 2029 Senior Notes | 1,500,000,000 | 1,266,928,000 | 84.46 |
| | **9,750,000,000** | **8,610,754,200** | **88.32** |

22.     Immediately prior to the commencement of these cases, the Debtors began soliciting votes on the Plan from the five classes of impaired creditors of the DBS Debtors (each corresponding to a series of DBS Notes) and from the class of general unsecured creditors of the DISH Wireless Debtors.  The Plan incorporates the "Effective Date Transactions" and other restructuring transactions contemplated by the RSA, as well as the restructuring of claims against the DISH Wireless Debtors.

## II.     Background

### A.     Overview of the Company and Its Businesses

23.     The Company is a premier provider of technology, networking services, television entertainment, and connectivity, offering consumer, enterprise, operator, and government solutions worldwide under its Boost Mobile, DISH, Gen Mobile, Sling TV, EchoStar®, Hughes®, HughesNet®, HughesON™, and JUPITER™ brands.

24.     The Company was founded by Charlie Ergen, Candy Ergen, and James DeFranco in 1980 as a C-band satellite distributor.  During the ensuing 46 years, the Company has pioneered technological advancements that have redefined the telecommunications industry.   The Company's historical milestones and achievements include:

- filing for a direct broadcast satellite license in 1987 and being granted its first real estate in space in 1992: orbital slot 119° west longitude;

- launching its first satellite—EchoStar I—in 1995, which cleared the way for the Company to gain its first pay-TV customers in March 1996;

- continuing to deploy satellite assets, allowing DNC to grow rapidly from the late 1990s through the 2000s, innovating the world's first DVR and voice remote;

- completing a significant corporate restructuring in 2008, which spun off DNC from EchoStar into a separate, publicly traded company, allowing each company to pursue distinct strategic objectives, with EchoStar increasingly focused on satellite assets, technology development, and related infrastructure services and DNC retaining the consumer-facing satellite television business;

- beginning in 2008, spending more than $30 billion to acquire spectrum licenses from the FCC and through the secondary market;

- launching Sling TV, the first live, over-the-top domestic television service in 2015, transforming the television industry and ushering in a new era of affordable, flexible, and accessible entertainment;

- acquiring Boost Mobile in 2020 to maintain the existence of a fourth facilities-based carrier following T-Mobile's acquisition of Sprint;

- deploying the 5G Network, which pioneered use of a cloud-native, open radio access network architecture that was the first of its kind deployed at nationwide scale in the United States;

- merging DNC with EchoStar as of December 31, 2023, reuniting the companies after more than a decade of separate public operations and combining Satellite and Broadband Communications, Pay-TV, and Wireless assets under a single corporate structure to pursue a unified strategy centered on integrated connectivity; and

- successfully launching the EchoStar XXV satellite, a high-power Ku-band satellite that delivers direct-to-home television broadcasting for DISH Network across North America, into a geosynchronous transfer orbit in March 2026.

Today, the Company is a diversified, multi-billion dollar telecommunications enterprise with millions of customers across the globe, supported by billions of dollars of capital investments.

25.     The Company has four primary business segments: (a) Pay-TV, which operates through the DBS Debtors and their subsidiaries; (b) Wireless, which operates as a Hybrid MNO through DNC and its non-Debtor subsidiaries, including BoostCo; (c) Broadband and Satellite Services, which operates through EchoStar's direct, wholly-owned subsidiary Hughes Satellite Systems Corporation and its subsidiaries; and (d) Other,[4] which consists of the Company's legacy 5G Network and related assets that are not used in the Wireless segment's Hybrid MNO operations. Neither the business operations of the Company's Broadband and Satellite Services segment nor the Wireless segment (which now conducts its Hybrid MNO operations through BoostCo) is implicated by these Chapter 11 Cases.

26.     For the fiscal year ended 2025, the Company reported consolidated revenue of approximately $15.0 billion. As of December 31, 2025, the Company had total assets of approximately $43.0 billion (comprised of approximately $5.1 billion of current assets and approximately $37.9 billion of non-current assets) and total liabilities of approximately $37.2 billion (comprised of approximately $12.4 billion of current liabilities and approximately $24.8 billion of non-current liabilities).

### 1.    Pay-TV

27.     The DBS Debtors offer pay-TV services under the DISH and Sling TV brands. The DBS Debtors are responsible for selling, billing, and servicing pay-TV subscriptions, managing the associated customer relationships, and holding necessary FCC licenses for direct broadcasting satellite and fixed satellite service spectrum used to deliver television programming.

---

[4]     This segment is defined as "Other" in EchoStar's public filings with the United States Securities and Exchange Commission (the "**SEC**").

28.     The Pay-TV segment has historically been the Company's largest revenue driver. For the 2025 fiscal year, Pay-TV accounted for approximately 65% (approximately $9.7 billion) of the Company's consolidated revenue, producing operating income of approximately $2.4 billion.  As of March 31, 2026, DBS had approximately 6.6 million pay-TV subscribers in the United States, including approximately 4.8 million DISH TV subscribers and approximately 1.8 million Sling TV subscribers.

### (a)     *DISH*

29.     The Company's vertically integrated direct-to-home satellite television business operates under the DISH brand.  Unlike cable, which depends on terrestrial hybrid fiber-coax networks, DISH transmits linear multichannel video via satellites positioned in fixed orbital slots. The DBS Debtors rely on a fleet of eight satellites orbiting roughly 22,300 miles above the equator. The Company owns seven of these satellites and leases one from a third party.  Programming from national cable networks, local broadcast affiliates, and premium programmers is aggregated at centralized broadcast centers, where it is encoded, compressed, encrypted, and transmitted to satellites.  Those satellites retransmit signals across the continental United States, Alaska, Hawaii, and Puerto Rico.

30.     Subscribers pay monthly fees structured around tiered channel bundles and often commit to two-year service agreements. Additional revenue streams include premium movie networks, sports add-ons, international programming tiers, pay-per-view events, video-on-demand rentals, equipment lease fees, installation charges, and protection plans.

### (b)     *SLING*

31.     Debtor Sling TV L.L.C. ("**Sling**") operates as the Company's multichannel, live-linear and on-demand streaming service provider for customers who do not subscribe to traditional satellite or cable pay-TV services, desire a lower cost alternative, or intend to watch programming

primarily on mobile devices.  Sling takes in live feeds from programmers at centralized facilities, transcodes them into streaming formats, and distributes them to users across smart TVs, streaming devices, mobile platforms, gaming consoles, and web browsers.  Because delivery occurs over the internet, no dish installation, technician visit, or proprietary receiver is required.  Subscribers simply download an app and activate service, significantly lowering onboarding costs.

32.     Sling's business model was designed to disrupt traditional large cable bundles by introducing smaller, modular "skinny bundles."  Its core offerings—Sling Orange and Sling Blue—divide channel lineups into thematic clusters (*i.e.*, sports, news, or entertainment) and can be combined or supplemented with optional mini-bundles (*e.g.*, sports extras, kids programming, lifestyle packages, and international add-ons).  Pricing is daily, weekly, or month-to-month without long-term contracts, giving consumers flexibility.  This structure enhances Sling's competitive appeal by lowering barriers to entry for prospective subscribers and positioning the service as an attractive, low-risk alternative to traditional Pay-TV offerings.

33.     The Sling user interface emphasizes personalization, integrated search, curated recommendations, and cross-device continuity.  Sling must therefore continuously optimize streaming quality, latency, buffering performance, and app compatibility across devices, which requires ongoing software development and cloud infrastructure investment, rather than satellite capital expenditure.

### (c)      *Legal and Regulatory Framework*

34.     The Company's pay-TV operations exist within a complex and highly technical regulatory structure that I understand spans communications law, copyright law, antitrust policy, consumer protection statutes, advertising regulation, satellite spectrum licensing, and contractual

carriage obligations.  FCC oversight is at the core of the DISH satellite television framework.[5] The FCC regulates spectrum licensing, orbital slot assignments, satellite construction milestones, signal carriage rules, and public interest obligations.  The Company must maintain authority to operate satellites in assigned orbital positions and must comply with strict technical parameters governing, among other things, interference, signal strength, and coverage.

35.     Additionally, the Company must obtain approvals for retransmission and content licensing.  The Company may be required to seek consent to retransmission from local broadcast stations, forcing the Company to negotiate per-subscriber fees.  Without retransmission ability, the Company risks programming interruptions, reputational harm, and subscriber churn.  Content licensing is governed primarily by private contract but intersects heavily with copyright law.  The Company must negotiate multiyear agreements with programmers covering linear distribution rights, video-on-demand rights, cloud DVR rights, out-of-home streaming rights, and digital streaming rights.  These contracts typically include minimum subscriber thresholds, most-favored-nation clauses, and annual fee escalators.  Copyright compliance also requires payment of statutory royalties in certain retransmission scenarios and adherence to anti-piracy obligations.

36.     I understand that the DBS Debtors' operations may also be subject to consumer protection regulations, including FCC and Federal Trade Commission truth-in-billing and advertising transparency standards, the Telephone Consumer Protection Act's restrictions on telemarketing, and privacy requirements under the Cable Communications Policy Act and applicable state-level data protection statutes.

---

[5]     The FCC's oversight functions arise under the Communications Act of 1934, as amended by the Cable Television Consumer Protection and Competition Act of 1992 and the Satellite Television Extension and Localism Act and its successors (the "**Communications Act**").

37.     In the aggregate, I understand that the regulatory and legal framework governing the Company's Pay-TV business is multifaceted and ever-evolving.  Compliance costs are significant, regulatory risks can affect strategic flexibility, and legislative changes can influence the economic viability of the entire Pay-TV model.

### 2.     Wireless

#### (a)     Segment Background

38.     Wireless is the Company's newest business segment.  The Company offers nationwide wireless communications services to subscribers under its Boost Mobile and Gen Mobile brands, along with a competitive portfolio of wireless devices.  As of the Petition Date, the Company had approximately 7 million wireless subscribers who are primarily served by the Company's Hybrid MNO operations implemented following EchoStar's entry into definitive agreements to sell spectrum licenses to AT&T and SpaceX.  For the 2025 fiscal year, the Wireless segment accounted for approximately 25% (approximately $3.8 billion) of the Company's consolidated revenue, producing net losses of approximately $495 million.  The Wireless segment has incurred operating losses for each fiscal year since 2022.

39.     Boost Mobile represents the largest portion of the Company's Wireless subscriber base.  The brand offers wireless service aimed at price-sensitive consumers.  Most subscribers pay in advance for monthly service and are not tied to long-term contracts.  Plans typically emphasize unlimited talk and text with tiered data offerings, and the Company currently offers a broad range of premium wireless devices, including the latest generation iPhones, as well as a wide selection of Samsung, Motorola, and other premium devices.  Boost Mobile relies on a hybrid distribution model that includes branded retail stores, third-party retail partnerships (including national retailers such as Amazon and Walmart), and digital channels.

18

40.     Gen Mobile serves a narrower and strategically distinct segment.  The brand focuses heavily on low-income consumers and participants in federal support programs such as Lifeline and, previously, the Affordable Connectivity Program.  Its subscriber base is highly price-sensitive and often dependent on government subsidies to maintain service affordability.  Gen Mobile's plans are typically ultra-low-cost, emphasizing essential connectivity rather than premium features.

### (b)    *Legal and Regulatory Framework*

41.     The Company's Wireless business is highly regulated.  Among other things, like any company, the Company is unable to operate and control its facilities using electromagnetic frequencies without a license for those frequencies from the FCC.  Therefore, the FCC's intention to invalidate EchoStar's licenses in short order meant that the Company would be unable to continue operation of its licensed system.  *See supra* ¶¶ 8–16.

42.     Specifically, under the Communications Act, the FCC has authority to issue licenses and authorizations for the use of the electromagnetic spectrum, including the wireless spectrum licenses held by the Company.  The FCC generally establishes buildout milestones and other conditions that licensees must meet.  Failure to meet these milestones and conditions can result in termination of the license.  The FCC has also established various bureaus that act on behalf of the FCC under delegated authority, including the FCC Wireless Bureau and Space Bureau (the "**FCC Space Bureau**").  These bureaus can, among other things, seek public comment on the application of Commission rules to licenses and authorizations, decide license extension requests, review petitions for reconsideration of their respective prior licensing decisions, and terminate (or declare the termination of) licenses.  FCC licensees, such as the Company, are required to always control their licenses and any licensed facilities, to not cause harmful

19

interference into other authorized users of the spectrum, and to coordinate their operations with such other spectrum users.

43. FCC licensees and regulated companies also generally have an obligation to pay annual regulatory fees to the FCC, as well as filing fees for any applications for new or modified licenses. In the event of reorganization, even one that involves control and operation by a debtor in possession, the transition is viewed as a transfer of control under FCC rules and requires FCC approval, which will be timely requested from the FCC in this case.

### 3. Other[6]

44. The Other segment primarily consists of the Company's legacy 5G Network and related deployment operations that are not utilized in the Wireless segment's Hybrid MNO operations. As described above and discussed in further detail in Section III.C below, in August and September 2025, EchoStar and certain of its non-Debtor affiliates entered into definitive agreements to sell a material portion of its spectrum licenses to AT&T and SpaceX—including the licenses necessary for DWLLC to operate the 5G Network. In August 2025, following EchoStar's entry into these transactions, DWLLC discontinued its deployment of the 5G Network after meeting certain interim and final build-out requirements established by the FCC, and began decommissioning efforts. As of November 15, 2025, the Company had no customer traffic on the 5G Network.

### B. Corporate Structure

45. As set forth on the organizational structure chart attached hereto as **Exhibit 1**, EchoStar is the ultimate parent company of each of the Debtors. EchoStar is domiciled in Nevada and headquartered in Colorado. It has two classes of voting common equity outstanding.

---

[6] This segment is defined as "Other" in EchoStar's public filings with the SEC.

EchoStar's Class A shares trade on NASDAQ under the symbol "ECHO,"[7] and its Class B shares, which are not publicly traded, are convertible at the option of the holder into an equal number of Class A shares. EchoStar's Chairman and Chief Executive Officer, Charlie Ergen, beneficially owns approximately 51.0% of EchoStar's equity securities (assuming conversion of the Class B common stock beneficially owned by Mr. Ergen into Class A common stock and giving effect to the exercise of certain options held by Mr. Ergen) and beneficially owns approximately 90.3% of the total voting power of all classes of shares (assuming no conversion of any Class B common stock and giving effect to the exercise of certain options held by Mr. Ergen). Class A shares entitle holders to one vote per share, and Class B shares entitle holders to ten votes per share.

46. EchoStar's direct subsidiary, DNC, is the indirect parent of DBS, which, together with its subsidiaries (including the other DBS Debtors), operates the Company's Pay-TV segment. DBS is also the direct parent of Neyland Networks, which, in turn, is the sole member of DWLLC. DWLLC and its subsidiaries (including the other DISH Wireless Debtors) comprise the Company's Other segment.

### C.    DBS Debtors' Prepetition Capital Structure

47. The DBS Debtors currently have approximately $9.75 billion in aggregate principal amount of funded debt obligations—*i.e.*, the DBS Notes. Approximately $5.25 billion in aggregate principal amount of DBS Notes are secured by substantially all of the DBS Debtors' assets and approximately $4.5 billion is unsecured. The DBS Debtors have sufficient cash or cash equivalents and accounts receivable as of the Petition Date to fund their operations in the ordinary

---

[7]    Previously, EchoStar's Class A shares traded on NASDAQ under the symbol "SATS".

course and pay restructuring expenses.[8]  The DBS Debtors do not anticipate needing any debtor-in-possession financing in these cases.

| Funded Debt Obligations | |
|---|---|
| DBS Notes | Principal Amount |
| 5.250% Senior Secured Notes due December 1, 2026 | $2,750,000,000 |
| 7.750% Senior Notes due July 1, 2026[9] | $2,000,000,000 |
| 5.750% Senior Secured Notes due December 1, 2028 | $2,500,000,000 |
| 7.375% Senior Notes due July 1, 2028 | $1,000,000,000 |
| 5.125% Senior Notes due June 1, 2029 | $1,500,000,000 |
| **Total** | **$9,750,000,000** |

### 1.    Secured Funded Debt Obligations

48.    DBS is the issuer of the 2026 Senior Secured Notes in the aggregate principal amount of $2.75 billion and the 2028 Senior Secured Notes in the aggregate principal amount of $2.5 billion.  The 2026 Senior Secured Notes and the 2028 Senior Secured Notes are collectively referred to herein as the "**DBS Senior Secured Notes**."   The DBS Senior Secured Notes are secured by substantially all of the assets of DBS, subject to exclusions including the DNC 2021 Intercompany Loan (as defined below).  DBS's obligations under the DBS Senior Secured Notes are guaranteed by each of the other DBS Debtors.  As of the Petition Date, the full principal amount of the DBS Senior Secured Notes remains outstanding.

### 2.    Unsecured Funded Debt Obligations

49.    DBS is also the issuer of three series of unsecured senior notes: (a) the 2026 Senior Notes in the aggregate principal amount of $2.0 billion; (b) the 2028 Senior Notes in the aggregate principal amount of $1.0 billion; and (c) the 2029 Senior Notes in the aggregate principal amount

---

[8]    The Ad Hoc Group has consented to use of cash collateral under the *Stipulation and Agreed Order Granting Adequate Protection to Prepetition DBS Notes Secured Parties* filed concurrently herewith.

[9]    The Reorganized DBS Debtors will pay the aggregate principal balance and accrued and unpaid interest on the 2026 Senior Notes in full in cash on or as soon as practicable after the Effective Date under the terms of the Plan.

of \$1.5 billion.  DBS's obligations under the DBS Senior Notes are guaranteed by each of the other DBS Debtors.  As of the Petition Date, the full principal amount of the DBS Senior Notes remains outstanding.  The maturity date of the 2026 Senior Notes is July 1, 2026.  As of the Petition Date, DBS does not have sufficient liquidity to both repay the 2026 Senior Notes and to satisfy its ordinary course obligations.  Upon the AT&T closing, DNC will pay in full amounts that DBS will use to, among other things, pay in full and retire the 2026 Senior Notes.  However, owing to unforeseen delays in obtaining the requisite regulatory approvals, the AT&T Transactions have not yet closed.

### 3.      Intercompany Loans and Obligations

50.      In addition to their funded debt, the DBS Debtors are parties to certain intercompany loans with their affiliates, including the DISH Wireless Debtors and DNC.  The loans described below do not include the June or September 2024 loans that DBS made to DNC in the amounts of \$1.711 billion and \$535 million, respectively, which DNC repaid concurrently with execution of the RSA.

### (a)      DBS Secured Loan

51.      On April 21, 2026, following deliberation and approval by the DWLLC Special Committee, DBS, as lender, and DWLLC, as borrower, entered into that certain Loan and Security Agreement in respect of a \$75 million term loan to DWLLC for general corporate purposes (the "**DBS Secured Loan**").  On May 26, 2026, DISH Wireless Leasing L.L.C. ("**DW Leasing**"), as guarantor, and DBS, as lender, entered into that certain Guarantee and Security Agreement with respect to the DBS Secured Loan.  The DBS Secured Loan matures on April 21, 2027.  Interest accrues at 5.50% per annum, is payable in cash on the first day of each calendar month, and, upon a default or after acceleration, accrues interest at an additional 2.0% per annum at DBS's option.  DWLLC may prepay the DBS Secured Loan in full or in part at any time without premium

23

or penalty. The DBS Secured Loan is secured by a lien on substantially all of DWLLC's and DW Leasing's assets and guaranteed by DW Leasing. As of the Petition Date, the aggregate principal amount outstanding under the DBS Secured Loan is $75 million. The DBS Secured Loan will be repaid in full upon the closing of the DISH Wireless Debtors' sale of substantially all of their assets, subject to Bankruptcy Court approval.

### (b)     DNC 2021 Intercompany Loan

52.     On November 26, 2021, DBS, as lender, and DNC, as borrower, entered into that certain Loan and Security Agreement (the "**2021 Loan Agreement**" and the loan issued thereunder, the "**DNC 2021 Intercompany Loan**"). DNC used the loan proceeds to finance the purchase of wireless spectrum licenses and for general corporate purposes, including the 5G Network deployment. The DNC 2021 Intercompany Loan matures in two tranches, with the first tranche of approximately $4.8 billion maturing on December 1, 2026 (the "**2026 Tranche**"),[10] and the second tranche of approximately $2.8 billion maturing on December 1, 2028 (the "**2028 Tranche**"). The DNC 2021 Intercompany Loan was initially secured by interests in the Company's 3.45–3.55 GHz Licenses. During the first quarter of 2025, in compliance with the 2021 Loan Agreement, certain of the 3.45–3.55 GHz Licenses were substituted for other previously unencumbered wireless spectrum licenses of equal or greater value (based on the most recent third-party valuation). Interest on the DNC 2021 Intercompany Loan accrues and is payable semiannually in cash. As of the Petition Date, the total amount outstanding under the DNC 2021 Intercompany Loan was approximately $7.6 billion plus accrued interest.

---

[10]     In January 2024, the Company completed a series of assignments, resulting in the transfer of the receivable of $4.7 billion in respect of the 2026 Tranche from DBS to EchoStar Intercompany Receivable Company L.L.C., a direct subsidiary of EchoStar.

#### D.      DISH Wireless Debtors' Prepetition Capital Structure

53.      As of the Petition Date, (a) DWLLC and DW Leasing guaranteed DNC's obligations under the DNC Senior Secured Notes (as defined below) in the aggregate principal amount of $3.5 billion; (b) DWLLC is the borrower under the DWLLC Intercompany Loan in the aggregate amount of approximately $8.8 billion (including principal and accrued interest); and (c) DWLLC is the borrower under the DBS Secured Loan in the aggregate principal amount of $75 million.  Prior to the Petition Date, in accordance with the RSA, a Loan Agreement dated as of November 1, 2024 in the borrowing principal amount of $4.50 billion from EchoStar Financing L.L.C. to DWLLC was extinguished in the amount of $3.89 billion.

##### 1.      DNC Senior Secured Notes Guarantee

54.      DWLLC and DW Leasing are guarantors under the 11.75% senior secured notes due 2027 issued by DNC in the aggregate principal amount of $3.5 billion (the "**DNC Senior Secured Notes**").  The DNC Senior Secured Notes are secured by the Company's 600 MHz spectrum licenses, which EchoStar has agreed to sell to AT&T under the AT&T License Purchase Agreement (as defined below).  EchoStar is therefore required, at least ten (10) calendar days prior to the closing, to obtain and deliver to AT&T evidence that it has delivered a notice of redemption of all outstanding DNC Senior Secured Notes in accordance with the terms of the relevant indenture.  The DNC Senior Secured Notes will be redeemed substantially concurrently with the AT&T closing with proceeds of the AT&T Transactions, resulting in the termination or discharge in full of indebtedness under the indenture governing the DNC Senior Secured Notes.  For these reasons, the Plan provides that the DNC Senior Secured Notes will be redeemed in full on the AT&T closing date and no distributions shall be required or made on account of the DNC Senior Secured Notes under the Plan.

### 2. Intercompany Loans and Obligations

55. From time to time prior to the Petition Date, beginning in 2020, DNC extended intercompany loans to DWLLC, which were used to, among other things, build out the 5G Network (the "**DWLLC Intercompany Loan**"). On August 22, 2025, DNC memorialized these loans under the Loan Agreement with DWLLC on account of the DWLLC Intercompany Loan which, as of June 28, 2026, had an aggregate balance of $8,856,507,760.88, including principal and accrued interest, which reflects $5.0 billion of loan forgiveness as consideration for the contributions related to the Hybrid MNO transaction described above.[11] The DWLLC Intercompany Loan matures on November 30, 2030. Interest accrues at an annual rate of 11.50% and is payable monthly in kind (and after the second anniversary of the effective date, in cash or in kind).

56. As described above, DWLLC is the borrower under the DBS Secured Loan in the aggregate principal amount of $75 million. The DBS Secured Loan is contemplated to be repaid in full upon the closing of the DISH Wireless Debtors' sale of substantially all of their assets, subject to Bankruptcy Court approval.

### 3. Lease Obligations

57. DWLLC is party to long-term leases of real property, including communications towers, data centers, office space, warehouses and distribution centers, as well as operating and finance leases of vehicles and equipment. The DISH Wireless Debtors became party to a significant portion of these long-term leases in connection with the deployment of the 5G Network. In 2025, the DISH Wireless Debtors' rent under tower leases totaled approximately $567.8

---

[11] DNC, the lender under the DWLLC Intercompany Loan, is the indirect parent of BoostCo and DWLLC.

million.  As described above, DWLLC has asserted that, as a result of the FCC's actions in 2025, its performance obligations under these tower leases were excused from and after the date DWLLC sent notices informing contract counterparties that the FCC's actions constituted force-majeure events or otherwise excused DWLLC's performance obligations under applicable law, and DWLLC therefore discontinued deployment of the 5G Network.  In light of the Company's transition to Hybrid MNO operations, the Company no longer has any business operations for which it can make use of these communication tower leases.

### E.      The Debtors' Shared Services Obligations

58.      As described more fully in the *Debtors' Emergency Motion for Entry of (I) Interim Order (A) Authorizing, but Not Directing, the Debtors to Continue Performing Under the Shared Services Agreement and Satisfy Prepetition Obligations Related Thereto, and (B) Granting Related Relief; and (II) Final Order Authorizing the Debtors to Assume the Shared Services Agreement*, filed concurrently herewith, in the ordinary course of business, the Debtors rely on non-Debtor affiliates EchoStar, DNC, DISH Purchasing Corporation, and Echosphere L.L.C. ("**Echosphere**" and, collectively with EchoStar, DNC, and DISH Purchasing Corporation, the "**Shared Services Providers**") for the provision of certain operational, administrative, technological, and other corporate services that are critical to their business operations. Echosphere is the Company's employer of record and provides the Debtors with the necessary employees to operate their respective businesses.  As part of this arrangement, DNC, on behalf of the Debtors, makes employee compensation and benefits payments to the employees that provide services to the Debtors.  These payments include payments related to employee wages, health and welfare benefits, incentive programs, severance obligations, 401(k) plan contributions, paid leave benefits, workers compensation insurance and related obligations, additional fringe benefits, non-

27

employee director compensation, and payroll and benefit program processing obligations. The Debtors, in turn, incur intercompany obligations to DNC in exchange for such payments.

59.     The Debtors also benefit from a variety of services from third parties that the Shared Services Providers provide or arrange in the ordinary course of business, including certain tax services, insurance and surety bond services, utilities services, customer programs, and third-party vendor services, among others. The Shared Services Providers typically contract or engage with various third parties on the Debtors' behalf for the provision of essential shared business services to the Debtors. DNC makes payments to the Shared Services Providers or the third-party providers, as applicable. The Debtors do not incur obligations to pay these third parties directly but incur intercompany obligations to reimburse DNC for the shared business services the Debtors receive.

60.     As of the Petition Date, the DISH Wireless Debtors owe approximately $3.7 million to the Shared Services Providers in respect of their shared services obligations, and the DBS Debtors owe approximately $2.2 billion. The Debtors have filed a motion to continue performing under their shared services agreement with their non-Debtor affiliates contemporaneously herewith.

## III.     Events Leading to the Chapter 11 Cases

### A.     DBS Debtors' Prepetition Restructuring Initiatives

#### 1.     Operational Challenges and Initiatives

61.     The DBS Debtors' operations continue to generate significant revenue and cash flow for the Company. Nevertheless, the DBS Debtors have faced numerous operational challenges in recent years associated with industry-wide cord-cutting, steadily increasing programming costs, and increased competition from streaming platforms. After peaking at more than fourteen (14) million subscribers in 2014, the Company reported its first full-year net pay-TV

subscriber loss in 2015 and has since experienced consistent year-over-year decline, even with Sling TV's growth. Since 2014, the Company's Pay-TV segment has lost roughly 7.3 million net subscribers. As consumers increasingly migrate to on-demand streaming platforms and broadband-delivered content, linear channel bundles are perceived as expensive and inflexible. Although Sling TV mitigates some losses by appealing to cord-cutters, it experiences higher churn than the satellite segment due to its month-to-month subscription model, which requires constant marketing and acquisition efforts to maintain subscriber levels.

62. In response to these operational challenges, the DBS Debtors have shifted from prioritizing gross subscriber counts to optimizing profitability per remaining subscriber. For the satellite television business, the DBS Debtors have implemented various churn-management initiatives, such as targeted retention credits (rather than blanket discounts), selective short-term bill reductions or contract extensions for higher-value or long-tenured customers, improved customer service processes, and selective content packaging. For Sling TV, the Company has moderated acquisition marketing spend to manage customer acquisition costs and has avoided excessive promotional pricing.

63. To manage high programming expenses, the Company has been forced to take a more aggressive posture in negotiations with broadcasters, occasionally accepting temporary takedowns rather than agreeing to inflated programming costs. In parallel, the Company has adapted its programming packaging strategy and has placed high-cost channels in higher subscription tiers. Other cost-cutting initiatives include reducing corporate staff, vehicle fleets, field and warehouse operations, and call-center staffing to reflect a smaller subscriber footprint.

### 2. 2024 Transactions and Bondholder Lawsuit

64. EchoStar acquired DNC and its subsidiaries, including DBS, in an all-stock merger closing on December 31, 2023. Subsequently, the newly combined companies worked to integrate

29

the EchoStar and DNC businesses in a manner that maximized synergies, cost savings, and growth opportunities. In connection with such integration, EchoStar and DNC announced a series of transactions designed to unlock incremental strategic, financial, and operational flexibility for the combined business (the "**January 2024 Transactions**"), including: (a) an assignment of approximately three million pay-TV subscribers from DBS to its wholly owned subsidiary, DBS Issuer L.L.C. ("**DBS SubscriberCo**"), and the designation of DBS SubscriberCo as an unrestricted subsidiary; (b) an assignment by DBS of the receivable in respect of the 2026 Tranche of the DNC 2021 Intercompany Loan to an EchoStar subsidiary; and (c) the designation of certain DBS subsidiaries constituting the Sling TV business as unrestricted subsidiaries. DBS also made a loan to DNC in connection with customary, ordinary-course cash management functions to support permitted business activities, as memorialized by an intercompany loan agreement maturing in 2028 (the "**2024 Intercompany Loans**"). On September 29, 2024, DBS SubscriberCo entered into a financing arrangement with outside investors who provided approximately $2.3 billion in secured debt and $200 million in preferred equity (the "**DBS SubscriberCo Financing**"), the proceeds of which were loaned to DBS primarily to repay in full approximately $2.0 billion of DBS senior notes maturing in November 2024, with the remainder used for general corporate purposes, including the payment of interest on other DBS debt when due.

65. In April 2024, the indenture trustee for two series of DBS Notes, acting at the direction of certain bondholders, commenced a lawsuit (the "**Bondholder Lawsuit**"), which challenged the January 2024 Transactions. The Bondholder Lawsuit was commenced in the Supreme Court of the State of New York; the defendants removed it to the United States District Court for the Southern District of New York, where it was captioned *U.S. Bank Tr. Co. Nat'l Ass'n v. DISH DBS Corp.*, No. 1:24-cv-3646 (JGLC) (S.D.N.Y.). The complaint was amended twice,

30

culminating in a second amended complaint that added DNC as a defendant and asserted claims for breach of the DBS Notes indentures and actual and constructive fraudulent transfer under the Colorado Uniform Fraudulent Transfer Act concerning: (a) the January 2024 Transactions; (b) the 2024 Intercompany Loans; and (c) the DBS SubscriberCo Financing (the "**September 2024 Transactions**").  The defendants moved to dismiss, arguing, among other things, that the complaint failed to adequately plead actual fraudulent intent, and that the challenged transactions were ordinary-course corporate restructuring transactions undertaken in connection with the post-merger integration of EchoStar and DNC.  On August 21, 2025, the Court granted Defendants' motion in part, dismissing plaintiff's fraud claims relating to the September 2024 Transactions without prejudice on the ground that Plaintiffs had alleged only speculative, rather than actual, injury arising from those transactions.  As to the remaining claims, the Court found that the parties' disputes were principally factual in nature and could not be resolved on the pleadings, and accordingly denied the motion in part.  After a period of discovery, the Bondholder Lawsuit was ultimately dismissed on March 20, 2026 pursuant to and in connection with the RSA.

### 3.     DirecTV Transaction

66.     The Company also pursued a strategic transaction to address the structural mismatch between declining pay-TV revenue and high fixed debt service obligations.  On September 29, 2024, the Company entered into that certain Equity Purchase Agreement with DirecTV, under which DirecTV would have acquired all of the Company's issued and outstanding equity interests in DBS, subject to closing conditions including government approvals and the successful completion of related debt-exchange offers made to holders of DBS Notes.  If consummated, the deal with DirecTV would have reduced the Company's consolidated Pay-TV debt by an estimated $11.7 billion and significantly mitigated near-term refinancing needs.  Ultimately, holders of DBS Notes rejected the proposed debt exchange, and DirecTV terminated

the Equity Purchase Agreement on November 22, 2024 because the exchange offer was not consummated by the applicable outside date.

**B.      DISH Wireless Debtors' Prepetition Regulatory Challenges**

**1.      The Company's Wireless Spectrum Licenses**

67.      In 2008, the Company began strategically acquiring spectrum licenses at auction from the FCC to assemble a nationwide portfolio of low-band and mid-band spectrum (including AWS-3 and AWS-4 mid-band holdings) intended to support future mobile broadband and voice services.  The Company also acquired spectrum licenses through strategic acquisitions, including its acquisition of reorganized DBSD North America, Inc. and substantially all of the assets of TerreStar Networks, Inc. through their respective bankruptcy proceedings in 2011 and 2012.

68.      Beginning in 2018, T-Mobile sought regulatory approval of its acquisition of Sprint, which would have reduced the number of facilities-based wireless carriers in the United States from four to three.  The United States Department of Justice ("**DOJ**") and the United States District Court for the District of Columbia agreed that the merger would harm competition in violation of antitrust laws.  As a condition to approval of the merger, the DOJ required T-Mobile and Sprint to sell sufficient assets to maintain and promote the existence of a fourth facilities-based carrier.  The Company stepped in as that fourth carrier, acquired certain assets and liabilities associated with Boost Mobile from Sprint in July 2020 for $1.4 billion, subject to working-capital adjustments, and subsequently commenced the buildout of its own 5G Network.

69.      In connection with the government's approval of the merger and the Boost Mobile sale, the FCC imposed on the Company a complex set of commitments and milestones governing the 5G Network deployment.  If the Company failed to meet the buildout commitments and milestones, it would risk forfeiting its licenses and incurring fines of up to $2.2 billion.  Despite a global pandemic, severe supply chain disruptions, and inflation, the Company timely met all of its

commitments and each of these milestones (as such milestones have been extended from time to time). These included meeting band-specific 5G commitments, as well as nationwide commitments to deploy a 5G network with download speeds equal to or greater than 35 megabits per second to at least 70% of the United States population with a minimum of 15,000 sites, as verified by a drive test overseen by a third party using a methodology approved by the FCC.

70. In total, the Company invested more than $46 billion to deploy and operationalize its 5G Network. The Company invested more than $30 billion to acquire wireless spectrum licenses, including at FCC auctions (excluding $10 billion of capitalized interest related to the carrying value of such licenses). In addition, the Company invested more than $16 billion (including approximately $13 billion paid by DWLLC and certain of its subsidiaries) to construct the extensive network infrastructure needed to deploy the Company's wireless spectrum, including more than 144,000 radios installed on over 24,000 5G cell sites throughout the United States.

71. During the 5G Network deployment, the Company was also transitioning from operating primarily as a mobile virtual network operator ("**MVNO**") to a mobile network operator ("**MNO**"). An MVNO is a wireless carrier that does not own its own radio spectrum and physical network infrastructure. Instead, it purchases wholesale network access from one or more facilities-based carriers and resells that connectivity to its own subscribers under its own brand. An MNO, by contrast, owns and operates its own licensed spectrum and physical network infrastructure, enabling it to deliver wireless services directly to subscribers over its own facilities without relying on a third-party carrier's network. Pending the completion of the Company's 5G Network deployment, only a portion of the Company's wireless subscribers were on its 5G Network, with the Company relying on T-Mobile and AT&T to carry a large portion of its subscribers' voice and data traffic over those carriers' respective networks. The Company was in the process of

transitioning to operating primarily as an MNO as the buildout proceeded and coverage of the network grew, delivering wireless services to its subscribers entirely over its own licensed spectrum and physical infrastructure.

### 2. The FCC Grants the Company's Request to Accelerate or Extend Certain Deadlines

72. In connection with T-Mobile's acquisition of Sprint, the FCC updated the buildout deadlines for certain of the Company's wireless spectrum licenses to June 14, 2025. The Company was required to make 5G wireless broadband available to either 70% or 75% of the regional population, depending on the license type, within the geographic footprint for each of the vast majority of the Debtors' 600 MHz, Lower 700 MHz E Block, AWS H Block, and AWS-4 licenses on or before such deadline. Separately, the Company was also required to make 5G wireless broadband available to 75% of the regional population within the geographic footprint for nearly all of its AWS-3 licenses by October 27, 2025. These commitments required substantial investments, as the Company estimated that it would need to deploy 15,000–20,000 additional cell sites to satisfy the FCC's coverage requirements, among other reasons, because many of the Company's AWS-3 licenses covered rural areas that are among the hardest and most expensive to cover in the United States. While the Company was prepared to continue to meet the then-existing FCC requirements, it became apparent to the Company that the best use of available resources to achieve its business objectives and promote stronger competition would be to strengthen and densify the 5G Network in the markets and geographies that were already being served by the 5G Network.

73. On September 17, 2024, the Company submitted a request to the FCC for the conditional extension of the final buildout deadlines related to various wireless spectrum licenses (the "**2024 Extension Request**"). Specifically, the 2024 Extension Request sought to

conditionally extend the construction milestones associated with certain of its AWS-4, Lower 700

MHz E Block, 600 MHz, AWS-3, and AWS H Block licenses so that the Company could optimize

its buildout for maximum competitive impact, which would serve the public interest by allowing

it to deploy higher quality service in the most populous markets.  In exchange for the proposed

extensions, the Company committed to additional milestones that went beyond the requirements

of T-Mobile's acquisition of Sprint, including to:

(a) accelerate the deployment of its 5G Network so that it would cover over 80% of the United States population by December 31, 2024 ("**Commitment 1**");

(b) accelerate and expand the final construction milestones for certain of the AWS-4 licenses, H Block licenses, 700 MHz licenses, and 600 MHz licenses to require EchoStar to provide 5G broadband service to 85% of the population in each respective license by December 31, 2024, and modify the final construction milestones to require EchoStar to provide reliable signal coverage and offer service to 85% of the population in specific AWS-3 license areas by December 31, 2024 ("**Commitment 2**");

(c) accelerate and expand the final construction milestones for additional AWS-4 licenses, H Block licenses, 700 MHz licenses, and 600 MHz licenses to require EchoStar to provide 5G broadband service to 80% of the population in each respective license by December 31, 2024, and modify the final construction milestones to require EchoStar to provide reliable signal coverage and offer service to 80% of the population in additional specific AWS-3 licenses by December 31, 2024 ("**Commitment 3**");

(d) provide a nationwide affordable 5G plan and devices to consumers for the duration of the extension period ("**Commitment 4**");

(e) deploy 24,000 5G sites by June 14, 2025 (a 60% increase in 5G site obligations) ("**Commitment 5**");

(f) upgrade the deployed 5G sites to a next-generation 5G standard (3GPP Release 17) by June 14, 2025 ("**Commitment 6**"); and

(g) load at least 75% of new subscribers with compatible devices on EchoStar's MNO network in accelerated markets ("**Commitment 7**").

The Company also agreed to permit small carriers and tribes to lease the Company's spectrum in

the license extension areas.

74. Only upon fulfilling the accelerated and expanded milestones would the targeted extensions proposed in the 2024 Extension Request go into effect. Specifically, the 2024 Extension Request provided that, if EchoStar fulfilled Commitments 2 and 3, the final construction milestones for (a) certain of the AWS-4, AWS H Block, Lower 700 MHz E Block, and 600 MHz licenses would be further extended from June 14, 2025 to December 14, 2026, and (b) certain of the AWS-3 licenses would be extended from October 27, 2025 to December 14, 2026.

75. The 2024 Extension Request explained that, in addition to the greater public interest commitments proposed by the Company's new obligations, the proposed milestone adjustments promoted the FCC's public interest objectives by increasing competition in the markets in which the Company would accelerate its commitments. On September 20, 2024, the FCC Wireless Bureau accepted and approved the 2024 Extension Request (the "**2024 Extension Grant**").

### 3. The Company Dedicates Significant Resources and Capital to Satisfy Its Accelerated Commitments

76. The Company accelerated its efforts and the pace of its buildout to successfully meet the expanded commitments by the December 31, 2024 deadline to obtain an extension to June 2028. The Company invested significant capital and prioritized its resources in markets subject to accelerated and expanded commitments, and away from markets where the Company's obligations had been deferred under the 2024 Extension Grant.

77. The Company successfully fulfilled Commitments 1–4 by December 31, 2024, thereby extending the final buildout milestones for 1,173 wireless spectrum licenses to December 14, 2026. The Company certified completion of these commitments on January 10, 2025 in a buildout report it submitted to the FCC. The Company further certified completion of Commitment 5 on May 5, 2025, Commitment 6 on March 17, 2025, and Commitment 7 on June 17, 2025. The Company repeatedly met with the FCC Wireless Bureau to walk through the

supporting documentation and address any questions, consistent with the FCC Wireless Bureau's practice when reviewing regulated entities' compliance with FCC milestones.

78.     Under the 2024 Extension Grant, satisfaction of each commitment triggered the extension of the final buildout milestones for 1,173 wireless spectrum licenses from June 14, 2025 to December 14, 2026—and, ultimately, to June 14, 2028.

### 4.     The May 2025 FCC Letter and the Public Notices

79.     On May 9, 2025, the FCC Chairman sent the May 2025 FCC Letter informing the Company that FCC staff had been directed to begin reviewing and investigating the Company's (a) compliance with its federal obligations to provide 5G service throughout the United States per the terms of its wireless spectrum licenses, and (b) mobile satellite service ("**MSS**")[12] utilization in the 2 GHz Band.  The May 2025 FCC Letter questioned the 2024 Extension Grant that the FCC Wireless Bureau had issued merely eight months earlier under the previous administration.

80.     On May 12, 2025, the FCC issued two separate public notices.  The first was the FCC Wireless Bureau's request for comment on a petition by another telecommunications company that had sought reconsideration of the 2024 Extension Grant.  The second was issued by the FCC Space Bureau seeking comment on the current status of the Company's MSS operations in the 2 GHz Band, including information on whether the Company was utilizing the 2 GHz Band for MSS and on the steps the FCC might take to support more intensive use of the 2 GHz Band, such as by allowing new MSS entrants into that band.

81.     The May 2025 FCC Letter and subsequent issuance of the public notices caused significant uncertainty regarding the Company's spectrum rights.  If the FCC were to reverse the

---

[12]     MSS authorizations allow the Company to deploy integrated satellite and terrestrial wireless communications networks that provide users with seamless two-way coverage through traditional land-based wireless networks when in range and satellite communications when not in range.

2024 Extension Grant—which would reinstate the milestones in place before the FCC granted the 2024 Extension Request—it could have resulted in the termination of hundreds of the Company's wireless spectrum licenses and the MSS authorizations because the Company had not satisfied the 2025 milestones that were subsequently extended under the 2024 Extension Grant, and no longer had sufficient time to do so.  In addition, if the FCC opened the 2 GHz Band to other licensees, it would have upended decades of FCC precedent and caused severe interference with the Company's MSS operations in the 2 GHz Band.

82.     In comments filed with the FCC and meetings among FCC representatives and the Company, the Company set forth that it had invested tens of billions of dollars to deploy the 5G Network, which was capable of providing broadband service to more than 268 million people nationwide, created tens of thousands of American jobs, was a competitive alternative to incumbent wireless carriers, and helped ensure that the United States is at the forefront of wireless leadership.  The Company further explained that the extended buildout deadlines adopted by the FCC Wireless Bureau enhanced its network's scope and its ability to provide competitive alternatives for consumers, that EchoStar had fulfilled its commitments in exchange for the 2024 Extension Grant, and that the 2024 Extension Grant was consistent with long-standing FCC precedent.  The Company also explained that the 2 GHz band must remain exclusively with EchoStar because sharing was not technically feasible and would cripple EchoStar's present and planned terrestrial and MSS operations, all to the detriment of competition.

**5.     The Company Delays Certain Interest Payments**

83.     As EchoStar observed in its filings with the FCC, the May 2025 FCC Letter and resulting public notices "created a dark cloud of uncertainty over EchoStar's spectrum rights and its . . . 5G network.  This cloud . . . effectively froze[] EchoStar's decision making—it cannot reasonably invest more capital into a buildout if the Commission indicates it may take away its

licenses through unprecedented actions."[13]  Given this uncertainty, the Company delayed making certain interest payments on the Company's funded debt, consistent with the Company's rights under the applicable debt documents.  Specifically, in late May and early June 2025, EchoStar and DBS elected not to make scheduled interest payments under certain of their outstanding notes, thereby entering applicable thirty (30)-day grace periods, to allow time for EchoStar to gather information and assess its alternatives on a more informed basis.  In July 2025, DBS again elected not to make scheduled interest payments on additional series of DBS Notes, likewise entering applicable thirty (30)-day grace periods.  Prior to the expiration of each applicable grace period, EchoStar and DBS, as applicable, made the scheduled interest payments, in each case including interest on the defaulted interest, before any such non-payment would constitute an event of default under the relevant indentures.

### 6.    The Company Engages in Discussions with the FCC Regarding Potential Pathways to Resolve the FCC's Stated Concerns

84.    After the Company disclosed that it had elected not to make cash interest payments on certain outstanding notes, the FCC agreed to meet with the Company.  In June 2025, EchoStar representatives held a series of meetings and calls with the FCC Chairman and his staff regarding the Company's spectrum holdings.

85.    During these meetings, the FCC communicated its position that the Company's spectrum was being underutilized and that the Company's continued ownership of such wireless spectrum licenses was inconsistent with the public interest.  As a result, the FCC asserted that EchoStar needed to exit the terrestrial wireless business.

---

[13]    EchoStar Corp., Comments of EchoStar Corporation, SB Docket No. 25-173, WT Docket No. 22-212 (Fed. Commc'ns Comm'n May 27, 2025).

86.     On June 12, 2025, EchoStar representatives met with President Trump, who encouraged the parties to reach an amicable resolution.  In a subsequent meeting with the FCC Chairman, EchoStar was directed to sell a substantial portion of its wireless spectrum licenses on an expedited time frame.  During the ensuing weeks, the FCC repeatedly pressed EchoStar to accelerate the pace of negotiations and expand the scope of any proposed sale, rejecting EchoStar's initial proposals as insufficient.

### C.     EchoStar's Prepetition Wireless Spectrum License Sales

87.     After extensive meetings with and input from the FCC, in the third quarter of 2025, EchoStar and certain of its non-Debtor affiliates entered into transactions with AT&T and SpaceX to sell a material portion of its wireless spectrum licenses.[14]  Shortly after these agreements were announced, the FCC concluded its investigation of EchoStar's compliance with its buildout obligations.

### 1.     The AT&T Transactions

88.     On August 25, 2025, the Company and AT&T entered into a License Purchase Agreement (the "**AT&T License Purchase Agreement**," and the transactions contemplated thereby, the "**AT&T Transactions**").  Pursuant to the terms of the AT&T License Purchase Agreement, EchoStar and certain of its non-Debtor affiliates agreed to sell their 3.45–3.55 GHz and 600 MHz wireless spectrum licenses to AT&T, and to grant a 99-year extension of existing leases for AT&T's exclusive use of certain wireless spectrum licenses in Hawaii, for an aggregate purchase price of approximately $23 billion in cash, subject to certain potential adjustments (the

---

[14]     The following summaries of the terms of the AT&T Transactions and SpaceX Transactions (each as defined below) are qualified in their entirety by reference to the applicable provisions of the AT&T License Purchase Agreement, Original SpaceX License Purchase Agreement, and A&R SpaceX License Purchase Agreement (each as defined below).  To the extent of any inconsistency between these summaries and the terms of the applicable transaction documents, the terms of the applicable transaction documents shall control.

"**AT&T Purchase Price**").  The AT&T License Purchase Agreement also extends to AT&T the right to lease certain additional 3.45 GHz licenses, which AT&T exercised at the end of the third quarter of 2025.  The AT&T Purchase Price was subject to downward adjustment if certain 3.45 GHz and 600 MHz licenses were ultimately excluded by either the Company or AT&T from the sale.  EchoStar was not obligated to consummate the sale to AT&T if the AT&T Purchase Price, after giving effect to the aggregate amount of any such adjustments, would be less than $18.6 billion.  In that case, AT&T could still elect to proceed by paying a minimum cash purchase price of at least $18.6 billion.  The consummation of the AT&T Transactions is subject to the satisfaction or waiver of additional customary closing conditions, including obtaining approvals from the FCC and DOJ.  As of the Petition Date, the closing of the AT&T Transactions has yet to occur.

### 2.       SpaceX Transactions

89.       On September 7, 2025, EchoStar, SpaceX, and Spectrum Business Trust 2025-1 (the "**Spectrum Trust**") entered into a License Purchase Agreement (the "**Original SpaceX License Purchase Agreement**" and the transactions contemplated thereby and by the A&R SpaceX License Purchase Agreement (as defined below), the "**SpaceX Transactions**").  Pursuant to the terms of the Original SpaceX License Purchase Agreement, EchoStar and certain of its non-Debtor affiliates agreed to sell to SpaceX their rights and licenses related to an aggregate of 50 MHz of spectrum in frequency ranges 2000–2020, 2180–2200, 1915–1920, and 1995–2000 (the "**AWS-4 and H-Block Licenses**"), together with certain international authorizations and rights for that spectrum and certain related assets (collectively, the "**Foreign Assets**").  The transfer of the AWS-4 and H-Block Licenses occurs in two steps, the first of which has already occurred:  first, the AWS-4 and H-Block Licenses were transferred to the Spectrum Trust (the "**Spectrum Transfer Closing**") on May 22, 2026, and second, the AWS-4 and H-Block Licenses will be transferred by the Spectrum Trust to SpaceX (the "**Spectrum Acquisition Closing**").  The Foreign

Assets will be transferred directly to SpaceX at the Spectrum Acquisition Closing, to the extent that required regulatory approvals have been obtained by such date.

90. The consideration for the SpaceX Transactions payable at the Spectrum Acquisition Closing is $17 billion, comprised of up to $8.5 billion of cash and up to $8.5 billion of SpaceX stock at a per share price of $212.00 as adjusted for stock dividends, splits, or reorganization (the "**Total Consideration Amount**"). A portion of the Total Consideration Amount will be used to: (a) fully pay off all outstanding amounts owed on certain secured notes issued by EchoStar due in 2029 and 2030, which are secured by the Company's AWS-4 and AWS-3 licenses (the "**EchoStar Secured 2029 Notes**" and "**EchoStar Secured 2030 Notes**"), and (b) settle the anticipated redemption and conversion of certain convertible notes issued by EchoStar (the "**EchoStar Convertible Notes**," and, together with the EchoStar Secured 2029 Notes and EchoStar Secured 2030 Notes, the "**Seller Notes**"). The remaining amount after paying off the Seller Notes (the "**Purchase Price**") will be paid by SpaceX to EchoStar as follows: (i) up to $8.5 billion will be paid in SpaceX's Class A Common Stock (the "**Equity Amount**"); and (ii) any amount exceeding $8.5 billion will be paid in cash. If the amount necessary to pay off the Seller Notes exceeds $8.5 billion, the Company may elect to pay the excess using cash, the Company's Class A Common Stock (with respect to the EchoStar Convertible Notes), or both, to maintain its receipt of the full Equity Amount. If the Company elects not to pay such excess amount, the Equity Amount will be reduced dollar-for-dollar to ensure that the combined Equity Amount and amounts necessary to pay off the Seller Notes do not exceed the Total Consideration Amount. As of December 31, 2025, the aggregate principal amount outstanding of the Seller Notes was $9.821 billion.

91. On November 5, 2025, EchoStar, SpaceX, and the Spectrum Trust entered into an Amended and Restated License Purchase Agreement (the "**A&R SpaceX License Purchase**

42

**Agreement**" and, together with the Original SpaceX License Purchase Agreement, the "**SpaceX License Purchase Agreement**").  Pursuant to the A&R SpaceX License Purchase Agreement, EchoStar agreed to transfer up to an aggregate of 15 MHz of AWS spectrum in the frequency range of 1695–1710 MHz for each relevant license area to SpaceX in exchange for additional consideration of $2.6 billion, all of which will be paid in SpaceX's Class A Common Stock.  As a result of this change, the total consideration for the SpaceX Transactions increased from $17 billion to $19 billion with up to $11 billion to be paid in SpaceX's Class A Common Stock at a per share price of $212.00 as adjusted for stock dividends, splits, or reorganization.  The material terms of the A&R SpaceX License Purchase Agreement are otherwise substantially the same as the terms of the Original SpaceX License Purchase Agreement.

92.     Following the approval of the transactions by the FCC Wireless Bureau and FCC Space Bureau, the first step of the SpaceX Transactions, the Spectrum Transfer Closing, occurred on May 22, 2026.  At the Spectrum Transfer Closing, EchoStar and its licensing subsidiaries executed and delivered assignment and assumption instruments to convey the licenses comprising the AWS-4/H-Block Licenses and the AWS-3 Licenses to the Spectrum Trust, making the Spectrum Trust the interim license holder.  Concurrently with the Spectrum Transfer Closing, SpaceX funded the Spectrum Trust, and the Spectrum Trust, in turn, paid EchoStar an amount equal to the interest accrued on the Seller Notes from June 1, 2025 through the Spectrum Transfer Closing Date, plus the applicable "Make-Whole Amount" in the amount of $432,034,989.24.  Following the Spectrum Transfer Closing, the Spectrum Trust is required to service ongoing interest payments on the Seller Notes from funds contributed by SpaceX.

93.     The Spectrum Acquisition Closing is expected to occur on or about November 30, 2027, following the expiration of the make-whole period for the Seller Notes and the date on which

the EchoStar Convertible Notes become eligible for redemption.  If SpaceX elects to proceed with the Spectrum Acquisition Closing prior to November 30, 2027, SpaceX will be responsible for any additional amounts required to satisfy the Seller Notes, other than additional amounts payable as a result of any potential default under the Seller Notes.

94.     The completion of the SpaceX Transactions is subject to the satisfaction or waiver of customary closing conditions.  The SpaceX License Purchase Agreement also includes specified termination rights.

95.     Finally, the SpaceX License Purchase Agreement provides for future long-term commercial agreements that will enable the Company to offer its wireless subscribers access to SpaceX's next-generation Starlink "Direct to Cell" text, voice, and broadband services, which will utilize certain rights and licenses related to the spectrum to be conveyed by the Company to SpaceX at the Spectrum Acquisition Closing.  The commercial agreements will also provide for a fee-based referral program that lets the Company refer existing HughesNet customers and new Starlink customers to SpaceX.

### 3.     Resolution of the FCC Investigation

96.     On September 8, 2025, one day after EchoStar announced its entry into the Original SpaceX License Purchase Agreement, the Company received a follow-up letter from the FCC Chairman, which stated as follows:

> Earlier this year, I wrote a letter notifying you that I had asked FCC staff to investigate EchoStar's compliance with its buildout milestones and other obligations regarding the company's federal spectrum licenses. . . .
>
> I have appreciated your responses, engagement, and information provided since my original letter.
>
> Accordingly, I have asked FCC staff to bring the agency's investigation to conclusion. In particular, I have directed FCC staff to:  (1)  dismiss VTel's  petition  for  reconsideration;  (2)

confirm that EchoStar holds exclusive terrestrial and MSS rights over the AWS-4 spectrum to which it is currently licensed; and (3) find that relevant FCC buildout and other related obligations have been satisfied by EchoStar in view of the company's current FCC milestones.

### 4.      5G Network Decommissioning

97.      In September 2025, shortly after EchoStar's entry into the AT&T Transactions and SpaceX Transactions, under which the spectrum licenses necessary to operate the 5G Network were agreed to be sold, and the closing of the FCC's investigation, DWLLC began the decommissioning process for the portions of its 5G Network that will not be utilized in its Hybrid MNO operations.  As a result of these sales, which encompassed only the spectrum licenses and none of the 5G Network infrastructure, and the resulting transition to Hybrid MNO operations, which was necessary to ensure continuity of service to customers, DWLLC had no need for—and was rendered incapable of performing obligations under—the agreements relating to the 5G Network, including tower leases.  These decommissioning efforts have included removing software from cell site equipment, turning down communications circuits and electrical connections, and deploying field personnel to remove certain of the DISH Wireless Debtors' equipment from the former 5G Network sites and storing or disposing of such equipment as appropriate via various warehouse facilities.

98.      The DISH Wireless Debtors intend to sell substantially all of their assets, except assets authorized by the Bankruptcy Court to be abandoned under section 554(a) of the Bankruptcy Code, to EchoStar as the stalking horse bidder or to any party that submits a bid determined to be higher or better than EchoStar's proposal.  Concurrently herewith, the DISH Wireless Debtors have filed the *DISH Wireless Debtors' Emergency Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the DISH Wireless Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Related Notices, (IV)*

45

*Authorizing Entry Into the Stalking Horse Agreement, (V) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (VI) Granting Related Relief.*

### 5. Tower Lease Litigation

99.     As noted above, beginning in September 2025, DWLLC sent notices to its tower lessors and other 5G Network contract counterparties asserting that the unforeseeable actions taken by the FCC outside of DWLLC's control and the resulting spectrum sales constituted one or more events of force majeure under the applicable agreements, frustrated the principal purpose of such agreements, and rendered DWLLC's performance commercially impracticable (see **Exhibit 5** for a representative sample of the notices).  In each of these notices, DWLLC expressed its willingness to discuss a mutually acceptable resolution, and DWLLC has reached settlements with hundreds of 5G Network claimants.  Many claimants have disputed DWLLC's defenses, and more than 170 lawsuits have been filed against DWLLC by tower lessors and other 5G Network counterparties.  These lawsuits generally assert claims for breach of contract or unlawful detainer and seek declaratory relief, damages, and possession of property with respect to DWLLC's purported performance obligations under 5G Network leases and other contracts following EchoStar's entry into the AT&T License Purchase Agreement and the SpaceX License Purchase Agreement.  In particular, these plaintiffs seek damages for, among other things, unpaid rent, future rent obligations, equipment removal costs, and other amounts allegedly owed under the applicable agreements.  In the aggregate, the asserted damages in these tower lease and infrastructure-related actions total more than $6 billion dollars, far exceeding DWLLC's available assets and ability to pay.  DWLLC continues to vigorously defend against and dispute these claims.

100.     Six lawsuits also name EchoStar as a defendant and assert claims for tortious interference with contract, alleging that EchoStar intentionally and improperly directed DWLLC to repudiate its contractual obligations to counterparties through baseless invocations of force

46

majeure, frustration of purpose, and impossibility. EchoStar has filed motions to dismiss in two of these actions, both pending in the District of Colorado. Approximately 85 of these cases have advanced past the pleading stage into the early stages of discovery. There are currently three dispositive motions pending: a motion for judgment on the pleadings against DWLLC in *SBA Telecommunications, LLC et al. v. DISH Wireless L.L.C.*, Docket No. 1:26-cv-00218 (W.D.N.Y. Feb 05, 2026), and motions to dismiss filed on behalf of EchoStar in *Aircomm of Avon, L.L.C. et al. v. DISH Wireless LLC*, Docket No. 1:25-cv-03756 (D. Colo. Nov 20, 2025) and *Comcast Business Communications, LLC v. DISH Wireless L.L.C. et al*, Docket No. 1:26-cv-00824 (D. Colo. Feb 27, 2026). Discovery is also underway in several actions, though it is in the preliminary stages. On March 2, 2026, DWLLC filed a motion with the Judicial Panel on Multidistrict Litigation (the "**JPML**") seeking transfer and consolidation of 10 pending federal actions into a single multidistrict litigation proceeding in the District of Colorado. On June 4, 2026, the JPML denied DWLLC's motion because "[t]he limited factual overlap among these actions is overshadowed by numerous case-specific factual and legal questions." *In re DISH Wireless L.L.C. Commc'n Towers Contract Litig.*, MDL No. 3182, ECF No. 106 at 2 (J.P.M.L. June 4, 2026).

### 6.    Appointment of Independent Managers

101.    On February 26, 2026, Gerard Uzzi and Vikram Jindal were appointed to the Board of Managers of DWLLC as the Independent Managers. On March 3, 2026, the Board of Managers (excluding the Independent Managers) unanimously approved the formation and appointment of the DWLLC Special Committee, comprised of the Independent Managers, having concluded that the Independent Managers possess no material business relationships, close personal relationships, or other affiliations, or any history of any such material business relationships, close personal relationships, or other affiliations, with the Company or any of its related parties that would cause either of them to be unable to (a) exercise independent judgment based on the best interests of the

47

Company or (b) make decisions and carry out their responsibilities as members of the Board of Managers, in accordance with the terms of DWLLC's operating agreement and applicable law.

102. The Board of Managers delegated to the Special Committee authority to: (a) review and evaluate DWLLC's capital structure, assets, liabilities, operations, liquidity, and general financial condition and to consider, evaluate, and negotiate financing transactions, restructuring transactions, and/or other strategic alternatives for DWLLC and its stakeholders, including the possibilities of undertaking a strategic, restructuring, financing, and/or any sale transaction or series of such transactions (each, a "**Transaction**") involving DWLLC or its subsidiaries, and approve and implement any such Transaction, in each case to the extent that the Board of Managers or the Special Committee reasonably determines that such matter or matters present an actual or potential conflict of interest between DWLLC or its subsidiaries, on the one hand, and EchoStar or one or more of its subsidiaries (other than DWLLC or its subsidiaries), on the other hand; (b) conduct an independent investigation and assess the merits and potential value of any potential claims and causes of action held by DWLLC or its subsidiaries against one or more of EchoStar or its subsidiaries (other than DWLLC or its subsidiaries); and (c) take any and all actions necessary or desirable in connection with the foregoing, including the authority to retain independent advisors. The Special Committee retained Dentons US LLP as its counsel to advise and support the Special Committee in the discharge of its duties. DWLLC also retained FTI Capital Advisors, LLC ("**FTICA**") to advise on one or more Transactions pursuant to an engagement letter dated June 17, 2026. FTICA is working at the direction of the Special Committee to market the DISH Wireless Debtors' assets.

### D. The RSA

103. On March 19, 2026, after several months of negotiations, the DBS Debtors and an initial group of Consenting Creditors holding 82% in aggregate principal amount of DBS Notes

entered into the RSA.  The RSA is now supported by more than 88% of such holders.  As of the Effective Date, set forth in the following table, the Plan provides for the reduction of the aggregate principal balance of the DBS Debtors' funded debt from $9.75 billion to $5.0 billion, and contemplates that such balance may be further reduced through the possible redemption of the 2028 Senior Secured Notes at par using DBS's available cash in excess of $500 million, commencing with the fiscal quarter ended March 31, 2027.

| Pre- and Post-Emergence Capital Structure | | |
|---|---|---|
| DBS Notes | Prepetition Principal Amount | Post-Emergence Principal Amount |
| 2026 Senior Secured Notes | $2,750,000,000 | $0.00 |
| 2026 Senior Notes | $2,000,000,000 | $0.00 |
| 2028 Senior Secured Notes | $2,500,000,000 | $2,500,000,000* |
| 2028 Senior Notes | $1,000,000,000 | $1,000,000,000 |
| 2029 Senior Notes | $1,500,000,000 | $1,500,000,000 |
| **Total** | **$9,750,000,000** | **$5,000,000,000** |

\*  2028 Senior Secured Notes to be redeemed at par to the extent of DBS's "Available Cash" in excess of $500 million commencing with the fiscal quarter ended March 31, 2027.  The 2028 Secured Notes are also entitled to recover up to the full aggregate principal balance of the notes plus accrued interest, at par, under the DWLLC Intercompany Loan.

104.    The RSA contemplates certain "Execution Date Transactions" and "Effective Date Transactions" that provide for the repayment or amendment of the indentures governing approximately $11.55 billion of funded debt obligations, including $9.75 billion in aggregate principal amount of DBS Notes and approximately $1.8 billion of term loan and preferred equity obligations of DBS SubscriberCo.

105.    Under the RSA, the Company Parties were entitled to notify counsel to the Ad Hoc Group, on or before March 31, 2026—as such date was extended by the Company Parties to June 29, 2026—of their intent, subject to approval by their respective boards of directors or managers, to implement the RSA transactions through confirmation of the Plan (the "**Chapter 11 Election**").

106.    The recovery allocations annex to the RSA provides that if the Company Parties make the Chapter 11 Election, then, concurrently with the Company Parties' delivery of written notice thereof, the Company Parties may determine to implement the provisions set forth therein.

107.    On June 29, 2026, the DBS Debtors made the Chapter 11 Election under the RSA. On behalf of the DISH Wireless Debtors, the Special Committee separately determined to make the Chapter 11 Election and to commence Chapter 11 cases to be jointly administered with the cases of the other Debtors.

108.    Also on June 29, 2026, in accordance with the RSA, the Debtors commenced solicitation of votes to accept or reject the Plan from holders of DBS Notes (with respect to the DBS Debtors) and from holders of DISH Wireless General Unsecured Claims[15] (with respect to the DISH Wireless Debtors).

### E.    FCC Trust and Security Agreement

109.    On September 18, 2025, AT&T and EchoStar filed applications pursuant to section 310(d) of the Communications Act of 1934, as amended, seeking the consent of the FCC to assign EchoStar's 3.45 GHz and 600 MHz wireless spectrum licenses to AT&T under the AT&T License Purchase Agreement.   On the same date, the Spectrum Trust, SpaceX, and EchoStar filed applications seeking the FCC's consent to a two-step assignment whereby EchoStar's AWS-4 and AWS-H Block wireless spectrum licenses and several earth station licenses would be assigned to the Spectrum Trust and then, approximately two years later, to SpaceX under the terms of the Original SpaceX License Purchase Agreement.   On November 10, 2025, the Spectrum Trust, SpaceX, and EchoStar amended their pending applications and filed two new applications with the

---

[15]    As defined in the Plan.

FCC to add EchoStar's unpaired AWS-3 licenses to the assignment applications from EchoStar ultimately to SpaceX under the A&R SpaceX License Purchase Agreement.

### 1.     FCC Orders

110.    On May 12, 2026, the FCC Wireless Bureau entered orders approving the AT&T Transactions and the SpaceX Transactions.  As a condition to that approval, the FCC Wireless Bureau imposed a single limited trust fund condition requiring the $2.4 billion Contribution be deposited into the trust within thirty days of closing of the AT&T Transactions to help pay obligations to 5G Network claimants that obtain a final judgment or arbitration award against, or may enter into a settlement with, EchoStar, DNC, DWLLC or any of their affiliates (each, an "**EchoStar Party**" and, collectively, the "**EchoStar Parties**") for amounts due in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned in the AT&T Transactions (collectively, the "**Covered Activities**").  A claim for such a final judgment, arbitration award, or settlement, prior to a determination that such claim is eligible to receive a distribution from the FCC Trust, is referred to as a "**Covered Claim**" and a holder of such Covered Claim a "**Claimant**." A Covered Claim is eligible for a distribution from the FCC Trust, and the Trustee is bound to pay the applicable Claimant in accordance with the FCC Trust Agreement, if it is the subject of a Judicial or Arbitral Claim Determination or a Covered Claim Settlement.[16]  No EchoStar Party

---

[16]     A "**Judicial or Arbitral Claim Determination**" means any final and non-appealable judgment by or order of a court of competent jurisdiction or a final and binding arbitration award that is no longer subject to appeal or any analogous challenge or review, in either case awarding or allowing damages under applicable law against an EchoStar Party for a Covered Claim, including as such damages shall have been reduced by the Claimant's duty to mitigate damages, and a "**Covered Claim Settlement**" means any definitive written settlement between a Claimant and one or more EchoStar Parties providing that such Claimant's Covered Claim is an Eligible Covered Claim, providing whether such Eligible Covered Claim

will obtain possession or control of any portion of the Contribution, which will be remitted to the

Trust directly from the proceeds of the AT&T Transactions upon consummation of the assignment.

### 2. FCC Trust Agreement

111. In furtherance of these requirements, EchoStar entered into the Trust Agreement

(the "**FCC Trust Agreement**"),[17] dated as of June 26, 2026, with The Bank of New York Mellon,

solely in its capacity as trustee (the "**Trustee**"), establishing the "Wireless Creditor Trust," defined

herein as the FCC Trust, for the benefit of (a) the "Beneficiaries"[18] and (b) DWLLC in its capacity

as secured party (the "**Secured Party**") on behalf of 5G Network Claimants holding Eligible Type

A Claims against DWLLC. A copy of the FCC Trust Agreement is attached to the Plan as Exhibit

A. The FCC Trust was created for the purpose of holding, administering, and liquidating the

Contribution and any income, proceeds or other earnings received by the FCC Trust thereon (the

"**Trust Assets**"), distributing Trust Assets to the Beneficiaries and the Secured Party, verifying

the validity and eligibility of Covered Claims, granting and perfecting security interests with

respect to the Type A Claims Reserve in support of the entitlement of Type A Claims to

distributions, and performing such other duties as set forth in the Trust Agreement. The FCC Trust

has been established pursuant to the FCC's orders approving the AT&T Transaction and the

SpaceX Transactions for the purpose of resolving tort, breach of contract, or other Covered Claims

---

is a Type A Claim, a Type B-1 Claim, or a Type B-2 Claim, and fixing the amount of such Eligible Covered Claim, and under which all conditions to effectiveness have been satisfied or waived.

[17] All capitalized terms used but not defined in this Section III.E have the meanings ascribed to them in the Plan or the FCC Trust Agreement, as applicable.

[18] The "Beneficiaries" of the FCC Trust are (a) 5G Network Claimants holding Eligible Type A Claims (including to the extent such Eligible Type A Claims recover on account of the security interests of the Secured Party), (b) 5G Network Claimants holding Eligible Type B-1 Claims or Eligible Type B-2 Claims, subject in each case to all Trust Expenses and distributions on account of Eligible Type A Claims being paid in full in cash, and (c) EchoStar, insofar as it holds an interest in the remainder of the Trust Assets, if any, after satisfaction of all Eligible Covered Claims.

and will remain subject to the Bureau's continuing jurisdiction in accordance with the Orders and the Trust Agreement.

### 3.    Covered Claim Categories

112.    The Trust Agreement establishes three priority-based categories of Covered Claims, and distributions follow a strict waterfall:

(a)    A "**Type A Claim**" is a Covered Claim for $100,000 or less in damages, including a Covered Convenience Claim.  A "Covered Convenience Claim" arises where a Claimant holding a Covered Claim in an amount exceeding $100,000 agrees to voluntarily reduce its claim to $100,000 and be treated in all respects as a Type A Claim. The Trust is required to make full distributions on an Eligible Type A Claim from the Type A Claims Reserve promptly after the Trustee determines that such Type A Claim is an Eligible Covered Claim.  Any distribution made by the Trustee to DWLLC, as the Secured Party, on account of an Eligible Type A Claim may be paid or transferred to the applicable Claimant only after entry of the Secured Party Distributions Order,[19] which shall then be in effect and not have been stayed. The Trust also retains discretion, for administrative convenience, to elect to make distributions on any Eligible Type A Claim directly to the applicable Claimant on five (5) Business Days' notice to DWLLC notwithstanding DWLLC's security interest in the Type A Claims Reserve.

(b)    A "**Type B-1 Claim**" is a Covered Claim to the extent it is for (i) outstanding amounts due as of the earlier of December 31, 2025 or the date the Claimant

---

[19]    "**Secured Party Distributions Order**" means an order of a court of competent jurisdiction that remains in effect and has not been stayed (1) requiring that the Secured Party use any distributions it receives only to pay Eligible Type A Claims against DWLLC in accordance with this Agreement and (2) prohibiting the Secured Party from using such funds for any other purpose.

received notice from an EchoStar Party that it is excused from its obligations under the agreements underlying the Covered Claim, and/or (ii) amounts expended or reasonably expected to be expended by the completion of the Covered Activities (e.g., costs for decommissioning towers and cell sites, costs for electricity used).  The Trust is required to make the first distribution on an Eligible Type B-1 Claim within thirty (30) days of the first Semi-Annual Determination Date following the Trustee's determination that such Type B-1 Claim is an Eligible Covered Claim, subject to maintenance of the Type A Claims Reserve, and to continue making distributions within 30 days after each subsequent Semi-Annual Determination Date until all Eligible Type B-1 Claims are paid in full or, if insufficient Trust Assets remain, such claims receive pro rata distributions from remaining Trust Assets.

(c)      A "**Type B-2 Claim**" is a Covered Claim to the extent it is for (i) lost future rents or profits and other future amounts (e.g., future taxes, insurance) due under agreements (including leases) for Covered Activities that have been terminated, and/or (ii) costs incurred for Covered Activities that the Claimant reasonably expected to be paid out of future receipts. If, after five years from the date on which the FCC Trust begins accepting Covered Claim Submissions (the "**Claims Opening Date**"), all Eligible Type A Claims and Eligible Type B-1 Claims have received distributions sufficient to satisfy them in full and sufficient Trust Assets remain to pay all Trust Expenses, then the Trust shall make distributions sufficient to satisfy each Eligible Type B-2 Claim in full or, if insufficient Trust Assets remain, such claims shall receive pro rata distributions.  If all Eligible Type A Claims and Eligible Type B-1 Claims have been paid in full before five years from the

Claims Opening Date, the Trustee may accelerate distributions to Eligible Type B-2 Claims.

### 4.     Type A Claims Reserve

113.    Central to the priority structure is the Type A Claims Reserve.  Upon receipt of the Contribution, the Trustee is required to cause $200 million to be deposited into the Type A Claims Reserve, a segregated bank account of the Trust subject to the terms of the Trust Agreement. The Trustee must maintain the Type A Claims Reserve at all times in an amount sufficient to satisfy in full all Type A Estimated Eligible Claims and initial Trust Expenses, and no distribution on account of an Eligible Type B-1 Claim or Eligible Type B-2 Claim may be made unless, after giving effect to such distribution, the Trust retains Trust Assets in an amount at least equal to the Type A Claims Reserve. If all Eligible Type A Claims are paid in full, any remaining amounts in the Type A Claims Reserve become available for distribution to other Eligible Covered Claims.

114.    To further support the entitlement of Eligible Type A Claims to receive distributions, and following the Special Committee's deliberation and approval, the Trustee entered into a security agreement (the "**Security Agreement**") in favor of DWLLC (on behalf of claimants holding Eligible Type A Claims against DWLLC, as the Secured Party), granting a security interest over all of the Trustee's right, title, and interest in and to the Type A Claims Reserve.  The Trustee also entered into a deposit account control agreement (the "**Control Agreement**") among the Trustee, DWLLC (as the Secured Party), and the bank at which the Type A Claims Reserve is maintained, pursuant to which the security interest in the Type A Claims Reserve is perfected by control, together with the filing of one or more UCC financing statements. The "Collateral" under the Security Agreement consists of the Type A Claims Reserve, the Secured Trust Account (or any replacement or substitution thereof, or any account that otherwise holds the Type A Claims Reserve from time to time), together with any monies, securities, or

instruments deposited or required to be deposited in such Secured Trust Account, all Security Entitlements in and to the foregoing, and all proceeds thereof.  The security interest secures only the Trust's obligations to make distributions to Claimants holding Eligible Type A Claims against the Secured Party (the "**Specified Purpose**"), with Eligible Type A Claims determined, liquidated, or fixed by a Judicial or Arbitral Claim Determination or a Covered Claim Settlement, subject to entry of the Secured Party Distributions Order.  The Trustee, as Grantor, has good and valid title to the Collateral, free and clear of all liens other than the security interest granted to the Secured Party, and such security interest constitutes a first-priority perfected security interest in the Collateral, subject to no prior or pari passu liens.

### 5. Covered Claim Submissions

115.    With respect to the process for making Covered Claim Submissions, within 30 days of Claims Opening Date, (a) the Trustee is required to (i) establish an online portal (the "**Trust Website**") for the submission of Covered Claims and (ii) begin accepting Covered Claim Submissions and (b) EchoStar is required to give notice to all known or reasonably ascertainable potential Claimants of the establishment of the FCC Trust and the Trust Website, though such notice shall not be deemed an admission that any potential Claimant holds an Eligible Covered Claim. Each Claimant's Covered Claim Submission Deadline is the later of 180 days after the Claims Opening Date (as the Trustee may extend from time to time with EchoStar's prior written consent) and forty-five (45) days after a Judicial or Arbitral Claim Determination or Covered Claim Settlement, and any Claimant that fails to submit by the deadline is forever barred from asserting its Covered Claim against the FCC Trust and from receiving distributions.

116.    For each Covered Claim Submission, the Trustee determines whether the Covered Claim is an Eligible Covered Claim, and a Covered Claim may be determined eligible only if the Claimant has obtained a Judicial or Arbitral Claim Determination or entered into a Covered Claim

Settlement and timely made the Covered Claim Submission in the manner specified on the Trust Website. Upon determining that a Covered Claim is eligible, the Trustee promptly notifies the Claimant of the determination and the projected timing of any distribution. If the Trustee determines that a claim is not eligible (a "**Denied Claim**"), the Trustee promptly notifies the Claimant with a reasonably detailed explanation. A Claimant's sole recourse with respect to the Trustee's determination is to make a Reconsideration Request or to proceed before a court of competent jurisdiction, in each case within 30 days of the applicable notice; any Claimant that fails to do so by such deadline is deemed to accept the determination.

### 6. Recovery Sources

117. Any Claimant that makes a Covered Claim Submission agrees that the FCC Trust is its sole source of recovery on account of its Covered Claim (except as any EchoStar Party may otherwise agree), and that, subject to execution of a release in form and substance acceptable to EchoStar and DWLLC, such submission constitutes a voluntary irrevocable waiver and release of any legal rights the Claimant may have against any EchoStar Party to otherwise recover against or enforce the underlying determination or settlement. Any distribution by the FCC Trust to a Claimant on account of an Eligible Covered Claim is subject to the Claimant's execution of a full and complete release and discharge of any and all Covered Claims against the EchoStar Parties, in a form prepared and promulgated by the Trustee that is acceptable to EchoStar and DWLLC.

118. With respect to payments from other sources, distributions to a Claimant shall be reduced by the aggregate amount of any Third-Party Payments—*i.e.*, payments received by the Claimant on account of its Covered Claim from any source other than the FCC Trust, including under the Plan—and no Claimant shall recover more than the full amount of its Eligible Covered Claim from the FCC Trust or DWLLC, as Secured Party, including after taking into account any Third-Party Payments. If a Claimant receives any Third-Party Payment after making a Covered

Claim Submission, the Claimant must notify the Trustee within ten (10) Business Days, and any failure to provide timely notice after receiving a distribution will result in the Claimant owing the FCC Trust annualized interest at the federal judgment rate on the amount of the Third-Party Payment for each Business Day after the ten (10)-day notice period until the Trustee is notified.

### 7.      Termination of the FCC Trust

119.      The FCC Trust terminates upon the earlier of satisfaction of all Trust Expenses and all obligations owed in connection with Eligible Covered Claims in full, or distribution of all Trust Assets on account of Eligible Covered Claims, at which time any remaining Trust Assets (including all amounts earned thereon) are returned to EchoStar. If the FCC Trust has not been terminated by the date that is five years from the FCC Trust Effective Date (the "**Outside Termination Date**"), the Trustee shall distribute all Trust Assets to Beneficiaries and DWLLC, as Secured Party, and pay any remaining Trust Assets to EchoStar, and the FCC Trust shall dissolve.  If Trust Assets remain, the Bureau may order in its reasonable discretion that the FCC Trust remain open for additional time.  The FCC Trust may not be terminated by the Beneficiaries or DWLLC.

### F.      The Plan

120.      Concurrently with the commencement of the Chapter 11 Cases, the Debtors have filed the Plan.[20] Although proposed jointly for administrative convenience, the Plan constitutes a separate plan for each Debtor, classifies claims and interests separately by Debtor, and does not provide for the substantive consolidation of any of the Debtors' estates. The Plan pursues two parallel objectives that are inextricably linked to one another: it implements the transactions agreed

---

[20]      The following description is intended only as a summary of certain material terms of the Plan. Capitalized terms used but not defined in this Section III.F have the meanings ascribed to them in the Plan. To the extent there is any inconsistency between the description set forth herein and the terms of the Plan, the terms of the Plan shall govern and control.

upon by the Debtors and Consenting Creditors under the RSA to effectuate a balance sheet restructuring of the DBS Debtors, and it establishes a centralized, court-supervised process for the DISH Wireless Debtors to sell substantially all of their assets and to address the substantial volume of claims arising from the decommissioning of the 5G Network.  The Debtors began to solicit votes from the impaired classes of creditors prior to the Petition Date and, as described elsewhere in this Declaration, expect overwhelming creditor support for the Plan.

121.    The Plan classifies claims against and interests in the DBS Debtors into ten classes and claims against and interests in the DISH Wireless Debtors into eight classes.  With respect to the DBS Debtors, the voting impaired classes consist of the five (5) classes of DBS Notes claims, while all other DBS classes are unimpaired, presumed to accept the Plan, and not entitled to vote. With respect to the DISH Wireless Debtors, the sole voting impaired class is DISH Wireless General Unsecured Claims, while all other Wireless classes are unimpaired and entitled to the full payment of their claims in cash or other treatment that leaves them unimpaired under the Bankruptcy Code.

122.    For the DBS Debtors, the core restructuring transactions under the Plan are the exchange of DBS Notes for amended notes or the early repayment of the DBS Notes at par without any make-whole payment, premium, penalty, or other charge of any kind:

(a)    the 2028 Senior Secured Notes will be exchanged for Amended 2028 Senior Secured Notes in a principal amount equal to their Allowed claims;

(b)    the 2028 Senior Notes will be exchanged for Amended 2028 Senior Notes in a principal amount equal to their Allowed claims;

(c)    the 2029 Senior Notes will be exchanged for Amended 2029 Senior Notes in a principal amount equal to their Allowed claims;

(d)     the 2026 Senior Secured Notes will be exchanged for the Amended 2026 Senior Secured Notes in a principal amount equal to their Allowed claims; and

(e)     the 2026 Senior Notes will be paid in cash in an amount equal to 100% of the outstanding principal amount plus all accrued and unpaid interest through the Effective Date, without any make-whole payment, premium, penalty, or other charge of any kind, after which the applicable notes and indenture will be cancelled except to the limited extent necessary to effectuate wind-down and distribution mechanics.

123.     Prior to the Petition Date, DBS's claims against DWLLC under the DWLLC Intercompany Loan were assigned to the DWLLC Claims Trust for the ratable benefit of holders of the 2028 Senior Secured Notes, 2028 Senior Notes, and 2029 Senior Notes.  The claims arising from that assignment are treated as Allowed DISH Wireless General Unsecured Claims against DWLLC.  Distributions received by the DWLLC Claims Trust on account of those claims will be distributed in the following order of priority:

(a)     first, up to an aggregate amount equal to the $300 million DWLLC Recovery Cap, such amounts shall be distributed on a pro rata basis to holders of 2028 Senior Secured Notes Claims, 2028 Senior Notes Claims, and 2029 Senior Notes Claims, to be applied to the optional redemption of such DBS Notes at the applicable optional redemption price in accordance with the applicable DBS Notes Indenture;

(b)     second, if the DWLLC Claims Trust recovers any amounts from DWLLC's estate and/or the FCC Trust in excess of the DWLLC Recovery Cap (such excess amounts, the "**DWLLC Excess Recovery**"), such amounts shall be applied solely to redeem a corresponding aggregate amount of principal and

accrued and unpaid interest on 2028 Senior Secured Notes then outstanding, in each case at par, without any premium, penalty, or charge; and

(c)   third, any amounts by which the DWLLC Excess Recovery exceeds the aggregate outstanding principal amount and accrued and unpaid interest on the 2028 Senior Secured Notes (the "**DWLLC Residual Recovery**") shall be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on 2028 Senior Notes and 2029 Senior Notes at par, without any premium, penalty, or charge.

124.   Importantly, the treatment of the DBS Notes classes under the Plan does not alter, reduce, or satisfy the separate Allowed DISH Wireless General Unsecured Claim arising from the assigned intercompany loan, and holders of the DBS Notes will not receive a recovery in excess of 100%.

125.   For the DISH Wireless Debtors, the primary distribution mechanism under the Plan is the payment to holders of Allowed DISH Wireless General Unsecured Claims of their pro rata share of "DISH Wireless Distributable Value," which is defined as the net proceeds from the Sale actually received by the DISH Wireless Debtors' estates plus cash on hand as of the Effective Date, after deducting transaction costs, amounts paid or payable in satisfaction of senior claims (including DIP Financing Claims, Prepetition Secured Loan Claims, and other senior priority claims), and the Wind Down Amount funded into the Wind Down Debtor Account to cover the estimated costs of administering and winding down the DISH Wireless Debtors' estates following the Effective Date.  Distributions to the beneficial holders of Allowed DISH Wireless General Unsecured Claims on account of the claims under the DWLLC Intercompany Loan assigned to them by DBS prior to the Petition Date are subject to the DWLLC Recovery Cap, with any

DWLLC Excess Recovery or DWLLC Residual Recovery to be applied to repay principal and accrued interest under the 2028 Senior Secured Notes, 2028 Senior Notes, and 2029 Senior Notes, as applicable.  Additionally, on the AT&T Closing Date, DNC will redeem all outstanding DNC Senior Secured Notes, with the result that claims on account of the DNC Senior Secured Notes against DWLLC and DW Leasing as guarantors will be fully satisfied without any distribution required under the Plan.

126.    The Plan also establishes a framework for the treatment of claims being satisfied from the FCC Trust.  Holders of Allowed Secured Type A Claims—which consist of certain claims secured by the FCC Trust's Type A Claims Reserve—are unimpaired and will be paid in full in cash solely from the Type A Claims Reserve established under the FCC Trust Documents, which, due to DWLLC's security interest in the Type A Claims Reserve, constitutes a distribution required from DWLLC's estate under the Plan.  In addition, holders of Allowed DISH Wireless General Unsecured Claims who assert a Covered Claim may elect to pursue recovery outside of the Plan from the FCC Trust (the "**FCC Trust Election**") or, for claims exceeding $100,000, may elect instead to reduce the claim to $100,000 and have it treated as a Secured Type A Claim (the "**Type A Convenience Claim Election**"), but may not make both elections with respect to the same claim.  To prevent double recoveries, any Plan distribution on a claim for which the holder has made the FCC Trust Election is treated as a "Third-Party Payment" that reduces the holder's FCC Trust distribution dollar-for-dollar.  Holders who submit a Covered Claim to the FCC Trust generally provide an irrevocable waiver and release of other recovery rights against the EchoStar Parties, including the Debtors.

127.    The Plan contains customary release, exculpation, and injunction provisions.  The Debtors provide releases in favor of the Released Parties, effective on the Effective Date, for

claims relating to the Debtors' restructuring, the Sale, the FCC Trust matters, and other matters addressed by the Plan, subject to carve-outs for post-Effective Date obligations, claims for actual fraud, gross negligence, or willful misconduct as determined by a Final Order, and certain other reserved rights. Mutual releases are also exchanged among the Debtors, EchoStar, DNC, specified non-debtor affiliates, and the Consenting Creditors. The Plan further provides for third-party releases by Releasing Parties in favor of Released Parties through an opt-in framework, with holders having the opportunity to submit a Release Opt-In Form in connection with the solicitation process. The Exculpated Parties are also afforded exculpation for acts and omissions in connection with the Chapter 11 Cases and the Plan process, subject to the same carve-out for actual fraud, gross negligence, or willful misconduct. After the Effective Date, the Plan enjoins parties from pursuing released or discharged claims against the Debtors and other protected parties, and from interfering with the implementation and consummation of the Plan.

128.   The Effective Date of the Plan is the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all conditions to consummation have been satisfied or waived. Those conditions include, among other things, the RSA remaining in effect, the closing of the AT&T Transactions, the implementation of the restructuring transactions in all material respects, receipt of all required governmental and regulatory approvals, entry and non-appealability of the Disclosure Statement Order and Confirmation Order, execution and filing of all definitive documents in a form consistent with the RSA, establishment and funding of the Professional Fee Escrow Accounts, and payment of all amounts then due under the RSA, including the Ad Hoc Group Professional Fees. The Debtors may waive any condition to consummation of the Plan only with the prior written consent of the Consenting Creditors.

### G.    The DIP Facility

129.    The DISH Wireless Debtors are seeking the Bankruptcy Court's authorization, on regular notice and on a final basis, to enter into that certain Debtor-In-Possession Loan and Security Agreement (the "**DIP Credit Agreement**"), by and among DWLLC as borrower, each other DISH Wireless Debtor as a guarantor, and EchoStar as lender (in such capacity, the "**DIP Lender**"), which provides for a secured, junior, multi-draw debtor-in-possession term loan facility in an aggregate principal amount of up to $85 million to be used in accordance with an approved 13-week cash flow forecast (the "**Approved Budget**") for the general corporate purposes of DWLLC and the other DISH Wireless Debtors. Because EchoStar is the indirect parent of the DISH Wireless Debtors, the DIP Credit Agreement was negotiated and authorized by the Special Committee on behalf of DWLLC.  The DISH Wireless Debtors have filed a motion concurrently herewith seeking entry of an order of the Bankruptcy Court authorizing entry into the DIP Facility on the terms set forth in the DIP Credit Agreement (the "**DIP Motion**").[21]  On June 29, 2026, DWLLC received approximately $56.0 million, which had been held in a restricted account containing DWLLC cash to collateralize DWLLC's obligations to Apple Inc. under a prepetition agreement.  Given DWLLC's receipt of these unencumbered funds, the DISH Wireless Debtors currently have sufficient unencumbered cash to fund operations and prosecute their Chapter 11 Cases in the immediate term.  Accordingly, the DISH Wireless Debtors are not seeking entry of an order approving the relief requested in the DIP Motion on an emergency basis.  A copy of the DIP Credit Agreement and initial Approved Budget is attached to the DIP Motion.

---

[21]    All summaries in this Declaration of the terms of the DIP Facility are qualified in their entirety by reference to the applicable provisions of the DIP Credit Agreement and proposed interim and final orders granting the relief requested in the DIP Motion.  To the extent of any inconsistency between the summaries in this Declaration and the terms of the applicable documents, the terms of the applicable transaction documents shall control.

H.     **The Stalking Horse APA**

130.     As described above, the DISH Wireless Debtors intend to sell substantially all of their assets to maximize value for the benefit of their estates and creditors.  To that end, DWLLC and its subsidiaries listed on Schedule I to the Stalking Horse APA have entered into the Stalking Horse APA with EchoStar (in such capacity, the "**Stalking Horse Bidder**").  The Stalking Horse APA is attached to the Bidding Procedures Motion filed concurrently with this Declaration.  Under the Stalking Horse APA, the DISH Wireless Debtors have agreed to sell, transfer, and assign to the Stalking Horse Bidder substantially all of the Selling Entities' assets, properties, and rights of every kind and nature, wherever located (collectively, the "**Purchased Assets**"), under sections 105 and 363 of the Bankruptcy Code, free and clear of all encumbrances, claims, interests, and liabilities (other than Permitted Encumbrances and Assumed Liabilities), subject to the entry of a sale order by the Bankruptcy Court and completion of the investigation being conducted by the Special Committee of the Board of Managers of DWLLC with respect to claims and causes of action proposed to be sold by the DISH Wireless Debtors to the Stalking Horse Bidder.  The DISH Wireless Debtors, with the assistance of FTICA, began conducting a marketing process for the DISH Wireless Debtors' assets prior to the Petition Date in an effort to identify any higher or better bids.  The DISH Wireless Debtors have proposed to establish a bid deadline of August 10, 2026.  If any qualifying bids are received by such deadline, an auction is proposed to be held on August 12, 2026, and the hearing to approve the sale(s) to the successful bidder(s) is proposed to proceed on August 17, 2026.  Because EchoStar is the indirect parent of the DISH Wireless Debtors, the Stalking Horse APA was negotiated and authorized by the Special Committee on behalf of DWLLC.[22]

---

[22]     All summaries in this Declaration of the terms of the Stalking Horse APA and the bidding procedures are qualified in their entirety by reference to the applicable provisions of the Stalking Horse

### I.     Proposed Timeline for These Chapter 11 Cases

131.    It is imperative that the Debtors proceed swiftly to confirmation of the Plan, obtain

Bankruptcy Court approval of the sale of the DISH Wireless Debtors' assets, and emerge from the

Chapter 11 Cases as soon as practicable.  In accordance with the milestones set forth in the Stalking

Horse APA, the Debtors have proposed the following case timeline, subject to the Court's approval

and availability.

| Event | Date |
| --- | --- |
| Supplemental Voting Record Date | July 27, 2026 at 5:00 p.m. (prevailing Central Time) |
| Rule 3018 Motion Deadline | July 27, 2026 |
| Supplemental Solicitation Deadline | July 30, 2026 |
| Supplemental Rule 3018 Motion Deadline | August 3, 2026 |
| Rule 3018(a) Motion Objection Deadline | August 5, 2026 |
| Voting Resolution Event Deadline | August 7, 2026 |
| Voting Deadline and Opt-In Deadline | August 7, 2026 at 5:00 p.m. (prevailing Central Time) |
| Plan and Disclosure Statement Objection Deadline | August 7, 2026 at 5:00 p.m. (prevailing Central Time) |
| Voting Report Deadline | August 13, 2026 (or two business days prior to any adjourned Combined Hearing) |
| Confirmation Brief Deadline | August 13, 2026 (or two business days prior to any adjourned Combined Hearing) |
| Combined Hearing | August 17, 2026, subject to the Court's availability |

### IV.    The First Day Motions

132.    The Debtors have filed the First Day Motions to minimize the adverse effects on

their business caused by the filing of these Chapter 11 Cases.  The First Day Motions seek relief

---

APA, such procedures, and the proposed order granting the relief requested in the Bidding Procedures
Motion.  To the extent of any inconsistency between the summaries in this Declaration and the terms of the
applicable documents, the terms of the applicable documents shall control.

66

to stabilize the Debtors' operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite the Debtors' restructuring.  The First Day Motions include:

### A.  Administrative First Day Motions

- *Notice of Designation as Complex Chapter 11 Bankruptcy Cases*;

- *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Cases and (II) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of An Order (I) Authorizing the Debtors to Redact Certain Personal Identifying Information of Natural Persons, (II) Approving the Form and Manner of the Notice of Commencement, and (III) Granting Related Relief*; and

- *Debtors' Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent*.

### B.  Operational First Day Motions

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, (C) Pay Related Prepetition Obligations, and (D) Continue Intercompany Transactions; (II) Granting Administrative Expense Status to Intercompany Transactions; (III) Extending Time to Comply With and Waiving Section 345(b) Deposit and Investment Requirements; and (IV) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of (I) Interim Order (A) Authorizing, but Not Directing, the Debtors to Continue Performing Under the Shared Services Agreement and Satisfy Prepetition Obligations Related Thereto, and (B) Granting Related Relief; and (II) Final Order Authorizing the Debtors to Assume the Shared Services Agreement*;

- *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs*

*of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief;*

- *DBS Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the DBS Debtors to Continue Their Prepetition Business Operations, Policies, and Practices and Satisfy Related Claims in the Ordinary Course of Business On a Postpetition Basis, (II) Granting Administrative Expense Priority to All Outstanding Orders and Authorizing, but Not Directing, the DBS Debtors to Satisfy Such Obligations In the Ordinary Course, and (III) Granting Related Relief;*

- *DBS Debtors' Emergency Motion for Entry of an Order (I) Authorizing the DBS Debtors to (A) Maintain and Administer Their Existing Customer Programs and (B) Honor Certain Prepetition Customer Obligations, and (II) Granting Related Relief;*

- *DISH Wireless Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief;*

- *DISH Wireless Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the DISH Wireless Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and (B) Lien Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders and Authorizing the Debtors to Satisfy Such Obligations, and (III) Granting Related Relief; and*

- *DISH Wireless Debtors' Emergency Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the DISH Wireless Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Related Notices, (IV) Authorizing Entry Into the Stalking Horse Agreement, (V) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (VI) Granting Related Relief.*

### C.   Additional Motions (Seeking Second Day Relief)

- *DISH Wireless Debtors' Motion for Entry of an Order (I) Authorizing, but Not Directing, the DISH Wireless Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief.*

133.   I am familiar with the content and substance of the First Day Motions and have reviewed each of them including their exhibits.  To the best of my knowledge and belief, the factual

68

statements in each of the First Day Motions are true and accurate.  I incorporate by reference those factual statements as though set forth in this Declaration.

134.    I believe that failure to obtain the relief requested in the First Day Motions could result in immediate and irreparable harm to the Debtors, their business, and their estates, and could impair the Debtors' ability to successfully emerge from these Chapter 11 Cases.  For all these reasons, I believe the relief requested in the First Day Motions is in the best interest of the Debtors' estates and that their approval will allow the Debtors to preserve and maximize the value of their estates for the benefit of their stakeholders.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  June 30, 2026

/s/ *John Swieringa*
John Swieringa

## Exhibit 1

**Organizational Structure Chart**

# Simplified Corporate Structure



# Simplified Corporate Structure – Chapter 11 Debtors







**DISH PayTV**

**DISH DBS Corporation**

- Neyland Networks LLC
  - DISH Wireless L.L.C.
    - DISH Wireless Leasing L.L.C.
    - DISH Wireless Puerto Rico L.L.C.
    - DISH Wireless Retail Holding L.L.C.
      - DISH Infinite Corporation
      - DISH Wireless Retail Operating L.L.C.

- DISH Network L.L.C.
  - DISH Operations Holding I L.L.C.
    - DISH Network Puerto Rico LLC
    - EchoStar XV Holding L.L.C
    - DISH Integration L.L.C.
    - DISH Puerto Rico L.L.C.
    - DISH Satellite Holding Corporation
    - DISH Acquisition L.L.C.
    - NHL Network US — 8.8% [4]
    - Invidi Technologies Corp. — 34.57% [2]
    - DISH Network Satellite Puerto Rico Corporation
    - DISH NJ CSC L.L.C.
    - DISH VA CSC L.L.C.
    - DISH OK CSC L.L.C.
    - DISH WAH L.L.C.
    - DISH Broadband L.L.C.
    - DISH OH CSC L.L.C.
  - DISH Operating L.L.C.
    - DISH Operations Holding II L.L.C.
    - DISH Programming L.L.C.
    - DISH Media Sales L.L.C.
    - DISH CSC L.L.C.
    - DISH TX CSC L.L.C.
    - DISH CO CSC L.L.C.
    - DISH Broadcasting Corporation
      - Hughes Integration L.L.C.
      - EchoStar Uplink Puerto Rico Corporation
      - DISH Cloud Services & Hosting L.L.C.
    - DISH WV CSC L.L.C.
    - DISH AZ CSC L.L.C.
    - DISH NY CSC L.L.C.

- Echosphere L.L.C.
  - Echosphere De Mexico S.De R. L. De C.V. — 79% / 21%
  - Dish Network California Service Corporation

- DISH Network Service L.L.C.
  - Dish Network Service Puerto Rico Corporation

- DISH Technologies Holding Corporation
  - Sling TV Holding L.L.C. — 90% / 10%
    - Sling TV Purchasing L.L.C.
    - Sling TV L.L.C.
    - Sling TV Gift Card Corporation
  - DISH Technologies L.L.C.
    - NagraStar L.L.C. — 50% [1]
    - DISH Engineering Corporation — 0.01%
      - DISH Ukraine LLC — 99.99%
    - EchoStar Broadband L.L.C.
    - EchoStar Data Networks L.L.C.
      - American Legal Channel Inc.
      - Skycast Broadcasting Network Inc.
    - Sling Media, L.L.C. — 99.99%
      - Dish Network Technologies India Private Ltd. [3]
      - Troppus Software LLC

Right column:
- Wright Travel Corporation
- DISH Real Estate Corporation V
- Transponder Encryption Services Corporation
- DBS Intercompany Receivable L.L.C.
- DISH Purchasing Corporation
- Air TV L.L.C.
- Kelly Broadcasting Systems L.L.C.
- New Russian Television Network Americas, Inc.
- Echo Acceptance Corporation
- WS Acquisition L.L.C.
- DBS Call Center Coordination Ltd.

**Footnotes**
1. Balance of stock held by Nagravision SA (Kudelski Group)
2. Balance of stock held by WPP plc and DirectTV
3. Balance of stock held by an individual
4. Balance of stock owned by DirecTV, Comcast and TSN/Insight

**Legend**
- Chapter 11 Debtor
- Non-Debtor Affiliate
- Equity Pledge Guarantor
- Spectrum Assets Guarantor
- Unsecured Guarantor
- Details on Different Page
- Guarantor
- Issuer
- AT&T Spectrum Seller
- SpaceX Spectrum Seller

- DNC 11.750% Senior Secured 2027 Notes
- DNC Convertible 2025 Notes
- DNC Convertible 2026 Notes
- EchoStar 10.750% Senior Secured 2029 Notes
- EchoStar 6.750% Senior Secured 2030 Notes
- EchoStar Convertible Notes
- HSSC 6.625% Senior 2026 Notes
- HSSC 5.250% Secured 2026 Notes
- DDBS Senior Secured Notes
- DDBS 7.750% Senior 2026 Notes
- DDBS 7.375% Senior 2028 Notes
- DDBS 5.125% Senior 2029 Notes

*Note: Ownership percentages are 100% unless otherwise indicated.*



**Exhibit 2**

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

### March 19, 2026

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED EITHER OUT OF COURT OR THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

This RESTRUCTURING SUPPORT AGREEMENT (as may amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and including all exhibits (including, for the avoidance of doubt, the Term Sheet), annexes, and schedules hereto, this "**Agreement**"), is made and entered into as of the date first written above, by and among the

following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, a "**Party**" and, collectively, the "**Parties**"):[1]

    i.     DISH DBS Corporation ("**DBS**"), each of its subsidiaries listed on **Exhibit A** to this Agreement, and such additional subsidiaries or affiliates of DBS that DBS identifies in connection with the Chapter 11 Election, in each case that shall have executed and delivered a counterpart signature page to this Agreement to Ad Hoc Group Counsel (collectively, the "**Company Parties**");[2]

    ii.    EchoStar Corporation ("**EchoStar**"), which, for the avoidance of doubt, is not a Company Party;

    iii.   DISH Network Corporation ("**DNC**"), which, for the avoidance of doubt, is not a Company Party;

    iv.   EchoStar Intercompany Receivable Company, L.L.C., DISH DBS Issuer, L.L.C., and DBS Intercompany Receivable L.L.C., (collectively, the "**Release Parties**"), each solely as to the commitments set forth in Sections 6.1(a)(x) and (xii) and 7.1(a)(xiv) of this Agreement, and none of which, for the avoidance of doubt, are Company Parties; and

    v.    the undersigned beneficial owners or holders of, or investment advisors, sub-advisors, or managers of funds or accounts that beneficially own or hold, DBS 2026 Secured Notes, DBS 2026 Unsecured Notes, DBS 2028 Secured Notes, DBS 2028 Unsecured Notes, or DBS 2029 Unsecured Notes, and DNC Notes (to the extent applicable solely with respect to the DNC Notes Commitments, the Transfer Provision, and the Consenting Creditor Representations) that have, in each case, executed and delivered counterpart signature pages to this Agreement or a Joinder or Transfer Agreement, as applicable, to Company Counsel and Ad Hoc Group Counsel (collectively, the "**Consenting Creditors**"); *provided, however,* that the Consenting Creditors include such owners and holders of DNC Notes only to the extent that such DNC Notes are owned or held by an investment vehicle that holds DBS Notes.[3]

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

[2]   If the Company Parties make the Chapter 11 Election, each Company Party listed on Exhibit A and any additional subsidiary or affiliate of DBS that executes this Agreement on or after the date hereof shall be a debtor in the Chapter 11 Cases unless otherwise mutually agreed.

[3]   For the avoidance of doubt, Consenting Creditors do not include any funds or accounts managed by or affiliated with the signatories hereto that do not beneficially own or hold DBS Notes.

2

## RECITALS

**WHEREAS**, the Company Parties, EchoStar, DNC, the Release Parties, and the Consenting Creditors have in good faith and at arm's length negotiated or been apprised of certain transactions on the terms set forth in this Agreement, including as specified in the Refinancing Term Sheet agreed between the Consenting Creditors and the other Parties attached hereto as **Exhibit B** (collectively with all exhibits, annexes, and schedules thereto, the "**Term Sheet**" and, such transactions that are specifically described in the Term Sheet as Execution Date Transactions or Effective Date Transactions, the "**Transactions**");[4]

**WHEREAS**, the Transactions shall be implemented in the manner specified in this Agreement, either (a) out of court or (b) solely if necessary to effectuate any of the indenture amendments described in the Effective Date Transactions section of the Term Sheet in a manner that is binding as to all holders of the DBS 2028 Secured Notes, DBS 2026 Secured Notes, and DBS 2026 Unsecured Notes, through voluntary cases commenced under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Transactions on the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

## AGREEMENT

**Section 1.**     *Definitions and Interpretation.*

1.1     Definitions.  The following terms shall have the following definitions:

"**Ad Hoc Group Counsel**" means Milbank LLP as counsel to the Ad Hoc Group.

"**Ad Hoc Group Professional Fees**" has the meaning set forth in Section 11.

"**Agreement**" has the meaning set forth in the preamble hereof.

---

[4]    For the avoidance of doubt and notwithstanding anything to the contrary in the Term Sheet, the definitions of Execution Date Transactions, Effective Date Transactions, and Transactions do not include any AT&T Transaction or SpaceX Transaction, any Permitted Asset Sale, any DirectTV business combination (whether by merger, acquisition, or other transaction), or any other transaction that is not specified in the Term Sheet as an Execution Date Transaction or Effective Date Transaction or that is not necessary to consummate an Execution Date Transaction or Effective Date Transaction or otherwise expressly agreed in writing by the Company Parties and the Initial Consenting Creditors to be a Transaction; *provided* that, for the avoidance of doubt, this Agreement does not alter the provisions of the Term Sheet that relate to a potential DirectTV business combination.

3

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 3 of this Agreement have been satisfied or waived in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or the date a Party executes a Joinder or Transfer Agreement, if applicable) to the Termination Date as to such Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties, or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Transactions.

"**Asset Sale**" has the meaning set forth in each indenture pursuant to which each series of DBS Notes was issued.

"**AT&T Closing Date**" has the meaning set forth in the Term Sheet.

"**AT&T Transactions**" means the transactions contemplated by the License Purchase Agreement dated as of August 25, 2025 by and among EchoStar, the other "Seller Parties" set forth therein, and AT&T Mobility II LLC.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas or such other United States Bankruptcy Court where the Company Parties determine, in consultation with the Consenting Creditors, that venue is proper under applicable law.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, and are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the preamble of this Agreement.

"**Chapter 11 Election**" has the meaning set forth in the Term Sheet.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Claim Settlement Amount**" has the meaning set forth in the Term Sheet.

"**Company Claims**" means any Claim against any Company Party (a) with respect to the DBS Notes or (b) expressly granted to the holder of DBS Notes pursuant to the Term Sheet as consideration related to the Execution Date Transactions.  For the avoidance of doubt, Company Claims shall not include any other debt of any Company Party.

4

"**Company Counsel**" means White & Case LLP.

"**Company Parties**" has the meaning set forth in the preamble of this Agreement, all of which shall be debtors in the Chapter 11 Cases; *provided*, that to the extent any additional party becomes a debtor in the Chapter 11 Cases, that party shall execute a joinder agreement and become party to this Agreement as a Company Party in all respects and in the same capacity as all other Company Parties.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Transactions between the Company Parties and/or their affiliates, on the one hand, and any Consenting Creditor, on the other.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under, among other statutes, section 1129 of the Bankruptcy Code, which order shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company Parties and the Required Consenting Creditors.

"**Consenting Creditor Related Fund**" means, with respect to a Consenting Creditor, any fund, account or investment vehicle managed, advised or sub-advised by (i) such Consenting Creditor, (ii) any of its affiliates or (iii) the same investment manager, advisor or subadvisor that manages, advises or sub-advises such Consenting Creditor or an affiliate of such investment manager, advisor or subadvisor.

"**Consenting Creditor Representations**" means the representations set forth in Section 9.2.

"**Consenting Creditors**" has the meaning set forth in the preamble of this Agreement.

"**Co-Op Agreement**" means that certain Cooperation Agreement, dated as of October 1, 2024, and amended as of October 30, 2024, by and among certain holders of Company Claims party thereto.

"**DBS**" has the meaning set forth in the preamble of this Agreement.

"**DBS 2026 Secured Notes**" means the 5.25% Senior Secured Notes due 2026 issued under that certain Secured Indenture, dated as of November 26, 2021, by and among DBS, the guarantors party thereto and U.S. Bank National Association, as trustee and collateral agent.

"**DBS 2026 Unsecured Notes**" means the 7.75% Senior Notes due 2026 issued under that certain Indenture, dated as of June 13, 2016, by and among DBS, the guarantors party thereto and U.S. Bank National Association, as trustee.

"**DBS 2028 Secured Notes**" means the 5.75% Senior Secured Notes due 2028 issued under that certain Secured Indenture, dated as of November 26, 2021, by and among DBS, the guarantors party thereto and U.S. Bank National Association, as trustee and collateral agent.

5

"**DBS 2028 Unsecured Notes**" means the 7.375% Senior Notes due 2028 issued under that certain Indenture, dated as of July 1, 2020, by and among DBS, the guarantors party thereto and U.S. Bank National Association, as trustee.

"**DBS 2029 Unsecured Notes**" means the 5.125% Senior Notes due 2029 issued under that certain Indenture, dated as of May 24, 2021, by and among DBS, the guarantors party thereto and U.S. Bank National Association, as trustee.

"**DBS Company Parties**" means the Company Parties that are obligors under the DBS Notes as of the Agreement Effective Date prior to the consummation of any Transactions.

"**DBS Notes**" means, collectively, the DBS 2026 Secured Notes, the DBS 2026 Unsecured Notes, the DBS 2028 Secured Notes, the DBS 2028 Unsecured Notes, and the DBS 2029 Unsecured Notes.

"**DBS Notes Exchange**" means any exchange of certain of the DBS Note for Exchange Notes, on the terms and subject to the conditions set forth in an Exchange Offer Memorandum and Consent Solicitation Statement.

"**Debt Document**" means (a) the indentures governing the Existing Notes; and (b) any other definitive documentation in respect of any such indentures, in each case together with all other guarantees, collateral and security documents, agreements, exhibits, schedules, notes, promissory notes, financing statements, assignments, indemnities, closing statements, certificates, affidavits, stock powers, letters of credit, consents, instruments, or documents of any kind or nature whatsoever relating thereto (and in each case as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"**Definitive Documents**" has the meaning set forth in Section 5(a) of this Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, which shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Required Consenting Creditors.

"**Dismissal Stipulation**" means a stipulation to be filed with the District Court, substantially in the form attached hereto as **Exhibit E**, seeking voluntary dismissal of the Lawsuit with prejudice.

"**District Court**" means the United States District Court for the Southern District of New York.

"**DNC**" has the meaning set forth in the preamble of this Agreement.

"**DNC Notes**" means the 11.75% Senior Secured Notes due 2027 issued under that certain Secured Indenture, dated as of November 15, 2022, by and among DNC, the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent.

"**DNC Notes Claims**" means any Claim with respect to the DNC Notes against DNC or any guarantors party thereto.

6

"**DNC Notes Commitments**" means the affirmative and negative commitments of the Consenting Creditors with respect to their DNC Notes Claims, if any, solely as set forth in Sections 6.1(a)(vii) and 6.1(b)(v).

"**EchoStar**" has the meaning set forth in the preamble of this Agreement.

"**EchoStar Guaranty**" means the payment obligation of EchoStar, and/or any of its successors or assigns, following the Agreement Effective Date specified in the Term Sheet under the sub-heading "Claim Settlement Amount," which is subject to the conditions set forth in Section 10.5 herein.

"**Effective Date Transactions**" means the Transactions set forth in the Term Sheet under the heading "Effective Date Transactions."

"**Election Date**" has the meaning set forth in the Term Sheet.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Exchange Commencement Date**" has the meaning set forth in Section 4(d) of this Agreement.

"**Exchange Notes**" means the new notes issued under an Exchange Notes Indenture pursuant to the Exchange Transactions.

"**Exchange Notes Indentures**" means, collectively, the indentures governing the applicable series of Exchange Notes, which indentures shall be consistent in all material respects with this Agreement and the Term Sheet.

"**Exchange Offer Memorandum and Consent Solicitation Statement**" means an exchange offer memorandum and consent solicitation statement, the terms and conditions of which are consistent with the terms and conditions set forth in the Term Sheet.

"**Exchange Transaction**" means a DBS Notes Exchange, on the terms and subject to the conditions set forth in the Exchange Offer Memorandum and Consent Solicitation Statement.

"**Execution Date**" has the meaning set forth in the Term Sheet.

"**Execution Date Transactions**" means the Transactions set forth in the Term Sheet under the heading "Execution Date Transactions."

"**Existing Notes**" means the DBS Notes prior to the Agreement Effective Date.

"**Fiduciary Out**" has the meaning set forth in Section 7.3(a) of this Agreement.

"**Fiduciary Out Notice**" has the meaning set forth in Section 7.3(a) of this Agreement.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal

7

that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file upon the commencement of the Chapter 11 Cases, which shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Required Consenting Creditors.

"**Governmental Approval**" means the approval of, including the submission of required prior notice with, relevant federal, state, local, foreign or other Governmental Authority having jurisdiction over the Company Parties required to effectuate the Transactions.

"**Governmental Authority**" means any non-U.S. or U.S. federal, state, local or subdivision thereof, or legislative, judicial, executive, administrative or regulatory body or other governmental or quasi-governmental Entity with competent jurisdiction.

"**Holdings Confirmation**" means a confirmation delivered by each Consenting Creditor (or by Ad Hoc Group Counsel on behalf of any Consenting Creditor) to Company Counsel, contemporaneously with each Consenting Creditor's signature page to this Agreement, substantially in the form of Annex 1 to such Consenting Creditor's signature page (or with each Consenting Creditor's signature page to a Joinder or Transfer Agreement, as applicable, in the case of any Consenting Creditor that becomes a party hereto after the Agreement Effective Date), disclosing each series of DBS Notes and DNC Notes (if applicable) then beneficially owned or held by such Consenting Creditor (including in such Consenting Creditor's capacity as an investment advisor, sub-advisor, or manager of discretionary accounts that beneficially own or hold any applicable series of DBS Notes or DNC Notes (if applicable); *provided*, that, unless required to be disclosed by applicable Law, under no circumstance shall such Holdings Confirmation, the identity of the holder(s), or the amount of holdings be (a) disclosed publicly or to any other party by the Company Parties, EchoStar, or DNC (in each case solely for the purpose of confirming holdings) or (b) used in any litigation, or (c) for any other purpose.

"**Indenture Consenting Creditors**" means, at the time of determination, the Consenting Creditors that hold at least 66.67% of the aggregate outstanding principal amount held by all Initial Consenting Creditors of, as applicable, the DBS 2026 Secured Notes, the DBS 2026 Unsecured Notes, the DBS 2028 Secured Notes, the DBS 2028 Unsecured Notes, and the DBS 2029 Unsecured Notes.

"**Initial Consenting Creditors**" means the beneficial owners or holders of, or investment advisors, sub-advisors, or managers of funds or accounts that beneficially own or hold, DBS 2026 Secured Notes, DBS 2026 Unsecured Notes, DBS 2028 Secured Notes, DBS 2028 Unsecured Notes, or DBS 2029 Unsecured Notes that have, in each case, executed and delivered counterpart signature pages to this Agreement on or prior to the Agreement Effective Date.

"**Intercompany Transactions**" means the Effective Date Transactions specified in the Term Sheet under the sub-heading "Payment of Certain Intercompany Loans."

"**Indebtedness**" has the meaning set forth in each indenture pursuant to which each series of DBS Notes was issued.

"**Investment**" has the meaning set forth in each indenture pursuant to which each series of DBS Notes was issued.

"**Joinder**" means a joinder to this Agreement, substantially in the form attached hereto as **Exhibit C**; *provided*, that, unless required to be disclosed by applicable Law, under no circumstance shall any Joinder, the identity of the holder(s), or the amount of holdings be (a) disclosed publicly or to any other party by the Company Parties, EchoStar, or DNC or (b) used in any litigation, or (c) for any other purpose.

"**Law**" means any federal, state, local, or European Union law instruments (including directives and regulations), or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Authority (including the Bankruptcy Court).

"**Lawsuit**" has the meaning set forth in the Term Sheet.

"**Milestones**" has the meaning set forth in Section 4 of this Agreement.

"**New Notes Indentures**" means, collectively, the supplemental or amended indentures governing each series of DBS Notes (together with all ancillary documentation contemplated thereunder, including any and all documents or agreements necessary to effectuate the entry thereof), in each case consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company Parties that are required to be signatories thereto, the Required Consenting Creditors, and the Indenture Consenting Creditors for such series of DBS Notes.

"**Other DNC Noteholders**" means holders of DNC Notes that are not Consenting Creditors.

"**Parties**" has the meaning set forth in the preamble of this Agreement.

"**Permitted Asset Sale**" means a sale for fair market value of personal or other property of a Company Party that such Company Party determines, in its good faith judgment, is no longer used or useful in the business of such Company Party.

"**Permitted Transferee**" has the meaning set forth in Section 8.1 of this Agreement.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

9

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the chapter 11 plan(s) for the Company Parties, as may be amended, modified, or supplemented from time to time in accordance with the terms of this Agreement, which shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company Parties and the Required Consenting Creditors.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms and this Agreement; *provided*, *that*, among other things, the consummation of each Execution Date Transaction and Effective Date Transaction shall be a condition precedent to the Plan Effective Date that cannot be waived or modified without the consent of the Required Consenting Creditors.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court, which shall be in form and substance consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Required Consenting Creditors.

"**Qualified Marketmaker**" means a Person or Entity that: (a) holds itself out to the public or the applicable market as standing ready in the ordinary course of its business to purchase from customers and sell to customers Company Claims (or enter with customers into long and short positions in Company Claims), in its capacity as a dealer or market maker in Company Claims; and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Release Parties**" has the meaning set forth in the preamble of this Agreement.

"**Required Consenting Creditors**" means, at the time of determination, the Consenting Creditors that hold at least 66.67% of the aggregate outstanding principal amount of DBS Notes held by all Initial Consenting Creditors.

"**Restricted Payment**" has the meaning set forth in each indenture pursuant to which each series of DBS Notes was issued.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) under the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended, 15 U.S.C. 77a et seq., and the rules and regulations promulgated thereunder.

"**Solicitation**" means the solicitation of votes in favor of the Plan.

"**Solicitation Commencement Deadline**" has the meaning ascribed to such term in Section 4(a).

10

"**Solicitation Materials**" means all solicitation materials in respect of the Plan together with the Disclosure Statement, which solicitation materials shall be in accordance with this Agreement, the Term Sheet, and the Definitive Documents and shall be in form and substance consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company Parties and the Required Consenting Creditors.

"**SpaceX Transactions**" means the transactions announced on September 8, 2025 and November 6, 2025, between EchoStar and certain of the Company Parties' affiliates, on the one hand, and Space Exploration Technologies Corp., on the other hand.

"**Supporting Noteholders**" has the meaning set forth in the Term Sheet.

"**Term Sheet**" has the meaning set forth in the recitals; a copy of the Term Sheet is attached hereto as **Exhibit B**.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 10.

"**Transactions**" has the meaning set forth in the recitals.

"**Transfer**" means a Consenting Creditor directly or indirectly selling, assigning, granting a participation interest in or otherwise transferring any right, title or interest in respect of any of its Company Claims, in whole or in part; *provided*, *however* that any ordinary course pledge (i) in favor of a bank or broker dealer at which a Consenting Creditor maintains an account, where such bank or broker dealer holds a security interest in or other encumbrance with respect to property in the account or (ii) to any holders of obligations owed, or securities issued, by such Consenting Creditor, including to any trustee for, or any other representative of, such holders shall not be deemed a "Transfer" for any purposes hereunder.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**; *provided*, that unless required to be disclosed by applicable Law, under no circumstance shall any Transfer Agreement, the identity of the holder(s), or the amount of holdings be (a) disclosed publicly or to any other party by the Company Parties, EchoStar, or DNC or (b) used in any litigation, or (c) for any other purpose.

"**Transfer Provisions**" means the provisions of Section 8.

"**Trustee**" means the indenture trustee for any applicable series of DBS Notes.

1.2    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

11

(c)        unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)        unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement; *provided*, *however*, that any capitalized terms in this Agreement that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)        unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;

(f)        the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)        captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)        references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)        the use of "include" or "including" is without limitation, whether stated or not;

(j)        the use of "writing," "written" and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form; and

(k)        references to actions taken by any Party in the Chapter 11 Cases are references to such actions if the Company Parties timely make the Chapter 11 Election and commence the Chapter 11 Cases.

**Section 2.        *Exhibits Incorporated by Reference; Conflicts.***  Each of the exhibits attached hereto, including the Term Sheet, is expressly incorporated herein and made part of this Agreement, and all references to this Agreement, unless otherwise specified, shall include such exhibits, including the Term Sheet; *provided*, *however*, that (a) to the extent that there is a conflict between this Agreement (excluding the Term Sheet) on the one hand, and the Term Sheet on the other hand, the terms and provisions of the Term Sheet shall govern other than as expressly provided herein and (b) to the extent that there is a conflict between this Agreement, on the one hand, and any of the Definitive Documents, on the other hand, the terms of the Definitive Documents shall govern; *provided further*, *however*, that no such conflict or purported conflict shall in any way impact the Company Parties' rights pursuant to Section 7.3 to take or refrain from

taking any action that would be inconsistent with its or their fiduciary obligations under applicable Law.

**Section 3.** *Conditions to Effectiveness.* This Agreement, and the rights and obligations of the Parties hereunder, shall become effective and binding upon each of the Parties on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a) the following shall have executed and delivered counterpart signature pages of this Agreement to Company Counsel and Ad Hoc Group Counsel in the manner set forth in Section 14.7:[5]

(i) each Company Party, EchoStar and DNC; and

(ii) with respect to the DBS 2026 Secured Notes, the DBS 2026 Unsecured Notes, the DBS 2028 Secured Notes, the DBS 2028 Unsecured Notes, and the DBS 2029 Unsecured Notes, Initial Consenting Creditors that constitute at least 66.67% of the aggregate outstanding principal amount of each such series of DBS Notes.

(b) Company Counsel shall provide written notice to Ad Hoc Group Counsel in the manner set forth in Section 14.11 that the conditions to the Agreement Effective Date set forth in Section 3(a) have occurred, which notice, for the avoidance of doubt, is not a condition to the occurrence of the Agreement Effective Date.

**Section 4.** *Milestones.* Notwithstanding anything to the contrary in the Term Sheet, the following milestones (the "**Milestones**") shall apply to this Agreement unless extended, modified or waived in writing by the Required Consenting Creditors:

(a) no later than three (3) Business Days after the Agreement Effective Date, the Company Parties, EchoStar and DNC shall have satisfied their obligations with respect to each Execution Date Transaction as set forth in the Term Sheet, including by satisfying in full, in cash, DBS's payment of its portion of the Claim Settlement Amount to the Supporting Noteholders in the amount of $75,000,000, by wire transfer of immediately available funds to the account(s) designated by the Required Consenting Creditors;

(b) on or as soon reasonably practicable following the AT&T Closing Date, and no later than three (3) Business Days after the AT&T Closing Date, the Intercompany Transactions shall have occurred as set forth in the Term Sheet; *provided* that if payment of the 2021 Intercompany Loan – Tranche B (as defined in the Term Sheet) as set forth in the Intercompany Transactions has not been made by December 1, 2026, it will be made on such date;

---

[5] Unless required to be disclosed by applicable Law, under no circumstance shall any Consenting Creditor signature pages, the identity of the holder(s), or the amount of holdings be disclosed publicly or to any other party, or used in any litigation or for any purpose other than to confirm that the requirements contained in Section 3 are satisfied.

(c)      no later than the Election Date, the Company Parties shall have notified Ad Hoc Group Counsel in writing of whether they are making the Chapter 11 Election; *provided* that the Election Date may be extended in accordance with the section of the Term Sheet entitled "Company Party Election";

(d)      if the Company Parties do not make the Chapter 11 Election on or before the Election Date:

(i)      no later than 11:59 p.m. (prevailing Eastern Time) on the earlier of (x) the date that the Company Parties have notified Ad Hoc Group Counsel that they are not making the Chapter 11 Election and (y) the Election Date, the Company Parties shall have commenced the Exchange Transaction (the "**Exchange Commencement Date**");

(ii)     no later than 11:59 p.m. (prevailing Eastern Time) on the date that is twenty (20) days after the Exchange Commencement Date, the proposed amendments set forth in the Exchange Notes Indentures shall have been deemed effective and the Effective Date (as defined in the Term Sheet) shall have occurred; and

(iii)    on or prior to the Effective Date, an Exchange Transaction with participation from 98% of the holders of each series of the Existing Notes shall have settled pursuant to the terms and conditions of an Exchange Offer Memorandum and Consent Solicitation Statement.

(e)      if the Company Parties make the Chapter 11 Election on or before the Election Date, then:

(i)      within one Business Day after making the Chapter 11 Election, the Company Parties shall have commenced solicitation of votes in favor of the Plan (the "**Solicitation Commencement Deadline**");

(ii)     no later than the date that is one (1) Business Day after the Solicitation Commencement Deadline, the Petition Date shall have occurred;

(iii)    on the Petition Date, the Company Parties shall have filed the Plan and Disclosure Statement with the Bankruptcy Court;

(iv)     no later than the date that is 120 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(v)      no later than ten (10) Business Days after entry of the Confirmation Order, the Plan Effective Date shall have occurred, and, for the avoidance of doubt, each Execution Date Transaction and Effective Date Transaction shall have occurred as set forth in the Term Sheet.

14

**Section 5.**   *Definitive Documents.*

(a)    The Definitive Documents governing the Transactions and any amendments, supplements, or other modifications thereto shall each be in all respects consistent with this Agreement and in form and substance reasonably acceptable to the Company Parties that are required to be signatories thereto and the Required Consenting Creditors; *provided* that, with respect to any Exchange Notes Indentures or New Notes Indentures applicable to a series of DBS Notes or any other material, documents, opinions, instruments, schedules or exhibits described in, related to, contemplated in, or reasonably necessary to implement such Exchange Notes Indentures or New Notes Indentures, the form and substance of such Exchange Notes Indentures, New Notes Indentures or other related documents shall also be in form and substance reasonably acceptable to the Indenture Consenting Creditors for such series of DBS Notes.

The "**Definitive Documents**" consist of the following:

(i)    if the Transactions are implemented through the Chapter 11 Cases:

(A)    the Plan;

(B)    the Confirmation Order;

(C)    the Disclosure Statement;

(D)    the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials;

(E)    the First Day Pleadings and all orders requested pursuant thereto;

(F)    the Plan Supplement;

(G)    the New Notes Indentures;

(ii)    if the Transactions are not implemented through the Chapter 11 Cases:

(A)    the Exchange Offer Memorandums and Consent Solicitation Statements;

(B)    the proposed amendments set forth in the Exchange Notes Indentures and any ancillary documentation, including any and all documents or agreements necessary to effectuate the entry thereof;

(C)    the Exchange Notes Indentures and ancillary documentation, including any and all documents or agreements necessary to effectuate the entry thereof; and

(iii)    any other material, documents, opinions, instruments, schedules or exhibits described in, related to, contemplated in, or reasonably necessary to implement the foregoing.

15

(b)     The Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation and completion in accordance with this Section 5.  The Definitive Documents and every other document, agreement, deed, filing (including any filings with the SEC), notification, letter, opinion, instrument, form, amendment, waiver, consent and other documentation related to the Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, restated, or supplemented in accordance with Section 13 of this Agreement and otherwise be subject to the consent requirements set forth in Section 5(a). Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date shall otherwise be subject to the consent requirements set forth in Section 5(a).

**Section 6.**     ***Commitments of the Consenting Creditors.***

6.1     <u>General Commitments</u>.

(a)     <u>Affirmative Commitments of the Consenting Creditors</u>.  During the Agreement Effective Period (or at such other time specified below), each Consenting Creditor agrees, severally and not jointly, in respect of all of its Company Claims (and, solely with respect to the DNC Notes Commitment in Section 6.1(a)(vii), in respect of all of its DNC Notes Claims), to:

(i)     use commercially reasonable and good faith efforts to (A) pursue, support, implement, and consummate the Transactions in accordance with the terms and conditions set forth in this Agreement, including by voting and exercising any powers or rights available to it in favor of any matter requiring approval to the extent necessary to implement the Transactions, (B) provide information as may be reasonably requested by the Company Parties and necessary to obtain any necessary regulatory approvals to consummate the Transactions, and (C) authorize and consent (such authorization and consent to be evidenced solely by such Consenting Creditors' execution of this Agreement) to the commencement of the Chapter 11 Cases by the Company Parties in respect of the DBS Notes beneficially owned or held by any subset of the Consenting Creditors; *provided*, *however*, that no Consenting Creditor shall be obligated to waive (to the extent waivable by such Consenting Creditor) any condition to the consummation of any Transaction;

(ii)     use commercially reasonable efforts to cooperate with the Company Parties as may be reasonably requested by the Company Parties to obtain any and all required Governmental Approvals reasonably necessary to implement and/or consummate the Transactions; *provided* that any agreements with or commitments to any Governmental Authority with respect to the Transactions, including any decision to accept and/or not to oppose any proposed material conditions or limitations on any such required Governmental Approvals, shall require the prior approval of the Required Consenting Creditors;

(iii)     use commercially reasonable efforts to cooperate with the Company Parties, as may be reasonably requested by the Company Parties, in obtaining additional support for the Transactions from the Company Parties' other stakeholders that is necessary to

16

consummate the Transactions; *provided* that no Consenting Creditor shall be required to provide an indemnity or incur any potential expense or liability in connection therewith; *provided further* that, notwithstanding anything to the contrary in this Agreement, obtaining any consent, waiver, forbearance, or similar assurance or agreement from Other DNC Noteholders is neither necessary nor reasonably necessary to consummate the Transactions, and the Consenting Creditors have no obligations with respect thereto;

(iv)    use commercially reasonable efforts to give any notice, order, instruction, or direction to any applicable agent reasonably necessary to give effect to the Transactions (including, for the avoidance of doubt, any notice, order, instruction, or direction required in connection with the execution and delivery of the Definitive Documents), on the terms and subject to the conditions of this Agreement; *provided* that no Consenting Creditor shall be required to provide an indemnity or incur any potential expense or liability in connection therewith;

(v)    negotiate in good faith and use commercially reasonable efforts to finalize, execute and deliver the Definitive Documents to which it is required to be a party or to which it has a consent right pursuant to Section 5(b);

(vi)    use commercially reasonable efforts to negotiate in good faith any appropriate additional or alternative provisions or agreement reasonably necessary to address any legal, financial, or structural impediment that arises or is likely to arise that would prevent, hinder, impede, delay or are reasonably necessary to effectuate the consummation of the Transactions, as reasonably determined by both the Company Parties and the Required Consenting Creditors, in accordance with this Agreement (without affecting the economic outcome for the Consenting Creditors or other material term contemplated by this Agreement);

(vii)    (A) forbear from exercising any remedies with respect to any actual or purported acceleration, breach, default, or event of default by any Company Party under the DBS Notes that shall or may arise solely as a result of the commencement of any Chapter 11 Cases or any of the steps, actions or Transactions required by, specified or contemplated in and/or implemented by or undertaken pursuant to this Agreement, and (B) waive, forbear, or rescind in connection with acceleration or purported acceleration of the DNC Notes related to the Transactions;

(viii)    use commercially reasonable efforts to cooperate with the Company Parties in opposing the efforts of any Person or Entity to object to, delay, impede or take any other action to interfere with approval, confirmation, acceptance, implementation or consummation of the Transactions;

(ix)    consistent with Section 14.10, ensure that any of its respective successors, assigns, heirs, executors, administrators and representatives are informed of the existence of this Agreement and its binding effect on such successors, assigns, heirs, executors, administrators and representatives;

17

(x)     cause the Lawsuit to be dismissed with prejudice on or as soon as reasonably practicable after the date on which the Company Parties, EchoStar, DNC, and the Release Parties shall have satisfied their obligations under this Agreement with respect to each other Execution Date Transaction and provided any necessary signatures to the Dismissal Stipulation; *provided* that the filing of the Dismissal Stipulation, substantially in the form attached hereto as **Exhibit E**, within two (2) Business Days of such date shall, regardless of any delay by the District Court in entering the dismissal, be deemed to satisfy such obligation;

(xi)     on the Agreement Effective Date, hereby consent to the execution and delivery of each of the supplemental indentures (to the extent such Consenting Creditor is a holder of related DBS Notes under such applicable supplemental indenture), substantially in the form attached hereto as **Exhibit F**, by each of the appliable Company Parties and the Trustees and, as applicable, Collateral Agent, expressly identified therein; and, in furtherance of the foregoing and notwithstanding Section 14.19 hereof, each such Trustee and Collateral Agent shall be entitled to rely upon such consents and each Consenting Creditor's representations and warranties set forth in Section 9 with respect its right, title, interests, powers and authority with respect to its beneficial ownership of and/or power to vote the applicable DBS Notes and if applicable, to deliver this Agreement on behalf of and to bind the beneficial owner of such DBS Notes (in the amounts set forth on its certificate of beneficial ownership to be provided on the Agreement Effective Date) and the right, power and authority to execute this Agreement and deliver the forgoing Consents in such capacity, which consents shall remain valid and effective until revoked in a written notice to the applicable Trustee and applicable Collateral Agent in accordance with the terms of the applicable indenture related to the DBS Notes.

(xii)     hereby grant, on the Agreement Effective Date, the following releases, which releases shall not become effective until the occurrence of the Effective Date (upon which date the releases shall become effective without any further notice to or action by any person):

From and after the Effective Date (as defined in the Term Sheet), each of the Consenting Creditors to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, shall expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release each of the Company Parties, EchoStar, DNC, the Release Parties, and their respective property and successors and assigns, of and from any and all claims, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing as of the Effective Date or thereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of laws, or otherwise, including, without limitation, causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that any Consenting Creditor would have been legally entitled to assert (whether individually or collectively) against any Company Party, EchoStar, DNC, or Release Party, in each

18

case based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Execution Date.

(b)    Negative Commitments of the Consenting Creditors.   During the Agreement Effective Period, each Consenting Creditor agrees, severally and not jointly, in respect of all of its Company Claims (and, solely with respect to the DNC Notes Commitment in Section 6.1(b)(v), in respect of all of its DNC Notes Claims), that it shall not, directly or indirectly, and shall not direct any Person or Entity, including the Trustee under any indenture for any series of DBS Notes, to:

(i)    take, or direct any Person or Entity to take, the following actions: (A) object to, delay, impede, condition or take any other action to interfere with approval, confirmation, acceptance, implementation or consummation of the Transactions or of any AT&T Transaction or SpaceX Transaction; *provided*, that nothing in the foregoing shall be construed to limit any Consenting Creditor's ability to exercise its consent or termination rights provided herein; (B) seek, solicit, encourage, propose, file, support, consent to, vote for, or enter into or participate in any discussions, agreements, understandings, or other arrangements with any Person or Entity regarding, or otherwise pursue or consummate, any Alternative Restructuring Proposal; and (C) file with any court any motion, pleading, or other document (including any modifications or amendments thereof) that, in whole or in part, is not consistent, in all material respects, with this Agreement or the Transactions;

(ii)    take, or direct the applicable Trustee to take, any action to enforce or exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims, including rights or remedies arising or asserting or bringing any claims, that is inconsistent with the terms of this Agreement; *provided* that nothing in this Agreement shall prevent any Consenting Creditor or Trustee from filing a proof of claim in the Chapter 11 Cases with respect to its respective Company Claims;

(iii)    enter into a new cooperation agreement or similar agreement or arrangement with any other holder of the Company Claims (excluding, for the avoidance of doubt, (i) the Co-Op Agreement, (ii) any extension of the term of the Co-Op Agreement, or (iii) any amendment of the Co-Op Agreement that is not inconsistent, in any material respect, with this Agreement or the Transactions) that (A) is inconsistent with the terms of this Agreement, (B) relates to the holding, voting or disposition of Company Claims or any entitlements to distributions, sharing of recoveries, or opportunities to participate in future transactions in relation to Company Claims, and (C) is entered into in such Consenting Creditor's capacity as a holder of Company Claims; *provided*, *that*, for the avoidance of doubt, this Section 6.1(b)(iii) shall not prohibit or limit in any way any Consenting Creditor's right to enter into a new cooperation agreement or similar agreement that (A) relates to the holding, voting or disposition of any claims that are not Company Claims, or any entitlement to distributions, sharing of recoveries, or opportunities to participate in future transactions in relation to claims that are not Company Claims, or (B) is entered into in such Consenting Creditor's capacity as a holder of claims that are not Company Claims;

19

(iv)     take any action that would reasonably be expected to frustrate, interfere with, condition, delay, or impede any Transaction;

(v)     assert, or knowingly encourage or knowingly facilitate any Person or Entity in asserting, that any action taken by the Company Parties to pursue, support, implement, or consummate the Transactions in accordance with the terms and conditions set forth in this Agreement has or will have accelerated the DNC Notes;

(vi)     announce publicly its intention not to support the Transactions;

(vii)     initiate, or direct to be initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the Transactions, or, to the extent applicable, the Chapter 11 Cases, against any Company Party, EchoStar, DNC, or Release Party that is inconsistent with the terms of this Agreement (other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement);

(viii)     knowingly encourage any Person or Entity or knowingly facilitate any effort by any Person or Entity to do any of the foregoing; or

(ix)     withdraw, revoke, or otherwise interfere with the entry of the Dismissal Stipulation.

6.2     <u>Commitments of the Consenting Creditors with Respect to Chapter 11 Cases</u>.

(a)     <u>Affirmative Commitments of the Consenting Creditors</u>.  Each Consenting Creditor agrees, severally and not jointly, that it shall, during the Agreement Effective Period, whether before or after the commencement of the Chapter 11 Cases:

(i)     timely vote each of its Company Claims it is entitled to vote to accept the Plan by timely delivering its duly executed and completed ballot(s) accepting the Plan following the date of the Solicitation and its actual receipt of the Solicitation Materials and the ballot;

(ii)     (A) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan (and consistent with this Agreement), elect not to opt out of such releases and (B) to the extent it is permitted to elect whether to opt in to the releases set forth in the Plan (and consistent with this Agreement), elect to opt in to such releases (without delay or condition), in each case by delivering its duly executed and completed ballot(s) indicating such election prior to the deadline for such delivery;

(iii)     use commercially reasonable efforts to support the DBS Company Parties in obtaining entry of orders granting the relief requested by the First Day Pleadings or the entry of orders that are otherwise necessary to implement the Transactions and consistent with this Agreement, including approval of the Disclosure Statement, Solicitation of the Plan, confirmation and consummation of the Plan, and entry of the Confirmation Order, in each case with respect to the DBS Company Parties; and

(iv)    except as set forth herein, not change or withdraw, amend, condition, or revoke (or cause to be changed, withdrawn, amended, conditioned or revoked) any vote or election referred to in clause (i) or (ii) above; *provided*, *however*, that nothing in this Agreement shall prevent any Consenting Creditor from withholding, amending, conditioning, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Consenting Creditor.

(b)    <u>Negative Commitments of the Consenting Creditors</u>.  Each Consenting Creditor agrees, severally and not jointly, that it shall not, during the Agreement Effective Period, whether before or after the commencement of the Chapter 11 Cases, directly or indirectly, in respect of its Company Claims, take any of the following actions:

(i)    take any action that is inconsistent, in any material respect, with this Agreement or the Transactions or would reasonably be expected to interfere with, delay, condition, or impede the Solicitation and approval of the Disclosure Statement, confirmation and consummation of the Plan and the Transactions, or entry of the Confirmation Order; *provided*, that, for the avoidance of doubt, Consenting Creditors are otherwise entitled to take actions that are not expressly prohibited by this Agreement;

(ii)    file any motion, objection, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement, the Plan or the Transactions;

(iii)    object to any pleadings that are consistent with this Agreement and filed by the Company Parties in furtherance of the Transactions;

(iv)    exercise, or direct any other Person or Entity to exercise, any right or remedy for the enforcement, collection, or recovery of any Company Claim that is inconsistent with the terms of this Agreement; or

(v)    encourage any Person or Entity or facilitate any effort by any Person or Entity to do any of the foregoing.

6.3    <u>Additional Provisions Regarding the Consenting Creditors' Commitments</u>.

Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement shall:

(a)    limit any Consenting Creditor's ability to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Definitive Documents;

(b)    affect the ability of any Consenting Creditor to consult with any other Consenting Creditor or the Company Parties;

(c)    be construed to prohibit any Consenting Creditor from either itself or through any representatives or agents, soliciting, initiating, negotiating, facilitating, proposing, continuing or

21

responding to any proposal to purchase or sell any Company Claims, so long as such Consenting Creditor complies with Section 8;

(d)   (i) constitute an amendment of any term or provision of any Debt Document, or (ii) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under any Debt Document;

(e)   (i) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with the Transactions or (ii) prevent any Consenting Creditor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is consistent with, this Agreement or Definitive Documents;

(f)   other than as set forth in this Agreement or Definitive Documents, require any Consenting Creditor to fund or commit to fund any additional amounts, incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Creditor;

(g)   prevent a Consenting Creditor from taking any action that is required to comply with applicable Law, or require any Consenting Creditor to take any action that is prohibited by applicable Law or to waive or forgo the benefit of any applicable legal professional privilege;

(h)   prevent any Consenting Creditor by reason of this Agreement or the Transactions from making, seeking or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses or similar;

(i)   prevent any Consenting Creditor from (i) defending against or responding to any pleading filed with the Bankruptcy Court or any other court against a Consenting Creditor or seeking to challenge the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of its Company Claims or any liens or collateral securing its Company Claims; or (ii) taking or directing any action relating to the maintenance, protection or preservation of any collateral;

(j)   require any Consenting Creditor to (i) file any motion or pleading, (ii) incur any financial or other liability (including fees or expenses), (iii) indemnify or otherwise incur any liability to any agent or Trustee, (iv) take any action that would result in a breach of, or refrain from taking any action the result of which would be a breach of, (x) any Law or regulation, (y) any order or direction of any relevant court or Governmental Authority, or (z) the terms of any non-disclosure agreement to which it is party, or (v) take any action that, in its reasonable determination, would result in a failure to comply with any antitrust or regulatory obligation;

(k)   affect any Consenting Creditor's rights (whether arising under law or contract) other than with respect to the DBS Notes or the DNC Notes (and then, (i) with respect to the DBS Notes, only to the extent contemplated under this Agreement or the Transactions and (ii) with respect to the DNC Notes, only to the extent of the DNC Notes Commitments, the Transfer Provisions, and Consenting Creditor Representations);

22

(l)     prohibit any Consenting Creditor from taking any other action that is not inconsistent with this Agreement; or

(m)   require any Consenting Creditor to approve the form or substance of any Definitive Document except in accordance with Section 5.

**Section 7.      *Commitments of the Company Parties, EchoStar, DNC, and the Release Parties.***

7.1      General Commitments.

(a)     Affirmative Commitments of the Company Parties, EchoStar, DNC, and the Release Parties.  During the Agreement Effective Period (or at such other time specified below), the Company Parties, EchoStar, DNC, and the Release Parties (solely as to the commitments set forth in Section 7.1(a)(xiv) below) jointly and severally (unless otherwise specified below), agree to:

(i)     support and take all steps reasonably necessary and desirable to pursue, support, obtain additional support for, solicit, implement, confirm, and consummate the Transactions in accordance with the terms and conditions set forth in this Agreement (including the Milestones);

(ii)    use commercially reasonable and good faith efforts to negotiate in good faith any appropriate additional or alternative provisions or agreements reasonably necessary to address any legal, financial or structural impediment that may arise that would prevent, hinder, impede, delay, or are reasonably necessary to effectuate the consummation of the Transactions, as determined by the Company Parties and the Required Consenting Creditors, in accordance with this Agreement;

(iii)   use commercially reasonable efforts to, and support the Consenting Creditors' efforts to, obtain any and all required Governmental Approvals and/or third-party approvals for the Transactions, including any approvals or the expiration of any waiting periods; *provided* that any agreements with or commitments to any Governmental Authority with respect to the Transactions, including any decision to accept and/or not to oppose any proposed material conditions or limitations on any such required Governmental Approvals, shall require the prior approval of the Required Consenting Creditors;

(iv)   negotiate in good faith and use commercially reasonable efforts to finalize, execute and implement the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement on the timelines contemplated by this Agreement and the Definitive Documents;

(v)    maintain good standing (or the equivalent concept) under the jurisdiction in which each Company Party, EchoStar and DNC is incorporated or organized;

(vi)   except as otherwise expressly set forth in this Agreement, use commercially reasonable efforts to (A) conduct their ongoing businesses and operations in the ordinary course in a manner that is consistent, in all material respects, with practices existing as of the Agreement Effective Date, including to the extent such businesses and operations may

23

be limited due to the commencement of the Chapter 11 Cases and (B) preserve their ongoing business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, and customers) and employees in the ordinary course;

(vii)    (A) complete the preparation, as soon as practicable after the Agreement Effective Date, of each of the Definitive Documents not executed or not in a form attached to this Agreement, in each case, as of the Agreement Effective Date in form and substance consistent with this Agreement and in form and substance acceptable to the Required Consenting Creditors; (B) negotiate in good faith with the Consenting Creditors regarding the form and substance of the applicable Definitive Documents in advance of the execution, distribution or use (as applicable) thereof; and (C) provide each Definitive Document to, and afford reasonable opportunity for comment and review of each Definitive Document (which, for all material pleadings the Company Parties intend to file with the Bankruptcy Court, shall be at least three (3) Business Days prior to filing, or, if three (3) Business Days' notice is not reasonably practicable, as soon as reasonably practicable thereafter) by Ad Hoc Group Counsel in advance of any filing, execution, distribution, or use (as applicable) thereof; *provided*, *however*, that the obligations under this Section 7.1(a)(vii) shall in no way alter or diminish any right expressly provided to the Company Parties, EchoStar, DNC or the Required Consenting Creditors, as applicable, under this Agreement to review, comment on and/or consent to the form and/or substance of any document or agreement;

(viii)   actively oppose and object to the efforts of any party seeking to object to, delay, impede, condition or take any other action to interfere with the acceptance, implementation, or consummation of the Transactions (including, if applicable, the timely filing of objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Transactions;

(ix)    provide, and direct their employees, officers, advisors and other representatives to provide, to the Consenting Creditors and their advisors (including Ad Hoc Group Counsel) (A) reasonable access to the books and records of the Company Parties, EchoStar and DNC during normal business hours on reasonable advance notice to the applicable Party's representatives and without disruption to the operation of such Party's business, (B) reasonable access to the management and advisors of the Company Parties, EchoStar and DNC on reasonable advance notice and without disruption to the operation of the business of such Party for the purpose of participating in the planning process with respect to the Transactions, and (C) such other information as reasonably requested by the Consenting Creditors and their advisors (including Ad Hoc Group Counsel); in all cases, subject to the appropriate agreement on use and confidentiality;

(x)    make in cash, in full all payments contemplated under this Agreement as and when due;

(xi)    act in good faith with regard to the successful consummation of the Transactions consistent with this Agreement;

24

(xii)    consistent with Section 14.10, ensure that any of their respective successors, assigns, heirs, executors, administrators and representatives are informed of the existence of this Agreement and its binding effect on such successors, assigns, heirs, executors, administrators and representatives;

(xiii)   inform Ad Hoc Group Counsel as soon as reasonably practicable after becoming aware of (and in any event, no later than two (2) Business Days after becoming aware of):

(A)    any matter or circumstances, that they know, or believe is likely, to be a material impediment to the implementation or consummation of the Transactions;

(B)    any insolvency proceeding or material legal suit, in each case, filed by or against any Company Party or any affiliate of a Company Party, including EchoStar and DNC;

(C)    the initiation, institution or commencement of any proceeding by a Governmental Authority or other Person or Entity regarding any Governmental Approval with respect to any Company Party, EchoStar or DNC, or challenging the validity of the Transactions contemplated by this Agreement;

(D)    any occurrence, or failure to occur, of any event that would be reasonably likely to cause (1) any representation or warranty of any of the Company Parties, EchoStar or DNC contained in this Agreement or the Definitive Documents to be untrue or inaccurate in any material respect when made or deemed to have been made, (2) any covenant of any of the Company Parties, EchoStar or DNC contained in this Agreement or the Definitive Documents not to be or able to be satisfied in any material respect, or (3) any condition precedent contained in this Agreement or the Definitive Documents not to occur or become impossible to satisfy;

(E)    a breach of this Agreement of which it becomes aware (including a breach by any Company Party, EchoStar or DNC to the extent actually known); and

(F)    any matter or circumstance that they know gives, or believe is likely to give, rise to a termination of this Agreement under Section 10; and

(xiv)   hereby grant, on the Agreement Effective Date, severally and not jointly and severally, the following releases, which releases shall not become effective until the occurrence of the Effective Date (upon which date the releases shall become effective without any further notice to or action by any person):

From and after the Effective Date (as defined in the Term Sheet), each of the Company Parties, EchoStar, DNC, and the Release Parties, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the

25

Effective Date, shall expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release each of the Consenting Creditors (solely in the Consenting Creditors' capacities as such), respectively, and their respective property and successors and assigns, of and from any and all claims, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing as of the Effective Date or thereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of laws, or otherwise, including, without limitation, causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that any Company Party, EchoStar, DNC, or Release Party would have been legally entitled to assert (whether individually or collectively) against any Consenting Creditor based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Execution Date.

(b)     Negative Commitments of the Company Parties, EchoStar and DNC.  During the Agreement Effective Period, the Company Parties, EchoStar and DNC shall not, without the prior written consent of the Required Consenting Creditors, directly or indirectly:

(i)     take any action that is inconsistent with this Agreement, the Definitive Documents or the Transactions or take any other action that would reasonably be expected to interfere with, delay, or impede solicitation, implementation, or consummation of, the Transactions;

(ii)     file with any court any motion, pleading, or other document (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Transactions;

(iii)     violate the terms of any Governmental Approvals;

(iv)     except to the extent expressly required by this Agreement, require any Consenting Creditor to fund or commit to fund any additional amounts, incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities or other obligations to such Consenting Creditor;

(v)     commence, support or join any litigation or adversary proceeding against the Consenting Creditors;

(vi)     directly or indirectly prepare, commence or support any third party in connection with an avoidance action or other legal proceeding that challenges the amount, validity, allowance, character, enforceability, liens or encumbrances securing, or priority of any Company Claims;

(vii)     except to the extent permitted by Section 7.3 hereof, seek, solicit, support, initiate, encourage, propose, negotiate, discuss, assist, consent to, vote for or enter into any

26

agreement regarding (in each case, directly or indirectly) any Alternative Restructuring Proposal;

(viii)   incur any Indebtedness for borrowed money, make any Investment, make any Asset Sale, authorize or consummate any issuance or sale of equity interests of any Company Party, make any Restricted Payment or make any payment with respect to the principal amount of any Indebtedness, in each case, except as required by this Agreement or in furtherance of the Transactions (for the avoidance of doubt, to the extent in furtherance of and not inconsistent with the Transactions, the Company Parties are not prohibited by this Section 7.1(b)(viii) to make any Permitted Asset Sale, on motion and notice to creditors);

(ix)   exercise, or direct any other Person or Entity to exercise, any action with respect to any Company Claim that is inconsistent with the terms of this Agreement; or

(x)   encourage any Person or Entity or facilitate any effort by any Person or Entity to do any of the foregoing.

7.2   Commitments of the Company Parties with Respect to Chapter 11 Cases.

(a)   Affirmative Commitments of the Company Parties.  Each of the Company Parties, jointly and severally, agrees that it shall, during the Agreement Effective Period, whether before or after the commencement of the Chapter 11 Cases:

(i)   provide Ad Hoc Group Counsel an initial draft of all material pleadings the Company Parties intend to file with the Bankruptcy Court (including Definitive Documents) as early as reasonably practicable but, in any case, at least three (3) Business Days prior to the applicable document's filing, or, if three (3) Business Days' notice is not reasonably practicable, as soon as reasonably practicable but in all events prior to the filing of such pleading;

(ii)   provide in the Plan, Disclosure Statement and Confirmation Order that Echosphere, L.L.C. shall reinstate its guarantee of the DBS Notes and execute all documentation necessary to evidence such guarantee immediately and effective upon emergence by the Company Parties from the Chapter 11 Cases;

(iii)   timely file a formal objection, after consultation in good faith with Ad Hoc Group Counsel, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a chapter 11 plan, as applicable, (B) directing the appointment of a trustee or examiner, (C) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (D) dismissing any of the Chapter 11 Cases; or (E) that is otherwise inconsistent with the terms of this Agreement or the Transactions;

(iv)   take all commercially reasonable actions that are reasonably necessary or appropriate to obtain the Bankruptcy Court's approval of the Disclosure Statement, Solicitation Materials, and the Plan;

27

(v)     take all commercially reasonable actions that are reasonably necessary or appropriate to cause the Plan Effective Date to occur as soon as practicable in accordance with the Plan, the Confirmation Order, and the Milestones; and

(vi)     subject to Section 7.3, object to any motion to approve or confirm, as applicable, any Alternative Restructuring Proposal.

(b)     <u>Negative Commitments of the Company Parties</u>.  Each of the Company Parties, jointly and severally, agrees that it shall not, during the Agreement Effective Period, whether before or after the commencement of the Chapter 11 Cases:

(i)     take any action that is inconsistent with this Agreement or the Transactions or that would reasonably be expected to interfere with, delay, condition or impede the Solicitation and approval of the Disclosure Statement, confirmation and consummation of the Plan and the Transactions or entry of the Confirmation Order;

(ii)     amend or modify the Plan, in whole or in part, in a manner that is inconsistent with this Agreement;

(iii)     withdraw or revoke the Plan or publicly state its intention not to pursue the Plan or, without the prior written consent of the Required Consenting Creditors, delay in any way the pursuit of confirmation of the Plan in a manner that is inconsistent with this Agreement, the Definitive Documents or the Milestones;

(iv)     seek, solicit, propose, support, assist, or participate in the formulation or preparation of any Alternative Restructuring Proposal;

(v)     file any motion, pleading, order or any Definitive Documents with the Bankruptcy Court (including any modification or amendment thereof) that in whole or in part, is inconsistent with this Agreement, the Plan or the Definitive Documents;

(vi)     commence, support, or join any litigation or adversary proceeding relating to the Chapter 11 Cases against any Consenting Creditor; or

(vii)     encourage any Person or Entity or facilitate any effort by any Person or Entity to do any of the foregoing.

7.3     <u>Additional Provisions Regarding the Commitments of the Company Parties, EchoStar and DNC</u>.

(a)     Notwithstanding anything to the contrary in this Agreement, solely following the commencement of the Chapter 11 Cases, nothing in this Agreement shall require any Company Party that becomes a debtor or debtor-in-possession or the board of directors, board of managers, or similar governing body of such Company Party (including any committee of such governing body, as applicable), to take any action or to refrain from taking any action with respect to the Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law (as reasonably determined in good faith by such Party on the advice of external counsel) (the "**Fiduciary Out**"); *provided* that

such determination shall not impede any Consenting Creditor's right to terminate this Agreement in accordance with the terms hereof, including due to such action or inaction constituting or resulting in a Consenting Creditor Termination Event. The applicable Company Parties shall promptly notify Ad Hoc Group Counsel of any such determination within twenty-four (24) hours following such determination (the "**Fiduciary Out Notice**"). Notwithstanding anything to the contrary herein, each Consenting Creditor reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

(b)     Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.3(a) of this Agreement and not limiting or impacting the obligations of EchoStar (and its successors and assigns) with respect to the EchoStar Guaranty), solely following the commencement of the Chapter 11 Cases, each Company Party that becomes a debtor or debtor-in-possession and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, other advisors, and representatives shall have the rights to: (i) consider, respond to, and facilitate any unsolicited Alternative Restructuring Proposal; (ii) provide access to non-public information concerning any Company Party to any Person or Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Person or Entity; (iii) maintain or continue discussions or negotiations with respect to any unsolicited Alternative Restructuring Proposal; (iv) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of any unsolicited Alternative Restructuring Proposal; and (v) enter into or continue discussions or negotiations with holders of claims against or interests in a Company Party (including any Consenting Creditors), EchoStar, DNC, any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Person or Entity regarding the Transactions or any unsolicited Alternative Restructuring Proposal in a manner that is not otherwise inconsistent with the terms of this Agreement or the Transactions. If any Company Party, EchoStar or DNC, receives an Alternative Restructuring Proposal, it or they shall:  (x) within twenty-four (24) hours, provide Ad Hoc Group Counsel with notice and a copy of such proposal, including all annexes, ancillary terms and other components of such proposal (and to the extent the proposal is not in writing, a detailed written summary thereof), including the identity of the person or group of persons involved unless any Confidentiality Agreement that was executed prior to the date of the Term Sheet (January 11, 2026) and in effect at the time of determination precludes the identification of such person or group of persons; (y) provide Ad Hoc Group Counsel with reasonable updates as to the status and progress of such Alternative Restructuring Proposal; and (z) reasonably promptly respond to reasonable information requests and questions from Ad Hoc Group Counsel relating to such Alternative Restructuring Proposal, in each case solely to the extent disclosing such information is not subject to any attorney-client privilege.

(c)     Nothing in this Agreement shall (i) impair or waive the rights of any Consenting Creditor, Company Party, EchoStar or DNC to assert or raise any objection permitted under this Agreement in connection with the Transactions or (ii) prevent any Consenting Creditor, Company Party, EchoStar or DNC from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

29

7.4     EchoStar Guaranty.  Subject to Section 10.5, EchoStar hereby guarantees to the Consenting Creditors and each of their successors and assigns the prompt payment in full in immediately available funds when due of the EchoStar Guaranty, which obligations of EchoStar under this Section 7.4 are primary and enforceable to the fullest extent permitted by applicable law, irrespective of any circumstance that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, or otherwise.  The guarantee in this Section 7.4 is a continuing guarantee and is a guaranty of payment and not merely of collection.

**Section 8.     *Transfer of Company Claims or DNC Notes Claims*.**

8.1     Restrictions on Transfer.  Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Creditor to Transfer any Company Claims or DNC Notes Claims; *provided*, *however*, that, during the Agreement Effective Period, such Consenting Creditor shall not Transfer any Company Claims or DNC Notes Claims, and any such purported Transfer of Company Claims or DNC Notes Claims (other than any Transfer of Company Claims or DNC Notes Claims to a prime broker or in connection with derivatives or financing transactions, including repurchase agreements, subject, in each case, to the conditions set forth in clause (d) below) shall be void *ab initio* and without effect unless: (a) the transferee is a Consenting Creditor; (b) the transferee is a Consenting Creditor Related Fund; *provided* that, upon such Transfer, such transferee shall be deemed to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (which obligations may be enforced against such transferee by the Parties); (c) before such Transfer, the transferee agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Creditor for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to a Consenting Creditor (including with respect to any and all Company Claims or DNC Notes Claims it already may hold before such Transfer) by executing a Transfer Agreement and delivering an executed copy of such Transfer Agreement to Company Counsel (which may be provided by email from Ad Hoc Group Counsel to Company Counsel) and Ad Hoc Group Counsel within five (5) Business Days following execution (each transferee identified in the foregoing clauses (a) through (c), a "**Permitted Transferee**"); or (d) the transferee is (x) such Consenting Creditor's prime broker holding the Company Claims or DNC Notes Claims, solely as part of a custodian arrangement whereby such Consenting Creditor retains, and no securities lending or other arrangement would deprive them of, all of its rights to vote, deliver consents or waivers relating to, sell or exchange such Company Claims or DNC Notes Claims in accordance with this Agreement or (y) the counterparty in an ordinary course derivatives or financing transactions, including repurchase agreements, in each case, so long as such counterparty is or, at the discretion of the Consenting Creditor, could become obligated to return such Company Claims or DNC Notes Claims to the Consenting Creditor sufficiently in advance of any voting or other deadline necessary for such Consenting Creditor to comply with its obligations hereunder.  Any Permitted Transferee shall be deemed a Consenting Creditor hereunder.  If any Consenting Creditor has validly transferred all of its Company Claims or DNC Notes Claims to a Permitted Transferee in accordance with this Section 8.1, such Consenting Creditor shall be deemed to relinquish all rights and be released from all obligations under this Agreement; *provided* that such Consenting Creditor shall continue to be liable for any breach of

30

this Agreement by such Consenting Creditor that occurs before such Consenting Creditor's Transfer of all of its Company Claims or DNC Notes Claims.

8.2     Additional Company Claims or DNC Notes Claims.  This Agreement shall not preclude Consenting Creditors from acquiring additional Company Claims or DNC Notes Claims; *provided*, *however*, that, during the Agreement Effective Period, (a) if a Consenting Creditor acquires additional Company Claims or DNC Notes Claims after executing this Agreement, such Consenting Creditor shall notify Company Counsel (which may be provided by email from Ad Hoc Group Counsel to Company Counsel) and Ad Hoc Group Counsel of such acquisition within five (5) Business Days after the closing of such acquisition, which notice shall include the amount and type of Company Claims or DNC Notes Claims Transferred and (b) such additional Company Claims or DNC Notes Claims shall automatically and immediately upon acquisition by the Consenting Creditor be deemed subject to all of the terms of this Agreement whether or not notice of such acquisition is given to the Company Parties and Ad Hoc Group Counsel.  Each of the Consenting Creditors agrees not to create any subsidiary, affiliate or other vehicle or device for the purpose of acquiring Company Claims or DNC Notes Claims without first causing such subsidiary, affiliate, vehicle or device to be bound by and subject to this Agreement by executing a Joinder or Transfer Agreement.  This Section 8.2 shall not impose any obligation on the Company Parties to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling the Consenting Creditor to effectuate a Transfer of any Company Claims or DNC Notes Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations arising under such Confidentiality Agreement.

8.3     Qualified Marketmaker Exception**.**  Notwithstanding anything to the contrary herein, (a) a Consenting Creditor may transfer any Company Claims or DNC Notes Claims to a Person or Entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Party only if such Qualified Marketmaker has purchased such Company Claims or DNC Notes Claims with a view to immediate resale of such Company Claims or DNC Notes Claims (by purchase, sale, assignment, transfer, participation or otherwise) to a Consenting Creditor or Permitted Transferee as soon as reasonably practicable, and in no event later than ten (10) Business Days after its acquisition; and (b) to the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may transfer or participate any right, title, or interest in any Company Claims or DNC Notes Claims that the Qualified Marketmaker acquires from a holder of Company Claims or DNC Notes Claims who is not a Consenting Creditor without the requirement that the transferee be a Consenting Creditor or a Permitted Transferee.  For the avoidance of doubt, any Person or Entity that acquires Company Claims or DNC Notes Claims in its capacity as a Qualified Marketmaker and does not resell such Company Claims or DNC Notes Claims to a Consenting Creditor or a Permitted Transferee within ten (10) Business Days after its acquisition thereof must become a Consenting Creditor hereunder by executing and delivering a Joinder or Transfer Agreement within five (5) Business Days after

31

the expiration of such period, to Company Counsel (which may be provided by email from Ad Hoc Group Counsel to Company Counsel) and Ad Hoc Group Counsel.

8.4     Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any Company Claims or DNC Notes Claims in favor of a bank or broker-dealer holding custody of such Company Claims or DNC Notes Claims in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Company Claims or DNC Notes Claims.

**Section 9.     *Representations and Warranties.***

9.1     <u>Mutual Representations and Warranties</u>.  Each Party, severally and not jointly, represents and warrants to each other Party, as of the date such Party executes and delivers this Agreement (including by execution and delivery of a Joinder or Transfer Agreement, as applicable) and as of the Agreement Effective Date, that the following statements are true, correct and complete:

(a)     Such Party is validly existing and in good standing (or the equivalent concept) under the Laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the Transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)     The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of Law applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, in each case (other than with respect to violations of or conflicts with its certificate of incorporation or by-laws), except where any such conflict, individually or in the aggregate, would not reasonably be expected to have, either individually or in the aggregate, a material adverse effect on the business, operations, assets, liabilities (actual or contingent), or financial condition of such Party and its subsidiaries, taken as a whole, or to materially impair its ability to perform its obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the Transactions;

(c)     Except as expressly provided in this Agreement and the Definitive Documents, no consent or approval (to the extent not already obtained by the Agreement Effective Date) is required by any other Person or Entity for it to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement;

(d)     As of the Agreement Effective Date, such Party has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person or Entity, would prevent it from taking any action required of it under this Agreement;

32

(e)     Except as expressly provided in this Agreement, the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or Governmental Authority;

(f)     Except as expressly provided in this Agreement, it has not made or participated in the formulation of any Alternative Restructuring Proposal, restructuring or similar agreement or arrangement with other Parties to this Agreement or any other Person or Entity that has not been disclosed to all Parties to this Agreement; and

(g)     This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

9.2     _Additional Representations of the Consenting Creditors_.  Each of the Consenting Creditors represents and warrants that, in addition to the representations and warranties set forth in Section 9.1 hereof, as of the date of this Agreement, the following statements are true, correct and complete as of the Agreement Effective Date:

(a)     subject to customary exceptions contained in ordinary course fund financing arrangements (including repurchase agreements), it (i) is the beneficial owner of the principal amount of the Company Claims and DNC Notes Claims (if any) set forth on its Holdings Confirmation, or has investment or voting discretion with respect to the principal amount of such Claims and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Company Claims and DNC Notes Claims (if any) and to dispose of, exchange, assign and transfer such Claims; _provided_ that any contractual obligation that a Consenting Creditor has to purchase or sell such a Claim, which obligation as of the Agreement Effective Date remains an outstanding obligation that has not yet settled as an assignment, participation, or other transfer shall be considered settled for purposes of this Agreement;

(b)     (i) it is (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act) or (C) an institutional accredited investor (as defined in the Rules) and (ii) any securities acquired by the Consenting Creditor in connection with the Transactions will have been acquired for investment and not with a view to distribute or resale in violation of the Securities Act; and

(c)     other than (i) with respect to any ordinary course pledge (A) in favor of a bank or broker dealer at which a Consenting Creditor maintains an account, where such bank or broker dealer holds a security interest in or other encumbrance over property in the account generally,  or (B) to any holders of obligations owed, or securities issued, by such Consenting Creditor, including to any trustee for, or any other representative of, such holders, and (ii) pursuant to this Agreement:

(A)     such Company Claims and DNC Notes Claims (if applicable) are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any

33

kind that would adversely affect, in any material respect, such Consenting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(B)     it has made no prior assignment, sale, participation, grant, conveyance, pledge, or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey, pledge, or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any of its Company Claims or DNC Notes Claims (if applicable) that are inconsistent or conflict with representations and warranties of such Consenting Creditor herein or would render it otherwise unable to comply with this Agreement and perform its obligations hereunder.

## Section 10.     *Termination Events*.

10.1     Consenting Creditor Termination Events.     This Agreement may be terminated (a) as to all Parties by the Required Consenting Creditors and (b) with respect to a particular Consenting Creditor, by any affected Consenting Creditor described in Section 10.1(d), in each case by the delivery to the Company Parties and Ad Hoc Group Counsel of a written notice in accordance with Section 14.11 upon the occurrence of the following events:

(a)     the breach in any material respect by a Company Party, EchoStar or DNC, of any representation, warranty or covenant set forth in this Agreement or any Definitive Document (once executed by each of the parties thereto) that, if capable of being cured, remains uncured for five (5) Business Days after the Company Parties, EchoStar or DNC, as applicable, receive a written notice in accordance with Section 14.11 detailing any such breach;

(b)     the failure of a Company Party, EchoStar or DNC to meet a Milestone that has not been waived, modified, extended or otherwise amended in a manner consistent with this Agreement unless such failure is the direct result of any act, omission or delay on the part of the terminating Consenting Creditor in violation of its obligations under this Agreement;

(c)     the issuance, promulgation or enactment by any Governmental Authority, including any regulatory authority, licensing authority or court of competent jurisdiction (including an order of the Bankruptcy Court that has not been stayed), of any statute, regulation or final, non-appealable ruling or order that (i) enjoins the consummation of the Transactions to be consummated by any DBS Company Party, EchoStar or DNC and (ii) remains in effect for fourteen (14) days after such terminating Consenting Creditor transmits a written notice in accordance with Section 14.11 detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation under this Agreement;

(d)     this Agreement or any Definitive Document is amended, modified, or supplemented in a manner that adversely affects, in any material respect, the rights or treatment of any Consenting Creditor; *provided*, that this Section 10.1(d) shall only apply to a Consenting Creditor whose rights or treatment are so adversely affected by such amendment, modification, or supplement, and, if a Consenting Creditor terminates this Agreement in accordance with this

34

Section 10.1(d), such Agreement shall otherwise remain in full force and effect with respect to all other Parties;

(e)     ten (10) Business Days after the entry of a Final Order by any court of competent jurisdiction or other Governmental Authority or a change in Law that, in each such case, makes illegal or otherwise prevents or prohibits the consummation of the Transactions, and such Final Order has not been reversed or vacated;

(f)     any Company Party, EchoStar or DNC files a motion, application, pleading, or proceeding (or any such Party supports or, in the case of any Company Party, does not oppose any such motion, application, pleading, or proceeding filed by a third party) (i) challenging, in any manner, the Company Claims under the existing Debt Documents, or the liens securing such Claims or asserting any other cause of action against or with respect to such Claims or the liens securing such Claims, or (ii) that is otherwise inconsistent with this Agreement in any material respect;

(g)     any Definitive Document fails to comply with this Agreement, which failure remains uncured for a period of five (5) Business Days after receipt by the Company Parties of written notice of such failure from the Consenting Creditor;

(h)     the Company Parties, EchoStar or DNC suspend or revoke or announce their intention to suspend or revoke, the Transactions;

(i)     failure of the Company Parties, EchoStar or DNC to make all payments contemplated under this Agreement as and when due;

(j)     a Company Party or the board of directors, board of managers or similar governing body of a Company Party (including any committee of such governing body, as applicable), exercises the Fiduciary Out, provides the Fiduciary Out Notice, or otherwise gives notice of termination of the Agreement pursuant to this Section;

(k)     if the Company Parties elect to implement the Transactions through the Chapter 11 Cases:

(i)     the withdrawal of the Plan or Disclosure Statement or the amendment or modification of, or the filing of a motion or pleading by the Company Parties, in each case without the prior written consent of the Required Consenting Creditors, that seeks to amend or modify the Plan or the Disclosure Statement or any Definitive Documents, which amendment, modification or filing is (i) inconsistent with this Agreement, the Transactions or the Plan, as applicable or (ii) adverse to any Consenting Creditor; and such amendment or modification has not been reversed and/or such motion or pleading has not been withdrawn prior to the earlier of (A) five (5) Business Days after the Company Parties receive written notice from the applicable Required Consenting Creditors that such amendment, modification, motion or pleading is (1) inconsistent with this Agreement and/or the Plan and (2) adverse to such Consenting Creditors, and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

35

(ii)     the Company Parties (i) withdraw the Plan, (ii) execute a definitive written agreement with respect to an Alternative Restructuring Proposal, (iii) file, propound or otherwise support any plan of reorganization other than the Plan, or (iv) publicly announce or otherwise notify the Consenting Creditors of their intention to do any of (i), (ii) or (iii);

(iii)     the entry of a Final Order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order terminating exclusivity under section 1121 of the Bankruptcy Code;

(iv)     any Company Party, EchoStar or DNC files, joins, or supports through a pleading filed with the Bankruptcy Court any motion, application, adversary proceeding or cause of action (i) challenging the validity, enforceability or priority of, or seeking to avoid, disallow, subordinate or otherwise limit the liens on any asset or assets comprising any portion of the collateral securing Company Claims, (ii) seeking to impose liability upon or enjoin the holders of Company Claims, in their capacity as such, or (iii) seeking to restrict the rights of holders of Company Claims, in their capacity as such, in each case without the prior written consent of the Required Consenting Creditors, and in case to the extent inconsistent with this Agreement;

(v)     the entry of a Final Order by the Bankruptcy Court, or the filing of a motion or application by any Company Party, EchoStar or DNC seeking an order (without the prior written consent of the Required Consenting Creditors) (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement; or

(vi)     the Bankruptcy Court enters a Final Order denying confirmation of the Plan with respect to the DBS Company Parties.

10.2     Company Party, EchoStar and DNC Termination Events.  For clauses (a), (b), and (d), the Company Parties may terminate this Agreement as to all Parties, for clause (c), the applicable Company Party may terminate this Agreement as to itself, and for clause (d), EchoStar or DNC may terminate this Agreement with respect to itself, in each case subject to the survival of the EchoStar Guaranty set forth in Sections 7.4 and 10.5, which cannot be terminated following the Agreement Effective Date except under the limited circumstance set forth therein, by the delivery of written notice to all Parties in accordance with Section 14.11 of this Agreement upon the occurrence of the following events:

(a)     the breach in any material respect by any Consenting Creditor of any representation, warranty, or covenant of such Consenting Creditor set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with Section 14.11) such that the non-breaching Consenting Creditors no longer constitute Required Consenting Creditors;

(b)     the issuance, promulgation or enactment by any Governmental Authority, including any regulatory authority, licensing authority or court of competent jurisdiction, of any final,

36

non-appealable ruling or order that (i) enjoins the consummation of the Transactions to be consummated by any DBS Company Party, EchoStar or DNC and (ii) remains in effect for ten (10) Business Days after the Company Parties transmit a written notice in accordance with Section 14.11 detailing any such issuance; *provided* that this termination right may not be exercised if a Company Party, DNC, or EchoStar sought or requested such ruling or order in contravention of any obligation under this Agreement;

(c)      the board of directors, board of managers, or similar governing body of any Company Party determines in good faith, upon the advice of external counsel, to exercise its Fiduciary Out in accordance with  the terms and conditions set forth in Section 7.3(a); *provided*, that, for the avoidance of doubt, the Required Consenting Creditors may terminate this Agreement in accordance with Sections 7.3(a) and 10.1(j) hereof; or

(d)      the Bankruptcy Court enters a Final Order denying confirmation of the Plan with respect to the DBS Company Parties.

10.3     Automatic Termination.  This Agreement shall terminate automatically without further required action or notice as to all Parties upon the Plan Effective Date; *provided*, *that* the obligations of the Company Parties, EchoStar and DNC with respect to the Intercompany Transactions or the EchoStar Guaranty and under Section 11 (with respect to payments of fees and expenses relating to the recoveries of the Claims Trust after the Plan Effective Date) shall continue in full force and effect following any automatic termination set forth in this Section 10.3 in accordance with Section 10.5.

10.4     Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company Parties, EchoStar, DNC, and the Required Consenting Creditors.

10.5     On the Termination Date as to a Party, subject to Section 14.21, this Agreement shall be of no further force and effect as to such Party, and each such Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all claims or causes of action; *provided*, that, notwithstanding anything to the contrary contained in this Agreement (including, for the avoidance of doubt, the Term Sheet) or any Definitive Document, the obligations of the Company Parties, EchoStar (and any of its successors or assigns) and DNC (i) with respect to the EchoStar Guaranty shall continue in full force and effect following the Agreement Effective Date regardless of any termination or other event that may occur thereafter, including the termination of this Agreement by any party in accordance with this Section 10 or the failure to consummate (or timely consummate) any of the Transactions contemplated hereby; *provided*, that, notwithstanding the foregoing, the EchoStar Guaranty as set forth in Section 7.4 shall terminate upon a termination of this Agreement pursuant to Section 10.2(a) if such termination is not contested as to the Required Consenting Creditors or if such termination is contested, upon entry of a Final Order determining that the material breach of this Agreement by a Consenting Creditor has occurred; *provided*, *further*, that if such termination is

37

contested, EchoStar's obligations with respect to the EchoStar Guaranty shall be held in abeyance until entry of such Final Order, at which time EchoStar shall, as applicable, pay its portion of the Claim Settlement Amount to the Supporting Noteholders or be forever relieved and discharged from the EchoStar Guaranty; and (ii) with respect to the Intercompany Transactions shall continue in full force and effect following any termination of this Agreement pursuant to Section 10.3. If the Transactions are consummated at any time following termination of this Agreement pursuant to Section 10.2(a) (upon which termination the EchoStar Guaranty shall have terminated pursuant to the foregoing clause (i)), the EchoStar Guaranty shall be deemed automatically reinstated upon such consummation and shall continue in full force and effect. Upon the termination of this Agreement as to any Consenting Creditor prior to the Plan Effective Date, any and all consents or ballots tendered by such Consenting Creditor before such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Transactions and this Agreement or otherwise; *provided*, *however*, that if such termination occurs on or after the Petition Date and after the deadline for Company Claims to vote to accept the Plan, the Company Parties may also request that the Consenting Creditor file a notice of withdrawal with the Bankruptcy Court within two (2) Business Days of the applicable Termination Date. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any purported termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner, waive, limit, or impair the ability of any Consenting Creditor to protect and preserve its rights (including rights under this Agreement), remedies, claims or interests in or against any Company Party, EchoStar, DNC, or any other Consenting Creditor. No purported termination of this Agreement shall be effective under this Section 10.5 or otherwise if the Party seeking to terminate this Agreement is in breach of, in any material respect, this Agreement and such breach has been noticed to the other Party in accordance with this Agreement and remains uncontested.

10.6    Automatic Stay. Each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required. The Company Parties, EchoStar and DNC acknowledge that after the Petition Date, the giving of notice of termination and the exercise of any rights under this Agreement by any Party shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code.

**Section 11.    *Professional Fees*.** During the pendency of the Chapter 11 Cases, the Company Parties, DNC, or EchoStar shall pay on a current basis all reasonable and documented professional fees and expenses incurred by Ad Hoc Group Counsel and any local counsel or other advisor engaged by Ad Hoc Group Counsel on behalf of the Consenting Creditors (i) following the Agreement Effective Date or (ii) in connection with the Chapter 11 Cases (such fees and expenses, collectively, the "**Ad Hoc Group Professional Fees**"); *provided* that the Ad Hoc Group Professional Fees payable by the Company Parties under this Agreement incurred through the date that is 180 days after the Petition Date shall not exceed $10,000,000 in the aggregate. For the

38

avoidance of doubt, (i) all reasonable and documented Ad Hoc Group Professional Fees incurred during the pendency of the Chapter 11 Cases following the date that is 180 days after the Petition Date shall be paid by the Company Parties, DNC, or EchoStar on a current basis and not subject to any cap, and (ii) unless otherwise expressly agreed, the Company Parties, DNC, and EchoStar shall have no obligation pursuant to this Agreement to pay any fees and expenses of Lazard Frères & Co. LLC in connection with its representation of the Consenting Creditors on or following the Petition Date. The full satisfaction, in cash, of all Ad Hoc Group Professional Fees as set forth in this Section 11 shall be a condition precedent to the Plan Effective Date.

**Section 12.** *Cooperation and Support.* The Parties shall cause each of their applicable subsidiaries and affiliates to cooperate with each other and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transactions. Furthermore, subject to the terms of this Agreement, each of the Parties shall, to the extent practicable, cause each of their applicable subsidiaries and affiliates to take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary, commercially reasonable and consistent with applicable Law to carry out the purposes and intent of this Agreement and shall, to the extent practicable, refrain from taking any action that would frustrate the purposes and intent of this Agreement; provided, however, that nothing contained in this Section 12 or any other provision of this Agreement requires a Party to cause any such subsidiaries or affiliates to become Parties to this Agreement. Notwithstanding anything to the contrary in this Agreement, (a) to the extent that any Consenting Creditor lacks authority to bind its affiliates, nothing in this Agreement shall require such Consenting Creditor to bind such affiliates, (b) nothing in this Agreement shall apply to any portfolio company of a Consenting Creditor other than the Parties, and (c) nothing in this Agreement shall apply to any Consenting Creditor other than (i) in its capacity as a holder of Company Claims and (ii) as applicable, in its capacity as a holder of DNC Notes Claims.

**Section 13.** *Amendments and Waivers.* This Agreement, including the exhibits hereto, may not be modified, amended, waived or supplemented except in writing signed by (a) each Company Party, (b) EchoStar, (c) DNC, and (d) the Required Consenting Creditors, other than as expressly provided herein; *provided,* that any modification of this Section 13, Section 10.1(d), or the definitions of "Required Consenting Creditors" or "Consenting Creditors" shall require the consent of (a) all Consenting Creditors (other than those that have terminated this Agreement as to themselves pursuant to Section 10.1(d)) and (b) the Company Parties. Any modification, amendment, waiver, or supplement to this Agreement that materially, adversely, and disproportionately affects any Consenting Creditor relative to the other Consenting Creditors shall not be binding on such affected Consenting Creditor without the written consent of such affected Consenting Creditor; *provided*, *however*, that any modification, amendment, waiver, or supplement to any New Notes Indentures, the Exchange Notes Indentures or any other material, documents, opinions, instruments, schedules or exhibits described in, related to, contemplated in, or reasonably necessary to implement such New Notes Indentures or Exchange Notes Indentures shall be subject solely to the applicable consent rights set forth in Section 5. Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*. Notice of any modification, amendment, waiver, or supplement shall be immediately delivered to all Consenting Creditors not consenting, or party, thereto. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be

39

construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by a Party preclude any other or further exercise of any right, power or remedy by such Party. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.** *Miscellaneous.*

14.1    Further Assurances. Subject to the other terms of this Agreement, the Parties shall execute and deliver such other instruments and perform such other acts, in addition to the matters herein specified, as may be reasonably necessary, from time to time, to effectuate the Transactions.

14.2    Complete Agreement. This Agreement, including the exhibits hereto, together with the other Definitive Documents, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes any prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement and the Co-Op Agreement.

14.3    Parties. This Agreement shall be binding upon, and inure to the benefit of, the Parties. No rights or obligations of any Party under this Agreement may be assigned or transferred to any other Person or Entity except as provided in Section 8. Any beneficial owner, or investment manager or advisor to a beneficial owner, of the Existing Notes that is not already a party to this Agreement may become a Party by executing a Joinder or a Transfer Agreement and, upon becoming a Party, shall be deemed a Consenting Creditor hereunder.

14.4    Headings. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

14.5    GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT and any claim, controversy, dispute or cause of action (whether at law, in equity, in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or other proceeding in respect of any claim arising out of or related to this Agreement in the Federal District Court for the Southern District of New York in New York, New York or the state courts located therein; *provided* that each Party agrees that, during the pendency of the Chapter 11 Cases, it shall bring any such action or proceeding in the Bankruptcy Court and, solely in connection with claims arising under this Agreement, each Party: (a) irrevocably submits to the exclusive jurisdiction of such courts; (b) waives any objection to laying venue in any such action or proceeding in such courts; and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over any Party hereto.

40

14.6    TRIAL BY JURY WAIVER.    EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.7    Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery.  Each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

14.8    Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties, EchoStar, DNC, and the Consenting Creditors each were represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.9    Severability. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.10    Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives.

14.11    Notices.  All notices and information hereunder shall be deemed given if in writing and delivered by electronic mail, courier or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    If to a Company Party:

DISH DBS Corporation
9601 South Meridian Boulevard
Englewood, Colorado 80012
Attn:   Chief Legal Officer (legal.notices@dish.com)

*with a copy to (which shall not constitute notice) to Company Counsel:*

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020-1095
Attn:   Thomas E Lauria (tlauria@whitecase.com)
          Jonathan Michels (jmichels@whitecase.com)

41

White & Case LLP
300 N. LaSalle Drive
Chicago, Illinois 60654-3406
Attn:   Matthew E. Linder (mlinder@whitecase.com)
        Laura E. Baccash (laura.baccash@whitecase.com)

White & Case LLP
609 Main Street, Suite 2900
Houston, Texas 77002
Attn:   A.J. Ericksen (aj.ericksen@whitecase.com)

    (b)    If to Company Counsel, the addresses of Company Counsel set forth in clause (a) above.

    (c)    If to EchoStar or DNC:

9601 South Meridian Boulevard
Englewood, Colorado 80012
Attn:   Chief Legal Officer (legal.notices@echostar.com)

    (d)    If to the Consenting Creditors:

Each Consenting Creditor at the address set forth in its signature page to this Agreement (or in the signature page to a Joinder or Transfer Agreement, as applicable, in the case of any Consenting Creditor that becomes a party hereto after the Agreement Effective Date).

*with a copy to (which shall not constitute notice) to Ad Hoc Group Counsel:*

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:   Dennis F. Dunne (ddunne@milbank.com)
        Lisa Laukitis (llaukitis@milbank.com)
        Nelly Almeida (nalmeida@milbank.com)
        Lawrence G. Wee (lwee@milbank.com)

    (e)    If to Ad Hoc Group Counsel, the addresses of Ad Hoc Group Counsel set forth in clause (d) above.

Any notice given by delivery, mail, or courier shall be effective when received, and any notice delivered or given by electronic mail shall be effective when sent.  For the avoidance of doubt, notice may be delivered by email by White & Case LLP on behalf of any or all of the Company Parties and by Milbank LLP on behalf of any or all entities constituting the Consenting Creditors.

42

14.12   Independent Due Diligence and Decision Making.   Each Consenting Creditor hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties, and it has been represented by counsel or other advisors (or has had ample opportunity to seek representation or advice from counsel or other advisors) in connection with this Agreement and the Transactions.

14.13   Waiver.   Except as expressly provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair or restrict any right or the ability of the Consenting Creditors to protect and preserve each of their rights, remedies, claims and interests in or against the Company Parties.   Without limiting the foregoing sentence in any way, if the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties each fully reserve any and all of their rights and remedies.   Except as expressly set forth herein, nothing herein is intended to, or shall, modify the terms of the existing Debt Documents, the rights or remedies of any party thereunder, or the voting or consent requirements thereunder. This Agreement is part of a proposed settlement of matters that could otherwise be subject to litigation among the Parties.   Nothing herein shall be deemed an admission of any kind.   Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14   Email Consents.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 13 or otherwise, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if it is conveyed in writing (including by email) between counsel to the Parties.

14.15   Good Faith Cooperation.   The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transactions in a manner consistent with each such Party's rights and obligations under this Agreement.

14.16   Specific Performance.   Money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.   No right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at Law, or in equity.

14.17   Several, Not Joint, Obligations.   The agreements, representations and obligations of the Consenting Creditors under this Agreement are, in all respects, several and neither joint nor joint and several.

14.18   Remedies Cumulative.   All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and

not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party.

14.19   Third-Party Beneficiaries.  This Agreement shall be solely for the benefit of the Parties.  No other Person or Entity shall be a third-party beneficiary hereof.

14.20   No Recourse. This Agreement may be enforced only against the Parties hereto (and then only to the extent of the specific obligations undertaken by such Parties under this Agreement).  All claims or causes of action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the entities that are expressly identified as Parties hereto (and then only to the extent of the specific obligations undertaken by such Parties herein). No past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling Person or Entity, agent, attorney, or other representative of any Party hereto (including any Person or Entity negotiating or executing this Agreement on behalf of a Party hereto), nor any past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling Person or Entity, agent, attorney, or other representative of any of the foregoing (other than any of the foregoing that is a party hereto), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity, or any other theory that seeks to "pierce the corporate veil" or impose liability of a Person or Entity against its owners or affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

14.21   Survival.  Notwithstanding (a) any Transfer of any Company Claims in accordance with Section 8 or (b) the termination of this Agreement in accordance with Section 10, each of the following shall survive any such Transfer or termination: (i) any claim for material breach of this Agreement that occurs prior to the Transfer or termination, as applicable; and (ii) the agreements and obligations under any Confidentiality Agreement in accordance with the terms thereof.

14.22   Disclosure; Publicity.  Except as may be required by Law, none of the Parties, or any Person or Entity acting on their behalf, prior to the Petition Date, as applicable, shall issue any press release or make any public statement regarding the Transactions, including the existence or contents of this Agreement, other than in a form mutually agreed to by the Parties.  The Consenting Creditors acknowledge that, on or about the Agreement Effective Date, the Company Parties, EchoStar and DNC will file a Form 8-K with the Securities and Exchange Commission disclosing this Agreement, including each exhibit hereto.

14.23   Relationship Among Parties. It is understood and agreed that the Consenting Creditors, on one hand, and the Company Parties, EchoStar or DNC, on the other hand, do not have any duty of trust or confidence in any form with each other, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Party to this Agreement may trade in Company Claims or equity interests without the consent of the Company Parties, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable Confidentiality Agreement, and the terms of this Agreement; *provided* that no Party shall have any responsibility

44

45

for any such trading by any other Party by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidence among or between the Parties shall in any way affect or negate this understanding and agreement.  No Consenting Creditor shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended) with any other Party. For the avoidance of doubt, no action taken by a Consenting Creditor pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that any Consenting Creditors are in any way acting in concert or as such a "group."

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.


**DISH DBS CORPORATION**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


**DISH BROADCASTING CORPORATION**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


**DISH NETWORK L.L.C.**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


**DISH NETWORK SERVICE L.L.C.**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


**DISH OPERATING L.LC.**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


**DISH TECHNOLOGIES HOLDING CORPORATION**

By: /s/ Dean A. Manson
     Name: Dean A. Manson
     Title: Director


*[Signature Page to Restructuring Support Agreement]*

**DISH TECHNOLOGIES L.L.C.**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer

**SLING MEDIA, L.L.C.**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer

**SLING TV GIFT CARD CORPORATION**

By: /s/ Dean A. Manson
     Name: Paul W. Orban
     Title: Executive Vice President, General Counsel and Secretary

**SLING TV HOLDING L.L.C.**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer

**SLING TV L.L.C.**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer

*[Signature Page to Restructuring Support Agreement]*

**SLING TV PURCHASING L.L.C.**

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


**DISH NETWORK CORPORATION**


By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


**ECHOSTAR CORPORATION**


By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


**ECHOSTAR INTERCOMPANY RECEIVABLE COMPANY L.L.C.**


By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Treasurer


**DISH DBS ISSUER L.L.C.**


By: DISH Network  L.L.C.,
as Common Member

By: /s/ Paul W. Orban
     Name: Paul W. Orban
     Title: Executive Vice President and Chief Financial Officer


*[Signature Page to Restructuring Support Agreement]*

**DBS INTERCOMPANY RECEIVABLE L.L.C.**

By: /s/ Paul W. Orban

   Name: Paul W. Orban
   Title: Executive Vice President and Chief Financial Officer

*[Signature Page to Restructuring Support Agreement]*

**DISH WIRELESS L.L.C.**

By: /s/ Paul W. Orban
    Name: Paul W. Orban
    Title: Executive Vice President, Chief Financial Officer and Treasurer

**DISH INFINITE CORPORATION**

By: /s/ Paul W. Orban
    Name: Paul W. Orban
    Title: Executive Vice President and Chief Accounting Officer

**DISH WIRELESS LEASING L.LC.**

By: /s/ Paul W. Orban
    Name: Paul W. Orban
    Title: Executive Vice President and Chief Financial Officer

**DISH WIRELESS RETAIL HOLDING L.L.C.**

By: /s/ Paul W. Orban
    Name: Paul W. Orban
    Title: Executive Vice President and Chief Financial Officer

**DISH WIRELESS RETAIL OPERATING L.L.C.**

By: /s/ Paul W. Orban
    Name: Paul W. Orban
    Title: Executive Vice President and Chief Financial Officer

**NEYLAND NETWORKS LLC**

By: /s/ Paul W. Orban
    Name: Paul W. Orban
    Title: Treasurer

*[Signature Page to Restructuring Support Agreement]*

**[CONSENTING CREDITOR]**[1] in its capacity as a holder of DBS Notes and in its capacity as a holder of DNC Notes with respect to the DNC Notes Commitments, the Transfer Provisions, and the Consenting Creditor Representations

By:_____

   Name:

   Title:

Email Address:

Address:

---

[1]  This Agreement applies only to [signatory entity] ("[signatory entity]") and, as set forth in the Agreement, the Company Claims and DNC Notes Claims (if applicable) beneficially held by [signatory entity] in the aggregate principal amount(s) set forth below its signature herein held on behalf of, and with respect to, [institution]. Accordingly, the terms "Consenting Creditor," "Party," and/or "Parties" for all purposes of the Agreement mean and refer only to [signatory entity] and such business unit's holdings of Company Claims and DNC Notes Claims (if applicable). Notwithstanding any provision of this Agreement to the contrary, this Agreement does not apply to (i) any credit facilities, claims, securities, notes, other obligations or any other interests in the Company Parties, EchoStar or DNC (other than the DNC Notes Claims as set forth in the Agreement) that may be held, acquired or sold by, or any activities, services or businesses conducted or provided by, any other group or business unit within, or affiliate of [institution], (ii) any credit facilities or indentures to which [institution] or any of its affiliates (collectively, "[institution group]") is a party in effect as of the date hereof, (iii) any new credit facilities or indentures, amendment to an existing credit facility or indenture, or debt or equity securities offering involving [institution group] or to which [institution group] is or becomes a party, (iv) any direct or indirect principal activities undertaken by any [institution group] entity engaged in the venture capital, private equity or mezzanine businesses, or portfolio companies in which they have investments, (v) any ordinary course sales and trading activity undertaken by employees who are not a member of [institution], (vi) any [institution group] entity or business engaged in providing private banking or investment management services, or (vii) any claims, loans, DBS Notes, DNC Notes, notes, debt or equity securities or related claims that may be beneficially owned by non-affiliated clients of [institution group] or for which [institution group] acts in a fiduciary capacity.

For the avoidance of doubt, unless required to be disclosed by applicable Law, under no circumstance shall this signature page, the identity of the holder(s), or the amount of holdings be disclosed publicly or to any other party, or used in any litigation or for any purpose other than to confirm that the requirements contained in Section 3 of the Agreement are satisfied.

*[Signature Page to Restructuring Support Agreement]*

# ANNEX 1

## RESTRUCTURING SUPPORT AGREEMENT HOLDINGS CONFIRMATION

| Amounts Beneficially Owned or Managed on Account Of: | |
|---|---|
| DBS 2026 Secured Notes (if any) | $ |
| DBS 2026 Unsecured Notes (if any) | $ |
| DBS 2028 Secured Notes (if any) | $ |
| DBS 2028 Unsecured Notes (if any) | $ |
| DBS 2029 Unsecured Notes (if any) | $ |
| DNC Notes (if any) | $ |

## **EXHIBIT A**

### **COMPANY PARTIES**

DISH DBS Corporation
DISH Wireless L.L.C.
DISH Broadcasting Corporation
DISH Infinite Corporation
DISH Network L.L.C.
DISH Network Service L.L.C.
DISH Operating L.L.C.
DISH Technologies Holding Corporation
DISH Technologies L.L.C.
DISH Wireless Leasing L.L.C.
DISH Wireless Retail Holding L.L.C.
DISH Wireless Retail Operating L.L.C.
Neyland Networks LLC
Sling Media, L.L.C.
Sling TV Gift Card Corporation
Sling TV Holding L.L.C.
Sling TV L.L.C.
Sling TV Purchasing L.L.C.

**EXHIBIT B**

**TERM SHEET**

**ECHOSTAR CORPORATION, DISH NETWORK CORPORATION, DISH DBS CORPORATION AND DISH DBS ISSUER LLC**

**REFINANCING TERM SHEET**

**March 19, 2026**

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(A)(2) OF THE SECURITIES ACT OF 1933 AND/OR SECTION 1145 OF THE BANKRUPTCY CODE AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.

THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE REFINANCING TRANSACTIONS DESCRIBED HEREIN, WHICH WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN.  THE CLOSING OF ANY REFINANCING TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTATION.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY, AND NO BINDING OBLIGATIONS SHALL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTATION IS EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES.  THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND, EXCEPT AS REQUIRED BY LAW, SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY PARTIES.

This term sheet (this "*Term Sheet*")[1] sets forth the principal terms of a refinancing (the "*Refinancing Transactions*") of aspects of the capital structure and financial obligations of DISH

---

[1] Capitalized terms have the meaning ascribed to them in this Term Sheet or **Annex 1** attached hereto. All ratios contained herein are based on LTM EBITDA without giving effect to any synergies (whether with respect to a potential combination with DirecTV or otherwise).

Network Corporation ("**DNC**"), DISH DBS Corporation ("**DBS**"), DISH DBS Issuer LLC ("**DBS SubscriberCo**"), and their respective subsidiaries that are guarantors under the DBS Notes (as defined herein) (such subsidiaries, collectively with DNC, DBS, and DBS SubscriberCo, the "**Company Parties**").  The Refinancing Transactions will be accomplished either (a) out of court or (b) solely if necessary to effectuate any of the indenture amendments described in the Effective Date Transactions section of this Term Sheet in a manner that is binding as to all holders of DBS 2028 Secured Notes and DBS 2026 Notes, through voluntary cases (the "**Chapter 11 Cases**") commenced under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to implement a prepackaged, prearranged or other chapter 11 plan for one or more of the Company Parties and their affiliates (the "**Chapter 11 Plan**") that certain holders of DBS Notes (the "**Consenting Creditors**") would be obligated to support in accordance with the Restructuring Support Agreement (as defined below).

The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Refinancing Transactions have not been fully evaluated, and any such evaluation may affect the terms and structure of any Refinancing Transactions. The Refinancing Transactions detailed in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of a definitive agreement regarding the terms of the Refinancing Transactions (the "**Restructuring Support Agreement**" and, together with any and all related definitive documentation, the "**Definitive Documentation**").

## Transaction Overview

| | |
|---|---|
| Summary of Refinancing Transactions:[2] | The Refinancing Transactions address $11,750,000,000 of the Company Parties' funded debt obligations.  The Refinancing Transactions described in this Term Sheet relate to the DBS Notes, the DBS SubscriberCo Term Loans and the DBS SubscriberCo Preferred, as each such term is defined in **Annex 1** hereto. |
| | As contemplated herein, each of the Refinancing Transactions will occur on either the Execution Date or the Effective Date (each as defined below); *provided that*, notwithstanding the following provisions, if elected by each of (i) the Consenting Creditors and (ii) the Company Parties, all Refinancing Transactions (including all payments and dismissal of the pending lawsuit) shall instead occur on the Effective Date (with only entry into the Restructuring Support Agreement occurring on the Execution Date). |
| | On or about the date when the Company Parties and the Consenting Creditors enter into the Restructuring Support Agreement (the "**Execution Date**"): |

---

[2]   Capitalized terms used but not defined in this summary shall have the meaning hereinafter ascribed to such terms.  To the extent this "Transaction Overview" is inconsistent or conflicts with the "Terms" below, the "Terms" shall govern.

(1) DNC will pay DBS approximately $2,190,000,000 on account of the 2024 Intercompany Loans (which reflects the full principal, PIK interest and accrued and unpaid interest to November 30, 2025) plus any accrued and unpaid interest (including any interest paid in kind) to the date of such payment;

(2) DBS and EchoStar agree to make the nonrefundable $125,000,000 Claim Settlement Amount to the Consenting Creditors as set forth below;

(3) DBS will pay the Consenting Creditors an amount equal to $75,000,000 of the Claim Settlement Amount as set forth below;

(4) DBS will pay all of the obligations of DBS SubscriberCo with respect to the DBS SubscriberCo Term Loans and the DBS Subscriber Preferred;

(5) DBS SubscriberCo (and the DBS subscribers therein) will be reconsolidated with DBS such that credit support for the DBS Notes will include all of the subscribers of the DBS Pay TV business;

(6) all Company Parties or their affiliates that, in each case, hold the SlingTV business assets will be consolidated with DBS such that credit support for the DBS Notes will include the full value of the SlingTV business;

(7) the indenture for the DBS 2028 Secured Notes will be amended to include the DBS Cash Sweep as set forth below;

(8) as set forth below, the indentures for the DBS Notes will be amended to (a) limit the circumstances under which DBS (or, in the case of a business combination, the surviving entity) may upstream cash or other value, including (i) tax distributions by DBS being limited to the lesser of (x) the cash tax liability of DBS as a stand-alone corporate entity without giving effect to tax sharing agreements and (y) DBS's proportionate share (based on taxable income) of the cash taxes of the consolidated group, (ii) direct and indirect upstream payments to affiliates of DBS in respect of usage of satellites (or other related services) being limited to market rates and (iii) direct and indirect upstream payments being limited to the portion of corporate overhead reasonably allocable to DBS, (b) limit the ability of DBS and its subsidiaries to engage in further financing transactions

constituting priming financings and other liability management transactions (to be defined in a manner mutually agreed), (c) reflect such modifications reasonably necessary to facilitate a potential DirecTV business combination, consisting of: (i) a waiver or amendment to the applicable definition of "Change of Control" to permit such business combination so long as the following prong (ii) is met; and (ii) the requirement that the combined company's total net leverage ratio not exceed 2.75x at closing of the business combination, and (d) restrict DBS's and, if the DirecTV business combination is consummated, the combined company's ability to incur any new debt for borrowed money with a maturity date before June 30, 2029;

(9) the Consenting Creditors will cause the Lawsuit to be dismissed with prejudice; and

(10) the parties will enter into Mutual Releases as provided below, which shall be held in escrow and become effective only as of the Effective Date.

On or about the date on which the parties consummate the remaining Refinancing Transactions in accordance with the agreed terms set forth in the Restructuring Support Agreement and this Term Sheet (the "*Effective Date*") or, in the case of items (1)–(3) below, on or before the date of consummation of the transactions contemplated by the License Purchase Agreement dated as of August 25, 2025 by and among EchoStar Corporation, the other Seller Parties set forth therein, and AT&T Mobility II LLC (the "*AT&T Closing Date*"):[3]

(1) DNC will pay DBS approximately $2,845,000,000 plus accrued and unpaid interest on account of the 2021 Intercompany Loan – Tranche B; *provided* that if such payment has not been made by December 1, 2026, it will be made on such date;

(2) DNC will pay or otherwise satisfy and discharge in full approximately $4,767,000,000 plus accrued and unpaid

---

[3] The Effective Date shall not occur prior to (1) satisfaction or waiver of the conditions precedent specified in the Restructuring Support Agreement, as applicable, (2) if the Company Parties elect to implement the Refinancing Transactions through Chapter 11 Cases, the effective date of the Chapter 11 Plan, and (3) the AT&T Closing Date. For the avoidance of doubt, the EchoStar Guaranty (as defined in the Restructuring Support Agreement) shall survive the Effective Date in accordance with the terms of the Restructuring Support Agreement.

interest on account of the 2021 Intercompany Loan – Tranche A;

(3)   any and all liens or encumbrances with respect to the collateral that secures the 2021 Intercompany Loan will be released;

(4)   as provided below, the indentures for the DBS 2026 Notes will be amended to permit such notes to be redeemed, at any time after March 31, 2026, at par plus accrued and unpaid interest to any such date of redemption without any premium, penalty, or charge;

(5)   if the amendments reflected in item (4) above are implemented, DBS will redeem any remaining DBS 2026 Unsecured Notes at par plus accrued and unpaid interest to any such date of redemption without any premium, penalty, or charge as provided below;

(6)   on June 1, 2026, EchoStar Corporation will pay the Consenting Creditors such portion of the $125,000,000 Claim Settlement Amount, if any, that the Consenting Creditors have not received from another Company Party or affiliate thereof as of such date as set forth below; and

(7)   the Mutual Releases shall become effective.

Under certain circumstances, a further $175,000,000 could be available from certain affiliates of DBS for the redemption of the DBS 2028 and 2029 Notes.

Overall, the Refinancing Transactions will deleverage the Company Parties, simplify their capital structure, and favorably position the Company Parties to continue to deliver value to customers and stakeholders.

For the avoidance of doubt, other than as specified herein, the Refinancing Transactions will not affect the terms of or the applicable Company Parties' obligations under or with respect to the DBS Notes.  The Refinancing Transactions will not affect the DNC Notes.

**Terms**

**Execution Date Transactions**

| | |
|---|---|
| Repayment of 2024 Intercompany Loans | On or as soon as reasonably practicable after the Execution Date, DNC shall pay (or cause to be paid) the following amounts: |

(1) to DBS, cash in the amount of approximately $1,631,000,000 plus accrued and unpaid interest (including any interest paid in kind) to the date of such payment, in full and final satisfaction of the June 2024 intercompany loan from DBS to DNC, which matures on August 13, 2028 (the "*June 2024 Intercompany Loan*"); and

(2) to DBS, cash in the amount of approximately $510,000,000 plus accrued and unpaid interest (including any interest paid in kind) to the date of such payment, in full and final satisfaction of the September 2024 intercompany loan from DBS to DNC, which matures on November 13, 2028 (the "*September 2024 Intercompany Loan*" and, together with the June 2024 Intercompany Loan, the "*2024 Intercompany Loans*").

| | |
|---|---|
| DBS's Claim Settlement Amount: | On the Execution Date, DBS shall pay the Consenting Creditors $75,000,000 of the nonrefundable $125,000,000 payment (the "*Claim Settlement Amount*") payable to the Consenting Creditors for their support of the Consenting Creditors of the Refinancing Transactions and the payment of the reasonable and documented professional fees of Milbank LLP and Lazard Frères & Co. LLC incurred up to and including the Execution Date; *provided, however*, that the Claim Settlement Amount will be allocated as determined by the steering committee of the ad hoc group of holders of the DBS Notes represented by Milbank LLP (the "*Steering Committee*").[4] |

As of the Execution Date, EchoStar Corporation agrees to pay, on June 1, 2026, such portion of the $125,000,000 Claim Settlement Amount owed to the Consenting Creditors, if any, that the Consenting Creditors have not received from another Company Party or affiliate thereof as of such date.

---

[4] The Company shall cooperate with the Consenting Creditors to allocate the Claim Settlement Amount as determined by the Steering Committee. Any Consenting Creditor entitled to receive any portion of the Claim Settlement Amount as set forth in this Term Sheet, subject to the allocation of the Claim Settlement Amount as determined by the Steering Committee (as defined below), shall have the right to appoint one or more designees to receive such portion of the Claim Settlement Amount on such Consenting Creditor's behalf.

In addition, if the Chapter 11 Election is made, DBS shall pay the reasonable and documented professional fees of Milbank LLP and Lazard Frères & Co. LLC incurred during the chapter 11 cases on a current basis; *provided* that such fees and expenses shall not exceed $10,000,000 in the aggregate solely for the first 180 days of the chapter 11 cases (and thereafter no cap shall apply).

| | |
|---|---|
| DBS SubscriberCo Repayments: | On or as soon as reasonably practicable after the Execution Date, DBS shall pay all of the obligations of DBS SubscriberCo with respect to the DBS SubscriberCo Term Loans and the DBS Subscriber Preferred. |
| DBS SubscriberCo Reconsolidation: | On or as soon as reasonably practicable after the Execution Date, (1) DBS SubscriberCo (and the DBS subscribers and other assets therein) shall be reconsolidated with DBS such that the credit support for the DBS Notes shall include all of the subscribers and other assets of the DBS Pay TV business and (2) to the extent they continue to exist after the reconsolidation referenced in clause (1), DBS SubscriberCo and its Subsidiaries shall be designated as Restricted Subsidiaries (as each such term is defined in the DBS Notes indentures) and joined as additional guarantors for purposes of the indentures and security documents governing all the DBS Notes. |
| SlingTV Business Consolidation: | On or as soon as reasonably practicable after the Execution Date, (1) all Company Parties or their affiliates that, in each case, hold subscribers and other assets of the SlingTV business shall be consolidated with DBS such that the credit support for the DBS Notes shall include all of the value of the SlingTV business and (2) such entities shall be designated as Restricted Subsidiaries and joined as additional guarantors for purposes of the indentures and security documents governing all the DBS Notes. |
| DBS 2028 Secured Notes Cash Sweep: | On the Execution Date, the indenture for the DBS 2028 Secured Notes shall be amended to require DBS to make an offer to repurchase DBS 2028 Secured Notes principal and accrued and unpaid interest on such notes, in each case at par without any premium, penalty, or charge, in an amount such that the price payable in connection with each such repurchase equals DBS's "Available Cash" (to be measured based on balance sheet cash at quarter end and defined in a manner to be mutually agreed) in excess of $500,000,000.<br><br>The required offer to repurchase (or, as set forth below, the required redemptions on and after the Effective Date if the |

Refinancing Transactions are implemented under a chapter 11 plan for DBS) (in each case, the "**DBS Cash Sweep**") shall be made on a quarterly basis commencing with the fiscal quarter ending March 31, 2027 (and with respect to the Available Cash for such quarter); *provided*, *however*, that the DBS Cash Sweep shall be suspended automatically if DBS consummates a DirecTV business combination (whether by merger, acquisition or other transaction) (1) so long as the combined company reaches (and remains below) a total net leverage ratio of less than 2.25x or (2) so long as the aggregate principal amount of the DBS 2028 Secured Notes is reduced (and remains below) to 50% or less of the aggregate principal amount of such notes outstanding as of the execution of the Restructuring Support Agreement; *provided*, *further*, that the combined company shall not be permitted to make restricted payments under the indentures for the DBS 2028 and 2029 Notes.

| | |
|---|---|
| Other Amendments to DBS Note Indentures: | On the Execution Date, the indentures for each of the DBS Notes shall be amended, on terms to be mutually agreed in Definitive Documentation, to (1) limit the circumstances under which DBS (or, in the case of a business combination, the surviving entity) may upstream cash or other value, including (i) tax distributions by DBS being limited to the lesser of (x) the cash tax liability of DBS as a stand-alone corporate entity without giving effect to tax sharing agreements and (y) DBS's proportionate share (based on taxable income) of the cash taxes of the consolidated group, (ii) direct and indirect upstream payments to affiliates of DBS in respect of usage of satellites (or other related services) being limited to market rates and (iii) direct and indirect upstream payments being limited to the portion of corporate overhead reasonably allocable to DBS, (2) limit the ability of DBS and its subsidiaries to enter into further financing transactions constituting priming financings or liability management transactions (to be defined in a manner to be mutually agreed), (3) reflect such modifications reasonably necessary to facilitate a potential DirecTV business combination (whether by merger, acquisition or other transaction), consisting of: (a) a waiver or amendment to the applicable definition of "Change of Control" to permit such business combination so long as the following prong (b) is met; and (b) the requirement that the combined company's total net leverage ratio not exceed 2.75x at closing of the business combination, and (4) restrict DBS's and, if the DirecTV business combination is consummated, the combined company's ability to incur any new debt for borrowed money with a maturity date before June 30, 2029; *provided further*, *however*, that such amendments shall permit DBS to pay or |

upstream cash for amounts owed to affiliates in the ordinary course, including, without limitation, for satellite lease payments and tax obligations (to be mutually agreed in the Definitive Documentation).

| | |
|---|---|
| **Dismissal of Lawsuit With Prejudice:** | On or as soon as reasonably practicable after the Execution Date, the Consenting Creditors will cause the lawsuit captioned *U.S. Bank Tr. Co. Nat'l Ass'n v. DISH DBS Corp., et al.*, No. 1:24-cv-3646 (JGLC), pending in the United States District Court for the Southern District of New York (the "***Lawsuit***") to be dismissed with prejudice. |
| **Mutual Releases:** | On the Execution Date, the Company Parties and the Consenting Creditors shall execute mutual releases of any and all claims, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or thereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of laws, or otherwise, including, without limitation, causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that any Company Party or Consenting Creditor would have been legally entitled to assert (whether individually or collectively) against the other, based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Execution Date (the "***Mutual Releases***"); *provided*, *however*, that the Mutual Releases shall become effective as of the Effective Date. |

### Effective Date Transactions

| | |
|---|---|
| **Payment of Certain Intercompany Loans:** | On or as soon as reasonably practicable after the AT&T Closing Date, DNC shall pay (or cause to be paid, or solely in the case of the 2021 Intercompany Loan – Tranche A, otherwise satisfy and discharge in full) the following amounts:<br><br>(1)  to DBS, cash in the amount of approximately $2,845,000,000 plus accrued and unpaid interest (including any interest paid in kind) to the date of such payment, in full and final satisfaction of the loan tranche that matures on December 1, 2028 under that certain Loan and Security Agreement dated November 26, 2021 between DBS, as lender, and DNC, as borrower (the "***2021 Intercompany Loan – Tranche B***"); *provided* that if such payment has not been made by December 1, 2026, it will be made on such date; and |

<table>
<tr><td></td><td>(2) the amount of approximately $4,767,000,000 plus accrued and unpaid interest (including any interest paid in kind) to the Effective Date, in full and final satisfaction of the loan tranche that matures on December 1, 2026 under that certain Loan and Security Agreement dated November 26, 2021 between DBS, as lender, and DNC, as borrower, the receivable for which DBS transferred to EchoStar Intercompany Receivable Company L.L.C. in January 2024 (the "*2021 Intercompany Loan – Tranche A*" and, collectively with the Tranche B Intercompany Loan, the "*2021 Intercompany Loan*").</td></tr>
<tr><td>Release of Liens:</td><td>Concurrently with DNC's payment of all amounts owed under the 2021 Intercompany Loan, all liens or encumbrances with respect to the collateral that secures the 2021 Intercompany Loan shall be released.</td></tr>
<tr><td>DBS 2028 Secured Notes Cash Sweep:</td><td>On the Effective Date, if the Refinancing Transactions are implemented pursuant to a chapter 11 plan of reorganization of DBS (a "*DBS Chapter 11 Plan*"), the indenture for the DBS 2028 Secured Notes shall be further amended to require DBS to redeem DBS 2028 Secured Notes principal and accrued and unpaid interest on such notes, in each case at par without any premium, penalty, or charge, in an amount such that the price payable in connection with each such redemption equals DBS's "Available Cash" (to be measured based on balance sheet cash at quarter end and defined in a manner to be mutually agreed) in excess of $500,000,000, which required redemption shall be made by DBS on a quarterly basis commencing with the fiscal quarter ending March 31, 2027 (and with respect to the Available Cash for such quarter); *provided*, *however*, that the DBS Cash Sweep shall be suspended automatically if DBS consummates a DirecTV business combination (whether by merger, acquisition or other transaction) (1) so long as the combined company reaches (and remains below) a total net leverage ratio of less than 2.25x or (2) so long as the aggregate principal amount of the DBS 2028 Secured Notes is reduced (and remains below) to 50% or less of the aggregate principal amount of such notes outstanding as of the execution of the Restructuring Support Agreement; *provided*, *further*, that the combined company shall not be permitted to make restricted payments under the indentures for the DBS 2028 and 2029 Notes.</td></tr>
<tr><td>Amendments to Optional Redemption</td><td>On the Effective Date, if the Refinancing Transactions are implemented pursuant to a DBS Chapter 11 Plan that is binding on all holders of the DBS 2026 Notes, the indentures for each of</td></tr>
</table>

| | |
|---|---|
| Provisions of the DBS 2026 Note Indentures: | the DBS 2026 Notes shall be further amended to permit the obligations thereunder to be redeemed, at any time after March 31, 2026, by paying the outstanding principal at par plus accrued and unpaid interest, if any, to the date of redemption, without any premium, penalty, or charge. |
| Redemption of DBS 2026 Unsecured Notes: | On the later of (1) March 31, 2026 and (2) the Effective Date, DBS shall redeem any remaining DBS 2026 Unsecured Notes at a redemption price equal to 100.0% of the principal amount thereof plus accrued and unpaid interest, if any, to the date of redemption. |
| EchoStar's Claim Settlement Amount: | On June 1, 2026, EchoStar Corporation shall pay the Consenting Creditors the balance of the $125,000,000 Claim Settlement Amount (in accordance with the allocation as determined by the Steering Committee) net of (1) the $75,000,000 payment made by DBS on the Execution Date (to the extent allocated as determined by the Steering Committee) and (2) any amounts paid by any Company Party or affiliate thereof that are applied to the Claim Settlement Amount as provided herein (to the extent allocated as determined by the Steering Committee). |
| Mutual Releases: | The Mutual Releases are to be held in escrow and shall become effective only as of the Effective Date. |
| Tax Structure: | The Refinancing Transactions will be implemented in a tax-efficient manner as agreed in good faith among the Company Parties and the Consenting Creditors. |

### Chapter 11 Election and Related Terms

| | |
|---|---|
| Company Party Election: | The Company Parties shall notify counsel to the ad hoc committee of holders of DBS Notes, on or before March 31, 2026 (the "*Election Date*"), of their intent, subject to approval by their respective boards of directors or managers, to accomplish the Refinancing Transactions through confirmation of the Chapter 11 Plan (the "*Chapter 11 Election*"). The Company Parties may make the Chapter 11 Election at any time up to and including 11:59 p.m. (prevailing Eastern Time) on the Election Date by providing written notice (email being sufficient) to counsel to the Consenting Creditors. The Election Date may be extended, in the Company Parties' discretion, in one or more increments of up to a total of ninety (90) days by providing written notice (email being sufficient) to counsel to the Consenting Creditors. If the Company Parties wish to further extend such date beyond the ninety (90) days permitted under the foregoing sentence, then |

such date may be further extended with the written consent of the Consenting Creditors (email being sufficient), which consent shall not unreasonably be withheld.

| | |
|---|---|
| Venue: | The Chapter 11 Cases shall be commenced in the United States Bankruptcy Court for the Southern District of Texas or such other bankruptcy court where the Company Parties determine, in consultation with the Consenting Creditors, that venue is proper under applicable law. |
| Supporting Noteholder Obligations: | The Consenting Creditors shall agree to customary affirmative and negative covenants that shall apply if the Company Parties make the Chapter 11 Election, which covenants shall be set forth in Definitive Documentation. |
| Company Party Obligations: | The Company Parties shall agree to customary affirmative and negative covenants, including milestones, that shall apply if the Company Parties make the Chapter 11 Election, which covenants shall be set forth in Definitive Documentation. |
| DBS Notes Interest: | Interest on the DBS Notes will be paid in full in cash on a current basis during the Chapter 11 Cases on the terms and at the rates set forth in the indentures for the DBS Notes (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the Chapter 11 Cases extend past such date, unless such DBS Notes are repaid, redeemed or repurchased in full on or prior to such maturity date). |

*[Remainder of Page Intentionally Left Blank]*

**ANNEX 1**

**Definitions**

"*DBS 2026 Notes*" means, collectively, the DBS 2026 Secured Notes and the DBS 2026 Unsecured Notes.

"*DBS 2026 Secured Notes*" means the 5.25% Senior Secured Notes due 2026, in the aggregate principal amount of $2,750,000,000, issued by DBS pursuant to that certain Secured Indenture, dated November 26, 2021, by and among DBS, the guarantors identified therein, and U.S. Bank National Association, as trustee and collateral agent.

"*DBS 2026 Unsecured Notes*" means the 7.75% Senior Notes due 2026, in the aggregate principal amount of $2,000,000,000, issued by DBS pursuant to that certain Indenture, dated June 13, 2016, by and among DBS, the guarantors listed on the signature page, and U.S. Bank National Association, as trustee.

"*DBS 2028 and 2029 Notes*" means, collectively: (1) the 5.125% Senior Notes due 2029, in the aggregate principal amount of $1,500,000,000, issued by DBS pursuant to that certain Indenture, dated May 24, 2021, by and among DISH DBS Corporation, the guarantors identified therein, and U.S. Bank National Association, as trustee; and (2) the DBS 2028 Notes.

"*DBS 2028 Notes*" means, collectively, the DBS 2028 Secured and DBS 2028 Unsecured Notes.

"*DBS 2028 Secured Notes*" means the 5.75% Senior Secured Notes due 2028, in the aggregate principal amount of $2,500,000,000, issued by DBS pursuant to that certain Secured Indenture, dated November 26, 2021, by and among DBS, the guarantors identified therein, and U.S. Bank National Association, as trustee and collateral agent.

"*DBS 2028 Unsecured Notes*" means the 7.375% Senior Notes due 2028, in the aggregate principal amount of $1,000,000,000, issued by DBS pursuant to that certain Indenture, dated July 1, 2020, by and among DISH DBS Corporation, the guarantors identified therein, and U.S. Bank National Association, as trustee.

"*DBS Notes*" means, collectively, the DBS 2026 Notes and the DBS 2028 and 2029 Notes.

"*DBS SubscriberCo Preferred*" means the redeemable preferred equity interests issued by DBS SubscriberCo to certain investors with an aggregate liquidation preference of $200,000,000, which mature on June 30, 2029 and have a preferential cumulative return that accumulates at a rate of 13.75% per annum.

"*DBS SubscriberCo Term Loans*" means the term loans under that certain Loan and Security Agreement dated as of September 29, 2024 by and among DBS SubscriberCo, Alter Domus (US) LLC, as administrative agent, and the lenders party thereto, in the aggregate principal amount of $1,800,000,000, which mature on June 30, 2029 and accrue interest at a rate of 11.25% per annum.

"*DNC Notes*" means the 11.75% Senior Secured Notes due 2027, in the aggregate principal amount of $3,500,000,000, issued by DNC pursuant to that certain Secured Indenture, dated as of November 15, 2022, by and among DNC, the guarantors listed on the signature page, and U.S. Bank National Association, as trustee and collateral agent.

# ANNEX 2

## Recovery Allocations

In connection with the Company Parties making the Chapter 11 Election, the following provisions shall apply.

| | |
|---|---|
| Scope of Chapter 11 Cases: | In addition to commencing Chapter 11 Cases for DBS and some or all of its subsidiaries as necessary or desirable to implement the Refinancing Transactions as they pertain to the DBS Notes, Chapter 11 Cases would be commenced for DISH Wireless L.L.C. ("***DWLLC***"), its subsidiaries, and such affiliates as necessary or desirable to implement the Refinancing Transactions and resolve trade obligations and other issues identified by the Company Parties, which (in addition to DWLLC) may include:<br><br>DISH Infinite Corporation<br>DISH Wireless Leasing L.L.C.<br>DISH Wireless Retail Holding L.L.C.<br>DISH Wireless Retail Operating L.L.C.<br>Neyland Networks LLC<br><br>Upon a determination by DWLLC and any of the foregoing entities to commence a Chapter 11 Case, it and they shall execute and deliver a counterpart signature page to the Restructuring Support Agreement to counsel to the ad hoc group of holders of DBS Notes. |
| DNC Intercompany Loan Assignment: | As partial consideration for the agreements of the Consenting Creditors set forth in the Term Sheet, DNC shall assign to DBS, and DBS shall assign to a newly formed trust, acting as agent, for the benefit of the relevant indenture trustees on behalf of the holders of DBS Notes (the "***Claims Trust***"), its claims against DWLLC under that certain Loan Agreement dated as of August 22, 2025, by and among DWLLC and DNC, in the aggregate amount of $8,856,507,760.88, comprised of principal plus accrued and unpaid PIK interest as of June 28, 2026 (such loan, the "***DWLLC Intercompany Loan***" and the claims relating to such loan, the "***Assigned Claims***") (it being understood that interest on such DWLLC Intercompany Loan ceased as of June 28, 2026), subject to the Recovery Cap and the provisions hereof governing any Excess Recovery and any Residual Recovery (each as defined below).  For the avoidance of doubt, the Claims Trust, as agent, shall cast votes to accept the Plan on account of the Assigned Claims on behalf of all beneficial holders of 2028 and 2029 Notes in proportion to their respective holdings of DBS Notes. |

| | |
|---|---|
| Extinguishment of EchoStar Financing Loan: | Prior to the commencement of Chapter 11 Cases, the intercompany loan from EchoStar Financing L.L.C. to DWLLC, in the principal amount of $3,890,491,943.00, shall be contributed to DWLLC such that the loan shall have been extinguished as of the date of commencement of Chapter 11 Cases. |
| Terms of Claims Trust: | <u>Trustee</u>:  Wilmington Savings Fund Society, FSB, or another trustee (which may be a trustee under one or more of the DBS Notes Indentures) (the "***Claims Trustee***") appointed by the Steering Committee. |

<u>Governance</u>: The Claims Trustee will initially act at the direction of the Steering Committee (the "***Instructing Party***"), including to vote the claims held by the Claims Trust in the Chapter 11 Cases, as applicable.  On the Effective Date of the Chapter 11 Cases, the Steering Committee shall be entitled to resign as the Instructing Party under the trust agreement governing the Claims Trust, in which case DBS, as trustor, shall be entitled to appoint a replacement Instructing Party in consultation with the indenture trustee for the DBS 2028 Secured Notes.  If the Steering Committee resigns in accordance with the preceding sentence, Milbank shall be entitled to resign as special counsel to the Claims Trust.

<u>Required Distributions</u>: The Claims Trust will recover from the DWLLC estate and distribute such proceeds as provided below under "Recoveries from DWLLC's Estate and the FCC Trust."

<u>Indemnity and Trustee Fees</u>: The Claims Trustee and each Consenting Creditor will have the benefit of a customary indemnity and the Claims Trustee shall receive a customary fee related to the services it will provide.  The indemnity will cover, among other customary matters, claims and actual, necessary and documented costs of the Claims Trustee related to the Chapter 11 Cases and any related litigations or other matters, including as such litigations or other matters relate to the submission by the Claims Trustee of the Assigned Claims to the FCC Trust (as defined below).  The Claims Trustee will appoint Milbank LLP as special counsel to the Claims Trust in respect of the Assigned Claims and related litigations (and may retain separate corporate counsel for the Claims Trustee on customary terms).  For the avoidance of doubt, the indemnity and reimbursement described above shall be separate from the $10,000,000 expense reimbursement and other fees and expense reimbursements

3

described in the Term Sheet under "DBS's Claim Settlement Amount," and shall be paid in cash, in full on a current basis during the pendency of the Chapter 11 Cases. All reasonable and documented professional fees and expenses incurred by Milbank LLP (or any successor counsel thereto) in connection with its representation of the Claims Trust as special counsel are "Ad Hoc Group Professional Fees" within the meaning of the Restructuring Support Agreement.

Termination: The Claims Trust will terminate immediately after it distributes all of the amounts it recovers from the DWLLC estate on account of the Assigned Claims following the Effective Date.

Other Terms: The Claims Trust will otherwise have customary terms, as reasonably agreed among the Claims Trustee, the Company Parties and the Steering Committee.

|  |  |
|---|---|
| Recoveries from FCC Trust: | The Claims Trust or the indenture trustees for the DBS Notes, as applicable, shall be entitled to submit the Assigned Claims to the Wireless Creditor Trust (the "**FCC Trust**") formed pursuant to Order 26-470 of the Federal Communications Commission in accordance with the FCC Trust Agreement. |
| Recoveries from DWLLC's Estate and the FCC Trust: | On the Effective Date, the Claims Trust or the relevant indenture trustees for the DBS Notes, as applicable, shall be entitled to recover from DWLLC's estate and/or the FCC Trust on account of the Assigned Claims, with any recoveries to be distributed as follows: |

*first*, up to a maximum aggregate recovery of $300,000,000 (the "**Recovery Cap**"), to the trustees under the DBS Notes to optionally redeem, pro rata, a corresponding aggregate principal amount of DBS 2028 and 2029 Notes calculated based on the applicable redemption price of each such series of DBS Notes as provided in the relevant indentures;

*second*, if the Claims Trust recovers any amounts in excess of the Recovery Cap (the "**Excess Recovery**"), then the Claims Trust shall (a) hold the Excess Recovery in trust for the benefit of the indenture trustee for the DBS 2028 Secured Notes on behalf of the holders of the DBS 2028 Secured Notes and (b) promptly remit the Excess Recovery to such trustee (without set-off or counterclaim), to be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on

4

DBS 2028 Secured Notes then outstanding, in each case at par without any premium, penalty, or charge (pursuant to provisions of the Secured Indenture to be amended to implement such redemption feature); and

*third*, if the Excess Recovery exceeds the amount payable or to be paid under "*second*" above (the "**Residual Recovery**"), then the Claims Trust shall (a) hold the Residual Recovery in trust for the benefit of the indenture trustee(s) for the DBS 2028 Unsecured Notes and the DBS 2029 Unsecured Notes on behalf of  holders such notes and (b) promptly remit the Residual Recovery to such trustee(s) (without set-off or counterclaim), to be applied solely to redeem, pro rata, a corresponding aggregate amount of principal and accrued and unpaid interest on the DBS 2028 Unsecured Notes and the DBS 2029 Unsecured Notes then outstanding, in each case at par without any premium, penalty, or charge (pursuant to provisions of the indentures governing the 2028 Unsecured Notes and the 2029 Unsecured Notes to be amended to implement such redemption features).

For the avoidance of doubt, application of the foregoing recoveries to redeem DBS 2028 Secured Notes on the terms provided herein is in addition to, and not in lieu of, the DBS Cash Sweep.

| | |
|---|---|
| EchoStar's Claim Settlement Amount: | EchoStar Corporation is subrogated to the rights and claims of the Consenting Creditors against DWLLC in respect of the $50,000,000 portion of the Claim Settlement Amount that it paid to the Consenting Creditors on June 1, 2026. |
| Tax Reporting: | Tax reporting for the assignment of the DWLLC Intercompany Loan and the related transactions shall be determined jointly by the Consenting Creditors and the Company Parties. |

*[Remainder of Page Intentionally Left Blank]*

5

**EXHIBIT C**

**JOINDER**

**JOINDER TO RESTRUCTURING SUPPORT AGREEMENT**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement (the "**Agreement**"),[1] dated as of _____, 2026, by and among the Company Parties, EchoStar, DNC and the Consenting Creditors and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and be deemed a Consenting Creditor thereunder with respect to any and all Company Claims and DNC Notes Claims held by Joinder Party as of the date hereof or hereafter acquired.

Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof.

**[JOINDER PARTY]**

Dated: _____, 2026          By: _____
                                            Name:
                                            Title:
                                            Email:
                                            Mailing Address:

Company Claims held by Joinder Party:

$_____ of DBS 2026 Secured Notes

$_____ of DBS 2026 Unsecured Notes

$_____ of DBS 2028 Secured Notes

$_____ of DBS 2028 Unsecured Notes

$_____ of DBS 2029 Unsecured Notes

$_____ of DNC Notes

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**EXHIBIT D**

**TRANSFER AGREEMENT**

**TRANSFER AGREEMENT**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement (the "**Agreement**"),[1] dated as of _____, 2026, by and among the Company Parties, EchoStar, DNC and the Consenting Creditors, including _____ ( "**Transferor**"), which has agreed, subject to the execution of this Agreement, to transfer Company Claims or DNC Notes Claims, as applicable, to Transferee in the amounts set forth below.

Transferee hereby agrees to be bound by the terms and conditions of the Agreement to the extent Transferor was thereby bound, it being understood that Transferee shall hereafter be deemed to be a Consenting Creditor under the Agreement with respect to any and all Company Claims and DNC Notes Claims, including any and all Company Claims and DNC Notes Claims held by such Transferee before or as of the date hereof or hereafter acquired.  Transferee specifically agrees to be bound by the vote of the Transferor if cast in favor of the Plan before the effectiveness of the transfer of the Company Claims and DNC Notes Claims, as applicable.  If there is any inconsistency between this Transfer Agreement and the Agreement, the Agreement shall control in all respects.

Transferee acknowledges and agrees that it has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, the Agreement and that all representations and warranties set forth in the Agreement are true and correct in all material respects as of the date hereof with respect to Transferee.

This Transfer Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the Law of any other jurisdiction.

This Transfer Agreement shall take effect and shall become an integral part of the Agreement immediately upon its execution, and Transferee shall be deemed to be bound by all of the terms, conditions and obligations of the Agreement as of the date hereof.

**[TRANSFEREE]**

Dated: _____, 2026

By: _____
    Name:
    Title:
    Email:
    Mailing Address:

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Company Claims and DNC Notes Claims Transferred:

$_____ of DBS 2026 Secured Notes

$_____ of DBS 2026 Unsecured Notes

$_____ of DBS 2028 Secured Notes

$_____ of DBS 2028 Unsecured Notes

$_____ of DBS 2029 Unsecured Notes

$_____ of DNC Notes

*[Remainder of Page Intentionally Left Blank]*

## EXHIBIT E

## DISMISSAL STIPULATION

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILMINGTON SAVINGS FUND SOCIETY, FSB, in its capacities as Trustees,<br><br>                          Plaintiffs,<br><br>v.<br><br>DISH DBS CORPORATION, DISH NETWORK CORPORATION, DISH NETWORK L.L.C., ECHOSTAR INTERCOMPANY RECEIVABLE COMPANY L.L.C., DISH DBS ISSUER LLC, and DBS INTERCOMPANY RECEIVABLE L.L.C.,<br><br>                          Defendants. | No. 1:24-cv-3646 (JGLC) |

## NOTICE OF AGREEMENT AND
## STIPULATION OF VOLUNTARY DISMISSAL WITH PREJUDICE

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto, through their undersigned counsel, that in accordance with an agreement providing for the resolution of all claims asserted in the above-captioned matter and pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), this action shall be, and hereby is, dismissed with prejudice.

DATED: _____, 2026
       New York, New York

Respectfully submitted,

*/s/*
Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 100001
Telephone:  (212) 530-5770
Facsimile:  (212) 822-5770

- and -

Andrew M. Leblanc
**MILBANK LLP**
1101 New York Avenue NW,

Washington, D.C. 20005
Telephone:  (202) 835-7574
Facsimile:  (202) 263-7574

- and –

Samir L. Vora (admitted *pro hac vice*)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone:  (424) 386-4316
Facsimile:    (213) 629-5063

*Attorneys for Plaintiffs*

 /s/
Glenn M. Kurtz
Joshua D. Weedman
Christopher D. Volpe
WHITE & CASE LLP
1221 Avenue of the Americas
New York, N.Y. 10020-1095
T: (212) 819-8200
gkurtz@whitecase.com
jweedman@whitecase.com
chris.volpe@whitecase.com

*Attorneys for Defendants*

SO ORDERED this ___ day of _____, ____:

_____
Jessica G.L. Clarke
United States District Judge

## EXHIBIT F

### FORM OF SUPPLEMENTAL INDENTURE

**[FORM OF]
SUPPLEMENTAL INDENTURE**

[FIRST][SECOND] SUPPLEMENTAL INDENTURE ("Supplemental Indenture"), dated as of March [___], 2026, among DISH DBS Corporation, a Colorado corporation (the "Company"), the guarantors listed on the signature pages hereto (the "Initial Guarantors"), Sling TV Holding L.L.C., a Colorado limited liability company ("Sling TV Holding"), Sling TV Purchasing L.L.C., a Colorado limited liability company ("Sling TV Purchasing"), Sling TV L.L.C., a Colorado limited liability company ("Sling TV"), Sling TV Gift Card Corporation, a Virginia corporation ("Sling TV Gift Card"), Sling Media, L.L.C., a Delaware limited liability company ("Sling Media" and, together with Sling TV Holding, Sling TV Purchasing, Sling TV and Sling TV Gift Card, the "Supplemental Guarantors" and each a "Supplemental Guarantor" and together with the Initial Guarantors, the "Guarantors"), [Wilmington Savings Fund Society, FSB, a Delaware federal saving bank (as successor to U.S. Bank Trust Company National Association) as successor trustee (the "Trustee")][U.S. Bank Trust Company, National Association, a national banking association (the "Trustee")] and U.S. Bank Trust Company, National Association, a national banking association, as collateral agent (the "Collateral Agent").

**RECITALS**

WHEREAS, the Company, the guarantors named therein, the Trustee and the Collateral Agent entered into that certain [secured indenture, dated as of November 26, 2021 (the "Secured Indenture"), relating to the issuance of 5.25% Senior Secured Notes due 2026 (the "2026 Secured Notes") and 5.75% Senior Secured Notes due 2028 (the "2028 Secured Notes" and together with the 2026 Secured Notes, the "Secured Notes")][1][indenture, dated as of June 13, 2016 (the "Indenture"), relating to the issuance of 7.75% Senior Notes due 2026 (the "Notes")][indenture, dated as of July 1, 2020 (the "Indenture"), relating to the issuance of 7.375% Senior Notes due 2028 (the "Notes")][indenture, dated as of May 24, 2021 (the "Indenture"), relating to the issuance of 5.125% Senior Notes due 2029 (the "Notes")];

WHEREAS, Section 9.02 of the Indenture authorizes the Company, the Initial Guarantors, the Trustee and the Collateral Agent to enter into a supplemental indenture to amend the Indenture as set forth in Article 2 hereof (each, an "Amendment" and collectively, the "Amendments") with the written consent of the Holders of at least a majority (and, in the case of certain amendments related to definitions used in Section 4.15 of the Indenture, 66-2/3%) of the aggregate principal amount of the Notes of such series then outstanding (the "Requisite Consents");

WHEREAS, the Company has obtained the Requisite Consents to the Amendments to the Indenture as set forth in Article 2 hereof;

WHEREAS, Section 9.01(d) of the Indenture authorizes the Company, the Guarantors, the Trustee [and the Collateral Agent] to enter into a supplemental indenture to amend the Indenture to add Guarantees (the "Supplemental Guarantees") [or Collateral] as set forth in Article 3 hereof without the consent of any Holders;

WHEREAS, Section 12.02 of the Indenture provides to evidence its Guarantee under the Indenture, each Guarantor shall deliver an executed Guarantee;

WHEREAS, each of the Company and each of the Guarantors has been authorized by the resolutions of the board of directors by the Company to enter into this Supplemental Indenture, the Supplemental Guarantees [and the Supplemental Collateral Documents (as defined herein)];

WHEREAS, the Company (i) has requested that the Trustee and Collateral Agent execute and deliver this Supplemental Indenture to implement the Amendments, the Supplemental Guarantees and the Supplemental Collateral Documents, (ii) has delivered to the Trustee and Collateral Agent an Officer's Certificate of the Company

---

[1] NTD: References to "Indenture" and "Notes" to be globally updated to "Secured Indenture" and "Secured Notes," respectively, in the Supplemental Indenture for the DBS Secured Notes. Additionally, various references herein to the Collateral Agent, the Supplemental Collateral Documents and related matters to the collateral package are bracketed herein so as to only be included in the Supplemental Indenture for the DBS Secured Notes

and an Opinion of Counsel in accordance with Sections 4.13, 7.02(b), 9.01, 9.02, 9.06 and [13.04][11.04] of the Indenture; and (iii) in connection with the foregoing, the Company has complied with and satisfied all conditions precedent and covenants in the Indenture [and the Security Agreement] relating to the execution and delivery of this Supplemental Indenture, the Supplemental Guarantees [and Supplemental Collateral Documents]; and

WHEREAS, pursuant to Article 9 and Section [13.04][11.04] of the Indenture and subject to receipt of deliverables stated therein, each of the Trustee and Collateral Agent is authorized to execute and deliver this Supplemental Indenture.

## AGREEMENT

NOW THEREFORE, in consideration of the premises and covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the equal and proportionate benefit of the Holders of each series of the Notes, the Company, the Guarantors, the Trustee and the Collateral Agent hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.01.    *General*. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Indenture.

## ARTICLE 2

## AGREEMENTS OF PARTIES

Section 2.01.    *Amendments*. The following portions of the Indenture (with any consequential changes to be made to the Notes, as applicable) are hereby amended as set forth below.

(a)    *Section 1.01 (Definitions) of the Indenture is hereby amended by inserting the text therein which is double underlined (indicated textually in the same manner as the following example: double underlined text), in each case, in the place where such text appears below:*

"Acquisition Secured Leverage Ratio" means, with respect to any acquisition and any fiscal quarter, the ratio, calculated on a pro forma basis in accordance with GAAP and Article 11 of Regulation S-X of: (a) the Indebtedness of the Company and its Restricted Subsidiaries that is secured by a Lien, as of the end of such fiscal quarter to (b) the Business Combination Consolidated Cash Flow for the Company for such fiscal quarter (calculated as if such acquisition were a Business Combination and the Company on a pro forma basis were the Combined Company).

["Available Cash" means, with respect to any fiscal quarter of the Company, the excess, if positive, of (x) the "unrestricted" cash as set forth on the consolidated balance sheet of the Company and its Restricted Subsidiaries for such fiscal quarter (provided that all cash outflows and inflows in the 21 days prior to the end of any fiscal quarter (including the last day of such fiscal quarter) are in the ordinary course of business and in accordance with industry practice and are not accelerated for the purpose of reducing the amount of Available Cash), over (y) $500,000,000.][2]

"Business Combination" means a transaction or series of related transactions in which the business of the Company and its Restricted Subsidiaries is combined with the business of DIRECTV Holdings, LLC ("DIRECTV") and its affiliates, including by means of a merger, consolidation, acquisition, business combination or any transaction involving the sale, assignment, transfer, conveyance, disposition of all or

---

[2] NTD: To be included in the Supplemental Indenture for the 2028 Secured Notes only.

substantially all of assets or properties, or equity interests, of the Company or its Restricted Subsidiaries with or to (as the case may be) DIRECTV and/or its affiliates.

"Business Combination Consolidated Cash Flow" means, with respect to the Combined Company and any measurement period, (1) the consolidated operating income of the Combined Company and its Restricted Subsidiaries (adjusted to exclude any income, gains, losses, expenses or charges that are non-recurring or extraordinary or related to any equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation, equity incentive programs or similar rights, stock options, restricted stock or other similar rights) for such measurement period, calculated in accordance with GAAP, plus (2) the consolidated depreciation and amortization of the Combined Company and its Restricted Subsidiaries for such measurement period, plus (3) the consolidated impairments of long-lived assets and goodwill of the Combined Company and its Restricted Subsidiaries for such measurement period.  For the avoidance of doubt, no pro forma acquisition-related synergies or cost savings shall be adjusted for in the parenthetical in clause (1) above, and any such adjustments shall be made on a pro forma basis in accordance with the definition of "Business Combination Total Net Leverage Ratio," to the extent permitted by such definition.

"Business Combination Total Net Leverage Ratio" means, with respect to a Combined Company and any fiscal quarter, the ratio, calculated on a pro forma basis in accordance with GAAP and Article 11 of Regulation S-X of: (a) the Indebtedness of the Combined Company and its Restricted Subsidiaries, as of the end of such fiscal quarter *plus* the amount of any Indebtedness incurred subsequent to the end of such fiscal quarter (provided that the cash raised from the incurrence of any such Indebtedness shall not be included in the calculation set forth in this definition of "Business Combination Total Net Leverage Ratio") *minus* any cash that would not appear as "restricted" on a consolidated balance sheet of the Combined Company as of the end of such fiscal quarter to (b) the Business Combination Consolidated Cash Flow for the Combined Company and its Restricted Subsidiaries for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the Business Combination.

"Change of Control" means: (a) any transaction or series of transactions the result of which is that any Person (other than the Principal or a Related Party) individually owns more than 50% of the total Equity Interest of DISH Network Corporation; or (b) the first day on which a majority of the members of the Board of Directors of DISH Network Corporation are not Continuing Directors; provided that any Business Combination shall constitute a Change of Control unless immediately after giving effect to such Business Combination, the Business Combination Total Net Leverage Ratio (calculated with respect to the most recent fiscal quarter completed prior to the date of consummation of such Business Combination for which internal financial statements are available) is less than or equal to 2.75 to 1.0.

"Combined Company" means the combined company that is formed, incorporated, acquired or created pursuant to a Business Combination.

"Notes Obligations" means the Obligations of the Company and its Restricted Subsidiaries under this [Secured] Indenture, the [Secured Notes], the Guarantees and the [documents and instruments related thereto, including the security documents, mortgages and perfection documents related thereto].

"Priming Financing/Liability Management Transaction" means any exchange, refinancing, amendment or extension transaction (or any transaction specifically designed to circumvent the restrictions set forth in Section 4.25 but contemporaneously achieve the same effect as an exchange, refinancing, amendment or extension transaction) of any existing Indebtedness of the Company or any of its Restricted Subsidiaries (the "Existing LMT Debt") with any other Indebtedness or Preferred Equity Interests (including that of the Company or any of its Affiliates or of any other Person) (the "New LMT Debt") in a transaction that is designed to directly or indirectly "uptier", or has the effect of, "uptiering", holders of such Existing LMT Debt into contractually, effectively (including as to lien priority or recourse to additional assets or through a "double dip" or "pari plus" structure), temporally (i.e., having a shorter maturity) or structurally senior New LMT Debt ("Priming Debt") or the issuance of Priming Debt, in each case, other than: (1) Permitted Transactions, (2) the incurrence of Indebtedness to finance an acquisition secured by the acquired assets and/or guaranteed by an acquired entity, so long as (i) such Indebtedness and the acquisition

are otherwise permitted under this Indenture, (ii) any acquired assets that are pledged to secure such other Indebtedness are also pledged as Collateral to secure the Notes Obligations on a basis pari passu with or senior to such Indebtedness, (iii) any acquired entity becomes a Restricted Subsidiary and grants a Guarantee of the Notes Obligations under this Indenture and of such other Indebtedness pursuant to Section 4.13 as if such acquired entity had received a transfer of more than $100 million of assets from the Company and (iv) the pro forma Acquisition Secured Leverage Ratio is not greater than the Acquisition Secured Leverage Ratio prior to giving pro forma effect to such acquisition and related transactions, (3) Acquired Debt and (4) any Permitted Refinancing or Refinancing Indebtedness otherwise permitted under this Indenture, so long as (i) the relevant Indebtedness being refinanced was already Priming Debt, and (ii) the Permitted Refinancing or Refinancing Indebtedness is not more contractually, effectively, temporally or structurally senior to the Notes Obligations than the refinanced Indebtedness. For the avoidance of doubt, Indebtedness incurred to finance (or assumed in connection with) any Business Combination shall not be deemed to be a Priming Financing/Liability Management Transaction. For purposes of this Indenture, "Permitted Transactions" shall mean any transaction pursuant to which the Company and the Guarantors may incur secured Indebtedness (which secured indebtedness, to the extent any 2028 Secured Notes remain outstanding, shall be secured only by a lien in respect of the collateral securing the 2028 Secured Notes that ranks junior in priority (pursuant to customary intercreditor arrangements) to the liens on such collateral securing the 2028 Secured Notes, and is permitted at such time under Section 4.09 and Section 4.12 of this Indenture) that raises proceeds that are applied to redeem in full either or both of the 2020 DDBS Notes and/or the 2021 DDBS Notes; provided that to the extent that the Company elects to refinance either the 2020 DDBS Notes in full or the 2021 DDBS Notes in full but not both series concurrently, the remaining applicable 2020 DDBS Notes and/or the 2021 DDBS Notes shall be granted an equal and ratable lien with such new secured Indebtedness.

(b)	[*Article 3 of the Secured Indenture is hereby amended by inserting the following new Section 3.09*:]

Section 3.09	Offer to Repurchase 2028 Secured Notes

(a)	No later than ten (10) Business Days after the date on which the financial statements with respect to each fiscal quarter of the Company are required to be delivered pursuant to Section 4.03, commencing with the fiscal quarter ending March 31, 2027, the Company shall, to the extent Available Cash exceeds $15,000,000 with respect to such fiscal quarter (each, an "Available Cash Completed Fiscal Quarter"), make an offer to all Holders of the 2028 Secured Notes (an "Available Cash Offer") to purchase the maximum principal amount of 2028 Secured Notes (such maximum to be calculated including accrued and unpaid interest thereon) that may be purchased out of the amount equal to the Available Cash with respect to such Available Cash Completed Fiscal Quarter, at an offer price in cash in an amount equal to 100% of the principal amount thereof, together with accrued and unpaid interest to the date fixed for the closing of such Available Cash Offer in accordance with the procedures set forth in this Secured Indenture.

(b)	The Available Cash Offer shall remain open for a period of twenty (20) Business Days following its commencement and no longer, except to the extent that a longer period is required by applicable law (the "Available Cash Offer Period"). No later than five Business Days after the termination of the Available Cash Offer Period (the "2028 Secured Notes Purchase Date"), the Company shall purchase the maximum principal amount of 2028 Secured Notes (such maximum to be calculated including accrued and unpaid interest thereon) that may be purchased with the amount equal to the Available Cash for such Available Cash Completed Fiscal Quarter (which maximum principal amount of 2028 Secured Notes shall be the "Available Cash Offer Amount") or, if less than the Available Cash Offer Amount has been tendered, all 2028 Secured Notes tendered in response to the Available Cash Offer.

(c)	If the 2028 Secured Notes Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued interest shall be paid to the Person in whose name a 2028 Secured Note is registered at the close of business on such record date, and no additional interest shall be payable to Holders who tender 2028 Secured Notes pursuant to the Available Cash Offer.

(d)      Upon the commencement of any Available Cash Offer, the Company shall send, by first class mail or any other applicable electronic delivery through DTC, a notice to each of the Holders of 2028 Secured Notes, with a copy to the Trustee. The notice shall contain all instructions and materials necessary to enable such Holders to tender the 2028 Secured Notes of such series pursuant to the Available Cash Offer. The notice, which shall govern the terms of the Available Cash Offer, shall state:

(i)      that the Available Cash Offer is being made pursuant to this Section 3.09 and the length of time the Available Cash Offer shall remain open;

(ii)      the Available Cash Completed Fiscal Quarter, the Available Cash Offer Amount (together with a calculation of the Available Cash Offer Amount), the purchase price and the 2028 Secured Notes Purchase Date;

(iii)      that any 2028 Secured Note not tendered or accepted for payment shall continue to accrue interest;

(iv)      that any 2028 Secured Note accepted for payment pursuant to the Excess Proceeds Offer shall cease to accrue interest after the 2028 Secured Notes Purchase Date;

(v)      that Holders electing to have a 2028 Secured Note purchased pursuant to any Available Cash Offer shall be required to surrender the 2028 Secured Note, to the Company, a depositary, if appointed by the Company, at the address specified in the notice at least three business days before the 2028 Secured Notes Purchase Date;

(vi)      that Holders shall be entitled to withdraw their election if the Company, Depositary, as the case may be, receives, not later than the expiration of the Available Cash Offer Period, a facsimile transmission, letter or electronic transmission setting forth the name of the Holder, the principal amount of the 2028 Secured Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have the 2028 Secured Note purchased;

(vii)      that, if the aggregate principal amount of 2028 Secured Notes surrendered by Holders exceeds the Available Cash Offer Amount, the 2028 Secured Notes shall be purchased on a *pro rata* basis in accordance with DTC procedures (with such adjustments as may be deemed appropriate by the Company so that only 2028 Secured Notes in denominations of $2,000, or integral multiples of $1,000 in excess thereof, shall be purchased); and

(viii)      that Holders whose 2028 Secured Notes were purchased only in part shall be returned any unpurchased portion of their 2028 Secured Notes so surrendered.

(e)      On or before the 2028 Secured Notes Purchase Date, the Company shall, to the extent lawful, accept for payment, on a pro rata basis to the extent necessary, the Available Cash Offer Amount of 2028 Secured Notes or portions thereof tendered pursuant to the Available Cash Offer, or if less than the Available Cash Offer Amount has been tendered, all 2028 Secured Notes so tendered, and deliver to the Trustee an Officers' Certificate stating that such 2028 Secured Notes or portions thereof were accepted for payment by the Company in accordance with the terms of this Section 3.09. The Company, Depositary or Paying Agent, as the case may be, shall promptly (but in any case not later than five days after the Purchase Date) wire to each tendering Holder an amount equal to the purchase price of the 2028 Secured Note tendered by such Holder and accepted by the Company for purchase, and any unpurchased portion of the 2028 Secured Notes surrendered by any such tendering Holder shall be promptly returned to such Holder by the Company. To the extent that the aggregate principal amount of 2028 Secured Notes tendered pursuant to an Available Cash Offer is less than the amount of Available Cash for such Available Cash Offer, the Company may use any remaining Available Cash for general corporate purposes.

(f)      Other than as specifically provided in this Section 3.09, any purchase pursuant to this Section 3.09 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of this Secured Indenture.

(g)        Notwithstanding any other provision of this Section 3.09, the Company shall not be required to make any Available Cash Offer with respect to an Available Cash Completed Fiscal Quarter ending after the consummation of a Business Combination if (x) the Business Combination Total Net Leverage Ratio (without giving effect to netting of any cash) of the Combined Company for such Available Cash Completed Fiscal Quarter does not exceed 2.25 to 1.0 or (y) as of the last day of such Available Cash Completed Fiscal Quarter, the aggregate principal amount of 2028 Secured Notes outstanding does not exceed $1,250,000,000.][3]

(c)        *Section 4.07 (Limitation on Restricted Payments) of the Indenture is hereby amended and restated as follows:*

Section 4.07 Limitation on Restricted Payments.[4] Neither the Company, nor any of its Restricted Subsidiaries may, directly or indirectly:

(a)        declare or pay any dividend or make any distribution on account of any Equity Interests of the Company other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company;

(b)        purchase, redeem or otherwise acquire or retire for value any Equity Interests of DISH Network, the Company or any of their respective Subsidiaries or Affiliates other than any such Equity Interests owned by the Company or by any Wholly Owned Restricted Subsidiary;

(c)        purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness that is expressly subordinated in right of payment to the Secured Notes or the Guarantees, except:

(i)        in accordance with the scheduled mandatory redemption, sinking fund or repayment provisions set forth in the original documentation governing such Indebtedness and

(ii)        the purchase, repurchase or other acquisition of subordinated Indebtedness with a stated maturity earlier than the maturity of the Secured Notes or the Guarantees purchased in anticipation of satisfying a payment of principal at the stated maturity thereof, within one year of such stated maturity;

(d)        declare or pay any dividend or make any distribution on account of any Equity Interests of any Restricted Subsidiary, other than:

(i)        to the Company or any Wholly Owned Restricted Subsidiary; or

(ii)        to all holders of any class or series of Equity Interests of such Restricted Subsidiary on a pro rata basis; provided that in the case of this clause (ii), such dividends or distributions may not be in the form of Indebtedness or Disqualified Stock; or

(e)        make any Restricted Investment (all such prohibited payments and other actions set forth in clauses (a) through (e) being collectively referred to as "Restricted Payments").

The foregoing provisions will not prohibit the following (provided that with respect to clauses (3), (5), (7), (8), and (11) below, no Default or Event of Default shall have occurred and be continuing):

(1)        the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at such date of declaration such payment would have complied with the provisions of this Secured Indenture;

---

[3] NTD: To be included in the Supplemental Indenture for the 2028 Secured Notes only.
[4] NTD: For purposes of the form, we have included the Restricted Payment covenant from the Secured Indenture. Cross references/covenants to be updated for other indentures as applicable.

(2)     [reserved];

(3)     Investments made for a bona-fide business purpose in an aggregate amount not to exceed $500 million plus, to the extent not included in Consolidated Cash Flow, an amount equal to the net reduction in such Investments resulting from payments in cash of interest on Indebtedness, dividends or repayment of loans or advances, or other transfers of property, in each case, to the Company or to a Wholly Owned Restricted Subsidiary or from the net cash proceeds from the sale, conveyance or other disposition of any such Investment; provided, however, that the foregoing sum shall not exceed, with respect to any Person in whom such Investment was made, the amount of Investments previously made by the Company or any Restricted Subsidiary in such Person pursuant to this clause (3);

(4)     [reserved];

(5)     a Permitted Refinancing;

(6)     [reserved];

(7)     Investments in any Guarantor or any entity that becomes a Guarantor promptly following such Investment;

(8)     Investments made for a bona-fide business purpose in businesses strategically related to businesses described in Section 4.16 of this Secured Indenture in an aggregate amount not to exceed $700 million;

(9)     [reserved];

(10)     [reserved];

(11)     Investments made as a result of the receipt of non-cash proceeds from Asset Sales made in compliance with Section 4.10 of this Secured Indenture and Investments entered into in connection with an acquisition of assets used in or constituting a business permitted under Section 4.16 of this Secured Indenture as a result of "earn-outs" or other deferred payments or similar obligations;

(12)     [reserved];

(13)     any payment which is used (or designated to be used) to pay for the construction, launch, operation, usage, service or insurance of satellites owned or leased by the Company or any Subsidiaries of the Company, in each case, in the ordinary course of business of the Company and its Subsidiaries, in an amount not to exceed the then market rate for such construction, launch, operation, usage, service or insurance of satellites, as reasonably determined by the Company in good faith;

(14)     [reserved];

(15)     the redemption, repurchase, defeasance or other acquisition or retirement for value of subordinated Indebtedness, including premium, if any, and accrued and unpaid interest, with the proceeds of, or in exchange for: (a) the proceeds of a capital contribution or a substantially concurrent offering of, shares of Capital Stock of the Company (or options, warrants or other rights to acquire such Capital Stock), or (b) Indebtedness that is at least as subordinated in right of payment to the Notes Obligations, including premium, if any, and accrued and unpaid interest, as the Indebtedness being redeemed, repurchased, defeased, acquired or retired and with a final maturity equal to or greater than, and a Weighted Average Life to Maturity equal to or greater than, the final maturity and Weighted Average Life to Maturity, respectively, of the Indebtedness being redeemed, repurchased, defeased, acquired or retired;

(16)     repurchases of Equity Interests deemed to occur upon (a) the exercise of stock options, warrants or convertible securities issued as compensation if such Equity Interests represent a portion of the exercise price thereof and (b) the withholding of a portion of the Equity Interests granted or awarded to an employee to pay taxes associated therewith (or a dividend or distribution to finance such a deemed repurchase by DISH Network);

(17)     amounts paid by the Company to DISH Network, EchoStar or any other person with which the Company is included in a consolidated tax return equal to the amount of federal, state and local income taxes payable in respect of the income of the Company and its Subsidiaries as if the Company and its Subsidiaries filed returns as a consolidated group independent of DISH Network, EchoStar or such person with which the Company is included in a consolidated tax return;

(18)     [reserved];

(19)     [reserved];

(20)     any Investment, dividend, distribution, or payment which is used to pay (w) the operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including, but not limited to, administrative, legal, accounting, tax reporting, management fees, service fees, franchise and similar taxes, fees or expenses required to maintain organizational existence, rent and building costs, systems costs, and other fees, costs and expenditures related to the foregoing), in each case, that are (1) attributable to the ownership or operation of the Company and its Restricted Subsidiaries, (2) reasonable and customary and (3) incurred by a direct or indirect parent of the Company in the ordinary course of business, (x) any reasonable and customary indemnification claims made against a direct or indirect parent of the Company by directors or officers of the Company (or any parent thereof) attributable to the ownership or operations of the Company and its Restricted Subsidiaries and (y) fees and expenses paid or to be paid by a direct or indirect parent of the Company that are (1) due and payable by the Company and its Restricted Subsidiaries and (2) otherwise permitted to be paid by the Company and its Restricted Subsidiaries under this Secured Indenture; and

(21)     any payment by the Company or any of its Affiliates of any structuring, support and professional fees expenses and any reasonable and documented professional fees, in each case, pursuant to that Restructuring and Support Agreement, dated as of March 19, 2026 (the "RSA") as in effect on the date hereof, among the Company, the Subsidiaries of the Company listed therein and the Consenting Creditors (as defined therein).

If the Company or any Restricted Subsidiary makes an Investment that was included in computations made pursuant to this Section 4.07 and the Person in which such Investment was made subsequently becomes a Restricted Subsidiary that is a Guarantor, to the extent such Investment resulted in a reduction in the amounts calculated under clause (iii) of the first paragraph of or under any other provision of this Section 4.07, then such amount shall be increased by the amount of such reduction.

Notwithstanding anything to the contrary in this [Secured] Indenture, no Investment permitted pursuant to clauses (1) through (21) above or by Section 4.18 may be made, directly or indirectly (including by means of an Investment in a Person who subsequently makes an Investment or other payment), (i) in connection with, or to facilitate, a Restricted Payment described in clause (a), (b), (c) or (d) of the definition of "Restricted Payments" or (ii) in any Related Party or any Affiliate of the Principal or of a Related Party, other than such a Related Party or Affiliate that is a Related Party or Affiliate solely because it is a direct or indirect Subsidiary of the Company.

EXHIBIT F - Project Neyland - Supplemental Indenture (Form) (AutoRecovered).docx

(d)      *Section 4.09 (Limitation on Incurrence of Indebtedness) of the Indenture is hereby amended and restated as follows:*

Section 4.09 <u>Limitation on Incurrence of Indebtedness</u>.[5]

(a)      The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to (collectively, "incur") any Indebtedness (including Acquired Debt); <u>provided</u>, however, that, notwithstanding the foregoing the Company and any Guarantor may incur Indebtedness (including Acquired Debt), if, after giving effect to the incurrence of such Indebtedness and the application of the net proceeds thereof on a pro forma basis (including, in the case of an acquisition, merger or other business combination giving pro forma effect to such transaction), either (a) the Indebtedness to Cash Flow Ratio of the Company would not have exceeded 8.0 to 1 or (b) the aggregate amount of Indebtedness of the Company and the Guarantors would not exceed $1,500 per Acquired Subscriber; <u>provided</u> that such Indebtedness is not incurred in connection with or in furtherance of a Priming Financing/Liability Management Transaction;

(b)      The foregoing limitation will not apply to any of the following incurrences of Indebtedness:

(1)      Indebtedness represented by the 2026 Secured Notes issued on the Issue Date and the Guarantees thereof, the 2028 Secured Notes issued on the Issue Date and the Guarantees thereof and this Secured Indenture;

(2)      the incurrence by the Company or any Guarantor of Acquired Subscriber Debt not to exceed $1,750 per Acquired Subscriber (less any amount used to incur Indebtedness pursuant to clause (b) of the immediately preceding paragraph); <u>provided</u> that such Indebtedness is not incurred in connection with or in furtherance of a Priming Financing/Liability Management Transaction;

(3)      the incurrence by the Company or any Guarantor of Deferred Payments and letters of credit with respect thereto;

(4)      Indebtedness of the Company or any Guarantor in an aggregate principal amount not to exceed $1,050,000,000 at any one time outstanding; <u>provided</u> that such Indebtedness is not incurred in connection with or in furtherance of a Priming Financing/Liability Management Transaction;

(5)      Indebtedness between and among the Company and any Guarantor;

(6)      Acquired Debt of a Person incurred prior to the date upon which such Person was acquired by the Company or any Guarantor (excluding Indebtedness incurred by such entity other than in the ordinary course of its business in connection with, or in contemplation of, such entity being so acquired) in an amount not to exceed (A) $250 million in the aggregate for all such Persons other than those described in the immediately following clause (B); and (B) Acquired Debt owed to the Company or any of its Restricted Subsidiaries; <u>provided</u> that such Indebtedness is not incurred in connection with or in furtherance of a Priming Financing/Liability Management Transaction;

(7)      Existing Indebtedness;

(8)      the incurrence of Purchase Money Indebtedness by the Company or any Guarantor in an amount not to exceed the cost of construction, acquisition or improvement of assets used in any business permitted under Section 4.16 of this Secured Indenture, as well as any launch costs and insurance premiums related to such assets; <u>provided</u> that such Indebtedness is not incurred in connection with or in furtherance of a Priming Financing/Liability Management Transaction;

---

[5] NTD: For purposes of the form, we have included the Debt covenant from the Secured Indenture. Cross references/covenants to be updated for other indentures as applicable.

(9)     the incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations that are incurred in the ordinary course of business and not for speculative purposes, including without limitation Hedging Obligations covering the principal amount of Indebtedness entered into in order to protect the Company or any of its Restricted Subsidiaries from fluctuation in interest rates on Indebtedness;

(10)     Indebtedness of the Company or any Restricted Subsidiary in respect of performance bonds or letters of credit of the Company or any Restricted Subsidiary or surety bonds provided by the Company or any Restricted Subsidiary incurred in the ordinary course of business and on ordinary business terms in connection with the businesses permitted under Section 4.16 of this Secured Indenture;

(11)     Indebtedness of the Company or any Guarantor the proceeds of which are used solely to finance the construction and development of call centers owned by the Company or any of its Restricted Subsidiaries or any refinancing thereof; provided that the aggregate of all Indebtedness incurred pursuant to this clause (11) shall in no event exceed $100 million at any one time outstanding; provided that such Indebtedness is not incurred in connection with or in furtherance of a Priming Financing/Liability Management Transaction;

(12)     the incurrence by the Company or any Guarantor of Indebtedness issued in exchange for, or the proceeds of which are used to extend, refinance, renew, replace, substitute or refund in whole or in part Indebtedness referred to in the first paragraph of this Section 4.09 or in clauses (1), (2), (3), (6), (7) or (8) above ("Refinancing Indebtedness"); provided, however, that:

(a)     the principal amount of such Refinancing Indebtedness shall not exceed the principal amount and accrued interest of the Indebtedness so exchanged, extended, refinanced, renewed, replaced, substituted or refunded and any premiums payable and reasonable fees, expenses, commissions and costs in connection therewith;

(b)     the Refinancing Indebtedness shall have a final maturity equal to or later than, and a Weighted Average Life to Maturity equal to or greater than, the final maturity and Weighted Average Life to Maturity, respectively, of the Indebtedness being exchanged, extended, refinanced, renewed, replaced, substituted or refunded;

(c)     the Refinancing Indebtedness shall not have different obligors, or greater guarantees or security (if any), than the Indebtedness being exchanged, extended, refinanced, renewed, replaced, substituted or refunded;

(d)     the Refinancing Indebtedness shall have covenants and defaults that are (i) not materially more restrictive with respect to the obligors thereunder, as reasonably determined by the Company in good faith, than the covenants and defaults of the Indebtedness being exchanged, extended, refinanced, renewed, replaced, substituted or refunded or (ii) reflective of market terms and conditions for the type of Indebtedness issued or incurred at the time of issuance or incurrence thereof, as reasonably determined by the Company in good faith;

(e)     if the Indebtedness being exchanged, extended, refinanced, renewed, replaced, substituted or refunded is secured by any collateral [(whether equally and ratably with, or junior to, the secured parties under this Secured Indenture or otherwise)][6], such Refinancing Indebtedness may be secured by such collateral on terms no more favorable to the holders of such Refinancing Indebtedness than those then in effect and applicable to the Indebtedness being exchanged, extended, refinanced, renewed, replaced, substituted or refunded;

(f)     if the Indebtedness being exchanged, extended, refinanced, renewed, replaced, substituted or refunded is unsecured, the Refinancing Indebtedness shall be unsecured; and

---

[6] NTD: To be included in the Supplemental Indenture for the 2028 Secured Notes only.

EXHIBIT F - Project Neyland - Supplemental Indenture (Form) (AutoRecovered).docx

(g)      the Refinancing Indebtedness shall be subordinated in right of payment to the Secured Notes and the Guarantees, if at all, on terms at least as favorable to the holders of Secured Notes as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, substituted or refunded (a "Permitted Refinancing");

provided that such Indebtedness is not incurred in connection with or in furtherance of a Priming Financing/Liability Management Transaction;

(13)    the guarantee by the Company or any Guarantor of Indebtedness of the Company or a Restricted Subsidiary that was permitted to be incurred by another provision of this Section 4.09;

(14)    Indebtedness under Finance Lease Obligations of the Company or any Guarantor with respect to no more than seven direct broadcast satellites at any time; provided that such Indebtedness is not incurred in connection with or in furtherance of a Priming Financing/Liability Management Transaction; and

(15)    Indebtedness of the Company or any Restricted Subsidiary owed to (including obligations in respect of letters of credit for the benefit of) any Person in connection with workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance provided by such Person to the Company or such Restricted Subsidiary pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business and consistent with industry practices.

(c)      For purposes of determining compliance with this Section 4.09, if an item of Indebtedness meets the criteria of more than one of the categories described in clauses (1) through (15) above or is permitted to be incurred pursuant to the first paragraph of this Section 4.09 and also meets the criteria of one or more of the categories described in clauses (1) through (15) above, the Company shall, in its sole discretion, classify such item of Indebtedness in any manner that complies with this Section 4.09 and may from time to time reclassify such item of Indebtedness in any manner in which such item could be incurred at the time of such reclassification. Accrual of interest and the accretion of accreted value will not be deemed to be an incurrence of Indebtedness for purposes of this Section 4.09.

(d)      Notwithstanding any other provision of this Section 4.09, the Company and any Combined Company and each's Restricted Subsidiaries shall not be permitted to incur any Indebtedness for borrowed money or (Preferred Equity Interests) with a final maturity date (or mandatory redemption date, as the case may be) prior to June 30, 2029.

(e)      *Article 4 (Covenants) of the Indenture is hereby amended by inserting the following new Section 4.25:*

Section 4.25 Priming Financing/Liability Management Transactions.

The Company shall not, and shall not permit any other Person to, enter into any Priming Financing/Liability Management Transaction or make any Investment, sale, transfer or disposition of assets or Restricted Payment in connection with or in furtherance of a Priming Financing/Liability Management Transaction (other than any such transaction or action permitted under the definition of Priming Financing/Liability Management Transaction.

(f)      *Section 5.01 (Merger, Consolidation, or Sale of Assets of the Company) of the Indenture is hereby amended by and inserting the following text as the last provision in Section 5.01:*

For the avoidance of doubt, any Business Combination shall be permitted under this Section 5.01 (provided that Section 5.01(a) and (b) shall continue to apply to any such Business Combination). With respect to any Business Combination, (i) each entity (other than the Company or its successor pursuant to Section 5.02) whose operating income or loss is included in the calculation of Business Combination Consolidated Cash Flow shall, immediately after such Business Combination is consummated, be a Restricted Subsidiary and shall become a Guarantor pursuant to Section 4.13 (and comply with clauses (i) through (iii) thereunder) if such entity has more than $100 million of assets and (ii) the Combined Company

whose Business Combination Total Net Leverage Ratio is measured for purposes of the definition of "Change of Control" shall be the successor obligor to the Company pursuant to Section 5.02.

(g)     *Section 9.02 (With Consent of Holders of Notes) of the Indenture is hereby amended by inserting the following text immediately after Section 9.02(h):*

(i) make any change or amendment to the definition of "Priming Financing/Liability Management Transaction" or Section 4.25; or

(j) make any amendment, waiver or modification that would (i) subordinate or have the effect of subordinating any Notes Obligations in right of payment or in the right to receive payments from the Collateral, in each case to other Indebtedness (including other Notes Obligations), (ii) subordinate or have the effect of subordinating the Liens on the Collateral securing any Notes Obligations to Liens on the Collateral securing other Indebtedness (including other Notes Obligations), or (iii) permit or have the effect of permitting a Priming Financing/Liability Management Transaction.

(h)     *[Section 10.03 (Release of Collateral) of the Secured Indenture is hereby amended by and inserting the following text as the last provision in Section 10.03:*

(c) Notwithstanding the foregoing, no Collateral shall be released from the Liens and security interest created by the Security Documents in connection with or in furtherance of a Priming Financing/Liability Management Transaction.][7]

(i)     *[Section 12.05][Section 10.05] (Releases from Guarantees) of the Indenture is hereby amended by and inserting the following text as the last provision in Section 12.05:*

Notwithstanding the foregoing, no Guarantor shall be released from its Notes Obligations in connection with or in furtherance of a Priming Financing/Liability Management Transaction.

(j)     *Section 4.10 (Asset Sales) of the Indenture is hereby amended by deleting the text in paragraph (a)(6) thereof and replacing such text with:*

[reserved]; or

## ARTICLE 3

## ADDITIONAL GUARANTORS [AND COLLATERAL]

Section 3.01.     *Designation of Guarantors [and Collateral].* Each of Sling TV Holding, Sling TV Purchasing, Sling TV, Sling TV Gift Card and Sling Media is hereby designated as Guarantor under the Indenture and each agrees to (i) provide an unconditional Guarantee on the terms and subject to the conditions set forth in the Indenture, (ii) be bound by the terms under the Indenture applicable to Guarantors and (iii) contemporaneously with the execution and delivery of this Supplemental Indenture, execute and deliver (a) an executed Guarantee in the form required pursuant to Section [10.02][12.02] of the Indenture[ and (b) a Joinder Agreement (as defined and in the form required under the Security Agreement), together with all related supplemental collateral documents, in each case pursuant to and as required by the Security Agreement (collectively, the "Supplemental Collateral Documents")]. Delivery of the Requisite Consents and execution of this Supplemental Indenture by the Trustee shall constitute an instruction by such consenting Holders and the Trustee to the Collateral Agent under the Secured Indenture and the Security Agreement, to accept the delivery of and to execute, as applicable, each of the Joinder Agreement and Supplemental Collateral Documents.]

Section 3.02.     *Release of Echosphere Guarantee.* In the event that the Company makes a Chapter 11 Election (as defined in the RSA as in effect on the date hereof) and upon the Trustee's receipt of a written notice

---

[7] NTD: To be included in the Supplemental Indenture for the 2028 Secured Notes only.

from the Company confirming that it has made such Chapter 11 Election, Echosphere L.L.C. ("Echosphere") shall be automatically released from its guarantee, but remain a Restricted Subsidiary of the Company, for the pendency of the Chapter 11 Cases (as defined in the RSA) with respect to the Company Parties (as defined in the RSA).

## ARTICLE 4

## MISCELLANEOUS PROVISIONS

Section 4.01.      *Effectiveness; Construction.* This Supplemental Indenture shall become effective upon its execution and delivery. Upon such effectiveness, the Indenture shall be modified in accordance herewith. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered under the Indenture shall be bound hereby. The Indenture and this Supplemental Indenture shall henceforth be read and construed together.

Section 4.02.      Indenture *Remains in Full Force and Effect.* Except as supplemented hereby, all provisions in the Indenture shall remain in full force and effect. For the avoidance of doubt, to the extent any actions or transactions were completed by the Company and its Restricted Subsidiaries prior to the date of this Supplemental Indenture and were permitted by a provision of the Indenture at the date of such action or transaction, such actions or transactions shall continue to be permitted by (and be allocated to, as applicable) to the same provision as of the date of this Supplemental Indenture (and may be later reallocated, to the extent permitted by the Indenture, as supplemented by this Supplemental Indenture), notwithstanding the execution of this Supplemental Indenture.

Section 4.03.      *Trustee and Collateral Agent Matters.* Each of the Trustee and Collateral Agent accepts the Indenture, as supplemented hereby, and agrees to perform the same upon the terms and conditions set forth therein, as supplemented hereby. In entering into this Supplemental Indenture, each of the Trustee and the Collateral Agent (a) have relied upon the certifications, statements and opinions set forth in the Officer's Certificate of the Company, the Opinion of Counsel shall be entitled to the benefit of every provision of the Indenture and the Security Agreement relating to the conduct or affecting the liability or affording protection to each of the Trustee and Collateral Agent, whether or not elsewhere herein so provided. The recitals contained in this Supplemental Indenture shall be taken as the statements of the Company and each of the Trustee and Collateral Agent assumes no responsibility for their correctness, and none of the recitals contained herein are intended to or shall be construed as statements made or agreed to by the Trustee or the Collateral Agent. Each of the Trustee and Collateral Agents makes no representation as to the statements or the representations made herein, in the Indenture, the Security Agreement, or any Supplemental Collateral Documents (collectively, the "Subject Documents") or the validity or sufficiency of this Supplemental Indenture or any other Subject Documents or the consequences of any amendment provided herein.

Section 4.04.      *Effect of Headings.* The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

Section 4.05.      *Successors and Assigns.* All covenants and agreements in this Supplemental Indenture by the Company shall bind its successors and assigns, whether so expressed or not.

Section 4.06.      *Separability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 4.07.      *Benefits of the Indenture.* Nothing in this Supplemental Indenture, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder and the Holders of the Notes, any benefit or any legal or equitable right, remedy or claim under the Indenture, as supplemented hereby.

Section 4.08.      *Governing Law.* This Supplemental Indenture shall be governed by and construed in accordance with the laws of the State of New York.

Section 4.09.      *Supplemental Indenture May Be Executed in Counterparts.* This Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts

shall together constitute one and the same instrument. The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Supplemental Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first written above.

DISH DBS CORPORATION


By: _____
    Name:
    Title:


DISH NETWORK L.L.C.
DISH OPERATING L.L.C.
ECHOSPHERE L.L.C.
DISH NETWORK SERVICE L.L.C.
DISH BROADCASTING CORPORATION
DISH TECHNOLOGIES L.L.C.
as Initial Guarantors


By: _____
    Name:
    Title:


SLING TV HOLDING L.L.C.
SLING TV PURCHASING L.L.C.
SLING TV L.L.C.
SLING TV GIFT CARD CORPORATION
SLING MEDIA, L.L.C.
as Supplemental Guarantors


By: _____
    Name:
    Title:

*[Signature Page to Supplemental Indenture relating to the DBS [●]]*

EXHIBIT F - Project Neyland - Supplemental Indenture
(Form) (AutoRecovered).docx

[WILMINGTON SAVINGS FUND SOCIETY, FSB][U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION], as Trustee

By: _____
      Name:
      Title:


[U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Collateral Agent]

By: _____
      Name:
      Title:

**Exhibit 3**

**May 2025 FCC Letter**



FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Chairman

May 9, 2025

Mr. Charles W. Ergen
Chairman of the Board of Directors
EchoStar Corporation
9601 South Meridian Boulevard
Englewood, Colorado 80112

**RE: EchoStar's Spectrum Licenses**

Dear Mr. Ergen:

The FCC has an obligation to ensure that the companies we regulate comply with the terms of their federal spectrum licenses. As you know, EchoStar or its affiliated companies hold a large number of FCC spectrum licenses that cover a significant amount of spectrum. I am therefore writing to inform you that I have asked the FCC's staff to take several steps regarding spectrum licenses that your companies hold.

Specifically, I have directed agency staff to begin a review of EchoStar's compliance with its federal obligations to provide 5G service throughout the United States per the terms of its federal spectrum licenses.

As you know, buildout obligations are one way that the FCC can ensure that Americans, including those living in rural communities, have a fair shot at next-generation connectivity. After all, failure to meet buildout obligations leaves these communities behind.

In 2019, EchoStar's predecessor, DISH, agreed to meet specific buildout obligations in connection with a number of spectrum licenses across several different bands. In particular, the FCC agreed to relax some of EchoStar's then-existing buildout obligations in exchange for EchoStar's commitment to put its licensed spectrum to work deploying a nationwide 5G broadband network. EchoStar promised—among other things—that its network would cover, by June 14, 2025, at least 70% of the population within each of its licensed geographic areas for its AWS-4 and 700 MHz licenses, and at least 75% of the population within each of its licensed geographic areas for its H Block and 600 MHz licenses.

The terms of the deal were clear. The FCC structured the buildout obligations to prevent spectrum warehousing and to ensure that Americans would gain broader access to high-speed

wireless services, including in underserved and rural areas. To ensure that EchoStar's commitments were credible, the FCC provided that EchoStar's failure to meet its new buildout requirements could result in the loss of its spectrum licenses and significant financial payments. In the end, the Commission noted that the 2019 commitments would increase EchoStar's incentives to grow market share and provide robust competition.

Rather than abiding by the terms of that 2019 Commission-level decision, EchoStar negotiated behind closed doors during the previous Administration in September 2024. Under the terms of that bureau-level decision, EchoStar would no longer have to meet the June 2025 buildout obligations—meaning, its commitment to provide 5G to a broad swath of America. Nor would EchoStar have to face the agreed-upon consequences for failing to do so. Instead, EchoStar would generally kick the can down the road while agreeing to buildout milestones for some major-market licenses by December 2024, along with other commitments. Today, there are fewer Boost Mobile subscribers than when EchoStar acquired the company five years ago.

Of course, 2024 was not the first time EchoStar sought extensions or missed milestones. Neither was 2019. Earlier, in 2017, the company informed the FCC that it would not meet its interim coverage and service milestones for its AWS-4 and Lower 700 MHz E Block licenses. Then, in 2018, EchoStar informed the FCC that it would not meet its interim coverage and service milestones for its H Block licenses.

That history is relevant today. Currently before the FCC are filings from EchoStar that claim to satisfy the bureau's new December 2024 buildout obligation. But questions remain regarding these submissions. Accordingly, I have asked FCC staff to investigate EchoStar's compliance with its buildout milestones.

At the same time, a petition for reconsideration of the 2024 bureau-level extension of the 2019 Commission-level buildout obligations remains pending at the FCC. Given the issues raised in that filing, I have asked FCC staff to seek public comment on the petition and the bureau's 2024 extension of EchoStar's buildout obligations. More generally, to help inform the FCC's thinking about EchoStar's use of spectrum, I have also asked agency staff to issue a public notice seeking comment on the scope and scale of MSS utilization in the 2 GHz band that is currently licensed to EchoStar or its affiliates.

2

As I am sure you understand, the deployment of broadband service throughout the country, and the robust and efficient use of the nation's spectrum resources, is of paramount importance to the FCC.

Sincerely,

Brendan Carr

3

## <u>Exhibit 4</u>

**September 2025 FCC Letter**

Exhibit 99.1



**FEDERAL COMMUNICATIONS COMMISSION**
WASHINGTON, DC 20554

Brendan Carr
Chairman

September 8, 2025

Mr. Charles W. Ergen
Chairman of the Board of Directors EchoStar
Corporation
9601 South Meridian Boulevard Englewood,
Colorado 80112

    **RE: EchoStar's Spectrum Licenses**

Dear Mr. Ergen:

Earlier this year, I wrote a letter notifying you that I had asked FCC staff to investigate EchoStar's compliance with its buildout milestones and other obligations regarding the company's federal spectrum licenses. As I noted at the time, the FCC's buildout obligations are designed to ensure that communities in rural and urban America have a fair shot at next-generation connectivity.

I have appreciated your responses, engagement, and information provided since my original letter.

Accordingly, I have asked FCC staff to bring the agency's investigation to conclusion. In particular, I have directed FCC staff to: (1) dismiss VTel's petition for reconsideration; (2) confirm that EchoStar holds exclusive terrestrial and MSS rights over the AWS-4 spectrum to which it is currently licensed; and (3) find that relevant FCC buildout and other related obligations have been satisfied by EchoStar in view of the company's current FCC milestones.

Sincerely,

Brendan Carr

**Exhibit 5**

**Sample Force Majeure Notice**

September 24, 2025

American Towers LLC
c/o American Tower Corporation
Attention: Legal Department
10 Presidential Way
Woburn, MA 01801

with a copy to:
American Towers LLC
c/o American Tower Corporation
Attention: Legal Department
116 Huntington Ave., 11th Floor
Boston, MA 02116

Reference: STRATREGIC COLLOCATION AGREEMENT between American Towers LLC, SpectraSite Communications, LLC, InSite Wireless Group, LLC (collectively, "ATC") and DISH Wireless L.L.C. ("DISH Wireless") dated March 12, 2021  (the "Agreement")

Since 2020, working with you and our other partners, we successfully built the nation's first 5G Open RAN network, meeting our buildout milestones.  As you likely know, in May 2025, the Federal Communications Commission (the "FCC") announced it had begun an investigation into reversing prior grants of license authority to DISH Wireless's ultimate parent corporation, EchoStar Corporation, and its subsidiaries (collectively, "EchoStar") with respect to certain of EchoStar's spectrum licenses.  During ensuing discussions, the FCC made clear that EchoStar's utilization of its spectrum was unacceptable given the small number of Boost Mobile subscribers on its network.  The FCC further made clear that EchoStar's continued ownership of such spectrum licenses failed to best serve the public interest and that EchoStar needed to sell certain spectrum licenses or face a wide-ranging license revocation by the FCC.  Either way, EchoStar would have had to abandon its longstanding business plan for Boost Mobile.

Accordingly, EchoStar entered into a series of transactions that will, over time, result in the decommissioning of our Boost Mobile radio access network.  Specifically, on August 26, 2025 and September 7, 2025, respectively, EchoStar Corporation and certain of its subsidiaries entered into agreements to sell 3.45 GHz and 600 MHz spectrum licenses to AT&T and AWS-4 and H-block spectrum licenses to SpaceX.  FCC Chairman Carr then directed FCC staff to bring the agency's investigation to conclusion, finding that, among other things, EchoStar has satisfied its buildout and other related obligations.  DISH Wireless is not a party to the AT&T or SpaceX agreements, does not own the spectrum licenses being sold to AT&T or SpaceX, and is not entitled to receive any of the spectrum sale proceeds at closing.

The Agreement and all of the Tower Facilities (as defined in the Agreement) have been impacted by these unforeseeable actions by the FCC taken outside of DISH Wireless's control.  As such, we are writing to inform you that the FCC's actions and the resulting spectrum sales have frustrated the principal purpose and completely destroyed the value of the Agreement and DISH Wireless's

ability to perform.  As a result, DISH Wireless's obligations are excused.  This letter will serve as notice under the Agreement of the events described herein, to the extent required, including without limitation with respect to any force majeure event, without waiver of any rights, remedies, defenses and positions with respect to DISH Wireless's rights and obligations under the Agreement and under law and equity, and all such rights, remedies, defenses and positions are expressly reserved.

Despite the occurrence of these events, DISH Wireless needs to continue to operate certain Tower Facilities (as defined in the Agreement) for a period of time.  We intend to promptly engage in discussions with you to reach an agreement regarding the appropriate amount that DISH Wireless will pay ATC during this transition period for ATC's continued performance under the Agreement.

We also acknowledge receipt of your letter to DISH Wireless dated September 12, 2025.  We are reviewing the letter and considering our response in light of our current circumstances.  We will respond within the time frame requested in the letter.

Sincerely,

John Swieringa (Sep 24, 2025 21:45:24 MDT)

John Swieringa
President, Technology & Chief Operating Officer
DISH Wireless L.L.C.

2

**Exhibit 6**

**AT&T Order**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Applications of AT&T Mobility II LLC and EchoStar | ) WT Docket No. 25-303 |
| Corporation for Consent to Assign Licenses | ) |

**MEMORANDUM OPINION AND ORDER**

**Adopted:  May 12, 2026** **Released:  May 12, 2026**

By the Chief, Wireless Telecommunications Bureau:

**TABLE OF CONTENTS**

Heading Paragraph #

I. INTRODUCTION ................................................................................................................... 1
II. BACKGROUND ................................................................................................................... 3
   A. Description of the Applicants ........................................................................................ 3
      1. AT&T ..................................................................................................................... 3
      2. EchoStar Corporation ........................................................................................... 4
   B. Description of the Transaction ...................................................................................... 5
   C. Transaction Review Process .......................................................................................... 11
III. STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK ........................... 13
IV. QUALIFICATIONS OF THE APPLICANTS AND COMPLIANCE WITH
   COMMUNICATIONS ACT AND COMMISSION RULES AND POLICIES .................... 17
V. POTENTIAL PUBLIC INTEREST HARMS ....................................................................... 19
   A. Market Definitions ........................................................................................................ 21
      1. Product Market ...................................................................................................... 21
      2. Geographic Market ................................................................................................ 23
      3. Input Market for Spectrum ................................................................................... 24
   B. Competitive Analysis ..................................................................................................... 25
      1. Initial Screen ......................................................................................................... 31
      2. Market Analysis .................................................................................................... 33
         a. Total Spectrum Holdings .............................................................................. 34
         b. Enhanced Factor Review .............................................................................. 36
         c. Nationwide Effects ....................................................................................... 40
VI. POTENTIAL PUBLIC INTEREST BENEFITS ................................................................... 42
VII. OTHER PUBLIC INTEREST ISSUES ................................................................................ 51
VIII. WAIVERS ............................................................................................................................ 63
   A. Waiver of 600 MHz Construction Requirements .......................................................... 64
   B. Waiver of the Time-Limited Aggregation Limit for 3.45 GHz Spectrum ................... 81
IX. CONCLUSION ..................................................................................................................... 82
X. ORDERING CLAUSES ........................................................................................................ 83
APPENDIX A: Petitioners and Commenters
APPENDIX B

## I.    INTRODUCTION

1.    The FCC takes another step today towards restoring America's leadership in wireless. We do so by approving a transfer of spectrum that will extend high-speed wireless services to even more Americans.  Specifically, in this Memorandum Opinion and Order, we grant the assignment applications filed by AT&T Mobility II LLC, an indirect wholly owned subsidiary of AT&T Inc. (collectively, AT&T), and EchoStar Corporation and its wholly owned subsidiaries (collectively, EchoStar, and together with AT&T, the Applicants).[1]  We also grant the request for waiver of the 600 MHz buildout requirements under section 27.14(t) conditioned on AT&T meeting more robust buildout deadlines than it proposed in the request.  In addition, we grant a temporary partial waiver and extension of the discontinuance rule under section 1.953 to the extent necessary to effectuate the transaction.  We dismiss as moot the request to waive section 1.946(e)(3) of the Commission's rules as it applies to AT&T because a waiver is not necessary, as explained below.  In addition, we dismiss as moot AT&T's request for waiver of the time-limited 40 megahertz aggregation limit on 3.45 GHz spectrum under section 27.1606(a) of the Commission's rules because that limit expired on January 4, 2026.

2.    After carefully evaluating the potential competitive effects of the proposed assignments, we find that the likelihood of competitive harm is low, for the reasons set forth below, and does not warrant denial of the assignments.  Further, our review of the record demonstrates that the proposed transaction is likely to result in significant public interest benefits.  AT&T plans to deploy this valuable spectrum, which covers approximately 99% of the U.S. population and which could otherwise be left unused or underutilized.  AT&T will use this spectrum to improve its 5G network's coverage, capacity, and performance throughout the country, including rural areas, allowing it to better compete against the other nationwide providers and provide a better customer experience.  Additionally, the proposed assignments will facilitate EchoStar's ability to improve the services provided to its Boost Mobile customers.  For these reasons, we conclude that the public interest, convenience, and necessity would be served by approving these Applications.

## II.    BACKGROUND

### A.    Description of the Applicants

#### 1.    AT&T

3.    AT&T Mobility II LLC is an indirect, wholly owned subsidiary of AT&T Inc.,[2] a publicly traded telecommunications services provider incorporated in Delaware.[3]  AT&T Inc. and its

---

[1] *See* Applications of AT&T Mobility II LLC and EchoStar Corporation for Consent to Assign Licenses, WT Docket No. 25-303, ULS File Nos. 0011749148 (lead application), 0011749151, 0011749122 and paper applications filed in ECFS File Nos. 50001WTAA25 and 50002WTAA25 (filed Sept. 18, 2025) (Applications).  ULS File No. 0011944971 was filed in ULS to replace ECFS File Nos. 50001WTAA25 and 50002WTAA25 (filed March 13, 2026).  The Applicants state that EchoStar has on file and may file additional requests for the acquisition of 600 MHz or 3.45 GHz licenses and/or for authorizations for new or modified facilities that may be granted before the Commission acts on these Applications.  Applications, Exh. 1, Description of Transaction, Public Interest Showing, and Related Demonstrations at 38 (Public Interest Statement).  The Applicants request that any approval of the Applications for the instant transaction include authority for AT&T to acquire any licenses that EchoStar obtains through pending assignment applications.  Public Interest Statement at 38.  The Applicants further request that any Commission approval include any authorizations that may have been inadvertently omitted.  Public Interest Statement at 38.  The Applicants state that the public notice announcing this transaction provides adequate notice to the public with respect to the licenses involved, including licenses for which modifications are pending and, therefore, a waiver of sections 1.927(h), 1.929(a)(2) and 1.933(b) of the Commission's rules is not necessary.  Public Interest Statement at 39.

[2] *See* Public Interest Statement at 6–7; AT&T Inc., FCC Form 602, File No. 0011895370 at 1 (filed Feb. 3, 2026) (AT&T Form 602); AT&T Inc., SEC Form 10-K, Ex. 21 at 3 (filed Feb. 9, 2026) (AT&T 10-K).

[3] AT&T 10-K at 1.

2

subsidiaries provide nationwide wireless service to approximately 91 million postpaid subscribers, 18 million prepaid subscribers, and 11 million subscribers through resellers; and sell handsets; wireless data cards and wireless computing devices for use with its services.[4]  AT&T reported 2025 total operating revenues of approximately $125.6 billion, with an operating income of approximately $24.1 billion.[5]

### 2.        EchoStar Corporation

4.        EchoStar Corporation, a Nevada corporation, is a publicly traded holding company that provides technology, networking services, television entertainment, and connectivity.[6]  Through its subsidiaries, EchoStar operates in three primary business segments: (1) pay-TV; (2) wireless; and (3) broadband and satellite services.[7]  EchoStar's pay-TV business offers satellite TV services as well as multichannel, live linear and on-demand streaming over-the-top Internet-based video programming services; its wireless business provides wireless communications services and products under its Boost Mobile and Gen Mobile brands; and its broadband and satellite services business provides broadband services to consumers, small- to medium-sized businesses, government customers, and large commercial enterprise customers.[8]  As of December 31, 2025, EchoStar had approximately 7.5 million wireless subscribers.[9]  EchoStar reported 2025 consolidated revenues of approximately $15 billion, with an operating loss of approximately $17.7 billion.[10]

### B.        Description of the Transaction

5.        Under the proposed transaction, EchoStar will assign all of its 3.45 GHz and 600 MHz licenses to AT&T.[11]  These licenses cover approximately 99% of the U.S. population in 3,155 counties or county-equivalents in all or parts of 720 Cellular Market Areas (CMAs) across 50 states and the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, and the Gulf of America.[12]  Altogether, AT&T would acquire 10 megahertz to 40 megahertz of 600 MHz spectrum and up to 40 megahertz of 3.45 GHz spectrum in the markets at issue.[13]

6.        The Applicants request a waiver, extension, and/or substitution of the 600 MHz buildout requirements under sections 27.14(t), 1.953, and 1.946(e)(3) of the Commission's rules to give AT&T sufficient time to build out the 600 MHz spectrum.[14]  AT&T also seeks a waiver of section 27.1606(a) of the rules, which temporarily limits licensees, until January 4, 2026, to holding no more than 40 megahertz of 3450–3550 MHz band licenses in any service area.[15]

---

[4] AT&T 10-K at 1, 3–4, 23.

[5] AT&T 10-K at 20–21.

[6] Public Interest Statement at 6; EchoStar Corporation, SEC Form 10-K at F-9 (filed Mar. 2, 2026) (EchoStar 10-K).

[7] EchoStar 10-K at 6, F-9.

[8] Public Interest Statement at 6; EchoStar 10-K at 6–7.

[9] EchoStar 10-K at 6.

[10] EchoStar 10-K at 74.

[11] Public Interest Statement at 6–7.

[12] *See, e.g.*, Public Interest Statement, Exh. 3 AT&T Aggregation Chart (amended Jan. 30, 2026) (Exh. 3 AT&T Amended Aggregation Chart).

[13] Exh. 3 AT&T Amended Aggregation Chart.

[14] Public Interest Statement at 29–37; Letter from Maureen R. Jeffreys, Arnold & Porter Kaye Scholer LLP, Counsel to AT&T, and Pantelis Michalopoulos, Steptoe LLP, Counsel to EchoStar Corporation, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, at 1 (filed Apr. 17, 2026) (Applicants' Apr. 17, 2026 Letter).

[15] Public Interest Statement at 37–38; 47 CFR § 27.1606(a); *see also Facilitating Shared Use in the 3100–3550 MHz Band*, WT Docket No. 19-348, Second Report and Order, Order on Reconsideration, and Order of Proposed

(continued….)

7.      The Applicants contend that the transaction is in the public interest because it would enable AT&T to increase its spectrum depth and improve its network performance, leading to better service and also the expanded availability of AT&T's fixed wireless service and converged fixed broadband and mobile wireless services.[16]  The Applicants state that the 3.45 GHz spectrum at issue is unused and that AT&T will be able to deploy the 3.45 GHz spectrum rapidly[17] and "will be able to use the 3.45 GHz spectrum for 5G more intensively than EchoStar promptly upon closing."[18]

8.      The Applicants also assert that the proposed transaction would ensure the 600 MHz spectrum will be put to its "highest and best use" and explain that EchoStar is "not in a position to undertake additional 5G deployments."[19]  The Applicants contend that, by contrast, AT&T has the resources and a strong incentive to deploy the 600 MHz spectrum.[20]  In addition, the Applicants state that waiving the 600 MHz buildout requirements is in the public interest because it would avoid the risk of underutilization of the 600 MHz spectrum and give AT&T the time it needs to incorporate the 600 MHz spectrum into its network.[21]

9.      As part of the broader transaction, the Applicants explain that EchoStar and AT&T have also entered into what they describe as a hybrid-Mobile Network Operator (MNO) arrangement, which builds on their existing network-as-a-service (NaaS) arrangement that enables the routing of Boost Mobile customer traffic from AT&T's cell sites to EchoStar's core facilities.[22]  They explain that under the new arrangement, EchoStar will have lower rates and AT&T will increase the interconnection points that it provides EchoStar, providing for better service.[23]  The Applicants contend that through its hybrid-MNO arrangement, EchoStar will offer more reliable wireless service at lower cost, making it a more effective competitor than it is currently.[24]

10.      On May 30, 2025, EchoStar announced that it elected not to make an approximately $326 million cash interest payment due on May 30, 2025 on certain secured notes and that such non-payment was a default, and that it had a 30-day grace period to make the payments.[25]  On June 2, 2025, EchoStar made a similar announcement with respect to approximately $183 million in cash interest payments due on June 2, 2025 on other secured notes.[26]  On June 6, 2025, the Wall Street Journal reported that EchoStar

---

(Continued from previous page)

Modification, 36 FCC Rcd 5987, 6022–23, 6025, paras. 102, 106 (2021) (*3.45 GHz Order*).  Auction 110 closed on January 4, 2022. *See Auction of Flexible-Use Service Licenses in the 3.45–3.55 GHz Band Closes, Winning Bidders Announced for Auction 110*, AU Docket No. 21-62, Public Notice, 37 FCC Rcd 308, 308, para. 1 (OEA/WTB 2022) (*Auction 110 Public Notice*).

[16] Public Interest Statement at 10, 15.

[17] Public Interest Statement at 4, 10, 13–14.

[18] Public Interest Statement at 37.  Since filing the Applications, AT&T announced that it is already using the 3.45 GHz spectrum. *See, e.g.*, Press Release, AT&T, AT&T Boosts 5G Capacity Nationwide with New Spectrum, Giving Customers a Stronger, Faster Connection (Nov. 17, 2025), https://about.att.com/story/2025/att-boosts-5g-capacity-nationwide.html.

[19] Public Interest Statement at 36.

[20] Public Interest Statement at 2, 10, 17.

[21] Public Interest Statement at 36–37.

[22] Public Interest Statement at 7, 22; Declaration of John Swieringa, Exh. B to Public Interest Statement, ¶¶ 5–9 (Public Interest Statement, Swieringa Decl.).

[23] Public Interest Statement at 22; Public Interest Statement, Swieringa Decl. ¶¶ 6–7, 12.

[24] Public Interest Statement at 3, 22–23.

[25] EchoStar Corp., SEC Form 8-K at Item 2.04 (filed May 30, 2025).

[26] EchoStar Corp., SEC Form 8-K at Item 2.04 (filed June 2, 2025).

was considering a Chapter 11 bankruptcy filing.[27]  On June 27, 2025 EchoStar announced that it would make both sets of interest payments, but that it would not pay approximately $114 million of cash interest payments on other notes due July 1, 2025.[28]  In its August 26, 2025 statement announcing the proposed transaction, EchoStar stated that the transaction "puts [its] business on a solid financial path, further facilitating EchoStar's long-term success, and enhancing [its] ability to innovate and compete as a hybrid network operator.  The proceeds of this transaction will be used for, among other things, retiring certain debt obligations and funding EchoStar's continued operations and growth initiatives."[29]

### C.    Transaction Review Process

11.    On September 18, 2025, AT&T and EchoStar filed five applications seeking Commission consent to assign EchoStar's 3.45 GHz and 600 MHz spectrum to AT&T.  On September 30, 2025, a public notice was released accepting the Applications for filing and seeking comment on the Applicants' request for waiver of section 27.1606(a) of the Commission's rules and request for "waiver, extension, and/or substitution of the 600 MHz buildout requirements" under sections 27.14(t), 1.953, and 1.946(e) of the Commission's rules.[30]

12.    On November 18, 2025, one petition to deny or condition the transaction,[31] and two comments were timely filed.[32]  On December 3, 2025, AT&T and EchoStar filed a Joint Opposition[33] and the Information Technology and Innovation Foundation (ITIF) filed comments and an Opposition in support of the proposed transaction and against the petition to deny the transaction.[34]  On December 15, 2025, the Rural Wireless Association (RWA) filed reply comments.[35]  In December 2025 through May 2026, multiple parties filed *ex parte* submissions and letters concerning EchoStar subsidiary DISH Wireless LLC's (DISH Wireless) contractual obligations.[36]

---

[27] Alexander Gladstone and Drew Fitzgerald, Wall Street Journal, EchoStar Prepares Potential Bankruptcy Filing Amid FCC Review (June 6, 2025).

[28] EchoStar Corp., SEC Form 8-K at Item 8.01, Item 2.04 (filed June 27, 2025).

[29] News Release, EchoStar, EchoStar Announces Spectrum Sale and Hybrid Mobile Network Operator (MNO) Agreement, Steps Toward Resolving Federal Communications Commission's (FCC) Inquiries (Aug. 26, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-hybrid-mobile-network.

[30] *Wireless Telecommunications Bureau Accepts for Filing AT&T Mobility II LLC and EchoStar Corporation's Spectrum Assignment Applications*, WT Docket No. 25-303, Public Notice, DA 25-919 (WTB Sept. 30, 2025).

[31] Petition to Condition or Deny of T-Mobile USA, Inc., WT Docket No. 25-303 (filed Nov. 18, 2025), https://www.fcc.gov/ecfs/document/1118614525157/1 (T-Mobile Petition).

[32] Rural Wireless Association, Inc. Comments (RWA); Public Knowledge and Open Technology Institute at New America Comments (Public Knowledge and OTI).  RWA and Public Knowledge and OTI filed their submissions as comments.  Accordingly, any oppositions to the proposed transaction raised in their filings will be given the weight of comments and not petitions to deny.  *See* 47 CFR § 1.939 (requirements for petitions to deny spectrum assignment applications).

[33] Joint Opposition to Petition to Condition or Deny and Reply Comments of AT&T Mobility II LLC and EchoStar Corporation (Joint Opposition) (Dec. 3, 2025).

[34] Letter from Joe Kane, Director of Broadband and Spectrum Policy, ITIF, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303 (Dec. 3, 2025) (ITIF Comments).

[35] Reply to Opposition of the Rural Wireless Association, Inc. (Dec. 15, 2025) (RWA Reply).

[36] Appendix A lists all submissions filed in this docket from December 2025 through May 2026.  *See infra* Appendix A, Petitioners and Commenters.  A broad range of parties, including the Wireless Infrastructure Association, NATE the Communications Infrastructure Contractors Association, the Michigan Coalition to Protect Public Rights-of-Way (representing municipalities), and individual property owners, submitted comments or *ex partes* requesting that the FCC take action to address DISH Wireless's contractual obligations to its infrastructure

(continued….)

5

## III.      STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK

13.      Pursuant to section 310(d) of the Communications Act of 1934, as amended (the Act),[37] we must determine whether the proposed assignment to AT&T of licenses held and controlled by EchoStar will serve the public interest, convenience, and necessity.  In making this determination, we first assess whether the proposed transaction complies with the specific provisions of the Act, other applicable statutes, and the Commission's rules.[38]

14.      If the proposed transaction does not violate a statute or rule, we then consider whether the transaction could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes.[39]  Our competitive analysis, which forms an important part of the public interest evaluation, is informed by, but not limited to, traditional antitrust principles.[40]  The United States Department of Justice has independent authority to examine the competitive impacts of proposed mergers and transactions involving transfers of Commission licenses, but the Commission's competitive analysis under the public interest standard is somewhat broader, and often takes a more extensive view of potential and future competition and its impact on the relevant markets.[41]  Notably, the Commission has determined it may impose and enforce transaction-related conditions to ensure that the public interest is served by the transaction.[42]

---

(Continued from previous page)

partners.  Filings in Appendix A that were submitted after the December 15, 2025 close of the pleading cycle for this transaction by their respective filers are accorded consideration as *ex parte* filings under the Commission's rules.  47 CFR §§ 1.1200 *et seq.*; *see generally* 47 CFR § 1.419(b).

[37] 47 U.S.C. § 310(d).  Section 310(d) of the Act requires that the Commission consider applications for transfer or assignment of Title III licenses under the same standard as if the proposed transferee or assignee were applying for licenses directly under section 308 of the Act, 47 U.S.C. § 308.  *See, e.g.*, *Applications of T-Mobile US, Inc. and United States Cellular Corporation for Consent to Transfer Control of Licenses, Authorizations, and Leases*, GN Docket No. 24-286, Memorandum Opinion and Order, 40 FCC Rcd 4776, 4783, para. 13 & n.43 (WTB 2025) (*T-Mobile-UScellular Order*); *Applications of Level 3 Communications, Inc. and CenturyLink, Inc. for Consent to Transfer Control of Licenses and Authorizations*, WC Docket No. 16-403, Memorandum Opinion and Order, 32 FCC Rcd 9581, 9585, para. 8 (2017) (*CenturyLink-Level 3 Order*); *Applications of GCI Communication Corp., ACS Wireless License Sub, Inc., ACS of Anchorage License Sub, Inc., and Unicom, Inc. for Consent to Assign Licenses to the Alaska Wireless Network, LLC*, WT Docket No. 12-187, WC Docket No. 09-197, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 10433, 10442, para. 23 & n.71 (2013) (*Alaska Wireless-GCI Order*).

[38] 47 U.S.C. § 310(d); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 13; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 8; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[39] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 14; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 9; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[40] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 14; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 9; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 25; *see also Ne. Utils. Serv. Co. v. FERC*, 993 F.2d 937, 947 (1st Cir. 1993) (public interest standard does not require agencies "to analyze proposed mergers under the same standards that the Department of Justice . . . must apply").

[41] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 14; *Applications for Consent to the Transfer of Control of Licenses, XM Satellite Radio Holdings Inc., Transferor to Sirius Satellite Radio Inc., Transferee*, MB Docket No. 07-57, Memorandum Opinion and Order and Report and Order, 23 FCC Rcd 12348, 12365–66, para. 32 (2008); *AT&T Inc. and BellSouth Corporation Application for Transfer of Control*, WC Docket No. 06-74, Memorandum Opinion and Order, 22 FCC Rcd 5662, 5673–74, para. 21 (2007) (*AT&T-BellSouth Order*); *Application of EchoStar Communications Corp., (A Nevada Corp.), General Motors Corp., and Hughes Electronics Corp. (Delaware Corps.) (Transferors) and EchoStar Communications Corp. (A Delaware Corp.) (Transferee)*, CS Docket No. 01-348, Hearing Designation Order, 17 FCC Rcd 20559, 20575, para. 27 (2002).

[42] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 14; *Applications of AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Docket No. 14-90, Memorandum Opinion and Order, 30 FCC Rcd 9131, 9141, para. 22 (2015) (*AT&T-DIRECTV Order*); *Applications of Comcast*

(continued….)

15.        If we determine that a transaction raises no public interest harms or that any such harms have been ameliorated by the Commission-imposed conditions or voluntary commitments, we next consider a transaction's public interest benefits.  Applicants bear the burden of proving those benefits by a preponderance of the evidence.[43]  As part of our public interest authority, we may impose conditions to ensure for the public the transaction-related benefits claimed by the applicants.[44]

16.        Finally, if we are able to find that transaction-related conditions are able to ameliorate any public interest harms and the transaction is in the public interest, we may approve the transaction as so conditioned or agreed.[45]  In contrast, if we are unable to find that a proposed transaction even with such conditions serves the public interest or if the record presents a substantial and material question of fact, then we must designate the application for hearing.[46]

## IV.        QUALIFICATIONS OF THE APPLICANTS AND COMPLIANCE WITH COMMUNICATIONS ACT AND COMMISSION RULES AND POLICIES

17.        Section 310(d) of the Act requires that we make a determination as to whether the Applicants have the requisite qualifications to hold Commission licenses.[47]  Among the factors the Commission considers in its public interest review is whether the applicant for a license has the requisite "citizenship, character, financial, technical, and other qualifications."[48]  Therefore, as a threshold matter, the Commission must determine whether the applicants to a proposed transaction meet the requisite qualification requirements to hold and transfer licenses under section 310(d) of the Act and the Commission's rules.[49]

18.        AT&T will acquire certain EchoStar spectrum licenses.  No issues were credibly raised regarding the basic qualifications of AT&T or EchoStar.  AT&T and its subsidiaries and affiliates[50] and

(Continued from previous page) ────────────────

*Corp., General Electric Co. and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licenses*, MB Docket No. 10-56, Memorandum Opinion and Order, 26 FCC Rcd 4238, 4249, para. 25 (2011); *see also Application of WorldCom, Inc. and MCI Commc'ns Corp. for Transfer of Control of MCI Commc'ns Corp. to WorldCom, Inc.*, CC Docket No. 97-211, Memorandum Opinion and Order, 13 FCC Rcd 18025, 18032, para. 10 (1998) (stating that the Commission may attach conditions to the transfers); *Applications of T-Mobile US, Inc., and Sprint Corp., for Consent to Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corp., Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, WT Docket No. 18-197, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578, 10596, para. 42 (2019) (*T-Mobile-Sprint Order*).

[43] 47 U.S.C. § 309(e); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 15; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 10; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[44] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 15; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 26; *Applications of AT&T Inc. and Centennial Communications Corp. for Consent to Transfer Control of Licenses, Authorizations, and Spectrum Leasing Arrangements*, WT Docket No. 08-246, Memorandum Opinion and Order, 24 FCC Rcd 13915, 13929, para. 30 (2009) (*AT&T-Centennial Order*).

[45] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 16; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 11.

[46] 47 U.S.C. § 309(e); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 16; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586–87, para. 11; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10444, para. 27.

[47] 47 U.S.C. § 310(d).

[48] 47 U.S.C. §§ 308, 310(d); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 17; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10596–97, para. 43; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9587, para. 12.

[49] *See, e.g.*, *T-Mobile-Sprint Order*, 34 FCC Rcd at 10596–97, para. 43; *CenturyLink-Level3 Order*, 32 FCC Rcd at 9587, para. 12.

[50] *See, e.g.*, *Application of AT&T Mobility Spectrum, LLC and Kaplan Telephone Company, Inc. for Consent to Assign Licenses*, WT Docket No. 14-167, Memorandum Opinion and Order, 30 FCC Rcd 8502, 8506–07, para. 9

(continued….)

separately EchoStar and its subsidiaries and affiliates previously and repeatedly have been found qualified to hold Commission licenses.[51]  T-Mobile argues that EchoStar's alleged misrepresentations made as part of its buildout showing certainly rise to a level that calls into question whether EchoStar possesses the requisite qualifications to hold FCC licenses.[52]  We disagree.  The Commission generally does not reevaluate the qualifications of transferors unless issues related to basic qualifications have been sufficiently raised in petitions to warrant designation for hearing on the question whether the transferee is fit to be a licensee or should instead have its licenses revoked.[53]  That has not occurred here.  Moreover, as was the case in the *T-Mobile-Sprint* proceeding, there is no evidence that the alleged violations rise under our precedent to the level that would warrant designation for an evidentiary hearing.[54]  In sum, we do not find there is a material question of fact regarding EchoStar's basic qualifications as a licensee that would warrant setting these Applications for a hearing.  Accordingly, pursuant to Commission precedent,[55] we find that there is no reason to reevaluate the requisite citizenship, character, financial, technical, or other basic qualifications of AT&T or EchoStar under the Act and our rules, regulations, and

---

(Continued from previous page)

(WTB 2015); *Application of AT&T Mobility Spectrum, LLC and Data-Max Wireless, LLC for Consent to Assign License*, WT Docket No. 16-59, Memorandum Opinion and Order, 31 FCC Rcd 12662, 12664–65, para. 6 (WTB 2016).

[51] *See, e.g.*, *Applications of Liberty Latin America Ltd. and DISH Network Corporation For Consent To Assignment of Spectrum Licenses, Assets, and Customers of DISH Network Corporation to Liberty Latin America Ltd. in Puerto Rico and the U.S. Virgin Islands*, GN Docket No. 24-55, Memorandum Opinion and Order and Declaratory Ruling, 39 FCC Rcd 8772, 8776, para. 11 (WTB/OIA 2024) (finding no basis to reevaluate the qualifications of DISH Network Corporation (a wholly owned subsidiary of EchoStar) to hold Commission licenses).

[52] T-Mobile Petition at 11 & n.22.

[53] *T-Mobile-Sprint Order*, 34 FCC Rcd at 10597, para. 45; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9587, para. 13; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10445, para. 29.  *See generally Jefferson Radio Co. v. FCC*, 340 F.2d 781, 783 (D.C. Cir. 1964); *Stereo Broadcasters, Inc. v. FCC*, 652 F.2d 1026, 1030 (D.C. Cir. 1981) (Commission policy generally prohibits the assignment of a license while basic qualifications issues raised against the licensee remain unresolved, and thus serves as a deterrent to licensee misconduct)).

[54] Compare *Terry Keith Hammond Application For Renewal of License for Station KBKH(FM) Shamrock, Texas*, EB Docket No. 06-163, Order to Show Cause, Notice of Opportunity for Hearing, and Hearing Designation Order, 21 FCC Rcd 10267 (2006) (hearing designated with respect to licensee's felony conviction and issues concerning possible rule violations, false certifications and failure to respond to Commission inquiries), and *San Francisco Unified School District for Renewal of License for Station KALW(FM), San Francisco, California*, MB Docket No. 04-191, Hearing Designation Order and Notice of Apparent Liability for Forfeiture, 19 FCC Rcd 13326 (2004) (hearing designated on issues relating to possible misrepresentations, lack of candor in licensee's statements in renewal application regarding station public file), with *Springfield Broadcasting Partners, Urbana Champaign Broadcasting Partners*, Notice of Apparent Liability for Forfeiture, 14 FCC Rcd 3683 (1999) and *Liability of Springfield Broadcasting Partners Licensee of Television Station WRSP-TV, Springfield, Illinois Facility I.D. No. 62009 and Urbana Champaign Broadcasting Partners Licensee of Television Station WCCU(TV), Urbana-Champaign, Illinois Facility I.D. No. 69544 for Forfeitures*, Memorandum Opinion and Order and Forfeiture Order, 14 FCC Rcd 19230 (1999) (forfeiture imposed for 304 violations of children's advertising limits, renewal application granted); *Application of Morgan County Industries, Inc. for Renewal of License for Station WMOR(AM) Morehead, Kentucky*, Memorandum Opinion and Order and Notice of Apparent Liability for Forfeiture, 21 FCC Rcd 13712 (MB 2006) (forfeiture proposed for station operation at an unauthorized location; renewal application granted), *Application of High I-Q Radio, Inc. Noncommercial Educational FM Station KOLI(FM), Electra, Texas et al.*, Memorandum Opinion and Order, 19 FCC Rcd 7225 (2004) (license assignment approved in case involving unauthorized transfer of control, commercial operation of a radio station authorized as a non-commercial station, and failure to timely file certain contracts).

[55] The Commission generally does not reevaluate the qualifications of transferors unless issues related to basic qualifications have been sufficiently raised in petitions to warrant designation for hearing.  *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10597, para. 45; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 25.

policies.  We also find that the transaction will not violate any statutory provision or Commission rule with the exception of section 27.14(t) for which we grant a waiver request below.[56]

## V.    POTENTIAL PUBLIC INTEREST HARMS

19.    In reviewing applications involving a proposed transaction, the Commission evaluates the potential public interest harms, including potential competitive harms, that may result from the transaction.[57]  Spectrum is an essential input in the provision of mobile wireless services, and ensuring that sufficient spectrum is available for incumbent licensees as well as potential new entrants is critical to promoting effective competition and innovation in the marketplace.[58]  Regarding mobile spectrum holding policies, the Commission's fundamental goal is the preservation and promotion of competition, which in turn leads to lower prices, improved quality, and increased innovation.[59]  When considering the potential competitive effects of spectrum aggregation, the Commission has considered whether there would be an increased likelihood that rival service providers or potential entrants would be foreclosed from expanding capacity, deploying advanced mobile broadband technologies, or entering the market, and also whether rivals' costs would be increased to the extent that they would be less likely to be able to compete robustly.[60]

20.    Following long-standing Commission precedent, we begin our competitive analysis by determining the appropriate market definitions for the proposed transaction.[61]  We then turn to our consideration of the potential competitive effects of the proposed transaction.  First, we apply our initial two-part screen to help identify markets of potential concern.[62]  We then undertake our market analysis that evaluates the likelihood of competitive harm in the markets implicated by this transaction to ensure that the public interest, convenience, and necessity is served.[63]  As discussed in detail below, we find that, post-transaction, the likelihood of competitive harm in the markets at issue is low.

---

[56] As explained below, to the extent necessary we also grant a temporary waiver of section 1.953 of the Commission's rules, and we dismiss several waiver requests as moot, including the request for waiver of section 27.1606(a) of the Commission's rules, which is moot because the time-limited aggregation limit on 3.45 GHz spectrum has already expired.

[57] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4793, para. 28; *Application of T-Mobile US, Inc., Nextel West Corp., and LB License Co, LLC for License Assignment*, ULS File No. 0010923038, Memorandum Opinion and Order, 39 FCC Rcd 11482, 11487, para. 11 (WTB/OEA 2024) (*T-Mobile-LB License Order*); *Application of Horry Telephone Cooperative, Inc. and T-Mobile License LLC to Assign Spectrum Licenses*, ULS File Nos. 0010864059, 0010877919, and 0010902770, Memorandum Opinion and Order, 39 FCC Rcd 10712, 10716–17, para. 11 (WTB/OEA 2024) (*T-Mobile-HTC Order*).

[58] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4801–02, para. 46; *T-Mobile-HTC Order*, 39 FCC Rcd at 10716–17, para. 11; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10617–18, para. 94.

[59] *See, e.g.*, *Policies Regarding Mobile Spectrum Holdings; Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, WT Docket No. 12-269, GN Docket No. 12-268, Report and Order, 29 FCC Rcd 6133, 6143–44, para. 17 (2014) (*Mobile Spectrum Holdings Report and Order*).

[60] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4801–02, para. 46; *T-Mobile-HTC Order*, 39 FCC Rcd at 10716–17, para. 11; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10617–18, para. 94.

[61] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4793, para. 28; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10600–01, para. 53; *Applications of Cricket License Company, LLC, et al., Leap Wireless International, Inc., and AT&T Inc. for Consent to Transfer Control of Authorizations; Application of Cricket License Company, LLC and Leap Licenseco Inc. for Consent to Assignment of Authorization*, WT Docket No. 13-193, Memorandum Opinion and Order, 29 FCC Rcd 2735, 2746, para. 22 (WTB/IB 2014) (*AT&T-Leap Order*).

[62] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4793, para. 28; *T-Mobile-LB License Order*, 39 FCC Rcd at 11492, para. 24; *T-Mobile-HTC Order*, 39 FCC Rcd at 10722, para. 25.

[63] *See, e.g.*, *T-Mobile-LB License Order*, 39 FCC Rcd at 11491, para. 22; *T-Mobile-HTC Order*, 39 FCC Rcd at 10721, para. 23; *AT&T-Leap Order*, 29 FCC Rcd at 2741–42, 2752, paras. 13, 38.

### A.      Market Definitions

#### 1.      Product Market

21.      In previous mobile wireless transactions, the Commission has defined the relevant product market as a combined "mobile telephony/broadband services" product market that comprises mobile voice and data services, including mobile voice and data services provided over advanced broadband wireless networks (mobile broadband services).[64]  For the purposes of our initial screens,[65] we continue to do so here.  In addition, the Commission has recognized the importance of a forward-looking analysis given that ongoing innovation and reinvention are defining characteristics of the mobile telephony/broadband services market.[66]  Accordingly, as the Commission has previously stated, the mobile telephony/broadband services product market includes not only traditional wireless services, but also necessarily encompasses the recent significant and rapidly evolving advances in mobile broadband services technologies.[67]

22.      We also recognize there are good arguments for adopting a broader market definition that accounts for a range of technologies and offerings, given the modern trends in the communications sector.  However, for purposes of our analysis today, we use the same market definition that the Commission has been using for recent transactions.  Even under this narrower definition, we find, as specified below, that the transaction is in the public interest.

#### 2.      Geographic Market

23.      The Commission has previously found that the geographic market for wireless transactions is local, generally the CMA.[68]  The Commission has repeatedly found that because most consumers use their mobile wireless services at or close to where they live, work, and travel, they generally purchase mobile wireless services from service providers that offer and market such services locally.[69]  The Commission has found, however, that a proposed transaction's competitive effects should also be evaluated at the national level where a proposed transaction exhibits certain national characteristics that provide cause for concern.[70]  The Applicants assert that the relevant geographic market consists of the local markets directly affected by the proposed transaction.[71]  For this proposed

---

[64] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4793–94, para. 30; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10601, 10603, paras. 55, 60; *AT&T-Leap Order*, 29 FCC Rcd at 2746, para. 23.

[65] *See T-Mobile-UScellular Order*, 40 FCC Rcd at 4793–94, para. 30; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10603, para. 60.

[66] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4794, para. 31; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10603–04, para. 61.

[67] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4794, para. 31; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10603–04, para. 61.  As we have explained, we also consider the offerings by mobile virtual network operators (MVNOs) and cable providers as part of the range of differentiated services offered to consumers within the broader mobile telephony/broadband services product market.  *T-Mobile-UScellular Order*, 40 FCC Rcd at 4794, para. 31; *see also* AT&T 10-K at 6 ("[o]ur [wireless business] competitors include two national wireless providers; a larger number of regional providers and resellers of each of those providers' services; and certain cable companies").

[68] *See, e.g.*, *T-Mobile-LB License Order*, 39 FCC Rcd at 11491–92, para. 23; *T-Mobile-HTC Order*, 39 FCC Rcd at 10721, para. 24; *Applications of T-Mobile License LLC, Nextel West Corp. and LB License Co LLC for License Assignment*, ULS File Nos. 0010168412, 0010168420, and 0010168439, Memorandum Opinion and Order, 38 FCC Rcd 12150, 12164, para. 33 (WTB/OEA 2023) (*T-Mobile-Channel 51-LB License Order*).

[69] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4795, para. 34; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10606, para. 68; *AT&T-Leap Order*, 29 FCC Rcd at 2748–49, para. 29.

[70] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4795–96, paras. 33–34; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10605–06, para. 66; *AT&T-Leap Order*, 29 FCC Rcd at 2748, para. 27.

[71] Public Interest Statement at 17 & n.57 (citing *T-Mobile-Sprint Order*, 34 FCC Rcd at 10605–06, para. 66).

transaction, we continue to use CMAs as the appropriate local market for analyzing potential spectrum aggregation issues and, in addition, given its broad geographic scope, we analyze potential nationwide effects of the proposed transaction on competition.[72]

### 3. Input Market for Spectrum

24.     When a proposed transaction would increase the concentration of spectrum holdings in any local market, the Commission evaluates the acquiring firm's post-transaction holdings of spectrum that are "suitable" and "available" in the near term for the provision of mobile telephony/broadband services.[73]  The Commission has previously determined that the following bands, or portions thereof, should be included in the input market for spectrum:  600 MHz, 700 MHz, cellular, specialized mobile radio service (SMR), broadband Personal Communications Service (PCS), Advanced Wireless Services (AWS) in the 1710–1755 and 2110–2155 MHz band (AWS-1), AWS-3, AWS in the 2000–2020 MHz and 2180–2200 MHz spectrum bands (AWS-4), Broadband Radio Service (BRS), Wireless Communications Service (WCS) spectrum, H Block, Educational Broadband Service (EBS), 3.7 GHz, and 3.45 GHz.[74]

### B. Competitive Analysis

25.     We turn now to our consideration of the potential competitive effects of the proposed transaction.  We first address broader concerns raised in the record regarding competition and then turn to our initial screen and market analysis.  As detailed below, based on our competitive analysis, we determine that the likelihood of competitive harm is low.

26.     *Record.*  The Applicants state that there is robust competition in the wireless marketplace[75] and that the proposed transaction would not reduce competition or cause spectrum aggregation that would present an anticompetitive risk.[76]  The Applicants contend that the proposed license assignments will enhance competition because the resulting improvements to AT&T's network will allow it to provide better service and also put pressure on the other nationwide wireless providers and cable providers to upgrade their own offerings.[77]  The Applicants further contend that EchoStar's

---

[72] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4795–96, para. 34; *T-Mobile-LB License Order*, 39 FCC Rcd at 11491–92, para. 23; *T-Mobile-HTC Order*, 39 FCC Rcd at 10721, para. 24; *T-Mobile-Channel 51-LB License Order*, 38 FCC Rcd at 12164, para. 33; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10605–06, para. 66.

[73] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4796, para. 35; *Applications of AT&T Inc., E.N.M.R. Telephone Cooperative, Plateau Telecommunications, Inc., New Mexico RSA 4 East Limited Partnership, and Texas RSA 3 Limited Partnership for Consent to Assign Licenses and Authorizations*, WT Docket No. 14-144, Memorandum Opinion and Order, 30 FCC Rcd 5107, 5116–17, para. 21 (2015) (*AT&T-Plateau Order*); *AT&T-Leap Order*, 29 FCC Rcd at 2749–50, para. 32.

[74] *See, e.g.*, *Communications Marketplace Report*, GN Docket No. 24-119, 2024 Communications Marketplace Report, 39 FCC Rcd 14116, 14173–74, paras. 69–70, Fig. II.B.11 (2024) (*2024 Communications Marketplace Report*); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4796, para. 35; *T-Mobile-LB License Order*, 39 FCC Rcd at 11491–92, para. 23; *T-Mobile-HTC Order*, 39 FCC Rcd at 10721, para. 24.

[75] Public Interest Statement at 18–20; Public Interest Statement, Exh. A, Declaration of Gordon Mansfield, Vice President—Global Technology, Planning and Engineering, AT&T, ¶ 25 (Public Interest Statement, Mansfield Decl.); Joint Opposition at 15.  The Applicants explain that the additional spectrum "will allow AT&T to compete more effectively with its many rivals" and will "narrow the unpaired mid-band spectrum gap between AT&T and the two other nationwide providers."  Public Interest Statement at 2, 20.  AT&T further explains that it faces "vigorous competition from not only Verizon and T-Mobile, but increasingly from cable providers."  Joint Opposition at 15.

[76] Public Interest Statement at 1, 4, 17, 25; Joint Opposition at 1–2, 7, 13.

[77] Public Interest Statement at 4, 20–21; Joint Opposition at 4.

transition to a hybrid-MNO model would allow it to become a stronger competitor in the mobile wireless marketplace.[78]

27.    RWA and Public Knowledge and OTI raise concerns about the transaction's impact on competition, including the potential emergence of a fourth facilities-based competitor, due to further concentration of spectrum among the three nationwide providers as well as the impact of EchoStar exiting the market as a potential fourth nationwide facilities-based provider and instead becoming a hybrid-MNO.[79]  RWA also argues that the continued spectrum aggregation by the three nationwide wireless providers makes it difficult for rural and small wireless providers to serve their respective markets.[80]

28.    The Applicants respond that no party makes a serious argument that the transaction should be denied and that commenters raise conclusory statements of harm only.[81]  The Applicants state that commenters have not shown any competitively harmful spectrum aggregation.[82]

29.    *Discussion.*  With respect to RWA and Public Knowledge and OTI's generalized concerns about concentration of spectrum among the three nationwide providers, we note that consistent with section 310(d) and precedent, we look to the specific facts and markets at issue in the proposed transaction and evaluate the potential harm.[83]  We agree with Applicants that the commenters have not raised any particular allegations of harm with respect to AT&T's spectrum holdings as a result of this transaction.  Based on our evaluation, as further detailed below, we find that the proposed license assignments have a low likelihood of competitive harm.

30.    As explained in the *T-Mobile-UScellular Order*, our analysis "turns on a fact-specific assessment of the competitive landscape."[84]  While the amount of 3.45 GHz and 600 MHz spectrum with which AT&T would be attributed in certain CMAs post-transaction triggers our spectrum screen and enhanced factor review, our screens are not a hard cap and when they are triggered, further competitive analysis is generally necessary.[85]  We apply our standard competitive analysis and conclude, as detailed

---

[78] Public Interest Statement at 21–24; Joint Opposition at 3, 7.

[79] RWA Comments at i, 2–7; RWA Reply at 2–4; Public Knowledge and OTI Comments at 3, 7–10.  RWA particularly focuses on small and rural providers' ability to compete in their respective markets.  RWA Comments at I, 2–7; RWA Reply at 3–4.  Public Knowledge and OTI express concern about the transaction's impact on Open RAN deployment efforts.  Public Knowledge and OTI Comments at 7.  Public Knowledge and OTI also comment that secondary market transfers are subject to the Commission's statutory obligation under section 309(j)(3)(B) of the Communications Act to avoid "undue concentration of licenses" and ensure spectrum is disseminated among a "wide variety of applicants."  *Id.* at 9.  We note that while they raise concerns about the proposed transaction, Public Knowledge and OTI acknowledge that it is better that AT&T acquire this spectrum to achieve parity with T-Mobile and Verizon, and that the proposed transaction contemplates that EchoStar will continue to operate as a hybrid MVNO.  Public Knowledge and OTI Comments at 8.

[80] RWA Comments at i, 2–3; RWA Reply at 3–4.  T-Mobile argues that the transaction should be denied or conditioned, but it does not raise issues of competitive harm or spectrum aggregation.  *See generally* T-Mobile Petition.

[81] Joint Opposition at 1–2, 13.

[82] Joint Opposition at 13.

[83] *T-Mobile-LB License Order*, 39 FCC Rcd at 11490–91, paras. 19–20 ("When analyzing the potential competitive effects of a proposed transaction, the Commission consistently has analyzed the specific markets implicated in the transaction at issue"; "The Commission does not consider as part of its public interest analysis of proposed transactions spectrum aggregation regarding CMAs that are not involved in the transaction at issue"); *T-Mobile Channel 51-LB License Order*, 38 FCC Rcd at 12157, 12159, paras. 13–14, 19.

[84] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4793, para. 29.

[85] *See, e.g.*, *Applications of Liberty Latin America Ltd. and DISH Network Corporation for Consent to Assignment of Spectrum Licenses, Assets, and Customers of DISH Network Corporation to Liberty Latin America Ltd. in Puerto Rico and the U.S. Virgin Islands*, GN Docket No. 24-55, Memorandum Opinion and Order and Declaratory Ruling,

(continued….)

below, that the acquisition of this spectrum is not likely to impair other providers from effectively competing or otherwise lead to significant anticompetitive harms in any of the markets at issue or at a national level.

### 1.       Initial Screen

31.       To help identify those local markets in which competitive concerns are more likely, we apply a two-part screen.  The first part of the screen is based on the size of the post-transaction Herfindahl-Hirschman Index (HHI) and the change in the HHI.[86]  Because this is a spectrum-only transaction that would not result in the acquisition of wireless business units and customers, we do not apply the HHI screen here.[87]  The second part of the screen, which is applied on a county-by-county basis, identifies those local markets where an entity would hold approximately one-third or more of the total spectrum suitable and available for the provision of mobile telephony/broadband services post-transaction.[88]  Further, if the acquiring entity would increase its below-1-GHz spectrum holdings so as to hold approximately one-third or more of such spectrum post-transaction, we apply enhanced factor review.[89]

(Continued from previous page) ──────────────

39 FCC Rcd 8772, 8773, para. 2 (OIA/WTB 2024); *T-Mobile-Channel 51-LB License Order*, 38 FCC Rcd at 12151, para. 2; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10614–15, 10620–621, paras. 87, 101–102; *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6223–24, 6233, 6238–40, paras. 231, 267, 282–88 (each discussing the Commission's total spectrum screen); *T-Mobile-HTC Order*, 39 FCC Rcd at 10721–22, 10724–25, paras. 23, 26, 31; *see also Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6233, 6240, paras. 267, 286–88 (observing that triggering of enhanced factor review does not preclude a conclusion that a transaction furthers the public interest).

[86] The initial HHI screen identifies, for further case-by-case market analysis, those markets in which, post-transaction: (1) the HHI would be greater than 2800 and the change in HHI would be 100 or greater; or (2) the change in HHI would be 250 or greater, regardless of the level of the HHI.  *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4799–800, para. 41 & n.143; *T-Mobile-HTC Order*, 39 FCC Rcd at 10722, para. 25 & n.85; *Application of AT&T Mobility Spectrum LLC and Club 42CM Limited Partnership for Consent to Assign Licenses*, WT Docket No. 14-145, Memorandum Opinion and Order, 30 FCC Rcd 13055, 13065–66, para. 23 & n.84 (2015) (*AT&T-Club 42 Order*).

[87] *See, e.g.*, *Applications of New Cingular Wireless PCS, LLC and United States Cellular Corporation For Consent to Assign Licenses*, WT Docket No. 25-150, Memorandum Opinion and Order, DA 25-1006, at 13, para. 24 (WTB Dec. 3, 2025) (*AT&T-UScellular Order*); *Applications of AT&T Mobility Spectrum, LLC and FTC Management Group, Inc. for Long-Term De Facto Transfer Leasing Arrangements*, WT Docket No. 25-138, Memorandum Opinion and Order, 40 FCC Rcd 6105, 6110–11, para. 14 & n.38 (WTB 2025); *T-Mobile-Channel 51-LB License Order*, 38 FCC Rcd at 12165, paras. 36–37.

[88] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4799–800, para. 41; *Application of New Cingular Wireless PCS, LLC and Qualcomm Incorporated for Consent to Assign License*, WT Docket No. 16-75, Memorandum Opinion and Order, 31 FCC Rcd 13336, 13341–42, para. 14 (WTB 2016) (*AT&T-Qualcomm Order*); *Application of AT&T Mobility Spectrum LLC and Club 42CM Limited Partnership for Consent to Assign Licenses*, WT Docket No. 14-145, Memorandum Opinion and Order, 30 FCC Rcd 13055, 13065–66, para. 23 (2015) (*AT&T-Club 42 Order*).  The total amount of spectrum that is currently considered suitable and available for the provision of mobile telephony/broadband services is 1,123 megahertz, with an associated spectrum screen trigger of 385 megahertz. *2024 Communications Marketplace Report*, 39 FCC Rcd at 14173–74, paras. 69–70, Fig. II.B.11.  We note that 3.7 GHz and 3.45 GHz spectrum are not available for use in Hawaii, Alaska, and the territories.  In these areas, the total amount of suitable and available spectrum is 743 megahertz, and the associated spectrum screen trigger is 250 megahertz.  *2024 Communications Marketplace Report*, 39 FCC Rcd at 14173, para. 69 & n.189.

[89] *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6240, paras. 286–88; *see also T-Mobile-UScellular Order*, 40 FCC Rcd at 4799–4800, para. 41; *AT&T-Qualcomm Order*, 31 FCC Rcd at 13341–42, para. 14; *AT&T-Club 42 Order*, 30 FCC Rcd at 13065–66, para. 23.  The total amount of below-1-GHz spectrum that is currently considered suitable and available for the provision of mobile telephony/broadband services is 204 megahertz, with

(continued….)

32.     If the applications are approved, post transaction, AT&T would be attributed with a maximum of 405 megahertz of spectrum, including a maximum of 110 megahertz of below-1-GHz spectrum and a maximum of 100 megahertz of 3.45 GHz spectrum.[90]  Our analysis shows that post-transaction, AT&T would be attributed with approximately one-third or more of the total suitable and available spectrum in 10 CMAs covering less than 1% of the U.S. population, and with approximately one-third or more of the total suitable and available below-1-GHz spectrum in 354 CMAs covering approximately 65% of the U.S. population, which are thus subject to enhanced factor review.[91]

### 2.     Market Analysis

33.     Consistent with existing Commission precedent,[92] we consider various competitive variables that help to predict the likelihood of competitive harm as a result of the proposed transaction. These competitive variables include, but are not limited to: the total number of rival service providers; the number of rival firms that can offer competitive service plans; the coverage by technology of the firms' respective networks;[93] the rival firms' market shares;[94] the applicant's market share; the total amount of spectrum available; the amount of spectrum suitable for the provision of mobile telephony/broadband services controlled by the applicant; and the spectrum holdings of each of the rival service providers and licensees.[95]  As discussed below, we find that AT&T's acquisition of additional spectrum in these markets would not foreclose competitors from expanding capacity or deploying advanced mobile broadband

---

(Continued from previous page)

an associated enhanced factor review trigger of 68 megahertz.  *See 2024 Communications Marketplace Report*, 39 FCC Rcd at 14173–74, paras. 69–70, Fig. II.B.11.

[90] As a result of the proposed transaction, AT&T would acquire up to 40 megahertz of 600 MHz spectrum and up to 40 megahertz of 3.45 GHz spectrum in 3,155 counties in all or parts of 720 CMAs.

[91] Of these 354 markets, 325 are subject to enhanced factor review as set forth in paragraph 286 of the *Mobile Spectrum Holdings Report and Order*, and 29 are subject to enhanced factor review as set forth in paragraph 287 of the *Mobile Spectrum Holdings Report and Order. Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6240, paras. 286–287.  The *Mobile Spectrum Holdings Report and Order* requires that, where the entity acquiring below-1-GHz spectrum already holds approximately one-third or more of the below-1-GHz spectrum in a particular market, the demonstration of the public interest benefits of the proposed transaction would need to clearly outweigh the potential public interest harms, irrespective of other factors.  *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6240, para. 287; *see also AT&T-Club 42 Order*, 30 FCC Rcd at 13056, 13066, paras. 2, 24.

[92] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4816–17, para. 73; *AT&T-Qualcomm Order*, 31 FCC Rcd at 13342, para. 17; *AT&T-Club 42 Order*, 30 FCC Rcd at 13071, para. 34.

[93] We base the coverage analysis on providers' coverage data they submitted pursuant to the Broadband Data Collection for coverage as of June 30, 2025.  Broadband Deployment Accuracy and Technological Availability Act, Pub. L. No. 116-130, 134 Stat. 228 (2020) (codified at 47 U.S.C. §§ 641–646) (Broadband DATA Act); 47 U.S.C. § 642(a)(1)(A) (Broadband Data Collection).

[94] We base providers' market shares on June 2025 Numbering Resource Utilization/Forecast (NRUF) data, which indicate the number of phone numbers that a wireless service provider has been assigned in a particular rate center (there are approximately 18,000 rate centers in the country).  *See* 47 CFR § 52.15(f)(5).  Rate centers are geographic areas used by local exchange carriers for a variety of reasons, including the determination of toll rates.  *2024 Communications Marketplace Report*, 39 FCC Rcd at 14162–63, para. 59 & n.156.  We calculate the total number of wireless subscribers from the total number of assigned phone numbers reported by wireless service providers in their required NRUF reports.  For purposes of geographical analysis, the rate center data can be associated with a geographic point, and all points that fall within a county boundary can be aggregated together and associated with much larger geographic areas based on counties.  We note that the aggregation to larger geographic areas, such as to whole counties or groups of counties, reduces the level of inaccuracy inherent in combining non-coterminous areas, such as rate center areas and counties.

[95] *E.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4816–817, para. 73; *AT&T-Qualcomm Order*, 31 FCC Rcd at 13342, para. 17; *AT&T-Club 42 Order*, 30 FCC Rcd at 13071, para. 34.

technologies, or significantly raise their costs in doing so, or that it would otherwise lead to a lessening of competition.

### a.        Total Spectrum Holdings

34.        *Record.*  The Applicants assert that after the proposed transaction, AT&T would still be at or below the total spectrum screen trigger in all but parts of four CMAs,[96] and thus the Commission should assume that the acquisition of this additional spectrum would not lead to any competitive harms.

35.        *Discussion.*  As stated above, post-transaction, AT&T would be attributed with one-third or more of the total suitable and available spectrum in 10 CMAs, covering less than 1% of the U.S. population.  Across these local markets, AT&T would be attributed with a maximum of 405 megahertz of spectrum post-transaction.  In all 10 markets, we find little competitive concern when we evaluate the factors we ordinarily consider.  First, in each of the 10 markets, the other two nationwide providers are attributed with substantial amounts of spectrum, including low-band spectrum.  Second, in each of these markets, both other nationwide providers have substantial 4G LTE coverage, and at least one has deployed its 5G-NR network to some extent in each CMA.[97]  Finally, in all 10 of these markets, the other two nationwide providers have significant market shares.  Therefore, based on our evaluation of the factors ordinarily considered, in each of these markets, we find it highly unlikely that AT&T's acquisition of this additional amount of spectrum would foreclose competitors from expanding or would raise their costs.

### b.        Enhanced Factor Review

36.        *Record.*  While the Applicants acknowledge that the transaction would trigger enhanced factor review in certain areas—because AT&T would hold more than 68 megahertz of below-1-GHz spectrum in certain CMAs—they assert that the transaction nonetheless has no potential for competitive or other public interest harms in those areas.[98]  They argue that the Commission's focus on low-band spectrum is outdated, that service providers need a balanced portfolio of spectrum, and that AT&T's acquisition of this spectrum is "unlikely to materially lessen the ability of rival service providers to respond to any anticompetitive behavior."[99]  No commenters raise specific concerns about AT&T's acquisition of below-1-GHz spectrum.

37.        *Discussion*.  The Commission has recognized that having sufficient amounts of below-1-GHz spectrum is necessary for providers to be able to compete effectively.[100]  The Commission, however, has not set a bright line limit on the amount of low-band spectrum a service provider is allowed to hold.[101]  Rather, the Commission has closely examined transactions involving below-1-GHz spectrum to ensure that as a result of the acquisition, other providers are not foreclosed or face significantly higher costs and that the acquisition would not allow the acquiring provider to engage in anti-competitive behavior.[102]  If

---

[96] Public Interest Statement at 25.  The Applicants state that in these four CMAs there would be no reduction in the number of competitors.  Public Interest Statement at 25.

[97] Staff analysis of June 2025 Broadband Data Collection data.

[98] Public Interest Statement at 26.

[99] Public Interest Statement at 26–28.

[100] *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6231, para. 256.

[101] *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6239, para. 283.  Indeed, as AT&T has noted, the Bureau has frequently approved transactions where the acquiror would have more than one-third of below 1-GHz spectrum where the transaction was "unlikely to materially lessen the ability of rival service providers to respond to any anticompetitive behavior."  Public Interest Statement at 27 & n.96 (quoting *Application of AT&T Mobility Spectrum LLC & Kaplan Telephone Company, Inc. for Consent to Assign Licenses*, WT Docket No. 14-167, Memorandum Opinion and Order, 30 FCC Rcd 8502, 8513–14, para. 25 (WTB 2015)).

[102] *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6239, para. 285.

our analysis of the proposed transaction indicates a low potential for competitive harm, the fact that the acquiring provider will have one-third or more of the suitable and available below-1-GHz spectrum will not prevent us from approving the transaction.

38.       As stated above, in this transaction, AT&T would be acquiring between 10 and 40 megahertz of 600 MHz spectrum. As a result, AT&T would hold one-third or more of the total suitable and available below-1-GHz spectrum in 354 CMAs covering approximately 65% of the U.S. population. More specifically, in these markets, AT&T would hold an average of approximately 37% of the total suitable and available below-1-GHz spectrum,[103] and an average of approximately 31% across its entire network. In each of these 354 CMAs, T-Mobile and Verizon are attributed with substantial amounts of low-band spectrum, as well as substantial amounts of spectrum in total. Further, in 349 of the 354 CMAs, both of the other nationwide providers have substantial 4G LTE coverage, and at least one has deployed its 5G-NR network to some extent.[104] Finally, in 317 of these CMAs, both other nationwide providers have significant market shares.[105]

39.       After carefully reviewing each of the markets at issue, based on the record before us and the facts discussed above, we conclude that AT&T's acquisition of the below 1-GHz spectrum involved in this transaction is not likely to impair other providers from effectively competing or otherwise lead to significant anticompetitive harms in any of the markets at issue or at a national level.

### c.       Nationwide Effects

40.       Commenters also argue that the transaction will harm competition because EchoStar will no longer be a fourth nationwide facilities-based provider.[106] The Applicants, on the other hand, explain that "EchoStar—with a small share—has not played a significant role in the mobile marketplace,"[107] and they argue that this new arrangement will improve EchoStar's competitiveness.[108] We agree with the Applicants that EchoStar has not played a significant role in the mobile marketplace, and we disagree with concerns that the transaction is likely to lead to EchoStar being a less competitive alternative for consumers. Rather, EchoStar already operates primarily as an MVNO, through agreements with AT&T and T-Mobile.[109] Further, as a result of the transaction, EchoStar's amended agreement with AT&T will

---

[103] Specifically, across its network, AT&T would hold a population-weighted average of approximately 36% of the suitable and available below-1-GHz spectrum.

[104] Staff analysis of June 2025 Broadband Data Collection data. In four of the five remaining CMAs, GCI has substantial 4G LTE coverage and has deployed its 5G-NR network to some extent. In the fifth remaining CMA—Gulf of America—no providers have coverage.

[105] We note that four of the markets that trigger enhanced factor review—Anchorage, AK, Maryland 1 – Garrett, Rhode Island 1 – Newport, and Tennessee 8 – Johnson—are single-county markets; for this reason we believe that the shares in these markets based on June 2025 NRUF data are unreliable and inaccurate, and so we do not rely on them in our analysis. Another market—Gulf of America—has no population so we cannot calculate a market share.

[106] *See, e.g.*, Public Knowledge and OTI Comments at 2–3, 7–9; RWA Reply at 3.

[107] Public Interest Statement at 21; *see also* Letter from Maureen R. Jeffreys, Arnold & Porter Kaye Scholer LLP, Counsel to AT&T, and Pantelis Michalopoulos, Steptoe LLP, Counsel to EchoStar, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, Attachment, AT&T's Purchase of EchoStar Spectrum Submission by AT&T to US Department of Justice (Antitrust Division) at 7 (Nov. 24, 2025) (DOJ White Paper) (noting that EchoStar's "numbers tell a story of limited current competitive significance").

[108] Public Interest Statement at 22; Public Interest Statement, Swieringa Decl. ¶ 13; Joint Opposition at 7–8.

[109] Public Interest Statement at 21; EchoStar 10-K at 6, 68 ("Prior to November 15, 2025, we were operating primarily as an MVNO utilizing network services under the [amended Master Network Services Agreement] and the [Network Services Agreement, as amended] and secondarily as an [mobile network operator]"; "As a mobile virtual network operator ('MVNO'), we depended on either T-Mobile or AT&T to provide us with network services . . . .").

provide EchoStar with both more favorable terms and conditions and lower rates than it currently enjoys.[110]

41.        In terms of its competitive presence in the marketplace, we note that as of 2020, when the Boost divestiture from T-Mobile to EchoStar was finalized, EchoStar had 9.4 million wireless subscribers.[111]  In comparison, EchoStar had approximately 7 million mobile wireless subscribers as of the end of 2024,[112] out of the total 579.3 million connections, giving it a 1.2% nationwide market share.[113]  Further, in May 2025, EchoStar indicated that only 1.3 million of its subscribers were hosted on its facilities-based network.[114]  Finally, we note that post-transaction, the number of mobile wireless providers operating in the market and the market shares of those providers will not change.[115]  We therefore find no likelihood of significant competitive harm at the national level as a result of the transaction.[116]

## VI.      POTENTIAL PUBLIC INTEREST BENEFITS

42.        Having determined that the likelihood of competitive harms associated with the transaction is low, we next discuss the public interest benefits.[117]  The Commission finds a claimed benefit to be cognizable when it arises as a result of the transaction and likely could not be accomplished in the absence of the transaction[118] and is verifiable.[119]  Because much of the information relating to the potential

---

[110] Public Interest Statement at 7, 22–24.  Indeed, EchoStar's President, Technology & Chief Operating Officer states that the rates will be lower than what it costs EchoStar to use its own network.  Public Interest Statement, Swieringa Decl. ¶¶ 6, 12.  EchoStar will shift to what it deems a "hybrid-MNO" model, under which EchoStar will use AT&T's radio access network to provide service while maintaining control of its customers through its own core network.  *See, e.g.*, Public Interest Statement at 7, 22–24, & n.83.

[111] DISH Network Corporation, SEC Form 10-Q, at 6 (filed Nov. 6, 2020).

[112] EchoStar Corporation, SEC Form 10-K at 2 (filed Feb. 27, 2025) (EchoStar 10-K for Fiscal Year Ending Dec. 31, 2024).

[113] CTIA, Year-End 2024 Wireless Industry Indices Report at 24.

[114] DOJ White Paper at 7 & n.27 (citing EchoStar Comments, SB Docket No. 25-173, WT Docket No. 22-212, at 12–13 (rec. May 27, 2025)).

[115] We also note that, according to Consumer Price Index data, smartphone and wireless telephone service prices have decreased year over year, including during the period of time in which EchoStar decreased its facilities-based offerings.  *See* Press Release, U.S. Bureau of Labor Statistics, Consumer Price Index – March 2026 at 14, 16 (Apr. 10, 2026), https://www.bls.gov/news.release/pdf/cpi.pdf (showing smartphone prices decreased by 13.8% from March 2025 to March 2026, and wireless telephone service prices decreased by 3.6% from March 2025 to March 2026).

[116] With respect to Public Knowledge and OTI's comment that the transaction extinguishes the only ongoing nationwide Open Radio Access Network (Open-RAN) deployment effort, this is not a concern, as other providers such as AT&T are deploying Open-RAN in their networks.  *See* Rob Soni & Alisha Remek, AT&T, *Pushing Forward on Open RAN* (Oct. 24, 2025), https://about.att.com/blogs/2025/pushing-forward-on-open-ran.html; Paul Lipscombe, Data Center Dynamics, AT&T Continues Open RAN overhaul, builds on Ericsson partnership with Cloud RAN tests (Mar. 4, 2026), https://www.datacenterdynamics.com/en/news/att-continues-open-ran-overhaul-builds-on-ericsson-partnership-with-cloud-ran-tests/ (discussing AT&T's programs towards its goal to operate a fully Open RAN mobile network in the US).  *But see* Public Knowledge and OTI Comments at 7.

[117] *See T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 1067172, para. 214.

[118] *See*, *e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671–72, para. 214; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9604, para. 50 (citing *AT&T-BellSouth Order*, 22 FCC Rcd at 5761, para. 202); *AT&T-DIRECTV Order*, 30 FCC Rcd at 9237, para. 273.

benefits of a transaction is in the sole possession of the applicants, they are required to provide sufficient evidence supporting each claimed benefit so that the Commission can verify its likelihood and magnitude.[120]  Benefits expected to occur only in the distant future may be discounted or dismissed because, among other things, predictions about the distant future are inherently more speculative than predictions about events that are expected to occur closer to the present.[121]

43.        *Record.*  The Applicants assert that the proposed transaction would have substantial public interest benefits, including network and service improvements and expanded service availability,[122] and would also enhance competition.[123]  The Applicants explain that AT&T is spectrum constrained and cannot adequately address growing consumer demand for mobile broadband and fixed wireless offerings with its existing spectrum holdings; this transaction will enable AT&T to compete more effectively and improve its network performance.[124]  The Applicants explain that the acquisition of this spectrum will also enable AT&T to expand its fixed wireless service and its converged offerings for both fixed broadband and mobile wireless services.[125]  In addition, the Applicants explain that the improvements to AT&T's network from the proposed transaction would benefit customers of service providers that rely on AT&T's network to provide mobile service including through service improvements.[126]

44.        The Applicants assert that AT&T is uniquely positioned to deploy the 3.45 GHz spectrum, which previously was fallow, and will do so almost immediately, with anticipated completion of the deployment within three months.[127]  The Applicants contend that the 3.45 GHz spectrum is contiguous to AT&T's existing holdings and the contemplated increase in AT&T's unpaired mid-band

(Continued from previous page) ────────────────

[119] *See*, *e.g.*, *T-Mobile-UScellular Order,* 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671–72, para. 214; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9604, para. 50; *AT&T-Leap Order*, 29 FCC Rcd at 2793–94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *T-Mobile-MetroPCS Order*, 28 FCC Rcd at 2342, para. 58.

[120] *See*, *e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671–72, para. 214; *AT&T-Leap Order*, 29 FCC Rcd at 2793–94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *T-Mobile-MetroPCS Order*, 28 FCC Rcd at 2342, para. 58.  In addition, "the magnitude of benefits must be calculated net of the cost of achieving them." *See, e.g.*, *AT&T-Leap Order*, 29 FCC Rcd at 2793–94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *T-Mobile-MetroPCS Order*, 28 FCC Rcd at 2342, para. 58.

[121] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671–72, para. 214; *AT&T-Leap Order*, 29 FCC Rcd at 2793–94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *T-Mobile-MetroPCS Order*, 28 FCC Rcd at 2342, para. 58.

[122] Public Interest Statement at 9–17; Public Interest Statement, Mansfield Decl. ¶¶ 3–14; Joint Opposition at 4; DOJ White Paper at 2.

[123] Public Interest Statement at 1, 9, 17, 20–24; *see also* Public Interest Statement, Mansfield Decl. ¶ 2; Public Interest Statement, Swieringa Decl. ¶ 13; DOJ White Paper at 1.  The Applicants anticipate that AT&T's investment in its network will trigger a competitive response from other wireless providers.  Public Interest Statement at 4; Joint Opposition at 4.

[124] Public Interest Statement at 1–2, 4, 14; Public Interest Statement, Mansfield Decl. ¶¶ 8–9; DOJ White Paper at 2, 20.

[125] Public Interest Statement at 4, 14–15; Joint Opposition at 4; *see also* Public Interest Statement, Mansfield Decl. ¶¶ 13–14; DOJ White Paper at 2.

[126] Public Interest Statement at 4; Public Interest Statement, Mansfield Decl. ¶ 25; Joint Opposition at 4.

[127] Public Interest Statement at 2, 4, 10–11, 13–14; DOJ White Paper at 1–2, 23; *see also* Public Interest Statement, Mansfield Decl. ¶ 16.  The Applicants explain that AT&T's existing 3.45 GHz spectrum deployments use software-defined radios at cell sites across its network, which means it can retune these radios to add EchoStar's 3.45 GHz spectrum with just a remote reconfiguration.  Public Interest Statement at 13–14; Public Interest Statement, Mansfield Decl. ¶ 15; DOJ White Paper at 23.

spectrum holdings would improve AT&T's network performance, including by "boosting network throughput, increasing speed, decreasing latency," allowing more customers to simultaneously enjoy high-quality service.[128]  The Applicants also assert that this additional 3.45 GHz spectrum would help AT&T realize the full benefits of 5G service.[129]  In support of their claims, the Applicants state that pursuant to a short-term manager lease, AT&T has already deployed this spectrum to nearly 23,000 cell sites covering more than 5,300 cities, resulting in AT&T's mobile customers experiencing up to an 80% increase in download speeds and AT&T fixed wireless customers experiencing a 55% increase in download speeds.[130]

45.     The Applicants assert that AT&T would invest significant resources to build out and deploy the 600 MHz spectrum across the country as AT&T has a strong incentive to enhance the experience of consumers using its network.[131]  The Applicants explain that AT&T will use this spectrum to supplement its existing 5G deployment in the near term, ameliorate congestion on AT&T's network, open up carrier aggregation opportunities to improve network speed and performance, and improve indoor performance, particularly in urban and hurricane prone coastal areas.[132]  The Applicants also assert that the 600 MHz spectrum would improve AT&T's spectrum depth, resulting in better 5G service for mobile customers including through improved speeds and reduced latency, and also broader availability of AT&T's fixed wireless service, AT&T Phone-Advanced service, and AT&T's converged fixed and mobile service offerings.[133]  The Applicants further explain that the 600 MHz spectrum would serve as an anchor band to allow AT&T to deploy 6G service while also preserving LTE services requiring dedicated channels.[134]

46.     With respect to EchoStar, the Applicants contend that the proposed transaction is part of a broader transaction between the Applicants that would convert EchoStar to a hybrid-MNO and enhance the public interest benefits of the proposed transaction.[135]  The Applicants claim that EchoStar faces

---

[128] Public Interest Statement at 10–11; Public Interest Statement, Mansfield Decl. ¶¶ 4–5.

[129] Public Interest Statement at 10, 12–13, 20; Public Interest Statement, Mansfield Decl. ¶¶ 4–6.

[130] Joint Opposition at 1, 4–6; Press Release, AT&T, AT&T Boosts 5G Capacity Nationwide with New Spectrum, Giving Customers a Stronger, Faster Connection (Nov. 17, 2025), https://about.att.com/story/2025/att-boosts-5g-capacity-nationwide.html.

[131] Joint Opposition at 2, 6, 8, 10; Public Interest Statement at 10, 16–17, 30–32; Public Interest Statement, Mansfield Decl. ¶ 25; DOJ White Paper at 23.

[132] Public Interest Statement at 16; Public Interest Statement, Mansfield Decl. ¶¶ 2, 8–12; Joint Opposition at 6.  The Applicants explain that AT&T expects the current congestion in its low-band spectrum to increase as more consumers adopt 5G-capable devices and transition to 6G.  Public Interest Statement at 16; Public Interest Statement, Mansfield Decl. ¶ 8.  The Applicants further state that this spectrum would position AT&T to deploy 6G when it arrives.  Public Interest Statement at 2, 17; Public Interest Statement, Mansfield Decl. ¶¶ 2, 12; DOJ White Paper at 2, 21.

[133] Public Interest Statement at 10, 16, 20; *see also* Public Interest Statement, Mansfield Decl. ¶¶ 7–12, 14; DOJ White Paper at 21–22.  The Applicants assert that AT&T does not currently use 600 MHz spectrum in its network.  Public Interest Statement at 31; Public Interest Statement, Mansfield Decl. ¶ 17.

[134] Public Interest Statement at 16–17; Public Interest Statement, Mansfield Decl. ¶¶ 7–12; Joint Opposition at 6; DOJ White Paper at 21–22.

[135] Public Interest Statement at 7, 21–23; DOJ White Paper at 11–14.  EchoStar provides mobile wireless service under its Boost Mobile and Gen Mobile brands.  EchoStar 10-K at 2, 6.  EchoStar states that it has started building out its spectrum but currently serves most of its customers through wholesale agreements with AT&T and T-Mobile.  *See* Public Interest Statement at 3.  The Applicants state that as a hybrid-MNO, EchoStar will "remain a facilities-based provider" with complete control over its core network.  Public Interest Statement at 3, 7, 23 & n.83; Public Interest Statement, Swieringa Decl. ¶¶ 6–8.  The Applicants also state that EchoStar has the unilateral right to keep the MNO agreement in place until December 31, 2035.  Public Interest Statement at 22; Public Interest Statement, Swieringa Decl. ¶ 13; *see also* DOJ White Paper at 12–13.

19

**Federal Communications Commission**                    DA 26-470

challenges as a wireless competitor in its current form.[136]  The Applicants claim that under the hybrid-MNO structure, EchoStar would continue to offer wireless service using a combination of its core network capabilities and access to AT&T's network and its expanded MVNO agreement with AT&T.[137] The Applicants assert that the arrangement would also give EchoStar more interconnection points to AT&T's network, allowing EchoStar to support expected increased traffic.[138]  The Applicants also assert that this arrangement would permit EchoStar to offer more reliable service at lower cost[139] and would also result in an enhanced customer experience.[140]  The Applicants further assert that the hybrid-MNO structure eliminates the need for EchoStar to construct its own nationwide network, freeing up EchoStar's financial resources for increased investment in the wireless business.[141]  The Applicants contend that the customer benefits of EchoStar's transition to a hybrid-MNO model will exert competitive pressure on other providers.[142]

47.       Although commenters do not specifically contest the Applicants' claimed benefits, T-Mobile and RWA both suggest—in the context of AT&T's buildout waiver request—that AT&T's proposed timeline for deploying the 600 MHz spectrum would not benefit the public interest, particularly in rural areas.[143]  Further, RWA argues that the assertion that EchoStar will emerge a stronger competitor as a hybrid-MNO is "too speculative."[144]

48.       *Discussion.*  Based on our review of the record, we agree with the Applicants that the assignment of 3.45 GHz and 600 MHz licenses to AT&T is likely to result in increased network efficiencies and spectrum utilization, resulting in additional capacity and coverage benefits for AT&T's mobile customers—with increased data speeds, coverage quality, and reduced network congestion.  We find that the buildout conditions attached[145] to AT&T's acquisition of this spectrum provide meaningful assurances that the spectrum assignment is in the public interest and will prevent the potential that the 600 MHz spectrum would be unused or underutilized.[146]  The Applicants have demonstrated that AT&T has the ability to rapidly deploy the subject 3.45 GHz spectrum to improve AT&T's midband spectrum

---

[136] Public Interest Statement at 3, 21; *see also* DOJ White Paper at 7.

[137] Public Interest Statement at 3, 7; Public Interest Statement, Swieringa Decl. ¶¶ 7–11; Joint Opposition at 4.

[138] Public Interest Statement at 22–23; Public Interest Statement, Swieringa Decl. ¶ 7; *see also* DOJ White Paper at 13.

[139] Public Interest Statement at 3, 22–23; Swieringa Decl. ¶¶ 6–7; *see also* DOJ White Paper at 2, 12–13.  The Applicants explain that this structure would reduce EchoStar's costs because it would give EchoStar access to wireless capacity at a lower cost than it currently pays.  Public Interest Statement at 3, 22; Joint Opposition at 7.

[140] Public Interest Statement at 22–23; Public Interest Statement, Swieringa Decl. ¶¶ 6, 10; Joint Opposition at 7–8; DOJ White Paper at 12–14.  The Applicants explain that the change in EchoStar's structure would not negatively impact pricing or plans for Boost Mobile customers.  Public Interest Statement, Swieringa Decl. ¶ 17.  As examples of enhancements to the customer experience, EchoStar states that the hybrid-MNO arrangement would allow it to port numbers faster, customize new services, handle functionality such as authentication, security, session management, and aggregation of traffic from end-user devices.  Public Interest Statement, Swieringa Decl. ¶¶ 9–10.

[141] Public Interest Statement at 3; Public Interest Statement, Swieringa Decl. ¶ 13.

[142] Public Interest Statement at 3; Joint Opposition at 4; DOJ White Paper at 2.

[143] *See, e.g.*, T-Mobile Petition at 2, 5; RWA Comments at 12–13; RWA Reply at 4.

[144] RWA Reply at 3; *see also* RWA Comments at 7–8; Public Knowledge and OTI Comments at 8–9.

[145] *See infra* section VIII.A (Waiver of 600 MHz Construction Requirements).

[146] *See* Public Interest Statement at 4 (the 3.45 GHz and 600 MHz spectrum at issue has so far lain fallow or else not been fully built out to date); *see also AT&T-Plateau Order*, 30 FCC Rcd at 5129, paras. 52–53 (finding public interest benefits accrue when a spectrum assignment increases the potential for the efficient use of spectrum that would otherwise lay fallow); *AT&T-Club 42 Order*, 30 FCC Rcd at 13076–77, paras. 46–47.

contiguity and network performance.[147]  We find it likely that doing so will meaningfully improve AT&T's network offerings and performance, resulting in improved service quality, including through higher throughput, lower latency, and fewer service interruptions.[148]  Indeed, the Applicants have submitted evidence that these benefits are already being realized under the short-term spectrum lease arrangement between the Applicants for the 3.45 GHz spectrum included in this transaction.[149]  The record evidences that the improvements to AT&T's network resulting from this additional spectrum will also benefit customers of other service providers who rely on AT&T's network to provide wireless service.[150]  Based on the record, we credit the Applicants' claims that the acquired spectrum will allow it to increase the geographic area and number of customers that AT&T can serve with, and quality of, its fixed wireless access service and converged fixed broadband and mobile wireless services.[151]

49.     We also agree with the Applicants that the 600 MHz spectrum will allow AT&T to improve its network's performance, expand its network-based service offerings, and improve its upgrade path to 6G technologies.[152]  We credit Applicants' explanation that the wide geographic footprint of the 600 MHz spectrum will allow AT&T to ameliorate low-band congestion in its network on a nationwide

---

[147] *See* Public Interest Statement at 13–14 (AT&T will not have to change equipment at cell sites to activate the subject 3.45 GHz spectrum in its network); Public Interest Statement, Mansfield Decl. ¶¶ 15–16 (describing the use of remote configuration to rapidly activate the subject 3.45 GHz spectrum); Joint Opposition at 4; Press Release, AT&T, AT&T Boosts 5G Capacity Nationwide with New Spectrum, Giving Customers a Stronger, Faster Connection (Nov. 17, 2025), https://about.att.com/story/2025/att-boosts-5g-capacity-nationwide.html (describing AT&T's deployment of the subject 3.45 GHz spectrum under short-term spectrum lease arrangements and related performance improvements).

[148] *See* Public Interest Statement at 11, 13–14; Public Interest Statement, Mansfield Decl. ¶¶ 4, 6, 16, 25; Joint Opposition 5–6; *see also, e.g.*, *Application of AT&T Mobility Spectrum LLC and West Carolina Communications, LLC for Consent to Assign Licenses*, WT Docket No. 15-313, Memorandum Opinion and Order, 31 FCC Rcd 8664, 8673, para. 24 (WTB 2016); *Applications of New Cingular Wireless PCS, LLC, Bluegrass Cellular, Inc. and Bluegrass Wireless LLC for Consent to Assign Licenses*, WT Docket No. 15-225, Memorandum Opinion and Order, 31 FCC Rcd 378, 389, para. 22 (WTB 2016); *Applications of AT&T Inc. and Cellular Properties, Inc. for Consent to Assign Authorizations*, WT Docket No. 15-78, Memorandum Opinion and Order, 31 FCC Rcd 318, 329–330, para. 30 (WTB 2016); *Application of New Cingular Wireless PCS, LLC and NEP Cellcorp, Inc. for Consent to Assign Licenses*, WT Docket No. 15-221, Memorandum Opinion and Order, 30 FCC Rcd 15702, 15710, para. 20 (WTB 2015); *Applications of AT&T Mobility Puerto Rico Inc. and Worldcall Inc.*, WT Docket No. 14-206, Memorandum Opinion and Order, 30 FCC Rcd 9763, 9772, para. 21 (WTB 2015) (each finding public interest benefits based on the rapid deployment of network improvements post-transaction).

[149] Joint Opposition at 4–6; Press Release, AT&T, AT&T Boosts 5G Capacity Nationwide with New Spectrum, Giving Customers a Stronger, Faster Connection (Nov. 17, 2025), https://about.att.com/story/2025/att-boosts-5g-capacity-nationwide.html.

[150] Public Interest Statement at 4; Public Interest Statement, Swieringa Decl. ¶¶ 14–18 (stating that AT&T's acquisition of additional 3.45 GHz and 600 MHz spectrum from EchoStar will benefit Boost Mobile customers and citing evidence of lower churn rates for Boost Mobile customers under a hybrid-MNO arrangement); Joint Opposition at 4–5.

[151] Public Interest Statement at 4, 14–15; Public Interest Statement, Mansfield Decl. ¶ 13 (stating that AT&T's ability to expand its fixed wireless access offering is "constrained by its limited spectrum holdings in many areas" but that unpaired mid-band spectrum offers "wider channels" that would allow AT&T to deliver a consistent broadband experience and support more fixed wireless access customers); Joint Opposition at 4–5; Press Release, AT&T, AT&T Boosts 5G Capacity Nationwide with New Spectrum, Giving Customers a Stronger, Faster Connection (Nov. 17, 2025), https://about.att.com/story/2025/att-boosts-5g-capacity-nationwide.html (describing the expansion of AT&T's fixed wireless access offering based on its use of the subject spectrum).

[152] *See* Public Interest Statement at 16–17; Public Interest Statement, Mansfield Decl. ¶¶ 3–12; Joint Opposition at 6–7; *see also* DOJ White Paper at 2, 21–22.

**Federal Communications Commission**                                                    **DA 26-470**

basis, allowing it to expand and improve its 5G offerings.[153]  We also credit Applicants' claims that AT&T will achieve 5G coverage and performance improvements, including for indoor use cases, based on its stated plans to use the 600 MHz spectrum to shift its 5G offerings from mid-band to low-band spectrum holdings, which have desirable coverage and building penetration characteristics.[154]  Based on the record, we similarly credit the Applicants' claims that AT&T will use the characteristics of the 600 MHz spectrum to improve its service offerings through carrier aggregation techniques and the expansion of its network's uplink capacity.[155]  For these reasons, we find that the record supports AT&T's claims that it has the ability and incentive to deploy the 600 MHz spectrum.[156]  To the extent commenters raise concerns that the transaction is not in the public interest because of AT&T's extended deployment timeline for the 600 MHz spectrum,[157] as we discuss below, we disagree and find that a waiver of the buildout deadline is in the public interest, particularly in light of the strict conditions we impose on AT&T to meet a final deployment milestone.[158]

50.    Finally, we agree with the Applicants that improvements to AT&T's network have the potential to benefit customers of EchoStar (Boost Mobile) and those MVNOs that rely on AT&T's network to provide mobile wireless service.[159]  We also agree with the Applicants that the proposed arrangement between AT&T and EchoStar has the potential to lower EchoStar's costs while still allowing it to maintain control of its core network, including the customer-facing functions of a facilities-based provider, and that the arrangement will also provide Boost Mobile with expanded coverage and increased speeds, ultimately resulting in better service and lower prices for Boost Mobile's wireless customers.[160]  We also acknowledge the Applicants' claimed public interest benefits associated with the broader transaction to transition EchoStar to a hybrid-MNO provider.  We find that the record supports the Applicants' contention that EchoStar's shift to a hybrid-MNO structure has the potential to result in more reliable service at a lower cost and reduced prices for Boost Mobile customers, and that this transition could free-up financial resources for EchoStar to invest in the customer experience and enhance competition.[161]  We disagree with arguments that the benefits of such an arrangement are too speculative,[162] particularly in light of the fact that EchoStar already provisions most of its customers through its MVNO agreements and the amended arrangement between EchoStar and AT&T offers EchoStar better terms than EchoStar had before.[163]

---

[153] *See* Public Interest Statement at 16; Public Interest Statement, Mansfield Decl. ¶¶ 2, 7–9; Joint Opposition at 6; *see also* DOJ White Paper at 2.

[154] *See* Public Interest Statement at 16–17, 20; Public Interest Statement, Mansfield Decl. ¶¶ 9–10, 12.

[155] *See* Public Interest Statement at 16–17; Public Interest Statement, Mansfield Decl. ¶¶ 9–12.

[156] *See, e.g.*, Joint Opposition at 6–7; Public Interest Statement at 15–17, Public Interest Statement, Mansfield Decl. ¶¶ 2, 7–12, 17–25.

[157] *See, e.g.*, T-Mobile Petition at 1–2, 5; RWA Comments at 12–13.

[158] *See infra* section VIII.A (Waiver of 600 MHz Construction Requirements).

[159] Public Interest Statement at 3–4; Public Interest Statement, Swieringa Decl. ¶ 18.

[160] Public Interest Statement at 3, 22–24; Public Interest Statement, Swieringa Decl. ¶¶ 6–19; Public Interest Statement, Mansfield Decl. ¶ 25; *see also* Joint Opposition at 7–8.

[161] *See* Public Interest Statement at 3, 22–24; Public Interest Statement, Swieringa Decl. ¶¶ 6–19; *see also* Joint Opposition at 7–8.

[162] *See, e.g.*, RWA Reply at 3.

[163] *See* Public Interest Statement at 21–24; EchoStar 10-K at 6, 68; Public Interest Statement, Swieringa Decl. ¶¶ 5–14, 18–19; DOJ White Paper at 11–13.

## VII.    OTHER PUBLIC INTEREST ISSUES

51.     *Request to Delay Action on the Applications.*  We decline RWA's request that the Commission delay action on the instant Applications until the Commission completes, or at least initiates, a rulemaking to consider the competitive impact of Mobile Virtual Network Operators (MVNOs) in the wireless marketplace and modifies its resale rules to promote MVNO resale competition.[164]  We agree with the Applicants that RWA's arguments for delayed action are not related to the transaction and, thus, do not provide a basis for delaying action on the instant Applications.[165]  Further, delaying action on the Applications pending a rulemaking is not in the public interest because that would significantly delay the deployment of the 600 MHz spectrum at issue.[166]

52.     *Roaming and Wholesale.*  We reject Public Knowledge and OTI's request to impose a roaming and resale condition because this is a spectrum-only transaction and does not implicate roaming or resale issues.[167]  As we have previously explained, the Commission's generally applicable roaming policies and rules are designed to ensure entities can obtain roaming agreements on reasonable terms and conditions.[168]  If an entity encounters difficulties in obtaining reasonable roaming services or roaming rates, it can file complaints with the Commission pursuant to our established roaming rules.[169]  Concerns with the Commission's current roaming or resale rules are industry-wide matters that are not appropriately addressed in the context of an individual transaction.[170]  We also note that no resale or

---

[164] RWA Comments at i, 6–11; RWA Reply at 6, 8.

[165] Joint Opposition at 14; *see also, e.g.*, *Application of AT&T Inc. & Qualcomm Inc. for Consent to Assign Licenses and Authorizations*, WT Docket No. 11-18, Order, 26 FCC Rcd 17589, 17622, para. 79 (2011) (*2011 AT&T-Qualcomm Order*) (declining requests for relief pertaining to industry-wide issues, "as these issues are better addressed in the context of these industry-wide proceedings"); *AT&T-Centennial Order*, 24 FCC Rcd at 13969, 13972, paras. 133, 141 (2009) (finding issues that "apply broadly across the industry . . . are more appropriate for a Commission proceeding where all interested industry parties have an opportunity to file comments"); *Applications of AT&T Inc., Cellco P'ship d/b/a Verizon Wireless, Grain Spectrum, LLC, & Grain Spectrum II, LLC For Consent to Assign & Lease AWS-1 & Lower 700 MHz Licenses*, WT Docket No. 08-246, Memorandum Opinion and Order, 28 FCC Rcd 12878, 12899, para. 52 (2013) (*AT&T-Verizon-Grain Order*) (same).

[166] AT&T entered into a short-term leasing arrangement with EchoStar and has already started deploying the 3.45 GHz spectrum at issue.  *See, e.g.*, Joint Opposition at 1.

[167] Joint Opposition at 15; Public Knowledge and OTI Comments at 14.  We similarly declined a requested roaming condition in the *AT&T-UScellular Order* because that transaction was a spectrum-only transaction and did not implicate roaming issues.  *AT&T-UScellular Order* at 22, para. 46.

[168] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4840, para. 122; *AT&T-UScellular Order* at 22, para. 46.

[169] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4840, para. 122; *AT&T-UScellular Order* at 22, para. 46; *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, WT Docket No. 05-265, Second Report and Order, 26 FCC Rcd 5411, 5448–53, paras. 74–87 (2011) (*Data Roaming Order*); *see also, e.g.*, *Verizon-TracFone Order*, 36 FCC Rcd at 17033, para. 102 (citing *T-Mobile-Sprint Order*, 34 FCC Rcd at 10710, para. 297) (finding roaming conditions unnecessary because general roaming policies, rules, and dispute resolution process provide adequate protection).  The Commission's roaming rules are found in section 20.12 of the Commission's rules and the roaming rules include a special dispute resolution framework to ensure that providers negotiate in good faith to develop commercially reasonable terms and conditions for roaming agreements and to confirm that host providers are properly implementing such agreements when supplying roaming services. *See* 47 CFR § 20.12(e); *see also, e.g.*, *Data Roaming Order*, 26 FCC Rcd at 5448–53, paras. 74–87; 47 CFR § 20.12(e)(1); *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, WT Docket No. 05-265, Declaratory Ruling, 29 FCC Rcd 15483, 15484, para. 1 (WTB 2014) (granting T-Mobile petition regarding Commission review of data roaming disputes).

[170] *See, e.g.*, *2011 AT&T-Qualcomm Order*, 26 FCC Rcd at 17622, para. 79 (declining requests for relief pertaining to industry-wide issues, "as these issues are better addressed in the context of these industry-wide proceedings"); *AT&T-Centennial Order*, 24 FCC Rcd at 13969, 13972, paras. 133, 141 (2009) (finding issues that "apply broadly

(continued….)

wholesale providers requested such conditions in our record.  For these reasons, and consistent with precedent for spectrum-only transactions, we decline requests to impose roaming and resale conditions on this transaction.[171]

53.     *Partitioning and Assigning Spectrum Licenses to Rural Carriers.*  We decline RWA's request that the Commission condition approval of the transaction on requiring AT&T to partition and assign certain 600 MHz licenses at issue to rural carriers in certain rural markets.[172]  As set forth above in the competitive analysis, we disagree that there are spectrum aggregation harms in the proposed transaction.[173]  In the *AT&T-UScellular Order*, we rejected similar requests to reserve spectrum for smaller or rural providers because this is a novel remedy that is more appropriately addressed in a rulemaking.[174]  The same rationale applies here.  In addition, AT&T's interim and final buildout conditions discussed below for the 600 MHz spectrum will ensure deployment to rural areas for each license.

54.     *Lifeline Participation and Prepaid, No Contract Offerings.*  We decline Public Knowledge and OTI's request that the Commission require AT&T and EchoStar (through its Boost Mobile brand) to maintain active participation in the Lifeline program and any successor low-income support program, and require AT&T to maintain and publicly advertise pre-paid plans.[175]  We agree with

(Continued from previous page) ─────────────────────

across the industry . . . are more appropriate for a Commission proceeding where all interested industry parties have an opportunity to file comments"); *AT&T-Verizon-Grain Order*, 28 FCC Rcd at 12899, para. 52 (same); *see also* Joint Opposition at 19.

[171] *AT&T-UScellular Order* at 22, para. 46 (declining to adopt proposed roaming conditions in a spectrum-only transaction and referencing the existing roaming rules); *T-Mobile-UScellular Order*, 40 FCC Rcd 4839–40, para. 122 (declining to adopt proposed roaming conditions because the roaming rules were sufficient to address access to roaming post-transaction); *see also Verizon-Tracfone Order*, 36 FCC Rcd at 17033, para. 102; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10710, para. 297; *AT&T-Leap Order*, 29 FCC Rcd at 2784, para. 107.

[172] RWA Comments at 4–6; RWA Reply at 5, 8.  RWA comments that this condition is needed to ensure rural communities benefit from the transaction.  RWA Comments at 4–6 and Exh. A; RWA Reply at 5, 8.  In support of the requested condition, RWA cites to the T-Mobile-Sprint transaction in which the Commission required post-closing secondary license assignments to DISH.  RWA Comments at 5 (citing to *T-Mobile-Sprint Order*, 34 FCC Rcd at 10592, para. 35).  However, that requirement in the T-Mobile-Sprint transaction was based on the facts and competitive analysis specific to that transaction, which are not the same as the instant Transaction.  *See generally T-Mobile-Sprint Order*, 34 FCC Rcd at 10591–93, paras. 33–35 (discussing the terms of the Department of Justice's settlement agreement).

[173] *See also* Joint Opposition at 13 (asserting that RWA does not show any competitively harmful spectrum aggregation that would warrant spectrum divestiture).  RWA states that the license assignments through the AT&T-UScellular transaction and the Verizon-UScellular transaction support the requested condition because they further concentrate spectrum among the nationwide wireless carriers.  RWA Comments at 3.  We previously reviewed and approved the AT&T-UScellular transaction and found no spectrum aggregation harms.  *AT&T-UScellular Order* at 18, para. 37.  The Verizon-UScellular transaction will undergo separate review.

[174] *AT&T-UScellular Order* at 22, para. 45.

[175] *See* Public Knowledge and OTI Comments at 12–13.  We also decline Public Knowledge and OTI's request for reporting requirements related to this requested condition.  *See* Public Knowledge and OTI Comments at 15.  Public Knowledge and OTI state that the requested conditions concerning Lifeline and value conscious customers mirror the Commission's approach in prior transactions.  *Id.* at 12–13 (citing to the Commission's orders for the T-Mobile-Sprint, Verizon-TracFone, and AT&T-Leap transactions).  However, the Commission's approach in those prior transactions was based on the specific facts of those transactions in which a significant Lifeline or value-conscious provider left the marketplace.  *See, e.g.*, *T-Mobile-Sprint Order*, 34 FCC Rcd 10578, 10729–31, paras. 341–344; *Verizon-TracFone Order*, 36 FCC Rcd 16994, 17043–44, paras. 131–135; *AT&T-Leap Order*, 29 FCC Rcd 2735, 2801, 2804–05, paras. 158, 170–171.  As noted above, EchoStar is not exiting the market and post-transaction intends to continue to operate as a hybrid-MNO.

the Applicants that the instant transaction will have limited impact on Lifeline consumers or value-conscious consumers.[176]  Nothing in the record indicates that EchoStar or AT&T intend to cease or decrease their value-conscious service offerings or their participation in the Lifeline program as a result of the transaction, or that the transaction would reduce their incentive to serve value-conscious or Lifeline consumers.[177]

55.    *Device Unlocking and Portability.*  We decline Public Knowledge and OTI's request for a handset unlocking condition and related reporting.[178]  These issues are not related to the instant transaction.  As we concluded in the *AT&T-UScellular* and *T-Mobile-UScellular Orders*, general, industry-wide handset unlocking issues are more adequately addressed through the Commission's pending handset unlocking rulemaking proceeding.[179]

56.    *Open-Internet and Non-Discrimination Commitments*.  We decline Public Knowledge and OTI's request that we adopt a condition prohibiting AT&T and EchoStar from blocking, throttling, or engaging in the paid prioritization of lawful content on broadband applications until the Commission adopts uniform rules governing all providers.[180]  These issues are not related to the instant transaction.  Further, in January 2025, the Sixth Circuit Court of Appeals determined that the Communications Act precludes the regulation of the Internet as a Title II telecommunications service.[181]

57.    *Cancellation or Surrender of EchoStar's Unconstructed 600 MHz licenses*.  We decline T-Mobile's call to cancel or require the surrender of EchoStar's unconstructed 600 MHz licenses to "prevent unjust enrichment."[182]  The Commission's rules do not prohibit assignment of unconstructed 600

---

[176] Joint Opposition at 17.  As the Applicants note, we previously declined a Lifeline-related condition in the *T-Mobile-UScellular Order* where, as is the case here, the transaction would have minimal impact on Lifeline customers.  Joint Opposition at 17 (citing to *T-Mobile-UScellular Order*, 40 FCC Rcd at 4845, para. 137).

[177] Joint Opposition at 17.  AT&T is not a significant provider of Lifeline service.  For 2024, AT&T's Lifeline claims represented less than 1% of total Lifeline claims.  FCC, 2025 Universal Service Monitoring Report at 34, Table 2.5 (2026), https://docs.fcc.gov/public/attachments/DOC-418505A1.pdf (*2025 Universal Service Monitoring Report*).  In each state where EchoStar's Boost Mobile brand offers Lifeline, multiple other providers also offer Lifeline, creating incentive to compete and providing Lifeline consumers with choices.  Universal Serv. Admin. Co., FCC Filings, Fourth Quarter 2025, Low Income, Appx. LI-03 Eligible Telecommunications Carriers 1Q 2026, https://www.usac.org/about/reports-orders-fcc-filings/#results (last visited May 4, 2026) (identifying all eligible telecommunications carriers (ETCs) by state).  The Applicants contend that robust competition forces AT&T and EchoStar to make a variety of offerings available to meet the needs of consumers in different circumstances.  Joint Opposition at 17.

[178] *See* Public Knowledge and OTI Comments at 13, 15; Joint Opposition at 17–18 (opposing a handset unlocking condition).

[179] *AT&T-UScellular Order* at 24, para. 49; *T-Mobile UScellular Order*, 40 FCC Rcd at 4846–47, paras. 139–140; *see also Promoting Consumer Choice and Wireless Competition Through Handset Unlocking Requirements and Policies,* WT Docket No. 24-186, Notice of Proposed Rulemaking, 39 FCC Rcd 8111 (2024).

[180] *See* Public Knowledge and OTI Comments at 13; *but see* Joint Opposition at 18 (opposing requests to adopt net neutrality conditions).

[181] *Ohio Telecom Ass'n v. FCC*, 124 F.4th 993, 998, 1003–1009 (6th Cir. 2025).  We note that the Commission's rules continue to require providers to "disclose accurate information regarding the network management practices, performance characteristics, and commercial terms of [their] broadband internet access services."  47 CFR § 8.1(a); *see also Restoring Internet Freedom*, WC Docket No. 17-108, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311, 440–41, para. 220 (2017).

[182] *See* T-Mobile Petition at 6–12; Joint Opposition at 11 (opposing T-Mobile's request that the Commission reclaim unconstructed EchoStar licenses); *see also* RWA Reply at 7 (requesting termination and a reauction of certain EchoStar licenses).

MHz licenses.[183]  Further, EchoStar's licenses remain in active status, and we grant new buildout deadlines for all of the 600 MHz licenses.[184]  Accordingly, nothing prevents EchoStar from assigning these licenses, whether they are constructed or not.

58.     *EchoStar's Contractual Obligations to its Partners.*  In 2019, in connection with purchasing Boost Mobile from Sprint Corp. as part of the T-Mobile/Sprint merger, DISH Network Corp. (DISH) committed to becoming a "nationwide facilities-based competitor" using a "first-of-its-kind 5G network built from the ground up."[185]  To help accomplish this goal, DISH sought extensions of the construction deadlines for various licenses it owned through subsidiaries, including the 600 MHz licenses at issue here and the AWS-4 and AWS-H Block licenses it proposes to sell to SpaceX.  It further committed to not selling its 600 MHz licenses for six years without FCC approval.  Those commitments were imposed as conditions on those licenses in September 2020 when the Wireless Telecommunications Bureau (Bureau) modified DISH's licenses.[186]

59.     Since 2020, to fulfill those conditions, DISH has built various parts of that network, leasing tower space, installing new radios on towers, and entering into contracts for backhaul, among other actions.  It has also gone through a number of internal restructurings, including merging with and becoming a subsidiary of EchoStar.[187]  When that transaction was first announced, EchoStar was to become a subsidiary of DISH, a corporate structure that would have inverted the current relationship between the two entities.[188]

60.     EchoStar seeks not only to sell the 3.45 GHz and 600 MHz licenses it now controls to AT&T, but in a separate set of applications before us, seeks to sell its AWS-4, AWS-H Block, and unpaired AWS-3 spectrum licenses and several earth station licenses to SpaceX, effectively dismantling its radio network.[189]  As described above, EchoStar has also entered into an agreement with AT&T to use

---

[183] *Compare* 47 CFR § 1.948(i) (FCC may review assignment applications to determine if the transaction is for purposes of trafficking in service authorizations but there is no general prohibition on assignment of unconstructed licenses) *with* 47 CFR § 101.55(a) (fixed microwave licenses not authorized pursuant to competitive bidding procedures may not be assigned prior to the completion of construction, except as provided in section (d)(1)–(3)).

[184] EchoStar's construction deadlines for most of the 600 MHz spectrum licenses was June 14, 2025.  EchoStar filed a September 17, 2024, extension request for certain of its 600 MHz licenses and later filed notices of construction for some of its 600 MHz licenses and additional extension requests for the remainder of its 600 MHz licenses with 2025 construction deadlines in ULS.  *See*, *e.g.*, Call Signs WQZM255 and WQZM256; ULS File Nos. 0011244885, 0011373480 and 0011604639.  Accordingly, the 600 MHz licenses that EchoStar seeks to assign remain in active standing.  Because we grant AT&T's waiver request and set new construction deadlines for all of the subject 600 MHz licenses, we find that EchoStar's pending construction and extension filings for these licenses are moot.  *See infra* section VIII.A (Waiver of 600 MHz Construction Requirements).

[185] Letter from Jefffrey H. Blum, Senior Vice President, Public Policy & Government Affairs, DISH, to Donald Stockdale, Chief, Wireless Telecommunications Bureau, FCC, DBSD Corporation, AWS-4, Lead Call Sign T070272001, et al., at 2–3 (July 26, 2019).

[186] *See Applications of T-Mobile US, Inc., and Sprint Corporation et al.,* Order of Modification and Extension of Time to Construct, WT Docket No. 18-197, 35 FCC Rcd 9580 (WTB 2020) (*DISH Modification Order*).

[187] *See* EchoStar Corporation, SEC Form 10-K for fiscal year ending December 31, 2024 at 1 (filed Feb. 27, 2025), https://www.sec.gov/Archives/edgar/data/1415404/000155837025001663/tmb-20241231x10k.htm; *see also* EchoStar, *EchoStar Corporation Completes Merger With DISH Network Corporation*, (Jan. 2, 2024), https://ir.echostar.com/news-releases/news-release-details/echostar-corporation-completes-merger-dish-network-corporation.

[188] Press Release, EchoStar, DISH Network Corporation and EchoStar Corporation Combine (Aug. 8, 2023), https://ir.echostar.com/news-releases/news-release-details/dish-network-corporation-and-echostar-corporation-combine.

[189] *See* Amended Applications of Spectrum Business Trust 2025-1, Space Exploration Technologies Corp., and EchoStar Corporation for Consent to Assign Spectrum and Earth Station Licenses, GN Docket No. 25-302, ULS File

(continued….)

AT&T's radio network, in what the parties describe as a hybrid-Mobile Network Operator (MNO) arrangement.  Thus, while Boost Mobile will continue to provide wireless service to its customers, it will no longer operate its own radio network.

61.      A number of commenters allege that EchoStar has told various tower companies, fiber backhaul providers, and construction firms that it will not fulfill its contracts nor pay the monies it owes them for constructing that radio network.[190]  They also allege that EchoStar claims that the subsidiary that contracted with them will not be receiving any of the monies from the sale of these licenses.[191]  We note that EchoStar will receive approximately $23 billion from the sale of the licenses to AT&T alone.[192]  The commenters therefore ask that we condition our approval of the transaction on requiring DISH Wireless, LLC to honor or meet its existing contractual obligations to its infrastructure partners, including requiring the deposit of monies in an escrow account.[193]  EchoStar responds that it has reached settlements with hundreds of vendors and made hundreds of millions of dollars of payments.  It argues that any escrow condition is illegal and unmanageable.[194]

(Continued from previous page) ————————————

Nos. 0011755472, 0011755474,0011755481, 0011783085, and 0011783097, and File Number 50000ALAA25 filed in ECFS (filed November 20, 2025); ICFS File Nos. SES-ASG-20250918-00146 and SES-ASG-20250918-00147 and Submission ID 1091941380832 filed in ECFS (filed Sept. 18, 2025).

[190] *See, e.g.*, Letter from Michael D. Saperstein, Jr., Senior Vice President, Government Affairs & Chief Strategy Officer, Wireless Infrastructure Association, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 5–6 (filed Dec. 15, 2025) (WIA Dec. 15, 2025 *Ex Parte*); Letter from Michael D. Saperstein, Jr., Senior Vice President, Government Affairs & Chief Strategy Officer, Wireless Infrastructure Association, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 3–4 (filed Jan. 8, 2026) (WIA Jan. 8, 2026 *Ex Parte*); Letter from Michael D. Saperstein, Jr., Senior Vice President, Government Affairs & Chief Strategy Officer, Wireless Infrastructure Association, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 2 (filed Jan. 22, 2026) (WIA Jan. 22, 2026 *Ex Parte*); Letter from Roger Laperna et al., President and CEO 1 Source Tower, to Marlene Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 2 (filed Dec. 19, 2025) (Wireless Infrastructure Providers *Ex Parte*); Letter from Jill Sandford, Chief Legal Officer, FirstLight Fiber Inc. to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 2 (filed Dec. 23, 2025) (FirstLight *Ex Parte*); Letter from Todd Schlekeway, President and CEO, NATE the Communications Infrastructure Contractors Association, to Marlene H. Dortch, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 1–2 (filed Jan. 6, 2026) (NATE *Ex Parte*).

[191] *See, e.g.*, WIA Dec. 15, 2025 *Ex Parte* at 4; Letter from Nanette S. Edwards, Counsel for Horry Telephone Cooperative, Inc., to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, Attach. Letter from Arnold Agcoaili, Vice President-National Development, DISH Wireless L.L.C., to Horry Telephone Cooperative Inc., at 1 ("DISH Wireless L.L.C. ('DISH Wireless') is not a party to the AT&T or SpaceX agreements, does not own the spectrum licenses being sold to AT&T or SpaceX, and is not entitled to receive any of the spectrum sale proceeds at closing.") (filed Feb. 20, 2026).

[192] Press Release, EchoStar, EchoStar Announces Spectrum Sale and Hybrid Mobile Network Operator (MNO) Agreement, Steps Toward Resolving Federal Communications Commission's Inquiries, (Aug. 26, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-hybrid-mobile-network.

[193] *See, e.g.*, WIA Dec. 15, 2025 *Ex Parte* at 5–6; WIA Jan. 8, 2026 *Ex Parte* at 3–4; WIA Jan. 22, 2026 *Ex* Parte 2; Wireless Infrastructure Providers *Ex Parte* at 2; FirstLight *Ex Parte* at 2, NATE *Ex Parte* at 1–2; *see also* 1Finity Filing at 3 (requesting that any approval of the transaction be conditioned on DISH Wireless's assignment of its contractual requirements to AT&T and make 1Finity whole if DISH Wireless cannot meet its contractual obligations); Michel *Ex Parte* at 2 (requesting that the FCC clarify that it has not authorized or endorsed a suspension of site rents owed by Dish Wireless); Bethel Church Comments.

[194] Letter from Pantelis Michalopoulos, Andrew Golodny, Andrew Magloughlin, Steptoe LLP, Counsel to EchoStar Corporation, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302 at 1 (filed May 8, 2026) (EchoStar May 8, 2026 *Ex Parte*).

62.    *Discussion*.  Given the unique factual and legal circumstances presented in this transaction and the accompanying one, as well as the record that has developed, we impose a limited escrow or trust fund obligation on EchoStar as a condition of approving these transactions.  As noted above, EchoStar seeks approval to sell the licenses at issue here and in the related SpaceX-EchoStar applications for tens of billions of dollars.  However, a number of entities have argued that EchoStar has indicated that it will not pay companies for work—the construction of a new facilities-based nationwide 5G network, including the leasing of space on towers and rooftops to house its antennas—that it was required to undertake as a condition on those licenses.  At the same time, EchoStar disputes claims that have been raised by those companies.  With the attached condition, the FCC continues to allow the relevant parties and, if necessary, courts or other bodies, to adjudicate or settle these issues.  The Commission's unique role in the underlying series of events creates a precedentially novel fact pattern and cognizable public-interest harms specific to this transaction that we find necessary to resolve here.[195] Therefore, as set forth in more detail in Appendix B, we condition our approval on EchoStar, within 30 days of consummating the transaction, creating a trust fund and depositing $2.4 billion into that fund to help pay obligations potentially incurred in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned or transferred in this transaction.[196]  We find that such a condition is necessary to conclude that the proposed transaction serves the public interest.[197]

## VIII.   WAIVERS

63.    The Applicants request a waiver, extension, or substitution of sections 27.14(t), 1.953, and 1.946(e)(3) of the Commission's rules to give AT&T sufficient time to deploy the 600 MHz spectrum and also request a waiver of the time-limited spectrum aggregation limit for 3.45 GHz spectrum under section 27.1606(a) of the Commission's rules.[198]  The Commission may grant a waiver when either "[t]he underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and . . . grant of the requested waiver would be in the public interest," or "[i]n view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative."[199]  As explained below, based on the record, we find that given the unique circumstances present here, granting the requested waiver of the 600 MHz deployment obligations under section 27.14(t), with the imposition of more robust buildout conditions than were proposed in the waiver request, is in the public interest and would avoid the potential that this spectrum is left unused or underutilized.  We also grant a temporary waiver and extension of the discontinuance rule for the Applicants to the extent necessary to effectuate the transaction.  Finally, we dismiss as moot the requested waiver of the rule governing prohibitions on extensions of time because it is not necessary, and we dismiss as moot the request for a waiver of the time-limited aggregation limit on 3.45 GHz spectrum, because it has already expired.

---

[195] Although EchoStar contends that Commission precedent forecloses the remedy we adopt today, *see* EchoStar May 8, 2026 *Ex Parte*, we find this precedent inapposite and materially different from the unique circumstances presented in this transaction.

[196] *See DISH Modification Order*, 35 FCC Rcd 9580; *T-Mobile-Sprint Order*, 34 FCC Rcd 10578 (2019).  An identical condition is being placed on the Bureau and Space Bureau's approval of SpaceX's acquisition of licenses in GN Docket No. 25-302.  Only one fund is required to be created, and only $2.4 billion is required to be placed into the fund.

[197] We also note that the Bureau and the Commission retain full authority to apply all appropriate sanctions and remedies for a violation of the conditions contained in this Order.

[198] Public Interest Statement at 28; Applicants' Apr. 17, 2026 Letter at 1 (clarifying that the request regarding the discontinuance rules applies to both Applicants).

[199] 47 CFR § 1.925(b)(3)(i)–(ii).

### A.        Waiver of 600 MHz Construction Requirements

64.        The Applicants state that AT&T does not currently operate in the 600 MHz band and in order to give AT&T additional time to deploy the 600 MHz spectrum, they request a "waiver, extension, and/or substitution of the 600 MHz buildout requirements" including, as relevant, the "June 14, 2028 extended buildout deadline that the Commission adopted for some of EchoStar's 600 MHz licenses."[200] Specifically, AT&T asks that the deadlines for offering service over all of the 600 MHz licenses it is acquiring from EchoStar be adjusted.[201]  We recognize AT&T's need for additional time to deploy the spectrum, but we acknowledge concerns raised about AT&T's initial proposal to ultimately cover 40% of each PEA for the 600 MHz licenses.  Buildout requirements are necessary to promote the productive use of spectrum, and as such, we impose more substantial buildout conditions than what the Applicants originally proposed. As detailed below, we grant waiver of the extension request, conditioned on AT&T meeting these more stringent buildout obligations.

65.        *Waiver Requests.*  Specifically, to allow time for AT&T to integrate the 600 MHz into its network, the Applicants seek waiver of the buildout requirements at section 27.14(t), the discontinuance rule at section 1.953, and—to the extent necessary—the prohibition on granting extension requests that are "because the licensee intends to assign the authorization" at section 1.946(e)(3).  The Applicants request a waiver of the foregoing rules because AT&T claims it needs time to deploy the 600 MHz spectrum, which it does not currently have in its network, and plans to significantly invest in deploying the 600 MHz spectrum nationwide.[202]  In place of the 600 MHz buildout deadlines, AT&T originally proposed to offer service: (1) to at least 40% of the U.S. population within three years; and (2) to at least 75% of the U.S. population and to 40% of the total population of each license area within five years.[203]

66.        Section 27.14(t) of the Commission's rules sets interim and final deployment milestones for 600 MHz spectrum: license holders must (1) provide reliable signal coverage and offer service within six years from the date of the initial license to at least 40% of the population in each of its license areas; and (2) provide reliable signal coverage and offer service within 12 years from the date of the initial license to at least 75% of the population in each of its license areas.[204]  The Applicants explain that the Commission has previously waived performance and construction requirements under section 27.14(t) when the underlying purpose of the rule would otherwise be frustrated.[205]

67.        Under section 1.953(a) of the Commission's rules, a licensee's authorization will terminate automatically if the licensee permanently discontinues service or operations under the license during the license term after the date it is required to be providing service or operating, although the period may be extended for good cause.[206]  The Applicants explain that EchoStar plans to decommission its RAN before consummating the transaction, and that AT&T will need more than 180 days after closing

---

[200] Public Interest Statement  at 29–37; *see also* 47 CFR §§ 27.14(t), 1.946(e)(3), and 1.953.

[201] Public Interest Statement at 29.

[202] Public Interest Statement at 29–30, 32–37; Public Interest Statement, Mansfield Decl. ¶ 17.  The Applicants describe the steps that AT&T must take to deploy the 600 MHz spectrum including engineering analysis, developing and procuring new radios, developing new antennas, coordinating with handset vendors, and negotiating with tower companies to deploy equipment.  Public Interest Statement at 31; Public Interest Statement, Mansfield Decl. ¶¶17, 19–24.

[203] Public Interest Statement at 29.

[204] 47 CFR § 27.14(t)(1)–(2).

[205] Public Interest Statement at 33.

[206] 47 CFR § 1.953(a), (g).  For geographic licenses, permanent discontinuance of service or operations is defined as 180 consecutive days during which a licensee does not operate or, in the case of commercial mobile radio service providers, does not provide service to at least one subscriber that is not affiliated with, controlled by, or related to the licensee. 47 CFR § 1.953(b).

to deploy the 600 MHz spectrum in its network.[207]  The Applicants therefore request a waiver and extension of section 1.953 of the Commission's rules for both EchoStar and AT&T to the extent necessary, until AT&T begins offering service to a subscriber not affiliated with, controlled by, or related to AT&T.[208]  The Applicants state that a waiver and extension are needed to give AT&T "a reasonable period of time for deployment."[209]  The Applicants further state that waiving section 1.953 would be consistent with precedent given AT&T's planned deployment schedule.[210]

68.     Finally, section 1.946(e)(3) of the Commission's rules provides that requests for extension of construction deadlines will not be granted because the licensee intends to assign authorization or solely to allow an assignee to complete the facilities that the assignor failed to construct.[211]  The Applicants request that the Commission find that section 1.946(e)(3) of the Commission's rules "does not apply to the 600 MHz Licenses with a June 14, 2028 extended buildout deadline" or that the Commission waive the rule to the extent necessary.[212]  The Applicants state that granting the requested relief is consistent with precedent[213] and that not granting the waiver risks this spectrum sitting idle.[214]

69.     *Record.*  T-Mobile and RWA oppose AT&T's waiver requests based on AT&T's initial proposed deployment obligations, both arguing that the proposed obligations would neglect rural areas.[215]  T-Mobile and RWA assert that to ensure service to rural areas, the Commission should require AT&T to meet a more accelerated timeline and a geography-based coverage requirement instead of AT&T's proposed population-based coverage requirement.[216]  T-Mobile also requests that AT&T be required to

---

[207] Public Interest Statement at 33.

[208] Public Interest Statement at 33; Applicants' Apr. 17, 2026 Letter at 1.

[209] Public Interest Statement at 36.

[210] Public Interest Statement at 33–35.

[211] 47 CFR § 1.946(e)(3).

[212] Public Interest Statement at 34.

[213] Public Interest Statement at 34–35 & n.121 (citing *Application for Consent to Assignment of PCS Licenses KNLH637 & KNLH638 from Northstar Tech., LLC to Bellevue Wireless*, *LLC*, Memorandum Opinion & Order, 24 FCC Rcd 13476, 13479, para. 9 (WTB/OMD 2009) (waiving section 1.953's predecessor, consenting to the assignment of the licenses to a third party, and granting the third party additional time to construct facilities sufficient to satisfy the applicable construction requirement); *see also* Public Interest Statement at 35 & n.124 (citing *T-Mobile License LLC, Request for Waiver of Section 27.14(g)(1)*, WT Docket No. 16-319, Memorandum Opinion and Order, 32 FCC Rcd 10619, 10623–29, paras. 11–25 (2017) (notwithstanding section 1.946(e)(3)—waived section 27.14 to give T-Mobile additional time to satisfy fast approaching performance requirements where T-Mobile demonstrated significant steps towards meeting the performance requirements and denying the waiver would frustrate the purpose of section 27.14(g)(1))); *id.* at n.125 (citing *Leap Wireless Int'l, Inc. Request for Waiver and Extension of Broadband PCS Construction Requirements*, Memorandum Opinion and Order, 16 FCC Rcd 19573, 19575, 19578, paras. 7, 13 (WTB 2001) (new licensee demonstrated diligence in preparing to construct facilities and the extension would serve the public interest because it would "allow the introduction of new, innovative, advanced services to sparsely-populated areas, promoting competition and ultimately benefiting consumers")).

[214] Public Interest Statement at 35.

[215] T-Mobile Petition at 3; RWA Comments at 12 (arguing that "[d]elaying buildout by two years is inconsistent with the purpose of the rule to ensure expeditious build-out and is not in the public interest, as waiver would harm rural Americans by allowing spectrum that rural providers could put to quick use to go unused for an additional two years"); RWA Reply at 4.  T-Mobile's petition to deny or condition the transaction focuses primarily on concerns with the 600 MHz buildout waiver request.  *See generally* T-Mobile Petition.

[216] T-Mobile Petition at 3–4; RWA Reply at 7–8.  Specifically, T-Mobile requests that AT&T be required to cover (1) at least 40% of the 600 MHz geographic area by the third anniversary of the transaction's closing date, (2) at least 75% of the 600 MHz license area by the fifth anniversary of the transaction's closing date, and (3) 75% of the
(continued….)

conduct drive-testing to demonstrate compliance with the deployment obligations for the 600 MHz spectrum.[217] RWA requests that the Commission require AT&T to meet the existing 600 MHz buildout requirements in the FCC's rules and asserts that if AT&T cannot meet these requirements, the Commission should reclaim and reallocate this spectrum consistent with the obligations under section 309(j) of the Act.[218] RWA also comments that a waiver would be unnecessary if AT&T partitioned the 600 MHz spectrum under the Enhanced Competition Incentive Program (ECIP) because all parties to such a transaction would receive a one-year deadline extension.[219]

70.     In response, the Applicants argue that T-Mobile's proposed buildout deadlines and proposed conditions are unreasonable and unnecessary, given AT&T's strong incentives to deploy the spectrum.[220] They note that the "Commission has previously rejected similar calls for additional buildout conditions where, as here, the applicant has demonstrated a credible deployment plan and strong incentives to use the spectrum intensively."[221]

71.     *Discussion.* The Commission adopted the interim and final deployment milestones for 600 MHz spectrum set forth in section 27.14(t) "to promote the productive use of spectrum, to encourage licensees to provide service to customers in a timely manner, and to promote the provision of innovative services in unserved areas, particularly rural areas."[222] AT&T does not currently operate in the 600 MHz band, and we credit Applicants' statement that AT&T plans to significantly invest in deploying the 600 MHz spectrum and that it has sufficient incentives to do so.[223] We also note that AT&T's near-immediate deployment of the 3.45 GHz spectrum via a spectrum manager lease indicates an intent to deploy on the spectrum assets as quickly as feasible.[224] We find that, with the more stringent buildout conditions that we adopt here, waiving section 27.14(t) of the Commission's rules in these circumstances better serves these purposes than strict application of the rules.

72.     EchoStar's 600 MHz licenses remain in active status,[225] and the assignment of these licenses to AT&T, and our grant of AT&T's request for waiver of section 27.14(t), will avoid the possibility that the 600 MHz band licenses will be left unused or underutilized.[226] AT&T states that it will use this spectrum in the near term to supplement its existing 5G deployment, e.g., to ameliorate congestion, open up further carrier aggregation opportunities, and improve network speed and

---

(Continued from previous page)

geographic area for all of the 600 MHz licenses it acquires in this transaction. T-Mobile Petition at 4. RWA supports T-Mobile's proposal in its Reply. RWA Reply at 7–8.

[217] T-Mobile Petition at 6.

[218] RWA Comments at 13.

[219] RWA Comments at 13 ("RWA members . . . would be interested in purchasing the 600 MHz licenses from AT&T in whole or in part in certain markets" and build out extensions could be tied to the transactions under ECIP rules); RWA Reply at 4 (discussing ECIP as an alternative to the waiver).

[220] Joint Opposition at 8–10.

[221] Joint Opposition at 10.

[222] *Expanding the Econ. & Innovation Opportunities of Spectrum Through Incentive Auctions*, GN Docket No. 12-268, Report and Order, 29 FCC Rcd 6567, 6877–78, para. 764 (2014).

[223] Public Interest Statement at 15–17; Public Interest Statement, Mansfield Decl. at ¶¶ 2, 17, 25.

[224] *See* Joint Opposition at 1, 4–6; Press Release, AT&T, AT&T Boosts 5G Capacity Nationwide with New Spectrum, Giving Customers a Stronger, Faster Connection (Nov. 17, 2025), https://about.att.com/story/2025/att-boosts-5g-capacity-nationwide.html.

[225] *See supra* section VII (Other Public Interest Issues, *Cancellation or Surrender of EchoStar's Unconstructed 600 MHz licenses*).

[226] *See, e.g.*, ITIF Comments at 2.

performance, including indoors given the strong building-penetration characteristics of 600 MHz spectrum.[227]

73.       We are persuaded that AT&T needs reasonable time for deployment because it currently does not operate in the 600 MHz band and the time-consuming steps required to deploy this spectrum at tens of thousands of cell sites nationwide "rise to the level of 'unique or unusual factual circumstances'" under which application of the Commission's rules "would be 'unduly burdensome [and] contrary to the public interest.'"[228]  In particular, because AT&T operates an extensive network in other bands, we credit AT&T's claims that it will need time to ensure the right solutions to deploy the new 600 MHz band together with the different spectrum bands and blocks at different cell sites to avoid interference, size antennas to make the best use of limited tower space, as well as work with its handset vendors to develop any needed software upgrades.[229]  We also agree that granting AT&T's requested waiver of section 27.14(t) is consistent with precedent granting such relief when doing so serves the public interest.[230]  Finally, the record reflects that AT&T has sufficient incentives to invest the resources necessary to realize a nationwide deployment of the 600 MHz spectrum for the benefit of consumers[231] and has a demonstrated track record of deploying spectrum acquired in large secondary market transactions.[232]

74.       We do not agree, however, that AT&T's proposed buildout commitments are sufficient to ensure robust deployment of the 600 MHz spectrum.[233]  Accordingly, we impose, as a condition to the waiver, more stringent buildout obligations, including a final buildout condition requiring AT&T to offer 600 MHz band coverage and service to at least 75% of the population covered by each 600 MHz license at issue on a license-by-license basis no later than the tenth anniversary of the closing date, which will facilitate significant deployment for each license, including to rural areas, consistent with the purpose of the rule.  We impose the following buildout conditions to the licenses and also apply the Commission's rules for 600 MHz licenses that provide for the automatic cancellation of a license if a licensee fails to

---

[227] *See* Public Interest Statement at 16 & nn.51–54 (citing Public Interest Statement, Mansfield Decl. ¶¶ 7–10).

[228] Public Interest Statement at 36 (quoting *AT&T Mobility Spectrum LLC, BellSouth Mobile Data, Inc., New Cingular Wireless PCS, LLC, & SBC Telecom, Inc., Petition for Ltd. Waiver of Interim Performance Requirement for 2.3 GHz WCS C & D Block Licenses*, WT Docket No. 16-181, Order, 32 FCC Rcd 708, 713, para. 11 (WTB 2017) (waiving the performance requirements under section 27.14(p)(1) in light of AT&T's greater than anticipated difficulties in developing, fully coordinating, and deploying "a network that will not adversely impact entities operating in adjacent spectrum within the required construction timeframe"); *T-Mobile-Sprint Order*, 34 FCC Rcd at 10742, para. 373 (waiving construction requirements under section 27.14(g), (q) and (r) because "DISH's contemplated acquisition of divestiture assets associated with the proposed merger of T-Mobile and Sprint present[ed] unique factual circumstances" that would have rendered denial of a waiver "contrary to the public interest").

[229] *See* Public Interest Statement, Mansfield Decl. ¶¶ 19–21.  AT&T also states that it will conduct an engineering analysis for each cell site to design the network "to avoid passive intermodulation interference of new 600 MHz radios to AT&T's existing 700 MHz and 850 MHz radios at each of its cell sites."  *Id.* ¶ 19.  "Intermodulation interference occurs when two or more nearby signals combine to create new signals at unwanted frequencies . . . [that] could lead to degraded user experience—for example, dropped calls and reduced speeds."  *Id.* & n.4.

[230] *See generally T-Mobile-Sprint Order*.

[231] *See, e.g.*, Public Interest Statement at 2, 10, 17, 34, & n.122 (citing Public Interest Statement, Mansfield Decl. ¶¶ 17–18).

[232] *See* Public Interest Statement at 30, & n.104 (citing buildout reports for spectrum that AT&T acquired in other large secondary market transactions).

[233] *See* Public Interest Statement at 29.

meet its Final Buildout Requirement for a 600 MHz band license,[234] and to accelerate the final buildout deadline if a licensee fails to meet its Interim Buildout Requirement for a particular license.[235]

75. Our grant of AT&T's request for waiver of section 27.14(t) for the 600 MHz licenses is subject to the following conditions, on each license, for providing 600 MHz band coverage and service:

1. No later than the date that is the third anniversary of the transaction's closing date reported in the Notice of Consummation, AT&T shall provide reliable signal coverage and offer service to at least forty (40) percent of the U.S. population who are covered by AT&T's 600 MHz band licenses (Nationwide Interim Buildout Requirement).

2. No later than the date that is the fifth anniversary of the transaction's closing date reported in the Notice of Consummation, AT&T shall provide reliable signal coverage and offer service to at least seventy-five (75) percent of the U.S. population who are covered by AT&T's 600 MHz band licenses (Nationwide Final Buildout Requirement).

3. No later than the date that is the fifth anniversary of the transaction's closing date reported in the Notice of Consummation, AT&T shall provide reliable signal coverage and offer service to at least forty (40) percent of the total population covered by each 600 MHz band license on a license-by-license basis (PEA Interim Buildout Requirement).

4. No later than the date that is the tenth anniversary of the transaction's closing date reported in the Notice of Consummation, AT&T shall provide reliable signal coverage and offer service to at least seventy-five (75) percent of the total population covered by each 600 MHz band license on a license-by-license basis (PEA Final Buildout Requirement).

5. If the Bureau determines that AT&T has failed to meet the Nationwide Interim Buildout Requirement, the deadline for the Nationwide Final Buildout Requirement shall be accelerated by one (1) year (to the date that is the fourth anniversary of the transaction's closing date).

6. If the Bureau determines that AT&T has failed to meet the Nationwide Final Buildout Requirement, the PEA Final Buildout Requirement for each license shall be accelerated by one (1) year (to the date that is the ninth anniversary of the transaction's closing date); provided, however, that if the Bureau determines AT&T failed to meet the PEA Interim Buildout Requirement for a particular license area, then the PEA Final Buildout Requirement for such license area shall be accelerated by two (2) years (to the date that is the eighth anniversary of the transaction's closing date).

7. If the Bureau determines that AT&T has failed to meet the PEA Final Buildout Requirement for a particular license area, AT&T's authorization for such license area shall terminate automatically without Commission action, and the licensee shall be ineligible to regain it if the Commission makes the license available at a later date.

8. To demonstrate compliance with the Nationwide Buildout Requirements, AT&T shall file in ULS a report that conforms to 47 CFR § 27.14(k) (except for the reference to § 1.946(d) and (t)(5)) within 15 days of the expiration of the coverage period as an attachment to a designated, 600 MHz band license: Call Sign WQZM232.[236] AT&T shall

---

[234] 47 CFR § 27.14(t)(4).

[235] 47 CFR § 27.14(t)(3). We also adopt conditions for the nationwide buildout conditions based on section 27.14(t)(3).

[236] The nationwide reports for Conditions 1 and 2 are not license-by-license notifications filed on FCC Form 601, Schedule K under 47 CFR § 1.946(d).

demonstrate compliance with the PEA Buildout Requirements for each license in accordance with 47 CFR §§ 1.946(d), 27.14(k), (t).[237]

76.      The interim and final deployment obligations that we impose, and as set forth above, address the concerns that T-Mobile raises about ensuring deployment in rural areas within each license PEA.[238]  We decline T-Mobile and RWA's request that any waiver of the 600 MHz deployment obligations include geographic-based coverage requirements in order to ensure significant deployment in rural areas.[239]  In the *600 MHz Order*, the Commission declined to adopt geographic-based coverage requirements and explained that "measuring build-out by percentage of population served 'provides a clear metric that will promote efficient deployment'" including to less densely populated areas.[240]  The Commission further explained that it was not persuaded by arguments that a geographic-based metric was needed to ensure less-densely populated, often rural communities, have timely access to advanced services.[241]  The record does not support reversing this approach.  Further, we find unpersuasive RWA's assertion that granting the request for waiver of section 27.14(t) is unnecessary because AT&T could gain additional time by partitioning or disaggregating the licenses under the Enhanced Competition Incentive Program (ECIP).[242]  AT&T has demonstrated that it needs more than a one-year extension of the interim and final performance requirement deadlines and such license assignments could further complicate and delay AT&T's deployment of 600 MHz band spectrum into its network.[243]

77.      We also decline T-Mobile's request to require AT&T to conduct drive testing to verify compliance with the 600 MHz buildout obligations for this transaction.[244]  T-Mobile's comparison to the drive testing conditions in T-Mobile-Sprint is inapposite.  In the T-Mobile-Sprint transaction, a primary benefit of the transaction was the promise by both T-Mobile and DISH to deploy 5G networks where none previously existed in large swaths of the country.[245]  The drive testing commitments were intended to verify compliance with this significant 5G deployment and accompanying speed commitments to determine whether this benefit was realized.[246]  By contrast, the instant proposed transaction is a spectrum-only transaction, and AT&T intends to use the spectrum at issue to bolster its established 5G network.  Moreover, many of the 600 MHz band licenses at issue in the proposed transaction were not involved in the *T-Mobile-Sprint Order*.  We disagree with T-Mobile's argument that drive testing is the only means to ensure the 600 MHz spectrum is deployed to provide coverage to previously unserved or underserved rural areas.[247]  The FCC's notification and documentation requirements for the 600 MHz

---

[237] Section 1.946(d) requires filing FCC Form 601 for each license.  Per the above conditions, this requirement shall only apply to the PEA Buildout Requirements for each license.

[238] *See* T-Mobile Petition at 3.

[239] *See* T-Mobile Petition at 2, 4–5; RWA Reply at 7–8.

[240] *600 MHz Order*, 29 FCC Rcd at 6878–79, paras. 767–768.

[241] *600 MHz Order*, 29 FCC Rcd at 6878, para. 768.

[242] RWA Reply at 4, 8; *see also* 47 CFR § 1.60005(a)(2) (providing parties to a qualifying transactions under ECIP a one-year extension on interim and final build out deadlines).

[243] *See also supra* section VII (Other Public Interest Issues).

[244] *See* T-Mobile Petition at 5–6.

[245] *See, e.g.*, *T-Mobile-Sprint Order*, 34 FCC Rcd at 10581–83, paras. 5–8, 12 (describing benefits of T-Mobile's commitment to deploy 5G); *id.* at 10742–43, paras. 374, 377 (describing benefits of DISH's commitment to deploy a 5G network).

[246] *See, e.g.*, *T-Mobile-Sprint Order*, 34 FCC Rcd at 10589–90, paras. 26–27, 31 (describing T-Mobile's coverage, speed, and drive testing commitments); *id.* at 10740–41, paras. 368–370 (describing DISH's coverage, speed, and drive testing commitments).

[247] T-Mobile Petition at 6.

interim and final deployment obligations apply to the 600 MHz band licenses included in this transaction by condition or rule.[248]

78.     Finally, we decline T-Mobile's request that any approval of the proposed transaction explicitly provide that the failure to satisfy the deployment obligations, including the interim deployment obligations, for any license included in the transaction should result in automatic license cancellation.[249] The FCC's rules already provide for the acceleration of the final buildout requirements for 600 MHz spectrum if a licensee fails to meet its interim buildout obligations.[250]  The FCC's rules also provide for the automatic cancellation of a license if a licensee fails to meet its final deployment obligations.[251]  The record does not provide a basis for taking a different approach for the licenses included in this transaction.

79.     In light of our finding that AT&T has justified the requested waiver of section 27.14(t), we conclude that the request for waiver of section 1.946(e)(3), which provides that extensions will not be granted because the licensee intends to assign the authorization or solely to allow an assignee to complete facilities that the assignor failed to construct, is unnecessary.  We are not granting extensions solely to allow AT&T to complete construction of facilities that the assignor failed to construct—rather, we are setting new buildout deadlines for all of the 600 MHz licenses to allow AT&T sufficient time to integrate the spectrum into its network.

80.     Given that AT&T will not be using EchoStar's facilities, we grant the Applicants a temporary and partial waiver and extension of section 1.953 for any permanent discontinuance of service under a 600 MHz band license until the transaction is consummated (or abandoned).[252]  Once the transaction is consummated, new buildout deadlines will govern all of AT&T's 600 MHz licenses and section 1.953 will become applicable on "the date [AT&T] is required to be providing service or operating."[253]

B.     **Waiver of the Time-Limited Aggregation Limit for 3.45 GHz Spectrum**

81.     AT&T seeks, to the extent not already expired, a waiver of section 27.1606(a) of the Commission's rules, which provides that until four years after the close of Auction 110, licensees may not hold more than 40 megahertz of 3.45 GHz spectrum.[254]  The temporary 40 megahertz aggregation limit on 3.45 GHz spectrum automatically expired on January 4, 2026.[255]  Therefore, we dismiss AT&T's waiver request as moot.[256]

---

[248] 47 CFR § 1.946(d); *600 MHz Order*, 29 FCC Rcd at 6883, paras. 778–79.

[249] T-Mobile Petition at 6.  T-Mobile explains that this requirement is needed because of the prior delays in deploying this spectrum. *Id.*

[250] 47 CFR § 27.141(t)(3).

[251] 47 CFR § 27.141(t)(4).

[252] "Permanent discontinuance of service or operations for Covered Geographic Licenses is defined as 180 consecutive days during which a licensee does not operate or, in the case of commercial mobile radio service providers, does not provide service to at least one subscriber that is not affiliated with, controlled by, or related to the licensee."  47 CFR § 1.953(b).

[253] 47 CFR § 1.953(a).  If the assignment is not timely consummated or if the parties abandon the assignment, the waiver and extension of section 1.953 will cease.

[254] 47 CFR § 27.1606(a); *see also 3.45 GHz Order*, 36 FCC Rcd at 6022–23, 6025, paras. 102, 106.

[255] *3.45 GHz Order*, 36 FCC Rcd at 6022–23, 6025, paras. 102, 106; *Auction 110 Public Notice*, 37 FCC Rcd at 308, para. 1 (announcing January 4, 2022 as the end date of the auction).

[256] Consistent with this action, we also dismiss as moot Public Knowledge and OTI's objections to the requested waiver of the time-limited aggregation limit for 3.45 GHz spectrum.  *See* Public Knowledge OTI Comments at 9.

## IX. CONCLUSION

82. Based on our review of the record and our competitive analysis, we conclude that the risk of public interest harm from granting the Applications is low. We find it unlikely that the proposed acquisition of 600 MHz and 3.45 GHz spectrum would allow AT&T to foreclose entry, raise rivals' costs, or otherwise harm the public interest. In addition, we substantially credit the Applicants' claims that the instant transaction will produce public interest benefits including avoiding the potential for valuable spectrum to be left unused or underutilized and providing improved performance in AT&T's network and the services AT&T offers to its customers.[257] We find it likely that AT&T's customers in the markets at issue will benefit from AT&T's increased network capacity, reduced latency, faster speeds, as well as additional, improved, and expanded products and services, and that these network improvements will also benefit customers of service providers that use AT&T's network to provide wireless service.[258] The public interest would be further served by any service improvements and lower prices that result from EchoStar's restructuring as a hybrid-MNO.[259] We thus conclude that overall, the proposed transaction would serve the public interest, convenience, and necessity. We further find that waiving certain buildout requirements for the 600 MHz spectrum, conditioned on meeting new buildout deadlines, is in the public interest as it will give AT&T additional time to deploy this spectrum and will ensure the spectrum is put to use. We grant temporary waiver and extension of section 1.953 of the Commission rules governing discontinuance for both EchoStar and AT&T, to the extent necessary to effectuate the transaction. We dismiss as moot the request to waive section 1.946(e)(3) of the Commission's rules governing limitations on granting extensions of time to deploy 600 MHz spectrum and we also dismiss as moot AT&T's request for waiver of the time-limited aggregation limit for 3.45 GHz spectrum, which expired on January 4, 2026.

## X. ORDERING CLAUSES

83. ACCORDINGLY, having reviewed the Applications and record in this matter, **IT IS ORDERED** that, pursuant to sections 4(i) and (j), 5(c), 303(r), 309, and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 303(r), 309, 310(d), and pursuant to the authority delegated under sections 0.131 and 0.331 of the Commission's rules, 47 CFR §§ 0.131 and 0.331 the applications for consent to assignment filed by AT&T and EchoStar **ARE GRANTED**, to the extent specified in the Memorandum Opinion and Order and **SUBJECT TO** the conditions specified herein.

84. **IT IS FURTHER ORDERED** that the above grant includes authority for the transfer or assignment of any 600 MHz or 3.45 GHz licenses or authorizations that may have inadvertently been omitted from the application forms filed by the Applicants.

85. **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j), 303(r), 309, and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), (j), 303(r), 309, 310(d), the Petition to Condition or Deny filed by T-Mobile, **IS DENIED** for the reasons stated herein.

86. **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j) of the Communications Act of 1934 as amended, 47 U.S.C. § 154(i), (j) and sections 1.3 and 1.925 of the Commission's rules, 47 CFR §§ 1.3, 1.925, the waiver request concerning the 600 MHz buildout obligations under section 27.14(t) of the Commission's rules, 47 CFR § 27.14(t) **IS GRANTED** to the extent described herein and **SUBJECT TO** the conditions described herein.

87. **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j) of the Communications Act of 1934 as amended, 47 U.S.C. § 154(i), (j) and sections 1.3 and 1.925 of the

---

[257] Public Interest Statement at 3–4, 10–11, 15–16.

[258] *See, e.g.*, Public Interest Statement at 3–4, 11, 14–16; Mansfield Decl. ¶¶ 2, 4, 13–14, 25.

[259] *See, e.g.*, Public Interest Statement at 3, 22–23; Public Interest Statement, Swieringa Decl. ¶¶ 12–13, 18.

Commission's rules, 47 CFR §§, 1.3, 1.925, the request to waive section 1.953 of the Commission's rules, 47 CFR § 1.953, **IS GRANTED** to the extent described herein.

88.     **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j) of the Communications Act of 1934 as amended, 47 U.S.C. § 154(i), (j) and sections 1.3 and 1.925 of the Commission's rules, 47 CFR §§, 1.3, 1.925, the request to waive section 1.946(e)(3) of the Commission's rules, 47 CFR §  1.946(e)(3) **IS DISMISSED** as moot.

89.     **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j) of the Communications Act of 1934 as amended, 47 U.S.C. § 154(i), (j) and sections 1.3 and 1.925 of the Commission's rules, 47 CFR §§ 1.3, 1.925, AT&T's waiver request concerning the time-limited 3.45 GHz aggregation limit under section 27.1606(a) of the Commission's rules, 47 CFR § 27.1606(a), **IS DISMISSED** as moot.

90.     **IT IS FURTHER ORDERED** that this Memorandum Opinion and Order **SHALL BE EFFECTIVE** upon adoption.  Petitions for Reconsideration under section 1.106 of the Commission's Rules, 47 CFR § 1.106, may be filed within thirty days of the date of adoption of this Memorandum Opinion and Order.

91.     This action is taken under delegated authority pursuant to sections 0.131 and 0.331 of the Commission's rules, 47 CFR §§ 0.131, 0.331.

                                    FEDERAL COMMUNICATIONS COMMISSION




                                    Joel Taubenblatt

                                    Chief, Wireless Telecommunications Bureau

**APPENDIX A**
**Petitioners and Commenters**
**(WT Docket No. 25-303)**

**Petition to Deny**
T-Mobile USA, Inc., Petition to Condition or Deny (Nov. 18, 2025)

**Oppositions co-filed with Comments**[1]
Information Technology and Innovation Foundation, Comment and Opposition to Petitions to Deny (Dec. 3, 2025)
AT&T Mobility II LLC and EchoStar Corporation, Joint Opposition to Petition to Condition or Deny and Reply to Comments (Dec. 3, 2025)

**Replies**
Rural Wireless Association, Inc., Reply to Opposition (Dec. 15, 2025)

**Comments**[2]
Public Knowledge and Open Technology Institute at New America, Comments (Nov. 18, 2025)
Rural Wireless Association, Inc., Comments (Nov. 18, 2025)

***Ex Parte* Submissions**[3]
EchoStar Corporation, *Ex Parte* Submission (Dec. 3, 2025)
Wireless Infrastructure Association, *Ex Parte* Submission (Dec. 15, 2025)
Small-Medium Infrastructure Providers, *Ex Parte* Submission (Dec. 19, 2025)
FirstLight Fiber, Inc., *Ex Parte* Submission (Dec. 23, 2025)
NATE: The Communications Infrastructure Contractors Association, *Ex Parte* Submission (Jan. 6, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Jan. 8, 2026)
1Finity Americas, Inc., *Ex Parte* Submission (Jan. 13, 2026)
TowerNorth Development, LLC, *Ex Parte* Submission (Jan. 20, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Jan. 20, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Jan. 22, 2026)
1Finity Americas, Inc., *Ex Parte* Submission (Jan. 30, 2026)
Suzette Michel, *Ex Parte* Submission (Feb. 3, 2026)
AT&T Mobility II LLC and EchoStar Corporation, *Ex Parte* Submission (Feb. 11, 2026)
Bethel Church of San Jose, Comment (Feb. 12, 2026)
Litan Salman, Reuven Salman, and Clifford Steinberg, *Ex Parte* Submission (Feb. 17, 2026)
The American Wireless Builders Coalition, *Ex Parte* Submission (Feb. 19, 2026)
Horry Telephone Cooperative, Inc., *Ex Parte* Submission (Feb. 20, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Feb. 23, 2026)
American Tower Corporation, *Ex Parte* Submission (Feb. 25, 2026)
Marshall A. Lewis, *Ex Parte* Submission (Mar. 9, 2026)
Center for American Rights, *Ex Parte* Submission (Mar. 10, 2026)
Bull Moose Project, *Ex Parte* Submission (Mar. 11, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Mar. 11, 2026)

---

[1] The filings listed in this section were identified by their respective filers as including both an Opposition and Comments.

[2] The filings listed in this section were submitted during this proceeding's pleading cycle and classified as a comment filings by their respective filers. Accordingly, they will be accorded consideration as comment filings.

[3] The filings listed in this section are *ex parte* submissions and/or were submitted after the December 15, 2025 close of the pleading cycle for this transaction by their respective filers. They are accorded consideration as *ex parte* filings under the Commission's rules. 47 CFR §§ 1.1200 *et seq.*; *see generally* 47 CFR § 1.419(b).

Zada Realty LLC, Comment (Mar. 25, 2026)
Daniel Rahimzada Zada Realty LLC, Comment (Mar. 26, 2026)
Zada Realty Corp Daniel Rahimzada, Comment (Mar. 26, 2026)
Center for American Rights, *Ex Parte* Submission (Mar. 31, 2026)
Tax Payer USA, Comment (Apr. 10, 2026)
The Michigan Coalition to Protect Public Rights-of-Way, *Ex Parte* Submission (Apr. 14, 2026)
AT&T Mobility II LLC and EchoStar Corporation, *Ex Parte* Submission (Apr. 17, 2026)
520 West 20 LLC, Comment (Apr. 29, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Apr. 29, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (May 1, 2026)
EchoStar Corporation, *Ex Parte* Submission (May 8, 2026)
332 Gates LLC and the Board of Managers of the 322 Gates Condominium, Comment (May 11, 2026)

**APPENDIX B**

1.        Within 30 days of consummating the assignment to AT&T of the licenses at issue in this Order[1] (the Consummation Date), EchoStar shall establish and deposit $2.4 billion into a trust (the Fund) to be used to pay certain obligations potentially incurred in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned or transferred in this transaction.  The trustee of the Fund (Trustee) shall be authorized to reasonably undertake any actions that are necessary and proper and solely intended to effectuate the purposes identified herein.  The terms of the Fund (including the amount of compensation for the Trustee) and any governing documents and the selection of the Trustee must be submitted to and approved by the Bureau.

2.        Within 30 days of the Consummation Date, EchoStar shall select the Trustee, who must (a) be a neutral third-party, free of any conflicts of interest, including but not limited to not having any financial interests in EchoStar, AT&T, or Space Exploration Technologies Corp. or any of its subsidiaries or affiliates (SpaceX); (b) have experience serving as trustee for trusts in excess of $500 million in assets; and (c) be insured in an amount reasonably commensurate with insured amounts for trustees of funds similar in size to the Fund.  The Trustee may not have been employed by EchoStar, AT&T, or SpaceX within the past five years.  Any employees or agents of the Trustee also shall have no conflicts of interest and not have been employed by EchoStar, AT&T, or SpaceX within the past five years.

3.        The Trustee shall, within 30 days of being selected, establish a process for filing claims with the Fund, including, without limitation, establishing a website providing instructions for filing a claim, and begin accepting claims (the Claims Opening Date).

4.        EchoStar shall give notice within 30 days of the Claims Opening Date to all creditors of DISH Wireless LLC of establishment of the Fund and the Internet address of the website established by the Trustee.

5.        A person or entity (Claimant), who has a final judgment or arbitration award against or a settlement with EchoStar Corp., DISH Network Corp., DISH Wireless LLC, and/or any other EchoStar subsidiary or affiliate for amounts due it for the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned in the transaction at issue[2] (collectively, the Covered Activities), may file a claim with the Fund (a Fund Claim).[3]  For the avoidance of doubt, Covered Activities include amounts expended or reasonably expected to be expended by the termination of EchoStar's operation of its network (e.g., costs for

---

[1] The applications containing the licenses are listed in footnote 1 of the body of this Order.

[2] *See Applications of T-Mobile US, Inc., and Sprint Corporation, For Consent To Transfer Control of Licenses and Authorizations, WT Docket No. 18-197, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, ULS File Nos. 0008741236, 0008741420, 0008741603, and 0008741789 et al., WT Docket No. 18-197, Order of Modification and Extension of Time to Construct, 35 FCC Rcd 9580 (WTB 2020); *Applications of T-Mobile US, Inc., and Sprint Corporation, For Consent To Transfer Control of Licenses and Authorizations, WT Docket No. 18-197, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, ULS File Nos. 0008741236, 0008741420, 0008741603, and 0008741789 et al., WT Docket No. 18-197, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578 (2019).  For the avoidance of doubt, Covered Activities are not limited to those activities necessary to meet the minimum requirements of the conditions placed on these licenses.

[3] For the avoidance of doubt, a Fund Claim includes final court judgments and arbitration awards and settlements for Covered Activities regardless whether they are based on contract law, principles of *quantum* meruit, or other similar contract or quasi-contract legal principles.

decommissioning towers and cell sites, costs for electricity used); and for lost future or profits and other amounts (e.g., future taxes, insurance, etc.) due under agreements (including leases) for operating the network that have been terminated, and/or costs incurred that the Claimant reasonably expected to be repaid out of future receipts.

6.        A Claimant may file only one Fund Claim, which shall include all claims for which the Claimant and its affiliates seek to pursue recovery from the Fund (for the avoidance of doubt, applicable claims not included in the Fund Claim filed by a Claimant shall be unrecoverable from the Fund).

7.        Fund Claims shall be categorized as follows:  Type A Claims are those claims that seek $100,000 or less in total for amounts owed for Covered Activities.  Type B Claims are those that seek more than $100,000 for amounts owed for Covered Activities and are further split into two types.  Type B-1 Claims are those portions of a Type B claim that are (i) for outstanding amounts due as of December 31, 2025, or the date the Claimant received notice from EchoStar that EchoStar would no longer fulfill its commitments under the agreement underlying the claim (whichever is earlier) for Covered Activities and/or (ii) for amounts expended or reasonably expected to be expended by the completion of the Covered Activities (e.g., costs for decommissioning towers and cell sites, costs for electricity used).  Type B-2 Claims are those portions of a Type B claim that are for lost future rents or profits and other future amounts (e.g., future taxes, insurance, etc.) due under agreements (including leases) for Covered Activities that have been terminated, and/or costs incurred for Covered Activities that the Claimant reasonably expected to be repaid out of future receipts.

8.        By filing a Fund Claim, a Claimant, and to the extent applicable any affiliates thereof, agrees that it waives any legal rights it may have against EchoStar Corp., DISH Network Corp., DISH Wireless LLC, and/or another EchoStar subsidiary or affiliate to otherwise recover against or enforce the judgment(s), arbitration award(s), or settlement(s) on which the Fund Claim is based.

9.        The Trustee shall verify the validity and eligibility of a Fund Claim.  If a portion of a Fund Claim is invalid or ineligible, only the valid and eligible portion shall be considered a Fund Claim. The Bureau retains jurisdiction to require the modification of the process described in this appendix, including, without limitation, regarding the determination of a Fund Claim.

10.        The Trustee shall pay out the funds of the Fund as follows: the Trustee shall pay the Fund's reasonable expenses (including his or her own reasonable compensation) as they become due, no more often than once per month.  The Trustee shall pay Type A Claims as he or she determines that they are valid and eligible for payment.  Every six (6) months, starting six (6) months after the Claims Opening Date, the Trustee shall determine whether the Fund has sufficient money to pay in full all of the pending Type B-1 Claims (after payment of the Fund's reasonable expenses and the Type A Claims).  If so, then the Trustee shall pay the pending Type B-1 Claims; if not, then the Trustee shall pay the pending Type B-1 Claims pro rata.  After five (5) years from the Claims Opening Date, the Trustee shall determine whether the Fund has sufficient money to pay all of the Type B-2 Claims in full (after payment of the Fund's reasonable expenses and the Type A Claims and the Type B-1 Claims).  If so, the Trustee shall pay the Type B-2 Claims; if not, the Trustee shall pay the Type B-2 Claims pro rata (retaining sufficient monies to pay the Fund's closing expenses).  If any monies remain in the Fund, upon request of the Trustee or a potential Claimant, the Bureau may order that the Fund remain open for additional time. If there is no such request or the Bureau does not so order, the Trustee shall close the Fund, pay its final expenses, and pay any remaining monies to EchoStar.

**Exhibit 7**

**SpaceX Order**

**Federal Communications Commission**                    DA 26-471

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Applications of Spectrum Business Trust 2025-1, | )   GN Docket No. 25-302 |
| Space Exploration Technologies Corp., and | ) |
| EchoStar Corporation for Consent to Assign | ) |
| Spectrum and Earth Station Licenses | ) |

**MEMORANDUM OPINION AND ORDER**

**Adopted:  May 12, 2026**                    **Released:  May 12, 2026**

By the Chief, Wireless Telecommunications Bureau and Chief, Space Bureau

**TABLE OF CONTENTS**

Heading                                                                 Paragraph #

I.   INTRODUCTION ............................................................................................................. 1
II.  BACKGROUND ............................................................................................................. 7
     A.  Description of the Applicants ................................................................................. 7
         1.  Space Exploration Technologies Corp. ............................................................ 7
         2.  Spectrum Business Trust 2025-1 ..................................................................... 8
         3.  EchoStar Corporation ...................................................................................... 9
     B.  Description of the Transaction and Transaction Review Process ......................... 11
     C.  SpaceX D2D Application ..................................................................................... 18
III. STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK ....................... 21
IV.  QUALIFICATIONS OF THE APPLICANTS AND COMPLIANCE WITH
     COMMUNICATIONS ACT AND COMMISSION RULES AND POLICIES ............... 25
V.   POTENTIAL PUBLIC INTEREST HARMS ................................................................. 29
     A.  Competitive Analysis .......................................................................................... 30
     B.  Other Potential Competitive Harms ..................................................................... 34
VI.  POTENTIAL PUBLIC INTEREST BENEFITS ............................................................ 38
VII. WAIVERS ..................................................................................................................... 46
     A.  Waiver of Terrestrial Construction Requirements ................................................ 47
     B.  Waiver of Consummation Period ......................................................................... 63
VIII. OTHER PUBLIC INTEREST ISSUES ........................................................................ 65
IX.  CONCLUSION .............................................................................................................. 79
X.   ORDERING CLAUSES ................................................................................................. 80
APPENDIX A: Petitioners and Commenters
APPENDIX B
APPENDIX C: SpaceX Buildout Commitments

## I.    INTRODUCTION

1.    In this Memorandum Opinion and Order, we take a major step towards expanding spectrum-based connectivity for Americans by approving the assignment of approximately 65 megahertz of mid-band spectrum to Space Exploration Technologies Corp. (SpaceX) for use in its next generation direct-to-device (D2D) network.  Specifically, we grant the applications filed by SpaceX, Spectrum

**Federal Communications Commission**                                                     **DA 26-471**

Business Trust 2025-1 (the Trust), and EchoStar Corporation and its wholly owned subsidiaries (EchoStar) (collectively, the Applicants) to assign EchoStar's AWS-4, AWS-H Block, and unpaired AWS-3 spectrum licenses and several earth station licenses to SpaceX through a two-step transaction.[1] And through a series of waivers[2] and rigorous buildout conditions, we establish technological flexibility and strong expectations to ensure that SpaceX will unlock this underutilized spectrum to bring transformational benefits for the American people.

2.       In the near term, consumers will benefit from supercharged D2D services throughout the United States.[3]  Even with the small amount of D2D spectrum available to date, supplemental coverage from space has brought ubiquitous and oftentimes lifesaving connectivity to consumers in mobile dead zones.  The infusion of approximately 65 megahertz for D2D promises generational upgrades in the quality of D2D services: from text-based services to reliable mobile voice and data.  Indeed, according to the Applicants, the wider bandwidth operations enabled by assignment of this dedicated spectrum, combined with SpaceX's next-generation D2D technology, will support a tremendous increase in D2D capacity from SpaceX's earlier system.[4]

3.       In the longer term, we expect this transaction to enhance competition to provide spectrum-based services to mobile devices.  With a dedicated supply of D2D spectrum, we expect SpaceX to be able to compete with incumbent terrestrial wireless providers with the beneficial result of potentially lowering prices for consumers.  Just as fixed wireless access—first slowly, then suddenly—revolutionized the market for in-home broadband, we expect a similar transformation in the market for terrestrial wireless services as the 65 megahertz of spectrum at issue is deployed fully for D2D.  To ensure these consumer benefits are real and not merely hypothetical, we impose stringent buildout conditions that will require SpaceX to meet deployment milestones that are on par with a similarly situated terrestrial wireless network.

4.       In approving this transaction, we also take decisive steps to fulfill the Commission's policies to advance technological neutrality and intermodal competition.  We grant waivers of our service rules that will allow SpaceX to use the spectrum at issue flexibly for terrestrial or D2D services.  This transaction reflects a recognition of converging satellite and terrestrial wireless networks that will shape the future of connectivity for mobile devices.  The $17 billion transaction before us is merely one piece of evidence of the growing demand for this new type of connectivity.  The D2D market, which is expected

---

[1] Amended Applications of Spectrum Business Trust 2025-1, Space Exploration Technologies Corp., and EchoStar Corporation for Consent to Assign Spectrum and Earth Station Licenses, GN Docket No. 25-302, ULS File Nos. 0011755472, 0011755474,0011755481, 0011783085, and 0011783097, and File Number 50000ALAA25 filed in ECFS (filed November 20, 2025) (Amended Spectrum Transaction Applications); ICFS File Nos. SES-ASG-20250918-00146 and SES-ASG-20250918-00147 and Submission ID 1091941380832 filed in ECFS (filed Sept. 18, 2025) (Earth Station Transaction Applications, and together with the Amended Spectrum Transaction Applications, Transaction Applications).  The Applicants first filed applications requesting approval for the assignment of EchoStar's spectrum to SpaceX on September 18, 2025, and subsequently amended the applications in ECFS on November 10, 2025, and in ULS on November 20, 2025.  *See, e.g.*, ULS File No. 0011755472 (reflecting original Sept. 18, 2025 filing); GN Docket No. 25-302 (reflecting November 10, 2025 amendment).

[2] *See generally* Transaction Applications, Amended Exh. B, Waiver Requests (Nov. 20, 2025) (Amended Waiver Requests).  We grant waiver of the terrestrial buildout requirements, the discontinuance rule, and the 180-day consummation requirements.  Requests for waiver of 47 CFR §§ 2.106 and 25.115 will be addressed in GN Docket No. 25-340.  *See infra* section VII (Waivers).

[3] D2D service is connectivity provided directly to a smartphone or device from next-generation satellites.  We note that the filings in the record for this transaction may also refer to this as Direct-to-Cell (D2C) service, which represents a subset of D2D.

[4] *See* Amended Spectrum Transaction Applications, Amended Description of Transaction, Public Interest Showing, and Related Demonstrations at 4 (Nov. 20, 2025) (Amended Public Interest Statement); *see also* SpaceX, The Future of Starlink Direct to Cell (Sept. 8, 2025), https://www.spacex.com/updates.

to grow from $5.03 billion in 2026 to $13.80 billion in 2031,[5] has witnessed an explosion in investment as the technology is iteratively standardized at 3GPP[6] and global changes are considered at the International Telecommunications Union.

5.        Today's decision, combined with recent action by the Space Bureau, also serves the public interest by bringing finality to disputes over the AWS-3, AWS-4, and AWS-H Block spectrum bands previously held by EchoStar.[7]  Confirming SpaceX's exclusive rights to these bands throughout the United States will stimulate investment in D2D.  Terminating ongoing controversy over EchoStar's utilization of this spectrum, one that has persisted for more than a decade, will resolve years-long uncertainty about the status of these bands.  We expect that the definitive resolution that our decision provides will result in more intensive use of valuable spectrum.  Indeed, approval of this transaction, combined with upcoming mid-band auctions[8] and recent approval of other transactions,[9] continues this agency's execution of President Trump's ambitious plan to bring a pipeline of additional spectrum to facilities-based providers with the incentive and ability to build American networks that benefit American consumers.

6.        Accordingly, based on our analysis, and in light of the stringent conditions we place on SpaceX's deployment of this spectrum, we find that granting these applications and the accompanying waiver requests serves the public interest, convenience, and necessity.

## II.        BACKGROUND

### A.        Description of the Applicants

#### 1.        Space Exploration Technologies Corp.

7.        SpaceX is a private Texas corporation that operates two primary businesses: a space launch business and a global satellite-based broadband service.[10]  SpaceX also recently acquired X.AI Corp., an artificial intelligence and social media company.[11]  SpaceX's satellite business designs, manufactures, launches, and operates advanced communications satellites.[12]  This business includes

---

[5] Mordor Intelligence, Direct-to-Device Satellite Connectivity Market Size & Share Analysis-Growth Trends and Forecast (2026-2031), https://www.mordorintelligence.com/industry-reports/direct-to-device-satellite-connectivity-market.

[6] 3GPP, or the 3rd Generation Partnership Project, is a collaboration of seven international standard development organizations for mobile telecommunications.  *See* 3GPP, Introducing 3GPP, https://www.3gpp.org/about-us/introducing-3gpp (last visited May 4, 2026).

[7] *See Space Exploration Holdings LLC et al.*, Order, DA 26-398 (SB, April 23, 2026) (*MSS Spectrum Clarification Order*).

[8] *See generally Upper C-Band* (*3.98-4.2 GHz*), GN Docket No. 25-59, Notice of Proposed Rulemaking, FCC 25-78 (Nov. 21, 2025); *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses*, *Applying New Average Annual Gross Revenue Benchmarks for Small Business Bidding Credit*, *Amendment of the Commission's Rules with Regard to Commercial Operations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands*, GN Docket Nos. 25-70, 25-71, 13-185, Report and Order and Second Report and Order, 40 FCC Rcd 5544 (2025).

[9] *See, e.g.*, *Applications of T-Mobile US, Inc. and United States Cellular Corporation for Consent to Transfer Control of Licenses, Authorizations, and Leases*, GN Docket No. 24-286, Memorandum Opinion and Order, 40 FCC Rcd 4776 (WTB/OIA July 11, 2025) (*T-Mobile-UScellular Order*); *Applications of New Cingular Wireless PCS, LLC and United States Cellular Corporation for Consent to Assign Licenses*, WT Docket No. 25-150, Memorandum Opinion and Order, DA 25-1006 (WTB Dec. 3, 2025).

[10] Amended Public Interest Statement at 1.

[11] *See* Press Release, SpaceX, xAI joins SpaceX to Accelerate Humanity's Future (Feb. 2, 2026), https://www.spacex.com/updates#xai-joins-spacex.

[12] Amended Public Interest Statement at 1-2.

Starlink, a satellite-based broadband service, which uses a low Earth orbit satellite constellation and ground infrastructure to deliver low-latency, high-speed broadband capable of supporting Internet access, streaming, video calls, and more, as well as service directly to user handsets in cooperation with terrestrial mobile operators.[13]  According to SpaceX's application, as of November 2025, it had over 17,000 employees based in the United States and served more than two million subscribers in the United States and over six million globally.[14]  SpaceX and its wholly owned subsidiaries, Space Exploration Holdings, LLC and SpaceX Services, Inc., currently hold multiple Commission licenses and authorizations, including space station licenses, earth station licenses, private land mobile radio licenses, and experimental licenses.[15]

### 2.	Spectrum Business Trust 2025-1

8.	On September 7, 2025, SpaceX and The Bank of New York Mellon Trust Company, N.A.,[16] a subsidiary of The Bank of New York Mellon Corporation, a global financial services firm that provides custody, asset management, and other services,[17] entered into a Trust Agreement to establish the Spectrum Business Trust 2025-1, a Statutory Trust formed under Nevada law.[18]  SpaceX is the sole beneficiary of the Trust.[19]

### 3.	EchoStar Corporation

9.	EchoStar Corporation, a Nevada corporation, is a publicly traded holding company that provides technology, networking services, television entertainment, and connectivity.[20]  Through its subsidiaries, EchoStar operates in three primary business segments: (1) pay-TV; (2) wireless; and (3) broadband and satellite services.[21]  EchoStar's pay-TV business offers satellite services as well as multichannel, live linear and on-demand streaming over-the-top Internet-based video programming services; its wireless business provides wireless communications services and products under its Boost Mobile and Gen Mobile brands; and its broadband and satellite services business provides broadband services to consumers, small- to medium-sized businesses, government customers, and enterprise customers.[22]  As of December 31, 2025, EchoStar had approximately 7.5 million wireless subscribers.[23]

---

[13] Amended Public Interest Statement at 2.

[14] Amended Public Interest Statement at 2.  At the end of February 2026, Starlink reported it had increased its number of active users to 10 million.  *See* Will Robinson-Smith, *SpaceX reaches 10,000 Simultaneous Starlink Satellites in Orbit Following Falcon 9 Launch from California*, Spaceflight Now (Mar. 16, 2026), https://spaceflightnow.com/2026/03/16/live-coverage-spacex-to-launch-25-starlink-satellites-on-falcon-9-rocket-from-california ("As of February 13, 2026, SpaceX said its Starlink service had more than 10 million active customers . . . ."); @Starlink, X, (Feb. 13, 2026, 6:04 pm), https://x.com/Starlink/status/2022446814591615013.

[15] Amended Public Interest Statement at 2.

[16] The Applicants note that the Bank of New York Mellon Trust Company, N.A. is "the nation's first professional trustee, leveraging over 200 years of expertise in managing trusts."  Amended Public Interest Statement at 2.

[17] Amended Public Interest Statement at 2.

[18] Amended Public Interest Statement at 2.

[19] Amended Public Interest Statement at 2.

[20] Amended Public Interest Statement at 3; EchoStar Corporation, SEC Form 10-K at F-9 (filed Mar. 2, 2026) (EchoStar 10-K).

[21] EchoStar 10-K at 6.

[22] EchoStar 10-K at 6-13; *see also* Amended Public Interest Statement at 3-4.

[23] EchoStar 10-K at 6.

EchoStar reported 2025 consolidated revenues of approximately $15 billion, with an operating loss of approximately $17.7 billion.[24]

10.     EchoStar's wholly owned licensee subsidiaries, DBSD Corporation (DBSD) and Gamma Acquisition L.L.C. (Gamma),[25] hold the AWS-4 licenses and earth station licenses at issue in this transaction, as well as the U.S. market access grants issued for 2 GHz Mobile Satellite Service (MSS) from non-U.S.-licensed satellites.[26]  EchoStar's wholly owned licensee subsidiary, American H Block Wireless LLC (AHB Wireless), holds the AWS-H Block licenses at issue in this transaction.[27]  EchoStar's wholly owned licensee subsidiaries, Northstar Wireless, LLC (Northstar) and SNR Wireless LicenseCo, LLC (SNR) hold the AWS-3 licenses at issue in this transaction.[28]

### B.     Description of the Transaction and Transaction Review Process

11.     On September 7, 2025, SpaceX, EchoStar, and the Trust entered into a License Purchase Agreement, which they further amended on November 5, 2025, pursuant to which EchoStar's AWS-4, AWS-H Block, and unpaired AWS-3 spectrum licenses and several earth station licenses would ultimately be assigned to SpaceX.[29]  Under the proposed transaction, EchoStar will assign the 10 megahertz of AWS H-Block, 40 megahertz of AWS-4 spectrum, and 5-15 megahertz of AWS-3 spectrum in all Economic Areas (BEAs) except for BEA 174: Puerto Rico and the U.S. Virgin Islands.[30]

12.     The Applicants propose a two-step transaction, both steps of which they seek approval for now.  In step one, the licenses will be assigned from EchoStar's wholly owned licensee subsidiaries to the Trust for the benefit of SpaceX.[31]  In step two, these licenses will be assigned from the Trust to SpaceX.[32]  The Applicants expect the final closing and assignments in step two to occur on or about November 30, 2027, with the possibility of either an accelerated closing or limited extensions.[33]  As

---

[24] EchoStar 10-K at 74.

[25] *See DBSD North America, Inc., Debtor-in-Possession; New DBSD Satellite Services G.P., Debtor-in-Possession; Pendrell Corporation, Transferor; and TerreStar License, Inc., Debtor-in-Possession; Assignor, and DISH Network Corp., Transferee; and Gamma Acquisition L.L.C.; Assignee*, IB Docket Nos. 11-149, 11-150, Order, 27 FCC Rcd 2250 (IB 2012).

[26] *See* Amended Public Interest Statement at 3-4; Transaction Applications, Amended Exh. A (Licenses).  In a separate order, the Space Bureau recently confirmed that EchoStar holds the exclusive terrestrial and MSS licenses over the AWS-4/2 GHz MSS spectrum.  *See MSS Spectrum Clarification Order*, paras. 19-24.

[27] *See* Amended Public Interest Statement at 3; Amended Exh. A (Licenses).

[28] *See* Amended Public Interest Statement at 3; Amended Exh. A (Licenses).

[29] *See* Amended Public Interest Statement at 1; Amended Spectrum Transaction Applications, Attach., Amended and Restated License Purchase Agreement By and Among Space Exploration Technologies Corp., EchoStar Corporation and Spectrum Business Trust 2025-1, at 1, 12 (dated Nov. 5, 2025) (filed Nov. 20, 2025); Amended Spectrum Transaction Applications Attach., Spectrum Trust Agreement and Amendment 1 (dated Nov. 5, 2025) (filed Nov. 20, 2025).  DBSD and Gamma's U.S. market access grants issued for 2 GHz MSS from non-U.S.-licensed satellites located at 93° W.L. and 111° W.L., respectively, will also be assigned by EchoStar but are not part of these applications because no prior Commission consent is required for such assignments.  As required under section 25.137(g) of the Commission's rules, the Applicants state they will notify the Commission within 30 days after consummation of the assignment of these grants to both the Trust and to SpaceX.  Amended Public Interest Statement at 4 & n.4 (citing 47 CFR § 25.137(g)).

[30] Amended Spectrum Transaction Applications, Amended Exh. C.

[31] *See* Amended Public Interest Statement at 3-4; Amended Exh. A (Licenses).

[32] Amended Public Interest Statement at 4-5.

[33] Amended Public Interest Statement at 5.

described in more detail below,[34] the Applicants say that this two-step process will allow them time to receive necessary regulatory approvals outside the United States and will allow an orderly transition in the bands, all in an "efficient and consumer-friendly manner."[35]

13.      To facilitate SpaceX's plans to deploy a hybrid satellite and terrestrial network with the licenses subject to the instant transaction, the Applicants request a number of waivers and extensions, including, as relevant to this transaction, (1) waiver of the terrestrial construction requirements currently applicable to EchoStar's AWS-4, AWS-H Block, and unpaired AWS-3 licenses;[36] (2) waiver and extension of the discontinuance rule in section 1.953;[37] and (3) waiver of the consummation period under sections 1.948(d) and 25.119(f) to extend the consummation deadline for step two of the transaction through November 30, 2027.[38]

14.      The Applicants state that granting the transaction and the associated waivers will allow SpaceX to deploy a hybrid satellite and terrestrial network and provide satellite service direct to consumer handsets nationwide.[39]  They also state that as part of the transaction, EchoStar will have access to SpaceX's D2D services, which will facilitate its transition to a "hybrid mobile network operator" (hybrid-MNO) model, benefit its Boost Mobile customers, and enhance its ability to compete.[40]

15.      On May 30, 2025, EchoStar announced that it elected not to make an approximately $326 million cash interest payment due on May 30, 2025 on certain secured notes and that such non-payment was a default, and that it had a 30-day grace period to make the payments.[41]  On June 2, 2025, EchoStar made a similar announcement with respect to approximately $183 million in cash interest payments due on June 2, 2025 on other secured notes.[42]  On June 6, 2025, the Wall Street Journal reported that EchoStar was considering a Chapter 11 bankruptcy filing.[43]  On June 27, 2025 EchoStar announced that it would make both sets of interest payments, but that it would not pay approximately $114 million of cash interest payments on other notes due July 1, 2025.[44]  In its August 26, 2025 statement announcing the proposed

---

[34] *See* section VII.B.

[35] Amended Public Interest Statement at 9-10.

[36] Amended Waiver Requests at 2-5.

[37] Letter from William Wiltshire, Counsel to SpaceX, and Pantelis Michalopoulos, Counsel to EchoStar, to Marlene H. Dortch, GN Docket No. 35-302, at 2 (filed Apr. 14, 2026) (*Applicants' Discontinuance Rule Waiver/Extension Request Letter*).

[38] Amended Waiver Requests at 9; Letter from David Goldman, Vice President of Satellite Policy, SpaceX, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 25-302, at 1 (filed Oct. 21, 2025) (SpaceX Oct. 21, 2025 *Ex Parte*) ("SpaceX clarified that its request for waiver of the consummation period . . . should extend through the date of final closing and assignments to SpaceX expected to occur on November 30, 2027, rather than November 16, 2027.").

[39] *See* Amended Public Interest Statement at i, 1, 15, 20.  SpaceX has separately filed an application for a new non-geostationary orbit (NGSO) system license for authority to use the spectrum to deploy the next generation D2D system discussed herein.  *See* Amended Public Interest Statement at 13 & n.38; *see also infra* section II.C (SpaceX D2D Application); Application, ICFS File No. SAT-LOA-20250916-00282 (filed Sept 19, 2025) (SpaceX D2D Application) and Amended Application, ICFS File No. SAT-AMD-20251125-00339 (filed Nov. 25, 2025) (SpaceX D2D Amended Application).  We use the acronym D2D to refer to SpaceX's planned operations and satellite application.  SpaceX seeks MSS and SCS authorizations in its NGSO application in order to provide D2D service.

[40] Amended Public Interest Statement at 10, 13, 17, 20.

[41] EchoStar Corp., SEC Form 8-K at Item 2.04 (filed May 30, 2025).

[42] EchoStar Corp., SEC Form 8-K at Item 2.04 (filed June 2, 2025).

[43] Alexander Gladstone and Drew Fitzgerald, Wall Street Journal, EchoStar Prepares Potential Bankruptcy Filing Amid FCC Review (June 6, 2025).

[44] EchoStar Corp., SEC Form 8-K at Item 8.01, Item 2.04 (filed June 27, 2025).

transaction, EchoStar stated that the transaction "puts [its] business on a solid financial path, further facilitating EchoStar's long-term success, and enhancing [its] ability to innovate and compete as a hybrid network operator.  The proceeds of this transaction will be used for, among other things, retiring certain debt obligations and funding EchoStar's continued operations and growth initiatives."[45]

16.     *Transaction Review Process.*  On September 18, 2025, the Applicants filed two sets of applications pursuant to section 310(d) of the Communications Act of 1934, as amended,[46] seeking Commission consent to the two-step assignment described above:  (1) EchoStar to the Trust, filed electronically in the Commission's Universal Licensing System (ULS) and the International Communications Filing System (ICFS) databases; and (2) the Trust to SpaceX, filed on paper in the Commission's Electronic Comment Filing System (ECFS).[47]  The Applicants explain that because the Trust is only an interim step for the licenses "on their way to SpaceX," step two is "practically speaking, *pro forma*," and they seek authority for both steps of the transaction now.[48]  On September 30, 2025, the Wireless Telecommunications Bureau (WTB) and the Space Bureau (SB, and together with WTB, the Bureaus) accepted both sets of applications for filing and established a pleading cycle for the transaction and the accompanying waiver requests.[49]  In November 2025, the Applicants amended their pending applications to add EchoStar's unpaired AWS-3 licenses to the spectrum assignment applications from EchoStar ultimately to SpaceX.[50]  On November 25, 2025, the Bureaus accepted the amended applications for filing and established an updated pleading cycle for the transaction and accompanying waiver requests.[51]

17.     *Record.*  Frequency Forward filed a petition to deny the transaction on October 30, 2025, before the initial pleading cycle closed.[52]  On December 3, 2025, the Information Technology and Innovation Foundation (ITIF) filed comments opposing the Frequency Forward petition and supporting the transaction.[53]  On December 15, 2025, one petition to condition the transaction[54] and six comments or

---

[45] News Release, EchoStar, EchoStar Announces Spectrum Sale and Hybrid Mobile Network Operator (MNO) Agreement, Steps Toward Resolving Federal Communications Commission's (FCC) Inquiries (Aug. 26, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-hybrid-mobile-network.

[46] 47 U.S.C. § 310(d).

[47] Due to the two-step nature of the transaction, the Applicants filed paper applications for the second step of the transaction so that both steps could be considered by the Commission at the same time.  Amended Waiver Requests at 10-11.  By accepting the paper applications for filing and establishing a pleading cycle for both steps of the transaction, the Bureaus waived the electronic filing requirements of sections 1.913(b) and 25.110(b).  *See Revised Pleading Cycle Established for Applications of Space Exploration Technologies Corp., Spectrum Business Trust 2025-1, and EchoStar Corporation, as Amended, to Assign Certain Spectrum and Earth Station Licenses Held by EchoStar to SpaceX*, Public Notice, GN Docket No. 25-302, Public Notice, DA 25-989, 2 & n.9 (WTB/SB Nov. 25, 2025) (*SpaceX-EchoStar Amendment Public Notice*).

[48] Amended Public Interest Statement at 4-5.

[49] *Spectrum Business Trust 2025-1, Space Exploration Technologies Corp., and EchoStar Corporation Seek FCC Consent to the Proposed Assignment of Certain Spectrum and Earth Station Licenses Held by EchoStar to SpaceX*, GN Docket No. 25-302, Public Notice, DA 25-917 (WTB/SB Sept. 30, 2025).

[50] *See* Amended Spectrum Transaction Applications.

[51] *SpaceX-EchoStar Amendment Public Notice*.

[52] Frequency Forward Petition to Deny (Oct. 30, 2025).

[53] Letter from Joe Kane, Director of Broadband and Spectrum Policy, ITIF, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 25-302, WT Docket No. 25-303 (Dec. 3, 2025) (ITIF Comments).

[54] DQE Communications LLC, Petition to Condition (Dec. 15, 2025) (DQE Communications Petition).

letters were timely filed under the updated pleading cycle.[55]  On December 29, 2025, SpaceX and EchoStar each filed consolidated oppositions to petitions and responses to comments.[56]  In January 2026, five reply comments were timely filed.[57]  In the period from December 2025 through May 2026, multiple parties filed letters and *ex parte* submissions concerning EchoStar subsidiary DISH Wireless LLC's (DISH Wireless) contractual obligations.[58]  On May 12, 2026, SpaceX submitted buildout commitments in support of its terrestrial buildout waiver requests.[59]

### C.    SpaceX D2D Application

18.     On September 19, 2025, the day after the Applicants first filed the Transaction Applications, SpaceX applied for a new non-geostationary orbit (NGSO) system license—which SpaceX later amended on November 25, 2025—to use the spectrum at issue in this transaction, as well as other spectrum, to deploy a D2D system.[60]  In its D2D Application, SpaceX requests authority to provide Supplemental Coverage from Space (SCS), to perform MSS operations, and to perform related Fixed-Satellite Service (FSS) and telemetry, tracking, and control operations.[61]

---

[55] Comments of Liberty Latin America Ltd. (Dec. 15, 2025) (LLA Comments); Comments of the Open Technology Institute at New America and Public Knowledge (Dec. 15, 2025) (OTI and Public Knowledge Comments); Comments of the Rural Wireless Association, Inc. (Dec. 15, 2025) (RWA Comments); Comments of Satelio IoT Services USA, Inc. (Dec. 15, 2025) (Satelio Comments); Comments of Syndicat CFE-CGC Télécom (Dec. 15, 2025) (Syndicat CFE-CGC Télécom Comments); Wireless Infrastructure Association Comments, WT Docket No. 25-303, GN Docket No. 25-302 (rec. Dec. 15, 2025) (WIA Comments).  RWA, Syndicat CFE-CGC Télécom, and LLA filed their submissions as comments or a letter.  Accordingly, any oppositions to the proposed transaction raised in their filings will be given the weight of comments and not petitions to deny.  *See* 47 CFR § 1.931 (requirements for petitions to deny spectrum assignment applications).

[56] Consolidated Opposition to Petition and Reply Comments of EchoStar Corporation (Dec. 29, 2025) (EchoStar Consolidated Response); Consolidated Opposition to Petitions and Response to Comments of Space Exploration Technologies Corp. (Dec. 29, 2025) (SpaceX Consolidated Response).

[57] FirstLight Fiber, Inc. Reply (Jan. 7, 2026) (FirstLight Fiber Reply); DQE Communications LLC Reply (Jan. 8, 2026) (DQE Communications Reply); Frequency Forward Reply (Jan. 8, 2026) (Frequency Forward Reply); Liberty Latin America Ltd. Reply (Jan. 8, 2026) (LLA Reply); Rural Wireless Association, Inc. Reply (Jan. 8, 2026) (RWA Reply).

[58] Appendix A lists all submissions filed in this docket from December 2025 through May 2026.  *See infra* Appendix A, Petitioners and Commenters.  A broad range of parties, including the Wireless Infrastructure Association, NATE the Communications Infrastructure Contractors Association, the Michigan Coalition to Protect Public Rights-of-Way (representing municipalities), and individual property owners, submitted comments or *ex partes* requesting that the FCC take action to address DISH Wireless's contractual obligations to its infrastructure partners.  The filings in Appendix A that were submitted after the January 8, 2026 close of the pleading cycle for this transaction by their respective filers are accorded consideration as *ex parte* filings under the Commission's rules.  47 CFR §§ 1.1200 *et seq.*; *see generally* 47 CFR § 1.419(b).  We decline Nickolai G. Bakken's request for consolidation of this docket with other SB proceedings.  *See* Nickolai Bakken Comments, GN Docket Nos. 23-65, 23-135, 25-302, and 25-340; CG RM-11861; IB Docket No. 18-313; SB Docket No. 26-54 (rec. Mar. 15, 2026).  Mr. Bakken's request was filed after the close of the comment cycle and is thus treated as an *ex parte* filing under our rules, and Mr. Bakken accordingly does not qualify for party in interest status under our rules.

[59] Letter from David Goldman, Vice President of Satellite Policy, SpaceX, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 25-302 (May 11, 2026), attached to this Order as Appendix C (Appx. C: SpaceX Buildout Commitments).

[60] SpaceX D2D Application.

[61] SpaceX D2D Application.  SpaceX requests to launch and operate a new NGSO MSS and SCS system of up to 15,000 satellites operating at altitudes as low as 226 kilometers and as high as 435 kilometers and at various inclinations to provide connectivity to mobile devices.  SpaceX D2D Application.

**Federal Communications Commission**        DA 26-471

19.       By way of background, Commission rules provide two distinct regulatory frameworks that providers can use to provide satellite mobile connectivity directly to consumer devices in the United States—SCS and conventional MSS. Under the SCS framework, a provider uses spectrum that is allocated on a primary basis for terrestrial wireless and on a secondary basis for MSS for the provision of space-based coverage to terrestrial consumer devices domestically.[62] Satellite operators derive the right to operate SCS on wireless-licensed frequencies from a terrestrial wireless provider via a leasing arrangement.[63] By comparison, MSS providers operate on spectrum allocated on a primary basis to MSS to communicate directly with consumer devices that are licensed pursuant to the Commission's part 25 earth station licensing rules.[64] The primary MSS spectrum is also harmonized globally.

20.       SpaceX requests to provide SCS and MSS on the spectrum it seeks to acquire from EchoStar. Specifically, in its D2D Application, SpaceX requests to provide SCS in the United States in the 1915-1920 MHz (Earth-to-space) and 1995-2000 MHz (space-to-Earth) bands using the AWS-H Block licenses.[65] SpaceX also seeks to provide SCS in the 1695-1710 MHz (Earth-to-space) on the unpaired AWS-3 licenses.[66] In addition, SpaceX seeks authority to perform NGSO MSS operations in the United States in the 2 GHz MSS bands—2000-2020 MHz (Earth-to-space) and 2180-2200 MHz (space-to-Earth)[67]—with a request for waiver of the Table of Allocations to have the option to use 2000-2020 MHz for space-to-Earth on a Geographically Independent Area (GIA)-by-GIA basis,[68] SpaceX also requests various waivers of the Commission's rules in its D2D Application.[69] The application remains pending.

---

[62] 47 CFR § 2.106(d)(33)(i).

[63] 47 CFR §§ 1.9047, 25.103, 25.125; *Single Network Future: Supplemental Coverage from Space*; *Space Innovation*, GN Docket No. 23-65; IB Docket No. 22-271, Report and Order and Further Notice of Proposed Rulemaking, 39 FCC Rcd 2622, 2623-24, 2630-31, 2643-45, 2646, 2649-50, 2652-54, 2660-65, 2669-83, paras. 4, 7, 18, 50, 52, 55, 63, 69-73, 88-104, 113-39 (2024) (*SCS Report and Order*).

[64] *SCS Report and Order*, 39 FCC Rcd at 2724-25, paras. 237-38.

[65] SpaceX D2D Amended Application Attach. 3, Legal Narrative at i, 1-2.

[66] SpaceX D2D Amended Application Attach. 3, Legal Narrative at i, 1. In the D2D Application, SpaceX requests rule waivers to use the unpaired AWS-3 band for SCS. SpaceX D2D Amended Application Attach. 3, Legal Narrative at ii, 4-5. The user equipment (UE) for the SCS uplink bands would be "ordinary handsets" that meet the applicable part 27 rules for devices that operate in the 1695-1710 MHz and 1915-1920 MHz bands. SpaceX D2D Amended Application Attach. 3, Legal Narrative at i.

[67] SpaceX D2D Amended Application Attach. 3, Legal Narrative at 2-3. The other frequencies for which SpaceX seeks MSS and SCS authorizations to operate its NGSO MSS and SCS system in the United States are as follows: PCS G Block (1910-1915 MHz (Earth-to-space) and 1990-1995 MHz (space-to-Earth)) for SCS and, with a request for waiver of section 2.106, the 2020-2025 MHz band for MSS (space-to-Earth). SpaceX also seeks authorization to operate MSS in various frequency bands outside the United States and to use certain FSS bands for backhaul and telemetry, tracking, and command. For a complete list of frequencies requested, see SpaceX D2D Amended Application, Legal Narrative at 4, Table A.2.2.

[68] SpaceX D2D Amended Application Attach. 3, Legal Narrative at 2-3. SpaceX filed the GIA-by-GIA clarification in this docket as well as the SpaceX D2D Application docket. *See* Letter from David Goldman, Vice President of Satellite Policy, SpaceX, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 25-302, at 1 (Jan. 16, 2026) (SpaceX Jan. 16, 2026 *Ex Parte*); SpaceX Consolidated Opposition and Response, GN Docket No. 25-340, at 19 (filed Jan. 15, 2026), https://www.fcc.gov/ecfs/document/10115637204420/1 (SpaceX MSS Consolidated Opposition). SpaceX then filed a further clarification regarding this waiver request for its D2D application. *See* Letter from Joseph Bissonnette, Principal, Satellite Policy, SpaceX, to Marlene H. Dortch, Secretary, FCC, General Docket No. 25-340, ICFS File Nos. SAT-LOA-20250916-00282 and SAT-AMD-20251125-00339 (April 24, 2026).

[69] SpaceX D2D Amended Application Attach. 2, Waiver Requests; *see also Space Bureau and Wireless Telecommunications Bureau Accept for Filing Application of SpaceX Requesting NGSO MSS Authorization and Supplemental Coverage from Space Authorization and Seek Comment on Waivers*, Public Notice, GN Docket No.

(continued….)

9

## III.    STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK

21.    Pursuant to section 310(d) of the Communications Act of 1934, as amended (the Act),[70] we must determine whether the proposed assignment of licenses held and controlled by EchoStar to the Trust and ultimately to SpaceX will serve the public interest, convenience, and necessity.  In making this determination, we first assess whether the proposed transaction complies with the specific provisions of the Act, other applicable statutes, and the Commission's rules.[71]

22.    If the proposed transaction does not violate a statute or rule, we then consider whether the transaction could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes.[72]  Our competitive analysis, which forms an important part of the public interest evaluation, is informed by, but not limited to, traditional antitrust principles.[73]  The United States Department of Justice has independent authority to examine the competitive impacts of proposed mergers and transactions involving transfers of Commission licenses, but the Commission's competitive analysis under the public interest standard is somewhat broader, and often takes a more extensive view of potential and future competition and its impact on the relevant markets.[74]  Notably, the Commission has determined it may impose and enforce transaction-related conditions to ensure that the public interest is served by the transaction.[75]

(Continued from previous page) ────────────
25-340, ICFS File Nos. SAT-LOA-20250916-00282 and SAT-AMD-20251125-00339 (SB/WTB Dec. 5, 2025). The comment cycle closed on January 22, 2026, with a number of comments filed and five petitions to deny or dismiss the application.  *See* GN Docket No. 25-340.

[70] 47 U.S.C. § 310(d).  Section 310(d) of the Act requires that the Commission consider applications for transfer or assignment of Title III licenses under the same standard as if the proposed transferee or assignee were applying for licenses directly under section 308 of the Act, 47 U.S.C. § 308.  *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4783-84, para. 13 & n.43; *Applications of Level 3 Communications, Inc. and CenturyLink, Inc. for Consent to Transfer Control of Licenses and Authorizations*, WC Docket No. 16-403, Memorandum Opinion and Order, 32 FCC Rcd 9581, 9585, para. 8 & n. 26 (2017) (*CenturyLink-Level 3 Order*); *Applications of GCI Communication Corp., ACS Wireless License Sub, Inc., ACS of Anchorage License Sub, Inc., and Unicom, Inc. for Consent to Assign Licenses to the Alaska Wireless Network, LLC*, WT Docket No. 12-187, WC Docket No. 09-197, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 10433, 10442, para. 23 & n.71 (2013) (*Alaska Wireless-GCI Order*).

[71] 47 U.S.C. § 310(d); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 13; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 8; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[72] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 14; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 9; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[73] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 14; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 9; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 25; *see also Northeast Utils. Serv. Co. v. Fed. Energy Regulatory Comm'n*, 993 F.2d 937, 947 (1st Cir. 1993) (public interest standard does not require agencies "to analyze proposed mergers under the same standards that the Department of Justice . . . must apply").

[74] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 14; *Applications for Consent to the Transfer of Control of Licenses, XM Satellite Radio Holdings Inc., Transferor to Sirius Satellite Radio Inc., Transferee*, MB Docket No. 07-57, Memorandum Opinion and Order and Report and Order, 23 FCC Rcd 12348, 12365-66, para. 32 (2008); *AT&T Inc. and BellSouth Corporation Application for Transfer of Control*, WC Docket No. 06-74, Memorandum Opinion and Order, 22 FCC Rcd 5662, 5673-74, para. 21 (2007) (*AT&T-BellSouth Order*); *Application of EchoStar Communications Corp., (A Nevada Corp.), General Motors Corp., and Hughes Electronics Corp. (Delaware Corps.) (Transferors) and EchoStar Communications Corp. (A Delaware Corp.) (Transferee)*, CS Docket No. 01-348, Hearing Designation Order, 17 FCC Rcd 20559, 20575, para. 27 (2002).

[75] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4784, para. 14; *Applications of AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Docket No. 14-90, Memorandum Opinion and Order, 30 FCC Rcd 9131, 9141, para. 22 (2015) (*AT&T-DIRECTV Order*); *Applications of Comcast Corp., General Electric Co. and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of*

(continued….)

23.     If we determine that a transaction raises no public interest harms or that any such harms have been ameliorated by the Commission-imposed conditions or voluntary commitments, we next consider a transaction's public interest benefits.  Applicants bear the burden of proving those benefits by a preponderance of the evidence.[76]  As part of our public interest authority, we may impose conditions to ensure for the public the transaction-related benefits claimed by the applicants.[77]

24.     Finally, if we are able to find that transaction-related conditions are able to ameliorate any public interest harms and the transaction is in the public interest, we may approve the transaction as so conditioned or agreed.[78]  In contrast, if we are unable to find that a proposed transaction even with such conditions serves the public interest or if the record presents a substantial and material question of fact, then we must designate the application for hearing.[79]

## IV.     QUALIFICATIONS OF THE APPLICANTS AND COMPLIANCE WITH COMMUNICATIONS ACT AND COMMISSION RULES AND POLICIES

25.     Section 310(d) of the Act requires that we determine whether the Applicants have the requisite qualifications to hold Commission licenses.[80]  Among the factors the Commission considers in its public interest review is whether the applicant for a license has the requisite "citizenship, character, financial, technical, and other qualifications."[81]  Therefore, as a threshold matter, the Commission must determine whether the applicants to a proposed transaction meet the requisite qualification requirements to hold and transfer licenses under section 310(d) of the Act and the Commission's rules.[82]

26.     SpaceX will acquire certain EchoStar spectrum and earth station licenses, with the Trust holding the licenses for up to two years for the benefit of SpaceX.  No issues were raised regarding the basic qualifications of EchoStar, the Trust, or the Trustee.  We have previously found EchoStar to be qualified to hold Commission licenses and authorizations.[83]  Further, there is nothing in the record that

(Continued from previous page) ————————————

*Licenses*, MB Docket No. 10-56, Memorandum Opinion and Order, 26 FCC Rcd 4238, 4249, para. 25 (2011); *see also Application of WorldCom, Inc. and MCI Commc'ns Corp. for Transfer of Control of MCI Commc'ns Corp. to WorldCom, Inc.*, CC Docket No. 97-211, Memorandum Opinion and Order, 13 FCC Rcd 18025, 18032, para. 10 (1998) (stating that the Commission may attach conditions to the transfers); *Applications of T-Mobile US, Inc., and Sprint Corp., for Consent to Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corp., Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, WT Docket No. 18-197, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578, 10596, para. 42 (2019) (*T-Mobile-Sprint Order*).

[76] 47 U.S.C. § 309(e); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 15; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 10; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[77] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 15; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 26; *Applications of AT&T Inc. and Centennial Communications Corp. for Consent to Transfer Control of Licenses, Authorizations, and Spectrum Leasing Arrangements*, WT Docket No. 08-246, Memorandum Opinion and Order, 24 FCC Rcd 13915, 13929, para. 30 (2009) (*AT&T-Centennial Order*).

[78] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 16; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 11.

[79] 47 U.S.C. § 309(e); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 16; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586-87, para. 11; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10444, para. 27.

[80] 47 U.S.C. § 310(d).

[81] 47 U.S.C. §§ 308, 310(d); *T-Mobile-UScellular Order*, 40 FCC Rcd at 4785, para. 17; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10596-97, para. 43; *Century Link-Level 3 Order*, 32 FCC Rcd at 9587, para. 12.

[82] *See, e.g.*, *T-Mobile-Sprint Order*, 34 FCC Rcd 10596-97, para. 43; *CenturyLink-Level-3 Order*, 32 FCC Rcd at 9587, para. 12.

[83] *See, e.g.*, *Applications of Liberty Latin America Ltd. and DISH Network Corp. for Consent To Assignment of Spectrum Licenses, Assets, and Customers of DISH Network Corp. to Liberty Latin America Ltd. in Puerto Rico and*

(continued....)

suggests that the Trust would not be legally, technically, or financially qualified to be a Commission licensee.  Accordingly, we find that the Trust is qualified to hold the licenses and authorizations that are being transferred in the proposed transaction.

27.      We also find that SpaceX is qualified to be a licensee.  In its petition to deny, Frequency Forward "seeks an evidentiary hearing on the applications and the qualifications of SpaceX to remain an FCC licensee," based on Frequency Forward's arguments that Elon Musk, as majority shareholder of SpaceX, is "controlled by, or subject to the direction of" the Chinese Communist Party (CCP).[84]  SpaceX responds that it has disclosed all parties that hold a 10% or greater interest,[85] none of whom are citizens of the People's Republic of China,[86] and that Frequency Forward's arguments are inaccurate.[87]  We find that the articles Frequency Forward cites fail to sufficiently support its contention that SpaceX has disclosable investors from the People's Republic of China.[88]  The Commission has previously found that SpaceX is qualified to hold Commission licenses and authorizations,[89] and we find no evidence that would warrant an evidentiary hearing under section 309(e) of the Communications Act[90] to determine SpaceX's

(Continued from previous page) ————————————————

*the U.S. Virgin Islands*, GN Docket No. 24-55, Memorandum Opinion and Order and Declaratory Ruling, 39 FCC Rcd 8772, 8776, para. 11 (WTB/OIA 2024) (*LLA-DISH Order*) (finding no basis to reevaluate the qualifications of DISH Network Corporation (a wholly owned subsidiary of EchoStar) to hold Commission licenses).

[84] Frequency Forward Petition to Deny at 1, 8.  Frequency Forward points to "business arrangements with China" by Elon Musk and his separate company, Tesla, as well as "testimony before a court in Delaware" regarding potential "Chinese investors" in SpaceX.  Frequency Forward Petition to Deny at 2-3, 5-7; Frequency Forward Reply at 3.

[85] SpaceX Consolidated Response at 17.

[86] *See* Amended Public Interest Statement at 1-2; SpaceX Consolidated Response at 17; ULS. File No. 0011758623 (Space Exploration Technologies Corp. Ownership Disclosure Filing) (Sept 19, 2025).

[87] SpaceX argues that Frequency Forward's advocacy "falls back on pedestrian business details" to reach the conclusion that Tesla, a separate company, "is under the control of the Chinese government and could indirectly control SpaceX."  SpaceX Consolidated Response at 16-17.  SpaceX also responds that Frequency Forward's sole basis to support its allegation that SpaceX allows "'Chinese investors'" to "'purchase shares in privately held SpaceX'" is a lawsuit "involving an investment firm being sued because SpaceX forced it to *reject* approximately $50 million it had raised from Chinese sources."  SpaceX Consolidated Response at 16 (emphasis in original).

[88] 47 CFR § 1.2112(a)(2), (3), (5), (6) (requiring full disclosure of parties with a 10 percent or greater ownership interest for each application to participate in competitive bidding, or for a license, authorization, assignment or transfer of control) ; SpaceX Consolidated Response at 17; *see also* Frequency Forward Petition to Deny at 3, 6; Frequency Forward Reply at 3-6.  Further, Frequency Forward's suggestion that certain loans made to companies controlled by Elon Musk, as SpaceX is, would "influence and control" Mr. Musk and by extension, SpaceX specifically is not supported by any evidence in the record.  *See* Frequency Forward Reply at 3, 5-7; Frequency Forward Petition to Deny at 2-3, 5-6, 8.

[89] *See, e.g.*, *Space Exploration Holdings, LLC, Application for Approval for Orbital Deployment and Operating Authority for the SpaceX NGSO Satellite System*; *Application For Approval For Orbital Deployment And Operating Authority for the SpaceX NGSO Satellite System Supplement*, IBFS File Nos. SAT-LOA-20161115-00118, SAT-LOA-20170726-00110, Memorandum Opinion, Order and Authorization, 33 FCC Rcd 3391 (2018) (*SpaceX 2018 NGSO Authorization Order*); *Space Exploration Holdings, LLC, Request for Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System*; *Application for Authority for Modification of the SpaceX NGSO Satellite System to Add a Direct to Cellular System*; *Application for Modification of the SpaceX V-band Satellite System*; *Space Bureau and Wireless Telecommunications Bureau Seek Comment on Filings of SpaceX and T-Mobile Requesting to Establish Supplemental Coverage from Space*, ICFS File Nos.: SAT-LOA-20200526-00055, SAT-AMD-20210818-00105, SAT-AMD-20221216-00175, SAT-AMD-20241017-00228, SAT-MOD-20230207-00021, SAT-AMD-20240322-00061, SAT-MOD-20240423-00089; GN Docket No. 23-135, Order and Authorization, 39 FCC Rcd 12550 (SB 2024) (*SpaceX SCS Lower Altitude Authorization Order*); *see also* SpaceX Consolidated Response at 17 (noting that the Commission has "determined on numerous occasions that SpaceX is qualified to hold spectrum licenses").

[90] 47 U.S.C. § 309(e).

qualifications to hold the licenses at issue.  We therefore find SpaceX to be qualified to hold the Commission licenses at issue.

28.     Finally, we find that the transaction will not violate any statutory provision or Commission rule with the exception of the waiver requests for sections 1.948(d), 1.953(a), 25.119(f), and 27.14(q), (r), and (s) of the Commission's rules, which we grant below.[91]

## V.     POTENTIAL PUBLIC INTEREST HARMS

29.     In reviewing applications seeking approval for assignment of licenses or authorizations, the Commission, among other things, evaluates the potential public interest harms, including potential competitive harms, that may result from the proposed transaction.[92]  In this transaction, EchoStar proposes to assign certain spectrum and earth station licenses to SpaceX following EchoStar's decision to transition offering its Boost Mobile service through a "hybrid-MNO" model.[93]  Because this transaction centers on the acquisition of spectrum and would not result in the acquisition of wireless business units, network facilities, or customers, we begin our competitive analysis by noting that there is no loss of direct competition between SpaceX and EchoStar that would result from approving this transaction.  Indeed, as discussed in section VI, we anticipate that SpaceX's acquisition and use of the licenses at issue in this transaction will facilitate greater competition in the provision of advanced spectrum-based services to consumers.

### A.     Competitive Analysis

30.     *Market Definitions*.  In previous transactions, the Commission has defined the relevant product market as a combined "mobile telephony/broadband services" product market that comprises mobile voice and data services, including mobile voice and data services provided over advanced broadband wireless networks (mobile broadband services).[94]  In addition, the Commission has previously found that the geographic market for wireless transactions is local, generally the CMA, but has also found that competitive effects should be evaluated at the national level where a proposed transaction exhibits certain national characteristics.[95]

31.     Our analysis recognizes these definitions for the purposes of applying our initial spectrum screen, but we also recognize the fundamental importance of a forward-looking analysis given that ongoing innovation and reinvention are defining characteristics of the provision of mobile

---

[91] *See infra* section VII.B (Waiver of Consummation Period).

[92] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4793, para. 28; *Application of T-Mobile US, Inc., Nextel West Corp., and LB License Co, LLC for License Assignment*, ULS File No. 0010923038, Memorandum Opinion and Order, 39 FCC Rcd 11482, 11487, para. 11 (WTB/OEA 2024) (*T-Mobile-LB License Order*); *Application of T-Mobile License LLC and Horry Telephone Cooperative, Inc. to Assign Spectrum Licenses*, ULS File Nos. 0010864059, 0010877919, and 0010902770, Memorandum Opinion and Order, 39 FCC Rcd 10712, 10716-17, para. 11 (WTB/OEA 2024) (*T-Mobile-HTC Order*).

[93] *See* Amended Public Interest Statement at 2, 10, 17.

[94] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4793-94, para. 30; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10601, 10603, paras. 55, 60; *Applications of Cricket License Company, LLC, et al., Leap Wireless International, Inc., and AT&T Inc. for Consent to Transfer Control of Authorizations et al.*, WT Docket No. 13-137, Memorandum Opinion and Order, 29 FCC Rcd 2735, 2746, para. 23 (WTB/IB 2014) (*AT&T-Leap Order*).

[95] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4795-96, paras. 33-34; *T-Mobile-LB License Order*, 39 FCC Rcd at 11491-92, para. 23; *T-Mobile-HTC Order*, 39 FCC Rcd at 10721, para. 24; *Application of T-Mobile License LLC, Nextel West Corp. and Channel 51 License Company LLC for License Assignment*, ULS File Nos. 0010168412, 0010168420, and 0010168439, Memorandum Opinion and Order, 38 FCC Rcd 12150, 12164, para. 33 (WTB/OEA 2023) (*T-Mobile-Channel 51-LB License Order*); *T-Mobile-Sprint Order*, 34 FCC Rcd at 10605-06, para. 66; *AT&T-Leap Order*, 29 FCC Rcd at 2748, para. 27.

**Federal Communications Commission**                                      **DA 26-471**

telephony/broadband services.[96]  Accordingly, as the Commission has previously stated, the definition of the mobile telephony/broadband services product market not only includes traditional wireless services, but also necessarily encompasses the recent significant and rapidly evolving advances in mobile broadband services technologies.[97]

32.      We also recognize there are good arguments for adopting a broader market definition that accounts for a range of technologies and offerings, given the modern trends in the communications sector. Advances in technology have begun to blur traditional service characteristics, enabling service providers across various market segments to offer their services to the same consumers, thereby intensifying competition.  We note that, while Space X is currently not providing terrestrial mobile telephony/broadband services, we recognize that its planned deployment may fundamentally transform the marketplace.  However, even relying on these narrow definitions for our spectrum screen analysis that the Commission has been using for recent transactions, we find, as specified below, that the transaction is in the public interest.

33.      *Spectrum Aggregation.*  The Commission has consistently recognized that spectrum is an essential input in the provision of mobile wireless services, and that it is critical to ensure that sufficient spectrum is available for incumbent licensees as well as potential new entrants to promote effective competition and innovation in the mobile wireless marketplace.[98]  When considering the potential competitive effects of spectrum aggregation, the Commission has considered whether spectrum transfers would increase the likelihood that rival service providers or potential entrants would be foreclosed from entering or expanding capacity or deploying advanced mobile broadband technologies, and also whether rivals' costs would be increased to the extent that they would be less likely to be able to compete robustly.[99]  In undertaking our spectrum aggregation analysis, we note that the Commission's spectrum screen helps identify those markets that provide particular reason for further competitive review.[100] Spectrum bands that are currently found suitable and available for the provision of mobile wireless services are included in the spectrum screen.[101]  While this transaction does involve the assignment of spectrum that is included in our spectrum screen,[102] the transaction does not trigger the current spectrum

---

[96] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4793-94, paras. 30-31; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10603-04, paras. 60-61.

[97] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4794, para. 31; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10603-04, para. 61.  As we have explained, we also consider the advances by mobile virtual network operators (MVNOs) and cable providers within the range of differentiated services offered to consumers within the broader mobile telephony/broadband services product market.  *T-Mobile-UScellular Order*, 40 FCC Rcd at 4794, para. 31.

[98] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4801-02, para. 46; *T-Mobile-HTC Order*, 39 FCC Rcd at 10716-17, para. 11; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10617-18, para. 94.

[99] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4801-02, para. 46; *T-Mobile-HTC Order*, 39 FCC Rcd at 10716-17, para. 11; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10617-18, para. 94.

[100] *T-Mobile-Sprint Order*, 34 FCC Rcd at 10614, para. 87.

[101] *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10608, para. 72.  The Commission has previously determined that the following bands, or portions thereof, should be included in the input market for spectrum:  600 MHz, 700 MHz, cellular, specialized mobile radio service (SMR), broadband Personal Communications Service (PCS), Advanced Wireless Services (AWS) in the 1710-1755 and 2110-2155 MHz band (AWS-1), AWS-3, AWS in the 2000-2020 MHz and 2180-2200 MHz spectrum bands (AWS-4), Broadband Radio Service (BRS), Wireless Communications Service (WCS) spectrum, H Block, Educational Broadband Service (EBS), 3.7 GHz, and 3.45 GHz.  *See, e.g.*, *Communications Marketplace Report*, GN Docket No. 24-119, 2024 Communications Marketplace Report, 39 FCC Rcd 14116, 14173-74, paras. 69-70, Fig. II.B.11 (2024) (*2024 Communications Marketplace Report*); *T-Mobile-LB License Order*, 39 FCC Rcd at 11491-92, para. 23; *T-Mobile-HTC Order*, 39 FCC Rcd at 10721, para. 24.

[102] Prior to the transaction, SpaceX leased 10 megahertz of spectrum nationwide from T-Mobile.  As a result of the proposed transaction, SpaceX would hold a maximum of 75 megahertz of spectrum in any local market post-transaction, none of which is below 1 GHz.

14

screen in any local market.[103]  The trigger is currently 385 megahertz and the maximum attributable post-transaction to SpaceX in any local market would be 75 megahertz, suggesting that the spectrum transfer does not raise any competitive concerns.  Further we do not find any evidence that competition would be harmed at the national level; rather, we believe there is potential for increased competition due to SpaceX's planned deployment of currently underutilized spectrum.  We also find no other factors that would suggest any spectrum aggregation concerns that would arise as a result of the transaction.  After applying our standard spectrum screen analysis, we conclude that the acquisition of this spectrum by SpaceX is not likely to lessen the ability of other service providers from competing robustly or otherwise lead to significant anticompetitive harms in any of the services at issue.

### B.        Other Potential Competitive Harms

34.        We find unpersuasive Syndicat CFE-CGC Télécom's claims that approving the transaction and enabling SpaceX's plans for D2D service would "lead to a global monopoly" and that the transaction would result in "endangering the viability of the U.S. mobile industry" due to SpaceX's having the ability to offer services on a global scale.[104]  The licenses and authorizations at issue in this transaction are geographically limited to the United States and its territories, and as SpaceX points out, it would need to seek authorization from foreign regulatory authorities in order to provide satellite services in other countries using these bands.[105]  In addition, we note that there are several other bands that are available to provide MSS and similar D2D services from space, including the L-Band (1.5/1.6 GHz), the "Big LEO" band (1.6/2.4 GHz) and the five SCS bands.[106]  Finally, we agree with SpaceX that the 55 megahertz to 65 megahertz of incremental spectrum capacity that EchoStar is seeking to assign to SpaceX is more likely to increase competition than to "destabilize" it.[107]

35.        We also find unpersuasive Liberty Latin America's (LLA's) claims of harm in Puerto Rico and the U.S. Virgin Islands.  LLA argues that approval of the transaction would strand the investments LLA has made to build out a 5G network in these markets using the Lower AWS-3, AWS-4, and AWS H-Block licenses that LLA acquired from EchoStar.[108]  In particular, LLA asserts that SpaceX's plans to use these licenses to provide D2D service throughout the country rather than traditional terrestrial wireless service would eliminate the market for handsets and other equipment needed to deploy terrestrial wireless service in these bands, which ultimately would lead to "dead zones" in the provision of

---

[103] The Commission's spectrum screen, which is applied on a county-by-county basis, identifies those local markets where an entity would hold approximately one-third or more of the total spectrum suitable and available for the provision of mobile telephony/broadband services post-transaction.  Further, if the acquiring entity would increase its below-1-GHz spectrum holdings so as to hold approximately one-third or more of such spectrum post-transaction, we apply enhanced factor review.  *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4799-800, para. 41; *see also Policies Regarding Mobile Spectrum Holdings*; *Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, WT Docket No. 12-269, GN Docket No. 12-268, Report and Order, 29 FCC Rcd 6133, 6240, paras. 286-88 (2014) (*Mobile Spectrum Holdings Report and Order*).

[104] Syndicat CFE-CGC Télécom Comments at 2.  Syndicat CFE-CGC Télécom describes itself as a "trade union organisation representing workers in the telecommunications sector in France."  Syndicat CFE-CGC Télécom Comments at 1.

[105] SpaceX Consolidated Response at 15.

[106] *See* 47 CFR § 2.106(d)(33)(i); *SCS Report and Order* 39 Rcd at 2625, 2634-35, paras. 10 & n.11, 28.

[107] *See* SpaceX Consolidated Response at 15.

[108] LLA Comments at 2, 8-10.  We address LLA's arguments regarding SpaceX's acquisition of EchoStar's 2 GHz MSS rights and the potential impacts on LLA's use of its AWS-4 licenses below.  *See infra* section VIII (Other Issues).

communications service in Puerto Rico and the U.S. Virgin Islands.[109]  Contrary to LLA's claims, there are already a wide range of handsets that currently support the spectrum bands that LLA acquired from EchoStar, and we find that it is unlikely that manufacturers would no longer support this band post-transaction.[110]  Moreover, there are many other bands available for the provision of mobile wireless services and available handsets that are compatible with those bands.  As such, we find it unlikely that the transaction would result in dead zones due to the lack of availability of or support for suitable handsets to meet LLA customer needs.

36.  We likewise are unpersuaded by the Rural Wireless Association's (RWA's) argument that approving the transaction would enable "spectrum aggregation by the nationwide wireless carriers."[111]  Contrary to RWA's suggestion, the spectrum is being transferred to SpaceX and not a nationwide mobile wireless provider, so there would be no increase in spectrum aggregation among the national, terrestrial wireless providers.  Moreover, we anticipate that SpaceX's use of the spectrum will bring substantial benefits to customers in geographically hard-to-reach areas.[112]

37.  Finally, with regard to the effect of EchoStar no longer offering service as a traditional facilities-based provider,[113] we note that EchoStar has decided to continue to offer mobile wireless service through an infrastructure-based MVNO model that it terms "Hybrid-MNO," whereby EchoStar plans to leverage its own core network with access to AT&T's nationwide network and SpaceX's proposed D2D service to better serve Boost Mobile customers.[114]  We find no harm as a result of EchoStar's sale of the spectrum to SpaceX and ultimate shift of its business model to offer wireless service as a Hybrid-MNO.  Today, we note that EchoStar primarily operates as an MVNO, through agreements with AT&T and T-Mobile.[115]

---

[109] LLA Comments at 2, 9.  LLA also notes that "since SpaceX would not be acquiring the Puerto Rico and U.S. Virgin Island licenses as part of the Transaction," these geographies would not benefit from SpaceX's proposed service.  LLA Comments at 9.

[110] There are currently 272 devices, including devices from all major device manufacturers, that support the n70 band, which incorporates lower AWS-4 and upper H Block spectrum, listed on the Frequency Check website. Frequency Check, *5G NR Interface Frequency Bands*, https://www.frequencycheck.com/interfaces/5g-new-radio (last visited May 4, 2026).  *See also* SpaceX Consolidated Response at 12, n.31 (providing device data from frequency check.com as of Dec. 18, 2025).  There are currently 1,681 devices that support the n66 band, which incorporates the AWS-3 spectrum, listed on the Frequency Check website.  Frequency Check, https://www.frequencycheck.com/interfaces/5g-new-radio (last visited May 4, 2026).  We note that these standards are available in devices used by service providers other than EchoStar.  *See, e.g.*, Frequency Check, *Wireless Carriers and Mobile Network Operators*, https://www.frequencycheck.com/carriers?q%5Bfrequency_bands_id_eq%5D=130 (last visited May 4, 2026).

[111] RWA Comments at 4-6.  While OTI and Public Knowledge assert that the proposed transaction will not improve competition in the foreseeable future, they do not suggest that the transaction would result in competitive harm.  OTI and Public Knowledge Comments at 3.  Rather, OTI and Public Knowledge assert that the proposed transaction would not entrench an "'oligopoly' of the 'Big 3' wireless carriers."  OTI and Public Knowledge Comments at 3.

[112] We address RWA's arguments that the Commission should re-auction the spectrum because EchoStar failed to meet its buildout requirements below.  *See infra* section VIII (Other Issues).

[113] *See* LLA Comments at 1; RWA Comments at 5-6.  *But see* OTI and Public Knowledge Comments at 7 (noting that "to the extent that Boost's hybrid MVNO service will incorporate SpaceX's D2[D] service, this transaction promises to differentiate Boost and make it a more viable alternative in the marketplace").

[114] Amended Public Interest Statement at 17.

[115] EchoStar 10-K at 6, 68 ("Prior to November 15, 2025, we were operating primarily as an MVNO utilizing network services under the [amended Master Network Services Agreement] and the [Network Services Agreement, as amended] and secondarily as an [mobile network operator]"; "As a mobile virtual network operator ('MVNO'), we depended on either T-Mobile or AT&T to provide us with network services . . . .").

## VI.    POTENTIAL PUBLIC INTEREST BENEFITS

38.    Having determined that the likelihood of public interest harms associated with the transaction is low, we next discuss the public interest benefits of the transaction.[116] We find the transaction is likely to result in significant public interest benefits in light of SpaceX's plans to rapidly deploy a first of its kind, next-generation D2D network using this approximately 65 megahertz of dedicated spectrum.  This transaction—with the forward-looking waivers and rigorous buildout conditions we adopt below—has the potential to unlock transformational, ubiquitous connectivity to mobile users, particularly in hard-to-reach areas of the United States.  It also has the potential ultimately to impact service offerings in the broader wireless marketplace.  In addition, we accept the Applicants' claims that the transaction has the potential to facilitate EchoStar's plans to become a Hybrid-MNO and ultimately provide the benefits of SpaceX's planned D2D service to Boost Mobile customers.

39.    The Commission finds a claimed benefit to be cognizable when it arises as a result of the transaction and likely could not be accomplished in the absence of the transaction[117] and is verifiable.[118] Because much of the information relating to the potential benefits of a transaction is in the sole possession of the applicants, they are required to provide sufficient evidence supporting each claimed benefit so that the Commission can verify its likelihood and magnitude.[119]  Further, the Commission is "more likely to find marginal cost reductions to be cognizable than reductions in fixed cost" as, in general, reductions in marginal cost are more likely to result in lower prices for consumers.[120]  And benefits expected to occur only in the distant future may be discounted or dismissed because, among other things, predictions about the distant future are inherently more speculative than predictions that are expected to occur closer to the present.[121]

40.    We credit SpaceX's plans to use this spectrum to deploy a next generation D2D network that will "help[] to close coverage gaps"[122] and provide "increased capacity, reduced latency, and broader

---

[116] *T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671-72, para. 214.

[117] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671-72, para. 214; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9604, para. 50 (citing *AT&T-BellSouth Order*, 22 FCC Rcd at 5761, para. 202); *AT&T-DIRECTV Order*, 30 FCC Rcd at 9237, para. 273.

[118] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671-72, para. 214; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9604, para. 50; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9237, para. 274; *AT&T-Leap Order*, 29 FCC Rcd at 2793-94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *Applications of Deutsche Telekom AG, T-Mobile USA, Inc., and MetroPCS Communications, Inc. For Consent To Transfer of Control of Licenses and Authorizations*, WT Docket No. 12-301, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 2322, 2342, para. 58 (WTB/IB 2013) (*T-Mobile-MetroPCS Order*).

[119] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671-72, para. 214; *AT&T-Leap Order*, 29 FCC Rcd at 2793-94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *T-Mobile-MetroPCS Order*, 28 FCC Rcd at 2342, para. 58.  In addition, "the magnitude of benefits must be calculated net of the cost of achieving them." *See, e.g.*, *AT&T-Leap Order*, 29 FCC Rcd at 2793-94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *T-Mobile-MetroPCS Order*, 28 FCC Rcd at 2342, para. 58.

[120] *See, e.g.*, *T-Mobile-UScellular Order*, 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671, para. 214; *AT&T-Leap Order*, 29 FCC Rcd at 2793-94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *T-Mobile-MetroPCS Order*, 28 FCC Rcd at 2342, para. 58.

[121] *See, e.g.*, *T-Mobile-UScellular Order,* 40 FCC Rcd at 4822, para. 89; *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671-72, para. 214; *AT&T-Leap Order*, 29 FCC Rcd at 2793-94, para. 132; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10468, para. 87; *T-Mobile-MetroPCS Order*, 28 FCC Rcd at 2342, para. 58.

[122] Amended Public Interest Statement at i.

service coverage for mobile users" across the United States.[123]  We agree with the Applicants that this advanced and new iteration of D2D service has the potential to improve connectivity for mobile users across America and to "facilitate a leap in technology,"[124] leading to efficient and effective use of these valuable spectrum resources.[125]

41.     Even with the small amount of D2D spectrum authorized to date, D2D service has already proven effective in supplementing existing terrestrial service, particularly for hard-to-reach areas or in scenarios when terrestrial networks are unavailable—such as emergencies and natural disasters.[126] The Applicants explain that combining this 65 megahertz of "exclusive spectrum with new state-of-the-art satellite technologies," SpaceX will be able to deliver "next generation Direct to Cell ('D2C') service . . . to standard, unmodified cell phones and Internet of Things devices—helping to close coverage gaps and ultimately eliminate mobile dead zones around the world."[127]  OTI and Public Knowledge likewise assert that the proposed license assignments will serve the public interest by enabling a robust D2D service "that extends basic mobile phone and even broadband connectivity to virtually all locations in the country," marking "an important step toward achieving ubiquitous and seamless connectivity for consumers, anytime and anywhere."[128]

42.     We also credit that this transaction has the potential to lead to more intensive use of this AWS-4, AWS-H Block, and AWS-3 spectrum.  Although the spectrum at issue has been authorized for either MSS operations, terrestrial wireless service, or both for over a decade,[129] the spectrum has been

---

[123] Amended Public Interest Statement at 13.

[124] Amended Public Interest Statement at ii, 13-16.

[125] Amended Public Interest Statement at 13-14 ("With the world's most advanced phased arrays, the wider bandwidth operations enabled by this spectrum purchase, and optimized 5G protocols, the system will support an overall capacity increase of more than 100x the first-generation SpaceX D2[D] system.").

[126] *See, e.g.*, *SpaceX SCS Lower Altitude Authorization Order*, 39 FCC Rcd at 12560-61, para. 17 ("We find that SpaceX and T-Mobile's SCS operations will yield many benefits, including an increase in access to emergency services in areas where consumers would otherwise not have the capability to access a terrestrial network to call or text 911, as evidenced, for example, through SpaceX's provision of emergency SCS in areas affected by Hurricanes Helene and Milton."); *see also, e.g.*, Chris Velazco, *When Storms Knock Out Cell Service, Satellites Can Help Keep You Connected*, (Oct. 10, 2024), https://www.washingtonpost.com/technology/2024/10/10/how-text-message-satellite-without-cell-service/; David Shepardson, *US Lets Starlink Provide Direct-to-Cell Coverage for Hurricane-Hit Areas*, (Oct. 6, 2024), https://www.reuters.com/world/us/us-lets-starlink-provide-direct-to-cell-coverage-hurricane-hit-areas-2024-10-06/.

[127] Amended Public Interest Statement at i.

[128] OTI and Public Knowledge Comments at 4-5.

[129] The Commission first allowed MSS operations in the 2000-2020 MHz and 2180-2200 MHz frequency bands more than 25 years ago, and allowed terrestrial wireless services in the same spectrum, the AWS-4 band, as well as the AWS-H Block of 1915-1920 MHz and 1995-2000 MHz, and the unpaired AWS-3 blocks of 1695-1700 MHz and 1700-1710 MHz, more than 10 years ago.  *See, e.g.*, *Amendment of the Commission's Rules with Regard to Commercial Operations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands*, GN Docket No. 13-185, Report and Order, 29 FCC Rcd 4610 (2014); *Service Rules for Advanced Wireless Services in the 2000-2020 MHz and 2180-2200 MHz Band et al.,* WT Docket Nos. 12-70 and 04-356, ET Docket No. 10-142, Report and Order and Order of Proposed Modification, 27 FCC Rcd 16102 (2012); *Flexibility for Delivery of Communications by Mobile Satellite Service Providers in the 2 GHz Band, the L-Band, and the 1.6/2.4 GHz Bands et al.*, IB Docket Nos. 01-185, 02-364, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 1962 (2003); *Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for Use by the Mobile-Satellite Service*, ET Docket No. 95-18, First Report and Order Further Notice of Proposed Rulemaking, 12 FCC Rcd 7388 (1997). The 2 GHz MSS band and the AWS-4 band are 2000-2020 MHz and 2180-2200 MHz.  The AWS-H Block is 1915-1920 MHz and 1995-2000 MHz.  The unpaired AWS-3 band is 1695-1700 MHz and 1700-1710 MHz.

underutilized.  SpaceX's demonstrated track record of launching its Gen1 NGSO system[130] and commercial SCS service with T-Mobile[131] indicate that SpaceX has the tools to deploy the system as proposed,[132] leading to efficient and effective use of these valuable spectrum resources.[133]  The AWS-4 (with associated 2 GHz MSS rights) and AWS-H Block spectrum bands are well suited for SpaceX's planned system given that these bands have both terrestrial and satellite allocations.[134]  SpaceX also seeks to use the unpaired AWS-3 spectrum bands for this system,[135] and justifies the request that it would "build on" the existing SCS framework "to enable deployment of SCS in additional bands and scenarios," as envisioned by the Commission in support of "innovative solutions for supplemental satellite coverage."[136]  As the Applicants explain, SpaceX will have the potential to "harness these bands to dramatically enhance connectivity for mobile users across the United States, including first responders, commercial enterprises, and other users who are underserved or unserved by existing networks."[137]  They explain that with the "wider bandwidth operations enabled by this spectrum purchase, and optimized 5G protocols, the system will support an overall capacity increase of more than 100x the first-generation SpaceX D2[D] system."[138]  They further explain that "[i]n most environments," SpaceX's planned system "will enable full 5G cellular connectivity with a comparable consumer experience to current terrestrial LTE service, which will be used in partnership with MNOs to augment high-capacity terrestrial 5G networks."[139]  SpaceX's

---

[130] Amended Public Interest Statement at 16 (citing *SpaceX 2018 NGSO Authorization Order*, 33 FCC Rcd at 3407, para. 42(b) (2018) (establishing March 29, 2024, as first milestone date); *Satellite Policy Branch Information*, Report No. SAT-01663, Public Notice, 37 FCC Rcd 10214, 10214 (2022) (finding SpaceX had satisfied its first milestone)).

[131] Amended Public Interest Statement at 16 (citing *SpaceX SCS Lower Altitude Authorization Order*, 39 FCC Rcd (granting SCS authority); Mike Robuck, *T-Mobile US launches Starlink D2D public beta*, (Feb. 10, 2025),https://www.mobileworldlive.com/t-mobile-us/embargoed-t-mobile-us-launches-starlink-d2d-beta/; Press Release, T-Mobile, It's Official: T-Mobile Has the Best Network in America (June 23, 2025), https://www.t-mobile.com/news/network/best-network-in-america (announcing commercial availability of SCS on July 23, 2025)).

[132] Amended Public Interest Statement at 16-17 ("Building the constellation to its present form with its unique regenerative architecture involved designing, manufacturing, launching and operating cell towers in space, including development of the system's eNodeB payload, phased array antennas, and core network, which enables network integration similar to a standard roaming partner.  SpaceX also worked with leading device manufacturers and application developers to enhance the services provided over the satellite network.  SpaceX's track record clearly demonstrates that it is uniquely qualified to deliver advanced services across the United States in a compressed timeframe using the AWS-4/2 GHz MSS, AWS-H Block, and AWS-3 spectrum—and thoroughly intends to do so.").

[133] Amended Public Interest Statement at 13-14 ("With the world's most advanced phased arrays, the wider bandwidth operations enabled by this spectrum purchase, and optimized 5G protocols, the system will support an overall capacity increase of more than 100x the first-generation SpaceX D2[D] system.  In most environments, this will enable full 5G cellular connectivity with a comparable consumer experience to current terrestrial LTE service, which will be used in partnership with MNOs to augment high-capacity terrestrial 5G networks.").  ITIF likewise argues that "permitting these transactions would enhance the productivity of the spectrum governed by these licenses."  ITIF Comments at 2.

[134] Amended Public Interest Statement at 14-15.

[135] Amended Public Interest Statement at 14-15.

[136] *SCS Report and Order*, 39 FCC Rcd at 2623, 2632, paras. 3, 23.

[137] Amended Public Interest Statement at 15-16.

[138] Amended Public Interest Statement at 13-14.

[139] Amended Public Interest Statement at 14.

plans to use this spectrum to deploy a hybrid satellite and terrestrial network demonstrate the rapidly evolving convergence of satellite and terrestrial service to provide mobile users with ubiquitous service.[140]

43.      Not only will SpaceX's planned deployment bring ubiquitous connectivity, it also has the potential to increase competition in the mobile wireless marketplace.  SpaceX's plans to offer this next generation D2D service will supplement current mobile networks and potentially lead to more mobile wireless service options for consumers, particularly for those consumers who live or work in geographically hard-to-reach areas of the United States.  Further, as technology advances, SpaceX's transformational service offerings may lead to increased competition in the provision of retail wireless services to the benefit of all consumers in the United States.  As we have similarly noted in the context of SCS applications, SpaceX's planned service here is "reflective of an increase in innovation, investment, and competition in the marketplace that the Commission sought to encourage in the *SCS R&O*."[141]

44.      Finally, we credit the Applicants' arguments that by providing EchoStar access to SpaceX's planned D2D service, Boost Mobile's customers will benefit from a greater availability of service.[142]  Through its Hybrid-MNO infrastructure, EchoStar claims that it will continue to provide service to Boost Mobile subscribers through its core network, which will be augmented by "Starlink's forthcoming innovative D2D MSS services."[143]  OTI and Public Knowledge agree that the services that would result from the transaction would strengthen Boost Mobile as a hybrid-MNO.[144]  This has the potential to improve service to Boost Mobile customers, directly connecting them with the benefits of SpaceX's D2D advancements, offering them "near-ubiquitous connectivity nationwide—even in the hardest to reach remote areas of the country."[145]

45.      For these reasons, we find that the transaction has the potential to provide several public interest benefits including facilitating the use of valuable spectrum resources to increase mobile connectivity across the United States—particularly in areas that are unserved or underserved.

## VII.   WAIVERS

46.      As detailed below, to promote technological flexibility and innovation—and ensure that the benefits of the transaction are real and enforceable—we grant Applicants a series of waivers and impose rigorous buildout conditions that will require SpaceX to meet deployment milestones on par with

---

[140] *See, e.g.*, Amended Public Interest Statement at 15; Amended Waiver Requests at 4 ("The ideal network design will aim to maximize utilization of the MSS system (as the satellites, once deployed, will be capable of delivering service across the entire United States), employing terrestrial base stations to enhance capacity where needed.").

[141] *See SpaceX SCS Lower Altitude Authorization Order*, 39 FCC Rcd at 12561, para. 17 (citing *SCS Report and Order*, 39 FCC Rcd at 2623, 2640, 2725, paras. 2, 44, 238).

[142] Amended Public Interest Statement at ii, 17.

[143] Amended Public Interest Statement at 17.

[144] OTI and Public Knowledge Comments at 4-8.  Although generally supportive of the public interest benefits of the transaction, however, OTI and Public Knowledge do note that "this transaction will not improve the competitive landscape in mobile services in the foreseeable future," but rather will "provide consumers with new, innovative services that *supplement* terrestrial wireless service" and will not "further entrench" the "'oligopoly' of the 'Big 3' wireless carriers."  OTI and Public Knowledge Comments at 3.

[145] Amended Public Interest Statement at 17.  SpaceX and EchoStar assert that "no commenter disputes" these "fundamental and transformative public interest benefits," namely, that SpaceX will "gain the ability to provide high-quality mobile connectivity from space" and that EchoStar will "gain the ability to enhance [Boost Mobile's] service through new direct-to-device [] capabilities."  SpaceX Consolidated Response at 2; *see also* EchoStar Consolidated Response at 1.  In its Consolidated Response, EchoStar also states that "[n]o commenter disputes" that the proposed transaction will enhance "EchoStar's ability to compete in the mobile wireless marketplace."  EchoStar Consolidated Response at 1.  This issue, which was also raised by RWA in its Comments and Reply Comments, is discussed in section V, *supra*, addressing potential public interest harms.

a similarly situated terrestrial wireless network.  The Commission may grant a waiver of rules governing the Wireless Radio Services when either (i) "[t]he underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest," or (ii) "[i]n view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative."[146]  The Commission may also waive any provision of its rules "for good cause shown."[147]  As explained below, based on the record, we find that given the unique circumstances present here, it is in the public interest to grant the requested waivers of the terrestrial construction requirements for the AWS-4, AWS-H Block, and unpaired AWS-3 licenses, as conditioned to facilitate rigorous buildout; the discontinuance rule to the extent necessary to effectuate the transaction; and the 180-day consummation rules.[148]

### A.    Waiver of Terrestrial Construction Requirements

47.    We find that it serves the public interest to grant a waiver to SpaceX of the terrestrial construction requirements currently applicable to EchoStar's AWS-4, AWS-H Block, and unpaired AWS-3 licenses, and to the extent necessary, the requirements contained in section 27.14(q), (r), and (s) of the Commission's rules, with conditions.[149]  As discussed above, SpaceX is acquiring AWS-4, AWS-H Block, and unpaired AWS-3 licenses for purposes of deploying a next-generation D2D network, a reflection of the rapidly evolving convergence of satellite and terrestrial wireless technologies that can provide users of mobile devices with ubiquitous connectivity.  In recognition of this evolution of technologies that will provide significant public interest benefits, we find that the public interest would not be served by retaining buildout requirements designed for traditional terrestrial wireless services. Nonetheless, waiving the buildout requirements without substituting an alternate set of requirements would not ensure that the benefits of expanded connectivity and robust spectrum use are achieved.  In that regard, we will apply as a condition of approving this transaction a new set of buildout requirements tailored to the provision of D2D, with elements developed to facilitate a quality user experience, robust use of spectrum, and timely deployment.  For purposes of facilitating SpaceX's planned deployment of this spectrum, we also grant waiver and extension of the discontinuance rule in section 1.953 to the extent necessary to effectuate the transaction.

48.    *Buildout Requirements*.  An AWS-3 or AWS-H Block licensee must provide signal coverage and offer service to at least 75% of the population in each of its license areas.[150]  An AWS-4 licensee must provide terrestrial signal coverage and offer terrestrial service to at least 70% of the

---

[146] 47 CFR § 1.925(b)(3).

[147] 47 CFR § 1.3.  Under this standard, waivers are appropriate only if "both (i) special circumstances warrant a deviation from the general rule, and (ii) such deviation will serve the public interest."  *See, e.g.*, *Lazo Technologies, Inc. et al.*, CC Docket No. 02-6, Order on Reconsideration, 26 FCC Rcd 16661, 16668 & n.56 (2011); *see also Northeast Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990).  The rule applicable to wireless services, 47 CFR § 1.925(b)(3), requires "substantially the same" showing as 47 CFR § 1.3.  *Barry P. Lunderville, College Creek Broadcasting, Inc., & Cumulus Licensing LLC et al.*, Memorandum Opinion and Order, 28 FCC Rcd 665, 671, para. 14 & n.51 (2013).

[148] The Applicants also seek waiver of section 2.106 to use the 2000-2020 MHz band for MSS downlink; and waiver of section 25.115 to allow AWS-4 handsets to operate as earth stations.  Amended Waiver Requests at 7–8.  We find that the instant waiver requests are more appropriate to address in the context of the SpaceX D2D Application proceeding, where SpaceX requests the same or similar relief, rather than in the instant transaction.  Accordingly, we will consider these waiver requests in the SpaceX licensing proceeding, as we note that there are other earth station issues that will also need to be addressed in SpaceX's D2D Application.  *See, e.g.*, 47 CFR § 25.216; *see also* 47 CFR § 25.265.

[149] Amended Waiver Requests at 2–5.

[150] 47 CFR § 27.14(r)(2), (s)(2).

population in each of its license areas in the 2000-2020 MHz and 2180-2200 MHz bands (AWS-4 Final Buildout Requirement).[151] If an AWS-3, AWS-H Block, or AWS-4 licensee fails to establish that it meets the Final Buildout Requirement for a particular license area, its authorization for each license area in which it fails to meet the Final Buildout Requirement shall terminate automatically without Commission action and the licensee will be ineligible to regain it if the Commission makes the license available at a later date.[152]

49.      EchoStar's AWS-4 and AWS-H Block licenses have unique buildout obligations as a result of EchoStar's commitments as part of the *T-Mobile-Sprint* transaction.[153] EchoStar waived its right to claim buildout based on the Commission's flexible-use policies—these AWS-4 and AWS-H Block licenses are expressly conditioned on EchoStar building, deploying, and offering 5G Broadband Service.[154] Subsequently, EchoStar committed to "accelerated and expanded" buildout commitments by December 31, 2024, for some of its AWS-4, AWS-H Block, and AWS-3 licenses as part of its own extension request for certain of its licenses.[155]

50.      With respect to the application of buildout requirements in the context of the SCS framework, in 2024 the Commission found that the provision of SCS cannot satisfy a terrestrial wireless licensee's construction and performance requirements.[156] Specifically, section 1.9407(g) of the rule governing SCS leasing arrangements provides "a licensee may not attribute to itself the build-out or performance activities of its SCS spectrum lessee(s) for purposes of complying with any applicable performance or build-out requirement."[157]

51.      *Requests for Waiver of Terrestrial Buildout Requirements.* SpaceX seeks a waiver of the AWS-4, AWS-H Block, and AWS-3 buildout requirements applicable to these licenses, including the requirements in section 27.14(q), (r), and (s), asserting that its planned D2D system will require full use of the spectrum, such that a D2D system and terrestrial base stations cannot serve the same location at the same time.[158] SpaceX argues the part 27 rules dictate a far more extensive deployment of terrestrial base stations, which would be inefficient and wasteful, undermining the viability of SpaceX's planned D2D network.[159]

52.      SpaceX contends that grant of the buildout waiver would facilitate the Commission's goals to enable mobile broadband connectivity in the AWS-4, AWS-H Block, and AWS-3 bands.[160] SpaceX asserts that the buildout waiver is justified because it enables efficient and rapid deployment of its planned commercial satellite service in these bands and would serve the public interest by promoting

---

[151] 47 CFR § 27.14(q)(2).

[152] 47 CFR § 27.14(q)(4), (r)(4), (s)(4).

[153] *T-Mobile-Sprint Order*, 34 FCC Rcd at 10589, paras. 26-28; *Applications of T-Mobile US, Inc., and Sprint Corporation et al.*, Order of Modification and Extension of Time to Construct, WT Docket No. 18-197, 35 FCC Rcd 9580 (WTB 2020) (*DISH Modification Order*).

[154] *DISH Modification Order*, 35 FCC Rcd at 9586-87, para. 12.

[155] *See, e.g.*, Letter from Jeffrey H. Blum, Executive Vice President, External & Legislative Affairs, EchoStar Corp., to Joel Taubenblatt, Chief, Wireless Telecommunications Bureau, FCC, ULS File No. 0011245488, at 3-5 (Sept. 17, 2024) (Construction Milestone Extension Request).

[156] *SCS Report and Order*, 39 FCC Rcd at 2673-77, paras. 123-26.

[157] 47 CFR § 1.9047(g).

[158] Amended Waiver Requests at 3-4.

[159] Amended Waiver Requests at 4.

[160] SpaceX Consolidated Response at 6-10.

innovation and competition in the wireless connectivity market.[161]   SpaceX further claims that the Commission's objective in adopting buildout requirements is to enable ubiquitous mobile service and not to prioritize terrestrial deployment.[162]   After discussions with staff,[163] on May 12, 2026, SpaceX submitted commitments to meet certain performance metrics for its D2D system in support of its waiver request.[164]

53.       *Record.*   OTI and Public Knowledge support SpaceX's buildout waiver request, but explain that "waiver [of the terrestrial construction requirements] should be contingent on the deployment and operation of a ubiquitous D2D service over the entire continental United States."[165]   With respect to the AWS-4 requirements specifically, OTI and Public Knowledge explain that "neither the Commission's initial authorization of an ancillary terrestrial component, nor its subsequent *AWS-4 Order* and terrestrial buildout requirements, were intended 'to transform the band into exclusively terrestrial spectrum.'"[166]

54.       RWA and LLA oppose SpaceX's request for waiver of the terrestrial construction requirements applicable to EchoStar's AWS-3, AWS-4, and AWS-H Block licenses.[167]   RWA asserts that waiver in this instance would undermine the Commission's goals that the spectrum support a terrestrial network built in a timely manner.[168]   RWA argues that the requested relief from the construction requirements to replace terrestrial service in these spectrum bands with D2D would be more appropriately achieved by rule changes, following a petition for rulemaking and public notice and comment.[169]   RWA further contends that waiver of the construction requirements is not aligned with the "fundamental purpose" of the AWS-4 rules, asserting that buildout of a terrestrial network is central to the *AWS-4 Order*.[170]   LLA argues that waiver of the construction requirements to allow D2D instead of traditional terrestrial wireless service would run counter to the Commission's finding in the *SCS Report and Order* that SCS operations cannot fulfill the terrestrial-based buildout responsibilities.[171]   LLA also suggests that a waiver of the construction requirements would change the terms of the unique 5G buildout

---

[161] *See* SpaceX Consolidated Response at 6–10.

[162] *See* SpaceX Consolidated Response at 7-8.

[163] *See, e.g.*, SpaceX Mar. 3, 2026 *Ex Parte.*

[164] Appx. C: SpaceX Buildout Commitments.

[165] OTI and Public Knowledge Comments at 12.

[166] OTI and Public Knowledge Comments at 11 (citing Amended Waiver Requests at 3).

[167] RWA Comments at 2, 10-12; LLA Comments at 4-7, 10-12; RWA Reply Comments at 4-6.

[168] RWA Comments at 10-11; RWA Reply at 4–6.   LLA similarly asserts the premise that terrestrial service should be provided in these bands in accordance with a reliable timeline and argues that waiver of the construction requirements to enable D2D instead of traditional terrestrial wireless service conflicts with this premise.   LLA Comments at iii, 10–11; LLA Reply at 2–5.

[169] RWA Comments at 2–3, 12; RWA Reply at 4-6.

[170] RWA Comments at ii, 2, 11–12.   In response to arguments from RWA, SpaceX asserts that the terrestrial construction requirement is not fundamental to the AWS-4 rules.   SpaceX Consolidated Response at 8–9.

[171] LLA Comments at 11-12.   In response, SpaceX argues that the "hybrid (rules-based and waiver-based) approach" in the Commission's *SCS Report and Order* is relevant here, and that waiver of the buildout requirements is appropriate because SpaceX would be able to provide "true mobile broadband service" with its planned D2D satellite system, which was not foreseeable in 2024 when the Commission adopted the *SCS Report and Order* due to the rapidly changing D2D market.   SpaceX Consolidated Response at 8–10.   RWA and LLA disagree with SpaceX's interpretation of the *SCS Report and Order* claiming that Commission dicta invites waiver-based approaches to enable D2D to replace terrestrial buildout rules.   RWA Reply at 4; LLA Reply at 3.   RWA and LLA disagree with SpaceX for different reasons.   RWA argues the Commission intended to leave the door open to waivers of SCS technical rules and not waivers of the terrestrial buildout rules.   RWA Reply at 4.   LLA argues that "it is absurd" to suggest that SpaceX's planned D2D network was not foreseeable to the Commission in 2024.   *See* LLA Reply at 3.

responsibilities imposed upon EchoStar's licenses and asserts that measures must be in place to protect the public interest if there is a waiver.[172]

55.     *Discussion.* We find that waiver of the terrestrial construction requirements, with the stringent buildout conditions that we adopt, serves the public interest, as waiver will provide SpaceX with technological flexibility to use the spectrum for its next generation D2D network.  The purposes of the buildout rules—and the unique EchoStar 5G deployment commitments—are to ensure the productive use of spectrum, encourage service is provided in a timely manner, and promote innovative services and technologies in rural areas.  Strict application of the buildout requirements would require the deployment of a traditional terrestrial wireless network with ground-based infrastructure, such as cellular towers equipped with antennas.  In the instant case, however, we consider SpaceX's planned D2D network, which would connect directly to mobile handsets using satellites instead of traditional ground-based cellular towers.  D2D satellite beams and terrestrial base stations cannot effectively serve the same location at the same time on the same spectrum due to severe interference challenges and operational limitations.  In light of the coexistence challenges, we find that the underlying purposes of the buildout requirements would not be served by requiring SpaceX to deploy a traditional terrestrial wireless network.  Instead, we find that a waiver, as conditioned, would facilitate SpaceX's planned D2D network and serve the purposes of the buildout requirements.

56.     For the same reasons, we also find that unique circumstances justify a waiver in this context.  In particular, SpaceX plans to use the terrestrial licenses it acquires from EchoStar to be at the forefront of D2D development.  SpaceX's planned D2D network, as conditioned under the waiver relief provided herein, promises to offer enhanced performance compared with previous hybrid satellite/terrestrial solutions.  Waiver relief in the instant case would enable SpaceX's plans to deploy its cutting-edge D2D technology, whereas application of the buildout rules to these unique circumstances would be an inequitable regulatory burden that essentially perpetuates technological stagnation.

57.     We recognize, however, the importance of ensuring the benefits of expanded connectivity and robust spectrum use are realized.  It would not be in the public interest to waive the terrestrial buildout requirements without placing conditions on SpaceX to use the spectrum to deploy a next-generation D2D network that delivers on the substantial public interest benefits discussed above.  For purposes of SpaceX's acquisition of these licenses, therefore, we adopt SpaceX's buildout commitments as conditions.  Accordingly, we waive the buildout requirements applicable to the AWS-3, AWS-4, and AWS-H Block licenses, subject to the following conditions:[173]

- For each license, SpaceX shall meet the following minimum performance metrics per block[174] for downlink quality of service (Signal-to-Interference-Plus-Noise Ratio (SINR)); uplink user throughput; and spectral efficiency:
    - Downlink Quality of Service (SINR):

---

[172] LLA Comments at 10-11.  LLA further argues that SpaceX should not be permitted to retain rights to deploy a terrestrial network using EchoStar's spectrum without meeting buildout requirements.  LLA Reply at 5.

[173] *See* Appx C: SpaceX Buildout Commitments.

[174] The AWS-4 band is two blocks (Channel A: 2000-2010 MHz and 2180-2190 MHz; and Channel B: 2010-2020 MHz and 2190-2200 MHz); AWS-3 unpaired spectrum is two blocks (1695-1700 and 1700-1710 MHz); and the AWS-H block is two blocks (1915-1920 and 1995-2000 MHz).  3GPP Non-Terrestrial Network (NTN) standards—which enable D2D connectivity to end user devices—do not currently support satellite communication for the 1915-1920 MHz band.  *See* Appx. C: SpaceX Buildout Commitments at 1 n.2.  We anticipate that SpaceX will work with diligence towards 3GPP standards and equipment deployment for this block.  As the milestone nears, if SpaceX believes that it needs additional time to meet applicable performance metrics for this block, SpaceX would need to file a request for waiver with appropriate justifications.

**Federal Communications Commission**                    DA 26-471

- First Interim Performance Requirement (two years from November 30, 2027): SINR of 5 dB; Service Availability[175] of 70% of the time in 90% of the total geographic area of each Basic Economic Area (BEA) license[176];

- Second Interim Performance Requirement (four years from November 30, 2027): SINR of 5 dB; Service Availability of 80% of the time in 90% of the total geographic area of each BEA license; and

- Final Performance Requirement (nine years from November 30, 2027): SINR of 10 dB; Service Availability of 90% of the time in 90% of the total geographic area of each BEA license.

o Uplink User Throughput:

- First Interim Performance Requirement (two years from November 30, 2027): 5th percentile user throughput of at least 100 kbps/MHz in the uplink over 90% of the geographic area at Service Availability of 70% of the time;

- Second Interim Performance Requirement (four years from November 30, 2027): 5th percentile user throughput of at least 200 kbps/MHz in the uplink over 90% of the geographic area at Service Availability of 80% of the time; and

- Final Performance Requirement (nine years from November 30, 2027): 5th percentile user throughput of at least 300 kbps/MHz in the uplink over 90% of the geographic area at Service Availability of 90% of the time.

o Spectral Efficiency:

- First Interim Performance Requirement (two years from November 30, 2027): 300 kbps/MHz/beam in the downlink and 100 kbps/MHz/beam in the uplink; and

- Final Performance Requirement (nine years from November 30, 2027): 600 kbps/MHz/beam in the downlink and 200 kbps/MHz/beam in the uplink.

- SpaceX shall demonstrate compliance with the performance metrics with respect to each license (e.g., per spectrum block and per BEA) for downlink quality of service (SINR), uplink user throughput, and spectral efficiency by filing a construction notification with the Commission in accordance with the provisions set forth in §1.946(d) of the Commission's rules within 30 days of each milestone. In its construction notification, SpaceX shall certify whether it has met the performance requirements and file documentation to support its claim. For each license, the supporting documentation shall include:

o Technical narrative with a link budget that describes and demonstrates the satellite link performance, including but not limited to, SINR and 5th percentile user throughput of the service being provided, system parameters (transmit powers, antenna gains, receive sensitivity, noise figures, orbit altitude, minimum elevation angle, etc.) and link degradations (attenuation, atmosphere noise, etc.), carrier-to-noise ratio, energy-per-bit density, percentage of time performance, and any other performance parameters necessary to support the construction showing.

---

[175] "Service Availability" is a user receiving the signal (SINR) or a user transmitting the signal (uplink user throughput) at a point in the covered geographic area at the applicable percentage of the time (as detailed herein), when the user is outdoors. *See* Appx. C: SpaceX Buildout Commitments at 1 n.4.

[176] For purposes of meeting any metric by geographic area, the relevant geographic area is the one associated with the AWS-3, AWS-4, and AWS-H Block terrestrial licenses, i.e., the Basic Economic Area. *See* Appx. C: SpaceX Buildout Commitments at 1 n.5.

- ▪ The technical narrative shall include the service availability in terms of the number of antennas and beams serving the geographic area at any given time;

- ▪ Demonstration of spectral efficiency per beam should include analysis and/or modeling to support the system performance. This analysis should include assumptions on UE distribution, UE parameters, beam coverage, and other deployment assumptions. The methodology should be clearly described.

- o Electronic maps (in both shapefile and PDF format) accurately depicting the boundaries of the BEA license area and where in the BEA license area the licensee provides service that meets the performance requirements. SpaceX shall submit separate map representations demonstrating SINR and separate map representations demonstrating uplink user throughput.

- SpaceX shall submit measurements and/or data representing service to customers to verify its compliance with each milestone. At least 9 months before the First Interim Performance Requirement, SpaceX shall submit for WTB approval a plan describing the type of measurements and/or data that SpaceX shall be required to submit to verify compliance, which shall be based on industry-standard practices (e.g., on-the-ground test results via a sampling methodology; network logs; or crowd-sourced data). SpaceX shall submit the required verification measurements and/or data within 6 months of each milestone.

- If the Bureaus determine that SpaceX has failed to meet its performance requirements as set forth above, the following conditions shall apply:

  - o If the Bureaus determine that SpaceX has failed to meet all of the First Interim Performance Requirements listed above (Downlink Quality of Service (SINR); Uplink User Throughput; and Spectral Efficiency) for a particular license, the deadline for all of the Final Performance Requirements for that license shall be accelerated by one (1) year (i.e., the Final Performance Requirements must be met 8 years after the Effective Date, rather than 9 years after the Effective Date);

  - o If the Bureaus determine that SpaceX has failed to meet all of the Second Interim Performance Requirements (Downlink Quality of Service (SINR) and Uplink User Throughput) for a particular license, the deadline for the Final Performance Requirements for that license shall be accelerated by two (2) years. This acceleration shall be cumulative to any acceleration if the First Interim Performance Requirements were not met. For example, the Final Performance Requirements must be met 7 years from the Effective Date for that license, rather than 9 years after the Effective Date; or if the First Interim Performance Requirements were not met, the Final Performance Requirements must be met by 6 years, rather than 9 years after the Effective Date.

  - o If the Bureaus determine that SpaceX has failed to meet all of the Final Buildout Requirements for a particular license, upon such determination, SpaceX's license for such license area shall terminate automatically without Commission action, and SpaceX will be ineligible to regain it if the Commission makes the license available at a later date.

58.     SpaceX's planned D2D network—as conditioned under this buildout waiver relief—will advance the leadership of the United States in hybrid satellite/terrestrial D2D technology while providing real benefits to consumers nationwide. The buildout waiver conditions promote the efficient use of spectrum resources and ensure reliable two-way communications. Specifically, the waiver conditions are designed to ensure meaningful widespread outdoor coverage by measuring performance in each spectrum block and in each geographic area where SpaceX's planned D2D network is intended to operate. The metrics for uplink and downlink communications in the conditions establish that consumers will stay

seamlessly connected.  The conditions also impose a rigorous schedule with deadlines that are designed to ensure the high-quality D2D service expectations are met in a timely manner.

59.     The waiver, with conditions, on the terrestrial licenses intended for SpaceX's planned D2D network, is in the public interest because the relief will facilitate uninterrupted coverage outdoors in the geographic areas of the AWS-4, AWS-H Block, and AWS-3 licenses that SpaceX seeks to acquire from EchoStar.  Moreover, the waiver will facilitate SpaceX to leverage innovative technology to provide advanced communications services to mobile devices in rural and remote areas.  We find the buildout waiver, as conditioned, will enable nearly ubiquitous mobile connectivity across the nation.

60.     LLA argues that a waiver to enable SpaceX's planned D2D operations instead of traditional terrestrial wireless service would contradict the Commission's finding in the *SCS Report and Order*.[177]  We disagree.  We do not believe the Commission's findings in the *SCS Report and Order* preclude a waiver of the applicable buildout requirements.  Moreover, we are not waiving any SCS rules in this Order.  We find the buildout waiver relief, as conditioned, recognizes the fast-developing nature of D2D, the need for adapting a set of buildout requirements that reflect technologically neutral elements for D2D service, and the characteristics of SpaceX's planned D2D network.  We will continue to assess the appropriate buildout requirements for D2D in a broader context as D2D technologies and services develop and expand.

61.     For these reasons, we believe the purpose of the terrestrial buildout rules in the instant case and public interest considerations warrant grant of the requested waiver relief, as conditioned.  For the foregoing reasons, we waive the applicable buildout requirements pursuant to section 1.925(b)(3).  This waiver relief is subject to the conditions herein.  The waiver will apply to both the Trust and SpaceX, and will be effective upon consummation of step one of the transaction.

62.     *Waiver of Discontinuance Rule.*  In light of the fact that we waive the terrestrial buildout requirements so that SpaceX can use the spectrum for its D2D service—and thus SpaceX will not be using EchoStar's facilities—we also extend the discontinuance period and grant the Applicants a temporary and partial waiver of the discontinuance rule to the extent necessary to effectuate the transaction.  Under section 1.953(a) of the Commission's rules, a licensee's authorization will terminate automatically if the licensee permanently discontinues service or operations under the license during the license term after the date it is required to be providing service or operating, although the period may be extended for good cause.[178]  The Applicants request a waiver and/or extension of the discontinuance rule, to the extent necessary for assignment of the licenses, for all of the AWS-4, AWS H-Block, and AWS-3 licenses included in the proposed transaction.[179]  Given that SpaceX will not be using EchoStar's facilities and the licenses will be held in the Trust during the transition period before consummation of step two of the transaction to assign the licenses to SpaceX, we find good cause to extend the discontinuance period and waive section 1.953 until step 1 of the transaction is consummated (or abandoned) for any permanent

---

[177] LLA Comments at 11-12; LLA Reply at 3; *see also* RWA Reply at 4.

[178] 47 CFR § 1.953(a), (g).

[179] *Applicants' Discontinuance Waiver/Extension Request Letter* at 2.  Prior to this letter, certain EchoStar subsidiaries separately requested an extension and/or waiver of the 180-day period in section 1.953 of the Commission's rules for certain of the licenses included in the assignment applications "to the extent necessary for the time needed to complete the first step of a two-step transaction for which approval has already been requested from the Commission."  *See*, *e.g.*, DBSD Corporation Waiver Request, Call Sign T070272136 (filed Mar. 6, 2026) (*DBSD Waiver Request*); American H Block Wireless L.L.C. Waiver Request, Call Sign WQTX335 (filed Mar. 6, 2026) (*American H Block Waiver Request*); Gamma Acquisition L.L.C. Waiver Request, Call Sign T060430136 (filed Mar. 6, 2026) (*Gamma Waiver Request*).  The parties explained that if the requested waiver and/or extension is not granted, it would frustrate "EchoStar's ability to arrange for the orderly assignment of licenses to assignees that can put the spectrum to its best and highest use."  *DBSD Waiver Request* at 3; *American H Block Waiver Request* at 3; *Gamma Waiver Request* at 3.

discontinuance of service of the AWS-4, AWS-H Block, and AWS-3 licenses.[180]  We note that once step one of the transaction is consummated, new buildout deadlines will govern all of the licenses and section 1.953(a) will become applicable on "the date [SpaceX] is required to be providing service or operating."[181]

**B.      Waiver of Consummation Period**

63.      We grant SpaceX's waiver of the consummation period under sections 1.948(d) and 25.119(f), because strict application of this rule would not serve the public interest, as the structure of this transaction is not conducive to consummation within 180 days.[182]  Section 1.948(d) requires applicants to notify the Commission of consummation of an approved assignment within 180 days of public notice of approval of the transaction.[183]  Similarly, section 25.119(f) requires that assignments of station authorizations be completed within 180 days from the date of authorization, and that a letter be filed with the Commission with the date of consummation and application file numbers within 30 days of consummation."[184]  The Applicants explain that final consummation of the second step of the transaction may not occur within the 180-day period and ask for a preemptive extension of the consummation deadline through November 30, 2027.[185]  They assert that waiver of the rule serves the public interest because it will "allow for the orderly completion of the transaction without requiring either a new application or a request for extension," and will thus avoid needless burden on Commission staff and give Applicants assurance that they can consummate their transaction within their planned timetable.[186]

64.      We have determined that it is reasonable and more efficient to consider whether the transaction as a whole will serve the public interest, convenience, and necessity, rather than to consider only step one now and delay consideration of step two until closer to the intended time of consummation. Because the Trust is for the benefit of SpaceX, and because the Applicants have provided a timeline for consummation of step two of the transaction to SpaceX, we have sufficient certainty as to the ownership of the underlying assets for the limited duration of the waiver.[187]  In addition, the buildout requirements we have adopted for the spectrum are sufficient to address any concerns that the requested waiver of the consummation period could impact the use of the spectrum.[188]  We find that in view of the unique factual

---

[180] Section 1.953(b) provides "[p]ermanent discontinuance of service or operations for Covered Geographic Licenses is defined as 180 consecutive days during which a licensee does not operate or, in the case of commercial mobile radio service providers, does not provide service to at least one subscriber that is not affiliated with, controlled by, or related to the licensee."  47 CFR § 1.953(b).

[181] 47 CFR § 1.953(a).  If step one of the transaction is not timely consummated or if the parties abandon the transaction, the waiver and extension of section 1.953 will cease.

[182] The Applicants explain that the proposed two-step transaction and the timeframe contemplated by the Applicants "will provide the time necessary for an orderly transition in these bands" and will enable SpaceX to "ramp up in preparation to begin commercial service by designing, constructing, and beginning to deploy satellite facilities." Amended Public Interest Statement at 10.

[183] 47 CFR § 1.948(d).

[184] 47 CFR § 25.119(f).

[185] Amended Waiver Requests at 9; SpaceX Oct. 21, 2025 *Ex Parte* at 1.

[186] Amended Waiver Requests at 9.

[187] *See, e.g.*, *Federal Communications Commission Announces Waiver Relief for Untimely Notifications of Consummation of Wireless License Assignment and Transfer of Control Applications*, Public Notice, 19 FCC Rcd 24549, 24550 (2004) (noting with respect to the need for timely filed consummation notices that "[i]t is critical that the Commission be able to identify, and to contact as needed, the entity authorized in fact to control a Commission-licensed facility").

[188] *See* Syndicat CFE-CGC Télécom Comments at 2 (expressing concern that under the proposed assignment "the market opportunity is sterilised for the next 2 years.").

28

circumstances of the instant case, strict application of the 180-day consummation rule to the Applicants would be contrary to the public interest. Accordingly, we waive sections 1.948(d) and 25.119(f) and grant the Applicants an extension to consummate the second step of the transaction until November 30, 2027.[189]

## VIII.   OTHER PUBLIC INTEREST ISSUES

65.     *AWS-4 and 2 GHz MSS in Puerto Rico and the U.S. Virgin Islands.* We decline to adopt LLA's requested condition that SpaceX will not deploy 2 GHz in Puerto Rico and the U.S. Virgin Islands and that it may not operate in a manner that would interfere with LLA's use of its AWS-4 spectrum in those geographic areas. As we explain below, such a condition would be inconsistent with our rules.

66.     As noted above, in a prior transaction, EchoStar assigned its AWS-4 terrestrial wireless licenses in Puerto Rico and the U.S. Virgin Islands to LLA.[190] It did not assign its 2 GHz MSS rights to LLA.[191] LLA raises concerns with SpaceX's assertion that LLA's AWS-4 operations in Puerto Rico and the U.S. Virgin Islands would need to protect SpaceX's proposed 2 GHz MSS operations in those geographic areas.[192] LLA states that such a requirement would override LLA's right to use the AWS-4 licenses that it purchased from EchoStar and would cause great harm to consumers in Puerto Rico and the U.S. Virgin Islands.[193] LLA further asserts that, by Commission rules, EchoStar gave up protection for its satellite services when it sold its AWS-4 spectrum to LLA and that SpaceX should have to protect LLA's AWS-4 deployment in Puerto Rico and the Virgin Islands.[194] Accordingly, LLA requests the Commission condition the proposed transaction on a commitment from SpaceX that it will not deploy 2 GHz MSS in these geographic areas or otherwise operate "in a manner that would interfere with LLA's use of its terrestrial wireless spectrum."[195]

67.     In response, SpaceX asserts that this issue has no bearing on, and does not warrant delayed approval of, the instant proposed transaction.[196] SpaceX contends that it will have full rights to provide MSS in Puerto Rico and the U.S. Virgin Islands as a result of the assignment of EchoStar's MSS licenses, and that the AWS-4 operations of LLA must be conducted in a way that does not impinge upon SpaceX's space-based service in the band.[197] SpaceX also disputes LLA's claims that the obligation to protect 2 GHz MSS would result in depriving residents of Puerto Rico and the U.S. Virgin Islands of terrestrial broadband service, explaining instead that LLA holds significant spectrum in these territories without the AWS-4 licenses and provided "significant" mobile broadband coverage in these areas even

---

[189] SpaceX will have 30 days from November 30, 2027, to file its consummation notices for step two of the transaction.

[190] *See generally LLA-DISH Order*, 39 FCC Rcd 8772. When the *LLA-DISH* transaction was filed, DISH Network Corporation (DISH) was the assignor. On December 31, 2023, EchoStar completed its acquisition of DISH, with DISH becoming a wholly owned subsidiary of EchoStar. *See* EchoStar Corporation, SEC Form 10-K at 1 (filed Feb. 29, 2024). For consistency in our discussion, we refer to EchoStar as the relevant party, even though DISH was the entity named in the *LLA-DISH Order*.

[191] *See generally LLA-DISH Order*, 39 FCC Rcd 8772.

[192] LLA Comments, ICFS File Nos. SAT-LOA-20250916-00282, SAT-AMD-20251125-00339, GN Docket No. 25-340, at 2-3 (Jan. 5, 2026) (LLA D2D Comments) (commenting on SpaceX D2D Application); LLA Reply at 2 (incorporating by reference LLA's comments on SpaceX D2D Application into the instant docket).

[193] LLA D2D Comments at 5; *see* LLA Reply at 3-4.

[194] *See* LLA Feb. 20, 2026, *Ex Parte* at 3; LLA Reply at 4, 6.

[195] LLA Reply at 3, 6; *see also* LLA D2D Comments at 7.

[196] SpaceX Consolidated Response at 13.

[197] *See* SpaceX Consolidated Response at 13; SpaceX Mar. 2, 2026 *Ex Parte* at 1; SpaceX Feb. 6, 2026 *Ex Parte* at 1.

**Federal Communications Commission**                     **DA 26-471**

before acquiring the AWS-4 spectrum from EchoStar.[198]  EchoStar argues that LLA has no right to the licenses being assigned, and that LLA does not argue that the agreement imposes any surviving obligation on EchoStar or restrict EchoStar's freedom to assign its remaining licenses for these bands.[199]

68.     We decline LLA's request for a condition on SpaceX.  When LLA sought approval to purchase EchoStar's AWS-4 licenses, it did not include in that application EchoStar's complementary 2 GHz MSS authorizations.[200]  Further, nothing in the order approving the LLA-EchoStar assignment of AWS-4 licenses precluded EchoStar from selling or transferring the 2 GHz MSS authorizations to another party in the future.[201]  Thus, LLA cannot complain about a transfer of those authorizations to SpaceX here.

69.     Nor can LLA complain about SpaceX's future exercise of its interference protection rights under its MSS authorizations.  The Commission's rules require AWS-4 licensees, such as LLA, to protect MSS operations in the 2000-2020 MHz and 2180-2200 MHz bands from harmful interference and to accept interference from duly authorized MSS operations in these bands.[202]  LLA contends that the requirement to protect MSS operations does not apply here because EchoStar voluntarily limited the use of this spectrum for MSS when it sold the two AWS-4 licenses to LLA.[203]  We disagree.  The *2012 AWS-4 Order* and our rules do not support LLA's contention that a private agreement could modify the MSS license.  Although the Commission permitted an MSS licensee "to limit voluntarily its ability to offer satellite service as part of a secondary market arrangement enabling another party to better provide flexible use terrestrial service, including mobile broadband using AWS-4 spectrum,"[204] the Commission's part 25 rules do not provide for the partitioning or disaggregation of space station licenses, in other words, the assignment of a portion of the MSS interference protection rights.[205]  The Commission also did not

---

[198] SpaceX Mar. 2, 2026 *Ex Parte* at 2.

[199] EchoStar Consolidated Response at 6.

[200] *See* ULS File No. 0010802260; *Federal Communications Commission Establishes Docket for Petition for Declaratory Ruling and Proposed Assignment of Spectrum Licenses, Assets, and Customers of DISH Network Corporation to Liberty Latin America Ltd in Puerto Rico and U.S. Virgin Islands*, GN Docket No. 24-55, Public Notice, 39 FCC Rcd 1381 (WTB 2024); *LLA-DISH Order*, 39 FCC Rcd 8772.

[201] *See generally LLA-DISH Order*, 39 FCC Rcd 8772; *see also* 47 CFR § 27.2(d) ("Operators in the 2000-2020 MHz and 2180-2200 MHz bands may not provide the mobile-satellite service under the provisions of this part; rather, mobile-satellite service shall be provided in a manner consistent with part 25 of this chapter.").

[202] 47 CFR § 27.1136.

[203] LLA D2D Comments at 3-4; LLA Reply at 6; LLA Feb. 20, 2026 *Ex Parte* at 3.  In fact, LLA says that EchoStar "partitioned" its AWS-4 spectrum in Puerto Rico and USVI, but this is not correct.  LLA D2D Comments at 3-4; LLA Reply at 3-4.  EchoStar assigned the full AWS-4 licenses in these markets and did not partition them.  *See generally Liberty-DISH Order*, 39 FCC Rcd 8772.  We also note that there is nothing in the *LLA-DISH Order* or in the record before us that gives any indication that EchoStar did voluntarily limit its MSS rights.  Indeed, LLA's argument seems to rest on an interpretation of the *AWS-4 Order* that an MSS licensee could somehow "voluntarily limit" interference protections in a secondary market transaction without explicitly agreeing to such limitation.  We disagree that such a voluntary limitation could occur automatically.  We do not have this private agreement before us, but even *if* it imposed any restriction on EchoStar's own MSS operations or on its freedom to assign its remaining licenses, this would not warrant a condition restricting SpaceX's ability to use 2 GHz spectrum for MSS in Puerto Rico and the U.S. Virgin Islands in accordance with the assigned MSS licenses and our rules, as discussed here.

[204] *AWS-4 Report and Order*, 27 FCC Rcd at 16196, para. 251.

[205] The Commission sought comment in 2012 on whether the part 25 rules should be amended to address partitioning or disaggregation of 2 GHz MSS spectrum by its licensees.  *Service Rules for Advanced Wireless Services in the 2000-2020 MHz and 2180-2200 MHz Bands*, WT Docket No. 12-70 et al., Notice of Proposed Rulemaking and Notice of Inquiry, 27 FCC Rcd 3561, 3598-99, para. 114 (2012).  Ultimately, however, the Commission did not adopt any such changes to part 25.  Absent such rules, modification of the parameters of a

(continued….)

state that any arrangements by an MSS licensee to forego protection or to encumber its operations under an MSS license would run with the MSS license, in contrast to its statements about secondary market arrangements for AWS-4 licenses.[206] Thus, any action taken by an MSS licensee voluntarily to encumber its MSS operations or forego protection for its MSS operations are limited to that licensee and, contrary to LLA's argument, do not "run with the license" so that they modify the underlying MSS license to restrict the scope of the license or the protection of such a license under the Commission's rules.[207] We will therefore not impose a condition to impose a constraint on SpaceX that our rules do not warrant.[208]

70.    *Cancellation or Surrender of EchoStar's Unconstructed Licenses*.  We reject RWA's suggestion that the Commission should reclaim the spectrum and auction it off because EchoStar allegedly failed to meet its buildout requirements.[209] As an initial matter, the Commission's rules do not prohibit assignment of unconstructed AWS-4, AWS-H Block, and AWS-3 licenses.[210] The licenses that

---

(Continued from previous page) ————————

space station license can only be done through an application for modification approved by the Commission. *See* 47 CFR § 25.117(a) (providing that with the exception of modifications not requiring prior authorization, no modification of a space station license that affects the parameters or terms and conditions of the station authorization shall be made except upon application to and grant of such application by the Commission).

[206] *AWS-4 Report and Order*, 27 FCC Rcd at 16195, para. 249 (stating that "the MSS interference protection rule we adopt above will 'run with the license', obligating any partitionee or disaggregatee to avoid interference with MSS operations").

[207] Indeed, Special Condition 1 on every AWS-4 license, including the licenses assigned to LLA, reads substantially as follows:

> This license document as first issued on March 7, 2013, reflects the Order of Modification and Authorization (DA 13-231) to existing Mobile Satellite Service ("MSS") call sign E060430 to add Part 27 rights and obligations for Advanced Wireless Service-4 ("AWS-4") terrestrial operating authority with all of the attendant rights, limitations, and obligations associated with the AWS-4 service rules adopted in WT Docket No. 12-70 (FCC 12-151), and any subsequent orders. The license document issued on March 7, 2013, is not a separate authorization in and of itself. The parameters reflected in the [ICFS] for the MSS authorization of the license (call sign E060430) together with the parameters reflected in the [ULS] for the standalone terrestrial authorization of the license (call sign T060430001 - T060430176 derivatives) as of March 7, 2013 constitute the whole of the modified license. Except as otherwise ordered, a licensee of AWS-4 operating authority is permitted to partition, disaggregate, and lease AWS-4 spectrum as provided under the FCC's rules. *See, e.g.*, FCC 19-103; 47 CFR Parts 1, 27. The partition, disaggregation, or lease of AWS-4 spectrum does not encompass the MSS authorization. *See, e.g.*, ULS, Call Sign T060430174, Special Condition 1.

[208] Satelio IoT Services USA (Satelio) urges the Commission to ensure that access to the 2 GHz MSS band remains available for additional entrants deploying Internet-of-Things (IoT) MSS systems. Satelio Comments at 1–2. These concerns are primarily focused on interoperability and innovation in the band. Satelio Comments at 4–5. In response, SpaceX urges the Commission to reject Satelio's request. SpaceX Consolidated Response at 11. While, the concerns raised by Satelio are broader general industry-wide matters that are beyond the scope of the current transaction, SB has confirmed that EchoStar holds the exclusive terrestrial and MSS licenses over the AWS-4/2 GHz MSS spectrum. *See MSS Spectrum Clarification Order* at 10, para. 22. By extension, once the assignment to SpaceX is consummated, SpaceX will hold the exclusive terrestrial and MSS licenses over the AWS-4/2 GHz MSS spectrum, with the exception of the AWS-4 licenses in Puerto Rico and U.S. Virgin Islands.

[209] RWA Comments at i, 2, 8-10, 12; RWA Reply at 2-3 & nn.4, 7. LLA asserts that the proposed transaction would result in a windfall to EchoStar, but does not expressly request the cancellation or surrender of EchoStar's spectrum licenses. *See* LLA Comments at 7, 12-13. SpaceX responds to RWA and LLA's assertions to suggest that EchoStar's unique buildout obligations are not at issue. SpaceX Consolidated Response at 7-8.

[210] *Compare* 47 CFR § 1.948(i) (FCC may review assignment applications to determine if the transaction is for purposes of trafficking in service authorizations but there is no general prohibition on assignment of unconstructed licenses) *with* 47 CFR § 101.55(a) (fixed microwave licenses not authorized pursuant to competitive bidding procedures may not be assigned prior to the completion of construction, except as provided for in section 101.55(d)).

EchoStar seeks to assign remain in active status.[211]  Accordingly, contrary to RWA's suggestion, nothing prevents EchoStar from assigning these licenses, whether they are constructed or not.  Further, by this order, we waive the existing terrestrial construction requirements and grant SpaceX new buildout deadlines for all of the AWS-4, AWS-H Block, and AWS-3 licenses, so any of EchoStar's active notifications or requests are now moot.[212]

71.    *Roaming and Rural Provider Access to SCS.*  RWA requests a change to section 25.125(a) of the Commission's rules requiring an applicant for SCS space station authorization to enter into a lease arrangement with one or more terrestrial licensees.[213]  RWA contends that rural carriers do not qualify for required leasing under this rules section.[214]  RWA also argues that rural and small providers need roaming agreements to service their customers and approval of this transaction would result in reduced roaming revenues for rural carriers.[215]  RWA further expresses concern that SpaceX will not work with rural providers to help rural Americans connect to satellite-enabled wireless services, or help coordinate a way for rural carriers to provide SCS.[216]  However, RWA does not request a condition on roaming or rural carrier SCS access.  SpaceX asserts that it hopes to be able to partner with RWA's members to ensure their customers can access MSS service, and also explains that RWA members will "benefit from the ability to partner with satellite operators in the evolving mobile market."[217]

72.    We decline to impose RWA's requested condition.  RWA does not indicate that its members have roaming arrangements with EchoStar, thus, there is no indication that the proposed transaction would directly impact RWA's existing roaming arrangements.  In addition, RWA's requested rule change is a general industry-wide issue that is outside the scope of the review of an individual transaction.[218]  We further note that under our existing regulatory framework, multiple co-channel

---

[211] EchoStar's construction deadlines for the AWS-4 and AWS-H Block licenses were June 14, 2025, and the construction deadlines for the AWS-3 spectrum licenses were October 27, 2025.  EchoStar filed a September 17, 2024, extension request for certain of its AWS-4, AWS-H Block, and AWS-3 licenses and later filed notices of construction for some of its AWS-4, AWS-H Block, and AWS-3 licenses and additional extension requests for the remainder of its licenses with 2025 construction deadlines in ULS.  *See, e.g.*, ULS call signs T060430130 (AWS-4 license); ULS call signs T070272001 (AWS-4 license); WQTX329 (AWS-H Block license); WQTX217 (AWS-H Block license); WQWQ560 (unpaired AWS-3 license); WQWQ824 (unpaired AWS-3 license).  Accordingly, all licenses that EchoStar seeks to assign remain in active standing.

[212] *See infra* section VII.A (Waiver of Terrestrial Construction Requirements).  Specifically, we find that any active construction notifications or extension and waiver requests for EchoStar's licenses that it seeks to assign are moot, as this Order provides new construction deadlines for all of these licenses.

[213] RWA Reply at 6-7.  While RWA advocates for a rule change "that would allow RWA members to work with SpaceX," RWA does not propose specific changes to section 25.125, thus, it is not clear what changes RWA seeks.  RWA Reply at 6-7.

[214] RWA Reply at 6.  RWA asserts that rural wireless carriers are precluded from benefitting from SCS under section 25.125(a) because rural carriers by nature "do not have a nationwide reach or hold all co-channel licenses throughout a GIA in a given band."  RWA Reply at 6.

[215] RWA Comments at 4-5.

[216] RWA Reply at 2, 6.

[217] SpaceX Consolidated Response at 5, 8.

[218] *See, e.g., 2011 AT&T-Qualcomm Order*, 26 FCC Rcd at 17622, para. 79 (declining requests for relief pertaining to industry-wide issues, "as these issues are better addressed in the context of these industry-wide proceedings"); *AT&T-Centennial Order*, 24 FCC Rcd at 13969, 13972, paras. 133, 141 (2009) (finding issues that "apply broadly across the industry are more appropriate for a Commission proceeding where all interested industry parties have an opportunity to file comments"); *Applications of AT&T Inc., Cellco Partnership d/b/a Verizon Wireless, Grain Spectrum, LLC, and Grain Spectrum II, LLC for Consent to Assign and Lease AWS-1 and Lower 700 MHz Licenses,* WT Docket No. 13-56, Memorandum Opinion and Order, 28 FCC Rcd 12878, 12899, para. 52 (WTB 2013) (same).  We note that in the *SCS Report and Order*, the Commission contemplated applying the roaming rules in part 20 to

(continued….)

licensees can partner with a single satellite operator to provide SCS in a GIA and therefore, RWA's concern that section 25.125(a) precludes rural carriers from participation in SCS is unfounded.[219]  Further, RWA's concerns about SpaceX's willingness to cooperate with rural providers are speculative and, thus, do not warrant action.

73.      *EchoStar's Contractual Obligations to its Partners.*  In 2019, in connection with purchasing Boost Mobile from Sprint Corp. as part of the T-Mobile/Sprint merger, DISH Network Corp. (DISH) committed to becoming a "nationwide facilities-based competitor" using a "first-of-its-kind 5G network built from the ground up."[220]  To help accomplish this goal, DISH sought extensions of the construction deadlines for various licenses it owned through subsidiaries, including the AWS-4 and AWS-H Block licenses at issue here and the 600 MHz licenses it proposes to sell to AT&T.  It further committed to not selling its AWS-4 licenses for six years without FCC approval.  Those commitments were imposed as conditions on those licenses in September 2020 when WTB modified DISH's licenses.[221]

74.      Since 2020, to fulfill those conditions, DISH has built various parts of that network, leasing tower space, installing new radios on towers, and entering into contracts for backhaul, among other actions.  It has also gone through a number of internal restructurings, including merging with and becoming a subsidiary of EchoStar.[222]  When that transaction was first announced, EchoStar was to become a subsidiary of DISH, a corporate structure that would have inverted the current relationship between the two entities.[223]

75.      EchoStar seeks not only to sell the AWS-4, AWS-H Block, and unpaired AWS-3 spectrum licenses it now controls, as well as several earth station licenses, to SpaceX, but in a separate set of applications before us, seeks to sell its 3.45 GHz and 600 MHz licenses to AT&T, effectively dismantling its radio network.[224]  As described in those other applications, EchoStar has also entered into an agreement with AT&T to use AT&T's radio network, in what the parties describe as a hybrid-Mobile

---

(Continued from previous page)

satellite operators providing SCS and concluded that the roaming rules would not apply to satellite operators.  *SCS Report and Order*, 39 FCC Rcd at 2693-94, paras. 169, 172.  In that order, the Commission explained that it was premature to apply roaming requirements in early stages of SCS deployment and determined that doing so "could affect the development of SCS collaborations."  *SCS Report and Order*, 39 FCC Rcd at 2694, para. 172.  Accordingly, the Commission found that intervening in contractual arrangements between private parties would not serve the public interest and declined to impose roaming requirements for SCS.

[219] 47 CFR § 25.125(a); *see also SCS Report and Order*, 39 FCC Rcd at 2660, 2664-65, paras. 90, 99-104.

[220] Letter from Jefffrey H. Blum, Senior Vice President, Public Policy & Government Affairs, DISH, to Donald Stockdale, Chief, Wireless Telecommunications Bureau, FCC, DBSD Corporation, AWS-4, Lead Call Sign T070272001, et al., at 2-3 (July 26, 2019)

[221] *See DISH Modification Order*, 35 FCC Rcd 9580.

[222] *See* EchoStar Corporation, SEC Form 10-K for fiscal year ending December 31, 2024 at 1 (filed Feb. 27, 2025), https://www.sec.gov/Archives/edgar/data/1415404/000155837025001663/tmb-20241231x10k.htm; *see also* EchoStar, *EchoStar Corporation Completes Merger With DISH Network Corporation*, (Jan. 2, 2024), https://ir.echostar.com/news-releases/news-release-details/echostar-corporation-completes-merger-dish-network-corporation.

[223] Press Release, EchoStar, DISH Network Corporation and EchoStar Corporation Combine, (Aug. 8, 2023), https://ir.echostar.com/news-releases/news-release-details/dish-network-corporation-and-echostar-corporation-combine.

[224] *See* Applications of AT&T Mobility II LLC and EchoStar Corporation for Consent to Assign Licenses, WT Docket No. 25-303, ULS File Nos. 0011749148 (lead application), 0011749151, 0011749122 and paper applications filed in ECFS File Nos. 50001WTAA25 and 50002WTAA25 (filed Sept. 18, 2025).  ULS File No. 0011944971 was filed in ULS to replace ECFS File Nos. 50001WTAA25 and 50002WTAA25 (filed March 13, 2026).

**Federal Communications Commission** DA 26-471

Network Operator (MNO) arrangement.  Thus, while Boost Mobile will continue to provide wireless service to its customers, it will no longer operate its own radio network.

76.      A number of commenters allege that EchoStar has told various tower companies, fiber backhaul providers, and construction firms that it will not fulfill its contracts nor pay the monies it owes them for constructing that radio network.[225]  They also allege that EchoStar claims that the subsidiary that contracted with them will not be receiving any of the monies from the sale of these licenses.[226]  We note that EchoStar will receive approximately $8 billion in cash, plus $2 billion of interest payments that SpaceX will assume, plus over $10 billion in SpaceX stock from the transaction at issue here, as well as another $23 billion from the sale of the licenses to AT&T.[227]  The commenters therefore ask that we condition our approval of the transaction on requiring DISH Wireless, LLC to honor or meet its existing contractual obligations to its infrastructure partners, including requiring the deposit of monies in an escrow account.[228]  EchoStar responds that it has reached settlements with hundreds of vendors and made hundreds of millions of dollars of payments.  It argues that any escrow condition is illegal and unmanageable.[229]

---

[225] *See, e.g.*, WIA Comments at 2-5; WIA Jan. 8, 2026 *Ex Parte* at 3-4; WIA Jan. 22, 2026 *Ex* Parte at 2; Wireless Infrastructure Providers *Ex Parte* at 2; FirstLight *Ex Parte* at 2, NATE *Ex Parte* at 1-2.

[226] *See, e.g.*, WIA Comments at 4; Letter from Nanette S. Edwards, Counsel for Horry Telephone Cooperative, Inc., to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, Attach. Letter from Arnold Agcoaili, Vice President-National Development, DISH Wireless L.L.C., to Horry Telephone Cooperative Inc., at 1 ("DISH Wireless L.L.C. ('DISH Wireless') is not a party to the AT&T or SpaceX agreements, does not own the spectrum licenses being sold to AT&T or SpaceX, and is not entitled to receive any of the spectrum sale proceeds at closing.") (filed Feb. 20, 2026).

[227] Press Release, EchoStar, EchoStar Announces Spectrum Sale and Commercial Agreement with SpaceX (Sept. 8, 2025) https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-commercial-agreement-spacex; Press Release, EchoStar, EchoStar Agrees to Sell Full Unpaired AWS-3 Spectrum License Portfolio to SpaceX, (Nov. 6, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-agrees-sell-full-unpaired-aws-3-spectrum-license; Press Release, EchoStar, EchoStar Announces Spectrum Sale and Hybrid Mobile Network Operator (MNO) Agreement, Steps Toward Resolving Federal Communications Commission's Inquiries, (Aug. 26, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-hybrid-mobile-network.

[228] *See, e.g.*, DQE Communications Petition at 1-3; WIA Comments at 5-6; Letter from Michael D. Saperstein, Jr., Senior Vice President, Government Affairs & Chief Strategy Officer, Wireless Infrastructure Association, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 3-5 (filed Jan. 8, 2026) (WIA Jan. 8, 2026 *Ex Parte*); Letter from Michael D. Saperstein, Jr., Senior Vice President and Chief Strategy Officer, Wireless Infrastructure Association, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 2 (filed Jan. 23, 2026) (WIA Jan. 23, 2026 *Ex Parte*); Letter from Roger Laperna, President and CEO 1 Source Towers, et al., to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 2, (filed Dec. 19, 2025) (Wireless Infrastructure Providers *Ex Parte*); Letter from Jill Sandford, Chief Legal Officer, FirstLight Fiber Inc. to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 2 (filed Dec. 23, 2025) (FirstLight *Ex Parte*); Letter from Todd Schlekeway, President and CEO, NATE: The Communications Infrastructure Contractors Association, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 1-2 (filed Jan. 6, 2026) (NATE *Ex Parte*).  *See also* Letter from John Flynn, Counsel for 1Finity Americas, Inc., to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 3 (filed Jan. 30, 2026) (1Finity Filing) (requesting approval be conditioned on DISH Wireless's assignment of its contractual requirements to AT&T and make 1Finity whole if DISH Wireless cannot meet its contractual obligations); Letter from Suzette Michel, Landowner, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, at 2 (filed Feb. 3, 2026) (Michel *Ex Parte* at 2) (requesting that the FCC clarify that it has not authorized or endorsed a suspension of site rents owed by DISH Wireless).

[229] Letter from Pantelis Michalopoulos, Andrew Golodny, Andrew Magloughlin, Steptoe LLP, Counsel to EchoStar Corporation, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-303, GN Docket No. 25-302, at 1 (filed May 8, 2026) (EchoStar May 8, 2026 *Ex Parte*).

77.    *Discussion*.  Given the unique factual and legal circumstances presented in this transaction and the accompanying one, as well as the record that has developed, we impose a limited escrow or trust fund obligation on EchoStar as a condition of approving these transactions.  As noted above, EchoStar seeks approval to sell the licenses at issue here and in the related AT&T-EchoStar applications for tens of billions of dollars.  However, a number of entities have argued that EchoStar has indicated that it will not pay companies for work—the construction of a new facilities-based nationwide 5G network, including the leasing of space on towers and rooftops to house its antennas—that it was required to undertake as a condition on those licenses.  At the same time, EchoStar disputes claims that have been raised by those companies.  With the attached condition, the FCC continues to allow the relevant parties and, if necessary, courts or other bodies, to adjudicate or settle these issues.  The Commission's unique role in the underlying series of events creates a precedentially novel fact pattern and cognizable public-interest harms specific to this transaction that we find necessary to resolve here.[230]  Therefore, as set forth in more detail in Appendix B, we condition our approval on EchoStar, within 30 days of consummating the transaction, creating a trust fund and depositing $2.4 billion into that fund to help pay obligations potentially incurred in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned or transferred in this transaction..[231]  We find that such a condition is necessary to conclude that the proposed transaction serves the public interest.[232]

78.    *Other Issues Related to Space Station Application*.  Syndicat CFE-CGC Télécom opposes the transaction and raises several concerns arising from SpaceX's proposed D2D system.  These include issues relating to international coordination of the system through the International Telecommunications Union (ITU) process, pre-judging the outcome of the 2027 World Radiocommunications Conference, space safety, harmful interference, and space sustainability.[233]  These issues are unrelated to the instant transaction involving the assignment of terrestrial and earth station licenses.

## IX.    CONCLUSION

79.    Based on our review of the record and our competitive analysis, we conclude that the risk of public interest harms from granting the Applications is low and the potential public interest benefits are significant.  The assignment of approximately 65 megahertz of dedicated spectrum to SpaceX for use in its next generation D2D network represents a major step in expanding spectrum-based connectivity for consumers.  Our grant of the waivers and adoption of rigorous buildout conditions will further establish technological flexibility for SpaceX's deployment and ensure the public interest benefits are realized.  In the near term, consumers will benefit from the advances to D2D services that will result from infusion of this spectrum for D2D, resulting in increased mobile connectivity in hard-to-reach areas.  In the longer term, the transaction has the potential to invigorate wireless competition, as we expect wireless options for consumers to expand with SpaceX's D2D deployment, with the potential to lower prices for wireless offerings.  Further, we expect that the clarity we bring to disputes over this AWS-4, AWS-H Block, and AWS-3 spectrum will result in intensive use of this previously underutilized spectrum.  We also credit the Applicants' claims that by providing EchoStar access to SpaceX's planned D2D service, Boost Mobile's

---

[230] Although EchoStar contends that Commission precedent forecloses the remedy we adopt today, *see* EchoStar May 8, 2026 *Ex Parte*, we find this precedent inapposite and materially different from the unique circumstances presented in this transaction.

[231] *See DISH Modification Order*, 35 FCC Rcd 9580; *T-Mobile-Sprint Order*, 34 FCC Rcd 10578.  An identical condition is being placed on WTB's approval of EchoStar's assignment of licenses to AT&T in WT Docket No. 25-303.  Only one fund is required to be created, and only $2.4 billion is required to be placed into the fund.

[232] We also note that the Bureaus and the Commission retain full authority to apply all appropriate sanctions and remedies for a violation of the conditions contained in this Order.

[233] Syndicat CFE-CGC Télécom Comments at 2-3.

customers will benefit from a greater availability of service.  We thus conclude that the proposed transaction would serve the public interest, convenience, and necessity.  We further find that, given the unique circumstances present here, granting the requested waivers of the terrestrial construction requirements, as conditioned; the discontinuance rule to the extent necessary; and the 180-day consummation rules is in the public interest and would ensure that the spectrum at issue is not unused or underutilized.

## X.      ORDERING CLAUSES

80.      ACCORDINGLY, having reviewed the Applications and record in this matter, **IT IS ORDERED** that, pursuant to sections 4(i) and (j), 5(c), 303(r), 309, and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 155(c) 303(r), 309, 310(d), and pursuant to the authority delegated under sections 0.51, 0.131, 0.261, and 0.331 of the Commission's rules, 47 CFR §§ 0.51, 0.131, 0.261, and 0.331, the applications for consent to assignment filed by SpaceX and EchoStar **ARE GRANTED**, to the extent specified in the Memorandum Opinion and Order and **SUBJECT TO** the conditions specified herein.

81.      **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j), 303(r), 309, and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), (j), 303(r), 309, 310(d), the Petition to Deny filed by Frequency Forward, **IS DENIED** for the reasons stated herein.

82.      **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j) of the Communications Act of 1934 as amended, 47 U.S.C. § 154(i), (j) and sections 1.3 and 1.925 of the Commission's rules, 47 CFR §§ 1.3, 1.925(a), the waiver request concerning the terrestrial construction requirements currently applicable to EchoStar's AWS-4, AWS-H Block and unpaired AWS-3 licenses, and requirements in section 27.14(q), (r), and (s) of the Commission's rules, 47 CFR § 27.14(q), (r), (s), **IS GRANTED** to the extent described herein and **SUBJECT TO** the conditions described herein.

83.      **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j) of the Communications Act of 1934 as amended, 47 U.S.C. § 154(i), (j) and sections 1.3 and 1.925 of the Commission's rules, 47 CFR §§ 1.3 and 1.925, the waiver request concerning the MSS allocation under section 2.106 of the Commission's rules, 47 CFR § 2.106, **IS DEFERRED** to GN Docket No. 25-340 to the extent described herein.

84.      **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j) of the Communications Act of 1934 as amended, 47 U.S.C. § 154(i), (j) and sections 1.3 and 1.925 of the Commission's rules, 47 CFR §§ 1.3 and 1.925, the waiver request concerning the use of end-user handsets using the AWS-4 Band under section 25.115 of the Commission's rules, 47 CFR § 25.115, **IS DEFERRED** to GN Docket. No. 25-340 to the extent described herein.

85.      **IT IS FURTHER ORDERED** that, pursuant to sections 4(i) and (j) of the Communications Act of 1934 as amended, 47 U.S.C. § 154(i), (j) and sections 1.3 and 1.925 of the Commission's rules, 47 CFR §§ 1.3 and 1.925, partial waiver of the consummation periods under sections 1.948(d) and 25.119(f) of Commission's rules, 47 CFR §§ 1.948(d) and 25.119(f), **IS GRANTED** to the extent described herein.

86.      **IT IS FURTHER ORDERED** that this Memorandum Opinion and Order **SHALL BE EFFECTIVE** upon adoption.  Petitions for Reconsideration under section 1.106 of the Commission's Rules, 47 CFR § 1.106, may be filed within thirty days of the date of adoption of this Memorandum Opinion and Order.

87.    This action is taken under delegated authority pursuant to sections 0.51, 0.131, 0.261 and 0.331 of the Commission's rules, 47 CFR §§ 0.51, 0.131, 0.261, 0.331.

FEDERAL COMMUNICATIONS COMMISSION

Joel Taubenblatt
Chief, Wireless Telecommunications Bureau

Jay Schwarz
Chief, Space Bureau

37

Federal Communications Commission                                          DA 26-471

**APPENDIX A**
**Petitioners and Commenters**
**(GN Docket No. 25-302)**

**Petition to Deny**
Frequency Forward, Petition to Deny (rec. Oct. 30, 2025)

**Petition to Condition**
DQE Communications LLC Petition to Condition Assignment of Certain Spectrum and Earth Station Licenses (rec. Dec. 15, 2025)

**Oppositions Co-Filed with Comments**
Information Technology and Innovation Foundation, Comment and Opposition to Petitions to Deny (rec. Dec. 3, 2025)
SpaceX, Consolidated Opposition to Petitions and Response to Comments (rec. Dec. 29, 2025)
EchoStar Corporation, Consolidated Opposition to Petition and Reply Comments (rec. Dec. 29, 2025)

**Comments**
Syndicat CFE- CGC Télécom, Comments (rec. Dec. 15, 2025)
Satelio IOT Services USA, Inc., Comments  (rec. Dec. 15, 2025)
Rural Wireless Association, Inc., Comments (rec. Dec. 15, 2025)
Open Technology Institute at New America and Public Knowledge, Comments (rec. Dec. 15, 2025)
Liberty Latin America LTD, Comments (rec. Dec. 15, 2025)
Wireless Infrastructure Association, Comments (rec. Dec. 15, 2025)

**Replies**
Liberty Latin America LTD., Reply Comments (rec. Jan. 8, 2026)
DQE Communications LLC, Reply Comments (rec. Jan. 8, 2026)
Frequency Forward, Reply Comments (rec. Jan. 8, 2026)
Rural Wireless Association, Inc., Reply Comments (rec. Jan. 8, 2026)

***Ex Parte* Submissions**[1]
SpaceX, *Ex Parte* Submission (Nov. 18, 2025)
EchoStar Corporation, *Ex Parte* Submission (Dec. 3, 2025)
Small and Medium-sized Infrastructure Providers, *Ex Parte* Submission (Dec. 19, 2025)
FirstLight Fiber, Inc., *Ex Parte* Submission (Dec. 23, 2025)
NATE: The Communications Infrastructure Contractors Association, *Ex Parte* Submission (Jan. 6, 2026)
FirstLight, Fiber, Inc., *Ex Parte* Submission (Jan. 7, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Jan. 8, 2026)
TowerNorth Development, LLC, *Ex Parte* Submission (Jan. 20, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Jan. 20, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Jan. 22, 2026)
1Finity Americas, Inc., *Ex Parte* Submission (Jan. 30, 2026)
Suzette Michel, *Ex Parte* Submission (Feb. 3, 2026)
SpaceX, *Ex Parte* Submission (Feb. 6, 2026)
KSS Investments LLC, Comment (Feb. 13, 2026)

---

[1] Filings listed in this section that were submitted after the January 8, 2026, close of the pleading cycle for this transaction by their respective filers are accorded the same consideration as *ex parte* filings under the Commission's rules.  47 CFR §§ 1.1200 *et seq.*; *see generally* 47 CFR § 1.419(b).

Litan Salman, Reuven Salman, and Clifford Steinberg, *Ex Parte* Submission (Feb. 17, 2026)
The American Wireless Builders Coalition, *Ex Parte* Submission (Feb. 19, 2026)
Horry Telephone Cooperative, Inc., *Ex Parte* Submission (Feb. 20, 2026)
Liberty Latin America Ltd., *Ex Parte* Submission (Feb. 20, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Feb. 23, 2026)
American Tower Corporation, *Ex Parte* Submission (Feb. 25, 2026)
SpaceX, *Ex Parte* Submission (Mar. 2, 2026)
Center for American Rights, *Ex Parte* Submission (Mar. 10, 2026)
Wireless Infrastructure Assocition, *Ex Parte* Submission (Mar. 11, 2026)
Bull Moose Project, *Ex Parte* Submission (Mar. 11, 2026)
Nickolai Bakken, *Ex Parte* Submission (Mar. 16, 2026)
Zada Realty LLC, Comment (Mar. 25, 2026)
Daniel Rahimzada, Zada Realty LLC, Comment (Mar. 26, 2026)
Daniel Rahimzada, Zada Realty LLC, Comment (Mar. 26, 2026)
Center for American Rights, *Ex Parte* Submission (Mar. 31, 2026)
PROTEC, *Ex Parte* Submission (Apr., 14, 2026)
Space Exploration Technologies Corp., EchoStar Corporation, Spectrum Business Trust 2025-1, *Ex Parte* Submission (Apr. 15, 2026)
520 West 20 LLC, Comment (Apr. 29, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (Apr. 29, 2026)
Wireless Infrastructure Association, *Ex Parte* Submission (May 1, 2026)
EchoStar Corporation, *Ex Parte* Submission (May 8, 2026)
332 Gates LLC and the Board of Managers of the 322 Gates Condominium, Comment (May 11, 2026)
John Freund, Comment (May 11, 2026)

**APPENDIX B**

1.        Within 30 days of consummating the assignment to AT&T of the licenses at issue in the AT&T/EchoStar proceeding[1] (the Consummation Date), EchoStar shall establish and deposit $2.4 billion into a trust (the Fund) to be used to pay certain obligations potentially incurred in connection with the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned or transferred in this transaction.  The trustee of the Fund (Trustee) shall be authorized to reasonably undertake any actions that are necessary and proper and solely intended to effectuate the purposes identified herein.  The terms of the Fund (including the amount of compensation for the Trustee) and any governing documents and the selection of the Trustee must be submitted to and approved by the Wireless Telecommunications Bureau (the Bureau).

2.        Within 30 days of the Consummation Date, EchoStar shall select the Trustee, who must (a) be a neutral third-party, free of any conflicts of interest, including but not limited to not having any financial interests in EchoStar, AT&T, or SpaceX or any of its subsidiaries or affiliates; (b) have experience serving as trustee for trusts in excess of $500 million in assets; and (c) be insured in an amount reasonably commensurate with insured amounts for trustees of funds similar in size to the Fund.  The Trustee may not have been employed by EchoStar, AT&T, or SpaceX or any of its subsidiaries or affiliates within the past five years.  Any employees or agents of the Trustee also shall have no conflicts of interest and not have been employed by EchoStar, AT&T, or SpaceX or any of its subsidiaries or affiliates within the past five years.

3.        The Trustee shall, within 30 days of being selected, establish a process for filing claims with the Fund, including, without limitation, establishing a website providing instructions for filing a claim, and begin accepting claims (the Claims Opening Date).

4.        EchoStar shall give notice within 30 days of the Claims Opening Date to all creditors of DISH Wireless LLC of establishment of the Fund and the Internet address of the website established by the Trustee.

5.        A person or entity (Claimant), who has a final judgment or arbitration award against or a settlement with EchoStar Corp., DISH Network Corp., DISH Wireless LLC, and/or any other EchoStar subsidiary or affiliate for amounts due it for the construction, operation, maintenance, building, decommissioning, and/or provisioning of goods or services related to or arising out of the communications sites and/or communications network associated with certain of the licenses being assigned in the transaction at issue[2] (collectively, the Covered Activities), may file a claim with the Fund

---

[1] *See* Applications of AT&T Mobility II LLC and EchoStar Corporation for Consent to Assign Licenses, WT Docket No. 25-303, ULS File Nos. 0011749148 (lead application), 0011749151, 0011749122 and paper applications filed in ECFS File Nos. 50001WTAA25 and 50002WTAA25 (filed Sept. 18, 2025).  ULS File No. 0011944971 was filed in ULS to replace ECFS File Nos. 50001WTAA25 and 50002WTAA25 (filed March 13, 2026).

[2] *See Applications of T-Mobile US, Inc., and Sprint Corporation, For Consent To Transfer Control of Licenses and Authorizations, WT Docket No. 18-197, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, ULS File Nos. 0008741236, 0008741420, 0008741603, and 0008741789 et al., WT Docket No. 18-197, Order of Modification and Extension of Time to Construct, 35 FCC Rcd 9580 (WTB 2020); *Applications of T-Mobile US, Inc., and Sprint Corporation, For Consent To Transfer Control of Licenses and Authorizations, WT Docket No. 18-197, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, ULS File Nos. 0008741236, 0008741420, 0008741603, and 0008741789 et al., WT Docket No. 18-197, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578 (2019).  For the avoidance of doubt, Covered Activities are not limited to those activities necessary to meet the minimum requirements of the conditions placed on these licenses.

40

(a Fund Claim).[3]  For the avoidance of doubt, Covered Activities include amounts expended or reasonably expected to be expended by the termination of EchoStar's operation of its network (e.g., costs for decommissioning towers and cell sites, costs for electricity used); and for lost future or profits and other amounts (e.g., future taxes, insurance, etc.) due under agreements (including leases) for operating the network that have been terminated, and/or costs incurred that the Claimant reasonably expected to be repaid out of future receipts.

6.      A Claimant may file only one Fund Claim, which shall include all claims for which the Claimant and its affiliates seek to pursue recovery from the Fund (for the avoidance of doubt, applicable claims not included in the Fund Claim filed by a Claimant shall be unrecoverable from the Fund).

7.      Fund Claims shall be categorized as follows:  Type A Claims are those claims that seek $100,000 or less in total for amounts owed for Covered Activities.  Type B Claims are those that seek more than $100,000 for amounts owed for Covered Activities and are further split into two types.  Type B-1 Claims are those portions of a Type B claim that are (i) for outstanding amounts due as of December 31, 2025, or the date the Claimant received notice from EchoStar that EchoStar would no longer fulfill its commitments under the agreement underlying the claim (whichever is earlier) for Covered Activities and/or (ii) for amounts expended or reasonably expected to be expended by the completion of the Covered Activities (e.g., costs for decommissioning towers and cell sites, costs for electricity used).  Type B-2 Claims are those portions of a Type B claim that are for lost future rents or profits and other future amounts (e.g., future taxes, insurance, etc.) due under agreements (including leases) for Covered Activities that have been terminated, and/or costs incurred for Covered Activities that the Claimant reasonably expected to be repaid out of future receipts.

8.      By filing a Fund Claim, a Claimant, and to the extent applicable any affiliates thereof, agrees that it waives any legal rights it may have against EchoStar Corp., DISH Network Corp., DISH Wireless LLC, and/or another EchoStar subsidiary or affiliate to otherwise recover against or enforce the judgment(s), arbitration award(s), or settlement(s) on which the Fund Claim is based.

9.      The Trustee shall verify the validity and eligibility of a Fund Claim.  If a portion of a Fund Claim is invalid or ineligible, only the valid and eligible portion shall be considered a Fund Claim.  The Bureau retains jurisdiction to require the modification of the process described in this appendix, including, without limitation, regarding the determination of a Fund Claim.

10.      The Trustee shall pay out the funds of the Fund as follows: the Trustee shall pay the Fund's reasonable expenses (including his or her own reasonable compensation) as they become due, no more often than once per month.  The Trustee shall pay Type A Claims as he or she determines that they are valid and eligible for payment.  Every six (6) months, starting six (6) months after the Claims Opening Date, the Trustee shall determine whether the Fund has sufficient money to pay in full all of the pending Type B-1 Claims (after payment of the Fund's reasonable expenses and the Type A Claims).  If so, then the Trustee shall pay the pending Type B-1 Claims; if not, then the Trustee shall pay the pending Type B1 Claims pro rata.  After five (5) years from the Claims Opening Date, the Trustee shall determine whether the Fund has sufficient money to pay all of the Type B-2 Claims in full (after payment of the Fund's reasonable expenses and the Type A Claims and the Type B-1 Claims).  If so, the Trustee shall pay the Type B-2 Claims; if not, the Trustee shall pay the Type B-2 Claims pro rata (retaining sufficient monies to pay the Fund's closing expenses).  If any monies remain in the Fund, upon request of the Trustee or a potential Claimant, the Bureau may order that the Fund remain open for additional time.  If there is no such request or the Bureau does not so order, the Trustee shall close the Fund, pay its final expenses, and pay any remaining monies to EchoStar.

---

[3] For the avoidance of doubt, a Fund Claim includes final court judgments and arbitration awards and settlements for Covered Activities regardless whether they are based on contract law, principles of *quantum* meruit, or other similar contract or quasi-contract legal principles.

41

## APPENDIX C
## SpaceX Buildout Commitments



May 12, 2026

**BY ELECTRONIC FILING**

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, DC 20554

Re: *Applications of Spectrum Business Trust 2025-1, Space Exploration Technologies Corp., and EchoStar Corporation for Consent to Assign Spectrum and Earth Station Licenses*, GN Docket No. 25-302

Dear Ms. Dortch,

      To support its waiver requests[1] in the above referenced proceeding, SpaceX voluntarily commits to meet the following performance metrics per spectrum block[2] for downlink quality of service signal-to-interference-plus-noise ratio ("SINR"); uplink user throughput; and spectral efficiency. Each metric will be met with respect to each license.

| Downlink Quality of Service (SINR) | |
|---|---|
| First Interim Performance Requirement (2 years from the Effective Date[3]) | SINR of 5 dB; Service Availability[4] of 70% of the time in 90% of the total geographic area of each Basic Economic Area ("BEA") license[5] |
| Second Interim Performance Requirement (4 years from the Effective Date) | SINR of 5 dB; Service Availability of 80% of the time in 90% of the total geographic area of each BEA license |
| Final Interim Performance Requirement (9 years from the Effective Date) | SINR of 10 dB; Service Availability of 90% of the time in 90% of the geographic area of each BEA license |

---

[1] See *Applications of Spectrum Business Trust 2025-1, Space Exploration Technologies Corp., and EchoStar Corporation*, WT Docket No. 25-302, Amended Exhibit B - Waivers (Nov. 20, 2025).

[2] The AWS-4 band is two blocks (Block A: 2000-2010 and 2180-2190 MHz; Block B: 2010-2020 MHz and 2190-2200 MHz); AWS-3 unpaired spectrum is two blocks (1695-1700 and 1700-1710 MHz); and the AWS-H block is two blocks (1915-1920 and 1995-2000 MHz). Due to the current lack of 3GPP standardization for 1915-1920 MHz, additional time may be needed to meet applicable performance metrics to account for availability of compatible user devices.

[3] "Effective Date" means November 30, 2027.

[4] "Service Availability" is a user receiving the signal (SINR) or a user transmitting the signal (uplink user throughput) at a point in the covered geographic area at the applicable percentage of the time (as detailed in the tables herein), when the user is outdoors.

[5] For purposes of meeting any metric by geographic area, the relevant geographic area is the one associated with the AWS-3, AWS-4 and AWS-H block terrestrial licenses, i.e., the Basic Economic Area.

1

**Federal Communications Commission**                                **DA 26-471**



| Uplink User Throughput | |
|---|---|
| First Interim Performance Requirement (2 years from the Effective Date) | 5th percentile user throughput of at least 100 kbps/MHz in the uplink over 90% of the geographic area at Service Availability of 70% of the time |
| Second Interim Performance Requirement (4 years from the Effective Date) | 5th percentile user throughput of at least 200 kbps/MHz in the uplink over 90% of the geographic area at Service Availability of 80% of the time |
| Final Interim Performance Requirement (9 years from the Effective Date) | 5th percentile user throughput of at least 300 kbps/MHz in the uplink over 90% of the geographic area at Service Availability of 90% of the time |
| Spectral Efficiency | |
| First Interim Performance Requirement (2 years from the Effective Date) | 300 kbps/MHz/beam in the downlink and 100 kbps/MHz/beam in the uplink |
| Final Performance Requirement (9 years from the Effective Date) | 600 kbps/MHz/beam in the downlink and 200 kbps/MHz/beam in the uplink |

## Verification

SpaceX will demonstrate compliance with the performance metrics with respect to each license (e.g., per spectrum block and per BEA) for Downlink Quality of Service (SINR); Uplink User Throughput; and Spectral Efficiency by filing a construction notification with the Commission in accordance with the provisions set forth in Section 1.946(d) of the Commission's rules within 30 days of each commitment deadline. In its construction notification, SpaceX will certify whether it has met the performance requirements and file documentation to support its claim.

SpaceX will submit measurements and/or data representing service to customers to verify its compliance with each milestone. At least nine (9) months before SpaceX's two-year milestone (the First Interim Performance Requirement), SpaceX will submit for Wireless Telecommunications Bureau ("WTB") approval a plan describing the type of measurements and/or data that SpaceX will be required to submit to verify compliance, which shall be based on industry-standard practices (e.g., on-the-ground test results via a sampling methodology; network logs; or crowd-sourced data). SpaceX will submit the required verification measurements and/or data within six (6) months of each milestone.

2

43



### Enforcement

SpaceX proposes the following license conditions in connection with the voluntary commitments above:

- If the WTB and Space Bureau (the Bureaus) determine that SpaceX has failed to meet all of the First Interim Performance Requirements listed above (Downlink Quality of-Service (SINR); Uplink User Throughput; and Spectral Efficiency) for a particular license, the deadline for all of the Final Performance Requirements for that license will be accelerated by one (1) year (i.e., the Final Performance Requirements must be met eight (8) years after the Effective Date, rather than nine (9) years after the Effective Date).

- If the Bureaus determine that SpaceX has failed to meet all of the Second Interim Performance Requirements (Downlink Quality of Service (SINR) and Uplink User Throughput) for a particular license, the deadline for the Final Performance Requirements for that license will be accelerated by two (2) years. This acceleration will be cumulative to any acceleration if the First Interim Performance Requirements were not met. For example, the Final Performance Requirements must be met seven (7) years from the Effective Date for that license, rather than nine (9) years after the Effective Date; or if the First Interim Performance Requirements were not met, the Final Performance Requirements must be met by six (6) years, rather than nine (9) years after the Effective Date.

- If the Bureaus determine that SpaceX has failed to meet all of the Final Buildout Requirements for a particular license, upon such determination, SpaceX's license for such license area shall terminate automatically without Commission action, and SpaceX shall be ineligible to regain it if the Commission makes the license available at a later date.

SpaceX looks forward to continuing to work with the Commission to advance the efficient use of spectrum and ensure delivery of meaningful services to consumers everywhere.

Sincerely,

*/s/ David Goldman*

David Goldman
Vice President, Satellite Policy

SPACE EXPLORATION TECHNOLOGIES CORP.
1155 F Street, N.W.
Suite 475
Washington, DC 20004
Tel: 202-649-2641
Email: David.Goldman@spacex.com

3