**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DISH DBS CORPORATION, | ) | Case No. 26-90627 (CML) |
| DISH WIRELESS L.L.C., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | (Joint Administration Requested) |

**DISH WIRELESS DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING, BUT NOT DIRECTING, THE DISH WIRELESS DEBTORS TO
OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE
AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-five days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-five days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The DISH Wireless Debtors[2] state as follows in support of this motion (this "**Motion**"):[3]

---

[1]   The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388.  A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/DBS.  The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

[2]   The "**DISH Wireless Debtors**" include: (a) Neyland Networks LLC; (b) DISH Wireless L.L.C. ("**DWLLC**"); (c) DISH Wireless Leasing L.L.C.; (d) DISH Wireless Retail Holding L.L.C.; (e) DISH Infinite Corporation; and (f) DISH Wireless Retail Operating L.L.C.  For the avoidance of doubt, the DISH Wireless Debtors are only seeking relief under this Motion with respect to the DISH Wireless Debtors and not the DBS Debtors (as defined in the First Day Declaration (as defined below) and, together with the DISH Wireless Debtors, the "**Debtors**").

[3]   A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of John Swieringa in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed concurrently herewith.  Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the First Day Declaration.

**Relief Requested**

1.    The DISH Wireless Debtors request entry of a final order, substantially in the form

attached hereto as **Exhibit A** (the "**Proposed Order**"), granting the following relief:

- authorizing DWLLC (the "**DIP Borrower**"), as borrower, to obtain postpetition financing pursuant to a secured, multi-draw debtor-in-possession term loan facility (the "**DIP Facility**"), consisting of loans in an aggregate principal amount of up to $85,000,000 (the commitments in respect thereof, the "**DIP Commitments**" and such loans, the "**DIP Loans**") from EchoStar Corporation, as lender (the "**DIP Lender**"), which shall be immediately available to the DIP Borrower upon entry of the Proposed Order, subject to the terms and conditions set forth in that certain Debtor-in-Possession Loan and Security Agreement, attached to the Proposed Order as **Exhibit A** and dated as of June 30, 2026 (as the same may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**DIP Credit Agreement**"[4] and, together with all agreements, documents, and instruments delivered or executed in connection therewith, the "**DIP Documents**"), by and among the DIP Borrower, the DIP Guarantors (as defined below), and the DIP Lender;

- authorizing each of the DISH Wireless Debtors other than the DIP Borrower (collectively, the "**DIP Guarantors**" and, together with the DIP Borrower, the "**DIP Loan Parties**") to guarantee, on an unconditional joint and several basis, the principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts (including, without limitation, all Secured Obligations (as defined in the DIP Credit Agreement)), as and when due and payable under the DIP Credit Agreement (collectively, the "**DIP Obligations**");

- authorizing the DIP Loan Parties to execute, deliver, and perform under the DIP Credit Agreement and the other DIP Documents, and to perform such other and further acts as may be necessary or desirable in connection with the Proposed Order, the DIP Documents, and the transactions contemplated thereby;

- authorizing the DIP Borrower to use the proceeds of the DIP Facility and the DIP Collateral (as defined below) (i) to pay fees, interest, and other amounts payable under the DIP Documents and (ii) solely in accordance with the DIP Documents and the Approved Budget (as defined below), subject to the Permitted Variances (as defined in the DIP Credit Agreement), in form and substance reasonably acceptable to the DIP Lender, (A) to pay reasonable and documented transaction and administrative costs, fees, and expenses that are incurred in connection with the above-captioned chapter 11 cases (the "**Chapter 11 Cases**" or the "**Cases**") (including funding the Carve Out (as defined in the Proposed Order)), (B) for working capital and general corporate purposes of the DIP Loan Parties, including

---

[4]    Capitalized terms used and not otherwise defined in this Motion shall have the meanings ascribed to such terms in the DIP Credit Agreement.

costs and expenses related to the ongoing orderly Decommissioning (as defined below) of the DISH Wireless Debtors' extensive physical infrastructure, and (C) for such other purposes as may be detailed in the Approved Budget (subject to the Permitted Variances);

- granting to the DIP Lender, and authorizing the DIP Loan Parties to incur, valid, enforceable, binding, non-avoidable, and fully perfected security interests in and liens on all DIP Collateral (the "**DIP Liens**") as security for the DIP Obligations, in each case, in accordance with and subject to the relative rights and priorities of (i) the Carve Out and (ii) with respect to the Prepetition Collateral, the Prepetition Liens (as defined below), *provided that*, with respect to Deposit Accounts, Securities Accounts, and Commodity Accounts, a security interest therein may only be perfected by "control" within the meaning of the UCC absent a control agreement;

- granting to the DIP Lender allowed superpriority administrative expense claims against each of the DISH Wireless Debtors' estates with respect to the DIP Obligations, with priority over any and all other administrative expenses of any kind or nature, which superpriority claims shall be (i) junior to the Carve Out, (ii) with respect to the Prepetition Collateral, junior to the Prepetition Secured Loan Claims (as defined in the Proposed Order), (iii) with respect to the Apple Securities Account, junior to any claims of Apple, Inc., and (iv) recoverable from proceeds of any Avoidance Actions (as defined in the DIP Credit Agreement), on the terms and conditions set forth herein and in the DIP Documents (the "**DIP Superpriority Claims**");

- modifying the automatic stay imposed by section 362 of title 11, United States Code (the "**Bankruptcy Code**") to the extent necessary to implement and effectuate the terms and provisions of the Proposed Order and the DIP Documents, and waiving any applicable stay (including under Fed. R. Bankr. P. 6004) with respect to the effectiveness and enforceability of the Proposed Order, and providing for immediate effectiveness of the Proposed Order upon entry thereof; and

- granting related relief.

### Jurisdiction, Venue, and Predicates for Relief

2.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  The DISH Wireless Debtors confirm their consent to the entry of a final order by the Court.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3

3.      The predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c) and 507(b) of the Bankruptcy Code, rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 1075-1, 2002-1, 4001-1(b), 4002-1, 9013-1, and 9037-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

**Background**

4.      **Overview of Chapter 11 Cases**.  On June 30, 2026 (the "**Petition Date**"), each Debtor filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committee has been appointed.

5.      The Debtors are subsidiaries of EchoStar Corporation (NASDAQ: ECHO) ("**EchoStar**" and, together with its Debtor and non-Debtor subsidiaries, the "**Company**"), which is not itself a Debtor in these cases.  EchoStar was founded in 1980 and provides pay-TV, wireless, and internet services to millions of customers, having pioneered technological advancements that redefined those industries.  As of the Petition Date, the Company has approximately 10,400 employees in the United States and serves more than 6 million pay-TV subscribers, approximately 7 million wireless subscribers, and approximately 641,000 broadband subscribers.  The Debtors comprise two of the Company's business segments.  The DBS Debtors operate the Company's Pay-TV segment, which includes DISH®- and Sling TV®- branded pay-TV services.  In 2025, Pay-TV generated operating income of $2.4 billion on revenue of $9.7 billion.  From 2020 to 2025,

the DISH Wireless Debtors, led by DWLLC, operated the Company's Wireless segment under the Boost Mobile® and Gen Mobile® brands.

6.      The DBS Debtors commenced these prepackaged Chapter 11 Cases to implement a global resolution of disputes with holders of their debt securities pursuant to the Restructuring Support Agreement dated as of March 19, 2026 (the "**RSA**"), which is supported by holders of approximately 88.3% of the $9.75 billion in aggregate principal amount of the DBS Debtors' secured and unsecured notes.  In accordance with the RSA, the joint prepackaged chapter 11 plan filed concurrently with this Motion (the "**Plan**") deleverages the DBS Debtors' balance sheet by providing for the reduction of the aggregate principal balance of the DBS Debtors' funded debt obligations from $9.75 billion to $5.0 billion, as such balance may be further reduced by a sweep of available cash of the DBS Debtors in excess of $500 million, commencing with the fiscal quarter ended March 31, 2027, to redeem up to the entire aggregate principal balance of the $2.5 billion of  5.750% senior secured notes due 2028.

