**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DISH DBS CORPORATION, | ) | Case No. 26-90627 (CML) |
| DISH WIRELESS L.L.C., *et al.*,[1] | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**CROWN CASTLE'S OBJECTION AND RESERVATION OF RIGHTS WITH
RESPECT TO THE DISH WIRELESS DEBTORS' REQUESTED FIRST DAY RELIEF**

Crown Castle,[2] by and through its undersigned counsel, submits this objection and reservation of rights (the "Objection") with respect to certain of the relief requested by the above-captioned debtors and debtors in possession (collectively, the "Debtors") at the first day hearing in these chapter 11 cases, including the: (a) *DISH Wireless Debtors' Emergency Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the DISH Wireless Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Related Notices, (IV) Authorizing Entry Into the Stalking Horse Agreement, (V) Authorizing the*

---

[1]   The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388.  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/DBS.  The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

[2]   "Crown Castle" means, collectively, Aircomm of Avon, LLC; Atlantic Coast Communications LLC; CCATT LLC; CCTMO LLC; CCTM1 LLC; CCTM2 LLC; Coverage Plus Antenna Systems LLC; Crown Atlantic Company LLC; Crown Castle GT Company LLC; Crown Castle MU LLC; Crown Castle South LLC; Crown Castle Towers 05 LLC; Crown Castle Towers 06-2 LLC; Crown Castle Towers 09 LLC; Crown Communication LLC; Global Signal Acquisitions LLC; Global Signal Acquisitions II LLC; Global Signal Acquisitions III LLC; Global Signal Acquisitions IV LLC; GoldenState Towers, LLC; High Point Management Co. LLC; ICB Towers, LLC; Interstate Tower Communications LLC; IntraCoastal City Towers LLC; Pinnacle Towers Acquisition LLC; Pinnacle Towers Asset Holding LLC; Pinnacle Towers LLC; Pinnacle Towers III LLC; Radio Station WGLD LLC; Shaffer & Associates, Inc.; Sierra Towers, Inc.; Tower Development Corporation; Tower Systems LLC; Tower Technology Company of Jacksonville LLC; Tower Ventures III, LLC; WCP Wireless Lease Subsidiary, LLC; and TVHT, LLC.

*Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (VI) Granting Related Relief* [Docket No. 15] (the "<u>Bidding Procedures Motion</u>"); (b) *DISH Wireless Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 16] (the "<u>Rejection Procedures Motion</u>"); and (c) *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures, (III) Approving the Form of Ballots and Notices, (IV) Approving Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan, (V) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Confirmation of the Plan, (VI) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Creditors Meeting for the DBS Debtors and (B) the DBS Debtors File Schedules of Assets and Liabilities and Statements of Financial Affairs, and Rule 2015.3 Reports, and (VII) Granting Related Relief* [Docket No. 18] (the "<u>Solicitation Procedures Motion</u>," and, collectively with the Bidding Procedures Motion and the Rejection Procedures Motion, the "<u>First Day Motions</u>").[3]  In support thereof, Crown Castle respectfully states as follows:

### INTRODUCTION

1.     Crown Castle owns and operates communications infrastructure, including communications towers, and makes that infrastructure available to wireless carriers so that they can build and operate their networks.  When Debtor DISH Wireless L.L.C. ("<u>DISH Wireless</u>") and its affiliates set out to build a nationwide 5G network in 2019, Crown Castle was DISH Wireless's first tower partner, and later its anchor partner.  The relationship between Crown Castle and DISH

---

[3]     Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

Wireless is memorialized in and governed by two long-term agreements:  a master agreement and a master product agreement (together, the "Agreements").  Crown Castle is one of the largest—if not the largest—creditor of DISH Wireless, with a claim in excess of $3.5 billion.

2.      The above-captioned cases involve two entirely separate and distinct restructurings: *first,* a straightforward balance sheet restructuring of the DBS Debtors to be implemented in a pre-packaged bankruptcy pursuant to a Restructuring Support Agreement entered into with a majority of the DBS Debtors' creditors and executed in March 2026 (the "RSA"), where general unsecured creditors are unimpaired; and *second,* a liquidation and wind down of the DISH Wireless Debtors, which seeks to impair more than $10 billion of unsecured claims and for which the only supporting creditor is a recently-created trust holding an intercompany claim that DBS assigned to it.  The Debtors, however, propose to treat these two cases the same, and fast track both cases on a prepackaged timeline with confirmation in less than two months.

