**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DISH DBS CORPORATION, | ) | Case No. 26-90627 (CML) |
| DISH WIRELESS L.L.C., *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**MODIFIED JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**DISH DBS CORPORATION, DISH WIRELESS L.L.C., AND THEIR**
**RESPECTIVE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:     (713) 496-9700
Email:     charles.koster@whitecase.com

Ronald K. Gorsich (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:     (213) 620-7700
Email:     rgorsich@whitecase.com
     doah.kim@whitecase.com

**WHITE & CASE LLP**
Thomas E Lauria (Texas Bar No. 11998025)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:     (305) 371-2700
Email:     tlauria@whitecase.com

Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
300 N. LaSalle Drive
Chicago, Illinois 60654
Telephone:     (312) 881-5400
Email:     mlinder@whitecase.com
     laura.baccash@whitecase.com

David M. Turetsky (admitted *pro hac vice*)
Samuel P. Hershey (S.D. Texas Fed. No. 3465170)
Andrea Amulic (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Email:     david.turetsky@whitecase.com
     sam.hershey@whitecase.com
     andrea.amulic@whitecase.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

---

[1]     The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388.  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/DBS.  The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

# TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW** ...........................................................................................................................1
    A.    Defined Terms. ...........................................................................................................1
    B.    Rules of Interpretation. ............................................................................................26
    C.    Computation of Time. ..............................................................................................27
    D.    Governing Law. ........................................................................................................27
    E.    Reference to Monetary Figures. ..............................................................................27
    F.    Controlling Document. ............................................................................................27
    G.    Consultation, Notice, Information, and Consent Rights. .........................................27

**ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS, AND DIP FINANCING CLAIMS** ............................................................................................28
    A.    Administrative Claims. ............................................................................................28
    B.    Professional Compensation. ....................................................................................29
    C.    Priority Tax Claims. .................................................................................................31
    D.    DIP Financing Claims. .............................................................................................31
    E.    U.S. Trustee. ............................................................................................................32
    F.    Ad Hoc Group Professional Fees .............................................................................33
    G.    Indenture and DWLLC Claims Trust Trustee Fees and Expenses. ..........................33

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ..............................34
    A.    Classification of Claims and Interests. ....................................................................34
    B.    Treatment of Claims and Interests. .........................................................................35
    C.    Special Provision Governing Unimpaired Claims. ..................................................49
    D.    Elimination of Vacant Classes. ...............................................................................49
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes. .............................49
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .........................50
    G.    Controversy Concerning Impairment. .....................................................................50

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ...........................................................50
    A.    General Settlement of Claims and Interests. ............................................................50
    B.    Sources of Plan Consideration. ...............................................................................50
    C.    FCC Trust Matters. ..................................................................................................51
    D.    DNC Transactions. ...................................................................................................53
    E.    Intercompany Transactions. .....................................................................................54
    F.    Restructuring Transactions. ......................................................................................54
    G.    Director, Officer, and Manager Liability Insurance. ................................................55
    H.    Cancellation of Notes, Instruments, Certificates, and Other Documents. ................55
    I.    Corporate Existence. ................................................................................................57
    J.    Corporate Action. ....................................................................................................57
    K.    The Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors. ..........................58
    L.    The Wind Down Debtor Account. ...........................................................................58
    M.    Vesting of Assets in Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors..59
    N.    Wind-Down Authority of the Post-Effective Date DISH Wireless Debtors. .............59
    O.    Effectuating Documents; Further Transactions. .......................................................60
    P.    Section 1146 Exemption. .........................................................................................60
    Q.    Certain Securities Law Matters. ..............................................................................61
    R.    Preservation of Causes of Action. ...........................................................................61
    S.    Closing the Chapter 11 Cases. .................................................................................62

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........................62

|   |   |   |   |
|---|---|---|---|
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | | 62 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | | 64 |
| C. | Cure of Defaults for Assumed Contracts and Leases. | | 64 |
| D. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | | 65 |
| E. | Indemnification Obligations. | | 65 |
| F. | Insurance Policies. | | 66 |
| G. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | | 66 |
| H. | Reservation of Rights. | | 67 |
| I. | Nonoccurrence of Effective Date. | | 67 |
| J. | Contracts and Leases Entered Into After the Petition Date. | | 67 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ............................................................. **67**

| A. | Timing and Calculation of Amounts to Be Distributed. | | 67 |
| B. | Disbursing Agent. | | 68 |
| C. | Rights and Powers of Disbursing Agent. | | 68 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | | 69 |
| E. | Distributions to Consenting Creditors. | | 70 |
| F. | Compliance with Tax Requirements/Allocations. | | 72 |
| G. | Allocation of Plan Distributions Between Principal and Interest. | | 72 |
| H. | No Postpetition Interest on Claims. | | 73 |
| I. | Foreign Currency Exchange Rate. | | 73 |
| J. | Setoffs and Recoupment. | | 73 |
| K. | Claims Paid or Payable by Third Parties. | | 74 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ............................................................................................................................................. **75**

| A. | Allowance of Claims. | | 75 |
| B. | Claims Administration Responsibilities. | | 76 |
| C. | Disputed Claims Process. | | 76 |
| D. | Disputed Claims Reserve. | | 76 |
| E. | Estimation of Claims. | | 77 |
| F. | Adjustment to Claims or Interests Without Objection. | | 78 |
| G. | Disallowance of Claims or Interests. | | 78 |
| H. | Amendments to Proofs of Claim or Interest. | | 78 |
| I. | No Distributions Pending Allowance. | | 78 |
| J. | Distributions After Allowance. | | 79 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ...................... **79**

| A. | Discharge of Claims and Termination of Interests and Intercompany Interests. | | 79 |
| B. | Release of Liens. | | 80 |
| C. | Releases by the Debtors. | | 80 |
| D. | Releases by the Debtors, EchoStar, DNC, and the Specified Non-Debtor Affiliates. | | 82 |
| E. | Releases by the Consenting Creditors. | | 83 |
| F. | Releases by Holders of Claims, Interests and Intercompany Interests. | | 83 |
| G. | Exculpation. | | 85 |
| H. | Injunction. | | 86 |
| I. | Protection Against Discriminatory Treatment. | | 87 |
| J. | Subordination Rights. | | 87 |
| K. | Document Retention. | | 87 |
| L. | Reimbursement or Contribution. | | 87 |

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** ................................. **88**

| A. | Conditions Precedent to the Effective Date. | | 88 |
| B. | Waiver of Conditions. | | 89 |
| C. | Substantial Consummation. | | 90 |
| D. | Effect of Non-Occurrence of Conditions to the Effective Date. | | 90 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**.................................**90**
    A.    Modifications and Amendments..................................................................................90
    B.    Effect of Confirmation on Modifications..................................................................90
    C.    Revocation or Withdrawal of the Plan.......................................................................91

**ARTICLE XI. RETENTION OF JURISDICTION**....................................................................................**91**

**ARTICLE XII. MISCELLANEOUS PROVISIONS**....................................................................................**93**
    A.    Immediate Binding Effect..........................................................................................93
    B.    Additional Documents. ..............................................................................................93
    C.    Payment of Statutory Fees. ........................................................................................94
    D.    Dissolution of Statutory Committees.........................................................................94
    E.    Reservation of Rights. ...............................................................................................94
    F.    Successors and Assigns. .............................................................................................94
    G.    Notices.......................................................................................................................94
    H.    Enforcement of Confirmation Order...........................................................................96
    I.    Term of Injunctions or Stays......................................................................................96
    J.    Entire Agreement. .....................................................................................................96
    K.    Exhibits......................................................................................................................96
    L.    Nonseverability of Plan Provisions............................................................................97
    M.    Votes Solicited in Good Faith....................................................................................97
    N.    Waiver. .....................................................................................................................97

**INTRODUCTION**

DISH DBS Corporation, DISH Wireless L.L.C., and their respective Debtor Affiliates hereby propose this Plan for the treatment and resolution of the outstanding Claims against, and Interests in, the Debtors.  Capitalized terms used in this Plan shall have the meanings set forth in Article I.A.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.   The classifications of Claims and Interests set forth in Article III shall be deemed to apply separately with respect to each Debtor, as applicable.   The Plan does not contemplate substantive consolidation of any of the Debtors.   Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, the transactions under the Plan, and certain related matters.  All exhibits, schedules, and supplements to this Plan, including the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019, and the terms and conditions set forth in the Restructuring Support Agreement and this Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan before its substantial consummation.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

**A.    Defined Terms.**

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.      "*2021 Intercompany Loan – Tranche A Payment*" means (a) payment of Cash in the amount of approximately $4,767,000,000 plus accrued and unpaid interest (including any interest paid in kind) to the date of such payment, in full and final satisfaction of the loan tranche that matures on December 1, 2026 under that certain Loan and Security Agreement dated November 26, 2021 between DBS, as lender, and DNC, as borrower, the receivable for which DBS transferred to EchoStar Intercompany Receivable Company L.L.C. in January 2024 or (b) other satisfaction and discharge in full of such loan tranche.

2.      "*2021 Intercompany Loan – Tranche B Payment*" means payment of Cash in the amount of approximately $2,845,000,000 plus accrued and unpaid interest (including any interest paid in kind) to the date of such payment, in full and final satisfaction of the loan tranche that matures on December 1, 2028 under that certain Loan and Security Agreement dated November 26, 2021 between DBS, as lender, and DNC, as borrower.

3.     "*2021 Intercompany Loan Payments*" means the 2021 Intercompany Loan – Tranche A Payment and the 2021 Intercompany Loan – Tranche B Payment.

4.     "*2026 Senior Notes*" means the 7.75% Senior Notes due 2026 issued by DBS under the 2026 Senior Notes Indenture.

5.     "*2026 Senior Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2026 Senior Notes or the 2026 Senior Notes Indenture, arising under, arising from, or relating to the 2026 Senior Notes or the 2026 Senior Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

6.     "*2026 Senior Notes Indenture*" means that certain Indenture, dated as of June 13, 2016, by and among DISH DBS Corporation, the guarantors party thereto, and Wilmington Savings Society, FSB, as successor trustee, governing the 2026 Senior Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

7.     "*2026 Senior Secured Notes*" means the 5.25% Senior Secured Notes due 2026 issued by DBS under the 2026 Senior Secured Notes Indenture.

8.     "*2026 Senior Secured Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2026 Senior Secured Notes or the 2026 Senior Secured Notes Indenture, arising under, arising from, or relating to the 2026 Senior Secured Notes or the 2026 Senior Secured Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

9.     "*2026 Senior Secured Notes Indenture*" means that certain Secured Indenture, dated as of November 26, 2021, by and among DISH DBS Corporation, the guarantors party thereto, and Wilmington Savings Society, FSB as successor trustee, and U.S. Bank National Association, as collateral agent, governing the 2026 Senior Secured Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

10.     "*2028 and 2029 Notes*" means, collectively, the 2028 Senior Notes, the 2028 Senior Secured Notes, and the 2029 Senior Notes.

11.     "*2028 Senior Notes*" means the 7.375% Senior Notes due 2028 issued by DBS under the 2028 Senior Notes Indenture.

12.     "*2028 Senior Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2028 Senior Notes or the 2028 Senior Notes Indenture, arising under, arising from, or relating to the 2028 Senior Notes or the 2028 Senior Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

13.     "*2028 Senior Notes Indenture*" means that certain Indenture, dated as of July 1, 2020, by and among DISH DBS Corporation, the guarantors party thereto, and Wilmington Savings Society, FSB as successor trustee, and U.S. Bank National Association, as collateral agent,

2

governing the 2028 Senior Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

14.     "*2028 Senior Secured Notes*" means the 5.75% Senior Secured Notes due 2028 issued by DBS under the 2028 Senior Secured Notes Indenture.

15.     "*2028 Senior Secured Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2028 Senior Secured Notes or the 2028 Senior Secured Notes Indenture, arising under, arising from, or relating to the 2028 Senior Secured Notes or the 2028 Senior Secured Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

16.     "*2028 Senior Secured Notes Indenture*" means that certain Secured Indenture, dated as of November 26, 2021, by and among DISH DBS Corporation, the guarantors party thereto, and Wilmington Savings Society, FSB, as successor trustee, and U.S. Bank National Association, as collateral agent, governing the 2028 Senior Secured Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

17.     "*2029 Senior Notes*" means the 5.125% Senior Notes due 2029 issued by DBS under the 2029 Senior Notes Indenture.

18.     "*2029 Senior Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2029 Senior Notes or the 2029 Senior Notes Indenture, arising under, arising from, or relating to the 2029 Senior Notes or the 2029 Senior Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

19.     "*2029 Senior Notes Indenture*" means that certain Indenture, dated as of May 24, 2021, by and among DISH DBS Corporation, the guarantors party thereto, and U.S. Bank National Association, as trustee, governing the 2029 Senior Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

20.     "*Ad Hoc Group Professional Fees*" means (x) all reasonable and documented professional fees and expenses incurred by Milbank LLP, in its capacity as counsel to certain Consenting Creditors, and any local counsel or other advisor engaged by Milbank LLP on behalf of the Consenting Creditors (i) following the Agreement Effective Date (as defined in the Restructuring Support Agreement) or (ii) in connection with the Chapter 11 Cases, (y) the DBS Claims Trust Special Counsel Fees, and (z) the DBS Claims Trust Indemnity, which shall in each case be payable by the Debtors, EchoStar, or DNC on a current basis during the pendency of the Chapter 11 Cases; provided that (a) the Ad Hoc Group Professional Fees (excluding the DBS Claims Trust Special Counsel Fees and the DBS Claims Trust Indemnity) payable by the Debtors, EchoStar, or DNC through the date that is 180 days after the Petition Date shall not exceed $10,000,000 in the aggregate, (b) all reasonable and documented Ad Hoc Group Professional Fees incurred during the pendency of the Chapter 11 Cases after the date that is 180 days after the Petition Date shall be payable on a current basis and shall not be subject to any cap, and (c) unless otherwise expressly agreed, neither the Debtors, DNC, nor EchoStar shall have any obligation to pay any fees or expenses of Lazard Freres & Co. LLC incurred on or following the Petition Date.

3

For the avoidance of doubt, neither the DBS Claims Trust Special Counsel Fees nor the DBS Claims Trust Indemnity shall be subject to the cap set forth in the foregoing clause (b).

21.     "*Administrative Claim*" means any Claim against any of the Debtors for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates; (b) Allowed Professional Fee Claims; (c) the Ad Hoc Group Professional Fees; (d) any adequate protection claims to which the secured parties under the 2026 Senior Secured Notes or 2028 Senior Secured Notes are entitled pursuant to an order of the Bankruptcy Court; and (e) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

22.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

23.     "*Allowed*" means all or a portion of any Claim or Interest: (a) that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Proof of Claim or proof of Interest has been timely filed as to which no objection or request for estimation has been filed on or before the deadline to object to Claims or Interests set forth in the Bar Date Order or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) that is evidenced by a timely filed Proof of Claim or proof of Interest as to which no objection or request for estimation has been timely filed, (c) as to which any objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors or (iii) pursuant to the terms of the Plan. The Debtors retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. For the avoidance of doubt, (x) a Proof of Claim filed after the Claims Bar Date or a request for payment of an Administrative Claim filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim, and (y) a Claim or Interest that has been Disallowed by a Final Order or settlement shall not be Allowed for any purposes whatsoever. "Allow" and "Allowing" have correlative meanings.

24.     "*Amended 2026 Senior Secured Notes*" means the 2026 Senior Secured Notes, as amended and supplemented pursuant to the applicable Amended Notes Indenture.

25.     "*Amended 2028 Senior Notes*" means the 2028 Senior Notes, as amended and supplemented pursuant to the applicable Amended Notes Indenture.

26.     "*Amended 2028 Senior Secured Notes*" means the 2028 Senior Secured Notes, as amended and supplemented pursuant to the applicable Amended Notes Indenture.

27.    "*Amended 2029 Senior Notes*" means the 2029 Senior Notes, as amended and supplemented pursuant to the applicable Amended Notes Indenture.

28.    "*Amended Notes*" means, collectively, the (a) Amended 2026 Senior Secured Notes, (b) Amended 2028 Senior Secured Notes, (c) Amended 2028 Senior Notes, and (d) Amended 2029 Senior Notes.

29.    "*Amended Notes Indentures*" means the supplemental indentures adopted in accordance with the Restructuring Support Agreement with respect each of the following: (a) the Amended 2026 Senior Secured Notes Indenture, (b) the Amended 2028 Senior Notes Indenture, (c) the Amended 2028 Senior Secured Notes Indenture, and (d) the Amended 2029 Senior Notes Indenture, in each case, together with all ancillary documentation contemplated thereunder. The Amended Notes Indentures shall be in all respects consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Required Consenting Creditors and the applicable Indenture Consenting Creditors.

30.    "*Assumed Contracts and Leases*" means those Executory Contracts and Unexpired Leases that are assumed under sections 365(a) or 1123 of the Bankruptcy Code, including Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to any order of the Bankruptcy Court.

31.    "*AT&T Closing Date*" means the date on which the transactions contemplated by the AT&T Transactions are consummated, including the assignment of EchoStar's 3.45 GHz and 600 MHz spectrum licenses to AT&T Mobility II LLC (or its designee) pursuant to the applicable FCC order(s) and the related transaction documentation and the closing of the assignment of such spectrum licenses as approved by the FCC Order.

32.    "*AT&T License Purchase Agreement*" means that certain License Purchase Agreement by and among EchoStar Corporation, the other Seller Parties set forth therein, and AT&T Mobility II LLC, dated as of August 25, 2025, collectively with all exhibits and schedules thereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

33.    "*AT&T Transactions*" means the transactions pursuant to which EchoStar (and/or its applicable subsidiaries) shall assign the 3.45 GHz and 600 MHz spectrum licenses to AT&T Mobility II LLC (or its designee), as approved by the FCC's Wireless Telecommunications Bureau pursuant to the FCC Order.

34.    "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or interest in property or an obligation incurred by any of the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552, 553(b), and 724(a) of the Bankruptcy Code, or other similar or related state or federal statutes and common law.

35.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

36.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

37.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

38.    "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Dkt. No. 262] (as may be amended, supplemented, or modified from time to time).

39.    "*Bidding Procedures*" means the procedures governing the sale process with respect to any Sale (as such procedures may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof).

40.    "*Business Day*" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, both the State of New York and the State of Texas.

41.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

42.    "*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

43.    "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

44.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

45.     "*Claims and Noticing Agent*" means Epiq Corporate Restructuring LLC in its capacity as claims and noticing agent retained by the Debtors in the Chapter 11 Cases.

46.     "*Claims Register*" means the official register of Claims against the Debtors maintained by the Claims and Noticing Agent.

47.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

48.     "*Company Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

49.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

50.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

51.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

52.     "*Confirmation Order*" means an order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in all respects consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Required Consenting Creditors.

53.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code (as such committee may be reconstituted from time to time).

54.     "*Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

55.     "*Consummation*" or "*Consummated*" means the occurrence of the Effective Date.

56.     "*Covered Claim*" has the meaning ascribed to such term in the FCC Trust Agreement.

57.     "*Covered Claim Submission*" has the meaning ascribed to such term in the FCC Trust Agreement.

58.     "*Cure Costs*" means all amounts, including an amount of $0, required to cure any monetary defaults based upon a Debtor's defaults under the Assumed Contracts and Leases under section 365 of the Bankruptcy Code (unless such defaults are waived or modified by the applicable

counterparty), other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

59.     "*D&O Policies*" means, collectively, all insurance policies (including any "tail policy") issued at any time to or providing coverage to any of the Debtors' current or former directors', managers', members', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

60.     "*DBS*" means DISH DBS Corporation.

61.     "*DBS Cash Sweep*" means the payment or payments made by DNC to DBS on account of the 2021 Intercompany Loan in accordance with Article IV.E, the proceeds of which shall be used by Reorganized DBS to fund distributions to Holders of Allowed DBS Notes Claims in accordance with this Plan.

62.     "*DBS Debtors*" means, collectively (a) DISH DBS Corporation; (b) DISH Broadcasting Corporation; (c) DISH Network L.L.C.; (d) Dish Network Service L.L.C.; (e) DISH Operating L.L.C.; (f) DISH Technologies Holding Corporation; (g) DISH Technologies L.L.C.; (h) Sling Media, L.L.C.; (i) Sling TV Gift Card Corporation; (j) Sling TV Holding L.L.C.; (k) Sling TV L.L.C.; and (l) Sling TV Purchasing L.L.C.

63.     "*DBS General Unsecured Claim*" means any Claim against a DBS Debtor that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a 2026 Senior Secured Notes Claim, a 2028 Senior Secured Notes Claim, a 2026 Senior Notes Claim, a 2028 Senior Notes Claim, a 2029 Senior Notes Claim, or a DBS Intercompany Claim. For the avoidance of doubt, DBS General Unsecured Claims shall include any Claim against a DBS Debtor held by an Affiliate of a Debtor that is not itself a Debtor.

64.     "*DBS Intercompany Claim*" means any Claim against a DBS Debtor held by another Debtor.

65.     "*DBS Notes*" means, collectively, the 2026 Senior Secured Notes, the 2026 Senior Notes, the 2028 Senior Secured Notes, the 2028 Senior Notes, and the 2029 Senior Notes.

66.     "*DBS Notes Claim*" means a Claim relating to the 2026 Senior Secured Notes, the 2026 Senior Notes, the 2028 Senior Secured Notes, the 2028 Senior Notes, or the 2029 Senior Notes.

67.     "*DBS Professional Fee Escrow Account*" means the account funded in accordance with Article II.B in an amount equal to the aggregate of the DBS Professional Fee Escrow Amount.

