**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| DISH DBS CORPORATION,<br>DISH WIRELESS L.L.C., *et al.*,[1] | ) | Case No. 26-90627 (CML) |
| Debtors. | ) | (Jointly Administered) |

**DISH WIRELESS DEBTORS' FIRST OMNIBUS OBJECTION**
**TO THE CLAIMS OF CROWN CASTLE, AMERICAN TOWER, AND SBA**

**This is an objection to your claim.**

**The objecting party is asking the Court to disallow the claim that you filed in this bankruptcy case. If you do not file a response within 30 days after the objection was served on you, your claim may be disallowed without a hearing.**

**Represented parties should act through their attorney.**

[1] The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/DBS. The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

RELIEF REQUESTED ....................9

JURISDICTION ....................9

BACKGROUND ....................10

I. The 5G Network Buildout ....................10

II. The FCC's Unprecedented Actions and the FCC-Directed Sale Transactions ......10

III. The Force Majeure Notices and the Tower Lessor Actions ....................11

IV. The Real Property Leases ....................13

A. The Crown Castle MLA ....................13

B. The ATC SCA and ATC Leases ....................17

C. The SBA MLA ....................21

V. The Tower Lessors' Proofs of Claim ....................25

A. Crown Castle POC ....................25

B. ATC POC ....................27

C. SBA POC ....................27

VI. Relevant Procedural History ....................29

ARGUMENT ....................29

I. The Tower Lessors' Claims Should Be Disallowed and Expunged in Their Entirety ....................30

A. The Purpose of the Real Property Leases Has Been Frustrated and DWLLC's Performance Rendered Impossible ....................32

1. The FCC-Directed Sale Transactions Were Unforeseeable .......... 33

2. The FCC-Directed Sale Transactions Were Not Voluntary ......... 39

3. The FCC-Directed Sale Transactions Destroyed the Purpose of the Real Property Leases and Rendered Performance Impossible ....................42

B. The Real Property Leases' Force Majeure Clauses Excuse DWLLC's Performance ....................43

1. The FCC's Compelled Divestiture of EchoStar's Spectrum Licenses Constitutes a Force Majeure Event Within the Plain Meaning of the Real Property Leases ....................45

2. The FCC's Compelled Divestiture of Spectrum Licenses Constitutes a Force Majeure Event Because It Falls Within the

Real Property Leases' Broad Catchall for Causes Beyond DWLLC's Reasonable Control ........ 47

3. The Forced Sale of EchoStar's Spectrum Prevented DWLLC's Performance of Its Obligations Under the Real Property Leases ........ 48

II. In the Alternative, the Claims Should Be Disallowed to the Extent They Exceed the Statutory Cap Set Forth in Section 502(b)(6) of the Bankruptcy Code. ........ 50

A. Section 502(b)(6) of the Bankruptcy Code Applies to the Tower Lessors' Claims. ........ 50

1. The Tower Lessor Agreements Are, in Substance, Leases and Not Licenses ........ 54

a. Crown Castle MLA and SLAs ........ 54
b. ATC SCA and ATC Leases ........ 61
c. SBA MLA and Applicable SLAs ........ 68

2. The Leases are Real Property Leases ........ 74

a. The Ground Space Is Real Property ........ 74
b. The Towers Are Fixtures on the Realty ........ 75
c. The Tower Lessors' REIT Elections Confirm that They Are in the Business of Leasing Real Property ........ 77

3. Prepetition Termination of the Real Property Leases Is Irrelevant to Whether the Section 502(b)(6) Cap Applies to the Tower Lessors' Claims ........ 80

B. The Termination Date Is the Correct Measurement Date for Calculating the Claim Under Section 502(b)(6) ........ 85

1. Prepetition Termination Can Establish the Earlier Surrender or Repossession Date Under § 502(b)(6)(A)(ii) ........ 86

2. The Same Surrender and Repossession Date Is Confirmed Under *Broadfoot*'s Federal-Law Effective-Termination Test ........ 87

3. The Tower Lessors' Contrary Arguments Fail ........ 89

C. The Tower Lessors' Non-Rent Damages Result From Lease Termination and Are Capped by Application of Section 502(b)(6) of the Bankruptcy Code ........ 90

1. Case Law in this Circuit Endorses Capping Non-Rent Damages that Result from Termination, Including Crown Castle's, ATC's, and SBA's Removal and Decommissioning Costs ........ 90

2. The Tower Lessors' Decommissioning and Modification Claims Are Still Reduced Under the More Restrictive Tests Articulated in *Filene's Basement* and *El Toro* ........ 95

a. Crown Castle ........ 96
b. ATC ........ 97

c. SBA ... 98

3. The Tower Lessors' Decommissioning Costs Are Not Postpetition Administrative Expenses ... 99

III. Contingent Reimbursement or Contribution Claims Should Be Disallowed Under Section 502(e) of the Bankruptcy Code ... 99

RESERVATION OF RIGHTS ... 101

NOTICE ... 102

CONCLUSION ... 102

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*1600 Walnut Corp. v. Cole Haan Co. Store*,
530 F. Supp. 3d 555 (E.D. Pa. 2021) .......... 48

*Acheron Med. Supply, LLC v. Cook Inc.*,
2019 WL 2574147 (S.D. Ind. June 24, 2019) .......... 46

*Aircomm of Avon, LLC v. DISH Wireless L.L.C.*,
2025 No. 1:25-cv-03756 (D. Colo. 2025) .......... 12

*All City Commc'n Co. v. State Dep't of Revenue*,
661 N.W.2d 845 (Wis. Ct. App. 2003) .......... 76

*In re Alta Mesa Res., No. 19-35133*,
2022 Bankr. LEXIS 3649 (Bankr. S.D. Tex. Dec. 28, 2022) .......... 100

*Am. Jewish Theatre v. Roundabout Theatre Co.*,
203 A.D.2d 155 (N.Y. App. Div. 1994) .......... 59, 64, 67

*American Coin-Meter, Inc. v. Poole*,
31 Colo. App. 316 (1972) .......... 4, 51

*In re Armstrong*,
347 B.R. 581 (Bankr. N.D. Tex. 2006) .......... 30

*Ashland Oil & Ref. Co. v. Cities Serv. Gas Co.*,
462 F.2d 204 (10th Cir. 1972) .......... 43

*In re Austin Dev. Co.*,
19 F.3d 1077 (5th Cir. 1994) .......... 91

*Banner v. United States*,
238 F.3d 1348 (Fed. Cir. 2001) .......... 75

*In re Barnett*,
12 F.2d 73 (2d Cir. 1926) .......... 53

*Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*,
783 F.3d 266 (5th Cir. 2015) .......... 2

*BP Prucenter Acquisition LLC v. Saks Fifth Ave. LLC*,
2022 WL 17976023 (Mass. Land Ct. Dec. 15, 2022) .......... 50

*Broadfoot v. Jamestown Management Corp. (In re International Biochemical Industries, Inc.)*,
521 B.R. 395 (Bankr. N.D. Ga. 2014) .................... 87, 88, 89

*Burnside 711, LLC v. Nassau Reg'l Off-Track Betting Corp.*,
67 A.D.3d 718; 888 N.Y.S.2d 212 (2009) .................... 46

*City of Littleton v. Emps. Fire Ins. Co.*,
453 P.2d 810 (Colo. 1969) .................... 33

*City of Portland v. Elec. Lightwave, Inc.*,
452 F. Supp. 2d 1049 (D. Or. 2005) .................... 76

*Delauter v. Shafer*,
822 A.2d 423 (Md. 2003) .................... 71

*Doman v. Heartland Recreational Vehicles, LLC*,
2023 WL 6637619 (N.D. Ind. Oct. 12, 2023) .................... 37

*Dover Mall, LLC v. Tang,*
2023 WL 6536975 (Del. Super. Ct. Oct. 5, 2023) .................... 48

*In re Drexel Burnham Lambert Group, Inc.*,
146 B.R. 92 (S.D.N.Y. 1992) .................... 100

*In re Dronebarger,*
2011 WL 350479 (Bankr. W.D. Tex. Jan. 31, 2011) .................... 93

*In re E. Penn Child.'s Learning Acad., LLC*,
635 B.R. 243 (Bankr. E.D. Pa. 2021) .................... 85

*In re El Toro Materials Co., Inc.,*
504 F.3d 978 (9th Cir. 2007) .................... 95

*Est. of Christensen v. Vail Mountain View Residences Phase II, LLC*,
2025 WL 869636 (Colo. App. Mar. 20, 2025) .................... 58

*In re Falcon V, L.L.C.*,
620 B.R. 256 (Bankr. M.D. La. 2020) .................... 101

*Far West Federal Bank, S.B. v. Dir., Office of Thrift Supervision*,
787 F. Supp. 952 (D. Or. 1992) .................... 34, 35, 37

*In re Fidelity Holding Co., Ltd.*,
837 F.2d 696 (5th Cir. 1988) .................... 30

*Fifth Ave. Jewelers v. Great E. Mall (In re Fifth Ave. Jewelers)*,
203 B.R. 372 (Bankr. W.D. Pa. 1996) .......... 83, 86

*In re Filene's Basement, LLC*,
2015 Bankr. LEXIS 1350 (Bankr. D. Del. Apr. 16, 2015) .......... 81

*Fisher v. U.S. Fid. & Guar. Co.*,
39 N.E.2d 67 (Ill. App. Ct. 1942) .......... 42

*Fla. Power & Light Co. v. Westinghouse Elec. Corp.*,
826 F.2d 239 (4th Cir. 1987) .......... 43

*In re Flanigan*,
374 B.R. 568 (Bankr. W.D. Pa. 2007) .......... 89

*Gillespie v. Simpson*,
588 P.2d 890 (Colo. App. 1978) .......... 44

*Goldberg v. Pace Univ.*,
88 F.4th 204 (2nd Cir. 2023) .......... 47

*Harriscom Svenska, AB v. Harris Corp.*,
3 F.3d 576 (2d Cir. 1993) .......... 40, 41, 44

*Int'l Minerals & Chem. Corp. v. Llano, Inc.*,
770 F.2d 879 (10th Cir. 1985) .......... 41, 43

*In re Jack Kline Co., Inc.*,
440 B.R. 712 (Bankr. S.D. Tex. 2010) .......... 30

*JN Contemp. Art LLC*,
29 F.4th 123 .......... 46, 47

*John Hancock Life Ins. Co. v. Abbott Labs.*,
863 F.3d 23 (1st Cir. 2017) .......... 38

*In re Klein Sleep Products, Inc.*,
78 F.3d 18 (2d Cir. 1996) .......... 8

*Kohn v. Darlington Cmty. Sch.*,
698 N.W.2d 794 (Wis. 2005) .......... 76

*Konover Dev. Corp. v. Waterbury Omega, LLC*,
281 A.3d 1221 (Conn. App. Ct. 2022) .......... 76

*Kupfer v. Salma (In re Kupfer)*,
852 F.3d 853 (9th Cir. 2016) ........................................................................ 95, 98

*L.U. Cattle Co. v. Wilson*,
714 P.2d 1344 (Colo. App. 1986) ........................................................................ 59

*Lampo Grp., LLC v. Marriott Hotel Servs., Inc.*,
2021 WL 3490063 (M.D. Tenn. Aug. 9, 2021) ........................................................ 48

*Lincoln Triangle Com. Holding Co. LLC v. Halperin (In re Cortlandt Liquidating LLC)*,
658 B.R. 244 (S.D.N.Y. 2024) ........................................................................ 89

*In re Main, Inc.*,
207 B.R. 832 (Bankr. E.D. Pa. 1997) ........................................................................ 90

*In re Mallett, Inc., No. 21-11619 (JLG)*,
2023 Bankr. LEXIS 3008 (Bankr. S.D.N.Y. Dec. 22, 2023) ........................................ 89

*Mallory Assocs. v. Barving Realty Co.*,
300 N.Y. 297 (1949) ........................................................................ 53

*In re Mattlage-Thurmond,*
2022 WL 3544393 (5th Cir. Aug. 18, 2022) ........................................................ 27

*In re MCorp Fin., Inc.*,
122 B.R. 52 (Bankr. S.D. Tex. 1990) ........................................................ 4, 50, 51, 67

*In re MDC Systems, Inc.*,
488 B.R. 74 (Bankr. E.D. Pa. 2013) ........................................................ 87, 88

*Message Center Management, Inc. v. Getchell,*
2000 WL 1912210 (Conn. Super. Ct. Dec. 18, 2000) ........................................ 59, 60

*In re Metals USA, Inc., No. 01-42530-H4-11*,
2004 WL 771096 (Bankr. S.D. Tex. Jan. 15, 2004) ........................................ 91

*Metromedia, Inc. v. City of N.Y.*,
455 N.E.2d 1252 (N.Y. 1983) ........................................................................ 76

*Miller v. City of N.Y.*,
203 N.E.2d 478 (N.Y. 1964) ........................................................ 64, 66, 74

*In re Mirant Corp.*,
2005 WL 6443618 (Bankr. N.D. Tex. Nov. 22, 2005) . 4, 50, 51, 56, 57, 67, 69, 70, 71, 75

*Mirant Peaker, LLC v. S. Md. Elec. Coop., Inc. (In re Mirant Corp.),*
2004 Bankr. LEXIS 2455 (Bankr. N.D. Tex. June 28, 2004).......................................... 77

*In re Mr. Gatti's, Inc.*,
162 B.R. 1004 (Bankr. W.D. Tex. 1994)........................................................... 84, 84, 91

*Nelkin v. Wedding Barn at Lakota's Farm, LLC*,
152 N.Y.S.3d 216 (N.Y. Civ. Ct. 2020)................................................................... 46

*New Hampshire v. Maine*,
532 U.S. 742 (2001)................................................................................................ 80

*Nextel of N.Y., Inc. v. Assessor for Vill. of Spring Valley*,
4 Misc. 3d 233 (N.Y. Sup. Ct. 2004)....................................................................... 76

*Nextel of N.Y., Inc. v. Time Mgmt. Corp.*,
297 A.D.2d 282 (N.Y. App. Div. 2002)............................................................. 4, 51, 65

*North Canton Board of Education v. American Telephone & Telegraph, Inc.,*
822 F. App'x 326 (6th Cir. 2020)............................................................................ 60

*Nosaj Ent. v. Tristate & Beyond, LLC*,
2025 WL 1126817 (S.D.N.Y. Apr. 16, 2025)........................................................... 44

*Oldden v. Tonto Realty Corp.*,
143 F.2d 916 (2d Cir. 1944)................................................................... 6, 7, 61, 85

*In re Perry*,
411 B.R. 368 (Bankr. S.D. Tex. 2009)..................................................................... 86

*In re PPI Enterprises (U.S.), Inc.*,
324 F.3d 197 (3d Cir. 2003)........................................................................ 81, 86, 90

*In re PPI Enters.*,
228 B.R. 339 (Bankr. D. Del. 1998)......................................................................... 83

*In re Premier Ent. Biloxi, LLC*,
413 B.R. 370 (Bankr. S.D. Miss. 2009).................................................................... 91

*Quinio v. Aala*,
603 F. Supp. 3d 50 (E.D.N.Y. 2022)........................................................................ 53

*Raleigh v. Ill. Dep't of Revenue*,
530 U.S. 15 (2000).................................................................................................. 30

*Reade v. Stoneybrook Realty, LLC*,
63 A.D.3d 433; 882 N.Y.S.2d 8 (2009) ........ 46

*Reed v. Luxury Vacation Home LLC*,
632 F. Supp. 3d 489 (S.D.N.Y. 2022) ........ 32, 33

*Republican Party of Texas v. Houston First Corp.*,
2022 WL 619708 (Tex. App. Mar. 3, 2022) ........ 48

*Reynolds v. State Bd. for Cmty. Colls. & Occupational Educ.*,
937 P.2d 774 (Colo. App. 1996) ........ 76

*Riverside Rsch. Inst. v. KMGA, Inc.*,
497 N.E.2d 669 (N.Y. 1986) ........ 86

*In re RNI Wind Down Corp.*,
369 B.R. 174 (Bankr. D. Del. 2007) ........ 101

*Roaring Fork Club, LLC v. Pitkin Cnty. Bd. of Equal.*,
342 P.3d 467 (Colo. App. 2013) ........ 4, 51

*In re S. Cinemas, Inc.*,
256 B.R. 535 ........ 85

*In re Sonora Convalescent Hospital, Inc.*,
69 B.R. 134 (Bankr. E.D. Ca. 1986) ........ 77

*In re Southern Cinemas, Inc.*,
256 B.R. 520 (Bankr. M.D. Fla. 2000) ........ 6

*SPX Credit Corp. v. Fadeyi*,
1998 Colo. App. LEXIS 1349 (Sep. 24, 1998) ........ 33, 42

*T-Mobile Ne., LLC v. DeBellis*,
143 A.D.3d 992; 118 N.E.3d 873 (N.Y. App. Div. 2016) ........ 76

*Texas Co. v. Hogarth Shipping Corp.*,
256 U.S. 619 (1921) ........ 41

*Town of Fraser v. Davis*,
644 P.2d 100 (Colo. App. 1982) ........ 33

*In re Tri-Union Dev. Corp.*,
314 B.R. 616 ........ 100

*In re Tri-Union Dev. Corp.*,
314 B.R. 618 .......... 100

*Trump on the Ocean, LLC v. Ash*,
2009 NYSlipOp 51837 (2009).......... 46

*In re Unidigital, Inc.*,
262 B.R. 283 (Bankr. D. Del. 2001) .......... 99

*Unihealth v. U.S. Healthcare, Inc.*,
14 F. Supp. 2d 623 (D.N.J. 1998) .......... 42

*Union Square Park Cmty. Coal., Inc. v. N.Y.C. Dep't of Parks & Recreation*,
8 N.E.3d 797 (N.Y. 2014).......... 4, 51, 61, 64

*Union Square Park*,
22 N.Y.3d 656.......... 74

*In re Vectrix Bus. Solutions, Inc.*,
2005 WL 3244199 (Bankr. N.D. Tex. 2005).......... 101

*Virginia Power Energy Mktg., Inc. v. Apache Corp.*,
297 S.W.3d 397 (Tex. App. 2009).......... 49

*Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.*,
96 Wash. 2d 558 (1981).......... 35

*Women's Interart Ctr., Inc. v. N.Y.C. Econ. Dev. Corp.*,
97 A.D.3d 17 (N.Y. App. Div. 2012) .......... 66

*Yodice v. Touro Coll. & Univ. Sys.*,
767 F. Supp. 3d 86 (S.D.N.Y. 2025).......... 32

*Z. Justin Mgmt. Co. v. Metro Outdoor, LLC*,
137 A.D.3d 577 (N.Y. App. Div. 2016) .......... 67

**STATUTES**

11 U.S.C. § 11.1(b)(6) .......... 52

11 U.S.C. § 301(b) .......... 30

11 U.S.C. § 365(d)(4) .......... 77

11 U.S.C. § 502.......... 85

15 U.S.C. § 77k ........ 54

18 U.S.C. § 1350 ........ 54

26 U.S.C. § 856 ........ 78

28 U.S.C. § 157(b) ........ 9

28 U.S.C. § 1334 ........ 9

28 U.S.C. § 1408 ........ 9

28 U.S.C. § 1409 ........ 9

**REGULATIONS**

26 C.F.R. § 1.856 ........ 78

**FEDERAL RULES**

Fed. R. Bankr. P. 3001 ........ 9

Fed. R. Bankr. P. 3007 ........ 9, 27

Fed. R. Bankr. P. 3018(a)(4) ........ 1, 2, 29

**LEGISLATIVE MATERIALS**

*Oldden*. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 353-354 (1977) ........ 7

Rep. No. 595, 95th Cong., 1st Sess. 353-354 (1977) ........ 85

**OTHER AUTHORITIES**

EchoStar Corporation, *Comments of EchoStar Corp.* 3 (May 27, 2025), https://www.fcc.gov/ecfs/document/105280597605377/1 ........ 11, 34, 39

EchoStar Corporation, *Reply Comments of EchoStar Corp.* 1 (June 6, 2025), https://www.fcc.gov/ecfs/document/10607392405127/1 ........ 11, 34, 40

https://www.sbasite.com/English/Company/About-SBA/default.aspx ........ 68

Master Lease Agreement with SBA (Feb. 22, 2021), https://www.sbasite.com/English/Investors-overview/news-events/news-details/2021/DISH-signs-Master-Lease-Agreement-with-SBA/default.aspx ........ 68

Restatement (Second) of Contracts § 261 cmt. b ........................................................................ 37

Restatement (Second) of Contracts § 264 ................................................................................... 32

The DISH Wireless Debtors state as follows in support of this omnibus objection (this "**Objection**")[1] to the proofs of claim filed by Crown Castle, American Tower, and SBA (each as defined on **Annex 1** appended hereto), asserted in liquidated amounts of approximately $4.69 billion, $2.7 billion, and $194 million, respectively, in addition to various unliquidated amounts. *See* **Annex 2** for all related proof of claim numbers. Crown Castle, American Tower, and SBA are collectively referred to herein as the "**Tower Lessors**," and their claims are collectively referred to herein as, the "**Tower Lessors' Claims**." In support of this Objection, the DISH Wireless Debtors submit the *Declaration of Peter Strom in Support of the DISH Wireless Debtors' Omnibus Objection to the Claims of Crown Castle, American Tower, and SBA* (the "**Strom Declaration**") and respectfully state as follows:[2]

## PRELIMINARY STATEMENT

1. The Court's ruling on this Objection should resolve the entire case. The FCC's July 30 Order provides that a claim eligible to recover from the FCC Trust "exclude[s] any claims on behalf of EchoStar or its subsidiaries or affiliates, or any assignee thereof," which includes the DWLLC Intercompany Claim.[3] Assuming that the Tower Lessors' claims that are the subject of

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in the *Declaration of John Swieringa in Support of Chapter 11 Petitions and Requests for First Day Relief* [Dkt. No. 19] (the "**First Day Declaration**"), *the DISH Wireless Debtors' Motion for Entry of an Order Estimating Claims for Voting Purposes Under Rule 3018(a)(4) of the Federal Rules of Bankruptcy Procedure* [Dkt. No. 168], or the *Modified Joint Prepackaged Chapter 11 Plan of DISH DBS Corporation, DISH Wireless L.L.C., and Their Respective Affiliated Debtors and Debtors in Possession* [Dkt. No. 494] (the "**Plan**"), as applicable.

