**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| DISH DBS CORPORATION, DISH WIRELESS L.L.C., *et al.*, | Case No. 26-90627 (CML) |
| | (Jointly Administered) |
| Debtors.[1] | **Re: Docket No. 304** |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF 315 E58 BH LLC AND NAMDAR 315 EAST 58 LLC IN RESPONSE TO DEBTORS' TENTH NOTICE OF REJECTION**

315 E58 BH LLC and NAMDAR 315 East 58 LLC (together, "Landlord"), by and through their undersigned counsel, Kudman Trachten Aloe Posner LLP, respectfully submit this limited objection and reservation of rights (the "Objection") in response to the *Tenth Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* (the "Rejection Notice") [Docket No. 304], and respectfully states as follows:

## PRELIMINARY STATEMENT

1. Landlord does not object to the Debtors' exercise of business judgment to reject the Site Lease Agreement described below (the "Lease"). Landlord objects solely to: (a) the proposed June 30, 2026 rejection date; (b) any purported abandonment of the Equipment remaining at the Premises; (c) any determination that would relieve the Debtors of their obligation under section 365(d)(3) to timely perform their post-petition obligations under the Lease—including the payment of holdover charges and the removal of the Equipment, restoration of the Premises, and

[1] The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388. A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/DBS. The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

surrender of possession—through the effective rejection date; and (d) any attempt to impair, limit, subordinate, recharacterize, or otherwise prejudice Landlord's rights, claims, remedies, or their priority arising from the Debtors' continuing obligations under the Lease and applicable law.

2. The Lease requires the Debtors, upon expiration or earlier termination of the Lease, to remove their equipment and restore the Premises. The Lease further provides that the Debtors will be deemed to be in holdover status until such equipment is removed. Approximately one month into these chapter 11 cases, the Debtors' equipment remains installed at the Premises, removal has not been completed, and restoration has not been performed. Accordingly, Landlord objects to any determination that the Lease was effectively rejected on June 30, 2026, or that the Debtors have fully surrendered possession and control of the Premises.

3. Landlord further objects to the extent the Rejection Notice or any related abandonment relief could be construed to extinguish, waive, impair, cap, subordinate, release, or otherwise prejudice any claims—or the priority of any claims—arising from the Debtors' continuing obligations to remove the Equipment, restore the Premises, surrender the Premises, pay holdover charges, reimburse expenses, or satisfy any other contractual or statutory obligation.

## BACKGROUND

4. On June 30, 2026 (the "Petition Date"), the above-captioned debtors (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5. On July 14, 2026, the Court entered the *Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and Abandon Estate Property and (II) Granting Related Relief* (the "Rejection Procedures Order") [Docket No. 294]. Shortly

after entry of the Rejection Procedures Order, the Debtors filed and served the Rejection Notice, seeking to reject certain unexpired leases, including the Lease.

6. Landlord is the owner of the property located at 315 East 58th Street, New York, New York 10022 (the "Property").

7. On or about March 29, 2023, Landlord and DISH Wireless L.L.C. ("DWLLC") entered into that certain Site Lease Agreement concerning telecommunications equipment installed at the Premises, identified by the Debtors as Site ID NYNYC01803A. A copy of the Lease is attached to this Objection as **Exhibit A**.

8. Under the Lease, Landlord leased to DWLLC approximately 50 square feet of space at the Property (the "Premises") for use as a telecommunications facility. *See* Lease §§ 2.1, 3.1. The Lease has an initial term of sixty (60) months and provides for up to four additional renewal terms of sixty (60) months each. *See* Lease § 2.2. The Lease had not expired by its terms and remained in effect as of the Petition Date.

9. The Lease requires DWLLC to pay monthly Rent to Landlord, initially set at $4,000.00 and subject to a three percent (3%) annual increase. *See* Lease § 2.3.

10. Pursuant to the Lease, DWLLC installed telecommunications equipment at the Premises (collectively, the "Equipment").

11. Section 7.1 of the Lease, entitled "Surrender," provides:

> Except as set forth to the contrary herein, within ninety (90) days following the expiration or termination of this Agreement (the "Equipment Removal Period"), in accordance with the terms of this Agreement, Tenant will surrender the Premises to Landlord in a condition similar to that which existed immediately prior to Tenant's Installation together with any additions alteration and improvements to the Premises, in either case, normal wear and tear excepted. The Parties acknowledge and agree that Rent will not accrue during the Equipment Removal Period. However, if Tenant's Equipment is not removed during the Equipment Removal Period, Tenant will be deemed to be in Hold Over (as defined in Section 7.2 below) until Tenant's Equipment is removed from the Premises. Tenant shall

> have the right to access the Premises to remove any or all of Tenant's Equipment from the Premises at any time during the Term or the Equipment Removal Period.

12. Section 7.2 of the Lease, entitled "Hold Over," provides:

> If Tenant occupies the Premises beyond the Equipment Removal Period without Landlord's written consent ("Hold Over"), Tenant will be deemed to occupy the Premises on a month-to-month basis, terminable by either Party on thirty (30) days' written Notice to the other Party. All of the terms and provisions of this Agreement shall be applicable during that period, except that Tenant shall pay Landlord a rental fee equal to one hundred and fifty percent (150%) of the then current monthly Rent applicable at the expiration or termination of the Agreement, prorated for the number of days of such hold over.

13. The Rejection Notice seeks to reject the Lease effective June 30, 2026.[2]

14. Notwithstanding the Debtors' proposed rejection date, the Equipment remains installed at the Premises.

15. The Debtors have not removed the Equipment.

16. The Debtors have not restored the Premises to the condition required by the Lease.

17. The Equipment remains the Debtors' property, and the Debtors have neither removed it nor returned possession and control of the Premises to Landlord.

18. The Debtors have not paid all Rent and other amounts due under the Lease, including amounts accruing on and after the Petition Date.

## LIMITED OBJECTION

### I. Rejection of the Lease Constitutes a Breach, Not a Termination, and Does Not Extinguish Landlord's Rights

19. Rejection of an unexpired lease under section 365 of the Bankruptcy Code constitutes a breach of the lease; it does not rescind or terminate the lease or extinguish the

[2] Landlord's Lease was removed from the *Certificate of No Objection to Tenth Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 852] that the Debtors filed on August 10, 2026, and accordingly was not included in Schedule 1 to the *Order (I) Authorizing the DISH Wireless Debtors to Reject Certain Unexpired Lease and (II) Granting Related Relief (Tenth Rejection Notice)* [Docket No. 931] that the Court entered on August 11, 2026.

counterparty's rights. *See* 11 U.S.C. § 365(g); *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 372 (2019) ("A rejection breaches a contract but does not rescind it. And that means all the rights that would ordinarily survive a contract breach, including those conveyed here, remain in place."). The Fifth Circuit has held that section 365(g)'s statement that rejection "constitutes a breach" does not mean that the lease has been terminated, but only that a breach is deemed to occur. *Matter of Austin Dev. Co.*, 19 F.3d 1077, 1082–83 (5th Cir. 1994). The decision to reject is "correctly viewed only as a 'power to breach,'" and the "lease liabilities remain intact after rejection" and "give the non-debtor party a claim in the distribution of the estate." *Id.* at 1083.

20. Accordingly, rejection does not permit the Debtors to rewrite the Lease, to avoid unperformed surrender obligations, or to impose a rejection date inconsistent with the parties' agreement and the facts on the ground.

21. Landlord does not dispute that the Debtors may reject the Lease. Rather, Landlord objects to the Debtors' attempt to deem that rejection effective as of June 30, 2026, and to any construction of the Rejection Notice or any related abandonment relief that would extinguish, waive, cap, or otherwise impair Landlord's rights, claims, defenses, or remedies.

## II. The Debtors Have Not Established That Rejection of the Lease May Be Made Effective as of June 30, 2026

22. A debtor may reject an unexpired lease only "subject to the court's approval." 11 U.S.C. § 365(a). As a general rule, rejection is effective no earlier than the date the court enters an order approving it. *See In re Romacorp, Inc.*, No. 05-86818, 2006 WL 6544088, at *5–6 (Bankr. N.D. Tex. Feb. 2, 2006). The Debtors nonetheless seek to reject the Lease effective as of June 30, 2026—the Petition Date—two weeks before the Rejection Notice was even filed and served.

23. Rejection under section 365(a) does not take effect until the court approves it, and the effective date is ordinarily the date of the order approving rejection. *See In re Stonebridge*

*Techs., Inc.*, 430 F.3d 260, 273 (5th Cir. 2005) (quoting *In re Jamesway Corp.*, 179 B.R. 33, 37 (S.D.N.Y. 1995)) ("[T]he effective date of rejection is the date of the bankruptcy court's order approving rejection, and that court approval is a condition precedent to effective rejection."). Backdating rejection to an earlier date is an extraordinary remedy reserved for "exceptional circumstances." *In re O'Neil Theatres, Inc.*, 257 B.R. 806, 808 (Bankr. E.D. La. 2000); *see also In re Thinking Machines Corp.*, 67 F.3d 1021, 1028–29 (1st Cir. 1995) (rejection "does not take effect until judicial approval is secured," although a court has "equitable power, in suitable cases, to order a rejection to operate retroactively"); *In re At Home Corp.*, 392 F.3d 1064, 1065–66 (9th Cir. 2004). And even where retroactive relief is available, courts in this Circuit permit it "no earlier than the time the lessee vacates the premises," and require that, before granting retroactivity, "something more than the Debtor's business judgment must be shown." *Romacorp*, 2006 WL 6544088, at *5–6; *see also In re Cafeteria Operators, L.P.*, 299 B.R. 384, 394 (Bankr. N.D. Tex. 2003) (allowing retroactive rejection only to "the later of" the motion-filing date or the date the leased space was vacated, and denying it for locations the debtor continued to occupy). The Debtors cannot make the required showing here.

