**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| DISH DBS Corporation,<br>DISH Wireless L.L.C., *et al.*, [1] | ) | Case No. 26-90627 (CML) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Docket Nos. 836, 1361** |

**DISH DBS CORPORATION'S OMNIBUS OPPOSITION TO EMERGENCY MOTIONS FILED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

DISH DBS Corporation, as a debtor-in-possession in these jointly administered cases ("DBS"), hereby files this omnibus opposition (the "Opposition") to (i) the *Emergency Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Prosecute Certain Estate Claims on Behalf of DWLLC's Estate* (ECF 836) (the "Standing Motion"), which attaches a proposed complaint (the "Proposed Complaint"), and (ii) emergency consideration of the *Emergency Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Appointing A Chapter 11 Trustee for the DISH Wireless Debtors Pursuant to Bankruptcy Code Section 1104(a) or, Alternatively (II) Terminating the DISH Wireless Debtors' Exclusive Periods Pursuant to Bankruptcy Code Section 1121(d)* (ECF 1361) (the "Trustee Motion" and with the Standing Motion, the "Emergency Motions"), filed by the Official

[1] The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s (collectively, with their other debtor-affiliates in the above-captioned bankruptcy cases, the "Debtors") respective tax identification numbers are 8967 and 6388. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/DBS. The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

Committee of Unsecured Creditors (the "Committee"). In support of this Opposition, DBS respectfully states as follows:

**OPPOSITION**

The $8.8 billion Intercompany Loan Claim[2] is by far the largest claim in the DWLLC estate. DBS has significant legal and equitable interests therein, which DBS assigned to the DWLLC Claims Trust[3] for the ratable benefit of the holders of DBS Notes as part of the transactions contemplated under DBS's Restructuring Support Agreement, dated March 19, 2026 (ECF 7-2) (the "RSA"). Not only does DBS have a contractual obligation under the RSA to object to any motion seeking entry of an order that is inconsistent with the terms of the RSA or any of the transactions contemplated thereunder, *see* RSA § 7.2(a)(iii), but it also benefits from the distributions the DWLLC Claims Trust will receive on account of the Intercompany Loan Claim. Specifically, those distributions will be applied to redeem DBS Notes, thereby reducing reorganized DBS's debt obligations. *See* Claims Trust Agreement § 5.01 (Distributions). Moreover, DBS holds a residual interest in the Intercompany Loan Claim, entitled to distributions in excess of amounts needed to redeem all of DBS's 2028 Senior Secured Notes, 2028 Unsecured Notes, and 2029 Unsecured Notes per the terms of the Claims Trust Agreement. *See id.*

Allowance of the Intercompany Loan Claim is the subject of separate proceedings before this Court (the "Intercompany Loan Proceedings"). But, the claims that the Committee is

---

[2] "Intercompany Loan Claim" means the claims against DISH Wireless L.L.C. ("DWLLC") in respect of the intercompany loans extended from time to time by DISH Network Corporation ("DNC") to DWLLC (the "Intercompany Loan"), which were memorialized in the respective companies' books and records and in the August 22, 2025 Loan Agreement between DWLLC and DNC (as amended, the "Intercompany Loan Agreement"). DNC subsequently assigned the Intercompany Loan Claim to DBS, which then granted this asset to the DWLLC Claims Trust on the terms set forth therein.

[3] Capitalized terms not defined herein have the meanings given to them in the *Declaration of John Swieringa in Support of Chapter 11 Petitions and Requests for First Day Relief* (ECF 19).

requesting standing to pursue (the "Proposed Claims") have in their sights disallowance of the Intercompany Loan Claim. Indeed, the Proposed Complaint seeks a judgment "[d]isallowing any claims in respect of the Alleged DWLLC Intercompany Loan pursuant to section 502(d) of the Bankruptcy Code[.]" Proposed Complaint at 23. Moreover, the Committee's proposed constructive fraudulent transfer claim is premised on prevailing in the Intercompany Loan Proceedings, namely, the bid to recharacterize the largest unsecured claim of DWLLC as equity. *See* Proposed Complaint ¶ 57; Standing Motion ¶ 57.[4]

DBS submits that the Standing Motion should be denied because it fails to establish either of the conditions necessary for the Court to grant the Committee derivative standing. *See La. World Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988) (derivative standing may be granted only where (i) the proposed claims are colorable and (ii) the debtors have unjustifiably refused to pursue them).

