**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| DISH DBS CORPORATION,<br>DISH WIRELESS L.L.C., *et al.*,[1] | ) | Case No. 26-90627 (CML) |
| Debtors. | ) | (Jointly Administered) |

# SECOND MODIFIED JOINT PREPACKAGED CHAPTER 11 PLAN OF DISH DBS CORPORATION AND CERTAIN OF ITS SUBSIDIARIES


**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Email: charles.koster@whitecase.com

Ronald K. Gorsich (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Email: rgorsich@whitecase.com
doah.kim@whitecase.com

**WHITE & CASE LLP**
Thomas E Lauria (Texas Bar No. 11998025)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Email: tlauria@whitecase.com

Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
300 N. LaSalle Drive
Chicago, Illinois 60654
Telephone: (312) 881-5400
Email: mlinder@whitecase.com
laura.baccash@whitecase.com

David M. Turetsky (admitted *pro hac vice*)
Samuel P. Hershey (S.D. Texas Fed. No. 3465170)
Andrea Amulic (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: david.turetsky@whitecase.com
sam.hershey@whitecase.com
andrea.amulic@whitecase.com

*Proposed Counsel to the Debtors and Debtors in Possession*


[1] The last four digits of DISH DBS Corporation's and DISH Wireless L.L.C.'s respective tax identification numbers are 8967 and 6388. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/DBS. The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

# TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** .......... **1**
A. Defined Terms. .......... 1
B. Rules of Interpretation. .......... 15
C. Computation of Time. .......... 16
D. Governing Law. .......... 16
E. Reference to Monetary Figures. .......... 16
F. Controlling Document. .......... 16
G. Consultation, Notice, Information, and Consent Rights. .......... 16

**ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS** .......... **17**
A. Administrative Claims. .......... 17
B. Professional Compensation. .......... 17
C. Priority Tax Claims. .......... 19
D. U.S. Trustee. .......... 19
E. Ad Hoc Group Professional Fees. .......... 19
F. Indenture and DWLLC Claims Trust Trustee Fees and Expenses. .......... 20

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .......... **21**
A. Classification of Claims and Interests. .......... 21
B. Treatment of Claims and Interests in the DBS Debtors. .......... 22
C. Special Provision Governing Unimpaired Claims. .......... 29
D. Elimination of Vacant Classes. .......... 29
E. Voting Classes; Presumed Acceptance by Non-Voting Classes. .......... 30
F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .......... 30
G. Controversy Concerning Impairment. .......... 30

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .......... **30**
A. General Settlement of Claims and Interests. .......... 30
B. Sources of Plan Consideration. .......... 31
C. Restructuring Transactions .......... 31
D. Director, Officer, and Manager Liability Insurance. .......... 32
E. Cancellation of Notes, Instruments, Certificates, and Other Documents. .......... 32
F. Corporate Existence. .......... 33
G. Corporate Action. .......... 34
H. The Reorganized DBS Debtors .......... 35
I. Vesting of Assets in Reorganized DBS Debtors. .......... 35
J. Effectuating Documents; Further Transactions. .......... 35
K. Section 1146 Exemption. .......... 35
L. Certain Securities Law Matters. .......... 36
M. Preservation of Causes of Action. .......... 36
N. Closing the Chapter 11 Cases. .......... 37

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......... **37**
A. Assumption and Rejection of Executory Contracts and Unexpired Leases. .......... 37
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases. .......... 38
C. Cure of Defaults for Assumed Contracts and Leases. .......... 40
D. Preexisting Obligations to the DBS Debtors Under Executory Contracts and Unexpired Leases. .......... 41
E. Indemnification Obligations. .......... 41
F. Insurance Policies. .......... 41

G. Modifications, Amendments, Supplements, Restatements, or Other Agreements. ....42
H. Reservation of Rights. ....42
I. Nonoccurrence of Effective Date. ....42
J. Contracts and Leases Entered Into After the Petition Date. ....42

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ....43**
A. Timing and Calculation of Amounts to Be Distributed. ....43
B. Disbursing Agent. ....43
C. Rights and Powers of Disbursing Agent. ....44
D. Delivery of Distributions and Undeliverable or Unclaimed Distributions. ....44
E. Distributions to Holders of Allowed DBS Notes Claims. ....45
F. Compliance with Tax Requirements/Allocations. ....45
G. Allocation of Plan Distributions Between Principal and Interest. ....46
H. No Postpetition Interest on Claims. ....46
I. Foreign Currency Exchange Rate. ....46
J. Setoffs and Recoupment. ....47
K. Claims Paid or Payable by Third Parties. ....47

**ARTICLE VII. [RESERVED.] ....48**

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ....48**
A. Discharge of Claims and Termination of Interests and Intercompany Interests. ....48
B. Release of Liens. ....49
C. Releases by the DBS Debtors. ....50
D. Releases by the DBS Debtors, EchoStar, DNC, and the Specified Non-Debtor Affiliates. ....52
E. Releases by the Consenting Creditors. ....53
F. Releases by Holders of Claims, Interests and Intercompany Interests. ....54
G. Exculpation. ....56
H. Injunction. ....57
I. Protection Against Discriminatory Treatment. ....59
J. Subordination Rights. ....59
K. Document Retention. ....59
L. Reimbursement or Contribution. ....59

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ....60**
A. Conditions Precedent to the Effective Date. ....60
B. Waiver of Conditions. ....61
C. Substantial Consummation. ....61
D. Effect of Non-Occurrence of Conditions to the Effective Date. ....61

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....62**
A. Modifications and Amendments. ....62
B. Effect of Confirmation on Modifications. ....62
C. Revocation or Withdrawal of the Plan. ....62

**ARTICLE XI. RETENTION OF JURISDICTION ....63**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ....65**
A. Immediate Binding Effect. ....65
B. Additional Documents. ....65
C. Payment of Statutory Fees. ....66
D. Dissolution of Statutory Committees. ....66
E. Reservation of Rights. ....66
F. Successors and Assigns. ....66
G. Notices. ....67
H. Enforcement of Confirmation Order. ....68

I. Term of Injunctions or Stays. ....................68
J. Entire Agreement. ....................68
K. Exhibits. ....................69
L. Nonseverability of Plan Provisions. ....................69
M. Votes Solicited in Good Faith. ....................69
N. Waiver. ....................69

# INTRODUCTION

DISH DBS Corporation and its DBS Debtor Affiliates hereby propose this Plan for the treatment and resolution of the outstanding Claims against, and Interests in, the DBS Debtors. Capitalized terms used in this Plan shall have the meanings set forth in Article I.A. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each DBS Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each DBS Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III shall be deemed to apply separately with respect to each DBS Debtor, as applicable. This Plan does not contemplate substantive consolidation of any of the DBS Debtors. Reference is made to the Disclosure Statement for a discussion of the DBS Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, the transactions under the Plan, and certain related matters. All exhibits, schedules, and supplements to this Plan, including the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019, and the terms and conditions set forth in the Restructuring Support Agreement and this Plan, the DBS Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan before its substantial consummation.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DBS DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

# ARTICLE I.
# DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

## A. Defined Terms.

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1. "*2026 Senior Secured Notes*" means the 5.25% Senior Secured Notes due 2026 issued by DBS under the 2026 Senior Secured Notes Indenture.

2. "*2026 Senior Secured Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2026 Senior Secured Notes or the 2026 Senior Secured Notes Indenture, arising under, arising from, or relating to the 2026 Senior Secured Notes or the 2026 Senior Secured Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

3. "*2026 Senior Secured Notes Indenture*" means that certain Secured Indenture, dated as of November 26, 2021, by and among DISH DBS Corporation, the guarantors party thereto, and Wilmington Savings Society, FSB as successor trustee, and U.S. Bank National Association, as collateral agent, governing the 2026 Senior Secured Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

4. "*2028 and 2029 Notes*" means, collectively, the 2028 Senior Notes, the 2028 Senior Secured Notes, and the 2029 Senior Notes.

5. "*2028 Senior Notes*" means the 7.375% Senior Notes due 2028 issued by DBS under the 2028 Senior Notes Indenture.

6. "*2028 Senior Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2028 Senior Notes or the 2028 Senior Notes Indenture, arising under, arising from, or relating to the 2028 Senior Notes or the 2028 Senior Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

7. "*2028 Senior Notes Indenture*" means that certain Indenture, dated as of July 1, 2020, by and among DISH DBS Corporation, the guarantors party thereto, and Wilmington Savings Society, FSB as successor trustee, and U.S. Bank National Association, as collateral agent, governing the 2028 Senior Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

8. "*2028 Senior Secured Notes*" means the 5.75% Senior Secured Notes due 2028 issued by DBS under the 2028 Senior Secured Notes Indenture.

9. "*2028 Senior Secured Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2028 Senior Secured Notes or the 2028 Senior Secured Notes Indenture, arising under, arising from, or relating to the 2028 Senior Secured Notes or the 2028 Senior Secured Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

10. "*2028 Senior Secured Notes Indenture*" means that certain Secured Indenture, dated as of November 26, 2021, by and among DISH DBS Corporation, the guarantors party thereto, and Wilmington Savings Society, FSB, as successor trustee, and U.S. Bank National Association, as collateral agent, governing the 2028 Senior Secured Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

11. "*2029 Senior Notes*" means the 5.125% Senior Notes due 2029 issued by DBS under the 2029 Senior Notes Indenture.

12. "*2029 Senior Notes Claim*" means any Claim, against any DBS Debtor that is an obligor or guarantor with respect to the 2029 Senior Notes or the 2029 Senior Notes Indenture, arising under, arising from, or relating to the 2029 Senior Notes or the 2029 Senior Notes Indenture, including any Claim for principal, interest, fees, costs, expenses, and any other amounts due thereunder.

13. "*2029 Senior Notes Indenture*" means that certain Indenture, dated as of May 24, 2021, by and among DISH DBS Corporation, the guarantors party thereto, and U.S. Bank National Association, as trustee, governing the 2029 Senior Notes, as amended, amended and restated, supplemented, or otherwise modified from time to time.

14. "*Ad Hoc Group Professional Fees*" means (x) all reasonable and documented professional fees and expenses incurred by Milbank LLP, in its capacity as counsel to certain Consenting Creditors, and any local counsel or other advisor engaged by Milbank LLP on behalf of the Consenting Creditors (i) following the Agreement Effective Date (as defined in the Restructuring Support Agreement) or (ii) in connection with the Chapter 11 Cases, (y) the DBS Claims Trust Special Counsel Fees, and (z) the DBS Claims Trust Indemnity, which shall in each case be payable by the DBS Debtors, EchoStar, or DNC on a current basis during the pendency of the Chapter 11 Cases; provided that (a) the Ad Hoc Group Professional Fees (excluding the DBS Claims Trust Special Counsel Fees and the DBS Claims Trust Indemnity) payable by the DBS Debtors, EchoStar, or DNC through the date that is 180 days after the Petition Date shall not exceed $10,000,000 in the aggregate, (b) all reasonable and documented Ad Hoc Group Professional Fees incurred during the pendency of the Chapter 11 Cases after the date that is 180 days after the Petition Date shall be payable on a current basis and shall not be subject to any cap, and (c) unless otherwise expressly agreed, neither the DBS Debtors, DNC, nor EchoStar shall have any obligation to pay any fees or expenses of Lazard Freres & Co. LLC incurred on or following the Petition Date. For the avoidance of doubt, neither the DBS Claims Trust Special Counsel Fees nor the DBS Claims Trust Indemnity shall be subject to the cap set forth in the foregoing clause (b).

15. "*Administrative Claim*" means any Claim against any of the DBS Debtors for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the DBS Estates; (b) Allowed Professional Fee Claims; (c) the Ad Hoc Group Professional Fees; (d) any adequate protection claims to which the secured parties under the 2026 Senior Secured Notes or 2028 Senior Secured Notes are entitled pursuant to an order of the Bankruptcy Court; and (e) all fees and charges assessed against the DBS Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

16. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

17. "*Allowed*" means (a) all or a portion of any DBS Notes Claim, (b) with respect to any Professional Fee Claim, such amount as has been allowed by a Final Order, or (c) with respect to a Priority Tax Claim as set forth in Article II.C. "Allow" and "Allowing" have correlative meanings. For the avoidance of doubt, "Allowed" shall not apply to any Claim treated hereunder other than a DBS Notes Claim, Professional Fee Claim, or Priority Tax Claim.

18. "*Amended 2026 Senior Secured Notes*" means the 2026 Senior Secured Notes, as amended and supplemented pursuant to the applicable Amended Notes Indenture.

19. "*Amended 2028 Senior Notes*" means the 2028 Senior Notes, as amended and supplemented pursuant to the applicable Amended Notes Indenture.

20. "*Amended 2028 Senior Secured Notes*" means the 2028 Senior Secured Notes, as amended and supplemented pursuant to the applicable Amended Notes Indenture.

21. "*Amended 2029 Senior Notes*" means the 2029 Senior Notes, as amended and supplemented pursuant to the applicable Amended Notes Indenture.

22. "*Amended Notes*" means, collectively, the (a) Amended 2026 Senior Secured Notes, (b) Amended 2028 Senior Secured Notes, (c) Amended 2028 Senior Notes, and (d) Amended 2029 Senior Notes.

23. "*Amended Notes Indentures*" means the DBS Indentures as supplemented by the supplemental indentures adopted respectively in accordance with the Restructuring Support Agreement and this Plan with respect to each of the following: (a) the Amended 2026 Senior Secured Notes Indenture, (b) the Amended 2028 Senior Notes Indenture, (c) the Amended 2028 Senior Secured Notes Indenture, and (d) the Amended 2029 Senior Notes Indenture, in each case, together with all ancillary documentation contemplated thereunder. The Amended Notes Indentures shall be in all respects consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Required Consenting Creditors and the applicable Indenture Consenting Creditors.

24. "*Assumed Contracts and Leases*" means those Executory Contracts and Unexpired Leases that are assumed under sections 365(a) or 1123 of the Bankruptcy Code, including Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to any order of the Bankruptcy Court.

25. "*AT&T Closing Date*" means July 28, 2026, which was the date on which the transactions contemplated by the AT&T Transactions were consummated.

26. "*AT&T Transactions*" means the transactions pursuant to which EchoStar (and/or its applicable subsidiaries) assigned the 3.45 GHz and 600 MHz spectrum licenses to AT&T Mobility II LLC (or its designee), as approved by the FCC's Wireless Telecommunications Bureau pursuant to the FCC's May 2026 Order.

27. "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or interest in property or an obligation incurred by any of the DBS Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552, 553(b), and 724(a) of the Bankruptcy Code, or other similar or related state or federal statutes and common law.

28. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

29. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

30. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

31. "*Business Day*" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, both the State of New York and the State of Texas.

32. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

33. "*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

34. "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court, which include the chapter 11 cases of the DBS Debtors and the DISH Wireless Debtors.

35. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code and solely with respect to the DBS Debtors.

36. "*Claims and Noticing Agent*" means Epiq Corporate Restructuring LLC in its capacity as claims and noticing agent retained by the Debtors in the Chapter 11 Cases.

37. "*Claims Register*" means the official register of claims against the Debtors maintained by the Claims and Noticing Agent.

38. "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

39. "*Company Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

40. "*Confirmation*" means entry of the Confirmation Order for this Plan on the docket of the Chapter 11 Cases.

41. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order for this Plan on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

42. "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the DBS Debtors seek entry of the Confirmation Order.

43. "*Confirmation Order*" means an order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in all respects consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Required Consenting Creditors.

44. "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code (as such committee may be reconstituted from time to time).

45. "*Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

46. "*Consummation*" or "Consummated" means the occurrence of the Effective Date.