7.      The DISH Wireless Debtors commenced these Chapter 11 Cases, as contemplated by the RSA, concurrently with the DBS Debtors to address billions of dollars of disputed claims asserted by tower lease and other 5G network infrastructure creditors following EchoStar's entry into definitive agreements to sell spectrum licenses to AT&T and SpaceX, as directed by the Federal Communications Commission (the "**FCC**") to resolve its investigation of EchoStar's use of spectrum.  The sales, which the Wireless Telecommunications Bureau (the "**Bureau**") of the FCC approved on May 12, 2026, will dispose of the spectrum licenses on which the DISH Wireless Debtors relied to operate more than 24,000 tower sites that the DISH Wireless Debtors built from the ground up at a cost of more than $13 billion—plus an additional $3 billion invested in the buildout by EchoStar's non-Debtor subsidiaries—between 2020 and 2025.   The Bureau

conditioned approval of the FCC-directed sales on EchoStar's establishment of a trust funded with $2.4 billion to pay qualifying judicially determined or settled claims related to the 5G Network (the "**FCC Trust**"), which was established by EchoStar on June 26, 2026. The Chapter 11 Cases afford holders of claims against the DISH Wireless Debtors a centralized forum to assert, liquidate, and recover against the DISH Wireless Debtors—subject to the DISH Wireless Debtors' defenses—or obtain judicially determined claims for submission to and evaluation and potential payment by the FCC Trust.

8. **Formation of the Special Committee**. On February 26, 2026, in anticipation of entry into the RSA, the Company appointed Gerard Uzzi and Vikram Jindal to the Board of Managers of DWLLC as independent managers (the "**Independent Managers**"). On March 3, 2026, DWLLC established a special committee of the Board of Managers composed of the Independent Managers (the "**DWLLC Special Committee**"). First Day Decl. ¶ 18. The Board of Managers delegated to the Special Committee authority to: (a) review and evaluate DWLLC's capital structure, assets, liabilities, operations, liquidity, and general financial condition and to consider, evaluate, and negotiate financing transactions, restructuring transactions, and/or other strategic alternatives for DWLLC and its stakeholders, including the possibilities of undertaking a strategic, restructuring, financing, and/or any sale transaction or series of such transactions (each, a "**Transaction**") involving DWLLC or its subsidiaries, and approve and implement any such Transaction, in each case to the extent that the Board of Managers or the Special Committee reasonably determines that such matter or matters present an actual or potential conflict of interest between DWLLC or its subsidiaries, on the one hand, and EchoStar or one or more of its subsidiaries (other than DWLLC or its subsidiaries), on the other hand; (b) conduct an independent investigation and assess the merits and potential value of any potential claims and causes of action

held by DWLLC or its subsidiaries against one or more of EchoStar or its subsidiaries (other than DWLLC or its subsidiaries); and (c) take any and all actions necessary or desirable in connection with the foregoing, including the authority to retain independent advisors.  *Id*.  ¶ 102.

9.      **The Decommissioning**.  As a result of the FCC-directed spectrum sales described above, DWLLC can no longer operate the 5G open radio access network (the "**5G Network**") that the DISH Wireless Debtors had invested more than $13 billion in developing.  *See supra* ¶ 7; First Day Decl. ¶ 24.  The sales also forced the Company to begin transitioning its Boost Mobile subscribers to third-party networks and converting its operations to those of a hybrid mobile network operator ("**Hybrid MNO**").[5]  First Day Decl. ¶ 12.  In light of the Company's transition to Hybrid MNO operations, the DISH Wireless Debtors no longer have any business operations for which they can make use of their physical infrastructure across more than 24,000 cell sites throughout the United States.  First Day Decl. ¶¶ 57, 70.  Accordingly, the DISH Wireless Debtors are in the process of decommissioning that physical infrastructure (the "**Decommissioning**").  The Decommissioning involves taking offline thousands of tower sites, retrieving and relocating equipment to forward stocking locations and other warehouses, remediating any associated property damage, and addressing obligations to tower landlords and other counterparties.  First Day Decl. ¶ 57.

10.      **The Sale Transaction**.  The DISH Wireless Debtors are also pursuing a sale of substantially all of their assets in accordance with the terms of that certain Asset Purchase Agreement, dated as of June 30, 2026 (the "**Stalking Horse Agreement**").   In connection with providing the DIP Facility, EchoStar has agreed to serve as the stalking horse bidder (the "**Stalking**

---

[5]     A hybrid mobile network operator is a telecom provider that owns and operates certain core network functions, such as the software systems that authenticate subscribers and process calls, texts and data, while relying on third-party carriers to provide the spectrum frequencies and cell sites that actually deliver wireless service to subscribers' devices.

**Horse Bidder**").  The Stalking Horse Agreement contemplates that, as the Stalking Horse Bidder, EchoStar will be entitled to credit bid any outstanding DIP Obligations against the $300,000,000 cash portion of its purchase price.  EchoStar shall not be entitled to any bid protections in connection with serving as the Stalking Horse Bidder.

11.      **The Need For Financing**.  Completion of the Decommissioning requires payments to numerous vendors on a regular basis.  Historically, vendor payments were remitted by non-Debtor affiliate, DISH Network Corporation ("**DNC**"), on behalf of the DISH Wireless Debtors pursuant to that certain shared services agreement dated May 5, 2026 (the "**Shared Services Agreement**"), as further described in the Shared Services Motion.[6]  Because the Decommissioning at times requires the DISH Wireless Debtors to engage with and pay counterparties directly and on short notice—including in connection with taking offline thousands of tower sites across the country, interacting with uncooperative landlords, and addressing other obstacles—the DISH Wireless Debtors determined they needed direct access to cash, rather than solely relying on DNC to fund disbursements under the Shared Services Agreement.  Accordingly, on April 21, 2026, following deliberation and approval by the Special Committee, DISH DBS Corporation ("**DBS**"), as lender, and DWLLC, as borrower, entered into the Prepetition Secured Loan Agreement in respect of the Prepetition Secured Loan Facility (each as defined and described in greater detail below), the proceeds of which DWLLC used to, among other things, make payments to vendors.

12.      As the Decommissioning progressed, the DISH Wireless Debtors, with the assistance of their advisors, determined that the proceeds of the Prepetition Secured Loan Facility

---

[6]   Additionally, in certain cases, vendors involved in the DISH Wireless Debtors' Decommissioning efforts are paid directly by the DISH Wireless Debtors, as described in the *DISH Wireless Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the DISH Wireless Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and (B) Lien Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders and Authorizing the Debtors to Satisfy Such Obligations, and (III) Granting Related Relief.*

would not be sufficient to complete the Decommissioning, fund the administration of these Chapter 11 Cases, and consummate a value-maximizing sale of the DISH Wireless Debtors' assets. The Debtors accordingly negotiated the terms of the DIP Facility with the DIP Lender prior to the Petition Date and were prepared to seek emergency interim approval thereof on the first day of these cases.

13.     One day before the Petition Date, DWLLC received approximately $56 million in unrestricted cash that had been held in the Apple Securities Account (such cash, the "**Released Funds**").  While the Released Funds provide sufficient near-term liquidity to fund operations and the administration of these Cases in the immediate term, they do not eliminate the need for the DIP Facility.  As detailed in the Approved Budget, the DISH Wireless Debtors' total projected cash needs through the conclusion of these Cases (including for payment of ongoing Decommissioning costs, chapter 11 administrative expenses, professional fees, and costs associated with the Sale Transaction) exceed the $56 million of Released Funds received.  The DIP Facility provides the committed liquidity backstop that the DISH Wireless Debtors will need as these Cases progress and expenditures accumulate.  The DIP Credit Agreement also provides that, at the DIP Lender's election, any Released Funds (or future releases from the Apple Securities Account) may be applied to prepay outstanding DIP Loans or permanently reduce the Total Commitment (as defined in the DIP Credit Agreement) on a dollar-for-dollar basis, ensuring that the DIP commitment scales down to the extent liquidity from the Apple Securities Account becomes available.

14.     Because the Released Funds provide sufficient near-term liquidity, the DISH Wireless Debtors are seeking approval of the DIP Facility on a final basis (rather than on an emergency interim basis), following a twenty-one day notice period.