3.      Crown Castle objects to the Debtors' attempt to push through the DISH Wireless cases on such an aggressive and unnecessary timeline—the purpose of which is only to limit investigation of numerous intercompany transactions involving billions of dollars that these Debtors have secretly undertaken over the last year to orchestrate the present cases.  For example, in August 2025, EchoStar transferred the Boost Mobile business—worth billions of dollars—out of the DISH Wireless Debtors to purportedly satisfy, in part, an alleged unsecured intercompany claim that DISH Wireless owed to DISH Network Corporation.  In March 2026, as it was negotiating the RSA with the DBS Bondholders, EchoStar transferred DISH Wireless itself to DBS.  At or around the same time, the Company transferred the remaining portion of the alleged intercompany claims owing to DNC to DBS, which then transferred such claims to a trust for the benefit of DBS's bondholders.  Shortly thereafter, in May 2026, the Company caused DISH

Wireless to borrow $75 million from DBS and grant liens on its property to secure such borrowings.  Now, EchoStar proposes to provide insider DIP financing to DISH Wireless, while also serving as the Stalking Horse Bidder for its remaining assets, in a transaction in which EchoStar will also acquire DISH Wireless's causes of actions, including valuable avoidance claims under chapter 5 of the Bankruptcy Code.

4.      The DISH Wireless Debtors' cases are not typical pre-packaged bankruptcies, and there is no basis for treating them as such.  DISH Wireless does not appear to have any ongoing operations; rather, it appears to hold legacy liabilities and assets resulting from EchoStar's decision to sell its spectrum for $42 billion—a $12 billion profit—and abandon its efforts to build out a nationwide 5G network.

5.      That the DBS Debtors and DISH Wireless cases are entirely separable is evident from the RSA itself.  The DBS Bondholders signed the RSA in March 2026 and that version—which reflects the terms of the current Plan as to the treatment of DBS bondholders—did not involve DISH Wireless at all.  Rather, the parties signed the original RSA three months ago and DISH Wireless became a party only *two days ago*.  Moreover, Article X.A of the Plan expressly contemplates the Plan being modified, with the consent of the Required Consenting Creditors, to sever the DISH Wireless Debtors' confirmation process and timeline from the DBS Debtors.

6.      The issues that must be resolved in the DISH Wireless Debtors' cases are many and complex, and cannot possibly be resolved fairly and with due process on the timeline that the Debtors propose.  These include whether the Debtors' obligations under various tower agreements, including the Agreement with Crown Castle, were excused by *force majeure* because EchoStar voluntarily decided to sell its spectrum for a $12 billion profit (it did not), whether claims under agreements terminated six months before the bankruptcy can be capped under section 502(b)(6)

(they cannot); whether a nearly $9 billion intercompany loan that a Debtor partially transfers to a third-party trust can carry a class under section 1129(a)(10) (it cannot); and whether there are potentially valuable causes of action that the DISH Wireless Debtors have against their affiliates, directors, officers, and other related parties that should be investigated (there are and they should be).

7.      Crown Castle requests that substantive relief *as to the DISH Wireless Debtors only* be delayed and considered upon proper notice to DISH Wireless' creditors who—unlike the DBS Debtors' creditors—have not been involved in engineering these cases for more than six months. There are substantial issues that must be resolved, and the Court should not be forced into making a false choice that for the DBS cases to proceed expeditiously, the DISH Wireless cases must as well.

## BACKGROUND

8.      Crown Castle is one of the largest providers of shared wireless communications infrastructure in the United States, including wireless communication towers.

9.      DISH Wireless L.L.C. is a Colorado limited liability company and an indirect subsidiary of EchoStar.  DISH Wireless is the entity that holds DISH's wireless tower agreement obligations, including its obligations to Crown Castle and to other tower lessors.

10.     In 2019, EchoStar set out to build a nation-wide 5G network for its Boost Mobile business.  Building that network required two things: licenses to the FCC-regulated radio spectrum, and access to the physical infrastructure on which to deploy the network.  DISH Wireless obtained the spectrum by committing to network buildout milestones with the FCC, and it obtained the infrastructure by entering into long-term agreements with Crown Castle and other tower, fiber, and equipment providers.  It was those infrastructure providers, not the Debtors' funded-debt lenders,

who built the network in reliance on DISH Wireless's long-dated commitments under the Agreements.