68.     "*DBS Professional Fee Escrow Amount*" means the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services prior to and as of the Confirmation Date that are allocable to the DBS Debtors, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B.

69.     "*Debtor Release*" means the release set forth in Article VIII.C.

8

70. "*Debtors*" means, collectively, the DBS Debtors and DISH Wireless Debtors.

71. "*Definitive Documents*" means the documents listed in Section 5 of the Restructuring Support Agreement, which shall be in all respects consistent with the Restructuring Support Agreement and subject to the consent requirements set forth in Section 5(a) thereof.

72. "*DIP Facility*" has the meaning set forth in the DIP Order.

73. "*DIP Financing Agreement*" means that certain Debtor-in-Possession Loan and Security Agreement by and among DISH Wireless L.L.C., as borrower, the other DISH Wireless Debtors, as guarantors, and the DIP Lender, as lender, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms or any applicable DIP Orders.

74. "*DIP Financing Claims*" means any Claim held by the DIP Lender arising under, out of, or relating to the DIP Financing Agreement, the other DIP Financing Documents, or any DIP Orders, including any Claim for principal, interest, fees, expenses, indemnification, reimbursement, or any other amounts due thereunder.

75. "*DIP Financing Documents*" means the DIP Financing Agreement and all other agreements, instruments, guarantees, security documents, certificates, notices, and other documents executed or delivered in connection therewith, as each may be amended, supplemented, or otherwise modified from time to time in accordance with its terms and any applicable DIP Orders.

76. "*DIP Lender*" means EchoStar in its capacity as lender under the DIP Financing Agreement, or such other lender as determined by an order of the Bankruptcy Court.

77. "*DIP Orders*" means one or more orders, if any, entered by the Bankruptcy Court approving the DIP Financing Agreement and the DIP Financing Documents and authorizing the Debtors to obtain the DIP financing contemplated thereunder.

78. "*Disallowed*" means, with respect to any Claim or Interest, or any portion thereof, that such Claim, Interest, or any portion thereof, is not Allowed.

79. "*Disbursing Agent*" means, with respect to all distributions to be made under this Plan, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, or any Entity the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, select to make or to facilitate distributions in accordance with this Plan.

80. "*Disclosure Statement*" means the disclosure statement with respect to this Plan that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable Law, and all exhibits, schedules, supplements, modifications and amendments thereto.

81. "*Disclosure Statement Order*" means any order of the Bankruptcy Court approving the adequacy of the Disclosure Statement.

82.    "*DISH Wireless Administrative Claims Bar Date*" means the applicable deadline by which all requests for payment of Administrative Claims against the DISH Wireless Debtors must be Filed and served on the DISH Wireless Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, which shall be the date that is thirty (30) days after the Effective Date, except as otherwise specifically set forth in this Plan or a Final Order of the Bankruptcy Court.

83.    "*DISH Wireless Administrative Claims Objection Deadline*" means the deadline for Filing objections to requests for payment of Administrative Claims against the DISH Wireless Debtors (other than requests for payment of Professional Fee Claims and fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code), which shall be the later of (a) the date that is ninety (90) days after the Effective Date and (b) the date that is ninety (90) days after the Filing of the applicable request for payment of the Administrative Claims; provided that the DISH Wireless Administrative Claims Objection Deadline may be extended by the Bankruptcy Court after notice and a hearing.

84.    "*DISH Wireless Backup Bidder(s)*" means any Entity or Entities whose bid for any of the DISH Wireless Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the next-highest or otherwise second-best bid for such assets as compared to the applicable DISH Wireless Successful Bidder's bid for such assets pursuant to the Bidding Procedures, including, for the avoidance of doubt, the DISH Wireless Initial Stalking Horse Bidder if its bid is so selected and approved, or any designee of such Entity or Entities. For the avoidance of doubt, a DISH Wireless Backup Bidder may be more than one Entity, submitting one or more bids, and, if applicable, use of the term "DISH Wireless Backup Bidder" herein may be read as "DISH Wireless Backup Bidders."

85.    "*DISH Wireless Debtors*" means, collectively: (a) DISH Wireless L.L.C.; (b) DISH Wireless Leasing L.L.C.; (c) DISH Wireless Retail Holding L.L.C.; (d) DISH Wireless Retail Operating L.L.C.; (e) DISH Infinite Corporation; and (f) Neyland Networks LLC.

86.    "*DISH Wireless Distributable Value*" means Cash in an amount equal to the sum of (i) the aggregate net proceeds actually received by the DISH Wireless Debtors' Estates from the Sale, (ii) all Cash on hand of the DISH Wireless Debtors' Estates as of the Effective Date, and (iii) any other amounts remaining in the DISH Wireless Debtors' Estates, including any amounts remaining in the Wind Down Account, following the completion of the Wind Down, which shall, in each case, be net of all amounts paid or payable (whether before, on, or after the Effective Date) on account of: (a) any transaction costs and other fees and expenses incurred in connection with the consummation of such Sale and payable from such proceeds pursuant to the Sale Order, (b) the amounts actually paid (or required to be paid or reserved) from such proceeds, on or prior to the applicable distribution date, in respect of Claims against the DISH Wireless Debtors that are senior in right of payment to the DISH Wireless General Unsecured Claims, including Allowed DIP Financing Claims, Allowed Prepetition Secured Loan Claims, Allowed Other Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims, in each case to the extent such amounts are payable from, or are required to be satisfied from, the proceeds of the Sale or Cash on hand of the DISH Wireless Debtors' Estates, (c) the Wind Down Amount, which shall be funded into the Wind Down Debtor Account from the proceeds of the Sale on or before the Effective Date, and (d) the DISH Wireless Professional Fee Escrow Amount in accordance with Article II.B.

87. "*DISH Wireless General Unsecured Claim*" means any Claim against any DISH Wireless Debtor that is not an Administrative Claim, a DIP Financing Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Prepetition Secured Loan Claim, a Secured Type A Claim or a DISH Wireless Intercompany Claim.  For the avoidance of doubt, DISH Wireless General Unsecured Claims include (a) any Claim against a DISH Wireless Debtor held by an Affiliate of a Debtor that is not itself a Debtor and (b) any Claim held by the DWLLC Claims Trust against DWLLC under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries prior to the Petition Date in accordance with the terms of the Restructuring Support Agreement.

88. "*DISH Wireless Initial Stalking Horse Bidder*" means EchoStar Corporation, in its capacity as the initial stalking horse bidder pursuant to the Asset Purchase Agreement by and among the DISH Wireless Debtors and EchoStar Corporation.

89. "*DISH Wireless Intercompany Claim*" means any Claim against a DISH Wireless Debtor held by another Debtor, other than any (a) Prepetition Secured Loan Claim or (b) Claim arising under or relating to the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date.

90. "*DISH Wireless Professional Fee Escrow Account*" means the account funded in accordance with Article II.B in an amount equal to the aggregate of the DISH Wireless Professional Fee Escrow Amount.

91. "*DISH Wireless Professional Fee Escrow Amount*" means the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services prior to and as of the Confirmation Date that are allocable to the DISH Wireless Debtors, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B.

92. "*DISH Wireless Successful Bidder(s)*" means any Entity or Entities whose bid for any of the DISH Wireless Debtors' assets is selected by the DISH Wireless Debtors and approved by the Bankruptcy Court as the highest or otherwise best bid for such assets, including, for the avoidance of doubt, the DISH Wireless Initial Stalking Horse Bidder if its bid is so selected and approved. For the avoidance of doubt, a DISH Wireless Successful Bidder may be more than one Entity, submitting one or more bids, and, if applicable, use of the term "DISH Wireless Successful Bidder" herein may be read as "DISH Wireless Successful Bidders."

93. "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest, or any portion thereof, that is not yet Allowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable, and that is or has been listed on the Schedules as disputed, contingent, or unliquidated, or as to which a Proof of Claim or Interest has been Filed and the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, have interposed, or retain the right to interpose, a timely objection or request for estimation, recharacterization, reclassification, subordination, offset, or other challenge. For the avoidance of doubt, no Claim or Interest that is Allowed pursuant to this Plan or a Final Order shall be a Disputed Claim or Interest.

94. "*Disputed Claims Reserve*" means one or more reserves of Cash that may be established and maintained by the Disbursing Agent, in its reasonable discretion, solely from the DISH Wireless Distributable Value, for the limited purpose of facilitating distributions, if any, on account of DISH Wireless General Unsecured Claims that are Disputed as of the Effective Date.

95. "*Disputed Claims Reserve Amount*" means the amount of Cash, if any, that the Disbursing Agent determines, in its reasonable discretion, to set aside in the Disputed Claims Reserve with respect to Disputed DISH Wireless General Unsecured Claims. The Disputed Claims Reserve Amount may be based on the Disbursing Agent's good-faith estimate of the amount that could become distributable on account of such Claims from the DISH Wireless Distributable Value if and to the extent such Claims become Allowed, and may be adjusted, reduced, or released from time to time as Disputed Claims are resolved by settlement or Final Order.

96. "*Distribution Record Date*" means, other than with respect to any publicly traded securities, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is agreed to by the Debtors; provided, however, that the Distribution Record Date shall not apply to the DBS Notes or any Securities of the Debtors for which a Plan distribution is to be made in exchange for such Securities.

97. "*DNC*" means DISH Network Corporation.

98. "*DNC Notes*" means the 11.75% Senior Secured Notes due 2027 issued by DNC under the DNC Notes Indenture.

99. "*DNC Notes Indenture*" means that certain Secured Indenture, dated as of November 15, 2022, by and among DNC, the guarantors party thereto, and U.S. Bank Trust Company, National Association, as trustee, which governs the DNC Notes, as amended by that certain Supplemental Indenture, dated as of May 29, 2026, among DNC, the guarantors party thereto, and U.S. Bank Trust Company, National Association, as trustee and collateral agent.

100. "*DNC Notes Guarantee Claim*" means any Claim against DISH Wireless L.L.C. or DISH Wireless Leasing L.L.C., each in its capacity as a guarantor with respect to the DNC Notes or under the DNC Notes Indenture, in each case to the extent such Claim arises under, arises from, or relates to the DNC Notes or the DNC Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

101. "*DWLLC*" means DISH Wireless L.L.C.

102. "*DWLLC Claims Trust*" means the trust established by the DBS Claims Trust Agreement pursuant to the Restructuring Support Agreement to receive, hold, administer, and distribute, for the ratable benefit of the DWLLC Claims Trust Beneficiaries, distributions on account of Allowed DISH Wireless General Unsecured Claims under the DWLLC Intercompany Loan assigned to such trust prior to the Petition Date.

103. "*DWLLC Claims Trust Agreement*" means the Claims Trust Agreement, dated as of June 26, 2026, by and between DBS, as trustor, and Wilmington Savings Fund Society, FSB,

not in its individual capacity, but solely as trustee, as amended, amended and restated, supplemented, or otherwise modified from time to time.

104.   "*DWLLC Claims Trust Beneficiaries*" means the Indenture Trustees of 2028 and 2029 Notes on behalf of the respective Holders thereof to the extent they are beneficiaries of the DWLLC Claims Trust.

105.   "*DWLLC Claims Trust Indemnity*" means any indemnification obligations of the Debtors or their Affiliates owed to any DWLLC Claims Trust Beneficiaries, the trustee of the DWLLC Claims Trust, or any Consenting Creditor under the Restructuring Support Agreement or the DBS Claims Trust Agreement.

106.   "*DWLLC Claims Trust Special Counsel Fees*" means all reasonable and documented fees and expenses incurred by Milbank LLP (or any successor counsel thereto) in its capacity as special counsel the DWLLC Claims Trust.

107.   "*DWLLC Excess Recovery*" means any amounts recovered by the DWLLC Claims Trust from DWLLC's Estate and/or the FCC Trust in excess of the DWLLC Recovery Cap, which the DWLLC Claims Trust shall (a) hold in trust for the benefit of the applicable Indenture Trustee for the 2028 Senior Secured Notes on behalf of the Holders of the 2028 Senior Secured Notes and (b) promptly remit to such Indenture Trustee (without set-off or counterclaim), to be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on 2028 Senior Secured Notes then outstanding at par, without any premium, penalty, or charge, in accordance with the Restructuring Support Agreement and Article VI.E.

108.   "*DWLLC Intercompany Loan*" means those certain intercompany loans extended by DNC to DWLLC from time to time beginning in 2020, the proceeds of which were used by DWLLC in connection with Covered Activities (as defined in the FCC Trust Agreement), as memorialized pursuant to that certain Loan Agreement, dated as of August 22, 2025, between DNC, as lender, and DWLLC, as borrower, in the aggregate amount of $8,856,507,760.88 (inclusive of principal and accrued interest and net of $5,000,000,000.00 of prior loan forgiveness) as of June 28, 2026 (it being understood that interest on such DWLLC Intercompany Loan ceased as of June 28, 2026), as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, which were assigned by DNC to DBS, and by DBS, in its capacity as trustor under the DWLLC Claims Trust Agreement, to the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries prior to the Petition Date in accordance with the terms of the Restructuring Support Agreement.

109.   "*DWLLC Recovery Cap*" means an amount equal to $300,000,000, which is the maximum aggregate amount distributable to DWLLC Claims Trust Beneficiaries, as beneficiaries of the DWLLC Claims Trust and Holders of Allowed DISH Wireless General Unsecured Claims against DWLLC under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of such Holders in accordance with the Restructuring Support Agreement.

110.   "*DWLLC Residual Recovery*" means any amounts by which the DWLLC Excess Recovery exceeds the aggregate outstanding principal amount and accrued and unpaid interest on

the 2028 Senior Secured Notes at the time of any distribution on account of the Allowed DISH Wireless General Unsecured Claims held by the DWLLC Claims Trust under the DWLLC Intercompany Loan, which the DWLLC Claims Trust shall (a) hold in trust for the benefit of the applicable Indenture Trustees for the 2028 Senior Notes and the 2029 Senior Notes on behalf of the respective Holders thereof and (b) promptly remit to such Indenture Trustees (without set-off or counterclaim), to be applied solely to redeem, on a Pro Rata basis, a corresponding aggregate amount of principal and accrued and unpaid interest on 2028 Senior Notes and 2029 Senior Notes then outstanding at par, without any premium, penalty, or charge, in accordance with the Restructuring Support Agreement and Article VI.E.

111. "*EchoStar*" means EchoStar Corporation.

112. "*EchoStar Parties*" has the meaning ascribed to such term in the FCC Trust Agreement.

113. "*Effective Date*" means, with respect to this Plan, the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A have been satisfied or waived in accordance with the Plan.

114. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

115. "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

116. "*Exculpated Party*" means each of: (a) the Debtors; (b) Vikram Jindal and Gerard Uzzi, solely in their capacity as the Independent Managers serving on the Special Committee, for conduct within the scope of their duties; and (c) the Committee and each of its members, for conduct within the scope of their duties.

117. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 and 1123 of the Bankruptcy Code.

118. "*FCC*" means the Federal Communications Commission.

119. "*FCC Order*" means the Memorandum Opinion and Order, *In re Applications of AT&T Mobility II LLC and EchoStar Corporation for Consent to Assign Licenses*, DA 26-470, App'x B (WTB May 12, 2026).

120. "*FCC Trust*" means the trust established at the direction of the Wireless Telecommunications Bureau of the FCC pursuant to the FCC Trust Agreement and FCC Order.

121. "*FCC Trust Agreement*" means that certain Trust Agreement, dated as of June 26, 2026, by and between EchoStar and the Trustee, establishing the "Wireless Creditor Trust" (referred to herein as the FCC Trust), as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms. A copy of the FCC Trust Agreement is appended hereto as **Exhibit A**.

14

122.    "*FCC Trust Assets*" means all property from time to time held by, or for the benefit of, the FCC Trust, including the FCC Trust Contribution and any income, proceeds, or other earnings received by the FCC Trust thereon, together with any proceeds of any of the foregoing and any earnings thereon.

123.    "*FCC Trust Collateral Documents*" means, collectively: (a) the FCC Trust Security Agreement; and (b) the deposit account control agreement among the Trustee, DWLLC (as the Secured Party), and the bank at which the Type A Claims Reserve is maintained.

124.    "*FCC Trust Contribution*" means two billion four hundred million dollars ($2,400,000,000.00) deposited into the FCC Trust in accordance with the FCC Trust Agreement and the FCC Trust Collateral Documents.

125.    "*FCC Trust Distributions Order*" has the same meaning as the term "Secured Party Distributions Order" in the FCC Trust Agreement, including an order of the Bankruptcy Court (which may be the Confirmation Order) that is in effect and not stayed and that (a) requires DWLLC to use any distributions it receives from the FCC Trust on account of Secured Type A Claims solely to pay Holders of Secured Type A Claims and (b) prohibits DWLLC from using such distributions for any other purpose.

126.    "*FCC Trust Documents*" means, collectively: (a) (i) the FCC Trust Agreement, (ii) the FCC Trust Security Agreement, and (iii) the deposit account control agreement contemplated by the FCC Trust Agreement and the FCC Trust Security Agreement with respect to the Type A Claims Reserve, in each case as may be amended, supplemented, or modified from time to time in accordance with its terms; and (b) the FCC Order.

127.    "*FCC Trust Election*" means the election made by a Holder of an Allowed DISH Wireless General Unsecured Claim to pursue recovery on such Claim from the FCC Trust by making a Covered Claim Submission to the FCC Trust in accordance with the FCC Trust Documents.

128.    "*FCC Trust Security Agreement*" means that certain Security Agreement, dated as of June 26, 2026, by and between DWLLC, as Secured Party, and the Trustee, as grantor, granting to DWLLC a security interest over the Trustee's right, title and interest in and to the Type A Claims Reserve to secure the FCC Trust's obligation to make distributions to DWLLC on behalf of Holders of Secured Type A Claims against DWLLC, as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms.

129.    "*FCC Trust Third-Party Payment Provisions*" means the provisions of the FCC Trust Agreement, including sections 4.1, 4.2.1(d), 4.2.5, 4.2.9(b)(v), and 4.2.10 thereof, that pertain to Third-Party Payments or the waiver and release of legal rights against EchoStar Parties upon the submission of a Covered Claim to the FCC Trust:

    (a)    any Distributions to a Claimant on account of an Eligible Covered Claim (i) are subject to the Claimant's execution of a full and complete release and discharge of any and all Covered Claims against the EchoStar Parties, in a form prepared and promulgated by the Trustee that is acceptable to EchoStar and DWLLC and (ii) shall be

reduced by the aggregate amount of any payments received by the Claimant on account of its Covered Claim from any source that is not the Trust (a "*Third-Party Payment*");

(b)     except as any EchoStar Party may otherwise agree in writing, any Claimant that makes a Covered Claim Submission agrees that its sole source of recovery on account of its Covered Claim is the Trust, and that, subject to execution of a release in form and substance acceptable to EchoStar and DWLLC, such Covered Claim Submission constitutes a voluntary irrevocable waiver and release by the Claimant of any legal rights it may have against any EchoStar Party to otherwise recover against or enforce the Judicial or Arbitral Claim Determination or Covered Claim Settlement on which the Covered Claim is based;

(c)     a Covered Claim is an Eligible Covered Claim only if the holder of a Covered Claim shall have, among other things, certified that Claimant has not received any Third-Party Payment or, if the Claimant has received a Third-Party Payment, specifying the aggregate amount thereof;

(d)     if a Claimant receives any Third-Party Payment after making a Covered Claim Submission, such Claimant shall notify the Trustee within ten (10) Business Days, and the Trustee shall be entitled to adjust any Distributions made to such Claimant on account of the Third-Party Payment; and

(e)     any failure of a Claimant to timely notify the Trustee of a Third-Party Payment after receiving a Distribution shall result in the Claimant owing the Trust annualized interest at the federal judgment rate on the amount of such Third-Party Payment for each Business Day after the applicable 10-day period specified above until the Trustee is notified.

All capitalized terms used but not defined in this definition have the meanings ascribed to such terms in the FCC Trust Agreement.

130.     "*Federal Judgment Rate*" means the rate of interest calculated pursuant to the provisions of 28 U.S.C. § 1961, which shall be a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, as of the Petition Date.

131.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims and Noticing Agent or the Bankruptcy Court.

132.     "*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified or amended, that is not stayed, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order could be appealed or from which certiorari could be sought or the new

16

trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

133.    "*First Day Pleadings*" means those certain pleadings Filed by the Debtors contemporaneously with their voluntary petitions on the Petition Date.

134.    "*General Claims Bar Date*" means August 7, 2026 at 5:00 p.m., prevailing Central Time, the date established by the Bankruptcy Court pursuant to the Bar Date Order, by which Proofs of Claim against the DISH Wireless Debtors must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims for which the Bankruptcy Court shall have entered an order excluding the Holders of such Claims from the requirement of Filing Proofs of Claim.

135.    "*Governmental Bar Date*" means December 27, 2026 at 5:00 p.m., prevailing Central Time, the date established by the Bankruptcy Court pursuant to the Bar Date Order, by which all Governmental Units holding Claims (whether secured, unsecured priority, or unsecured non-priority) that arose (or are deemed to have arisen) prior to the Petition Date, including requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code, must File Proofs of Claim, including Claims for unpaid taxes, whether such Claims arise from prepetition tax years or periods or prepetition transactions to which any of the Debtors were a party.

136.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

137.    "*Holder*" means an Entity holding a Claim against or Interest in a Debtor, as applicable.