[2] The DISH Wireless Debtors reserve their rights to object to any other claims filed by the Tower Lessors (or any portion thereof) and to object to the Tower Lessors' Claims on additional or modified grounds after further investigation.

[3] Memorandum Opinion and Order, *In re Applications of AT&T Mobility II LLC and EchoStar Corporation for Consent to Assign Licenses*, DA 26-797 (WTB July 30, 2026) (hereinafter, the "**FCC's July 30 Order**") ¶ 6 & n.13. The Debtors filed a copy of the FCC's July 30 Order with the Court on July 31 [Dkt. No. 726].

this Objection are disallowed or capped under section 502(b)(6), the Debtors project that the FCC Trust has more than sufficient assets to pay all eligible allowed claims in full—***even if no additional claims were subject to section 502(b)(6)***.[4]

2. The Debtors have promptly filed the Claims Objection to rein in the restructuring expense burn rate and place these cases on the pathway to near-term confirmation. The Committee's focus on litigating every conceivable dispute at substantial fees fails to serve anyone's interests, including those of its constituents, and is quickly depleting the DISH Wireless Debtors' finite resources. Notably, Committee counsel managed to bill $6.5 million in less than three weeks of July ($325,000 per day) and has projected $20 million of fees for August and September.[5] ***Based on current projections, which assume all of the Committee's and Tower Lessors' litigations proceed as proposed, the DISH Wireless Debtors' estates will need financing by late-September for the professional fees associated with such litigations.*** Therefore, the Debtors will request a merits hearing on the Claims Objection as soon as the Court permits. Given that the Tower Lessors have already collectively filed 112 pages of briefing on the applicability of section 502(b)(6) and have already taken discovery of the Debtors on that issue,[6]

---

4 For the avoidance of doubt, the Debtors intend to object to all other tower lease claims in due course on any and all applicable grounds, including that amounts allowed on account of such claims, if any, are limited by section 502(b)(6) of the Bankruptcy Code.

5 The Debtors reserve all rights with respect to the reasonableness of the Committee's fees incurred pursuing unnecessary litigation. Where, as here, an available and materially less expensive approach could achieve the same estate objective, the prospective benefit of separate committee litigation must be measured against its anticipated cost. Although litigation need not ultimately succeed to be compensable, it must have been a reasonable "good gamble" when undertaken. *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner),* 783 F.3d 266, 273–77 (5th Cir. 2015) (en banc).

6 *See Objection of Crown Castle to the DISH Wireless Debtors' Motion for Entry of an Order Estimating Claims for Voting Purposes under Rule 3018(a)(4) of the Federal Rules Of Bankruptcy Procedure* [Dkt. No. 776]; *American Tower's Objection and Reservation of Rights with Respect to the DISH Wireless Debtors' Motion for Entry of an Order Estimating Claims for Voting Purposes under Rule 3018(a)(4) of the Federal Rules of Bankruptcy Procedure* [Dkt. No. 769]; *SBA's Response and Objection to*

the Debtors submit that a hearing in mid-September is appropriate. After the Court rules on the Objection, the Debtors will be prepared to demonstrate that the FCC Trust can pay in full all eligible allowed DISH Wireless General Unsecured Claims.

3. The Tower Lessors' claims addressed in this Objection fail regardless of the FCC Trust's value for two independent reasons. *One*, DWLLC's non-performance is excused as a matter of law. The FCC's directive that EchoStar sell its spectrum licenses or else forfeit them—a mandate that came after EchoStar had committed ***more than $30 billion*** to acquire the spectrum licenses and DWLLC and non-debtor affiliates committed ***more than $16 billion*** to build out the 5G network, and despite EchoStar then being in full compliance with its buildout obligations—was neither foreseeable nor voluntary. In fact, it was unprecedented. EchoStar fought against forfeiture at every turn, including in meetings at the highest levels of government, before conceding it had no option but to comply. Because DWLLC entered into real property leases with the Tower Lessors for the singular purpose of enabling DWLLC to deploy equipment operating on the spectrum that EchoStar was directed to sell, the forced loss of the spectrum destroyed both the purpose of those leases and DWLLC's ability to perform under them. Tellingly, each lease [redacted]—confirming that the parties never contemplated, much less allocated, this risk. DWLLC's performance, therefore, is excused under the doctrines of impossibility and frustration of purpose. *See infra* Section I.A.

4. Performance is also excused under the plain terms of the real property leases. Each such [redacted]

---

*Debtors' Motion for Entry of an Order Estimating Claims of SBA Telecommunications, LLC and Its Affiliated Entities for Voting Purposes Pursuant to Bankruptcy Rule 3018(a)(4)* [Dkt. No. 772].

[redacted].

That loss prevented DWLLC from using the leased tower and ground space for its contracted purpose. Accordingly, each lease's force majeure clause excuses DWLLC's performance, independent of, and consistent with, the common-law defenses described above. *See infra* Section I.B.

5. *Two*, any claims are capped under section 502(b)(6) of the Bankruptcy Code. That statute caps the claim of a lessor for damages resulting from the termination of a lease of real property. Courts evaluate the economic substance of the transaction, rather than the label attached to the agreement, to discern whether the agreement bears more characteristics of a lease than another type of contract.[7] The most important characteristic of a real property lease is possession; courts also consider whether the leased property is clearly defined and demarcated, whether the term is fixed and renewable, and whether the instrument contains other provisions typically found in a lease, such as a narrowly defined termination right. [8]

6. The Tower Lessors' leases with the Debtors are "real property leases," and their claims are "damages resulting from the termination of a lease of real property." 11 U.S.C. § 502(b)(6). The Debtors' agreements with Crown Castle and SBA are styled as "leases" and use the terminology that one would expect in a real property lease—including references to payment

---

[7] *See In re MCorp Fin., Inc.*, 122 B.R. 49, 52 (Bankr. S.D. Tex. 1990); *In re Mirant Corp.*, 2005 WL 6443618, at *7 (Bankr. N.D. Tex. Nov. 22, 2005).

[8] See *Nextel of N.Y., Inc. v. Time Mgmt. Corp.*, 297 A.D.2d 282, 283 (N.Y. App. Div. 2002); *American Coin-Meter, Inc. v. Poole*, 31 Colo. App. 316, 317 (1972); *Union Square Park Cmty. Coal., Inc. v. N.Y.C. Dep't of Parks & Recreation*, 8 N.E.3d 797, 802 (N.Y. 2014); *Roaring Fork Club, LLC v. Pitkin Cnty. Bd. of Equal.*, 342 P.3d 467, 472–73 (Colo. App. 2013).

of "rent" and to DWLLC as "tenant." EchoStar's filings with the U.S. Securities and Exchange Commission (the "**SEC**") likewise describe all such agreements "non-cancelable . . . leases for, among other things, communication towers." EchoStar Corp., Form 10-K at F-26 (Feb. 27, 2025).[9] The leases [redacted]—all hallmarks of a lease, not a license. That the ground space is a bounded parcel of land, and that the towers themselves are fixtures annexed to the realty, further confirms that these are leases of real property within the meaning of section 502(b)(6). *See infra* Section II.

7. The Tower Lessors' own tax and financial-reporting positions confirm what the agreements show on their face: these are leases of real property, not licenses. Crown Castle, ATC, and SBA each holds itself out as a REIT and must satisfy statutory income tests under which at least 75% of gross income is derived from specified real-estate-related sources, including "rents from real property." The Treasury regulations expressly classify permanently affixed cell towers as real property and recognize that even an instrument styled as a permit or license may constitute an interest in real property when it grants rights in the nature of a leasehold to occupy a designated location. Each Tower Lessor has repeatedly told shareholders and the SEC that its core business is leasing tower and ground space, has accounted for the resulting revenue as "site rental" or "tower lease income" under lessor and operating-lease accounting, and has represented that its tower-leasing business generates REIT-qualified income. Having obtained the substantial tax benefits associated with REIT status while treating its tower-leasing operations as generating qualifying real-estate income, the Tower Lessors cannot now—when section 502(b)(6)'s damages cap makes

---

[9] Strom Decl., Ex. 5.

that characterization inconvenient—ask this Court to treat the same agreements as something other than leases of real property.

8. [redacted] in a transparent and improper effort to avoid application of section 502(b)(6), cannot circumvent application of that statute. For nearly a century, courts have dismissed attempts by real property lessors like ATC to evade the statutory cap imposed by section 502(b)(6) and have "not allow[ed] it to be nullified by crafty draftsmanship in particular leases." *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 920 (2d Cir. 1944); *In re Southern Cinemas, Inc.*, 256 B.R. 520, 535–36 (Bankr. M.D. Fla. 2000) ("To circumvent the purpose of the statute on account of 'labels' would encourage crafty drafters to invent relationships that fall outside the scope of the lessor-lessee contract and limit the reach of § 502(b)(6).").

9. ATC's own sworn public statements reveal its characterization of the agreement as a "license" to be an artifice. For example, in a 2021 press release filed with the SEC, ATC announced that it [redacted] Am. Tower Corp., Form 8-K, Ex. 99.1 (Mar. 15, 2021)[10] (emphasis added). In a recent SEC filing, [redacted] Am. Tower Corp., Form 10-K at 10 (Feb. 24, 2026)[11] (stating that "we occasionally experience disputes with our customers, generally regarding the interpretation of terms in our leases," including the "DISH" lease). Additionally, ATC has broadly conceded that it "considers an arrangement to be a lease if it conveys the right to control the use of the communications infrastructure or ground space underneath communications infrastructure for a period of time in exchange for consideration"—[redacted]

[10] Strom Decl., Ex. 6.

[11] Strom Decl., Ex. 7.

[redacted]. Am. Tower Corp., Form 10-K at F-19 (Feb. 27, 2024).[12] ATC has further referenced its lease counterparties, called "licensees" in its submissions to this Court, as "tenants" in its SEC filings. *Id.* Although it now asserts that its agreement is "highly bespoke," and that "no other tower creditor has the same contractual terms,"[13] [redacted] and reap a windfall that Congress has expressly prohibited since 1934. *See Oldden*, 143 F.2d at 917, 920 (explaining that Congress adopted § 63a(9) of the Bankruptcy Act, the historical antecedent to section 502(b)(6), because the landlord, who "regains his original assets upon bankruptcy," "is not in the same position as other general creditors, and there is no very compelling reason why he should be treated on par with them").[14]

10. Crown Castle and SBA have similarly admitted that their tower leases are real property leases in their SEC filings, financial statements, on their websites, and in other public documents. Indeed, Crown Castle's own witnesses made such admissions, repeatedly and under oath, in a recent jury trial concerning the very same agreements at issue here. Crown Castle's Chief Operating Officer for Towers, Mike Kavanagh, testified under oath that Crown Castle "at the core, is a specialized real estate company" that "lease[s] tower space and ground space to wireless carriers, Verizon, AT&T, T-Mobile, DISH, those types of companies," and that Crown Castle "make[s] money" because "we lease space . . . on the tower itself, as well as . . . the compound, that's the ground space underneath the tower."[15] Crown Castle's trial counsel then

---

[12] Strom Decl., Ex. 8.

[13] ATC Obj. ¶¶ 1–3.

[14] The legislative history of the Bankruptcy Code expressly approved *Oldden*. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 353-354 (1977), Pub.L. No. 95-598, 1978 U.S.C.C.A.N. (92 Stat.) 6309-10.

[15] Reporter's Tr. of Trial Proceedings at 216:8–11, *AirComm of Avon, L.L.C. v. DISH Wireless L.L.C.*, No. 2022CV32353 (Denver Dist. Ct., Colo.) (Apr. 1, 2024).

told the jury that "[c]ell phone carriers lease two things from my client: they lease space on the tower . . . and they lease space on the ground," and that "Crown is a real estate company," whose "business model is simple: we make money by leasing our space on the tower and on the ground next to the tower"—which is why, as Crown Castle's counsel explained, the parties' contract "is called the 'Master Lease Agreement' . . . because Crown is a leasing company."[16]

11. Nor can the Tower Lessors escape section 502(b)(6) by pointing to their own prepetition termination notices. To the contrary, the statute caps damages "resulting from the termination of a lease of real property" regardless of whether that termination occurred as a result of rejection under section 365 or by a lessor's unilateral prepetition election to terminate the lease under its terms. The statute's unambiguous language simply is not limited to postpetition terminations or rejections. Nor would any such limitation make sense. The statute is designed to cap disproportionate recoveries to lessors with long term leases. *See, e.g.*, *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 20 (2d Cir. 1996) (observing that "Congress capped unsecured claims for future rent" because, "[w]hen one claimant is a landlord holding a long-term lease, its single unsecured claim for twenty or thirty years of future rent could devour so much of the debtor's estate that only crumbs could be left for the other unsecured creditors."). The timing of the termination is irrelevant. A lessor cannot evade the rule by terminating, rewarding a lessor who terminates on the eve of bankruptcy over the lessor who does not. The Tower Lessors' remaining efforts to carve out equipment-removal, decommissioning, and other non-rent damages as somehow independent of termination fare no better: each of those obligations is triggered by, and arises only in connection with, the termination of the underlying leases, placing the resulting damages squarely within the Tower Lessors' single, unified—and statutorily capped—

[16] *Id*. at 172:14–15, 173:3–10, 175:6–7.

termination-damages claims.

12. For all of these reasons, as set forth more fully below, the Court should disallow and expunge the Tower Lessors' claims in their entirety. In the alternative, the Court should allow those claims in the reduced amounts mandated by section 502(b)(6) of the Bankruptcy Code.

**RELIEF REQUESTED**

13. By this Objection, the DISH Wireless Debtors request entry of an order, substantially in the form attached hereto (the "**Order**") (i) (a) disallowing and expunging each Tower Lessor's Claim in its entirety, or (b) reducing and allowing each Tower Lessor's Claim to an amount that does not exceed the damages allowed under section 502(b)(6) of title 11 of the United States Code (the "**Bankruptcy Code**"); (ii) disallowing American Tower's and SBA's contingent, unliquidated indemnification-type claims under section 502(e) of the Bankruptcy Code; and (iii) granting such other and further relief as the Court deems just and proper.

**JURISDICTION**

14. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

15. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16. The bases for the relief requested herein are section 502(b) of the Bankruptcy Code, rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 3007-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

## BACKGROUND

### I. The 5G Network Buildout

17. Beginning in 2008, the Company began strategically acquiring a portfolio of nationwide spectrum licenses to support future mobile broadband and voice services. First Day Decl. ¶ 67. In total, the Company committed more than $46 billion to deploy and operationalize the 5G network. *Id.* ¶ 70. DWLLC does not currently own, and never owned, the spectrum sold to AT&T and SpaceX in the FCC-Directed Sale Transaction; those licenses are held by EchoStar and certain of its non-Debtor subsidiaries, which permitted DWLLC to use them in furtherance of the 5G network buildout. *Id.* ¶ 12.

18. The Company acquired the Boost Mobile brand and subscriber base in July 2020 as a condition of the T-Mobile/Sprint merger required by the Department of Justice. *Id.* ¶¶ 68–69. In connection with that acquisition, the FCC imposed a complex series of 5G network buildout commitments and milestones. *Id.* From 2020 to 2025, the Debtors, led by DWLLC, committed more than $13 billion to construct the Company's nationwide 5G mobile network infrastructure. *Id.* ¶ 70. In furtherance of that buildout, DWLLC entered into thousands of agreements with tower lessors and other vendors, all of which were premised on EchoStar's spectrum portfolio being available to DWLLC. *Id.* ¶¶ 14–15.

### II. The FCC's Unprecedented Actions and the FCC-Directed Sale Transactions

19. By May 2025, the Company had timely met all applicable FCC buildout milestones. First Day Decl. ¶ 9. On May 9, 2025, the FCC Chairman sent a letter to EchoStar expressing concerns about the extension granted by the prior administration related to the Company's 5G Network buildout and disclosing that he had directed FCC staff to commence an investigation and seek public comment to "inform the FCC's thinking about EchoStar's use of spectrum." *Id*. On May 12, 2025, the FCC issued public notices regarding the same investigation. *Id.* On May 27,

2025, EchoStar filed comments on the FCC's public notices, noting the unprecedented nature of the inquiry given that "at no other time has the agency opened such inquiries after a company has invested billions into both acquiring spectrum and deploying a network in conformance with the agency's requirements."[17] On June 6, 2025, EchoStar explained to the FCC that reversing course on its prior buildout extension would mean "pulling the rug out from under a licensee" that had relied on the agency's own prior authorization.[18] Over the ensuing weeks, EchoStar held meetings with government officials, including with President Trump, regarding its spectrum licenses, and the FCC ultimately directed EchoStar to divest its spectrum portfolio. *Id.* ¶¶ 82, 84, 85, 86.

20. As a direct result of the FCC's unprecedented and unforeseeable directive, EchoStar was required to sell a material portion of its wireless spectrum portfolio to AT&T and SpaceX for approximately $42 billion of total consideration (together, the "**FCC-Directed Sale Transactions**"). *Id.* ¶ 10. A day after EchoStar entered into the SpaceX component of the FCC-Directed Sale Transaction, the FCC Chairman confirmed that EchoStar had met all applicable FCC buildout milestones and was in full compliance with its buildout requirements. EchoStar Corp., Current Report (Form 8-K), at Item 8.01 (Sept. 8, 2025)[19] (FCC Chairman sent a follow-up letter directing FCC staff "to terminate the agency's investigation of EchoStar" commenced by the May 9, 2025 letter). As a result of the sale of the wireless spectrum portfolio, DWLLC could no longer continue to build out or operate the 5G network. First Day Decl. ¶ 12.

## III. The Force Majeure Notices and the Tower Lessor Actions

21. To build out and operate the 5G Network, DWLLC entered into thousands of

---

17 EchoStar Corporation, *Comments of EchoStar Corp.* 3 (May 27, 2025), https://www.fcc.gov/ecfs/document/105280597605377/1.

18 EchoStar Corporation, *Reply Comments of EchoStar Corp.* 1 (June 6, 2025), https://www.fcc.gov/ecfs/document/10607392405127/1.