24. The Equipment remains installed at the Premises. The Debtors have not removed it, have not restored the Premises, and have not returned possession and control of the Premises to Landlord. Under Section 7.1 of the Lease, removal of the Equipment is not an ancillary post-termination task but an essential component of surrender itself, and the Lease deems DWLLC to remain in holdover until the Equipment is removed. Where a debtor-tenant leaves its property on the leased premises and neither removes nor abandons it, the purported rejection is "illusory," and retroactive rejection to the petition date is not warranted. *See Romacorp*, 2006 WL 6544088, at

*5–6 (denying retroactive rejection to the petition date where the debtor left its equipment on the premises and had neither removed it nor abandoned it under section 554).

25. The Debtors continue to enjoy the benefits of leaving the Equipment in place, including preserving their ability to recover the Equipment while avoiding the immediate costs of complying with their removal and restoration obligations. Those continuing rights and benefits are squarely inconsistent with any claim that the Debtors fully relinquished possession and control of the Premises as of June 30, 2026.

26. The Debtors will likely seek to justify the June 30, 2026 rejection date by arguing that every counterparty knew (or should have anticipated) that rejection of their contract was coming. In their motion seeking approval of the Rejection Procedures (the "Rejection Procedures Motion") [Docket No. 16], the Debtors state that, "[b]ased on the Contract Notices, the transparent and public circumstances giving rise to the Contract Notices, and the DISH Wireless Debtors' position that performance was excused under applicable law prior to the Petition Date," they "intend to reject . . . the Covered Contracts effective as of the Petition Date." Rejection Procedures Motion ¶ 11. The Contract Notices are the force majeure notices the Debtors assert they began sending to counterparties in September 2025, in which they unilaterally claimed that their performance was excused. But that contention does not support backdating rejection to the Petition Date under the circumstances presented here.

27. *First*, advance notice that the Debtors might cease performing is not a relinquishment of possession. The Contract Notices did not terminate the Lease, surrender the Premises, or abandon the Equipment. To the contrary, the Debtors expressly stated in the Contract Notices that they were "without waiver of any rights, remedies, defenses and positions with respect to DISH Wireless's rights and obligations under the Agreement and under law and equity, and all

such rights, remedies, defenses and positions are expressly reserved." Having reserved all their rights and committed to nothing, the Debtors cannot now recast the Contract Notices as an unequivocal, backdated surrender sufficient to justify a retroactive effective rejection date.

28. *Second*, the Debtors' reservation of rights left Landlord with no ability to retake the Premises in the monthslong interim period before the Debtors commenced these chapter 11 cases. The Equipment is the Debtors' property, and upon the filing of these cases it became property of the estate that Landlord could not remove, store, or dispose of without violating the automatic stay and exposing itself to liability to the Debtors. Moreover, under the Rejection Procedures Order, the Debtors' property remaining on the Premises is "deemed abandoned, as is," only "as of the applicable Rejection Date," and only "[a]s of the applicable Rejection Date" may Landlord "utilize and/or dispose of" it. Rejection Procedures Order ¶ 1(f). Accordingly, until the effective rejection date is fixed, Landlord can neither compel the Debtors to remove the Equipment nor lawfully dispose of it. Having reserved their rights, left their Equipment installed, and retained that Equipment as estate property, the Debtors—not Landlord—retained possession and control of the Premises after June 30, 2026. The "transparent and public circumstances" on which the Debtors rely thus confirm, rather than cure, the illusory character of rejection retroactive to the Petition Date.

29. Because the Debtors had not relinquished possession and control of the Premises as of June 30, 2026, the Court should decline to fix that date as the effective rejection date and should instead fix the Rejection Date no earlier than the date on which the Debtors fully relinquish possession and control of the Premises and complete their obligations under Section 7.1 of the Lease to remove the Equipment and restore the Premises, or such other date as the Court determines to be appropriate.

## III. The Debtors Must Timely Perform Their Post-Petition Obligations Under the Lease Through the Effective Rejection Date

30. Section 365(d)(3) requires the Debtors to "timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1)." 11 U.S.C. § 365(d)(3). Section 365(d)(3) obligations are not limited to payment of rent. They include the Debtors' obligations under Section 7.1 of the Lease to remove the Equipment, restore the Premises, and surrender possession, together with the Debtors' resulting liability for holdover charges under Section 7.2. Each is an obligation the Debtors must timely perform through the rejection date, and the Debtors' failure to perform gives rise to administrative expense claims and other remedies available to Landlord under the Bankruptcy Code and applicable law.

31. That a surrender or return-condition obligation is tied to the expiration or termination of a lease—here, running through a defined post-termination Equipment Removal Period—does not remove it from section 365(d)(3). In *In re Fore Machine, LLC*, the court held that section 365(d)(3) "is not ambiguous" and requires timely performance of all obligations arising between the petition date and the rejection date, and that a lease obligation triggered "at"—not "after"—the earlier of expiration or termination arises "prior to or simultaneously with" rejection and is therefore "within the time period required under § 365(d)(3)." No. 22-40487-MXM-11, 2023 WL 5355840, at *13–14 (Bankr. N.D. Tex. Aug. 21, 2023). The Fifth Circuit likewise treats section 365(d)(3) as entitling the lessor to performance "from the filing of bankruptcy to the date of lease rejection." *Matter of Austin Dev. Co.*, 19 F.3d at 1084; *see In re Imperial Beverage Grp., LLC*, 457 B.R. 490, 499–504 (Bankr. N.D. Tex. 2011) (unpaid postpetition, pre-rejection lease obligations are allowed as administrative expenses at the contract rate).

32. Here, the Lease's surrender and holdover provisions confirm that these obligations continue through, and accrue up to, the effective rejection date: Section 7.1 deems DWLLC to remain in holdover "until Tenant's Equipment is removed," and Section 7.2 fixes DWLLC's liability for after the Equipment Removal Period at a rental fee equal to 150% of the then-current monthly Rent. The effective rejection date therefore carries direct economic consequences: the later the rejection date, the longer the Debtors' section 365(d)(3) obligation to perform—including to pay holdover charges at the contract rate—continues.

33. To the extent the Debtors contend that a removal or restoration obligation is only a prepetition rejection-damages claim because it "accrue[s] instantly" at lease termination, *see In re TreeSource Indus., Inc.*, 363 F.3d 994, 998 (9th Cir. 2004), that reasoning does not fit this Lease. Section 7.1's holdover mechanism makes the Debtors' obligation a continuing one that accrues over time rather than a single duty arising only at lease-end, and the obligation is in any event triggered at, and continues through, the rejection date. *See Fore Machine*, 2023 WL 5355840, at *13–14.

34. In the alternative, and particularly because the Lease's Equipment Removal Period runs after termination, to the extent any removal or restoration obligations fall after the effective rejection date, the Debtors' continued storage of the Equipment on the Premises after rejection would entitle Landlord to an administrative expense under section 503(b)(1)(A), measured by the benefit to the estate, with the contract rate (including the Lease's 150% holdover rate) presumed to reflect that value. *See Imperial Beverage*, 457 B.R. at 502–05. Leaving a debtor's property on the leased premises is itself a benefit to the estate that supports such a claim. *Id.* Landlord objects to the Rejection Notice to the extent it purports to cut off any of these obligations as of June 30,

2026, and reserves all rights to assert administrative claims for unpaid rent, removal and restoration costs, use and occupancy, and holdover amounts.

**IV. Any Abandonment Relief Must Preserve Landlord's Rights**

35. The Rejection Notice and Rejection Procedures Order also provide that the Debtors' property remaining on the Premises may be deemed abandoned "as is" under section 554 of the Bankruptcy Code. Rejection Procedures Order ¶ 1(f). Section 554 permits a debtor to abandon property that is "burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). The effect of abandonment is simply to divest the estate of the property and revert it to the party with the possessory interest—ordinarily the debtor. *See Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 483–84 (5th Cir. 2024) (abandonment is "an act of jurisdictional significance" that removes property from the estate).

36. Abandonment does not, however, extinguish Landlord's claims, shift to Landlord the cost of the Debtors' unperformed obligations, or alter the priority those claims would otherwise receive. Even where a debtor properly abandons property, that "does not eliminate the trustee's contractual obligation . . . to remove it from a leased premises." *In re Oldco Tire Distribs., Inc.*, 676 B.R. 310, 316 n.27 (Bankr. D. Del. 2025). As set forth above, the Debtors' obligations to remove the Equipment and restore the Premises are obligations the Debtors must timely perform under section 365(d)(3), and Landlord's resulting claims are entitled to administrative priority.

37. At a minimum, to the extent any portion of those claims is not accorded administrative priority, it survives as a claim against the estate that abandonment cannot eliminate. *See* 11 U.S.C. § 502(g). Landlord therefore objects to any abandonment relief to the extent it could be construed to shift the cost, burden, or responsibility of removing the Equipment and restoring the Premises to Landlord, or to waive, release, cap, discharge, subordinate, recharacterize, or otherwise impair Landlord's corresponding claims—including claims for removal costs,

restoration costs, property damage, holdover charges, use and occupancy, administrative expenses, and rejection damages.

38. This result is all the more appropriate given the position in which the Debtors' own conduct placed Landlord. From the moment the Debtors sent the Contract Notices, Landlord had no lawful means of self-help: the Equipment remained the Debtors' property, the Contract Notices expressly reserved the Debtors' rights and remedies, and after the Petition Date the automatic stay barred Landlord from exercising control over it. The Rejection Procedures Order likewise did not permit Landlord to dispose of the Equipment before the Rejection Date. Rather, it provides that the Debtors' property is "deemed abandoned, as is, as of the applicable Rejection Date," and that any continued access by the Debtors to retrieve it is left to the parties' written agreement. Rejection Procedures Order ¶ 1(f). Landlord thus could not simply rip out and discard the Equipment in the interim without risking a stay violation and a damages claim by the Debtors. The Debtors should not be permitted to reserve their rights, leave their Equipment installed on the Premises, defer removal, and then shift to Landlord the cost, burden, and risk of the very removal and restoration obligations the Debtors themselves declined to perform.