[4] As DBS will demonstrate in connection with the Intercompany Loan Proceedings, the Intercompany Loan is not subject to recharacterization as equity. The Fifth Circuit has held that any power to recharacterize debt as equity may only derive from state law, not from federal common law or the bankruptcy court's purported equitable powers under Bankruptcy Code section 105. *See In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011). Significantly, neither of the potentially applicable state laws—New York and Colorado—recognizes a claim for "equity recharacterization." Instead, both states rely on basic principles of contract law, under which the intent of the parties to an agreement—as gleaned primarily from the plain text of their agreement—governs. *See, e.g., In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 1295928, at *12 (Bankr. S.D.N.Y. Apr. 29, 2022) ("[T]he Court finds no merit to the Committee's assertion that in addressing that issue [of recharacterization], it should look behind the plain language of the agreements and undertake an analysis of the 'true character' of the agreements akin to that conducted by courts applying the *AutoStyle* factors in determining whether to recharacterize debt as equity. . . . [T]he Court is not aware of any New York state court that has applied the *AutoStyle* factors in assessing the 'true character' of a purported loan agreement and finds no grounds for doing so.").

As DBS will demonstrate in connection with the Intercompany Loan Proceedings, the Intercompany Loan Agreement (which is governed by New York law) expressly memorialized and ratified the parties' longstanding intent that the advances were loans. And even if the Court were to look beyond the four corners of the Intercompany Loan Agreement, overwhelming contemporaneous evidence, including book entry evidence and financial records, demonstrates that the Intercompany Loan was debt. In any event, as noted, the issues of the validity, characterization, priority, and allowance of the Intercompany Loan Claim should and will be adjudicated in the Intercompany Loan Proceedings, not in connection with this Standing Motion. DBS reserves all rights.

### A. The Standing Motion Is, At Best, Premature

As a threshold matter, the Committee's "emergency" Standing Motion represents an effort by an ill-informed constituency to rush to judgment. Typically, motions for derivative standing follow months of pre-litigation discovery, learning, discussions, development of a cost-benefit analysis, and even negotiations with a debtor in possession. In contrast, the Committee lodged the Standing Motion 38 days after the Petition Date, without any informed review of the facts, let alone a reasonable debtor-creditor dialogue about what would be in the best interests of the estate. The Committee proverbially shot first and sought to ask questions later, all while incurring substantial fees chargeable to the DWLLC estate. This is not the conduct of a responsible estate fiduciary; it is the opposite.

Given the structure and text of the Bankruptcy Code, contested matters concerning derivative standing in Chapter 11 should turn on whether an estate fiduciary's refusal to pursue a (colorable) claim is *unjustified* in its determination. Here, to DBS's knowledge, the debtor in possession has not even made its determination. Upon information and belief, DWLLC's Special Committee either only days ago issued a report regarding its investigation of potential claims held by DWLLC against EchoStar and its subsidiaries or is still in the process of finalizing its conclusions—DBS is of course not privy to the inner workings of the Special Committee. For its part, DBS—along with its affiliates, EchoStar and DNC—have raised substantial defenses to the Proposed Claims that should be considered by anyone analyzing these issues.[5] As relevant to the Standing Motion, to DBS's knowledge, DWLLC has never *refused* to investigate, evaluate, or, if

[5] A copy of the August 26, 2026 letter from DBS, EchoStar, and DNC to the Special Committee is attached hereto as Exhibit A.

warranted, prosecute any putative claims. To the contrary, DWLLC's Special Committee has been actively engaged in reviewing precisely these issues.

Meanwhile, DBS understands that, as recently as September 1, 2026, the Special Committee notified the Committee of its determination not to proceed with the Stalking Horse APA's contemplated sale of DWLLC's litigation claims, including the Proposed Claims. Thus, any purported "emergency" associated with the Standing Motion is non-existent.

The Committee should withdraw without prejudice, or at least hold in abeyance, its Standing Motion in light of the Special Committee's position. The Committee may not like the pace, sequencing, or priorities under which DWLLC is administering its estate, but those are not grounds for a grant of derivative standing. Nor is there any basis for the Committee's implicit suggestion that the Proposed Claims are depreciating assets requiring immediate pursuit. No applicable statute of limitations is at risk of expiring during the pendency of these cases, the Special Committee is actively evaluating the claims, and the debtor in possession has in no way abdicated its responsibilities. There are no melting ice cubes here—only a Committee unwilling to await the results of the process already underway.