47. "*Cure Costs*" means all amounts, including an amount of $0, required to cure any monetary defaults based upon a Debtor's defaults under the Assumed Contracts and Leases under section 365 of the Bankruptcy Code (unless such defaults are waived or modified by the applicable counterparty), other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

48. "*D&O Policies*" means, collectively, all insurance policies (including any "tail policy") issued at any time to or providing coverage to any of the DBS Debtors for current or former directors', managers', members', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

49. "*DBS*" means DISH DBS Corporation.

50. "*DBS Cash Sweep*" means the required redemptions of the 2028 Senior Secured Notes on and after the Effective Date, on a quarterly basis commencing with the fiscal quarter ending March 31, 2027, to the extent of "Available Cash" of the Reorganized DBS Debtors, as set forth in the Restructuring Support Agreement and the Amended 2028 Senior Secured Notes Indenture.

51. "*DBS Debtor Release*" means the release set forth in Article VIII.C.

52. "*DBS Debtors*" means, collectively (a) DISH DBS Corporation; (b) DISH Broadcasting Corporation; (c) DISH Network L.L.C.; (d) Dish Network Service L.L.C.; (e) DISH Operating L.L.C.; (f) DISH Technologies Holding Corporation; (g) DISH Technologies L.L.C.; (h) Sling Media, L.L.C.; (i) Sling TV Gift Card Corporation; (j) Sling TV Holding L.L.C.; (k) Sling TV L.L.C.; and (l) Sling TV Purchasing L.L.C.

53. "*DBS Estate*" means the estate of any DBS Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable DBS Debtor's Chapter 11 Case.

54. "*DBS General Unsecured Claim*" means any Claim against a DBS Debtor that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a 2026 Senior Secured Notes Claim, a 2028 Senior Secured Notes Claim, a 2028 Senior Notes Claim, a 2029 Senior Notes Claim, or a DBS Intercompany Claim. For the avoidance of doubt, DBS General Unsecured Claims shall include any Claim against a DBS Debtor held by an Affiliate of a DBS Debtor that is not itself a DBS Debtor.

55. "*DBS Intercompany Claim*" means any Claim against a DBS Debtor held by another DBS Debtor.

56. "*DBS Notes*" means, collectively, the 2026 Senior Secured Notes, the 2028 Senior Secured Notes, the 2028 Senior Notes, and the 2029 Senior Notes.

57. "*DBS Notes Claim*" means a Claim relating to the 2026 Senior Secured Notes, the 2028 Senior Secured Notes, the 2028 Senior Notes, or the 2029 Senior Notes.

58. "*Debtors*" means, collectively, the DBS Debtors and the DISH Wireless Debtors.

59. "*Definitive Documents*" means the documents listed in Section 5 of the Restructuring Support Agreement, which shall be in all respects consistent with the Restructuring Support Agreement and subject to the consent requirements set forth in Section 5(a) thereof.

60. "*DISH Wireless Debtors*" means, collectively: (a) DISH Wireless L.L.C.; (b) DISH Wireless Leasing L.L.C.; (c) DISH Wireless Retail Holding L.L.C.; (d) DISH Wireless Retail Operating L.L.C.; (e) DISH Infinite Corporation; and (f) Neyland Networks LLC.

61. "*DISH Wireless General Unsecured Claim*" has the meaning ascribed to it in the DISH Wireless Plan.

62. "*DISH Wireless Plan*" means a separate chapter 11 plan of the DISH Wireless Debtors, including all exhibits, supplements (including the plan supplement), appendices, and schedules, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof.

63. "*Disallowed*" means, with respect to any Claim or Interest, or any portion thereof, that such Claim, Interest, or any portion thereof, is not Allowed. For the avoidance of doubt, "Disallowed" shall not apply to any Claim Reinstated hereunder.

64. "*Disbursing Agent*" means, with respect to all distributions to be made under this Plan, the Reorganized DBS Debtors, or any Entity the DBS Debtors or the Reorganized DBS Debtors select to make or to facilitate distributions in accordance with this Plan.

65. "*Disclosure Statement*" means the disclosure statement with respect to this Plan that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b),

and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable Law, and all exhibits, schedules, supplements, modifications and amendments thereto.

66. "*Disclosure Statement Order*" means any order of the Bankruptcy Court approving the adequacy of the Disclosure Statement on a final basis under section 1125 of the Bankruptcy Code.

67. "*DNC*" means DISH Network Corporation.

68. "*DWLLC*" means DISH Wireless L.L.C.

69. "*DWLLC Claims Trust*" means the trust established by the DBS Claims Trust Agreement pursuant to the Restructuring Support Agreement to receive, hold, administer, and distribute, for the ratable benefit of the DWLLC Claims Trust Beneficiaries, distributions on account of Allowed (as defined in the DISH Wireless Plan) DISH Wireless General Unsecured Claims under the DWLLC Intercompany Loan, if any, assigned to such trust prior to the Petition Date.

70. "*DWLLC Claims Trust Agreement*" means the Claims Trust Agreement, dated as of June 26, 2026, by and between DBS, as trustor, and Wilmington Savings Fund Society, FSB, not in its individual capacity, but solely as trustee, as amended, amended and restated, supplemented, or otherwise modified from time to time.

71. "*DWLLC Claims Trust Beneficiaries*" means the Indenture Trustees of 2028 and 2029 Notes on behalf of the respective holders thereof to the extent they are entitled to receive distributions from the DWLLC Claims Trust.

72. "*DWLLC Claims Trust Indemnity*" means any indemnification obligations of the Debtors or their Affiliates owed to any DWLLC Claims Trust Beneficiaries, the trustee of the DWLLC Claims Trust, or any Consenting Creditor under the Restructuring Support Agreement or the DBS Claims Trust Agreement.

73. "*DWLLC Claims Trust Special Counsel Fees*" means all reasonable and documented fees and expenses incurred by Milbank LLP (or any successor counsel thereto) in its capacity as special counsel to the DWLLC Claims Trust.

74. "*DWLLC Intercompany Loan*" means those certain intercompany loans extended by DNC to DWLLC from time to time beginning in 2020, as memorialized pursuant to that certain Loan Agreement, dated as of August 22, 2025, between DNC, as lender, and DWLLC, as borrower, in the aggregate amount of $8,856,507,760.88 (inclusive of principal and accrued interest and net of $5,000,000,000.00 of prior loan forgiveness) as of June 28, 2026 (it being understood that interest on such DWLLC Intercompany Loan ceased as of June 28, 2026), as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, which were assigned by DNC to DBS, and by DBS, in its capacity as trustor under the DWLLC Claims Trust Agreement, to the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries prior to the Petition Date in accordance with the terms of the Restructuring Support Agreement.

75. "*DWLLC Recovery*" means any amounts recovered by the DWLLC Claims Trust from DWLLC or its chapter 11 estate, which the DWLLC Claims Trust shall distribute in accordance with the Restructuring Support Agreement and the DWLLC Claims Trust Agreement.

76. "*EchoStar*" means EchoStar Corporation.

77. "*Effective Date*" means, with respect to this Plan, the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A have been satisfied or waived in accordance with the Plan.

78. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

79. "*Exculpated Party*" means each of: (a) the DBS Debtors; and (b) the Committee and each of its members (including Charter Communications Operating, LLC, as successor in interest to CoxCom LLC and in its capacity as an *ex officio* member of the Committee), for conduct within the scope of their duties related to the DBS Debtors.

80. "*Executory Contract*" means a contract to which one or more of the DBS Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 and 1123 of the Bankruptcy Code.

81. "*Federal Judgment Rate*" means the rate of interest calculated pursuant to the provisions of 28 U.S.C. § 1961, which shall be a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, as of the Petition Date.

82. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims and Noticing Agent or the Bankruptcy Court.

83. "*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified or amended, that is not stayed, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice. Notwithstanding the foregoing, solely with respect to disputes between the Reorganized DBS Debtors and a non-Debtor counterparty regarding Cure Costs, in the event a court other than the Bankruptcy Court issues an order regarding Cure Costs and such order is subject to a pending appeal, or the time to appeal or seek certiorari has not expired, such order shall be enforceable as a Final Order unless such order is stayed by a court of competent jurisdiction or by operation of applicable non-bankruptcy law.

84. "*First Day Pleadings*" means those certain pleadings Filed by the Debtors contemporaneously with their voluntary petitions on the Petition Date.

85. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

86. "*Holder*" means an Entity holding a Claim against or Interest in a DBS Debtor, as applicable.

87. "*HSSC Entities*" means Hughes Satellite Systems Corporation and its direct and indirect subsidiaries.

88. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

89. "*Indenture Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

90. "*Indenture Trustees*" means, collectively: (a) Wilmington Savings Fund Society, FSB, in its capacity as trustee under the 2026 Senior Secured Notes Indenture and the 2028 Senior Secured Notes Indenture; (b) U.S. Bank Trust Company, National Association, in its capacity as trustee under the 2028 Senior Notes Indenture and the 2029 Senior Notes Indenture; and (c) U.S. Bank Trust Company, National Association, in its capacity as collateral agent under the 2026 Senior Secured Notes Indenture and the 2028 Senior Secured Notes Indenture, in each case, together with any successor trustee or successor collateral agent, as applicable, appointed under any such indenture.

91. "*Indenture and DWLLC Claims Trust Trustee Fees and Expenses*" means the reasonable fees and expenses of the Indenture Trustees (including as registrar, paying agent, collateral agent and related roles under the relevant DBS Notes Indenture) and the trustee of the DWLLC Claims Trust in connection with the performance of their respective duties.

92. "*Intercompany Interest*" means, other than an Interest, any shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, profits interests, puts, options, warrants, rights, or other Securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests in a DBS Debtor held by an Affiliate of such DBS Debtor, which Affiliate may be another DBS Debtor.

93. "*Interest*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code) partnership interests, membership interests, and any other equity, ownership, or profits interests of any DBS Debtor and options, warrants, rights, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other Securities or agreements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, partnership interests, membership interests, or any other equity, ownership, or profits interests of any DBS Debtor (in each case whether or not arising under or in connection with any employment agreement and regardless of whether such equity interests are held directly or indirectly).

94. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, treaty, duty, requirement, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

95. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

96. "*Other Priority Claim*" means any Claim against any of the DBS Debtors entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim, (b) a Priority Tax Claim, and (c) any other Claim that is expressly classified in a separate Class under Article III.

97. "*Other Secured Claim*" means any Secured Claim against a DBS Debtor other than (a) any 2026 Senior Secured Notes Claim, (b) any 2028 Senior Secured Notes Claim, and (c) any other Claim that is expressly classified in a separate Class under Article III.

98. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

99. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

100. "*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof.

101. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, each of which shall be consistent with the Restructuring Support Agreement (and subject to the consent rights provided thereunder), including: (a) any Schedule of Rejected Contracts and Leases; (b) the Amended Notes Indentures and any other ancillary documentation contemplated thereby; and (c) any disclosures required under section 1129(a)(5) of the Bankruptcy Code (including, to the extent known and determined, a document disclosing the identity of the directors and officers of the Reorganized DBS Debtors). Unless otherwise provided in this Plan, the DBS Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement through the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the consent rights provided thereunder).

102. "*Priority Tax Claim*" means any Claim against the DBS Debtors of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

103. "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 328, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(3)-(4) of the Bankruptcy Code. For the avoidance of doubt, "Professional" includes an Entity for which an application for retention is pending, but not decided, as of the Confirmation Date, provided that such Entity shall be treated

as a "Professional" hereunder only upon and to the extent of the subsequent entry of a Final Order approving such retention.

104. "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses are allocable to DBS Debtors and have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

105. "*Proof of Claim*" means a proof of Claim Filed against any of the DBS Debtors in the Chapter 11 Cases.

106. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. For avoidance of doubt, Reinstated Claims are not Disallowed under this Plan.

107. "*Rejected Contracts and Leases*" means those Executory Contracts and Unexpired Leases of a DBS Debtor that shall be rejected by the DBS Debtors, including each Executory Contract and Unexpired Lease of a DBS Debtor identified on the Schedule of Rejected Contracts and Leases.

108. "*Related Parties*" means, with respect to an Entity, in each case solely in its capacity as such, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, members, equity holders (including preferred equity holders and regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, trustees, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders (including preferred equity holders), officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, trustees, and other professionals.

109. "*Release Opt In Form*" means the form, substantially in the form attached to the Solicitation Materials (or otherwise approved by the Bankruptcy Court), by which a Holder of a Claim or Interest may affirmatively opt in to the Third-Party Release.

110. "*Released Parties*" means, collectively, each of the following, in each case solely in their respective capacities as such: (a) each DBS Debtor; (b) each Reorganized DBS Debtor; (c) each Consenting Creditor; (d) EchoStar; (e) each Releasing Party; and (f) each Related Party of each Entity in the foregoing clauses (a) through clause (e); provided, however, that, in each case, an Entity shall not be a Released Party if it: (x) elects not to opt in to (as applicable) the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before entry of the Confirmation Order. For the avoidance of doubt and

notwithstanding anything in this Plan to the contrary, no Entity that is not a Releasing Party shall be a Released Party.

111. "*Releasing Parties*" means, collectively, each of the following, in each case solely in their respective capacities as such: (a) each DBS Debtor; (b) each Reorganized DBS Debtor; (c) each Consenting Creditor; (d) EchoStar; (e) each Holder of one or more Claims that is not a Consenting Creditor; (f) each Holder of one or more Interests; and (g) each Related Party of each Entity in the foregoing clauses (a) through (f); provided, however, that, notwithstanding anything to the contrary in this Plan, (i) in the case of the parties referenced in clauses (e) or (f), an Entity shall not be a Releasing Party if it: (x) elects not to opt in to (as applicable) the Third-Party Release or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before entry of the Confirmation Order and (ii) no DISH Wireless Debtor or HSSC Entity shall constitute a Releasing Party. For the avoidance of doubt, the Indenture Trustees are not Releasing Parties.

112. "*Reorganized DBS Debtor*" means each DBS Debtor, or any successor(s) or assign(s) thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, trust, or other form, as the case may be, on and after the Effective Date. "Reorganized DBS Debtors" means all of the Reorganized DBS Debtors, collectively.

113. "*Representatives*" means, with respect to an Entity, such Entity's current and former (a) officers, (b) directors, (c) managers, (d) principals, (e) members, (f) employees, (g) agents, (h) advisory board members, (i) financial advisors, (j) partners, (k) attorneys, (l) accountants, (m) investment bankers, (n) consultants, and (o) other professionals, each in their capacity as such.

114. "*Required Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

115. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of March 19, 2026, by and among the Company Parties, EchoStar, DNC, the Release Parties (as defined therein), and the Consenting Creditors, including the Term Sheet and all other exhibits and attachments thereto, as may be amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof, which is attached to the Disclosure Statement as Exhibit B.

116. "*Restructuring Transactions*" means the transactions described in Article IV.

117. "*Schedule of Rejected Contracts and Leases*" means any schedule of Executory Contracts and Unexpired Leases of a DBS Debtor to be rejected by the DBS Debtors pursuant to this Plan, filed as part of the Plan Supplement, as may be amended, supplemented, or modified by the DBS Debtors at any time prior to the Confirmation Date without order of the Bankruptcy Court, or after the Confirmation Date to the extent agreed with the relevant counterparties and upon entry of an order of the Bankruptcy Court. For the avoidance of doubt, the Schedule of Rejected Contracts and Leases shall only identify Executory Contracts and Unexpired Leases that have not previously been rejected pursuant to a Final Order, and the inclusion or omission of any Executory

Contract or Unexpired Lease on or from the Schedule of Rejected Contracts and Leases shall not affect the treatment of any Executory Contract or Unexpired Lease that has previously been addressed by a Final Order.

118. "*Secured*" or "Secured Claim" means, when referring to a Claim, a Claim that is: (a) secured by a Lien on property in which a DBS Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the value of such right of setoff.