**Summary of Terms of DIP Facility and Use of Cash Collateral**

15.     In accordance with Bankruptcy Rules 4001(b)-(d) and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Procedures**"), as incorporated by Bankruptcy Local Rule 1075-1, the below chart summarizes the significant terms of the DIP Facility, with references to the applicable sections of the relevant DIP Documents.[7]

| Material Term | DIP Facility |
|---|---|
| **DIP Borrower** Bankruptcy Rule 4001(c)(1)(B) | DWLLC. DIP Credit Agreement, Preamble; Proposed Order, Preamble (i) |
| **DIP Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Each of the DISH Wireless Debtors other than the DIP Borrower (*i.e.*, Neyland Networks LLC; DISH Wireless Leasing L.L.C.; DISH Wireless Retail Holding L.L.C.; DISH Infinite Corporation; and DISH Wireless Retail Operating L.L.C.). DIP Credit Agreement § 1.1; Proposed Order, Preamble (ii) |
| **DIP Lender** Bankruptcy Rule 4001(c)(1)(B) | EchoStar Corporation. DIP Credit Agreement, Preamble; Proposed Order, Preamble (i) |
| **DIP Commitments** Bankruptcy Rule 4001(c)(1)(B) | A secured superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $85,000,000, which shall be immediately available to the DIP Borrower, subject to and upon entry of the Proposed Order and satisfaction of applicable conditions precedent. DIP Credit Agreement §§ 1.1, 2.1, 3.2; Proposed Order ¶ 3(c) |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall be subject to customary conditions, including: (a) the DIP Lender shall have received a borrowing request in respect of such DIP Loan and the proposed funding date for such DIP Loan shall be during the Availability Period (as defined in the DIP Credit Agreement); |

---

[7]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used and not otherwise defined in this summary chart have the meanings ascribed to such terms in the DIP Documents or the Proposed Order, as applicable.

| Material Term | DIP Facility |
|---|---|
| | (b) the DIP Loan Parties shall have no more than $10,000,000 of available unencumbered cash on hand in the aggregate; (c) from and after the Petition Date, the DIP Loan Parties shall have reasonably complied with the Approved Budget; (d) no contested matter or adversary proceeding shall have been commenced by the DIP Loan Parties against the DIP Lender or its non-Debtor affiliates and shall be pending in the Chapter 11 Cases or otherwise; (e) the representations and warranties of the DIP Borrower contained in Article IV of the DIP Credit Agreement shall be true and correct in all material respects on and as of the date of such proposed funding; (f) a final order granting the relief requested in this Motion shall have been entered and, in each case, shall be in full force and effect and shall not have been amended, modified, or stayed without the DIP Lender's consent; (g) the DIP Borrower shall be in compliance with the Approved Budget (subject to Permitted Variances) on the date of such proposed funding and after giving effect to the incurrence of such DIP Loan; (h) no Event of Default shall exist immediately prior to or immediately after giving effect to such DIP Loan; and (i) any DIP Loan advanced under the DIP Facility shall not exceed the aggregate projected cumulative disbursements set forth in the Approved Budget for the four (4)-week period immediately following the proposed funding date (for the avoidance of doubt, inclusive of any amounts required to be deposited into the Professional Fee Escrow Account during such period).<br><br>DIP Credit Agreement § 3.2; Proposed Order ¶ 33 |
| **Use of Proceeds** Bankruptcy Rule 4001(b)(1)(B) | Proceeds of the DIP Facility may be used solely in accordance with the DIP Documents and the Approved Budget (subject to the Permitted Variances), including: (1) to pay fees, interest, and other amounts payable under the DIP Documents; (2) to pay reasonable and documented transaction and administrative costs, fees, and expenses incurred in connection with these Chapter 11 Cases (including funding the Carve Out); (3) for working capital and general corporate purposes of the DIP Loan Parties, including costs and expenses related to the Decommissioning; and (4) for such other purposes as may be detailed in the Approved Budget (subject to the Permitted Variances).<br><br>Proposed Order ¶ 17 |

11

| Material Term | DIP Facility |
|---|---|
| **Maturity**<br>Bankruptcy Rules 4001(b)(1)(B); 4001(c)(1)(B) | December 31, 2026 or, if earlier, the date on which the outstanding principal amount of the DIP Loans has been declared, or automatically has become, due and payable (whether by acceleration or otherwise).<br><br>DIP Credit Agreement § 1.1 |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Interest Rate:  11.50%, paid in kind.<br><br>Default Interest Rate: During the continuance of an Event of Default that has not been cured within any applicable notice or grace period, interest shall accrue on each DIP Loan at the Interest Rate plus an additional 2.00% per annum, paid in kind.<br><br>DIP Credit Agreement §§ 1.1, 2.3 |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | Voluntary Prepayments:  The DIP Borrower may prepay all or any portion of the outstanding principal amount of the DIP Loans, together with accrued and unpaid interest, without premium, penalty or break costs, on at least 3 Business Days' prior written notice.<br><br>Mandatory Prepayments:  The DIP Lender may, in its sole discretion, require the DIP Borrower to (i) prepay the outstanding Secured Obligations in an amount equal to the proceeds of the Apple Securities Account that are released and become available to the DIP Loan Parties after the Agreement Execution Date (such released proceeds, the "**Released Funds**") (or, if the amount of the outstanding Secured Obligations at such time is less than the amount of the Released Funds, all of such outstanding Secured Obligations) and/or (ii) reduce the Total Commitment on a dollar-for-dollar basis, up to the total amount of the Released Funds *plus* the Previously Released Funds (as defined in the DIP Credit Agreement), in each case without duplication.  Any such prepayment or reduction will not constitute an acceleration or change the Maturity Date.  Within three (3) Business Days of receiving written instructions from the DIP Lender, the Borrower must apply the Released Funds and/or the Previously Released Funds accordingly, with no premium, penalty, or break costs.<br><br>DIP Credit Agreement § 2.5 |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall be subject to an Approved Budget, in form and substance reasonably acceptable to the DIP Lender, subject to Permitted Variances. |

| Material Term | DIP Facility |
|---|---|
| Bankruptcy Local Rule 4001-3 | DIP Credit Agreement §§ 1.1, 4.9; Proposed Order ¶ 5 |
| **Variance Reporting** Bankruptcy Rule 4001(c)(1)(B) | Compliance with the Approved Budget shall be tested for each Variance Testing Period.  The initial Variance Testing Period shall be the four-week period commencing on the Monday immediately following the Petition Date and ending on the Friday of the fourth full calendar week occurring after the Petition Date, and thereafter, each successive four-week period ending on Friday (each, a "**Variance Testing Period**"). Actual cumulative disbursements for any Variance Testing Period (excluding Excluded Disbursements (as defined in the DIP Credit Agreement)) shall not exceed one hundred fifteen percent (115%) of projected cumulative total disbursements set forth in the Approved Budget for such period.<br><br>DIP Credit Agreement § 1.1; Proposed Order ¶ 5(b)-(c) |
| **DIP Collateral** Bankruptcy Rule 4001(c)(1)(B) | All of the DIP Borrower's and each Guarantor's right, title, and interest in, to, and under the following property of such DIP Loan Party, whether now owned or existing or hereafter acquired or arising and wherever located, whether tangible or intangible:  (i) Accounts; (ii) Chattel Paper; (iii) Documents; (iv) General Intangibles; (v) Payment Intangibles; (vi) Goods; (vii) Instruments; (viii) Investment Property; (ix) Deposit Accounts, Securities Accounts and Commodity Accounts; (x) Letter-of-Credit Rights; (xi) receivables; (xii) Commercial Tort Claims; (xiii) Inventory; (xiv) Equipment; (xv) any Avoidance Actions, except for such claims against the DIP Lender or any of its affiliates, representatives, agents, successors, or assigns (other than the DIP Guarantors) or the proceeds thereof; (xvi) to the extent not otherwise included above, all books, correspondence, files, and other records; (xvii) to the extent not otherwise included above, all other existing or after-acquired property of such DIP Loan Party and the proceeds thereof; and (xviii) to the extent not otherwise included above, all Proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions, and replacements of and to any of the property of such DIP Loan Party described in the preceding clauses (including any proceeds of insurance thereon and all causes of action, claims, and warranties now or hereafter held by such DIP Loan Party in respect of any of the items listed above).<br><br>For the avoidance of doubt, in no event shall the DIP Collateral include (a) the Apple Securities Account, (b) the Professional Fee Escrow Account or any amounts on deposit therein, (c) any claims against current or former directors, officers, managers, members or other fiduciaries |