11.    At the time, DISH Wireless held valuable assets, including the Boost Mobile business, which over time included millions of subscriber contracts that had an aggregate value of billions of dollars.

12.    In May 2025, the FCC opened an investigation into the Debtors' use of its spectrum, and specifically whether the Debtors' ultimate parent, EchoStar Corporation's ("EchoStar") continued ownership of the licenses served the public interest.  Despite publicly maintaining that the FCC's inquiry was meritless and that it could not be ordered to sell its spectrum licenses, EchoStar pursued a sale of its spectrum.  In August and September 2025, EchoStar agreed to sell the spectrum to AT&T and SpaceX for approximately $42 billion, roughly $12 billion more than EchoStar had paid to acquire it.

13.    Although only disclosed yesterday as part of the Disclosure Statement, at the time EchoStar agreed to sell its spectrum rights, it transferred the Boost Mobile business from DISH Wireless to a newly created entity—Boost SubscriberCo LLC ("BoostCo") which is a non-debtor.

14.    Having monetized the spectrum, EchoStar then took the position that the FCC investigation and spectrum sales were a *force majeure* that excused its obligations under the Agreements.  Crown Castle disagreed and commenced litigation in the District of Colorado seeking a declaration that no *force majeure* occurred and that the Agreements remain in full force and effect.

15.    In December 2025, after DISH Wireless stopped making payments under the Agreements, Crown Castle sent DISH Wireless a notice of default.  After DISH Wireless failed to cure such defaults, Crown Castle terminated the Agreements effective January 9, 2026.   As a

result of DISH Wireless' breach of the Agreements, and the subsequent termination thereof, DISH Wireless owes Crown Castle at least $3.5 billion in damages, making Crown Castle one of the largest creditors of DISH Wireless.[4]

16.     On June 30, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.  As of the Petition Date, the approximately $42 billion of value generated by the spectrum sales remains with non-Debtor EchoStar, while the long-term infrastructure obligations owed to Crown Castle and the numerous other communications providers that built the network remain with DISH Wireless, which the Debtors now assert has little or no ability to satisfy those obligations.

17.     The *Joint Prepackaged Chapter 11 Plan of DISH DBS Corporation, DISH Wireless L.L.C., and Their Respective Affiliated Debtors and Debtors in Possession* [Docket No. 6] (the "Plan"), does not contemplate a reorganization of the DISH Wireless Debtors.  Instead, it contemplates a liquidation and wind-down process that features an impaired class of general unsecured claims, the provision of a debtor-in-possession loan by an affiliate, a sale to an insider stalking horse, and a contested claims process, and rests on several intercompany transactions that warrant a thorough and independent investigation and may be subject to challenge.

18.     By the Debtors' own account, more than 170 lawsuits have been filed against DISH Wireless by tower lessors, fiber providers, equipment vendors, and other counterparties, asserting billions of dollars in claims.  These arm's-length, third-party creditors constitute the only impaired class of DISH Wireless creditors that is not an insider of the Debtors:  Class 2E, the DISH Wireless

---

[4]     While the Debtors dispute the amount of Crown Castle's damages claims and, for voting purposes, treat Crown Castle's claims as unliquidated (a treatment Crown Castle contests in this Objection), Crown Castle is, by any reasonable measure, one of the single largest creditors at DISH Wireless and is listed on the Debtors' consolidated list of top 30 unsecured creditors.

general unsecured claims class and the sole impaired class of third-party creditors entitled to vote on the DISH Wireless Debtors' restructuring.

## OBJECTIONS

19.     Without limiting the generality of the reservations provided herein, Crown Castle objects to the entry of the relief described below on a final basis or on the Debtors' proposed expedited timeline, and identifies the following concerns, each of which Crown Castle reserves the right to develop further:

### A. The Disclosure Statement Should not be Approved and Solicitation Should not be Authorized on the Proposed Accelerated Timeline

20.     As to the DISH Wireless Debtors, there is no basis to approve the Disclosure Statement, whether conditionally or on a final basis, on less than one day's notice.  Nor should the Court authorize the solicitation of votes on the DISH Wireless Debtors' restructuring before creditors have had a fair opportunity to evaluate the Plan, the Disclosure Statement, and the assets and causes of action belonging to DISH Wireless's estate.  On the present record, the Disclosure Statement does not provide impaired creditors the adequate information necessary to make an informed decision, and the proposed solicitation and confirmation schedule does not afford them a reasonable opportunity to do so.