138.    "*HSSC Entities*" means Hughes Satellite Systems Corporation and its direct and indirect subsidiaries.

139.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

140.    "*Indenture Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

141.    "*Indenture Trustees*" means, collectively: (a) Wilmington Savings Fund Society, FSB, in its capacity as trustee under the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, and the 2028 Senior Secured Notes Indenture; (b) U.S. Bank Trust Company, National Association, in its capacity as trustee under the 2028 Senior Notes Indenture and the 2029 Senior Notes Indenture; and (c) U.S. Bank Trust Company, National Association, in its capacity as collateral agent under the 2026 Senior Secured Notes Indenture and the 2028 Senior Secured Notes Indenture, in each case, together with any successor trustee or successor collateral agent, as applicable, appointed under any such indenture.

142.    "*Indenture and DWLLC Claims Trust Trustee Fees and Expenses*" means the reasonable fees and expenses of the Indenture Trustees (including as registrar, paying agent,

17

collateral agent and related roles under the relevant DBS Notes Indenture) and the trustee of the DWLLC Claims Trust in connection with the performance of their respective duties.

143. "*Independent Managers*" means, collectively, Vikram Jindal and Gerard Uzzi, each in his capacity as an independent and disinterested manager of the board of managers of DWLLC.

144. "*Initial Distribution Date*" means the date on which the Disbursing Agent makes initial distributions to Holders of Allowed Claims pursuant to this Plan.

145. "*Intercompany Claim*" means any DBS Intercompany Claim or DISH Wireless Intercompany Claim.

146. "*Intercompany Interest*" means, other than an Interest, any shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, profits interests, puts, options, warrants, rights, or other Securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests in a Debtor held by an Affiliate of such Debtor, which Affiliate may be another Debtor.

147. "*Interest*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code) partnership interests, membership interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other Securities or agreements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, partnership interests, membership interests, or any other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement and regardless of whether such equity interests are held directly or indirectly).

148. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, treaty, duty, requirement, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

149. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

150. "*Other Priority Claim*" means any Claim against any of the Debtors entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim, (b) a Priority Tax Claim, and (c) any other Claim that is expressly classified in a separate Class under Article III.

151. "*Other Secured Claim*" means any Secured Claim against a Debtor other than (a) any 2026 Senior Secured Notes Claim, (b) any 2028 Senior Secured Notes Claim, (c) any DIP Financing Claim, (d) any Prepetition Secured Loan Claim, and (e) any other Claim that is expressly classified in a separate Class under Article III.

152.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

153.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

154.    "*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof.

155.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, each of which shall be consistent with the Restructuring Support Agreement (and subject to the consent rights provided thereunder), including: (a) any Schedule of Rejected Contracts and Leases; (b) the Amended Notes Indentures and any other ancillary documentation contemplated thereby; and (c) any disclosures required under section 1129(a)(5) of the Bankruptcy Code (including, to the extent known and determined, a document disclosing the identity of the directors and officers of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors). The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement through the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the consent rights provided thereunder).

156.    "*Post-Effective Date DISH Wireless Debtor*" means each DISH Wireless Debtor, or any successor(s) or assign(s) thereto, by merger, consolidation, or otherwise, in the form of a corporation, limited liability company, partnership, trust, or other form, as the case may be, on and after the Effective Date. "Post-Effective Date DISH Wireless Debtors" means all of the Post-Effective Date DISH Wireless Debtors, collectively.

157.    "*Post-Effective Date DWLLC*" means DWLLC, or any successor or assign thereto by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, trust, or other form, as the case may be, on and after the Effective Date.

158.    "*Prepetition Secured Loan Agreement*" means that certain Loan and Security Agreement, dated as of April 21, 2026, by and between DWLLC, as borrower, and DBS, as lender (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time) pursuant to which DBS extended to DWLLC secured term loans in an aggregate principal amount of $75,000,000.

159.    "*Prepetition Secured Guarantee Agreement*" means that certain Guarantee and Security Agreement, dated as of May 26, 2026, by and between DISH Wireless Leasing, L.L.C., as guarantor, and DBS, as lender (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time), pursuant to which DISH Wireless Leasing L.L.C. agreed to guarantee and secure the obligations of DWLLC under the Prepetition Secured Loan Agreement.

160.    "*Prepetition Secured Loan Claims*" means any and all Claims against (a) DWLLC and (b) DISH Wireless Leasing L.L.C. (in its capacity as guarantor) held by DBS arising under,

out of, or relating to the Prepetition Secured Loan Agreement or any other documents executed or delivered in connection therewith, including any Claim for outstanding principal, accrued and unpaid interest, fees, costs, expenses, indemnification obligations, reimbursement obligations, and any other amounts due and owing thereunder or arising therefrom.

161.    "*Prepetition Secured Loan Documents*" means the Prepetition Secured Loan Agreement and the Prepetition Secured Guarantee Agreement.

162.    "*Priority Tax Claim*" means any Claim against the Debtors of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

163.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

164.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 328, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(3)-(4) of the Bankruptcy Code.

165.    "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

166.    "*Professional Fee Escrow Accounts*" means, collectively, the DBS Professional Fee Escrow Account and the DISH Wireless Professional Fee Escrow Account.

167.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

168.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

169.    "*Rejected Contracts and Leases*" means those Executory Contracts and Unexpired Leases that shall be rejected by the Debtors, including (a) each Executory Contract and Unexpired Lease of a DBS Debtor identified on the Schedule of Rejected Contracts and Leases; and (b) each Executory Contract and Unexpired Lease of a DISH Wireless Debtor deemed rejected under Article V.A.

170.    "*Rejection Procedures Order*" means the *Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and Abandon Estate Property*

20

*and (II) Granting Related Relief* [Dkt. No. 294], as may be amended, supplemented, or modified from time to time.

171.    "*Related Parties*" means, with respect to an Entity, in each case solely in its capacity as such, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, members, equity holders (including preferred equity holders and regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, trustees, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders (including preferred equity holders), officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, trustees, and other professionals.

172.    "*Release Opt In Form*" means the form, substantially in the form attached to the Solicitation Materials (or otherwise approved by the Bankruptcy Court), by which a Holder of a Claim or Interest may affirmatively opt in to the Third-Party Release.

173.    "*Released Parties*" means, collectively, each of the following, in each case solely in their respective capacities as such: (a) each Debtor; (b) each Reorganized DBS Debtor and each Post-Effective Date DISH Wireless Debtor; (c) each Consenting Creditor; (d) the DIP Lender; (e) EchoStar; (f) each Releasing Party; and (g) each Related Party of each Entity in the foregoing clauses (a) through clause (f); provided, however, that, in each case, an Entity shall not be a Released Party if it: (x) elects not to opt in to (as applicable) the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before entry of the Confirmation Order.  For the avoidance of doubt and notwithstanding anything in this Plan to the contrary, no Entity that is not a Releasing Party shall be a Released Party.

174.    "*Releasing Parties*" means, collectively, each of the following, in each case solely in their respective capacities as such: (a) each Debtor; (b) each Reorganized DBS Debtor and each Post-Effective Date DISH Wireless Debtor; (c) each Consenting Creditor; (d) the DIP Lender; (e) EchoStar; (f) each Holder of one or more Claims; (g) each Holder of one or more Interests; and (h) each Related Party of each Entity in the foregoing clauses (a) through (g); provided, however, that, in each case, an Entity shall not be a Releasing Party if it: (x) elects not to opt in to (as applicable) the Third-Party Release; (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before entry of the Confirmation Order; or (z) is an HSSC Entity.

175.    "*Reorganized DBS Debtor*" means each DBS Debtor, or any successor(s) or assign(s) thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, trust, or other form, as the case may be, on and after the Effective Date. "Reorganized DBS Debtors" means all of the Reorganized DBS Debtors, collectively.

176.    "*Representatives*" means, with respect to an Entity, such Entity's current and former (a) officers, (b) directors, (c) managers, (d) principals, (e) members, (f) employees, (g) agents, (h) advisory board members, (i) financial advisors, (j) partners, (k) attorneys, (l)

21

accountants, (m) investment bankers, (n) consultants, and (o) other professionals, each in their capacity as such.

177.    "*Required Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

178.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of March 19, 2026, by and among the Company Parties, EchoStar, DNC, the Release Parties (as defined therein), and the Consenting Creditors, including the Term Sheet and all other exhibits and attachments thereto, as may be amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof, which is attached to the Disclosure Statement as Exhibit B.

179.    "*Restructuring Transactions*" means the transactions described in Article IV.

180.    "*Sale*" means one or more transactions pursuant to which any of the DISH Wireless Debtors sells, transfers, conveys, leases, licenses, or otherwise disposes of any assets, rights, or interests, in each case as such transaction or transactions shall have been approved by the Bankruptcy Court (to the extent required) or otherwise consummated in accordance with the Plan.

181.    "*Sale Order*" means one or more orders of the Bankruptcy Court approving one or more Sales.

182.    "*Sale Documents*" means all motions, filings, documents, agreements, and related documents pursuant to which the DISH Wireless Debtors have effectuated or will effectuate a Sale, including any purchase agreements, any Sale Order, and the Bidding Procedures.

183.    "*Schedule of Rejected Contracts and Leases*" means any schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan, filed as part of the Plan Supplement, as may be amended, supplemented, or modified by the Debtors at any time prior to the Confirmation Date without order of the Bankruptcy Court, or after the Confirmation Date to the extent agreed with the relevant counterparties and upon entry of an order of the Bankruptcy Court. For the avoidance of doubt, the Schedule of Rejected Contracts and Leases shall only identify Executory Contracts and Unexpired Leases that have not previously been rejected pursuant to a Final Order, including pursuant to the Rejection Procedures Order or a notice filed thereunder, and the inclusion or omission of any Executory Contract or Unexpired Lease on or from the Schedule of Rejected Contracts and Leases shall not affect the treatment of any Executory Contract or Unexpired Lease that has previously been addressed by a Final Order or pursuant to the Rejection Procedures Order.

184.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs to be Filed by the DISH Wireless Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

185.    "*Secured*" or "*Secured Claim*" means, when referring to a Claim, a Claim that is: (a) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order to the extent

of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the value of such right of setoff.

186.   "*Secured Party*" means (a) prior to the Effective Date, DWLLC and (b) on and after the Effective Date, Post-Effective Date DWLLC, in each case in its capacity as a secured party under the FCC Trust Collateral Documents.

187.   "*Secured Tax Claim*" means any Secured Claim against any of the Debtors that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

188.   "*Secured Type A Claim*" means a Claim against DISH Wireless L.L.C. or any other DISH Wireless Debtor in an amount of $100,000.00 or less that is asserted to be a Covered Claim entitled, upon an eligibility determination by the Trustee in accordance with the FCC Trust Documents, to receive a distribution from the Type A Claims Reserve pursuant to the FCC Trust Documents; provided, that the DISH Wireless Debtors intend the $100,000.00 threshold for such a Claim to be determined without regard to interest, if any, to which the Bankruptcy Court may determine the Holder of a Type A Convenience Claim is entitled; provided further, that such a Claim in an amount greater than $100,000.00 shall be treated as a Secured Type A Claim to the extent the Holder thereof makes the Type A Convenience Claim Election.

189.   "*Securities Act*" means the U.S. Securities Act of 1933, as amended.

190.   "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

191.   "*Solicitation Materials*" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to section 1125 and 1126 of the Bankruptcy Code, which shall be in all respects consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Required Consenting Creditors.

192.   "*Special Committee*" means the special committee of the board of managers of DWLLC, composed of the Independent Managers.

193.   "*Specified Non-Debtor Affiliates*" means, collectively, EchoStar Intercompany Receivable Company, L.L.C., DISH DBS Issuer, L.L.C., and DBS Intercompany Receivable L.L.C.

194.   "*Subsequent Distribution Date*" means any date following the Initial Distribution Date on which the Disbursing Agent in its reasonable discretion elects to make distributions to Holders of Allowed Claims pursuant to this Plan.

195.   "*Term Sheet*" means that certain Refinancing Term Sheet, dated as of March 19, 2026, attached as Exhibit B to the Restructuring Support Agreement, as may be amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms of the Restructuring Support Agreement.

196.    "*Third-Party Release*" means the releases given by the Releasing Parties to the Released Parties in Article VIII.F.

197.    "*Trustee*" means The Bank of New York Mellon, solely in its capacity as trustee of the FCC Trust, together with its successors in such capacity.

198.    "*Type A Claims Reserve*" means the segregated deposit account of the FCC Trust established and maintained by the Trustee pursuant to the FCC Trust Documents into which, upon the FCC Trust's receipt of the FCC Trust Contribution, the Trustee shall deposit an amount equal to $200,000,000, and which the Trustee shall thereafter maintain as a reserve under the FCC Trust Documents in an amount sufficient to satisfy in full Type A Claims the Trustee estimates may become eligible for distribution from the FCC Trust and the FCC Trust's initial expenses, in each case in accordance with the FCC Trust Documents.

199.    "*Type A Convenience Claim*" means a DISH Wireless General Unsecured Claim in an amount greater than $100,000.00 that the Holder thereof has irrevocably elected, pursuant to and in accordance with the election procedures set forth in the Solicitation Materials and on the applicable ballot, to reduce to $100,000.00 and have treated as Secured Type A Claim.

200.    "*Type A Convenience Claim Election*" means the irrevocable election by a Holder of a DISH Wireless General Unsecured Claim, pursuant to and in accordance with the election procedures set forth in the Solicitation Materials and on the applicable ballot, to have such Claim treated as a Type A Convenience Claim, as a result of which: (a) the Type A Convenience Claim shall be treated in all respects as a Secured Type A Claim under the Plan entitled, subject to the Trustee's determination of eligibility, to receive a distribution from the Type A Claims Reserve under the FCC Trust Documents; and (b) the Holder shall agree to waive and release any right to assert, recover, or receive any distribution on account of  the portion of such Claim in excess of $100,000.00 from any EchoStar Party, including the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, and the Estates, and the FCC Trust, if the Trustee determines such Claim to be eligible for a distribution under the FCC Trust; provided, however, that if and to the extent that the Trustee determines that such Holder's Claim is not eligible to receive a distribution from the FCC Trust, then, subject to the Holder's timely filing of a reconsideration request in accordance with the FCC Trust Documents and the denial of such reconsideration request, such Holder shall be solely entitled to receive its Pro Rata share of the DISH Wireless Distributable Value in accordance with the Plan without reduction of such Holder's Allowed DISH Wireless General Unsecured Claim to $100,000.00.

201.    "*True-Up Amount*" means the amounts, if any, by which clause (a) of the True-Up Statement exceeds clause (b) of the True-Up Statement, which amounts shall be deposited by the Debtors into the DBS Professional Fee Escrow Account or the DISH Wireless Professional Fee Escrow Account, as applicable, within two (2) Business Days after Confirmation in accordance with Article II.B.2.

202.    "*True-Up Statement*" means the written statement calculated and delivered by the Debtors to the DIP Lender within two (2) Business Days after Confirmation in accordance with Article II.B, setting forth: (a) the aggregate of the DBS Professional Fee Escrow Amount and the DISH Wireless Professional Fee Escrow Amount as of the Confirmation Date, respectively, as

reasonably estimated in good faith by the Debtors in consultation with their advisors (or, to the extent any Professional does not timely provide an estimate or allocation, as estimated and allocated by the Debtors in their reasonable discretion in accordance with Article II.B.3); and (b) the amount of Cash then on deposit in the DBS Professional Fee Escrow Account or the DISH Wireless Professional Fee Escrow Account, as applicable.

203. "*Undeliverable Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution. Distributions on account of the DBS Notes shall be made in accordance with and governed by the relevant DBS Notes Indenture as amended by the Amended Indentures and shall not be deemed Undeliverable Distributions under the Plan.

204. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

205. "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

206. "*U.S. Trustee*" means the Office of the United States Trustee for Region 7.

207. "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

208. "*Voting Deadline*" means with respect to all Holders of Claims entitled to vote on this Plan, August 7, 2026 at 5:00 p.m. (prevailing Central Time), as may be extended by order of the Bankruptcy Court.

209. "*Voting Report*" means the report certifying the methodology for the tabulation of votes and results of voting under the Plan, prepared and filed by the Claims and Noticing Agent.

210. "*Wind Down*" means the process of winding down the DISH Wireless Debtors' remaining assets, affairs, and operations following the Effective Date, including collecting and monetizing any remaining assets of the DISH Wireless Debtors' Estates, paying or otherwise resolving all remaining claims and obligations, and taking all actions necessary or appropriate to complete the administration of the DISH Wireless Debtors' Estates.

211. "*Wind Down Amount*" means Cash in an amount sufficient to fund all estimated fees, costs, and expenses required to administer and complete the Wind Down of the DISH Wireless Debtors' Estates on and after the Effective Date, which amount shall be determined by the DISH Wireless Debtors in good faith prior to the Confirmation Date with the prior written consent of the Required Consenting Creditors (such consent not to be unreasonably withheld).

212. "*Wind Down Debtor Account*" means the bank account or accounts of the Post-Effective Date DISH Wireless Debtors used to fund all fees, expenses, and payments required to

be made by the Post-Effective Date DISH Wireless Debtors in connection with the Wind Down of the DISH Wireless Debtors' Estates, which shall be funded on or prior to the Effective Date with Cash equal to the Wind Down Amount from the gross proceeds of the Sale.

## B.     Rules of Interpretation.

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (11) any immaterial effectuating provisions may be interpreted by the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; provided that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party; (12) on and after the Effective Date, all references to the Debtors in this Plan shall be deemed references to the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable; (13) with respect to any provision in this Plan providing for any payment, distribution or treatment to be made subject to the election, option, discretion or agreement of any Debtor, Reorganized DBS Debtor, or the Post-Effective Date DISH Wireless Debtor, as applicable, such election, option, discretion or agreement shall be subject to any consent rights set forth in this Plan and to the extent applicable, the Restructuring Support Agreement; (14) except as otherwise provided, any references to the Effective Date or the AT&T Closing Date shall mean the Effective Date or as soon as reasonably practicable thereafter or the AT&T Closing Date or as soon as reasonably practicable thereafter, respectively; and (15) each reference to one or more Debtors, Reorganized DBS Debtors, or Post-Effective Date DISH Wireless Debtors means the applicable Debtor, Debtors, Reorganized DBS Debtors, or Post-Effective Date DISH Wireless Debtors, as the context requires.

26

### C.     Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

### D.     Governing Law.

Except to the extent that a federal law or rule of procedure of the United States applies (including the Bankruptcy Code and the Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

### E.     Reference to Monetary Figures.

All references in this Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

### F.     Controlling Document.

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. Except with respect to Article IX, which shall control in all instances, in the event of an inconsistency between the Plan (excluding the Plan Supplement) and the Plan Supplement, the Plan Supplement shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided, that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification to this Plan. Notwithstanding anything to the contrary in this Article I.F or elsewhere in this Plan, in the event of any inconsistency between the Plan or the Confirmation Order, on the one hand, and the FCC Trust Documents, on the other hand, the FCC Trust Documents shall control with respect to all matters relating to FCC Trust Assets, FCC Trust administration, Covered Claims, and distributions from the FCC Trust (including from the Type A Claims Reserve).

### G.     Consultation, Notice, Information, and Consent Rights.

Notwithstanding anything herein to the contrary, all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as applicable, and as respectively set forth therein, including with respect to the form and substance of each Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable

27

definitions in Article I.A) and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS, AND DIP FINANCING CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Financing Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III.

### A.    Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, or such Holder has been paid by any Debtors on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) shall receive, in full and final satisfaction of its Allowed Administrative Claim, an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in this Article II of the Plan or in an order of the Bankruptcy Court, requests for payment of Administrative Claims against the DISH Wireless Debtors must be Filed with the Bankruptcy Court and served on the Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, by the DISH Wireless Administrative Claims Bar Date. **Any Holder of an Administrative Claim against the DISH Wireless Debtors that is required to, but does not, File and serve a request for payment of such Administrative Claim by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claim against the DISH Wireless Debtors, their Estates, or their property, and such Administrative Claim shall be deemed discharged as of the Effective Date without the need for any objection by the Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party by the DISH Wireless Administrative Claims

Objection Deadline. For the avoidance of doubt, no request for payment of an Administrative Claim against a DBS Debtor shall be required to be Filed under the Plan unless otherwise ordered by the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

### B.  Professional Compensation.

#### 1.  Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and orders of the Bankruptcy Court. Any objections to a Professional Fee Claim shall be Filed and served no later than twenty-one (21) days after the Filing of the final request for payment of such Professional Fee Claim.

Each Professional seeking allowance of a Professional Fee Claim shall, to the extent reasonably practicable, identify in its final fee application the portion of its Professional Fee Claim allocable to the DBS Debtors and the portion allocable to the DISH Wireless Debtors. To the extent any Professional Fee Claim is not so allocated, the Debtors shall allocate such Professional Fee Claim between the DBS Debtors and the DISH Wireless Debtors in good faith and in their reasonable discretion, after consultation with the applicable Professional, and such allocation shall control absent further order of the Bankruptcy Court.

The portion of each Allowed Professional Fee Claim allocable to the DBS Debtors shall be paid by the DBS Debtors or the Reorganized DBS Debtors, as applicable, from the DBS Professional Fee Escrow Account to the extent previously unpaid, and the portion of each Allowed Professional Fee Claim allocable to the DISH Wireless Debtors shall be paid by the DISH Wireless Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, from the DISH Wireless Professional Fee Escrow Account to the extent previously unpaid, in each case as soon as reasonably practicable after such Allowed Professional Fee Claim is Allowed by Final Order.