19 Strom Decl., Ex. 9.

contracts (including site lease agreements, master service agreements, and equipment supply and maintenance contracts) with owners and operators of communications tower sites and providers of network equipment and services to operationalize EchoStar's spectrum for subscribers (the "**5G Network Providers**"), including the Tower Lessors. *Id.* ¶¶ 14–15. EchoStar is not a party to any of the agreements with the Tower Lessors and has no direct contractual relationship with any of the Tower Lessors. *Id.*

22. In compliance with its obligations under the respective agreements, DWLLC sent notices to all of the 5G Network Providers, including to each of the Tower Lessors on September 24, 2025, that the FCC's unprecedented actions and the resulting FCC-Directed Sale Transactions constituted a force majeure event, frustrated the principal purpose of the relevant contracts, and rendered DWLLC's performance thereunder commercially impractical and impossible. *Id.* ¶¶ 14–15, 99. The notices explained that EchoStar's sale of its spectrum licenses was involuntary and unavoidable, that the FCC's actions were not foreseeable, and that, without access to the spectrum, there was no remaining purpose for or ability of DWLLC to perform under its contracts with the 5G Network Providers. *Id.* ¶¶ 14–15.

23. After receiving these notices, the Tower Lessors each initiated actions[20] against DWLLC (the "**Tower Lessor Actions**"), with American Tower and Crown Castle also naming EchoStar as a defendant. These lawsuits seek damages in the form of unpaid rent and other costs under lease and service agreements, future rent extending more than 10 years into the future term, and other costs. *Id.* ¶ 99. The aggregate amount of damages asserted in these actions exceeds $6

[20] See American Towers LLC v. DISH Wireless L.L.C., No. 1:25-cv-03311 (D. Colo. Oct. 20, 2025); Aircomm of Avon, LLC v. DISH Wireless L.L.C., No. 1:25-cv-03756 (D. Colo. Nov. 20, 2025); SBA Telecommunications, LLC, et al. v. DISH Wireless L.L.C., No. 1:26-cv-00218 (W.D.N.Y. Feb. 5, 2026).

billion. *Id.*

24. Each of the Tower Lessor Actions involves claims arising from DWLLC's assertion of its force majeure, impossibility, and frustration of purpose defenses in connection with the FCC-Directed Sale Transactions and the resulting cessation of payments by DWLLC under various agreements entered into in connection with the 5G network buildout.

## IV. The Real Property Leases[21]

25. During the course of its 5G network infrastructure buildout, DWLLC entered into various real property lease agreements with thousands of 5G Network Providers, including the Tower Lessors, for the rental of physical space, including towers, rooftops, and other structures, as well as the ground space surrounding such structures, to maintain and operate 5G network equipment. [redacted] Set forth below are the relevant terms of the now-terminated Crown Castle MLA, ATC SCA, and SBA MLA (each as defined below and collectively, the "**Real Property Leases**") and the individual lease agreements governed by them.

### A. The Crown Castle MLA[22]

26. On or about [redacted], DWLLC entered into that certain Master Lease Agreement (the "**Crown Castle MLA**")[23] with Crown Castle, [redacted], pursuant to which DWLLC leased certain Leased Property at Crown Castle-owned Sites. Crown Castle

---

[21] Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the Crown Castle MLA, the ATC SCA, or the SBA MLA, as applicable.

[22] The Crown Castle POC [redacted]

[23] Strom Decl., Ex. 1.

[redacted][redacted] [redacted]

27. In sum, [redacted][redacted]

28. [redacted]

[24] [redacted]

[25] Strom Decl., Ex. 10.

[redacted]

29. Additional relevant terms of the Crown Castle MLA and associated Crown Castle SLAs are summarized below:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

30. The Crown Castle MLA's Force Majeure clause provides that [redacted]

[redacted]

31. [redacted] of the Crown Castle MLA addresses [redacted]

**B. The ATC SCA and ATC Leases**

32. DWLLC and American Towers LLC, SpectraSite Communications, LLC, and InSite Wireless Group, LLC are parties to a Strategic Collocation Agreement dated [redacted] (the "**ATC SCA**"),[26] [redacted]

[26] Strom Decl., Ex. 2.

[redacted] By notices dated May 29, 2026[28] and June 1, 2026,[29] American Tower asserted that DWLLC had failed to cure alleged defaults on its payment obligations and terminated the ATC Leases identified in those notices effective June 2, 2026, which American Tower stated resulted in termination of the ATC SCA pursuant to ATC SCA § 2(c).

33. [redacted]

---

[27] As addressed in the Preliminary Statement, *supra*, and in Section II.A.1, *infra*, the substance of the ATC SCA and "New Licenses," together with ATC's own sworn public statements reveal that ATC's characterization of the SCA and "New Licenses" as anything other than real property leases is an artifice. Accordingly, throughout this Objection, the DISH Wireless Debtors refer to the ATC agreements by their functional terminology rather than the artificial terminology chosen by ATC to subvert section 502(b)(6) of the Bankruptcy Code. References in the ATC SCA or "New Licenses" to defined terms containing the word "Licensee" or "Licensed" (and correlative terms) have been revised herein to use the words "Lessee" or "Leased" (and correlative terms) to comport with the true nature of the agreement as a real property lease.

[28] Strom Decl., Ex. 11.

[29] Strom Decl., Ex. 12.

[redacted]

34. Additional terms and conditions relating to the nature of each ATC Lease are set forth [redacted] to the ATC SCA and summarized below:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

35. [redacted]

[redacted]

36. [redacted] of the ATC SCA addresses [redacted]

C. **The SBA MLA**

37. DWLLC, as successor-in-interest, and SBA Telecommunications, LLC entered into that certain Master Lease Agreement dated [redacted], as amended by the First Amendment to Master Lease Agreement dated February 12, 2021 (the "**First Amendment**"[30] and together with the Master Lease Agreement, the "**SBA MLA**"),[31] [redacted]

[30] Strom Decl., Ex. 4.

[31] Strom Decl., Ex. 3.

[32] SBA has identified the number of SBA SLAs as "approximately 3,000" and "roughly 3,800." *See* SBA Obj. 2, 4.

[redacted] By notice dated January 27, 2026[33] and June 11, 2026[34] SBA terminated the SBA SLAs covered by the primary MLA, asserting that DWLLC had failed to cure alleged nonpayment defaults under the primary MLA and those SBA SLAs.

38. Additional relevant terms of the SBA MLA and associated SBA SLAs are summarized below:

[redacted]

[33] Strom Decl., Ex. 13.

[34] Strom Decl., Ex. 14.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

39. The SBA MLA's Force Majeure clause provides that [redacted]

40. [redacted]

[redacted]

## V. The Tower Lessors' Proofs of Claim

### A. Crown Castle POC[35]

41. Crown Castle's proof of claim (the "**Crown Castle POC**") asserts a total, unliquidated amount of no less than approximately $4,680,702,674.00 for damages under the MLA, MLA SLAs, Non-MLA SLAs, and Other Agreements (each as defined in the Crown Castle POC). Crown Castle POC Add. ¶ 9. Crown Castle asserts this amount jointly on behalf of the 42 Crown Castle Entities identified in the Crown Castle POC, each of which is alleged to be a party to one or more of the Agreements and to hold claims against one or more of the Debtors arising thereunder. *Id.* ¶¶ 4, 11. The Crown Castle POC breaks this total down into the following categories of asserted damages, summarized in Exhibit I to the Crown Castle POC.

42. Recurring Payment Obligations. Crown Castle asserts $3,750,057,184 in damages for recurring payment obligations under the Agreements that were due and owing as of the Petition Date, including, [redacted]. Crown Castle POC Add. ¶ 10(a); *id.* Ex. I.

43. Equipment Overages. Crown Castle asserts $264,521,879 in additional charges allegedly owed where DISH Wireless [redacted]. *Id.* ¶ 10(b); *id.* Ex. I.

---

[35] Certain of these amounts, such as the Equipment Overages, are the subject of a long-standing billing dispute between the parties due to improper billing practices by Crown Castle. Among other defenses, DWLLC contends that Crown Castle forfeited any right to seek payment of such amounts under the doctrine of claim preclusion by not raising the issue in the prior proceedings between the parties.

44. Holdover Charges. Crown Castle asserts $186,768,327 [redacted] (as defined in the Crown Castle POC). *Id.* ¶ 10(c); *id.* Ex. I.

45. Utility, Property Tax, and Sales Tax Reimbursements. Crown Castle asserts $93,453 in unreimbursed utility and operating expenses, $2,015,181 in unreimbursed property tax and similar assessments, and $412,705 in unreimbursed sales, use, and similar taxes, in each case allegedly advanced or incurred by Crown Castle on DWLLC's behalf. *Id.* ¶¶ 10(d)–(f); *id.* Ex. I.

46. Landlord Settlement and Property Damage Claim Payments. Crown Castle asserts $336,151 for amounts it has incurred, paid, or been demanded by third parties in connection with claims, demands, lawsuits, or other proceedings by underlying property owners, vendors, contractors, or other third parties, allegedly arising from DWLLC's installation, operation, or maintenance of equipment at Crown Castle sites. *Id.* ¶ 10(g); *id.* Ex. I.

47. Decommissioning and Removal Costs. Crown Castle asserts $324,147,700 in costs incurred, and reasonably expected to be incurred, in disconnecting, removing, transporting, and disposing of DWLLC's equipment, and in restoring the affected sites following such removal. *Id.* ¶ 10(h); *id.* Ex. I.

48. Miscellaneous Charges and Adjustments. Crown Castle reflects a net credit of $(682,823) [redacted]. *Id.* ¶ 10(j); *id.* Ex. I.

49. Accrued Interest. [redacted] *Id.* ¶¶ 10(i), 13; *id.* Ex. I.

**B. ATC POC**

50. ATC filed 76 separate proofs of claim against DWLLC, one for each ATC entity identified in Annex 1,[36] each attaching an identical addendum (the "**ATC Addendum**") and an accompanying Exhibit A schedule of entity-specific claim amounts. The ATC Addendum asserts that, as a result of DWLLC's alleged prepetition breach of the ATC SCA and [redacted] Based on the foregoing, the ATC Addendum states that ATC's aggregate portfolio-wide claims total no less than $2.2 billion and potentially more than $2.7 billion, exclusive of unliquidated "Other Amounts" (including indemnified amounts, attorneys' fees, court costs, interest, and rejection damages) that ATC expressly reserves the right to assert. *See* Annex 2 for the proof of claim number associated with each ATC entity.

**C. SBA POC**

51. SBA's proof of claim (POC No. 11425) (the "**SBA POC**") asserts $194,347,674.20 for damages under the SBA MLA and SBA SLAs. *See* SBA POC Description ¶ 1.[37]

---

[36] Individual entity-level claim amounts range from approximately $19,101.80 (GTP Infrastructure III, LLC) to $657,155,123.04 (American Towers LLC).

[37] In addition to damages asserted under the SBA MLA and SBA SLAs, SBA asserts claims totaling $10,455,597.83 under a separate Master License Agreement for Antenna Attachment dated December 30, 2021 with Golden State Licensing, LLC, an affiliate of SBA (the "**PG&E MLA**") and 45 individual Site License Acknowledgements (the "**PG&E SLAs**") related thereto, as well as claims totaling $7,714,385.98 under 75 individual License Agreements with SBA Site Management, LLC, another affiliate of SBA (the "**SBAM Agreements**"). This Objection does not address SBA's claims related to the PG&E MLA, PG&E SLAs, and individual SBAM Agreements as such claims are not the main agreements governing the Debtors' tower lease relationship with SBA. The Debtors reserve the right to object to claims asserted under the PG&E MLA, PG&E SLAs, and SBAM Agreements in a subsequent claim objection. *See* Bankruptcy Rule 3007 Advisory Comm. Notes (2007) ("[U]se of an omnibus objection generally does not preclude the objecting party from raising a subsequent objection to the claim on other grounds."); *see In re Mattlage-Thurmond*, No. 22-50032 (ADA), 2022 WL

52. Prepetition Amounts. [redacted] In addition, SBA asserts a $11,503,509.90 prepetition unsecured claim for damages arising from SBA's [redacted] *Id.* ¶ 9. As of the Petition Date, SBA holds unapplied payments/credits in the amount of $365,643.35. *Id.* ¶ 10.

53. Rejection Damages. SBA asserts that DWLLC owes $82,044,425.79 in damages for the remaining term under the applicable agreements, consisting of (a) $69,792,382.02 in prepetition accelerated amounts arising from SBA's prepetition termination of certain agreements, and (b) $12,252,041.77 in rejection damages. *Id.* ¶ 13. The rejection and accelerated amounts are further broken down by agreement, with (1) $69,986,068.93 due under the SBA MLA and SBA SLAs, (2) $8,643,281.67 due under the PG&E Agreements, and (3) $3,415,075.19 due under the SBAM Agreements. *Id.*

54. Decommissioning and Removal Costs. SBA asserts a contingent, unliquidated unsecured claim of $65,775,000 for damages relating to the removal of DWLLC's property from abandoned sites, which SBA estimates would cost between $25,000.00 and $65,000.00 per rejected agreement. *Id.* ¶ 14.

3544393, at *2 (5th Cir. Aug. 18, 2022) (finding that the debtors could have objected to an additional amount asserted in proof of claim carved out of prior order adjudicating settled claim amount).

55. Indemnification Costs and Attorneys' Fees. SBA asserts contingent and [redacted] (including reasonable attorneys' fees and costs) and claims of liability or losses that arise out of DWLLC's use and/or occupancy. SBA also asserts an unliquidated claim for attorneys' fees. *Id.* ¶ 17.

## VI. Relevant Procedural History

56. On July 6, 2026, the DISH Wireless Debtors filed their *Motion for Entry of an Order Estimating Claims for Voting Purposes Under Rule 3018(a)(4) of the Federal Rules of Bankruptcy Procedure* [Dkt. No. 168] (the "**First Voting Estimation Motion**") applying the section 502(b)(6) cap. On August 4, 2026, each of the Tower Lessors filed an objection to the First Voting Estimation Motion. *See* Dkt. No. 769; Dkt. No. 772; and Dkt. No. 776. On August 10, 2026, the Tower Lessors stipulated to the relief, and the Court entered an order approving the stipulation. *See* Dkt. No. 890.

## ARGUMENT

57. Section 502(a) of the Bankruptcy Code provides, in pertinent part, as follows: "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Further, section 502(b)(1) of the Bankruptcy Code provides that a court "shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that [ ] such claim is unenforceable against the debtor and the property of the debtor . . . ." 11 U.S.C. § 502(b)(1). Moreover, Bankruptcy Rule 3007(d) provides certain grounds upon which "objections to more than one claim may be joined in an omnibus objection," which includes when "the objections are based solely on the grounds that the claims should be disallowed, in whole or in part, because . . . they duplicate other claims . . . they have been amended by subsequently filed

proofs of claim . . . they have been satisfied or released during the case in accordance with the Code, applicable rules, or a court order . . . [or] they were presented in a form that does not comply with applicable rules . . . and the objector is therefore unable to determine a claim's validity." Fed. R. Bankr. P. 3007(d).

58. As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes prima facie evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code. *See, e.g., In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010). A proof of claim, however, loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that is essential to the claim's legal sufficiency. *See In re Fidelity Holding Co., Ltd*., 837 F.2d 696, 698 (5th Cir. 1988) (discussing the former Bankruptcy Rules 301(b), 11 U.S.C. § 301(b), predecessor to the modern Rule 3001(f)). Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence. *See id*. Despite this shifting burden during the claim objection process, "the ultimate burden of proof always lies with the claimant." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

59. As set forth below, the Court should disallow and expunge the Tower Lessors' Claims in their entirety. Alternatively, the Court should allow them only in the reduced amounts set forth in Section II.

## I. The Tower Lessors' Claims Should Be Disallowed and Expunged in Their Entirety

60. The Tower Lessors' claims should be disallowed and expunged in their entirety because any non-performance by DWLLC purportedly giving rise to the Tower Lessors' claims is excused as a matter of law as a result of the FCC-Directed Sale Transactions for at least two reasons.

61. *One*, the FCC-Directed Sale Transactions excuse DWLLC's performance under the doctrines of impossibility and frustration of purpose. The FCC's mandate that EchoStar sell its spectrum licenses or else have them forfeited was neither voluntary nor foreseeable to DWLLC. EchoStar (and certain of its non-Debtor subsidiaries), not DWLLC, owned the spectrum, and it was EchoStar that entered into the FCC-Directed Sale Transactions only after the FCC left it no alternative. EchoStar's compliance with the FCC's mandate—the only alternative to forfeiture of EchoStar's licenses without compensation—does not mean that its conduct was voluntary. Indeed, courts have repeatedly found a party's compliance with an informal government directive is involuntary where, as here, the government has the power to otherwise compel compliance. *See infra* ¶¶ 81–82. The FCC gave EchoStar only two choices, and both of those choices required EchoStar to lose access to the spectrum it needed to operate a network. [redacted] Indeed, the FCC's action is totally unprecedented. Accordingly, EchoStar's forced sale of its spectrum assets, and DWLLC's consequential loss of access to EchoStar's spectrum destroyed the entire purpose of the Real Property Leases and rendered DWLLC's performance under those leases impossible, since DWLLC can no longer build, operate, or pay for a 5G network without access to spectrum. DWLLC simply has no access to the spectrum necessary to operate its business. *See infra* Section A.

62. *Two*, the FCC-Directed Sale Transactions were forced governmental actions, which independently constitute a force majeure event under DWLLC's Real Property Leases, eliminating DWLLC's ability to utilize the cell sites it had leased. The FCC-Directed Sale Transactions constitute the exact type of [redacted]

[redacted] *See infra* Section B.

### A. The Purpose of the Real Property Leases Has Been Frustrated and DWLLC's Performance Rendered Impossible

63. [redacted], which govern DWLLC's Real Property Leases,[38] a party's performance under a contract is excused under the doctrines of impossibility and frustration of purpose if: (i) there has been an unforeseen event; (ii) occurring involuntarily or without the fault of the party seeking excuse; that (iii) destroys the practical means of performance (impossibility) or the principal purpose for which the contract was made (frustration of purpose).

64. Specifically, under New York law, the doctrine of impossibility is a defense to a breach of contract action only where "performance is rendered objectively impossible by an unanticipated event that could not have been foreseen or guarded against in the contract." *Reed v. Luxury Vacation Home LLC*, 632 F. Supp. 3d 489, 512 (S.D.N.Y. 2022). The doctrine also excuses a party's performance "[i]f the performance of a duty is made impracticable by having to comply with a . . . governmental regulation or order, [and] that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." *Yodice v. Touro Coll. & Univ. Sys.*, 767 F. Supp. 3d 86, 93 (S.D.N.Y. 2025); *see also* Restatement (Second) of Contracts § 264 (Am. L. Inst. 1981) cmt. a ("[I]f supervening governmental action prohibits a performance or imposes requirements that make it impracticable, the duty to render that performance is discharged, subject to the qualifications stated in § 261.").

65. Similarly, under Colorado law, "impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss

---

[38] *See* [redacted]; [redacted]; [redacted].

involved." *City of Littleton v. Emps. Fire Ins. Co.*, 453 P.2d 810, 812 (Colo. 1969); *accord Town of Fraser v. Davis*, 644 P.2d 100, 101 (Colo. App. 1982) ("[t]he essence of the defense is not impossibility, but rather impracticability.").

66. The doctrine of frustration of purpose generally involves the same elements as the doctrine of impossibility. In New York, "[t]he doctrine of frustration of purpose discharges a party's duties to perform under a contract where a wholly unforeseeable event renders the contract valueless to one party," and "the frustrated purpose must be so completely the basis of the contract that, as both parties understood, the transaction would have made little sense." *Reed*, 632 F. Supp. 3d at 512. Colorado requires the same showing: "a showing of a near total destruction of the essential purpose of the transaction," and that "the frustration must be so severe that it is not fairly to be regarded as within the risks that the party assumed by entering into the contract." *SPX Credit Corp. v. Fadeyi*, 1998 Colo. App. LEXIS 1349, at *7-8 (Colo. Ct. App. Sep. 24, 1998). Courts accordingly analyze the two defenses together and apply them in parallel. *See Reed*, 632 F. Supp. 3d at 511–13 (analyzing impossibility and frustration of purpose together as parallel defenses); *SPX Credit Corp. v. Fadeyi*, 1998 Colo. App. LEXIS 1349, at *6 (Colo. Ct. App. Sep. 24, 1998) (noting that the defenses are separate but related). All elements are met here.

**1. The FCC-Directed Sale Transactions Were Unforeseeable**

67. The FCC-Directed Sale Transactions were entirely unforeseeable. In fact, they are wholly unprecedented in the history of the FCC.