39. Any order approving rejection or abandonment should make clear that nothing therein adjudicates, waives, subordinates, or otherwise affects Landlord's rights to assert any and all claims and remedies arising from the Debtors' failure to remove the Equipment, restore the Premises, surrender the Premises, or otherwise comply with the Lease and applicable law.

**<u>RESERVATION OF RIGHTS</u>**

40. This Objection is not, nor shall it be deemed to be, (a) a waiver, release, limitation, impairment, or adjudication of any of Landlord's rights, claims, causes of action, defenses, remedies, or interests against any person, entity, property, or estate; (b) an election of remedies;

(c) consent to the rejection of the Lease as of June 30, 2026; (d) consent to the abandonment of any Equipment located at the Premises; or (e) a waiver or release of any claims currently owing or that may become due and owing in the future.

41. Landlord expressly reserves all rights to assert administrative expense claims, rejection damages claims, unpaid rent claims, holdover rent or use and occupancy claims, equipment removal claims, restoration claims, property damage claims, indemnification claims, attorneys' fees and costs, FCC Trust-related claims or recoveries, claims against non-debtor parties, and any other contractual, statutory, equitable, bankruptcy, or non-bankruptcy claims, causes of action, defenses, offsets, remedies, and rights arising under the Lease, the Bankruptcy Code, applicable non-bankruptcy law, any chapter 11 plan, any trust structure, or otherwise.

42. Without limiting the foregoing, Landlord does not by this Objection seek any determination of its rights under any chapter 11 plan, the FCC Trust, or any covered-claim or similar claims-resolution process, and reserves all rights to assert and pursue any such recovery at the appropriate time; nothing in any order approving the Rejection Notice or any abandonment of Equipment shall impair, limit, or prejudice those rights.

**WHEREFORE,** Landlord respectfully requests that the Court enter an order: (i) denying the relief requested in the Rejection Notice to the extent it purports to effectuate rejection of the Lease as of June 30, 2026; (ii) clarifying that any rejection of the Lease shall be effective no earlier than the date on which the Debtors have fully relinquished possession and control of the Premises and satisfied their obligations under Section 7.1 of the Lease to remove the Equipment and restore the Premises; (iii) providing that nothing in any order approving the Rejection Notice or abandoning any Equipment shall waive, release, limit, impair, adjudicate, or otherwise prejudice

any of Landlord's rights, claims, defenses, remedies, or interests; and (iv) granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
August 30, 2026

By: */s/ David N. Saponara*

David N. Saponara
KUDMAN TRACHTEN ALOE POSNER LLP
488 Madison Avenue, 23rd Floor
New York, New York 10022
Tel: (212) 868-1010
Email: dsaponara@ktap.com

*Counsel for 315 E58 BH LLC
and NAMDAR 315 East 58 LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2026, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ David N. Saponara*
David N. Saponara

# <u>Exhibit A</u>

**Lease**

# SITE LEASE AGREEMENT

This Site Lease Agreement (the "**Agreement**" or "**Lease**") is made and effective as of the date the last Party executes this Agreement (the "**Effective Date**"), by and between 315 E58 BH, LLC, a New York limited liability company having a place of business at 9 Park Place, Third Floor, Great Neck, NY 11021 and NAMDAR 315 East 58, LLC, a New York limited liability company having a place of business at 150 Great Neck Road, Suite 304, Great Neck, New York 11021 ("**Landlord**"), and DISH Wireless L.L.C., a Colorado limited liability company having a place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112 ("**Tenant**," and together with Landlord, the "**Parties**," each a "**Party**").

## WITNESSETH:

WHEREAS, Landlord is the owner of the building commonly known as 315 West 58th Street, New York, New York 10022, and all fixtures, equipment and other appurtenances of every kind and description now or hereafter erected (the "**Building**"), and more particularly described on Exhibit A, attached hereto and made a part hereof (the "**Property**");

WHEREAS, Tenant wishes to lease from Landlord, and Landlord wishes to lease to Tenant the Premises (as defined in Section 2.1 below) on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the premises, and other good and valuable consideration, the mutual receipt and legal sufficient of which the parties hereto hereby acknowledge, Landlord and Tenant hereby agree as follows:

**1. Definitions**.

"**Affiliate(s)**" means any person or entity, directly or indirectly, controlling, controlled by, or under common control with such Party, in each case for so long as such control continues. For purposes of this definition, "control" shall mean (i) the ownership, directly or indirectly, or at least fifty percent (50%) of either: (a) the voting rights attached to issued voting shares; or (b) the power to elect fifty percent (50%) of the directors of such entity, or (ii) the ability to direct the actions of the entity. Notwithstanding the preceding, for purposes of this Agreement, EchoStar Corporation and its direct and indirect subsidiaries shall not be deemed to be "Affiliates" of Tenant unless after the Effective Date any such entity qualifies as a direct or indirect subsidiary of DISH Network Corporation.

"**Applicable Law**" means, collectively, any applicable federal, state, or local law, statute, ordinance, building code, rule, regulation or permit, or any order, judgment, consent, or approval of all Governmental Authority having jurisdiction over the Parties or this Agreement.

"**Governmental Authority**" means any: (i) federal, state, county, municipal, tribal, or other local government and any political subdivision thereof having jurisdiction over Landlord, Tenant, the Building, the Premises or any portion thereof; (ii) any court or administrative tribunal exercising proper jurisdiction; or (iii) any other governmental, quasi-governmental, self- regulatory, judicial, public, or statutory instrumentality, authority, body, agency, bureau, or entity of competent jurisdiction.

"**Hazardous Substances**" shall mean any substances now or hereafter defined as or included in the definition of "hazardous substance," "hazardous waste," "hazardous material," "hazardous chemical," "pollutant or contaminant," or "toxic substance" under any applicable Federal, State or local laws or regulations (including but not limited to §101(14) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601(14); 42 U.S.C. 101(33), 42 U.S.C. §9601(33); 42 U.S.C. 6903(5); §311 of the Water Pollution Control Act, 33 U.S.C. §1321; 40 C.F.R. Part 260; and 29 C.F.R. Part 1910).

"**Installation**" means the installation of Tenant's Equipment at the Premises.

"**Lease Year"** means (i) with respect to the first Lease Year, the period commencing on the Commencement Date and ending on the last calendar day of the calendar month immediately preceding the calendar month in which occurs the first anniversary of the Commencement Date, and (ii) with respect to each succeeding Lease Year through the expiration of the Term, the twelve (12) month period commencing on the first calendar day of the calendar month immediately following the expiration of the immediately preceding Lease Year.

"**Mortgage**(s)" shall mean any mortgage, which may now or hereafter encumber the Property, or the Building and all renewals, extensions, supplements, amendments, modifications, consolidations, and replacements thereof or thereto, substitutions therefor, and advances made thereunder.

"**Property**" has the meaning set forth in the Recitals of this Agreement.

"**Structure**" means that Building of which the Premises are a part.

**2. Premises, Term, Rent and Contingencies**.

2.1 Premises. Landlord hereby demised and leases to Tenant, and Tenant hereby hires and takes from Landlord approximately fifty (50) square feet of space for its communications equipment, together with additional space for antennas and cabling in connection with the use and operation of its facilities located on the roof of the Building as depicted on Exhibit B attached hereto and made a part hereof (collectively referred to as the **"Premises"**). Landlord also grants to Tenant: (a) the non-exclusive right to use any available electrical systems and/or fiber installed at the Property to support Tenant's Installation at Tenant's sole cost and expense: and (b) non-exclusive easements on, over, under, and across the Property for utilities, fiber, and access to the Premises (the "**Communications Facilities**"). Landlord agrees that providers of utility or fiber services may use such non-exclusive easement(s) and/or available conduit(s) for the installation of any equipment necessary to provide utility or fiber service. If the existing utility or fiber sources located within the Premises or on the Property are insufficient for Tenant's Permitted Use, Landlord agrees to grant Tenant and/or the applicable third party utility or fiber provider the right, at Tenant's sole cost and expense, to install such utilities or fiber on, over and/or under the Property as is necessary for Tenant's Permitted Use; provided that Landlord and Tenant shall mutually agree on the location of such installation(s). At least ten (10) business days prior to installation, Tenant shall prepare and deliver to Landlord plans and specifications (the "**Plans**") of the install of such utilities or fiber for Landlord's review and approval. No work shall commence until Landlord has approved the Plans, which approval will not be unreasonably withheld, conditioned, or delayed. Landlord shall have ten (10) business days within which to review and approve the Plans. Any requests not responded to within such ten (10) business days' time period shall be "deemed approved", and Tenant shall have the right to proceed as though Landlord had expressly approved of it.

2.2 Term. This Agreement shall be effective as of the Effective Date. The initial term of this Agreement (the "**Initial Term**") will commence on the earlier of the first (1st) day of the month following either (i) the commencement of Tenant's Installation or (ii) four (4) months after the Effective Date (the "**Commencement Date**"), and will expire on the last day of the month that is sixty (60) months after the Commencement Date unless terminated sooner, renewed or extended in accordance with this Agreement. The Initial Term shall automatically renew for up to four (4) additional terms of sixty (60) months each (each, a "**Renewal Term**" and together with the Initial Term, the "**Term**"); provided that that on the date of the expiration of the then current term: (a) no event of Default shall have occurred which shall not have been remedied by the Tenant in accordance with the provisions of this Agreement; and (b) this Agreement shall not have been terminated for any reason. However, Tenant may, in its sole and absolute discretion, elect not to renew the lease at the end of the then-current Term by giving Landlord written Notice at least ninety (90) days prior to the end of the then-current Term. The Parties agree that, subject to the Contingencies, this Agreement constitutes a binding and valid obligation on each Party and that each Party has vested rights in this Agreement as of the Effective Date.