While one of the two alleged exigencies purportedly justifying the Committee's emergency motion—the contemplated sale of the Proposed Claims—has now been rendered moot, the other, grounded in Bankruptcy Code section 502(d), is legally flawed. *See* Standing Motion ¶ 86. According to the Committee, it is seeking authority to bring the Proposed Claims "now" so that "it can make the threshold arguments as appropriate in respect of the Bankruptcy Code section 502(d)" in connection with the Intercompany Loan Proceedings. *Id.* But, as even the Committee itself acknowledges in the Proposed Complaint, a claim is not subject to disallowance under section

502(d) "unless and until the Defendants satisfy the *judgments* against them." Proposed Complaint at 23 (emphasis added).

Consistent with due process and the text of the Bankruptcy Code, under section 502(d), the mere assertion of "threshold arguments" in support of an avoidance action is of no legal significance. The Fifth Circuit, of course, has held that section 502(d) may be applied to disallow a claim only ***after*** the creditor is first adjudged liable, and even then "[t]he creditor is still entitled to a reasonable time after the final determination until section 502(d) is kicked into effect." *Campbell v. United States (In re Davis)*, 889 F.2d 658, 662 (5th Cir. 1989); *see id.* at 661 ("The legislative history and policy behind Section 502(d) illustrates that the section is intended to have the coercive effect of insuring compliance with judicial orders."); *see also In re IFS Fin. Corp.*, 2008 WL 4533713, at *5 (Bankr. S.D. Tex. Oct. 2, 2008) (Isgur, J.) ("This Court is bound by the Fifth Circuit. The Fifth Circuit holds that § 502(d) operates to enforce orders and judgments, not to disallow claims based on theoretically avoidable transfers when no liability has been established and when no liability can be established."). Therefore, neither the Committee nor any other objector in the Intercompany Loan Proceedings can invoke section 502(d) to disallow the Intercompany Loan Claim unless and until there is a judgment. *See Holloway v. Internal Revenue Serv. (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003) (noting that a court can determine if section 502(d) "should be used to disallow a claim" only "after the entity is first adjudged liable"). Mere commencement of an adversary proceeding is not sufficient; section 502(d) cannot provide a basis for the Committee's requested emergency relief.

**B. The Proposed Claims Are Not Colorable**

Even if the Special Committee had unjustifiably refused to pursue the Proposed Claims or the Committee faced true exigencies to file the Proposed Complaint (neither of which has been established), the Committee still should not be granted standing to do so.

The Proposed Claims are not colorable. The Intercompany Loan Claim cannot be recharacterized as equity, notwithstanding the Committee's request that the Court act pursuant to a federal common law doctrine appropriately struck down by the Fifth Circuit. *See* n.4; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) ("Nor would we adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law."). This all but eliminates any fraudulent transfer claim. *See* 11 U.S.C. § 548(d)(2)(A) ("value" includes "satisfaction . . . of a present or antecedent debt"); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 518 (Bankr. D. Del. 2010) ("Where a bona fide antecedent debt exists, a debtor's payment on account of that creditor's claim, even if it has the result of preferring that creditor over others, is not by itself a fraudulent transfer.").

Moreover, any preference claim, among other deficiencies, is subject to a dispositive defense under Bankruptcy Code section 547(c)(4) based upon the subsequent new value that DNC, together with EchoStar and their affiliates, provided to DWLLC and its creditors by establishing the $2.4 billion FCC Trust. *See* 11 U.S.C. § 547(c)(4) (a transfer is not an avoidable preference if it was made "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor"); *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 257 (8th Cir. 1996) (noting that the "central inquiry" under section 547(c)(4) is determining whether the new value was advanced to benefit the debtor, such that the "debtor's assets have not been depleted to the disadvantage of other creditors"). In bankruptcy, cash is king and $2.4 billion of it has been made available by DNC and its non-debtor affiliates for the benefit of DWLLC's creditors—the very creditors that the Committee represents. Indeed the same creditors asked for the money. *See* Ex. A, Aug. 26, 2026 Letter to Special Committee at 6, n.7

Moreover, even assuming the Proposed Claims were colorable, the estate has already received more than the functional equivalent of any potential avoidance recovery. The $2.4 billion FCC Trust—established and funded for the direct benefit of DWLLC's creditors—constitutes a single satisfaction of any recovery available under section 550(a). *See id.* at 8-9; 11 U.S.C. § 550(d) ("The trustee is entitled to only a single satisfaction under subsection (a) of this section."). The Committee cannot justify the cost and disruption of avoidance litigation when the estate's creditors already have access to recovery that likely exceeds their claims.