119. "*Secured Tax Claim*" means any Secured Claim against any of the DBS Debtors that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

120. "*Securities Act*" means the U.S. Securities Act of 1933, as amended.

121. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

122. "*Shared Services Agreement*" means the Shared Services Agreement, dated as of May 5, 2026, by and among EchoStar and its direct and indirect subsidiaries party thereto.

123. "*Solicitation Materials*" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to section 1125 and 1126 of the Bankruptcy Code, which shall be in all respects consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Required Consenting Creditors.

124. "*Specified Non-Debtor Affiliates*" means, collectively, EchoStar Intercompany Receivable Company, L.L.C., DISH DBS Issuer, L.L.C., and DBS Intercompany Receivable L.L.C.

125. "*Term Sheet*" means that certain Refinancing Term Sheet, dated as of March 19, 2026, attached as Exhibit B to the Restructuring Support Agreement, as may be amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms of the Restructuring Support Agreement.

126. "*Third-Party Release*" means the releases given by the Releasing Parties to the Released Parties in Article VIII.F.

127. "*Undeliverable Distribution*" means any distribution under the Plan on account of an Allowed DBS Notes Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the DBS Debtors of an intent to accept a particular distribution; (c) responded to the DBS Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution. Distributions on account of the DBS Notes shall be made in accordance with and governed by the relevant DBS Notes Indenture as amended by the Amended Notes Indentures and shall not be deemed Undeliverable Distributions under the Plan.

128. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the DBS Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

129. "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

130. "*U.S. Trustee*" means the Office of the United States Trustee for Region 7.

131. "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

132. "*Voting Deadline*" means with respect to all Holders of Claims entitled to vote on this Plan, September 21, 2026 at 5:00 p.m. (prevailing Central Time), as may be extended by order of the Bankruptcy Court.

133. "*Voting Report*" means the report certifying the methodology for the tabulation of votes and results of voting under the Plan, prepared and filed by the Claims and Noticing Agent.

**B. Rules of Interpretation.**

For purposes of the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (11) any immaterial effectuating provisions may be interpreted by the DBS Debtors or the Reorganized DBS Debtors in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; provided that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party; (12) on and after the Effective Date,

all references to the DBS Debtors in this Plan shall be deemed references to the DBS Debtors or the Reorganized DBS Debtors, as applicable; (13) with respect to any provision in this Plan providing for any payment, distribution or treatment to be made subject to the election, option, discretion or agreement of any DBS Debtor or Reorganized DBS Debtor, as applicable, such election, option, discretion or agreement shall be subject to any consent rights set forth in this Plan and to the extent applicable, the Restructuring Support Agreement; and (14) each reference to one or more DBS Debtors or Reorganized DBS Debtors means the applicable DBS Debtor, DBS Debtors, or Reorganized DBS Debtors, as the context requires.

## C. Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

## D. Governing Law.

Except to the extent that a federal law or rule of procedure of the United States applies (including the Bankruptcy Code and the Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## E. Reference to Monetary Figures.

All references in this Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

## F. Controlling Document.

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. Except with respect to Article IX, which shall control in all instances, in the event of an inconsistency between the Plan (excluding the Plan Supplement) and the Plan Supplement, the Plan Supplement shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided, that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification to this Plan.

## G. Consultation, Notice, Information, and Consent Rights.

Notwithstanding anything herein to the contrary, all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as applicable, and as respectively set forth therein, including with respect to the form and substance of each Definitive

Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

## ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III.

### A. Administrative Claims.

Unless otherwise agreed to by the Holder of an Administrative Claim against the DBS Debtors, on the one hand, and the DBS Debtors or the Reorganized DBS Debtors, as applicable, or such Holder has been paid by the DBS Debtors on account of such Administrative Claim prior to the Effective Date, each Holder of such Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) shall receive, in full and final satisfaction of such Claim, an amount of Cash equal to the amount of such Claim in accordance with the following: (1) if such Administrative Claim is an Administrative Claim against any DBS Debtor, such Administrative Claim shall be paid (a) on or before the Effective Date or, if later, when such Administrative Claim becomes due in accordance with the terms and conditions of the contract or transaction giving rise to such Administrative Claim, without any further action by the Holder of such Administrative Claim; or (b) with respect to an Administrative Claim that is disputed by the DBS Debtors, upon entry of a Final Order of a court of competent jurisdiction, subject to Article XI.16 (if applicable), determining the amount payable by the DBS Debtors or Reorganized DBS Debtors, as applicable; provided that, notwithstanding the foregoing, subject to Article XI.2 (if applicable), any dispute regarding an Administrative Claim that is not a Professional Fee Claim between the DBS Debtors and any non-Debtor counterparty, including any non-Debtor counterparty to an Executory Contract or Unexpired Lease, shall be adjudicated in accordance with the terms of the agreement giving rise to such Administrative Claim; or (2) at such time and upon such terms as may be agreed upon by such Holder and the DBS Debtors or the Reorganized DBS Debtors, as applicable.

Notwithstanding anything to the contrary herein, no request for payment of an Administrative Claim against a DBS Debtor shall be required to be Filed under the Plan unless otherwise ordered by the Bankruptcy Court.

### B. Professional Compensation.

#### 1. Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date shall be Filed on or before the date that is forty-five (45) days after the later of (a) the Effective Date and (b) entry of an order authorizing the retention

of such Professional. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and orders of the Bankruptcy Court. Any objections to a Professional Fee Claim shall be Filed and served no later than twenty-one (21) days after the Filing of the final request for payment of such Professional Fee Claim.

Each Professional seeking allowance of a Professional Fee Claim against the DBS Debtors shall include in its final fee application filed with respect to the DBS Debtors, (i) an approximate allocation of such Professional's fees and expenses incurred in connection with the Chapter 11 Cases as between the DBS Debtors and the DISH Wireless Debtors, to the extent applicable, (ii) copies of any monthly fee statements filed by such Professional in accordance with the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 696], and (iii) a request for final allowance of such Professional's fees and expenses for services allocated to the DBS Debtors pursuant to the allocation set forth in such final fee application.

Each Allowed Professional Fee Claim against the DBS Debtors shall be paid by the DBS Debtors or the Reorganized DBS Debtors, as applicable, to the extent not previously paid, as soon as reasonably practicable after such Allowed Professional Fee Claim is allowed by Final Order.

2. **Post-Effective Date Fees and Expenses.**

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the DBS Debtors or the Reorganized DBS Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by any Professional after the Effective Date in connection with the implementation and Consummation of the Plan that are allocable to the DBS Debtors.

On and after the Effective Date, unless otherwise ordered by the Bankruptcy Court, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date for the DBS Debtors shall terminate, and the DBS Debtors or the Reorganized DBS Debtors, as applicable, shall compensate Professionals in the ordinary course of business without further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that if there is any dispute with respect to the payment of any Professionals with respect to fees and expenses, such dispute shall be resolved by the Bankruptcy Court.

3. **Substantial Contribution.**

Except as otherwise specifically provided in this Plan or ordered by the Bankruptcy Court, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases of the DBS Debtors pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code shall File an application for the allowance of such compensation or reimbursement and serve such application on counsel for the DBS Debtors, counsel for the

Committee, and such other parties as required by the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court, no later than thirty (30) days after the Effective Date.

Any amount allowed by the Bankruptcy Court on account of a substantial contribution claim with respect to the DBS Debtors' Chapter 11 Cases shall be payable by the DBS Debtors. For the avoidance of doubt, the Indenture and DWLLC Claims Trust Trustee Fees and Expenses shall be paid in accordance with the relevant DBS Indentures as amended by the Amended Notes Indentures and with any applicable DWLLC Claims Trust agreement and shall not be subject to any requirement of allowance as an administrative expense claim under section 503 of the Bankruptcy Code.

**C. Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the DBS Debtors agree to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, and in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the DBS Debtors, (a) payment in full in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter, (b) Reinstatement of such Allowed Priority Tax Claim, or (c) such other treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code and reasonably acceptable to the Required Consenting Creditors. To the extent an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall be treated as a Secured Tax Claim (and, to the extent not paid in full, as an Other Secured Claim) in accordance with the Plan. Upon payment in full of an Allowed Priority Tax Claim to the extent required by the Plan (or upon such other treatment agreed by the Holder and the DBS Debtors consistent with the Plan), any Lien securing such Claim shall be deemed released, terminated, and extinguished, without further notice to or order of the Bankruptcy Court, and without any further act or action under applicable law.

**D. U.S. Trustee.**

The DBS Debtors or the Reorganized DBS Debtors, as applicable, shall timely pay all applicable U.S. Trustee Fees for each quarter under 28 U.S.C. § 1930(a)(6), until the entry of an order dismissing or closing the applicable Chapter 11 Case, or converting such Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. Following Confirmation and until all of the DBS Debtors' Chapter 11 Cases are closed, dismissed, or converted, the DBS Debtors or the Reorganized DBS Debtors, as applicable, shall file with the Bankruptcy Court such post-confirmation reports as may be required by the Bankruptcy Court and the U.S. Trustee.

**E. Ad Hoc Group Professional Fees.**

To the extent payable under Section 11 of the Restructuring Support Agreement, the DBS Debtors, EchoStar, or DNC shall pay, or cause to be paid, the Ad Hoc Group Professional Fees in accordance with, and subject to, Section 11 of the Restructuring Support Agreement. For the avoidance of doubt, (1) the Ad Hoc Group Professional Fees shall not constitute Professional Fee Claims and shall not be subject to the procedures set forth in Article II.A or Article II.B, including the requirement to file fee applications; and (2) nothing in this Plan shall require Milbank LLP or

any other advisor entitled to payment of Ad Hoc Group Professional Fees under the Restructuring Support Agreement to file a Proof of Claim or an application under sections 330 or 503 of the Bankruptcy Code as a condition to payment of the Ad Hoc Group Professional Fees.

To the extent not otherwise paid, the DBS Debtors, EchoStar, DNC, or the Reorganized DBS Debtors, as applicable, shall promptly pay in Cash in full outstanding and invoiced Ad Hoc Group Professional Fees as follows: (i) on the Effective Date, Ad Hoc Group Professional Fees incurred, or estimated to be incurred, during the period prior to the Effective Date to the extent invoiced to the DBS Debtors at least two (2) Business Days in advance of the Effective Date, and (ii) after the Effective Date, any unpaid Ad Hoc Group Professional Fees within five (5) Business Days of receiving an invoice; provided that such Ad Hoc Group Professional Fees shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval; provided further that, to the extent timely invoiced, Ad Hoc Group Professional Fees that are not paid by the DBS Debtors or the Reorganized DBS Debtors, as applicable, within the timeframes set forth herein, such Ad Hoc Group Professional Fees shall not be deemed waived and shall be included in a subsequent invoice.

## F. Indenture and DWLLC Claims Trust Trustee Fees and Expenses.

On the Effective Date, the DBS Debtors or the Reorganized DBS Debtors, as applicable, shall pay in full in Cash all reasonable and documented fees, expenses, costs, disbursements, indemnities, and other amounts due and owing to the Indenture Trustees under the applicable Indentures, including the reasonable and documented fees and expenses of counsel and other professionals retained by the Indenture Trustees, in each case to the extent not previously paid. The Indenture Trustees shall not be required to file a Proof of Claim, Administrative Claim request, fee application, or any other application or request for allowance, and no Bankruptcy Court approval shall be required, as a condition to payment of such amounts. To the extent any such fees, expenses, costs, disbursements, indemnities, or other amounts are incurred after the Effective Date in connection with distributions, cancellation mechanics, lien releases, implementation of the Plan, enforcement of the Indenture Trustees' rights, or any other duties expressly required under the Plan, the Confirmation Order, or the applicable Indentures, such amounts shall be paid promptly in Cash by the Reorganized DBS Debtors or such other applicable funding source provided under the Plan. Nothing in the Plan or the Confirmation Order shall impair, waive, release, discharge, or otherwise affect the Indenture Trustees' rights to payment, reimbursement, indemnification, priority of payment, charging liens, or any other rights, protections, privileges, immunities, or remedies under the applicable Indentures, the Plan, the Confirmation Order, or applicable law.

All reasonable and documented fees, expenses, costs, disbursements, indemnities, and other amounts incurred by the trustee of the DWLLC Claims Trust, including the reasonable and documented fees and expenses of its professionals, in each case to the extent not previously paid, shall be paid in full in Cash by the DBS Debtors or the Reorganized DBS Debtors, as applicable, on the Effective Date, without the need for the trustee of the DWLLC Claims Trust to file a Proof of Claim, Administrative Claim request, fee application, or other request for allowance, and without Bankruptcy Court review or approval. For the avoidance of doubt, notwithstanding anything in this Plan or any agreement related to the DWLLC Claims Trust to the contrary, in no

event shall any of the DISH Wireless Debtors or their estates, successors, or assigns pay or have any obligation to pay any Indenture and DWLLC Claims Trust Trustee Fees and Expenses.

## ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A. Classification of Claims and Interests.

This Plan constitutes a separate Plan proposed by each DBS Debtor. Except for the Claims addressed in Article II, all Claims and Interests against the DBS Debtors are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed DBS Notes Claim or other Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, the DBS Debtors have not classified Administrative Claims, Priority Tax Claims, and Professional Fee Claims, as described in Article II.

#### 1. Classes of Claims Against and Interests in the DBS Debtors.

The classification of Claims against and Interests in the DBS Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 1A | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 1B | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 1C | 2026 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 1D | 2028 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 1F[2] | 2028 Senior Notes Claims | Impaired | Entitled to Vote |
| 1G | 2029 Senior Notes Claims | Impaired | Entitled to Vote |
| 1H | DBS General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| 1I | DBS Intercompany Claims | Unimpaired | No (Presumed to Accept) |
| 1J | Interests in DBS Debtors | Unimpaired | No (Presumed to Accept) |

[2] The DBS Debtors have eliminated Class 1E because DBS repaid the 7.75% Senior Notes due 2026 issued by DBS, including the $2.0 billion in aggregate principal amount outstanding thereunder plus all accrued and unpaid interest to and including July 28, 2026 (the date of such repayment), pursuant to the *Order (I) Authorizing the DBS Debtors to Pay All Amounts Outstanding under DBS's 2026 Senior Notes and (II) Granting Related Relief* [Dkt. No. 589].

**B. Treatment of Claims and Interests in the DBS Debtors.**

Each Holder of an Allowed DBS Notes Claim or other Claim or Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed DBS Notes Claim or other Claim or Interest, except to the extent different treatment is agreed to by the DBS Debtors or the Reorganized DBS Debtors, on the one hand, and the Holder of such Allowed DBS Notes Claim or other Claim or Interest, on the other hand, as applicable. Unless otherwise indicated herein, each Holder of an Allowed DBS Notes Claim or other Claim or Interest, as applicable, shall receive such treatment as of the Effective Date.

1. **Class 1A – Other Secured Claims.**

(a) *Classification*: Class 1A consists of Other Secured Claims against the DBS Debtors.

(b) *Treatment*: The legal, equitable, and contractual rights of Holders of Other Secured Claims are unaltered by this Plan. Except to the extent that a Holder of an Other Secured Claim agrees to less favorable treatment of its Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Other Secured Claim, at the option of the DBS Debtors or the Reorganized DBS Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Other Secured Claim, (B) Reinstatement of such Other Secured Claim as of the Effective Date or (C) such other treatment that renders such Holder's Other Secured Claim Unimpaired.

(c) *Impairment and Voting*: Class 1A is Unimpaired, and each Holder of an Other Secured Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Other Secured Claims. Each Holder of an Other Secured Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Other Secured Claim to affirmatively opt in to the Third-Party Release.

2. **Class 1B – Other Priority Claims.**

(a) *Classification*: Class 1B consists of Other Priority Claims against the DBS Debtors.