13

| Material Term | DIP Facility |
|---|---|
| | (including any claims under any D&O insurance policies), or the proceeds thereof, (d) any claims, obligations, receivables or causes of action against any affiliate of the Borrower, or the proceeds thereof, or (e) the work product, materials and other records of the Special Committee.<br><br><br>DIP Credit Agreement, § 1.1; Proposed Order ¶ 8 |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(1)(B)(i) | DIP Liens<br>The DIP Facility shall be secured by a Lien on the DIP Collateral that shall be junior to the Liens on the DIP Collateral securing the Prepetition Secured Loan.  The DIP Borrower and the other DIP Loan Parties agree that, if reasonably requested by the DIP Lender, they shall enter into any subordination, intercreditor, or other similar agreement to evidence such priority.<br><br>Notwithstanding the foregoing, perfection by "control" shall not be required with respect to any assets.<br><br>DIP Superpriority Claims<br>The DIP Lender shall have a superpriority administrative expense claim against the DISH Wireless Debtors (without the need to file a proof of claim) with priority over any and all other administrative expenses and all other claims asserted against the DIP Loan Parties, including all administrative expenses of the kind that are specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506, 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code or any other provisions of the Bankruptcy Code and any other claims against the DISH Wireless Debtors. Notwithstanding the foregoing, the DIP Superpriority Claims shall at all times be (i) junior to the Carve Out, (ii) with respect to any DIP Collateral that also constitutes Prepetition Collateral, junior to the Prepetition Secured Loan Claims, (iii) with respect to the Apple Securities Account, junior to any claims of Apple, Inc., and (iv) recoverable from proceeds of any Avoidance Actions.<br><br>DIP Credit Agreement § 4.8(a); Proposed Order ¶¶ 6-7 |
| **Carve Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | An amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent |

| Material Term | DIP Facility |
|---|---|
| | allowed at any time, whether by Proposed Order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the DIP Loan Parties pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtors' Professionals**") and, as of the date of determination, by any Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtors' Professionals, "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined in the DIP Credit Agreement), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined in the Proposed Order); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $8,000,000 incurred after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). <br><br> The Carve Out shall be funded through weekly deposits into the Professional Fee Escrow Account, as described below. <br><br> DIP Credit Agreement §§ 1.1, 4.13(e); Proposed Order ¶ 11 |
| **Professional Fee Escrow Account** Bankruptcy Rule 4001(c)(1)(B) | DWLLC and Epiq Corporate Restructuring LLC, as escrow agent, shall establish a segregated escrow account (the "**Professional Fee Escrow Account**") for the purpose of collecting and disbursing Allowed Professional Fees to Professional Persons. <br><br> Upon the filing of the Chapter 11 Cases, and on a weekly basis thereafter, DWLLC shall deposit into the Professional Fee Escrow Account the amounts set forth in the Approved Budget for professional fees. Such deposits may be funded from the proceeds of the DIP Facility. <br><br> Funds on deposit in the Professional Fee Escrow Account shall be disbursed only upon (a) written authorization from the DIP Loan Parties' counsel or financial advisor and (b) entry of a Court order approving the applicable professional fees. <br><br> DWLLC retains a reversionary interest in any amounts remaining in the Professional Fee Escrow Account after (i) payment in full of all Secured Obligations and termination of the DIP Facility, (ii) all Professional Fees within the Carve-Out have been allowed and paid in full, and (iii) all appeal periods on fee orders have expired or any appeals have been resolved, with such amounts held in trust for Professionals until those conditions are met. |

15

| Material Term | DIP Facility |
|---|---|
|  | DIP Credit Agreement §§ 1.1, 4.13; Proposed Order ¶ 11(h) |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B) | The Challenge Period expires on the earlier of (a) the deadline to object to confirmation of the DISH Wireless Debtors' plan of reorganization and (b)(I) in the case of any party other than an Official Committee, 45 calendar days after entry of the Proposed Order, or (II) in the case of an Official Committee, 30 calendar days after the appointment of such Official Committee (the "**Challenge Period Termination Date**"); *provided that*, if the Cases are converted to chapter 7 or a chapter 11 trustee is appointed prior to the expiration of the Challenge Period, the Challenge Period shall be extended by the time remaining until the then-existing Challenge Period Termination Date plus 30 days. Upon expiration of the Challenge Period without the filing of a Challenge (or if any such Challenge is filed and overruled), all such Challenges shall be deemed forever barred, and the DISH Wireless Debtors' Stipulations (as defined in the Proposed Order) shall be binding upon all parties in interest in these Cases and any Successor Cases.<br><br>Proposed Order ¶ 14 |
| **Investigation Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | From and after the Agreement Execution Date, notwithstanding any provision of the DIP Credit Agreement to the contrary, and notwithstanding the DIP Budget, the Special Committee may expend up to $1,000,000.00 (the "**Special Committee Investigation Budget**"), subject to increase pursuant to the following proviso, in connection with conducting the Special Committee Investigation, which amounts may be used for professional fees and other reasonable and documented expenses, disbursements, and other costs reasonably incurred in connection therewith; *provided* that, if the Special Committee requests that the DIP Lender consent to an increase in the amount of the Special Committee Investigation Budget, and the DIP Lender declines to grant such request or fails to respond to such request within three (3) Business Days, then the Special Committee shall have the right to file a motion with the Bankruptcy Court for entry of an order increasing the Special Committee Investigation Budget for cause (as determined by the Bankruptcy Court).  Neither the DIP Lender nor its affiliates nor the DIP Loan Parties shall oppose any request by the Special Committee that such motion be heard by the Bankruptcy Court on shortened notice.  Any order of the Bankruptcy Court granting such relief requested by the Special Committee shall not constitute an Event of Default hereunder.  Any expenditure by the Special Committee within the Special Committee Investigation Budget shall not constitute an Event of Default hereunder.  For the avoidance of doubt, "cause" shall not include events that are within the DIP Loan Parties' or Special Committee's control. |

| Material Term | DIP Facility |
|---|---|
| | DIP Credit Agreement § 4.12 |
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B) | None. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(1)(B); 4001(c)(1)(B)(ii) | None. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | Events of Default include:  (a) default in the payment when due, whether at stated maturity or otherwise, of any installment, fee, interest, or principal of the DIP Loan, which default is not cured within three (3) Business Days of the applicable payment due date (provided that such grace period shall not apply to any principal payment due on the Maturity Date); (b) default in the performance of, or breach of, the covenants set forth in Sections 4.5, 4.6, or 4.8 of the DIP Credit Agreement; (c) default in the performance of, or breach of, any other covenant in the DIP Credit Agreement (other than a default specified in clauses (a) or (b) above), which default remains uncured for 20 calendar days; (d) the dissolution, winding up, or liquidation of any Loan Party; (e) the Bankruptcy Court shall have entered an order (i) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (ii) dismissing any of the Chapter 11 Cases; (f) any DIP Loan Party shall (i) obtain any postpetition debtor-in-possession financing pursuant to section 364 of the Bankruptcy Code other than the DIP Facility (an "**Alternative Financing**"), or (ii) seek authorization from the Bankruptcy Court to obtain any such Alternative Financing, in each case unless such Alternative Financing (x) is junior in priority to the DIP Facility or (y) provides for the indefeasible payment in full in cash of all Obligations under the DIP Facility concurrently with the closing thereof; (g) the entry of any order by the Bankruptcy Court reversing, staying for a period of ten (10) days or more, vacating, or otherwise amending, supplementing, or modifying any Proposed Order without the prior written consent of the DIP Lender; *provided* that it shall not constitute an Event of Default if such amendment, modification, or supplement (i) does not adversely affect the DIP Lender's economic rights under the DIP Credit Agreement (including the priority, perfection, or amount of the DIP Obligations or the DIP Collateral), and (ii) is approved by the Bankruptcy Court following notice to the DIP Lender and an opportunity to object in accordance with applicable law; (h) (i) the DIP Order, for any reason |

17

| Material Term | DIP Facility |
| --- | --- |
| | other than as expressly permitted under the DIP Credit Agreement or satisfaction in full of all the Secured Obligations, ceases to be in full force and effect with respect to any Loan Party or (ii) any Loan Party asserts in writing that the Secured Obligations are not legal, valid and binding obligations or contests in any manner the validity or enforceability of the DIP Credit Agreement; (i) the DIP Lender, for any other reason, shall not have or shall cease to have a valid secured claim against the DIP Loan Parties for the DIP Obligations and/or a valid and perfected Lien on a material portion of the DIP Collateral (other than cash or cash equivalents or any Deposit Accounts, Securities Accounts, or Commodity Accounts with respect to which the parties have agreed pursuant to Section 5.4 of the DIP Credit Agreement that perfection by control is not required) and/or the DIP Lender's claim against the DIP Borrower in respect of the DIP Obligations and/or lien on a material portion of the DIP Collateral is subordinated to other indebtedness or other obligations of the DIP Borrower (other than the Prepetition Secured Loan); (j) a trustee, a responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner), or any similar person is appointed or elected in any of the Chapter 11 Cases, any Loan Party applies for, consents to, or fails to contest in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lender in its sole discretion; (k) the entry of a Final Order in any of the Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any assets of the DIP Loan Parties having an aggregate value of $1,000,000 or more; (l) noncompliance by any Loan Party with the terms of the DIP Order; (m) (i) the Asset Purchase Agreement shall be terminated or invalidated or it and/or the transactions contemplated thereby enjoined by a court of competent jurisdiction (other than in connection with a separate Credit Bid by the DIP Lender); (ii) the Bankruptcy Court enters an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any material portion of the DIP Collateral pursuant to section 363 of the Bankruptcy Code or otherwise, other than (A) pursuant to a Credit Bid by the DIP Lender, (B) an Alternative Sale consented to in writing by the DIP Lender (such consent not to be unreasonably withheld, conditioned or delayed), or (C) an Alternative Sale that has been approved by the Special Committee and authorized by the Bankruptcy Court upon notice and hearing to the DIP Lender; or (iii) the Bankruptcy Court shall not have held a hearing to consider approval of the sale of substantially all of the DIP Loan Parties' |

| Material Term | DIP Facility |
|---|---|
|  | assets pursuant to the Asset Purchase Agreement or any Alternative Sale by the date that is seventy-five (75) days after the Petition Date.