21.     Moreover, no official committee of unsecured creditors (a "Committee") has yet been appointed in these cases, and the relief sought affects a large number of counterparties and thousands of contracts.

### B. The Proposed Solicitation and Vote-Tabulation Procedures are Improper

22.     Crown Castle objects to solicitation and tabulation procedures that:  (a) value disputed contract claims, including Crown Castle's multi-billion-dollar claims, at $1.00 for voting purposes (only after such claimants file proofs of claim); (b) count each affiliated claimant

separately rather than aggregating affiliated entities; and (c) permit the sole impaired voting class at DISH Wireless to be carried by an intercompany claim of approximately $8.8 billion that was recently assigned to the DWLLC Claims Trust for the express purpose of gerrymandering votes on the Plan.  That intercompany claim originated as a loan from DISH Network Corporation to DISH Wireless, was assigned to DBS, and was then routed through a claims trust for the benefit of certain bondholders, whose recovery on the claim is capped at approximately $300 million, demonstrating that a large portion of the claim is still for the benefit of an undisputed insider, DBS. Simply put, an insider intercompany claim should not be permitted to supply the third-party acceptance that carries an entire impaired class; and Crown Castle reserves all rights with respect to the classification, treatment, voting, numerosity, and gerrymandering issues that these procedures present.

23.     Crown Castle further objects to the extent the proposed procedures fail to require the Debtors to affirmatively solicit the holders of contested contract claims.  The Debtors know the identities of these claimants as they were parties to prepetition litigation with them, and their claims are reflected on the Debtors' schedules.  Despite this, the procedures provide that such claimants will be solicited only after they file a proof of claim, the deadline for which falls just ten days before the proposed voting deadline.  That approach does not afford claimants adequate time to receive solicitation packages, evaluate their treatment under the Plan, and cast ballots, and it raises significant due process concerns.  The Debtors should instead be required to solicit the known contested contract claimants directly.

24.     Moreover, the Solicitation Procedures improperly modify the parties' burdens of proof.  If a creditor timely files a claim, such claim is *prima facie* valid under Bankruptcy Rule 3001, and should be able to vote in the amount of such claim unless and until the Debtor carries

its burden of objecting to such claim. The proposed procedures here place the burden on the claimant who has filed a valid claim to also seek relief under Rule 3018(a).

25.     The proposed process under Bankruptcy Rule 3018(a) is likewise proposed to be run on an accelerated timeline. Under the proposed procedures, a claimant that disputes the $1.00 voting amount must file a motion under Rule 3018(a) by July 27, 2026—the same day as the claims bar date—after which the Debtors would have until August 5, 2026 to object, and any such motion must be resolved two-days later by August 7, 2026 or the $1.00 voting amount remains in place. That timeline is not realistic: it affords creditors no practical opportunity to prepare and prosecute a temporary-allowance motion and leaves the Court almost no time to resolve disputes before the voting deadline, with the result that known contested contract claimants may be disenfranchised or reduced to nominal $1.00 votes. The Court should not countenance such a truncated process, ***especially where the Debtors intend to use an intercompany claim*** to carry this supposed "pre-packaged" bankruptcy.

### C. The Proposed Bidding Procedures and Sale Process Should not be Approved on the Debtors' Contemplated Timeline

26.     Crown Castle does not oppose a sale of the DISH Wireless assets as such, but objects to the proposed bidding procedures and sale process to the extent they (i) impose a bidding and auction timeline too compressed to permit a fair, open, and competitive process; (ii) are structured around a credit bid by an insider stalking horse, EchoStar, using financing provided by that same insider; or (iii) contain bespoke or unusual bid requirements, asset or liability descriptions, or bidder protections, including any stalking-horse or break-up fee, expense reimbursement, or minimum-overbid provision, that would chill competitive bidding or entrench an insider transaction before a committee can be heard.

27.     The Court should take particular note that EchoStar—DISH Wireless's ultimate parent—proposes to acquire all causes of action held by the DISH Wireless Debtors, including causes of action under chapter 5 of the Bankruptcy Code.  The Court should not green-light a process today that contemplates a parent's purchase of claims against the parent itself in less than two months' time—especially given the significant history of intercompany claims and transactions that exist in this case.

28.     Crown Castle reserves all rights to object to the bidding procedures, the identity of any purchaser, the sale, and any related relief, and requests that any consideration of the Bidding Procedures be postponed until after an Official Committee of Unsecured Creditors has been appointed.