If the amounts in the DBS Professional Fee Escrow Account or the DISH Wireless Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims allocable to the DBS Debtors or the DISH Wireless Debtors, respectively, the Holder of such deficiency shall have an Allowed Administrative Claim against the DBS Debtors or the DISH Wireless Debtors, as applicable, for such deficiency, which shall be satisfied in accordance with Article II.A.

#### 2.  Professional Fee Escrow Amount.

Within seven (7) Business Days after Confirmation, the Debtors shall have calculated and delivered to the DIP Lender the True-Up Statement and deposited the True-Up Amount into the Professional Fee Escrow Accounts. After such True-Up Amount has been deposited into the Professional Fee Escrow Accounts, the balance of each Professional Fee Escrow Account shall be an amount equal to the DBS Professional Fee Escrow Amount or the DISH Wireless Professional

Fee Escrow Amount, as applicable. Under no circumstances shall funds in the DBS Professional Fee Escrow Account be used to satisfy Professional Fee Claims against the DISH Wireless Debtors, and under no circumstances shall funds in the DISH Wireless Professional Fee Escrow Account be used to satisfy Professional Fee Claims against the DBS Debtors.

Consistent with the DIP Order, each Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and solely for the purpose of paying Allowed Professional Fee Claims. Amounts deposited into the Professional Fee Escrow Accounts shall not constitute property of the Debtors' Estates, except to the extent of any residual amounts remaining after payment in full of all Allowed Professional Fee Claims.

After payment in full of all Allowed Professional Fee Claims allocable to the DBS Debtors and the DISH Wireless Debtors, respectively, any remaining amounts in the corresponding Professional Fee Escrow Account attributable thereto shall become DISH Wireless Distributable Value available for distribution to Holders of Allowed DISH Wireless General Unsecured Claims in accordance with this Plan without further notice to or action, order, or approval of the Bankruptcy Court.

3. **Estimation of Fees and Expenses.**

Each Professional shall reasonably estimate its unpaid Professional Fee Claims and any other unpaid fees and expenses incurred before and as of the Confirmation Date and shall deliver such estimate to the Debtors by the earlier of (a) five (5) Business Days after the Confirmation Date and (b) two (2) Business Days prior to the Effective Date; provided, however, that such estimate shall not constitute an admission or agreement with respect to the fees and expenses of such Professional, and neither the Professionals nor the Debtors shall be bound by such estimates for any purpose.

Each such estimate shall, to the extent reasonably practicable, identify the portion of such unpaid fees and expenses allocable to the DBS Debtors and the portion of such unpaid fees and expenses allocable to the DISH Wireless Debtors. If a Professional does not timely provide such estimate, or does not provide such allocation, or such allocation is incomplete, the Debtors may estimate and allocate such unpaid and unbilled fees and expenses in good faith and in their reasonable discretion for purposes of delivering a True-Up Statement to the DIP Lender that sets forth the True-Up Amount to be deposited into the Professional Fee Escrow Accounts.

4. **Post-Confirmation Fees and Expenses.**

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the DBS Debtors or the Reorganized DBS Debtors, as applicable, and the DISH Wireless Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred in connection with the implementation and Consummation of the Plan that are allocable to the DBS Debtors or the DISH Wireless Debtors, respectively.

On and after the Confirmation Date, unless otherwise ordered by the Bankruptcy Court, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the

30

Bankruptcy Code in seeking retention or compensation for services rendered after the Confirmation Date shall terminate, and the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, may employ and compensate Professionals in the ordinary course of business without further notice to or action, order, or approval of the Bankruptcy Court.

### 5. Substantial Contribution.

Except as otherwise specifically provided in this Plan or ordered by the Bankruptcy Court, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code shall File an application for the allowance of such compensation or reimbursement and serve such application on counsel for the Debtors and such other parties as required by the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court, no later than thirty (30) days after the Effective Date.

Any amount Allowed by the Bankruptcy Court on account of a substantial contribution claim shall be allocated between, and payable by, the DBS Debtors or the DISH Wireless Debtors, as applicable, as determined by the Debtors in good faith and in their reasonable discretion or as otherwise ordered by a Final Order of the Bankruptcy Court. For the avoidance of doubt, the Indenture and DWLLC Claims Trust Trustee Fees and Expenses shall be paid in accordance with the relevant DBS Indentures as amended by the Amended Indentures and with any applicable DWLLC Claims Trust agreement and shall not be subject to any requirement of allowance as an administrative expense claim under section 503 of the Bankruptcy Code.

### C. Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, and in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, (a) payment in full in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter, (b) Reinstatement of such Allowed Priority Tax Claim, or (c) such other treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code and reasonably acceptable to the Required Consenting Creditors. To the extent an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall be treated as a Secured Tax Claim (and, to the extent not paid in full, as an Other Secured Claim) in accordance with the Plan. Upon payment in full of an Allowed Priority Tax Claim to the extent required by the Plan (or upon such other treatment agreed by the Holder and the Debtors consistent with the Plan), any Lien securing such Claim shall be deemed released, terminated, and extinguished, without further notice to or order of the Bankruptcy Court, and without any further act or action under applicable law.

### D. DIP Financing Claims.

Notwithstanding anything to the contrary herein, the DIP Financing Claims held by the DIP Lender shall be deemed Allowed as of the Effective Date in an amount equal to all obligations

due and owing under the DIP Financing Documents and applicable DIP Orders, including (1) the outstanding principal amount thereunder, (2) all accrued and unpaid interest thereon up to and including the date of satisfaction, (3) all accrued and unpaid fees, expenses, and noncontingent indemnification and reimbursement obligations payable thereunder, and (4) all other obligations due and owing thereunder.

Except to the extent that the DIP Lender agrees to less favorable treatment of its Allowed DIP Financing Claims, the Allowed DIP Financing Claims shall be treated as follows, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Financing Claims: (a) if the DISH Wireless Successful Bidder is the DIP Lender and makes a credit bid in the Sale Transaction, and the amount of the purchase price is greater than the Allowed DIP Financing Claims, the aggregate amount of the Allowed DIP Financing Claims outstanding as of the closing of the Sale shall be credited against and shall reduce, on a dollar-for-dollar basis, the purchase price payable by such DISH Wireless Successful Bidder at closing, and such credit shall constitute full and final satisfaction and discharge of the Allowed DIP Financing Claims (up to the full amount of the purchase price) as of such closing date; or (b) if the DISH Wireless Successful Bidder is not the DIP Lender, or if the DISH Wireless Successful Bidder is the DIP Lender but the Allowed DIP Financing Claims exceed the purchase price, then the DIP Lender shall, in either case, receive Cash in an amount equal to the full amount of the Allowed DIP Financing Claims (or the remaining amount of the Allowed DIP Financing after reduction and crediting against the purchase price, if applicable) from, as applicable, the DISH Wireless Debtors' available cash or the proceeds of the Sale on the closing date thereof, or as soon as reasonably practicable thereafter.

All Liens, security interests and superpriority claims granted to the DIP Lender pursuant to the DIP Financing Documents shall continue in full force and effect and shall not be released until the Allowed DIP Financing Claims have been satisfied in full in accordance with this Article II.D. Upon satisfaction in full of the Allowed DIP Financing Claims, all such Liens, security interests and superpriority claims shall be deemed automatically released, terminated, and extinguished without further notice to or order of the Bankruptcy Court and without any further act or action under applicable law; provided, however, that any contingent indemnification or reimbursement obligations under the DIP Financing Documents as to which no claim has been asserted and that are not then due and payable shall survive in accordance with their terms.

For the avoidance of doubt, (i) the Allowed DIP Financing Claims shall not be subject to the procedures set forth in Article II.A or Article II.B, including any requirement to File a request for payment of an Administrative Claim, a Proof of Claim, or a fee application; and (ii) the Allowed DIP Financing Claims shall not be subject to avoidance, reduction, setoff, recoupment, recharacterization, subordination, counterclaim, defense, disallowance, impairment, objection, or challenge of any kind under applicable law or regulation.

## E.   U.S. Trustee.

The Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, shall timely pay all applicable U.S. Trustee Fees for each quarter under 28 U.S.C. § 1930(a)(6), until the entry of an order dismissing or closing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Following

Confirmation and until all of the Chapter 11 Cases are closed, dismissed, or converted, the Debtors shall file with the Bankruptcy Court such post-confirmation reports as may be required by the Bankruptcy Court and the U.S. Trustee.

**F.    Ad Hoc Group Professional Fees**

To the extent payable under Section 11 of the Restructuring Support Agreement, the Debtors, EchoStar, or DNC shall pay, or cause to be paid, the Ad Hoc Group Professional Fees in accordance with, and subject to, Section 11 of the Restructuring Support Agreement. For the avoidance of doubt, (1) the Ad Hoc Group Professional Fees shall not constitute Professional Fee Claims, shall not be subject to the procedures set forth in Article II.A or Article II.B, including the requirement to file fee applications, and shall not be payable from any Professional Fee Escrow Account; and (2) nothing in this Plan shall require Milbank LLP or any other advisor entitled to payment of Ad Hoc Group Professional Fees under the Restructuring Support Agreement to file a Proof of Claim or an application under sections 330 or 503 of the Bankruptcy Code as a condition to payment of the Ad Hoc Group Professional Fees.

To the extent not otherwise paid, the Debtors, EchoStar, DNC, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, shall promptly pay in Cash in full outstanding and invoiced Ad Hoc Group Professional Fees as follows: (i) on the Effective Date, Ad Hoc Group Professional Fees incurred, or estimated to be incurred, during the period prior to the Effective Date to the extent invoiced to the Debtors at least two (2) Business Days in advance of the Effective Date, and (ii) after the Effective Date, any unpaid Ad Hoc Group Professional Fees within five (5) Business Days of receiving an invoice; provided that such Ad Hoc Group Professional Fees shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval; provided further that, to the extent timely invoiced, Ad Hoc Group Professional Fees that are not paid by the Debtors or the Reorganized DBS Debtors, as applicable, within the timeframes set forth herein, such Ad Hoc Group Professional Fees shall not be deemed waived and shall be included in a subsequent invoice

**G.    Indenture and DWLLC Claims Trust Trustee Fees and Expenses.**

On the Effective Date, the Debtors or the Reorganized DBS Debtors, as applicable, shall pay in full in Cash all reasonable and documented fees, expenses, costs, disbursements, indemnities, and other amounts due and owing to the Indenture Trustees under the applicable Indentures, including the reasonable and documented fees and expenses of counsel and other professionals retained by the Indenture Trustees, in each case to the extent not previously paid. The Indenture Trustees shall not be required to file a Proof of Claim, Administrative Claim request, fee application, or any other application or request for allowance, and no Bankruptcy Court approval shall be required, as a condition to payment of such amounts. To the extent any such fees, expenses, costs, disbursements, indemnities, or other amounts are incurred after the Effective Date in connection with distributions, cancellation mechanics, lien releases, implementation of the Plan, enforcement of the Indenture Trustees' rights, or any other duties expressly required under the Plan, the Confirmation Order, or the applicable Indentures, such

33

amounts shall be paid promptly in Cash by the Reorganized DBS Debtors or such other applicable funding source provided under the Plan.  Nothing in the Plan or the Confirmation Order shall impair, waive, release, discharge, or otherwise affect the Indenture Trustees' rights to payment, reimbursement, indemnification, priority of payment, charging liens, or any other rights, protections, privileges, immunities, or remedies under the applicable Indentures, the Plan, the Confirmation Order, or applicable law.

All reasonable and documented fees, expenses, costs, disbursements, indemnities, and other amounts incurred by the trustee of the DWLLC Claims Trust, including the reasonable and documented fees and expenses of its professionals, in each case to the extent not previously paid, shall be paid in full in Cash by the Debtors or the Reorganized DBS Debtors, as applicable, on the Effective Date, without the need for the trustee of the DWLLC Claims Trust to file a Proof of Claim, Administrative Claim request, fee application, or other request for allowance, and without Bankruptcy Court review or approval.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Classification of Claims and Interests.

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Financing Claims as described in Article II.

### 1.    Classes of Claims Against and Interests in the DBS Debtors.

The classification of Claims against and Interests in the DBS Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 1A | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 1B | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 1C | 2026 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 1D | 2028 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 1E | 2026 Senior Notes Claims | Impaired | Entitled to Vote |
| 1F | 2028 Senior Notes Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 1G | 2029 Senior Notes Claims | Impaired | Entitled to Vote |
| 1H | DBS General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| 1I | DBS Intercompany Claims | Unimpaired | No (Presumed to Accept) |
| 1J | Interests in DBS Debtors | Unimpaired | No (Presumed to Accept) |

2.      **Classes of Claims Against and Interests in the DISH Wireless Debtors.**

The classification of Claims against and Interests in the DISH Wireless Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 2A | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2B | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2C | Prepetition Secured Loan Claims | Unimpaired | No (Presumed to Accept) |
| 2D | Secured Type A Claims | Unimpaired | No (Presumed to Accept) |
| 2E | DISH Wireless General Unsecured Claims | Impaired | Entitled to Vote |
| 2F | DNC Notes Guarantee Claims | Unimpaired | No (Presumed to Accept) |
| 2G | DISH Wireless Intercompany Claims | Unimpaired / Impaired | No (Presumed to Accept or Deemed to Reject) |
| 2H | Interests in DISH Wireless Debtors | Unimpaired / Impaired | No (Presumed to Accept or Deemed to Reject) |

**B.      Treatment of Claims and Interests.**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, on the one hand, and the Holder of such Allowed Claim or Allowed Interest, on the other hand, as applicable. Unless otherwise indicated herein, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date on which such Claim or Interest is Allowed or, in either case, as soon as reasonably practicable thereafter (or, if payment of such Allowed Claim is not then due, in accordance with the terms governing such Allowed Claim).

1.      **DBS Debtor Claims and Interests.**

(a) **Class 1A – Other Secured Claims.**

(i)      *Classification*: Class 1A consists of Other Secured Claims against the DBS Debtors.

35

(ii)     *Treatment*: The legal, equitable, and contractual rights of Holders of Allowed Other Secured Claims are unaltered by this Plan.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, at the option of the Debtors or the Reorganized DBS Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (B) Reinstatement of such Allowed Other Secured Claim as of the Effective Date or (C) such other treatment that renders such Holder's Allowed Other Secured Claim Unimpaired.

(iii)    *Impairment and Voting*: Class 1A is Unimpaired, and each Holder of an Other Secured Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Other Secured Claims. Each Holder of an Other Secured Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Other Secured Claim to affirmatively opt in to the Third-Party Release.

(b) **Class 1B – Other Priority Claims.**

(i)      *Classification*: Class 1B consists of Other Priority Claims against the DBS Debtors.

(ii)     *Treatment*: The legal, equitable, and contractual rights of Holders of Allowed Other Priority Claims are unaltered by this Plan.  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, at the option of the Debtors (with the consent of the Required Consenting Creditors (such consent to not be unreasonably withheld)) or the Reorganized DBS Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (B) treatment that is otherwise consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on

36

which such Other Priority Claim becomes an Allowed Other Priority Claim.

(iii)   *Impairment and Voting*: Class 1B is Unimpaired, and each Holder of an Other Priority Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to Other Priority Claims. Each Holder of an Other Priority Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Other Priority Claim to affirmatively opt in to the Third-Party Release.

(c)  **Class 1C – 2026 Senior Secured Notes Claims.**

(i)   *Classification*: Class 1C consists of 2026 Senior Secured Notes Claims.

(ii)   *Allowance*: The 2026 Senior Secured Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2026 Senior Secured Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2026 Senior Secured Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the Chapter 11 Cases extend past such date) and any other amounts due and owing under the 2026 Senior Secured Notes Indenture as of the Effective Date.

(iii)   *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2026 Senior Secured Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2026 Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2026 Senior Secured Notes Claim, (A) Amended 2026 Senior Secured Notes in a principal amount equal to the amount of such Holder's Allowed 2026 Senior Secured Notes Claim on account of the unpaid principal amount of the 2026 Senior Secured Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2026 Senior Secured Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2026 Senior Secured Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2026 Senior Secured Notes Claim (but not yet due and owing under the 2026 Senior Secured Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2026 Senior

37

Secured Notes, but instead will be paid in full in accordance with the Amended 2026 Senior Secured Notes Indenture and Amended 2026 Senior Secured Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2026 Senior Secured Notes in accordance with the terms of the Amended 2026 Senior Secured Notes Indenture and Amended 2026 Senior Secured Notes.

(iv) *Impairment and Voting*. Class 1C is Impaired, and each Holder of a 2026 Senior Secured Notes Claim is entitled to vote to accept or reject this Plan.  Each Holder of a 2026 Senior Secured Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2026 Senior Secured Notes Claim to affirmatively opt in to the Third-Party Release.

(d) **Class 1D – 2028 Senior Secured Notes Claims.**

(i) *Classification*: Class 1D consists of 2028 Senior Secured Notes Claims.

(ii) *Allowance*: The 2028 Senior Secured Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2028 Senior Secured Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2028 Senior Secured Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the Chapter 11 Cases extend past such date) and any other amounts due and owing under the 2028 Senior Secured Notes Indenture as of the Effective Date.

(iii) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2028 Senior Secured Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2028 Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2028 Senior Secured Notes Claim, (A) Amended 2028 Senior Secured Notes in a principal amount equal to the amount of such Holder's Allowed 2028 Senior Secured Notes Claim on account of the unpaid principal amount of the 2028 Senior Secured Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2028 Senior Secured Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2028 Senior Secured Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2028 Senior Secured Notes Claim (but not yet due and owing under the

38

2028 Senior Secured Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2028 Senior Secured Notes, but instead will be paid in full in accordance with the Amended 2028 Senior Secured Notes Indenture and Amended 2028 Senior Secured Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2028 Senior Secured Notes in accordance with the terms of the Amended 2028 Senior Secured Notes Indenture and Amended 2028 Senior Secured Notes. For the avoidance of doubt, the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2028 Senior Secured Notes Claim (and Holders of Allowed 2028 Senior Notes Claims and Allowed 2029 Senior Notes Claims) shall be preserved and treated solely in accordance with Class 2E and Article VI.E.

(iv)     *Impairment and Voting*. Class 1D is Impaired, and each Holder of a 2028 Senior Secured Notes Claim is entitled to vote to accept or reject this Plan. Each Holder of a 2028 Senior Secured Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2028 Senior Secured Notes Claim to affirmatively opt in to the Third-Party Release.

(e) **Class 1E – 2026 Senior Notes Claims.**

(i)      *Classification*: Class 1E consists of 2026 Senior Notes Claims.

(ii)     *Allowance*: The 2026 Senior Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2026 Senior Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2026 Senior Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the Chapter 11 Cases extend past such date) and any other amounts due and owing under the 2026 Senior Notes Indenture as of the Effective Date.

(iii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2026 Senior Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2026 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2026 Senior Notes Claim, Cash equal to (A) 100% of the outstanding principal amount thereof, plus (B) all accrued and unpaid interest, including interest on the defaulted

39

interest, in each case up to and including the Effective Date, to the extent not previously paid, without any make-whole amount, premium, penalty, or other charge, distributed through the applicable Indenture Trustee in accordance with the 2026 Senior Notes Indenture, including the charging lien provisions thereof. As part of the treatment of Class 1E Claims, all unpaid Indenture and DWLLC Claims Trust Trustee Fees and Expenses of the Indenture Trustee for the 2026 Senior Notes, as of the Effective Date, shall be paid in cash by DBS.

(iv) *Impairment and Voting*. Class 1E is Impaired, and each Holder of an Allowed 2026 Senior Notes Claim is entitled to vote to accept or reject this Plan. Each Holder of a 2026 Senior Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2026 Senior Notes Claim to affirmatively opt in to the Third-Party Release.

(f) **Class 1F – 2028 Senior Notes Claims.**

(i) *Classification*: Class 1F consists of 2028 Senior Notes Claims.

(ii) *Allowance*: The 2028 Senior Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2028 Senior Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2028 Senior Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the Chapter 11 Cases extend past such date) and any other amounts due and owing under the 2028 Senior Notes Indenture as of the Effective Date.

(iii) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2028 Senior Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2028 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2028 Senior Notes Claim, (A) Amended 2028 Senior Notes in a principal amount equal to the amount of such Holder's Allowed 2028 Senior Notes Claim on account of the unpaid principal amount of the 2028 Senior Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2028 Senior Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2028 Senior Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2028 Senior Notes Claim (but not yet due and owing under the 2028 Senior Notes Indenture) as of the Effective Date will not be included

40

in the principal amount of the Amended 2028 Senior Notes, but instead will be paid in full in accordance with the Amended 2028 Senior Notes Indenture and Amended 2028 Senior Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2028 Senior Notes in accordance with the terms of the Amended 2028 Senior Notes Indenture and Amended 2028 Senior Notes. For the avoidance of doubt, the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2028 Senior Notes Claim (and Holders of Allowed 2028 Senior Secured Notes Claims and Allowed 2029 Senior Notes Claims) shall be preserved and treated solely in accordance with Class 2E and Article VI.E.

(iv) *Impairment and Voting*. Class 1F is Impaired, and each Holder of an Allowed 2028 Senior Notes Claim is entitled to vote to accept or reject this Plan. Each Holder of a 2028 Senior Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2028 Senior Notes Claim to affirmatively opt in to the Third-Party Release.

(g) **Class 1G – 2029 Senior Notes Claims.**

(i) *Classification*: Class 1G consists of 2029 Senior Notes Claims.

(ii) *Allowance*: The 2029 Senior Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2029 Senior Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2029 Senior Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the Chapter 11 Cases extend past such date) and any other amounts due and owing under the 2029 Senior Notes Indenture to the extent Allowed and not previously paid or otherwise satisfied in accordance with the Plan, the Restructuring Support Agreement, or any order of the Bankruptcy Court.