68. EchoStar's conduct further demonstrates the unprecedented nature of the FCC's actions was unforeseen. EchoStar committed over $46 billion to acquire its spectrum portfolio and build out a wireless network, and the Company was in compliance with all of the FCC's buildout requirements when the FCC commenced its investigation in May 2025. It is simply not plausible that EchoStar would have spent more than 15 years acquiring spectrum and building out

a network if it were foreseeable that the FCC would turn around and require EchoStar to sell its spectrum or face forfeiture—something it has never done before. The FCC's decision to require the sale of EchoStar's spectrum was particularly unforeseeable given that EchoStar had met all applicable FCC buildout milestones and was in full compliance with its buildout requirements. The FCC Chairman reconfirmed this compliance just *one day* after EchoStar entered into the second of the two FCC-Directed Sale Transactions—further underscoring that the entire process was driven by the government, not EchoStar (and certainly not by DWLLC).

69. On May 27, 2025, EchoStar submitted a public filing in which it noted the unprecedented nature of the FCC's actions given that "at no other time has the agency opened such inquiries after a company has invested billions into both acquiring spectrum and deploying a network in conformance with the agency's requirements."[39] On June 6, 2025, EchoStar further explained to the FCC that reversing course on its prior buildout extension would mean "pulling the rug out from under a licensee" that had relied on the agency's own prior authorization.[40]

70. The FCC's actions represent a paradigmatic case of unforeseen governmental action that excuses a party's performance under a contract. In fact, courts have found that comparable government interventions satisfy the "unanticipated event" element for the impossibility and frustration defenses. For example, in *Far West Federal Bank, S.B. v. Dir., Office of Thrift Supervision*, 787 F. Supp. 952 (D. Or. 1992), the court held that investors were entitled to rescind an agreement with a federal regulator on frustration-of-purpose and impossibility grounds after a sweeping new banking statute rendered the regulator unable to honor the capital-

[39] EchoStar Corporation, Comments of EchoStar Corp. 3 (May 27, 2025), https://www.fcc.gov/ecfs/document/105280597605377/1.

[40] EchoStar Corporation, Reply Comments of EchoStar Corp. 1 (June 6, 2025), https://www.fcc.gov/ecfs/document/10607392405127/1.

standard and lending forbearances at the agreement's core. *Id.* at 960–61. The court rejected the government's argument that the new legislation was foreseeable merely because the banking industry had long been subject to heavy regulation, holding that "even if it was entirely foreseeable that Congress would enact [the statute] (or some other law affecting the banking industry), [its] impact on the Conversion Agreement was not foreseeable." *Id.* at 961. Similarly, in *Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.*, 96 Wash. 2d 558 (1981), the court held that a contract involving a strip-mining lessee was commercially frustrated where an unprecedented wave of public opposition and environmental litigation made the required permit impracticable to obtain. *Id.* at 563–64. Although the parties knew that permits would be required and could be challenging to obtain, the court held that the parties did not foresee "the flood of environmental legislation and litigation that ensued," and that this unanticipated escalation of scrutiny around the permitting process excused the lessee's performance. *Id.* at 564.

71. So too here: DWLLC could not have foreseen that after EchoStar's expenditure of tens of billions of dollars in acquiring spectrum and financing a buildout of a 5G network, the FCC, through no fault of EchoStar, would pull the rug out from under it and threaten to cancel all of EchoStar's licenses unless EchoStar sold those licenses. DWLLC and the Tower Lessors knew that the FCC regulated spectrum licensing, but they could not have foreseen that it would take the unprecedented step of requiring EchoStar to sell entire nationwide bands of the necessary spectrum assets—which it had spent $30 billion to acquire—or else face forfeiture of those assets. Indeed, a government mandate like this has never been imposed before, so it was not foreseeable.

72. [redacted]

[redacted][42]

73. These provisions—[redacted]—serve only to underscore that the parties did not foresee

[41] *See, e.g.*, [redacted]; [redacted]; [redacted].

[42] DISH Network Corporation ("**DNC**")'s 2019 Form 10-K makes clear that any risk of EchoStar spectrum license revocation was contemplated only on a limited, license-area basis—not as a wholesale or portfolio-wide action. *See* DNC, Annual Report (Form 10-K) (Feb. 20, 2020), at 17, 65, 66 ("Failure to comply with FCC build-out requirements and/or renewal requirements *in a given license area* could result in revocation of the license *for that license area*.") (emphasis added), Strom Decl., Ex. 15. This is consistent in subsequent filings. *See, e.g.*, DNC, Annual Report (Form 10-K), at 8, 25, 35, 42 (Feb. 23, 2021) (same), Strom Decl., Ex. 16; DNC, Annual Report (Form 10-K), at 10, 26, 35, 42 (Feb. 24, 2022) (same), Strom Decl., Ex. 17; DNC, Annual Report (Form 10-K), at 20, 30 (Feb. 23, 2023) (same), Strom Decl., Ex. 18; DNC, Annual Report (Form 10-K), at 10, 24 (Feb 29, 2024) (same), Strom Decl., Ex. 19; DNC, Annual Report (Form 10-K), at 9, 24 (Feb 27, 2025) (same), Strom Decl., Ex. 20.

the far larger risk of a complete, involuntary, nationwide loss of spectrum foreclosing the possibility of a network entirely. The fact that the parties addressed [redacted]. *See Far West*, 787 F. Supp. at 961 ("even if it was entirely foreseeable that Congress would enact [legislation]...,[its] impact on [the] agreement was not foreseeable"); Restatement (Second) of Contracts § 261 cmt. b (Am. L. Inst. 1981) ("the fact that the event was foreseeable, or even foreseen, does not necessarily compel a conclusion that its non-occurrence was not a basic assumption").

74. *Doman v. Heartland Recreational Vehicles, LLC* is instructive. 2023 WL 6637619, at *6 (N.D. Ind. Oct. 12, 2023). There, the court held that a manufacturer's warranty addressing ordinary defects, such as electrical issues, did not mean the parties had anticipated and allocated the risk of the vehicle's total, sudden destruction by fire. *Id.* Although the fire was, in one sense, a more severe version of a risk the warranty did address, the court explained that parties who allocate the risk of an ordinary hazard do not thereby assume the risk of a categorically more extreme version of it—just as parties who contract with the possibility of adverse winds in mind do not thereby assume the risk of a tempest that destroys the ship entirely—and held that the more extreme event fell outside the scope of the risk the parties had actually contemplated. *Id.* [redacted] the complete, involuntary, nationwide forfeiture of the spectrum portfolio necessary to operate the entire 5G network.

75. Here, too, the FCC-Directed Sale Transactions were unforeseeable: because the FCC's directive to sell EchoStar's spectrum or face forfeiture was unprecedented in both its application and effect, the parties cannot be expected to have foreseen it.

76. [redacted] is reinforced by the parties' own drafting. [redacted] *See supra* ¶ 72 & n.30. The remedies each clause supplies confirm the point: [redacted]; [redacted]; and [redacted]. [redacted] *See John Hancock Life Ins. Co. v. Abbott Labs.*, 863 F.3d 23, 43–44 (1st Cir. 2017) (parties' inclusion of funding-ratio provision elsewhere in agreement showed they "obviously knew how" to provide for that allocation, supplying "compelling basis" to infer that omission from disputed provision was deliberate, and declining to add term "that the parties easily could have included but chose to

forgo”).

### 2. The FCC-Directed Sale Transactions Were Not Voluntary

77. Courts next assess whether the conduct giving rise to the impossibility defense was voluntary. The Tower Lessors focus on EchoStar, but the question is whether *DWLLC*—the contract party—acted voluntarily. DWLLC had no role in those transactions: it did not own (and never owned) the spectrum at issue, and it did not sell that spectrum. DWLLC also did not receive any of the proceeds of those sales.

78. EchoStar is a wholly separate corporate entity, that owned the spectrum and entered into the FCC-Directed Sale Transactions, so its conduct is irrelevant to DWLLC’s defense. Nonetheless, EchoStar’s decision to enter into the FCC-Directed Sale Transactions was not voluntary. As set forth above, *see supra* ¶ 19, on May 9, 2025, the FCC Chairman sent EchoStar a letter raising concerns about its 5G Network buildout and disclosing that he had directed FCC staff to commence an investigation—even though EchoStar had, by that time, met all applicable FCC buildout milestones and was in full compliance with its buildout requirements, as the FCC Chairman would later concede.

79. EchoStar did everything within its power to fight to retain its spectrum licenses. On May 27, 2025, EchoStar submitted a filing with the FCC in which it argued that the FCC’s threat was unprecedented, observing that “at no other time has the agency opened such inquiries after a company has invested billions into both acquiring spectrum and deploying a network in conformance with the agency’s requirements.”[43] Subsequently, on June 6, 2025, EchoStar submitted a filing with the FCC in which it explained that the FCC’s unprecedented decision to

[43] EchoStar Corporation, *Comments of EchoStar Corp.* 3 (May 27, 2025), https://www.fcc.gov/ecfs/document/105280597605377/1.

reverse course on its prior buildout extension would mean "pulling the rug out from under a licensee" that had relied on the agency's own prior authorization and committed billions of dollars deploying the spectrum that authorization covered.[44] Over the ensuing weeks, EchoStar held numerous meetings at the highest levels of government—including with President Trump—in an effort to retain its spectrum licenses. In the end, however, it had no other option to avoid forfeiture than to sell the spectrum on an expedited time frame. The FCC—not EchoStar or DWLLC—directed the sale.

80. The FCC's actions, and the resulting FCC-Directed Sale Transactions, constitute the exact type of compelled governmental action that courts have found to constitute involuntary conduct justifying the application of the doctrines of impossibility and frustration. And EchoStar's compliance with the FCC's sale directive, as the only alternative to license forfeiture without compensation, does nothing to change the involuntary nature of the sales.

81. In *Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 576, 580 (2d Cir. 1993), for example, a radio manufacturer stopped filling a distributor's orders for Iran after U.S. Customs detained a shipment and the State Department began considering whether the radios were regulated "munitions." *Id.* at 578–79. Before any formal ruling, the manufacturer negotiated an informal agreement with the Departments of Commerce, State and Defense: it would voluntarily exit the Iranian market, abandoning $5.9 million in orders and $10 million in prospective sales, and the government would not add the radios to the Munitions List. *Id.* at 578. The distributor alleged that this negotiated choice, rather than a direct government prohibition, rendered the manufacturer's nonperformance voluntary. *Id.* at 580. The Second Circuit rejected the argument

[44] EchoStar Corporation, *Reply Comments of EchoStar Corp.* 1 (June 6, 2025), https://www.fcc.gov/ecfs/document/10607392405127/1.

that a party "acted voluntarily when it and the United States government reached a compromise," holding instead that the party "established the affirmative defense of commercial impracticability because it complied in good faith with the government's informal requirements" once it was clear that "the government would not allow defendant to continue" its prior course of conduct. *Id.* The court explained that "for [the manufacturer] to have failed to comply would have been unusually foolhardy and recalcitrant, for the government had undoubted power to compel compliance." *Id.*

82. In *Texas Co. v. Hogarth Shipping Corp.*, 256 U.S. 619 (1921), the Supreme Court rejected a similar voluntariness argument where a shipowner complied with a government requisition of its vessel. Rejecting the charterer's claim that the owner had "voluntarily turned the vessel over to the government," the court found the owner instead "respected the requisition, when made, because no other course was reasonably open," and held the requisition excused performance. *Id.* at 627, 629–30. That compliance "gave promise of a better return" did not make it voluntary. *Id.* at 627. So too in *Int'l Minerals & Chem. Corp. v. Llano, Inc.*, 770 F.2d 879, 887 (10th Cir. 1985): "as a matter of law, government policy need not be explicitly mandatory to cause impracticability," and a party's cooperation with regulators "can hardly be termed" improper collusion, as shown by an aircraft manufacturer excused for complying with wartime production requests and shipowners excused for anticipating government requisition.[45] *Id.*

83. EchoStar's decision to enter into the FCC-Directed Sale Transactions was compelled by the FCC's clear threat of license forfeiture—leaving no other course reasonably open despite EchoStar's sustained efforts to resist—that conduct was involuntary.

[45] Although the court in *Llano* separately held that the contract's force majeure clause did not excuse the buyer's performance, that holding turned on contractual notice issues which are not present here.

### 3. The FCC-Directed Sale Transactions Destroyed the Purpose of the Real Property Leases and Rendered Performance Impossible

84. The FCC-Directed Sale Transactions destroyed both the purpose and the practical means of performance of each Real Property Lease by disposing of the spectrum that was essential to DWLLC's ability to build and operate its 5G network.

85. Each of the Real Property Leases was entered into [redacted].[46] Once EchoStar's spectrum was no longer available, DWLLC had no conceivable use for the leased tower space or equipment, and DWLLC's continued performance under the Real Property Leases—including its payment obligations—was not simply burdensome, but ***impossible***. *See Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 637 (D.N.J. 1998) (repeal of state regulatory regime "depriving the parties of the security of their compromise" frustrated contract's purpose); *SPX Credit Corp. v. Fadeyi*, 1998 Colo. App. LEXIS 1349, at *9 (Sep. 24, 1998) ("pertinent legislation frustrated defendant's primary purpose for entering into the lease agreement, and as a result, he was released from all obligations he assumed"); *Fisher v. U.S. Fid. & Guar. Co.*, 39 N.E.2d 67 (Ill. App. Ct. 1942) (holding that construction contract was unenforceable where city ordinance barred operation of completed theater as movie house, entirely defeating the purpose for which all parties contracted).

---

[46] *See* [redacted]; [redacted]; [redacted].

86. Crucially, DWLLC no longer has the *physical means* to deploy or operate the network contemplated by the Real Property Leases, not merely a diminished incentive to do so. DWLLC's ability to use the leased tower space depended entirely on its capacity to operate spectrum-carrying equipment there; once the spectrum was sold as a result of the FCC's mandates, no amount of effort or expenditure by DWLLC could restore that capacity. ***It is simply impossible to operate a 5G network without the requisite spectrum***. *See Ashland Oil & Ref. Co. v. Cities Serv. Gas Co.*, 462 F.2d 204, 209-211 (10th Cir. 1972) (supervening change in law rendered contractual provision impossible where contract was premised on parties' ability to effectuate withdrawal without regulatory approval); *Int'l Minerals*, 770 F.2d at 886–87 (where "there was no technically suitable way for [plaintiff] to comply with the [regulation] without [breaching the contract]" its performance was legally impracticable under provision of the relevant agreement that excused plaintiff's performance under circumstances "beyond the reasonable control of the parties" that rendered it "unable" to perform); *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 273–74 (4th Cir. 1987) (performance excused by impossibility when federal government unforeseeably discontinued all commercial reprocessing, leaving no available means of performance).

87. Because the FCC-Directed Sale Transactions eliminated [redacted], DWLLC's continued performance was not merely more burdensome but impossible, discharging its obligations under the doctrines of impossibility and frustration of purpose.

**B. The Real Property Leases' Force Majeure Clauses Excuse DWLLC's Performance**

88. In addition to the common-law defenses of impossibility and frustration of purpose discussed above, the contractual provisions of the Real Property Leases independently excuse

DWLLC's performance through their force majeure clauses.

89. A force majeure clause serves to "excuse[] nonperformance when circumstances beyond the control of the parties prevent performance," and should be interpreted consistent with that purpose. *See Harriscom,* 3 F.3d at 580; *Nosaj Ent. v. Tristate & Beyond, LLC*, 2025 WL 1126817, at *4 (S.D.N.Y. Apr. 16, 2025) ("A force majeure event is an event beyond the control of the parties which prevents performance under a contract…"); *Gillespie v. Simpson*, 588 P.2d 890, 892 (Colo. App. 1978) (excusing performance under force majeure clause where governmental act beyond lessee's control interfered with its ability to perform).[47]

90. Here, the Tower Lessors' proofs of claim should be disallowed and expunged because the FCC-Directed Sale Transactions constitute, collectively, a force majeure event under each of DWLLC's Real Property Leases. [redacted] As set forth below, the FCC's action falls under the Tower Lessors' force majeure clauses for several reasons.

91. *One*, the FCC's compelled divestiture of EchoStar's spectrum licenses resulting in the FCC-Directed Sale Transactions [redacted]. *Two*, the FCC's mandate leading to the FCC-Directed Sale Transactions independently [redacted]. *Three*, [redacted]

[47] Like impossibility and frustration of purpose, *see supra* Section A, the standard for the application of a force majeure clause does not materially differ between Colorado and New York law.

[redacted], not merely rendered that performance more burdensome or less profitable.

### 1. The FCC's Compelled Divestiture of EchoStar's Spectrum Licenses Constitutes a Force Majeure Event Within the Plain Meaning of the Real Property Leases

92. Each Real Property Lease [redacted][48] The FCC's compelled divestiture of EchoStar's spectrum licenses culminating in the FCC-Directed Sale Transactions is [redacted] on DWLLC's continued right to use the spectrum licenses.

93. Courts have repeatedly recognized that governmental orders can constitute a force majeure event. For example, in *Harriscom*, F.3d at 580, discussed *supra* ¶¶ 81–82, the Second Circuit concluded that the force majeure clauses in the parties' contracts, which covered "governmental interference," excused the defendant's performance. The court rejected the argument that the defendant "acted voluntarily" in reaching an informal compromise with the United States government, where "the government would not allow [defendant] to continue" selling its radio communications products to Iran. *Id.* at 580. The court did not require the

[48] *See, e.g.*, [redacted]; [redacted]; [redacted].

defendant to point to a formal statute, regulation, or agency order prohibiting it from acting; informal governmental pressure that left the defendant no real choice but to comply was sufficient to excuse performance because the government had the power to compel compliance.

94. Other courts have also so held. *See JN Contemp. Art LLC,* 29 F.4th at 123–24 (contract to hold live auction was properly terminated pursuant to force majeure clause because "COVID-19 pandemic and the orders issued by New York's governor that restricted how nonessential businesses could conduct their affairs during the pandemic[ ] constituted 'circumstances beyond our or your reasonable control'"); *Nelkin v. Wedding Barn at Lakota's Farm*, *LLC*, 152 N.Y.S.3d 216, 220, 222-23 (N.Y. Civ. Ct. 2020) (cancellation of wedding-venue contract was excused under force majeure provision, which included "government regulations" where state government regulations required the cancellation of large gatherings and events during COVID-19 pandemic); *Acheron Med. Supply, LLC v. Cook Inc.*, 2019 WL 2574147, at *2 (S.D. Ind. June 24, 2019) (distributor's failure to obtain Federal Supply Schedule contract was excused under force majeure clause covering "act of government or . . . agency," caused by a government agency's audit demand); *Trump on the Ocean*, *LLC v. Ash*, 2009 NY Slip Op 51837(U), at *5–6 (Sup. Ct. Nassau Cnty. Aug. 25, 2009) (force majeure clause covering "unforeseen restrictive governmental laws, regulations, acts or omissions" excused tenant's rent payments where state agency's shifting construction-permitting requirements and denial of necessary variance prevented construction from proceeding); *Burnside 711, LLC v. Nassau Reg'l Off-Track Betting Corp.*, 67 A.D.3d 718, 719–20, 888 N.Y.S.2d 212 (2009) (force majeure clause covering "governmental action or inaction" invalidated lease after zoning amendment frustrated parties' reasonable expectations for use of premises); *see also Reade v. Stoneybrook Realty, LLC*, 63 A.D.3d 433, 434, 882 N.Y.S.2d 8 (1st Dep't 2009) (judicial temporary restraining order preventing landlord from

continuing construction fell within force majeure clause's "governmental prohibitions" category, extending landlord's time for performance).

95. Here, just as the government in *Harriscom* never issued a formal order but nonetheless left the manufacturer no real choice but to withdraw from the Iranian market, and as the shipowner in *Hogarth* had no reasonably available course but to surrender its vessel to the British government's requisition, the FCC's determination to revoke EchoStar's licenses left EchoStar no viable option but to enter into the FCC-Directed Sale Transactions. *See supra* ¶¶ 81–82. EchoStar challenged the FCC's mandate at the highest levels of government, including to President Trump, before ultimately determining it had no choice but to comply. The government's mandate was the force majeure event.

**2. The FCC's Compelled Divestiture of Spectrum Licenses Constitutes a Force Majeure Event Because It Falls Within the Real Property Leases' Broad Catchall for Causes Beyond DWLLC's Reasonable Control**

96. [redacted] to include "events that [are] similar to the events [specifically] listed" therein. *See Goldberg v. Pace Univ.*, 88 F.4th 204, 211-12 (2nd Cir. 2023) (including within scope of force majeure provision event that caused same type of harm to invoking party as enumerated causes) (citing *JN Contemp. Art LLC*, 29 F.4th at 124 (limiting a force majeure provision to its enumerated categories would "render meaningless the catchall phrase")).