2.3 Rent. Beginning on the Commencement Date and continuing through the term of this Agreement, Tenant shall pay Landlord rent for the Premises ("**Rent**") in the amount of four thousand and 00/100 Dollars ($4,000.00) per month. The first Rent payment shall be made within sixty (60) days after the Commencement Date

with subsequent rent payable by the fifth (5th) day of each month. On each annual anniversary of the Commencement Date, the rent shall be automatically increased three percent (3%) of the then current Rent.

Additionally, within sixty (60) days following the Effective Date, Tenant shall pay Landlord (i) a one (1) time fee in the amount of Five Thousand and 00/100 Dollars ($5,000.00) to defray Landlord's costs associated with reviewing this Agreement, which is a condition precedent to Tenant's use of the Premises (the "**Site Development Fee**"), plus (ii) another one (1) time fee in the amount of Five Thousand and 00/100 Dollars ($5,000.00 ) as an incentive for Landlord to execute this Agreement by March 30, 2023 (the "**Signing Bonus**"). If Landlord does not execute the Agreement by March 31, 2023, Landlord is not entitled to the Signing Bonus and Tenant will not pay said Signing Bonus.

Payments shall be delivered to the address designated by Landlord in Section 12.11, or by electronic payment. All payments for any fractional month shall be prorated based upon the number of days during such month that the payment obligation was in force. Tenant shall receive from Landlord (or any subsequent owner, assignee, or transferee) of a validly completed IRS approved W-9 form (or its equivalent) prior to paying any Rent or any other amount(s) due under this Agreement.

2.4 Contingencies. The Parties acknowledge and agree that Tenant's ability to lawfully use the Premises is contingent upon Tenant obtaining all certificates, permits, approvals and other authorizations that may be required by any Governmental Authority in accordance with Applicable Law (collectively, the "**Governmental Approvals**"). Tenant, at its sole cost and expense, shall apply for, secure, maintain and comply with all Governmental Approvals which may be required for the Permitted Use and shall pay, if, as and when due, all fees and charges of a similar nature in connection therewith, including any fines, penalties, or interest that may accrue thereon, and provide Landlord with copies thereof. Tenant shall obtain all such Governmental Approvals promptly. Landlord hereby authorizes Tenant, at Tenant's sole cost and expense, to file and submit for Governmental Approvals. Landlord shall: (a) reasonably cooperate with Tenant, at no cost and expense to Landlord, in Tenant's efforts to obtain such Governmental Approvals; (b) promptly execute and deliver all documents reasonably necessary to obtain and maintain the Government Approvals; and (c) not act in bad faith to adversely affect Tenant's ability to obtain and/or maintain the Governmental Approvals. If: (i) any application for Governmental Approvals is rejected, conditioned, materially delayed or otherwise not approved for any or no reason through no fault of Tenant; or (ii) Tenant determines, in Tenant's sole and absolute discretion, that such Governmental Approvals cannot be obtained in a timely and commercially reasonable manner (clauses (i) and (ii) collectively, (the "**Contingencies**"), then, Tenant shall have the right in its sole and absolute discretion to terminate this Agreement upon thirty (30) days prior written Notice to Landlord, and upon Landlord's receipt of such notice of termination, this Agreement shall terminate and neither party shall have any further rights or obligations hereunder, except those that are expressly stated to survive the termination of this Agreement. If, following the Commencement Date, and through no fault of Tenant, any Governmental Approval issued to Tenant is canceled, expires, lapses or is otherwise withdrawn or terminated by the applicable Governmental Authority, then Tenant shall have the right in its sole and absolute discretion to terminate this Agreement upon ninety (90) days' Notice to Landlord without penalty or further obligation. If this Agreement is terminated, this Agreement shall be of no further force or effect (except as set forth to the contrary herein).

**3. Use, Access and Modifications to Tenant's Equipment**.

3.1 Tenant's Permitted Use. Tenant shall use the Premises for the purpose of the installation, operation, maintenance and management of a telecommunications facility (including, without limitation, equipment designed to transmit and receive radio frequency signals) (collectively, "**Tenant's Equipment**"), which shall include the right to replace, repair, add, modify, maintain and/or remove any or all of Tenant's Equipment and the frequencies over which Tenant's Equipment operates ("**Tenant's Permitted Use**"). Landlord acknowledges and agrees that if radio frequency signage and/or barricades are required by Applicable Law, Tenant shall have the right to install the same on the Property. Tenant's Equipment shall belong to Tenant, and shall be located at the Property at sole risk of Tenant, and Owner shall not be liable for damage thereto or theft, misappropriation or loss thereof, except to the extent of the negligence or willful misconduct of Landlord, its employees or contractors or as otherwise set forth

herein.

3.2 Access. Commencing on the Effective Date and continuing throughout the Term, Tenant, its employees, agents and contractors shall have the right to access the Premises 24 hours per day, 7 days per week and at no additional cost or expense to Tenant for the Tenant's Permitted Use. Further, Landlord grants to Tenant the right of ingress and egress to the Building and the Premises. However, Tenant's access to the Building on the Property, other than ingress and egress to the Premises and Communications Facility, exclusive of Tenant's travel on open and improved public roads, shall require Tenant to be accompanied by Landlord's personnel, if Landlord elects, on reasonable prior notice to Landlord, no less than 24 hours, except in case of Emergency.

3.3 Additions and Modifications to Tenant's Equipment. After Tenant's initial Installation, Tenant shall make any changes, additions or modifications in or to the Premises or Tenant's Equipment, including those which allow Tenant to (i) modify or add additional technologies and (ii) modify or add equipment within the Premises (collectively, "**Permitted Modifications**") without Landlord's prior written consent in each instance without incurring any increase in the then-current Rent or other modification of the terms and conditions set forth in this Agreement. In the event Tenant desires to make changes, modifications or additions that are not Permitted Modifications, Tenant shall furnish to Landlord for Landlord's approval of Tenant's installation plans and specifications for each such change, addition or modification, such approval shall not be unreasonably withheld, conditioned or delayed. Landlord's approval shall not exceed ten (10) days from receipt of Tenant's plans and/or specification. Landlord's failure to respond with approval or a request for change(s) shall result in Tenant's proposed modifications as being deemed expressly approved by Landlord. Tenant shall pay Landlord, within sixty (60) days after Tenant's receipt of undisputed invoice and supporting documentation from Landlord, all reasonable, documented expenses incurred by Landlord in connection with any change, addition or modification to the Premises and Tenant's Equipment that is not a Permitted Modification, including, but not limited to, architectural and engineering fees incurred by Landlord, provided, however, that such expenses will not exceed Three Thousand Dollars ($3,000.00).

**4. Utilities, Liens and Taxes**.

4.1 Utilities. Tenant shall install (at Tenant's sole cost and expense) a separate electric utility meter in a location mutually approved by the Parties in their reasonable discretion. Tenant shall be solely responsible for and shall promptly pay all fees, deposits, and charges, including use, connection fees, hook-up fees, standby fees and penalties for discontinued or interrupted services to the electric company. Tenant shall maintain, repair and replace its utility meter in or serving the Premises.

4.2 Liens. Tenant shall endeavor not to create or permit to be created any lien attaching to the Property, Structure or any part thereof. If any lien is filed purporting to be for labor or material furnished or to be furnished at the request of Tenant, then Tenant shall cause same to be discharged and removed from record by payment, satisfaction or posting of bond within thirty (30) days of receipt of Notice of the same from Landlord; provided, that Tenant may contest any such lien if Tenant provides Landlord with cash or a letter of credit in the amount of said lien as security for its payment within such thirty (30) day period, and thereafter diligently contests such lien. In the event Tenant fails to deposit the aforementioned security with Landlord and fails to pay any lien claim after entry of final judgment in favor of the claimant, then Landlord shall have the right to expend all sums reasonably necessary to discharge the lien claim and Tenant shall, within thirty (30) days from Tenant's receipt of invoice and supporting documentation, reimburse Landlord for any and all actual, documented costs and expenses incurred by Landlord to discharge such lien including, without limitation, all attorneys' fees, court costs and similar expenses. Tenant shall use commercially reasonable efforts to cause all construction agreements pertaining to the Premises with its general contractors entered into by Tenant to provide that Landlord shall not be liable for any work performed or to be performed at the Premises for Tenant or for any materials furnished at the Premises, and that no mechanic's or other lien for such work or materials shall attach to or affect the estate or interest of Landlord in and to the Premises or Building. In addition, prior to the commencement of any such work, Tenant shall provide Landlord with a certificate of insurance required under this Agreement.

4.3 Taxes. Landlord shall pay all real estate taxes that are assessed upon the Building during the Term. If any tax or excise is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the taxing authority. Tenant shall be liable for all taxes against Tenant's personal property or Tenant's fixtures placed in the Premises, whether levied or assessed against Landlord or Tenant. Landlord shall reasonably cooperate with Tenant, at Tenant's expense, in any appeal or challenge to taxes. If, as a result of any appeal or challenge by Tenant, there is a reduction, credit or repayment received by Landlord for any taxes previously paid by Tenant, Landlord agrees to promptly reimburse to Tenant the amount of said reduction, credit or repayment.