### C. In Any Event, The Proposed Claims Do Not Survive The Requisite Cost-Benefit Analysis

Even if any of the Proposed Claims were colorable (they are not), the Court must "weigh the probability of success and financial recovery, as well as the anticipated costs of litigation" as part of a cost-benefit analysis to determine whether the pursuit of the Proposed Claims is likely to benefit the estate. *See* Standing Motion ¶ 39 (quoting *La. Dep't of Env't Quality v. Tidewater Landfill LLC (In re Tidewater Landfill LLC)*, 674 B.R. 218, 226 (Bankr. E.D. La. 2025)) (internal quotation marks omitted). Even without accounting for estimated costs of litigation, which, if the burn rate in these chapter 11 cases is any indication, will be significant, any resulting financial recovery to holders of allowed claims of DWLLC (excluding the beneficiaries of the Intercompany Loan Claim) (the "<u>Non-Intercompany GUCs</u>") will be relatively insignificant, if not zero.

In the unlikely event the Committee prevailed and recovered under section 550(a), the Intercompany Loan Claim assertable against DWLLC will be increased by $5 billion—the amount by which the Intercompany Loan Claim was reduced in connection with the Boost Transfer (as that term is defined in the Standing Motion) by operation of section 502(h) of the Bankruptcy Code. *See* 11 U.S.C. § 502(h) ("A claim arising from the recovery of property under section…550" shall be determined and allowed or disallowed as if such claim arose before the petition date). In other

words, the $8.8 billion Intercompany Loan Claim would be reinstated to its full amount and the hypothetical petition date amount would be $13.8 billion.

As discussed in the Debtors' *First Omnibus Objection to the Claims of Crown Castle, American Tower, and SBA* (ECF 904), certain of the tower lessors' claims are subject to the statutory cap applicable to real property leases under Bankruptcy Code section 502(b)(6). Once the tower lessors' claims are properly liquidated under the Bankruptcy Code, DWLLC's Non-Intercompany GUC claims pool will amount to no more than approximately $1.7 billion.[6] The $2.4 billion FCC Trust therefore would be more than sufficient to fund a full recovery for all Non-Intercompany GUCs. Assuming these creditors are rational actors and opt for such full recovery, ***100%*** of the recovery on the Committee's proposed avoidance actions would fund recoveries on account of the Intercompany Loan Claim. The Non-Intercompany GUCs—who support the Standing Motion—would receive absolutely no benefit. In contrast, none of the beneficiaries of the Intercompany Loan Claim would want estate professionals to fund expensive, protracted, and indeed wasteful litigation that, if successful, would only roundtrip value (net of administrative expenses).[7]

Even if the Non-Intercompany GUCs (inexplicably) forgo a full recovery from the FCC Trust, the vast majority of the proceeds of any successful avoidance action would *still* be used to

---

[6] *See Disclosure Statement for the Second Modified Joint Prepackaged Chapter 11 Plan of DISH DBS Corporation, DISH Wireless L.L.C., and Their Respective Affiliated Debtors and Debtors in Possession* (ECF 912) at 30-31 & n.26.

[7] With respect to non-debtor EchoStar's Application for Review (referenced *ad nauseum* in the Trustee Motion), just like court orders that are subject to appeal, unless and until the FCC's July 30, 2026 order is reversed, that order is the law of the land, which DWLLC may (and indeed must) rely upon in prosecuting its plan. And, just like the Committee's members are free—when they act in their individual capacity to advocate for outcomes that are not in DWLLC's estate's best interests (*see, e.g.*, Crown Castle and the other tower lessors opposing the application of § 502(b)(6) to their self-interested claims)—Mr. Blum is free (indeed, duty bound) to act in EchoStar's best interests when he is acting on behalf of EchoStar.

fund the Intercompany Loan Claim recovery. That is because the Intercompany Loan Claim, reverting to $13.8 billion, would represent nearly 90% of the $15.5 billion DWLLC general unsecured creditor claims pool (*i.e.*, $1.7 billion Non-Intercompany GUCs plus the $13.8 billion Intercompany Loan Claim). In other words, the beneficiaries of the Intercompany Loan Claim would receive approximately 90% of any hypothetical litigation recovery.

Even if the tower lessors' claims are not capped under section 502(b)(6) and instead are allowed in their full amount, the Intercompany Loan Claim would still represent approximately 73% of the total general unsecured creditor claims pool (*i.e.*, $13.8 billion out of $18.8 billion). The beneficiaries of the Intercompany Loan Claim would receive nearly three-quarters of any litigation recovery.

Finally, it must be noted that the value of litigation seeking to unwind the Boost Transfer (even before risk-adjusting for the applicable defenses or credits for costs subsequently expended to preserve Boost's operations) is far less than the $5 billion reduction in the Intercompany Loan Claim. The Committee has sought standing before even beginning to understand that hypothetical value to DWLLC in the event Boost were ordered to be returned to the DWLLC estate, including the amounts needed to preserve the operations of Boost.