(b) *Treatment*: The legal, equitable, and contractual rights of Holders of Other Priority Claims are unaltered by this Plan. Except to the extent that a Holder of an Other Priority Claim agrees to less favorable treatment of its Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Other Priority Claim, at the option of

the DBS Debtors (with the consent of the Required Consenting Creditors (such consent to not be unreasonably withheld)) or the Reorganized DBS Debtors, such Holder shall receive (A) payment in full in Cash, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Other Priority Claim, or (B) treatment that is otherwise consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Other Priority Claim.

(c) *Impairment and Voting*: Class 1B is Unimpaired, and each Holder of an Other Priority Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to Other Priority Claims. Each Holder of an Other Priority Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Other Priority Claim to affirmatively opt in to the Third-Party Release.

3. **Class 1C – 2026 Senior Secured Notes Claims.**

(a) *Classification*: Class 1C consists of 2026 Senior Secured Notes Claims.

(b) *Allowance*: The 2026 Senior Secured Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2026 Senior Secured Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2026 Senior Secured Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the DBS Debtors' Chapter 11 Cases extend past such date) and any other amounts due and owing under the 2026 Senior Secured Notes Indenture as of the Effective Date.

(c) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2026 Senior Secured Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2026 Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2026 Senior Secured Notes Claim, (A) Amended 2026 Senior Secured Notes in a principal amount equal to the amount of such Holder's Allowed 2026 Senior Secured Notes Claim on account of the unpaid principal amount of the 2026 Senior Secured Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2026 Senior Secured Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2026 Senior Secured Notes

Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2026 Senior Secured Notes Claim (but not yet due and owing under the 2026 Senior Secured Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2026 Senior Secured Notes, but instead will be paid in full in accordance with the Amended 2026 Senior Secured Notes Indenture and Amended 2026 Senior Secured Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2026 Senior Secured Notes in accordance with the terms of the Amended 2026 Senior Secured Notes Indenture and Amended 2026 Senior Secured Notes.

(d) *Impairment and Voting*. Class 1C is Impaired, and each Holder of a 2026 Senior Secured Notes Claim is entitled to vote to accept or reject this Plan. Each Holder of a 2026 Senior Secured Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2026 Senior Secured Notes Claim to affirmatively opt in to the Third-Party Release**.**

4. **Class 1D – 2028 Senior Secured Notes Claims.**

(a) *Classification*: Class 1D consists of 2028 Senior Secured Notes Claims.

(b) *Allowance*: The 2028 Senior Secured Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2028 Senior Secured Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2028 Senior Secured Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the DBS Debtors' Chapter 11 Cases extend past such date) and any other amounts due and owing under the 2028 Senior Secured Notes Indenture as of the Effective Date.

(c) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2028 Senior Secured Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2028 Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2028 Senior Secured Notes Claim, (A) Amended 2028 Senior Secured Notes in a principal amount equal to the amount of such Holder's Allowed 2028 Senior Secured Notes Claim on account of the unpaid principal amount of the 2028 Senior Secured Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2028 Senior Secured Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2028 Senior Secured Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2028 Senior Secured Notes Claim (but not yet due and owing under the 2028 Senior Secured Notes Indenture) as of the

Effective Date will not be included in the principal amount of the Amended 2028 Senior Secured Notes, but instead will be paid in full in accordance with the Amended 2028 Senior Secured Notes Indenture and Amended 2028 Senior Secured Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2028 Senior Secured Notes in accordance with the terms of the Amended 2028 Senior Secured Notes Indenture and Amended 2028 Senior Secured Notes. For the avoidance of doubt, (a) the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2028 Senior Secured Notes Claim (and Holders of Allowed 2028 Senior Notes Claims and Allowed 2029 Senior Notes Claims) is a claim against DWLLC classified and treated exclusively under the DISH Wireless Plan, and shall be preserved and treated solely in accordance with that DISH Wireless Plan, subject to Article VI.E of this Plan, and (b) such claim is disputed in DWLLC's Chapter 11 Case and no representation or warranty is made that there will be any distributions or recovery in respect of such claim and all Persons and Entities have reserved their rights with respect thereto.

(d) *Impairment and Voting*. Class 1D is Impaired, and each Holder of a 2028 Senior Secured Notes Claim is entitled to vote to accept or reject this Plan. Each Holder of a 2028 Senior Secured Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2028 Senior Secured Notes Claim to affirmatively opt in to the Third-Party Release**.**

5. **[Reserved]**[3]

6. **Class 1F – 2028 Senior Notes Claims.**

(a) *Classification*: Class 1F consists of 2028 Senior Notes Claims.

(b) *Allowance*: The 2028 Senior Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2028 Senior Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2028 Senior Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the DBS Debtors' Chapter 11 Cases

---

[3] The DBS Debtors have eliminated Class 1E because DBS repaid the 7.75% Senior Notes due 2026 issued by DBS, including the $2.0 billion in aggregate principal amount outstanding thereunder plus all accrued and unpaid interest to and including July 28, 2026 (the date of such repayment), pursuant to the *Order (I) Authorizing the DBS Debtors to Pay All Amounts Outstanding under DBS's 2026 Senior Notes and (II) Granting Related Relief* [Dkt. No. 589].

extend past such date) and any other amounts due and owing under the 2028 Senior Notes Indenture as of the Effective Date.

(c) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2028 Senior Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2028 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2028 Senior Notes Claim, (A) Amended 2028 Senior Notes in a principal amount equal to the amount of such Holder's Allowed 2028 Senior Notes Claim on account of the unpaid principal amount of the 2028 Senior Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2028 Senior Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2028 Senior Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2028 Senior Notes Claim (but not yet due and owing under the 2028 Senior Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2028 Senior Notes, but instead will be paid in full in accordance with the Amended 2028 Senior Notes Indenture and Amended 2028 Senior Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2028 Senior Notes in accordance with the terms of the Amended 2028 Senior Notes Indenture and Amended 2028 Senior Notes. For the avoidance of doubt, (a) the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2028 Senior Notes Claim (and Holders of Allowed 2028 Senior Secured Notes Claims and Allowed 2029 Senior Notes Claims) is a claim against DWLLC classified and treated exclusively under the DISH Wireless Plan, and shall be preserved and treated solely in accordance with that DISH Wireless Plan, subject to Article VI.E of this Plan, and (b) such claim is disputed in DWLLC's Chapter 11 Case and no representation or warranty is made that there will be any distributions or recovery in respect of such claim and all Persons and Entities have reserved their rights with respect thereto.

(d) *Impairment and Voting*. Class 1F is Impaired, and each Holder of an Allowed 2028 Senior Notes Claim is entitled to vote to accept or reject this Plan. Each Holder of a 2028 Senior Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2028 Senior Notes Claim to affirmatively opt in to the Third-Party Release.

7. **Class 1G – 2029 Senior Notes Claims.**

(a) *Classification*: Class 1G consists of 2029 Senior Notes Claims.

(b) *Allowance*: The 2029 Senior Notes Claims shall be Allowed in an amount equal to the unpaid principal amount of the 2029 Senior Notes outstanding as of the Effective Date, together with any accrued and unpaid interest at the rates set forth in the 2029 Senior Notes Indenture (including, for the avoidance of doubt, from and after the applicable maturity date consistent with the prematurity interest schedule if the DBS Debtors' Chapter 11 Cases extend past such date) and any other amounts due and owing under the 2029 Senior Notes Indenture to the extent Allowed and not previously paid or otherwise satisfied in accordance with the Plan, the Restructuring Support Agreement, or any order of the Bankruptcy Court.

(c) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed 2029 Senior Notes Claim agrees to less favorable treatment, each Holder of an Allowed 2029 Senior Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed 2029 Senior Notes Claim, (A) Amended 2029 Senior Notes in a principal amount equal to the amount of such Holder's Allowed 2029 Senior Notes Claim on account of the unpaid principal amount of the 2029 Senior Notes outstanding as of the Effective Date and (B) Cash in the amount of such Holder's Allowed 2029 Senior Notes Claim on account of any accrued and unpaid interest and any other amounts due and owing under the 2029 Senior Notes Indenture as of the Effective Date; provided that accrued and unpaid interest included in the Allowed 2029 Senior Notes Claim (but not yet due and owing under the 2029 Senior Notes Indenture) as of the Effective Date will not be included in the principal amount of the Amended 2029 Senior Notes, but instead will be paid in full in accordance with the Amended 2029 Senior Notes Indenture and Amended 2029 Senior Notes on the next scheduled semiannual interest payment date to Holders of record of the Amended 2029 Senior Notes in accordance with the terms of the Amended 2029 Senior Notes Indenture and Amended 2029 Senior Notes. For the avoidance of doubt, (a) the separate DISH Wireless General Unsecured Claim held by the DWLLC Claims Trust under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust prior to the Petition Date for the ratable benefit of each DWLLC Claims Trust Beneficiary that is a Holder of an Allowed 2029 Senior Notes Claim (and Holders of other Allowed 2028 Senior Notes Claims and Allowed 2028 Senior Secured Notes Claims) is a claim against DWLLC classified and treated exclusively under the DISH Wireless Plan, and shall be preserved and treated solely in accordance with that DISH Wireless Plan, subject to Article VI.E of this Plan, and (b) such claim is disputed in DWLLC's Chapter 11 Case and no representation or warranty is made that there will be any distributions or recovery in respect of such claim and all Persons and Entities have reserved their rights with respect thereto.

(d) *Impairment and Voting*. Class 1G is Impaired, and each Holder of an Allowed 2029 Senior Notes Claim is entitled to vote to accept or reject this

Plan. Each Holder of a 2029 Senior Notes Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a 2029 Senior Notes Claim to affirmatively opt in to the Third-Party Release**.**

8. **Class 1H – DBS General Unsecured Claims.**

(a) *Classification*: Class 1H consists of DBS General Unsecured Claims.

(b) *Treatment*: The legal, equitable, and contractual rights of Holders of DBS General Unsecured Claims are unaltered by this Plan. Except to the extent that a Holder of a DBS General Unsecured Claim agrees to less favorable treatment of its DBS General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each DBS General Unsecured Claim, such DBS General Unsecured Claim shall be Reinstated.

(c) *Impairment and Voting*. Class 1H is Unimpaired, and each Holder of a DBS General Unsecured Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of DBS General Unsecured Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such DBS General Unsecured Claims. Each Holder of a DBS General Unsecured Claim shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of a DBS General Unsecured Claim to affirmatively opt in to the Third-Party Release**.**

9. **Class 1I – DBS Intercompany Claims.**

(a) *Classification*: Class 1I consists of DBS Intercompany Claims.

(b) *Treatment*: On the Effective Date, each DBS Intercompany Claim shall be either: (A) Reinstated or (B) set off, settled, distributed, contributed, merged, canceled, or released, in each case in the discretion of the DBS Debtors or the Reorganized DBS Debtors.

(c) *Impairment and Voting*. Class 1I is Unimpaired, and Holders of DBS Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of DBS Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such DBS Intercompany Claims.

10. **Class 1J – Interests in DBS Debtors.**

(a) *Classification*: Class 1J consists of Interests in the DBS Debtors.

(b) *Treatment*: On the Effective Date, each Interest in the DBS Debtors shall be Reinstated.

(c) *Impairment and Voting*. Class 1J is Unimpaired, and Holders of Interests in the DBS Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Interests in the DBS Debtors are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Interests. Each Holder of an Interest in the DBS Debtors (excluding Debtors that hold Interests in the DBS Debtors) shall be provided a Release Opt In Form solely for the purpose of enabling such Holder of an Interest in the DBS Debtors to affirmatively opt in to the Third-Party Release.

## C. Special Provision Governing Unimpaired Claims.

Except as otherwise provided in this Plan, nothing under the Plan shall affect, diminish, or impair the rights of the DBS Debtors or the Reorganized DBS Debtors, as applicable, with respect to any Claim that is Unimpaired under the Plan, including all rights in respect of legal and equitable defenses to, and setoffs or recoupments against, any such Claim. All rights to exercise any and all such rights and to settle any such Claims shall be preserved and shall vest in Reorganized DBS Debtors as of the Effective Date; provided, however, that nothing under this Plan (including this Article III.C) shall give any Holder of an Unimpaired Claim, the DBS Debtors, or Reorganized DBS Debtors, as applicable, any greater rights with respect to any Claim that is Unimpaired under the Plan than it held prior to the Petition Date.

Other than with respect to Allowed DBS Notes Claims, to the extent that the payment of interest on a Claim is required by applicable law for such Claim to satisfy the requirements of section 1124 of the Bankruptcy Code, the Holder of such Claim shall receive interest on such Claim at the applicable contractual rate or, if no contractual rate governs, at the Federal Judgment Rate, in each case calculated from the Petition Date through the date on which such Claim is paid in full; provided that, other than with respect to Allowed DBS Notes Claims, nothing in this Plan shall be construed to require the payment of postpetition interest on any Claim to the extent not required by applicable law to satisfy the requirements of section 1124 of the Bankruptcy Code; provided, further, that nothing in the Plan shall impair any rights of the Holder of a DBS General Unsecured Claim to demand and receive payment of interest for periods preceding and/or postdating the Petition Date to the extent provided for under a contract or applicable non-bankruptcy law; provided, further, that the DBS Debtors and the Reorganized DBS Debtors expressly reserve all rights, claims, and defenses with respect to any such Holder's entitlement to, and the amount, validity, and enforceability of, any asserted right to interest, including any defense that no contract or applicable non-bankruptcy law entitles such Holder to such interest, and nothing in this Article III.C shall be construed as a concession, admission, or waiver of any such rights, claims, or defense.

## D. Elimination of Vacant Classes.

Any Class of Claims or Interests that does not have a Holder of a Claim or Interest as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E. Voting Classes; Presumed Acceptance by Non-Voting Classes**.

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

**F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**.

The acceptance of the Plan by at least one Impaired Class of Claims that is entitled to vote on the Plan shall satisfy section 1129(a)(10) of the Bankruptcy Code. The DBS Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. To the extent applicable, the DBS Debtors reserve the right to modify the Plan in accordance with Article X to the extent that Confirmation, pursuant to section 1129(b) of the Bankruptcy Code, requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**G. Controversy Concerning Impairment.**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A. General Settlement of Claims and Interests.**

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to this Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the DBS Debtors and the DBS Estates. For the avoidance of doubt, nothing in the Plan settles, releases, or discharges any Reinstated Claims. Distributions made to Holders of Allowed DBS Notes Claims or other Claims or Interests in any Class are intended to be (and shall be) final, except as expressly provided in this Plan.

### B. Sources of Plan Consideration.

Subject to the terms of the Plan (including the Restructuring Support Agreement), distributions to Holders of Allowed DBS Notes Claims or other Claims or Interests against the DBS Debtors in accordance with the treatment of such Claims and subject to the terms provided herein shall be funded from (a) Cash on hand and (b) the issuance and distribution of the Amended Notes.

### C. Restructuring Transactions

Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan, and any documents in connection therewith and herewith, shall be deemed authorized and approved without any requirement of further act or any actions by the DBS Debtors or their general partners, managers, members, directors, or other governing bodies, or any other Entity or Person. Upon the entry of the Confirmation Order, the DBS Debtors and the Reorganized DBS Debtors, as applicable, are authorized (without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation or rule, or the vote, authorization or approval of any Entity) to take all actions as may be necessary or appropriate to effect the Restructuring Transactions and any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the negotiation, execution, delivery, filing, and performance of the Amended Notes Indentures and any related instruments, agreements, and documentation contemplated thereby, and, to the extent required, the issuance and distribution of the Amended Notes, in each case, as provided in this Plan and the applicable Amended Notes Indentures; (3) to the extent required, the cancellation of any existing notes, instruments, certificates, and other documents being exchanged for, replaced by, or otherwise rendered of no further force or effect by the Amended Notes or any other transaction contemplated by this Plan; (4) taking any action deemed necessary, appropriate or desirable to carry out the provisions of this Plan; (5) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, interest, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (6) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (7) the execution, delivery, filing, recordation, and issuance of any other notes, documents, instruments, or agreements in connection with the Restructuring Transactions; and (8) subject to the occurrence of the Effective Date, the consummation of the remaining transactions contemplated by the Restructuring Support Agreement and the Plan that are to occur on or after the Effective Date.