DIP Credit Agreement, § 6.1; Proposed Order ¶ 15 |
| **Fiduciary Out** Bankruptcy Rule 4001(c)(1)(B) | Notwithstanding anything in the DIP Credit Agreement or any other Loan Document to the contrary (including, without limitation, any covenant or Event of Default relating to Alternative Financing or an Alternative Sale), no Loan Party shall be deemed to have breached the DIP Credit Agreement, and no default or Event of Default shall be deemed to have occurred, solely as a result of the Borrower or the Special Committee (a) evaluating, negotiating, supporting, seeking approval of, or consummating any Alternative Financing or Alternative Sale or (b) taking or refraining from taking any action, in each case, to the extent the Special Committee determines in good faith, after consultation with its independent legal and financial advisors, that such action or omission is necessary or appropriate to comply with its fiduciary duties under applicable law; *provided, however*, that (i) nothing in the DIP Credit Agreement shall impair or modify the DIP Lender's liens, claims or priorities, (ii) nothing in the DIP Credit Agreement shall waive or otherwise affect the DIP Loan Parties' obligations to indefeasibly repay the Obligations in full in cash to the extent required under the DIP Credit Agreement, and (iii) until such repayment of the DIP Obligations occurs, the Borrower shall continue to comply in all material respects with the terms of the DIP Credit Agreement that are not inconsistent with the exercise of such fiduciary duties.

DIP Credit Agreement § 6.1 |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Subject to any applicable grace period, the terms of the DIP Documents, and the Carve Out, upon the occurrence and during the continuation of a DIP Termination Event, the DIP Lender may file a motion with the Court seeking emergency relief (the "Stay Relief Motion") on no less than three (3) Business Days' written notice (the "Remedies Notice Period") to (i) the Court, (ii) counsel for the Debtors, (iii) counsel for any Official Committee, and (iv) the U.S. Trustee for a further order of the Court modifying the automatic stay in these Cases to permit the DIP Lender to take any or all Enforcement Actions (as defined in the Proposed Order).

Upon the Court's ruling on the Stay Relief Motion, the Court may fashion an appropriate remedy upon a determination that a Termination Event |

| Material Term | DIP Facility |
|---|---|
| | occurred, including, that the DIP Lender shall be entitled to take any or all of the Enforcement Actions, as permitted by the Court. |
| | Upon the occurrence and during the continuation of a DIP Termination Event, the DIP Lender shall be entitled to deliver to the DIP Borrower, with copies to counsel to the DISH Wireless Debtors, counsel to any Official Committee, and the U.S. Trustee, a written declaration by electronic mail (or other electronic means) (a "Termination Declaration") stating that a DIP Termination Event (as defined in the Proposed Order) has occurred and specifying the DIP Termination Event(s) giving rise thereto and/or a Carve Out Trigger Notice in accordance with paragraph 11(a) of the Proposed Order, and the automatic stay shall be modified modifying in these Cases to permit the DIP Lender to deliver such Termination Declaration or Carve Out Trigger Notice. |
| | Notwithstanding anything to the contrary in the Proposed Order, no Enforcement Actions set forth in paragraph 16 thereof shall be taken prior to the expiration of the Remedies Notice Period. |
| | DIP Credit Agreement, § 6.2; Proposed Order ¶¶ 3(f), 12, 16 |
| **Waiver / Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Lender and the Prepetition Secured Lender are authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted under the Proposed Order. |
| | Whether or not the DIP Lender shall choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to any Challenge (as defined in the DIP Order), subject to challenge, dispute, or subordination as of the date of entry of the Proposed Order. If the DIP Lender or the Prepetition Secured Lender determines to file or execute any financing statements, agreements, notice of liens, or similar instruments, the DIP Loan Parties shall use commercially reasonable efforts to cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Lender or the Prepetition Secured Lender, and the automatic stay shall be modified solely to allow such filings as provided for in the Proposed Order. |
| | A certified copy of the Proposed Order may, at the direction of the DIP Lender or the Prepetition Secured Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are authorized to accept such certified copy of the Proposed |

| Material Term | DIP Facility |
|---|---|
| | Order for filing and recording; *provided*, *however*, that, notwithstanding the date of any such filing, the date of such perfection shall be the date of entry of the Proposed Order.<br><br>Any provision of any lease or other license, contract, or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any DISH Wireless Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any DISH Wireless Debtor in accordance with the terms of the DIP Credit Agreement or the Proposed Order.<br><br>Notwithstanding anything to the contrary in the Proposed Order, the DIP Lender's security interest in Deposit Accounts, Securities Accounts, and Commodity Accounts is not perfected under applicable non-bankruptcy law absent the execution of a deposit account control agreement or similar control arrangement within the meaning of the UCC, and the deemed perfection provided for in paragraph 26 of the Proposed Order does not apply to such accounts.<br><br><br>DIP Credit Agreement §§ 1.1, 4.4, 5.3; Proposed Order ¶ 26 |

21

**Significant Provisions Under the Complex Case Procedures**

16.     The Proposed Order contains certain significant provisions identified in paragraph 8 of the Complex Case Procedures (the "**Significant Provisions**") as set forth below.  Each Significant Provision is justifiable because the DIP Lender would not provide the DIP Facility without such provisions.  The DIP Facility is fair and reasonable to the DISH Wireless Debtors under the total facts and circumstances of these Chapter 11 Cases (including the DIP Lender's agreement to serve as the Stalking Horse Bidder for the Sale Transaction), is the best financing option available, and is essential to facilitate the DISH Wireless Debtors' transition to a Hybrid MNO.

| Significant Provision | Description |
|---|---|
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | None. |
| **Cross-Collateralization** Bankruptcy Rule 4001(c)(1)(B) | None. |
| **Roll-Up** Bankruptcy Rule 4001(c)(1)(B)(ii) | None. |
| **Liens on Avoidance Actions or Proceeds Thereof** Bankruptcy Rule 4001(c)(1)(B)(xi) | The DIP Collateral shall include the Avoidance Actions and the proceeds thereof, except for any such claims against the DIP Lender or any of its affiliates, representatives, agents, successors or assigns (other than the DIP Guarantors), or the proceeds thereof, which shall remain excluded from the DIP Collateral.  DIP Credit Agreement § 1.1 |
| **Default and Remedies** Bankruptcy Rule 4001(c)(1)(B)(iv) | Subject to any applicable grace period, the terms of the DIP Documents, and the Carve Out, upon the occurrence and during the continuation of a DIP Termination Event, the DIP Lender may file a Stay Relief Motion during the Remedies Notice Period to (i) the Court, (ii) counsel for the Debtors, (iii) counsel for any Official Committee, and (iv) the U.S. Trustee for a further order of the Court modifying the automatic stay in |

| Significant Provision | Description |
|---|---|
| | these Cases to permit the DIP Lender to take any or all Enforcement Actions.<br><br>Upon the Court's ruling on the Stay Relief Motion, the Court may fashion an appropriate remedy upon a determination that a Termination Event occurred, including, that the DIP Lender shall be entitled to take any or all of the Enforcement Actions, as permitted by the Court.<br><br>Upon the occurrence and during the continuation of a DIP Termination Event, the DIP Lender shall be entitled to deliver to the DIP Borrower, with copies to counsel to the DISH Wireless Debtors, counsel to any Official Committee, and the U.S. Trustee, a Termination Declaration stating that a DIP Termination Event has occurred and specifying the DIP Termination Event(s) giving rise thereto and/or a Carve Out Trigger Notice in accordance with paragraph 11(a) of the Proposed Order, and the automatic stay shall be modified modifying in these Cases to permit the DIP Lender to deliver such Termination Declaration or Carve Out Trigger Notice.<br><br>Notwithstanding anything to the contrary in the Proposed Order, no Enforcement Actions set forth in paragraph 16 thereof shall be taken prior to the expiration of the Remedies Notice Period.<br><br><br>Proposed Order ¶¶ 15–16 |
| **Release of Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the rights and limitations set forth in paragraph 14 of the Proposed Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge the DIP Lender and the Prepetition Secured Lender, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, |