### D. The Rejection Procedures Motion Should not be Heard on an Emergency Basis, and No Rejection Procedures or Order Should Adjudicate the Debtors' Right to Reject the Agreements or Prejudice the Treatment of Crown Castle's Claims

29.     The Debtors seek approval of the Rejection Procedures Motion at the first day hearing, on an emergency basis, with respect to the "Covered Contracts" relating to the 5G network buildout, which include Crown Castle's Agreements.

30.     There is no basis for emergency treatment.  The Debtors have not been performing or paying under those contracts for more than six months, and no exigency requires that rejection be authorized on a compressed first day timeline.  To the extent the Debtors wish to reject any contract, that relief is available through ordinary rejection motions on regular notice.

31.     Notably, Crown Castle terminated its tower agreements with DISH Wireless effective January 9, 2026, months before the Petition Date.  The Debtors themselves have asserted, by letters dated September 24 and 25, 2025, that the Agreements were excused or terminated by a purported *force majeure*.  Accordingly, Crown Castle objects to any relief under the Rejection

Procedures Motion to the extent it purports to adjudicate the Debtors' right to reject the Agreements, or otherwise to prejudice Crown Castle's rights or the measure or treatment of its claims, including under section 502(b)(6) of the Bankruptcy Code, and reserves all rights with respect to whether rejection procedures are appropriate for agreements that have already been terminated.

32.     If any rejection procedures are approved, they should be modified to protect counterparties' rights.  The proposed procedures would permit the Debtors to reject contracts by filing rejection notices, each identifying as many as 250 contracts and with no cap on the total number of notices, specifying the affected counterparties, the proposed rejection date, any property to be retrieved or abandoned at the affected sites, and the applicable objection procedures.  Should the Court approve any such procedures over Crown Castle's objection, they should be modified in at least two respects.

33.     First, the proposed seven-day period to object to a rejection notice is too short; counterparties should be afforded at least twenty-one days to respond to a proposed rejection.

34.     Second, the proposed procedures would permit the Debtors to remove their property from the affected sites by the earlier of ninety days after the Petition Date or the closing of the last asset sale in the DISH Wireless cases, a period that is unduly long and would leave counterparties holding the Debtors' equipment, and the Debtors in the position of holdover tenants, for months.  The Debtors should instead be required to remove their property on or before the effective date of any rejection, and any property not so removed should be deemed abandoned as of that date, with the affected counterparties authorized to use, sell, dispose of, re-let, or otherwise deal with the property and the affected sites without further order of the Court and without liability, and with the automatic stay modified accordingly.

### E.  Admission of Evidence

35.    Crown Castle further objects to the admission into evidence of the declarations submitted by the Debtors, except for the limited and narrow purpose of supporting the specific interim relief sought at the first day hearing on the basis of avoiding immediate and irreparable harm, and only for purposes of the first day hearing.

### RESERVATION OF RIGHTS

36.    As described above, Crown Castle reserves all of its rights with respect to the First Day Motions and the other relief requested in these cases.  Crown Castle further reserves the right to supplement and amend this Objection and introduce evidence at any hearing on approval of the First Day Motions or any other first day pleadings filed in these cases, on an interim or final basis, or such other hearings as may be scheduled in these cases from time to time.  Further, Crown Castle reserves the right to respond, object, join in, or amend anything herein with respect to any argument or objection made by any person relating to the First Day Motions or the other relief requested in these cases.  Nothing herein shall be deemed a waiver of, and Crown Castle expressly preserves, all of its claims, rights, remedies, and defenses, including with respect to the Agreements, the amount and treatment of its claims, and the litigation pending in the District of Colorado.

WHEREFORE, Crown Castle respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: July 1, 2026
Houston, Texas

/s/ John F. Higgins

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Jack M. Eiband (TX Bar No. 24135185)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Emails:      jhiggins@porterhedges.com
             sjohnson@porterhedges.com
             myoung-john@porterhedges.com
             jeiband@porterhedges.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (*pro hac vice* pending)
Kyle J. Kimpler (*pro hac vice* pending)
Jeffrey J. Recher (*pro hac vice* pending)
Grace Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Emails:      bhermann@paulweiss.com
             kkimpler@paulweiss.com
             jrecher@paulweiss.com
             ghotz@paulweiss.com

*Co-Counsel to Crown Castle*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/  *John F. Higgins*
John F. Higgins