(iii) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2029 Senior Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2029 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2029 Senior Notes Claim, (A) Amended 2029 Senior Notes in a principal amount equal to the amount of such Holder's Allowed 2029 Senior Notes Claim on

41

account of the unpaid principal amount of the 2029 Senior Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2029 Senior Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2029 Senior Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2029 Senior Notes Claim (but not yet due and owing under the 2029 Senior Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2029 Senior Notes, but instead will be paid in full in accordance with the Amended 2029 Senior Notes Indenture and Amended 2029 Senior Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2029 Senior Notes in accordance with the terms of the Amended 2029 Senior Notes Indenture and Amended 2029 Senior Notes. For the avoidance of doubt, the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2029 Senior Notes Claim (and Holders of other Allowed 2028 Senior Notes Claims and Allowed 2028 Senior Secured Notes Claims) shall be preserved and treated solely in accordance with Class 2E and Article VI.E.

(iv) *Impairment and Voting.* Class 1G is Impaired, and each Holder of an Allowed 2029 Senior Notes Claim is entitled to vote to accept or reject this Plan. Each Holder of a 2029 Senior Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2029 Senior Notes Claim to affirmatively opt in to the Third-Party Release.

(h) **Class 1H – DBS General Unsecured Claims.**

(i) *Classification*: Class 1H consists of DBS General Unsecured Claims.

(ii) *Treatment*: The legal, equitable, and contractual rights of Holders of Allowed DBS General Unsecured Claims are unaltered by this Plan. Except to the extent that a Holder of an Allowed DBS General Unsecured Claim agrees to less favorable treatment of its Allowed DBS General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DBS General Unsecured Claim, such Allowed DBS General Unsecured Claim shall be Reinstated.

(iii) *Impairment and Voting.* Class 1H is Unimpaired, and each Holder of a DBS General Unsecured Claim is conclusively presumed to

42

have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of DBS General Unsecured Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such DBS General Unsecured Claims. Each Holder of a DBS General Unsecured Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a DBS General Unsecured Claim to affirmatively opt in to the Third-Party Release.

(i) **Class 1I – DBS Intercompany Claims.**

    (i) *Classification*: Class 1I consists of DBS Intercompany Claims.

    (ii) *Treatment*: On the Effective Date, each Allowed DBS Intercompany Claim shall be either: (A) Reinstated or (B) set off, settled, distributed, contributed, merged, canceled, or released, in each case in the discretion of the Debtors or the Reorganized DBS Debtors.

    (iii) *Impairment and Voting*. Class 1I is Unimpaired, and Holders of DBS Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of DBS Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such DBS Intercompany Claims.

(j) **Class 1J – Interests in DBS Debtors.**

    (i) *Classification*: Class 1J consists of Interests in the DBS Debtors.

    (ii) *Treatment*: On the Effective Date, each Interest in the DBS Debtors shall be Reinstated.

    (iii) *Impairment and Voting*. Class 1J is Unimpaired, and Holders of Interests in the DBS Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Interests in the DBS Debtors are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Interests. Each Holder of an Interest in the DBS Debtors (excluding Debtors that hold Interests in the DBS Debtors) shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Interest in the DBS Debtors to affirmatively opt in to the Third-Party Release.

2. **DISH Wireless Claims and Interests.**

(a) **Class 2A – Other Secured Claims.**

(i)     *Classification*: Class 2A consists of Other Secured Claims against the DISH Wireless Debtors.

(ii)    *Treatment*: The legal, equitable, and contractual rights of Holders of Allowed Other Secured Claims are unaltered by this Plan.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, at the option of the Debtors (with the consent of the Consenting Creditors) or the Post-Effective Date DISH Wireless Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim,  or (B) such other treatment that renders such Holder's Allowed Other Secured Claim Unimpaired.

(iii)   *Impairment and Voting*: Class 2A is Unimpaired, and each Holder of an Other Secured Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Other Secured Claims. Each Holder of an Other Secured Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Other Secured Claim to affirmatively opt in to the Third-Party Release.

(b) **Class 2B – Other Priority Claims.**

(i)     *Classification*: Class 2B consists of Other Priority Claims against the DISH Wireless Debtors.

(ii)    *Treatment*: The legal, equitable, and contractual rights of Holders of Allowed Other Priority Claims are unaltered by this Plan.  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, at the option of the Debtors (with the consent of the Consenting Creditors) or the Post-Effective Date DISH Wireless Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (B) treatment that is otherwise consistent with the provisions of

section 1129(a)(9) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

(iii)     *Impairment and Voting*: Class 2B is Unimpaired, and each Holder of an Other Priority Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims. Each Holder of an Other Priority Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Other Priority Claim to affirmatively opt in to the Third-Party Release.

(c)  **Class 2C – Prepetition Secured Loan Claims.**

(i)      *Classification*: Class 2C consists of Prepetition Secured Loan Claims against the DISH Wireless Debtors.

(ii)     *Treatment*: Except to the extent that a Holder of an Allowed Prepetition Secured Loan Claim agrees to less favorable treatment of its Allowed Prepetition Secured Loan Claim, solely to the extent such Allowed Prepetition Secured Loan Claim shall not have been paid in full in Cash upon the closing of the Sale, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition Secured Loan Claim, such Holder shall receive payment in full in Cash on or as soon as reasonably practicable after the Effective Date.

(iii)    *Impairment and Voting*: Class 2C is Unimpaired, and each Holder of an Allowed Prepetition Secured Loan Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Prepetition Secured Loan Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Allowed Prepetition Secured Loan Claims.  Each Holder of a Prepetition Secured Loan Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a Prepetition Secured Loan Claim to affirmatively opt in to the Third-Party Release.

(d)  **Class 2D – Secured Type A Claims.**

(i)      *Classification*: Class 2D consists of Secured Type A Claims.

45

(ii)    *Treatment*: Except to the extent that a Holder of an Allowed Secured Type A Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Type A Claim, each Holder of an Allowed Secured Type A Claim shall receive payment of such Allowed Claim in full in Cash solely from distributions made from the Type A Claims Reserve pursuant to the FCC Trust Documents; provided that any distribution that, as applicable, DWLLC or Post-Effective Date DWLLC receives from the FCC Trust on account of such Allowed Secured Type A Claim and pays or transfers to the applicable Holder in accordance with the FCC Trust Documents shall be subject to entry of the FCC Trust Distributions Order. For the avoidance of doubt, pursuant to the FCC Trust Security Agreement, distributions made from the Type A Claims Reserve constitute distributions from DWLLC's Estate which shall be made in the manner provided in the FCC Trust Documents—either (A) directly by the Trustee to the applicable Holder or (B) by the Trustee to the applicable Holder through DWLLC or Post-Effective Date DWLLC, as the Secured Party.

(iii)   *Impairment and Voting*. Class 2D is Unimpaired, and each Holder of a Secured Type A Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Type A Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Claims. Each Holder of a Secured Type A Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder to affirmatively opt in to the Third-Party Release.

(e)  **Class 2E – DISH Wireless General Unsecured Claims.**

(i)    *Classification*: Class 2E consists of DISH Wireless General Unsecured Claims.

(ii)   *Treatment*: On or as soon as reasonably practicable after the later of the Effective Date and the date on which a DISH Wireless General Unsecured Claim becomes an Allowed DISH Wireless General Unsecured Claim, except to the extent a Holder of an Allowed DISH Wireless General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed DISH Wireless General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed DISH Wireless General Unsecured Claim, its Pro Rata share of the DISH Wireless Distributable Value; provided that Allowed DISH Wireless General Unsecured Claims held by the DWLLC Claims Trust for the ratable benefit of DWLLC Claims

46

Trust Beneficiaries shall be subject to the waterfall set forth in Article VI.E, in accordance with the Restructuring Support Agreement.

(iii) *FCC Trust Election*: Each Holder of an Allowed DISH Wireless General Unsecured Claim that asserts such Claim is a Covered Claim may (A) make the FCC Trust Election, subject in all respects to the FCC Trust Third-Party Payment Provisions, or (B) if the amount of such Claim exceeds $100,000.00, shall be entitled to elect to have such Claim treated as a Secured Type A Claim in Class 2D by making the Type A Convenience Claim Election on such Holder's ballot on or before the Voting Deadline; provided that, for the avoidance of doubt, no such Holder shall be permitted to make both the FCC Trust Election on account of such Claim in an amount that exceeds $100,000.00, on the one hand, and a Type A Convenience Claim Election with respect to the same Claim as reduced to $100,000.00, on the other hand.

(iv) *Impairment and Voting*. Class 2E is Impaired, and Holders of DISH Wireless General Unsecured Claims are entitled to vote to accept or reject the Plan. Each Holder of a DISH Wireless General Unsecured Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a DISH Wireless General Unsecured Claim to affirmatively opt in to the Third-Party Release; provided, however, that in accordance with the Restructuring Support Agreement, each Holder of a DISH Wireless General Unsecured Claim that is a Consenting Creditor shall be deemed to opt in to the Third-Party Release.

(f) **Class 2F – DNC Notes Guarantee Claims.**

(i) *Classification*: Class 2F consists of DNC Notes Guarantee Claims.

(ii) *Allowance*: The DNC Notes Guarantee Claims shall be Allowed in an amount equal to the unpaid principal amount of the DNC Notes outstanding as of the Effective Date, together with any accrued and unpaid interest and any other amounts due and owing under the DNC Notes Indenture as of the Effective Date.

(iii) *Treatment*: Except to the extent that a Holder of an Allowed DNC Notes Guarantee Claim agrees to less favorable treatment of its Allowed DNC Notes Guarantee Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DNC Notes Guarantee Claim, on or before the Effective Date, on the AT&T Closing Date, non-Debtor DNC shall redeem or cause to be redeemed all outstanding DNC Notes in accordance with the terms of the DNC Notes Indenture. For the avoidance of doubt,

47

no distribution under this Plan from any Debtor or Estate shall be required or made on account of DNC Notes Guarantee Claims; <u>provided</u> that no DNC Notes Guarantee Claim shall be deemed satisfied, settled, released, or discharged with respect to any Debtor or Estate unless and until all Allowed Claims arising under the DNC Notes have been paid in full in Cash.

(iv)   *Impairment and Voting*. Class 2F is Unimpaired, and Holders of DNC Notes Guarantee Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of DNC Notes Guarantee Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Claims. Each Holder of a DNC Notes Guarantee Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a DNC Notes Guarantee Claim to affirmatively opt in to the Third-Party Release.

(g) **Class 2G – DISH Wireless Intercompany Claims.**

(i)   *Classification*: Class 2G consists of DISH Wireless Intercompany Claims.

(ii)   *Treatment*: On or as soon as reasonably practicable after the Effective Date, each DISH Wireless Intercompany Claim shall be: (A) Reinstated or (B) set off, settled, distributed, contributed, merged, canceled, or released, in each case in the discretion of the Debtors or the Post-Effective Date DISH Wireless Debtors.

(iii)   *Impairment and Voting*. Class 2G is either Unimpaired or Impaired, and Holders of DISH Wireless Intercompany Claims are conclusively presumed to have accepted or deemed to have rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, as applicable.   Therefore, DISH Wireless Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Claims.  Each Holder of a DISH Wireless Intercompany Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a DISH Wireless Intercompany Claim to affirmatively opt in to the Third-Party Release.

(h) **Class 2H – Interests in DISH Wireless Debtors.**

(i)   *Classification*: Class 2H consists of Interests in the DISH Wireless Debtors.

(ii)   *Treatment*: On the Effective Date, each Interest in the DISH Wireless Debtors shall be: (A) Reinstated or (B) cancelled, released,

48

or otherwise adjusted, in each case in the discretion of the Debtors or the Post-Effective Date DISH Wireless Debtors.

(iii)     *Impairment and Voting*. Class 2H is either Unimpaired or Impaired, and Holders of Interests in the DISH Wireless Debtors are conclusively presumed to have accepted or deemed to have rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, as applicable.  Therefore, Holders of Interests in the DISH Wireless Debtors are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Interests.  Each Holder of an Interest in the DISH Wireless Debtors (excluding Debtors that hold Interests in the DISH Wireless Debtors) shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Interest in the DISH Wireless Debtors to affirmatively opt in to the Third-Party Release.

C.     **Special Provision Governing Unimpaired Claims**.

Except as otherwise provided in this Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, with respect to any Claim that is Unimpaired under the Plan, including all rights in respect of legal and equitable defenses to, and setoffs or recoupments against, any such Claim. All rights to exercise any and all such rights and to settle any such Claims shall be preserved and shall vest in Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors as of the Effective Date.

To the extent that the payment of interest on a Claim is required by applicable law for such Claim to satisfy the requirements of section 1124 of the Bankruptcy Code, the Holder of such Allowed Claim shall receive interest on such Claim at the applicable contractual rate or, if no contractual rate governs, at the Federal Judgment Rate, in each case calculated from the Petition Date through the date on which such Claim is paid in full; provided that nothing in this Plan shall be construed to require the payment of interest on any Claim to the extent not required by applicable law to satisfy the requirements of section 1124 of the Bankruptcy Code.

D.     **Elimination of Vacant Classes**.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     **Voting Classes; Presumed Acceptance by Non-Voting Classes**.

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

49

**F.** **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**.

The acceptance of the Plan by at least one Impaired Class of Claims that is entitled to vote on the Plan shall satisfy section 1129(a)(10) of the Bankruptcy Code. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. To the extent applicable, the Debtors reserve the right to modify the Plan in accordance with Article X to the extent that Confirmation, pursuant to section 1129(b) of the Bankruptcy Code, requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**G.** **Controversy Concerning Impairment.**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.** **General Settlement of Claims and Interests.**

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to this Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be (and shall be) final, except as expressly provided in this Plan.

**B.** **Sources of Plan Consideration.**

Subject to the terms of the Plan (including the Restructuring Support Agreement), distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein shall be funded from (a) Cash on hand, (b) the issuance and distribution of the Amended Notes, (c) the DISH Wireless Distributable Value, and (d) solely with respect to Holders of Allowed Secured Type A Claims, the Type A Claims Reserve to the extent of DWLLC's perfected prepetition security interest therein.

C.    **FCC Trust Matters.**

As set forth below, any Holder of an Allowed DISH Wireless General Unsecured Claim that such Holder asserts is a Covered Claim may make the FCC Trust Election, subject in all respects to the FCC Trust Third-Party Payment Provisions, and any Holder of a DISH Wireless General Unsecured Claim may make the Type A Convenience Claim Election.  As provided in the FCC Order, no such Holder shall be permitted to make more than one FCC Trust Claim Submission, and no Holder of an Allowed DISH Wireless General Unsecured Claim may make both the FCC Trust Election on account of such Claim in an amount that exceeds $100,000.00 and the Type A Convenience Claim Election on account of such Claim in the amount of $100,000.00.

**Notwithstanding anything to the contrary in this Plan or the Confirmation Order, except as any EchoStar Party may otherwise agree in writing, under no circumstances shall the Disbursing Agent make a distribution to any Holder of an Allowed DISH Wireless General Unsecured Claim that has made the FCC Trust Election.**

1.    **Third-Party Payments.**

(a)    **Reduction for Third-Party Payments**

Any distribution made under this Plan (or otherwise from a Debtor or its Estate) to the Holder of an Allowed DISH Wireless General Unsecured Claim that makes the FCC Trust Election on account of such Claim is hereby deemed to be a "Third-Party Payment" under the FCC Trust Documents, which Third-Party Payment shall reduce, on a dollar-for-dollar basis, the amount distributable to such Holder from the FCC Trust on account of such Claim in accordance with the FCC Trust Third-Party Payment Provisions.

If the Disbursing Agent receives notice that the FCC Trust has made a distribution to a creditor asserting a Covered Claim, the Disbursing Agent shall reduce, on a dollar-for-dollar basis, any distribution payable under this Plan to such Holder on account of such Claim by the amount of such FCC Trust distribution.

The Disbursing Agent shall provide prompt written notice to the Trustee (with a copy to the relevant Holder) of any Plan distribution made on account of an Allowed DISH Wireless General Unsecured Claim that the Disbursing Agent determines is or has been asserted as a Covered Claim under the FCC Trust Documents, which notice shall be given no later than five (5) Business Days following such distribution.  The FCC Trust Documents provide that the Trustee will reduce any distribution made on account of such a Covered Claim from the FCC Trust on account of such Third-Party Payment in accordance with the FCC Trust Third-Party Payment Provisions.

If a Plan distribution and an FCC Trust distribution are made concurrently with respect to the same Claim, the Disbursing Agent and the Trustee shall coordinate in good faith to implement the FCC Trust Third-Party Payment Provisions.

51

2.      **Type A Claims Reserve.**

Pursuant to the FCC Trust Documents, the FCC Trust has been established and is administered by the Trustee in accordance with the FCC Trust Documents. Distributions from the Type A Claims Reserve on account of Allowed Secured Type A Claims constitute Plan distributions from DWLLC's Estate by virtue of DWLLC's perfected security interest in the Type A Claims Reserve pursuant to the FCC Trust Security Agreement. Such distributions on account of Allowed Secured Type A Claims shall be made solely pursuant to the FCC Trust Documents from the Type A Claims Reserve, including, as applicable, through DWLLC or Post-Effective Date DWLLC, as Secured Party (subject to entry of the FCC Trust Distributions Order) or directly by the FCC Trust, in each case in accordance with the FCC Trust Documents.

No distribution under the Plan by any Debtor or any Estate shall be permitted, required or otherwise made on account of Allowed Secured Type A Claims unless the FCC Trust Distributions Order shall have been entered, remains in effect, and shall not have been stayed and the Trustee makes a distribution to, as applicable, DWLLC or Post-Effective Date DWLLC, as Secured Party, on account of a Secured Type A Claim (including a Covered Convenience Claim), which DWLLC or Post-Effective Date DWLLC, in turn, distributes, pays or transfers to the applicable creditor in accordance with the FCC Trust Documents.  Nothing in this Plan is intended to or shall alter or modify the FCC Trust Documents or the administration of the FCC Trust thereunder.

Neither the Reorganized DBS Debtors nor the Post-Effective Date DISH Wireless Debtors shall take any action that would impair, challenge, release, or otherwise adversely affect the security interest granted by the Trustee in the Type A Claims Reserve under the FCC Trust Collateral Documents, or the perfection of such security interest pursuant to the FCC Trust Collateral Documents. For the avoidance of doubt, such security interest shall survive the Effective Date and shall not be released, subordinated, primed, impaired, or adversely affected by operation of any provision of this Plan, the Confirmation Order, or any other Definitive Document, no term, condition or provision of which shall or shall be construed to authorize or permit any action inconsistent with, or prohibit or preclude any Person (including the Post-Effective Date DISH Wireless Debtors) from taking or omitting to take any action contemplated by, the FCC Trust Collateral Documents.

3.      **Type A Convenience Claim Election.**

The Solicitation Materials specify how a Holder of a DISH Wireless General Unsecured Claim in an amount greater than $100,000.00 can make the Type A Convenience Claim Election. To make a valid Type A Convenience Claim Election, a Holder must complete and submit the appropriate ballot on or prior to the Voting Deadline in accordance with the Solicitation Procedures (or such other date as may be established by order of the Bankruptcy Court) and this Plan.  A valid Type A Convenience Claim Election shall constitute the irrevocable agreement of the electing Holder to: (a) reduce the amount of its Covered Claim to $100,000.00 for all purposes under the FCC Trust Documents and this Plan, it being understood and agreed by the DISH Wireless Debtors that the $100,000.00 threshold is intended to be determined without regard to interest, if any, to which the Bankruptcy Court may determine the Holder of a Type A Convenience Claim is entitled; (b) be treated in all respects as a Secured Type A Claim and receive distributions, if any, solely from the Type A Claims Reserve pursuant to the FCC Trust Documents in accordance

52

with Article IV.C.2; and (c) execute a waiver and release with respect to any right to assert, recover, or receive any distribution on account of the portion of such Covered Claim in excess of $100,000.00 against any Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, Estate, any other EchoStar Party, or the FCC Trust.

For the avoidance of doubt, a Holder of a DISH Wireless General Unsecured Claim that makes the Type A Convenience Claim Election shall not be treated as a Holder of an Allowed DISH Wireless General Unsecured Claim in Class 2E for purposes of receiving Plan distributions. Instead, such Claim shall be treated as a Secured Type A Claim that is conclusively presumed to have accepted the Plan and not be entitled to vote to accept or reject this Plan on account of such Secured Type A Claim. Making a Type A Convenience Claim Election shall not affect such Holder's right to affirmatively opt in to the Third-Party Release pursuant to a Release Opt In Form.

4.     **Sources of Recovery for DISH Wireless General Unsecured Claims Asserted Against the FCC Trust.**

As set forth in the FCC Trust Documents, subject to the FCC Trust Third-Party Payment Provisions, a Covered Claim Submission on account of any DISH Wireless General Unsecured Claim (including Type A Convenience Claims) constitutes a voluntary, irrevocable waiver and release by the relevant creditor of any legal rights it may have against the Debtors and any other EchoStar Party to otherwise recover on or enforce such Claim, subject to Article VI.E. If and to the extent that the Trustee determines that such Holder's Claim is not eligible to receive a distribution from the FCC Trust, then, subject to the Holder's timely filing of a reconsideration request in accordance with the FCC Trust Documents and the denial of such reconsideration request, such Holder shall be solely entitled to receive its Pro Rata share of the DISH Wireless Distributable Value in accordance with the Plan; provided, however, that making a Covered Claim Submission does not and shall not be deemed to adversely impact the jurisdiction of any court of competent jurisdiction or arbitration tribunal to reconsider any eligibility determination by the Trustee in accordance with the FCC Trust Documents. Notwithstanding any provision of this Plan to the contrary, in no event shall the aggregate amount of all distributions received by a Holder on account of such Claim from any source whatsoever—including from the FCC Trust, from the DISH Wireless Distributable Value, or any combination thereof—exceed the Allowed amount of such Claim.