97. Indeed, [redacted]. *See*

[49] *See* [redacted], and [redacted].

*Lampo Grp., LLC v. Marriott Hotel Servs., Inc.*, 2021 WL 3490063, at *8 (M.D. Tenn. Aug. 9, 2021) (catchall covers circumstances "of the same type as those enumerated"); *1600 Walnut Corp. v. Cole Haan Co. Store*, 530 F. Supp. 3d 555, 558–59 (E.D. Pa. 2021) (same); *Dover Mall, LLC v. Tang*, No. K22C-07-013 JJC, 2023 WL 6536975, at *4–5 (Del. Super. Ct. Oct. 5, 2023) (same).

### 3. The Forced Sale of EchoStar's Spectrum Prevented DWLLC's Performance of Its Obligations Under the Real Property Leases

98. A force majeure clause excuses nonperformance where the qualifying event actually prevented the specific performance at issue, and courts look to the language of the agreement itself to determine whether that causal link has been established.[50] *See, e.g., Republican Party of Texas v. Houston First Corp.*, 2022 WL 619708, at *2 (Tex. App. Mar. 3, 2022) (holding that force majeure language conditioning excuse on the affected party's performance being "affected" requires proof of a causal connection between the occurrence and the nonperformance). The causal link is established here.

99. Each Real Property Lease was entered into [redacted]. *See supra* Section A. The FCC-Directed Sale Transactions eliminated DWLLC's access to that spectrum, and that loss alone directly and actually prevented DWLLC from using

[50] The Real Property Leases contain similar causation language. *See* [redacted]; [redacted]; [redacted].

the leased space [redacted]—including paying rent for space it could no longer put to its intended use—and made DWLLC's performance under the lease impossible. But for the FCC-Directed Sale Transactions, DWLLC would still be able to perform under the Real Property Leases today. The FCC-Directed Sale Transactions thus did not merely make performance less profitable or more difficult—[redacted].[51] *See Virginia Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397,

[51] Notably, the Real Property Leases [redacted]. For example, the force majeure clause in SBA's lease states that [redacted]

Similarly, Crown Castle's lease follows the same two-provision structure. [redacted]

Finally, the force majeure clause in [redacted]

403 (Tex. App. 2009) (affirming force majeure provision excused party's performance where failure to perform was "caused by *Force Majeure*") (emphasis in original); *BP Prucenter Acquisition LLC v. Saks Fifth Ave. LLC*, 2022 WL 17976023 (Mass. Land Ct. Dec. 15, 2022) (granting force majeure defense where Governor's COVID-19 emergency orders closing non-essential businesses were "proximate cause" of commercial tenant's failure to pay rent).

## II. In the Alternative, the Claims Should Be Disallowed to the Extent They Exceed the Statutory Cap Set Forth in Section 502(b)(6) of the Bankruptcy Code.

100. Even if the Tower Lessors' claims are not disallowed in their entirety, they should be disallowed to the extent they exceed the statutory cap set forth in section 502(b)(6) of the Bankruptcy Code, with the precise allowed amount to be determined following further proceedings.

### A. Section 502(b)(6) of the Bankruptcy Code Applies to the Tower Lessors' Claims.

101. Section 502(b)(6) limits a lessor's claim for "damages resulting from the termination of a lease of real property." 11 U.S.C. § 502(b)(6). Each of the Real Property Leases is a "lease of real property" within the meaning of that section. Courts do not agree on whether federal or state law governs that characterization question, though at least one court in this Circuit has applied federal law. *Compare Mirant*, 2005 WL 6443618, at *8 (applying federal law to the question of whether an agreement was a lease for purposes of section 502(b)(6)), *with In re MCorp Fin., Inc.*, 122 B.R. at 52 ("State law determines whether an agreement is a lease [under section

[redacted]

365 of the Code].” (citations omitted)). The *Mirant* approach—applying federal law to the interpretation of a federal statute—is straightforward and logical, but, in any event, federal and state law apply the same substantive test, so the Real Property Leases are leases of real property under either body of law.

102. The *Restatement (Second) of Property: Landlord & Tenant* §§ 1.1–1.2 (Am. L. Inst. 1977) (the “**Restatement**”) defines the landlord-tenant relationship by the transfer of a right to possess sufficiently identified property, and defines possession in terms of control over the property and the power to exclude others—the feature that separates a lease from a mere license or privilege to use property that remains in another’s possession. Federal and state courts apply essentially the same standard: regardless of the label the parties attach to an agreement, courts ask whether, in economic substance, the agreement bears more of the characteristics of a lease than a license. *In re MCorp Fin., Inc.*, 122 B.R. at 52–53 (citations omitted); *Mirant*, 2005 WL 6443618, at *6–7 (“[T]he appropriate focus is on the . . . economic realities of [the] particular arrangement.”). The principal factor guiding that inquiry is whether the lessee has the right to exclusive possession of the property—a “well established. . . distinguishing feature of a lease,” *Mirant*, 2005 WL 6443618, at *7. *See Nextel of N.Y., Inc. v. Time Mgmt. Corp.*, 297 A.D.2d 282, 283 (N.Y. App. Div. 2002); *Union Square Park Cmty. Coal., Inc. v. N.Y.C. Dep't of Parks & Recreation*, 8 N.E.3d 797, 802 (N.Y. 2014); *Roaring Fork Club, LLC v. Pitkin Cnty. Bd. of Equal.*, 342 P.3d 467, 472–73 (Colo. App. 2013); *American Coin-Meter, Inc. v. Poole*, 31 Colo. App. 316, 317 (1972). In addition, courts look to whether the leased space is clearly defined and demarcated and whether the term is fixed and renewable and the instrument contains other lease-typical provisions, such as a narrow, cause-based termination right. *See Nextel of N.Y.*, 297 A.D.2d at 283; *Union Square Park Cmty. Coal., Inc.,* 8 N.E.3d at 802.

103. Even if the Court applies state rather than federal law, it should apply the governing law of the master agreements—[redacted], and [redacted]. Crown Castle, ATC, and SBA instead argue the Court must apply the law of every state where a tower is located, requiring analysis under the laws of nearly every state in the country. Crown Castle Obj. ¶ 77; ATC Obj. ¶ 44 & n.12; SBA Obj. ¶¶ 27–28. That argument is incorrect and, at bottom, an effort to complicate the choice-of-law issue and delay resolution of the allowance of their claims. The parties chose a [redacted] so this portfolio-wide agreement would not be parsed under dozens of states' laws, and that choice governs the antecedent lease-versus-license question—itself a matter of federal bankruptcy law's uniform application under section 502(b)(6). [redacted] *See infra* ¶ 108.

104. [redacted], addressing ordinary local property matters like recording and title. Crown Castle's claim, on the other hand, rests in large part on the [redacted] Because that fee is not a [redacted]

105. The same is true for ATC. [redacted] The vast majority of ATC's claim rests on the [redacted],

which ATC itself concedes is a [redacted]—not a fee specific to any particular ATC Lease, [redacted]. ATC Obj. ¶ 20 (quoting [redacted]). [redacted] therefore does not apply, and [redacted] law governs.

106. [redacted] thus governs by default—including the threshold question of whether the MLA is a lease of real property or a license—unless a matter falls within that narrow carve-out. SBA argues that, once an instrument is found to create rights *in rem*, those rights are governed by the *lex loci rei sitae*. *See* SBA Obj. ¶ 27 (citing *In re Barnett*, 12 F.2d 73 (2d Cir. 1926); *Mallory Assocs. v. Barving Realty Co.*, 300 N.Y. 297 (1949); *Quinio v. Aala*, 603 F. Supp. 3d 50 (E.D.N.Y. 2022); N.Y. EPTL § 3-5.1(i)). But that doctrine presupposes the very question in dispute—whether the SBA MLA is a lease of real property and thus creates a right in rem. That threshold characterization question is antecedent to, and distinct from, the situs-governed questions that follow only once an *in rem* interest is found to exist, so it falls outside the local-law carve-out and remains governed by [redacted]. None of SBA's authorities hold that situs law "mandatorily govern[s]" the lease-versus-license question in any analogous context.

107. Even if the Tower Lessors were correct that the Court needs to apply the state law of each individual situs (and they are not), it would not change the analysis. The lease-versus-license test is essentially uniform nationwide, focusing on exclusive possession as the key distinguishing feature. Indeed, despite protesting that the Court will need to engage in a complex

50-state analysis to resolve this basic question, no Tower Lessor actually identifies any conflict or material difference among states' tests, and SBA concedes that Texas, Colorado, and New York law "converge on the same conclusion." SBA Obj. ¶ 31. The only state-law split any Tower Lessor identifies concerns fixture law, not the lease-versus-license test. *See* SBA Obj. ¶ 30 (collecting cases); Crown Castle Obj. ¶¶ 78–79 (same). Fixture law—whether a structure has become annexed to the realty—is a separate inquiry from the "distinct feature" test for lease status, namely whether the agreement grants the lessee exclusive possession. *See supra* ¶ 102. That alleged split therefore does not undermine the uniformity of the lease-versus-license test applied here. In any event, the towers satisfy the fixture test under every relevant jurisdiction's law, and the Real Property Leases would qualify as leases of real property under Section 502(b)(6) even if the towers were not fixtures, since the Ground Space is independently real property. *See infra* Section II.A.2.a-b.

### 1. The Tower Lessor Agreements Are, in Substance, Leases and Not Licenses.

#### a. Crown Castle MLA and SLAs

108. The Crown Castle MLA and each associated Crown Castle SLA [redacted]. Moreover, Crown Castle itself consistently refers to the very same agreements as leases, not licenses, when it describes the nature of the agreements in its public filings with the SEC, including Form 10-Ks—which, in accordance with the Sarbanes-Oxley Act, Crown Castle's CEO and CFO certified were accurate, complete and not misleading.[52] For example:

> In Crown Castle Inc.'s Form 10-K for fiscal year 2024, Crown Castle identified DISH as one of its "***tenants***." Crown Castle, Form 10-K at 15 (March 14, 2025) (emphasis added).[53]

---

[52] 18 U.S.C. § 1350 and 15 U.S.C. § 77k.

[53] Strom Decl., Ex. 21.

> In the same Form 10-K, Crown Castle described its core operations as follows: "We own, operate and ***lease*** shared communications infrastructure." Crown Castle, Form 10-K at 4, 34 (Feb. 23, 2026)[54] (emphasis added).
>
> Crown Castle's lessor accounting policy confirms the same point: Crown Castle explained that its "***lessor arrangements*** primarily include ***tenant contracts*** for dedicated space (including dedicated fiber) on its shared" communications infrastructure, and that "[c]urrently, ***the Company classifies all of its lessor arrangements as" operating leases***, with "[s]ite rental revenues from the Company's lessor arrangements" recognized "on a straight-line, ratable basis over the fixed, non-cancelable term of the" lease. Crown Castle, Annual Report (Form 10-K), at 64 (Feb. 23, 2026). As of December 31, 2025 associated with its agreements with DISH, Crown Castle had recorded on its consolidated balance sheet approximately $150 million with "Deferred ***site rental*** receivables." Crown Castle, Form 10-K at 15 (Feb. 23, 2026).

109. These admissions are not confined to Crown Castle's SEC filings—they were made, repeatedly and under oath, by Crown Castle's own witnesses and counsel at the recent jury trial between Crown Castle and DISH Wireless concerning the same Crown Castle MLA and SLAs at issue here, which addressed whether DWLLC owed additional rent for space it used beyond the contractual 5-by-7 ground space lease area. Crown Castle's Chief Operating Officer for Towers (and Chief Commercial Officer during the 2020–2021 MLA negotiations), Mike Kavanagh, testified under oath that Crown Castle "at the core, is a ***specialized real estate company***" that "***lease[s] tower space and ground space to wireless carriers***, Verizon, AT&T, T-Mobile, ***DISH***, those types of companies." Reporter's Tr. of Trial Proceedings at 214:12–16, *AirComm of Avon, L.L.C. v. DISH Wireless L.L.C.*, No. 2022CV32353 (Denver Dist. Ct., Colo.) (Apr. 1, 2024)[55] (emphasis added). Kavanagh further testified under oath that Crown Castle "make[s] money" because "***we lease space . . . on the tower itself, as well as . . . the compound, that's the ground space underneath the tower***." *Id.* Kavanagh confirmed that Crown Castle is "leasing different

---

[54] Strom Decl., Ex. 22.

[55] Strom Decl., Ex. 23.

levels on the pole for the wireless carriers" and that it "***own[s] or lease[s] the ground space, and then . . . lease[s] it back to the wireless carriers***." *Id.* at 216:6–11. Kavanagh also described unused compound space as "space that we have ***leased or owned, that's marketable for other tenants***." *Id.* at 220:20–221:3.

110. Crown Castle's trial counsel likewise told the jury in her opening statement that "***[t]his is a case that involves leased space and cell phone towers***" and that "***[c]ell phone carriers like the defendant, Dish Wireless, lease space from my client.***" *Id*. at 172:21–22. She further stated that "[c]ell phone carriers lease two things from ***my client: they lease space on the tower . . . and they lease space on the ground . . . . Crown is a real estate company***. Our business model is simple: we make money by leasing our space on the tower and on the ground next to the tower." *Id.* at 173:3–10. And she explained that the MLA "***is called the 'Master Lease Agreement' . . . because Crown is a leasing company***." *Id.* at 175:3–7. These repeated characterizations, including in sworn testimony, of the very agreements at issue as leases of tower and ground space—not licenses—independently confirm the real-property-lease character of the Crown Castle MLA.

111. The substance of the relevant agreements matches these disclosures and admissions: the Crown Castle MLA and Crown Castle SLAs are, in economic substance, real property leases, and not licenses, [redacted]. *See Mirant*, 2005 WL 6443618, at *6–7 (focus is on the "economic realities of [the] particular arrangement").

112. [redacted]**.** The Crown Castle MLA expressly grants DISH Wireless [redacted] DWLLC holds the [redacted]

[redacted] Crown Castle warrants that [redacted] and covenants that DWLLC [redacted] also reflects the level of control that *Mirant* treats as part of the possession inquiry. *See Mirant*, 2005 WL 6443618, at *7 (examining the level of control the lessee enjoyed over the relevant facility).

113. The Crown Castle MLA repeatedly [redacted]. For instance, upon termination, DWLLC must [redacted] So long as any Crown Castle SLA remains in full force and effect, the lender [redacted] And the Crown Castle MLA expressly contemplates that [redacted]—are ordinary structural-safety and shared-infrastructure covenants that do not deprive DWLLC of [redacted]. Nor does Crown Castle's retained right to [redacted]

[redacted]

114. [redacted]. Crown Castle [redacted]. Rather, only [redacted] Such [redacted] are set forth in section 9.1 of the Crown Castle MLA. Moreover, [redacted]. Specifically, [redacted] Finally, section 10 of [a Crown Castle SLA] [redacted] This [redacted] structure is itself a marker of lease, not license, status: because Crown Castle [redacted], the Crown Castle MLA and Crown Castle SLAs are "effective to create" more than a mere license. *See Est. of Christensen v. Vail Mountain View Residences Phase II, LLC*, 2025 WL 869636, at *4 (Colo. App. Mar. 20, 2025) (label not determinative; irrevocability is a key marker distinguishing an interest greater than a license from a mere revocable privilege).

115. [redacted]. As is typical of commercial real property leases, [redacted] Crown Castle [redacted]. [redacted]

[redacted], support DWLLC's underlying leasehold interest in the Leased Property.

116. **Other Hallmarks.** The Crown Castle MLA provides for [redacted]. Crown Castle [redacted]; *see Am. Jewish Theatre v. Roundabout Theatre Co.*, 203 A.D.2d 155, 156 (N.Y. App. Div. 1994); *L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1347 (Colo. App. 1986). The Crown Castle MLA also contains provisions ordinarily found in leases, including [redacted]

117. Case law finding that an agreement to install equipment on a cell tower is a license rather than a lease is easily distinguishable. In *Message Center Management, Inc. v. Getchell* (relied on by Crown and SBA),[56] the court determined that agreements permitting carriers to install antennae on the property owner's towers were licenses, not leases, because "[n]o specific sites on the towers were conveyed"—the property manager, not the carriers, "assigned placement of the equipment so as to maximize spacing and minimize transmission interference," such that the carriers "obtained no possessory interest in the tower or the land upon which it rests" and "received no right to exclude the owner of the land from the land or the towers." 2000 WL 1912210, at *5 (Conn. Super. Ct. Dec. 18, 2000). The court likewise found the carriers' additional ground storage

[56] *See* SBA Obj. ¶¶ 36-37 (Dkt. No. 772, at 18); Crown Castle Obj. ¶¶ 66, 82 (Dkt. No. 777, at 22, 30-31).

space "inconsequential," because that space, too, "was assigned by [the manager] and created no possessory interest in the land." *Id.*

118. Similarly, in *North Canton Board of Education v. American Telephone & Telegraph, Inc.*, the Sixth Circuit held that a management agreement between a cell-tower lessee and a third-party manager was not a sublease because it did not transfer "a right to exclusive possession of any part of the [p]remises": the manager was granted access only "to perform[] its duties . . . [to] manage, administer[,] and operate" the site, not to install, operate, maintain, repair, replace, or relocate any equipment or to transmit or receive communication signals, so at most it received a license. 822 F. App'x 324, 328–29 (6th Cir. 2020) (applying Ohio law).

119. [redacted] in *Message Center* or *North Canton*. Unlike the carriers in *Message Center*, [redacted] that *Message Center* found lacking, and not some "inconsequential" storage allocation.

120. *North Canton* is equally distinguishable: the manager there received only the right to "manage, administer, and operate" an existing site—general upkeep, [redacted] 822 F. App'x at 326, 328. [redacted]

[redacted]

**b. ATC SCA and ATC Leases**

121. DWLLC's agreements with ATC are also leases. ATC relies heavily on the fact that its master agreement with the DWLLC is called a "strategic collocation agreement," and the associated site-level agreements are called "New Licenses" (and otherwise use the term "license"), which improperly elevates form over substance. *See Union Square Park*, 8 N.E.3d at 802 ("That a writing refers to itself as a license or lease is not determinative; rather, the true nature of the transaction must be gleaned from the rights and obligations set forth therein."). Lessors cannot evade section 502(b)(6) of the Bankruptcy Code through creative drafting. *See Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 920 (2d Cir. 1944) (explaining that section 502(b)(6)'s statutory predecessor may not "be nullified by crafty draftsmanship in particular leases"). As a matter of substance, the SCA and the New Licenses—referred to herein as "ATC Leases"—are leases, as set forth below.

122. ATC itself *consistently* refers to the very same agreements as leases, not licenses, in the ordinary course of business, outside of litigation. For example:

> In a 2021 press release, filed with the SEC, ATC announced that it "entered into a ***master lease agreement*** through which DISH may ***lease*** space on up to 20,000 American Tower communications sites . . . . Under the agreement, *cash lease payments* from DISH to [ATC] will commence in 2022 and grow over time as DISH's network deployment progresses." Am. Tower Corp., Form 8-K, Ex. 99.1 (Mar. 15, 2021) (emphases added). The press release does not use the term "license."

> In its September 5, 2025 Form 8-K filed with the SEC, ATC likewise disclosed, in reference to the SCA, its CEO, Steven O. Vondran's, statement that "the Company and DISH have a ***Master Lease Agreement*** that was signed in 2021 and expires in

2036." Am. Tower Corp., Form 8-K, Item 7.01 (Sept. 5, 2025) (emphasis added).[57] The Form 8-K does not use the term "license."

In another SEC filing, describing its prepetition contractual dispute with DWLLC, ATC stated: "[W]e occasionally experience disputes with our customers, generally regarding the interpretation of terms in our ***leases*** . . . . We filed a complaint seeking a declaratory judgment that DISH has not been excused from its obligations under the SCA . . . .". Am. Tower Corp., Form 10-K at 10 (Feb. 24, 2026) (emphasis added).

ATC, in fact, refers to its business model as follows: "We ***lease*** space on our communications sites to tenants providing a diverse range of communications services, including cellular voice and data, broadcasting, mobile video and a number of other applications," *id.* at 3 (emphasis added), and refers repeatedly to its "tower ***leasing*** businesses," *see, e.g.*, *id.* at 1, 6, F-8 (emphasis added).