**5. Interference and Relocation of Tenant's Equipment**.

5.1 Interference. Tenant agrees to use best efforts to ensure that Tenant's Equipment does not cause any interference, block or otherwise hinder or prevent any transmission or reception ("**Interference**") with any equipment installed at the Building as of the Effective Date in accordance with then existing industry standards. In the event any after-installed Tenant's Equipment causes such interference, and after Landlord has notified Tenant in writing of such interference, Tenant will take all commercially reasonable steps necessary to correct and eliminate the Interference, including but not limited to, at Tenant's option, powering down such equipment and later powering up such equipment for intermittent testing. Following the Effective Date, Landlord agrees not to install or to permit others to install any structure or equipment which could cause Interference with Tenant's Equipment. If an Interference continues for a period more than forty-eight (48) hours following a Party's receipt of notification thereof, Landlord (or Tenant, as the case may be) shall cause any interfering party to cease operating, and/or relocate, the source of Interference, or to reduce the power sufficiently to minimize the Interference until such Interference can be remedied.

5.2 Relocation of Tenant's Equipment. Following Tenant's receipt of a written Notice from Landlord, Tenant agrees to temporarily relocate its equipment to a mutually agreed upon location on the Property (a "**Temporary Location**") to facilitate Landlord's performance of maintenance, repair or similar work at the Property or in or on the Structure, provided that: (a) Landlord and Tenant shall equally split all costs incurred by Tenant for relocating Tenant's Equipment to the Temporary Location as well as back to the original location; (b) Landlord gives Tenant at least three (3) months prior written Notice (except in the case of an emergency which is reasonably likely to result in damage or injury to persons, the Structure or the Property (an "**Emergency**"), in which event Landlord will provide the greatest amount of notice possible under the circumstances); and (c) except for an Emergency Tenant shall not be required to relocate its equipment to a Temporary Location more than one (1) time within any five (5) year period. If Tenant's use of the Temporary Location requires Tenant to undergo re-zoning or re-permitting, Landlord shall not require Tenant to relocate Tenant's Equipment, absent an Emergency, until Tenant's receipt of all Governmental Approvals applicable to Tenant's use of the Temporary Location.

5.3 Redevelopment. Notwithstanding any term or provision in this Agreement to the contrary, in the event Landlord elects to redevelop, subdivide, rezone, demolish, reconstruct or materially alter (collectively "Redevelop" or, as a noun, "Redevelopment") the Property or any portion thereof in a manner that Landlord reasonably anticipates would impact Tenant's use and enjoyment of the Premises, and such Redevelopment reasonably requires that Tenant's telecommunications facilities and equipment to be removed, then Landlord shall have the right, to require Tenant to remove its Tenant's telecommunications facilities and equipment on the Property upon at least six (6) months prior written Notice ("**Redevelopment Notice**"); provided that (a) all costs for removal and reinstallation shall be paid for by Landlord, not to exceed $500,000.00; (b) upon the completion of the Redevelopment, Tenant shall have the right to (i) reconstruct, and reinstall the telecommunications facilities and equipment in or about the Property, subject to the terms of the Lease, in such locations as reasonable acceptable to Landlord and Tenant; and (c) Landlord shall include with its Redevelopment Notice reasonable evidence of its plan to Redevelop the Property. Upon drawing of plans, the Landlord will identify areas to the Tenant proposed temporary and/or permanent locations for Tenant's Permitted Use. Tenant shall be required to remove its equipment prior to the expiration of said six (6) months' notice; however, Tenant shall not be required to remove its equipment until Landlord has provided a copy of the building permit for the Redevelopment. All rental and other charges under this Agreement shall abate until Tenant's installation is fully operational after Redevelopment. During the Redevelopment, Tenant shall further have the right to place a temporary communications facility, such as a cell on

wheels, on the Property in a location sufficient to meet Tenant's coverage and/or engineering needs and as reasonably agreed upon by the Parties. Notwithstanding the foregoing, if at any point during the Redevelopment process Tenant determines, in its sole and absolute discretion, that there are no temporary and/or permanent locations on the Structure or Property that are sufficient to meet Tenant's coverage and/or engineering needs, then Tenant shall have the right to terminate this Agreement by giving written notice of Tenant's intent to terminate this Agreement as of the termination date designated in Tenant's notice letter.

**6. Maintenance and Repair Obligations**.

6.1 Landlord Maintenance of the Structure. Landlord represents and warrants that, to Landlord's actual knowledge, as of the Effective Date, the Structure, the Structure's systems and all structural elements of the Structure are in compliance with Applicable Law. Throughout the term of this Agreement, Landlord shall maintain, at its sole cost and expense, the Structure and the Property (but not Tenant's Equipment located thereon) in good operating condition. Landlord shall not have any obligation to maintain, repair or replace Tenant's Equipment except to the extent required due to the acts and/or omissions of Landlord, Landlord's agents, contractors or other tenants of the Structure. Landlord agrees to safeguard Tenant's Equipment with the same standard of care it uses to protect its own property, but in no event less than reasonable care.

6.2 Tenant Maintenance of Tenant's Equipment. Tenant assumes sole responsibility for the maintenance, repair and/or replacement of Tenant's Equipment, except as set forth in Section 6.1. Tenant agrees to perform all maintenance, repair, or replacement of Tenant's Equipment ("**Tenant Maintenance**") in accordance with Applicable Law, and in a good and workmanlike manner. Tenant shall not be permitted to conduct Tenant Maintenance in a manner that would materially increase the size of the Premises. .

6.3 Damage to Property or Structure.

a. Tenant shall, at Tenant's sole cost and expense, repair any damage to the Structure or Property to the extent caused by Tenant, or Tenant's employees, agents, or contractors, during the course of Tenant's construction, installation, maintenance, and/or removal work ("**Work**"). In the event that Tenant recognizes the damage during the course of such Work, Tenant shall give Notice to Landlord and coordinate the repairs. If Landlord has an onsite representative, Tenant may give oral Notice to, and coordinate the repairs directly with, such representative.

b. In the event that Tenant does not recognize the damage during the course of such Work, Landlord shall, within sixty (60) days of Tenant completing such Work, provide written Notice to Tenant clearly identifying the damage along with competent evidence reasonably supporting the claim that Tenant caused the damage ("**Damage Notice**"). Tenant may, within thirty (30) days of receiving the Damage Notice, inspect the damage for the purpose of confirming or denying that Tenant caused the damage. If Tenant either inspects and confirms that it caused the damage within the thirty (30) day period or elects not to inspect the damage within the thirty (30) day period, then Tenant shall repair the damage within sixty (60) days of the Damage Notice; provided, however, that Tenant shall have such additional time as may be needed to repair the damage if Tenant commences the repairs within the original sixty (60) day period and thereafter diligently pursues the repair work until completed. In the event that Tenant does not dispute the cause of the damage and fails to repair the damage within the time allotted hereinabove, Landlord may elect to repair the damage and Tenant will reimburse Landlord for the reasonable out-of-pocket costs paid by Landlord to third party contractors to repair the damage caused by Tenant within sixty (60) days of receipt of an itemized invoice and scope of work for the repairs.

c. In the event of an Emergency, Landlord may elect to repair such damage after sending the Damage Notice to Tenant, provided that Landlord may commence the repair work prior to sending the Damage Notice if reasonably necessary under the circumstances. In the event that Tenant does not dispute the cause of the damage, Tenant will reimburse Landlord for the reasonable out-of-pocket costs paid by Landlord to third party contractors to repair the damage caused by Tenant within sixty (60) days of receipt of an itemized invoice and scope of work for the repairs.

d. If Tenant reasonably disputes the claim that Tenant caused the damage, in whole or in part, and the Parties are unable to resolve the dispute within ninety (90) days of the Damage Notice, then either Party may pursue the remedies available to that Party at law or in equity.

**7. Surrender and Hold Over**.

7.1 Surrender. Except as set forth to the contrary herein, within ninety (90) days following the expiration or termination of this Agreement (the "**Equipment Removal Period**"), in accordance with the terms of this Agreement, Tenant will surrender the Premises to Landlord in a condition similar to that which existed immediately prior to Tenant's Installation together with any additions alteration and improvements to the Premises, in either case, normal wear and tear excepted. The Parties acknowledge and agree that Rent will not accrue during the Equipment Removal Period. However, if Tenant's Equipment is not removed during the Equipment Removal Period, Tenant will be deemed to be in Hold Over (as defined in Section 7.2 below) until Tenant's Equipment is removed from the Premises. Tenant shall have the right to access the Premises to remove any or all of Tenant's Equipment from the Premises at any time during the Term or the Equipment Removal Period.

7.2 Hold Over. If Tenant occupies the Premises beyond the Equipment Removal Period without Landlord's written consent ("**Hold Over**"), Tenant will be deemed to occupy the Premises on a month-to-month basis, terminable by either Party on thirty (30) days' written Notice to the other Party. All of the terms and provisions of this Agreement shall be applicable during that period, except that Tenant shall pay Landlord a rental fee equal to one hundred and fifty percent (150%) of the then current monthly Rent applicable at the expiration or termination of the Agreement, prorated for the number of days of such hold over.

**8. Default, Remedies and Termination**.

8.1 Default. If any of the following events occur during the Term (each a "Default"), then the non-Defaulting Party may elect one or more of the remedies set forth below in this Section 8 or seek any other remedy available: (a) Tenant's failure to make any payment required by this Agreement including, but not limited to any Rent or utilities, including electricity, within thirty (30) days after receipt of written Notice from the Landlord of such failure to pay; (b) failure by either Party to observe or perform any provision of this Agreement where such failure: (1) continues for a period of thirty (30) days after written Notice thereof from the non-Defaulting Party and the Defaulting Party has failed to cure or commenced the cure of such Default; and/or (2) as to an alleged Default by Landlord based upon Tenant's reasonable determination, materially affects Tenant's ability to transmit or receive wireless communications signals to or from the Premises (but not including a temporary interruption lasting less than thirty (30) days); (c) either Party files a petition in bankruptcy or insolvency or for reorganization or arrangement under the bankruptcy laws or under any insolvency act of any state, or admits the material allegations of any such petition by answer or otherwise, or is dissolved or makes an assignment for the benefit of creditors; and/or (d) involuntary proceedings under any such bankruptcy law or insolvency act or for the dissolution of either Party are instituted against either Party, or a receiver or trustee is appointed for all or substantially all of the property of either Party, and such proceeding is not dismissed, or such receivership or trusteeship vacated within sixty (60) days after such institution or appointment.