Put simply, even a successful prosecution of the Proposed Claims would provide little to no benefit to the creditors the Committee purports to represent and who appear to clamor for litigation for the sake of litigation. No rational fiduciary would determine, in the exercise of business judgment, to launch litigation in these circumstances—at least not without fully and fairly exploring these important considerations.

**D. Opposition To Emergency Consideration Of The Trustee Motion**

In continuing its pattern of demanding extraordinary relief on an "emergency" basis—despite facing no exigencies warranting such emergency consideration—the Committee has now

filed an "emergency" motion seeking the appointment of a chapter 11 trustee for the DISH Wireless Debtors (as that term is defined in the Trustee Motion) or, in the alternative, termination of the DISH Wireless Debtors' exclusive periods under Bankruptcy Code section 1121(d). As with its Standing Motion, the Committee can cite to no legitimate basis for emergency consideration of its request to strip the debtor in possession of its statutory responsibilities and its exclusive right to file a plan other than the Committee's dissatisfaction with the "current posture" of these cases. Trustee Motion ¶ 132.

The Committee's purported basis for requiring the appointment of a chapter 11 trustee (or termination of exclusivity) by September 23 is DISH Wireless Debtors' dwindling liquidity. But the remedy the Committee seeks would only compound the problem: the appointment of a chapter 11 trustee—or termination of exclusivity—would itself introduce significant disruption and cost to the DISH Wireless Debtors' estates, exacerbating rather than ameliorating the very liquidity pressures that the Committee invokes. Notably, the Committee is not seeking the conversion of the DISH Wireless Debtors' cases to chapter 7—a remedy that would actually address a true liquidity crisis—perhaps because it would result in the disbandment of the Committee. Nor does the Committee acknowledge its own role in the "mount[ing]…professional and advisor fees." *Id.* Yet the Standing Motion, which is at best premature, and the Committee's hundreds of Rule 2004 requests served on the Debtors and numerous third parties, are but two examples of the inefficiency and costliness directly attributable to the Committee's litigious approach to these cases. The Committee cannot manufacture urgency through its own relentless litigation activity and then invoke the resulting administrative burn rate as grounds for the extraordinary relief it now seeks on an emergency basis.

Parties in interest such as DBS, who holds an interest in the largest claim against the DWLLC estate, should have a full and fair opportunity to be heard in connection with the Trustee Motion.

* * *

For the reasons stated above, both Emergency Motions of the Committee should be summarily denied. However, if the Court believes it would be appropriate to hold a status conference before considering these motions, as was requested last night by DWLLC's Special Committee (ECF 1363), DBS would be willing to participate in whatever course the Court deems appropriate under the circumstances of DWLLC's liquidity. DBS was not furnished with a copy of the Special Committee's report but stands ready to address any questions the Court may have.

## RESERVATION OF RIGHTS

Nothing in this Opposition shall constitute or be deemed a waiver of any rights, claims, remedies, arguments, defenses, or positions of DBS or its affiliates, all of which are expressly reserved. Specifically, DBS files this Opposition without prejudice to, and expressly reserves, all of its rights, claims, defenses, objections, and remedies of any kind, including with respect to the validity, characterization, amount, priority, allowance, treatment, and voting of the Intercompany Loan Claim and any of the Proposed Claims. DBS further reserves its rights to raise additional arguments and defenses with respect to the Trustee Motion. Nothing in or omitted from this Opposition shall constitute a waiver of any of the foregoing rights.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, DBS respectfully requests that the Court (i) deny the Standing Motion, (ii) decline to hear the Trustee Motion on an emergency basis, and (iii) grant such other and further relief as the Court deems just, proper, and equitable.

Dated: September 8, 2026
Houston, Texas

Respectfully submitted,

By: */s/ Cameron M. Kelly*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Cameron M. Kelly (TX 24120936)
700 Louisiana St., Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7011
Email: cameronkelly@quinnemanuel.com

- and -

Susheel Kirpalani (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Kate Scherling (admitted *pro hac vice*)
Zachary Russell (admitted *pro hac vice*)
Emma McCabe (admitted *pro hac vice*)
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com
zacharyrussell@quinnemanuel.com
emmamccabe@quinnemanuel.com

*Proposed Special Litigation and Conflicts Counsel to Debtor DISH DBS Corporation*

**CERTIFICATION OF SERVICE**

I hereby certify that on September 8, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

By: */s/ Cameron M. Kelly*
Cameron M. Kelly (TX 24120936)