The Confirmation Order shall and shall be deemed to, pursuant to section 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Confirmation Order shall authorize the DBS Debtors and the Reorganized DBS Debtors, as applicable, to undertake the Restructuring Transactions, including those contemplated

by the Restructuring Support Agreement and pursuant to sections 363, 365, and 1123 of the Bankruptcy Code.

**D. Director, Officer, and Manager Liability Insurance.**

After the Effective Date, the Reorganized DBS Debtors shall not terminate, cancel, impair, or otherwise reduce the coverage under any D&O Policies (including any tail policy) in effect as of the Effective Date or purchased in connection with the Chapter 11 Cases, and all current and former members, managers, directors, officers, employees, and other individuals insured thereunder shall remain entitled to the full benefits of such D&O Policies for the full term of such policies, in each case, in accordance with and subject to the terms, conditions, limitations, and exclusions of such D&O Policies. Nothing in this Plan, any exhibit to this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings, or any order entered related thereto, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, shall alter, amend, modify, or otherwise impair any rights, obligations, or coverage under any D&O Policy.

Notwithstanding anything to the contrary in this Plan, including Article V.A, no D&O Policy shall be deemed rejected, terminated, cancelled, or adversely affected by operation of any provision of the Plan. To the extent any D&O Policy is deemed an Executory Contract, such D&O Policy shall be deemed assumed by the applicable Reorganized DBS Debtor as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, and the Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption.

**E. Cancellation of Notes, Instruments, Certificates, and Other Documents.**

On the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests (and any guarantees or other obligations of a DBS Debtor thereunder) shall, to the extent relating to Claims or Interests that are satisfied, released, compromised, discharged, cancelled, or otherwise treated under the Plan, be deemed cancelled and of no further force and effect. Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan or a Confirmation Order; provided, however, that the foregoing shall not cancel, impair, or otherwise affect (1) any Claim or Interest that is Reinstated under the Plan, (2) any Claim based upon the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture, in each case to the extent amended and supplemented pursuant to the applicable Amended Notes Indentures, or any obligations and rights thereunder or under any related documents or agreements, including any and all rights and obligations under security documents executed or delivered in connection with the 2026 Secured Notes Indenture or the 2028 Secured Notes Indenture, in each case as amended and supplemented, or (3) any claim of any DISH Wireless Debtor or its chapter 11 estate. All privileges, rights, indemnities and immunities of the Indenture Trustees, including the Collateral Agent for the 2026 Senior Secured Notes and the 2028 Senior Secured Notes, are expressly preserved. Notwithstanding anything to the contrary herein, the Plan's general provision for cancellation of any notes, indentures, securities, instruments,

certificates, or other documents shall not impair, waive, release, discharge or otherwise affect the rights of any Indenture Trustee or trustee of the DWLLC Claims Trust to payment of fees and expenses, indemnification, reimbursement, priority of payment, charging liens, exculpation, limitation of liability, or any rights or obligations necessary to receive, process, or make distributions under the Plan or to enforce the foregoing rights.

Any such cancelled instrument, agreement or other document that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of, as applicable: (a) enabling Holders of Allowed DBS Notes Claims or other Claims or Interests to receive distributions under the Plan as provided herein; and (b) allowing and preserving the rights of any applicable paying agent or trustee, to (i) make distributions in satisfaction of Allowed DBS Notes Claims or other Claims or Interests, (ii) maintain and exercise their respective charging liens, against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions or for any amount and enforcing any obligation owed to the applicable paying agent or trustee under this Plan, (iv) maintain and enforce any right to indemnification, expense reimbursement, contribution, subrogation, any priority of payment or charging liens or any other claim or entitlement, (v) exercise their rights and obligations relating to the interests of their holders, and (vi) appear and be heard in these Chapter 11 Cases.

On the Effective Date, the Indenture Trustees shall be automatically and fully released and discharged from any further responsibility under the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture and shall have no further obligation or liability in respect of the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, and the 2029 Senior Notes Indenture up to and including the Effective Date, except as provided in this Plan and the Confirmation Order. The Indenture Trustees on and after the Effective Date shall have the rights and duties set forth in the Amended Notes Indentures. The fees, expenses, and costs of any Indenture Trustee or trustee of the DWLLC Claims Trust, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the 2026 Senior Secured Notes Indenture, the 2028 Senior Notes Indenture, the 2028 Senior Secured Notes Indenture, the 2029 Senior Notes Indenture and any applicable DWLLC Claims Trust agreement, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to this Plan or any applicable DWLLC Claims Trust agreement, including the fees and expenses of counsel, shall be paid in accordance with the terms of this Plan and the applicable Definitive Documents.

**F. Corporate Existence.**

Except as otherwise provided in this Plan or the Plan Supplement, each DBS Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such DBS Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such

documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized DBS Debtors may be amended or modified in accordance with the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Reorganized DBS Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents of each Reorganized DBS Debtor shall prevent the issuance of non-voting equity securities.

**G. Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan (including any action to be undertaken by the DBS Debtors) shall be deemed authorized and approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the DBS Debtors, or any other Entity or Person, including: (a) the implementation of the Restructuring Transactions; (b) the execution, delivery, and performance of the Amended Notes Indentures and the issuance and distribution of the Amended Notes, in each case, in accordance with the Plan and the applicable Amended Notes Indentures; (c) the consummation of any intercompany settlements, setoffs, contributions, cancellations, reinstatements, or other intercompany transactions contemplated by the Plan (including with respect to DBS Intercompany Claims and Intercompany Interests); (d) the adoption, execution, and filing of any organizational documents or amendments thereto of the Reorganized DBS Debtors, if any, contemplated by the Plan; (e) the selection of the directors and officers (or managers, as applicable) of the Reorganized DBS Debtors as contemplated by the Plan and disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (f) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases and the payment of any Cure Costs in connection therewith, in each case in accordance with the Plan and any applicable Final Order; and (g) all other acts or actions contemplated by, or reasonably necessary or appropriate to implement, consummate, and effectuate the Plan and the Restructuring Transactions (whether to occur before, on, or after the Effective Date) in a manner consistent with the Plan and, to the extent applicable, the Restructuring Support Agreement.

All matters provided for in this Plan involving the corporate structure of the DBS Debtors or the Reorganized DBS Debtors, and any corporate action required by the DBS Debtors or the Reorganized DBS Debtors, as applicable, in connection with the Plan, shall be deemed to have occurred and shall be in effect without any requirement of further action by the directors, officers, managers, or other governing bodies of the DBS Debtors or the Reorganized DBS Debtors, as applicable.

On or prior to the Effective Date, as applicable, the appropriate officers of the DBS Debtors or the Reorganized DBS Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver any and all agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the DBS Debtors or the Reorganized DBS Debtors, as applicable. The

authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

## H. The Reorganized DBS Debtors

On the Effective Date, the Reorganized DBS Debtors shall be authorized to adopt any agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to Consummate the Plan.

## I. Vesting of Assets in Reorganized DBS Debtors.

Except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each DBS Estate, all Causes of Action belonging to the DBS Debtors or the DBS Estates, and any property acquired by any of the DBS Debtors pursuant to this Plan shall vest in the Reorganized DBS Debtors, as applicable, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances and interests. Notwithstanding anything to the contrary in this Plan, including this Article IV.I, such vesting free and clear shall not apply to, and nothing in this Plan or the Confirmation Order shall discharge, release, impair, waive, alter, or otherwise affect, the rights, interests, or Claims of Holders of Reinstated Claims or Unimpaired Claims. On and after the Effective Date, except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized DBS Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action belonging to the Reorganized DBS Debtors, the DBS Debtors, or the DBS Estates without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, all present and future property subject to Liens securing the indebtedness evidenced by the DBS Notes or obligations under the DBS Indentures as amended shall remain subject to all such Liens.

## J. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized DBS Debtors and the officers, managers, general partners, and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized DBS Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

## K. Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (including, for the avoidance of doubt, any transfers from a DBS Debtor to a Reorganized DBS Debtor or to any other Person) of property under or in connection with the Plan, including or pursuant to: (a) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, or other interest in the DBS Debtors or the Reorganized DBS Debtors, as applicable; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of

additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security pursuant to this Plan; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

**L. Certain Securities Law Matters.**

To the extent the Amended Notes are issued, offered, distributed, exchanged, or otherwise delivered under the Plan, such Amended Notes shall be issued, offered, and distributed to the fullest extent permitted in reliance on the exemption from registration provided by section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act and any other available exemption(s) from registration under applicable securities laws.

To the extent section 1145 of the Bankruptcy Code is applicable, the offer, issuance, and distribution of the Amended Notes under the Plan shall be exempt from the registration and prospectus delivery requirements of section 5 of the Securities Act and any applicable state securities laws, subject to the limitations set forth in section 1145 and applicable law.

To the extent section 1145 of the Bankruptcy Code is not available or is determined not to apply to any issuance or distribution of the Amended Notes, such notes shall be offered, issued, and distributed pursuant to one or more other available exemptions from registration (including, as applicable, section 4(a)(2) of the Securities Act, Regulation D, and/or Regulation S) and may be subject to customary legends and transfer restrictions consistent with applicable law and the applicable governing documents. The availability of section 1145 of the Bankruptcy Code or any other exemption shall not be a condition to the occurrence of the Effective Date.

**M. Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, and subject to Article VIII and the terms of the Restructuring Support Agreement, the Reorganized DBS Debtors shall retain and may enforce any and all Causes of Action of the DBS Debtors and the DBS Estates, whether arising before, on, or after the Petition Date, including any Causes of Action described in, or reserved by, the Plan, the Plan Supplement, or the Disclosure Statement.

Except to the extent that any Cause of Action is expressly waived, released, compromised, settled, exculpated, or otherwise disposed of pursuant to (a) the Plan, (b) the Confirmation Order, or (c) the Restructuring Support Agreement, no Cause of Action shall be deemed waived, released, compromised, exculpated, or otherwise disposed of by the DBS Debtors or the Reorganized DBS Debtors, and the DBS Debtors and the Reorganized DBS Debtors expressly reserve all rights to prosecute, enforce, settle, compromise, or otherwise resolve any such retained Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, upon the Effective Date, all Causes of Action of the DBS Debtors and the DBS Estates that are retained pursuant to this Plan shall vest in the Reorganized DBS Debtors, as applicable. The Reorganized DBS Debtors shall have the exclusive right, authority, and discretion to commence, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action, without the consent of any third party and without further notice to or order of the Bankruptcy Court, except as otherwise expressly provided in this Plan or the Confirmation Order.

Except to the extent a Cause of Action is expressly waived, released, compromised, settled, exculpated, or otherwise disposed of pursuant to this Plan, the Confirmation Order, or the Restructuring Support Agreement, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to any retained Cause of Action as a consequence of the filing, confirmation, or Consummation of the Plan.

### N. Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the DBS Debtors shall be permitted to close all of the Chapter 11 Cases of the DBS Debtors except for the Chapter 11 Case of one designated DBS Debtor, and all contested matters relating to each of the DBS Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of such DBS Debtor.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

As of the Effective Date, under the Confirmation Order pursuant to sections 365(a) and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease to which a DBS Debtor is a party shall be deemed assumed by the applicable Reorganized DBS Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is identified as a Rejected Contract or Lease on the Schedule of Rejected Contracts and Leases; (b) has expired or terminated pursuant to its own terms prior to the Confirmation Date; (c) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order; or (d) is the subject of a pending motion to reject filed by the DBS Debtors as of the Confirmation Date.

Nothing in this Article V.A shall limit, modify, or otherwise affect: (a) the treatment, including the effective date of assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease of a DBS Debtor that was previously assumed, assumed and assigned, or rejected pursuant to a Final Order; (b) the prosecution, resolution, withdrawal, or settlement, and the effective date of any relief granted, of any motion to assume, assume and

assign, or reject an Executory Contract or Unexpired Lease of a DBS Debtor that is pending as of the Confirmation Date; or (c) the right of any DBS Debtor to seek or obtain authority to abandon personal property under section 554 of the Bankruptcy Code. Any pending motion to assume, assume and assign, or reject may be withdrawn, settled, or otherwise prosecuted by the DBS Debtors prior to the Effective Date or the Reorganized DBS Debtors on and after the Effective Date, as applicable.

Except as otherwise provided in this Plan or agreed to by the DBS Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall be assumed in its entirety and shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by applicable law, any provision in an Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan that restricts, conditions, or prohibits, or purports to restrict, condition, or prohibit, or is breached or deemed breached by, such assumption or assumption and assignment, including any "change of control" provision or similar provision, shall be unenforceable, with respect to the assumption of such Executory Contract or Unexpired Lease in these Chapter 11 Cases, to the extent of such restriction, condition, prohibition, or breach, and shall not entitle the non-DBS Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any default-related rights or demands for payment with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases executed by the DBS Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Notwithstanding anything to the contrary in this Plan, the DBS Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Contracts and Leases with respect to Executory Contracts or Unexpired Leases to which the DBS Debtors are a party at any time prior to the Confirmation Date; provided, that the DBS Debtors or the Reorganized DBS Debtors, as applicable, may amend the Schedule of Rejected Contracts and Leases to add or remove any Executory Contract or Unexpired Lease after the Confirmation Date to the extent agreed with the relevant counterparties and upon entry of an order of the Bankruptcy Court authorizing such amendment.

## B. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases of a DBS Debtor by operation of this Plan must be Filed with the Bankruptcy Court within twenty-one (21) days after service of the Confirmation Order. For the avoidance of doubt, this deadline applies to any Executory Contract and Unexpired Lease of a DBS Debtor identified as a Rejected Contract or Lease on the Schedule of Rejected Contracts and Leases. The deadline for filing Claims arising from the rejection of an Executory Contract or Unexpired Lease of a DBS Debtor pursuant to any separate order of the Bankruptcy Court shall be governed by such order, as applicable.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease of a DBS Debtor not Filed with the Bankruptcy Court within such time shall be automatically disallowed, forever barred from assertion, and shall not be enforceable against the DBS Debtors, the Reorganized DBS Debtors, the DBS Estates, or their property without the need for any objection by the Reorganized DBS Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**

Any Claim arising from the rejection of an Unexpired Lease of nonresidential real property shall be subject to section 502(b)(6) of the Bankruptcy Code.

1. **Procedures for Disputed Rejection Damages Claims.**

Any Claim arising from the rejection of an Executory Contract or Unexpired Lease of a DBS Debtor that is timely Filed in accordance with Article V.B shall be treated as a disputed Claim unless and until it is allowed by a Final Order of the Bankruptcy Court or is otherwise resolved by agreement between the Holder of such Claim and the DBS Debtors or the Reorganized DBS Debtors, as applicable. The DBS Debtors or the Reorganized DBS Debtors, as applicable, may, but shall not be required to, File an objection to any such Claim on or before the later of (a) one-hundred eighty (180) days after any Proof of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases of a DBS Debtor by operation of this Plan is Filed with the Bankruptcy Court (as such deadline may be extended from time to time by a motion of the Reorganized DBS Debtors) and (b) such other date as may be established by the Bankruptcy Court upon motion of the DBS Debtors or the Reorganized DBS Debtors, as applicable, after which the Reorganized DBS Debtors shall be deemed to have waived any further right to object to such Claim. If the DBS Debtors or the Reorganized DBS Debtors, as applicable, do not File an objection to any such Claim on or before the applicable deadline described in the foregoing sentence, such Claim shall, without further notice to or action, order, or approval of the Bankruptcy Court, be deemed allowed in the amount set forth in the applicable Proof of Claim, effective as of the day immediately following such deadline. If the DBS Debtors or the Reorganized DBS Debtors, as applicable, timely File an objection to any such Claim, such Claim shall become and remain a disputed Claim, and the objection shall be resolved, determined, or adjudicated by the Bankruptcy Court, unless the DBS Debtors or the Reorganized DBS Debtors, as applicable, and the Holder of such Claim otherwise agree to resolve such objection by settlement or compromise, in which case no further notice to or action, order, or approval of the Bankruptcy Court shall be required to give effect to such settlement or compromise.