23

| Significant Provision | Description |
|---|---|
| | statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, DIP Liens, DIP Documents, Prepetition Obligations, Prepetition Liens, or Prepetition Loan Documents, as applicable, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all claims and causes of action arising under the Bankruptcy Code, and (c) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender and the Prepetition Secured Lender; provided, that nothing in paragraph 27 of the Proposed Order shall in any way limit or release any of the DIP Loan Parties' claims or causes of action related to, or arising from, (a) any obligations of the DIP Lender under the DIP Documents or (b) the Special Committee Investigation.<br><br>Proposed Order ¶ 27 |
| **Limitations on the Use of Cash Collateral other than General "Carve Outs" to Pay Approved Fees and Expenses**<br>Bankruptcy Rule 4001(b)(1)(B) | None. |
| **Non-Consensual Priming Liens**<br>Bankruptcy Rule 4001(b)(1)(B); 4001(c)(1)(B) | None. |
| **Waiver of Right to Seek Non-Consensual Use of Cash Collateral, Seek Extension of Time to File a Plan, Modify the Right to File a Plan, or Obtain Credit Under § 364**<br>Bankruptcy Rule 4001(c)(1)(B)(v) | Prior to indefeasible payment of the DIP Facility in full, it shall constitute an Event of Default and a DIP Termination Event if any Loan Party shall (i) obtain any post-petition debtor-in-possession financing pursuant to section 364 of the Bankruptcy Code other than the DIP Facility (an "Alternative Financing"), or (ii) seek authorization from the Bankruptcy Court to obtain any such Alternative Financing, in each case unless such Alternative Financing (x) is junior in priority to the DIP Facility or (y) provides for the indefeasible payment in full in cash of all DIP Obligations under the DIP Facility concurrently with the closing thereof.<br><br>DIP Credit Agreement § 6.1(h); Proposed Order ¶¶ 15, 27, 29(c) |

| Significant Provision | Description |
|---|---|
| **Limiting Ability of Estate Fiduciaries to Fulfill Their Duties** | The Proposed Order does not limit the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law. |
| **Marshaling and 506(c) Waivers** Bankruptcy Rules 4001(c)(1)(B)(vii); 4001(c)(1)(B)(x) | Except to the extent of the Carve Out, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, as applicable. No costs or expenses of administration that have been or may be incurred in these Cases or any Successor Cases at any time shall be charged against the DIP Lender, the Prepetition Secured Lender, or any of their respective claims or liens (including the DIP Liens and the Prepetition Liens) pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender or the Prepetition Secured Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Prepetition Secured Lender. The DIP Loan Parties irrevocably waive and shall not assert any right of surcharge, whether arising under section 506(c) of the Bankruptcy Code or otherwise, with respect to the DIP Collateral or the Prepetition Collateral. Proposed Order ¶¶ 21, 22. |

## The DISH Wireless Debtors' Prepetition Capital Structure

17.     As of the Petition Date, (a) DWLLC and DW Leasing guaranteed DNC's obligations under the DNC Senior Secured Notes (as defined below) in the aggregate principal amount of $3.5 billion; (b) DWLLC is the borrower under the DWLLC Intercompany Loan in the aggregate amount of approximately $8.8 billion (including principal and accrued interest); and (c) DWLLC is the borrower under the Prepetition Secured Loan in the aggregate principal amount of $75 million.  Prior to the Petition Date, in accordance with the RSA, a Loan Agreement dated as of November 1, 2024 in the borrowing principal amount of $4.50 billion from EchoStar Financing L.L.C. to DWLLC was extinguished in the amount of $3.89 billion.

18.     **DWLLC Intercompany Loan**.  From time to time prior to the Petition Date, beginning in 2020, DNC extended intercompany loans to DWLLC, which were used to, among

other things, build out the 5G Network (the "**DWLLC Intercompany Loan**").  On August 22, 2025, DNC memorialized these loans under the Loan Agreement with DWLLC on account of the DWLLC Intercompany Loan which, as of June 28, 2026, had an aggregate balance of $8,856,507,760.88, including principal and accrued interest, which reflects $5.0 billion of loan forgiveness as consideration for the contributions related to the Hybrid MNO transaction described above.[8]  The DWLLC Intercompany Loan matures on November 30, 2030.  Interest accrues at an annual rate of 11.50% and is payable monthly in kind (and after the second anniversary of the effective date, in cash or in kind).

19.     **Prepetition Secured Loan Facility**.  Pursuant to that certain Loan and Security Agreement (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Secured Loan Agreement**"), DBS agreed to provide DWLLC with term loan facility (the "**Prepetition Secured Loan Facility**" and the Secured Loan under and as defined therein, the "**Prepetition Secured Loan**") consisting of a secured term loan of up to $75,000,000 for general corporate purposes.  The Prepetition Secured Loan matures on April 21, 2027.  Interest accrues at 5.50% per annum, is payable in cash on the first day of each calendar month, and, upon a default or after acceleration, accrues interest at an additional 2.0% per annum at DBS's option.  Any amounts borrowed under the Prepetition Secured Loan Facility, if subsequently repaid or prepaid, may not be re-borrowed.  DWLLC may prepay the Prepetition Secured Loan Facility in full or in part at any time without premium or penalty.  As of the Petition Date, approximately $75,000,000.00 in the aggregate principal amount remains outstanding under the Prepetition Secured Loan Facility.

---

[8]     DNC, the lender under the DWLLC Intercompany Loan, is the indirect parent of BoostCo and DWLLC.

20. The Prepetition Secured Loan Facility is secured by: (i) a first priority security interest in substantially all of DWLLC's assets (the "**DWLLC Collateral**"), excluding the securities account of DWLLC (Account No. **** 014) in which DWLLC has granted a security interest in favor of Apple, Inc. to secure certain of its and its affiliates' obligations (the "**Apple Securities Account**"); and (ii) a first priority security interest in substantially all of the Prepetition Guarantor's assets (together with the DWLLC Collateral, the "**Prepetition Collateral**" and the liens securing the Prepetition Collateral, the "**Prepetition Liens**"), pursuant to that certain Guarantee and Security Agreement, dated as of May 26, 2026 (as amended, restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition Guarantee Agreement**" and, together with the Prepetition Secured Loan Agreement, the "**Prepetition Secured Loan Documents**"). As of the Petition Date, the aggregate principal amount outstanding under the DBS Secured Loan is $75,000,000. The DBS Secured Loan will be repaid in full upon the closing of the DISH Wireless Debtors' sale of substantially all of their assets, subject to Bankruptcy Court approval.

21. **Other Prepetition Obligations**. As described in the First Day Declaration, the DISH Wireless Debtors have obligations under long-term operating and financing leases as described in the First Day Declaration (First Day Decl. ¶ 57) and DWLLC and DW Leasing are guarantors under the 11.75% senior secured notes due 2027 issued by DNC in the aggregate principal amount of $3.5 billion (*id.* ¶ 54).

### The Need for the DIP Facility

22. **The Need for Additional Financing**. As described in paragraphs 9 through 13 above, to complete the Decommissioning, consummate the Sale Transaction, and fund the administration of these Chapter 11 Cases, the DISH Wireless Debtors require access to liquidity

beyond what is currently available from the Released Funds and any residual proceeds of the Prepetition Secured Loan Facility.

23.     As described in paragraph 11 above, DWLLC entered into the Prepetition Secured Loan Agreement in April of 2026 and used the proceeds of the Prepetition Secured Facility to, among other general corporate purposes, fund direct vendor payments.  Over time, it became apparent that the Prepetition Secured Loan Facility would not provide sufficient liquidity to complete the Decommissioning and consummate the restructuring transactions (including the Sale Transaction) contemplated by the Plan and the RSA.