D.     **DNC Transactions.**

On the AT&T Closing Date, non-Debtor DNC shall redeem or cause to be redeemed all then-outstanding DNC Notes in accordance with the AT&T License Purchase Agreement, and the DNC Notes Indenture. Upon such redemption, all DNC Notes Guarantee Claims against DWLLC and DISH Wireless Leasing L.L.C. in their respective capacities as guarantors of the DNC Notes shall be deemed fully satisfied, released, and discharged without any payment or distribution from any Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, or Estate. For the avoidance of doubt, no distribution under this Plan from any Debtor, Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, or Estate shall be required or made on account of DNC Notes Guarantee Claims; provided that no DNC Notes Guarantee Claim shall be deemed satisfied, settled, released or discharged with respect to any Debtor or Estate unless and until all Allowed DNC Note Claims have been paid in full in Cash.

53

E.    **Intercompany Transactions.**

On or as soon reasonably practicable following the AT&T Closing Date, and no later than three (3) Business Days after the AT&T Closing Date, DNC shall pay (or cause to be paid) the 2021 Intercompany Loan Payments to DBS; <u>provided</u> that if the 2021 Intercompany Loan – Tranche B Payment has not been paid by December 1, 2026, DNC will pay the 2021 Intercompany Loan – Tranche B Payment to DBS on December 1, 2026.

F.    **Restructuring Transactions.**

Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan, and any documents in connection therewith and herewith, shall be deemed authorized and approved without any requirement of further act or any actions by the Debtors or their general partners, managers, members, directors, or other governing bodies, or any other Entity or Person. Upon the entry of the Confirmation Order, the Debtors, the Reorganized DBS Debtors, and the Post-Effective Date DISH Wireless Debtors, as applicable, are authorized (without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation or rule, or the vote, authorization or approval of any Entity) to take all actions as may be necessary or appropriate to effect the Restructuring Transactions and any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the negotiation, execution, delivery, filing, and performance of the Amended Notes Indentures and any related instruments, agreements, and documentation contemplated thereby, and the issuance and distribution of the Amended Notes, in each case, as provided in this Plan and the applicable Amended Notes Indentures; (3) the cancellation of any existing notes, instruments, certificates, and other documents being exchanged for, replaced by, or otherwise rendered of no further force or effect by the Amended Notes or any other transaction contemplated by this Plan; (4) the execution and delivery of such agreements, instruments, and other documents as may be necessary or appropriate to implement any Sale and to distribute the DISH Wireless Distributable Value in accordance with the Plan; (5) taking any action deemed necessary, appropriate or desirable to carry out the provisions of this Plan and the FCC Trust Documents, including with respect to the treatment of Secured Type A Claims; (6) to the extent not previously redeemed, the redemption of all outstanding DNC Notes by or on behalf of non-Debtor DNC pursuant to <u>Article IV.D</u>; (7) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, interest, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (8) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (9) the implementation of the waterfall set forth in Article VI.E with respect to distributions on account of Allowed DISH Wireless General Unsecured Claims held by the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries, in accordance with the Restructuring Support Agreement and this Plan; (10) the execution, delivery, filing, recordation, and issuance of any other notes, documents, instruments, or agreements in connection with the Restructuring Transactions; and (11) subject to the occurrence of the Effective Date, the consummation of the remaining transactions

contemplated by the Restructuring Support Agreement and the Plan that are to occur on or after the Effective Date.

The Confirmation Order shall and shall be deemed to, pursuant to section 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Confirmation Order shall authorize the Debtors, the Reorganized DBS Debtors, and the Post-Effective Date DISH Wireless Debtors, as applicable, to undertake the Restructuring Transactions, including those contemplated by the Restructuring Support Agreement and pursuant to sections 363, 365, and 1123 of the Bankruptcy Code.

### G.    Director, Officer, and Manager Liability Insurance.

After the Effective Date, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors, shall not terminate, cancel, impair, or otherwise reduce the coverage under any D&O Policies (including any tail policy) in effect as of the Effective Date or purchased in connection with the Chapter 11 Cases, and all current and former members, managers, directors, officers, employees, and other individuals insured thereunder shall remain entitled to the full benefits of such D&O Policies for the full term of such policies, in each case, in accordance with and subject to the terms, conditions, limitations, and exclusions of such D&O Policies. Nothing in this Plan, any exhibit to this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings, or any order entered related thereto, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, shall alter, amend, modify, or otherwise impair any rights, obligations, or coverage under any D&O Policy.

Notwithstanding anything to the contrary in this Plan, including Article V.A, no D&O Policy shall be deemed rejected, terminated, cancelled, or adversely affected by operation of any provision of the Plan, including the deemed rejection of Executory Contracts and Unexpired Leases of the DISH Wireless Debtors pursuant to Article V.A. To the extent any D&O Policy is deemed an Executory Contract, such D&O Policy shall be deemed assumed by the applicable Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, and the Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption.

### H.    Cancellation of Notes, Instruments, Certificates, and Other Documents.

On the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests (and any guarantees or other obligations of a Debtor thereunder) shall, to the extent relating to Claims or Interests that are satisfied, released, compromised, discharged, cancelled, or otherwise treated under the Plan, be deemed cancelled and of no further force and effect.  Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof,

except the rights provided for pursuant to this Plan or a Confirmation Order; provided, however, that the foregoing shall not cancel, impair, or otherwise affect (1) any Claim or Interest that is Reinstated under the Plan, (2) the DIP Financing Documents, which shall be governed by Article II.D, or (3) any Claim based upon the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture, in each case to the extent amended and supplemented pursuant to the applicable Amended Notes Indentures, or any obligations and rights thereunder or under any related documents or agreements, including any and all rights and obligations under security documents executed or delivered in connection with the 2026 Secured Notes Indenture or the 2028 Secured Notes Indenture, in each case as amended and supplemented. All privileges, rights, indemnities and immunities of the Indenture Trustees, including the Collateral Agent for the 2026 Senior Secured Notes and the 2028 Senior Secured Notes, are expressly preserved. Notwithstanding anything to the contrary herein, the cancellation of any notes, indentures, securities, instruments, certificates, or other documents shall not impair, waive, release, discharge or otherwise affect the rights of any Indenture Trustee or trustee of the DWLLC Claims Trust to payment of fees and expenses, indemnification, reimbursement, priority of payment, charging liens, exculpation, limitation of liability, or any rights or obligations necessary to receive, process, or make distributions under the Plan or to enforce the foregoing rights.

Any such cancelled instrument, agreement or other document that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of, as applicable: (a) enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; and (b) allowing and preserving the rights of any applicable paying agent or trustee, to (i) make distributions in satisfaction of Allowed Claims, (ii) maintain and exercise their respective charging liens, against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions or for any amount and enforcing any obligation owed to the applicable paying agent or trustee under this Plan, (iv) maintain and enforce any right to indemnification, expense reimbursement, contribution, subrogation, any priority of payment or charging liens or any other claim or entitlement, (v) exercise their rights and obligations relating to the interests of their holders, and (vi) appear and be heard in these Chapter 11 Cases.

On the Effective Date, the Indenture Trustees shall be automatically and fully released and discharged from any further responsibility under the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture and shall have no further obligation or liability in respect of the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture, except as provided in this Plan and the Confirmation Order. The fees, expenses, and costs of any Indenture Trustee or trustee of the DWLLC Claims Trust, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the 2026 Senior Notes Indenture, the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, the 2029 Senior Notes Indenture and any applicable DWLLC Claims Trust agreement, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to this Plan or any applicable DWLLC Claims Trust agreement, including the fees and expenses of counsel, shall be paid in accordance with the terms of this Plan and the applicable Definitive Documents.

**I.    Corporate Existence.**

Except as otherwise provided in this Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors may be amended or modified in accordance with the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents of each Reorganized DBS Debtor and Post-Effective Date DISH Wireless Debtor shall prevent the issuance of non-voting equity securities.

**J.    Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan (including any action to be undertaken by the Debtors)  shall be deemed authorized and approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person, including: (a) the implementation of the Restructuring Transactions; (b) the execution, delivery, and performance of the Amended Notes Indentures and the issuance and distribution of the Amended Notes, in each case, in accordance with the Plan and the applicable Amended Notes Indentures; (c) the consummation of any intercompany settlements, setoffs, contributions, cancellations, reinstatements, or other intercompany transactions contemplated by the Plan (including with respect to Intercompany Claims and Intercompany Interests); (d) the distribution (if any) of the DISH Wireless Distributable Value in accordance with the Plan; (e) the administration of distributions on account of Allowed Secured Type A Claims in the manner provided in, to the extent applicable, the Plan and the FCC Trust Documents; (f) the adoption, execution, and filing of any organizational documents or amendments thereto of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, if any, contemplated by the Plan; (g) the selection of the directors and officers (or managers, as applicable) of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors as contemplated by the Plan and disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (h) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases and the payment of any Cure Costs in connection therewith, in each case in accordance with the Plan and any applicable Final Order; and (i) all other acts or actions contemplated by, or reasonably necessary or appropriate to

57

implement, consummate, and effectuate the Plan and the Restructuring Transactions (whether to occur before, on, or after the Effective Date) in a manner consistent with the Plan and, to the extent applicable, the Restructuring Support Agreement.

All matters provided for in this Plan involving the corporate structure of the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, and any corporate action required by the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, in connection with the Plan, shall be deemed to have occurred and shall be in effect without any requirement of further action by the directors, officers, managers, or other governing bodies of the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable.

On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver any and all agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

### K.   The Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors.

On the Effective Date, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall be authorized to adopt any agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to Consummate the Plan.

### L.   The Wind Down Debtor Account.

On or prior to the Effective Date, the Post-Effective Date DISH Wireless Debtors shall establish the Wind Down Debtor Account and deposit therein Cash equal to the Wind Down Amount from the gross proceeds of the Sale. The Wind Down Debtor Account shall be used to fund all fees, costs, and expenses incurred in connection with the administration and Wind Down of the DISH Wireless Debtors' Estates, including: (a) all administrative fees, costs, and expenses necessary to administer the Wind Down of the DISH Wireless Debtors' Estates; (b) all go-forward fees and expenses of Professionals retained by the Post-Effective Date DISH Wireless Debtors in connection with such Wind Down; (c) all fees and expenses of the Disbursing Agent incurred on or after the Effective Date allocable to the DISH Wireless Debtors; and (d) any taxes or fees payable by the Post-Effective Date DISH Wireless Debtors in connection with such Wind Down.

Following completion of the Wind Down of the Post-Effective Date DISH Wireless Debtors, any amounts remaining in the Wind Down Debtor Account shall be distributed by the Disbursing Agent in accordance with the priorities set forth in Article III of this Plan until all such remaining amounts are exhausted.

**M.**   **Vesting of Assets in Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors.**

Except as otherwise provided in this Plan, the Confirmation Order, any Sale Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances and interests. On and after the Effective Date, except as otherwise provided in this Plan, the Confirmation Order, any Sale Order, or any agreement, instrument, or other document incorporated herein, each Reorganized DBS Debtor and Post-Effective Date DISH Wireless Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, all present and future property subject to Liens securing the indebtedness evidenced by the DBS Notes or obligations under the DBS Indentures as amended shall remain subject to all such Liens.

**N.**   **Wind-Down Authority of the Post-Effective Date DISH Wireless Debtors.**

On and after the Effective Date, the Post-Effective Date DISH Wireless Debtors shall have full authority, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, to take any and all actions necessary or appropriate, in their reasonable business judgment, to implement, administer, and complete the Wind Down of the DISH Wireless Debtors' Estates, including the authority to:

1.   identify, collect, and wind down any assets of the DISH Wireless Debtors' Estates not transferred to the DISH Wireless Successful Bidder pursuant to the Sale, and to make distributions therefrom in accordance with this Plan;

2.   abandon or donate to a charitable organization of their choosing, pursuant to section 554 of the Bankruptcy Code and without further notice to or action, order, or approval of the Bankruptcy Court, any property of the DISH Wireless Debtors' Estates that is not transferred to the DISH Wireless Successful Bidder pursuant to the Sale and that the Post-Effective Date DISH Wireless Debtors determine, in their reasonable business judgment, to be of inconsequential value and benefit to, or to be burdensome upon, the DISH Wireless Debtors' Estates;

3.   investigate, prosecute, compromise, settle, or otherwise resolve any Causes of Action belonging to the DISH Wireless Debtors' Estates on and after the Sale that are not otherwise released or waived under this Plan, without further notice to or action, order, or approval of the Bankruptcy Court;

4.   object to, compromise, settle, or otherwise resolve any Disputed Claims against the DISH Wireless Debtors without further notice to or action, order, or approval of the Bankruptcy Court, except as otherwise required by this Plan or the Bankruptcy Code;

59

5.  retain, employ, and compensate such attorneys, accountants, and other professionals and consultants as the Post-Effective Date DISH Wireless Debtors deem necessary or appropriate in connection with the Wind Down, and pay the reasonable and documented fees and expenses of such Professionals solely from the Wind Down Debtor Account;

6.  maintain and store the books, records, and documents of the DISH Wireless Debtors' Estates and, upon completion of the Wind Down, dispose of or destroy such books, records, and documents to the extent permitted by applicable law and any applicable record retention obligations; and

7.  take all steps necessary or appropriate to wind up the affairs of each Post-Effective Date DISH Wireless Debtor under applicable non-bankruptcy law, without further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, all costs and expenses incurred by the Post-Effective Date DISH Wireless Debtors shall be paid solely from the Wind Down Debtor Account to the extent such costs and expenses are incurred in connection with the administration and Wind Down of the DISH Wireless Debtors' Estates.

## O.   Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors and the officers, managers, general partners, and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

## P.   Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (including, for the avoidance of doubt, any transfers from a Debtor to a Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor or to any other Person) of property under or in connection with the Plan, including or pursuant to: (a) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, or other interest in the Debtors, the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security pursuant to this Plan; (f) the consummation of any Sale and any transfer of assets pursuant thereto, or (g) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan,

shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

## Q.    Certain Securities Law Matters.

To the extent the Amended Notes are issued, offered, distributed, exchanged, or otherwise delivered under the Plan, such Amended Notes shall be issued, offered, and distributed to the fullest extent permitted in reliance on the exemption from registration provided by section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act and any other available exemption(s) from registration under applicable securities laws.

To the extent section 1145 of the Bankruptcy Code is applicable, the offer, issuance, and distribution of the Amended Notes under the Plan shall be exempt from the registration and prospectus delivery requirements of section 5 of the Securities Act and any applicable state securities laws, subject to the limitations set forth in section 1145 and applicable law.

To the extent section 1145 of the Bankruptcy Code is not available or is determined not to apply to any issuance or distribution of the Amended Notes, such notes shall be offered, issued, and distributed pursuant to one or more other available exemptions from registration (including, as applicable, section 4(a)(2) of the Securities Act, Regulation D, and/or Regulation S) and may be subject to customary legends and transfer restrictions consistent with applicable law and the applicable governing documents.  The availability of section 1145 of the Bankruptcy Code or any other exemption shall not be a condition to the occurrence of the Effective Date.

## R.    Preservation of Causes of Action.

Except as provided in any Sale Order, in accordance with section 1123(b) of the Bankruptcy Code, and subject to Article VIII and the terms of the Restructuring Support Agreement, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall retain and may enforce any and all Causes of Action of the Debtors and their Estates, whether arising before, on, or after the Petition Date, including any Causes of Action described in, or reserved by, the Plan, the Plan Supplement, or the Disclosure Statement.

Except to the extent that any Cause of Action is expressly waived, released, compromised, settled, exculpated, or otherwise disposed of pursuant to (a) the Plan, (b) the Confirmation Order, (c) the Restructuring Support Agreement, or (d) any Sale Order, no Cause of Action shall be deemed waived, released, compromised, exculpated, or otherwise disposed of by the Debtors, the

Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, and the Debtors, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors expressly reserve all rights to prosecute, enforce, settle, compromise, or otherwise resolve any such retained Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as provided in any Sale Order, upon the Effective Date, all Causes of Action of the Debtors and their Estates that are retained pursuant to this Plan shall vest in the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable. The Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall have the exclusive right, authority, and discretion to commence, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action, without the consent of any third party and without further notice to or order of the Bankruptcy Court, except as otherwise expressly provided in this Plan or the Confirmation Order.

Except to the extent a Cause of Action is expressly waived, released, compromised, settled, exculpated, or otherwise disposed of pursuant to this Plan, the Confirmation Order, the Restructuring Support Agreement, or the Sale Order, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to any retained Cause of Action as a consequence of the filing, confirmation, or Consummation of the Plan.

### S.    Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Debtors shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of one designated Debtor, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of such Debtor.

When all Claims that are Disputed have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Debtors shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

As of the Confirmation Date, under the Confirmation Order pursuant to sections 365(a) and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease to which a DBS Debtor is a party shall be deemed assumed by the applicable Reorganized DBS Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is identified as a Rejected Contract or Lease on the Schedule of Rejected Contracts and Leases; (b) has expired or terminated pursuant to its own terms prior to the Confirmation Date; (c) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order; or (d) is the subject of a pending motion to reject filed by the Debtors as of the Confirmation Date.

As of the Confirmation Date, under the Confirmation Order pursuant to sections 365(a) and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease to which a DISH Wireless Debtor is a party shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) has expired or terminated pursuant to its own terms prior to the Confirmation Date; (b) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order, including pursuant to the Rejection Procedures Order or any notice filed thereunder; (c) is the subject of (i) a pending motion to assume or assume and assign filed by the Debtors as of the Confirmation Date or (ii) a pending motion to reject or a pending notice filed pursuant to the Rejection Procedures Order; (d) is an FCC Trust Document; or (e) is a D&O Policy, which shall be governed by Article IV.F of the Plan.

Nothing in this Article V.A shall limit, modify, or otherwise affect: (a) the treatment, including the effective date of assumption, assumption and assignment, or rejection, of any Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected pursuant to a Final Order, including pursuant to the Rejection Procedures Order or any notice filed thereunder; (b) the prosecution, resolution, withdrawal, or settlement, and the effective date of any relief granted, of any motion to assume, assume and assign, or reject an Executory Contract or Unexpired Lease that is pending as of the Confirmation Date; (c) the right of any DISH Wireless Debtor, the applicable DISH Wireless Successful Bidder, or the applicable DISH Wireless Backup Bidder to cause an Executory Contract or Unexpired Lease to be assumed and assigned or rejected, as applicable; (d) the right of any DISH Wireless Debtor to seek or obtain authority to abandon personal property under section 554 of the Bankruptcy Code; or (e) the FCC Trust Documents or any aspect of the FCC Trust. Any pending motion to assume, assume and assign, or reject may be withdrawn, settled, or otherwise prosecuted by the Debtors prior to the Effective Date or the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors on and after the Effective Date, as applicable.

Except as otherwise provided in this Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall be assumed in its entirety and shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by applicable law, any provision in an Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan that restricts, conditions, or prohibits, or purports to restrict, condition, or prohibit, or is breached or deemed breached by, such assumption or assumption and assignment, including any "change of control" provision or similar provision, shall be unenforceable to the extent of such restriction, condition, prohibition, or breach, and shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any default-related rights or demands for payment with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Notwithstanding anything to the contrary in this Plan, the Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Contracts and Leases at any time prior to the Effective Date without order of the Bankruptcy Court; provided, that the Debtors, the

63

Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, may amend the Schedule of Rejected Contracts and Leases to add or remove any Executory Contract or Unexpired Lease after the Effective Date to the extent agreed with the relevant counterparties and upon entry of an order of the Bankruptcy Court authorizing such amendment.

### B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases by operation of this Plan must be Filed with the Bankruptcy Court within twenty-one (21) days after service of the Confirmation Order. For the avoidance of doubt, this deadline applies to all Executory Contracts and Unexpired Leases rejected by operation of this Plan, including (1) any Executory Contract and Unexpired Lease of a DISH Wireless Debtor rejected pursuant to Article V.A and (2) any Executory Contract and Unexpired Lease identified as a Rejected Contract or Lease on the Schedule of Rejected Contracts and Leases. The deadline for filing Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Rejection Procedures Order or any separate order of the Bankruptcy Court shall be governed by such order or the applicable Bar Date Order, as applicable.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time shall be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, the Estates, or their property without the need for any objection by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**

All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified and treated as follows: (i) to the extent such Allowed Rejection Damages Claim is a Claim against a DBS Debtor, it shall be treated as a DBS General Unsecured Claim in accordance with Article III; and (ii) to the extent such Allowed Rejection Damages Claim is a Claim against a DISH Wireless Debtor, it shall be treated as a DISH Wireless General Unsecured Claim in accordance with Article III.  Any Claim arising from the rejection of an Unexpired Lease of nonresidential real property shall be subject to section 502(b)(6) of the Bankruptcy Code.