For purposes of its financial statements, which break out lease revenue, ATC explained that it "considers an arrangement to be a lease if it conveys the right to control the use of the communications infrastructure or ground space underneath communications infrastructure for a period of time in exchange for consideration." *Id.* at F-18; Am. Tower Corp., Form 10-K at F-20 (Feb. 25, 2025);[58] Am. Tower Corp., Form 10-K at F-19 (Feb. 27, 2024). As set forth below, this definition unambiguously captures the SCA and ATC Leases between DWLLC and ATC.

123. In sum, when not posturing for litigation, and in contexts where it is required to give a truthful, plain-English description of the nature of its agreements with DWLLC, ATC has consistently described those agreements (and similar agreements) as leases, not licenses. ATC's own sworn SEC filings control over its litigation position to evade section 502(b)(6) of the Bankruptcy Code.

124. Additionally, consistent with ATC's public disclosures, [redacted].

125. [redacted] Specifically, DWLLC receives the [redacted]

[57] Strom Decl., Ex. 24.

[58] Strom Decl., Ex. 25.

[redacted] DWLLC is also [redacted] ATC expressly covenants that [redacted] Consistent with this [redacted], the SCA provides [redacted]

126. In its objection to the First Voting Estimation Motion, ATC argued that the SCA and ATC Leases did not give DWLLC exclusive use of the relevant space, selectively quoting a portion of the agreements [redacted] ATC Obj. ¶ 43. But ATC falsely indicated that the sentence ended there by simply omitting that the sentence continues: [redacted] ATC SCA App'x B § 2 (emphasis added). In other words, ATC simply omitted the exclusive grant to the leased property, with no ellipses, in arguing that it did not provide exclusive use of the leased property. Moreover, the very next sentence, which ATC also omits, states: [redacted] Thus, ATC omits that the SCA provides that [redacted]

127. [redacted] Each ATC Lease identifies [redacted]

128. [redacted] Each ATC Lease has [redacted] A [redacted] are typical of a leasehold.

129. **Other Hallmarks.** [redacted] Critically, ATC [redacted] This is far from the "broad termination clause reserving to the grantor 'the right to cancel whenever it decides in good faith to do so'" that New York courts treat as "strongly indicative of a license as opposed to a lease." *Union Square Park*, 8 N.E.3d at 802 (quoting *Miller v. City of N.Y.*, 203 N.E.2d 478, 480 (N.Y. 1964)); *Am. Jewish Theatre, Inc.*, 203 A.D.2d at 156 ("*Whereas a license connotes use or occupancy of the grantor's premises, a lease grants exclusive possession of designated space to a tenant, subject to rights specifically reserved by the lessor.* The former is cancellable at will, and without cause. Where one party's interest in another's real property exists for a fixed term, not revocable at will, and terminable only

on notice, a landlord-tenant relationship has been created." (citation omitted)).

130. Further, the [redacted] confirm the leasehold character of the arrangement. [redacted]

131. These hallmarks of a lease reflected in the terms of the agreement support a finding of lease as opposed to license. In *Nextel of New York*, for example, the court held that a similar carrier rooftop-and-equipment-room arrangement was a lease, notwithstanding the landlord's argument that it had granted only a "nonexclusive license":

> While several other cellular telephone carriers also occupied the roof and other portions of the building, pursuant to the equipment room plan, Nextel was to partition off an existing room by building a wall and by adding a new door to access its portion of the newly-created room. Nextel was to install a new "HVAC" unit to maintain the environment in its room, and radio equipment to handle the telephone signals. Nextel's sophisticated electronic equipment would occupy the entire new room, and thus its access thereto was to be exclusive. The term of the lease was for five years, with five automatic renewal terms of five years each. Nextel retained title to its equipment; the equipment would not become fixtures. Nextel's employees were to have unlimited access to the premises. Nextel had the expressly-granted right to quiet enjoyment. In short, the parties' agreement "contain[ed] many provisions typical of a lease and conferring rights well beyond those of a licensee or holder of a mere temporary privilege."

*Nextel of N.Y.*, 297 A.D.2d at 283. Likewise, here, [redacted] Such [redacted] is the most important factor for determining whether the agreement in question is a lease. *Nextel of N.Y.*, 297 A.D.2d at 282. Further, [redacted]

[redacted] Moreover, [redacted] Therefore, the SCA constitutes a lease.

132. That ATC reserves [redacted] *Miller*, 203 N.E.2d at 479–80 (finding that the arrangement was a lease, not a license, notwithstanding the park commissioner's strict control over matters including hours of operation and selection of employees, since such controls were "no more than would reasonably be demanded by a careful owner as against a lessee for such a business use and for so long a term"); *Women's Interart Ctr., Inc. v. N.Y.C. Econ. Dev. Corp.*, 97 A.D.3d 17, 22–23 (N.Y. App. Div. 2012) (holding that exclusive control may pass to a tenant notwithstanding "limitations or reservations," where the owner retained only limited rights to inspect, audit and cure defaults creating an immediate risk of

harm, all of which were consistent with reservations permitted in a lease).[59] And ATC's observation that it "is in the business of *licensing* space to *multiple* operators" and "shall have the right to continue to occupy the Tower Facility *and to grant rights to others to the Tower Facility* in its sole discretion," ATC Obj. ¶ 23 (emphases in original) (citation omitted), describes ATC's right to lease other, different space at the same Tower Facility to other carriers— *just as any landlord of a multi-tenant building retains the right to lease other units to other tenants without thereby converting any individual tenant's lease into a license*.

133. Finally, ATC's emphasis on the provision that DWLLC has "no property rights or interests in the Tower Facility by virtue of this ATC Lease," ATC Obj. ¶ 24, does not change the substance of the rights granted by the SCA and ATC Leases, which are, in substance, the terms of a lease. Just as the label "license" does not control, nor does a conclusory statement that merely purports to characterize the rights granted in the SCA and ATC Leases. As set forth above, courts look to the substance of the rights conveyed by the terms of the agreement in question. *In re MCorp Fin., Inc.*, 122 B.R. at 52 (citations omitted); *Mirant*, 2005 WL 6443618, at *6. Here, those terms, in substance, are the terms of a lease, not a license. As ATC stated in its own SEC filings, ATC "considers an arrangement to be a lease if it conveys the right to control the use of the communications infrastructure or ground space underneath communications infrastructure for a period of time in exchange for consideration." Am. Tower Corp., Form 10-K at F-18 (Feb. 24, 2026); Am. Tower Corp., Form 10-K at F-19 (Feb. 27, 2024). This language confirms that even

---

[59] Nor do the narrow, ancillary carve-outs from DWLLC's Ground Space entitlements for shared cable placement or grounding infrastructure, ATC SCA § 3(d), or the restrictions on "RAD Center Sharing" and "Network Hosting," *id.* App'x B § 4, undermine DWLLC's exclusive rights within its own Licensed Space; that a lessor reserves narrow and specific rights for itself is not inconsistent with a finding of a lease. *See, e.g.*, *Am. Jewish Theatre*, 203 A.D.2d at 156 ("Whereas a license connotes use or occupancy of the grantor's premises, a lease grants exclusive possession of designated space to a tenant, subject to rights specifically reserved by the lessor"); *Z. Justin Mgmt. Co. v. Metro Outdoor, LLC*, 137 A.D.3d 577, 578 (N.Y. App. Div. 2016) (same).

ATC itself looks past labels to the substance of the agreement, [redacted] *See supra* ¶¶ 121–22.

**c. SBA MLA and Applicable SLAs**

134. DWLLC's agreements with SBA are likewise leases. The SBA MLA and each associated SBA SLA are expressly titled as lease instruments, and their substance confirms the characterization.

135. As with Crown Castle and ATC, SBA itself consistently refers to the agreements as leases, not licenses, when it describes the nature of its business outside of this case. For example:

> In a February 2021 investor release announcing the SBA MLA, SBA stated that it had signed a "***Master Lease Agreement***" with DISH that provides DISH "***access to key real estate***."[60]
>
> SBA's own website describes its principal line of business as "***Site Leasing***," explaining that "***we lease antenna space*** on our multi-tenant towers and other structures to a variety of wireless service providers ***under long-term lease contracts***."[61]
>
> In its Form 10-K for fiscal year 2025, SBA describes its core operations as follows: "Our primary business line is our site ***leasing*** business, which contributed 97.9% of our total segment operating profit for the year ended December 31, 2025. In our site ***leasing*** business, we (1) ***lease*** space to wireless service providers and other customers on assets that we own or operate . . . ." SBA, Annual Report (Form 10-K), at 1 (Feb. 27, 2026)[62] (emphasis added). The same Form 10-K states that SBA's "primary focus is the ***leasing of antenna space*** on our multi-tenant towers to a variety of wireless service providers under long-term ***lease contracts***," and that SBA "derive[s] site ***leasing revenues*** primarily from wireless service provider tenants." *Id.* at 3 (emphasis added). The Form 10-K does not use the term "license" to describe this business.

---

[60] SBA, DISH signs Master Lease Agreement with SBA (Feb. 22, 2021), https://www.sbasite.com/English/Investors-overview/news-events/news-details/2021/DISH-signs-Master-Lease-Agreement-with-SBA/default.aspx.

[61] SBA, About SBA (last accessed Aug. 7, 2026), https://www.sbasite.com/English/Company/About-SBA/default.aspx.

[62] Strom Decl., Ex. 26.

> In its Form 10-K for fiscal year 2024, SBA identified DISH Wireless among the customers to which SBA "provided services or ***leased*** space" during 2024. SBA, Annual Report (Form 10-K), at 4 (Feb. 26, 2025)[63] (emphasis added).
>
> In describing its property interests, SBA states: "Our interests in towers and the land beneath them are comprised of a variety of fee interests, leasehold interests created by long-term lease agreements, perpetual easements, easements, licenses, rights-of-way, right-of-use, and other similar interests." SBA, Annual Report (Form 10-K), at 23 (Feb. 27, 2026) (emphasis added); SBA, Annual Report (Form 10-K) at 23 (Feb. 26, 2025). SBA thus itself distinguishes "leasehold interests created by long-term lease agreements" from mere "licenses" as separate categories of property interest, and DWLLC's agreements bear the former hallmarks, not the latter.
>
> For purposes of its financial statements, SBA discloses, under the heading "***Tenant Leases***," that "[t]he annual minimum ***tower lease*** income to be received for ***tower space rental*** under non-cancelable ***operating leases***, including fixed rate escalations," is set forth in a multi-year schedule. SBA, Annual Report (Form 10-K), at F-39 (Feb. 27, 2026); SBA, Annual Report (Form 10-K), at F-39 (Feb. 26, 2026) (identical disclosure).

136. The substance of the SBA MLA and SBA SLAs matches these disclosures and admissions: they are, in economic substance, real property leases, and not licenses. *See Mirant*, 2005 WL 6443618, at *6–7 (focus is on the "economic realities of [the] particular arrangement").

137. [redacted]

63 Strom Decl., Ex. 27.

[redacted]

138. SBA's Objection argues that the SBA MLA and SBA SLAs are licenses [redacted] Under the lease in *Mirant*, the landlord had the right to enter and inspect the premises, and the defendants argued this right defeated the tenant's exclusivity. *Mirant*, 2005 WL 6443618 at *7. Reasoning that the landlord "could only do so upon reasonable notice and conditions of access" and "[t]his is a right commonly given to landlords in leases," the court held that "[c]ontrary to the Defendants' assertions" the inspection right was not inconsistent with the existence of a lease. *Id*. A lessee's right to exclusive possession under a lease is always subject to the lessor's right to enter onto the property to demand rent or

make repairs. *Id*. (citing *Delauter v. Shafer*, 822 A.2d 423, 427 (Md. 2003)). [redacted]

139. [redacted]

[redacted]

140. SBA separately argues that, [redacted]

141. [redacted]

[redacted]

142. **Other Hallmarks.** [redacted]

[redacted] *Union Square Park*, 22 N.Y.3d at 656 (quoting *Miller*, 203 N.E.2d at 480); *see also supra* ¶ 116.

143. The SBA MLA and First Amendment also acknowledge DWLLC's possessory interest in the Leased Properties. [redacted]

## 2. The Leases are Real Property Leases

144. DWLLC's Real Property Leases with the Tower Lessors are not only leases, but leases of real property. And while the Tower Lessors have argued that the agreements are at most leases of personal property, the terms of the agreements, and the Tower Lessors' own admissions, confirm the real-property character of these leases. First, though dismissed by the Tower Lessors (or in the case of ATC, outright ignored), [redacted]

### a. The Ground Space Is Real Property

145. Under each Real Property Lease, the "Ground Space" leased to DWLLC is [redacted]

146. [redacted]

**b. The Towers Are Fixtures on the Realty**

147. Additionally, the towers upon which DWLLC also leases space are fixtures and/or improvements to the property and, therefore, are themselves part of the real property. *See, e.g. Mirant,* 2005 WL 6443618 at *9 (finding that buildings and structures were improvements to the land "and, consequently, they are real property.") (citing *Banner v. United States*, 238 F.3d 1348, 1356 (Fed. Cir. 2001) ("[I]t is well settled that improvements to the realty are considered part of the real property . . . .")). Under New York law, an item of personal property becomes a fixture, and thus part of the realty, where it is "(1) actually annexed to real property or something appurtenant thereto; (2) applied to the use or purpose to which that part of the realty with which it is connected is appropriate; and (3) intended by the parties as a permanent accession to the

freehold." *Metromedia, Inc. v. City of N.Y.*, 455 N.E.2d 1252, 1254 (N.Y. 1983). New York courts have held that cell towers satisfy all three elements and constitute fixtures, notwithstanding that they could theoretically be removed and that the underlying leases are typically for a term of several years with renewal options. *Nextel of N.Y., Inc. v. Assessor for Vill. of Spring Valley*, 4 Misc. 3d 233, 244–45 (N.Y. Sup. Ct. 2004); *T-Mobile Ne., LLC v. DeBellis*, 143 A.D.3d 992, 995–96 (N.Y. App. Div. 2016), *aff'd*, 118 N.E.3d 873 (N.Y. 2018). The leased space on the towers themselves is therefore real property for purposes of section 502(b)(6) of the Bankruptcy Code.

148. Under Colorado law, [redacted], the fixture test is substantially identical to New York's, examining: "(1) annexation to the real property; (2) adaptation to the use to which the real property is devoted; and (3) intention that the object become a permanent accession to the real property or a permanent structure on the real property." *Reynolds v. State Bd. for Cmty. Colls. & Occupational Educ.*, 937 P.2d 774, 778 (Colo. App. 1996).[64] A cell tower satisfies each element: it is physically annexed to a concrete foundation poured into the ground; it is purpose-built and site-specifically designed for telecommunications use at a particular location; and its permanent structural character, together with the long-term lease terms under which it is typically erected, manifests an intent to permanently affix it to the realty.[65]

---

[64] Colorado Real Property Law § 2.4.13 ("There is no universal test whereby the character of what is claimed to be a fixture can be absolutely determined. There are, however, certain recognized guides for determination, such as (1) the nature and character of the thing annexed, (2) the manner of annexation and resultant injury by its removal, (3) the intent of the party in making the annexation, (4) the purpose of annexation, (5) the adaptability of the thing attached to the use of the land, and (6) the relation of the party making it to the freehold.").

[65] The Oregon, Connecticut, and Wisconsin cases cited in the ATC Estimation Objection are distinguishable. *See* ATC Obj. at 23–24 (citing *City of Portland v. Elec. Lightwave, Inc.*, 452 F. Supp. 2d 1049, 1081 (D. Or. 2005), *Konover Dev. Corp. v. Waterbury Omega, LLC*, 281 A.3d 1221, 1239 (Conn. App. Ct. 2022), and *All City Commc'n Co. v. State Dep't of Revenue*, 661 N.W.2d 845, 854 (Wis. Ct. App. 2003)). Two of these cases did not even deal with the question discerning real property from personal property. *See Konover*, 281 A.3d at 1239 (concluding that an agreement setting

149. Even if the cell towers were not fixtures (and they are), the Real Property Leases would remain leases of real property for purposes of section 502(b)(6). Section 502(b)(6) applies to "a lease of real property," not a lease *exclusively* of real property. 11 U.S.C. § 502(b)(6); *see also Mirant Peaker, LLC v. S. Md. Elec. Coop., Inc. (In re Mirant Corp.)*, No. 03-46590, Adv. No. 04-4073, 2004 Bankr. LEXIS 2455, *26 (Bankr. N.D. Tex. June 28, 2004) (concluding that a claim arising from rejection of a single lease transferring possession and use of both real and personal property "could very well be found wholly subject to the cap of section 502(b)(6)"); *cf. In re Sonora Convalescent Hospital, Inc.*, 69 B.R. 134, 136 (Bankr. E.D. Ca. 1986) (finding that, although the lease agreement by its own terms called for lease of both real and personal property, it was "primarily a lease providing for rental of real property" and therefore subject to 11 U.S.C. § 365(d)(4), which governs the assumption and rejection of an unexpired lease of nonresidential real property). Here, the presence of a quintessential real-property component—the Ground Space—is sufficient to bring the Real Property Leases within the reach of section 502(b)(6).

**c. The Tower Lessors' REIT Elections Confirm that They Are in the Business of Leasing Real Property**

150. The Tower Lessors' longstanding treatment of their tower-leasing businesses for

commission fees in exchange for services marketing, licensing, and collecting usage payments did not confer the plaintiff any rights to an interest in property); *City of Portland*, 452 F.Supp.2d at 1081 (the defendant contending that there are two distinct aspect to its collocation product, renting physical space for a customer to place his own equipment and connecting the customer's own equipment to the defendant's network via a wired telecommunications connection supplied by the defendant; the court concluding that the revenue from the latter aspect cannot be exempted from rental revenue). *All City* is likewise distinguishable. There, the landowner and the tenant had a written lease expressly providing that improvements erected on the property would remain the tenant's property and that the tenant could remove those improvements upon expiration of the lease term. *All City Commc'n Co.*, 661 N.W.2d at 854. Under those circumstances, it is unsurprising that the communication towers at issue were not considered affixed to the property. Moreover, *All City* was decided for tax purposes and is inapplicable here for that reason as well. *See Kohn v. Darlington Cmty. Sch.*, 698 N.W.2d 794, 802 (Wis. 2005) ("The question in All City Communication was whether a communication tower was 'personal property' or 'real estate' for purposes of a tax statute.").

federal tax and financial-reporting purposes corroborates that the agreements at issue are leases of real property. Each of ATC, Crown Castle, and SBA report that it has elected to be treated as a real estate investment trust ("**REIT**") for U.S. federal income-tax purposes. That election carries substantive consequences. To qualify and remain qualified as a REIT, an entity must satisfy the organizational, ownership, asset, income, and distribution requirements prescribed by the Internal Revenue Code. *See* 26 U.S.C. §§ 856–857. A qualifying REIT generally may deduct dividends paid to shareholders and thereby avoid entity-level federal income tax on distributed qualifying income. The Tower Lessors have repeatedly represented to shareholders and the SEC that they operate as REITs and derive substantial revenue from leasing tower and ground space. *See* Am. Tower Corp., Annual Report (Form 10-K), at 1 (Feb. 24, 2026) (stating that ATC "operate[s] as a real estate investment trust for U.S. federal income tax purposes" and is "generally not required to pay U.S. federal income taxes on income generated by [its] REIT operations, including the income derived from leasing space on our towers"); Crown Castle, Annual Report (Form 10-K), at 4 (Feb. 23, 2026) (reporting that Crown Castle "operate[s] as a REIT for U.S. federal income tax purposes"); SBA, Annual Report (Form 10-K), at 7 (Feb. 27, 2026) (representing that SBA "is a real estate investment trust ('REIT') for federal income tax purposes").

151. Among the requirements for continued REIT qualification are two annual gross-income tests. At least 75% of a REIT's gross income must be derived from specified real-estate-related sources, and at least 95% must be derived from those sources together with certain additional passive-income sources. 26 U.S.C. § 856(c)(2)–(3). One qualifying category is "rents from real property." *Id.* § 856(c)(3)(A). The Code and Treasury regulations generally define that term to include amounts received for the use of, or the right to use, real property, subject to specified exclusions and limitations. Id. § 856(d)(1)–(2); 26 C.F.R. § 1.856-4(a). Income properly

characterized as royalties, compensation for services, or rent attributable to personal property may not qualify under that category. Accordingly, the Tower Lessors' treatment of their tower-leasing operations as REIT-qualified businesses necessarily rests on treating the relevant assets and revenue as real-estate assets and qualifying real-estate income—not merely as intangible rights or service revenue.