8.2 Remedies. Upon the occurrence of a Default, the non-Defaulting Party may thereafter terminate this Agreement immediately upon written Notice to the Defaulting Party and seek damages from the Defaulting Party. Upon termination of this Agreement, Tenant shall deliver the Premises to the Landlord in the condition required hereunder. Upon the occurrence of a Default described in Section 8.1 (c) or (d), the non-Defaulting Party may exercise any remedies available at law or in equity.

8.3 Termination. Tenant shall have the right to terminate this Agreement without further liability due to any one or more of the following: (i) upon thirty (30) days prior written Notice to Landlord, changes in Applicable Law which prohibit or materially adversely affect Tenant's ability to operate Tenant's Equipment at the Premises; (ii)

upon ninety (90) days prior written Notice to Landlord, Tenant, in its sole discretion, determines that Tenant's Permitted Use of the Premises is obsolete or unnecessary (iii) upon thirty (30) days prior written Notice to Landlord, Landlord or a third party installs any structure, equipment, or other item which blocks, hinders, limits, or prevents Tenant from being able to use the Tenant Equipment for Tenant's Permitted Use in any material way.

**9. Limitation of Liability and Indemnification**.

9.1 Limitation of Liability. EXCEPT FOR EACH PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH BELOW IN THIS SECTION 9, NEITHER PARTY NOR ANY OF ITS AGENTS, CONTRACTORS, OR EMPLOYEES, SHALL BE LIABLE TO THE OTHER PARTY OR ANY PERSON CLAIMING THROUGH THAT PARTY FOR ANY EXEMPLARY, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES FOR ANY CAUSE WHATSOEVER, INCLUDING, WITHOUT LIMITATION, CLAIMS CAUSED BY OR RESULTING FROM THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT PARTY, ITS AGENTS, CONTRACTORS, OR EMPLOYEES.

9.2 Tenant's Indemnity. Except to the extent caused by the breach of this Agreement by Landlord or the acts or omissions of Landlord, its officers, agents, employees, contractors, or any other person or entity for whom Landlord is legally responsible, Tenant shall defend, indemnify and hold Landlord and its officers, directors, shareholders, employees, agents and representatives ("**Landlord's Representatives**") harmless from and against any and all claims, demands, litigation, settlements, judgments, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (individually or collectively, a "**Claim**") arising directly or indirectly out of: (i) any act or omission of Tenant, its officers, agents, employees, contractors, or any other person or entity for whom Tenant is legally responsible ("**Tenant's Representatives**"); (ii) a breach of any representation, warranty or covenant of Tenant contained or incorporated in this Agreement; or (iii) Tenant contesting any violation, instituting any legal, regulatory or informal action in the name of Tenant with respect to the violations and other fines, or withholding any payment of violations or fines imposed on Tenant, except to the extent any of the foregoing is attributable to the negligent or intentional act or omission of Landlord, its employees, agents or independent contractor. Tenant's obligations under this Section 9.2 shall survive the expiration or earlier termination of this Agreement for two (2) years.

9.3 Landlord's Indemnity. Except to the extent caused by the breach of this Agreement by Tenant or the acts or omissions of Tenant or Tenant's Representatives, Landlord shall defend, indemnify and hold Tenant, its officers, directors, shareholders, employees, agents and representatives harmless from and against any and all Claims arising directly or indirectly out of: (i) any act or omission of Landlord, its officers, agents, employees, contractors or any other person or entity for whom Landlord is legally responsible; (ii) a breach of any representation, warranty or covenant of Landlord contained or incorporated in this Agreement; and/or (iii) the generation, possession, use, storage, presence, release, spill, treatment, transportation, manufacture, refinement, handling, production and/or disposal of Hazardous Substances in, on, about, adjacent to, under or near the Premises, the Structure and/or the Property, and/or any contamination of the Premises, the Structure and/or the Property by any Hazardous Substance, but only to the extent not caused by Tenant or Tenant's Representatives. Landlord's obligations under this Section 9.3 shall survive the expiration or earlier termination of this Agreement for two (2) years.

In the event Landlord becomes aware of any Hazardous Substances on the Premises or Communications Facility brought onto the Property by Tenant in violation of this Agreement, or any environmental, health or safety condition or matter relating to the Premises or Communication Facility which Landlord proves such condition or matter was caused by Tenant's release of Hazardous Substances onto the Property, Landlord shall notify Tenant in writing along with such sufficient proof, and, after Tenant's investigation confirming that it is the source of the condition or matter, Tenant shall abate and/or remediate said Hazardous Substances from the Property.

9.4 Indemnification Procedure. The Party seeking indemnification (the "**Indemnified Party**") shall promptly send Notice to the Party from whom indemnification is being sought (the "**Indemnifying Party**") of the claim or suit for which indemnification is sought. The Indemnified Party shall not make any admission as to liability

or agree to any settlement of or compromise any claim without the prior written consent of the Indemnifying Party. The Indemnified Party shall, at the Indemnifying Party request and expense, give the Indemnifying Party all reasonable assistance in connection with those negotiations and litigation.

**10. Insurance**.

10.1 Landlord Obligations. Throughout the Term, Landlord shall maintain, at Landlord's sole cost and expense, the following insurance coverage Commercial General Liability of not less than $1,000,000 per occurrence and $2,000,000 aggregate. Subject to the policy minimums set forth above in this Section 10.1, the insurance required of Landlord hereunder may be maintained by a blanket or master policy that includes properties other than the Property.

10.2 Tenant Obligations. Throughout the Term, Tenant shall maintain, at Tenant's sole cost and expense, the following insurance coverage: (i) workers' compensation insurance with no less than the minimum limits required by Applicable Law; (ii) employer's liability insurance with such limits as required by Applicable Law; and (iii) Commercial General Liability with a minimum limit of $1,000,000 per occurrence and $2,000,000 aggregate. All such policies shall be endorsed to include Landlord as additional insured. Such insurance policy shall be primary to all insurance applicable to the Property.

10.3 Insurance Requirements. All policies required by this Section 10 shall be issued by insurers that are (1) licensed to do business in the state in which the Property and/or Structure are located, and (2) rated A- or better by Best's Key Rating Guide.

10.4 Waiver of Subrogation. Intentionally Omitted.

**11. Representations and Warranties**.

11.1 Representations and Warranties. Landlord represents that: (a) Landlord has the right and authority to execute and perform this Agreement; (b) to Landlord's actual, current knowledge, without investigation, there are no liens, judgments or other title matters materially and adversely affecting Landlord's title to the Property; (c) to Landlord's actual, current knowledge, there are no covenants, easements or restrictions that prevent the use of the Premises for Tenant's Permitted Use; (d) to the best of Landlord's actual, current knowledge, without investigation, the Structure and the Premises are in good repair and suitable for Tenant's Permitted Use; (e) Landlord will comply with all federal, state, and local laws in connection with any substances brought on to the Property and/or Structure that are identified as toxic or hazardous by any Applicable Law, ordinance or regulation ("**Hazardous Substance**"); and (f) Tenant's use and quiet enjoyment of the Premises shall not be disturbed by Landlord or Landlord's Representatives so long as Tenant is not in Default under the terms herein beyond any applicable notice and cure periods. Landlord is responsible for any loss or damage, including remediation, with respect to Hazardous Substances as per Applicable Law, except as set forth elsewhere in this Agreement. Landlord understands and agrees that notwithstanding anything contained in this Agreement to the contrary, in no event shall Tenant have any liability whatsoever with respect to any Hazardous Substance that was on, about, adjacent to, under or near the Structure prior to the Effective Date, or that was generated, possessed, used, stored, released, spilled, treated, transported, manufactured, refined, handled, produced or disposed of on, about, adjacent to, under or near the Property and/or Structure by: (1) Landlord, its agents, employees, contractors or invitees; or (2) any third party who is not an employee, agent, contractor or invitee of Tenant.

**12. Miscellaneous**.

12.1 Assignment. Tenant shall not assign (whether by operation of law or otherwise), sublet, mortgage, encumber or otherwise transfer any of its rights or obligations under this Agreement to any third party without the prior written approval of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, Tenant may assign or transfer some or all of its rights and/or obligations under the Agreement to: (i) an Affiliate; (ii) a successor entity to its business, whether by merger, consolidation,

reorganization, or by sale of all or substantially all of its assets or stock; (iii) any entity in which a Party or its Affiliates have any direct or indirect equity investment; and/or (iv) any other entity directly or indirectly controlling, controlled by or under common control with any of the foregoing, and in each case, such assignment, transfer or other such transaction shall not be considered an assignment under this Section 12.1 requiring consent and the non-assigning Party shall have no right to delay, alter or impede such assignment or transfer provided: (a) Tenant shall not at the time of such assignment be in Default (beyond the applicable notice/grace periods) under any of the terms, covenants and conditions of this Lease; (b) such assignee shall agree in writing to perform all of the unperformed terms, covenants and conditions of this Lease after the effective date of the assignment (c) the use of the Premises will be for Tenant's Permitted Use and for no other use or purpose , and (d) Landlord shall receive thirty (30) days written notice after of the sublease or assignment together with the documents and satisfying the conditions described in this Section 12.1(a) through (d). .