To the extent a disputed Claim arising from the rejection of an Executory Contract or Unexpired Lease of a DBS Debtor is allowed by Final Order of the Bankruptcy Court, resolved by agreement, or deemed allowed as a result of the DBS Debtors' or the Reorganized DBS Debtors' failure to timely object, in each case in accordance with this Article V.B.1, such Claim shall be classified as a DBS General Unsecured Claim in accordance with Article III, and, except to the extent the Holder of such Claim agrees to less favorable treatment, such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, payment in full in Cash of the allowed amount of such Claim, payable on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes an allowed

Claim, whether by Final Order of the Bankruptcy Court, agreement, or deemed allowance as a result of the DBS Debtors' or the Reorganized DBS Debtors' failure to timely object.

Unless otherwise agreed by the DBS Debtors or the Reorganized DBS Debtors, as applicable, and the Holder of the applicable Claim, no disputed Claim arising from the rejection of an Executory Contract or Unexpired Lease of a DBS Debtor shall be Reinstated as a DBS General Unsecured Claim, and no amount shall be due or payable in the ordinary course on account of such Claim.

**C. Cure of Defaults for Assumed Contracts and Leases.**

With respect to each Executory Contract or Unexpired Lease assumed by a DBS Debtor pursuant to this Plan, as a condition to the assumption of such Executory Contract or Unexpired Lease, the DBS Debtors shall cure, or provide adequate assurance that they will promptly cure, any monetary defaults, pursuant to sections 365(b)(1) and 1123(b)(2) of the Bankruptcy Code, (1) on or prior to the Effective Date, for such amounts that have come due under the terms of the Executory Contract or Unexpired Lease prior to the Effective Date, (2) in accordance with the terms of the Executory Contract or Unexpired Lease, for such amounts that come due on or after the Effective Date, or (3) on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree in writing. In the event of a dispute regarding (a) the amount of any Cure Costs, (b) the DBS Debtors' or Reorganized DBS Debtors' ability to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the undisputed portion of such Cure Costs shall be paid in accordance with the first sentence of this Article V.C, and the applicable disputed Cure Costs shall be paid following the entry of a Final Order resolving the dispute; provided, however, that any dispute as to the amount of Cure Costs or any potential contractual obligation under such Executory Contract or Unexpired Lease, whether arising before or after the Effective Date, shall be resolved: (i) by any court of competent jurisdiction as provided (A) by the forum selection, venue, and choice of law provisions of such Executory Contract or Unexpired Lease or (B) under applicable non-bankruptcy law; or (ii) under the terms of a settlement between the DBS Debtors or the Reorganized DBS Debtors, on the one hand, and the non-Debtor party to such Executory Contract or Unexpired Lease, on the other hand, without any further notice to or action, order, or approval of the Bankruptcy Court. With respect to the foregoing proviso, if the dispute relates to the amount of any Cure Costs, the applicable Executory Contract or Unexpired Lease shall be treated as having been assumed by the DBS Debtors or the Reorganized DBS Debtors under sections 365 and 1123(b)(2) of the Bankruptcy Code pending resolution of any such dispute.

Notwithstanding anything herein to the contrary, any Cure Costs arising in connection with any assumption or assumption and assignment of any Executory Contract or Unexpired Lease of a DBS Debtor under any separate order of the Bankruptcy Court shall be governed by such order.

**Any and all Proofs of Claim based upon Assumed Contracts and Leases, and for which any Cure Costs have been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

**D. Preexisting Obligations to the DBS Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease of a DBS Debtor pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the DBS Debtors or the Reorganized DBS Debtors, as applicable, under such Rejected Contracts and Leases, and all rights to such preexisting obligations shall vest in the Reorganized DBS Debtors on the Effective Date. In particular, notwithstanding any non-bankruptcy law to the contrary, the DBS Debtors and the Reorganized DBS Debtors, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the DBS Debtors pursuant to Rejected Executory Contracts and Unexpired Leases in accordance with the terms of any such Rejected Executory Contract or Unexpired Lease.

**E. Indemnification Obligations.**

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any governing body, general partners, directors, officers, managers, members, employees, attorneys, accountants, investment bankers, advisors, and other professionals of, or acting on behalf of, the DBS Debtors, as applicable, shall be assumed by the Reorganized DBS Debtors and shall remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any governing body, general partners, directors, officers, managers, employees, attorneys, accountants, investment bankers, advisors, and other professionals of, or acting on behalf of, the DBS Debtors than the indemnification provisions in place prior to the Effective Date.

**F. Insurance Policies.**

Nothing in this Plan, any exhibit to this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the First Day Pleadings or any order entered related thereto, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, shall diminish, impair, or otherwise modify any rights of the Debtors, the Reorganized DBS Debtors, or any other insured, additional insured, beneficiary, or other covered party under any insurance policy that provides coverage to or for the benefit of any Debtor or such other insured, including any D&O Policies. To the extent any insurance policy issued to, or providing coverage to, any DBS Debtor is an Executory Contract and has not previously been rejected pursuant to a Final Order of the Bankruptcy Court, such insurance policy shall be deemed assumed by the applicable Reorganized DBS Debtor effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, nothing in this Plan shall be deemed to revest in any Reorganized DBS Debtor any insurance policy, proceeds, rights, or interests that are not property of the applicable DBS Estate.

### G. Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the DBS Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless otherwise agreed by the DBS Debtors and the Reorganized DBS Debtors, as applicable, and the counterparty to such Executory Contract or Unexpired Lease.

No modification, amendment, supplement, or restatement to a prepetition Executory Contract or Unexpired Lease made by the DBS Debtors during their Chapter 11 Cases shall, by virtue of such modification alone, give rise to an Administrative Claim against any DBS Debtor or DBS Estate under section 503(b) of the Bankruptcy Code or otherwise; provided that the foregoing shall not limit the right of any counterparty to assert an Administrative Claim to the extent such Claim would otherwise be allowable under applicable Law.

### H. Reservation of Rights.

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the DBS Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized DBS Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the DBS Debtors or the Reorganized DBS Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to seek relief from the Bankruptcy Court to alter its treatment of such contract or lease under the Plan.

### I. Nonoccurrence of Effective Date.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### J. Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any DBS Debtor, including any Executory Contracts and Unexpired Leases assumed by such DBS Debtor, will be performed by the applicable DBS Debtor or Reorganized DBS Debtor, as applicable, and shall remain liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.
# PROVISIONS GOVERNING DISTRIBUTIONS

## A. Timing and Calculation of Amounts to Be Distributed.

Except as otherwise provided herein, all Claims against the DBS Debtors other than DBS Notes Claims shall be paid or satisfied in the ordinary course of the DBS Debtors' business in accordance with the terms and conditions of the contract or transaction giving rise to such Claim. Unless otherwise provided in this Plan, including Articles II.A and V.C of the Plan, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed DBS Notes Claim against the DBS Debtors shall receive the full amount of the distributions or other treatment that the Plan provides for Allowed DBS Notes Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. Notwithstanding anything to the contrary in this Plan, no Holder of an Allowed DBS Notes Claim shall, on account of such Allowed DBS Notes Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

## B. Disbursing Agent.

All distributions under this Plan shall be made by the Disbursing Agent. All distributions to Holders of Allowed Claims in Classes 1C, 1D, 1F, and 1G on account of the DBS Notes shall be made by the Disbursing Agent in the first instance to the applicable Indenture Trustee for further distribution to the applicable Holders in accordance with the applicable DBS Indenture. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, if the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized DBS Debtors.

To the extent distributions are made through an Indenture Trustee, the trustee of the DWLLC Claims Trust, DTC, or other securities intermediary, such distributions shall be deemed made to the applicable Holders when delivered to the Indenture Trustee, the trustee of the DWLLC Claims Trust, DTC, or such intermediary, as applicable. Each Indenture Trustee and trustee of the DWLLC Claims Trust shall be entitled to rely on the records and procedures of DTC, Cede & Co., nominees, participants, brokers, banks, custodians, and other intermediaries and shall have no liability for any act or omission of any of the foregoing. Such distributions shall be subject in all respect to any rights of each Indenture Trustee to assert a charging lien against such distributions. All distributions to be made through DTC shall be made eligible for distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any distribution under the Plan to Holders of Allowed DBS Notes Claims on account of the DBS Notes if such distribution is not eligible to be distributed through the facilities of DTC. For the avoidance of doubt, the respective Indenture Trustees shall have no obligation to identify the Holders of Claims on account of the DBS Notes, respectively, calculate or allocate the amounts distributable to the Holders of Claims on account

of the DBS Notes hereunder, set up new positions at DTC relating to the distributions hereunder, or make or ensure such positions are DTC-eligible.

**C. Rights and Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized DBS Debtors.

**D. Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

1. **Delivery of Distributions in General.**

On and after the Effective Date, the Disbursing Agent shall make the distributions required to be made on account of Allowed DBS Notes Claims or other Claims under the Plan. Except as expressly provided in this Plan, nothing in this Article VI.D.1 shall be construed to require the establishment of any reserve with respect to any Claim. Except as otherwise provided in this Plan, including Articles III.C and VI.H, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to this Plan.

The DBS Debtors, the Reorganized DBS Debtors, and the Disbursing Agent (including any Agent that may be acting as Disbursing Agent), as applicable, shall not incur any liability whatsoever on account of any distributions under this Plan except for its own fraud, gross negligence, or willful misconduct as determined by a final, nonappealable order of a court of competent jurisdiction.

2. **Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without additional interest (if any); provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized DBS Debtors, automatically and without need for a further order by the Bankruptcy Court and the Claim of any Holder to such property or interest in property shall be released, discharged, settled, compromised, and forever barred.

3. **Manner of Payment Pursuant to this Plan.**

At the sole and exclusive discretion of the Disbursing Agent, any Cash payment to be made hereunder may be made by check, ACH transfer, or wire transfer or as otherwise required or provided in the applicable agreements. To the extent a Cash payment is made by check, the distribution shall be deemed made upon the Disbursing Agent's mailing of such check.

**E. Distributions to Holders of Allowed DBS Notes Claims.**

The remittance of any DWLLC Recovery to the applicable Indenture Trustee for the 2028 Senior Secured Notes for application to the optional redemption of Allowed 2028 Senior Secured Notes Claims pursuant to the Restructuring Support Agreement and the DWLLC Claims Trust Agreement is in addition to, and not in lieu of, any redemption of 2028 Senior Secured Notes after the Effective Date pursuant to the DBS Cash Sweep (or any other consideration provided to Holders of Allowed DBS Notes Claims under this Plan).

Notwithstanding anything to the contrary in this Article VI.E or elsewhere in this Plan, and for the avoidance of doubt, the treatment of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims against the DBS Debtors under Classes 1D, 1F and 1G, respectively, and the treatment of such Allowed DBS Notes Claims under this Plan with respect to the DBS Debtors shall not alter, impair, satisfy, discharge, or otherwise affect such holders' separate DISH Wireless General Unsecured Claims against DWLLC under the DWLLC Intercompany Loan assigned to the DWLLC Claims Trust for the ratable benefit of DWLLC Claims Trust Beneficiaries prior to the Petition Date in accordance with the Restructuring Support Agreement. All distributions for the benefit of the Holders of Allowed 2028 Senior Secured Notes Claims, Allowed 2028 Senior Notes Claims, and Allowed 2029 Senior Notes Claims against the DBS Debtors under Classes 1D, 1F, and 1G, respectively, shall be made through the applicable Indenture Trustee for application and further distribution to the applicable Holders in accordance with the applicable DBS Indenture. The Indenture Trustees shall have no duty with respect to the DWLLC Claims Trust except to distribute funds, if any, actually received in accordance with the applicable DBS Indenture. The duties, obligations, liabilities, and protections of the trustee of the DWLLC Claims Trust shall be limited to those expressly set forth in the applicable trust agreement and accepted by such trustee, and the trustee of the DWLLC Claims Trust shall have no personal liability for obligations of the DBS Debtors, Reorganized DBS Debtors, the DWLLC Claims Trust, holders, or beneficiaries, except as expressly provided in the applicable trust agreement. For the avoidance of doubt, the claims asserted against DWLLC in respect of the DWLLC Intercompany Loan are disputed in DWLLC's Chapter 11 Case and no representation or warranty is made that there will be any distributions or recovery in respect of the DWLLC Intercompany Loan and all Persons and Entities have reserved their rights with respect thereto.

**F. Compliance with Tax Requirements/Allocations.**

In connection with the Plan, to the extent applicable, the Disbursing Agent shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to

such withholding and reporting requirements unless an exception applies. Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes is reasonable and appropriate. The Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of a Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

**G. Allocation of Plan Distributions Between Principal and Interest.**

Unless (i) the terms and conditions of a contract between the Holder of a Claim and a DBS Debtor or (ii) a Final Order of a court of competent jurisdiction, including the Bankruptcy Court, involving a Holder of a Claim and a DBS Debtor provide otherwise, distributions in respect of Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as allowed therein. Distributions made to the Indenture Trustees for the benefit of their respective Holders shall be made, for each series of DBS Notes, in accordance with the terms of the relevant DBS Indenture.

**H. No Postpetition Interest on Claims.**

Other than with respect to Allowed DBS Notes Claims or as required by an applicable contract or by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the DBS Debtors, and except as otherwise provided thereby, no Holder of a prepetition Claim against the DBS Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Notwithstanding the foregoing, to the extent that the payment of postpetition interest on any Claim is required by applicable law for such Claim to satisfy the requirements of section 1124 of the Bankruptcy Code, the Holder of such Claim shall receive postpetition interest on such Claim at the applicable contractual rate or, if no contractual rate applies, at the Federal Judgment Rate, in each case calculated from the Petition Date through the date such Claim is paid in full; provided, that nothing in the Plan shall impair any rights of the Holder of a DBS General Unsecured Claim to demand and receive payment of interest for periods preceding and/or postdating the Petition Date to the extent provided for under a contract or applicable non-bankruptcy law.

**I. Foreign Currency Exchange Rate.**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)* on the Effective Date.

**J. Setoffs and Recoupment.**

Except as otherwise expressly provided herein, the DBS Debtors or the Reorganized DBS Debtors, as applicable, may, but shall not be required to, set off or recoup any Claims of any nature whatsoever that the DBS Debtors or the Reorganized DBS Debtors may have against the claimant against any amounts otherwise payable to such claimant under the Plan (including any Plan Distributions), but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the DBS Debtors or the Reorganized DBS Debtors of any such Claim they may have against the Holder of such Claim; provided, however, that nothing herein shall permit any DBS Debtor to setoff or recoup any claim of any nature against any DISH Wireless Debtor. On and after the Confirmation Date, without the need for Bankruptcy Court approval, the DBS Debtors or the Reorganized DBS Debtors, as applicable, may exercise, litigate, or settle any rights of setoff or recoupment that the DBS Debtors or the Reorganized DBS Debtors may have. On the Effective Date, all such rights of setoff or recoupment shall be preserved and shall vest in the Reorganized DBS Debtors, as applicable, provided, however, that nothing under this Plan (including this Article VI.J) shall give any Debtor or Reorganized DBS Debtor, as applicable, any greater rights with respect to any Claim that is Unimpaired under the Plan than it held prior to the Petition Date. Nothing in this Plan shall be construed to limit, impair, or extinguish any right of setoff preserved under section 553 of the Bankruptcy Code that any Holder of a Claim may have to the extent such right exists under applicable non-bankruptcy law and satisfies the requirements of section 553 of the Bankruptcy Code.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, nothing shall modify the rights, if any, of any Holder of Claims or any current or former party to an Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, (1) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; or (2) assertion of setoff or recoupment as a defense, if any, to any claim or action by the DBS Debtors or the Reorganized DBS Debtors.