24.     The DISH Wireless Debtors, with the assistance of FTI Consulting, analyzed their cash needs and developed an initial 13-week budget, a copy of which is attached as **Exhibit B** to the Proposed Order (the "**Approved Budget**").  The Approved Budget reflects, among other things, the DISH Wireless Debtors' anticipated operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each calendar week covered thereby and considers a number of factors, including fees and interest expense associated with the DISH Wireless Debtors' proposed DIP Facility, professional fees, and anticipated funding under the proposed DIP Facility, along with the Decommissioning expenses.

25.     This analysis demonstrated that, to complete the Decommissioning—including paying vendors, complying with regulatory obligations, and capitalizing on the economic value of the DISH Wireless Debtors' personal property through the Sale Transaction—the DISH Wireless Debtors needed access to additional liquidity.  The DISH Wireless Debtors, together with their advisors, determined they needed an additional $85 million of liquidity to effectuate the Decommissioning and consummate the restructuring transactions contemplated by the RSA and

the Plan, including the Sale Transaction and the orderly resolution of billions of dollars of claims asserted against the DISH Wireless Debtors, in a value-maximizing manner.

26.     Accordingly, the DISH Wireless Debtors negotiated the terms of the up to $85 million DIP Facility with the DIP Lender in the weeks leading up to the Petition Date.  As described in paragraph 13 above, DWLLC received approximately $56 million in Released Funds one day before the Petition Date.  The Released Funds provide sufficient near-term liquidity but do not eliminate the need for the DIP Facility given the DISH Wireless Debtors' total projected expenditures through the conclusion of these Cases.  The DIP Credit Agreement provides a mechanism for the DIP Lender to require prepayment of outstanding DIP Loans and/or a permanent reduction of the Total Commitment on a dollar-for-dollar basis to the extent Released Funds (or future releases from the Apple Securities Account) are available, ensuring the commitment scales with available liquidity.  The DISH Wireless Debtors are therefore seeking approval of the DIP Facility on a final basis following a twenty-one day notice period.

27.     **Alternative Sources of Financing Are Not Available on Better Terms**.  The DISH Wireless Debtors could not have obtained financing from a third party on better terms than those of the DIP Facility.  The DISH Wireless Debtors' financial advisor analyzed the economic terms of the DIP Facility, including interest rate, maturity, lien priority, fees, and covenants, and concluded that the terms are reasonable in light of the DISH Wireless Debtors' financial and operational position. The terms of the DIP Facility reflect several features that are more favorable than what a third-party lender would typically require, including:  (a) EchoStar's willingness to accept a junior lien on all encumbered assets as security for the DIP Facility; (b) EchoStar's agreement to forego upfront fees and commitment fees; and (c) EchoStar's agreement to serve as the Stalking Horse Bidder.  Additionally, EchoStar willingness to extend financing is directly tied

29

to, and contingent upon, its ability to credit bid the aggregate outstanding amount of DIP Obligations against the cash portion of the purchase price under the Stalking Horse Agreement on a dollar-for-dollar basis.

28.     The Special Committee independently evaluated the proposed DIP Facility and concluded that its terms are fair and reasonable, represent the best available financing option under the circumstances, and are in the best interests of the DISH Wireless Debtors' estates, their creditors, and all parties in interest.

**Basis for Relief**

**The DISH Wireless Debtors Should Be Authorized to Obtain
Postpetition Financing Through the DIP Facility**

a.     **Entry Into the DIP Facility Is an Exercise of the DISH Wireless Debtors'
Sound Business Judgment**

29.     The DISH Wireless Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and grant superpriority administrative status and liens on its property in exchange for that financing. Specifically, section 364(c)(1) of the Bankruptcy Code provides that the court may approve financing "with priority over any or all administrative expenses." 11 U.S.C. § 364(c)(1).

30.     Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Estrada*, Case No. 16-80003-G3-11, 2016 Bankr. LEXIS 573 at *8 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.") (citing *In re Ames Dep't Stores, Inc.*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990)); *In re Los Angeles Dodgers LLC*, 457

30

B.R. 308, 313 (Bankr. D. Del. 2011) ("courts will almost always defer to the business judgment of a debtor in the selection of the lender").

31.     Courts in the Fifth Circuit have described the business judgment standard as one that "is flexible and encourages discretion." *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011); *Inst. Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("Whether the proffered business justification is sufficient depends on the case [and] the bankruptcy judge 'should consider all salient factors pertaining to the proceeding . . . .'") (quoting *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983)).  To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  For this analysis, a court may take into consideration non-economic benefits to a debtor offered by a proposed postpetition financing facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York explained that "non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization" may be properly considered by debtors when selecting postpetition financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms."  No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

32.     Moreover, recognizing that an affiliate may be the only entity willing to extend credit to a distressed company, courts have approved postpetition secured financing even when such credit comes from an insider of the debtor.  *See, e.g.*, *In re Lion Ribbon Texas Corp.*, Case No. 25-90164 (Bankr. S.D.Tex. Aug. 6, 2025) [Docket No. 267] (approving postpetition secured

financing from an affiliate of the non-debtor parent); *In re SmileDirectClub, Inc.*, Case No. 23-90786 (Bankr. S.D.Tex. Nov. 7, 2023) [Docket No. 296] (approving postpetition secured financing from a vehicle controlled by the debtor's founder); *In re 4E Brands Northamerica LLC*, Case No. 22-50009 (Bankr. S.D.Tex. May 10, 2022) [Docket No. 144] (approving postpetition financing from the direct parent of the debtor-borrower); *In re AIO US, Inc.*, Case No. 24-11836 (Bankr. D. Del. Oct. 29, 2024) [Docket No. 318] (approving postpetition secured financing where the lender was an affiliate of the debtor).

33.     Approval of the proposed DIP Facility is subject to the business judgment standard because, although the DIP Borrower and the DIP Lender are affiliates, the proposed DIP Facility was negotiated and approved by the Special Committee of DWLLC.  The business judgment rule applies unless: (i) the directors did not make a decision; (ii) the directors' decision was uninformed; (iii) the directors were not disinterested or independent; or (iv) the directors were grossly negligent. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).  The members of the Special Committee made informed and reasonable decisions in their selection and negotiation of the proposed DIP Facility and, therefore, their selection of the DIP Facility as the best financing option available should be entitled to the deference of the business judgment rule.

34.     The DISH Wireless Debtors' determination to seek authorization of the DIP Facility is a sound exercise of their business judgment.  The DIP Facility is being provided by EchoStar in connection with its agreement to serve as the Stalking Horse Bidder in the proposed sale of the DISH Wireless Debtors' assets under section 363 of the Bankruptcy Code, and the DIP Facility is secured by liens junior to the liens securing the Prepetition Secured Loan Facility.  The DIP Facility is integral to the broader restructuring framework established by the RSA, which contemplates the transition of the DISH Wireless Debtors' business to a Hybrid MNO, the

completion of the Decommissioning, the resolution of billions of dollars of disputed claims against the DISH Wireless Debtors, a value-maximizing sale of the DISH Wireless Debtors' assets, and the distribution of recoveries to creditors pursuant to the Plan.

35.     In light of EchoStar's status as an affiliate of the DIP Loan Parties, the Special Committee separately evaluated the DIP Facility to ensure that the proposed financing was the product of good-faith, arm's-length bargaining and reflected the Special Committee's independent business judgment.  The Special Committee, exercising its independent judgment and with the assistance of its own advisors, oversaw the negotiation of the DIP Facility—the terms of which were negotiated in good faith and at arm's length by the DISH Wireless Debtors, at the direction of the Special Committee—and, after due deliberation, recommended that the DISH Wireless Debtors enter into the DIP Facility.  The DISH Wireless Debtors' financial advisor concluded that the economic terms of the DIP Facility are reasonable in light of the DISH Wireless Debtors' financial and operational position and shared such conclusions with the Special Committee and its advisors.  The Special Committee concluded that EchoStar's proposal represented the best financing option available under the circumstances.  Accordingly, the Court should authorize the DISH Wireless Debtors to obtain postpetition financing pursuant to the DIP Facility as a reasonable exercise of the DISH Wireless Debtors' business judgment.