### C.     Cure of Defaults for Assumed Contracts and Leases.

With respect to each Executory Contract and Unexpired Lease assumed by a DBS Debtor pursuant to this Plan, any monetary defaults shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash in the ordinary course of business on or after the Effective Date, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding: (a) the amount of any Cure Costs; (b) the ability of the applicable Reorganized DBS Debtor to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy

64

Code under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the applicable Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; provided, that the DBS Debtors or the Reorganized DBS Debtors, as applicable, may settle any dispute regarding the amount of any Cure Costs without any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything herein to the contrary, any Cure Costs asserted in connection with the assumption and assignment of any Executory Contract or Unexpired Lease pursuant to a Sale Order shall be governed by, and satisfied in accordance with, the Sale Order. Any Cure Costs arising in connection with any other assumption or assumption and assignment of any Executory Contract or Unexpired Lease under any separate order of the Bankruptcy Court shall be governed by such order.

**Any and all Proofs of Claim based upon Assumed Contracts and Leases, and for which any Cure Costs have been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.    **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, under such Rejected Contracts and Leases, and all rights to such preexisting obligations shall vest in the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors on the Effective Date. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to Rejected Executory Contracts and Unexpired Leases.

E.    **Indemnification Obligations.**

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any governing body, general partners, directors, officers, managers, members, employees, attorneys, accountants, investment bankers, advisors, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be assumed by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors and shall remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any governing body, general partners, directors, officers, managers, employees, attorneys, accountants, investment bankers, advisors, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

**F.      Insurance Policies.**

Nothing in this Plan, any exhibit to this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings or any order entered related thereto, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, shall diminish, impair, or otherwise modify any rights of the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, or any other insured, additional insured, beneficiary, or other covered party under any insurance policy that provides coverage to or for the benefit of any Debtor or such other insured, including any D&O Policies. To the extent any insurance policy issued to, or providing coverage to, any Debtor is an Executory Contract and has not previously been rejected pursuant to a Final Order of the Bankruptcy Court, such insurance policy shall be deemed assumed by the applicable Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, nothing in this Plan shall be deemed to revest in any Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor any insurance policy, proceeds, rights, or interests that are not property of the applicable Debtor's Estate.

**G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless otherwise agreed by the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, and the counterparty to such Executory Contract or Unexpired Lease.

No modification, amendment, supplement, or restatement to a prepetition Executory Contract or Unexpired Lease made by the Debtors during the Chapter 11 Cases shall, by virtue of such modification alone, give rise to an Administrative Claim against any Debtor or its Estate under section 503(b) of the Bankruptcy Code or otherwise; provided that the foregoing shall not limit the right of any counterparty to assert an Administrative Claim to the extent such Claim would otherwise be allowable under applicable Law.

66

### H.     Reservation of Rights.

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

### I.     Nonoccurrence of Effective Date.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### J.     Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor, Reorganized DBS Debtor, or Post-Effective Date DISH Wireless Debtor, as applicable, and shall remain liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Timing and Calculation of Amounts to Be Distributed.

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VI.  Notwithstanding anything to the contrary in this Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

For the avoidance of doubt, this Article VI governs only distributions made under the Plan from property of the Estates or other Plan consideration, including distributions from the Type A Claims Reserve on account of Allowed Secured Type A Claims. Notwithstanding any other

67

provision of this <u>Article VI</u>, the mechanics and procedures governing distributions from the Type A Claims Reserve on account of Allowed Secured Type A Claims shall be as set forth in the FCC Trust Documents, and nothing in this <u>Article VI</u> shall be construed to modify or supersede the FCC Trust Documents with respect to the administration of the Type A Claims Reserve or the manner in which such distributions are made  (including any distributions made by the Trustee directly to Holders of Allowed Secured Type A Claims or made to, as applicable, DWLLC or Post-Effective Date DWLLC for further payment in accordance with the FCC Trust Documents and the FCC Trust Distributions Order).

### B.    Disbursing Agent.

All distributions under this Plan shall be made by the Disbursing Agent.  All distributions to Holders of Allowed Claims in Classes 1C, 1D, 1E, 1F, and 1G on account of the DBS Notes shall be made by the Disbursing Agent in the first instance to the applicable Indenture Trustee for further distribution to the applicable Holders in accordance with the applicable DBS Indenture. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, if the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable.

To the extent distributions are made through an Indenture Trustee, the trustee of the DWLLC Claims Trust, DTC, or other securities intermediary, such distributions shall be deemed made to the applicable Holders when delivered to the Indenture Trustee, the trustee of the DWLLC Claims Trust, DTC, or such intermediary, as applicable.  Each Indenture Trustee and trustee of the DWLLC Claims Trust shall be entitled to rely on the records and procedures of DTC, Cede & Co., nominees, participants, brokers, banks, custodians, and other intermediaries and shall have no liability for any act or omission of any of the foregoing.  Such distributions shall be subject in all respect to any rights of each Indenture Trustee to assert a charging lien against such distributions. All distributions to be made through DTC shall be made eligible for distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any distribution under the Plan to Holders of Allowed Claims on account of the DBS Notes if such distribution is not eligible to be distributed through the facilities of DTC.  For the avoidance of doubt, the respective Indenture Trustees shall have no obligation to identify the Holders of Claims on account of the DBS Notes, respectively, calculate or allocate the amounts distributable to the Holders of Claims on account of the DBS Notes hereunder, set up new positions at DTC relating to the distributions hereunder, or make or ensure such positions are DTC-eligible.

### C.    Rights and Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized DBS Debtors or, in the case of costs allocable to the Post-Effective Date DISH Wireless Debtors, from the Wind Down Debtor Account, as applicable.

**D.  Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

1.  **Record Date for Distribution.**

On the Distribution Record Date, the Claims Register shall be closed and the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the Claims Register (or, as may be applicable, only those designees of such Holders that are affiliates of such Holders, as determined by or may be waived by the Debtors in their sole discretion) as of the close of business on the Distribution Record Date. The Distribution Record Date shall not apply to the DBS Notes or any Securities of the Debtors for which a Plan distribution is to be made in exchange for such Securities.  For the avoidance of doubt, the Distribution Record Date has no application to any distribution from the Type A Claims Reserve.

2.  **Delivery of Distributions in General.**

(a)  **Payments and Distributions on Disputed Claims.**

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Disbursing Agent, be deemed to have been made by the Disbursing Agent on the Effective Date unless the Disbursing Agent and the Holder of such Claim agree otherwise.

(b)  **Special Rules for Distributions to Holders of Disputed Claims.**

Notwithstanding any provision otherwise in this Plan and except as may be agreed to by the Debtors or the Disbursing Agent, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(c)  **Distributions.**

On and after the Effective Date, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims under the Plan. Any distribution that is not made on the Initial Distribution Date or on any other date specified in this Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date shall be made on the next Subsequent Distribution Date that occurs after such Claim becomes an Allowed Claim. To the extent any reserve is expressly required under Article VII.D or any other provision of the Plan, the Disbursing Agent may hold such distribution in and make such distribution from the

69

applicable reserve in accordance with the Plan. Except as expressly provided in this Plan, nothing in this Article VI.D.2(c) shall be construed to require the establishment of any reserve with respect to any Claim. Subject to Article VI.D, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to this Plan.

The Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, and the Disbursing Agent (including any Agent that may be acting as Disbursing Agent), as applicable, shall not incur any liability whatsoever on account of any distributions under this Plan except for its own fraud, gross negligence, or willful misconduct as determined by a final, nonappealable order of a court of competent jurisdiction.

Neither the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, nor the Disbursing Agent shall have any obligation to make a distribution that consists of less than one hundred dollars ($100) in the aggregate to any Holder of an Allowed Claim.

3.      **Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable, automatically and without need for a further order by the Bankruptcy Court and the Claim of any Holder to such property or interest in property shall be released, discharged, settled, compromised, and forever barred.

For the avoidance of doubt, any undeliverable, unclaimed, or undistributable amounts with respect to distributions from the Type A Claims Reserve shall be governed exclusively by the FCC Trust Documents (and any applicable order of a court of competent jurisdiction referenced therein), and not by section 347(b) of the Bankruptcy Code or this Plan.

4.      **Manner of Payment Pursuant to this Plan.**

At the sole and exclusive discretion of the Disbursing Agent, any Cash payment to be made hereunder may be made by check, ACH transfer, or wire transfer or as otherwise required or provided in the applicable agreements. For the avoidance of doubt, the manner of payment of any distribution from the Type A Claims Reserve shall be governed solely by the FCC Trust Documents.

E.   **Distributions to Consenting Creditors.**

Distributions to Holders of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims on account of their respective Allowed DISH Wireless General Unsecured Claims under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date in accordance with the

70

Restructuring Support Agreement shall be made to the DWLLC Claims Trust for the ratable benefit of the DWLLC Claims Trust Beneficiaries; provided, that pursuant to the terms of the Restructuring Support Agreement and notwithstanding anything to the contrary in this Article VI.E or elsewhere in this Plan, the Plan Supplement, or the Confirmation Order, all amounts recovered by the DWLLC Claims Trust from DWLLC's Estate and/or the FCC Trust on account of Allowed DISH Wireless General Unsecured Claims held by the DWLLC Claims Trust under the DWLLC Intercompany Loan shall be applied in the following order of priority:

1. first, to the trustee of the DWLLC Claims Trust and the DWLLC Claims Trust for any unpaid and outstanding fees and reasonable and documented expenses of the trustee and the DWLLC Claims Trust (including the outstanding fees of counsel to the trustee of the DWLLC Claims Trust and counsel to the DWLLC Claims Trust);

2. second, up to the DWLLC Recovery Cap, such amounts recovered by the DWLLC Claims Trust shall be distributed by the DWLLC Claims Trust to the applicable Indenture Trustees on behalf of Holders of 2028 Senior Secured Notes Claims, 2028 Senior Notes Claims, and 2029 Senior Notes Claims on a Pro Rata basis, to be applied to the optional redemption of the applicable 2028 and 2029 Notes at the applicable optional redemption price in accordance with the applicable DBS Notes Indenture;

3. third, if the DWLLC Claims Trust recovers any DWLLC Excess Recovery, the DWLLC Claims Trust shall (a) hold the DWLLC Excess Recovery in trust for the benefit of the applicable Indenture Trustee for the 2028 Senior Secured Notes on behalf of the Holders of the 2028 Senior Secured Notes and (b) promptly remit the DWLLC Excess Recovery to such Indenture Trustee (without set-off or counterclaim), to be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on 2028 Senior Secured Notes then outstanding, in each case at par, without any premium, penalty, or charge (pursuant to provisions of the Amended 2028 Senior Secured Notes Indenture to be amended to implement such redemption feature); and

4. fourth, any DWLLC Residual Recovery shall be remitted by the DWLLC Claims Trust to the applicable Indenture Trustees for the 2028 Senior Notes and the 2029 Senior Notes, to be applied solely to redeem a corresponding aggregate amount of principal and accrued and unpaid interest on the 2028 Senior Notes and 2029 Senior Notes then outstanding, on a Pro Rata basis, in each case at par, without any premium, penalty, or charge (pursuant to the provisions of the 2028 Senior Notes Indenture and the 2029 Senior Notes Indenture to be amended to implement such redemption features).

For the avoidance of doubt, the remittance of any DWLLC Excess Recovery to the applicable Indenture Trustee for the 2028 Senior Secured Notes for application to the optional redemption of Allowed 2028 Senior Secured Notes Claims pursuant to this Article VI.E and the Restructuring Support Agreement is in addition to, and not in lieu of, any distributions made to Holders of Allowed 2028 Senior Secured Notes Claims from the proceeds of the DBS Cash Sweep or any other consideration available to Holders of Allowed DBS Notes Claims under this Plan.

Notwithstanding anything to the contrary in this Article VI.E or elsewhere in this Plan, and for the avoidance of doubt, the treatment of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims against the DBS Debtors under Classes 1D, 1F and 1G, respectively, and the treatment of such Allowed Claims under this Plan with respect to the DBS Debtors shall not alter, impair, satisfy, discharge, or otherwise affect such Holders' separate Allowed DISH Wireless General Unsecured Claims against DWLLC under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries prior to the Petition Date in accordance with the Restructuring Support Agreement. All distributions for the benefit of the Holders of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims against the DBS Debtors under Classes 1D, 1F, and 1G, respectively, shall be made through the applicable Indenture Trustee for application and further distribution to the applicable Holders in accordance with the applicable DBS Indenture. The Indenture Trustees shall have no duty after the Effective Date with respect to the DWLLC Claims Trust except to distribute funds actually received in accordance with the applicable DBS Indenture. The duties, obligations, liabilities, and protections of the trustee of the DWLLC Claims Trust shall be limited to those expressly set forth in the applicable trust agreement and accepted by such trustee, and the trustee of the DWLLC Claims Trust shall have no personal liability for obligations of the Debtors, Reorganized DBS Debtors, Post-Effective Date DISH Wireless Debtors, the DWLLC Claims Trust, Holders, or beneficiaries, except as expressly provided in the applicable trust agreement.

### F.   Compliance with Tax Requirements/Allocations.

In connection with the Plan, to the extent applicable, the Disbursing Agent shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements unless an exception applies. Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes is reasonable and appropriate. The Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

### G.   Allocation of Plan Distributions Between Principal and Interest.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein. Distributions made to the Indenture Trustees for

72

the benefit of their respective Holders shall be made, for each series of DBS Notes, in accordance with the terms of the relevant DBS Indenture.

### H.   No Postpetition Interest on Claims.

Other than with respect to Allowed DBS Notes Claims or as required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim. Notwithstanding the foregoing, to the extent that the payment of postpetition interest on any Claim is required by applicable law for such Claim to satisfy the requirements of section 1124 of the Bankruptcy Code, the Holder of such Allowed Claim shall receive postpetition interest on such Claim at the applicable contractual rate or, if no contractual rate applies, at the Federal Judgment Rate, in each case calculated from the Petition Date through the date such Claim is paid in full.

Notwithstanding the foregoing, to the extent that a Holder of a Disputed DISH Wireless General Unsecured Claim asserts that it is entitled to postpetition interest on such Claim for the period from the Effective Date to the date of distribution, such Holder may seek an order of the Bankruptcy Court awarding such postpetition interest upon notice and a hearing; provided that no such postpetition interest shall be paid except pursuant to a Final Order of the Bankruptcy Court expressly authorizing such payment, and no such postpetition interest shall be payable from the DISH Wireless Distributable Value except to the extent expressly authorized or directed by such Final Order.

### I.   Foreign Currency Exchange Rate.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)* on the Effective Date.

### J.   Setoffs and Recoupment.

Except as otherwise expressly provided herein, the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, as applicable, may, but shall not be required to, set off or recoup any Claims of any nature whatsoever that the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors may have against the claimant against any amounts otherwise payable to such claimant under the Plan (including any Plan Distributions), but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors of any such Claim they may have against the Holder of such Claim. On and after the Confirmation Date, without the need for Bankruptcy Court approval, the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, may exercise,

73

litigate, or settle any rights of setoff or recoupment that the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors may have. On the Effective Date, all such rights of setoff or recoupment shall be preserved and shall vest in the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, as applicable. Nothing in this Plan shall be construed to limit, impair, or extinguish any right of setoff preserved under section 553 of the Bankruptcy Code that any Holder of a Claim may have to the extent such right exists under applicable non-bankruptcy law and satisfies the requirements of section 553 of the Bankruptcy Code.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, nothing shall modify the rights, if any, of any Holder of Allowed Claims or any current or former party to an Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, (1) the ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Leases with the DISH Wireless Debtors or the Post-Effective Date DISH Wireless Debtors under the Plan; (2) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; or (3) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors.

### K.    Claims Paid or Payable by Third Parties.

1.    **Claims Paid by Third Parties.**

The Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, a Reorganized DBS Debtor, or a Post-Effective Date DISH Wireless Debtor, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized DBS Debtor, or a Post-Effective Date DISH Wireless Debtor, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized DBS Debtor or a Post-Effective Date DISH Wireless Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

Notwithstanding anything to the contrary in this Article VI.K.1, no distribution under the FCC Trust Documents shall give rise to any obligation to repay or return any distribution made under the Plan to any Debtor, Reorganized DBS Debtor, or Post-Effective Date DISH Wireless Debtor.

74

2.      **Claims Payable by Insurance, Third Parties.**

No distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor-payors pays or satisfies in full or in part a Claim (if and to the extent finally adjudicated by a court of competent jurisdiction or otherwise settled), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

This Article VI.K.2 is not intended to direct any Holder of a Claim to exhaust remedies against the FCC Trust.

3.      **Applicability of Insurance Policies.**

Notwithstanding anything to the contrary in this Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party under any of the Debtor's insurance policies with respect to such policies (including the D&O Policies), nor shall anything contained herein (a) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under any insurance policy, applicable law, equity, or otherwise, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.   **Allowance of Claims.**

After the Effective Date and subject to the terms of the Plan, each of the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors shall have and retain any and all rights and defenses that such Debtor had with respect to any Claim or Interest immediately before the Effective Date.  The Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, may, in their discretion, deem any Unimpaired Claim to be Allowed to the same extent such Claim would be allowed under applicable non-bankruptcy law.

Any objections to Claims shall be served and Filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; provided that the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors, may extend such deadline to object to Claims for an additional one hundred and eighty (180) days in their sole discretion upon the filing of a notice with the Bankruptcy Court, without further notice or a hearing; provided, further, that any further extensions thereafter shall be permitted only after notice

75

and a hearing. All Disputed Claims not objected to by the end of such period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding anything to the contrary in this Article VII, the procedures in this Article VII shall not apply to Secured Type A Claims, and the eligibility, determination, and payment of Secured Type A Claims shall be governed solely by the FCC Trust Documents, and, to the extent applicable, subject to the FCC Trust Distributions Order.

### B.   Claims Administration Responsibilities.

Except as otherwise expressly provided in this Plan, from and after the Effective Date, the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors shall have the exclusive authority to: (a) File, withdraw, prosecute, or litigate to judgment any objection to any Claim; (b) settle or compromise any such objection, in each case, without further notice to, or action, order, or approval of, the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlement, compromise, or determination, without further notice to, or action, order, or approval of, the Bankruptcy Court.

Except as otherwise expressly provided in this Plan or the Confirmation Order, from and after the Effective Date, each of the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall have and retain any and all rights and defenses that such Entity had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including any Causes of Action retained pursuant to this Plan.

### C.   Disputed Claims Process.

If the Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, dispute any Proof of Claim that is Filed on account of an Unimpaired Claim, such dispute shall be determined, resolved, or adjudicated in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date; provided, however, that the Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, or the Holder of such Claim may elect to have the validity or amount of such Claim adjudicated by the Bankruptcy Court instead. If the Holder makes such election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been commenced.

If the Debtors, the Reorganized DBS Debtors, or Post-Effective Date DISH Wireless Debtors, as applicable, dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to Article III.B or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, shall File an objection with the Bankruptcy Court, and such dispute shall be determined, resolved, or adjudicated by the Bankruptcy Court.

### D.   Disputed Claims Reserve.

On or before the Effective Date, the Disbursing Agent shall be authorized, but not directed, to establish and maintain the Disputed Claims Reserve exclusively from the DISH Wireless Distributable Value, in the Disputed Claims Reserve Amount, to the extent the Disbursing Agent

76

determines is appropriate in its reasonable discretion.  The Disbursing Agent may, in its reasonable discretion, hold Cash in the Disputed Claims Reserve and make distributions, if any, from the Disputed Claims Reserve on account of Allowed DISH Wireless General Unsecured Claims in Class 2E that are Disputed as of the Effective Date as such Claims are resolved by settlement or Final Order.  To the extent any amount set aside in the Disputed Claims Reserve on account of a DISH Wireless General Unsecured Claim is not distributed to the Holder of such Claim because such Holder has received a prior or concurrent distribution from the FCC Trust, such amount shall be released from the Disputed Claims Reserve and redistributed as part of the DISH Wireless Distributable Value available for Pro Rata distribution to other Holders of Allowed DISH Wireless General Unsecured Claims in Class 2E, without further notice to or order of the Bankruptcy Court.

To the extent any Disputed DISH Wireless General Unsecured Claim in Class 2E is Allowed after the Effective Date, such Holder shall receive its distribution, if any, from the DISH Wireless Distributable Value in accordance with Article III.B.2(e) and the distribution provisions of Article VI, solely to the extent of amounts available in the Disputed Claims Reserve.  Any amounts remaining in the Disputed Claims Reserve after all such Disputed Claims have been resolved and all related distributions, if any, have been made shall be released and distributed as part of the DISH Wireless Distributable Value in accordance with the Plan, without further notice to or order of the Bankruptcy Court.

E.    **Estimation of Claims.**

Before, on, or after the Effective Date, the Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable Law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision in this Plan to the contrary, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed estimated at zero dollars ($0.00), unless otherwise ordered by the Bankruptcy Court.  If the Bankruptcy Court estimates any Claim and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings. The Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors, as applicable, may elect to pursue supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code (or otherwise) be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration no later than seven (7) days after the date on which such Claim is estimated.  The foregoing Claim objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or otherwise resolved by any mechanism approved by the Bankruptcy Court.

**F.     Adjustment to Claims or Interests Without Objection.**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors without having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**G.     Disallowance of Claims or Interests.**

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Reorganized DBS Debtors, and Post-Effective Date DISH Wireless Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided herein or as agreed to by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, any and all Proofs of Claim Filed after the General Claims Bar Date or Governmental Bar Date, as applicable, shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**H.     Amendments to Proofs of Claim or Interest.**

From and after the Effective Date, and subject to the Bar Date Order and Bankruptcy Rule 3003, a Proof of Claim (or, if applicable, a Proof of Interest) may not be Filed or materially amended with regard to amount, priority, or Secured status without the prior authorization of the Bankruptcy Court or the written consent of the Debtors (before the Effective Date) or the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors (after the Effective Date), as applicable.  Any such new or amended Proof of Claim (or, if applicable, Proof of Interest) Filed without such authorization or consent shall be deemed Disallowed in full and reflected accordingly in the Claims Register without any further action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, this paragraph applies only after the applicable General Claims Bar Date or Governmental Bar Date, as applicable, has occurred.