152. The Tower Lessors' own public descriptions reinforce that conclusion. ATC identifies itself as "one of the largest global real estate investment trusts," describes its "primary business" as "the leasing of space on communications sites to wireless service providers," and states that its "REIT-qualified businesses included [its] U.S. tower leasing business." Am. Tower Corp., Annual Report (Form 10-K), at 1–2 (Feb. 24, 2026). Crown Castle likewise states that it "operate[s] as a REIT for U.S. federal income tax purposes" and that its "core business is providing access, including space or capacity, to our towers via long-term contracts." Its disclosed accounting policies describe those tenant contracts as "lessor arrangements," classify them as "operating leases," and recognize "[s]ite rental revenues" over the fixed, noncancelable terms of the relevant contracts. Crown Castle, Annual Report (Form 10-K), at 4, 64 (Feb. 23, 2026). SBA similarly describes its "primary business line" as its "site leasing business," through which it "lease[s] space to wireless service providers and other customers" on towers and the land beneath them, and reports "tower lease income" received "for tower space rental under non-cancelable operating leases." SBA, Annual Report (Form 10-K), at 1, 7, F-39 (Feb. 27, 2026). These descriptions do not merely apply a litigation label. They are repeated, formal statements about the nature of the Tower Lessors' core businesses and the revenue those businesses generate.

153. Those representations are probative admissions that materially reinforce the conclusion compelled by the lease agreements' substance. The Tower Lessors have repeatedly

described their core business as leasing tower and ground space; characterized the resulting receipts as rent or lease income; applied lessor and operating-lease accounting; and represented that their tower-leasing businesses generate REIT-qualified income. They cannot obtain the substantial tax benefits associated with REIT status by treating their tower-leasing revenue as qualifying real-estate income and then, when section 502(b)(6) makes that characterization inconvenient, ask this Court to accept the opposite characterization of the same business and agreements. Judicial estoppel exists to prevent a party from changing positions according to the exigencies of the moment. *See New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001) (explaining that judicial estoppel generally applies when a party's later position is clearly inconsistent with its earlier position, the earlier position was accepted by a tribunal, and the change would confer an unfair advantage or impose an unfair detriment). The Tower Lessors' effort to characterize these agreements as something other than real-property leases is clearly inconsistent with the position underlying their repeated claims to REIT tax treatment and would afford them an unfair double benefit: favorable tax treatment premised on qualifying real-estate income, coupled with avoidance of the Bankruptcy Code's cap on damages arising from termination of a lease of real property. In all events, the Tower Lessors' repeated tax, accounting, and public representations are powerful admissions. They corroborate the agreements' lease terminology, possessory grants, and the Tower Lessors' own testimony and, considered together with that evidence, establish that the agreements are leases of real property—not licenses or some other form of contract outside section 502(b)(6).

### 3. Prepetition Termination of the Real Property Leases Is Irrelevant to Whether the Section 502(b)(6) Cap Applies to the Tower Lessors' Claims

154. Section 502(b)(6) caps the claim of "a lessor for damages resulting from the termination of a lease of real property." 11 U.S.C. § 502(b)(6). Nothing in this text conditions the

applicability of section 502(b)(6) on the lease having been rejected under section 365, as opposed to having been terminated prepetition by the lessor's own election. Courts applying the statute have confirmed that a landlord's claim need not arise from a formal section 365 rejection to be capped. In *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2015 Bankr. LEXIS 1350 (Bankr. D. Del. Apr. 16, 2015), the court noted that Congress deliberately chose the word "termination" over "rejection" in section 502(b)(6)'s introductory phrase, "and conclude[d] that such choice was intentional," precisely because the statute's reach is broader than rejection alone. *Id.* at *29-30. Circuit and other courts agree. *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 207-08 (3d Cir. 2003) (confirming, in the course of applying the section 502(b)(6)(A) cap, that the cap operates according to its plain terms "whether or not" the lease was formally assumed, rejected, or otherwise terminated by operation of state law, because the statute's concern is with the landlord's claim for lost future rent, not with the procedural label attached to the lease's end); ); *In re Herritt*, No. 23-12160 (CJP), 2025 Bankr. LEXIS 2503, at *9 n.8 (Bankr. D. Mass. Sept. 30, 2025) ("Section 502(b)(6) references 'termination' not 'rejection,' and the policy concerns addressed in the [section] 502(b)(6) cap are equally applicable.").

155. Crown Castle and SBA, however, make the novel and atextual argument in their Estimation Objections that prepetition termination of the leases somehow nullifies section 502(b)(6).[66] Crown Castle argues that because the Crown Castle SLAs were terminated on January 9, 2026, six months before the Petition Date, and DWLLC allegedly did not surrender the Sites or allow Crown Castle to repossess them until sometime after the Petition Date, the "applicable

66 In a footnote, ATC also adopts these arguments and incorporates them by reference. *See* ATC Obj. ¶ 56 n.13 ("American Tower is similarly situated to other tower claimants that terminated prepetition and commenced litigation against DISH Wireless for breach of contract, and incorporates their arguments on this point by reference.").

testing date" for the section 502(b)(6)(A) calculation is the Petition Date, at which point no rent was "reserved" because of the earlier termination. Crown Castle then makes the unfounded and unsupported logical leap that this would mean that section 502(b)(6) does not apply to Crown Castle's claim at all. Crown Castle Obj. ¶ 8.

156. Crown Castle's argument suffers from numerous flaws. As a threshold matter, Crown Castle is wrong that DWLLC did not surrender the sites prepetition, as discussed in more detail below. *See infra* Section II.B. In addition, Crown Castle is wrong that there was no "rent reserved" under the SLAs after termination. Crown Castle's own proof of claim belies this argument: Crown Castle continues to assert entitlement to the Monthly Access Fee and to holdover charges accruing for the period after the January 9, 2026 termination through the Petition Date, which is only possible if rent (or a rent-equivalent payment obligation) continued to be "reserved" under the SLAs and the MLA notwithstanding termination. *See supra* ¶¶ 44–47. Moreover, [redacted]

157. In any event, Crown Castle ignores that, under the plain text, the sole question for determining whether section 502(b)(6) applies is whether the claim is that of "a lessor for damages resulting from the termination of a lease of real property." And while Crown Castle makes the bare and conclusory statement that its damages cannot "be characterized as 'damages resulting from the termination of a lease,'" Crown Castle contradicts itself in the very next sentence, stating that "[t]he [Crown Castle] SLAs were terminated in January 2026, and DISH Wireless's ***resulting***

***damages*** liability under state law were fixed at that time." Crown Castle Obj. ¶ 88. Crown Castle thus concedes what is obvious: its claimed damages result from termination of the Crown Castle SLAs. In simple terms, the damages attendant to a failure to pay future rent are exactly the same regardless of when the lease was terminated.

158. While difficult to parse, Crown Castle's real argument appears to be that, notwithstanding the express language of the statute, it would be illogical to apply section 502(b)(6) to its prepetition-terminated lease because the prepetition termination means that the "rent reserved" as of the petition date was zero. But the rent reserved refers to the amounts left under the lease. *In re PPI Enters.*, 228 B.R. 339, 350 (Bankr. D. Del. 1998) ("§ 502(b)(6)'s cap on a landlord's claim takes effect at the earlier of (i) the date of filing and (ii) the date on which lessee surrenders or lessor repossesses the property"); *Fifth Ave. Jewelers v. Great E. Mall (In re Fifth Ave. Jewelers)*, 203 B.R. 372, 377 (Bankr. W.D. Pa. 1996) (502(b)(6) "is clear that the cap shall be calculated" from earlier of petition date or surrender or repossession). If the rent reserved is zero, then Crown Castle has no claim.

159. Strangely, SBA seems to make precisely this argument, *see* SBA Obj. ¶ 45, in reliance on *In re Fifth Ave. Jewelers, Inc.*, 203 B.R. 372 (Bankr. W.D. Pa. 1996), which noted that, in the case of a lease terminated prepetition, the lessor's allowable claim for future rent under section 502(b)(6) is zero. *Id.* at 379 n.5. The court viewed this result as proper, because "at the point of state law termination, 'the lessor retains all risk and benefits as to the value of the real estate.'" *Id.* at 379. But SBA ultimately does not claim that the rent reserved is zero, but rather is $82 million. *See* SBA POC ¶ 13. That rent reserved is subject to the section 502(b)(6) cap.

160. The Debtors have calculated the Tower Lessors' Claims assuming that "rent reserved" for the "remaining term of the lease" is determined without regard to any prepetition

termination somehow rendering the claim zero. But if Crown Castle were correct that there is no rent reserved in the case of a prepetition termination, then its claim (except for accrued and unpaid rent under section 502(b)(6)(B)) is capped to zero.

161. In any event, section 502(b)(6) does not include any limitation to postpetition terminations. To the contrary, the language is unambiguous in capping amounts due under the lease at issue. And the Tower Lessors' departure from the text would produce absurd results. Under their theory, a lessor who terminates the lease one day before the lessee files for bankruptcy escapes section 502(b)(6) entirely and may recover uncapped damages, while a lessor whose lease is instead terminated postpetition has its claim reduced. That result is backwards: nothing in the text of § 502(b)(6) turns on when the termination occurred or who effected it. The statute caps the claim of "a lessor for damages resulting from the termination of a lease of real property" and does not exclude prepetition terminations.

162. Also unfounded is the Tower Lessors' apparent argument that the prepetition termination means there was no lease to be rejected in bankruptcy and, therefore, section 502(b)(6) cannot apply. As set forth above, nothing in the text of section 502(b)(6) supports a reading that it is dependent on a postpetition lease rejection. To the contrary, in *In re Mr. Gatti's, Inc.*, 162 B.R. 1004 (Bankr. W.D. Tex. 1994), the court examined why Congress substituted "termination" for "rejection" in section 502(b)(6) as compared to its predecessor, former section 63a(9) of the Bankruptcy Act, and concluded that the amendment broadened, rather than narrowed, the statute's reach: the "plain meaning" of section 502(b)(6), "taken structurally and in context, is that the lease is being terminated for the purpose of affording the landlord a breach-of-contract claim for damages suffered because of the future non-performance by the tenant-debtor of the covenants in the lease." *Id.* at 1008–12.

163. This reading follows directly from the statute's purpose: preventing a real property lessor from reaping an outsized share of a debtor's estate at the expense of the general unsecured creditor body by asserting a claim for the full stream of rent that would have been due over a long remaining lease term. *See In re S. Cinemas, Inc.*, 256 B.R. at 535–36 ("To circumvent the purpose of the statute on account of 'labels' would encourage crafty drafters to invent relationships that fall outside the scope of the lessor-lessee contract and limit the reach of § 502(b)(6)."); *In re E. Penn Child.'s Learning Acad., LLC*, 635 B.R. 243, 249 (Bankr. E.D. Pa. 2021). That risk to the estate is identical whether a Tower Lessor elected to terminate its leases before the Petition Date or the DISH Wireless Debtors rejected the leases under section 365 after the Petition Date. *See Oldden*, 143 F.2d at 917, 920 (explaining that Congress adopted section 63a(9) of the Bankruptcy Act, the historical antecedent to section 502(b)(6), because the landlord, who "regains his original assets upon bankruptcy," "is not in the same position as other general creditors, and there is no very compelling reason why he should be treated on par with them").[67] Allowing a lessor to escape the cap simply by terminating unilaterally in advance of an anticipated filing would invite exactly the kind of preemptive, self-help termination and disproportionate recovery that the statute is designed to prevent.

**B. The Termination Date Is the Correct Measurement Date for Calculating the Claim Under Section 502(b)(6)**

164. Section 502(b)(6)(A) measures a lessor's maximum allowed termination claim from the earlier of the petition date or "the date on which such lessor repossessed, or the lessee surrendered, the leased property." 11 U.S.C. § 502(b)(6)(A). Here, the statutory measurement date is the effective date of the Tower Lessors' respective prepetition termination notices.

[67] *See also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 353-354 (1977), Pub.L. No. 95-598, 1978 U.S.C.C.A.N. (92 Stat.) 6309-10.

**1. Prepetition Termination Can Establish the Earlier Surrender or Repossession Date Under § 502(b)(6)(A)(ii)**

165. A lessor's prepetition termination claim remains subject to section 502(b)(6), and the events surrounding that termination may establish the earlier statutory measuring date. In *In re PPI Enterprises*, 324 F.3d at 207–08 & n.18, the landlord gave notice of its intent to terminate after the tenant abandoned the premises and failed to cure. The Third Circuit held that, because the landlord terminated long before bankruptcy, the bankruptcy court properly treated the landlord's acceptance of surrender as the starting point for the cap. *Id.* at 208 n.19 ("the § 502(b)(6) cap starts to operate on the date on which the lessee surrendered the leased property"). The court directed the bankruptcy court to determine "the exact date of [lessor's] termination or [lessee's] formal surrender" and begin the calculation then. *Id.* at 208 n.18.

166. *Fifth Avenue Jewelers* held that "the date upon which the leased premises were either 'repossessed' or 'surrendered' for purposes of § 502(b)(6)(A)(ii) is that date upon which the lease was terminated under state law." 203 B.R. at 380. Under that approach, a lessee's unilateral departure is only abandonment; termination occurs when the landlord accepts the offered surrender or reenters with intent to terminate. *Id.* at 378–80; *see also Riverside Rsch. Inst. v. KMGA, Inc.*, 497 N.E.2d 669, 670 (N.Y. 1986) ("surrender by operation of law is inferred from the conduct of the parties"); *In re Perry*, 411 B.R. 368, 376 (Bankr. S.D. Tex. 2009) (implied acceptance of surrender under state law where tenant vacated and landlord changed locks).

167. Here, the facts establish the termination date as the surrender date. DWLLC first abandoned the tower sites in the practical and contractual sense: it shut down its equipment, ceased paying rent, and could no longer operate the network without the spectrum licenses needed to do so. The Tower Lessors then did what *Fifth Avenue Jewelers* requires for termination: they issued formal notices affirmatively terminating the leases. Those notices were objective manifestations

that the Tower Lessors accepted the end of the leasehold relationship, not temporary vacancy preserving DWLLC's right to remain in possession of the leasehold. Once the notices became effective, DWLLC no longer had a right to operate, cure, or resume ordinary possession under the leases. Under *PPI Enterprises* and *Fifth Avenue Jewelers*, surrender and repossession therefore occurred no later than the termination effective date.

### 2. The Same Surrender and Repossession Date Is Confirmed Under *Broadfoot*'s Federal-Law Effective-Termination Test

168. Because the Tower Lessors affirmatively terminated the leases, the state-law surrender analysis discussed above is sufficient on its own to fix the measurement date under section 502(b)(6)(A)(ii). If the Court nonetheless wishes to test that conclusion against a federal-law standard, the same date is confirmed by *Broadfoot v. Jamestown Management Corp. (In re International Biochemical Industries, Inc.)*, 521 B.R. 395, 400–04 (Bankr. N.D. Ga. 2014), a case Crown Castle itself relies on. *See* Crown Castle Obj. n.10. Broadfoot treated the statute's coverage and measuring questions separately: Section 502(b)(6) first requires a termination and damages caused by that termination, and "[o]nce § 502(b)(6) is triggered," subsection (A) applies from the earlier of the petition date or surrender or repossession. *Id.* at 400. The court held that "termination" for bankruptcy purposes need not be confined to technical state-law termination where doing so would defeat section 502(b)(6)'s operation. *Id.* at 403. The court favorably discussed *In re MDC Systems, Inc.*, 488 B.R. 74 (Bankr. E.D. Pa. 2013), where

> the court applied an ordinary meaning to the word "surrender" for purposes of § 502(b)(6), rather than the state law definition of surrender. The court reasoned that "use of state law leads to an absurd result: a surrender would eliminate the landlord's claim entirely, making it unnecessary to 'cap' *the claim for future rent,* thus rendering § 502(b)(6)(A) superfluous." It also applied a textual analysis of § 502(b)(6). If Congress had intended "surrender" to mean the type of surrender required by state law to terminate a lease, it could have used the word "terminate" instead. The fact that it referred to either the date the "lessor repossessed" or the "lessee surrendered" the property indicates that Congress intended that either one of those unilateral actions would be sufficient to set the cap date. . . . Finally, the court pointed out that the purpose of § 502(b)(6) "is to reduce a landlord's

> claim for the period of time in which a valid state law claim for rent exists, but after the leased premises ceases to provide any benefit to the debtor of the bankruptcy estate." A federal definition of "surrender" best suits that purpose.

*Id.* at 403–04 (citations omitted).

169. *Broadfoot* arose on facts not present here—a state appellate court had already held, in prior litigation between the same parties, that the lease had not terminated under Georgia law because the parties had contracted around the general rule that eviction terminates a lease. *Id.* at 397–98, 399 & n.3. Faced with a lease that could not terminate under state law, the bankruptcy court held it was nonetheless "de facto, if not de jure, terminated" when the landlord obtained a writ of possession, *id.* at 402, adopting a federal concept of effective termination that applies the cap once "the beneficial interest in the premises has shifted in its entirety from the lessee to the landlord," *Id.* at 403. It accordingly found that "the cap applies after the lease has effectively terminated" and used the writ-of-possession date because, "under any definition," the landlord had repossessed by that date. *Id.* at 403–04.

170. Here, *Broadfoot*'s test is satisfied. As of the effective date of the Tower Lessors' termination notices: (1) DWLLC had shut down the tower equipment; (2) it had stopped paying rent; (3) the loss of the spectrum licenses made continued network operations impossible; (4) the Tower Lessors had affirmatively terminated DWLLC's right to possess and operate under the leases; and (5) any later entry was confined to decommissioning, equipment removal, and performance of end-of-lease obligations. Those facts establish that the beneficial possessory interest of the properties had shifted to the Tower Lessors no later than the termination notices' effective date. *See Broadfoot*, 521 B.R. at 403–04.

171. Crown Castle's later decision to lock DWLLC out of certain of its tower sites to prevent DWLLC from completing its decommissioning efforts does not change that result. *Broadfoot* focuses on when the lease was effectively terminated and the beneficial

possessory interest shifted—not on the last date the former tenant physically entered the property. *Id.* at 403.[68] Here, DWLLC's post-termination access did not involve resumed telecommunications operations or an asserted right to remain under the leases; they involved removal and turnover. The Tower Lessors' ability first to permit that limited activity and later to prohibit it confirms that control had already shifted to them. Thus, even if technical surrender under state law were disputed, the leases had effectively terminated and the Tower Lessors functionally repossessed the sites by the termination-notice date under *Broadfoot*.

172. Therefore, the Court need not choose between the tests and need not decide whether state or federal law should be applied. Both identify the effective date of the termination notices as the date from which maximum damages are calculated under section 502(b)(6)(A)(ii).

### 3. The Tower Lessors' Contrary Arguments Fail

173. Crown Castle argues that the relevant date is not the termination notices' effective date but the Petition Date, or later, because DISH did not physically vacate the tower sites or complete equipment removal until after the Petition Date. Crown Castle Obj. at 36–7. That argument rests on a single premise: that "surrender" under section 502(b)(6)(A)(ii) cannot occur until the tenant has fully removed its equipment and the landlord has resumed unencumbered physical control. That premise is wrong. *See Lincoln Triangle Com. Holding Co. LLC v. Halperin (In re Cortlandt Liquidating LLC),* 658 B.R. 244, 253, 257 (S.D.N.Y. 2024) (finding lease terminated since "functionally dead" due to tenant's intentional abandonment despite claim for

[68] Other courts have adopted this approach. *See, e.g.*, *In re Flanigan*, 374 B.R. 568, 575–79 (Bankr. W.D. Pa. 2007) (holding that "termination" includes "not only a technical state law termination" but also an uncured breach accompanied by intentional abandonment, because the lease was "functionally dead"); *In re Mallett*, *Inc.*, No. 21-11619 (JLG), 2023 Bankr. LEXIS 3008, at *29 (Bankr. S.D.N.Y. Dec. 22, 2023) ("[W]hether a 'lessee surrendered . . . the leased property' under section 502 is gauged by the actions of the debtor lessee" and when debtor intended to terminate the lease, lease-rejection claim should be calculated from date when debtor attempted to vacate lease).

cleanup costs); *In re Main, Inc.*, 207 B.R. 832, 835–36 (Bankr. E.D. Pa. 1997) (when tenant attempted to remove personal property from premises, tenant was prevented from retrieving the property, and personal property was never returned, termination occurred prepetition for purposes of 502(b)(6) despite property remaining); *see also In re PPI Enterprises*, 324 F.3d at 207–08 & n.18 (holding that because the landlord "terminated the lease long before [the tenant] filed its bankruptcy petition, the Bankruptcy Court correctly fixed the date on which [the landlord] accepted [the tenant's] surrender" as the starting point under § 502(b)(6), and remanding for a finding of "the exact date of . . . termination or . . . formal surrender").