12.2 Rights Upon Sale of Property or Structure. Should Landlord, at any time during the Term, sell or transfer all or any part of the Property or the Structure to a purchaser other than Tenant, such transfer shall be subject to this Agreement and Landlord shall require any such purchaser or transferee to recognize Tenant's rights under the terms of this Agreement in a written instrument signed by Landlord and the third party transferee. If Landlord completes any such transfer without executing such a written instrument, then Landlord shall not be released from its obligations to Tenant under this Agreement, and Tenant shall have the right to look to Landlord and the third party for the full performance of this Agreement.

12.3 Subordination and Non-Disturbance. This Agreement shall be subordinate to any Mortgage by Landlord which, from time to time, may encumber all or part of the Property; provided, however, the lender under every such Mortgage shall, in the event of a foreclosure of Landlord's interest, recognize the validity of this Agreement and Tenant's right to remain in occupancy of and have access to the Premises, as long as no Default by Tenant exists under this Agreement and Landlord shall endeavor to provide Tenant with a subordination non-disturbance and attornment agreement, in from its mortgagee.

12.4 Condemnation. If all or any portion of the Premises is condemned, taken by a Governmental Authority, or otherwise appropriated by the exercise of the right of eminent domain or a deed or conveyance in lieu of eminent domain (each, a "**Taking**"), either Party hereto shall have the right to terminate this Agreement upon Notice to the other Party. If either Party elects to terminate this Agreement, the Rent set forth herein shall be abated, and Tenant's liability therefor will cease as of the date of such Taking, this Agreement shall terminate as of such date, and any prepaid rent shall be returned to Tenant. If this Agreement is not terminated as herein provided, then it shall continue in full force and effect, and Landlord shall, within a reasonable time after possession is physically taken by the condemning authority restore the remaining portion of the Premises to render it reasonably suitable for Tenant's Permitted Use and the Rent shall be proportionately and equitably reduced. Notwithstanding the foregoing, Landlord shall not be obligated to expend an amount greater than the proceeds received from the condemning authority less all expenses reasonably incurred in connection therewith (including attorneys' fees) for the restoration. All compensation awarded in connection with a Taking shall be the property of Landlord, provided that if allowed under Applicable Law, Tenant may apply for and keep as its property a separate award for Tenant's relocation expenses.

12.5 Recording. If requested by Tenant, Landlord and Tenant agree to execute a Memorandum of Lease that Tenant may record at Tenant's sole cost and expense. The date set forth in the Memorandum of Lease is for recording purposes only, and bears no reference to commencement of the Term or rent payments of any kind. Within six (6) months after the expiration or earlier termination of this Agreement, Tenant shall execute a termination of any Memorandum of Lease.

12.6 Force Majeure. Notwithstanding anything to the contrary in this Agreement, neither Party shall be liable to the other Party for nonperformance or delay in performance of any of its obligations (except for the payment of Rent) under this Agreement due to causes beyond its reasonable control, including, without limitation, strikes, lockouts, pandemics, labor troubles, acts of God, insurrections, riots, enemy act, war, civil commotion, fire, explosion, flood, windstorm, earthquake, natural disaster ("**Force Majeure**"). In no event shall a Force Majeure

excuse Tenant's obligation to pay Rent hereunder except if such Force Majeure event interferes with the complete and full enjoyment and use of the Premises by Tenant. Upon the occurrence of a Force Majeure condition, the affected Party shall immediately notify the other Party with as much detail as possible and shall promptly inform the other Party of any further developments. Immediately after the Force Majeure event is removed or abates, the affected Party shall perform such obligations with all due speed. Neither Party shall be deemed in default of this Agreement to the extent that a delay or other breach is due to or related to a Force Majeure event. If such Force Majeure event prevents the affected Party from performing its obligations under this Agreement, in whole or in part, for a period of forty-five (45) or more days, then the other Party may terminate this Agreement immediately upon Notice to the affected Party.

12.7 Successors and Assigns. The respective rights and obligations provided in this Agreement shall bind and shall continue to apply for the benefit of the Parties hereto, their legal representative, heirs, successors and permitted assigns. No rights however, shall continue to apply for the benefit of any assignee, unless such assignment was made in accordance with Section 12.1 of this Agreement.

12.8 Governing Law and Construction. This Agreement shall be construed, governed, and enforced in accordance with the laws of the state of New York without giving effect to its conflicts of laws principles. The section and paragraph headings contained in this Agreement are solely for reference purposes, and shall not affect in any way the meaning or interpretation of this Agreement.

12.9 Severability. Each provision of this Agreement shall be construed as separable and divisible from every other provision and the enforceability of any one provision shall not limit the enforceability, in whole or in part, of any other provision. If a court or administrative body of competent jurisdiction holds any provision of this Agreement to be invalid, illegal, void or less than fully enforceable as to time, scope or otherwise, such provision shall be construed by limiting and reducing it so that such provision is valid, legal and fully enforceable while preserving to the greatest extent permissible the original intent of the parties as to the material terms of this Agreement; the remaining terms and conditions of this Agreement shall not be affected by such alteration, and shall remain in full force and effect.

12.10 Waiver; Remedies. It is agreed that, except as expressly set forth in this Agreement, the rights and remedies herein provided in case of Default or breach by either Landlord or Tenant are cumulative and shall not affect in any manner any other remedies that the non-breaching Party may have by reason of such default or breach. The exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided herein, at law, in equity or otherwise. In addition to, and not in limitation of, the preceding, the Parties acknowledge and agree that there will not be an adequate remedy at law for noncompliance with the provisions of Section 5, and therefore either Party shall have the right to equitable remedies, including, without limitation, injunctive relief and specific performance.

12.11 Notice. All notices or requests that are required or permitted to be given pursuant to this Agreement must be given in writing by certified US mail (postage pre-paid) with return receipt requested or by courier service (charges prepaid), or solely in the case of notice to Landlord by email, to the party to be notified, addressed to such party at the address(es) or email address(es) set forth below, or such other address(es), email address(es) or fax number(s) as such Party may have substituted by written notice (given in accordance with this Section 12.11) to the other Party ("**Notice**"). The sending of such Notice to the proper email address (in the case of email transmission) or the receipt of such Notice (in the case of delivery by first-class certified mail or by courier service) will constitute the giving thereof.

**If to be given to Landlord:**
315 E58 BH, LLC
9 Park Place
Third Floor
Great Neck, NY 11021

And

NAMDAR 315 EAST 58, LLC
150 Great Neck Road
Suite 304
Great Neck, NY 11021

**If to be given to Tenant:**
DISH Wireless L.L.C.
Attn: Lease Administration
5701 South Santa Fe Drive
Littleton, Colorado 80120

12.12 Entire Agreement. This Agreement sets forth the entire, final and complete understanding between the Parties hereto regarding the subject matter of this Agreement, and it supersedes and replaces all previous understandings or agreements, written, oral, or implied, regarding the subject matter of this Agreement made or existing before the date of this Agreement. Except as expressly provided by this Agreement, no waiver or modification of any of the terms or conditions of this Agreement shall be effective unless in writing and signed by both Parties. Any provision of this Agreement that is expressly stated to survive termination or expiration of this Agreement, shall survive the Expiration Date or earlier termination of this Lease.

12.13 Compliance with Law. Each Party shall comply with all applicable statutes, laws, rules, ordinances, codes and governmental or quasi-governmental orders or regulations (in each case, whether federal, state, local or otherwise) and all amendments thereto, now enacted or hereafter promulgated and in force during the Term of this Agreement, a Renewal Term or any extension of either of the foregoing.

12.14 Counterparts. This Agreement may be executed in any number of identical counterparts and, if so executed, shall constitute one agreement, binding on all the Parties hereto, notwithstanding that all the Parties are not signatories to the original or the same counterpart. Execution of this Agreement by facsimile or electronic signature shall be effective to create a binding agreement and, if requested, Landlord and Tenant agree to exchange original signed counterparts in their possession.

12.15 Attorneys' Fees. If an action is brought by either Party for breach of any covenant and/or to enforce or interpret any provision of this Agreement, the prevailing Party as determined by the trier of fact after exhaustion of all appeals shall be entitled to recover its costs, expenses, and reasonable attorneys' fees, both at trial and on appeal, in addition to all other sums allowed by law, as such amounts are determined by the trier of fact after exhaustion of all appeals.

12.16 Incorporation of Exhibits. All exhibits referenced herein and attached hereto are hereby incorporated herein in their entirety by this reference.

[*Remainder of page intentionally left blank. Signature page follows.*]

IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to execute this Agreement as of the Effective Date.

**LANDLORD:**

**315 E58 BH, LLC**

By: DocuSigned by: Steven Kashanian 473978AE0A3640E...

Name: Steven Kashanian

Its: Managing Principal

Date: 3/28/2023

**LANDLORD:**

**NAMDAR 315 EAST 58, LLC**

By: DocuSigned by: Igal Namdar CF1214D60682419...

Name: Igal Namdar

Its: Managing Member

Date: 3/28/2023

**TENANT:**

**DISH WIRELESS, LLC**

By: DocuSigned by: Dave Mayo 2C91432DEAF74BD...

Name: Dave Mayo

Its: Executive Vice President

Date: 3/29/2023

DS SM DS DM

# EXHIBIT A

## LEGAL DESCRIPTION OF PROPERTY

All that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 58th Street, distant 150 feet easterly from the corner formed by the intersection of the northerly side of 58th Street with the easterly side of Second Avenue;

RUNNING THENCE northerly parallel with said easterly side of Second Avenue, 100 feet 4 inches to the center line of the block; thence easterly along said center line of the block and parallel with said northerly side of 58th Street, 25 feet;

THENCE southerly again parallel with said easterly side of Second Avenue, 100 feet 4 inches to the northerly side of 58th Street; and

THENCE westerly along the said northerly side of 58th Street, 25 feet to the point or place of BEGINNING.