**K. Claims Paid or Payable by Third Parties.**

1. **Claims Paid by Third Parties.**

The DBS Debtors or the Reorganized DBS Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a DBS Debtor or a Reorganized DBS Debtor, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a DBS Debtor or a Reorganized DBS Debtor, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized DBS Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized DBS Debtor

annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2. **Claims Payable by Insurance, Third Parties.**

No distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the DBS Debtors' insurance policies, surety agreements, other non-DBS Debtor payment agreements, or collateral held by a third party, until the Holder of such Claim has made reasonable efforts to exhaust all remedies with respect to such insurance policy, surety agreement, other non-DBS Debtor payment agreement, or collateral, as applicable. To the extent that one or more of the DBS Debtors' insurers, sureties, or non-DBS Debtor-payors pays or satisfies in full or in part a Claim (if and to the extent finally adjudicated by a court of competent jurisdiction or otherwise settled), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. **Applicability of Insurance Policies.**

Notwithstanding anything to the contrary in this Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party under any of the DBS Debtors' insurance policies with respect to such policies (including the D&O Policies), nor shall anything contained herein (a) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under any insurance policy, applicable law, equity, or otherwise, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

## ARTICLE VII.
## [RESERVED.]

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. Discharge of Claims and Termination of Interests and Intercompany Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, including with respect to Reinstated Claims, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan or the Confirmation Order, the distributions, rights, and treatment provided in this Plan shall be in complete satisfaction and discharge, effective as of the Effective Date, of all Claims, Interests, Intercompany Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests and Intercompany Interests in, the DBS Debtors, the DBS Estates or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, Interests, or Intercompany Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations

or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim, Interest or Intercompany Interest based upon such debt, right, Interest or Intercompany Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such Claim, Interest or Intercompany Interest has accepted this Plan.

The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims), Interests, and Intercompany Interests (other than any Intercompany Interests that are Reinstated), subject to the occurrence of the Effective Date.

Notwithstanding anything to the contrary in this Article VIII.A, the discharge provided herein shall not apply to, and nothing in this Plan or the Confirmation Order shall discharge, release, impair, waive, or otherwise affect Reinstated Claims or any obligations of a Reorganized DBS Debtor to pay Cure Costs (or other amounts required under section 365(b)(1) of the Bankruptcy Code as a condition to assumption) with respect to an Executory Contract or Unexpired Lease assumed by a DBS Debtor pursuant to this Plan, to the extent such obligations remain unpaid as of the Effective Date.

Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to (a) release or enjoin any rights, claims, causes of action or defenses of the DISH Wireless Debtors or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals, and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action, and defenses of the DISH Wireless Debtors and/or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals, and any other Related Parties of the foregoing are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order, or (b) release, waive, enjoin, or modify any rights, claims, causes of action, or defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, including under section 502(h) of the Bankruptcy Code, it being understood that all rights, claims, causes of action, and defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.

## B. Release of Liens.

Except as otherwise specifically provided in this Plan, the Confirmation Order, the Amended Notes Indentures, or in any contract, instrument, release, or other agreement or document created pursuant to this Plan or existing in connection with the DBS Notes and any Liens securing any DBS Notes, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of an allowed Secured Claim, satisfaction in full of the portion of such allowed Secured Claim that is allowed as of the Effective Date, except for any Other Secured Claim that is Reinstated under this Plan, or any Liens required to continue in

accordance with this Plan and the applicable Amended Notes Indenture with respect to the Amended 2026 Senior Secured Notes or the Amended 2028 Senior Secured Notes, all mortgages, deeds of trust, Liens, pledges, or other security interests in or against any property of the DBS Debtors or the DBS Estates shall be fully satisfied and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable agent of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized DBS Debtors, and their successors and assigns. Each Holder of such an allowed Secured Claim (and the applicable agent for such Holder) shall be authorized and directed, and the Reorganized DBS Debtors shall be entitled to direct, at the sole cost and expense of the applicable Reorganized DBS Debtor, such Holder (or applicable agent for such Holder) to release any collateral or other property of any DBS Debtor (including any possessory collateral) held by such Holder (or the applicable agent for such Holder) and to take such actions as may be reasonably requested by the Reorganized DBS Debtors to evidence the release of such mortgage, deed of trust, Lien, pledge, or other security interest, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state or local agency records office or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgage, deed of trust, Lien, pledge, or other security interest.

**C. Releases by the DBS Debtors.**

**Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, in each case except for Claims arising under, or expressly preserved by, this Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the DBS Debtors, the DBS Estates, and the Reorganized DBS Debtors, in each case on behalf of themselves and their respective successors, assigns, and Representatives, and any and all Entities that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the DBS Debtors, the DBS Estates, and the Reorganized DBS Debtors, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or the DBS Estates, Affiliates, heirs, executors, administrators, successors, assigns, Representatives, or any other Entity claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, a DBS Debtor or other Entity, or that any Holder of any Claim against or Interest or Intercompany Interest in a DBS Debtor or other Entity could have asserted on behalf of the DBS Debtors based on or relating to, or in any manner arising from, in whole or in part, the DBS Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any**

**Security of the DBS Debtors or the Reorganized DBS Debtors, the Restructuring Transactions, the Chapter 11 Cases of the DBS Debtors, the DBS Debtors' in- or out- of-court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any DBS Debtor and any Released Party, the distribution of any Cash or other property of the DBS Debtors to any Released Party, the assertion of or enforcement of rights or remedies against the DBS Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases of the DBS Debtors, intercompany transactions between or among the DBS Debtors or between or among the DBS Debtors and their non-DBS Debtor Affiliates, the Restructuring Support Agreement, the Amended Notes, the Amended Notes Indentures, Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Definitive Documents, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, this Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, this Plan, or the Plan Supplement, the filing of the Chapter 11 Cases of the DBS Debtors, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any post-Effective Date obligations of any party or Entity under this Plan, any exhibit to this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the DWLLC Intercompany Loan, the First Day Pleadings or any order entered related thereto, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents; (2) any Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct; or (3) any Claim, defense, right of setoff or recoupment, or Cause of Action of the DBS Debtors, the DBS Estates, or the Reorganized DBS Debtors against any Released Party that has filed a Proof of Claim against any of the DBS Estates in the Chapter 11 Cases, to the extent such Claim, defense, right of setoff or recoupment, or Cause of Action: (a) constitutes a defense to, or basis for objection to, the allowance of such proof of claim in whole or in part; (b) constitutes a right of setoff, recoupment, or counterclaim with respect to any liability asserted in or arising from such proof of claim; or (c) arises from or relates to the same transaction, agreement, series of transactions, or occurrence or series of occurrences giving rise to the claims or liabilities asserted in such proof of claim; <u>provided</u> that nothing in this clause (3) shall be construed to (i) revive or reinstate any Claim or Cause of Action that has been separately released, waived, or relinquished by a written agreement entered into prior to the Effective Date, (ii) limit the rights of any Released Party to assert any defense to any such Claim or Cause of Action, or (iii) expand the rights of the**

**Reorganized DBS Debtors or any other Entity beyond those rights that existed under applicable Law as of the Petition Date.**

**Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to (a) release or enjoin any rights, claims, causes of action, or defenses of the DISH Wireless Debtors or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals, and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action, and defenses of the DISH Wireless Debtors and/or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals, and any other Related Parties of the foregoing are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order, or (b) release, waive, enjoin, or modify any rights, claims, causes of action, or defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, including under section 502(h) of the Bankruptcy Code, it being understood that all rights, claims, causes of action, and defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the DBS Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the DBS Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contribution to facilitating the Restructuring Transactions and implementing this Plan; (2) a good faith settlement and compromise of the Claims and Causes of Action released by the DBS Debtor Release; (3) in the best interests of the DBS Debtors, the DBS Estates, and all Holders of Claims, Interests, and Intercompany Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the DBS Debtors, the DBS Estates, and the Reorganized DBS Debtors asserting any Claim or Cause of Action released pursuant to the DBS Debtor Release.**

### D. Releases by the DBS Debtors, EchoStar, DNC, and the Specified Non-Debtor Affiliates.

**From and after the Effective Date, each of the DBS Debtors, EchoStar, DNC, and the Specified Non-Debtor Affiliates, to the maximum extent permitted under applicable Law, as such Law may be extended subsequent to the Effective Date, hereby expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharges and releases each of the Consenting Creditors (solely in the Consenting Creditors' capacities as such), respectively, and their respective property and successors and assigns (solely in their capacities as such), of and from any and all Claims, rights, suits, damages, Causes of Action, remedies and**

**liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, now existing or hereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of laws, or otherwise, including causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that the DBS Debtors EchoStar, DNC, or the Specified Non-Debtor Affiliates would have been legally entitled to assert (whether individually or collectively) against any Consenting Creditor based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Effective Date; provided, however, that the foregoing shall not apply to any Claim or Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.**

**Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to release or enjoin any rights, claims, causes of action or defenses of the DISH Wireless Debtors or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals, and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action, and defenses of the DISH Wireless Debtors and/or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.**

**E. Releases by the Consenting Creditors.**

**From and after the Effective Date, each of the Consenting Creditors, to the maximum extent permitted under applicable Law, as such Law may be extended subsequent to the Effective Date, hereby expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharges and releases each of the DBS Debtors, EchoStar, DNC, the Specified Non-Debtor Affiliates, and their respective property and successors and assigns, of and from any and all Claims, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, now existing or hereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of laws, or otherwise, including causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, that any Consenting Creditor would have been legally entitled to assert (whether individually or collectively) against the DBS Debtors, EchoStar, DNC, or the Specified Non-Debtor Affiliates, in each case based on, relating to, or in any manner arising from, in whole or in part, any act taken or omitted to be taken on or prior to the Effective Date solely to the extent related to the DBS Notes Claims or the DISH Wireless General Unsecured Claims held by applicable Consenting Creditors in their capacity as DWLLC Claims Trust Beneficiaries; provided, however, that the foregoing shall not apply to any Claim or Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. For the avoidance of doubt, notwithstanding anything to the contrary in this Plan or the Confirmation Order, no discharge or release by any Consenting Creditor under the Plan, including pursuant to this Article VIII.E or Article VIII.F, shall (a) bind any affiliate of a Consenting Creditor to the extent that such Consenting Creditor lacks authority to bind such affiliate, (b) apply to any**

**portfolio company of such Consenting Creditor other than parties to the Restructuring Support Agreement, or (c) apply to any Consenting Creditor other than its capacity as a Holder of DBS Notes Claims or, as applicable, in its capacity as a DWLLC Claims Trust Beneficiary.**

**F. Releases by Holders of Claims, Interests and Intercompany Interests.**

**Except as otherwise specifically provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each DBS Debtor, Reorganized DBS Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the DBS Debtors, the DBS Estates, or the Reorganized DBS Debtors (as applicable), whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or the DBS Estates, Affiliates, heirs, executors, administrators, successors, assigns, Representatives, and any other Entities claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the DBS Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any Security of the DBS Debtors or the Reorganized DBS Debtors, the Restructuring Transactions, the DBS Debtors' Chapter 11 Cases, the DBS Debtors' in- or out- of- court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any DBS Debtor and any Released Party, the distribution of any Cash or other property of the DBS Debtors to any Released Party, the assertion of or enforcement of rights or remedies against the DBS Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the DBS Debtors' Chapter 11 Cases, including the sale and marketing efforts related thereto, intercompany transactions between or among the DBS Debtors or between the DBS Debtors and their non-DBS Debtor Affiliates (other than the DISH Wireless Debtors), the Restructuring Support Agreement, the Amended Notes, the Amended Notes Indentures, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Definitive Documents, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, this Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Definitive Documents, this Plan, or the Plan Supplement, the filing of the DBS Debtors' Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement under the**

**Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under this Plan, any exhibit to this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the DWLLC Intercompany Loan, the First Day Pleadings or any order entered related thereto, the Sale Order, the Plan Supplement, the Amended Notes Indentures, or any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such orders, agreements and documents, or (2) any Cause of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.**

**Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to (a) release or enjoin any rights, claims, causes of action or defenses of the DISH Wireless Debtors or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action and defenses of the DISH Wireless Debtors and/or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived or discharged under the Plan or the Confirmation Order, or (b) release, waive, enjoin, or modify any rights, claims, causes of action, or defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, including under section 502(h) of the Bankruptcy Code, it being understood that all rights, claims, causes of action, and defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.**

**Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to release or enjoin any rights, claims, causes of action or defenses that any holder of a claim against the DISH Wireless Debtors may have against any Person or Entity, including the DISH Wireless Debtors, the DBS Debtors, their respective Professionals, and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action, and defenses of any holder of a claim against the DISH Wireless Debtors against any Person or Entity, including the DISH Wireless Debtors, the DBS Debtors, their respective Professionals, and any other Related Parties of the foregoing in any way related to their claims against the DISH Wireless Debtors are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of this Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contribution to facilitating the Restructuring Transactions and implementing this Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the DBS Debtors and the DBS Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.**

**G. Exculpation.**

**Except as otherwise specifically provided in this Plan or the Confirmation Order, to the fullest extent permitted by applicable law, each Exculpated Party is exculpated from, and no Exculpated Party shall have or incur any liability to, or be subject to any right, claim or cause of action by, any Entity for any act or omission in connection with, relating to, or arising out of, the DBS Debtors' Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Definitive Documents, the Solicitation Materials, this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the filing of the DBS Debtors' Chapter 11 Cases, the First Day Pleadings, the Definitive Documents, the negotiation and pursuit of the Restructuring Support Agreement, the Amended Notes Indentures, the Plan Supplement, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement; <u>provided</u>, <u>however</u>, that the foregoing exculpation shall not apply to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. The Exculpated Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities hereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability. The Exculpated Parties have, and upon Consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.**

**Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to (a) release or enjoin any rights, claims, causes of action or defenses of the DISH Wireless Debtors or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action and defenses of the DISH Wireless Debtors and/or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order, or (b) release, waive, enjoin, or modify any rights, claims, causes of action, or defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, including under section 502(h) of the Bankruptcy Code, it being understood that all rights, claims, causes of action, and defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.**

**Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to release or enjoin any rights, claims, causes of action, or defenses that any holder of a claim against the DISH Wireless Debtors may have against any Person or Entity, including the DISH Wireless Debtors, the DBS Debtors, their respective Professionals, and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action, and defenses of any holder of a claim against the DISH Wireless Debtors against any Person or Entity, including the DISH Wireless Debtors, the DBS Debtors, their respective Professionals, and any other Related Parties of the foregoing in any way related to their claims against the DISH Wireless Debtors are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.**

**H. Injunction.**

**Except as otherwise specifically provided in this Plan or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Intercompany Interests that have been released, discharged, or settled, or are subject to exculpation under this Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the DBS Debtors, the Reorganized DBS Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests; and (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the DBS Estates of such**

**Entities on account of or in connection with or with respect to any such Causes of Action, Claims, Interests, or Intercompany Interests. Notwithstanding anything to the contrary in this Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the DBS Debtors and any property dealt with by this Plan until the Effective Date.**

**Upon entry of the Confirmation Order, all Holders of Claims, Interests, and Intercompany Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Each Holder of an Allowed DBS Notes Claim or other Claim or Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, Interest, or Intercompany Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.H.**

**Notwithstanding the foregoing and for the avoidance of doubt, the injunctions and stays set forth in this Article VIII.H shall not apply to any Reinstated Claim or any Administrative Claim against a DBS Debtor.**

**Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to (a) release or enjoin any rights, claims, causes of action or defenses of the DISH Wireless Debtors or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action and defenses of the DISH Wireless Debtors and/or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived or discharged under the Plan or the Confirmation Order, or (b) release, waive, enjoin, or modify any rights, claims, causes of action, or defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, including under section 502(h) of the Bankruptcy Code, it being understood that all rights, claims, causes of action, and defenses against any of the DISH Wireless Debtors or their chapter 11 estates, or any Entity acting on behalf of the DISH Wireless Debtors or their chapter 11 estates, including the Special Committee, the Committee, or any successor of any of the forgoing, are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.**

**Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to release or enjoin any rights, claims, causes of action or defenses that any holder of a claim against the DISH Wireless Debtors may have against any Person or Entity, including the DISH Wireless Debtors, the DBS Debtors, their respective Professionals, and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action, and defenses of any holder of a claim against the DISH Wireless Debtors against any Person or Entity, including the DISH Wireless Debtors, the DBS Debtors, their respective**

**Professionals, and any other Related Parties of the foregoing in any way related to their claims against the DISH Wireless Debtors are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.**

### I. Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, no Governmental Unit shall deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, any Reorganized DBS Debtor, or another Entity with whom the Reorganized DBS Debtors have been associated, solely because such Reorganized DBS Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of its Chapter 11 Case (or during its Chapter 11 Case but before it is granted or denied a discharge), or has not paid a debt that is dischargeable in its Chapter 11 Case.