**b.      The DISH Wireless Debtors Should Be Authorized to Grant to the DIP Lender the DIP Liens and the DIP Superpriority Claims**

36.     Section 364(c) of the Bankruptcy Code provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
>> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

37.     To satisfy section 364(c), courts consider whether (a) the debtor has reasonably attempted, but failed, to obtain unsecured credit under section 364(a) and (b) of the Bankruptcy Code, (b) the credit transaction is necessary to preserve estate assets, and (c) the terms of the transaction are fair, reasonable, and adequate under the circumstances.  *See, e.g.*, *Ames*, 115 B.R. at 37-40; *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  A "debtor is not required to seek credit from every possible source but rather must demonstrate 'that it has made a reasonable effort to seek other sources of credit available under section 364(a) and (b)." *In re Republic Airways Holdings Inc.*, No. 16-10429, 2016 Bankr. LEXIS 1927 at *33-34 (Bankr. S.D.N.Y. May 3, 2016) (quotations and citations omitted).

38.     First, the DISH Wireless Debtors determined that they would not be able to obtain postpetition financing on an unsecured basis.  The DISH Wireless Debtors pledged substantially all of their assets to secure the Prepetition Secured Loan Facility prior to the Petition Date, and EchoStar was willing to provide DIP financing secured by a junior lien on such encumbered assets. EchoStar agreed to extend terms more favorable than those a third-party lender would typically require, including foregoing upfront fees and commitment fees that are customary in third-party DIP financings, and agreeing to serve as the Stalking Horse Bidder.  Additionally, in light of the DISH Wireless Debtors' ongoing Decommissioning and transition of operations to a Hybrid MNO, a formal DIP financing marketing process likely would not have produced a more favorable outcome.   Given these circumstances, the DISH Wireless Debtors could not have obtained postpetition financing on more favorable terms.

39.     Second, the DIP Facility will provide the DISH Wireless Debtors with liquidity to preserve the value of their estates as these Cases progress. Although the Released Funds provide sufficient near-term liquidity, the DISH Wireless Debtors' receipt of those Released Funds does not eliminate the need for postpetition financing. The DISH Wireless Debtors' total projected costs through the conclusion of these Cases (including Decommissioning expenses, chapter 11 administrative costs, professional fees, and costs associated with the Sale Transaction) exceed the $56 million of Released Funds received. Approval of the DIP Facility would ensure that the DISH Wireless Debtors have sufficient liquidity through emergence from these Cases, to the benefit of their creditors and other parties in interest.

40.     Third, the terms of the DIP Facility are fair, reasonable, and adequate. The DISH Wireless Debtors' financial advisor analyzed the economic terms of the DIP Facility, including interest rate, maturity, lien priority, fees, and covenants, and concluded that the terms are reasonable in light of the DISH Wireless Debtors' financial and operational position. The terms of the DIP Facility reflect several features that are more favorable than those a third-party lender would typically require, including:  (a) EchoStar's willingness to provide DIP financing secured by a junior lien on the encumbered assets; (b) EchoStar's agreement to forego upfront fees and commitment fees that are customary in third-party DIP financings; and (c) EchoStar's agreement to serve as the Stalking Horse Bidder in connection with providing the DIP Facility. The Special Committee independently evaluated the proposed DIP Facility and, after due deliberation, concluded that EchoStar's proposal represented the best financing option available under the circumstances.

**The DIP Lender Should Be Afforded Good Faith Protection
Under Section 364(e) of the Bankruptcy Code**

41.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

42.     The DIP Facility is the result of (a) the DISH Wireless Debtors' reasonable and informed determination that the terms offered by the DIP Lender were the best available given the circumstances, including in connection with EchoStar's proposal to acquire the DISH Wireless Debtors' assets as the Stalking Horse Bidder and after accounting for the receipt of the Released Funds and the total projected costs of the Cases, (b) extensive good-faith, arm's-length negotiations between the DISH Wireless Debtors and the DIP Lender, conducted at the direction, and with the oversight, of the Special Committee, and (c) the Special Committee's independent evaluation and approval of the DIP Facility after due deliberation.  The DIP Credit Agreement's dollar-for-dollar reduction mechanism, which permits the DIP Lender to require prepayment of outstanding DIP Loans and/or permanent reduction of the Total Commitment to the extent Apple Securities Account proceeds are released, reflects the parties' good-faith effort to size the DIP commitment appropriately in light of available liquidity.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP

36

Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lender is a "good-faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

### The Automatic Stay Should Be Modified on a Limited Basis

43.     The Proposed Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are modified solely to the extent necessary to permit the DIP Lender to perform any act authorized or permitted under or by virtue of the Proposed Order and the other DIP Documents, including, without limitation, (a) to implement the postpetition financing arrangements authorized by the Proposed Order, (b) to take any act to create, validate, evidence, attach, or perfect any lien, security interest, right, or claim in the DIP Collateral, (c) to assess, charge, collect, advance, deduct, and receive payments with respect to the DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Documents, and (d) upon the occurrence and during the continuance of an Event of Default, and subject to the filing of a Stay Relief Motion on no less than three (3) Business Days' written notice to the DIP Loan Parties, the U.S. Trustee, and counsel to any official committee, during which time the DIP Loan Parties or any party in interest may seek an emergency hearing before the Court (which hearing shall be limited solely to whether an Event of Default has occurred and is continuing), to take any action and exercise all rights and remedies provided to it by the Proposed Order, the other DIP Documents, or applicable law.

44.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the DISH Wireless Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. *See*, *e.g.*, *In re Audacy, Inc.*, No. 24-90004 (CML) (Bankr. S.D. Tex. Jan. 7, 2024) [Docket No. 290]; *In re Noble House*

*Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Sept. 11, 2023) [Docket No. 130]; *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 213]; *In re Instant Brands Acquisition Holdings, Inc.*, No. 23-90716 (DRJ) (Bankr. S.D. Tex. June 12, 2023) [Docket No. 257]; *In re Avaya, Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Feb. 14, 2023) [Docket No. 278]; *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. Jan. 17, 2023) [Docket No. 587]; *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) [Docket No. 144]; *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019) [Docket No. 255].

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

45.     To implement the foregoing successfully, the DISH Wireless Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the DISH Wireless Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

46.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any action taken pursuant to any order granting the relief requested herein is intended to be or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the DISH Wireless Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a release, waiver, or limitation of any claim or cause of action that the DISH Wireless Debtors have (or may have) against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code;

(g) a release, waiver, or limitation of any of the DISH Wireless Debtors' rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the DISH Wireless Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to this Motion are valid and the DISH Wireless Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of any such liens.  If the Court grants the relief requested herein, any payment made pursuant to an order of the Court granting such relief is not intended and should not be construed as an admission as to the validity or priority of any claim or a release, waiver, or limitation of the DISH Wireless Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

47.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**"); (b) the United States Attorney's Office for the Southern District of Texas; (c) the state attorneys general for the states in which the Debtors operate; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the Federal Communications Commission; (g) the indenture trustees, administrative agents, and collateral agents in respect of: (i) the 2026 Senior Secured Notes, (ii) the 2028 Senior Secured Notes, (iii) the 2026 Senior Notes, (iv) the 2028 Senior Notes, and (v) the 2029 Senior Notes; (h) counsel to the Ad Hoc Group; (i) the holders of the 30 largest unsecured claims against the DBS Debtors; (j) the holders of the 30 largest unsecured claims against the DISH Wireless Debtors; (k) counsel to the DIP Lender; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no other or further notice need be provided.

The Debtors request that the Court enter the Proposed Order granting the relief requested in this Motion and such other and further relief as the Court deems appropriate under the circumstances.

July 1, 2026
Houston, Texas

/s/ *Charles R. Koster*

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:     (713) 496-9700
Facsimile:     (713) 496-9701
Email:          charles.koster@whitecase.com


Ronald K. Gorsich (*pro hac vice* pending)
Doah Kim (*pro hac vice* pending)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:     (213) 620-7700
Email:          rgorsich@whitecase.com
                 doah.kim@whitecase.com

**WHITE & CASE LLP**
Thomas E Lauria (Texas Bar No. 11998025)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:     (305) 371-2700
Email:          tlauria@whitecase.com


Matthew E. Linder (*pro hac vice* pending)
Laura E. Baccash (*pro hac vice* pending)
300 N. LaSalle Drive
Chicago, Illinois 60654
Telephone:     (312) 881-5400
Email:          mlinder@whitecase.com
                 laura.baccash@whitecase.com


David M. Turetsky (*pro hac vice* pending)
Samuel P. Hershey (S.D. Texas Fed. No. 3465170)
Andrea Amulic (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Email:          david.turetsky@whitecase.com
                 sam.hershey@whitecase.com
                 andrea.amulic@whitecase.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Charles R. Koster*
Charles R. Koster

**Exhibit A**

Proposed Order

2

### Certificate of Service

I certify that on July 1, 2026, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Charles R. Koster*
Charles R. Koster