**I.     No Distributions Pending Allowance.**

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

**J.     Distributions After Allowance.**

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

**A.     Discharge of Claims and Termination of Interests and Intercompany Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan or the Confirmation Order, the distributions, rights, and treatment provided in this Plan shall be in complete satisfaction and discharge, effective as of the Effective Date, of all Claims, Interests, Intercompany Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests and Intercompany Interests in, the Debtors, their Estates or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, Interests, or Intercompany Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim, Interest or Intercompany Interest based upon such debt, right, Interest or Intercompany Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such Claim, Interest or Intercompany Interest has accepted this Plan.

The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims), Interests, and Intercompany Interests (other than any Intercompany Interests that are Reinstated), subject to the occurrence of the Effective Date.

Notwithstanding anything to the contrary in this Article VIII.A, the discharge provided herein shall not apply to, and nothing in this Plan or the Confirmation Order shall discharge, release, impair, waive, or otherwise affect, (x) any Person's rights (if any) to enforce the FCC Trust Documents in accordance with their terms, (y) any obligations of a Reorganized DBS Debtor to pay Cure Costs (or other amounts required under section 365(b)(1) of the Bankruptcy Code as a condition to assumption) with respect to an Executory Contract or Unexpired Lease assumed by a DBS Debtor pursuant to this Plan, to the extent such obligations remain unpaid as of the Effective Date, or (z) any Claim held by a Holder that is or may constitute a Covered Claim, which shall survive the discharge provided herein solely to the extent necessary for such Holder to assert such

79

Claim against the FCC Trust and receive distributions therefrom in accordance with the FCC Trust Documents and subject to the FCC Trust Third-Party Payment Provisions.

## B.    Release of Liens.

Except as otherwise specifically provided in this Plan, the Confirmation Order, the Amended Notes Indentures, the Sale Order, or in any contract, instrument, release, or other agreement or document created pursuant to this Plan or existing in connection with the DBS Notes and any Liens securing any DBS Notes, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of an Allowed Secured Claim, satisfaction in full of the portion of such Allowed Secured Claim that is Allowed as of the Effective Date, except for any Other Secured Claim that is Reinstated under this Plan, any Liens securing the DIP Financing Claims until such DIP Financing Claims have been paid in accordance with Article II.D, or any Liens required to continue in accordance with this Plan and the applicable Amended Notes Indenture with respect to the Amended 2026 Senior Secured Notes or the Amended 2028 Senior Secured Notes, all mortgages, deeds of trust, Liens, pledges, or other security interests in or against any property of the Debtors or their Estates shall be fully satisfied and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable agent of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, and their successors and assigns.  Each Holder of such an Allowed Secured Claim (and the applicable agent for such Holder) shall be authorized and directed, and the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors shall be entitled to direct, at the sole cost and expense of the applicable Reorganized DBS Debtor or Post-Effective Date DISH Wireless Debtor, such Holder (or applicable agent for such Holder) to release any collateral or other property of any Debtor (including any possessory collateral) held by such Holder (or the applicable agent for such Holder) and to take such actions as may be reasonably requested by the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors to evidence the release of such mortgage, deed of trust, Lien, pledge, or other security interest, including the execution, delivery, and filing or recording of such releases.   The presentation or filing of the Confirmation Order to or with any federal, state or local agency records office or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgage, deed of trust, Lien, pledge, or other security interest.

## C.    Releases by the Debtors.

**Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, in each case except for Claims arising under, or expressly preserved by, this Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, their Estates, and the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors, in each case on behalf of themselves and their respective successors, assigns, and Representatives, and any and all Entities that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether**

**known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, and the Reorganized DBS Debtors and Post-Effective Date DISH Wireless Debtors, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, Representatives, or any other Entity claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest or Intercompany Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, the Restructuring Transactions, the FCC Trust, the FCC Trust Documents, the FCC Trust Assets, the FCC Trust Contribution, the Type A Claims Reserve, the Chapter 11 Cases, the Debtors' in- or out- of- court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, including the sale and marketing efforts related thereto, intercompany transactions between or among the Debtors or between or among the Debtors and their non-Debtor Affiliates, the Restructuring Support Agreement, the Prepetition Secured Loan Agreement, the DIP Facility, the DIP Orders, the Sale, the Sale Order, the Sale Documents, the Amended Notes, the Amended Notes Indentures, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Definitive Documents, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, this Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, this Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any post-Effective Date obligations of any party or Entity under this Plan, any exhibit to this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings or any order entered related thereto, the Sale Order, the Plan Supplement, the Amended Notes Indentures, or any**

other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents; (2) any Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct; or (3) any rights, claims, or Causes of Action to enforce the FCC Trust Documents and the FCC Trust Distributions Order, in each case in accordance with their terms (including any rights to receive distributions from the FCC Trust or to compel the application of such distributions as required thereby); or (4) any Claim, defense, right of setoff or recoupment, or Cause of Action of the Debtors, their Estates, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors against any Released Party that has filed a Proof of Claim against any of the Debtors' Estates in the Chapter 11 Cases, to the extent such Claim, defense, right of setoff or recoupment, or Cause of Action: (a) constitutes a defense to, or basis for objection to, the allowance of such proof of claim in whole or in part; (b) constitutes a right of setoff, recoupment, or counterclaim with respect to any liability asserted in or arising from such proof of claim; or (c) arises from or relates to the same transaction, agreement, series of transactions, or occurrence or series of occurrences giving rise to the claims or liabilities asserted in such proof of claim; provided that nothing in this clause (4) shall be construed to (i) revive or reinstate any Claim or Cause of Action that has been separately released, waived, or relinquished by a written agreement entered into prior to the Effective Date, (ii) limit the rights of any Released Party to assert any defense to any such Claim or Cause of Action, or (iii) expand the rights of the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, or any other Entity beyond those rights that existed under applicable Law as of the Petition Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contribution to facilitating the Restructuring Transactions and implementing this Plan; (2) a good faith settlement and compromise of the Claims and Causes of Action released by the Debtor Release; (3) in the best interests of the Debtors, their Estates, and all Holders of Claims, Interests, and Intercompany Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, their Estates, and the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors,  asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.    **Releases by the Debtors, EchoStar, DNC, and the Specified Non-Debtor Affiliates.**

From and after the Effective Date, each of the Debtors, EchoStar, DNC, and the Specified Non-Debtor Affiliates, to the maximum extent permitted under applicable Law, as such Law may be extended subsequent to the Effective Date, hereby expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharges and releases each of the Consenting Creditors (solely in the Consenting Creditors' capacities as such), respectively, and their respective property and successors and assigns (solely in their capacities as such), of and from any and all Claims, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, now existing or hereafter arising, in law, equity, or otherwise, whether for tort,

82

fraud, contract, violations of laws, or otherwise, including causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that the Debtors, EchoStar, DNC, or the Specified Non-Debtor Affiliates would have been legally entitled to assert (whether individually or collectively) against any Consenting Creditor based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Effective Date; **provided, however,** that the foregoing shall not apply to any Claim or Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

E.    **Releases by the Consenting Creditors.**

From and after the Effective Date, each of the Consenting Creditors, to the maximum extent permitted under applicable Law, as such Law may be extended subsequent to the Effective Date, hereby expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharges and releases each of the Debtors, EchoStar, DNC, the Specified Non-Debtor Affiliates, and their respective property and successors and assigns, of and from any and all Claims, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, now existing or hereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of laws, or otherwise, including causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that any Consenting Creditor would have been legally entitled to assert (whether individually or collectively) against the Debtors, EchoStar, DNC, or the Specified Non-Debtor Affiliates, in each case based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Effective Date solely to the extent related to the DBS Notes Claims or the DISH Wireless General Unsecured Claims held by applicable Consenting Creditors in their capacity as DWLLC Claims Trust Beneficiaries; **provided, however,** that the foregoing shall not apply to any Claim or Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.  For the avoidance of doubt, notwithstanding anything to the contrary in this Plan or the Confirmation Order, no discharge or release by any Consenting Creditor under the Plan, including pursuant to this **Article VIII.E** or **Article VIII.F**, shall (a) bind any affiliate of a Consenting Creditor to the extent that such Consenting Creditor lacks authority to bind such affiliate, (b) apply to any portfolio company of such Consenting Creditor other than parties to the Restructuring Support Agreement, or (c) apply to any Consenting Creditor other than its capacity as a Holder of DBS Notes Claims or, as applicable, in its capacity as a DWLLC Claims Trust Beneficiary.

F.    **Releases by Holders of Claims, Interests and Intercompany Interests.**

Except as otherwise specifically provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Debtor, Reorganized DBS Debtor,

83

Post-Effective Date DISH Wireless Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors (as applicable), whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, Representatives, and any other Entities claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors, the Restructuring Transactions, the FCC Trust, the FCC Trust Documents, the FCC Trust Assets, the FCC Trust Contribution, the Type A Claims Reserve, the FCC Trust Distributions Order, the Chapter 11 Cases, the Debtors' in- or out- of- court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, including the sale and marketing efforts related thereto, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Restructuring Support Agreement, the Prepetition Secured Loan Agreement, the DIP Facility, the DIP Orders, the Sale, the Sale Order, the Sale Documents, the Amended Notes, the Amended Notes Indentures, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Definitive Documents, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, this Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Definitive Documents, this Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under this Plan, any exhibit to this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings or any order entered related thereto, the Sale Order, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other

84

modifications to such orders, agreements and documents, (2) any Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, (3) any rights, claims, or Causes of Action to enforce the FCC Trust Documents or the FCC Trust Distributions Order, in each case in accordance with their terms (including any rights to receive distributions from the FCC Trust or to compel the application of such distributions as required thereby), or (4) any Covered Claim held by a Releasing Party, which shall survive the releases provided above solely to the extent necessary for such Releasing Party to assert such Claim against the FCC Trust and receive distributions therefrom in accordance with the Plan (in respect of Secured Type A Claims) and the FCC Trust Documents.

Notwithstanding anything to the contrary in this Plan, neither this Plan, nor any order of the Bankruptcy Court, including the Confirmation Order, or any eligible Holder's election not to opt in to the Third-Party Release (as applicable), or to object to the Third-Party Release, shall modify or otherwise affect the requirement of the FCC Trust Documents that any Entity seeking to recover from the FCC Trust execute a full and complete release and discharge of any and all Covered Claims against the EchoStar Parties, in a form prepared and promulgated by the Trustee that is acceptable to EchoStar and DWLLC.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of this Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contribution to facilitating the Restructuring Transactions and implementing this Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

G.   Exculpation.

Except as otherwise specifically provided in this Plan or the Confirmation Order, to the fullest extent permitted by applicable law, each Exculpated Party is exculpated from, and no Exculpated Party shall have or incur any liability to, or be subject to any right, claim or cause of action by, any Entity for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Definitive Documents, the Solicitation Materials, this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the filing of the Chapter 11 Cases, the First Day Pleadings, the Definitive Documents, the negotiation and pursuit of the Restructuring Support Agreement, the Amended Notes Indentures, the Plan Supplement, the participation in the DIP Facility, the participation in the Sale, the pursuit of Confirmation, the FCC Trust, the FCC Trust Documents, the FCC Trust Assets, the FCC Trust Contribution, the Type A Claims Reserve, the FCC Trust Distributions Order, the pursuit of Consummation, the administration and

85

implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement; **provided**, **however**, that the foregoing exculpation shall not apply to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.  The Exculpated Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities hereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.  The Exculpated Parties have, and upon Consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

H.    Injunction.

Except as otherwise specifically provided in this Plan or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Intercompany Interests that have been released, discharged, or settled, or are subject to exculpation under this Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests; and (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests.  Notwithstanding anything to the contrary in this Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by this Plan until the closing of these Chapter 11 Cases.

Upon entry of the Confirmation Order, all Holders of Claims, Interests, and Intercompany Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Each Holder of an Allowed Claim, Allowed Interest, or Allowed

86

**Intercompany Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, Interest, or Intercompany Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.H.**

**Notwithstanding the foregoing, nothing in this Article VIII.H shall enjoin or otherwise restrict any Holder of a Claim that is or may constitute a Covered Claim from asserting such Claim against the FCC Trust or the Trustee, or from receiving distributions from the FCC Trust, in each case in accordance with this Plan (in respect of Secured Type A Claims) and the FCC Trust Documents.**

## I. Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, no Governmental Unit shall deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, any Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor, or another Entity with whom the Reorganized DBS Debtors or Post-Effective Date DISH Wireless Debtors have been associated, solely because such Reorganized DBS Debtor, Post-Effective Date DISH Wireless Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## J. Subordination Rights.

Any distributions under this Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property, assets, and interests distributed under this Plan, in each case other than as provided in this Plan.

## K. Document Retention.

On and after the Effective Date, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors.

## L. Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant

Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

**A.    Conditions Precedent to the Effective Date.**

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived in accordance with Article IX.B:

1.      the Restructuring Support Agreement shall not have been terminated as to the Consenting Creditors and shall be in full force and effect and no termination event thereunder shall have occurred and remain occurring;

2.      the AT&T Closing Date shall have occurred;

3.      the Sale shall have been consummated and the net proceeds thereof shall have been received by the DISH Wireless Debtors' Estates in accordance with the Sale Order;

4.      the Restructuring Transactions shall have been implemented in all material respects;

5.      no court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, or entered any final, non-appealable order or injunction (that has not been stayed) that makes illegal or otherwise restrains, enjoins, or prohibits the consummation of the Plan or any of the Definitive Documents;

6.      any and all authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by Law to be received or to occur to implement this Plan on the Effective Date shall have been obtained or shall have occurred;

7.      the Bankruptcy Court shall have entered the Disclosure Statement Order, which order shall be in full force and effect and shall not have been stayed, modified, or vacated on appeal;

8.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be in full force and effect and shall not have been reversed, stayed, modified, dismissed, reconsidered, or vacated on appeal, and such order shall:

(a)      authorize the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with this Plan;

(b)      decree that the provisions in the Confirmation Order and the Plan are non-severable and mutually dependent;

88

(c) authorize the Debtors, the Reorganized DBS Debtors, or the Post-Effective Date DISH Wireless Debtors, as applicable, to take all actions applicable or necessary to (i) implement the Restructuring Transactions, (ii) make all distributions and issuances as required under the Plan, including the Amended Notes pursuant to the Amended Notes Indentures, and (iii) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement;

(d) authorize the implementation of this Plan in accordance with the terms hereof;

(e) provide that all Claims for damages resulting from the rejection or termination of an Unexpired Lease of nonresidential real property shall be Allowed only to the extent provided under section 502(b)(6) of the Bankruptcy Code; and

(f) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

9. the final version of each of the Plan, the Plan Supplement, and the Definitive Documents, and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all material respects with the Restructuring Support Agreement and the Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement and the Plan, and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement and the Plan, and all conditions precedent to the effectiveness of the Definitive Documents shall have been satisfied or waived in accordance with the terms of such Definitive Documents;

10. the Amended Notes shall have been issued by DBS in accordance with the Plan;

11. the Professional Fee Escrow Accounts shall have been established and funded in Cash in amounts equal to the DBS Professional Fee Escrow Amount and the DISH Wireless Professional Fee Escrow Amount, respectively, in accordance with Article II.B; and

12. all amounts required to be paid by the Debtors, EchoStar, or DNC on or prior to the Effective Date as a condition precedent to the occurrence of the Effective Date under the Restructuring Support Agreement shall have been paid, or shall be paid substantially contemporaneously with the occurrence of the Effective Date, in accordance with the Restructuring Support Agreement and this Plan, including the Ad Hoc Group Professional Fees.

## B. Waiver of Conditions.

The conditions to Consummation of this Plan set forth in this Article IX may be waived by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting

Creditors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to Confirm or Consummate this Plan.

### C.   Substantial Consummation.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### D.   Effect of Non-Occurrence of Conditions to the Effective Date.

If Consummation does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release by the Debtors of any Claims, Interests, or Intercompany Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity in any respect; provided that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.   Modifications and Amendments.

Except as otherwise provided in this Plan and subject to any approval rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in this Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X. Notwithstanding anything to the contrary in the Plan, the Plan may be modified, with the consent of the Required Consenting Creditors, to provide for Consummation of the Plan as to the DBS Debtors to occur prior to Consummation of the Plan as to the DISH Wireless Debtors without resolicitation of votes on such modified Plan.

### B.   Effect of Confirmation on Modifications.

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

90

**C.      Revocation or Withdrawal of the Plan.**

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then: (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to this Plan with respect to such Debtor, other than the Restructuring Support Agreement and any rights or obligations thereunder that survive in accordance with its terms, shall be deemed null and void; and (3) nothing contained in this Plan with respect to such Debtor shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Assumed Contracts and Leases; (c) the Debtors amending, modifying, or supplementing, pursuant to Article V, any Executory Contracts or Unexpired Leases to the Schedule of Rejected Contracts and Leases; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

91

4.	Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.	Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.	Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.	Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.	Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.	Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.	Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.	Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.	Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.	Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI;

14.	Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.	Determine any other matters that may arise in connection with or relate to this Plan, the Restructuring Support Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.	Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

92

17.     Resolve any cases, controversies, suits, disputes, or Causes of Action arising in connection with any Sale, any Sale Order, or any Sale Documents, including any disputes relating to the interpretation, implementation, or enforcement thereof;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release;

23.     Enforce all orders previously entered by the Bankruptcy Court;

24.     Hear any other matter not inconsistent with the Bankruptcy Code; and

25.     Enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect.

Subject to Article VIII of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized DBS Debtors, the Post-Effective Date DISH Wireless Debtors, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, discharges, releases, and injunctions described in this Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.    Additional Documents.

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Reorganized DBS Debtors, or the

93

Post-Effective Date DISH Wireless Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to this Plan, and all other parties in interest, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.   Payment of Statutory Fees.

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### D.   Dissolution of Statutory Committees.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and the members thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases, except with respect to any continuing confidentiality obligations and any applications for Professional Fee Claims. Neither the Reorganized DBS Debtors nor the Post-Effective Date DISH Wireless Debtors shall be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committee, including the Committee, after the Effective Date.

### E.   Reservation of Rights.

The Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. Neither the Filing of the Plan, nor any statement or provision contained in this Plan, nor the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be, or be deemed to be, an admission or waiver of any rights of any Debtor with respect to any Holder of a Claim or Interest prior to the Effective Date.

### F.   Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in this Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### G.   Notices.

Any pleading, notice, or other document required by this Plan to be served on or delivered to the Debtors  shall be served on:

1.   **The Debtors:**

DISH DBS Corporation
DISH Wireless L.L.C.
9601 South Meridian Boulevard
Englewood, Colorado 80112

Attn:   Chief Legal Officer (legal.notices@dish.com)

with copies to (which shall not constitute notice):

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020-1095
Attn:   Thomas E Lauria (tlauria@whitecase.com)

White & Case LLP
300 N. LaSalle Drive
Chicago, Illinois 60654
Attn:   Matthew E. Linder (mlinder@whitecase.com)
        Laura E. Baccash (laura.baccash@whitecase.com)

2.      **The Consenting Creditors:**

Each Consenting Creditor at the address set forth in its signature page to the Restructuring Support Agreement (or in the signature page to a joinder or transfer agreement, as applicable, in the case of any Consenting Creditor that becomes a party to the Restructuring Support Agreement in accordance with its terms)

with a copy to (which shall not constitute notice):

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:   Dennis F. Dunne (ddunne@milbank.com)
        Lisa Laukitis (llaukitis@milbank.com)
        Nelly Almeida (nalmeida@milbank.com)
        Abigail L. Debold (adebold@milbank.com)

Milbank LLP
1101 New York Ave NW
Washington, DC 20005
Attn:   Andrew Leblanc (aleblanc@milbank.com)

3.      **Counsel to the Committee:**

Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Attn:   Marty L. Brimmage, Jr. (mbrimmage@akingump.com)
        Laura Warrick (lwarrick@akingump.com)

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park

New York, NY 10036-6745
Attn:   Ira S. Dizengoff (idizengoff@akingump.com)
            Philip C. Dublin (pdublin@akingump.com)
            Meredith A. Lahaie (mlahaie@akingump.com)

After the Effective Date, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized DBS Debtors and the Post-Effective Date DISH Wireless Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**H.      Enforcement of Confirmation Order.**

On and after the Effective Date, the Debtors, the Reorganized DBS Debtors, and the Post-Effective Date DISH Wireless Debtors, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

**I.      Term of Injunctions or Stays.**

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**J.      Entire Agreement.**

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**K.      Exhibits.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in this Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/DBS or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.

**L.**     **Nonseverability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, <u>provided</u> that at the request of the Debtors, which request shall be subject to the Restructuring Support Agreement, and the consent provisions herein, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

**M.**     **Votes Solicited in Good Faith.**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized DBS Debtors or the Post-Effective Date DISH Wireless Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**N.**     **Waiver.**

On the Effective Date, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity,  if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted,

Dated: July 22, 2026

**DISH DBS Corporation, DISH Wireless L.L.C., and their respective affiliated debtors and debtors in possession**

*/s/ John Swieringa*

Name:   John Swieringa
Title:     Authorized Signatory