174. SBA takes the position that its own prepetition termination notices—dated January 27, 2026 and June 11, 2026—mean there was no unexpired lease left for DWLLC to reject. SBA Obj. at 22–23. However, that position is not in tension with fixing the surrender date at the termination notices' effective date—it depends on it. If anything, SBA's own framing confirms that the termination notices, not any later physical vacatur, are what ended the leasehold relationship.

### C. The Tower Lessors' Non-Rent Damages Result From Lease Termination and Are Capped by Application of Section 502(b)(6) of the Bankruptcy Code

175. In their Proofs of Claim, the Tower Lessors' include additional non-rent-based damages, such as damages for decommissioning costs and other amounts. Crown Castle Obj. ¶¶ 94, 107–111; ATC Obj. ¶¶ 26–29; SBA Obj. ¶¶ 53–61. Any such allowed amounts are reduced by operation of section 502(b)(6) of the Bankruptcy Code.

#### 1. Case Law in this Circuit Endorses Capping Non-Rent Damages that Result from Termination, Including Crown Castle's, ATC's, and SBA's Removal and Decommissioning Costs

176. Section 502(b)(6) caps "damages *resulting* from the termination of a lease of real property." 11 U.S.C. § 502(b)(6) (emphasis added). Courts in this Circuit read that limitation

broadly, holding that it "encompasses virtually all aspects of the relationship related to the lease including, but not limited to rent, taxes, insurance, change orders as an aspect of rent and, indeed any miscellaneous 'non-rent' claims such as repair and maintenance, attorney's fees, and utilities." *In re Metals USA, Inc.*, No. 01-42530-H4-11, 2004 WL 771096, at *6 (Bankr. S.D. Tex. Jan. 15, 2004). As in *In re Mr. Gatti's,* the damages that the Tower Lessors seek in their Proofs of Claim result directly from DWLLC's termination of the Real Property Leases. *See In re Mr. Gatti's*, 162 B.R. at 1006–14 (agreeing with debtor that "damages from the Debtor's breach of the covenant to maintain and repair the leasehold premises" were "already included in and capped by the allowance of the lessor's claim under § 502(b)(6)"). The Fifth Circuit praised *In re Mr. Gatti's* as "particularly thoughtful." *In re Austin Dev. Co.*, 19 F.3d 1077, 1082 n.9 (5th Cir. 1994));[69] *accord In re Premier Ent. Biloxi, LLC*, 413 B.R. 370, 375 (Bankr. S.D. Miss. 2009) (following *In re Mr. Gatti's* and quoting the Fifth Circuit's description of it as "a particularly thoughtful bankruptcy court opinion").

177. Through the Estimation Objections and the Proofs of Claim, the Tower Lessors assert that the categories of damages in the below chart are uncapped, non-rent obligations regardless of whether this court determines that the agreement is a lease of real property. Each arises from a covenant DWLLC was obligated to perform under the Real Property Leases, and DWLLC's non-performance of that covenant occurred as part of, or in connection with, the termination of the leases as a whole, so the resulting damages are part of a single, unified termination-damages claim and are capped in the aggregate by section 502(b)(6).

[69] Although *Austin Dev. Co.* rejected one of the grounds on which *In re Mr. Gatti's* rested, the Fifth Circuit left undisturbed its alternative reasoning that led to the same conclusion. 19 F.3d at 1082.

| Tower Lessor | Damage Category | Amount | Related Covenant |
|---|---|---|---|
| Crown Castle | Monthly Access Fee[70]<br><br>*See* Crown Castle POC ¶ 10(a). | $200,000,000.00 | [redacted] |
| Crown Castle | Equipment Removal and Decommissioning Costs<br><br>*See* Crown Castle POC ¶ 10(h). | $324,147,700.00 | [redacted] |
| Crown Castle | Vertical-Envelope and Entitlement Overage Charges<br><br>*See* Crown Castle POC ¶ 10(b)-(c). | $264,521,879.00 | [redacted] |
| Crown Castle | Holdover Charges<br><br>*See* Crown Castle POC ¶ 10(b)-(c). | $186,768,327.00 | [redacted] |

70 In its objection to the First Voting Estimation Motion, Crown Castle argues that, regardless of whether the agreements at issue are real property leases, the Access Fee does not "result from" termination of any SLA because it is a single, fixed, non-cancelable, portfolio-wide obligation under the MLA that Crown Castle would be owed in identical form whether or not any SLA was terminated, such that termination merely accelerated the timing of an obligation that already existed independent of any SLA. Crown Castle Obj. ¶¶ 100–102. This argument is wrong. [redacted]

| Tower Lessor | Damage Category | Amount | Related Covenant |
|---|---|---|---|
| Crown Castle | Post-Termination Accrued Interest<br><br>*See* Crown Castle POC ¶ 10(i). | $153,032,918.00 | Not applicable, but capped.[71] |
| Crown Castle | Taxes, Revenue-Share Reimbursements, and Other Advanced Third-Party Charges<br><br>*See* Crown Castle POC ¶ 10(d)-(f). | $2,521,339.00 | [redacted] |
| Crown Castle | Third-Party Property Damage and Settlement Claims<br><br>*See* Crown Castle POC ¶ 10(g). | $336,151.00 | [redacted] |
| | | | |
| American Tower | Decommissioning Costs<br><br>*See* American Tower POC ¶ 5. | $185,900,000.00 | [redacted] |
| American Tower | Operating Costs, Repair Costs, and Common Expenses<br><br>*See* ATC Obj. ¶ 67. | Unliquidated | [redacted] |
| American Tower | Indemnified Amounts<br><br>*See* American Tower POC | Unliquidated | [redacted] |

[71] Crown Castle alleges that it is entitled to accrued prejudgment interest at the statutory 8% rate under Colorado law, accruing from the alleged date of termination (January 9, 2026) through the Petition Date. As explained in section II.B, *supra*, all post-termination rent payments are reduced by application of section 502(b)(6), and any interest payments derivative of limited amounts are also limited. *See In re Dronebarger*, No. 10-10889-HCM, 2011 WL 350479 (Bankr. W.D. Tex. Jan. 31, 2011) ("Similarly, since the pre-judgment and post-judgment interest awards in the Final Judgment are derivative of the actual damage award which the Court has found is not subject to the cap of § 502(b)(6), the Court concludes the interest award is not subject to reduction by § 502(b)(6).")

| Tower Lessor | Damage Category | Amount | Related Covenant |
|---|---|---|---|
| | ¶ 6. | | [redacted] |
| American Tower | Attorneys' Fees and Court Costs<br><br>*See* American Tower POC ¶ 6. | Unliquidated | [redacted] |
| American Tower | Post-Termination Accrued Interest<br><br>*See* American Tower POC ¶ 6. | Unliquidated | Not applicable, but capped[72] |
| | | | |
| SBA | Decommissioning and Removal Costs<br><br>*See* SBA POC ¶ 14. | $65,775,000.00 | [redacted] |
| SBA | Tower/Structure Modification (unrecovered investment) costs<br><br>*See* SBA POC ¶ 9. | $11,503,509.90 | Not applicable, but capped.[73] |
| SBA | Indemnification Costs and Attorneys' Fees<br><br>*See* SBA POC ¶¶ 15, 17. | Unliquidated | [redacted] |

72 *See* n. 76, *supra*.

73 SBA's Proof of Claim disclaims recovery of amounts due [redacted], and instead asserts reliance-based damages for capital SBA invested in anticipation of the long-term rent roll and other economic benefits it expected over the agreement term. *See* SBA POC ¶ 9. Because SBA would have recouped this investment through continued rent had the SBA MLA and SBA SLAs not terminated, the claim is nonetheless a termination-driven claim under the *In re Mr. Gatti's* framework, *see supra* Section II.C.1, and is limited in the aggregate with SBA's other termination damages under Section 502(b)(6), notwithstanding that it does not rest on breach of a specific covenant.

### 2. The Tower Lessors' Decommissioning and Modification Claims Are Still Reduced Under the More Restrictive Tests Articulated in *Filene's Basement* and *El Toro*

178. *Filene's Basement* holds that a lessee's obligation to remove abandoned property upon lease-end falls within the section 502(b)(6) cap because that obligation is triggered by the termination of the lease. *See* 2015 WL 1806347, at *6–8. *El Toro* holds the cap does not reach collateral damages—there, tort claims for waste and trespass—that would exist independent of termination, asking whether the landlord "would have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it." 504 F.3d 978, 981 (9th Cir. 2007). Read together, the two decisions draw a single line: a cost tied to lease-end performance is capped by section 502(b)(6); a cost the lessor could assert even if the lease had never ended is not. Applying that line to every category of damages set forth in the chart above confirms that all are capped, because none of the Tower Lessors' claimed damages—whether framed as recurring payment obligations, overage or reimbursement charges, indemnification or attorneys' fees claims, decommissioning and removal costs, or accrued interest—would exist if the underlying Real Property Leases had never terminated. Each recurring payment obligation (the Monthly Access Fee, the Aggregate Monthly Payment, and Basic Rent) would have continued to accrue and be paid in the ordinary course had the leases remained in effect, so a claim for those amounts as a lump-sum, present damages figure is a direct product of termination, not an independent debt. *See Kupfer v. Salma (In re Kupfer)*, 852 F.3d 853, 856–59 (9th Cir. 2016). Likewise, the overage, tax, and revenue-share reimbursement charges, and the equipment-removal and decommissioning costs, are only converted into an accelerated, lump-sum claim because performance under the leases stopped; absent termination, they would have continued to be trued up and paid periodically, or would not have accrued at all pending DWLLC's continued occupancy. The indemnification

and attorneys' fees claims asserted by American Tower and SBA are, in substance, damages the Tower Lessors incurred in connection with unwinding DWLLC's tenancy and pursuing collection following termination, not liabilities that would independently exist while the leases remained outstanding. Indeed, [redacted]. [redacted]; [redacted]. There could be no such claims absent the leases. And the accrued-interest claims asserted by Crown Castle and American Tower are derivative of, and calculated solely by reference to, the underlying payment obligations discussed above; because those principal obligations are capped as termination damages, the interest that accrues on them is capped in the same amount and to the same extent. Accordingly, every category of damages reflected in the chart above is a termination-driven claim subject to the aggregate cap of section 502(b)(6).

**a. Crown Castle**

179. Crown Castle asserts that it will incur approximately $300 million in costs removing DWLLC's stranded equipment from over 11,400 towers, Crown Castle Obj. ¶¶ 9, 45, [redacted]

[redacted]

180. Crown Castle separately asserts approximately $186.8 million in "Holdover Charges" for DWLLC's continued maintenance, occupancy, or other use of Crown Castle sites following termination of the Terminated Agreements, calculated through July 31, 2026. [redacted] The Holdover Charges are therefore, by definition, damages resulting from the termination of the Crown Castle SLAs, and are capped in the aggregate with Crown Castle's other termination damages under section 502(b)(6).

**b. ATC**

181. In its Estimation Objection, ATC asserts that its removal and decommissioning costs are not subject to the cap because DWLLC's equipment "remains installed" and its removal "would still be required" regardless of lease status. ATC Obj. ¶ 63. That is not the *El Toro* test.

The question is not whether equipment happens to be present on the tower at a fixed point in time; it is whether ATC's right to remove that equipment, or to charge DWLLC for removing it, exists independent of the ATC SCA's termination. [redacted] The claim is a termination-driven claim within the heartland of *Filene's Basement*, not an independent tort claim within the narrow exception carved out by *El Toro*.

**c. SBA**

182. SBA attempts to recast its $66.1 million decommissioning claim as arising from DWLLC's "use" of SBA's infrastructure rather than from termination, arguing the obligation is "independent" because it is "tied to installation, not a consequence of how or why an SLA ended." SBA Obj. ¶ 54. That framing does not survive application of the *El Toro* test set forth above: the question is not whether the presence of DWLLC's equipment originated in a valid installation, but whether SBA's claim for removing it would exist if the lease had never been terminated. [redacted]

183. SBA's reliance on *Kupfer* does not change this analysis. *Kupfer* applied the same *El Toro* test to attorney's fees and costs incurred in prepetition arbitration over a lease default—damages that, like the mining waste in *El Toro* itself, existed independent of, and prior to, any termination event, arising instead from the arbitration proceeding itself. *See Kupfer*, 852 F.3d at 858–59. [redacted]

#### 3. The Tower Lessors' Decommissioning Costs Are Not Postpetition Administrative Expenses

184. To the extent Crown Castle, ATC, or SBA contend, in the alternative, that their respective decommissioning costs should be allowed as postpetition administrative expenses under sections 365(d)(3) or 503(b)(1)(A) rather than as capped, prepetition rejection-damages claims, the DISH Wireless Debtors dispute that characterization. The removal costs at issue arose from the termination of the SLAs and ATC Leases and the DISH Wireless Debtors' resulting inability to remove equipment from thousands of Sites simultaneously, not from any continued, beneficial postpetition use of the Sites by the estate. These costs are properly treated as prepetition claims subject to the section 502(b)(6) cap under *Unidigital* and *Universal Building Products*.[74]

## III. Contingent Reimbursement or Contribution Claims Should Be Disallowed Under Section 502(e) of the Bankruptcy Code

185. Section 502(e)(1)(B) of the Bankruptcy Code provides that, notwithstanding subsections (a), (b), and (c) of section 502, the Court "shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on . . . the claim of a creditor, to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution." 11 U.S.C. § 502(e)(1)(B). "Embedded in this language are three elements necessary for a claim against the debtor to be disallowed under this provision: (i) the debtor is co-liable with the claimant; (ii) the claim is contingent; and (iii) the claim is for 'reimbursement or contribution.' Courts interpret a claim for

---

[74] *See In re Unidigital, Inc.*, 262 B.R. 283, 289–90 (Bankr. D. Del. 2001) (holding that a landlord's costs of removing equipment and cleaning premises following lease rejection were not entitled to administrative priority because rejection gave rise to a prepetition claim under 11 U.S.C. § 502(g), and the removal and cleanup conferred no substantial benefit on the estate); *In re Universal Building Products*, Case No. 10-12453 (MFW), slip op. at 4–6 (Bankr. D. Del. Mar. 7, 2011) (denying administrative-expense treatment for cleanup and exit costs incurred after rejection because the work was voluntary and did not preserve or benefit the estate, and explaining that the landlords' cleanup costs constituted prepetition rejection damages under § 502(g)).

indemnity to be a claim for 'reimbursement or contribution.'" *In re Alta Mesa Res.*, No. 19-35133, 2022 Bankr. LEXIS 3649, at *10-11 (Bankr. S.D. Tex. Dec. 28, 2022).

186. First, ATC and SBA claim co-liability with the Debtors on underlying claims. *In re Drexel Burnham Lambert Group, Inc.*, 146 B.R. 92, 95 (S.D.N.Y. 1992) ("[T]he co-liability requirement is to be interpreted to require a finding that the causes of action in the underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for the automatic stay."). The existence of a direct claim by the third party against the debtor does not preclude the application of section 502(e)(1)(B). *In re Tri-Union Dev. Corp.*, 314 B.R. at 618. [redacted]; [redacted].

187. Second, ATC and SBA's indemnification costs remain contingent. In *Tri-Union Dev. Corp.*, the court noted that "contingent" under section 502(e) in this context means "unfunded" and that claims remain "contingent" for purposes of section 502(e)(1)(B) until the co-debtor has paid the creditor. *In re Tri-Union Dev. Corp.*, 314 B.R. at 616-17. The ATC Addendum identifies "indemnified amounts" as unliquidated amounts that American Tower "expressly reserves all rights in connection therewith." ATC Addendum ¶ 6. Similarly, the SBA POC claim expressly asserts "contingent and unliquidated claims against the Debtors for indemnification." *See* SBA POC ¶ 15. Therefore, these claims are "contingent as of the time of allowance or disallowance" within the meaning of section 502(e)(1)(B).[75]

188. Third, the claims are for reimbursement or contribution. If ATC or SBA were able

[75] The same result follows for ATC's reserved claims for attorneys' fees, court costs, and interest and for SBA's claims for reasonable attorneys' fees and costs to the extent those amounts are themselves contingent on, or derivative of, unliquidated third-party or indemnification-type liabilities rather than fixed, presently-owed sums.

to establish that the Debtors had reimbursement obligations pursuant to certain agreements, then any claim they may have in the future against the Debtors would be for reimbursement or contribution. "[C]ourts have consistently held that 'the concept of reimbursement includes indemnity.'" *In re Falcon V, L.L.C.*, 620 B.R. 256, 269-70 (Bankr. M.D. La. 2020) (finding that surety that issued bonds was not entitled to claim pursuant to section 502(e)(1)(B) since it was a contingent claim); *In re RNI Wind Down Corp.*, 369 B.R. 174, 181-82 (Bankr. D. Del. 2007) (quoting *In re Vectrix Bus. Solutions, Inc.*, 2005 WL 3244199, at *3 (Bankr. N.D. Tex. 2005)).

189. Therefore, ATC's claim for "indemnified amounts" and SBA's claim for "indemnification costs" fall squarely within section 502(e)(1)(B). ATC Addendum ¶ 6; SBA POC ¶ 15. The Court should also disallow ATC and SBA's contingent, unliquidated claims for indemnification or contribution under section 502(e) of the Bankruptcy Code, without prejudice to SBA's right to seek reconsideration under section 502(j) if and when any such claim becomes fixed by actual payment or funding of the underlying obligation.[76]

**RESERVATION OF RIGHTS**

190. By this Objection, the DISH Wireless Debtors object to the Tower Lessors' Claims for the reasons identified therein. Regardless of whether one or more of the bases for objection stated herein is overruled, or otherwise not sustained, the DISH Wireless Debtors reserve the right to amend, modify, or supplement this Objection, and to file additional objections regarding the Tower Lessors' Claims on any basis after further investigation. Further, the DISH Wireless Debtors reserve the right to object to any other claims (or a portion thereof) of the Tower Lessors' Claims on any other grounds whatsoever, including, among other things, based on amount,

---

[76] To the extent that the Crown Castle POC could be construed as seek reimbursement or contribution, such amounts should be disallowed for the same reasons as set forth herein as to ATC and SBA's indemnification claims.

priority, classification, secured status, or otherwise.

191. Nothing in this Objection shall be deemed: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the DISH Wireless Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Objection; (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (f) a waiver of any of the Debtors' claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

## NOTICE

192. The Debtors will provide notice of this Objection to: (a) the Office of the United States Trustee for Region 7; (b) the United States Attorney's Office for the Southern District of Texas; (c) the state attorneys general for the states in which the Debtors operate; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the Federal Communications Commission; (g) the indenture trustees, administrative agents, and collateral agents in respect of: (i) the 2026 Senior Secured Notes, (ii) the 2028 Senior Secured Notes, (iii) the 2026 Senior Notes, (iv) the 2028 Senior Notes, and (v) the 2029 Senior Notes; (h) counsel to the Official Committee of Unsecured Creditors; (i) counsel to the Tower Lessors and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d). The DISH Wireless Debtors submit that no other or further notice of the Objection need be provided.

## CONCLUSION

193. For the foregoing reasons, the DISH Wireless Debtors respectfully request that the

Court enter the Proposed Order (i) disallowing and expunging the Tower Lessors' Claims; (ii) in the alternative, capping the Tower Lessors' Claims under 502(b)(6); and (iii) granting such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank*]

August 10, 2026
Houston, Texas

*/s/ Charles R. Koster*

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

Ronald K. Gorsich (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Email: rgorsich@whitecase.com
doah.kim@whitecase.com

**WHITE & CASE LLP**
Thomas E Lauria (Texas Bar No. 11998025)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Email: tlauria@whitecase.com

Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
300 N. LaSalle Drive
Chicago, Illinois 60654
Telephone: (312) 881-5400
Email: mlinder@whitecase.com
laura.baccash@whitecase.com

David M. Turetsky (admitted *pro hac vice*)
Samuel P. Hershey (S.D. Texas Fed. No. 3465170)
Andrea Amulic (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: david.turetsky@whitecase.com
sam.hershey@whitecase.com
andrea.amulic@whitecase.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on August 10, 2026, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*<u>/s/ Charles R. Koster</u>*
Charles R. Koster