EXHIBIT B

SITE PLAN

DocuSign Envelope ID: F9FF4E4A-EC79-4F51-9B5F-022657933DC3



Exhibit B (Page 1 of 4)




**KEY PLAN** 1 LE1
SCALE: NTS




NOTES:
1. LEASE EXHIBITS ARE A CONCEPTUAL DESIGN OF LEASE AGREEMENT ONLY. ACTUAL CONSTRUCTION DOCUMENTS MAY VARY TO COMPLY WITH BUILDING CODES.
2. THE INFORMATION SHOWN IS TAKEN FROM LIMITED FIELD MEASUREMENTS PERFORMED BY "KMB DESIGN GROUP, LLC." DURING SITE VISIT ON 03-11-22.
3. ELECTRIC/ TELCO SERVICES SHALL BE CONFIRMED PRIOR TO CONSTRUCTION DOCUMENT PHASE.
4. 24 HOUR, 7 DAYS PER WEEK ACCESS IS REQUIRED FOR SERVICE TECHNICIAN.

2 0 1 2 4 8 (IN FEET)

2 **ROOF PLAN**
11x17 SCALE: 1/8" = 1'-0" 24x34 SCALE: 1/4" = 1'-0"

OWNERSHIP OF DOCUMENTS: THIS DOCUMENT AND THE IDEAS AND DESIGNS INCORPORATED HEREIN, AS AN INSTRUMENT OF PROFESSIONAL SERVICE, ARE THE PROPERTY OF KMB DESIGN GROUP, LLC AND ARE NOT TO BE USED, IN WHOLE OR IN PART, FOR OTHER PROJECTS WITHOUT THE WRITTEN AUTHORIZATION OF KMB DESIGN GROUP, LLC. IT IS UNLAWFUL FOR ANY PERSON TO AMEND ANY ASPECT OF THESE DRAWINGS UNLESS THEY HAVE THE APPROVAL OF THE LICENSED PROFESSIONAL IN WRITING.

dish wireless.
5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

| REV. | DATE | REVISION DESCRIPTION | DRAWN BY | CHKD. BY |
|---|---|---|---|---|
| B | 03-30-22 | REVISE PER CLIENT COMMENTS | GO | JRB |
| A | 03-22-22 | INITIAL SUBMISSION | RC | JRB |

KMB DESIGN GROUP
kmbdg.com
1800 ROUTE 34, SUITE 209
WALL, NJ 07719
(732) 280-5623

SITE NUMBER:
**NYNYC01803A**

SITE ADDRESS:
**315 EAST 58TH STREET**
**NEW YORK, NY 10021**

DS IN DS SK

KMB JOB NUMBER: **336.0118.001**

DESIGN TYPE: ROOFTOP

SHEET TITLE: KEY & ROOF PLANS

SHEET NUMBER: LE1 REV.: B

L:\336_Dish\336.0118_NYNYC01803_NYC\336.0118.001_NYNYC01803A\336.0118.001_CAD\336.0118.001_Construction\336.0118.001.ANT010.dwg, 3/30/2022 8:34:12 AM, CCetu

DocuSign Envelope ID: F9FF4E4A-EC79-4F51-9B5F-022657933DC3



Exhibit B (Page 2 of 4)

OWNERSHIP OF DOCUMENTS: THIS DOCUMENT AND THE IDEAS AND DESIGNS INCORPORATED HEREIN, AS IN INSTRUMENT OF PROFESSIONAL SERVICE, ARE THE PROPERTY OF KMB DESIGN GROUP, LLC AND ARE NOT TO BE USED, IN WHOLE OR IN PART, FOR OTHER PROJECTS WITHOUT THE WRITTEN AUTHORIZATION OF KMB DESIGN GROUP, LLC. IT IS UNLAWFUL FOR ANY PERSON TO AMEND ANY ASPECT OF THESE DRAWINGS UNLESS THEY HAVE THE APPROVAL OF THE LICENSED PROFESSIONAL IN WRITING.




4 0 2 4 8 (IN FEET)

| 1 | SOUTHEAST ELEVATION |
|---|---|
| 11x17 SCALE: 3/32" = 1'-0" | 24x36 SCALE: 3/16" = 1'-0" |

dish wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

| REV. | DATE | REVISION DESCRIPTION | DRAWN BY | CHKD. BY |
|---|---|---|---|---|
| B | 03-30-22 | REVISE PER CLIENT COMMENTS | GO | JRB |
| A | 03-22-22 | INITIAL SUBMISSION | RC | JRB |

KMB DESIGN GROUP
kmbdg.com
1800 ROUTE 34, SUITE 209
WALL, NJ 07719
(732) 280-5623

SITE NUMBER:
**NYNYC01803A**

SITE ADDRESS:
**315 EAST 58TH STREET**
**NEW YORK, NY 10021**

DS IN DS SK

KMB JOB NUMBER:
**336.0118.001**

DESIGN TYPE:
ROOFTOP

SHEET TITLE:
ELEVATION

SHEET NUMBER: LE2

REV.: B

CGC

L:\336_Dish\336.0118_NYNYC01803_NYC\336.0118.001_NYNYC01803A\336.0118.001_CAD\336.0118.001_Construction\336.0118.001.ANT011.dwg, 3/30/2022 8:34:18 AM, CCetu

DocuSign Envelope ID: F9FF4E4A-EC79-4F51-9B5F-022657933DC3



Exhibit B (Page 3 of 4)




**NOTE:**
FINAL EQUIPMENT CABINET TYPE AND CONFIGURATION WITHIN LEASE SPACE MAY VARY AT TIME OF CONSTRUCTION.

| 1 | EQUIPMENT PLAN |
|---|---|
| 11x17 SCALE: 3/8" = 1'-0" | 24x36 SCALE: 3/4" = 1'-0" |

OWNERSHIP OF DOCUMENTS: THIS DOCUMENT AND THE IDEAS AND DESIGNS INCORPORATED HEREIN, AS AN INSTRUMENT OF PROFESSIONAL SERVICE, ARE THE PROPERTY OF KMB DESIGN GROUP, LLC AND ARE NOT TO BE USED, IN WHOLE OR IN PART, FOR OTHER PROJECTS WITHOUT THE WRITTEN AUTHORIZATION OF KMB DESIGN GROUP, LLC. IT IS UNLAWFUL FOR ANY PERSON TO AMEND ANY ASPECT OF THESE DRAWINGS UNLESS THEY HAVE THE APPROVAL OF THE LICENSED PROFESSIONAL IN WRITING.

dish wireless.
5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

CGC

| REV. | DATE | REVISION DESCRIPTION | DRAWN BY | CHKD. BY |
|---|---|---|---|---|
| B | 03-30-22 | REVISE PER CLIENT COMMENTS | GO | JRB |
| A | 03-22-22 | INITIAL SUBMISSION | RC | JRB |

KMB DESIGN GROUP
kmbdg.com
1800 ROUTE 34, SUITE 209
WALL, NJ 07719
(732) 280-5623

SITE NUMBER:
**NYNYC01803A**

SITE ADDRESS:
**315 EAST 58TH STREET**
**NEW YORK, NY 10021**

DS IN DS Sk

KMB JOB NUMBER:
**336.0118.001**

DESIGN TYPE:
ROOFTOP

SHEET TITLE:
EQUIPMENT PLAN

SHEET NUMBER: LE3

REV.: B

L:\336_Dish\336.0118_NYNYC01803_NYC\336.0118.001_NYNYC01803A\336.0118.001_CAD\336.0118.001_Construction\336.0118.001.ANT012.dwg, 3/30/2022 8:34:23 AM, CCretu

Exhibit B (Page 4 of 4)




| 1 | UTILITY PLAN (CELLAR) |
|---|---|
| 11x17 SCALE: 3/16" = 1'-0" | 24x36 SCALE: 3/8" = 1'-0" |

dish wireless.
5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

CGC

| REV. | DATE | REVISION DESCRIPTION | DRAWN BY | CHKD. BY |
|---|---|---|---|---|
| B | 03-30-22 | REVISE PER CLIENT COMMENTS | GO | JRB |
| A | 03-22-22 | INITIAL SUBMISSION | RC | JRB |

KMB DESIGN GROUP
kmbdg.com
1800 ROUTE 34, SUITE 209
WALL, NJ 07719
(732) 280-5623

SITE NUMBER:
**NYNYC01803A**

SITE ADDRESS:
**315 EAST 58TH STREET**
**NEW YORK, NY 10021**

DS IN DS Sk

KMB JOB NUMBER:
**336.0118.001**

DESIGN TYPE:
ROOFTOP

SHEET TITLE:
UTILITY PLAN
(CELLAR)

SHEET NUMBER: LE4
REV.: B

**OWNERSHIP OF DOCUMENTS:** THIS DOCUMENT AND THE IDEAS AND DESIGNS INCORPORATED HEREIN, AS AN INSTRUMENT OF PROFESSIONAL SERVICE, ARE THE PROPERTY OF KMB DESIGN GROUP, LLC AND ARE NOT TO BE USED, IN WHOLE OR IN PART, FOR OTHER PROJECTS WITHOUT THE WRITTEN AUTHORIZATION OF KMB DESIGN GROUP, LLC. IT IS UNLAWFUL FOR ANY PERSON TO AMEND ANY ASPECT OF THESE DRAWINGS UNLESS THEY HAVE THE APPROVAL OF THE LICENSED PROFESSIONAL IN WRITING.

L:\336_Dish\336.0118_NYNYC01803_NYC\336.0118.001_NYNYC01803A\336.0118.001_CAD\336.0118.001_Construction\336.0118.001.E010.dwg, 3/30/2022 8:34:27 AM, CCretu