### J. Subordination Rights.

Any distributions under this Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property, assets, and interests distributed under this Plan, in each case other than as provided in this Plan.

### K. Document Retention.

On and after the Effective Date, the Reorganized DBS Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized DBS Debtors, provided that nothing in this Plan, the Plan Supplement, or the Confirmation Order shall relieve the Reorganized DBS Debtors from any existing obligation to retain documents in connection with ongoing or anticipated litigation.

### L. Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent; provided, that the foregoing shall not apply to any claims for reimbursement or contribution of any DISH Wireless Debtors which are expressly preserved and unimpaired under the Plan and Confirmation Order.

# ARTICLE IX.
# CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

## A. Conditions Precedent to the Effective Date.

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived in accordance with Article IX.B:

1. the Restructuring Support Agreement shall not have been terminated as to the Consenting Creditors and shall be in full force and effect and no termination event thereunder shall have occurred and remain occurring;

2. the Restructuring Transactions for the DBS Debtors shall have been implemented in all material respects;

3. no court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, or entered any final, non-appealable order or injunction (that has not been stayed) that makes illegal or otherwise restrains, enjoins, or prohibits the consummation of the Plan or any of the Definitive Documents;

4. any and all authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by Law to be received or to occur to implement this Plan on the Effective Date shall have been obtained or shall have occurred;

5. the Bankruptcy Court shall have entered the Disclosure Statement Order, which order shall be in full force and effect and shall not have been stayed, modified, or vacated on appeal;

6. the Bankruptcy Court shall have entered the Confirmation Order, which shall be in full force and effect and shall not have been reversed, stayed, modified, dismissed, reconsidered, or vacated on appeal, and such order shall:

   (a) authorize the DBS Debtors or the Reorganized DBS Debtors, as applicable, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with this Plan;

   (b) decree that the provisions in the Confirmation Order and the Plan are non-severable and mutually dependent;

   (c) authorize the DBS Debtors or the Reorganized DBS Debtors, as applicable, to take all actions applicable or necessary to (i) implement the Restructuring Transactions, (ii) make all distributions and issuances as required under the Plan, including the Amended Notes pursuant to the Amended Notes Indentures, and (iii) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement;

   (d) authorize the implementation of this Plan in accordance with the terms hereof; and

(e) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

7. the final version of each of the Plan, the Plan Supplement, and the Definitive Documents, and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all material respects with the Restructuring Support Agreement and the Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement and the Plan, and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement and the Plan, and all conditions precedent to the effectiveness of the Definitive Documents shall have been satisfied or waived in accordance with the terms of such Definitive Documents;

8. the Amended Notes shall have been issued or deemed issued in accordance with the Amended Notes Indentures by DBS in accordance with the Plan;

9. DNC shall have returned any remaining amount of the DBS Advance Payment Deposit (as defined in the Shared Services Agreement) to DBS; and

10. all amounts required to be paid by the DBS Debtors, EchoStar, or DNC on or prior to the Effective Date as a condition precedent to the occurrence of the Effective Date under the Restructuring Support Agreement shall have been paid, or shall be paid substantially contemporaneously with the occurrence of the Effective Date, in accordance with the Restructuring Support Agreement and this Plan, including the Ad Hoc Group Professional Fees.

**B. Waiver of Conditions.**

The conditions to Consummation of this Plan set forth in this Article IX may be waived by the DBS Debtors only with the prior written consent (email shall suffice) of the Required Consenting Creditors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to Confirm or Consummate this Plan; provided, however, that the conditions to Consummation of this Plan set forth in Article IX.A.5 and 6 cannot be waived.

**C. Substantial Consummation.**

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**D. Effect of Non-Occurrence of Conditions to the Effective Date.**

If Consummation does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release by the DBS Debtors of any Claims, Interests, or Intercompany Interests; (2) prejudice in any manner the rights of the DBS Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any

other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the DBS Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity in any respect; provided that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A. Modifications and Amendments.

Except as otherwise provided in this Plan and subject to any approval rights set forth in the Restructuring Support Agreement, the DBS Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in this Plan, the DBS Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the DBS Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; provided, however, that no such modification may be made unless the DBS Debtors first file notice of the proposed modification with the Bankruptcy Court and serve such notice on parties in interest, and such parties are afforded a reasonable opportunity to object to, and to be heard by the Bankruptcy Court on the proposed modification before it becomes effective. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

### B. Effect of Confirmation on Modifications.

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C. Revocation or Withdrawal of the Plan.

The DBS Debtors reserve the right to revoke or withdraw this Plan with respect to any DBS Debtor or all DBS Debtors, prior to the Confirmation Date. If the DBS Debtors revoke or withdraw this Plan with respect to any DBS Debtor, or if Confirmation or Consummation does not occur with respect to any DBS Debtor, then: (1) this Plan with respect to such DBS Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan with respect to such DBS Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such DBS Debtor, and any document or agreement executed pursuant to this Plan with respect to such DBS Debtor, other than the Restructuring Support Agreement and any rights or obligations thereunder that survive in

accordance with its terms, shall be deemed null and void; and (3) nothing contained in this Plan with respect to such DBS Debtor shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the DBS Debtors, the DBS Estates, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the DBS Debtors, the DBS Estates, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, and except as otherwise set forth in Article II.A, Article V.C and/or with respect to Holders of DBS General Unsecured Claims as set forth below, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases of the DBS Debtors and all matters, arising out of, or related to, such Chapter 11 Cases and this Plan, including jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest (other than DBS General Unsecured Claims), and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of such Claims or Interests;

2. Decide and resolve all matters related to the granting and denying, in whole or in part, (a) any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan and (b) any requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases of the DBS Debtors pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code;

3. Subject to Article V.C and Article XI.16 with respect to each Executory Contract and Unexpired Lease, resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a DBS Debtor is party or with respect to which a DBS Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the DBS Debtors amending, modifying, or supplementing, pursuant to Article V, any Executory Contracts or Unexpired Leases to the Schedule of Rejected Contracts and Leases; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4. Ensure that distributions to Holders of Allowed DBS Notes Claims or other Claims or Interests are accomplished pursuant to the provisions of the Plan;

5. Adjudicate, decide, or resolve any motions, adversary proceedings, contested matters, and grant or deny any applications involving a DBS Debtor pending in the Bankruptcy Court on the Effective Date;

6. Adjudicate, decide, or resolve any and all matters related to Causes of Action, other than with respect to Causes of Action by or against Holders of DBS General Unsecured Claims;

7. Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created pursuant to the Plan or the Disclosure Statement;

9. Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10. Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI, except as otherwise set forth in the Plan;

14. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. Determine any other matters that may arise in connection with this Plan, the Restructuring Support Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created pursuant to the Plan or the Disclosure Statement;

16. Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein; provided, however, that, subject to Article V.C, with respect to Holders of Administrative Claims against the DBS Debtors, Holders of DBS General Unsecured Claims, and non-Debtor counterparties to any agreement with the DBS Debtors, including non-Debtor counterparties to an Executory Contract or Unexpired Lease, the court(s) provided by the forum selection, venue, and choice of law provisions of the Executory Contract or Unexpired Lease or other agreement to which the distribution or transaction relates shall have exclusive jurisdiction over any such dispute;

17. Adjudicate any and all disputes between the DBS Debtors or the Reorganized DBS Debtors, as applicable, and the DISH Wireless Debtors;

18. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19. Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed pursuant to the Plan;

22. Hear and determine all disputes involving the existence, nature, or scope of the DBS Debtors' release;

23. Enforce all orders previously entered by the Bankruptcy Court;

24. Hear any other matter not inconsistent with the Bankruptcy Code or this Plan; and

25. Enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A. Immediate Binding Effect.

Subject to Article VIII of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the DBS Debtors, the Reorganized DBS Debtors, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, discharges, releases, and injunctions described in this Plan, each Entity acquiring property under the Plan, and any and all non-DBS Debtor parties to Executory Contracts and Unexpired Leases with the DBS Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B. Additional Documents.

On or before the Effective Date, the DBS Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The DBS Debtors or the Reorganized DBS Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to this Plan, and all other parties in interest, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C. Payment of Statutory Fees.**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Reorganized DBS Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases of the DBS Debtors are converted, dismissed, or closed, whichever occurs first.

**D. Dissolution of Statutory Committees.**

If the Effective Date of this Plan occurs before the effective date of the DISH Wireless Plan, the Committee shall not dissolve on the Effective Date of this Plan. Instead, the Committee shall continue in existence following the Effective Date of this Plan and shall continue to have standing and a right to be heard in the Chapter 11 Cases, including with respect to matters arising in or related to the DISH Wireless Debtors' Chapter 11 Cases; provided that, from and after the Effective Date of this Plan, the Committee's continuing standing and right to be heard, insofar as they relate to the DBS Debtors, the Reorganized DBS Debtors, or matters arising under this Plan, shall be limited to the following purposes: (a) any applications, and any relief related thereto, for Professional Fee Claims and requests for allowance of fees and expenses under section 503(b) of the Bankruptcy Code that are allocable to the DBS Debtors, (b) any appeals of, or related to, the Confirmation Order of this Plan, (c) any other appeal relating to this Plan to which the Committee is a party, and (d) any matters related to the DISH Wireless Debtors until such time that the Committee is dissolved in accordance with the DISH Wireless Plan.

Except with respect to any continuing confidentiality obligations, the members of the Committee shall be released and discharged, as of the Effective Date of this Plan, from all rights and duties arising from or related to the Chapter 11 Cases solely to the extent such rights and duties relate to the DBS Debtors and are not among the limited purposes for which the Committee continues in existence as set forth in the foregoing sentence. For the avoidance of doubt, this Article XII.D does not release or discharge the Committee or its members from any rights or duties relating to the DISH Wireless Debtors' Chapter 11 Cases. The Reorganized DBS Debtors, as applicable, shall be responsible for paying any reasonable fees or expenses incurred by the members of or advisors to any statutory committee, including any reasonable fees or expenses incurred by Professionals for the Committee in connection with the purposes for which the Committee remains in existence following the Effective Date, after the Effective Date, in each case to the extent allocable to the Reorganized DBS Debtors or the DBS Debtors.

**E. Reservation of Rights.**

This Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. Neither the Filing of this Plan, nor any statement or provision contained in this Plan, nor the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be, or be deemed to be, an admission or waiver of any rights of any DBS Debtor with respect to any Holder of a Claim or Interest prior to the Effective Date.

**F. Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in this Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor,

administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## G. Notices.

Any pleading, notice, or other document required by this Plan to be served on or delivered to the Debtors shall be served on:

1. **The Debtors:**

DISH DBS Corporation
DISH Wireless L.L.C.
9601 South Meridian Boulevard
Englewood, Colorado 80112
Attn: Chief Legal Officer (legal.notices@dish.com)

with copies to (which shall not constitute notice):

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020-1095
Attn: Thomas E Lauria (tlauria@whitecase.com)

White & Case LLP
300 N. LaSalle Drive
Chicago, Illinois 60654
Attn: Matthew E. Linder (mlinder@whitecase.com)
Laura E. Baccash (laura.baccash@whitecase.com)

2. **The Consenting Creditors:**

Each Consenting Creditor at the address set forth in its signature page to the Restructuring Support Agreement (or in the signature page to a joinder or transfer agreement, as applicable, in the case of any Consenting Creditor that becomes a party to the Restructuring Support Agreement in accordance with its terms)

with a copy to (which shall not constitute notice):

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn: Dennis F. Dunne (ddunne@milbank.com)
Lisa Laukitis (llaukitis@milbank.com)
Nelly Almeida (nalmeida@milbank.com)
Abigail L. Debold (adebold@milbank.com)

Milbank LLP
1101 New York Ave NW
Washington, DC 20005
Attn: Andrew Leblanc (aleblanc@milbank.com)

3. **Counsel to the Committee:**

Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Attn: Marty L. Brimmage, Jr. (mbrimmage@akingump.com)
Laura Warrick (lwarrick@akingump.com)

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
Attn: Ira S. Dizengoff (idizengoff@akingump.com)
Philip C. Dublin (pdublin@akingump.com)
Meredith A. Lahaie (mlahaie@akingump.com)

After the Effective Date, the Reorganized DBS Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized DBS Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**H. Enforcement of Confirmation Order.**

On and after the Effective Date, the DBS Debtors and the Reorganized DBS Debtors, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

**I. Term of Injunctions or Stays.**

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the DBS Debtors' Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**J. Entire Agreement.**

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements,

understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**K. Exhibits.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the DBS Debtors' counsel at the address above or by downloading such exhibits and documents from the DBS Debtors' restructuring website at https://dm.epiq11.com/DBS or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.

**L. Nonseverability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, provided that at the request of the DBS Debtors, which request shall be subject to the Restructuring Support Agreement, and the consent provisions herein, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the consent of the DBS Debtors; and (3) nonseverable and mutually dependent.

**M. Votes Solicited in Good Faith.**

Upon entry of the Confirmation Order, the DBS Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the DBS Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals nor the Reorganized DBS Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

**N. Waiver.**

On the Effective Date, each Holder of a Claim or an Interest (other than Reinstated Claims) shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the DBS Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to release or enjoin any rights, claims, causes of action or defenses of the DISH Wireless Debtors or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action, and defenses of the DISH Wireless Debtors and/or their chapter 11 estates against any Person or Entity, including the DBS Debtors, their Professionals and any other Related Parties of the foregoing are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to release or enjoin any rights, claims, causes of action or defenses that any holder of a claim against the DISH Wireless Debtors may have against any Person or Entity, including the DISH Wireless Debtors, the DBS Debtors, their respective Professionals, and any other Related Parties of the foregoing, it being understood that all rights, claims, causes of action, and defenses of any holder of a claim against the DISH Wireless Debtors against any Person or Entity, including the DISH Wireless Debtors, the DBS Debtors, their respective Professionals, and any other Related Parties of the foregoing in any way related to their claims against the DISH Wireless Debtors are expressly preserved hereunder and shall not be released, enjoined, affected, impaired, compromised, settled, waived, or discharged under the Plan or the Confirmation Order.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted,

Dated: September 27, 2026

**DISH DBS Corporation and its DBS Debtor Affiliates**

*/s/ John Swieringa*

Name: John Swieringa
Title: Authorized Signatory